**PROTECT DEMOCRACY PROJECT**
BEAU C. TREMITIERE, SBN 320074
300 Center Ave, Suite G-251
Superior, CO 80027
GEOFFREY CURFMAN* NY Bar No. 5809199
JESSICA MARSDEN* NY Bar No. 5316526
82 Nassau St., #601
New York, NY 10038
HAYDEN JOHNSON* DC Bar No. 1671830
ZACHARY WEST* NY Bar No. 5192257O
ASHLEY FOX* LA Bar No. 41748
2020 Pennsylvania Ave., N.W., Suite 163
Washington, D.C. 20006
Telephone: (202) 579-4582
Facsimile: (202) 769-3176
Email:
beau.tremitiere@protectdemocracy.org
geoffrey.curfman@protectdemocracy.org
jess.marsden@protectdemocracy.org
hayden.johnson@protectdemcracy.org
zachary.west@protectdemocracy.org
ashley.fox@protectdemocracy.org

**NATIONAL IMMIGRATION LAW CENTER**
BENJAMIN R. FARLEY* DC Bar No. 90042585
IMANI FRANKLIN* DC Bar No. 90006160
PO Box 34573
Washington, D.C. 20043
Telephone: (213) 639-3900
Facsimile: (202) 738-9128
E-mail: farley@nilc.org
franklin@nilc.org

ATTORNEYS FOR PLAINTIFFS
CALIFORNIA NURSES ASSOCIATION,
NATIONAL NURSES UNITED, and VOTO
LATINO FOUNDATION

**CITY AND COUNTY OF SAN FRANCISCO**
DAVID CHIU, SBN 189542
City Attorney
YVONNE R. MERÉ, SBN 173594
Chief Deputy City Attorney
MOLLIE M. LEE, SBN 251404
Chief of Strategic Advocacy
SARA J. EISENBERG, SBN 269303
Chief of Complex and Affirmative Litigation
MICHAEL A. KEOUGH, SBN 327037
Special Counsel
JOEL F. WACKS, SBN 326561
Deputy City Attorney
Fox Plaza, 1390 Market Street, 7th Floor
San Francisco, California 94102-5408
Telephone: (415) 554-4700
Facsimile: (415) 437-4644
E-Mail: Michael.Keough@sfcityatty.org
Joel.Wacks@sfcityatty.org

Attorneys for Plaintiff
CITY AND COUNTY OF SAN FRANCISCO

**COUNTY OF SANTA CLARA**
TONY LOPRESTI, SBN 289269
County Counsel
KAVITA NARAYAN, SBN 264191
Chief Assistant County Counsel
MEREDITH A. JOHNSON, SBN 291018
Lead Deputy County Counsel
BILL NGUYEN, SBN 333671
Deputy County Counsel
70 W. Hedding Street, East Wing, 9th Floor
San José, CA 95110
Telephone: (408) 299-5900
Facsimile: (408) 292-7240
E-Mail: bill.nguyen@cco.sccgov.org

Attorneys for Plaintiff
COUNTY OF SANTA CLARA

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA NURSES ASSOCIATION; NATIONAL NURSES UNITED; CITY AND COUNTY OF SAN FRANCISCO; COUNTY | Case No. 26-10680<br><br>**COMPLAINT** |

OF SANTA CLARA; and VOTO LATINO FOUNDATION,

Plaintiffs,

v.

MARKWAYNE MULLIN, in his official capacity as Secretary of Homeland Security; UNITED STATES DEPARTMENT OF HOMELAND SECURITY; UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES; JOSEPH B. EDLOW, in his official capacity as Director of United States Citizenship and Immigration Services; UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT; DAVID J. VENTURELLA, in his official capacity as Senior Official Performing the Duties of the Director of the United States Immigration and Customs Enforcement; ANTHONY SALISBURY, in his official capacity as Executive Associate Director of Homeland Security Investigations and the Principal Deputy Homeland Security Adviser to the White House; UNITED STATES CUSTOMS AND BORDER PROTECTION; RODNEY S. SCOTT, in his official capacity as Commissioner of United States Customs and Border Protection; and THOMAS HOMAN, in his official capacity as Assistant to the President and Border Czar,

Defendants.

## INTRODUCTION

1. As part of its unprecedented campaign to interfere in elections this year, the Department of Homeland Security ("DHS") has developed a Policy—the Unlawful Voter Initiative, as the agency reportedly calls it—causing DHS to change its procedures to authorize broad-scale elections-related field operations. DHS is now deploying armed and often militarized agents to homes to interrogate residents about whether they are eligible to vote.

2. It is a near certainty that during these operations, conducted at the height of electoral activity for the 2026 midterm elections, DHS agents will engage in coercive confrontations with American citizens in a manner that intimidates voters in violation of Section 11(b) of the Voting Rights Act.

3. In fact, a USCIS whistleblower disclosure released by Senators Chuck Schumer and Alex Padilla on September 14 (hereafter "Whistleblower Disclosure") reveals DHS's admission in agent trainings that the source data for its target lists includes large categories of U.S. citizens.[1]

4. There is even a component of the Policy *directing agents to specifically target naturalized U.S. citizens.*

5. DHS's Policy is already being implemented in two forms most relevant here: *first*, an effort to insert various components of DHS into the state- and local-run process of examining voter eligibility, mainly via agents at U.S. Citizenship and Immigration Services ("USCIS"), by generating target lists of alleged unlawfully registered voters based on faulty data and procedures (hereafter the Voter Eligibility Matching Policy); and *second*, using the results of that flawed process for unprecedented field operations conducted by a unit of Immigration and Customs Enforcement ("ICE") called Homeland Security Investigations ("HSI") to directly confront a target list of people that will almost certainly include U.S. citizens eligible to vote (hereafter the Field Operations Policy).

---

[1] Exhibit 1, Letter from Alex Padilla, U.S. Sen., et al., to Markwayne Mullin, Sec'y of U.S. Dep't of Homeland Sec., et al. (letter dated September 13, 2026).

6. On September 1, DHS reportedly directed HSI to significantly increase the implementation of its Policy, with a specific instruction to conduct on-the-ground operations that include "field interviews" in the lead-up to and during the early voting period.

7. The September 1 Surge Initiative Guidance, as the agency calls it, reportedly instructs HSI agents in at least nine states across the country, including California, to surge their field operations through at least early October in a "coordinated criminal voter fraud surge initiative to pursue investigative leads, conduct field interviews, and support timely prosecutorial review."[2]

8. There are clear indications that these elections-related surge field operations are well underway in at least some of the targeted jurisdictions.

9. To support prior surge operations, DHS has repeatedly deployed agents for violent incursions in areas across the country, including in California, using roving patrols of armed and masked officers to terrorize communities; attack protestors, observers, and journalists with lethal and less-lethal force; and upend life for Americans made fearful of going to work, sending their children to school, or attending medical appointments or religious services.

10. The aggressive tactics of coercive confrontations that DHS uses in general and specifically to implement this Policy, the flawed data on which it relies, DHS's history of violent surge operations, and timing the Field Operations to coincide with the height of electoral activity combine to represent a significant and unlawful intimidation scheme against eligible and lawful American voters.

11. Defendants' Policy takes a page from the voter intimidation playbook used during the 1960s Civil Rights Era, when courts were compelled to intervene to quell local and state police engaged in harassing investigations and threatening tactics that chilled the electoral activity of voters and organizers. *See, e.g.*, *United States v. McLeod*, 385 F.2d 734, 740-41 (5th Cir. 1967).

12. Plaintiffs—groups of voters, a voter assistance and education organization, and local governments that administer elections and voter outreach programs—are harmed by this intimidation

[2] Nick Corasaniti & Hamed Aleaziz, *Trump Administration Launches Blitz to Find Elusive Voter Fraud Head of Midterms,* N.Y. Times (Sep. 2, 2026), https://www.nytimes.com/2026/09/02/us/politics/trump-election-voter-fraud.html?eafs_enabled=false.

scheme. They and the communities they serve credibly fear that Defendants are threatening and using DHS agents in large-scale field operations in a manner that chills the electoral participation of U.S. citizen voters and those who mobilize and assist those voters.

13. Based on DHS's track record and the flawed sourcing and matching it is using for its target lists, the communities that are particularly targeted and harmed include those who are, or who represent or support, the following: naturalized citizens, citizens who live in mixed immigration status households, U.S. citizens who have petitioned for citizenship for a non-U.S. citizen spouse, and so-termed "derivative citizens"—individuals who may have never received documentation of U.S. citizenship or whose citizenship may not appear in government information systems because they automatically became citizens as children when their parents naturalized or when they were adopted by U.S. citizens.[3]

14. Defendants' conduct is already chilling participation in the democratic process, both for Plaintiffs and the communities they serve and mobilize. Plaintiffs are currently facing threats that undermine the ability of their members and constituencies to participate in the electoral process; urge and aid the communities they serve to vote; or continue their voter education and mobilization services.

15. To prevent these ongoing harms, Plaintiffs seek a declaration that Defendants' policies and the ongoing surge implementations violate their or their citizens' constitutional and statutory rights and are contrary to Defendants' authority, equitable relief barring Defendants from engaging in such unlawful election interference and voter intimidation, and an APA stay and vacatur of the unlawful policies.

## PARTIES

### A. Plaintiffs

16. Plaintiffs are associations of voters and a voter services organization committed to assisting and mobilizing Americans to participate in the electoral process, as well as local governments

---

[3] 8 U.S.C. § 1431; U.S. Citizenship & Immigr. Servs., *USCIS Policy Manual*, vol. 12, pt. H, ch. 4 (last updated Mar. 28, 2024), https://perma.cc/UG7W-HEKE (describing criteria for derivative citizenship).

that administer elections and conduct voter outreach. Plaintiffs, their members, and the constituencies they serve face significant harms from the threats and ongoing use of DHS agents implementing the Unlawful Voter Initiative Policy.

17. DHS's implementation of the Unlawful Voter Initiative Policy ignores important considerations for these communities and the reality that our electoral process is powered by local governments, working in tandem with membership associations and voter services organizations, to ensure that our elections are accessible and safe for voters.

18. DHS's Policy and its implementation reasonably puts Plaintiffs and the people they serve in fear that their electoral engagement may expose them or their families to intrusive government surveillance, coercive confrontations with federal agents, and threats of force used against them.

19. Collectively, Plaintiffs have members or constituents, administer elections, and provide voter services and programs across the country, including specifically in the nine states reportedly targeted for field operations in the Surge Initiative Guidance (California, Connecticut, Georgia, Missouri, Nevada, New York, Pennsylvania, Washington, and Wisconsin), and in states where public reporting indicates that DHS has engaged in specific voter eligibility-related operations in recent months (Texas, Minnesota, Arizona, North Carolina, and Ohio).

20. Plaintiff California Nurses Association/National Nurses Organizing Committee ("CNA"), affiliate of Plaintiff National Nurses United ("NNU"), is a 501(c)(5) labor union and professional organization founded in 1903 and headquartered in Oakland, California.

21. NNU represents more than 225,000 members nationwide, making it the largest union and professional association of registered nurses in U.S. history. Members of NNU span affiliates including the District of Columbia Nurses Association, Michigan Nurses Association, Minnesota Nurses Association, New York State Nurses Association, and the California Nurses Association, which includes all the members described below.

22. CNA represents more than 105,000 members in more than 200 facilities throughout California. It also represents nurses at facilities in Alabama, Arizona, California, Colorado, District of

Columbia, Florida, Georgia, Iowa, Illinois, Kansas, Kentucky, Louisiana, Maine, Maryland, Missouri, Nevada, North Carolina, Ohio, Texas, Virginia, and West Virginia.

23. CNA operates under member-elected leadership: a Board of Directors; delegates to a triennial convention; a Ballot Committee, which oversees CNA's election process; and a Joint Nursing Practice Commission. CNA members also elect delegates to the National Nurses United Convention, and participate in the triennial NNU election of officers.

24. CNA's members organize to advance local and national legislative priorities, promote a unified vision of collective action for nurses, and encourage members to lend their voice and participation in elections to choose the leaders who decide policy affecting registered nurses and labor issues.

25. CNA also seeks to develop the professional and educational advancement of professional nurses, and to foster high standards of nursing practice.

26. Civic action and advocacy is a core part of CNA and NNU's programming, including launching national legislative and regulatory campaigns, hosting a National Day of Action, engaging with elected officials on campaign promises, and promoting direct action with legislators in response to national and state bills.

27. CNA's and NNU's membership include naturalized U.S. citizens and citizens who live in mixed immigration status households.

28. Due to Defendants' threats and conduct and actions challenged in this action, CNA and NNU members, and its members of color and naturalized citizen members in particular, are increasingly fearful of DHS operations that are intimidating, including threats related to their electoral participation.

29. Members are fearful that how and whether they participate in the electoral process could subject them to coercive confrontations with DHS agents, and they are circumscribing their electoral participation because of those credible fears.

30. As one example, CNA Registered Nurse 1 ("RN 1") is a resident of the San Francisco Bay Area, who resides within the jurisdiction of the United States District Court for the Northern District of California, and works as an acute care Registered Nurse.

31. She is a member of CNA and NNU and represented for purposes of collective bargaining by CNA.

32. RN 1 is currently afraid of investigation, coercive encounters, and even unlawful detention by DHS agents. She is afraid that she will be mistakenly targeted despite her U.S. citizenship or intentionally targeted because of her status as a naturalized citizen.

33. Because of RN 1's fear, she has changed her voting plan from in-person voting to voting by mail, despite a desire to vote in person this election.

34. RN 1 has also planned to stop attending and participating in campaign events due to her fears of DHS operations targeting individuals like RN 1.

35. Plaintiff City and County of San Francisco ("San Francisco") is a municipal corporation organized and existing under and by virtue of the laws of the State of California, and is a charter city and county.

36. San Francisco is responsible for conducting the November 3, 2026, general election within its boundaries. It must operate polling places, process and count ballots, and conduct significant voter outreach efforts.

37. San Francisco also operates a year-round multilingual outreach team that helps people learn about upcoming elections, how to register to vote, and the voting process.

38. San Francisco is also home to a large immigrant population. More than 250,000 of its residents are foreign-born residents, representing approximately 34% of its population. Of those, over 175,000–or nearly a quarter of the city's population—are naturalized United States citizens.

39. Plaintiff County of Santa Clara ("Santa Clara") is a charter county and political subdivision of the State of California. It is home to approximately 1.9 million residents, making it the most populous county in Northern California and more populous than 12 U.S. states. Santa Clara is

also one of the most diverse counties in the nation. Its foreign-born population exceeds 750,000, including over 400,000 naturalized U.S. citizens.

40. Santa Clara's Registrar of Voters ("ROV") is responsible for administering all federal, state, judicial, County, County Central Committee, municipal, school district, and special district elections—including the November 3, 2026, General Election—in Santa Clara County. The ROV's administrative responsibilities include siting and operating secure in-person vote centers, processing and counting ballots, and conducting significant voter outreach and education efforts. The ROV's mission is to protect and ensure the community's right to participate in fair, inclusive, accurate, and transparent elections.

41. Plaintiff Voto Latino Foundation ("Voto Latino") is a 501(c)(3) voter services and education organization dedicated to registering Latinx voters and encouraging their civic participation. It is the nation's largest Latinx voter registration organization. The organization aims to empower Latinx youth to mobilize their communities toward civic engagement in federal and state elections, including through voter education and voter turnout programming.

42. Voto Latino maintains a network of campus chapters across 37 states, including in Washington, Wisconsin, Missouri, Georgia, California, Pennsylvania, Nevada, New York, Connecticut, Texas, Minnesota, Arizona, North Carolina, and Ohio. Chapters are led by Voto Latino partners who serve as Voto Latino's local presence throughout the country, receive voter mobilization resources from Voto Latino, and inform the direction of Voto Latino's campus programming.

43. Because of Defendants' threats and conduct challenged in this action, Voto Latino's partners and the constituencies they serve are increasingly fearful of engaging in voting-related activity during this 2026 midterm election season. Students and student groups affiliated with Voto Latino have been fearful of being targeted by DHS for their civic engagement, and universities have also become more cautious of allowing voter-engagement activities on their campuses.

44. Voto Latino has faced a decline in engagement by donors, who have decreased their usual funding of Voto Latino out of fear of retribution; by partners, who have been less willing to

undertake activities; and by community members, whose attendance at Voto Latino's voter engagement events has noticeably declined.

45. Voto Latino has been forced to change its programming to mitigate the risks facing the organization due to Defendant's threats and conduct. For example, Voto Latino has unwillingly relocated voter engagement events that are most effective when held outdoors to engage bystanders to indoor locations in order to mitigate safety threats from DHS operations. Voto Latino is also reallocating staff as a result of DHS's threats and conduct, for example by reassigning staff ordinarily assigned to affirmative mobilization activities like direct-to-camera get-out-the-vote videos to know-your-rights campaigns in Texas and other locations facing a high threat of intimidation by DHS agents.

46. Voto Latino has also been forced to address community members' fears of being harassed or intimidated by DHS when attempting to vote or to engage in other election-related activity. For example, Voto Latino is, for the first time ever, focused on developing a know-your-rights explainer on DHS's threats to civic engagement and promoting those materials, and is currently spending resources on safety precautions for 87 activations across 27 states. Voto Latino has been forced to move some of its core direct services away from traditional voter registration and mobilization activities to instead prepare these know-your-rights initiatives and message testing associated with those initiatives.

47. Voto Latino has also canceled some of its standard voter engagement activities due to Defendants' campaign of intimidation, such as canceling plans to livestream its events, sacrificing a broader reach of engagement in order to mitigate the risk to its staff, programs, and partners.

48. Voto Latino fears becoming the target of DHS's investigations given the agency's targeting of other Latino-serving voting organizations. Voto Latino is regularly harassed by right-wing private citizens falsely accusing the organization of registering noncitizens to vote and fears that the Administration may similarly raise such baseless accusations.

**B. Defendants**

49. Defendant DHS is a Cabinet-level department in the federal government and is an "agency" within the meaning of 5 U.S.C. § 551(1). Its component agencies include U.S. Citizenship and Immigration Services ("USCIS"), U.S. Immigration and Customs Enforcement ("ICE"), and the U.S. Customs and Border Protection ("CBP"), which oversees the U.S. Border Patrol.

50. Defendant Markwayne Mullin is the Secretary of Homeland Security. He is sued in his official capacity.

51. Defendant USCIS is a federal agency within the meaning of 5 U.S.C. § 551(1). It oversees the naturalization process for citizenship to the United States, determines U.S. citizenship eligibility, and provides U.S. citizenship documentation upon request for individuals who acquired or derived U.S. citizenship through their parents.

52. Defendant Joseph B. Edlow is the Director of USCIS. He is sued in his official capacity.

53. Defendant ICE is a federal agency within the meaning of 5 U.S.C. § 551(1). It is responsible for enforcing immigration laws and oversees three operational directorates: Homeland Security Investigations ("HSI"), Enforcement and Removal Operations ("ERO"), and Office of the Principal Legal Advisor.

54. Defendant David J. Venturella is the Senior Official Performing the Duties of the Director of ICE. He is sued in his official capacity.

55. Defendant Anthony Salisbury is the Executive Associate Director of HSI and the Principal Deputy Homeland Security Adviser to the White House. He is sued in his official capacity.

56. Defendant CBP is a federal agency within the meaning of 5 U.S.C. § 551(1). CBP oversees the U.S. Border Patrol, which is responsible for enforcement of immigration law at the border.

57. Defendant Rodney S. Scott is the Commissioner of CBP. He is sued in his official capacity.

58. Defendant Thomas Homan is the Assistant to the President and the Border Czar. He has taken over operational command of DHS agents for at least one prior DHS surge mission in Operation Metro Surge targeting Minnesota. He is sued in his official capacity.

## VENUE AND JURISDICTION

59. This Court has jurisdiction under 28 U.S.C. §§ 1331, 1343 because this action involves federal questions under the Voting Rights Act, the U.S. Constitution, and the Administrative Procedure Act.

60. Venue is proper under 28 U.S.C. § 1391(b) and (e) because many Plaintiffs are located, operate programs, or serve members in this District; each Defendant is an agency of the United States, or an officer or employee of the United States or any agency thereof acting and sued in their official capacity, and many have field offices in this District; and a substantial part of the events or omissions giving rise to the claim occurred in this District.

61. Assignment to the San Francisco Division is proper under Local Rule 3-2(d) because a substantial part of the events giving rise to the claims in this action occurred in San Francisco County.

## FACTS

62. Under their Unlawful Voter Initiative Policy, Defendants have deployed DHS agents in a manner that harasses and coerces American citizens exercising the fundamental right to vote and engaging in the electoral process. Plaintiffs' credible fears of this Policy arise from Defendants' months of unprecedented operations targeting elections, recent announcement of an ongoing surge initiative during the height of electoral activity, a Whistleblower Disclosure revealing significant defects in the sourcing for the operation, series of threatening statements, and DHS pattern of violent and intrusive surges of federal forces.

63. DHS's Unlawful Voter Initiative, including DHS's current implementation of the Voter Eligibility Matching Policy and Field Operations Policy, are reflected and formalized in several internal but publicly reported DHS directives and policy documents, policymaker statements, agent communications, patterns of conduct, and a September 14 USCIS Whistleblower Disclosure to the U.S. Senate.

64. In developing and implementing its Unlawful Voter Initiative Policy, DHS has altered the traditional and longstanding work of its agencies to take on unprecedented involvement in elections during the height of electoral activity. This includes redirecting DHS agents' focus away from immigration matters, such as those concerning national security and drug trafficking, and toward elections-related operations.

65. As further described below, Defendants' current and imminent implementation of its Policy to conduct field operations interfering with the midterm elections follows three core steps: (1) produce a presumptive list of people DHS believes voted or registered to vote without U.S. citizenship status, based on a combination of government information systems run through algorithmic analyses or from lists provided directly by the White House; (2) have USCIS haphazardly compare basic information, such as names and birthdates, to either a public state voter portal or commercial databases when available, to potentially eliminate names from the presumptive list; and (3) generate prompts for field operations, known within DHS as TECS records, of anyone DHS agents did not eliminate from the presumptive target list.[4]

66. The resulting field operations are highly likely to sweep in numerous U.S. citizens and to be conducted in a manner that constitutes unlawful voter intimidation.

67. The inclusion of lawful U.S. citizen voters in the field operations is a near certainty based on the flawed and even specifically targeted source information DHS is using.

68. The Whistleblower Disclosure explains that DHS is identifying tens if not hundreds of thousands of persons using an amalgamation of information systems and analysis "brought in through supplemental magic," in DHS's words. DHS's own training materials concede that "there will be U.S. citizens in this population" among the information systems DHS is using. DHS's response while training agents to sift the data is simply that "we've done the best we can" to source the data.[5]

---

[4] TECS is a system used by the U.S. Department of Homeland Security, specifically CBP, to track individuals and generate target operations. *See* U.S. Dep't of Homeland Sec., DHS/CBP/PIA-021, TECS System: Platform (Aug. 2016), https://www.dhs.gov/publication/dhscbppia-021-tecs-system-platform.

[5] Whistleblower Disclosure at 19, 25.

69. In fact, the Whistleblower Disclosure explains that a core part of the DHS Policy, and a trigger for its field operations, *is to specifically target naturalized citizens* who DHS believes, based on its flawed data and matching methodologies, voted or registered to vote before their naturalization.[6]

**A. Defendants are Engaged in Unprecedented Field Operations that Intimidate Voters and Voter Services Organizations.**

70. Under its Field Operations Policy, Defendants' pattern of operations includes diverting agents across DHS to engage in broad-scale, face-to-face voter eligibility interrogations during the height of electoral activity.

71. DHS has specifically required HSI to focus on field operations related to electoral activity rather than other matters. This is a sharp departure from HSI's typical and historical duties focused on significant transnational crime and national security matters.

72. DHS has also conducted unprecedented levels of surveillance and field operations targeting organizations that provide voter assistance and mobilization services.

73. Defendants are engaging in these field operations during the height of electoral activity ahead of the midterm elections and at a time most likely to intimidate voters and voter service providers and to chill their participation in the democratic process.

***Field Operations Targeting Voters***

74. To implement its Field Operations Policy, Defendants have surged field operations involving armed and at times militarized DHS agents arriving at people's residential doorsteps or vehicles to interrogate the person about their voter eligibility.

75. On September 1, DHS reportedly issued an internal, non-public guidance document—which the agency titled the "Surge Initiative Guidance"—that instructs HSI to engage in significant field operations targeting individuals, including face-to-face interrogations.

---

[6] Whistleblower Disclosure at 22-28.

76. That policy document, which CNN journalists reportedly reviewed, directs that HSI agents are to lead a "coordinated criminal voter fraud surge initiative to pursue investigative leads, conduct field interviews, and support timely prosecutorial review."[7]

77. The Surge Initiative Guidance indicates that HSI agents have been surged for these field operations involving direct confrontations with individuals through at least mid-October in at least nine states: California, Connecticut, Georgia, Missouri, Nevada, New York, Pennsylvania, Washington, and Wisconsin.

78. Voter registration efforts, including by Plaintiffs, are at their height during this time leading up to an election.[8]

79. Additionally, the period of early voting when voters can return their ballot is underway or will soon be underway in many of the nine reportedly targeted states in the Surge Initiative Guidance.

80. For example, voting is underway as early as September 14 in Pennsylvania.[9]

81. Voting begins as early as September 21 in Wisconsin.[10]

82. Voting is also starting as early as September 22 in Missouri.[11]

83. Early voting opens on September 28 in Nevada.[12]

84. Voting begins as early as October 3 in Connecticut.[13]

---

[7] Priscilla Alvarez et al., *DHS Plans To Launch Voter Fraud Investigation Surge Tuesday,* CNN (Aug. 31, 2026), https://www.cnn.com/2026/08/31/politics/homeland-security-voter-fraud-investigations.

[8] *Voter Registration Deadlines*, Nat'l Conf. of St. Legislatures (May 20, 2026), https://perma.cc/L59K-QDUC.

[9] *2026 General Election: Mail Ballots, Office Hours, and Drop Boxes*, Philadelphia City Comm'rs (Sep. 15, 2026), https://vote.phila.gov/news/2026/09/15/2026-general-election-mail-ballots-office-hours-and-drop-boxes/.

[10] *Ballot Drop Box Locations & Schedule*, City of Milwaukee Election Comm'n, https://city.milwaukee.gov/election/ElectionInformation/Dropboxes (last visited Sep. 16, 2026).

[11] *How to Vote*, Mo. Sec'y of State, https://www.sos.mo.gov/elections/goVoteMissouri/howtovote#absentee (last visited Sep. 16, 2026) (stating that "no-excuse" absentee voting begins the second Tuesday before election day. However, if a voter in Missouri has a qualifying reason for absentee voting, the absentee voting period starts the 6th Tuesday before election day).

[12] *2026 Election Information*, Nev. Sec'y of State, https://www.nvsos.gov/elections/election-information/2026-election-information (last visited Sep. 16, 2026) (explaining that Nevada election law requires that counties begin distributing mail ballots to in-state active registered voters on or after the 5th Monday before election day).

[13] *Table 16: When Absentee/Mail Ballot Processing and Counting Can Begin*, Nat'l Conf. of State Legs., https://www.ncsl.org/elections-and-campaigns/table-16-when-absentee-mail-ballot-processing-and-counting-can-begin (last updated Sep. 15, 2026); *2026 Connecticut Absentee Voting*, Conn. Sec'y of State, https://portal.ct.gov/sots/election-services/voter-information/absentee-voting (last visited Sept. 16, 2026).

85. Voting is starting as early as October 5 in California.[14]

86. Voting begins as early as October 13 in Georgia.[15]

87. Voting begins as early as October 16 in Washington.[16]

88. Early voting opens on October 24 in New York.[17]

89. Yet CNN reports that the Surge Initiative Guidance's text makes no reference to the obvious concerns about the timing of the field operations during a peak of electoral activity for the midterm elections.[18]

90. When asked by the press about the Surge Initiative Guidance, a DHS spokesperson issued a statement defending the Policy implementation by saying in part that "HSI is actively rooting out and investigating election fraud wherever it can be found," "HSI is committed to restoring integrity to our election systems and ensuring that American citizens and only American citizens are electing American leaders," and "DHS is laser focused on prosecuting and removing aliens who vote and preventing the dilution of the votes of U.S. citizens." The statement further says: "Our message to aliens who vote in American elections is clear: we will find you, arrest you, and you will face the consequences — including criminal charges and deportation."[19]

91. There are indications from DHS itself that this surge is well underway in at least some of the targeted jurisdictions, including specifically heightened operations in California.

---

[14] *Early Voting and Vote-by-Mail Ballot Drop-Off Locations*, Cal. Sec'y of State, https://perma.cc/496U-CTWW (last visited Sep. 14, 2026).

[15] *How-to Guide: Voting*, Ga. Sec'y of State, https://sos.ga.gov/how-to-guide/how-guide-voting#Early%20Voting (last visited Sep. 16, 2026) (stating that county registrars are required to begin mailing absentee ballots to non-military/civic voters 22 days prior to a general election).

[16] *Dates and Deadlines 2026*, Wash. Sec'y of State, https://www.sos.wa.gov/elections/elections-calendar/dates-and-deadlines (last visited Sep. 16, 2026).

[17] *Early Voting in New York State*, N.Y. State Bd. of Elections, https://elections.ny.gov/early-voting (last visited Sep. 16, 2026).

[18] Priscilla Alvarez et al., *DHS Plans To Launch Voter Fraud Investigation Surge Tuesday,* CNN (Aug. 31, 2026), https://www.cnn.com/2026/08/31/politics/homeland-security-voter-fraud-investigations.

[19] Dan Gooding, *DHS Voter Fraud Push: Map of States Requiring Proof of ID or Citizenship,* Newsweek (Sep. 2, 2025), https://www.newsweek.com/trump-admin-says-california-doesnt-check-voter-citizenship-which-states-do-12387046; Mark Pazniokas, *Stephanie Thomas unsure if report of federal elections probe is true*, CT Mirror (Sep. 1, 2026), https://perma.cc/5DJA-JV6X.

92. HSI posted on September 17 that "HSI is committed to protecting election integrity," with a photo of at least two agents walking to a person's residential doorstep. The post, with photo, is screenshotted below.




93. HSI posted on social media on September 9 that the agency "is relentlessly hunting down voter fraudsters and protecting the integrity of American elections."[20]

94. On September 11, the HSI San Francisco Field Office posted four photos on social media of HSI agents knocking on residential doors along with a statement that HSI in Northern California will "investigate any allegations of noncitizen voting."[21] The post and all four photos are copied below for reference.

---

[20] HSI Gov (@hsigov), Instagram (Sep. 8, 2026), https://perma.cc/6VRK-T62Q.

[21] HSINorCal (@HSISanFrancisco), X (Sep. 11, 2026, 18:23 EST), https://perma.cc/AXZ6-J7EG.


HSI NorCal
@HSISanFrancisco

HSI in Northern California will investigate any allegations of noncitizen voting and is committed to ensuring the enforcement of federal election law.



5:23 PM · Sep 11, 2026 · 499 Views












95. This communication about the office's activities in Northern California followed HSI San Francisco's earlier promotion of a reported "Title-8 voter registration fraud operation" that occurred in California.

96. On September 2, HSI San Francisco posted on social media that "HSI conducted a Title-8 voter registration fraud operation alongside the FBI and U.S. Marshals" in California and "multiple 8 U.S.C. § 1326 [the unlawful reentry statute] were identified and were among those targeted for arrest."[22]

97. The video posted on social media shows footage of armed HSI agents in tactical vests interrogating numerous individuals, both at residences and during vehicle stops, as well as making apparent arrests and detentions. Screenshots of the post and stills of the video are copied below.

---

[22] HSINorCal (@HSISanFrancisco), X (Sep. 2, 2026, 14:15 PM EST), https://x.com/HSISanFrancisco/status/2095214009767059518?s=20.










98. The video includes an image of a blurred "target list" sent to field agents, with the "target list" header circled in yellow below for ease of identification.




99. DHS national social media accounts posted the same video on August 26. That post indicates the HSI elections-related field operations occurred during the week of August 10, 2026.[23] Below are additional screenshots of that video posted on multiple DHS accounts.







100. HSI social media activity confirms additional instances of elections-related DHS field operations in some of the other eight states reportedly targeted for the HSI surge operations.

---

[23] Dep't of Homeland Security (@dhsgov), Instagram (Aug. 26, 2026), https://www.instagram.com/reel/DcgysqMSWew/?utm_source=ig_web_copy_link&igsi=NTc4MTIwNjQ2YQ==.

101. As one illustration, on September 3, the HSI Kansas City Field Office published a photo on social media of HSI agents approaching a neighborhood property in St. Louis, Missouri while "investigating suspected unlawful voting."[24]




102. The nature of these coercive confrontations with individuals—using multiple agents in tactical gear, in some cases with guns drawn; using handcuffs and shackles for alleged non-violent offenses; documenting the coercive encounters with film crews—further reinforces that the field operations are intimidating.

103. Indeed, Defendants' conduct, and the way Defendants are posting and distributing the images and videos on social media in a way that propagandizes the field operations, indicates that intimidation is a purpose of the Field Operations Policy.

104. These operations are a stark departure from how the federal executive has previously been involved in the enforcement of federal laws concerning elections.

---

[24] HSI Kansas City (@HSIKansasCity), X (Sep. 3, 2026, 18:37 EST), https://perma.cc/49HF-JDDP.

105. Prior federal executive operations concerning elections, run through the Department of Justice, have strictly adhered to internal policies and relied on guardrails that sought to avoid law enforcement actions that intimidate voters and those engaged in voter services.

106. But, on information and belief, the federal executive has declined to abide prior internal regulations and has removed internal guardrails that acknowledge the legal limits on federal law enforcement agents operating in an intimidating manner around the time of an election.

107. For example, on information and belief, previously any federal executive investigations concerning elections during the voting period was conducted under DOJ supervision, and therefore had to be approved by DOJ's Public Integrity Section.

108. But ProPublica reports that "the Administration has reduced the role of its Public Integrity Section, which had been responsible for making sure the department's inquiries weren't improperly influenced by politics" in both staffing and function. The Administration reduced "[t]he 36-person section" down "to two" staffers as of April 2026, and the report cites sources confirming a change in policy that DOJ "no longer mandates that" the Public Integrity Section "review politically sensitive cases" for investigations across agencies.[25]

***Operations Targeting Voter Service and Mobilization Organizations***

109. Public reporting indicates that, as part of its Field Operations Policy, DHS has also changed its operating procedures to claim a role in targeting voter assistance and mobilization organizations.

110. DHS has no evident authority to investigate voter assistance and mobilization organizations.

111. The New York Times detailed in a June article that HSI agents worked with FBI agents to raid the offices and homes of numerous individuals affiliated with the Ohio Organizing

[25] Doug Bock Clark & Jen Fifield, *Inside Trump's Effort to "Take Over" the Midterm Elections*, ProPublica (Apr. 13, 2026), https://perma.cc/G54Q-6Z3V.

Collaborative, a nonpartisan get-out-the-vote group that conducts voter registration drives. DHS agents actively participated in the operation, including by questioning staff members.[26]

112. Court filings show that earlier this year, DHS agents also separately led a large-scale surveillance operation that probed years of activity by organizations that are engaged in election-related work, including unions, in Minnesota.[27]

**B. Defendants' Voter Eligibility Matching Policy Targets U.S. Citizens Based on Faulty Agency Information Systems and Flawed Data-Matching Procedures.**

113. To implement its Unlawful Voter Initiative Policy, the Administration has for months attempted to use various supposed sources of citizenship information within DHS and collected from other sources to erroneously assert that there is widespread illegal voting by non-U.S. citizens.

114. After other courts have upheld numerous states' refusal to provide additional voter data to the Administration and have enjoined certain federal agency uses of information systems containing some citizenship data,[28] DHS is now undertaking its current Voter Eligibility Matching Policy, which reportedly involves a three-step process: first, generating lists of people who DHS believes have registered or voted as non-U.S. citizens, using algorithmic analyses of unreliable government information systems or from White House-provided lists; second, having DHS agents, particularly at USCIS, query names and birthdates in a public state voter registration portal or in a commercial database in a process to remove someone from the presumptive target list; and finally sending any target not eliminated from the presumptive list for potential further investigation by ICE field offices via a TECS record to initiate the field operations described above.

---

[26] Madeleine Ngo, Nick Corasaniti & Hamed Aleaziz, *Homeland Security Intensifies Pursuit of Noncitizens on Voter Rolls*, N.Y. Times (Aug. 10, 2026), https://www.nytimes.com/2026/08/10/us/politics/noncitizens-vote-crackdown.html?eafs_enabled=false.

[27] Alan Feuer & Ernesto Londoño, *U.S. Investigated Left-Leaning Groups During Minnesota Immigration Crackdown*, N.Y. Times (Aug. 13, 2026), https://www.nytimes.com/2026/08/13/us/politics/dhs-inquiry-immigration-protests-minnesota.html.

[28] *See, e.g.*, *League of Women Voters v. U.S. Dep't of Homeland Sec.*, No. CV 25-3501 (SLS), 2026 WL 1784297, at *1 (D.D.C. June 22, 2026); *United States v. Simon*, No. 25-CV-3761 (KMM/EMB), 2026 WL 2389778, at *1 (D. Minn. Aug. 17, 2026) (collecting cases).

115. According to the Whistleblower Disclosure, this process is sweeping in tens if not hundreds of thousands of individuals—including known and even specifically targeted U.S. citizens––for DHS investigations that will include the intimidating field operations.[29]

116. This effort is a collaboration between HSI and USCIS. In August, CNN reported on an internal, non-public memorandum—hereafter the "HSI-USCIS Coordination Memo"—that directs HSI agents to coordinate with USCIS to initiate enforcement operations when a DHS inquiry links a purported non-U.S. citizen to alleged unlawful participation in elections.[30]

117. Likely as part of implementing the HSI-USCIS Coordination Memo and Defendants' Policy, an August 25 Washington Post article reports that DHS has reassigned hundreds of its USCIS officers normally responsible for vetting the applications of people seeking legal status in the United States, including for national security-related investigations, to instead conduct unprecedented broad-scale investigations into voter eligibility.[31]

***Phase One: DHS Presumptive List of People Voting or Registering Without Citizenship***

118. At phase one, DHS generates lists of names from amalgamated internal information systems that collect purported citizenship and voting data from a range of unreliable or ill-fitting sources across several executive agencies, or from names provided directly by the White House. DHS then conducts algorithmic analyses and "supplemental magic," in the agency's words, to produce a presumptive non-U.S. citizen voter fraud list.[32]

119. According to the Whistleblower Disclosure, the initial presumptive list DHS generates is based on data from DOJ, the Social Security Administration, the U.S. State Department, and from information systems within DHS.

---

[29] Whistleblower Disclosure at 1.

[30] Gabe Cohen, Priscilla Alvarez & Tierney Sneed, *How Trump Turned Homeland Security into an Engine of His Voter Fraud Crusade*, CNN (Aug. 12, 2026), https://www.cnn.com/2026/08/12/politics/trump-homeland-security-voter-fraud-crusade.

[31] Ted Hesson, *Immigration Officers Are Being Diverted to Trump's Voter-Fraud Effort*, Wash. Post (Aug. 25, 2026), https://www.washingtonpost.com/immigration/2026/08/25/immigration-officers-are-being-diverted-trumps-voter-fraud-effort/.

[32] Whistleblower Disclosure at 19.

120. Among the inputs from within DHS, the agency is reportedly still using data from the "Systematic Alien Verification for Entitlements" (SAVE) system, a composite aggregation of certain immigration data administered by USCIS.[33]

121. The structural and accuracy problems with the SAVE system are well-established and even acknowledged by the government itself. Both the SAVE system and the way it is used to compare DHS information to data in state voter registration lists are rife with errors and highly likely to incorrectly flag many U.S. citizens.

122. As one district court explained based on the evidence presented, flaws in the SAVE system and how it is used have already resulted in states erroneously "removing United States citizens from voter rolls based on inaccurate information." *League of Women Voters v. U.S. Dep't of Homeland Sec.*, No. CV 25-3501 (SLS), 2026 WL 1784297, at *1 (D.D.C. June 22, 2026) (holding unlawful, vacating, and setting aside DHS's 2025 modifications to and access permissions to the SAVE system); *see also California v. Trump*, No. 1:26-CV-11581-IT, 2026 WL 1826490, at *13 (D. Mass. June 25, 2026) (concluding based on the evidence from DHS that the agency "lack[s] the ability to create complete and accurate lists of the U.S. citizens residing in every State" to determine who is and is not an eligible voter), *stay granted on ripeness grounds*, No. 26A124, 2026 WL 2473573 (U.S. Aug. 24, 2026).

123. DHS's own internal assessments conclude that SAVE is unreliable.[34]

124. As one court concluded based on the summary judgment evidence, DHS admits that there are "[s]hortfalls in data accuracy" in the SAVE system, especially for naturalized citizens and derivative citizens. *See, e.g.*, *League of Women Voters*, 2026 WL 1784297, at *6.

---

[33] *Id.* at 18.

[34] *See* Whistleblower Disclosure Cover Letter at 3; *see also* U.S. Citizenship & Immigr. Servs., *Privacy Threshold Analysis for the SAVE Program* 17, 34, 38–39 (July 17, 2025), https://perma.cc/9AXY-WCLU; U.S. Dep't of Homeland Sec., *Privacy Impact Assessment for the Systematic Alien Verification for Entitlements "SAVE" Program,* DHS Ref. No. DHS/USCIS/PIA-006(d), at 19 (Oct. 31, 2025), https://perma.cc/G92U-LYPM (warning that SAVE "may share inaccurate information with registered agencies" and "may produce inaccurate results");; U.S. Citizenship & Immigr. Servs., *Voter Registration and Voter List Maintenance Fact Sheet* (Aug. 27, 2025), https://perma.cc/Q5F7-YBCA ("if an individual with acquired citizenship has not received a Certificate of Citizenship from USCIS (e.g., some foreign-born children of U.S. citizens) or is not designated as a U.S. citizen in SSA records, SAVE may not be able to confirm that individual's U.S. citizenship")).

125. News analyses also report that there is a potential error rate from SAVE as high as 81% in some localities.[35]

126. As one example, last October the Texas Secretary of State claimed that officials there had used the SAVE system to identify 2,724 potential non-U.S. citizens who were registered to vote in Texas. But this effort was error-prone, and Texas itself admitted it resulted in election officials improperly cancelling many valid registrations by U.S. citizens. *See League of Women Voters*, 2026 WL 1784297, at *16.

127. Beyond SAVE, DHS has obscured what exactly are the additional internal information systems that the agency is using to generate its list of people whom DHS believes voted or registered to vote without U.S. citizenship.

128. News reporting indicates that a principal source that DHS is attempting to use to create and/or house its flawed lists of non-U.S. citizens is the so-called HSI Innovation Lab or "I-Lab"—the research and development arm of HSI.[36]

129. This DHS shift to pulling data within the I-Lab is, on information and belief, at least in part because of federal court orders limiting the use of and access to the SAVE system.

130. DHS has obscured what exactly are the source inputs for the I-Lab information system that it is using.

131. But the Whistleblower Disclosure summarizes and quotes DHS training materials indicating that among the information DHS is pulling into its dataset are passport information from the U.S. Department of State, Social Security Administration information, and purported voter registration information from DOJ.

---

[35] *See* Jen Fifield & Zach Despart, *"Not Ready for Prime Time." A Federal Tool to Check Voter Citizenship Keeps Making Mistakes*, ProPublica & Tex. Trib. (Feb. 13, 2026), https://perma.cc/PR4Q-67NR; Judd Legum & Rebecca Crosby, *The Federal Database That Could Upend the Midterm Elections*, Mother Jones (Apr. 9, 2026), https://perma.cc/8YXC-WU7U; *see also* Madeleine Ngo, Nick Corasaniti & Hamed Aleaziz, *Homeland Security Intensifies Pursuit of Noncitizens on Voter Rolls*, N.Y. Times (Aug. 10, 2026), https://www.nytimes.com/2026/08/10/us/politics/noncitizens-vote-crackdown.html; Gabe Cohen, Priscilla Alvarez & Tierney Sneed, *How Trump Turned Homeland Security into an Engine of His Voter Fraud Crusade*, CNN (Aug. 12, 2026), https://www.cnn.com/2026/08/12/politics/trump-homeland-security-voter-fraud-crusade.

[36] Peter Elkind et al., *Inside Trump's Failed Hunt for Noncitizen Voters*, ProPublica (Aug. 14, 2026), https://perma.cc/6RLV-EWCJ.

132. These sources are necessarily incomplete and have substantial inaccuracies that are known to DHS.[37]

133. For example, despite the information being embedded in the DHS source list, the Whistleblower Disclosure quotes the DHS trainer explaining to USCIS agents that the information "may not be accurate." Specifically, the DHS trainer warned trainees: "Do not rely solely on the Social Security information."[38] DHS concedes that the Social Security and Department of State information is flawed, with a DHS trainer stating to USCIS agents that "it's not perfect."[39]

134. The Whistleblower Disclosure and previous public reporting discuss uncertainties and concerns among DHS's own personnel about the lack of clear explanation for how the lists DHS has generated, including specifically from I-Lab, are being produced or from where the information systems are sourcing the data.[40]

135. An August 14 ProPublica article summarizes communications from HSI staff working on the I-Lab that raised concerns about inaccuracies within the source data, how it was being analyzed and synthesized, and how DHS planned to use the I-Lab information in its new focus on election-related operations.[41]

136. News reporting indicates that a primary internal concern was that the HSI I-Lab's data was not suited for evaluating individual voter eligibility or supporting such inquiries and would create an "'ungodly' number of false positives."[42]

137. Yet the Whistleblower Disclosure states that these types of concerns have gone unaddressed. For example, the Disclosure states that in response to staff inquiries, leadership in DHS

[37] *See, e.g.*, Whistleblower Disclosure at 24.
[38] *See, e.g.*, Whistleblower Disclosure at 22.
[39] *Id.* at 24.
[40] Laura Barrón-López & Madeleine Bimonte, *Aggressive DHS hunt for voter fraud only finding a handful of possible noncitizen cases*, MS Now (Sep. 4, 2026), https://perma.cc/Y7LA-CKEY.
[41] Peter Elkind et al., *Inside Trump's Failed Hunt for Noncitizen Voters*, ProPublica (Aug. 14, 2026), https://perma.cc/6RLV-EWCJ.
[42] *Id.*

"does not and will not elaborate on the specific sources and dates of data it provides to the [USCIS] officers conducting the review" of the DHS-provided presumptive list of persons to investigate.[43]

138. At the same time, agents have been instructed to treat the DHS data as presumptively valid. According to the Whistleblower Disclosure, agents received "explicit instructions … that the data provided by DHS to [USCIS] should be assumed to be accurate enough to determine that an individual may have voted or registered to vote by a specific date."[44]

139. Beyond the sources being derived from or fed into the I-Lab system, DHS is also reportedly drawing names of alleged non-U.S. citizens to target directly from the White House.

140. DHS is reportedly conducting its elections-related operations in coordination with the White House and specifically via Defendant Anthony Salisbury, who serves a dual role as head of HSI and as a top deputy to the White House's head domestic policy advisor, Stephen Miller.[45]

141. As one publicly known example, news reporting indicates that, in February 2026, the White House gave HSI more than 1,000 names of purported non-U.S. citizens to target. The source of those names remains unclear.[46]

***Phase Two: USCIS's Rushed and Flawed Matching Program***

142. The second phase of the Voter Eligibility Matching Policy is for DHS agents, and reportedly specifically USCIS, to gain access to public state voter registration portals or commercial databases to attempt to match information from DHS's flawed non-U.S. citizen lists to information in voter files.

143. Because DHS agents are told to treat the DHS source data from phase one as presumptively valid, and to create the law enforcement follow-up TECS records that, according to the Whistleblower Disclosure, can "rely solely on the DHS source data for voter registration and/or voting

---

[43] Whistleblower Disclosure at 15.

[44] *Id.*

[45] Glenn Thrush et al., *Administration Targets Noncitizen Voting, Despite Finding It Rare*, N.Y. Times (Feb. 18, 2026), https://www.nytimes.com/2026/02/18/us/politics/voting-trump-immigrants-midterms.html.

[46] Carol Leonnig, Laura Barrón-López & Vaughn Hillyard, *White House Directing DHS To Hunt for Voter Fraud by Naturalized Citizens: Sources*, MS NOW (Feb. 18, 2026), https://perma.cc/B8MJ-GUD2.

dates," the process undertaken by USCIS agents is essentially to eliminate names from a presumptive list of persons for further investigation.[47]

**a. Unreliability of DHS's matching procedures**

144. This phase two is inevitably defective because of the poor training, time and quota pressure on agents, instruction to ignore known data inaccuracies, and poor matching methodologies that are highly likely to trigger numerous false positives.

145. The Whistleblower Disclosure states that on Friday, August 21, agents received a single "1 hour 45-minute training video" from USCIS headquarters and instruction to immediately "stop everything being worked on" to review the training video.[48]

146. The next Tuesday, August 25, USCIS agents "were considered trained" and were "mandatorily assigned, to effective immediately" begin reviewing the DHS source data and presumptive target lists.[49]

147. The Whistleblower Disclosure states that agents were "supposed to review and determine if the information belongs to an 'unlawful voter' and were given a quota of at least five subjects to be reviewed per hour," meaning no more than 12 minutes spent per individual reviewed and an expectation that they would review at minimum 40 individuals per work day.[50]

148. The Whistleblower Disclosure also states that "officers are told to do their own research and make their own determinations as to whether an individual may have unlawfully voted or registered to vote," meaning agents are also using arbitrary and *ad hoc* inputs, rather than consistent criteria, to determine whether a person is flagged for additional scrutiny.[51]

149. The agency's goal, according to the Whistleblower Disclosure, was to complete this data sourcing and matching portion of the DHS Policy by September 12, 2026.[52]

---

[47] Whistleblower Disclosure at 20.
[48] *Id.* at 1.
[49] *Id.*
[50] *Id.*
[51] *Id.* at 19.
[52] *Id.* at 1.

**b. DHS reliance on state voter portals or commercial data**

150. To implement the agency's flawed matching program, DHS is conducting shoddy comparisons on names and birthdates from the DHS presumptively valid source data to information found by accessing public state voter portals and in commercial datasets, where available.

151. Because the federal government failed to compel thirty states and Washington, D.C., to produce complete non-public state voter files, it has turned to various other dubious and outdated sources to fashion its own makeshift voter files for many states.[53]

152. Of the nine states reportedly targeted in DHS surge operations, courts have rejected DOJ efforts to force access to private voter information in seven: California, Connecticut, Nevada, New York, Pennsylvania, Washington, and Wisconsin.

153. The federal government has reportedly gained some broader access to public versions of files in a handful of states, such as Missouri and Georgia, the remaining two of the nine targeted states in the surge field operations; and it has reportedly compelled more complete non-public versions of entire voter registration files in sixteen states: Alabama, Alaska, Arkansas, Florida, Indiana, Iowa, Louisiana, Mississippi, Nebraska, Ohio, Oklahoma, South Carolina, South Dakota, Tennessee, Texas, and Wyoming.[54]

154. There are indications that DHS has impermissibly accessed the voter file information that DOJ has received or will receive from states, despite ongoing litigation challenging the collection and information sharing policies.[55]

155. The decision to allow DHS agents to access DOJ's voter data was part of Defendants' broader change in policy to involve DHS in attempting to make voter eligibility determinations, which required a new internal legal determination in an attempt to support the expanded scope of DHS's authority. In May 2026, the DOJ Office of Legal Counsel issued an opinion arguing that, "although an

---

[53] *United States v. Simon*, No. 25-CV-3761 (KMM/EMB), 2026 WL 2389778, at *1 (D. Minn. Aug. 17, 2026) (collecting cases).

[54] Kaylie Martinez-Ochoa et al., *Tracker of Justice Department Requests for Voter Information,* Brennan Ctr. for Just. (last updated Aug. 24, 2026), https://perma.cc/PVL3-P8M5.

[55] *See id.*; *see also Common Cause v. U.S. Dep't of Justice,* No. 1:26-cv-01352 (D.D.C. Apr. 21, 2026).

admittedly closer question," "HSI is authorized by law to investigate such voter fraud" by non-U.S. citizens and can access voter data that DOJ receives from states for that purpose.[56]

156. But because DOJ, and by extension DHS, lack access to more comprehensive non-public voter registration information in most states, including all of the nine reportedly targeted states in the September 1 Surge Initiative Guidance, DHS agents are reportedly directed to instead "scour from [a] 50-state list" for any public or commercial purported voter registration information it can attempt to use,[57] as the Whistleblower Disclosure further confirms.[58]

157. A core component of this scouring for access to purported state voter registration information includes accessing individuals' information on public state voter portals designed for state residents to check their own personal voter registration status.[59]

158. In some jurisdictions, having DHS agents gain access to this information involves agents ignoring warnings that the portals are specifically designated (and in some cases, restricted by state law) only for an individual state resident to look up their own information.[60]

159. In others, the access to the portal is only possible after specifically attesting that the person accessing the information is the registrant themself.[61]

160. The Office of Chief Counsel at DHS "has advised that it is perfectly OK" for agents to use all publicly available websites.[62]

161. The Whistleblower Disclosure quotes the internal website platform that USCIS uses for this matching program, which states that "OCC advises that it is permissible for Immigration Services Officers and Immigration Officers to use these state voter websites for purposes of confirming voter

[56] *Authority to Obtain and Share Statewide Voter Roll Data,* 50 Op. O.L.C. ___ (May 12, 2026).
[57] Nick Corasaniti & Hamed Aleaziz, *Trump Administration Begins Blitz to Find Elusive Voter Fraud Ahead of Midterms*, N.Y. Times (Sep. 2, 2026), https://www.nytimes.com/2026/09/02/us/politics/trump-election-voter-fraud.html?eafs_enabled=false.
[58] Whistleblower Disclosure at 1.
[59] *Id.*
[60] *Id.*
[61] *Id.*
[62] *Id.* at 12.

registration status as it pertains to an alien's eligibility for an immigration benefit;" there is a similar disclosure on the PowerPoint presentation DHS used for the August 21 training of USCIS agents.[63]

162. When individual USCIS agents raised concerns about these access limitations, including that they additionally violate internal agency rules of conduct and privacy restrictions, the Whistleblower Disclosure summarizes that they received a response that individual agents "are not personally liable for conducting these searches when done as part of their official duties and properly documented."[64]

163. As part of the Voter Eligibility Matching Policy, DHS also appears to be planning to invest significant additional federal funds to extract information from any public versions of state voter registration information ahead of the November election. In August 2026, ICE (the parent agency for HSI) announced its plans to award a contract, valued between $2 and $5 million, "to procure data services to support Homeland Security Investigations (HSI) ongoing fraud detection and analytical initiatives." The contractor would be required to obtain voter registration data, including voting history and potentially including party affiliation, for all 50 states.[65] According to ICE records, the contract is expected to be completed by September 30, 2026.

164. In addition to public state voter registration portal information, the Whistleblower Disclosure also explains that agents are expected to make comparisons to commercial databases called Accurint and Clear that purport to have voter information.[66]

165. But commercial voter data is often stale, incomplete, and inaccurate; it cannot be used for making reliable determinations about an individual's voting record or status.

---

[63] *Id.* at 11; *see also id.* Image 14.
[64] *Id.* at 13.
[65] U.S. Dep't of Homeland Sec., Forecast Record Number: F2026075233, Acquisition Planning Forecast System (Aug. 31, 2026), https://perma.cc/RJ44-JVKF; David Gilbert, I*CE Plans to Pay $5 Million to Create National Voting Database,* Wired (Sep. 2, 2026), https://perma.cc/Q28N-WQ7Y.
[66] Whistleblower Disclosure at 16.

**c. DHS uses flawed matching methodologies**

166. Even if Defendants' citizenship or voting data were accurate, and even if DHS agents had sufficient time or training or access to conduct their reviews, the methodology Defendants use for the comparisons of those sources is itself necessarily flawed and leads to significant inaccuracies.

167. For one, DHS describes that it uses information "brought in through supplemental magic," which on information and belief means the agency's use of generative artificial intelligence, to do a comparison that generates the initial presumptive DHS source data list.

168. But even for the manual USCIS searches reported in the Whistleblower Disclosure, the methodology is highly defective.

169. As noted above, the USCIS process reportedly in most cases involves agents taking names and birthdates from the presumptively accurate DHS source list, and then typing those names and birthdates into public state voter registration portals and commercial databases (where available) to see if anyone in the state with that criteria has registered or has voted.

170. Because of the commonality in names and birthdates, especially across large population sets, this matching methodology has led and will lead to many false positives. These significant matching flaws will almost certainly result in DHS agents improperly flagging U.S. citizens in TECS, and then subjecting them to harassing interrogations as part of DHS's Field Operations Policy.

171. Again, the Whistleblower Disclosure explains that DHS knows there are inaccuracies in the data and that it will lead to U.S. citizens being scrutinized. The August 21 DHS training video reportedly states of the DHS source data: "it's not perfect. So during your reviews, you will identify citizens. So I just want to throw that out there. My apologies. You know, thank you. We're, we're still, we're just doing the best we can."[67]

172. Moreover, DHS instructs its agents to at times ignore information in public state voter portals that would favor eliminating a person from the target list. For individual records that have voter registration history in the DHS source data provided to USCIS, agents are instructed to disregard

---

[67] *Id.* at 25.

contradicting information in the state voter portal that would eliminate an individual from further scrutiny.[68]

173. Reinforcing concerns about the reliability of this specific Policy, DHS's data comparison practices in general have displayed both sourcing and methodological flaws.

174. To illustrate, DHS agents in the Atlanta airport wrongfully detained a misidentified U.S. citizen traveler solely because he had the same name and birthdate as a purportedly removable individual.[69]

175. These flawed DHS information sourcing and comparison procedures are also new iterations of longstanding defects in States' prior searches for non-U.S. citizens allegedly unlawfully participating in elections.

176. In prior election cycles, both Florida and Texas were forced in federal court to abandon similarly flawed efforts because their problematic source data and matching methodologies returned significantly more false positives than actual instances of an individual being improperly registered. *See Texas League of United Latin Am. Citizens v. Whitley*, No. SA-19-CA-074-FB, 2019 WL 7938511, at *1 (W.D. Tex. Feb. 27, 2019); *United States v. Florida*, 870 F. Supp. 2d 1346, 1347–48 (N.D. Fla. 2012).

***Phase Three: USCIS Generates TECS Records to Trigger Field Operations***

177. The final phase of the Voter Eligibility Matching Policy is that USCIS generates TECS records—meaning records put into a DHS-wide database that are used to initiate further field operations.

178. According to the Whistleblower Disclosure, a TECS record is created to trigger further scrutiny of an individual if the agent does not in twelve minutes eliminate them from the initial DHS

---

[68] *Id.* at 15.
[69] Ashlyn Webb, *US Citizen Detained by ICE at Atlanta Airport as He Boarded Flight*, WSB-TV (Aug. 11, 2026), https://www.wsbtv.com/news/local/us-citizen-detained-by-ice-atlanta-airport-he-boarded-plane/S67XCCONANCJDIGQPXYUCMBW5E/.

list of presumptive non-U.S. citizen voters, which USCIS agents are told to assume is valid and to wholly rely upon without further information.[70]

179. According to the Whistleblower Disclosure cover letter, the whistleblower has knowledge "that TECS law enforcement records have been created against U.S. citizens" as part of this process, and that "[s]uch records can have ramifications for individuals far beyond the voting context. TECS law enforcement records can be used against them in any interaction they may have with the federal government, such as crossing the border during travel or seeking a benefit."[71]

180. The Whistleblower Disclosure describes how this generation of TECS records is overinclusive in general, but specifically problematic for states like California. In some states, USCIS agents have no other data source with which to compare and evaluate the names in the presumptive list drawn from the DHS source data, such as the commercial databases DHS is using like Accurint and Clear (which reportedly do not include California data).[72]

181. When asked about what to do in California when no other comparison data is provided, and when the public state voter registration portal is inaccessible, the Whistleblower Disclosure reports that USCIS agents are "specifically told to rely" entirely on the initial source data that "DHS provided for California and use the voter registration dates and voting dates provided in that data to indicate that the subject may be an unlawful voter and create a TECS record." In doing so, according to the Whistleblower Disclosure, "the officers' determinations must hold the DHS-provided voter registration dates and voting dates to be accurate despite any reasonable concerns or evidence to the contrary."[73]

182. Additionally, the Whistleblower Disclosure states that, "[w]hen explicitly asked if officers could complete the assignment without creating TECS records that rely solely on the DHS source data for voter registration and/or voting dates, officers were told 'no' by" DHS implementers of the Policy.[74]

---

[70] Whistleblower Disclosure at 1.
[71] Whistleblower Disclosure Cover Letter at 3.
[72] Whistleblower Disclosure at 16.
[73] *Id.* at 17.
[74] *Id.* at 20.

183. The upshot is that, in at least some states such as California, DHS agents are generating TECS records for further scrutiny, such as the field operations described above, *based solely on the admittedly flawed DHS source data that knowingly includes U.S. citizens*.

184. The Whistleblower Disclosure also states that, because of DHS source data problems, TECS records are highly likely to be generated against known U.S. citizens, such as derivative citizens or individuals who petitioned for U.S. citizenship for a non-citizen spouse, with inadequate safeguards to prevent such wrongful targeting.[75]

185. Moreover, the Whistleblower Disclosure reports that USCIS agents are assigned a specific task to generate TECS records for *known naturalized U.S. citizens* if DHS has any information in its amalgamation of information systems suggesting that the individual registered to vote or voted before naturalizing.[76]

186. Communications between DHS agents and local election officials in recent months further confirm that DHS operations targeting election-related activity are producing many false leads and false positives.

187. For example, news articles summarizing communications between an HSI agent and a Franklin County, Ohio, election official show that several people DHS flagged in that County had never been registered to vote in the first place.[77]

188. In one illustrative example, the agent admitted the false positive occurred, writing "Oops! Turns out the voter is actually his father."[78]

189. An August 14 ProPublica article describes additional emails between DHS agents and local election officials in Texas and Ohio that indicate much of the federal information on purported

---

[75] *See id.* at 24-28.
[76] *Id.* at 22-24.
[77] Gabe Cohen et al., *How Trump Turned Homeland Security into an Engine of His Voter Fraud Crusade*, CNN (Aug. 12, 2026), https://www.cnn.com/2026/08/12/politics/trump-homeland-security-voter-fraud-crusade.
[78] *Id.*

non-U.S. citizens was inaccurate, including from reportedly flawed data matching processes that DHS used.[79]

### C. Defendants' Policy and Current Surge Operations Build From Months of Redirecting DHS Agents and Resources to an Election-Related Focus.

190. The September 1 Surge Initiative Guidance is merely the latest implementation of DHS's months-long policy of directing its agents to engage in unprecedented election-related operations and broad investigations.

***Prior Policy Memoranda Implementing DHS's Initiative***

191. DHS's campaign to substantially redirect agents away from their traditional immigration work and toward elections-related operations is reported to have begun in approximately February 2026. The New York Times has reported on and quotes a February 2026 internal, non-public DHS memorandum—hereafter the "Reopen and Review Memo"—that requires ICE HSI agents to "review all open and closed voter fraud cases" involving claims against alleged non-U.S. citizens or recently naturalized citizens in recent years.[80] The Reopen and Review Memo reportedly states that DHS's initiative is broadly "designed to identify, investigate, and disrupt activities that undermine the integrity of federal, state, and local elections, and to ensure compliance with applicable election laws."[81]

192. In that same month, according to an August 14 ProPublica article, DHS began assigning many of its 7,100 HSI agents to investigate claims of non-U.S. citizen voter fraud, with about 25,000 investigations based on alleged comparisons to the SAVE system; another 15,000 investigations

---

[79] Peter Elkind et al., *Inside Trump's Failed Hunt for Noncitizen Voters*, ProPublica (Aug. 14, 2026), https://perma.cc/6RLV-EWCJ.

[80] Glenn Thrush et al., *Administration Targets Noncitizen Voting, Despite Finding It Rare*, N.Y. Times (Feb. 18, 2026), https://www.nytimes.com/2026/02/18/us/politics/voting-trump-immigrants-midterms.html.

[81] Priscilla Alvarez & Tierney Sneed, DHS Is Hunting for Any US Citizens Who May Have Voted Before Being Naturalized, CNN (Feb. 19, 2026), https://www.cnn.com/2026/02/19/politics/voter-fraud-dhs-us-citizens-voted-naturalized.

assigned to HSI's cross-border financial crimes unit; and an unknown number of other cases assigned to a unit led by HSI agent Frank Quiñones that specifically targets naturalized citizens.[82]

193. On June 9, DHS also posted a press release stating that it had issued an internal, non-public letter memorandum—hereafter the "HSI Targets Memo"—to ICE leadership to order that HSI devote resources to arrest and deport alleged non-U.S. citizens who DHS believes were improperly registered or had voted, even absent any criminal adjudication that they had in fact committed such violations.[83]

194. The press release for the HSI Targets Memo quotes DHS General Counsel James Percival stating that DHS is carrying out its assumed role to impose non-criminal but punitive "consequences" for alleged "illegal voting by aliens [that] dilutes the votes of American citizens and undermines our democracy." The press release further indicates that DHS is engaged in this process as part of the agency's assumed role in "verifying voter eligibility, . . . enforcement of federal integrity laws, improving voting systems, and criminal prosecution of unlawful voting by aliens."[84]

***Prior Patterns of Operations and Agent Communications Implementing the Initiative***

195. News reports on DHS communications concerning a handful of publicly known states provide further details on DHS's operations targeting voter eligibility.

196. These reports indicate that, as of summer 2026, DHS had carried out its Policy by issuing several different demands for non-public individual voter information from local officials in at least five states not included on the reported September 1 Surge Initiative Guidance list: Texas, Minnesota, Arizona, North Carolina, and Ohio.[85]

---

[82] Peter Elkind et al., *Inside Trump's Failed Hunt for Noncitizen Voters*, ProPublica (Aug. 14, 2026), https://perma.cc/6RLV-EWCJ; U.S. Immigr. & Customs Enf't, *HSI Careers*, https://perma.cc/EY98-DLMX (last visited Sep. 15, 2026) (stating current HSI staff totals).

[83] U.S. Dep't of Homeland Sec., *DHS Directs ICE to Deport Aliens Who Vote in American Elections* (June 9, 2026), https://perma.cc/4DAB-LYYS.

[84] *Id.*

[85] Gabe Cohen, Priscilla Alvarez & Tierney Sneed, *How Trump Turned Homeland Security into an Engine of His Voter Fraud Crusade*, CNN (Aug. 12, 2026), https://www.cnn.com/2026/08/12/politics/trump-homeland-security-voter-fraud-crusade; Ned Parker & Peter Eisler, *How Trump Is Moving to Control U.S. Elections, One State at a Time*, Reuters (Apr. 27, 2026), https://perma.cc/EDG9-VZWF; Natalia Contreras, *Feds Subpoena Texas Counties for Voters' Records*, Tex. Trib. (Apr. 10, 2026), https://perma.cc/YN5K-CBZD.

197. HSI agents issued administrative subpoenas for non-public voter information regarding certain alleged registrants in at least Texas.

198. DHS agents have reportedly sought and are attempting to execute grand jury subpoenas for certain alleged registrants' election records in at least Minnesota.

199. DHS agents made informal law enforcement requests for certain alleged registrants' election records in at least Arizona, North Carolina, and Ohio.

200. HSI's attempted collection of individual voter eligibility information through administrative subpoenas is ongoing.

201. For example, since the September 1 Surge Initiative Guidance, public reporting indicates that DHS has issued additional administrative subpoenas to officials in Washington and Georgia.[86]

202. In Washington and Georgia, the subpoena requests asked election officials to compile an "Individual Voter Report" including all voting history and participation, and a copy of any available voting documents including identity and/or citizenship documents.[87]

203. DHS agent communications show that the types of investigative activities and operations concerning elections that DHS is undertaking are far outside the norm for DHS agents.

204. For example, in communications CNN obtained between an HSI agent and election officials in Ohio, the HSI agent highlighted the unusualness of the operation, writing: "I wouldn't normally ask this of you if I was conducting an investigation with my usual methodology and speed, but there's a bit of pressure on the timeline of things."[88]

205. The HSI agent further acknowledged in the communication to the election official that "[v]oter fraud investigations aren't typically what HSI works."[89]

---

[86] Laura Barrón-López & Madeleine Bimonte, *Aggressive DHS hunt for voter fraud only finding a handful of possible noncitizenship cases*, MSNow (Sep. 4, 2026), https://perma.cc/UW37-A3XV.

[87] *Id.*

[88] Gabe Cohen, Priscilla Alvarez & Tierney Sneed, *How Trump Turned Homeland Security into an Engine of His Voter Fraud Crusade*, CNN (Aug. 12, 2026), https://www.cnn.com/2026/08/12/politics/trump-homeland-security-voter-fraud-crusade.

[89] *Id.*

206. An August 14 ProPublica article also reports on internal government emails describing problems with DHS election-related operations arising from the subpoenas issued in Minnesota noted above. The story quotes an email from a former top deputy in Minnesota's U.S. attorney's office describing a chaotic use of DHS agents that "presented a host of issues" for the office's election-related investigations. The email reportedly states that these issues include "[a]n unknown number of [DHS] agents [who] are constantly arriving in Minnesota without any knowledge of the investigation, the issues already discussed and decided, and the processes they need to follow" and "[i]nstead of getting up to speed and learning, [the DHS agents] have demanded many calls and subpoenas, most of which demonstrate a complete lack of understanding of the investigation."[90]

**D. Voters' Fears of DHS Investigations Are Deepened by Defendants' Stated Objective of "Nationalizing" Election Administration and Their Willingness to Use Federal Agents to Coerce Voters and Attempt to Substantiate False Voter Fraud Narratives.**

207. Throughout this year, relevant policymakers in the Administration and spokespersons for DHS have made statements supporting that there is an agency policy to use DHS agents to take over a role in voter eligibility determinations and confront people concerning their electoral activity for political reasons.

208. Policymakers have also made statements indicating a desire for the federal executive to take over elections, at the expense of state and local officials in charge of administering elections.

209. This background context deepens concerns among voters, including Plaintiffs, that the implementation of DHS policy is not a good faith attempt to actually identify voter fraud but an attempt to take over the elections or to cast doubt, confusion, and fear for partisan objectives.

210. Defendant Secretary of Homeland Security Mullin has repeatedly refused to rule out deploying DHS agents in a manner that intimidates voters and has suggested a plan to have agents conduct elections-related field operations this fall.

---

[90] *Id.*

211. Defendant Mullin has stated in various fora and ways that DHS agents are undertaking unprecedented elections-related operations to carry out the agency's assumed role in "election integrity" that is far astray from their components' immigration-enforcement scope, and an obscured plan to deploy agents in response to the agency's perceived "specific threats" to the election.[91]

212. In a July 17 press conference, Defendant Mullin stated that the President had given DHS the direction and resources to "secure our elections." Defendant Mullin further claimed that DHS "will be proactively looking at early voting" this year as part of its assumed operational mandate to deter alleged voting by non-U.S. citizens. He emphasized that the President is directing DHS activity and "there's no daylight between [the President and Mullin] and the enforcement" operations DHS takes.[92]

213. Mullin sent accompanying threat letters to California, Nevada, New Jersey, and Pennsylvania claiming without providing evidence that tens of thousands of non-U.S. citizens are registered to vote in those states, and seeking to coerce those officials to take action against their residents without providing any detailed information.[93]

214. During the July 17 press conference, Mullin promised that DHS "will pursue maximum pressure on this," and warned that, "once we gave [state election officials] the information they need to secure their elections, and they chose not to, then those individuals can also be held accountable by fines, by penalties and even, depending on how far it goes, prison time."[94]

215. In June, Defendant Mullin issued a statement to the press that refused to disclaim the ongoing threat of using DHS agents to interfere with the midterm election. He instead stated that he is

---

[91] Natalie Hausmann, *Trump's Pick for DHS Chief Won't Rule Out ICE at Polls*, Democracy Docket (Mar. 18, 2026), https://perma.cc/LC4Z-MLUM.

[92] U.S. Dep't of Homeland Sec., *Secretary Mullin Holds Press Conference on the Need to Fully Fund CBP & ICE for Next Three Years*, at 01:54, YouTube (July 17, 2026), https://perma.cc/4TM5-VZHP.

[93] Press Release, U.S. Dep't of Homeland Sec., DHS Secretary Markwayne Mullin Sends Letters to Secretaries of State Warning About Non-Citizens on Voter Rolls (July 17, 2026), https://www.dhs.gov/news/2026/07/17/dhs-secretary-markwayne-mullin-sends-letters-secretaries-state-warning-about-non.

[94] U.S. Dep't of Homeland Sec., Secretary Mullins Delivers Remarks on President Trump's Update on Election Integrity Efforts, YouTube (July 17, 2026), https://www.youtube.com/watch?v=jjuVaRAEpe4.

"committed to restoring integrity to our election systems and ensuring that American citizens, and only American citizens, are electing American leaders."[95]

216. In response to a May press inquiry about the threat of DHS agents deploying to confront voters while voting, a spokesperson for Mullin referred to his prior comments but then added that "[e]lections exist for the American people, not illegal aliens, to choose their leaders."[96]

217. A May 11 letter from then-Acting ICE Director Todd Lyons stated that "as the principal investigative component of DHS, ICE Homeland Security Investigations plays an important role in investigating voter fraud and will continue to perform this vital mission."[97]

218. On March 24, 2026, Defendant Tom Homan, Assistant to the President and the Border Czar, specifically alluded to a "plan" for using DHS agents in "secur[ing] election[s]" during the midterms, stating: "Are illegal aliens voting? I mean, bottom line is, what are they afraid of? And they say illegal aliens don't vote. Well, look, you know, part of DHS' job is secure elections, and I'm not going to say, you know, you know, what our plan is going forward, but if only U.S. citizens can vote, I don't see the issue of what they're concerned about" with DHS agents being engaged in elections-related operations.[98]

219. In general, and going back several years, the President has repeatedly declared his intent to seize federal control over the electoral process, which the Constitution commits to states and localities by default to administer and secure elections at a local level.

220. On May 12, the President stated that he "would do anything necessary to make sure we have honest elections. We have to have honest elections."[99]

---

[95] Miles Parks, *Voting Officials Fear DHS May Actually Be a Threat to Elections This Year*, NPR (June 16, 2026), https://www.npr.org/2026/06/16/nx-s1-5702491/trump-voting-threat-midterm-election-dhs.

[96] David Gilbert, *Election Officials Are Getting Ready for ICE To Show Up at the Polls*, Wired (May 20, 2026), https://perma.cc/7B9Y-TBY2.

[97] Letter from Todd Lyons, Senior Official Performing the Duties of the Director of U.S. Immigr. & Customs Enf't, to Colo. Sec'y of State Jena Griswold et al. (May 11, 2026), https://perma.cc/7KRS-M6B4.

[98] Rebecca Beitsch, *Homan on Democrats opposing ICE at voting sites: 'What are they afraid of?'*, The Hill (Mar. 25, 2026), https://thehill.com/homenews/campaign/5800012-homan-ice-polling-places/.

[99] *President Trump Says He's Willing to Send ICE, National Guard to the Polls in November*, C-SPAN (May 12, 2026), https://www.c-span.org/clip/white-house-event/president-trump-says-hes-willing-to-send-ice-national-guard-to-the-polls-in-november/5200208; Donald J. Trump, *Remarks in an Exchange with Reporters Prior to Departure for Beijing, China* (May 12, 2026), *in* Gerhard Peters & John T. Woolley, The American Presidency Project, https://perma.cc/G33T-LQLT.

221. In an Oval Office press conference on February 3, the President claimed that "[a] state is an agent for the federal government in elections."[100] He also stated that if "a state can't run an election," the federal government "should do something about it."[101]

222. In a February 2 interview, the President also urged that his Administration should "take over" elections in at least fifteen states and declared a desire to "nationalize the voting."[102]

223. In making these and other claims, the President has often tied his declarations to the false assertion that non-U.S. citizens are voting fraudulently in numbers that alter the outcome of elections.[103]

224. Following the 2020 presidential election, the President has engaged in an unrelenting years-long campaign to cast doubt on election results that he disfavors by claiming, contrary to the evidence, that there is widespread non-U.S. citizen voting.[104]

225. During the current Administration, the President has continued making unsubstantiated claims of widespread unlawful voting by non-U.S. citizens.

226. At his 2026 State of the Union address, for example, the President proclaimed, "cheating is rampant in our elections. It's rampant" because of claimed "illegal aliens and others who are unpermitted persons . . . voting in our sacred American elections."[105]

227. DHS has developed and engaged in its Unlawful Voter Initiative Policy as a means of responding to and promoting the President's unsubstantiated allegations that there are significant numbers of non-U.S. citizens illegally participating in federal elections.

---

[100] Donald Judd, *Trump Says States Are Agents of Federal Government in Elections*, CNN (Feb. 3, 2026), https://www.cnn.com/2026/02/03/politics/trump-nationalize-elections-states.

[101] Melissa Quinn, *Trump Suggests Republicans Should Nationalize Voting. Here's What to Know.*, CBS News (Feb. 3, 2026), https://perma.cc/RA7G-XQHZ.

[102] Reid J. Epstein, *Trump, in an Escalation, Calls for Republicans to 'Nationalize' Elections*, N.Y. Times (Feb. 2, 2026), https://www.nytimes.com/2026/02/02/us/politics/trump-nationalize-elections.html.

[103] Tom Hals et al., *Trump Claims Voting by Noncitizens Is Rampant in America. The Numbers Tell Another Story*, Reuters (July 19, 2026), https://perma.cc/VM6R-H7GF.

[104] *See, e.g.*, Donald J. Trump (@realDonaldTrump), Truth Social (Aug. 18, 2025, at 4:48 PM ET), https://perma.cc/USN6-WVFK.

[105] *Speech: Donald Trump Delivers the State of the Union Address – February 24, 2026*, Roll Call Factbase (Feb. 24, 2026), https://rollcall.com/factbase/trump/transcript/donald-trump-speech-state-of-the-union-february-24-2026/.

228. But the actual evidence has come nowhere close to substantiating President Trump's claims that tens of thousands of noncitizens are fraudulently registered to vote and illegally casting ballots.

229. Of the nine states named in DHS's Surge Initiative Guidance, for example, multiple states reported receiving no confirmation from DHS of even possible voter fraud investigations as of early September.[106]

230. In fact, established incidents of non-U.S. citizens knowingly violating election laws are exceedingly rare; where a non-U.S. citizen is on a voter registration list, it is often because of a governmental or technological mistake or a misunderstanding.

231. Public reporting indicates that the evidence that the Administration has taken to court shows only isolated incidents rather than a trend or widespread occurrence of non-U.S. citizens improperly participating in elections.[107]

232. As of May 2026, across the four states that received the above-referenced Mullin July 17 threat letters—California, New Jersey, Nevada, and Pennsylvania—federal prosecutors had reportedly initiated seven cases of alleged non-U.S. citizen voting since January 2025. These states, collectively, have more than 40 million registered voters.[108]

233. Specifically, despite initially publicizing a claim in July that Nevada had 16,000 non-U.S. citizens on its registration rolls, a month later DHS said it had actually flagged only 185 such individuals, and the agency has reportedly refused to identify those individuals in communications with state election officials.[109]

---

[106] Laura Barrón-López & Madeleine Bimonte, *Aggressive DHS hunt for voter fraud only finding a handful of possible noncitizen cases*, MS Now (Sep. 4, 2026), https://www.ms.now/news/aggressive-dhs-hunt-for-voter-fraud-only-finding-a-handful-of-possible-noncitizen-cases.

[107] Tom Hals et al., *Trump Claims Voting by Noncitizens Is Rampant in America. The Numbers Tell Another Story.*, Reuters (July 19, 2026), https://www.reuters.com/investigations/trump-claims-voting-by-noncitizens-is-rampant-america-numbers-tell-another-story-2026-07-19/; Peter Elkind et al., *Inside Trump's Failed Hunt for Noncitizen Voters*, ProPublica (Aug. 14, 2026), https://www.propublica.org/article/noncitizen-voting-trump-homeland-security-investigations.

[108] Peter Elkind et al., *Inside Trump's Failed Hunt for Noncitizen Voters*, ProPublica (Aug. 14, 2026), https://www.propublica.org/article/noncitizen-voting-trump-homeland-security-investigations.

[109] Jude Joffe-Block & Miles Parks, *DHS acknowledges the noncitizen numbers it touted on voter rolls were inflated,* NPR (Aug. 25, 2026), https://www.npr.org/2026/08/25/nx-s1-5940807/noncitizen-voters-trump-nevada-call.

### E. Plaintiffs Credibly Fear the Threat and Continued Use of DHS Agents to Make Voter Eligibility Determinations and Conduct Intimidating Field Operations.

234. Plaintiffs represent and assist U.S. citizen voters and people who support, encourage, or mobilize citizens to participate in our elections. They also administer elections and ensure that eligible citizens who want to participate can do so easily and safely. They and the constituents they serve credibly fear that Defendants, based on their Unlawful Voter Initiative Policy, will start or continue to improperly target the citizens they serve. Defendants' threats and conduct chill Plaintiffs' usual participation in the electoral process.

235. These fears are based on Defendants' actions and statements threatening harassing field operations that, on information and belief, have and will continue to include targeting U.S. citizens.

236. DHS has directly threatened individuals suspected of voting illegally with deportation and claimed the responsibility for determining the facts of such a violation, outside any criminal adjudication.[110]

237. Defendants have also in other contexts shown an inability to target only non-U.S. citizens. They have on countless occasions profiled, harassed, and unlawfully detained U.S. citizens.[111]

238. DHS has even gone so far as to unlawfully deport individuals who are in fact U.S. citizens.[112] Thus, although U.S. citizens should in theory have nothing to fear from immigration agents, Defendants' conduct has instilled wide-ranging fright among citizens—especially citizens with perceived links to immigrant communities.

239. As further explained above, Plaintiffs are harmed and chilled because they reasonably fear that they, their members, or citizens in the communities they serve will be subjected to increased

---

[110] U.S. Dep't of Homeland Sec., *DHS Directs ICE to Deport Aliens Who Vote in American Elections* (June 9, 2026), https://perma.cc/V3YB-8EFH; David Gilbert, *ICE Plans to Pay $5 Million to Create National Voting Database*, Wired (Sep. 2, 2026), https://www.wired.com/story/ice-plans-to-pay-5-million-to-create-national-voting-database/.

[111] Letter from Elizabeth Warren, U.S. Sen., et al., to Joseph V. Cuffari, Acting Officer for Civil Rights & Civil Liberties, U.S. Dep't of Homeland Sec., & Joseph Guy, Dir., Off. of the Immigr. Detention Ombudsman (Aug. 8, 2025), https://goldman.house.gov/sites/evo-subsites/goldman.house.gov/files/evo-media-document/letter-on-us-citizens-immigration-enforcement.pdf (collecting examples and relevant legal authorities).

[112] *See, e.g.*, *VML v. Harper,* No. 1:25-cv-00550, slip op. at 2 (W.D. La. Apr. 25, 2025).

surveillance, harassment, and/or retaliation by Defendants and their agents related to their protected electoral activity.

240. Plaintiffs reasonably fear that they, their members, and citizens in the communities they serve will be subjected to wrongful legal and societal repercussions from being erroneously targeted and accused of committing fraud by Defendants and their agents.

241. Plaintiffs reasonably fear that they, their members, or citizens in the communities they serve will be subjected to force, violent threats, and physical abuses by Defendants and their agents related to their protected electoral activity.

242. Plaintiffs' serious apprehension due to the implementation and threat of Defendants' Unlawful Voter Initiative Policy, particularly its Field Operations Policy, is reinforced by the surrounding context of the over a year's worth of violent DHS operations that have created a climate of fear, coercion, and harassment among many voters, particularly in immigrant communities.

243. Defendants have repeatedly used the threat and imposition of large-scale incursions of federal agents into American cities, portrayed as immigration enforcement operations, as a means of coercing people and jurisdictions viewed as politically opposed to the President, including in the election administration context.

244. Within its first year, the Administration deployed DHS agents and/or military personnel in large-scale surge operations in at least twelve locations, which typically involved roving patrols of DHS agents using threats and violence against civilians, with agents going door to door and block to block in neighborhoods profiling individuals for a suspected lack of U.S. citizenship.[113]

245. DHS also engaged in highly publicized raids, such as of entire apartment complexes and buildings, conducting mass arrests and detentions of individuals including U.S. citizens and children.[114]

---

[113] Nancy Gertner, *The door-to-door terror in Minneapolis,* WBUR (Jan. 18, 2026), https://www.wbur.org/cognoscenti/2026/01/18/minneapolis-renee-macklin-good-ice-trump-unrest-nancy-gertner.

[114] Melissa Sanchez, Jodi S. Cohen & Mariam Elba, *Immigrants Detained in Chicago Military-Style Raid Seek Millions in Damages*, ProPublica (May 13, 2026), https://www.propublica.org/article/chicago-immigration-raid-ice-dhs-fbi-federal-tort-claims.

246. Unprecedented violence has typified DHS's prior surge operations, including the killing of multiple citizens and non-U.S. citizens and widespread abuses of force leading to numerous lawsuits and state criminal prosecutions.[115]

247. The levels of harassment and violence typical of these DHS surge operations continue to spread significant fear in communities throughout the country—particularly among the wrongfully targeted naturalized citizens, derivative citizens, and citizens residing in mixed-status households—leading many U.S. citizens to change their daily routines for fear of harmful interactions with DHS agents.[116]

248. The Administration has itself tied its prior violent DHS surge operations to political and electoral objectives. For example, former Attorney General Pam Bondi explicitly connected the unprecedented incursion of federal agents and shows of force during the DHS surge operation in Minnesota to the Administration's efforts to obtain the State's voter data.[117]

249. Viewed in light of this track record of DHS violence and harassment targeting non-citizen immigrants and U.S. citizens alike, Defendants' Unlawful Voter Initiative Policy—in particular its ongoing and threatened interrogation surges under its Field Operations Policy—coerces and harms Plaintiffs and the communities of voters they represent and serve.

250. The unlawful policies also impede jurisdictions, like San Francisco and Santa Clara, that administer elections.

251. San Francisco is especially at risk of targeting by Defendants' Policy implementation. San Francisco has already been a target of DHS enforcement during the current Administration, and is home to over 175,000 naturalized U.S. citizens—a group with heightened risk of being incorrectly listed as ineligible to vote in the data sources that underpin the Voter Eligibility Matching Policy.

---

[115] *See, e.g.*, Jennifer Mascia, *How Many People Have Been Shot in Trump's Immigration Raids?*, The Trace (Dec. 8, 2025), https://www.thetrace.org/2025/12/immigration-ice-shootings-guns-tracker/ (last visited Sep. 17, 2026); *Charting the Crackdown: Misuse of Force*, Phys. for Hum. Rts., https://phr.org/charting-the-crackdown/ (last visited Sep. 15, 2026.

[116] *See, e.g.*, Atra Mohamed, *A Cloud of Fear Hangs Over Minnesota Immigrant Communities*, Minn. Reformer (Jan. 19, 2026), https://minnesotareformer.com/2026/01/19/a-cloud-of-fear-hangs-over-minnesota-immigrant-communities/.

[117] Letter from Pam Bondi, Att'y Gen., U.S. Dep't of Justice, to Tim Walz, Gov., State of Minn. (Jan. 24, 2026), https://www.sos.mn.gov/media/wihf4a05/ag-bondi-gov-walz-letter-012426.pdf.

252. To respond to the threat of DHS voter intimidation, San Francisco must expend City resources on trainings, emergency preparedness exercises, coordination efforts, and public outreach as part of this effort.

253. These increased outreach, training, and communication efforts were not necessary in prior years and will require additional staff time and City resources to implement.

254. San Francisco's public safety efforts will also suffer as a result of the Field Operations Policy in particular. When DHS uses heavy-handed tactics to threaten City residents including U.S. citizens, it creates a culture of fear among City residents and erodes hard-earned trust in local law enforcement. This leads to fewer crimes reported, fewer voluntary interactions with police, and increased resources needed to maintain public safety.

255. Santa Clara is likewise especially at risk of targeting by Defendants' Policy implementation. Santa Clara is home to over 400,000 naturalized United States citizens—a group with heightened risk of being incorrectly listed as ineligible to vote in the data sources that underpin the Voter Eligibility Matching Policy.

256. Defendants' policies significantly risk exacerbating existing community concerns, or inciting new ones, about the safety and integrity of Santa Clara's elections. Addressing these concerns ahead of the November 3, 2026, General Election would require the ROV to expend County resources to adjust voter outreach and education programming and related investments—including by requiring additional ROV staff time; discussion and planning with community partners; and updates to training, talking points, contingency plans, and both internal and community-facing educational materials.

257. The Voter Eligibility Matching Policy and Field Operations Policy could also reduce hard-earned community trust and confidence in the ROV and in Santa Clara as a government institution. Community trust in the ROV and Santa Clara, including in their ability to provide vote centers where voters feel safe and secure exercising the right to vote, is critical to continued voter engagement. The policies at issue run risks—for example, of producing false public reports of voter fraud—that many community members may impute to the ROV and Santa Clara. This loss of trust and confidence could have cascading chilling effects not just on the November 3, 2026, General Election

but beyond, diminishing the likelihood that many eligible voters in Santa Clara County will believe their vote counts and will feel secure exercising that right—and thus diminishing the likelihood that they will vote or register to vote.

## CLAIMS FOR RELIEF

### COUNT I: Intimidation of Voters

### Section 11(b) of the Voting Rights Act of 1965 (52 U.S.C. § 10307(b))

258. All other allegations of this complaint are reasserted and incorporated into this cause of action.

259. Defendants' conduct and threats to use DHS agents for harassing field operations and to interfere with the midterm election violates Plaintiffs' rights under Section 11(b) of the Voting Rights Act ("Section 11(b)").

260. Section 11(b) provides: "No person, whether acting under color of law or otherwise, shall intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for voting or attempting to vote, or intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person . . . for urging or aiding any person to vote or attempt to vote. . . ." 52 U.S.C. § 10307(b).

261. Under the Voting Rights Act, voting is specifically defined to include "all action necessary to make a vote effective in any . . . election, including, but not limited to . . . having such ballot counted properly and included in the appropriate totals of votes cast with respect to candidates for public or party office and propositions for which votes are received in an election." 52 U.S.C. § 10310(c)(1).

262. Defendants have engaged and will continue to engage in threats and conduct that in fact do or attempt to intimidate, threaten, and coerce voters concerning their protected electoral activity.

263. Because of Defendants' threats and conduct, Plaintiffs, their citizens, their U.S. citizen members, and the constituencies they serve reasonably fear being subjected to surveillance, board-scale

and harassing field operation interrogations, and privacy intrusions from DHS agents related to their voting activity.

264. Because of Defendants' conduct and threats, Plaintiffs, their citizens, their U.S. citizen members, and the constituencies they serve reasonably fear being subjected to legal, societal, and reputational repercussions from coercive confrontations with DHS agents and from having to overcome unfounded accusations of fraud related to their voting activity.

265. Because of Defendants' conduct and threats, Plaintiffs, their citizens, their U.S. citizen members, and the constituencies they serve reasonably fear being subjected to force, violence, and the risk of physical harm or altercation with DHS agents engaged in field operations related to their voting activity.

266. Defendants' actions disproportionately harm naturalized citizens, voters in mixed-immigration-status households, derivative citizens, U.S. citizen petitioners for spousal citizenship, and other voters of color.

267. Federal courts have an inherent equitable power to "grant injunctive relief … with respect to violations of federal law by federal officials." *Armstrong v. Exceptional Child Center, Inc*., 575 U.S. 320, 326–27 (2015); *accord Trump v. Cook*, 146 S. Ct. 2234, 2251 n.2 (2026). This includes to remedy violations of Section 11(b) by DHS agents.

268. Moreover, Section 11(b) itself contains an enforceable private right of action. *Michigan Welfare Rts. Org. v. Trump*, 600 F. Supp. 3d 85, 106 (D.D.C. 2022).

## COUNT II: Intimidation Affecting Voter Assistance and Mobilization

**Section 11(b) of the Voting Rights Act of 1965 (52 U.S.C. § 10307(b))**

269. All other allegations of this complaint are reasserted and incorporated into this cause of action.

270. Defendants' conduct and threats to use DHS agents to conduct broad-scale and harassing field operations and interfere with the midterm election violates the Section 11(b) rights of individuals and entities engaged in voter mobilization, advocacy, education, and monitoring activities and services.

271. Section 11(b) prohibits actual or attempted intimidation against "any person for urging or aiding any person to vote or attempt to vote." 52 U.S.C. § 10307(b).

272. Plaintiffs are, employ, or represent, persons that are urging or aiding individuals to vote or attempt to vote.

273. Defendants have engaged and will continue to engage in conduct that in fact does or attempts to intimidate, threaten, and coerce individuals and entities who assist voters, chilling their protected electoral activity.

274. Because of Defendants' conduct and threats, Plaintiffs, their U.S. citizen members, and the constituencies they serve reasonably fear being subjected to broad-scale field operations, surveillance, and privacy intrusions from DHS agents related to their protected electoral activity.

275. Because of Defendants' conduct and threats, Plaintiffs, their U.S. citizen members, and the constituencies they serve reasonably fear being subjected to legal, societal, or reputational repercussions because of confrontations with DHS agents, and facing unfounded accusations of voter fraud related to their protected electoral activity.

276. Because of Defendants' conduct and threats, Plaintiffs, their U.S. citizen members, and the constituencies they serve reasonably fear being subjected to force, violence, and the risk of physical harm or altercation with DHS agents related to their protected electoral activity.

277. These actions disproportionately harm naturalized citizens, voters in mixed immigration status households, derivative citizens, U.S. citizen petitioners for spousal citizenship, and other voters of color.

278. Federal courts possess an inherent power in equity to "grant injunctive relief . . . with respect to violations of federal law by federal officials." *Armstrong*, 575 U.S. at 326–27; *accord Cook*, 146 S. Ct. at 2251 n.2. This includes to remedy violations of Section 11(b) by DHS agents.

279. Moreover, Section 11(b) itself contains an enforceable private right of action. *Michigan Welfare Rts. Org.*, 600 F. Supp. 3d at 106.

**<u>COUNT III: Executive Action in Violation of the U.S. Constitution</u>**

**Constitutional Right to Vote**

280. All other allegations of this complaint are reasserted and incorporated into this cause of action.

281. Defendants' conduct and threats to use DHS agents for broad-scale field operations with intimidating tactics violate Plaintiffs' constitutional right to vote.

282. The First and Fifth Amendments safeguard the "precious" and "fundamental" right to vote and prohibit any encumbrance on the right to vote that is not adequately justified by valid and specific governmental interests. *Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 670 (1966); *see also Bolling v. Sharpe*, 347 U.S. 497, 498–500 (1954) (applying to the federal government under the Fifth Amendment). Such protections apply to both burdens on and denials of the right to vote.

283. Moreover, State and local governments have an interest in safeguarding the "fundamental . . . right to cast a ballot in an election free from the taint of intimidation and fraud." *Burson v. Freeman*, 504 U.S. 191, 211 (1992); *accord Poniktera v. Seiler*, 181 Cal. App. 4th 121, 137 (2010). Local government plaintiffs have a compelling interest in ensuring that their citizens may exercise their constitutional right to vote free from the interference and intimidation by Defendants' conduct and threats.

284. In evaluating encumbrances on the individual right to vote, courts "weigh 'the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate' against 'the precise interests put forward by the [government] as justifications for the burden imposed,'" while "taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'" *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 788–89 (1983)).

285. The character and magnitude of the voting rights burden here is substantial. Some Plaintiffs and the U.S. citizens they represent have changed their voting plans and activity because of Defendants' threats and conduct. Plaintiffs have good reason to believe that some of the U.S. citizens

they represent may refrain from participating in this election because of their fear of coercive confrontations with DHS agents related to their electoral activity.

286. Defendants have no valid or sufficiently weighty interest to support using harassing field operations and threatening tactics to impose such a heavy encumbrance on the right to vote.

287. Defendants' conduct and threat to use DHS agents to conduct broad-scale and harassing field operations, based on faulty citizenship information and a flawed matching process, is not sufficiently tailored to any such asserted interest.

288. Plaintiffs can sue in equity to enjoin federal officials violating federal constitutional rights. *See Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010); *see also Panama Ref. Co. v. Ryan*, 293 U.S. 388, 414 (1935) (noting that plaintiffs are "entitled to invoke the equitable jurisdiction to restrain enforcement" of unconstitutional acts by federal officials).

**COUNT IV: Executive Action in Violation of the U.S. Constitution**

**Violation of Separation of Powers and Federalism Principles under the Elections Clause, the Voter Qualifications Clause, and the Seventeenth Amendment**

289. All other allegations of this complaint are reasserted and incorporated into this cause of action.

290. Defendants' threats and conduct to use DHS agents to interfere with elections and intimidate voters violates the principles of constitutional federalism vesting in state and local officials the default responsibility to administer elections absent preempting positive law from Congress.

291. Under principles of federalism and the Constitution's Elections Clause, the Voter Qualifications Clause, and the 17th Amendment, states have the presumed primary responsibility and duty to decide who is eligible to vote in both state and federal elections and how to administer the election.

292. The Elections Clause authorizes states to determine the "Times, Places and Manner of holding Elections for Senators and Representatives." U.S. Const., Art. I, § 4, Cl. 1. California law, in turn, tasks county election officials with administering fair and free elections. *E.g.*, Cal. Elec. Code §

320. Defendants' unlawful conduct interferes with San Francisco and Santa Clara's ability to fulfill this responsibility.

293. States and localities have a compelling interest in safeguarding the "fundamental . . . right to cast a ballot in an election free from the taint of intimidation and fraud." *Burson*, 504 U.S. at 211.

294. If Congress wishes to alter the balance of state-federal power and supersede a state's regulation and administration of federal elections, it must do so clearly. *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 9 (2013). When Congress "has assumed to regulate such elections[,] it has *done so by positive and clear statutes*"; absent such clear interventions, Congress has opted "to leave the conduct of the election of its members to state laws, administered by state officers." *United States v. Gradwell*, 243 U.S. 476, 485 (1917) (emphasis added).

295. No such overriding federal statute authorizes Defendants to engage in broad-scale and harassing field operations and intimidating tactics to interfere with the midterm election.

296. Defendants' threatened and ongoing conduct intrudes on the states' constitutional prerogatives and violates federalism limits.

297. Moreover, the federal government has a highly circumscribed role in determining and adjudicating the qualifications of voters, limited to ensuring that states are not disenfranchising eligible voters in violation of their federal rights.

298. Defendants' threats and conduct seek to unlawfully usurp the state's role to set the qualifications to vote in that state (so long as the qualifications abide by federal constitutional limits) and to enforce such qualifications. *See Arizona*, 570 U.S. at 17.

299. States and local governments have an interest in "assuring that the benefits of the federal system are not denied to [their] general population." *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 607 (1982).

300. Plaintiffs can sue to vindicate these separation-of-powers federalism limits that structurally safeguard their own liberty interests and constitutional prerogatives. *See, e.g.*, *Bond v.*

*United States*, 564 U.S. 211, 222 (2011); *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952).

**COUNT V: Agency Action Contrary to Law and in Excess of Jurisdiction**

**APA – Violation of Section 11(b) of the VRA (Voting)**

301. All other allegations of this complaint are reasserted and incorporated into this cause of action.

302. Under the APA, a court must "hold unlawful and set aside agency action" that is "not in accordance with law" or taken "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

303. Defendant DHS and its components are each an "agency" under the APA, 5 U.S.C. § 551(1), and the steps taken and decisions to promulgate and to implement the Unlawful Voter Initiative Policy and its components represent final agency action, *id*. § 551(13).

304. For the reasons stated in Count I, Defendants' conduct and threats as part of the Policy constitute unlawful intimidation against voters, in violation of Section 11(b) of the VRA.

305. Defendants' actions are therefore "not in accordance with law" and "in excess of statutory jurisdiction, authority, or limitations," and can be remedied under the APA.

**COUNT VI: Agency Action Contrary to Law and in Excess of Jurisdiction**

**APA – Violation of Section 11(b) of the VRA (Urging or Aiding Voters)**

306. All other allegations of this complaint are reasserted and incorporated into this cause of action.

307. Under the APA, a court must "hold unlawful and set aside agency action" that is "not in accordance with law" or taken "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

308. Defendant DHS and its components are each an "agency" under the APA, 5 U.S.C. § 551(1), and the steps taken and decisions to promulgate and to implement the Unlawful Voter Initiative Policy and its components represent final agency action, *id*. § 551(13).

309. For the reasons stated in Count II, Defendants' conduct and threats as part of that Policy constitute unlawful intimidation of those urging and aiding people to vote, in violation of Section 11(b) of the VRA.

310. Defendants' actions are therefore "not in accordance with law" and "in excess of statutory jurisdiction, authority, or limitations," and can be remedied under the APA.

**COUNT VII: Agency Action Contrary to Constitutional Right**

**Administrative Procedure Act – Violation of the Right to Vote**

311. All other allegations of this complaint are reasserted and incorporated into this cause of action.

312. The APA requires that a court set aside agency action that is "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

313. Defendant DHS and its subcomponents are each an "agency" under the APA, 5 U.S.C. § 551(1), and the steps taken and decisions to promulgate and to implement the Unlawful Voter Initiative Policy and its components represent final agency action, *id*. § 551(13).

314. For the reasons stated in Count III, the threat and the implementation of that Policy constitute encumbrances on the right to vote, without any sufficiently weighty or tailored countervailing interest, that violate the constitutional right to vote.

315. The Policy is therefore "contrary to constitutional right, power, privilege, or immunity," and can be remedied under the APA.

**COUNT VIII: Agency Action Contrary to Constitutional Limitation**

**Administrative Procedure Act – Violation of Separation of Powers and Federalism Principles**

316. All other allegations of this complaint are reasserted and incorporated into this cause of action.

317. The APA requires that a court set aside agency action that is "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

318. Defendant DHS and its subcomponents are each an "agency" under the APA, 5 U.S.C. § 551(1), and the steps taken and decisions to promulgate and to implement the Unlawful Voter Initiative Policy and its components represent final agency action, *id*. § 551(13).

319. For the reasons stated in Count IV, Defendants' Policy violates constitutional separation-of-powers and federalism principles and structural constitutional limitations under the Elections Clause, the Voter Qualifications Clause, and the Seventeenth Amendment.

320. The Policy is therefore "contrary to constitutional right, power, privilege, or immunity," and can be remedied under the APA.

**COUNT IX: Arbitrary and Capricious Agency Action**

**Administrative Procedure Act**

321. Under the APA, a court must set aside final agency action that is "arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A).

322. An agency action is "arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Manufacturers Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). An agency acts arbitrarily and capriciously if it fails "to assess whether there were reliance interests [at stake], determine whether they were significant, and weigh any such interests against competing policy considerations," including when the agency "changes course" from longstanding policies or operating procedures. *DHS v. Regents of the Univ. of California*, 591 U.S. 1, 30, 33 (2020).

323. Defendants' creation of its target list based on substantially defective source data, matching methodologies, procedures, trainings, *ad hoc* determinations, and lack of consistent criteria and guardrails represent arbitrary and capricious agency actions.

324. Defendants threatening to and in fact deploying and using DHS agents to intimidate voters and those assisting voters is arbitrary and capricious agency action because Defendants fail to

consider important aspects of the problem, disregard reliance interests, frustrates local governments' critical role and interest in the orderly and safe administration of elections, take action in a stark departure from prior and longstanding agency norms and operating procedures, disregard substantial flaws in agency sourcing and methodologies, and require taking actions that are far beyond the competencies and justifications that Defendants could invoke.

325. Defendants' arbitrary and capricious actions are subject to APA relief.

## PRAYER FOR RELIEF

326. To remedy these violations, Plaintiffs respectfully request that the Court:

(A) Declare that Defendants have engaged in conduct and threats in violation of Section 11(b) of the VRA, the constitutional right to vote, constitutional separation-of-powers and federalism limitations, and the APA protections against contrary-to-law and arbitrary-and-capricious agency action.

(B) Preliminarily and Permanently enjoin Defendants, and anyone acting on behalf of or in concert with Defendants, to cease the conduct and threats to use DHS agents to interfere with the midterm elections by intimidating U.S. citizen voters individuals or entities engaged in voter outreach and assistance, including but not limited to deploying DHS agents to the homes of U.S. citizens to interrogate them about voter eligibility.

(C) Issue an APA stay and/or vacatur of Defendants' unlawful Unlawful Voter Initiative Policy, including Defendants' Voter Eligibility Matching Policy and Field Operations Policy.

(D) Preliminarily and permanently enjoin Defendants from retaliating against any Plaintiff for participating in this lawsuit or taking any adverse action based on any Plaintiff's participation in this lawsuit;

(E) Award attorney's fees, costs, and expenses in accordance with law, including the Equal Access to Justice Act, 28 U.S.C. § 2412;

(F) Grant such other relief as this Court may deem just and proper.

DATED: September 18, 2026 Respectfully submitted,

By: _/s/ Beau Tremitiere_
BEAU C. TREMITIERE
Counsel
GEOFFREY CURFMAN*
Counsel
HAYDEN JOHNSON*
Counsel
ZACHARY WEST*
Counsel
JESSICA MARSDEN*
Counsel
ASHLEY FOX*
Counsel

Attorneys for Plaintiffs
CALIFORNIA NURSES ASSOCIATION,
NATIONAL NURSES UNITED, AND
VOTO LATINO FOUNDATION

DAVID CHIU
City Attorney
YVONNE R. MERÉ
Chief Deputy City Attorney
MOLLIE M. LEE
Chief of Strategic Advocacy
SARA J. EISENBERG
Chief of Complex and Affirmative Litigation
MICHAEL A. KEOUGH
Special Counsel
JOEL F. WACKS
Deputy City Attorney

By: _/s/ David Chiu_
DAVID CHIU
City Attorney

Attorneys for Plaintiff
CITY AND COUNTY OF SAN FRANCISCO

TONY LOPRESTI
County Counsel
KAVITA NARAYAN
Chief Assistant County Counsel
MEREDITH A. JOHNSON
Lead Deputy County Counsel
BILL NGUYEN
Deputy County Counsel

By: */s/ Tony LoPresti*
TONY LOPRESTI
County Counsel

Attorneys for Plaintiff
COUNTY OF SANTA CLARA

BENJAMIN R. FARLEY*
Counsel
IMANI FRANKLIN*
Counsel

Attorneys for Plaintiffs
CALIFORNIA NURSES ASSOCIATION,
NATIONAL NURSES UNITED, AND
VOTO LATINO FOUNDATION