**PROTECT DEMOCRACY PROJECT**
BEAU C. TREMITIERE, SBN 320074
300 Center Ave, Suite G-251
Superior, CO 80027
GEOFFREY CURFMAN* NY Bar No. 5809199
JESSICA MARSDEN* NY Bar No. 5316526
82 Nassau St., #601
New York, NY 10038
HAYDEN JOHNSON* DC Bar No. 1671830
ZACHARY WEST* NY Bar No. 5192257O
ASHLEY FOX* LA Bar No. 41748
2020 Pennsylvania Ave., N.W., Suite 163
Washington, D.C. 20006
Telephone: (202) 579-4582
Facsimile: (202) 769-3176
E-Mail:
beau.tremitiere@protectdemocracy.org
geoffrey.curfman@protectdemocracy.org
jess.marsden@protectdemocracy.org
hayden.johnson@protectdemcracy.org
zachary.west@protectdemocracy.org
ashley.fox@protectdemocracy.org

**NATIONAL IMMIGRATION LAW CENTER**
BENJAMIN R. FARLEY* DC Bar No. 90042585
IMANI FRANKLIN* DC Bar No. 90006160
PO Box 34573
Washington, D.C. 20043
Telephone: (213) 639-3900
Facsimile: (202) 738-9128
E-mail: farley@nilc.org
franklin@nilc.org

Attorneys for Plaintiffs
CALIFORNIA NURSES ASSOCIATION, NATIONAL NURSES UNITED, and VOTO LATINO FOUNDATION

**CITY AND COUNTY OF SAN FRANCISCO**
DAVID CHIU, SBN 189542
City Attorney
YVONNE R. MERÉ, SBN 173594
Chief Deputy City Attorney
MOLLIE M. LEE, SBN 251404
Chief of Strategic Advocacy
SARA J. EISENBERG, SBN 269303
Chief of Complex and Affirmative Litigation
MICHAEL A. KEOUGH, SBN 327037
Special Counsel
JOEL F. WACKS, SBN 326561
Deputy City Attorney
Fox Plaza, 1390 Market Street, 7th Floor
San Francisco, California 94102-5408
Telephone: (415) 554-4700
Facsimile: (415) 437-4644
E-Mail:
Michael.Keough@sfcityatty.org
Joel.Wacks@sfcityatty.org

Attorneys for Plaintiff
CITY AND COUNTY OF SAN FRANCISCO

**COUNTY OF SANTA CLARA**
TONY LOPRESTI, SBN 289269
County Counsel
KAVITA NARAYAN, SBN 264191
Chief Assistant County Counsel
MEREDITH A. JOHNSON, SBN 291018
Lead Deputy County Counsel
BILL NGUYEN, SBN 333671
Deputy County Counsel
70 W. Hedding Street, East Wing, 9th Floor
San José, CA 95110
Telephone: (408) 299-5900
Facsimile: (408) 292-7240
E-Mail: bill.nguyen@cco.sccgov.org

Attorneys for Plaintiff
COUNTY OF SANTA CLARA

**Pro Hac Vice Application Forthcoming*

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

CALIFORNIA NURSES ASSOCIATION; NATIONAL NURSES UNITED; CITY AND COUNTY OF SAN FRANCISCO; COUNTY

Case No. 3:26-cv-10680

OF SANTA CLARA; and VOTO LATINO FOUNDATION,

Plaintiffs,

v.

MARKWAYNE MULLIN, in his official capacity as Secretary of Homeland Security; UNITED STATES DEPARTMENT OF HOMELAND SECURITY; UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES; JOSEPH B. EDLOW, in his official capacity as Director of United States Citizenship and Immigration Services; UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT; DAVID J. VENTURELLA, in his official capacity as Senior Official Performing the Duties of the Director of the United States Immigration and Customs Enforcement; ANTHONY SALISBURY, in his official capacity as Executive Associate Director of Homeland Security Investigations and the Principal Deputy Homeland Security Adviser to the White House; UNITED STATES CUSTOMS AND BORDER PROTECTION; RODNEY S. SCOTT, in his official capacity as Commissioner of United States Customs and Border Protection; and THOMAS HOMAN, in his official capacity as Assistant to the President and Border Czar,

Defendants.

**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR APA STAY AND PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**

Hearing Date: October 29, 2026
Time: 10:00am
Before: Hon. Thomas S. Hixson

## TABLE OF CONTENTS


TABLE OF AUTHORITES .......... ii

NOTICE OF MOTION AND MOTION .......... 1

MEMORANDUM OF POINTS AND AUTHORITIES .......... 2

INTRODUCTION .......... 2

BACKGROUND .......... 3

- I. The Trump Administration's False Claims of Noncitizen Voting .......... 3
- II. DHS's "Unlawful Voter Initiative" Policy .......... 4
  - A. The Field Operations Policy Implementing the Unlawful Voter Initiative Policy .......... 4
  - B. The Voter Eligibility Matching Policy Implementing the Unlawful Voter Initiative Policy .......... 6
- III. The Policy's Intimidating Effects on Plaintiffs and Eligible U.S. Citizen Voters .......... 8

LEGAL STANDARD .......... 9

ARGUMENT .......... 9

- I. Plaintiffs Are Likely to Succeed on the Merits .......... 9
  - A. Plaintiffs Have Standing .......... 9
  - B. Defendants' Policy and Conduct Violate Section 11(b) and the Right to Vote .......... 10
  - C. Defendants' Policy is Arbitrary and Capricious .......... 14
  - D. The Policy is "final agency action" Under the APA .......... 16
  - E. The Policy is Not a Matter "committed to agency discretion" Under the APA .......... 18
  - F. Judicial Authority to Enjoin Unlawful Investigations Like These is Well-Established .......... 19
- II. Plaintiffs Will Continue to Suffer Irreparable Harm Absent Preliminary Relief .......... 20
- III. The Balance of the Equities and Public Interest Clearly Favor Preliminary Relief .......... 22

CONCLUSION .......... 23

# TABLE OF AUTHORITES

**Cases**

*American Encore v. Fontes*, 152 F.4th 1097 (9th Cir. 2025) ... 21, 22

*Anderson v. Celebrezze*, 460 U.S. 780 (1983) ... 12, 13

*Arizona Alliance for Retired Americans v. Clean Elections USA*, 638 F. Supp. 3d 1033 (D. Ariz. Oct. 28, 2022) ... 11

*Arizona Alliance for Retired Americans v. Mayes*, 186 F.4th 622 (Aug. 7, 2026) ... 9, 10

*ASSE International, Inc. v. Kerry*, 803 F.3d 1059 (9th Cir. 2015) ... 18

*Bennett v. Spear*, 520 U.S. 154 (1997) ... 17

*Burdick v. Takushi*, 504 U.S. 428 (1992) ... 13, 22

*Center for Biological Diversity v. EPA*, 141 F.4th 153 (D.C. Cir. 2025) ... 15

*Center for Taxpayer Rights v. Internal Revenue Service*, No. 26-5006, 2026 WL 2635380 (D.C. Cir. Sep. 8, 2026) ... 17

*City & County of San Francisco v. Trump*, 783 F. Supp. 3d 1148 (N.D. Cal. 2025) ... 21

*City & County of San Francisco v. Trump*, No. 25-3889 (9th Cir. June 23, 2025) ... 22

*City & County of San Francisco v. Whitaker*, 357 F. Supp. 3d 931 (N.D. Cal. 2018) ... 10

*City of Sausalito v. O'Neill*, 386 F.3d 1186 (9th Cir. 2004) ... 10

*Colorado Montana Wyoming State Area Conference of NAACP v. Smith*, 180 F.4th 1266 (10th Cir. 2026) ... 10

*Colorado Montana Wyoming State Area Conference of NAACP v. U.S. Election Integrity Plan*, 653 F. Supp. 3d 861 (D. Colo. 2023) ... 11

*Colorado v. DeJoy*, 487 F. Supp. 3d 1061 (D. Colo. 2020) ... 22

*Cottonwood Environmental Law Center v. United States Forest Service*, 789 F.3d 1075 (9th Cir. 2015) ... 20

*Cuviello v. City of Vallejo*,
944 F.3d 816 (9th Cir. 2019) .... 21

*Deaver v. Seymour*,
822 F.2d 66 (D.C. Cir. 1987) .... 20

*DSCC v. Trump*,
No. 26-cv-01114 (CJN), 2026 WL 2681471 (D.D.C. Sep. 13, 2026) .... 23

*Garro Pinchi v. Noem*,
813 F. Supp. 3d 973 (N.D. Cal. 2025) .... 17, 19

*Harper v. Virginia State Board of Elections*,
383 U.S. 663 (1966) .... 12, 20

*Immigrant Legal Resource Center v. Wolf*,
491 F. Supp. 3d 520 (N.D. Cal. 2020) .... 9

*Jajati v. United States Customs & Border Protection*,
102 F.4th 1011 (9th Cir. 2024) .... 19

*Johnson Trustee of Charley E. Johnson Revocable Living Trust v. United States*,
145 F.4th 1158 (9th Cir. 2024) .... 18

*Jolt Initiative, Inc. v. Paxton*,
821 F. Supp. 3d 706 (W.D. Tex. 2026) .... 20, 23

*Juluke v. Hodel*,
811 F.2d 1553 (D.C. Cir. 1987) .... 20

*Kennedy v. Meta Platforms, Inc.*,
No. 3:24-cv-02869, 2024 WL 4031486 (N.D. Cal. Sep. 3, 2024) .... 11

*Krabach v. King County*,
No. 2:22-cv-1252, 2023 WL 7018431 (W.D. Wash. Oct. 25, 2023) .... 11

*Lair v. Bullock*,
697 F.3d 1200 (9th Cir. 2012) .... 22

*Lands Council v. Powell*,
395 F.3d 1019 (9th Cir. 2005) .... 14

*League of Women Voters of the United States v. Newby*,
838 F.3d 1 (D.C. Cir. 2016) .... 22

*League of Women Voters v. Trump*,
No. 1:26-cv-11548-IT, 2026 WL 2322705 (D. Mass. Aug. 11, 2026) .... 23

*League of Women Voters v. United States Department of Homeland Security*,
2026 WL 2643439 (D.C. Cir. 2026) .... 3

*League of Women Voters v. United States Department of Homeland Security*,
835 F. Supp. 3d 79 (D.D.C. 2026) .... 3, 6, 15

*LULAC v. Public Integrity Legal Foundation*,
No. 1:18-cv-00423, 2018 WL 3848404 (E.D. Va. Aug. 13, 2018) .......... 11

*Mecinas v. Hobbs*,
30 F.4th 890 (9th Cir. 2022) .......... 9

*Mi Familia Vota v. Fontes*,
129 F.4th 691 (9th Cir. 2025) .......... 10

*Michigan v. DeVos*,
481 F. Supp. 3d 984 (N.D. Cal. 2020) .......... 21

*National Coalition on Black Civic Participation v. Wohl*,
512 F. Supp. 3d 500 (S.D.N.Y. 2021) .......... 11, 12, 21

*Novedades Y Servicios v. Financial Crimes Enforcement Network*,
181 F.4th 961 (9th Cir. 2026) .......... 22

*Olagues v. Russoniello*,
484 U.S. 806 (1987) .......... 20

*Olagues v. Russoniello*,
797 F.2d 1511 (9th Cir. 1986) .......... 20

*Oregon Natural Desert Association v. United States Forest Service*,
465 F.3d 977 (9th Cir. 2006) .......... 18

*Perez Perez v. Wolf*,
943 F.3d 853 (9th Cir. 2019) .......... 18

*Prutehi Litekyan: Save Ritidian v. United States Department of Air Force*,
128 F.4th 1089 (9th Cir. 2025) .......... 16, 17, 18

*Roman v. Wolf*,
977 F.3d 935 (9th Cir. 2020) .......... 9, 22

*San Francisco Herring Association v. United States Department of Interior*,
946 F.3d 564 (9th Cir. 2019) .......... 17

*Smith v. Meese*,
821 F.2d 1484 (11th Cir. 1987) .......... 19, 20

*Stolt-Nielsen, S.A. v. United States*,
442 F.3d 177 (3d Cir. 2006) .......... 19

*Trout Unlimited v. Pirzadeh*,
1 F.4th 738 (9th Cir. 2021) .......... 18

*United States Postal Service v. California*,
No. 26A305, 2026 WL 2687160 (U.S. Sep. 14, 2026) .......... 23

*United States v. Clark*,
249 F. Supp. 720 (S.D. Ala. 1965) .......... 11, 19

*United States v. McLeod*,
385 F.2d 734 (5th Cir. 1967) ........ 11, 19

*United States v. Simon*,
No. 25-cv-3761, 2026 WL 2389778 (D. Minn. Aug. 17, 2026) ........ 3

*United States v. Tan Duc Nguyen*,
673 F.3d 1259 (9th Cir. 2012) ........ 11

*United States v. Weber*,
816 F.Supp.3d 1168 (C.D. Cal. 2026) ........ 13, 23

*United States v. Wood*,
295 F.2d 772 (5th Cir. 1961) ........ 11, 19

*Winter v. Natural Resource Defense Council, Inc.*,
555 U.S. 7 (2008) ........ 9, 20, 22

**Constitutional Provisions**

U.S. Constitution, art. I, § 4, cl. 1 ........ 21, 22

**Statutes**

5 U.S.C. § 551 ........ 16

5 U.S.C. § 704 ........ 16

5 U.S.C. § 705 ........ 1

5 U.S.C. § 706 ........ 14

52 U.S.C. § 10307 ........ 10, 18

Cal. Elec. Code § 320 ........ 21, 22

**Rules**

Civil Local Rule 65-2 ........ 1

Fed R. Civ. P. 65 ........ 1

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that on October 29, 2026, or as soon thereafter as may be heard[1] before the Honorable Thomas S. Hixson in Courtroom E – 15th Floor of the United States District Court for the Northern District of California, located at San Francisco, CA, CA, all Plaintiffs will and hereby do move the Court pursuant to this Court's authority under section 705 of the Administrative Procedure Act ("APA"), 5 U.S.C. § 705; Rule 65 of the Federal Rules of Civil Procedure; and Rule 65-2 of the Civil Local Rules, for an APA stay and preliminary injunction against Defendants: Markwayne Mullin, in his official capacity as Secretary of Homeland Security; U.S. Department of Homeland Security; U.S. Citizenship and Immigration Services; Joseph B. Edlow, in his official capacity as Director of U.S. Citizenship and Immigration Services; U.S. Immigration and Customs Enforcement; David J. Venturella, in his official capacity as Senior Official Performing the Duties of the Director of the U.S. Immigration and Customs Enforcement; Anthony Salisbury, in his official capacity as Executive Associate Director of Homeland Security Investigations and the Principal Deputy Homeland Security Adviser to the White House; U.S. Customs and Border Protection; Rodney S. Scott, in his official capacity as Commissioner of U.S. Customs and Border Protection; and Thomas Homan, in his official capacity as Assistant to the President and Border Czar. Plaintiffs respectfully move this Court to issue an order before October 5, 2026 staying and enjoining execution of the Unlawful Voter Initiative Policy by Defendants and their officers, agents, assigns, and all persons acting in concert with them.

This Motion presents the following issues to be decided: (1) whether Plaintiffs have shown a likelihood of success on the merits of their claims that Defendants' Policy, threats, and conduct violate Section 11(b) of the Voting Rights Act (Counts I–II) and the fundamental right to vote (Count III); (2) whether Plaintiffs have shown a likelihood of success on the merits of their claims that Defendants' Policy violates the APA as "not in accordance with law"; "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right"; and "contrary to constitutional right"

[1] Plaintiffs are concurrently moving to shorten time since relief is needed urgently, and no later than October 5, 2026.

arising from the statutory and constitutional violations (Counts V–VII); (3) whether Plaintiffs have shown a likelihood of success on the merits of their claims that Defendants' Policy violates the APA as arbitrary and capricious agency action; (4) whether Plaintiffs face a likelihood of irreparable harm in the absence of preliminary relief; and (5) whether the balance of equities and public interest favor preliminary relief.

Plaintiffs' Motion is based on this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, the accompanying declarations and exhibits thereto, the Complaint, as well as the papers, evidence, and records, and any other written or oral evidence or argument as may be presented at or before the time this Motion is heard by the Court.

## MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION

The Department of Homeland Security ("DHS") is engaged in unlawful voter intimidation. With electoral activity at its height going into the midterms, DHS has been amassing private or defective data on Americans and creating target lists that the agency knows include U.S. citizens, especially naturalized citizens. DHS has been deploying armed agents, often clad in tactical gear and accompanied by propagandizing media teams, to interrogate listed targets about their voter eligibility in their homes and at vehicle stops. These operations are well underway in California and elsewhere, and DHS has directed its agents to "surge" them in the coming weeks. This conduct is paradigmatic voter intimidation. It is occurring pursuant to what DHS calls its "Unlawful Voter Initiative," which has two core implementing policy components: (1) creating faulty target lists and (2) operationalizing those lists by conducting field operations at least through mid-October—immediately before and during early voting.

Preliminary relief is necessary to halt this unlawful attack on elections and the harms it is already inflicting on Plaintiffs—labor unions, a voter education and assistance organization, and local governments—and their U.S. citizen members and constituents. In a concurrently filed motion, Plaintiffs are also seeking expedited production of the Administrative Record and limited extra-record discovery. While preliminary relief is warranted on the known facts, the Court should order expedited

production to confirm and illuminate the details and extent of DHS's unlawful Policy, including current field operations targeting or involving U.S. citizens.

**BACKGROUND**

**I. The Trump Administration's False Claims of Noncitizen Voting**

President Donald Trump has engaged in an unrelenting, years-long campaign to cast doubt on American elections by claiming, contrary to all available evidence, that there is widespread unlawful voting by non-U.S. citizens. Ex. G, Tremitiere Decl., Exs. 32, 33, 35, 41. Since retaking office, he has enlisted the entire federal government in that campaign—a usurpation of the Constitution's clear assignment of responsibility for holding elections to states and local administrators or, in certain respects, to Congress. Tremitiere Decl., Exs. 1, 16, 21, 31, 43, 44. Over the past 18 months, the Administration has sought to force states to check their voter rolls against an unreliable DHS database, called SAVE; to require documentary proof of citizenship as part of voter registration; and to turn over their voter files to the Department of Justice ("DOJ"). Tremitiere Decl., Exs. 18, 19, 20.

Those efforts have been almost entirely unsuccessful: Congress refused to require states to use the SAVE database or to adopt a proof-of-citizenship requirement, and courts have uniformly rejected the Administration's efforts to take over voter registration maintenance and force access to confidential voter files. *See, e.g.*, *League of Women Voters v. U.S. Dep't of Homeland Sec.*, 835 F. Supp. 3d 79, 95 (D.D.C. 2026), *stay pending appeal denied*, 2026 WL 2643439 (D.C. Cir. 2026); *United States v. Simon*, No. 25-cv-3761, 2026 WL 2389778, at *1 (D. Minn. Aug. 17, 2026) (collecting cases); Tremitiere Decl., Ex. 21.

Moreover, when put to the test, the Administration's claims of noncitizen voting have collapsed. For example, in July, DHS publicized a claim that Nevada had 16,000 noncitizens on its registration rolls; a month later, DHS revealed it had identified only 185 such individuals, and the agency has reportedly refused to disclose even those names to state election officials. Tremitiere Decl., Ex. 68. Nevertheless, the Administration's fixation on unsubstantiated claims of widespread noncitizen voting has only intensified as the midterm elections approach, and as voter registration and outreach efforts reach their peak. Tremitiere Decl., Exs. 33, 34, 35.

## II. DHS's "Unlawful Voter Initiative" Policy

DHS, specifically the Immigration and Customs Enforcement's Homeland Security Investigations (HSI) unit, has taken an increasingly central role in the Administration's attempts to substantiate its falsehoods about widespread voter fraud. Tremitiere Decl., Ex. 21. In doing so, DHS has finalized its Unlawful Voter Initiative—an agency Policy consisting of a series of publicly reported memoranda, directives, agency statements, and patterns of conduct (hereafter often shorthanded as "Policy"). In bypassing APA procedures and rulemaking, DHS has concealed the contours of the Policy. Nevertheless, public reporting and a Whistleblower Disclosure published on September 14 have revealed some aspects of the Policy.[2]

In February 2026, HSI agents were directed to prioritize open *and closed* cases involving alleged unlawful voting by non-U.S. citizens or recently naturalized citizens. Tremitiere Decl., Ex. 23. In June, HSI was ordered to arrest and deport alleged non-U.S. citizens believed to have improperly registered or voted, whether criminally convicted or not. Tremitiere Decl., Ex. 27. In August, HSI was ordered to coordinate with agents of U.S. Citizenship and Immigration Services (USCIS) to use faulty data to generate target lists. Tremitiere Decl., Exs. 1 at 2; Ex. 20; Ex. 28. Reportedly starting in September, HSI agents have been directed to prioritize field operations questioning people about their voter eligibility, as described below. Ahead of the public reporting about this surge in HSI's elections-focused operations, Defendant Secretary Mullin announced that DHS is reassigning agents to "be proactively looking at early voting" and the agency "will pursue maximum pressure on this." *See id.*, Ex. 48 at 11:38–12:45.

### A. The Field Operations Policy Implementing the Unlawful Voter Initiative Policy

A core implementation of DHS's Unlawful Voter Initiative Policy is a directive to HSI field offices to interrogate individuals about their voter eligibility—what Plaintiffs title the Field Operations Policy. Tremitiere Decl., Exs. 3, 4. On September 1, 2026, DHS issued internal directives (the "Surge Initiative Guidance") implementing the Policy and instructing HSI agents to surge the

---

[2] Expedited production of the Administrative Record and discovery will further uncover DHS's implementation of the Policy.

elections-related field operations through at least mid-October and in at least nine reported states: California, Connecticut, Georgia, Missouri, Nevada, New York, Pennsylvania, Washington, and Wisconsin. Tremitiere Decl., Exs. 3, 4. This means DHS agents are and will be on the streets interrogating people, including U.S. citizens, at the height of voter registration and civic engagement, and amid early voting that is underway in some targeted states and that begins on October 5 in California. *Id.*, Exs. 5, 6, 7, 8, 9, 10, 11.

Directing HSI agents to be in the field inquiring about voter eligibility is historically aberrant; HSI has typically focused on transnational crime and national security. *Id.*, Exs. 4, 17, 20, 21. In the past, federal investigators responsible for these issues were directed to "not engage in overt criminal investigative measures in matters involving alleged ballot fraud until the election in question has been concluded" because "[d]oing otherwise runs the risk of chilling legitimate voting and campaign activities." *Id.*, Exs. 4, 45; *accord id.* Exs. 40, 46 at 84 (2017 DOJ Election Offenses Manual), 47 at 91 (2007 Election Offenses Manual). DHS was also never before provided access to confidential information about American voters, the legality of which DOJ's Office of Legal Counsel said is "an admittedly closer question" in its memorandum offering legal support for the changed policy justifying DHS's dragnet investigations. *Id.*, Ex. 25 at 37.

Today, the Field Operations Policy is in full effect: armed HSI agents are turning up in neighborhoods, knocking on doors, and asking residents if they are eligible to vote. Tremitiere Decl., Exs. 12–15, 36, 37. DHS and HSI field offices have posted photos and videos of these encounters on social media to promote the Field Operations Policy. *Id*. In these posts, armed HSI agents—often in tactical gear and trailed by a film crew—can be seen interrogating individuals at their homes and in their cars while investigating supposed voter fraud—a nonviolent and often unintentional offense in the rare instances when it does occur. *Id*.

Absent this court's intervention, these field operations are expected to continue over the coming weeks as voting starts and the election nears. Tremitiere Decl., Ex. 29, 30. According to statements made by Defendant Mullin after this lawsuit was filed, the agency is currently investigating 1,620 cases of purported noncitizen voting and has an additional 300,000 cases "that [they]'re looking into—and that list grows every single day." Tremitiere Decl., Ex. 80 at 1:23–1:37.

**B. The Voter Eligibility Matching Policy Implementing the Unlawful Voter Initiative Policy**

A preceding step to implement the Unlawful Voter Initiative Policy is a joint endeavor by HSI and USCIS, under what Plaintiffs title the Voter Eligibility Matching Policy, to identify alleged unlawful voters based on unreliable information systems and data-matching mechanisms. Tremitiere Decl., Ex. 1 at 1; *see* Ex. F, Expert Report of Dr. Jacob Grumbach, at 2 (summarizing data sourcing and matching flaws). A Whistleblower Disclosure published on September 14 details how this Policy consists of three steps, each of which introduces errors that will subject eligible voters to privacy intrusions, intimidation, and harassment. Tremitiere Decl., Ex. 2 at 18.

***First***, DHS generates a presumptive list of people believed to have voted or registered to vote as noncitizens using an error-riddled compilation of names and purported voter registration and voting dates derived from an obscured hodgepodge of government sources. Tremitiere Decl., Ex. 2 at 23; Ex. 24. One of those sources is the "Systematic Alien Verification for Entitlements" ("SAVE") system, which, even according to DHS, often inaccurately reports individual citizenship status. Tremitiere Decl., Ex. 2 at 3, 18; Exs. 18–20; *League of Women Voters*, 835 F. Supp. 3d at 101, 112 (DHS was aware that "shortfalls in data accuracy" in SAVE information "could cause incomplete or false results"). When election officials have previously used SAVE to remove voters they suspected were registered unlawfully, they have reported error rates up to 81%. Tremitiere Decl., Ex. 19. DHS has also told employees that when data is not available it is filled in using "supplemental magic." Tremitiere Decl., Ex. 2 at 23. It remains obscured what voter registration data DHS is using, but the Whistleblower Disclosure indicates that at least some information is coming from the DOJ. *Id.* at 22. Regardless of DHS's amalgamation of sources, the reality remains that there is no authoritative national citizenship or voter registration database to use in the manner DHS attempts here; any sources it draws from will have significant flaws. *See* Grumbach Expert Rep. 5–8.

***Second***, DHS agents attempt to match records from the presumptive list of supposed noncitizen voters with information in state voter files. Tremitiere Decl., Ex. 2 at 26–32. To do this, DHS agents have been directed to log into voter portals designed for state residents to check their own registration status. Tremitiere Decl., Ex. 1 at 1–2. Even in cases where a voter registration portal

user must attest they are the registrant themself, the Office of Chief Counsel at DHS has advised agents to proceed by falsely attesting they are the registrant. Tremitiere Decl., Ex. 2 at 16. In some cases, they log in using only the voter's name and birthdate—a matching protocol that is highly likely to lead to many false positives because it is common for two people to share the same name or birthday. *Id*. at 23; Ex. 26; Grumbach Expert Rep. 8–11. DHS knows this: according to the Whistleblower Disclosure, an August 21 training video for DHS employees acknowledges, "It's not perfect. So during your reviews, you will identify citizens." Tremitiere Decl., Ex. 2 at 29. DHS also instructs its agents to disregard certain exculpatory information in state voter portals—for instance, evidence that a voter did not register until after they were naturalized. *Id*. at 19, 26–28. DHS employees operate under quotas—at least five reviews per hour, for a total of at least forty per day—that give them an average of 12 minutes to complete each review. Tremitiere Decl., Ex. 2 at 2.

***Third***, unless a DHS employee is able to rule out the possibility that a target registered or voted unlawfully, they are required to create a record on that person in the DHS TECS system. Tremitiere Decl., Ex. 2 at 24. TECS records prompt further law enforcement follow-ups, including field operations by HSI agents implementing the Policy. Tremitiere Decl., Ex. 1 at 1, 3. According to the DHS whistleblower, TECS records have been created against U.S. citizens. Tremitiere Decl., Ex. 2 at 3. The impact of an erroneous TECS record is enormous: in addition to triggering further investigation by HSI, the records "can be used against [an individual] in any interaction they may have with the federal government, such as crossing the border during travel or seeking a benefit." *Id*., Ex. 2 at 3.

Moreover, DHS has instructed its agents *to specifically target naturalized citizens*, using its flawed data and matching to determine that a person registered to vote before becoming a U.S. citizen. *Id.*, Ex. 2, at 26–30.

Taken together, the voter eligibility matching and the field operations components of DHS's Policy all but ensure that U.S. citizens will be subject to intrusive investigations and harassment at the height of electoral activity, based on erroneous data and flawed matching procedures. Tremitiere Decl., Ex. 2 at 1–3; Ex. 21.

**III. The Policy's Intimidating Effects on Plaintiffs and Eligible U.S. Citizen Voters**

The Administration's Unlawful Voter Initiative Policy, and its ongoing threats and coercive conduct, have intimidated U.S. citizen voters and individuals and organizations that support, encourage, or mobilize citizens to participate in U.S. elections. Plaintiffs in this case are labor unions representing U.S. citizen members, local governments administering elections and conducting voter outreach programs, and the country's largest Latino-focused voter services organization that assists and educates eligible voters. Each of them has seen firsthand how DHS's Unlawful Voter Initiative Policy is causing fear and changing electoral participation, particularly in communities with large populations of naturalized citizens.

Members of the California Nurses Association and National Nurses United (together, "CNA/NNU"), particularly naturalized citizens, are fearful of coercive confrontations with DHS agents related to their electoral participation. Because of this fear, they have changed their voting plans and reduced their participation in civic-engagement activities, such as serving as poll monitors, to lessen their risk of being subjected to DHS's field operations. *See* Ex. A, Declaration of Bradley Van Waus.

Voto Latino, the nation's largest Latino voter registration organization, has drastically cut its voter-engagement activities because its constituents fear that participating in voter mobilization will subject them to targeting by DHS. Voter-engagement activities that have gone forward have seen a stark drop in attendance due to fears of DHS presence. *See* Ex. E, Declaration of Beatriz Lopez.

Both the City and County of San Francisco and the County of Santa Clara (together, "Local Government Plaintiffs") have large populations of naturalized U.S. citizens—over 400,000 of Santa Clara's total population of 1.9 million, and over 175,000 of San Francisco's total population of about 800,000—who are at heightened risk from the Unlawful Voter Initiative. Local Government Plaintiffs expect to expend additional resources on training and voter outreach and education to address voter intimidation caused by DHS's operations, which threaten to erode community trust in the elections they administer. *See* Ex. B, Declaration of Executive Director of the San Francisco Office of Civil Engagement and Immigrant Affairs Jorge Rivas; Ex. C, Declaration of San Francisco Elections Director John Arntz; Ex. D, Declaration of Santa Clara County Registrar of Voters Matt Moreles.

Plaintiffs filed this lawsuit to put a halt to the Administration's intimidation scheme and ensure that all U.S. citizens can vote this year free from fear and coercion.

## LEGAL STANDARD

A preliminary injunction is warranted when the moving party establishes (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm absent preliminary relief; and (3) the balance of equities and public interest support an injunction. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The same standard applies to a stay under section 705 of the APA. *Immigrant Legal Res. Ctr. v. Wolf*, 491 F. Supp. 3d 520, 529 (N.D. Cal. 2020). In the Ninth Circuit, courts evaluate these factors on a "sliding scale," such that "where the balance of hardships . . . tips sharply towards the plaintiff, a plaintiff need only show serious questions going to the merits, rather than likelihood of success on the merits, to warrant preliminary injunctive relief." *Roman v. Wolf*, 977 F.3d 935, 941 (9th Cir. 2020) (citation modified).

## ARGUMENT

Plaintiffs seek preliminary relief on their claims that the Policy violates Section 11(b) of the Voting Rights Act by intimidating eligible voters and those engaged in voter mobilization, advocacy, education, and monitoring; the fundamental right to vote; and the APA because the agency action is contrary to law, unconstitutional, and arbitrary and capricious. Plaintiffs are entitled to a stay and preliminary injunction because all factors weigh in their favor.

### I. Plaintiffs Are Likely to Succeed on the Merits

The following sections explain why Plaintiffs have standing to pursue this preliminary relief; the various ways in which the Policy is unlawful; how the APA's requirements for judicial relief are satisfied; and why principles that caution against staying or enjoining some types of criminal investigations do not apply here.

#### A. Plaintiffs Have Standing

The Court need only find that one Plaintiff has standing to proceed to the merits. *See Mecinas v. Hobbs*, 30 F.4th 890, 897 (9th Cir. 2022). Here, Defendants have imposed or will impose numerous forms of "concrete, particularized, and actual or imminent" injuries on Plaintiffs. *Ariz. All. for Retired Ams. v. Mayes*, 186 F.4th 622, 631 (Aug. 7, 2026). As a non-exhaustive list, Plaintiffs experience or

will imminently face chilling effects from the fear that Defendants create; circumscribed electoral participation; intrusions upon their privacy interests; pecuniary harms to local governments; and immediate barriers to Plaintiffs' direct voter outreach and assistance services. *See* Exs. A–F. These injuries are "fairly traceable" to Defendants' Policy, threats, and conduct, and preliminary relief would mitigate further injury. *See Mayes*, 186 F.4th at 640.

CNA/NNU further satisfy the three requirements for associational standing to sue on behalf of their members. *See Mi Familia Vota v. Fontes*, 129 F.4th 691, 708 (9th Cir. 2025). Voto Latino satisfies the requirements for organizational standing because Defendants' voter intimidation scheme has "directly affected and interfered with" their "core business activities." *Colo. Mont. Wyo. State Area Conf. of NAACP v. Smith*, 180 F.4th 1266, 1275 (10th Cir. 2026). And Local Government Plaintiffs have standing to sue to vindicate their own "proprietary interests to the full extent of" protecting their "'responsibilities, powers, and assets.'" *City & Cnty. of San Francisco v. Whitaker*, 357 F. Supp. 3d 931, 944 (N.D. Cal. 2018) (quoting *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1197 (9th Cir. 2004)).

**B. Defendants' Policy and Conduct Violate Section 11(b) and the Right to Vote**

Plaintiffs are likely to prevail on their claims that Defendants' Unlawful Voter Initiative violates Section 11(b) and the fundamental right to vote. Plaintiffs challenge the Policy under the APA and, independently, Defendants' threats and conduct as part of their standalone statutory and constitutional voting rights claims.

**1. Defendants' Intimidation Scheme Violates Section 11(b) of the VRA**

Defendants' reported surveillance, propagandized threats, and door-knocking interrogations unlawfully (1) put Plaintiffs (and the U.S. citizens they serve and represent) in reasonable fear and deter their participation in elections, and (2) interfere with their ability to support voters and to conduct elections. In both ways, Defendants likely violate Section 11(b).

Section 11(b) states: "No person, whether acting under color of law or otherwise, shall intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for voting or attempting to vote," or "for urging or aiding any person to vote or attempt to vote." 52 U.S.C. § 10307(b). The language "is broad and protects both the right to vote and the right to urge others to

vote." *Kennedy v. Meta Platforms, Inc.*, No. 3:24-cv-02869, 2024 WL 4031486, at *6 (N.D. Cal. Sep. 3, 2024). It prevents "threat of injury tending to deter individuals from exercising their voting rights." *Krabach v. King Cnty.*, No. 2:22-cv-1252, 2023 WL 7018431, at *6 (W.D. Wash. Oct. 25, 2023). Unlawful intimidation includes "[a]ctions or communications that inspire fear of . . . legal repercussions, privacy violations, and even surveillance." *Ariz. All. for Retired Ams. v. Clean Elections USA*, 638 F. Supp. 3d 1033, 1041 (D. Ariz. Oct. 28, 2022) ("*AARA*").[3] The statute applies "regardless of whether defendants acted with the specific intent" to intimidate, *see id.*, and of whether the conduct "successfully prevents a person from voting." *Nat'l Coal. on Black Civic Participation v. Wohl*, 512 F. Supp. 3d 500, 516 (S.D.N.Y. 2021).

Most relevant here, wrongfully identifying a person as a non-U.S. citizen and threatening them constitutes voter intimidation. *E.g.*, *LULAC v. Pub. Int. Legal Found.*, No. 1:18-cv-00423, 2018 WL 3848404, at *3–4 (E.D. Va. Aug. 13, 2018); *United States v. Tan Duc Nguyen*, 673 F.3d 1259, 1264–66 (9th Cir. 2012). A door-knocking campaign that threatens voters with interrogations about their voter eligibility also violates section 11(b). *See Colo. Mont. Wyo. State Area Conf. of NAACP v. U.S. Election Integrity Plan*, 653 F. Supp. 3d 861, 870 (D. Colo. 2023). And under a separate more stringent voter intimidation statute—section 131(b) of the Civil Rights Act—numerous courts during the 1960s Civil Rights Era enjoined campaigns of harassing investigations and prosecutions of voters by state and local police. *See United States v. McLeod*, 385 F.2d 734, 740–41 (5th Cir. 1967); *United States v. Wood*, 295 F.2d 772, 781–82 (5th Cir. 1961); *United States v. Clark*, 249 F. Supp. 720, 725 (S.D. Ala. 1965) (three-judge court).

Defendants' Policy, threats, and conduct would make a reasonable person, including Plaintiffs' members and the constituents they serve and represent, fearful about participating in elections. Defendants have amassed significant purported information about individuals that is private and often defective. *See, e.g.*, Tremitiere Decl., Ex. 2 at 17; Grumbach Expert Rep. 5–8. The

[3] The *AARA* court first denied preliminary relief, but held further proceedings and then entered a consent injunction based on a more developed record to prevent an armed voter-intimidation scheme in the vicinity of dropboxes. 2022 WL 17088041, at *1 (D. Ariz. Nov. 1, 2022). After the election, the Ninth Circuit vacated for mootness. *See* 2023 WL 1097766 (9th Cir. 2023).

Whistleblower Disclosure reveals that Defendants' source information, and the matching procedures Defendants use to eliminate individuals from the presumptive list of targets, are fatally flawed and exceedingly likely to wrongly include U.S. citizens. *See* Tremitiere Decl., Ex. 2 at 23, 29. Especially alarming is a disclosed part of Defendants' Policy that *directly targets naturalized U.S. citizens* based on DHS's faulty information. *See id.*, Ex. 2 at 26–28; Ex. 21. DHS has reportedly intruded on the privacy of thousands of individuals in its data collection. *See id.*, Ex. 1 at 1. And then Defendants have deployed armed agents, often in tactical gear and with cameras ready, to interrogate individuals at residential doorsteps or in vehicle stops. *See, e.g.*, *id.*, Ex. 12, 14–15, 36–38.

Plaintiffs are likely to establish that these operations deter and chill electoral participation in violation of section 11(b). As CNA/NNU describe, U.S. citizen members, particularly naturalized citizens, are fearful of coercive confrontations with DHS agents related to their electoral participation. Van Waus Decl. ¶¶ 13–17, 23–24, 32–34, 42–44. This fear related to voting is alone sufficient to show a likelihood of a section 11(b) violation. *See, e.g.*, *Wohl*, 512 F. Supp. 3d at 516. But Plaintiffs' fears have also deterred CNA/NNU members from specific engagement in the political process—such as deciding to not serve as a poll monitor and to not attend campaign events—and from voting in a manner of their choosing. Van Waus Decl. ¶¶ 25–26, 35–37, 45. Community members have expressed grave concerns that DHS voter intimidation will interfere with voting by U.S. citizens, which requires significant mitigating efforts from Plaintiffs to support continued voter engagement. *See, e.g.*, Rivas Decl. ¶¶ 6–9; Arntz Decl. ¶¶ 4–6; Moreles Decl. ¶¶ 5–7; Lopez Decl. ¶¶ 8–15. Indeed, the timing and the propaganda associated with the Field Operations indicates that causing fear is an objective of Defendants' unlawful Policy.

### 2. Defendants' Intimidation Scheme Violates the Right to Vote

For similar reasons, Plaintiffs are likely to establish that Defendants' Policy and actions violate the right to vote, which "is a fundamental matter in a free and democratic society." *Harper v. Virginia State Bd. of Elections*, 383 U.S. 663, 667 (1966). For constitutional challenges to even-handed election regulations, courts weigh the voting burdens against the tailored state interests. *Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983). Assuming for the sake of this Motion that the *Anderson-Burdick* standard applies, Plaintiffs have a likelihood of success.

***First***, the burdens Defendants impose on the voting rights of Plaintiffs' members and constituents are severe. Plaintiffs include those who prefer to vote in person—to ensure, for example, that their ballot is not ensnared in potential signature matching hurdles or in disruptions with Postal Service postmarking or delivery—but who are now fearful and compelled to vote by mail to avoid coercive confrontations with DHS. Van Waus Decl. ¶¶ 25, 36, 45. Plaintiffs' direct services urging and assisting voters to participate also suffer because they now must field questions and produce materials about what to do if DHS agents attempt to intimidate voters. *See* Rivas Decl. ¶¶ 5–10; Arntz Decl. ¶¶ 5–7; Moreles Decl. ¶ 6; Lopez Decl. ¶¶ 11–12.

***Second***, because the burdens on the right to vote are severe, Defendants' Policy and conduct must be "narrowly drawn" to a "compelling" interest in combating noncitizen voter fraud. *See Burdick v. Takushi*, 504 U.S. 428, 434 (1992). But the Policy is not so narrowly drawn, and their interest is not compelling. While non-U.S. citizens are barred from voting in federal elections, that problem is vanishingly rare, as the federal government's own prosecution numbers bear out; this is especially true for individuals who improperly *vote*, as opposed to those who are merely registered to vote—often by mistake. *See United States v. Weber*, 816 F.Supp.3d 1168, 1186 & n.26 (C.D. Cal. 2026) (collecting evidence that noncitizen voting is "exceedingly rare"); Tremitiere Decl, Ex. 21, 22, 41. Defendants' Policy is not narrowly drawn to their purported interest in addressing those rare occurrences. The data and processes DHS uses to target people are likely to sweep in many U.S. citizens. Tremitiere Decl., Ex. 1 at 1, 3; Grumbach Expert Rep. at 2. And part of the Policy specifically targets naturalized citizens. Tremitiere Decl., Ex. 2 at 26–28. This is far from the evenhanded, non-discriminatory regulation of elections that the *Anderson-Burdick* standard would permit. *Anderson*, 460 U.S. at 788–93. The threatening and propagandized tactics Defendants use are highly likely to strike fear in and encumber many eligible voters. The timing also turns Defendants' Policy into an intimidation scheme rather than resembling standard law enforcement efforts to penalize the rare cases of non-U.S. citizens voting in ways that lessen harm to eligible voters. Thus, Defendants' "cho[sen] means . . . unnecessarily restrict constitutionally protected liberty," and does so in an uneven manner, in violation of the fundamental right to vote. *Id.* at 806.

**C. Defendants' Policy is Arbitrary and Capricious**

Plaintiffs are likely to succeed on their claim that Defendants' adoption of the Unlawful Voter Initiative Policy was arbitrary and capricious. Defendants adopted it despite contrary evidence about the accuracy of the underlying data and DHS's own findings about flaws in the Voter Eligibility Matching methodology. *See* 5 U.S.C. § 706(2); *Lands Council v. Powell*, 395 F.3d 1019, 1026 (9th Cir. 2005) (agency action "is arbitrary and capricious if the agency fails to consider an important aspect of a problem, if the agency offers an explanation for the decision that is contrary to the evidence, [or] if the agency's decision is so implausible that it could not be ascribed to a difference in view or be the product of agency expertise"). Here, the DHS Whistleblower Disclosure demonstrates that, in implementing the Policy, DHS repeatedly (1) disregarded known flaws in its data sources and (2) disregarded its own findings about flaws in the Voter Eligibility Matching methodology. The Field Operations incorporate and propagate those failures by directing DHS agents to interrogate persons about their voter eligibility based on TECS records created through the Voter Eligibility Matching methodology.

***First***, DHS implemented the Voter Eligibility Matching component of the Policy despite knowing that the underlying citizenship data was unreliable and likely to falsely identify U.S. citizens as unlawful voters. When an agency's decision-making is based on clearly unreliable data, its decision is arbitrary and capricious. *See Lands Council*, 395 F.3d at 1032, 1036–37 (finding Forest Service action arbitrary and capricious where it was based on an "inaccurate" and "flawed database" and the agency's purported alternative methodology "c[ould] not make up for the problems with the database"). There is no existing federal database containing current citizenship status for all U.S. citizens. Grumbach Expert Rep. at 5. Instead, Defendants rely on other data sources, including DHS's error-filled SAVE database, for evidence of U.S. citizenship. Tremitiere Decl., Ex. 2 at 22 (source data coded "IRIS" came from the SAVE database). As of 2025, SAVE incorporates Social Security Administration ("SSA") data on citizenship. But SSA's data is incomplete: not all citizens have Social Security numbers, and SSA does not have citizenship status records for millions of Americans. Grumbach Expert Rep. at 5–6. And the records likely contain other mundane inaccuracies: naturalized citizens whose Social Security numbers are not updated, name changes, differences across systems,

and innocent data-entry errors. *Id.* at 5–6. Moreover, DHS is aware of these limitations. *See League of Women Voters*, 835 F. Supp. 3d at 101 (DHS was aware that "shortfalls in data accuracy" in the "new SAVE system could cause incomplete or false results"). In the specific context of the Voter Eligibility Matching, agency trainers told USCIS employees: "During your reviews, you *will* identify U.S. citizens. . . . We're just doing the best we can." Tremitiere Decl., Ex. 2 at 29.

***Second***, DHS disregarded other internal evidence about flaws in the Policy's specified procedures for identifying when individuals registered and/or voted unlawfully. *See Ctr. for Biological Diversity v. EPA*, 141 F.4th 153, 172 (D.C. Cir. 2025) (arbitrary and capricious for agency to "disregard[] the results of [their] own literature . . . without adequate explanation"). According to training materials, USCIS agents implementing the Policy were required to compare alleged voter registration and voting dates in DHS data sources with other records, like the (potentially unlawfully accessed) state voter databases in order to verify the DHS data. But in many cases, particularly in California, agents did not actually *have* access to any other sources of voter history or registration data. In those cases, they were told to defer to the DHS data without corroboration. Tremitiere Decl., Ex. 2 at 24. According to the whistleblower, "[t]he result is that a significant number of TECS records, potentially thousands or tens of thousands, will be created against California residents based on data that an officer may have good reason to believe is unreliable or inaccurate without corroboration." *Id.* In other states, the Policy directed employees to use imprecise matching criteria—in some states, only a name and birthdate—to identify their targets in state voting data. *Id.* at 8 (Alabama), 12 (Florida). Matching based on shared names and birthdates alone is well known to produce numerous false positives. Grumbach Expert Rep. at 7–9. Moreover, when critical information—including DHS's own immigrant identifiers, called A-numbers—were missing from the records, DHS told employees it used "supplemental magic"—possibly generative AI—to fill in those gaps. Tremitiere Decl., Ex. 2 at 23.

Despite these obvious flaws in the matching methodology, USCIS staff were told to accept the DHS source data and create a TECS record based on it, *even if they have reasons to doubt the accuracy of the data*. *Id.* at 24 (noting that "a significant number of TECS records, potentially thousands or tens of thousands, will be created against California residents based on data that an

officer may have good reason to believe is unreliable or inaccurate without corroboration" and yet officers must create records based solely on this data), 28 (agents are "required to create a TECS record against a known U.S. citizen if the voter registration date and/or voting date provided in the DHS data predates their confirmed naturalization date, even if an officer reasonably believes that the DHS source data is not reliable . . . . In other words, the current process is knowingly sweeping known U.S. citizens in as potentially 'unlawful voters.'").

Moreover, DHS instructs its agents to at times ignore information in public state voter portals that would favor eliminating a person from the target list. For individual records that have voter registration history in the DHS source data provided to USCIS, agents are instructed to disregard contradicting information in the state voter portal that would eliminate an individual from further scrutiny. *Id.* at 19. This inherently unreliable procedure is only exacerbated by the strict quota regimen imposed by USCIS. Officers were given a one-hour-and-45-minute video training on the matching procedure, including the complexities of naturalized and derivative citizenship cases, and then instructed to review five targets per hour, for a total of 40 subjects per day—meaning that an officer would have just 12 minutes to review an individual's available data and create the TECS record. *Id.* at 2. Pursuant to the Policy, the creation of that TECS record alone would be enough to trigger a field investigation.

Because the evidence overwhelmingly supports a finding that DHS decided to adopt the Policy notwithstanding contrary evidence about the reliability of the data and methods, Plaintiffs are likely to succeed on their claim that the Policy is unlawful and should be set aside.

**D. The Policy is "final agency action" Under the APA**

The Unlawful Voter Initiative Policy is reviewable under the APA because it qualifies as "agency action" and is "final." 5 U.S.C. § 704. To begin, the Policy constitutes "agency action" because it amounts to an "agency statement of general or particular applicability and future effect" that "prescribe[s]" and "implement[s] . . . policy," "procedure," and "practice requirements." *Prutehi Litekyan: Save Ritidian v. U.S. Dep't of Air Force*, 128 F.4th 1089, 1107 (9th Cir. 2025) (quoting 5 U.S.C. § 551(4)). DHS requires agents to identify targets for voting-related investigations using prescribed data-matching procedures and then generate TECS records flagging individuals for further

scrutiny. *See, e.g.*, Tremitiere Decl., Ex. 2, at 21–23. Additional directives and implementing materials direct agents to then "conduct field operations" targeting the subjects of these investigations and "support timely prosecutorial review." *see id.*, Exs. 3, 4. This "internal polic[y]" falls "squarely within the APA's definition" of agency action. *Garro Pinchi v. Noem*, 813 F. Supp. 3d 973, 1021–22 (N.D. Cal. 2025).

The Unlawful Voter Initiative Policy is also a "final" action under *Bennett v. Spear*, 520 U.S. 154, 178 (1997). Under the first *Bennett* factor, the Policy represents the "consummation" of Defendants' decisionmaking. *Id.* Agents received directions to conduct investigations into election activity using a specified data-matching methodology, *see* Tremitiere Decl., Ex. 2, at 18, and to conduct corresponding field operations, *see id*., Exs. 2, 4. These actions reflect DHS's "definitive" policy decision to investigate unlawful election participation using those procedures and indicate that "immediate compliance . . . is expected." *Prutehi*, 128 F.4th at 1108.

The Whistleblower Disclosure and DHS's own social media posts also show that the agency "put" this policy "into effect," *id.*, as agents are already using these data-matching processes and then conducting field operations targeting the individuals they identify, *see, e.g.*, Tremitiere Decl., Ex. 2, at 17–33; Exs. 17–20. And a surge in investigating alleged election-related crimes on this scale and using these methods in the run-up to a midterm election marks a definitive break from day-to-day operations. *Prutehi*, 128 F.4th at 1109. Nothing more is required. *See Ctr. for Taxpayer Rights v. I.R.S.*, No. 26-5006, 2026 WL 2635380, at *7 (D.C. Cir. Sep. 8, 2026); *Garro Pinchi*, 813 F. Supp. 3d at 1024 (citing *S.F. Herring Ass'n v. U.S. Dep't of Interior*, 946 F.3d 564, 579 (9th Cir. 2019)).

The Unlawful Voter Initiative Policy also satisfies the second *Bennett* factor: that "the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." 520 U.S. at 178 (internal citations and quotations omitted). For one, requiring agents to generate a TECS record any time their data-matching analysis identifies an individual as one who may have participated in unlawful voting activities imposes "direct and appreciable legal consequences," *id.*, because "TECS law enforcement records can be used against" the individual for whom a record is created "in any interaction they may have with the federal government, such as" heightened inspection and other requirements for citizens "crossing the border during travel or [when]

seeking a benefit," Tremitiere Decl. Ex. 2 at 3. Further, the mere existence and public knowledge of the Policy has a "direct and immediate effect" on voters and other affected parties, *see Prutehi*, 128 F.4th at 1108; *Oregon Natural Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 982 (9th Cir. 2006) (internal citations omitted), as they have already compelled changes in behavior around protected election activity, *see, e.g.*, Van Waus Decl. ¶¶ 13–17, 23–26, 32–37, 42–45; Arntz Decl. ¶ 5–7; Lopez Decl. ¶¶ 6–15. The Policy also imposes obligations on Defendants by mandating voter eligibility determinations and field operations using the procedures challenged here, an independent ground satisfying the second *Bennett* factor. *See Prutehi*, 128 F.4th at 1111–12.[4]

**E. The Policy is Not a Matter "committed to agency discretion" Under the APA**

The agency actions challenged here are not "committed to agency discretion by law," 5 U.S.C. § 701(a)(2), as there are "meaningful standard[s] against which to judge the agency's exercise of discretion," *Johnson Trustee of Charley E. Johnson Revocable Living Trust v. United States*, 145 F.4th 1158, 1162–63 (9th Cir. 2024) (internal citations omitted); *Trout Unltd. v. Pirzadeh*, 1 F.4th 738, 751 (9th Cir. 2021). Claims alleging a "constitutional error" like a violation of the right to vote supply a meaningful standard for review as a matter of law, *Perez Perez v. Wolf*, 943 F.3d 853, 861 (9th Cir. 2019). Similarly, Section 11(b) supplies a meaningful standard governing Plaintiffs' claims for agency action contrary to law and in excess of jurisdiction as it requires courts to assess whether the defendant "intimidate[d], threaten[ed], or coerce[ed] . . . any person for voting or attempting to vote," 52 U.S.C. § 10307 (b).

Relevant to Plaintiffs' claim for arbitrary and capricious agency action, past "practice[s]" also supply a relevant benchmark, *ASSE Int'l, Inc. v. Kerry*, 803 F.3d 1059, 1069 (9th Cir. 2015). In the decades since Congress created DHS, the agency has never undertaken operations to investigate election activity on anything approaching this scale, let alone using even remotely comparable faulty

[4] Any remaining questions as to whether the Policy reflects final agency action only reinforce the importance of ordering Defendants to produce the administrative record and limited additional discovery on an expedited basis, as Plaintiffs have requested by separate motion. The materials that comprise these requests are not publicly available and can shed light on the factors governing reviewability under the APA.

data and matching techniques, including by knowingly targeting U.S. citizens for interrogations while voting is underway. *See, e.g.*, Tremitiere Decl. Ex. 2, at 29–30. The past practice of forgoing operations like these "provides a benchmark against which to measure 'whether the agency justified its choice on specious grounds'" or "failed to satisfy the general requirements of reasoned agency decisionmaking." *Garro Pinchi*, 813 F. Supp. 3d at 1025 (quoting *Jajati v. U.S. Customs & Border Prot.*, 102 F.4th 1011, 1017 (9th Cir. 2024)).

**F. Judicial Authority to Enjoin Unlawful Investigations Like These is Well-Established**

Federal courts have the authority to enjoin investigations like the Policy at issue here "where the mere threat of prosecution would inhibit the exercise of constitutional freedoms," *Stolt-Nielsen, S.A. v. United States*, 442 F.3d 177, 183 (3d Cir. 2006), as the government "cannot cloak constitutional violations under the guise of prosecutorial discretion and expect the federal courts simply to look the other way," *Smith v. Meese*, 821 F.2d 1484, 1492 (11th Cir. 1987). Plaintiffs "do not challenge any particular decision to prosecute . . . [i]nstead, they challenge a policy and pattern of investigatory . . . decisions, alleging that the policy has the effect of depriving them of their constitutional rights to vote," amounting to a "widespread violation of the associational and political rights of a large group of people . . . ." *See id.* at 1489, 1492.

Specifically in the voter intimidation context, courts have repeatedly recognized that judicial intervention is appropriate when government tactics chill and impede protected voting rights. During the Civil Rights Era, courts enjoined harassing investigations and arrests that intimidated voters. *See McLeod*, 385 F.2d at 740, 747–48 ("Harassment in the form of baseless arrests and prosecutions is one of the most effective means of putting a halt to a voter registration drive" and "can be stopped only by a federal (remedy) as broad as the evil itself"); *Wood*, 295 F.2d at 784–85 (reversing district court's refusal to grant a restraining order against state officials whose continued prosecution of voter-registration worker would intimidate voters); *Clark*, 249 F. Supp. at 728 (enjoining "baseless arrests, unjustified prosecutions, [and] unwarranted and illegal injunctions" against prospective Black voters). In *Olagues v. Russoniello*, a now-vacated *en banc* Ninth Circuit decision (although applying an incorrect section 11(b) standard) explained that voting rights organizations' "voter education and

registration efforts [we]re unquestionably protected from unwarranted interference by prosecutorial officials" that harmed both organizations and their members, and therefore the district court "erred in ruling that it lacked jurisdiction" to enjoin DOJ's investigation. 797 F.2d 1511, 1519 (9th Cir. 1986) (en banc), *vacated as moot*, 484 U.S. 806 (1987); *accord Smith*, 821 F.2d at 1489–91 (holding justiciable a challenge to DOJ policy of investigating Black electoral activity). And earlier this year, a district court enjoined the Texas Attorney General's investigation of plaintiff "nonprofit organization focused on increasing the civic participation of young Latinos in Texas" for violating Section 11(b). *Jolt Initiative, Inc. v. Paxton*, 821 F. Supp. 3d 706, 711, 727 (W.D. Tex. 2026).

The exception to the court's equitable reach is that actual "subjects of federal investigation" may not, in some cases, need a civil injunction "[b]ecause these defendants are already guaranteed access to a federal court" to vindicate their rights via the criminal process. *Deaver v. Seymour*, 822 F.2d 66, 69–70 (D.C. Cir. 1987). But that exception does not apply here: Plaintiffs are not subjects of this investigation, could not be indicted through it, and cannot challenge the policies in criminal proceedings. And they and the U.S. citizens they represent and serve will continue to suffer from DHS's Policy unless this Court intervenes.

This is precisely the circumstance in which enjoining a policy of criminal investigation is appropriate: "[w]hen the civil action does not seek to enjoin an ongoing prosecution and where the movants are not being prosecuted, an injunction may issue." *Juluke v. Hodel*, 811 F.2d 1553, 1557 (D.C. Cir. 1987). Relief is especially appropriate here, where the challenged policies sweep in U.S. citizens and subject them to invasive field encounters at the height of electoral activity.

## II. Plaintiffs Will Continue to Suffer Irreparable Harm Absent Preliminary Relief

Plaintiffs are "likely to suffer irreparable harm in the absence of preliminary relief." *Winter*, 555 U.S. at 7. Given these threats to voting rights that are "preservative of" all other rights, *Harper*, 383 U.S. at 667, "establishing irreparable injury should not be an onerous task for plaintiffs," *Cottonwood Env't L. Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1091 (9th Cir. 2015).[5]

---

[5] In the Ninth Circuit, when "Plaintiffs have shown a likelihood of success on the merits with respect to their First Amendment challenge, the remaining factors are also met." *Am. Encore v. Fontes*, 152 F.4th 1097, 1120 (9th Cir. 2025).

"[T]he loss of First Amendment freedoms," including those underlying the constitutional right to vote, "for even minimal periods of time, unquestionably constitutes irreparable injury." *Am. Encore*, 152 F.4th at 1120 (internal citation omitted). In voter intimidation cases, courts recognize that plaintiffs suffer irreparable harm if their "right to vote freely is abridged" because of "intimidation, threatening conduct, or coercion." *Nat'l Coal. on Black Civic Participation v. Wohl*, 498 F.Supp.3d 457, 474 (S.D.N.Y. 2020). Moreover, "if some potential voters are improperly dissuaded from exercising their franchise, it is unlikely those voters can be identified, their votes cannot be recast, and no amount of traditional remedies such as money damages would suffice after the fact." *Id.* (internal quotation marks and citations omitted). While Defendants are already engaging in intimidating conduct, the mere threat of such enforcement actions is sufficient. *See Am. Encore v. Fontes*, 152 F.4th 1097, 1118 (9th Cir. 2025); *Cuviello v. City of Vallejo*, 944 F.3d 816, 833 (9th Cir. 2019). The ongoing credible fear, voter dissuasion, and privacy harms that CNA/NNU members experience, and the direct impediments to other Plaintiffs' voter outreach, education, and engagement efforts, favor preliminary relief. Van Waus Decl. ¶¶ 12–17, 23–27, 32–38, 42–46; Arntz Decl. ¶¶ 6–7; Moreles Decl. ¶ 6; Rivas Decl. ¶ 9; Lopez Decl. ¶¶ 8–15.

Defendants' Policy irreparably harms Local Government Plaintiffs in additional ways. Under the Elections Clause and state Elections Code, Local Government Plaintiffs are responsible for administering fair and free elections in San Francisco and Santa Clara. U.S. Const., art. I, § 4, cl. 1; Cal. Elec. Code § 320; Arntz Decl. ¶ 3; Moreles Decl. ¶ 3. Defendants' unlawful conduct requires expending additional resources—including on voter outreach and training for election workers—and threatens to erode community trust in the elections administered by Local Government Plaintiffs. *See* Arntz Decl. ¶¶ 6–7; Moreles Decl. ¶ 7; Rivas Decl. ¶ 9. This loss of trust would be pernicious and lasting, diminishing the likelihood that eligible voters in these communities will vote or register to vote. *See* Moreles Decl. ¶ 7. This loss of community trust, itself a harm, would in turn hinder Local Government Plaintiffs' ability to satisfy their constitutional and statutory responsibility to administer fair and free elections. Courts have held that these types of "cognizable irreparable harm[s]" support preliminary relief. *Michigan v. DeVos*, 481 F. Supp. 3d 984, 995–96 (N.D. Cal. 2020) (budgetary harms); *City & Cnty. of San Francisco v. Trump*, 783 F. Supp. 3d 1148, 1187, 1202 (N.D. Cal. 2025)

("damage [to] the trust between [localities] and the local communities upon which they depend to fulfill their [statutory] responsibilities," "damage [to] the relationship the Cities and Counties have built with their [local] communities"), *appeal on different grounds docketed*, No. 25-3889 (9th Cir. June 23, 2025); *Colorado v. DeJoy*, 487 F. Supp. 3d 1061, 1065 (D. Colo. 2020) (need to clear up confusion among voter population).

**III. The Balance of the Equities and Public Interest Clearly Favor Preliminary Relief**

The balance of the equities and public interest also support preliminary relief. *Winter*, 555 U.S. at 20. When the government is a party, these factors merge. *Roman*, 977 F.3d at 940–41.

In this case, Plaintiffs and countless lawful U.S. citizen voters are suffering grave harms. Voto Latino and CNA/NNU will suffer substantial harm if they are prevented or impeded from carrying out their voter engagement, registration, and mobilization programs during the final two months before an important midterm election. The U.S. citizen members of CNA/NNU suffer grave harm when their constitutional right to freely register to vote and to vote without fear of legal repercussions is trespassed. Indeed, "[i]t is beyond cavil that voting is of the most fundamental significance under our constitutional structure." *Burdick*, 504 U.S. at 433 (internal quotation marks omitted). Under this structure, Local Government Plaintiffs similarly have a strong interest in administering free and fair elections and protecting the right to vote in their jurisdictions. U.S. Const., art. I, § 4, cl. 1; Cal. Elec. Code § 320.

Likewise, the public has a vested interest in free elections untainted by the threat that Defendants will dissuade countless eligible voters from casting a ballot and voter engagement programs from conducting their core civic functions. *See Am. Encore*, 152 F.4th at 1120 ("Vindication of constitutional rights is always in the public interest."). The public's "deep interest in fair elections" weighs in favor of preliminary relief to protect free participation in the franchise this fall. *Lair v. Bullock*, 697 F.3d 1200, 1215 (9th Cir. 2012).

In sharp contrast, "there is generally no public interest in the perpetuation of unlawful agency action." *Novedades Y Servicios v. Fin. Crimes Enf't Network*, 181 F.4th 961, 981 (9th Cir. 2026) (quoting *League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016)). In this case, Defendants' actions are clearly unlawful. *Supra* Part I.B–C. And even if they were not, Defendants

would suffer little harm if the Policy were temporarily enjoined—i.e., restoring the *status quo ante*. The Policy is part of the Administration's effort to combat what it claims is widespread voter fraud. But in reviewing other aspects of the Administration's efforts, courts have held that the Administration has failed to establish that significant fraud threatens the reliability of upcoming elections. *See Weber*, 816 F. Supp. 3d 1186 & n.26 (collecting evidence that noncitizen voting is "exceedingly rare"); *see also League of Women Voters v. Trump*, No. 1:26-cv-11548-IT, 2026 WL 2322705, at *12 (D. Mass. Aug. 11, 2026), *stay pending appeal denied*, *U.S. Postal Service v. California*, No. 26A305, 2026 WL 2687160 (U.S. Sep. 14, 2026); *DSCC v. Trump*, No. 26-cv-01114 (CJN), 2026 WL 2681471, at *10 (D.D.C. Sep. 13, 2026).

Thus, Plaintiffs' and the public's interest in safe elections free from interference or intimidation far exceed Defendants' purported interest in combating barely existent unlawful voting by non-U.S. citizens. *See Jolt*, 821 F. Supp. 3d at 727 (holding that "[i]njunctions protecting First Amendment freedoms are always in the public interest" and voting rights group "ha[d] a more obvious interest in assisting others with registering to vote than" the Texas Attorney General did "in intimidating, threatening, or coercing Plaintiff, and the public interest favors preventing voter intimidation within the meaning of § 11(b) of the VRA").

**CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request this Court grant this Motion and enter the accompanying proposed section 705 stay and preliminary injunction.

DATED: September 21, 2026

Respectfully submitted,

By: <u>*/s/ Beau C. Tremitiere*</u>
BEAU C. TREMITIERE
Counsel
GEOFFREY CURFMAN*
Counsel
HAYDEN JOHNSON*
Counsel
ZACHARY WEST*
Counsel
JESSICA MARSDEN*
Counsel
ASHLEY FOX*

Counsel

Attorneys for Plaintiffs
CALIFORNIA NURSES ASSOCIATION,
NATIONAL NURSES UNITED, AND
VOTO LATINO FOUNDATION

DAVID CHIU
City Attorney
YVONNE R. MERÉ
Chief Deputy City Attorney
MOLLIE M. LEE
Chief of Strategic Advocacy
SARA J. EISENBERG
Chief of Complex and Affirmative Litigation
MICHAEL A. KEOUGH
Special Counsel
JOEL F. WACKS
Deputy City Attorney

By: *<u>/s/ Michael A. Keough</u>*
MICHAEL A. KEOUGH
Special Counsel

Attorneys for Plaintiff
CITY AND COUNTY OF SAN FRANCISCO

TONY LOPRESTI
County Counsel
KAVITA NARAYAN
Chief Assistant County Counsel
MEREDITH A. JOHNSON
Lead Deputy County Counsel
BILL NGUYEN
Deputy County Counsel

By: *<u>/s/ Bill Nguyen</u>*
BILL NGUYEN
Deputy County Counsel

Attorneys for Plaintiff
COUNTY OF SANTA CLARA

BENJAMIN R. FARLEY*
Counsel
IMANI FRANKLIN*
Counsel

By: */s/ Benjamin R. Farley*
BENJAMIN R. FARLEY*
Counsel

Attorneys for Plaintiffs
CALIFORNIA NURSES ASSOCIATION,
NATIONAL NURSES UNITED, AND
VOTO LATINO FOUNDATION

**Pro Hac Vice Application Forthcoming*

**FILER'S ATTESTATION**

I, Beau Tremitiere, am the ECF user whose identification and password are being used to file this Notice of Motion and Motion for APA Stay and Preliminary Injunction and Supporting Memorandum of Points and Authorities. Pursuant to Civil Local Rule 5-1(i)(3), I hereby attest that the other above-named signatories concur in this filing.

DATED: September 21, 2026 Respectfully submitted,

By: *<u>/s/ Beau C. Tremitiere</u>*
BEAU C. TREMITIERE
Counsel