# EXHIBIT G

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

CALIFORNIA NURSES ASSOCIATION; NATIONAL NURSES UNITED; CITY AND COUNTY OF SAN FRANCISCO; COUNTY OF SANTA CLARA; and VOTO LATINO FOUNDATION,

Plaintiffs,

v.

MARKWAYNE MULLIN, in his official capacity as Secretary of Homeland Security; UNITED STATES DEPARTMENT OF HOMELAND SECURITY; UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES; JOSEPH B. EDLOW, in his official capacity as Director of United States Citizenship and Immigration Services; UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT; DAVID J. VENTURELLA, in his official capacity as Senior Official Performing the Duties of the Director of the United States Immigration and Customs Enforcement; ANTHONY SALISBURY, in his official capacity as Executive Associate Director of Homeland Security Investigations and the Principal Deputy Homeland Security Adviser to the White House; UNITED STATES CUSTOMS AND BORDER PROTECTION; RODNEY S. SCOTT, in his official capacity as Commissioner of United States Customs and Border Protection; and THOMAS HOMAN, in his official capacity as Assistant to the President and Border Czar,

Defendants.

Case No. 3:26-cv-10680

**DECLARATION OF BEAU C. TREMITIERE IN SUPPORT OF PLAINTIFFS' MOTION FOR APA STAY AND PRELIMINARY INJUNCTION**

**DECLARATION OF BEAU TREMITIERE**

I, Beau Tremitiere, declare as follows:

1. I am an attorney at Protect Democracy Project and am one of the attorneys representing Plaintiffs. I submit this declaration in support of Plaintiffs' Motion for APA Stay and Preliminary Injunction. The facts stated herein are based upon my review of the files that are attached.
2. On September 21, 2026, I accessed each of the webpages, articles, letters, reports, and other materials identified below at the URLs provided. The documents and materials attached to this Declaration as Exhibits 1–47 are true and correct copies of the respective webpages, articles, letters, reports, and other materials accessed on September 21, 2026:
3. Letter from Alex Padilla, U.S. Sen., et al., to Markwayne Mullin, Sec'y of U.S. Dep't of Homeland Sec., et al. (Sep. 13, 2026) (Hereafter "Whistleblower Cover Letter") — attached as Exhibit 1.
4. Letter from Alex Padilla, U.S. Sen., et al., to Markwayne Mullin, Sec'y of U.S. Dep't of Homeland Sec., et al., Re: Systemic Pattern of Potential Illegal Conduct and Data Falsification at DHS's "Unlawful Voter Initiative" (Sep. 8, 2026) (Hereafter "Whistleblower Disclosure") — attached as Exhibit 2.
5. Nick Corasanti & Hamed Aleaziz, *Trump Administration Begins Blitz to Find Elusive Voter Fraud Head of Midterms*, N.Y. Times (September 2, 2026), https://www.nytimes.com/2026/09/02/us/politics/trump-election-voter-fraud.html?eafs_enabled=false — attached as Exhibit 3.
6. Priscilla Alvarez, Tierney Sneed & Gabe Cohen, *DHS Plans To Launch Voter Fraud Investigation Surge Tuesday*, CNN (August 31,

2026), https://www.cnn.com/2026/08/31/politics/homeland-security-voter-fraud-investigations— attached as Exhibit 4.

7. *Voter Registration Deadlines*, Nat'l Conf. of State Legislatures (May 20, 2026), https://www.ncsl.org/elections-and-campaigns/voter-registration-deadlines — attached as Exhibit 5.

8. *2026 General Election: Mail Ballots, Office Hours, and Drop Boxes*, Phila. City Comm'rs (Sep. 15, 2026), https://vote.phila.gov/news/2026/09/15/2026-general-election-mail-ballots-office-hours-and-drop-boxes/ — attached as Exhibit 6.

9. *Dates and Deadlines 2026*, Wash. Sec'y of State, https://www.sos.wa.gov/elections/elections-calendar/dates-and-deadlines — attached as Exhibit 7.

10. *Ballot Drop Box Locations & Schedule*, City of Milwaukee Election Comm'n, https://city.milwaukee.gov/election/ElectionInformation/Dropboxes — attached as Exhibit 8.

11. *Table 16: When Absentee/Mail Ballot Processing and Counting Can Begin*, Nat'l Conf. of State Legislatures, https://www.ncsl.org/elections-and-campaigns/table-16-when-absentee-mail-ballot-processing-and-counting-can-begin (updated Sept. 15, 2026) — attached as Exhibit 9.

12. *2026 Connecticut Absentee Voting*, Conn. Sec'y of State, https://portal.ct.gov/sots/election-services/voter-information/absentee-voting — attached as Exhibit 10.

13. *Early Voting and Vote-by-Mail Ballot Drop-Off Locations*, Cal. Sec'y of State, https://caearlyvothttps://caearlyvoting.sos.ca.gov/ing.sos.ca.gov/ — attached as Exhibit 11.

14. HSI Gov (@hsigov), Instagram (Sep. 8, 2026), https://www.instagram.com/p/DdB-1H3mC3_/ — attached as Exhibit 12.

15. HSI NorCalSan Francisco (@HSISanFrancisco), X (September 11, 2026, 18:23 EST), https://perma.cc/AXZ6-J7EG — attached as Exhibit 13.

16. Dep't of Homeland Sec. (@dhsgov), Instagram (Aug. 26, 2026), https://www.instagram.com/p/DcgysqMSWew/ — attached as Exhibit 14.

17. HSI Kansas City (@HSIKansasCity), X (September 3, 2026, 18:37 EST), EST), https://perma.cc/49HF-JDDP — attached as Exhibit 15.

18. Doug Bock Clark & Jen Fifield, *Inside Trump's Effort to "Take Over" the Midterm Elections*, ProPublica (Apr. 13, 2026), https://perma.cc/G54Q-6Z3V — attached as Exhibit 16.

19. Madeleine Ngo, Nick Corasaniti & Hamed Aleaziz, *Homeland Security Intensifies Pursuit of Noncitizens on Voter Rolls*, N.Y. Times (Aug. 10, 2026), https://www.nytimes.com/2026/08/10/us/politics/noncitizens-vote-crackdown.html?eafs_enabled=false — attached as Exhibit 17.

20. Jen Fifield & Zach Despart, *"Not Ready for Prime Time." A Federal Tool to Check Voter Citizenship Keeps Making Mistakes*, ProPublica & Tex. Trib. (Feb. 13, 2026), https://perma.cc/PR4Q-67NR — attached as Exhibit 18.

21. Judd Legum & Rebecca Crosby, *The Federal Database That Could Upend the Midterm Elections*, Mother Jones (Apr. 9, 2026), https://perma.cc/8YXC-WU7U — attached as Exhibit 19.

22. Gabe Cohen, Priscilla Alvarez & Tierney Sneed, *Markwayne Mullin uses Homeland Security to further Trump's voter fraud crusade*, , CNN (Aug. 12, 2026),

https://www.cnn.com/2026/08/12/politics/trump-homeland-security-voter-fraud-crusade — attached as Exhibit 20.

23. Peter Elkind et al., *Inside Trump's Failed Hunt for Noncitizen Voters*, ProPublica (August 14, 2026), https://www.propublica.org/article/noncitizen-voting-trump-homeland-security-investigations — attached as Exhibit 21.

24. Laura Barrón-López & Madeleine Bimonte, *Aggressive DHS hunt for voter fraud only finding a handful of possible noncitizen cases*, MS Now (Sept. 4, 2026), https://www.ms.now/news/aggressive-dhs-hunt-for-voter-fraud-only-finding-a-handful-of-possible-noncitizen-cases — attached as Exhibit 22.

25. Glenn Thrush et al., *Administration Targets Noncitizen Voting, Despite Finding It Rare*, N.Y. Times (February 18, 2026), https://www.nytimes.com/2026/02/18/us/politics/voting-trump-immigrants-midterms.html — attached as Exhibit 23.

26. Carol Leonnig, Laura Barrón-López & Vaughn Hillyard, *White House directing DHS to hunt for voter fraud by naturalized citizens: Sources*, MS NOW (Feb. 18, 2026), https://perma.cc/B8MJ-GUD2 — attached as Exhibit 24.

27. U.S. Dep't of Just*., Authority to Obtain and Share Statewide Voter Roll Data*, 50 Op. O.L.C. ___, (May 12, 2026) https://www.justice.gov/olc/media/1440346/dl— attached as Exhibit 25.

28. Ashlyn Webb, *US citizen detained by ICE at Atlanta Airport as he boarded flight*, WSB-TV (Aug. 11, 2026), https://www.wsbtv.com/news/local/us-citizen-detained-ice-atlanta-airport-he-boarded-plane/S67XCCONANCJDIGQPXYUCMBW5E/ — attached as Exhibit 26.

29. U.S. Dep't of Homeland Sec., *DHS Directs ICE to Deport Aliens Who Vote in American Elections* (June 9, 2026), https://perma.cc/V3YB-8EFH — attached as Exhibit 27.

30. Ted Hesson, *Immigration officers are being diverted to Trump's voter-fraud effort*, Wash. Post (Aug. 25, 2026), https://www.washingtonpost.com/immigration/2026/08/25/immigration-officers-are-being-diverted-trumps-voter-fraud-effort/ — attached as Exhibit 28.

31. Miles Parks, *Voting Officials Fear DHS May Actually Be a Threat to Elections This Year*, NPR (June 16, 2026), https://www.npr.org/2026/06/16/nx-s1-5702491/trump-voting-threat-midterm-election-dhs — attached as Exhibit 29.

32. David Gilbert, *Election Officials Are Getting Ready for ICE To Show Up at the Polls*, Wired (May 20, 2026), https://www.wired.com/story/election-officials-are-getting-ready-for-ice-to-show-up-midterms/ — attached as Exhibit 30.

33. Letter from Todd Lyons, Senior Official Performing the Duties of the Director of U.S. Immigr. & Customs Enf't, to Colo. Sec'y of State Jena Griswold et al. (May 11, 2026), https://perma.cc/7KRS-M6B4 — attached as Exhibit 31.

34. Donald J. Trump (@realDonaldTrump), Truth Soc. (May 10, 2026), https://truthsocial.com/@realDonaldTrump/posts/116551749766563494— attached as Exhibit 32.

35. Tom Hals et al., *Trump Claims Voting by Noncitizens Is Rampant in America. The Numbers Tell Another Story*, Reuters (July 19, 2026), https://www.reuters.com/investigations/trump-claims-voting-by-noncitizens-is-rampant-america-numbers-tell-another-story-2026-07-19/ — attached as Exhibit 33.

36. Alan Feuer & Ashley Ahn, *Trump Regrets Not Seizing Voting Machines After 2020 Election*, N.Y. Times (Jan. 11, 2026), https://www.nytimes.com/2026/01/11/us/trump-voting-machines-2020-election.html — attached as Exhibit 34.

37. *Speech: Donald Trump Delivers the State of the Union Address – February 24, 2026*, Roll Call Factbase (Feb. 24, 2026), https://rollcall.com/factbase/trump/transcript/donald-trump-speech-state-of-the-union-february-24-2026/ — attached as Exhibit 35.

38. HSI NorCal (@HSISanFrancisco), X (Sep. 2, 2026 2:15 PM EST), https://x.com/HSISanFrancisco/status/2095214009767059518?s=20— attached as Exhibit 36.

39. Homeland Security Investigations, (@HSI_HQ), X (Sep. 17. 2026 17:15 PM EST), https://x.com/HSI_HQ/status/2100695088712073278?s=20 — attached as Exhibit 37.

40. Homeland Security Investigations (@HSI_HQ), X (Sep. 13, 2026 21:05 PM EST), https://x.com/HSI_HQ/status/2099303368917164115?s=20 — attached as Exhibit 38.

41. U.S. Dep't of Justice, Justice Manual, 9-85.300 - Protection of Government Integrity, Non-Interference in Elections When Conducting Federal Criminal Investigations Involving Ballot Fraud, https://www.justice.gov/jm/jm-9-85000-protection-government-integrity — attached as Exhibit 39.

42. Nick Corasaniti & Hamed Aleaziz, *Whistle-Blower: Federal Agents May Have Broken State Laws in Search for Voter Fraud*, N.Y. Times (Sep. 14, 2026), https://www.nytimes.com/2026/09/14/us/politics/homeland-security-voter-fraud-investigation.html — attached as Exhibit 40.

43. John Danforth et al., *Lost, Not Stolen: The Conservative Case that Trump Lost and Biden Won the 2020 Presidential Election* (July 2022), https://drive.google.com/file/d/1aqorZ61AYFqZU-EDQBBzjqfvAoC5nKcB/view, — attached as Exhibit 41.

44. *Mullin Details Voter Fraud Probe, Border Protection After Texas Arrests*, Fox News (Sep. 19, 2026), https://www.foxnews.com/video/6405300436112—attached as Exhibit 42.

45. Donald Judd, *Trump Says States Are Agents of Federal Government in Elections*, CNN (Feb. 3, 2026), https://www.cnn.com/2026/02/03/politics/trump-nationalize-elections-states — attached as Exhibit 43.

46. Melissa Quinn, *Trump Suggests Republicans Should Nationalize Voting. Here's What to Know.*, CBS News (Feb. 3, 2026), https://perma.cc/RA7G-XQHZ. — attached as Exhibit 44.

47. Devlin Barrett, *Justice Dept. Pushes Limits of Its Power Over State Elections,* NY Times (June 11, 2026), https://www.nytimes.com/2026/06/11/us/politics/trump-california-vote-elections-investigations.html— attached as Exhibit 45.

48. Richard C. Pilger, Federal Prosecution of Election Offenses, GPO 9 (8th ed. 2017), https://perma.cc/NU6K-R72C — attached as Exhibit 46.

49. Craig C. Donsanto & Nancy L. Simmons, Federal Prosecution of Election Offenses 10 (7th ed. 2007), https://perma.cc/K59Z-7CDX.— attached as Exhibit 47.

50. U.S. Dep't of Homeland Sec., *Secretary Mullin Holds Press Conference on the Need to Fully Fund CBP & ICE for Next Three Years*, YouTube (July 17, 2026), https://www.youtube.com/watch?v=jjuVaRAEpe4 — attached as Exhibit 48.

Dated September 21, 2026

Respectfully submitted,

By: */s/ Beau Tremitiere*
BEAU C. TREMITIERE
Counsel

# EXHIBIT 1

# United States Senate

WASHINGTON, DC 20510

September 13, 2026

The Honorable Markwayne Mullin
Secretary
U.S. Department of Homeland Security
2707 Martin Luther King Jr. Avenue, SE
Washington, D.C. 20528

The Honorable Joseph B. Edlow
Director
U.S. Citizenship and Immigration Services
5900 Capital Gateway Drive
Camp Springs, MD 20529

Dear Secretary Mullin and Director Edlow:

On September 8, 2026, Senator Alex Padilla received a protected whistleblower disclosure (the "Disclosure") that reveals serious allegations of illegal and inappropriate activities within the Department of Homeland Security's ("DHS" or "the Department") U.S. Citizenship and Immigration Services ("USCIS") Fraud Detection and National Security Directorate ("FDNS").

According to the attached Disclosure, the Department and USCIS leadership have abruptly diverted FDNS personnel to an "Unlawful Voter Initiative" using highly questionable data and methods to identify purported unlawful voters. DHS materials admit these investigations will include naturalized U.S. citizens, some of whom will have federal law enforcement records created against them. FDNS employees are expressing concern that they are being directed to take actions that are against the law and Department policy, which will harm Americans. The whistleblower's Disclosure includes compelling evidence of wrongdoing and abuse of power by agency leadership including:

(1) USCIS personnel have been directed to access sensitive voter information in violation of state laws prohibiting unauthorized access to individual voter records potentially thousands of times;[1]

(2) USCIS personnel are under significant pressure from headquarters to enter federal TECS[2] records against individuals that are likely to be false in many cases, potentially harming thousands of people in likely violation of federal privacy requirements;[3]

(3) With minimal training, agency leadership is imposing reckless quotas that demand USCIS personnel investigate 40 subjects per day, a rate of roughly 12 minutes per subject, to complete this rushed investigation by September 12;[4] and,

(4) USCIS personnel are being tasked with unreliable DHS voter data of dubious origins, that is compiled with "supplemental magic", which they are required to accept as accurate.[5]

---

[1] Disclosure Letter to Senator Padilla from Anonymous Whistleblower re: Department of Homeland Security and U.S. Citizenship and Immigration Services Direction to Identify "Unlawful Voters", (Sept. 8, 2026), 1.
[2] "TECS" is a system where "users are able to input, access, or maintain law enforcement, inspection, intelligence-gathering, and operational records." *See* DHS/CBP/PIA-021 TECS System: Platform, available at: https://www.dhs.gov/publication/dhscbppia-021-tecs-system-platform
[3] Disclosure Letter, 1.
[4] *Id.* at 2.
[5] *Id.* at 3.

On Friday, August 21, 2026, USCIS FDNS personnel were instructed to drop everything and watch one training video. By the following Tuesday, August 25, they were directed to begin reviewing data provided by DHS to FDNS to hunt for "unlawful voters." Hundreds of employees have been diverted to chasing the Administration's unfounded claims of significant noncitizen voting. This sudden surge indicates that the Department's top priority is now manufacturing evidence for election conspiracy theories, rather than FDNS's fraud detection and national security mission.

It is notable that these activities come as federal courts have unanimously rejected the Administration's attempts to coerce states to share their citizens' voter data.[6] The Disclosure shows how DHS is deploying federal law enforcement resources to go around those judicial rulings and gather state voter information by any means, regardless of state laws. Further, the Administration's continued claims of election fraud signal its intent to use this unreliable evidence of "unlawful voters" in ways that can disenfranchise eligible voters, disrupt state and local election administration, and subject election officials to additional unwarranted threats of prosecution.[7]

**1. Illegal Access to State Voter Records Using PII**

The whistleblower's Disclosure shows this initiative appears to involve thousands of violations of state laws protecting voter data against unauthorized access. Several states, including Virginia, require a specific attestation that one is authorized to access the voter's information, under penalty of law.[8] However, the Department and USCIS are directing assigned personnel to make false claims, using Personally Identifiable Information (PII) from DHS data, on state government websites by affirming that they are the voter or have been authorized by the voter to obtain the desired state voter data. This appears to be a clear-cut violation of state laws regarding access to individual voter information and raises serious questions about federal privacy laws and data policies as well.

As documented by the Disclosure, federal employees are being directed to misrepresent themselves based on questionable guidance from USCIS's Office of Chief Counsel ("OCC"). This guidance stated that FDNS officers may conduct such searches on these websites as "open-source research for 'adjudicative or investigative' purposes," seemingly disregarding certain states' laws. This guidance also conflicts with 5 U.S.C. §552a(a)(7), which defines "routine use" "with respect to the disclosure of a record" as "the use of such record for a purpose which is compatible with the purpose for which it was collected." Further, statements made by Department leadership that personnel would not be "personally liable" for conducting these searches indicates a known concern about the legality of these actions.

**2. Creation of Erroneous Federal Law Enforcement Records**

The Disclosure also outlines the serious consequences for individuals whose information is being reviewed through this initiative. FDNS officers were instructed to create records known as "TECS records" for individuals who have been determined to be "unlawful voters" despite questions from

---

[6] Avery Lotz, *DOJ's voter roll crusade hits a courthouse wall,* Axios (Aug. 5, 2026), https://www.axios.com/2026/08/05/trump-doj-voter-roll-lawsuits-fail
[7] Assistant Attorney General Dhillon Letter to All States' Chief Election Officials Threatening Prosecution, Example Letter to Michigan Secretary of State Benson (July 7, 2026), available at: https://www.documentcloud.org/documents/28425163-20260707-doj-letter-and-memo-voter-eligibility/
[8] Disclosure Letter, 1.

officers regarding the source and accuracy of voting and immigration history information to make these determinations. TECS records are law enforcement records maintained by U.S. Customs and Border Protection (CBP) that carry significant downstream impacts on individuals, including naturalized U.S. citizens.

Now, tens of thousands of individuals are being investigated by FDNS officers through this initiative without their knowledge or ability to correct erroneous data. The Department's own training information acknowledges there will be serious flaws in the data, even stating "there will be U.S. citizens in this population."[9] At a time when immigration enforcement is significantly increasing at airports, U.S. citizens or other lawfully present noncitizens could be referred to secondary inspections by CBP personnel at ports of entry upon return to the United States from legally authorized travel abroad due to a TECS record based on questionable sources. While USCIS' materials caution about the possibility of unreliable data, personnel are nevertheless directed to generate records regardless of whether they believe that the DHS-provided data is correct, which can trigger referrals to Homeland Security Investigations (HSI).

### 3. Minimal Training and Reckless Quotas Leading to Criminal Investigations

As revealed in the Disclosure, staff were given just one session of training as part of this initiative – consisting only of a video that lasted approximately 1 hour and 45 minutes. Less than 3 business days later, assigned staff were expected to begin reviewing data, with quotas of 5 subjects per hour, or 40 per day over 8 hours. Not only is such a breakneck pace likely to cause fatigue amongst these staff, but it equates to approximately 12 minutes per subject – a completely inadequate timeline for investigating and reconciling multiple Alien Registration Numbers mistakenly or inadvertently issued to an individual, increasing the likelihood of error. Individual cases identified by this initiative can then be taken up by HSI for further action, including criminal investigations.

### 4. Questionable Source Data Compiled With "Supplemental Magic"

The Disclosure establishes a glaring lack of transparency around the source data provided by the Department for these investigations. The official training video states that the data was compiled with "supplemental magic." The video also establishes that both headquarters and USCIS personnel understand the shortcomings of both the state voter data and the federal immigration and citizenship data, including individuals with multiple alien numbers, but personnel are required to accept the data even when they believe it to be inaccurate. This use of "supplemental magic" on this data set to create records to be used against citizens shows a shocking disregard for the federal privacy and data laws enacted to protect the American people.

The Department has already shown repeated disregard for the Privacy Act and other laws and policies limiting federal agencies' collection, use, and sharing of individuals' records.[10] The Disclosure shows that some of the data being used to check against state voter rolls comes from the SAVE program. The

[9] *Appendix,* 25.
[10] *League of Women Voters v. Department of Homeland Security,* No. 25-cv-3501, Order Denying Federal Defendants' Motion for Stay Pending Appeal (D.D.C. July 8, 2026), *aff'd*, Order Denying Federal Defendants' Motion for Stay (D.C. Cir., Sept. 4, 2026).

modified use of SAVE is now barred by a federal court injunction, raising questions about whether the Department is following that court order.[11]

**Continuation of Administration's Baseless Claims of Election Fraud**

These activities are especially alarming just weeks before the 2026 midterm elections. They also must be seen in the context of the repeated, unverified claims by President Trump of widespread noncitizen voter fraud, including those made during his July 16, 2026, prime-time address from the White House. Over the past several weeks, *CNN*, *The New York Times*, *The Washington Post*, and *ProPublica* and other outlets have reported on the intense White House pressure on DHS and other agencies to back up the President's baseless claims of widespread election fraud.[12] Now, the Administration appears likely to use the "unlawful voters" supposedly identified with "supplemental magic" in ways that disenfranchise eligible voters and threaten state and local election officials before, during and after Election Day 2026.

In light of this Disclosure, DHS and USCIS must (1) be transparent about what they intend to do with the unreliable records they are generating; (2) immediately stop this initiative and related activities; and (3) remove any TECS or other law enforcement or administrative records generated from it. In addition to taking immediate corrective action, please provide answers to the attached questions no later than September 21, 2026.

Thank you for your prompt attention to this important matter.

Sincerely,

Alex Padilla
United States Senator
Ranking Member, Committee on Rules and Administration;
Ranking Member, Judiciary Subcommittee on Border Security and Immigration

Charles E. Schumer
United States Senator
Senate Democratic Leader

---

[11] Disclosure Letter, 3; *Appendix*, 18.

[12] Peter Elkind, et. al., *Inside Trump's Failed Hunt for Noncitizen Voters,* ProPublica (Aug. 14, 2026), https://www.propublica.org/article/noncitizen-voting-trump-homeland-security-investigations; Alvarez, et. al., *Exclusive: DHS plans to launch voter fraud investigation surge Tuesday*, CNN (Aug. 31, 2026), https://www.cnn.com/2026/08/31/politics/homeland-security-voter-fraud-investigations; Nick Corasaniti & Hamed Aleaziz, *Trump Administration Begins Blitz to Find Elusive Voter Fraud Ahead of Midterms*, New York Times (Sept. 2, 2026), https://www.nytimes.com/2026/09/02/us/politics/trump-election-voter-fraud.html; Ted Hesson, *Immigration Officers Are Being Diverted to Trump's Voter Fraud Effort,* Washington Post (Aug. 25, 2026), https://www.washingtonpost.com/immigration/2026/08/25/immigration-officers-are-being-diverted-trumps-voter-fraud-effort/.

cc: Chairman Mitch McConnell, Senate Committee on Rules and Administration
Chairman Chuck Grassley, Senate Committee on the Judiciary
Ranking Member Dick Durbin, Senate Committee on the Judiciary

## Questions for DHS and USCIS Regarding the Whistleblower Disclosure from Ranking Member Alex Padilla and Leader Chuck Schumer

1) How does DHS or any of its agencies plan to use the information generated by the USCIS "Unlawful Voter Initiative" (USCIS Initiative)? Has DHS or any of its agencies provided any information generated from the USCIS Initiative to HSI, the FBI, or any U.S. Attorneys' Offices? Has DHS or any of its agencies provided such information to any state or local election office for purposes of determining voter eligibility or does it intend to do so before or after November 3, 2026?

2) How many DHS employees, broken down by component agency and title, have been devoted to the USCIS Initiative, HSI "criminal voter fraud surge initiative," or any other initiative concerning alleged noncitizen voter registration or voting since January 20, 2025?

3) What assessment have DHS and USCIS conducted of the operational consequences of these reassignments on other missions, including fraud reviews and national security screenings? What work has DHS and USCIS chosen to pause or forego in order to reassign resources to the "Unlawful Voter Initiative"?

4) Which senior DHS or White House officials ordered, approved and oversee each election-related DHS initiative, including the HSI "criminal voter fraud surge initiative" and USCIS FDNS diversion?

5) What factual or statistical analyses did DHS conduct to determine that the prevalence of suspected voting by noncitizens warranted the personnel and resources assigned to these efforts? Please provide any analyses and explain how DHS determined that a surge immediately before Election Day 2026 was necessary and appropriate.

6) How is DHS obtaining voter data from states which have not voluntarily submitted it to the Department? Which office(s) at DHS headquarters or component agency is responsible for collecting and maintaining these records?

7) Provide all legal analysis for the USCIS Initiative, including any analysis of the Department's legal authority to access information on state voter websites, and specifically the direction for FDNS officers to enter false attestations or access state voter information websites identified for the use of voters or their authorized representatives.

    a) Did DHS or USCIS notify states that they intended to use these websites for this purpose?
    b) Does DHS or USCIS keep records of the numbers of false attestations by officers accessing state voter data by claiming to be a voter or their authorized representative?
    c) Has any officer who has access such websites ever truthfully identified themselves, and if so, under what circumstances?

8) Which federal, state or nongovernmental databases or other information sources are DHS employees using or accessing to identify, verify, or check for noncitizens on state voter rolls?

9) Did DHS or USCIS analyze whether any new or modified SORN, “routine use” justification, Privacy Impact Assessment, computer-matching/information sharing agreement, or other public notice or agreements were required before beginning these operations?

  a. Identify every Privacy Threshold Analysis, SORN, “routine use” justification, Privacy Impact Assessment, memorandum of understanding or agreement, data-use/information sharing agreement, legal opinion, Privacy Office review, state law or any other legal or compliance document applicable to these activities and explain how the Department has ensured compliance. Please provide a copy of each of the above that were completed for the USCIS Initiative, the HSI “criminal voter fraud surge initiative,” or any other initiative concerning alleged noncitizen voter registration or voting since January 20, 2025.

  b. If this disclosure of information was determined to be “routine use” as defined at 5 U.S.C. §552a(a)(7), please provide the reasoning that informed this conclusion. If not, please provide the basis under 5 U.S.C. §552a or any other federal privacy law that DHS and USCIS are subject to that justified the disclosure of this information and the reasoning that informed that justification.

10) What does the Department and USCIS mean in its use of the term “supplemental magic” in the training provided to FDNS officers? Please define the term and provide information about where the data FDNS staff were given to further their research originated from.

  a. How did the Department create its list of individuals to be investigated?
  b. What factors were considered when determining whether an individual merited review by USCIS?
  c. How many individuals were referred to USCIS for review under the USCIS Initiative?
  d. How many individuals have been reviewed by FDNS? How many individuals had TECS records created?

11) What training did DHS employees receive before initiating these voter efforts, including training concerning legal guardrails and limitations of DHS databases, state voter registration systems and the applicable restrictions on their use? Please provide a full copy of any training and guidance materials provided to officers and their supervisors on August 21, 2026, and any subsequent materials provided since the start of the USCIS Initiative.

12) What recourse do naturalized citizens and other noncitizens reviewed under this USCIS Initiative have to address an erroneous TECS record?

13) Please preserve and provide all guidance, policies, training materials, training videos, presentations, manuals, and other records regarding the USCIS “Unlawful Voter Initiative,” the HSI “criminal voter fraud surge initiative,” and related DHS activities to identify noncitizen voters on state voter rolls.

# EXHIBIT 2

Democracy Defenders Fund

**September 8, 2026**

The Honorable Alex Padilla
Ranking Member, Committee on Rules and Administration
U.S. Senate Committee on Rules and Administration
331 Hart Senate Office Building
Washington, D.C., 20510

**Re: Systemic Pattern of Potential Illegal Conduct and Data Falsification at DHS's "Unlawful Voter Initiative" — Anonymous Whistleblower Disclosure**

Senator Padilla:

Democracy Defenders Fund represents an anonymous federal whistleblower (hereinafter "Whistleblower" or "client") with direct knowledge of potential repeated illegality in connection with the U.S. Citizenship and Immigration Services-Fraud Detection and National Security Directorate Headquarters (USCIS-FDNS HQ) Unlawful Voter Initiative. The Whistleblower has reason to believe that, with the knowledge and at the direction of leadership at headquarters, the Unlawful Voter Initiative has potentially already committed thousands of violations of state law in an effort to improperly access individuals' voter records. The Whistleblower is similarly aware of detailed evidence of pressure to falsify federal records and believes that may have occurred on a large scale, potentially in violation of federal law. The details supporting our client's reports are set forth in the Appendix to this letter.

Our client reports that leadership of the Unlawful Voter Initiative are requiring DHS employees to utilize Personally Identifiable Information (PII), accessed through DHS internal data, to access state voter registration websites. The employees may be required to use the PII to make false attestations that they are the voter or are acting with the voter's express authorization, in order to access these individual voters' records. Such false representations would likely violate relevant state law. *See, e.g.*, Va. Code § 18.2-152.3. DHS has previously tried to obtain the unredacted voter files of nearly every State. *See* Nick Corasaniti & Alan Feuer, *Justice Department Issues Subpoenas for Voter Data in Nevada*, N.Y. Times (Sept. 4, 2026), https://tinyurl.com/yhdsjsn6. Because those demands violate the statutory and constitutional election framework, Democratic and Republican election officials have refused to comply. In response, DOJ has filed at least 31 lawsuits against those states and the District of Columbia to obtain the voter data. Melissa Quinn, *The Trump Administration has filed 31 lawsuits seeking states' voter data. Here's where they stand.*, CBS News (Aug. 17, 2026), https://tinyurl.com/3rvna3ut. DOJ has not been successful in a single case so far. The DHS Initiative appears to be an illegal alternative to DOJ's unlawful efforts.

Democracy Defenders Fund

The Whistleblower reports that given the nature of the Initiative, the pressures put on officers, and the instructions given by headquarters, it is likely the case that no officer who has sought to access information on a state website has been truthful about his or her identity. The Unlawful Voter Initiative includes all 50 states and is targeted at up to hundreds of thousands of individuals. The officers received their first and only training on Friday, August 21, and were considered ready to begin the Initiative on Tuesday, August 25. They are required to review and determine if the PII belongs to an "unlawful voter," and each officer was given a quota of at least five subjects to be reviewed per hour and 40 subjects per day, with USCIS-FDNS-HQ leadership tracking their output—giving officers only twelve minutes to determine if a subject is a U.S. citizen, if they should be considered an "unlawful voter," and enter a record against them (called a "TECS" record).[1] The Whistleblower understands that the goal is to complete this stage of the initiative by September 12.

When the Whistleblower and others expressed concerns about the legality of this conduct to USCIS-FDNS HQ, the response was that individual officers would not be personally liable for conducting the searches when they are done as part of their official duties and properly documented. No explanation was offered as to why officers would not be legally liable. That statement implies awareness that the activity is illegal and nevertheless requires DHS officials to continue improperly accessing state voter records. Only one substantive response was provided to the concerns raised by the Whistleblower and others, namely that these searches are permissible as open-source research for "adjudicative or investigative" purposes. However, that appears inconsistent with the guidance listed in DHS's Rules of Behavior required for accessing other, less sensitive information, such as social media posts; and also the USCIS Rules of Behavior, in which employees agree that they "will not attempt to access systems [they are] not authorized to access" and "will not attempt to bypass access control measures." No attempt was made to explain these discrepancies, leading the Whistleblower and others to believe that DHS leadership may be knowingly requiring them to break the law and DHS policies.

Furthermore, the Whistleblower reports widespread doubts among officers working on the Initiative about the accuracy of the source data DHS is providing to its employees, through USCIS-FDNS HQ, as part of the Unlawful Voter Initiative. The data DHS provides often consists of unverified voter registration and/or voting dates and is known to conflict with data found in other sources. Indeed, the inaccuracies of this DHS data are widely known and acknowledged by DHS itself. The State Citizenship Lists DHS is putting together, pursuant to the President's Executive Order No. 14399, *Ensuring Citizenship Verification and Integrity in*

[1] "TECS" is officially an acronym with no definition. It originally stood for Treasury Enforcement Communication System. https://www.aila.org/library/cbp-memo-muster-on-tecs-name-change.

Democracy Defenders Fund

*Federal Elections*, 91 Fed. Reg. 17125 (Mar. 31, 2026), must be compiled from "citizenship and naturalization records, SSA records, SAVE data, and other relevant Federal databases." 2026 Elections EO, § 2(a). Yet both SSA and DHS have both acknowledged systematic data gaps and unreliability in the underlying data set for purposes with respect to determining voter eligibility and citizenship. *See e.g.,* Letter from Nancy Morales Gonzalez, Assoc. Gen. Couns., SSA, to Jon Sherman, Litig. Dir. & Senior Couns., Fair Elections Ctr., Re: Application for Records and Testimony of a Social Security Administration (SSA) Employee in a Federal Civil Case 2 (Jul. 13, 2023), https://perma.cc/KS2N-U2US.[2]

Moreover, the internal data often does not include the sources of the information, and USCIS-FDNS HQ does not and will not elaborate on the specific sources and dates of data it provides to the officers conducting reviews. When officers expressed their misgivings about the unreliability of the data to leadership, they were told they were required to create the TECS law enforcement records of unlawful registration and/or voting irrespective of their concerns. Although the training acknowledges that the voter data set contains inconsistent information, officers were told to assume that the data provided by DHS to USCIS-FDNS HQ was accurate enough to determine whether an individual may have voted or registered to vote by a specific date.

At one point in the training video, there was an express recognition of these flaws. The video tells DHS employees that certain information that is not included in the source data will be "brought in through supplemental magic." Magic is not a recognized form of record keeping under state or federal law.

As a result, our client reports that TECS law enforcement records are regularly created against individuals based solely on DHS data that is unverified, inconsistent with other information, and/or is unexplained to the officers working on the Initiative. Our client also reports that TECS law enforcement records have been created against U.S. citizens. Such records can have ramifications for individuals far beyond the voting context. TECS law enforcement records can be used against them in ***any*** interaction they may have with the federal government, such as crossing the border during travel or seeking a benefit.

---

[2] *See also* DHS, Privacy Threshold Analysis for the SAVE Program 17, 34, 38–39 (approved Jul. 17, 2025), https://perma.cc/9AXY-WCLU (DHS knew that there were "shortfalls in data accuracy" for SAVE, and warned that SAVE "may share inaccurate information with registered agencies"); DHS, DHS Ref. No. DHS/USCIS/PIA-006(d), Privacy Impact Assessment for the Systematic Alien Verification for Entitlements "SAVE" Program 19 (Oct. 31, 2025), https://perma.cc/G92U-LYPM; USCIS, Voter Registration and Voter List Maintenance Fact Sheet (Aug. 27, 2025), https://perma.cc/Q5F7-YBCA ("if an individual with acquired citizenship has not received a Certificate of Citizenship from USCIS (e.g., some foreign-born children of U.S. citizens) or is not designated as a U.S. citizen in SSA records, SAVE may not be able to confirm that individual's U.S. citizenship").

Democracy Defenders Fund

Our client wants it known that they believe the responsibility for this potentially illegal activity lies solely with USCIS-FDNS HQ. The Whistleblower believes that their colleagues below that level, up to and including regional leadership, are likely also victims of an abuse of power. Our client wants it known that they would not have had the courage to come forward if not for them speaking up internally, many before our client did. They are outstanding public servants and do not deserve to be vilified for being placed in an impossible situation by headquarters.

Our client, a lawful anonymous whistleblower, feels it is their duty to come forward and reveal potentially unlawful conduct related to the "Unlawful Voter Initiative." Our client is understandably extremely concerned about retaliation by Administration officials should their identity become known. As such, we ask that reasonable steps be taken to maintain their anonymity throughout the whistleblowing process. The Whistleblower makes this disclosure out of concern that law enforcement records used against individuals, including U.S. citizens, are being created through potentially unlawful means and based upon unreliable information. That is a dangerous abuse of the power of the federal government. We respectfully submit this disclosure for inquiry and investigation. Our client welcomes referral of the matter to any other oversight bodies with relevant authority and jurisdiction.

Sincerely,

/s/ Norman L. Eisen
Norman L. Eisen
Executive Chair
Democracy Defenders Fund
[redacted]

/s/ Stephen A. Jonas
Stephen A. Jonas
Chief Counsel & Director, Rapid Response Legal
Democracy Defenders Fund
[redacted]

Democracy Defenders Fund

## Appendix — Anonymous Whistleblower Disclosure

This document reflects the Whistleblower's personal knowledge and assessment. Given the size of the Initiative and the speed being demanded of officials, USCIS-FDNS HQ has put extraordinary pressure on employees despite the legal risk involved. Our client has an extreme fear of retaliation, but they feel an obligation to speak up about the misconduct and gross mismanagement they have witnessed.

### 1. "UNLAWFUL VOTER INITIATIVE"

On Friday, 08/21/2026, FDNS IOs received instructions to stop everything being worked on and immediately watch a 1 hour 45 minute training video provided by USCIS-FDNS HQ. The video, referenced throughout this statement, is the only formal training provided by USCIS-FDNS HQ for the Unlawful Voter Initiative surge. It was also the first time officers may have heard of the Initiative that they would be mandatorily assigned, to effective immediately. USCIS-FDNS HQ also provided a link to an internal FDNS website listing all 50 states and provided links to each state's official state voter registration website, along with some other guides, links, and a PowerPoint presentation.

Three days later, on 8/24/2026, FDNS completed a reorganization that brought IOs throughout the country under more direct control of headquarters. The Unlawful Voter Initiative appears to be the very first action taken by headquarters using the newly reorganized FDNS.

By Tuesday, 8/25/2026, officers were considered trained and ready to begin reviewing data provided by DHS to the officers through USCIS-FDNS HQ. This data contains the personal information of tens or hundreds of thousands of individuals throughout all 50 states, including US citizens. Officers are supposed to review and determine if the information belongs to an "unlawful voter" and were given a quota of at least five subjects to be reviewed per hour. If the officer determines the subject to be an unlawful voter, they are to create a TECS record against them so that they may be subjected to additional scrutiny. Our client understands that the goal is to complete this stage of the Initiative by 9/12/2026.

**Details:** Evidence supporting this statement is provided below. This is not all of the evidence that exists, but it is what the Whistleblower feels can be provided at this time without revealing their identity. Much of the evidence discussed in this statement is sourced to the mandatory training video, along with a transcript that was provided with the video. The creation of the transcript appears to have been automated and there are minor transcription errors with some words, but the transcript accurately reflects what was said in the training video. We have only redacted information that could potentially be used to identify an individual officer as there is extreme fear within FDNS of retaliation for discussing this activity. We are only including details from the transcript that we believe to be indicative of violations of law, gross

mismanagement, and/or abuse of authority.

## 2. ACCESSING STATE VOTER REGISTRATION WEBSITES USING DECEPTIVE INFORMATION

Image 1 shows the mandatory training video provided by USCIS-FDNS HQ, with the URL in the bottom left of the screenshot being the link to the internal FDNS website for this initiative. The transcript for the training video was provided on the right side of the screen with timestamps for the video—which will be referenced throughout this statement:




Image 1 – FDNS Unlawful Voter Surge Training Video

Training Video Transcript:

14:00
But the part that I really want to emphasize for purposes of this surge, it's a lot, but there's information in a table at the bottom part of this sight and it go, it lists every single state available.
14:14
So we have in the column on the far left is obviously the state.
14:22
The next is that link in the state.
14:26
It's a hyperlink to go to their state voter registration or voter site.

Image 2 (below) shows the main page for the Initiative that was referenced in the video. The first state voter registration website that is linked to (Alabama) is shown at the bottom of the screenshot and is also used as an example in the training video (Image 3 and Image 4).



Image 2 - FDNS Unlawful Voter Initiative Internal Website with Link to Alabama State Voter Registration Website




Image 3 - FDNS Unlawful Voter Initiative Internal Website Visible in Training Video (Alabama)

Training Video Transcript:

> 14:56
> So I have Alabama up on the screen.
> 14:58
> If you are assigned to cases, Alabama cases, and you want to search their state registration site, you would need the first name, the last name, and the date of birth of the person as it was entered at their registration.




Image 4 – Alabama Voter Registration Website Linked from FDNS Unlawful Voter Initiative Internal Website

As can be seen from both the transcript of the training video and the screenshot of the Alabama Voter Registration website, in order to access the voter information and obtain the voter's information as instructed by the training, an officer must input the name and DOB of the voter as if it were that voter ("confirm *your* registration status….").

Images 5 and 6 (below) show the link to Virginia on the FDNS initiative website. The fact that an attestation is required for Virginia and some other states is highlighted on the FDNS initiative website with ("Attestation"). The link to Virginia's Department of Elections website is visible in the bottom left corner from moving the on-screen cursor over the "Virginia" hyperlink.



Image 5 - FDNS Unlawful Voter Initiative Internal Website Showing Virginia with "(Attestation)" Highlighted




Image 6 - Close-Up of Virginia State Voter Registration Website Link with "(Attestation)" Highlighted

Image 7 (below) shows the Virginia Department of Elections website linked on the FDNS initiative website. Note that in order to conduct a search on this site, the officer is required to make an attestation certifying and affirming that they are the voter or acting with their express authorization. It also makes clear that it is unlawful to access the information of any other voter.




Image 7 – Virginia State Voter Registration Website Linked from FDNS Unlawful Voter Initiative Internal Website.

What follows is the full text of attestation on Virginia website:

> "I certify and affirm that the information provided to access my voter registration is my own or l am expressly authorized by the voter to access this information. I understand that it is unlawful to access the record of any other voter, punishable as computer fraud under Va. Code § 18.2-152.3."

The two other states in the Initiative internal website with highlighted attestation requirements are Florida and Massachusetts (Image 8, Image 9, Image 10, and Image 11 below).




Image 8 – FDNS Unlawful Voter Initiative Internal Website Showing Florida with “(Attestation)” Highlighted.




Image 9 - Florida State Voter Registration Website Linked from FDNS Unlawful Voter Initiative Internal Website

The website makes clear that “This website is intended for use by a registered voter to determine his or her voter registration and voting status.”



Image 10 - FDNS Unlawful Voter Initiative Internal Website Showing Massachusetts with "(Attestation)" Highlighted




Image 11 - Massachusetts Voter Registration Website Linked from FDNS Unlawful Voter Initiative Internal Website

The website states that "This webpage is intended for use by the individual voter to determine their voter registration status."

Democracy Defenders Fund

While other states may not have an explicit attestation requirement, the wording and nature of their websites make it clear that their use is intended for the registered voter only. California is another example.



Image 12 - FDNS Unlawful Voter Initiative Internal Website Showing Link to California State Voter Registration Website

Democracy Defenders Fund




Image 13 - California State Voter Registration Website Linked from FDNS Unlawful Voter Initiative Internal Website

As stated on the website: “To find your record, you will need to enter some personal information. Close your browser when you are done to protect your personal information.” It goes on to say: “In order to find an exact match, your voter registration record must have either a California driver license or identification card (DL/ID) number, or the last four digits of your social security number. For best results, please enter both your DL/ID and last four digits of your social security number.”

In light of these instructions about access to the state websites, officers expressed concerns that accessing registered voter information on these websites may be illegal as officers are essentially misrepresenting themselves as the potential registered voter (with or without a specific attestation).

There is a statement on the FDNS initiative website that “OCC advises that it is permissible for Immigration Services Officers and Immigration Officers to use these state voter websites for purposes of confirming voter registration status as it pertains to an alien’s eligibility for an immigration benefit.” A similar statement is also found in the PowerPoint presentation provided for this initiative (Image 14 below).



Image 14 - FDNS Unlawful Voter Initiative PowerPoint Presentation Slide 12

However, this broad statement appears to conflict with the state law cited in the Virginia state voter registration site's attestation and likely other state laws requiring truthful information when accessing the state's websites. Moreover, it does not clarify the legal authority used to access state voter registration websites despite this clear and obvious conflict.

As noted, not all state websites call for attestations or possibly even identification as a voter to access information. But because of the nature and pressures put on officers participating in the Initiative and the instructions given by USCIS-FDNS HQ, it is likely the case that no officer who has sought to access information on a state website has been truthful about his or her identity.

The training video said that OCC "advised that it is perfectly OK for IS OS, for adjudicators and for FDNSIOS to use those websites [the "state websites on the ECN site"] to search records," and provided the links to those sites. (41:53).

Despite this conclusory statement in the training video, requests were made in the last week of August to leadership for details on the legal justification and authority for seemingly violating state law and making false attestations. The response was twofold:

- OCC advised that this type of review is permissible as open-source research when conducted for purposes related to adjudicative or investigative responsibilities.

- IOs and Immigration Services Officers (ISOs) are not personally liable for conducting these searches when done as part of their official duties and properly documented.

Notably, the statement "IOs and ISOs are not personally liable for conducting these searches when done as part of their official duties and properly documented" does not provide adequate legal justification or any authority for conducting these searches. Part of an officer's basic training includes a detailed overview of the legal basis for their authority, so it is not at all improper for an officer to ask for the specific laws that they are relying on to exercise it. However, this statement suggests that there may be legal implications for accessing these websites, but that the officers themselves are simply not personally liable. This leads us to believe that USCIS-FDNS HQ is aware that the activity may be illegal, and yet they are still requiring officers to engage in this illegal activity with promises of personal liability protection.

Stating that these searches are permissible as open-source research for "adjudicative or investigative" purposes relating to voting is a change from the earlier justification that the searches pertain to "an alien's eligibility for an immigration benefit."

This also appears to be inconsistent with USCIS and DHS guidance. The USCIS Rules of Behavior (which uses the same language as found in "Information Technology System Security Program, Sensitive Systems Attachment G Rules of Behavior") states that every USCIS employee must acknowledge and abide by a System Access section that specifically says, "I will not attempt to access systems I am not authorized to access." The next section (Passwords and Other Access Control Measures) specifies "I will not attempt to bypass access control measures." Accessing those state websites is therefore a fundamental violation of the most basic rules of behavior that all employees must acknowledge.

Furthermore, it is also inconsistent with the DHS Rules of Behavior required for accessing other, less sensitive information such as social media posts. For example, page 8 of the publicly available Privacy Policy for Operational Use of Social Media Instruction 110-01-001 states that employees should "Respect individuals' privacy settings and access only information that is publicly available unless the individual whose information the employee seeks to access has given consent to access it." It is inexplicable for private social media information to be afforded more protection than an individual's voter registration information and voting record, especially when sensitive PII is necessary to access the voter information without the individual's knowledge or consent and with the officer falsely attesting to be the registered voter.

## 3. SOURCE, ACCURACY, AND SCOPE OF PII DATA PROVIDED BY DHS TO USCIS-FDNS HQ

Democracy Defenders Fund

There are multiple steps to the Unlawful Voter Initiative: 1) verifying that the data provided by DHS to USCIS-FDNS-HQ matches USCIS holdings; 2) making a determination as to whether or not the identified individual is a U.S. citizen and voted/registered to vote ("lawfully" or "unlawfully" based on when their U.S. citizenship was acquired); and 3) creating a record in TECS to alert any government agency with access to TECS (including HSI) that the subject was identified as a potential unlawful voter.

Training Video Transcript:

> 0:38
> In a nutshell, you're going to review information, specifically voter data and determine if it is a match to USCIS subject data, USCIS holdings, and ultimately if it is, is that person an unlawful voter or not?
> —
> 1:07
> And then ultimately for unlawful voters, you will be creating a TECS record.



Image 15 - FDNS Unlawful Voter Initiative PowerPoint Presentation Slide 8

There are, however, widely known problems with the accuracy of the data provided by DHS to USCIS-FDNS HQ, which manifest in the second and third steps described above. As already documented earlier in this statement, officers are being directed to verify voter registration dates

and voting dates provided by DHS using state voter registration websites. Aside from the legal issues already discussed, officers have noted that sometimes the information provided by DHS to USCIS-FDNS HQ contradicts results from the state voter registration websites; a state voter registration website may show that there is no match to an individual, while the data provided to officers by USCIS-FDNS HQ lists specific voter registration dates and a date on which the subject may have first voted. With such a direct contradiction, knowing the specific source and date of the information is necessary to determine reliability before taking any action.

USCIS-FDNS HQ does not and will not elaborate on the specific sources and dates of data it provides to the officers conducting the review. In the training video and when directly questioned, generalized or canned statements are provided. The problem is further compounded by the fact that explicit instructions were given that the data provided by DHS to USCIS-FDNS HQ should be assumed to be accurate enough to determine that an individual may have voted or registered to vote by a specific date. Yet the training repeatedly points to the inconsistencies in the data, noting that sometimes the voter registration date is provided in the initial data set and sometimes it is not.

Training Video Transcript:

> 7:15
> You might also not have a registration date, but you would find that through other other research and we'll go over some of that in in just a minute.

The training leaves it up to the officer to check whether the person may have voted, again acknowledging that the data is inconsistent:

> 7:50
> So based on what you have available and information you find, did they vote yes or no?
> 7:55
> And if they did vote, you want to enter the earliest election date in the next field.
> 8:02
> Again, this might be a data point provided to you from the source data, and in some cases it might not be.
> 8:10
> You might have only a registration date provided in the source data.
> 8:15
> And when you go on to do some additional research, for example, looking up the subject in a state voter website, you might find an election in addition to a registration date provided in the data.
> 8:33
> Or vice versa, we might get an election date.

The training acknowledges that there is a confusing collection of data from many different sources as well as differences across the states. The training video compares Connecticut to Illinois, as an example. While Connecticut's records provide both the voter's registration date and their earliest election date, Illinois provides only the voter registration date and no election date whatsoever. (16:25-17:20).

The training video transcript then states that the information is coming from multiple sources, and acknowledges incongruities between the systems and the states, and between the states themselves:

> 17:43
> So accurate [*sic*: "Accurint" - see below] and clear [see below] both have voter records available.
> 17:47
> Some states are in both systems, some states are in one or the other, some states are in neither.
> 17:53
> So just know that in addition to the data points provided with your assignment, you also will have an opportunity to look up voter records
> in accurate and clear.
> 18:03
> I would say if like here for Arizona, Arizona isn't in accurate or clear.
> 18:10
> So you probably don't have to waste your time even looking because it's just not a record that is there at this time.

(Note that "accurate" refers to the commercial database Accurint, with the pronunciation similar enough to cause an error in the likely-automated transcription. "Clear" refers to the commercial database Thomson Reuters CLEAR.)

In some states, the only source for voter registration dates or voting dates besides the state voter registration website is DHS data. This is plainly visible on the internal Unlawful Voter Initiative website, with the rightmost column indicating where state voter registration data may also be found besides the state voter registration website (e.g., commercial databases like Accurint or Clear). For example, the training video states that the Social Security number included in the aforementioned Connecticut data comes from Accurint. (16:12). In the case of California, however, there is no such other source (Image 16 and Image 17):

Democracy Defenders Fund



Image 16 – FDNS Unlawful Voter Initiative Internal Website Showing Column Headers, Available Data Sources

| | | | |
|---|---|---|---|
| California (CA) | First Name; Last Name; Date of Birth; California Driver's License/Identification Card or Last 4 of SSN | Data Source(s): DHS<br>First Name: Yes<br>Middle Name: Yes<br>Last Name: Yes<br>Date of Birth: Yes<br>Year of Birth: No<br>Country of Birth: Yes<br>A#: No<br>SSN: No from source; Yes from Accurint<br>Address: Yes<br>Phone #: Yes<br>Registration Date: Yes<br>Election Date: Yes (all elections)<br>Email: Yes | |

Image 17 - Close-up of California State Voter Registration Website Link

For California, there is no way to verify the voter registration dates or voting dates in the data provided by DHS without accessing the California state voter registration website, which may not be legal and has been stated by officers to often be inaccessible due to technical errors. Officers are specifically told to rely on the data DHS provided for California and use the voter registration dates and voting dates provided in that data to indicate that the subject may be an unlawful voter and create a TECS record. Throughout the training video, officers are told to do their own research and make their own determinations as to whether an individual may have unlawfully voted or registered to vote. In practice, the officers' determinations must hold the DHS-provided voter registration dates and voting dates to be accurate despite any reasonable concerns or evidence to the contrary.

Training Video Transcript:

> 18:28
>
> I just want to, I want to really stress how important the source data is.

Democracy Defenders Fund

18:32
So like [REDACTED] mentioning in the third column, the data provided to FDNS.
18:36
So the data sources, it has IRIS.
18:38
If it says IRIS, that means it was received via save.
18:42
If it says DOJDHS or is there an ICE, [REDACTED], that might be an ICE too.
18:47
All of those values, that's just the, that's just the agency that passed us the public voter file.
18:54
So these are all still public voter files.
18:56
The data source.
18:56
It doesn't mean that the initial source was DHS.
18:58
It means that that's how we received the file.
19:00
So, this public voter file for California was passed to us by the department.
19:05
So like that's how we received it.
—
21:56
To illustrate the point, this will be populated with 10s of thousands of actual cases in the very near future.
22:06
And this is what you will access.
22:09
So this is what it will look like.
22:12
And for those of you who just click on the link, there's just going to be 10s of thousands of records here.
—
26:29
All of these things come in the source data if it's available, if it's blank, you know, or if the ECN site says for example the date of birth did was not something provided and you see a date of birth here, then that is possible that was brought in as a supplemental effort through FDNS enhancements.

> 26:52
> So if the ECN site says no date of birth and you see a date of birth that did not come from the source data, that would be applicable to any of these fields that could potentially come in the source data.
> 27:07
> So the reason we have it broken up here, we have a full date of birth and then we have a month and year, and we have a year of birth is because some states provide only a year of birth.
> 27:18
> It'll be a first name, middle name, a last name, and a year of birth only.
> 27:23
> So that's why you'll see so many variations of the date of birth.
> 27:29
> The voter address, some states do provide a voter address that they entered at the time of registration.
> —
> 29:20
> We do not get A numbers in source data not so we that is something that's going to be brought in through ***supplemental magic***. (emphasis added).

There may be no better description of the DHS source data, or at least the lack of visibility afforded to us in how it was compiled, than "supplemental magic." In the end, this "supplemental magic" is being relied upon to enter TECS records against people, including U.S. citizens, despite known issues with the source data.

As the Training Video Transcript states:

> 4:00
> Be aware of what is, what information was provided by the source compared to what information you have available, and you're ultimately going to compare those two things and determine is this a subject match?
> 4:14
> Is the voter a match to DHS systems?
> —
> 5:54
> We pull in the A number based on USCIS holdings, but in some instances you'll see people have multiple A numbers or for one reason or another, maybe there's an error in the data.
> —
> 8:56
> So if the subject, if you determine that the subject is an unlawful voter and you need to

enter a text record, in those instances for all unlawful voters, we're going to be entering text records.

(Note that "text records" in the transcript refer to "TECS records," with the pronunciation similar enough to cause an error in the likely-automated transcription.)

The Whistleblower emphasized that verifying data provided by DHS through USCIS-FDNS HQ is not an objectionable requirement. If the data for an individual is found to be accurate, lawfully using available systems and resources to determine if an alien did in fact vote or register to vote would also not be an objectionable requirement (at least not rising to the level of abuse of authority and/or gross mismanagement). Creating a TECS record on an individual (which is the responsibility of and attributable to an individual officer) would also not be an objectionable requirement, assuming the officer is reasonably certain that the data upon which the record relies is accurate enough that a TECS record is merited. However, it is clear to our client and other DHS employees that the data they are being forced to rely upon is not reliable.

Officers have expressed concerns about the requirement to enter TECS records that would not otherwise be created without the voter registration date and/or voting dates provided in the DHS source data. When explicitly asked if officers could complete the assignment without creating TECS records that rely solely on the DHS source data for voter registration and/or voting dates, officers were told "no" by FDNS leadership. This will have a significant impact on certain states, e.g. California, where voter registration and voting dates were often provided only in the DHS data because of inaccessibility or inconsistency with the California state voter registration website data and the absence of sources such as Accurint or Clear. The result is that a significant number of TECS records, potentially thousands or tens of thousands, will be created against California residents based on data that an officer may have good reason to believe is unreliable or inaccurate without corroboration.

This requires the officer to create a record in TECS under their own name that they may believe to be inaccurate or false due to reasonable reliability concerns with the DHS data. The Whistleblower, given their extensive experience serving in government, believes this rises to the level of gross mismanagement and abuse of authority by USCIS-FDNS HQ, as many of these records are likely being created by officers based on a fear of reprisal and discipline as opposed to confidence in their assessment of the data. From what our client has directly observed in the completed assignments, it appears more California residents than not that were included in the DHS source data have had TECS records created against them. From what our client has directly observed, multiple officers have specifically noted in their comments that the only accessible source for a voter registration date or voting date was the DHS data. Additional accuracy issues with the source data are also described throughout the video, including regarding US citizens which will be expanded on in the next section.

For example, the training video discussed the implications of multiple alien numbers ("A numbers") and Social Security numbers associated with a person:

> 29:32
> And then we have if there's multiple [A] numbers, perhaps consolidated a numbers, multiple related to subjects for whatever reason, you see that in the set column, the [A] number set and it just shows the primary versus what is possibly, you know, multiple [A] numbers for the same person that will help you drive your research.
> 29:55
> This social is the next column.
> 29:57
> If that is available in the data, it will be brought in.
> 30:02
> Generally, you will have this provided it is not provided in the source data generally, but it could be, it perhaps will be in the future, but it is *or* brought in from supplemental, you know, from supplementing the data.
> 30:17
> So you'll likely have a value there when you get these cases.
> 30:22
> And I'll just, sorry, I'll just add that [REDACTED] touched on this, but it's very likely that a lot of these assignments will have multiple and alien numbers and multiple Social Security numbers, right?
> —
> 30:49
> So there's a lot of different criteria here.
> 30:50
> When there are multiple alien number sets in that next column, there could be multiple alien numbers that both relate to the voter or there could be multiple alien numbers that relate to completely different people.
> 31:02
> And what we do is this is a sign because one of those alien numbers might be a non citizen.
> 31:07
> So it's important to check both alien numbers and see whether they relate back to your voter.
> 31:11
> And the same goes for the social.
> 31:13
> When you're reviewing cases, you will see you you will see a lot of cases that have multiple Social Security numbers as well.

> 31:19
> So, you know, they might not both relate to the same person.

And later in the video, the trainer says:

> 54:45
> Social Security numbers, last thing before we move on, they may not be accurate.
> 54:50
> Do not rely solely on the Social Security information.

### 4. U.S. CITIZENS

Officers are required to use the PII of confirmed U.S. citizens in order to access state voter registration websites without their knowledge or consent. This is done to find evidence that a naturalized US citizen may have registered to vote or voted prior to naturalization. If the "supplemental magic" associates someone with an alien number, even if it is outdated because that individual has long since become a citizen, and the reviewing officer confirms there is a match between the subject and the alien number in USCIS databases, they will use the known U.S. citizen's PII in an attempt to find evidence that they registered to vote or voted prior to naturalization. The only way for a U.S. citizen to escape this scrutiny is for the officer to determine that there is not a subject match. It is irrelevant if a subject naturalized decades ago, has no current applications with USCIS, or even if they're deceased. All that matters is that the DHS source data indicates that they are a subject with an alien number that registered to vote or voted.

As the Training Video Transcript states:

> 10:19
> So we have public voter files that people that voted in these states, that raw data includes a lot of U.S.
> 10:24
> citizens.
> 10:24
> So what we did is we took the voters and we tried to match them up against USCIS holdings.
> 10:30
> And then once we match them up against USCIS holdings, we tried to identify whether that CSUSCIS holding is a current citizen.
> 10:39
> But what I'll say is the two biggest determinations that you're going to make is 1, whether the person is a match, right?

10:45
So whether the voter is a match to the USCIS holding and two, whether that USCIS holding is a current alien or whether they're current USCS holding as a citizen.
—
19:16
So the two big elements to our review is 1, reviewing to see whether it's a subject match and two, and we'll stress this throughout the presentation.
19:24
And two, reviewing to see whether the person is [a US] citizen.
19:28
If you're reviewing the voter and you determine that the alien number that's brought in through USCIS holdings is not a subject match to the voter, then you are not, you know, you, you won't be reviewing citizenship, you'll be focusing on just the subject match.
—
19:56
So, you know, review the, the, the, the information you're reviewing is the voter source data and not the USCS holdings that we bring in.
20:03
*So* even if that [A] number is an alien, you wouldn't be marking that it's not a citizen because it doesn't correspond to the voter source data, which is always the most important data.
—
32:14
So starting with subject match, you will fill that in and when you sorry, it's not it's not working at the moment, but you will have a yes or no option
here to select.
32:30
If you select yes, you will continue through the form.
32:33
If you do not have a subject match, you will select no and then you can move.
32:41
You can move to the comments, which is the very last field and just say why it was not a subject match and move on to your next assignment.
32:53
USC.
32:54
This is how the subject match will work as well.
32:57
So it's a yes or no.
32:59

So if you have a subject match, you now move to the are they [a US] citizen, yes or no?
33:06
If yes, you know you look at when that occurred pre or post restoring election and make that determination.

Again, FDNS requires that the DHS-provided voter registration date and/or voting date in the source data must be considered accurate. An officer would therefore be required to create a TECS record against a known U.S. citizen if the voter registration date and/or voting date provided in the DHS data predates their confirmed naturalization date, even if an officer reasonably believes that the DHS source data is not reliable enough to justify creating a TECS record. In other words, the current process is knowingly sweeping known US citizens in as potentially "unlawful voters."

## 5. ADDITIONAL CONSIDERATIONS




Image 18-FDNS Unlawful Voter Initiative PowerPoint Presentation Slide 15

USCIS-FDNS HQ also acknowledges that there are U.S. citizens included in this data and references using Social Security Administration and Department of State data for assessing possible U.S. citizens. They also specifically state that U.S. citizens with petitioning spouses can have their Social Security Numbers inaccurately linked to their alien spouses. Officers, however, were instructed that the petitioning U.S. citizen spouses were "likely entitled to vote."

Training Video Transcript:

36:30
OK, I'm just going to, I'm going to state a couple of things really quick.
36:34
So first, there will be U.S.
36:37
citizens in this population.
36:39
So we've done the best we can.
36:41
We're going to talk about, you know, how we, the review process at the end, but like, unfortunately, we're relying on the data we have available.
36:48
We have taken it and bet and done batch, batch queries against Social Security Administration and Department of State for US passports.
36:55
But the way that, the way that the systems work, it's not perfect.
37:00
So during your reviews, you will identify U.S.
37:02
citizens.
37:03
So I just want to throw that out there.
37:04
My apologies.
37:05
You know, thank you.
37:06
We're, we're still, we're just doing the best we can.
—
55:41
One thing we've seen is that sometimes USC petitioning spouses, their socials are linked to their alien spouse.
55:53
So one thing to keep in mind is that as you search the social and and for example, PCIS, it might be returned to like an alien that I'm for sure the alien spouse.
56:03
But in reality, the social belongs to the petitioning spouse, who is the US citizen who was likely entitled to vote.

56:10
So that's just something to keep in mind.

As USCIS-FDNS HQ has acknowledged, it can be very difficult to determine if a subject is a U.S. citizen or not. They may be natural-born citizens and have no interactions with the federal government that can be easily queried (passports, cross-border travel, etc.), or they may have derived citizenship automatically even if they are not considered natural born. There is no single, clear data source to confirm that a subject is a U.S. citizen. In many cases, the only proof of U.S. citizenship for a person may be held in local or county birth records.

The last approximately 50 minutes of the hour-and-45-minute training video is specifically about derivative citizenship and complex scenarios, mentioned here to illustrate the potential complexity and difficulty in determining if someone is a U.S. citizen.

Here's one example from the Training Video Transcript:

54:20
And if they obtain their permanent residence as a minor look, you know, consider the derivative elements of that.
54:29
I'm not going to go into that right more because right now because the whole, you know, next section is on the Child Citizenship Act and we're going to go over the derivative part of this a bit.
—
56:35
But one thing we have found that the most complicated part or the most challenging part, these are pretty straightforward reviews.
56:43
And but the challenging, the most challenging ones we have seen are when they relate to people who have potentially derive citizenship.

Below is a case example that was discussed in the video.

Democracy Defenders Fund




Image 19 - FDNS Unlawful Voter Initiative PowerPoint Presentation Slide 34

Training Video Transcript:

1:23:53
And for our last example, this particular one is an instance when we talked about having multiple alien numbers or Social Security numbers associated in the systems.
1:24:08
What we were looking at for the particular this particular provided data was the voter name and the voter data was not a complete or exact match.
1:24:21
The DOB information provided only included a year.
1:24:26
[REDACTED] talked about in some instances you may have month and year, full date of birth and some of the other provided data it may only be the year.
1:24:35
This particular example, the year was also off by one year in terms of the partial name hit.
1:24:44
So first name was a match, last name was a match.
1:24:47
There was a little bit of a difference in terms of the formatting.
1:24:51

It was as if the surname had been combined together, but there also was a middle initial provided that middle initial could not be associated to the individual in our systems.
1:25:04
And then the other piece that we're looking at within the data is the address provided.
1:25:09
So the voter information, voter roll provided address when you're looking at our systems, is that an address that has been used on another USCIS
filing.
1:25:22
Can we, if not within our systems, can we associate that that that address to the individual using one of our commercial databases?
1:25:32
Clear, accurate, those are all things that as you're reviewing, you'll be sort of looking at in this instance that could not be associated when *you* do a little bit further dive into the two Social Security numbers provided.
1:25:49
One of those Social Security numbers in clear in this particular instance was associated to one individual.
1:25:58
The other Social Security number was actually and clear then associated to the actual voter.
1:26:06
It did require a little bit more of a deep dive in that we, you know, taking a closer look at the other Social Security number provided searches then showed an ACRQ record for [a US] passport issuance.
1:26:22
The other individual had naturalized it was prior to that voting date.
1:26:27
This one just allowed us to then determine, you know, it wasn't a match.
1:26:31
But because of the close similarities, the cross of the two Social Security numbers, the name, it required just a little bit more searching of that other Social Security number to determine if it was a match, if the individual voted and also, you know, were they a citizen prior to voting.
1:26:53
So these examples you'll see sort of common in terms of maybe being associated to more than one alien number, Social Security number.

Officers are expected to complete at *minimum* 40 subject reviews a day, or 5-6 per hour for 8 hours. This means that officers are expected to take no more than 12 minutes to determine if a

subject is a U.S. citizen or not, determine if they are to be considered an "unlawful voter," and enter a TECS record against them before moving on to the next subject. Officers are reminded that FDNS leadership is tracking their output and will question why they are not meeting quotas.

**CLOSING STATEMENT**

Anyone reading this account from our client could find themselves (or elements of their identity) linked in the DHS data through "supplemental magic." If so, will a federal officer use their identity to access their private voter records? Will the officer decide their identity to be that of a U.S. citizen and "lawful voter" within the allotted 12 minutes? Or will they be labeled an "unlawful voter" before the officer proceeds to the next person to meet their quota?

These are critical questions that our client believes must be presented to the American public.

# EXHIBIT 3

# *Trump Administration Begins Blitz to Find Elusive Voter Fraud Ahead of Midterms*

Election fraud is exceedingly rare, but President Trump has fixated on rooting it out this year, claiming without evidence that tens of thousands of noncitizens are registered to vote.

---

Listen · 11:32 min




**By Nick Corasaniti and Hamed Aleaziz**

Sept. 2, 2026

Hundreds of federal agents from the Department of Homeland Security have been assigned to an intensive, weekslong hunt for noncitizens among the nation's registered voters despite an absence of evidence of widespread fraud, according to documents and training videos reviewed by The New York Times.

Agents are scouring voter rolls managed by the states, and are using personally identifiable information about individual voters, such as their dates of birth and partial Social Security numbers, to look them up on those rolls, according to the documents.

In some cases, investigators are effectively posing as individual voters by plugging their names and personal information into public-facing websites run by the top election official in each state. Some of these sites declare they are meant for individual use, potentially raising privacy concerns.

The extraordinary operation reveals the extent to which the Trump administration is searching for evidence of fraud ahead of the November elections. The government is privately calling the effort the Unlawful Voter Initiative and is pulling agents from their normal duties, which include investigating such serious crimes as human trafficking and terrorism.

Given the decades of evidence showing how rare noncitizen voting is, it's unclear what the administration will discover, how verifiable any findings will be and what President Trump or Homeland Security Secretary Markwayne Mullin plans to do with those findings. A database managed by the conservative Heritage Foundation identifies roughly 100 instances of noncitizen voting over a quarter-century. More recently, roughly 400 noncitizens — a tiny fraction of the electorate — voted in New Jersey after a software glitch led to their improper registration.

Mr. Trump has falsely claimed since his defeat in 2020 that fraud is epidemic in U.S. elections. This year, he has focused heavily on noncitizen voting, calling it a "crisis of election security" in a speech in July and regularly making unsubstantiated claims that hundreds of thousands of residents who are not citizens have registered to vote or have cast ballots.

The president has used his claims to justify sweeping voting restrictions that he wants Congress to enact, and others that he is trying to implement with an executive order that remains tied up in federal court. He has also suggested that the restrictions, such as requiring proof of citizenship to register to vote, would help Republicans win elections in what polls suggest is shaping up to be an otherwise unfavorable year for his party.

Mr. Trump's unrelenting focus on noncitizen voting has concerned election officials from both parties. So far, the administration has been unable to verify his claims, and has effectively admitted at times that its numbers have been

overstated. Yet the public repetition of falsehoods about election fraud has continued to sow doubt and distrust in the electoral process ahead of a charged midterm election that will determine control of Congress.

All of it has left voting-rights groups and Democrats increasingly concerned that the president will try to interfere with the election. And it has alarmed former officials with the Department of Homeland Security that the agency is being weaponized as part of the effort.

“This is a nakedly political fishing expedition using questionable methods to intimidate people from exercising their right to vote,” said Amanda Baran, a former senior citizenship and immigration official from the Biden administration.

The Department of Homeland Security said in a statement that the department “is committed to ensuring that only U.S. citizens vote in U.S. elections. President Trump and Secretary Mullin have made the integrity and security of our elections a top priority.”

## A 50-State Hunt

Core to the operation is a compilation of data on hundreds of thousands of voters from across the country. It is not clear if this is the same data the department cited when it announced in July that tens of thousands of noncitizens were registered in four states — a claim that proved to be vastly overstated. It is also not clear what the criteria were for assembling the data: Early examinations revealed that it includes some United States citizens, according to an individual who spoke on the condition of anonymity to describe the sensitive operation.

Agents have made more than 1,000 referrals to Homeland Security Investigations of cases determined to warrant further review, according to a Department of Homeland Security official. The agents are looking for

noncitizens who have registered to vote or actually voted — or for naturalized citizens who registered before they were eligible, according to the documents. The cases then pass to H.S.I. officers who are in the field conducting interviews, said the official, who requested anonymity to discuss internal processes.

**Sign up for the On Politics newsletter.** It's a pivotal moment for American politics. Join us for 2026 and beyond. Get it sent to your inbox.

According to training documents reviewed by the Times, the agents involved in the operation are part of the Fraud Detection and National Security Directorate of U.S. Citizenship and Immigration Services. They received a training video last week, and were assigned voter data to scour from the 50-state list, according to a person familiar with the training.

The documents do not state what agency built the list or where the source data comes from. But a training video viewed by The Times states that most of the initial data came from public voter files obtained from states through various agencies within the government.

The agent's first step is to see if the voter data is a match to D.H.S. databases that include citizenship information, applications and other data regarding immigration status. Following a match, they are then instructed to scrub department databases for citizenship status and dates of naturalization for a "potential unlawful voter." This could include noncitizens who have cast ballots, those who have registered but not voted, or those who are now citizens but were registered to vote before becoming eligible, according to the documents.

The agents are instructed to use public voter registration websites hosted by secretaries of state or other top election officials in each state. An internal website for the Unlawful Voter Initiative, screenshots of which were reviewed by

The Times, includes links for each state directing agents to these websites, most of which were designed for voters to check their own personal registration status and vote history.

Since his defeat in 2020, Mr. Trump has falsely claimed that fraud is epidemic in U.S. elections. Jenn Ackerman for The New York Times

An introductory page on the internal website states that "conducting checks on open-source state voter registration websites" and commercial databases "can offer evidence of voter registration or voting."

One slide from the training reviewed by The Times includes guidance from the office of the chief counsel at Homeland Security, stating that "it is permissible" for agents "to use these state voter websites for purposes of confirming voter registration status as it pertains to an alien's eligibility for an immigration

benefit." During the training video, agents are told that the Office of Chief Counsel "has advised that it is perfectly OK" for agents "to use those websites to search records, so those links are there for you."

During a separate part of the training video, a D.H.S. official gives an example using Alabama's voter portal.

"I have Alabama up on the screen," the instructor says. "If you are assigned to cases, Alabama cases, and you want to search their state registration site, you would need the first name, the last name, and the date of birth of the person as it was entered at their registration."

Some of these public-facing voter look-up sites are intended only for use by the voter. In Florida, the voter status portal includes a disclaimer stating "this website is intended for use by a registered voter to determine his or her voter registration and voting status." In New York, the portal says, "To use this page, you must be a registered voter in the New York State." In Virginia, users must check a box attesting: "I certify and affirm that the information provided to access my voter registration is my own or I am expressly authorized by the voter to access this information. I understand that it is unlawful to access the record of any other voter."

Privacy protections and voter information statutes vary from state to state, so it is unclear what, if any, legal gray area federal investigators might be entering.

Nina Sheridan, a spokeswoman for the California attorney general, said the office is "working vigorously to protect confidential voter data, and we stand ready to guard against attempts by the federal government to circumvent longstanding protections we have in place." She added that the office will be "monitoring closely."

## A Diversion of Resources

The agents from the fraud division who have been pulled from their normal duties for the Unlawful Voter Initiative include a broad range of investigators who specialize in investigating a host of crimes including national security threats and immigration enforcement.

Documents reviewed by The Times reveal that the investigation spans multiple divisions within D.H.S., suggesting a broad, departmentwide operation. While most of the investigatory work is falling to agents within U.S. Citizenship and Immigration Services, the agents are sending referrals to Homeland Security Investigations and sharing data with D.H.S. Election and Integrity, a new division created during this administration and a top priority of Mr. Trump and Mr. Mullin.

Earlier this week, HSI agents were told of a "Criminal Voter Fraud surge initiative" that would start this week, and involve field interviews and "timely prosecutorial review," according to documents reviewed by The Times. The surge initiative was first reported by CNN.

Yet during training, D.H.S. officials appeared cautious of overzealous investigations and wary of their data. During one of the training videos, Paul Gleason, a D.H.S. official, urged trainees to avoid incorrectly identifying citizens as noncitizen voters. That error has occurred when investigators have identified noncitizens in government records, such as driver's license data, without digging in to see that they have since been naturalized.

"The purpose of this process is to refer unlawful voters and unlawful registered voters to H.S.I.," Mr. Gleason said. "You know, it's not the opposite. We're not referring confirmed U.S. citizens. So what I mean by that is, is if you believe somebody likely derived citizenship, we should lean towards not making the referral. Right? We don't want H.S.I. to go to the doors of U.S. citizens and, you know, put them in handcuffs or question them. We're only referring people that we believe are unlawful voters."

**Nick Corasaniti** is a Times reporter covering national politics, with a focus on voting and elections.

**Hamed Aleaziz** covers the Department of Homeland Security and immigration policy for The Times.

---

A version of this article appears in print on , Section A, Page 1 of the New York edition with the headline: Administration Pulling Agents From Usual Jobs To Examine Voter Rolls

# EXHIBIT 4

Sign in to CNN with Google

Continue

ADVERTISEMENT



POLITICS • 4 MIN READ

# Exclusive: DHS plans to launch voter fraud investigation surge Tuesday

UPDATED AUG 31, 2026

By Priscilla Alvarez, Tierney Sneed, Gabe Cohen




A polling station in Manhattan's Tribeca neighborhood on June 23, 2026. *(Laura Brett/Getty Images)*

The Department of Homeland Security is planning a surge in its efforts to investigate voter fraud in select states starting Tuesday, according to internal federal guidance reviewed by CNN.

Homeland Security Secretary Markwayne Mullin has accelerated efforts to make the department a central force in President Donald Trump's hunt for purported widespread election fraud. DHS has pushed states to share their voter rolls for audit and has vowed to withhold grant funding from those that refuse to adopt a broader set of election reforms.

ADVERTISEMENT

The department has leaned for investigative work on one of its agencies — Homeland Security Investigations — an arm of Immigration and Customs Enforcement that typically tackles major crimes like human trafficking, drug smuggling and child exploitation. The agency has already surged an unprecedented number of agents to work on cases, including chasing down voter histories of people believed to be noncitizens who may have illegally voted or registered to vote.

Experts say there is no evidence that widespread voter fraud has occurred in recent elections.

Starting Tuesday, HSI is launching a "coordinated criminal voter fraud surge initiative to pursue investigative leads, conduct field interviews, and support timely prosecutorial review," the guidance says.

Offices in nine states are expected to take investigative action from early September to mid-October, according to the guidance. Those states include Washington, Wisconsin, Missouri, Georgia, California, Pennsylvania, Nevada, New York and Connecticut.

The guidance's reference to investigative steps is notable given the push comes as midterm elections get underway. Such "overt" investigatory actions while elections were approaching have historically been discouraged, under long-standing Justice Department policy limiting investigative actions could influence elections.

ADVERTISEMENT

"Doing otherwise runs the risk of chilling legitimate voting and campaign activities and of interjecting the investigation itself into ongoing campaigns and the adjudication of any ensuing election contest," the Justice

Department manual says. "It may, however, often be appropriate, in consultation with the Public Integrity Section, to share information and allegations involving such matters with state or local authorities where an immediate need for overt measures exists."

The DOJ formally rescinded the policy under the first Trump administration but still mostly abided by it, and it was reinstated under President Joe Biden.

But DHS, as a separate department, is not obligated to follow the policy, and the new guidance makes no reference to those timing concerns.

"While ICE Homeland Security Investigations is not able to comment on any active investigations, HSI is actively rooting out and investigating election fraud wherever it can be found," a Homeland Security spokesperson said in a statement. "Under President Trump, HSI is committed to restoring integrity to our election systems and ensuring that American citizens and only American citizens are electing American leaders."

**RELATED ARTICLE**

What Trump's Supreme Court win means for mail ballots

7 MIN READ

Under the Trump administration, agents have, for example, been assigned to investigate whether naturalized US citizens registered or voted before becoming citizens, CNN previously reported. Another memo directed HSI agents to coordinate with US Citizenship and Immigration Services to begin removal proceedings when a noncitizen is suspected of or linked to voter fraud.

ADVERTISEMENT

Despite the dramatic shift of resources toward investigating election fraud, the administration has brought only a handful of prosecutions — mostly targeting cases of noncitizens voting or being unlawfully registered to vote.

Still, the administration has touted alleged election fraud arrests. Last week, the Justice Department announced that

a Honduran national who was legally living in the United States had been arrested and charged with fraudulently registering to vote and falsely claiming to be a US citizen.

“Today’s arrest is the first of many to come,” First Assistant United States Attorney Bill Essayli said in a statement.

Mullin, meanwhile, has positioned himself as a leading enforcer of Trump’s voter-fraud crackdown. Earlier this summer, his department announced an audit of public voter rolls had identified more than 250,000 registered noncitizens in just four states: California, Pennsylvania, New Jersey and Nevada.

“One thing that I love about numbers, and I love about facts, is they don’t lie,” Mullin told reporters at the time, warning that election officials who fail to secure the midterms could face fines or even jail time.

ADVERTISEMENT

But the numbers have, thus far, proved far less definitive than DHS initially suggested. The department publicly claimed it had found nearly 16,000 noncitizens on Nevada’s voter rolls. But behind closed doors, the department acknowledged to the state’s top election officials that it had “confirmed” just 185 of them, according to internal records reviewed by CNN. Another 6,200 were labeled “higher confidence matches” — but still required further vetting.

*This article has been updated with additional developments.*

## Up next



'A criminal is a criminal': DHS Secretary Mullin defends aggressive deportation efforts as some Republicans waver
6:52



Trial Tracker: Crime, Court, Consequences



Vulnerable Republicans are increasingly defying President Trump ahead of the midterms
7 MIN READ

## Most popular

1 Cindy Crawford's son, model Presley Gerber, dies at 27

2 'Crisis even bigger than Covid': American business owners are barely getting by

3 Venezuelan DoorDash driver shot and wounded by ICE agent in Austin, Texas, officials say

4 Major TV networks stand with CNN, decline to replace its White House pool crew

AID CONTENT



d by Charles Schwab
ow to Earn and Maximize Travel Points



Ad by E*TRADE from Morgan Stanley
Trade crypto*, stocks and more at E*TRADE. *Powered by zerohash







d by Charles Schwab
ack-to-School Stocks for Your Portfolio



Ad by Charles Schwab
Gambler's Blues: Betting Isn't Investing



d by MFS Investment Management
ispel myths and focus on ETF features
nstead



Ad by SmartAsset
Ask a Pro: "I'm 65 With $1.1M Saved. What's My Retirement Budget?"



Ad by Charles Schwab
Power and AI Boost Infrastructure Investments




d by FinanceBuzz
l Dumb Mistakes The Middle-Class Can’t Afford Right Now in
laryland .



Ad by E*TRADE from Morgan Stanley
Start investing in crypto* at E*TRADE. *Powered by zerohash



d by TradeStation
everage TradeStation's platform to trade



Ad by Fisher Investments
Get Planning Tips for Any Stage of



Ad by NerdWallet Advisors Match
Ask An Advisor: Should I Take Social

cross asset classes. Retirement [free guide] Security at 62 or Wait Until 70?



d by SavingsAccounts.com
D Rates That Can't be Ignored



Ad by The Motley Fool
Motley Fool Gives “Total Conviction” Buy Alert



d by Solace Bands
For $99: A New Experience With Your pple Watch



Ad by hear.com
Experts Tested 17 Hearing Aids. Their #1 Will Shock you



Ad by Reuters Plus for TD
What successful small businesses have in common

---

Search CNN...

Subscribe

Sign in

Listen

Watch

US

World

Politics

Business

Markets

Health

CNN Underscored

Entertainment

Tech

Style

Travel

Sports

Science

Climate

Weather

Ukraine-Russia War

Israel-Hamas War

Watch

Listen

Games

About CNN

Politics

FOLLOW CNN POLITICS

DOWNLOAD THE CNN APP

Download on the App Store GET IT ON Google Play

Terms of Use Privacy Policy Do Not Sell Or Share My Personal Information Ad Choices Accessibility & CC About Subscribe Newsletters Transcripts Help Center Sitemap

© 2026 Cable News Network. A Warner Bros. Discovery Company. All Rights Reserved.
CNN Sans ™ & © 2016 Cable News Network.

# EXHIBIT 6

An official website of the city of philadelphia government Here's how you know

Philadelphia City Commissioners

English

Menu

# News

# 2026 General Election: Mail Ballots, Office Hours, and Drop Boxes

**Last updated: September 17, 2026**

**With the 2026 General Election approaching, mail ballots are now being printed, and will arrive in voters' mailboxes soon!** Voters have until **5:00 PM on Tuesday, October 27th** to request a mail ballot. Mail ballot applications can be submitted online, by mail, or in person. Beginning **Wednesday, September 14th**, voters can apply for, complete, and return a mail ballot in person at City Hall or at any of our 10 District Satellite Election Offices.

The **Philadelphia County Board of Elections Office**, located in City Hall, Room 140, is now open for in-person mail ballot services. Visitors can access this office from 9:00 A.M. to 5:00 P.M. Monday through Friday, and 10:00 A.M. to 4:00 P.M. on Saturday and Sunday..

**Satellite Election Offices** across Philadelphia are also open, providing voter registration and in-person mail ballot services. These offices operate from **9:00 A.M. to 5:00 P.M. Monday through Friday, and from 10:00 A.M. to 4:00 P.M. on Saturday and Sunday.**. A full list of Satellite Election Office locations is available at vote.phila.gov/seos.

## Office Hours:

| **In-Person Mail Ballot Services**<br>City Hall, Room 140 | **Voter Registration and**<br>**In-Person Mail Ballot Services** |
|---|---|

| | |
|---|---|
| Mon – Fri: 9:00 A.M. – 5:00 P.M.<br>Sat – Sun: 10:00 A.M. – 4:00 P.M. | Satellite Election Offices<br>*Locations citywide*<br>Mon – Fri: 9:00 A.M. – 5:00 P.M.<br>Sat – Sun: 10:00 A.M. – 4:00 P.M. |

At these locations, voters may apply for a mail ballot in person, receive it, complete it, and return it, all in the same visit.

**Mail ballots must be returned and received—not postmarked—by the Philadelphia County Board of Elections no later than 8:00 P.M. on Election Day, Tuesday, November 3rd, 2025.** An interactive map of mail ballot drop-off locations is available at phila.gov/voting.

### Mail Ballot Drop Box Locations:

- City Hall (South Broad Apron): 1400 John F Kennedy Blvd, 19107
- ~~Corner of Kingsessing and S 50th St: 50th St & Kingsessing Ave, 19143~~ **Temporarily Closed.**
- ~~Corporal Jimmy O'Connor Memorial Playground: 4330 Deerpath Lane, 19154 (formerly Chalfont Playground)~~ **Temporarily Closed.**
- Dorothy Emanuel Rec. Center: 8500 Pickering Street, 19150
- Eastern State Penitentiary: 2027 Fairmount Ave, 19130
- Eastwick Library: 2851 Island Ave, 19153
- Election Warehouse: 11311 Roosevelt Blvd, 19154
- Engine 55 Fire Station: 101 W Luzerne St, 19140
- Engine 64 Fire Station: Benner St and Rising Sun Ave, 19111
- Ford PAL Rec. Center: 609 Snyder Ave, 19148
- Heitzman Rec: 3645 Amber St, 19134
- Independence Branch Library: 18 S 7th St, 19106
- ~~Kendrick Rec: 5822 Ridge Ave, 19128~~ **Temporarily Closed.**
- Markward Playground: 400 S LeCount St, 19146
- Overbrook Park Library: 7422 Haverford Ave, 19151
- Pelbano Rec. Center: 8101 Bustleton Ave, 19152
- Pleasant Playground: 6757 Chew Ave, 19119
- Satellite Election Office – 1st Council District: 1835 S Broad St, PA 19148
- Satellite Election Office – 2nd Council District: 6100 Woodland Ave, 19142

- Satellite Election Office – 3rd Council District: 4029 Market St, 19104
- Satellite Election Office – 4th Council District: 5610 Lancaster Ave, Unit 400, PA 19131
- Satellite Election Office – 5th Council District: 2301 N Broad St, 19132
- Satellite Election Office – 6th Council District: 6420 Frankford Ave, 19135
- Satellite Election Office – 7th Council District: 2739 N 5th St, Philadelphia, PA 19133
- Satellite Election Office – 8th Council District: 5301 Chew Ave, PA 19138
- Satellite Election Office – 9th Council District: 6233 N Broad St,PA 19141
- Satellite Election Office – 10th Council District: 1619-1681 Grant Ave, Ste. 15-16,PA 19115
- Shepard Rec. Center: 5700 Haverford Ave, 19131
- ~~Shissler Rec. Center: 1800 Blair Street, 19125~~ **Temporarily Closed.**
- Smith Playground: 2100 S 24th St, 19145
- Stenton Playground: 4600 N 16th, 19140
- Strawberry Mansion HC: 2840 W Dauphin St, 19132
- ~~Vogt Rec. Center: 4131 Unruh Ave, 19135~~ **Out of order due to construction.**
- Wynnefield Library: 5325 Overbrook Ave, 19131
- Voter Registration Office, Riverview Place: 520 N Columbus Blvd, 19123

**The deadline to apply for your mail ballot is Tuesday, October 27th, 2026, at 5:00 PM.** Voters can apply for an emergency absentee ballot if an emergency (an unexpected trip or illness, for example) arises after the deadline for standard mail ballot applications. An "emergency absentee application" may be obtained from the Board of Elections, either in person or by mail. Emergency applications and completed ballots MUST be received by the County Board of Elections no later than 8:00 P.M. on Election Day. For more information, visit our Vote by Mail page.

**Voters may only drop off their own ballot.** If a voter has a physical disability or illness which prevents them from personally picking up or returning their Absentee or Mail-in Ballot, they should complete the form to designate an agent to transport their ballot and submit the completed forms along with their ballot, secured with a rubber band or paper clip to the outside of the ballot. The **Designation and Certification of Agent Form** can be downloaded

below. (English)

Posted on: September 15, 2026

## More from City Commissioners

See All News

## Contact the City Commissioners

### Commissioner Omar Sabir (D), Chair

215-686-3462, 3463
215-587-9107
Omar.Sabir@phila.gov

### Commissioner Lisa M. Deeley (D), Vice-Chair

215-686-3460, 3461
215-686-3947
Lisa.Deeley@phila.gov

### Commissioner Seth Bluestein (R)

215-686-3464, 3467
215-686-3472
Seth.Bluestein@phila.gov

## Department contact Information

### Connect With Us

### County Board of Elections

City Hall, Rm 142
1400 John F Kennedy Blvd
Philadelphia, PA 19107
Phone: 215-686-3469

### Voter Registration Office

520 N Columbus Blvd, 5th Fl
Philadelphia, PA 19123
Phone: 215-686-1591

### Election Board Unit

520 N Columbus Blvd, Ste 512
Philadelphia, PA 19123
Phone: 215-685-4811

## Resources

Register to Vote

Polling Places

Election Results

Satellite Election Offices

# EXHIBIT 5

Brief

# Voter Registration Deadlines

Updated May 20, 2026

**Related Topic:** Elections

Voter registration deadlines vary by state. The National Voter Registration Act (NVRA) of 1993 requires that states set their voter registration deadlines for federal elections no more than 30 days before an election. Some states set their deadlines at this 30-day mark, while others permit voters to register up to Election Day and anywhere in between. States may also have different voter registration deadlines for applications completed online, by mail and in person. Deadlines may also differ based on election type.

The categories below summarize in-person registration deadlines. Additional state-by-state details are provided below in Table 1.

- Fifteen states, the Virgin Islands, and American Samoa have a voter registration deadline 28-30 days before an election:
    - Alaska, Arizona, Arkansas, Florida, Georgia, Indiana, Kentucky, Louisiana, Mississippi, New Mexico, Ohio, Rhode Island, South Carolina, Tennessee, and Texas
- Nine states have a voter registration deadline 20 to 27 days before an election:
    - Delaware, Kansas, Missouri, New Jersey, North Carolina, Oklahoma, Oregon and West Virginia
- Seven states and Guam have a voter registration deadline one to 19 days before an election:
    - Alabama, Massachusetts, Montana, Nebraska, New York, Pennsylvania and South Dakota
- Nineteen states and Washington, D.C., have voter registration available on Election Day. Many also offer same-day registration and voting during the early voting period (see NCSL's webpage on Same-Day Registration for additional information):
    - California, Colorado, Connecticut, District of Columbia, Hawaii, Idaho, Illinois, Iowa, Maine, Maryland, Michigan, Minnesota, Nevada, New Hampshire, Utah, Vermont, Virginia, Washington, Wisconsin and Wyoming.
- Montana and North Carolina offer same-day voter registration during the early voting period, but not on Election Day.
- North Dakota does not have voter registration.
- In Puerto Rico, SB 717 (2026) required the Electoral Registry to close 50 days prior to a general or primary election. The commission may establish a period shorter than 50 days for other types of voting.

This page is intended as a reference to legislators who are looking at their state's voter registration deadlines in comparison to other states and is not intended as a resource for voters to determine their state's voter registration deadline.

## Voter Registration Deadlines: Number of Days Before an Election Voters Must Register

*These states have a registration deadline but it does open back up with same-day registration and voting on Election Day or during the early voting period.




30+ days
28-30 days before Election Day
20-27 days before Election Day
1-19 days before Election Day

## Table 1: Voter Registration Deadlines

| State | Registration Deadline | Statute(s) |
|---|---|---|
| Alabama | Fifteen days before an election. | AL ST § 17-3-50 |
| Alaska | Thirty days before an election. | AK ST § 15.07.070(c) |
| American Samoa | Twenty-nine days before an election. | U.S. Vote Foundation |
| Arizona | Twenty-nine days before an election. | AZ ST § 16-120 |
| Arkansas | Thirty days before an election. | AR CONST Amend. 51, § 9 |
| California | Fifteen days before an election.<br><br>Same-day registration is permitted 14 days before an election and on Election Day. | CA ELEC § 2170 |
| Colorado | Eight days before an election.<br><br>Same-day registration is permitted during early voting and on Election Day.<br><br>Deadlines for voter registration drives are 22 days before an election. | C.R.S.A. § 1-2-201<br><br>C.R.S.A. § 1-2-217.7 |
| Connecticut | Seven days before an election.<br><br>Same-day registration is permitted on Election Day.<br><br>Deadlines for primary elections are different. | C.G.S.A. § 9-23g<br><br>C.G.S.A. § 9-19j |
| Delaware | Twenty-four days before an election.<br><br>Deadlines for special elections are different. | DE ST TI 15 § 2036 |
| District of Columbia | Twenty-one days before an election. | DC ST § 1-1001.07 |

| | | |
|---|---|---|
| | Same-day registration is permitted on Election Day. | |
| Florida | Twenty-nine days before an election. | FL ST § 97.055 |
| Georgia | Twenty-nine days before an election.<br><br>Deadlines for special elections are different. | GA ST § 21-2-224 |
| Guam | Fifteen days before an election. | Guam Code Ann. tit. 3, § 3105 |
| Hawaii | Ten days before an election<br><br>Same-day registration is permitted during early voting and on Election Day. | HI ST § 11-24<br><br>HI ST § 11-15.2 |
| Idaho | Eleven days before an election.<br><br>Same-day registration is permitted on Election Day. | Idaho Code § 34-408<br><br>Idaho Code § 34-408A |
| Illinois | Twenty-eight days before an election; 16 days before if registering online.<br><br>Same-day registration is permitted from 27 days before the election and on Election Day.<br><br>Availability and locations of same-day and Election Day registration vary by county. | 10 ILCS 5/4-6<br><br>10 ILCS 5/4-16<br><br>10 ILCS 5/5-5<br><br>10 ILCS 5/6-29<br><br>10 ILCS 5/5-50 |
| Indiana | Twenty-nine days before an election. | IN ST § 3-7-13-10 |
| Iowa | Fifteen days before an election; postmarked 15 days before an election for mail registrations.<br><br>Same-day registration is permitted during in-person absentee voting and on Election Day. | IA ST § 48A.9<br><br>IA ST § 48A.7A |

| | | |
|---|---|---|
| Kansas | Twenty-one days before an election.<br><br>Deadlines for presidential preference primaries are different. | KS ST § 25-2311 |
| Kentucky | Twenty-nine days before an election. | KY ST § 116.045 |
| Louisiana | Thirty days before an election; 20 days before if registering online. | LA R.S. 18:135 |
| Maine | Twenty-one days before an election.<br><br>Same-day registration is permitted on Election Day. | ME ST T. 21-A § 121-A<br><br>ME ST T. 21-A § 122 |
| Maryland | Twenty-one days before an election.<br><br>Same-day registration is permitted during early voting and on Election Day. | MD ELEC LAW § 3-302<br><br>MD ELEC LAW § 3-305<br><br>MD ELEC LAW § 3-306 |
| Massachusetts | Ten days before an election. | M.G.L.A. 51 § 26 |
| Michigan | Fifteen days before an election.<br><br>Same-day registration is permitted during early voting and on Election Day. | M.C.L.A. 168.497<br><br>M.C.L.A 168.498 |
| Minnesota | Twenty-one days before an election.<br><br>Same-day registration is permitted during early voting and on Election Day. | MN ST § 201.054<br><br>MN ST § 201.061 |
| Mississippi | Thirty days before an election. | MS ST § 23-15-37 |
| Missouri | Twenty-seven days before an election. | MO ST § 115.135 |

| | | |
|---|---|---|
| Montana | Thirty days before an election.<br><br>Voters may also register during the late registration period ending at noon the day before Election Day. | MT ST § 13-2-301<br><br>MT ST § 13-2-304<br><br>MT ST § 13-2-514 |
| Nebraska | Eleven days before an election if registering in person; 18 days before if registering online or by mail. | NE ST § 32-302<br><br>NE ST § 32-304 |
| Nevada | Twenty-eight days before an election in-person; postmarked 28 days before if registering by mail; five days before if registering online.<br><br>Deadlines for special elections are different.<br><br>Same-day registration is permitted during early voting and on Election Day. | NV ST § 293.560<br><br>NV ST 293.5847 |
| New Hampshire | Six to 13 days before an election, depending on local supervisors of the checklist.<br><br>Same-day registration is permitted on Election Day. | NH ST § 654:7<br><br>NH ST § 654:7-a |
| New Jersey | Twenty-one days before an election. | N.J.S.A. 19:31-6 |
| New Mexico | Twenty-eight days before an election.<br><br>Same-day registration is permitted 28 days prior to the election until the Saturday prior to Election Day. Election Day registration is available for statewide contests. | NM ST § 1-4-8 |
| New York | Ten days before an election | NY ELEC § 5-210 |
| North Carolina | Twenty-five days before an election.<br><br>Same-day registration is permitted during early voting. | NC ST § 163-82.6 |

| | | |
|---|---|---|
| North Dakota | North Dakota does not have voter registration. | N/A |
| Northern Mariana Islands | Sixty days before an election. | C.N.M.I. Code Ann. tit. 1, § 6205 |
| Ohio | Thirty days before an election. | OH ST § 3503.19 |
| Oklahoma | Twenty-five days before an election. | OK ST T. 26 § 4-110.1 |
| Oregon | Twenty-one days before an election. | OR ST § 247.017 |
| Pennsylvania | Fifteen days before an election. | 25 P.S. § 3071 |
| Puerto Rico | Fifty days before an election. | 16 L.P.R.A. § 4571; Law Number 39-2026 |
| Rhode Island | Thirty days before an election. | RI ST § 17-9.1-3 |
| South Carolina | Thirty days before an election. | SC ST § 7-5-150 |
| South Dakota | Fifteen days before an election. | SD ST § 12-4-5 |
| Tennessee | Thirty days before an election. | TN ST § 2-2-109 |
| Texas | Thirty days before an election. | TX ELECTION § 13.143 |
| Utah | Eleven days before an election. | UT ST § 20A-2-102.5 |

| | | |
|---|---|---|
| | Same-day registration is permitted during early voting and on Election Day. | UT ST § 20A-2-206<br><br>UT ST § 20A-2-207 |
| Vermont | Same-day registration is permitted through Election Day. | VT ST T. 17 § 2144 |
| Virginia | Eleven days before an election.<br><br>Same-day registration permitted during early voting and on Election Day.<br><br>Deadlines for special elections differ. | Va. Code § 24.2-416<br><br>Va. Code § 24.2-416 |
| Virgin Islands | Thirty days before and election. | VI ST T. 18 § 94 |
| Washington | Online and mail-in registrations must be received no later than eight days before an election.<br><br>In-person registration is permitted through 8 p.m. Election Day. | WA ST 29A.08.140 |
| West Virginia | Twenty-one days before an election. | WV ST § 3-2-6 |
| Wisconsin | Twenty days before an election if registering online or by mail. Friday before election if registering in-person.<br><br>Same-day registration is also permitted on Election Day. | WI ST § 6.28<br><br>WI ST § 6.29 |
| Wyoming | Fourteen days before an election.<br><br>Same-day registration is also permitted on Election Day. | WY ST § 22-3-102<br><br>WY ST § 22-3-104 |

**Same Day Voter Registration**
Same Day Voter Registration

Voter Registration Deadlines, Vote.org

U.S. Vote Foundation

## Note: This page should be used for general informational purposes only.

Our organization does not run elections and cannot provide legal advice. If you are a voter looking for assistance, please contact your local election official. You can find your local election official's website and contact information by using this database from the US Vote Foundation.

## Related Resources

Updated September 17, 2026

### Political Advertisement Disclaimers

Nearly every state has enacted disclaimer requirements for political advertising, although the scope and application of those laws vary considerably. At their core, disclaimer laws generally require political advertisements to identify who paid for the communication and, in some cases, whether it was authorized by a candidate or political committee. Common examples include statements such as "Paid for by..." or "Approved by..."

**Elections**

***Table***

Updated September 15, 2026

### 6 Questions: What's Going On With the New Mail Ballot Rules?

With elections in just 70 days, the White House, the courts and the Postal Service are involved in ongoing legal disputes over mail ballot rules.

**Elections**

***State Legislatures News***

Updated September 15, 2026

### Political Speech Is Protected, Even When Candidates Stretch the Truth

Various courts have ruled that state fair campaign practice laws can infringe on free speech rights.

**Elections**

***State Legislatures News***

# EXHIBIT 7

WASHINGTON

Secretary of State

Menu

# Dates and Deadlines 2026

English

If you are registered to vote but missed the opportunity to change your address, you can still vote. Contact the elections division in the county where you are registered to receive your ballot.

Registrations and changes to your registration made after the last day to change your information will take effect for the next election.

View the complete elections calendar.

## Special Election

| Date | Event |
|---|---|
| January 23 | Start of 18-day voting period (through Election Day). Ballots are mailed out and Accessible Voting Units (AVUs) are available at voting centers. |
| February 2 | Online and mail registrations must be received 8 days before Election Day. Register to vote in person during business hours and any time before 8:00 p.m. on Election Day |
| February 10 | Deadline for Washington State voter registration (in person only) |
| **February 10** | **Special Election** - Deposit your ballot in an official drop box by 8 p.m. on Election Day. |

## Special Election

| Date | Event |
| --- | --- |
| April 10 | Start of 18-day voting period (through Election Day). Ballots are mailed out and Accessible Voting Units (AVUs) are available at voting centers. |
| April 20 | Online and mail registrations must be received 8 days before Election Day. Register to vote in person during business hours and any time before 8:00 p.m. on Election Day. |
| April 28 | Deadline for Washington State voter registration (in person only) |
| **April 28** | **Special Election** - Deposit your ballot in an official drop box by 8 p.m. on Election Day. |

## Candidate Filing

| Date | Event |
| --- | --- |
| May 4 | First day to file a declaration of candidacy. |
| May 8 | Last day to file a declaration of candidacy. |
| May 11 | Final day to withdraw from the ballot. |
| May 19 | Deadline for candidates to submit Voters' Pamphlet profiles. |

## Primary

| Date | Event |
| --- | --- |
| July 17 | Start of 18-day voting period (through Election Day). Ballots are mailed out and Accessible Voting Units (AVUs) are available at voting centers. |
| July 27 | Online and mail registrations must be received 8 days before Election Day. Register to vote in person during business hours and any time before 8:00 p.m. on Election Day. |
| August 4 | Deadline for Washington State voter registration or updates (in person only). |

| | |
|---|---|
| **August 4** | **Primary** - Deposit your ballot in an official drop box by 8 p.m. on Election Day. |

## General Election

| Date | Event |
|---|---|
| October 16 | Start of 18-day voting period (through Election Day). Ballots are mailed out and Accessible Voting Units (AVUs) are available at voting centers. |
| October 26 | Online and mail registrations must be received 8 days before Election Day. Register to vote in person during business hours and any time before 8:00 p.m. on Election Day. |
| November 3 | Deadline for Washington State voter registration or updates (in person only). |
| **November 3** | **General Election** - Deposit your ballot in an official drop box by 8 p.m. on Election Day. |

View the complete elections calendar.

***Have questions?*** Call 1-800-448-4881 Monday-Friday between 8AM-5PM or email elections@sos.wa.gov.

Contact Us

County Elections Departments

Website Accessibility

Privacy Policy

Washington Secretary of State
Elections Division
PO Box 40229
Olympia, WA 98504-0229
elections@sos.wa.gov
1 (800) 448-4881

# EXHIBIT 8

# Ballot Drop Box Locations & Schedule

The City of Milwaukee operates 14 secure, heavy-duty steel drop boxes for use during election cycles. Between elections, these boxes are locked and unavailable for ballot return.

When active, drop boxes provide a secure and convenient means for City of Milwaukee residents to return their absentee ballots. To ensure the integrity of every vote, boxes are managed by specially trained election officials and remain under 24-hour video surveillance. Milwaukee's protocols follow best practice guidance established by the United States Election Assistance Commission.

## 2026 Election Cycle Update

Absentee ballot drop boxes are now open! They will remain open until 6pm on election day, August 11th.

## Upcoming 2026 Drop Box Availability

| Election | Election Day | Drop Box Period |
|---|---|---|
| **Partisan Primary** | August 11 | June 29 (Noon) – August 11 |
| **General Election** | November 3 | September 21 (Noon) – November 3 |

*Note: Drop boxes are opened after ballots are mailed to voters and remain open until 6:00 PM on Election Night. Locations and specific status updates will be posted prior to the Partisan Primary. Boxes will be open for drop off by noon of the first scheduled day.*

## Drop Box Google Map

Dropbox Locations ☆
Milwaukee Election Commission

This map was made with Google My Maps. Create your own.



## Drop Box Locations (North to South)

| Location | Address | Description |
| --- | --- | --- |
| Good Hope Library | 7715 W Good Hope Rd, Milwaukee, WI 53223 | The Good Hope Library Drop Box is located next to the library's main front doors on the left side. |
| Villard Square Library | 5190 N 35th St, Milwaukee, WI 53209 | The Villard Square Library Drop Box is located directly in front of the main entrance on 35th St. |
| Capitol Library | 3969 N 74th St, Milwaukee, WI 53216 | The Capitol Library Drop Box is located on 74th St., off the sidewalk, on the south side of the main entrance. |
| Atkinson Library | 1960 W Atkinson Ave, Milwaukee, WI 53209 | The Atkinson Library Drop Box is located on the southwest corner of the building, on the edge of the parking lot. |
| Martin Luther King Library | 2901 N Doctor M.L.K. Jr Dr, Milwaukee, WI 53212 | The Martin Luther King Library Drop Box is located on the south side of the building along W. Locust St. |
| Center Street Library | 2727 W Fond du Lac Ave, Milwaukee, WI 53210 | The Center Street Library Drop Box is located on Fond du Lac Ave., to the left of the book drop, which is to the left of the front door. |
| Washington Park Library | 2121 N Sherman Blvd, Milwaukee, WI 53208 | The Washington Park Library Drop Box is located near the front entrance. |
| East Library | 2320 N Cramer St, Milwaukee, WI 53211 | The East Library Drop Box is located west of the building, on the east side of Cramer St. |
| Zeidler Municipal Building | 830 N Market St, Milwaukee, WI 53202 | The Zeidler Municipal Building Drop Box is located between the main doors of the Zeidler Municipal Building on E. Market St., across from City Hall. |

| | | |
|---|---|---|
| Central Library - Centennial Hall | 733 N 8th Street Milwaukee, WI | The Central Library Drop Box is located on the 8th St. sidewalk, to the left of the Centennial Hall doors. |
| Mitchell Street Library | 906 W Historic Mitchell St, Milwaukee, WI 53204 | The Mitchell Street Library Drop Box is located on the west side of the building, next to the front doors on the Mitchell St. sidewalk. |
| Bay View Library | 2566 S Kinnickinnic Ave, Milwaukee, WI 53207 | The Bay View Library Drop Box is located on the S. Kinnickinnic Ave. sidewalk, near the front door and bike rack. |
| Zablocki Library | 3501 W Oklahoma Ave, Milwaukee, WI 53215 | The Zablocki Library Drop Box is located directly in front of the main entrance on 35th St. |
| Tippecanoe Library | 3912 S Howell Ave, Milwaukee, WI 53207 | The Tippecanoe Library Drop Box is located at the front entrance of the library off of S. Howell Ave. |

## Drop Box FAQ

Open All

**Can I drop off my ballot in a dropbox on election night?**

**Who can return a ballot to a dropbox?**

**What is the legal status of using a drop box in Wisconsin?**

**Does the City of Milwaukee Election Commission follow best practices for the operation of a dropbox program?**

**Are observers allowed to observe dropboxes?**

**How do I know my ballot is secured in a dropbox?**

**Why would someone want to use a dropbox instead of delivering their ballot in the mail or in-person?**

**What equipment and supplies are utilized by the City of Milwaukee Election Commission for ballot dropboxes?**

**What is the Chain of Custody for dropboxes?**

# EXHIBIT 9

Summary

# Table 16: When Absentee/Mail Ballot Processing and Counting Can Begin

Updated September 15, 2026

**Related Topic:** Elections

**Voting Outside the Polling Place Report**
This table is part of NCSL's Voting Outside the Polling Place report.

A number of steps must occur before absentee/mail ballots can be scanned and ultimately reported in total election results. These steps are often referred to as ballot processing or pre-processing.

01:09

## Processing

"Processing" means different things in different states. Typically the first step is to note that the ballot is received, often by scanning a barcode appearing on the envelope that identifies the voter and election. After that, signature verification and comparison may take place, depending on state laws. If the state does not conduct signature verification, then other information on the return envelope, like an ID number, may be examined and verified against voter records. This initial verification of returned envelopes can initiate ballot cure procedures, which allows a voter to correct deficiencies like mismatched signature or envelope information, if applicable in the state. For more information on how states verify returned absentee ballots, see Table 14.

Processing may also involve sorting the ballots into precincts or ballot style. Connecticut, for instance, conducts most of its ballot and envelope processing on Election Day, but allows local election officials to sort ballots into the correct precinct and verify the absentee voter's name on the envelope against voter lists before delivering the envelopes to the polling place or counting center for further processing.

In some states, once the signature is verified, the envelope can be opened and the ballot prepared for scanning by removing it from the envelope, flattening it and stacking it with other ballots. At this point in the process, ballot duplication may be necessary for some ballots that are damaged or otherwise unreadable by tabulating equipment or voting systems.

Forty-four states, Washington, D.C., Puerto Rico and the Virgin Islands permit election officials to begin processing absentee/mail ballots prior to the election:

- Alaska, Arizona, Arkansas, California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Missouri, Montana, Nebraska, Nevada, New Jersey, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Utah, Vermont, Virginia, Washington and Wyoming.

Six states permit election officials to begin processing absentee/mail ballots on Election Day, but prior to the closing of the polls:

- Alabama, Mississippi, New Hampshire, Pennsylvania, West Virginia and Wisconsin.

# Scanning

Because absentee/mail ballots are paper ballots, the process for receiving results typically involves inserting them into an optical scanner or tabulator, though in rare cases small jurisdictions may hand tabulate results.

Once absentee ballots are processed and verified, they are scanned into an optical scanner or tabulator. Modern tabulation equipment allows for scanning a ballot without viewing the results or the tally of the scanned ballots. As a result, many states allow fully processed and verified absentee ballots to be scanned into a tabulator before Election Day as long as the tabulator is configured to prohibit the release or viewing of vote totals.

The following 33 states, Washington, D.C. and Puerto Rico allow processed ballots to be scanned before Election Day in at least some circumstances:

- Arizona, California, Colorado, Delaware, Florida, Georgia, Hawaii, Indiana, Iowa, Kansas, Maine, Maryland, Massachusetts, Michigan, Minnesota, Montana, Nebraska, Nevada, New Jersey, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Rhode Island, Texas, Utah, Vermont, Virginia, Washington and Wyoming.

None of these states allow the results of scanned ballots to be viewed or released before the close of polls on Election Day.

The remaining 17 states and the U.S. Virgin Islands do not allow scanning of absentee ballots until Election Day. Of these, seven states permit scanning only after the close of polls: Alabama, Alaska, Idaho, Illinois, Mississippi, New Hampshire and West Virginia. Ten of these states permit scanning on Election Day, but before the close of polls: Arkansas, Connecticut, Kentucky, Louisiana, Missouri, Pennsylvania, South Carolina, South Dakota, Tennessee and Wisconsin.

## Tabulation and Releasing Results

No state allows results from scanned or processed absentee/mail ballots to be released before the close of polls on Election Day. Since all states must hold federal elections on the same day, early result release has the possibility to impact Election Day voter choices of how—and whether—to cast their vote.

After the polls close on Election Day, local election officials can obtain a final tally and add results to the election totals. In many states, obtaining this final tally—even if ballots are already scanned and processed—before the close of polls on Election Day may constitute a crime. For details on how states report results from absentee/mail ballots, see NCSL's Table 18.

# When States Begin Processing Absentee Ballots




No absentee ballot processing allowed before Election Day.

Absentee ballot processing allowed before Election Day.

## When Absentee Ballots Can Be Scanned




Scanning not permitted before Election Day.

Ballots can be scanned before Election Day in at least some circumstances.

The below table is a summary of state timelines for processing absentee/mail ballots as described in state statute. Local procedures and implementation of state law may vary from the exact statutory language.

# When Absentee/Mail Ballot Processing and Counting Can Begin

| State | When Absentee/Mail Ballot Processing Can Begin (includes common processes like examination and sorting) | When Processed Absentee/Mail Ballots Can Be Scanned (but results not released until after close of polls) | Details of Ballot Processing and Scanning |
|---|---|---|---|
| **Alabama**<br><br>Ala. Code § 17-11-10 | 7 a.m. on Election Day. | After the polls close on Election Day. | Beginning at 7 a.m. on Election Day: The signature and other information on the affidavit envelope is verified. Then the affidavit envelope is opened, the plain (secrecy) envelope is removed and placed into a sealed box.<br><br>Upon close of polls on Election Day: Ballots can be scanned and counted. |
| **Alaska**<br><br>Alaska Stat. §15.20.201 | No less than seven days before Election Day. | 8 p.m. on Election Day. | No less than seven days before Election Day: Voter certificate on the envelope is examined/verified. Once verified, the outer envelope is opened, and the secrecy sleeve is placed in container with other secrecy sleeve ballots.<br><br>8 p.m. on Election Day: Accepted ballots may be removed from secrecy envelope and scanned/counted. |
| **Arizona** | Upon receipt. | Scanning can begin | Upon receipt: Ballot envelope is examined and verified. Verified |

| | | | |
|---|---|---|---|
| Ariz. Rev. Stat. §§ 16-550, 16-551 | | immediately after processing. | ballots may be scanned immediately after processing. |
| **Arkansas**<br><br>Ark. Code Ann. § 7-5-416 | The Tuesday before Election Day. | 8:30 a.m. on Election Day. | No earlier than the Tuesday before Election Day: Outer envelope is verified and examined, then it is opened and any materials included inside the envelope are also examined. The inner envelope containing the ballot is removed from the outer ballot and placed in the ballot box.<br><br>8:30 a.m. on Election Day: Inner envelope may be opened, and absentee ballots can be scanned. |
| **California**<br><br>Cal. Elec. Code § 15101 | Beginning on the day that an election official mails out ballots, which is no later than 29 days before Election Day. | Ballots can be scanned after the completion of other processing, which occurs beginning when ballots are mailed out (no later than 29 days before Election Day). | Beginning on the day an official sends out mail ballots (no later than 29 days before Election Day): Processing of return envelopes may begin. This can include verifying signatures, opening the return envelope, removing the ballot and duplicating ballots as needed.<br><br>As part of the processing, ballots can be scanned or prepared to be scanned. |
| **Colorado**<br><br>Colo. Rev. Stat. § 1-7.5-107.5 | Upon receipt. | Fifteen days before Election Day. | Upon receipt: Envelope is verified/examined.<br><br>Fifteen days before Election Day: Ballots may be scanned. For counties with more than 10,000 active voters, scanning ***must*** begin no later than four days before the election. |

| | | | |
|---|---|---|---|
| **Connecticut**<br><br>Conn. Gen. Stat. §§ 9-140c, 9-150a | The day after the issuance of absentee voting sets, which must occur between 31 and 21 days before a general election per Conn. Gen Stat. § 9-140. | On Election Day, once the ballots have been processed. | Beginning no sooner than the day after the issuance of absentee voting sets: Absentee ballots may be sorted into the appropriate voting districts, and the outer envelopes can be checked against the names of absentee applicants.<br><br>Starting at 8 a.m. on Election Day: Ballots are delivered either to a polling place or central counting location on Election Day (depending on the jurisdiction's processes), the inner envelope can be removed, and the inner envelope is inspected for proper signature. Then the ballot can be removed from the inner envelope and scanned. |
| **Delaware**<br><br>Del. Code Ann. tit. 15, § 5510 | Thirty days before Election Day. | Scanning can begin when processing is complete. | Thirty days before Election Day: Envelope is verified/examined and voter information is compared to the list of absentee voters. Verified envelopes are then opened, ballots are removed and then scanned. |
| **District of Columbia**<br><br>D.C. Code § 1-1001.05(a)(4)<br><br>D.C. Mun. Regs. Tit. 3, § 808 | Signatures can be verified and the secrecy envelope removed prior to scanning, which may begin 15 days before Election Day | Fifteen days before Election Day. | No timeline specified but must occur prior to scanning: Signature is verified, then secrecy envelope is removed from the outer envelope. Starting 15 days before Election Day: Ballots may be scanned. |
| **Florida** | Upon receipt. | Upon the completion of | Upon receipt: Signature on envelope and other information is |

| | | | |
|---|---|---|---|
| Fla. Stat. §§ 101.68, 101.5612 | | the public testing of automatic tabulating equipment (which begins not more than 25 days before early voting commences). | verified. Verified envelope may then be opened, the secrecy envelope removed and mixed with other secrecy envelopes.<br><br>Upon completion of public testing of tabulation equipment: Ballots can be scanned. |
| **Georgia**<br><br>Ga. Code Ann. § 21-2-386 | Verification of driver's license or state identification number conducted upon receipt, and further processing can begin at 8 a.m. on the third Monday before Election Day. | Third Monday before Election Day. | Upon receipt: Driver's license or state ID number and other envelope information is verified.<br><br>Third Monday before Election Day: Outer oath envelope may be opened and the contents removed. The inner envelope containing the ballot is then opened, and the ballot is scanned. |
| **Hawaii**<br><br>Haw. Rev. Stat. §§ 11-108, 11-152, 15-9 | Signature verification conducted upon receipt, and further processing can begin 18 days before Election Day. | Eighteen days before Election Day. | Upon receipt: Envelope is examined and signature verified.<br><br>18th day before Election Day: Envelopes can be opened and ballots scanned. |
| **Idaho**<br><br>Idaho Code §§ 34-1005, 34-1007, 34-1008 | Signature verification conducted upon receipt. Ballots are not | After the polls close on Election Day. | Upon receipt: Envelope authenticity and signature are verified. Envelope is stamped or endorsed to indicate when it was received. |

| | | | |
|---|---|---|---|
| | opened until they are delivered to the polls or central location for counting. | | Opening of polls on Election Day: Carrier envelope is opened and the elector's name is checked to ensure they have not already voted, open the return envelope and remove the inner ballot envelope and place it in proper ballot box. Ballot envelope remains closed until ballot is counted.<br><br>Close of polls on Election Day: Absentee ballots are scanned and counted. |
| **Illinois**<br><br>10 Ill. Comp. Stat. 5/19-8 | Signature verification must begin within two days of receipt. | After the polls close on Election Day. | Within two days of receipt: Envelope is examined and signature verification is conducted.<br><br>Close of polls on Election Day: Accepted envelopes can be opened, and the ballot may be scanned. |
| **Indiana**<br><br>Ind. Code §§ 3-11.5-4-6, 3-11.5-4-11, 3-11.5-4-12 | Signature verification conducted upon receipt.. | Ballots may be scanned three days before Election Day only in counties using vote centers or electronic poll books. All other counties may begin scanning at 6 a.m. on Election Day. | Upon receipt: The outer envelope is removed and signature verification is conducted on the inner envelope. Once verified, the inner envelope can be opened and the ballot removed (without unfolding) and placed in a secure envelope showing the appropriate precinct.<br><br>Counties using vote centers or electronic poll books: Ballots may be scanned three days before Election Day.<br><br>All other counties: Ballots can be scanned beginning at 6 a.m. on Election Day. |

| | | | |
|---|---|---|---|
| **Iowa**<br><br>Iowa Code § 53.23 | The day before Election Day if directed by the commissioner to do so. | On Election Day, at a time set by the election commissioner to allow a reasonable amount of time to complete the count of absentee ballots by 10 p.m. on Election Day. The commissioner may also choose to convene the board the day before the election. | Election commissioner may direct the processing board to meet the day before the election to review affidavits on sealed envelopes. Additionally, if the commissioner determines it necessary because of a large quantity of absentee ballots, the workers may open the sealed affidavit envelopes and remove the secrecy envelope containing the ballot.<br><br>The commissioner may also convene the precinct board on the day before the election to begin scanning absentee ballots. |
| **Kansas**<br><br>Kan. Stat. Ann. § 25-1134 | Prior to Election Day. Exact timing not specified. | Ballots may be scanned prior to Election Day. Exact timing not specified. | Local election officials determine the time for convening the special counting board for canvassing/reviewing absentee ballots. The convening may be before Election Day, but exact timing is not specified in statute or regulation.<br><br>During the canvass, the voter names on ballot envelopes are checked against the advance voter list. If accepted, the ballot envelope is opened without defacing the form inside or the ballot.<br><br>Counties that use optical scan equipment may scan the ballots before Election Day but may not release results until the close of polls on Election Day. |

| | | | |
|---|---|---|---|
| **Kentucky**<br><br>Ky. Rev. Stat. § 117.087 | May begin 14 days before Election Day and must start by 8 a.m. on Election Day. | 8 a.m. on Election Day. | Up to 14 days before Election Day: Outer envelope is verified and signature verification is conducted. If accepted, the secrecy envelope containing the ballot is removed from the outer envelope, and the secrecy envelope remains sealed and is placed in a ballot box for later counting.<br><br>8 a.m. on Election Day: Ballot box is opened, ballots are removed from secrecy envelopes, and ballot scanning begins. |
| **Louisiana**<br><br>La. Rev. Stat. Ann. §§ 18:1313,18:1313.1 | Parishes may begin three days before Election Day with written approval of the secretary of state, or one day before Election Day without. | Scanning may begin before the polls close on Election Day, but no later than 8 p.m. on Election Day. | Three days before Election Day with approval of the secretary of state, or one day before without approval: The name on envelope certificate is compared with the absentee voter report, and any challenges are processed. If accepted, the outer envelope can be opened.<br><br>On Election Day: Ballots may be scanned before the close of polls on Election Day. |
| **Maine**<br><br>Me. Rev. Stat. Ann. tit. 21-A, §§ 759, 760-B | Seven days before Election Day if notice of processing times is posted at least 30 days before the election. | Seven days before Election Day. | Seven days before Election Day: Certificate envelope is examined and signature verification conducted. Ballots may be removed from the envelope and scanned after they have been verified. |
| **Maryland** | Eight business days before | Ballots can be scanned once | Eight business days before the first day of early voting: Envelope |

| | | | |
|---|---|---|---|
| Md. Election Law Code Ann. § 11-302 | the first day of early voting. | they are processed and verified, which begins eight business days before the first day of early voting. | is examined and checked for signature. Accepted envelopes can then be opened and the ballots scanned. |
| **Massachusetts**<br><br>Mass. Gen. Laws Ann. ch. 54, §§ 94, 95 | Upon receipt. | Ballots can be deposited into a tabulator for scanning immediately after processing. | Upon receipt: Outer envelope is opened and signature verification is conducted for the inner envelope. Accepted envelopes may be opened and the enclosed ballot deposited into a tabulator. |
| **Michigan**<br><br>Mich. Comp. Laws §§ 168.765a, 168.766 | Signature verification conducted upon receipt. Jurisdictions with at least 5,000 people may begin further processing eight days before Election Day, and other jurisdictions may begin the Monday before Election Day. | Jurisdictions with a population of at least 5,000 that have established an early tabulation absent voter counting board may scan ballots eight days before Election Day.<br><br>All other jurisdictions that have established an early tabulation absent voter counting board may scan ballots on the Monday immediately before Election Day. | Upon receipt: The clerk must conduct signature verification on the return envelope and endorse the envelope with the date.<br><br>Either at a polling place on Election Day or earlier with an absent voter counting board: Envelope is examined and verified to ensure the clerk filled out appropriate fields. If accepted, the ballot (or secrecy envelope containing the envelope, if applicable) may be removed from the outer envelope. The count of absentee ballots is compared with the recorded count. Ballots may then be scanned. |

| | | | |
|---|---|---|---|
| **Minnesota**<br><br>Minn. Stat. § 203B.121 | Verification upon receipt. After the close of business on the 19th day before the election, verified ballots can be opened and deposited in a ballot box. | Ballots can be scanned beginning after the close of business on the 19th day before Election Day. | Upon receipt: Envelope is examined and information verified.<br><br>Beginning after the close of business on the 19th before the election: Accepted signature envelopes may be opened, then the enclosed ballot envelopes may be opened, and ballots may be duplicated (if needed) and deposited into the ballot box. |
| **Mississippi**<br><br>Miss. Code Ann. § 23-15-639 | On Election Day when polls open. | After the polls close on Election Day. | On Election Day when polls open: Envelopes are examined and signature verification is conducted. If accepted, the envelope is opened and ballot is removed without being unfolded. Ballots are then deposited into the ballot box and voter's name is recorded.<br><br>Close of polls on Election Day: Ballots can be scanned and counted. |
| **Missouri**<br><br>Mo. Rev. Stat. §§ 115.299,115.300 | Five days before Election Day. | On Election Day. | Five days before Election Day: Ballot "preparation" may occur. Localities may determine what preparation entails, including envelope verification and opening of envelopes or putting ballots into scanners.<br><br>On Election Day (if not done before as part of preparation): Teams examine and open each envelope and then place the still-folded ballot into a ballot box. Ballots may be unfolded and scanned once all the ballots a |

| | | | |
|---|---|---|---|
| | | | team is working on have been placed verified and placed in the ballot box for scanning. |
| **Montana**<br><br>Mont. Code Ann. § 13-13-241 | Signature verification conducted upon receipt. Three business days before Election Day, election officials may open the secrecy envelope and place the ballot in a secured ballot box until scanning occurs. | One day before Election Day, if using a vote-counting machine. Tabulation using a manual count may not begin until Election Day. | Upon receipt: Signature verification is conducted and other envelope information is verified.<br><br>Three days before Election Day: The secrecy envelope can be opened and the ballot placed in a secure ballot box.<br><br>One day before Election Day: Ballots can be scanned. |
| **Nebraska**<br><br>Neb. Rev. Stat. §32-1027 | Verification can begin the second Friday before Election Day. | Twenty four hours before the opening of the polls. | Second Friday before Election Day: Envelopes can be examined and voter information verified. If approved, the envelope can be opened, the ballot can be removed and unfolded and flattened for the purpose of using an optical scanner, then placed in a sealed container.<br><br>Beginning 24 hours before polls open: Accepted ballots can be scanned. |
| **Nevada**<br><br>Nev. Rev. Stat. §§ 293.269927, 293.269931, | Signature verification conducted upon receipt. | Fifteen days before Election Day, and counting must be completed by | Upon receipt: Signature verification is conducted. Once the name of the voter is checked and signature verified, the return envelope is opened, and the |

| | | | |
|---|---|---|---|
| 293.29933 | | the seventh day after the election. | ballot removed.<br><br>Fifteen days before Election Day: Ballots can be scanned. |
| **New Hampshire**<br><br>N.H. Rev. Stat. § 659:49 | At 1 p.m. on Election Day, unless a different time, no earlier than two hours after the opening of the polls, is posted and announced. | After the polls close on Election Day. | Election Day at 1 p.m. (or no earlier than two hours after polls open): Outer envelope is opened and signature verification for the inner envelope is conducted. If accepted, the inner envelope is opened, and the ballot is removed and deposited into ballot box.<br><br>After close of polls on Election Day: Ballots can be scanned and counted. |
| **New Jersey**<br><br>N.J. Rev. Stat. §§ 19:63-17, 19:63-22 | Signature verification conducted upon receipt. The inner envelopes may be opened and ballots removed five days before Election Day. | Five days before Election Day. | Upon receipt: Outer envelope is opened and signature verification conducted on the inner envelope. Open outer envelope and verify the signature on inner envelope.<br><br>Five days before Election Day: Opening inner envelopes and removing ballots may begin. Must begin opening inner envelopes on Election Day. Ballots may also be scanned beginning five days before Election Day, but it is not required. |
| **New Mexico**<br><br>N.M. Stat. Ann. §§ 1-6-10, 1-6-14 | Within one day of receiving an absentee voter's ballot, the county clerk must verify envelope information | If more than 10,000 absentee ballots are sent in a county, they may be opened and inserted into an electronic voting | Within one day of receiving the ballot: The clerk must verify that the mailing envelope is signed and confirm that the SSN digits match the voter file. If confirmed, the envelope is put in a sealed box until delivered to the absentee election board. |

| | | | |
|---|---|---|---|
| | and signature. | machine two weeks before Election Day.<br><br>If fewer than 10,000 absentee ballots are sent in a county, they may be opened and inserted into an electronic voting machine five days before the election. | Monday before Election Day: Absentee election board reviews and determines whether to reject or accept uncured envelopes that the clerk determined were missing signatures, or the SSN did not match in the initial review.<br><br>Counties where at least 10,000 absentee ballots were mailed: During the two weeks preceding Election Day, the absentee board may open accepted mailing envelopes and inner envelopes and insert the enclosed ballot into tabulators to be scanned.<br><br>Counties where less than 10,000 absentee ballots were mailed: Five days before Election Day, the absentee board may open accepted mailing envelopes and inner envelopes and insert the enclosed ballot into tabulators to be scanned. |
| **New York**<br><br>N.Y. Elec. Law § 9-209 | Within four days of receipt. | Ballots are scanned beginning the day before the first day of early voting. | Within four days of receipt: Ballot envelope must be examined and information verified. If accepted, the ballot envelope is opened, and the ballot is removed, unfolded, stacked face down and stored in a secure ballot box or container.<br><br>The day before the first day of early voting: Valid ballots may be scanned. |
| **North Carolina**<br><br>N.C. Gen. Stat. §§ | At county board of elections | Beginning on the fifth Tuesday before Election | Beginning the fifth Tuesday before Election Day: At the same county election board meetings |

| | | | |
|---|---|---|---|
| 163-230.1, 163-234 | meetings, beginning the fifth Tuesday before Election Day. | Day, after envelopes have been verified and accepted. | where the board also reviews absentee applications, the board can examine envelopes and affidavits of returned ballot envelopes. If accepted, ballots can be removed from envelopes and scanned. |
| **North Dakota**<br><br>N.D. Cent. Code § 16.1-07-12 | Three business days before Election Day. | Three business days before Election Day. | Three business days before Election Day: Outer envelope can be examined, and signature verification is conducted. A verified and accepted envelope may be opened, the ballot removed and scanned. |
| **Ohio**<br><br>Ohio Rev. Code § 3509.06 | Processing, including using automatic tabulating equipment to scan ballots, may begin before the time for counting ballots at a time determined by the board of elections. Exact timing not specified. | Verified and accepted ballots can be scanned before Election Day. Exact timing not specified. | Before Election Day, timing not specified: Envelope is examined and signature verification conducted. If accepted, the envelope can be opened and the ballot removed, examined for validity, and then prepared and sorted for scanning by the automatic tabulating equipment.<br><br>Ballots may be scanned into automatic tabulating equipment before Election Day if the equipment permits scanning without tabulating or counting the votes on the scanned ballots. |
| **Oklahoma**<br><br>Okla. Stat. Ann. tit. 26, §§ 14-123, 14-125 | 10 a.m. on the Thursday before Election Day, or earlier with approval by the secretary of the state | On Election Day or the day before Election Day with approval by the secretary of the state election board. | 10 a.m. on the Thursday before Election Day (or earlier with approval by the secretary of the state election board): The return envelope is opened and the affidavit envelope is removed and examined. Once accepted, the affidavit envelope is removed, |

| | | | |
|---|---|---|---|
| | election board. | | and the secrecy sleeve containing the ballot is placed in a ballot box.<br><br>On Election Day (or the day before with written approval from the secretary of the state election board): The ballot box with envelopes is shaken and the envelopes and the enclosed ballots may be removed and scanned. |
| **Oregon**<br><br>Or. Rev. Stat. §§ 254.478, 260.705 | Upon receipt. | Ballots can be scanned immediately after processing. | Upon receipt: Identification envelopes may be examined and opened, along with any secrecy envelopes. Once envelopes are verified and opened, the ballots can be scanned. |
| **Pennsylvania**<br><br>25 Pa. Stat. § 3146.8 | 7 a.m. on Election Day. | At 7 a.m. on Election Day. | 7 a.m. on Election Day: Envelope declaration is examined and information is compared. Once accepted, the outer envelope is opened, the inner envelope removed, the ballot removed, and the ballot can be scanned. |
| **Puerto Rico**<br><br>16 Laws P.R. Ann. 4740 | Thirty before Election Day. | Thirty days before Election Day. | No statutory details found.<br><br>The Absentee and Early Voting Administrative Board (JAVAA, Spanish acronym) is required to administer the application, voting, and adjudication process of absentee and early voting ballots. The board is required to draft regulations that govern all absentee and early ballots voting methods which are required to have the Commission's evaluation and approval. |

| | | | |
|---|---|---|---|
| **Rhode Island**<br><br>R.I. Gen. Laws §§ 17-20-26, 17-22-1 | Twenty days before Election Day. | Twenty days before Election Day. | Twenty days before Election Day: Envelopes can be examined and verified. Accepted envelopes may be opened, the ballots removed from the envelopes and scanned. |
| **South Carolina**<br><br>S.C. Code Ann. § 7-15-420 | 7 a.m. two days before Election Day. | 7 a.m. on Election Day. | 7 a.m. on the second day before Election Day: Return envelopes can be examined and verified. If verified, the inner envelope may be removed from the outer one and placed in a lock box or otherwise kept secure.<br><br>7 a.m. on Election Day: Ballots may be removed from inner envelopes, placed in ballot boxes and scanned. |
| **South Dakota**<br><br>S.D. Codified Laws §§ 12-19-10, 12-19-43, 12-19-46 | On the day before Election Day (during regular business hours) if the county auditor deems it necessary. | On Election Day prior to the close of polls. | Upon receipt: Date of receipt marked on envelope, then it is delivered to the appropriate precinct or absentee counting center.<br><br>On the day before Election Day (if the county auditor chooses): Absent voters' affidavits are reviewed. Once verified, envelopes may be stamped and opened, and ballots may be placed in ballot box while remaining folded.<br><br>On Election Day, prior to the close of polls: Verified ballots can be scanned by automatic tabulating machines. |
| **Tennessee**<br><br>Tenn. Code Ann. | Signature verification conducted | On Election Day after the polls open and no | Upon receipt: Outer envelope is opened, and signature verification is conducted on the |

| | | | |
|---|---|---|---|
| §§ 2-6-202, 2-6-303, 2-6-304 | upon receipt. | later than four hours before closing for general elections, or two hours before closing for all other elections. | inner ballot envelope. Accepted envelopes are deposited in a sealed ballot box.<br><br>On Election Day, no later than four hours before the close of polls: The sealed ballot box is delivered to the counting board, which verifies the count of absentee ballots. Then the board opens the sealed inner envelopes, removes the ballots and scans them. |
| **Texas**<br><br>Tex. Elec. Code §§ 87.0241, 87.027, 87.041, 87.042 | No more than 20 days before Election Day. | In most jurisdictions, ballots can be scanned when the polls open on Election Day. In a jurisdiction with more than 100,000 people, scanning can begin the fourth day before Election Day. | Twentieth day before Election Day: Signature verification is conducted and the carrier envelope is examined. Once accepted, the carrier envelope is opened; the ballot is removed from the envelope and then placed in ballot box.<br><br>In a jurisdiction with a population of 100,000 or more: Ballots can be scanned beginning the fourth day before Election Day.<br><br>In all other jurisdictions: Ballots cannot be scanned until the polls open on Election Day. |
| **Utah**<br><br>Utah Code Ann. §§ 20A-3a-202(7), 20A-3a-401, 20A-3a-402 | Upon receipt. | Scanning may begin upon receipt. | Upon receipt: Examine and verify information on the envelope and conduct signature verification. Once accepted, ballot is removed from the return envelope and placed with the other ballots to be scanned. |
| **Vermont** | Envelope verification can | If a town board of civil authority | Forty-five days before Election Day: Mailing envelope can be |

| | | | |
|---|---|---|---|
| Vt. Stat. Ann. tit. 17, §§ 2546a, 2546b | begin 45 days before Election Day. | votes to do so, the town may begin scanning ballots 30 days before Election Day. Otherwise, ballots may be scanned on Election Day. | examined and opened and the appropriate voter marked off the checklist as received. The ballot is then placed in a container with other checked ballots. Verified early voter absentee ballots may be either taken to polling places on Election Day for final processing and counting, or they may be processed centrally, where the certificate envelope is opened and the voted ballot placed in ballot box or tabulator.<br><br>If a town board of civil authority chooses, they may permit elections officials to deposit early voter absentee ballots that have been processed into the vote tabulator or ballot box starting 30 days before the election. |
| **Virgin Islands**<br><br>18 V.I.C. §§ 665(a), 666, 667 | Upon receipt. | After the receipt deadline for all absentee ballots (10 days after Election Day). | Upon receipt: Envelope is stamped/endorsed, then opened. The affidavit on the inner envelope is examined, then placed into a sealed file with other verified envelopes.<br><br>Ten days after Election Day (the deadline for receiving mail ballots): Absentee ballots can be removed from the sealed file and tabulated. |
| **Virginia**<br><br>Va. Code Ann. §§ 24.2-709.1, 24.2-712 | Upon receipt. | Ballots may be inserted into optical scanning equipment once all other processing has taken place, which may begin | Upon receipt: Envelope is examined and verified. If accepted, the ballot envelope may be opened and the ballot scanned.<br><br>The registrar may choose to instead put the sealed envelope |

| | | | |
|---|---|---|---|
| | | upon receipt. If absentee ballots are counted by hand, tallying may begin after noon on Election Day. | into a secure container until they choose to initiate the removal from the envelope and scanning process at a later time. |
| **Washington**<br><br>Wash. Rev. Code §§ 29A.40.110, 29A.84.730<br><br>Wash. Admin. Code 434-250-110 | Upon receipt. | Scanning can begin immediately after processing. | Upon receipt: Signature verification is conducted and envelope and declaration are examined. The envelope may then be opened and the ballot scanned. |
| **West Virginia**<br><br>W. Va. Code §§ 3-3-5, 3-3-8, 3-4A-27 | Absentee ballots are delivered to precincts on Election Day. | On Election Day. | Upon receipt: Receipt of the ballot is recorded in system along with any challenges. Envelope is then placed into a sealed ballot box until it is delivered to the appropriate place for counting on Election Day. If ballots are processed at polls, the ballots are sorted by polling location.<br><br>On Election Day, prior to close of polls: Absentee ballots are delivered either to precincts or to the central count facility to be opened and processed.<br><br>Close of polls on Election Day: Ballots can scanned and counted. |
| **Wisconsin**<br><br>Wis. Stat. §§ 6.88, 7.52 | After the polls open on Election Day. | After the polls open on Election Day. | Upon receipt: Clerk endorses the envelope and then seals it.<br><br>On Election Day (time unspecified): The ballots are delivered either to the polling |

| | | | |
|---|---|---|---|
| | | | place or to a central absentee canvassing site, depending on whether a municipality adopts a central counting procedure.<br><br>Any time between opening and closing of polls on Election Day: Carrier envelope is opened and inner envelope information is verified. Inner envelope is then opened, and the ballot removed and inserted into ballot box. |
| **Wyoming**<br><br>Wyo. Stat. §§ 22-9-121, 22-9-125 | The Thursday or Friday preceding Election Day if prior notice is given to the secretary of state's office. | The Thursday or Friday before Election Day if prior notice is given to the secretary of state's office. | Thursday or Friday before Election Day (if the clerk gives prior notice to the secretary of state): Ballot envelope is examined, then the inner envelope is opened and ballot is removed. The ballot is placed in a ballot box or a tabulator and can be scanned. |

## Note: This page should be used for general informational purposes only.

Our organization does not run elections and cannot provide legal advice. If you are a voter looking for assistance, please contact your local election official. You can find your local election official's website and contact information by using this database from the US Vote Foundation.

### Related Resources

Updated September 17, 2026

## Political Advertisement Disclaimers

Nearly every state has enacted disclaimer requirements for political advertising, although the scope and application of those laws vary considerably. At their core, disclaimer laws generally require political advertisements to identify who paid for the communication and, in some cases, whether it was authorized by a candidate or political committee. Common examples include statements such as "Paid for by..." or "Approved by..."

**Elections**

***Table***

Updated September 15, 2026

## 6 Questions: What's Going On With the New Mail Ballot Rules?

With elections in just 70 days, the White House, the courts and the Postal Service are involved in ongoing legal disputes over mail ballot rules.

**Elections**

***State Legislatures News***

Updated September 15, 2026

## Political Speech Is Protected, Even When Candidates Stretch the Truth

Various courts have ruled that state fair campaign practice laws can infringe on free speech rights.

**Elections**

***State Legislatures News***

# EXHIBIT 10

Report an accessibility issue.

(https://portal.ct.gov/sots)

# Office of the
# Secretary of the State

CT.gov Home (https://portal.ct.gov/) Secretary of the State (https://portal.ct.gov/sots) Absentee Voting

FEEDBACK +

## 2026 Connecticut Absentee Voting

Any eligible Connecticut registered voter may request, receive, and vote an absentee ballot. Connecticut law requires election officials to issue absentee ballots to registered voters who submit an application starting 31 days before a general election and 2 days before a primary.

**Brochure detailing the three ways to vote in Connecticut**

(click above link or image below to download brochure)




## New - Expanded access to absentee ballots

**Public Act 26-42** implements the results of the November 2024 statewide referendum expanding absentee ballot access for Connecticut voters. Voters no longer need to provide a specific reason or excuse to request an absentee ballot for any referendum, primary or election.

Eligible voters in Connecticut may request an absentee ballot with an official absentee ballot application (ED-3). There are two convenient ways to access and submit the form:

**1. Online:** at **CT Online Absentee Ballot Request Portal (https://oabr-sots.ct.gov/OABR/absenteeBallotReqPortalHome.do)**

**Reminder:** the online absentee ballot portal opens 45 days before any referendum, primary or election.

**2. On paper:**

Application for Absentee Ballot
**English and Spanish Application for Absentee Ballot**

For an emergency ballot within 6 days of an election, please use the following Emergency Application for Absentee Ballot:
**English and Spanish Emergency Application for Absentee Ballot**

For a referendum with less than 3 weeks' notice, please use the following Application for Absentee Ballot for Referendum Authorized to Be Held with Less Than 3 Weeks' Notice
**English and Spanish Application for Referendum with less than 3 weeks' notice**

After completing your **paper** absentee ballot application, mail or hand deliver the application to the Town Clerk in the town where you reside.

## Absentee Ballot Availability

August 11, 2026, State Primary

**Online Absentee Ballot Portal** opens: June 27, 2026

**First day absentee ballots are issued:** July 21, 2026
**Deadline to request an absentee ballot:** August 10, 2026

November 3, 2026, State Election
**Online Absentee Ballot Portal** opens: September 19, 2026
**First day absentee ballots are issued:** October 2, 2026
**Deadline to request an absentee ballot:** November 2, 2026

## Absentee Ballot Distribution Information

In Connecticut, there are strict laws about who can hand out absentee ballot applications especially for candidates, campaign committees, and anyone working on a political campaign.

**Key Requirements:**

**Timeframe:** Town Clerks may issue serialized absentee ballot applications to individuals intending to distribute them, beginning no earlier than 90 days before the first day absentee ballots are issued.

**Registration:** If you intend to distribute five (5) or more absentee ballot applications, other than to your immediate family members, you must register with the Town Clerk of the municipality where distribution will occur before you begin.

**Absentee Ballot Distribution Log:** You must keep a record of every person to whom you give an application. This list must be filed with the Town Clerk before the day of the primary, election, or referendum.

**Handling Completed Applications:** If a voter gives a completed absentee ballot application, you are legally required to submit it to the Town Clerk immediately.

**Mailing Absentee Ballot Applications:** If a campaign mails unsolicited absentee ballot applications, the mailing must include a written warning statement as required by law.

## Absentee Ballot Do's and Don'ts 2026

The Secretary of the State and the State Election Enforcement Commission created this form to explain the essential rules for distributing and assisting with Connecticut absentee ballot applications. It outlines key do's and don'ts, along with important legal requirements, to help campaigns and volunteers handle applications correctly and comply with state law.

## Absentee Ballot Frequently Asked Questions

**Do I need a reason to request an absentee ballot?**
No, under Connecticut law, a voter does not need to provide a reason or “excuse” for their absentee ballot request.

**Who can vote by absentee ballot?**
Under Connecticut law, any active voter may vote by absentee ballot. To vote by absentee ballot, a voter must have filled out an absentee ballot application.

**Where can I find an absentee ballot application?**
Absentee ballot applications are available for download online at the Secretary of the State’s website (at **2026 Absentee Voting - Updates and Information (https://portal.ct.gov/sots/election-services/voter-information/2026-absentee-voting---updates-and-information)**) and at the Town Clerk’s Office in each town.

**May I apply for an absentee ballot online?**
Yes, active voters may apply online through the Office of the Secretary of the State’s absentee ballot request portal, which is located here: **Connecticut Online Absentee Ballot Request Portal (https://oabr-sots.ct.gov/OABR/absenteeBallotReqPortalHome.do)**.

**What happens after I apply for an absentee ballot?**
The Town Clerk processes the returned application, ensures that the voter is eligible to receive an absentee ballot, and enters the voter’s information into the Central Voter Registration System. At that point, a unique ballot identification number is created for each ballot to ensure only the voter who requested it can vote with that ballot.

**What materials must I use when returning my absentee ballot?**
Voters must return their absentee ballot in the return envelope that was sent to them with their absentee ballot. (Voters should take care to both print their name and sign their name on the envelope!) Voters may choose to use the privacy sleeve, but it is not required.

**Where must I return my absentee ballot, and what are the permitted return methods?**
Voters must return their absentee ballots to the Town Clerk in their town. There are several ways to return an absentee ballot to the Town Clerk: via the U.S. Postal Service, in person at your Town Clerk’s office, or using your town’s secure drop box. To find out where your town’s drop box is located, contact your Town Clerk. Information is also available on the Secretary of the State’s website here **Ballot Drop Box Locations 7-24.pdf** .

**If I have an illness or disability, may someone return my absentee ballot for me?**
Yes, an immediate family member who lives with the voter (such as a spouse, child, parent, or sibling) or a designee caring for a voter with an illness or disability—including, but not limited to, a doctor or nurse—can return an absentee ballot. **The only other** legal designees are a town police officer, Registrar of Voters, Deputy Registrar of Voters, or Assistant Registrar of Voters. **See C.G.S. 9-140b (a) (b) (https://cga.ct.gov/2019/pub/chap_145.htm#sec_9-140a)**.

**What is the deadline for returning absentee ballots?**

To be counted, absentee ballots must be received by the close of polls on the day of the election, which is 8:00 pm.

**What do Town Clerks do after receiving an absentee ballot to ensure security?**

When the Town Clerk receives the absentee ballot, they check that the unique ballot identification number appearing on the return envelope matches the one on the voter's application. They then secure the absentee ballot, still sealed in its envelope, until the day of the election.

For absentee ballots that are received before the day of an election, the Town Clerk pre-marks the voter checklist used at the polling place to indicate that the voter returned an absentee ballot. If an absentee ballot arrives on the day of an election, it is held until after 8:00 pm when the absentee ballot is compared to the official polling place checklist. If the voter who returned the absentee ballot on the day of an election has voted in person at a polling place, the absentee ballot is not opened, it is rejected, and it is not counted. This procedure ensures that no voter can vote twice, even by mistake.

**How do I know my absentee ballot remains private?**

Absentee ballots are counted publicly—typically in a central location—by election officials representing both parties. These election officials receive training on the importance of maintaining voter privacy. Practically speaking, because the ballots are counted publicly and grouped with hundreds or thousands of other ballots, it would be fairly obvious if someone interfered with or stopped the process to see how someone voted.

Further, it is a class D felony for anyone, including an election official, to do anything that enables them to find out how someone voted. A class D felony is punishable by up to five years in prison, a fine of up to $5,000, or both.

**What happens if I forget to sign my return envelope?**

Under a new state law, voters return their absentee ballots in one envelope. (Previously, Connecticut used a two-envelope system.) Voters must sign their name on the outside of the return envelope. This allows Town Clerks to determine ahead of the election if a voter's signature is missing. If this is the case, the Town Clerk will make their best effort to contact the voter so that they may cure the missing signature.

**What does signature "curing" mean and what is the process?**

If a signature is missing from an absentee ballot return envelope, the law allows absentee ballot voters to cure (i.e., correct) the defect so the ballot can be counted. Only absentee ballots missing a voter's signature on the return envelope are eligible for curing.

Town Clerks must use their best efforts to contact the voter, by phone or email, to inform them of their ability to cure the missing signature in person at the Town Clerk's Office. Voters may cure their absentee ballot up until the polls close at 8:00 p.m. on the day of the election.

When submitting an absentee ballot application, voters are encouraged to provide a phone number, email address, or both to assist the Town Clerk in contacting them, if needed, to cure their ballot.

**Additional questions about absentee voting?**

Please contact us at **LEAD@ct.gov (mailto:LEAD@ct.gov)** or **(860) 509-6100** for additional information about Connecticut's absentee voting laws.

# EXHIBIT 11

# Early Voting and Vote-by-Mail Ballot Drop-Off Locations

Any registered voter can go to a **county elections office** in person to request and receive a vote-by-mail ballot.

Definition of services available:

- **Early Voting:** A voter may pick up and/or vote a vote-by-mail ballot at this location.
- **Same Day Voter Registration:** Voters can conditionally register and vote after the 15-day voter registration deadline at this location. For more information please go to **Same Day Voter Registration**
- **Ballot Drop-Off:** A secured box where vote-by-mail ballots may be dropped off.

**Early voting and ballot drop-off locations for the November 3, General Election will be coming October 5, 2026.**
**If you would like more information about the General Election, please visit: https://www.sos.ca.gov/elections/upcoming-elections/general-election-november-3-2026.**

# EXHIBIT 12




hsigov • Follow

hsigov HSI is relentlessly hunting down voter fraudsters and protecting the integrity of American elections.

1w

libtardvag TRUMP VIOLENCE AGAINST CITIZENS ON DOMESTIC SOIL 🔥

1w 1 like Reply

libtardvag TRUMP SUPPORTS RUSSIA WHO SUPPORTS IRAN 🔥

109 likes

September 8

Add a comment... Post

# EXHIBIT 13

Post

**HSI NorCal**
@HSISanFrancisco

HSI in Northern California will investigate any allegations of noncitizen voting and is committed to ensuring the enforcement of federal election law.




6:23 PM · Sep 11, 2026 · **549** Views

2 3 13

Log in or sign up for X

See what's happening and join the conversation

Continue with phone

Continue with Apple

Continue with Google

or

Log in with username or email

Relevant people

HSI...
@H...
Follow

Terms · Privacy · Cookies · Accessibility · US TIDA · Ads Info · More ···
© 2026 X Corp.

Scan to get the app

See all the replies

Continue to X

# EXHIBIT 14

**dhsgov** and **3 others**
Sublime • Doin' Time (Marshall Arts Instrumental V

**dhsgov** ILLEGAL ALIEN VOTERS ARRESTED.

During the week of August 10, 2026, HSI conducted a Title-8 voter registration fraud operation in California and arrested targeted fraudsters.

Election security is NATIONAL security. Only American citizens should be electing American leaders.

3w

4,602 likes
August 26

Add a comment... Post

# EXHIBIT 15

← **Post**

**HSI Kansas City**
@HSIKansasCity

@HSIKansasCity is on the ground in St. Louis investigating suspected unlawful voting. HSI is committed to protecting election integrity and rooting out voter fraud wherever it occurs.




6:37 PM · Sep 3, 2026 · **484** Views

3 20

**Log in or sign up for X**

See what's happening and join the conversation

Continue with phone

Continue with Apple

Continue with Google

or

Log in with username or email

**Relevant people**

HSI...
@H...
Follow

Terms · Privacy · Cookies · Accessibility · US TIDA · Ads Info · More ···
© 2026 X Corp.

Scan to get the app

# EXHIBIT 16

FALL MEMBER DRIVE
Journalism for the people, not for profit.
Donate Now

ANIMATION BY MATT ROTA AND HENRIKE LENDOWSKI

# Inside Trump's Effort to "Take Over" the Midterm Elections

**by Doug Bock Clark and Jen Fifield**
April 13, 2026, 5:00 am

*ProPublica is a nonprofit newsroom that investigates abuses of power. Sign up to receive our biggest stories as soon as they're published.*

## Reporting Highlights

- **Safeguards Destroyed:** In advance of this year's midterm elections, President Donald Trump has systematically demolished federal guardrails that prevented him from overturning the 2020 election.
- **Changing of Guard:** At least 75 career staff are gone. Two dozen appointees, including many from the election denial movement, have been hired. Ten helped try to overturn the 2020 vote.
- **Political Interference:** Once-fringe actors now have access to vast powers, which they've already used to push forward unprecedented actions that critics say amount to partisan interference.

These highlights were written by the reporters and editors who worked on this story.

In mid-December 2020, federal officials responsible for protecting American elections from fraud converged in a windowless, dim, fortified room at the Justice Department's downtown Washington, D.C., headquarters.

They had been summoned by Attorney General William Barr.

Over the preceding weeks, Donald Trump's claims that the presidential election had been stolen from him had reached a crescendo. He'd become obsessed with a conspiracy theory that voting machines in Antrim County, Michigan, had switched votes from him to Joe Biden.

With each day, Trump ratcheted up the pressure to unleash the might of the federal government to undo his defeat.

Barr interrogated experts from the Cybersecurity and Infrastructure Security Agency, crammed in beside top FBI officials around a cheap table. He needed the group of around 10 to answer a crucial question: Was it really possible the 2020 presidential vote had been hacked?

ProPublica's description of the previously unreported meeting comes from several people who were in the room or were briefed on the gathering. Everyone understood that the meeting represented an important moment for the nation, they said. Barr, who did not respond to requests for comment, had walked a delicate line with Trump, instructing the FBI to investigate allegations of election irregularities while declaring publicly there had been no evidence "to date" of widespread fraud.

The nonpartisan specialists from CISA, backed by their FBI counterparts, explained they'd unravelled what had happened in Antrim County. A clerk had made a mistake when updating ballot styles on machines, leading to a software problem that initially transferred votes from Republicans to Democrats, they said. There was no fraud, just human error — which would soon be publicly confirmed through a hand count of the county's ballots.

ANIMATION BY MATT ROTA AND HENRIKE LENDOWSKI

Listening intently, Barr seemed to understand both the truth and that telling it to the president would almost certainly cost him his job.

At the end of the meeting, Barr turned to his top deputy, made hand motions as if he was tying on a bandana and said he was going to "kamikaze" into the White House.

What happened next is well known. When Barr met with Trump in the Oval Office on Dec. 14, the president launched into a monologue about how the events in Antrim County were "absolute proof" that the election had been stolen. Barr waited to get a word in edgewise before telling his boss what the experts from CISA had told him.

Do you have information you can share about federal officials working on elections or any of the individuals in this article? Reporter Doug Bock Clark can be reached at doug.clark@propublica.org and on Signal at 678-243-0784. Reporter Jen Fifield can be reached at jen.fifield@propublica.org and on Signal at 480-476-0108. If you're concerned about confidentiality, check out our advice on the most secure ways to share tips.

Then Barr offered his resignation letter, which Trump accepted. Barr left believing he'd done his part to preserve democratic norms.

"I was saddened," Barr wrote of Trump in his memoir. "If he actually believed this stuff he had become significantly detached from reality."

Barr was one of many federal officials — most of them Trump appointees — who refused to bend to the president's demands, which only intensified after Barr was gone. Although rioters inspired by Trump managed to delay the certification of his defeat by storming the Capitol on Jan. 6, 2021, ultimately the institutional guardrails of American democracy held — barely.

But if faced with the same tests today, the guardrails and people that held the line would largely be missing, an examination by ProPublica found.

ProPublica scrutinized what happened the last time Trump lost a national election. Some of that happened in plain sight: After a cascade of defeats in court, Trump began pressuring state and local officials to overturn the results. But more happened behind the scenes, like the meeting that helped persuade Barr to hold the line.

Our reporting uncovered previously undisclosed aspects of a federal effort to safeguard the results of the 2020 vote, which involved at least 75 people across several agencies. Today, nearly all of those people are gone, having resigned, been fired or been reassigned, particularly in the departments of Justice and Homeland Security. That included the cybersecurity specialists who had established that the Antrim County allegations were false and reported their findings to Barr.

The people we identified as resisting attempts to overturn the 2020 results have been replaced by roughly two dozen people Trump has installed in positions that could affect elections. Ten of them actively worked to reverse the 2020 vote, and the rest are associates of such people. In some cases, ProPublica found, officials have been hired from activist groups that are pillars of the election denial movement. Experts warn that shows the movement has merged with the federal government.

These new officials could influence how Trump reacts to the upcoming midterms as polling shows Republicans are approaching what could be a significant electoral loss, with the president's approval rating nearing record lows, and public concern growing about the weak economy, the administration's mass deportation effort and the war on Iran. Seemingly in preparation to head off such a blow, Trump has stepped up his efforts to "nationalize" the 2026 elections, saying that Republicans need "to take over" the

midterms. Democrats who monitored Trump's attempts to block his 2020 loss have begun to question whether he will allow a "blue wave," particularly if it flips control of a House of Representatives that impeached him twice in his first term.

ADVERTISEMENT

ProPublica's examination reveals new details on how the president has unleashed his loyalists to transform elections. This includes the background of this year's FBI raid in Georgia to seize 2020 election materials and how they are using federal resources to search for noncitizens voting. Ultimately, ProPublica's reporting shows how thoroughly and expansively the Trump administration has overhauled the federal government into what some fear is a vehicle for making sure elections go his way.

ProPublica's reporting is based on interviews with roughly 30 current or former executive branch officials familiar with the work of Trump loyalists installed in election roles. Most spoke on condition of anonymity because they fear retribution, including those knowledgeable about the December 2020 Barr meeting.

The Trump administration maintains its actions will make U.S. elections fairer and more secure — and keep those prohibited from voting, such as noncitizens, from doing so.

"Election integrity has always been a top priority for President Trump," White House spokesperson Abigail Jackson said in a statement. "The President will do everything in his power to defend the safety and security of American elections and to ensure that only American citizens are voting in them."

Spokespeople for the DOJ and DHS emphasized that their departments are focused on ensuring elections are free and fair, and that they are working closely with the states to achieve those goals. Contentions to the contrary, they say, are false.

A few guardrails have endured, preventing Trump from fully realizing his agenda for elections. Judges have blocked key parts of a March 2025 executive order in which Trump attempted to exert greater federal control over aspects of voting, and some Republican state officials have fought back against Justice Department lawsuits demanding state voter rolls.

Late last month, Trump issued another executive order on elections that attempts to exert unparalleled federal control over mail-in voting and voter eligibility, which Democrats and voting rights groups are challenging in court.

Experts say 2026 will serve as an unprecedented stress test of the integrity of American elections.

“Our election system withstood” Trump’s “attacks following the 2020 election,” said Sen. Alex Padilla, a California Democrat who has led the pushback to the administration’s actions on elections, “but this will be an even tougher test, with more election deniers having access to federal power than ever before.”

ANIMATION BY MATT ROTA AND HENRIKE LENDOWSKI

## The Dismantling

Barr has said that in the high-stakes days following the 2020 election, he felt like he was playing Whac-A-Mole with Trump’s “avalanche” of false election claims.

The investigators at DHS’ Cybersecurity and Infrastructure Security Agency supplied intelligence that disproved many of them, not just those involving Antrim County.

CISA was created by Trump in his first term to counter cyber threats in the aftermath of Russia's efforts to influence the 2016 vote. It soon came to provide crucial expertise and support to thousands of local election officials grappling with increasingly sophisticated attacks.

After the 2020 election, it also played a crucial part in puncturing fallacies spread by Trump supporters, producing a "Rumor Control" website to rebut them. And it partnered with state officials and technology vendors to release a statement calling the election "the most secure in American history." Trump swiftly fired Chris Krebs, whom he had appointed to lead CISA, but Krebs' defense of the election's soundness reverberated widely in the media and on Capitol Hill.

Among Trump's first actions upon returning to the Oval Office was eviscerating CISA.

Starting in February 2025, DHS leadership put employees focused on countering disinformation and helping safeguard elections on leave. The leadership also froze the agency's other election security work, which included assessing local election offices for physical and cybersecurity risks, and disseminating sensitive intelligence information on threats. Eventually, all three dozen or so CISA employees specializing in elections were fired or transferred to work in other areas.

"It took years of dedicated, bipartisan, cross-sector partnership to build the security infrastructure we've had, and dismantling CISA leaves a gaping hole," said Kathy Boockvar, an elections security expert who served as Pennsylvania's secretary of state from 2019 to 2021. "We are making the job of securing our democracy exponentially harder."

ADVERTISEMENT

A DHS spokesperson told ProPublica that the changes at CISA were in response to "a ballooning budget concealing a dangerous departure from its statutory mission," which included "electioneering instead of defending America's critical infrastructure." The spokesperson said that CISA's mission is still to coordinate protection of critical infrastructure, including by supporting local partners against cyber threats.

It isn't just CISA that's been gutted.

The Trump administration has discarded or diminished other federal initiatives with roles in protecting election integrity or blocking foreign interference. While many of these actions have been reported, together they reveal the full sweep of the changes.

First, the administration got rid of the National Security Council's election security group, which convened departmental leaders to coordinate federal actions related to voting. Then in August, the administration dismantled the Foreign Malign Influence Center, a branch of the Office of the Director of National Intelligence that had stymied efforts by Russia, China and Iran to interfere in the 2024 election.

A spokesperson for ODNI said the center was redundant and that its functions were folded into other parts of the office's intelligence apparatus in ways that "arguably makes our ability to monitor and address threats from foreign adversaries stronger, more efficient and more effective."

However, former national security officials, including one who had worked at the center, told ProPublica that its functions had largely ceased. Caitlin Durkovich, who led the NSC's election security work during the Biden administration, said that under Trump the federal government has "abandoned" its traditional role in preserving election integrity and security.

"Nearly every program and capability to stop bad actors and support election administrators has been dismantled," she said. "Heading into the midterms, this leaves states and localities exposed, without the intelligence support or federal coordination they need to detect and respond to threats in real time — precisely when the stakes are highest."

The early months of the second Trump administration also brought seismic changes to three parts of federal law enforcement with central roles in elections.

Kash Patel, the FBI's new director, dismantled the public corruption team, which had been deployed in previous administrations to help monitor possible criminal activity on Election Day. The Foreign Influence Task Force, which aimed to combat foreign influence in U.S. politics, was also disbanded. (An FBI spokesperson said the bureau "remains committed to detecting and countering foreign influence efforts by adversarial nations.")

Furthermore, the Justice Department substantially reduced the role of its Public Integrity Section, which had been responsible for making sure the department's inquiries weren't improperly influenced by politics.

After the 2020 election, senior lawyers in the section warned against having the FBI investigate fraud claims raised by Trump allies, saying that the agency's involvement could damage its reputation and appear motivated by partisanship. In this instance, they were overruled by Barr and his deputies, but former officials said this was a rare case in which their guidance was ignored. The need to directly overrule the unit, they said, made it a roadblock — one that no longer exists.

A month after Trump returned to the Oval Office, the unit's top staff resigned when agency leaders directed them to dismiss corruption charges against then-New York City Mayor Eric Adams. More resigned later or were transferred. The 36-person section was reduced to two. The administration no longer mandates that it review politically sensitive cases, according to multiple people familiar with the matter.

Another key DOJ office, the Civil Rights Division's voting section, had enforced federal laws that protect voting rights, particularly those that combat racial discrimination. In December 2020, the assistant attorney general overseeing the Civil Rights Division was one of the many department leaders who said they would resign if Trump promoted Jeffrey Clark, a leader who supported Trump's efforts to overturn the election results, to head the department after Barr's resignation. This mass threat of resignation ultimately led Trump to not promote Clark.

But now, nearly all of the section's roughly 30 career lawyers have resigned or been moved. This largely started last spring after Harmeet Dhillon, Trump's assistant attorney general for civil rights, put out a memo saying their mission would shift from ensuring voting rights to enforcing Trump's executive order on elections.

The Trump administration then filled the section with conservative lawyers who are now litigating against the lawyers they replaced. At least four of those newly appointed lawyers participated in challenging the 2020 vote or have worked with people who helped Trump try to overturn the 2020 election.

"It's just a shocking and depressing reversal of the federal government's role in making real the promise of nondiscrimination in voting and racial equality," said Anna Baldwin, an appellate attorney for the Civil Rights Division who resigned last year and is now one of those litigating against the Justice Department in a new role at Campaign Legal Center.

The Justice Department didn't respond to specific questions about the dismantling of the Public Integrity Section or the change in mission for the Civil Rights Division.

In all, at least 75 career officials who'd played important roles in elections work at DHS, DOJ and other departments have left or been fired, ProPublica found.

ANIMATION BY MATT ROTA AND HENRIKE LENDOWSKI

## Team America

Late last summer, after the Trump administration had forced out most of the career specialists, a small group of political appointees began convening at the Department of Homeland Security's headquarters.

The group — which once called itself "Team America," according to sources familiar with the matter — looked for federal levers it could pull to make Trump's March executive order about elections a reality, an effort that has not been previously reported.

They represented the new type of people running the show.

Its core members included David Harvilicz, a DHS assistant secretary tasked with overseeing the security of election infrastructure, including voting machines, and three of his top staffers. As ProPublica has reported, Harvilicz had co-founded an AI company with an architect of Trump's claims about Antrim County.

Despite the setbacks the executive order had met with in court, there "was not a whole lot of discussion or disagreement" about acting on the directive from Harvilicz or one of his deputies, said a former federal official who interacted with group members. "It was just us saluting to do it."

This small group was part of a wider team at DHS, DOJ and the White House seeking to push forward the president's agenda. Some of Trump's new guard are well known: After the 2020 election, Patel pressured military officials to help investigate a conspiracy theory about voting machines, according to a former Justice Department official. (Patel did not respond to a request for comment but claimed in congressional testimony that he did not recall the event.) Others, like Harvilicz, are more obscure but still wield consequential powers.

These newcomers are seeking to carry out Trump's executive orders and are unlikely to push back against his false claims that American elections are rife with fraud.

Team America members have echoed or spread such material themselves.

Heather Honey, who serves under Harvilicz in a newly created position focused on elections, falsely asserted that there were more ballots cast in Pennsylvania than voters in the 2020 presidential election. Trump cited this claim, which has been traced back to her, while exhorting his followers to march on the Capitol on Jan. 6, 2021.

At least 11 administration appointees, including Honey, have ties to the Election Integrity Network, a conservative grassroots organization seeking to transform American elections. It is led by Cleta Mitchell, a lawyer who tried to help Trump overturn the 2020 election. Gineen Bresso, who holds a top job in the White House counsel's office, coordinated with the network's leadership in 2024 as the Republican National Committee's election integrity chair, ProPublica has reported. Since moving into government, Honey has maintained close ties to Mitchell's organization, and she and at least two other federal officials have given its members private briefings.

ADVERTISEMENT

Experts say these former activists who helped forge a movement built on the idea that the 2020 election was stolen from Trump are seeking to make sure that does not happen again.

"The election denial movement is now interwoven within the federal government, and they are working together toward a shared goal of reshaping elections" in ways that undermine the freedom to vote, said Brendan Fischer, a director at the Campaign Legal Center, a nonpartisan, pro-democracy legal

organization. "It's not just last-minute slapdash attempts to overturn the results" as in 2020, "but more systematic efforts to influence how elections are run months ahead of time."

In response to questions sent to DHS, Harvilicz and Honey, a DHS spokesperson disputed that they were seeking to use the department's powers to advantage Trump, writing that its employees "are focused on keeping our elections safe, secure, and free" and working to "implement the President's policies." In response to questions about their ties to the election denial movement, the spokesperson wrote, "To meet the diverse and evolving challenges the Department faces, we hire experts with diverse backgrounds who go through a rigorous vetting process."

Mitchell did not respond to detailed questions from ProPublica. The White House answered questions sent to Bresso about her connection to Mitchell's network by reiterating its commitment to making American elections secure.

Through the fall and winter, as the Justice Department demanded that states turn over confidential voter roll information, Team America worked to solve problems hindering the use of digital tools to comb the lists for noncitizens who had illegally registered to vote. Honey and others ironed out the technical details of merging information from different agencies and crafted data-sharing contracts. When Honey or others hit roadblocks, they'd go to the White House or senior DHS leaders who "would come in hot" to clear her path, said officials who interacted with them.

Initially, the plan was to run voter information obtained by DOJ through a Homeland Security tool called the Systematic Alien Verification for Entitlements system.

More recently, according to two people familiar with the matter, Team America has worked to harness a more powerful tool used by another branch of DHS, Homeland Security Investigations, to increase its ability to search for noncitizen voters and bring criminal charges against them.

While DHS told ProPublica that SAVE has identified more than 21,000 potential noncitizens on voter rolls in the past year, officials who have checked those results in detail have found vast inaccuracies, as ProPublica has reported. Most states — including those with millions of voters — have eventually marked only a few to a few hundred potential noncitizens as registered to vote, and far less have ever voted. The DHS spokesperson also called SAVE "secure and reliable."

As the election approaches, current and former officials and election security experts expressed concerns that Harvilicz and Honey, who've espoused debunked conspiracy theories about elections, are in positions to control the narrative around the vote's soundness.

It's hard to debunk false claims "coming with the seal of the federal government," said Derek Tisler, counsel and manager with the Brennan Center for Justice's elections and government program. "I certainly worry what damage that could do to voters' confidence."

ANIMATION BY MATT ROTA AND HENRIKE LENDOWSKI

## Red Flags

Perhaps nothing better reflects the breakdown of the guardrails that thwarted Trump's rashest impulses in 2020 than his creation last fall of a special White House post reinvestigating his loss to Biden.

In December 2020, just days after Barr rebuffed Trump's Antrim County claims, lawyers in the White House counsel's office helped prevent the president from heeding activists' call to essentially declare martial law to seize voting machines. This multihour shouting and cussing match has been called the craziest meeting of the first Trump administration.

But the lawyer whom Trump hired in 2025 as his director of election security and integrity, Kurt Olsen, had worked to overturn Trump's loss in court in 2020 and was later sanctioned by judges, including for making baseless allegations about Arizona elections.

Olsen's work in the second Trump administration has breached the firewall between the White House and

DOJ officials, established after Watergate to prevent law enforcement officers from making decisions based on political pressure, said Gary Restaino, a former U.S. attorney in Arizona.

"This is not a constitutional or even a statutory requirement," Restaino said, "but it's a democracy requirement to make sure that citizens throughout America understand that decisions about life and liberty are being made in an objective and consistent manner."

In a previously unreported series of events, around the end of 2025, Olsen flew to Georgia to meet with Paul Brown, the head of the FBI's Atlanta field office, according to people familiar with the matter.

Olsen wanted the FBI to seize 2020 ballots from Fulton County, a Democratic stronghold, and gave Brown a report he claimed would justify the extraordinary action. Brown and his team emphasized to Olsen that any investigation his team did would be independent and fair.

When Brown and his team examined the report, they found that Georgia's election board had already looked into its allegations, dismissing many altogether, and concluding that others came down to human error, not criminal wrongdoing. The report had been assembled by a longtime ally of Olsen's and participant in the Election Integrity Network who had a history of discredited claims, ProPublica has reported.

Based on their own investigation, Brown's team submitted an affidavit to their superiors at DOJ that did not make a strong enough case to move forward with what Olsen wanted.

Soon after, Brown was offered a choice: retire or be moved to a new office, people with knowledge of the exchange told ProPublica.

Olsen did not respond to requests for comment.

An FBI spokesperson said that Brown "elected to retire" and that its "work in the election security space is entirely consistent with the law."

Brown's ouster after refusing to carry out the seizure of 2020 election materials has been reported, but Olsen's involvement and the details of their interactions leading to Brown's retirement have not been previously disclosed.

With Brown gone, the case moved ahead under his replacement.

ADVERTISEMENT

Trump administration officials also took another step to keep control of the investigation.

Then-Attorney General Pam Bondi chose Thomas Albus, whom Trump had appointed as U.S. attorney for the Eastern District of Missouri, to prosecute the case even though it fell far outside his usual regional jurisdiction. Albus had been meeting with Olsen since around the time the White House lawyer was hired, ProPublica has reported. (Albus declined a request for comment.)

In late January, the FBI carried out an unprecedented raid in Fulton County — and the agency's affidavit, put together by Albus and Brown's replacement, cited a version of the report Olsen gave to Brown as evidence supporting the seizure. ProPublica was part of a news coalition that sued to unseal the affidavit.

An FBI spokesperson said that its agents "followed all procedure to ensure everything was in proper order, and FBI evidence team had the necessary court-authorized search warrant before they arrived on site."

Ryan Crosswell, who worked in the Justice Department's Public Integrity Section for around half a decade, handling a number of election cases, called Brown's replacement and Albus' involvement a "red flag" because of the unusual circumstances of their appointments.

"They're just moving through people until they find someone who's willing to do exactly what they want," Crosswell said.

The Justice Department did not respond to a question about Crosswell's comment.

The extraordinary raid was also enabled in a previously unreported way by the destruction of the DOJ's Public Integrity Section.

Multiple former lawyers for the section said they likely would have tried to block the Fulton County investigation because it lacked strong evidence, had a clear political slant and went against department directives that actions should not be taken "for the purpose of giving an advantage or disadvantage to any candidate or political party."

Crosswell said, "Based on everything we know, if PIN was still there, we'd say no."

John Keller was principal deputy chief of the Public Integrity Section from 2020 to 2025 and was acting chief when he resigned in early 2025. He worries that allegations of irregularities in the upcoming election will be handled on a partisan basis.

"Without that review and without apolitical, objective, honest brokers involved in the process, there is a much greater risk for intentional manipulation or inadvertent interference," Keller said.

ANIMATION BY MATT ROTA AND HENRIKE LENDOWSKI

## "Dismantling the Brain"

The week the FBI seized Fulton County's ballots, about half of the nation's secretaries of state converged on Washington, D.C., for their winter conference.

They had urgent questions about elections for Bondi, then-DHS Secretary Kristi Noem and other luminaries who had promised to appear at the event. But none of the headline names showed, leaving conference attendees staring at an empty podium, until the session was abruptly canceled.

The breakdown was emblematic of a widening chasm between state officials and the parts of the federal government that had, until recently, worked with them to secure American elections.

Shenna Bellows, Maine's Democratic secretary of state, said in an interview that the trust between the Trump administration and states is "absolutely demolished."

This loss of trust reflects that election deniers have assumed so many top roles at federal agencies. Honey sometimes represents DHS on cross-departmental conference calls with state election chiefs, an unsettling

reality for those who spent years countering the false claims she made from outside the government.

On a February call, state officials expressed confusion about whether the Cybersecurity and Infrastructure Security Agency would still assess their election systems for physical and cyber vulnerabilities. Honey said it would, but Bellows said she'd been told it wouldn't.

Two DHS officials told ProPublica CISA's remaining staff avoids election work, afraid they could lose their jobs if they engage with state and local officials. "In CISA, elections are a toxic poison," one said.

A DHS spokesperson said state and federal officials are still working together "every single day" to protect elections and that "The claim that DHS has a broken partnership with states and made our elections less secure is simply false."

The cuts to career election specialists and their divisions have eliminated information channels that spotlighted threats as voting took place, including Election Day command posts run by the Justice Department and FBI. Another information channel, which DHS used to fund, will still operate but will be available only to state and local election offices, not the federal government.

Jessica Cadigan, a former FBI intelligence analyst who investigated Election Day threats, said FBI headquarters' command post was critical to her cases.

"That is dismantling the brain, if you will," she said. "They are the ones that piece the whole thing together."

An FBI spokesperson said the agency will still have capabilities to monitor the situation on the ground through designated election crimes coordinator experts in all its field offices.

Jena Griswold, Colorado's Democratic secretary of state, has come to see the federal government as adversarial to elections and election administration, rather than a partner.

Colorado is one of around 30 states the Justice Department has sued for confidential voter roll information. At least four courts that have fully considered those cases so far have dismissed them, although the Justice Department has appealed most of the decisions. (The others are pending.) Griswold told ProPublica she has added another lawyer to her staff to fight whatever comes next from the Trump administration.

"Donald Trump," she said, "has made American elections less safe."

Mollie Simon and Misty Harris contributed research. William Turton contributed reporting.



**Doug Bock Clark**

I'm a ProPublica reporter covering threats to democracy, elections and voting rights.

Have a Tip for a Story?

I welcome tips about how politicians, activists, and others are trying to transform American elections for partisan advantage. I am also interested in tips about North Carolina's legislature, court system, and state government.

**Jen Fifield**

I'm a ProPublica reporter covering election-related issues, voting rights and threats to democracy.

Have a Tip for a Story?

Send me tips on the Trump administration's actions related to voting and elections, along with local or national threats to accurate, fair and secure elections.

**Filed under —** Democracy, Trump Administration

Republish This Story

## Who owns ProPublica? No one.

The story you just read was made possible by our readers. We hope it inspires you to support ProPublica, so we can continue producing investigations that shine a light on power, uncover the truth and drive real change.

ProPublica is a nonprofit newsroom dedicated to nonpartisan, evidence-based journalism that holds power accountable. Founded in 2008 to address the decline in investigative reporting, we've spent over 15 years uncovering injustice, corruption and abuse of power — work that is slow, expensive and more critical than ever to our democracy. With nine Pulitzer Prizes and reforms sparked in state and local governments, businesses, institutions and more, our reporting ensures that the public interest comes first.

Today, the stakes are higher than ever. From ethics in our government offices, to reproductive health care, to the climate crisis and beyond, ProPublica remains on the front lines of the stories that matter most. Your gift helps us keep the powerful accountable and the truth accessible.

**Join over 90,000 supporters nationwide** in standing up for investigative journalism that informs, inspires and creates lasting impact. Thank you for making this work possible.

DONATE TO PROPUBLICA

# More in Democracy >




w About Mail-In Voting for the 2026 Midterms

U.S. Postal Service Failed to Properly Handle Some Ballo
During This Year's Primary Elections, Audit Finds

## Most Read

1 "Our Dear Friend Umar": How We Uncovered That a Russian Oligarch Bankrolled Donald Trump Jr.'s Wedding

2 Donald Trump Jr.'s Bahamas Wedding Was Secretly Bankrolled by Russian Oligarch Close to Putin

3 Papa Johns, Propaganda and Putin: How a MAGA Influencer With Ties to Russia Became Trump's Arctic Adviser

4 Watch: The New Supreme Court

5 Photos of Nude Children in Billionaire's Email Prompted Investigation

6 Ectopic Pregnancy Deaths Have Nearly Doubled. It's Worse in States With Abortion Bans.

7 "Not Medically Necessary": Inside the Company Helping America's Biggest Health Insurers Deny Coverage for Care

8 The Dominican Baseball Factory

9 Top Oversight Dem Opens Investigation of Donald Trump Jr.'s Russian Oligarch-Funded Wedding

10 "A Clear Watering Down": Drug Transparency Bill Stripped of Critical Provisions Ahead of Senate Vote

# Support Independent Journalism:

As a nonprofit newsroom, we rely on donations from individuals like you to fuel our work. **Your support today will directly fund investigations that shine a light on urgent issues:** corporations prioritizing profits over public safety, health insurers denying coverage to patients, unintended consequences of new laws and more.

Donate

**More Ways to Give**

Go behind the scenes of ProPublica's biggest investigations.

Your email address

**Get our weekly newsletter**

INFO

COVERAGE

LOCAL

CONTACT

SUPPORT US

# EXHIBIT 17

# *Homeland Security Intensifies Pursuit of Noncitizens on Voter Rolls*

Immigrants who said they inadvertently registered to vote while obtaining or renewing driver's licenses are increasingly facing deportation under the Trump administration.

Listen · 9:21 min





**By Madeleine Ngo, Nick Corasaniti and Hamed Aleaziz**

Aug. 10, 2026

The Trump administration is making an intense push to identify and deport noncitizens who registered to vote, even if they did so inadvertently or never cast ballots — an unusually aggressive approach that is helping it promote baseless claims that voter fraud is rampant.

State audits and studies have repeatedly found that noncitizen voting is extremely rare, and there have been no instances in which their votes are known to have swayed an election. It is against federal law for noncitizens to register to vote or actually vote, and doing so can carry steep penalties, including jail time and deportation.

In the past, the Department of Homeland Security has not aggressively tried to deport the relatively small number of noncitizens who unlawfully registered to vote, especially if they mistakenly signed up, according to immigration policy

experts. But the Trump administration is taking a harder line in hopes of increasing deportations while also building a case that illegal voting has been underestimated.

Homeland security agents are reopening voter fraud cases that had been closed and investigating voter registration efforts in major cities. Customs officers have detained immigrants suspected of being on the voter rolls at border checkpoints, according to immigration attorneys. And green card holders applying for citizenship have been placed in deportation proceedings for registering to vote.

The department's efforts are part of the Trump administration's extraordinary attempt to leverage federal agencies to promote the president's long-running false claims about a broken election system rife with fraud. Those claims have been used by Mr. Trump to justify his push for federal legislation that would require that people show proof of U.S. citizenship to register to vote and severely restrict voting by mail.

The changes are upending the lives of some green card holders who have lived in the United States for years and maintain that they did not vote or even intend to register.



President Trump is pushing for federal legislation that would require people to show proof of U.S. citizenship to register to vote. Anna Rose Layden for The New York Times

Abdullah Emre Basar first learned that he was on the voter rolls in Washington State when he applied for citizenship and an immigration officer at his interview last year informed him that he was registered, according to a court filing last month.

Mr. Basar later learned that he was registered in 2014 after visiting the local motor vehicle agency to update his address, said Devin Theriot-Orr, his attorney. The government denied him citizenship and placed him in removal proceedings in April, according to the filing.

Mr. Basar maintains that he never voted or asked to register. Ryan Dosch, a manager at the Spokane County elections office, said in an email that a voter registration record under Mr. Basar's name was canceled and had no history of a ballot cast.

"It brings a lot of worry and uncertainty," Mr. Basar said in a statement. "It is putting stress on my marriage, as my wife is a citizen and the unknown is very stressful."

The administration's actions have involved a close partnership between the Homeland Security Department and the Justice Department, which has sought to investigate and criminally charge noncitizens with illegal voting. Prosecutors have been instructed to file more charges against those individuals, and the Justice Department has sued dozens of states to obtain voter rolls. The department has also seized on revelations by New Jersey officials that a software glitch led to about 6,600 noncitizens being registered to vote between June 2023 and June 2024. Roughly 400 of them later cast ballots.

Harmeet Dhillon, who runs the Justice Department's civil rights division, has said officials are ready to arrest or deport those who improperly voted in New Jersey. Gov. Mikie Sherrill, a Democrat, indicated she would resist the Trump administration's demands to turn over the names of the registrants, who she said ended up on the voter rolls "through no fault of their own."

Homeland security officials are devoting significant resources to the effort, ordering agents who typically focus on transnational crimes like human trafficking and drug enforcement to hunt for voter fraud, a major shift for an arm of Immigration and Customs Enforcement known as Homeland Security Investigations.

In June, agents with the unit accompanied F.B.I. agents during a raid of the Ohio Organizing Collaborative, a group that conducts voter registration drives, and actively questioned staff members.

**Sign up for the On Politics newsletter.** It's a pivotal moment for American politics. Join us for 2026 and beyond. Get it sent to your inbox.

"Conducting voter fraud investigations is a real departure for H.S.I., and is not within the normal scope of their very important criminal investigative work," said Deborah Fleischaker, a senior ICE official during the Biden administration.

In a statement, a homeland security spokesperson said that ICE was rooting out and investigating election fraud wherever it could be found.

The Trump administration has also prodded states to upload tens of millions of voter records through SAVE, a federal immigration verification tool run by the Homeland Security Department that the administration revamped to look for noncitizens on the voter rolls.

But there have been problems with the SAVE tool itself. In October, Jane Nelson, the Texas secretary of state at the time, announced that her office had identified 2,724 potential noncitizens who were registered to vote in Texas. But local election officials who looked into the findings at the county level found that many identified by SAVE were actually citizens. An independent investigation in Travis County, Texas, home to Austin, found that 25 percent of the noncitizen matches were citizens, according to court records.

When she was the Texas secretary of state, Jane Nelson announced that her office had identified nearly 3,000 potential noncitizens who were registered to vote. Many, however, turned out to be citizens. Adam Powell/USA Today Network, via Reuters

Homeland security officials have continued to push evidence-free claims of widespread election fraud. Markwayne Mullin, the homeland security secretary, said last month that the administration uncovered more than 250,000 cases of noncitizens registered to vote in four states, but provided no evidence to support the finding or details about how officials arrived at that number.

Letters from the Homeland Security Department to some states indicated that the number was probably overestimated, with caveats and based on initial reviews. Some state officials, including in Nevada, have cast doubt on the methods the department used to calculate the estimate.

The intense focus on deporting noncitizens on the voter rolls marks a shift for the Homeland Security Department. Several immigration attorneys said they had clients who were still approved for citizenship under previous administrations if they explained that they mistakenly registered and had no other issues with their cases.

Michael Valverde, who was a senior official at U.S. Citizenship and Immigration Services for more than two decades, said that immigration officers used to have some ability to take into account factors like intent, age and mental capacity in

considering whether registering to vote or voting rendered them removable.

“Now officers have very limited discretion, and I am hearing that denials and removal proceedings based on voting are happening more frequently,” Mr. Valverde said.

Attorneys said many of their clients who registered did so inadvertently while obtaining or renewing driver’s licenses, pointing to voter laws that have made it easier for people to register to vote at motor vehicle agencies. Some immigrants lack English fluency and do not realize they are signing registration forms, lawyers said.

Altagracia White, a 61-year-old resident of Woodbury, N.J., who is married to a U.S. citizen, said the federal government was seeking to deport her. Ms. White said she first learned that she was registered to vote after she applied for citizenship and an immigration officer informed her. Ms. White later obtained documents from the state showing that she signed a voter registration application while renewing her driver’s license more than a decade ago.

Altagracia White with her husband, Michael White, in Woodbury, N.J., last month. She is facing deportation to the Dominican Republic after applying for citizenship and learning that she had signed a voter registration application years earlier while renewing her driver's license. Hannah Beier for The New York Times

"I never thought they were telling me to sign to vote or anything like that," Ms. White said. "At that time, I didn't even know how to say yes in English."

The federal government has initiated her deportation to the Dominican Republic, citing her voter registration and claiming she voted in 2020. County records show that Ms. White voted once via mail-in ballot that year. Ms. White denied that she sent the ballot or ever voted.

George Fishman, a deputy general counsel at the Homeland Security Department during the first Trump administration, praised the agency's efforts to pursue noncitizen voting. Although he said there was a "certain level of unfairness" when it came to noncitizens who inadvertently registered to vote, he thought it was Congress's responsibility to pass reforms that would prevent them from getting onto voter rolls.

"I think the most vigorous enforcement should be against those who knew they were voting illegally, but the law needs to be enforced," said Mr. Fishman, a senior legal fellow at the Center for Immigration Studies, an organization that supports lower immigration rates.

Coral Murphy Marcos contributed reporting.

**Madeleine Ngo** covers immigration and economic policy for The Times.

**Nick Corasaniti** is a Times reporter covering national politics, with a focus on voting and elections.

**Hamed Aleaziz** covers the Department of Homeland Security and immigration policy for The Times.

---

A version of this article appears in print on , Section A, Page 1 of the New York edition with the headline: Hunt Intensifies For Noncitizens On Voting Rolls

# EXHIBIT 18




Brianna Lennon, who runs elections in Boone County, Missouri, pushed back against the use of a new error-prone federal tool to identify potential noncitizens on her voter rolls. Joe Johnson for ProPublica and The Texas Tribune

# "Not Ready for Prime Time." A Federal Tool to Check Voter Citizenship Keeps Making Mistakes.

**by Jen Fifield, ProPublica, and Zach Despart, ProPublica and The Texas Tribune**
Co-published with The Texas Tribune
February 13, 2026, 5:30 am

*ProPublica is a nonprofit newsroom that investigates abuses of power. Sign up to receive our biggest stories as soon as they're published.*

*This article is co-published with The Texas Tribune, a nonprofit, nonpartisan local newsroom that informs and engages with Texans. Sign up for The Brief Weekly to get up to speed on their essential coverage of Texas issues.*

***Update, March 27, 2026:** A coalition of minority- and voting-rights organizations have sued Texas Secretary of State Jane Nelson and several county election officials, claiming that the state's use of SAVE to look for possible noncitizens on the voter rolls discriminates against naturalized citizens.*

*The complaint, filed Thursday in U.S. District Court, cites ProPublica and The Texas Tribune's reporting, which revealed the system often inaccurately flags citizens born outside of the United States as noncitizens. The groups are asking for the court to halt the use of SAVE in Texas.*

### Reporting Highlights

- **Widespread Errors:** An expanded federal tool for identifying noncitizens on voter rolls is making persistent mistakes, particularly in assessing citizenship for people born outside the U.S.
- **Banned From Voting:** In Missouri, state officials told local clerks to temporarily ban flagged voters from casting ballots, even though hundreds turned out to be citizens.
- **Texas Confusion:** As errors emerged in SAVE data, local clerks said the state hadn't provided them with clear guidance and worried about disenfranchising eligible citizens.

These highlights were written by the reporters and editors who worked on this story.

Listen to this article
– 1.0x +
00:00 / 24:09
Share feedback
To hear more, download the Noa app

When county clerk Brianna Lennon got an email in November saying a newly expanded federal system had flagged 74 people on the county's voter roll as potential noncitizens, she was taken aback.

Lennon, who'd run elections in Boone County, Missouri, for seven years, had heard the tool might not be accurate.

The flagged voters' registration paperwork confirmed Lennon's suspicions. The form for the second person on the list bore the initials of a member of her staff, who'd helped the man register — at his naturalization ceremony. It later turned out more than half the Boone County voters identified as noncitizens were actually citizens.

The source of the bad data was a Department of Homeland Security tool called the Systematic Alien Verification for Entitlements, or SAVE.

Once used mostly to check immigrants' eligibility for public benefits, SAVE has undergone a dramatic expansion over the last year at the behest of President Donald Trump, who has long falsely claimed that millions of noncitizens lurk on state voter rolls, tainting American elections.

At Trump's direction, DHS has pooled confidential data from across the federal government to enable states to mass-verify voters' citizenship status using SAVE. Many of the nation's Republican secretaries of state have eagerly embraced the experiment, agreeing to upload all or part of their rolls.

ADVERTISEMENT

But an examination of SAVE's rollout by ProPublica and The Texas Tribune reveals that DHS rushed the revamped tool into use while it was still adding data and before it could discern voters' most up-to-date citizenship information.

As a result, SAVE has made persistent mistakes, particularly in assessing the status of people born outside the U.S., data gathered from local election administrators, interviews and emails obtained via public records requests show. Some of those people subsequently become U.S. citizens, a step that the system doesn't always pick up.

According to correspondence between state and federal officials, DHS has had to correct information provided to at least five states after SAVE misidentified some voters as noncitizens.

Texas and Missouri were among the first states to try the augmented tool.

In Missouri, state officials acted on SAVE's findings before attempting to confirm them, directing county election administrators to make voters flagged as potential noncitizens temporarily unable to vote. But in hundreds of cases, the tool's determinations were wrong, our review found. Lennon was among dozens of clerks statewide who raised alarms about the system's errors.

"It really does not help my confidence," she said, "that the information we are trying to use to make really important decisions, like the determination of voter eligibility, is so inaccurate."

In Texas, news reports began emerging about voters being mistakenly flagged as noncitizens soon after state officials announced the results of running the state's voter roll through SAVE in October.

Our reporting showed these errors were more widespread than previously known, involving at least 87 voters across 29 counties. County election administrators suspect there may be more. Confusion took hold when the Texas secretary of state's office sent counties lists of flagged voters and directed clerks to start

demanding proof of citizenship and to remove people from the rolls if they didn't respond.

"I really find no merit in any of this," said Bobby Gonzalez, the elections administrator in Duval County in South Texas, where SAVE flagged three voters, all of whom turned out to be citizens.

Even counting people flagged in error, the first bulk searches using SAVE haven't validated the president's claims that voting by noncitizens is widespread. At least seven states with a total of about 35 million registered voters have publicly reported the results of running their voter rolls through the system. Those searches have identified roughly 4,200 people — about 0.01% of registered voters — as noncitizens. This aligns with previous findings that noncitizens rarely register to vote.

Brian Broderick leads the verification division of U.S. Citizenship and Immigration Services, the DHS branch that oversees SAVE. In an interview this month, he acknowledged the system can't always find the most current citizenship information for people not born in the U.S. But he defended the tool, saying it was ultimately up to states to decide how to use SAVE data.

"So we're giving a tool to these folks to say, 'Hey, if we can verify citizenship, great, you're good. If we can't, now it's up to you to determine whether to let this person on your voter rolls,'" Broderick said.

ADVERTISEMENT

## Archived Page Not Found

Sorry, this page was not found in this archive:

`https://2d960e625633006333b065b71e096bf5.safeframe.googlesyndication.com/safeframe/1-0-45/html/container.html?n=3`

Load the live page in a new tab (or download the file, if this URL points to a file).

In Texas, Secretary of State Jane Nelson declined an interview request. Her spokesperson, Alicia Pierce, said the office hadn't reviewed SAVE's citizenship determination before sending lists to counties because it isn't an investigative agency. In a statement, Pierce added that the use of SAVE was part of the office's "constitutional and statutory duty to ensure that only eligible citizens participate in Texas elections."

A spokesperson for Missouri Secretary of State Denny Hoskins called SAVE a valuable resource even though some people it flagged might later be confirmed as citizens. "No system is 100% accurate," Hoskins said in an interview, "but we're working to get it right."

Asked whether it was problematic that his office directed clerks to temporarily bar voters from casting ballots before verifying SAVE's findings, Hoskins said that was a "good point."

While 27 states have agreed to use SAVE, others have hesitated, concerned not only about inaccuracies, but also about privacy and the data's potential to be used in immigration enforcement. Indeed, speaking at a recent conference, Broderick said that when SAVE flags voters as noncitizens, they are also referred to DHS for possible criminal investigation. (It is a crime to falsely claim citizenship when registering to vote.)

People who've been flagged by SAVE in error say it's jarring to have to provide naturalization records to stay eligible to vote when they know they've done nothing wrong.





Sofia Minotti was erroneously flagged as a potential noncitizen voter by a Department of Homeland Security tool. Shelby Tauber for ProPublica and The Texas Tribune

Sofia Minotti, who lives north of Dallas in Denton County, was born in Argentina but became a U.S. citizen years ago. Nonetheless, she was one of 84 Denton County voters identified by SAVE as a potential noncitizen. She and 11 others have since provided proof of citizenship, giving the system an error rate in the county of at least 14%.

The real rate is probably higher, a county official acknowledged, since some of those sent notices to prove their citizenship might not respond in time to meet the deadline. They'll have to be reinstated to vote in the midterms later this year.

Minotti, though still on the rolls, felt singled out unfairly.

"I'm here legally, and everything I've done has been per the law," she said. "I really have no idea why I had to prove it."

Election administrators in many states have long hungered for better access to federal information on citizenship status.

States don't typically require people to provide proof of citizenship when they sign up to vote, only to attest to it under penalty of perjury. Previous efforts to use state data to catch noncitizens on voter rolls have gone poorly. Texas officials had to abandon a 2019 push after it became clear their methodology misidentified thousands of citizens, many of them naturalized, as ineligible voters.

Until recently, SAVE hadn't been much of a resource. State and local election officials needed to have voters' DHS-assigned immigration ID numbers — information not collected in the registration process — to verify their citizenship status. Plus, officials had to pay to conduct searches one by one, not in bulk.

In March, Trump issued an executive order that required DHS to give states free access to federal citizenship data and partner with the Department of Government Efficiency to comb voter rolls.

ADVERTISEMENT

The order triggered a series of meetings at USCIS designed to comply with a 30-day deadline to remake SAVE, a document obtained by the American Civil Liberties Union and reviewed by ProPublica shows.

The system's main addition was confidential Social Security Administration data, which allowed states to search using full or partial Social Security numbers and incorporated information on millions of Americans who were not previously in Homeland Security databases.

David Jennings, Broderick's deputy at USCIS, had pressed his team to move quickly, he said on a June video call with members of former Trump lawyer Cleta Mitchell's Election Integrity Network, which has spread false claims about noncitizen voting.

"We tested it and deployed it to our users in two weeks," Jennings said on the call, which ProPublica obtained a recording of. "I think that's remarkable. Kind of proud of it."

Jennings added that to get quick access to the Social Security data, which has been tightly guarded, USCIS partnered with DOGE. (In an unrelated matter, DOGE has since been accused of misusing Social Security data.) Jennings did not respond to questions from ProPublica and the Tribune.

Perhaps because of its accelerated timetable, USCIS expanded the system before meeting legal requirements to inform the public about how the data would be collected, stored and used, according to voting rights organizations that sued. (UCSIS did not respond to a request for comment about this.) It also blew past concerns from voter advocacy groups about the accuracy of SSA's citizenship data, which multiple audits and analyses have shown is often outdated or incomplete. This is particularly true for people not born in the U.S., who often get Social Security numbers well before they become citizens.

According to emails obtained by ProPublica and the Tribune, SAVE first checks SSA's citizenship information. If that shows a voter isn't a citizen, DHS searches other databases, but it can be difficult to locate and match all the data the systems have on a person. This can lead to errors.

Broderick said in the interview that Trump's executive order dramatically accelerated the timetable for launching SAVE, getting agencies to cooperate and move quickly. But he insisted the work was done responsibly.

"Do I think it was reckless? Do I think it wasn't planned? Do I think it wasn't tested? Absolutely not," he said.

By September, Texas had uploaded its entire list of more than 18 million registered voters into SAVE. Alabama, Arkansas, Indiana, Louisiana, Missouri, Montana, Tennessee, Utah and Wyoming put voter data into the system, too.

They would soon start to unveil what SAVE had found.

ADVERTISEMENT

One of the first out of the gate was Texas. In late October, with early voting underway in state and local elections, Nelson, the secretary of state, announced SAVE had identified 2,724 potential noncitizens on the rolls.

But as Nelson delegated the task of investigating those voters' statuses to local election officials, confusion took hold.

At a meeting, Nelson's staff told county clerks' offices to investigate flagged voters and then send notices to those for whom they were unable to confirm citizenship. In a follow-up email, Nelson's staff told the clerks they should already have heard from someone in the office with more details.

That set off a chain of messages on the local officials' email group

Travis County voter registration director Christopher Davis said he hadn't been contacted and had just learned the county had 97 flagged voters. Marsha Barbee, in Wharton County near Houston, shared that she talked to a Nelson staffer who said she'd been directed not to tell local officials about their lists because they were in the middle of early voting.

"They said we have enough on our plates and didn't want us to worry right now," Barbee wrote.

In the absence of clear state guidance, clerks proceeded inconsistently. Some said they didn't act on their lists, waiting for more direction. Others, unsure how to investigate flagged voters' status, said they simply sent notices asking for proof of citizenship, though some opted not to remove nonresponsive voters from the rolls.

"I give them many chances; I don't just expire them right away," Dee Wilcher, a clerk in East Texas' Anderson County, said about flagged voters, adding that she wanted to avoid removing citizens from the rolls and looking "stupid."

Chris McGinn, executive director of the Texas Association of County Election Officials, said many clerks expressed frustration with the secretary of state's lack of

guidance and failure to help with investigations. When he shared clerks' concerns, McGinn said Nelson's staff didn't respond, leading him to conclude that checking SAVE's findings wasn't an agency priority.

He called the state's use of SAVE "more political and appearance-based" than a practical way to ensure election integrity.

ADVERTISEMENT

One way to check SAVE's findings would have been to get information from the Texas Department of Public Safety, which requires proof of citizenship if residents register to vote when obtaining a driver's license. The secretary of state's office didn't do this and didn't direct counties to either.

Several county officials said they hadn't thought to ask DPS for information; those who did often found the agency had documentation showing some of the voters who SAVE identified as noncitizens were in fact citizens.

In the Texas Panhandle, Potter County elections officials quickly confirmed through DPS that three of nine voters on their list had proof of citizenship on file. In neighboring Randall County, DPS helped officials verify that one in five had a U.S. passport, according to interviews with the local officials.

In December, Travis County learned that 11 of the 97 voters flagged by SAVE had proven their citizenship to DPS. After getting the data, the county's voter registrar, Celia Israel, said in an interview that she felt even more uncomfortable about moving forward with sending notices to voters, given SAVE's errors.

"It has proven to be inaccurate," she said. "Why would I rely on it?"

To be sure, SAVE also identified some people who weren't eligible to vote, clerks said. Several came across instances in which voters marked on registration forms that they weren't citizens, but were registered by election office staffers in error. Clerks also said voters have told them they'd misunderstood questions about eligibility when getting drivers' licenses. (It's not clear if any of those registered in error voted; overall, noncitizens rarely vote.)

ProPublica and the Tribune surveyed the 177 Texas counties that had voters flagged by SAVE, receiving data from 97 that had either checked DPS records or sent notices to voters to try to verify SAVE's citizenship information. Overall, more than 5% of the voters SAVE identified as noncitizens proved to be citizens. In some smaller counties, most of those flagged were eligible to vote. That includes six of 11 in the Panhandle's Moore County, and two of three in Erath County, near Dallas.

But some of those who didn't respond to notices also might be citizens.

In Denton County, where Sofia Minotti lives, checks by elections administrator Frank Phillips' staff delivered clear answers on the citizenship status of 26 of the 84 voters flagged by SAVE. Twelve, including Minotti, proved they were citizens. Fourteen more had marked on their registration forms that they weren't and the blame rested with workers for registering them nonetheless.

Phillips said he removed anyone who didn't provide proof by the deadline from the rolls to comply with the secretary of state's instructions, but he fears some were eligible voters.

"What is bugging me is I think our voter rolls may be more accurate than this database," Phillips said. "My gut feeling is more of these are citizens than not."

ADVERTISEMENT

---

At least initially, Missouri took a more targeted approach to SAVE than Texas did. State officials used the system to search for information on a subset of about 6,000 voters they had reason to think might not be citizens, according to emails between federal and state officials.

The state had results by October, but in early November, a USCIS official wrote to Missouri and four other states to say some people flagged by SAVE as noncitizens were actually citizens, emails obtained through public records requests show.

"We have continued to refine our processes used to obtain and review the citizenship data available to us," the official wrote, adding that one such improvement revealed the errors.

The staffer attached amended search results, but Missouri officials withheld the attachment from its response to a public records request and did not respond to a question about how many corrections were made.

Based on the updated data from USCIS, Missouri sent lists of flagged voters to county election administrators in November. ProPublica and the Tribune obtained these lists for seven of 10 most populous counties in the state, which show SAVE initially identified more than 1,200 people as noncitizens just in these areas.

The Missouri secretary of state's office told election administrators it would work to verify SAVE's citizenship determinations. In the meantime, local officials were instructed to change the status of flagged voters, making them temporarily unable to vote.

The lists were met with swift pushback from county election officials, who, like Lennon, soon spotted people they knew to be citizens and questioned the directive's legality. On a group call in November, they traded examples, saying they recognized neighbors, colleagues and people they'd helped to register at naturalization ceremonies.

In St. Louis, the Board of Election Commissioners didn't alter the eligibility of anyone on its flagged voter list after being advised not to by its attorney.

Rachael Dunn, a spokesperson for Hoskins, the Missouri secretary of state, said state law allows officials to change voters' status during investigations into their eligibility — for example, if there are signs they've moved. The laws she cited don't directly address investigations into citizenship status, however.

In early December, some 70 clerks, Republicans and Democrats, wrote a letter to Missouri House Speaker Jonathan Patterson saying there were better ways than SAVE to keep noncitizens off voter rolls.

Weeks later, the state's election integrity director, Nick La Strada, wrote USCIS to ask why a voter that SAVE had identified as a noncitizen in October had showed up in a more recent search as a citizen.

A USCIS official replied that between the initial search and the follow-up, DHS had gotten access to passport data, which contains more up-to-date citizenship

information on some people not born in the U.S.

The USCIS staffer explained that some of the most accurate citizenship information — which is within DHS' own records — still wasn't searchable in SAVE because running that kind of search would require the voter's DHS identifier, which can't always be located. The staffer said they were working on improvements but those could take until March.

"You don't start with something at that scale until you work the bugs out, and that is not the case here," Clinton Jenkins, president of the Missouri Association of County Clerks and Election Authorities, said in an interview. Jenkins is also the clerk for Miller County in the Ozarks.

In early January, in what was framed as a "SAVE review update," the secretary of state's office sent counties across Missouri revised lists with reduced numbers of voters identified as potential noncitizens. It instructed election administrators to move voters who'd been initially flagged in error by SAVE back to active status, restoring their eligibility to vote.

ADVERTISEMENT

Dunn, Hoskins' spokesperson, didn't specify what prompted these adjustments. Even the new lists may not be final, she acknowledged. Once the review is complete, the state has said it plans to send letters to those still on the lists, demanding proof of citizenship and giving recipients 90 days to respond.

The addition of new data to SAVE makes it a more valuable resource, she maintained, "while also reinforcing the need for careful, layered review before any action is taken."

After the January revision, St. Louis County's initial list of 691 potential noncitizens dropped to 133.

Zuzana Kocsisova, who lives in St. Louis, was among those incorrectly flagged by SAVE on its first pass. Originally from Slovakia, she became a U.S. citizen in 2019. She showed ProPublica and the Tribune a copy of her naturalization certificate, which she keeps with a letter from Trump congratulating her for "becoming a citizen of this magnificent land."

When a reporter told her that SAVE had initially identified her as a potential noncitizen, she said she wasn't surprised. She saw it as part of the Trump administration's targeting of immigrants. She was more frustrated than relieved to learn that she wasn't on the smaller list of flagged voters sent in January.

"Overall, it seems like this process has done more to worry people who can vote than to identify actual registered voters who don't qualify," she said. "It's just a waste of resources. I don't think it makes the elections any more safe."

In Boone County, where Lennon is the clerk, the count of flagged voters fell from 74 to 33 and the naturalized citizen who Lennon's staff helped register was no longer on the list.

Lennon said she and other county clerks would happily accept data that helps them correctly identify noncitizens on their voter rolls. But so far, SAVE hasn't done that. And until it does, she said, she won't purge voters purely because SAVE has flagged them.

"This is not ready for prime time," Lennon said. "And I'm not going to risk the security and the constitutional rights of my voters for bad data."

Mollie Simon contributed research. Doug Bock Clark and Amy Yurkanin contributed reporting.

**Jen Fifield**

I'm a ProPublica reporter covering election-related issues, voting rights and threats to democracy.

MORE STORIES HAVE A TIP FOR A STORY?

Send me tips on the Trump administration's actions related to voting and elections, along with local or national threats to accurate, fair and secure elections.

**Zach Despart**

I'm a reporter with the ProPublica-Texas Tribune investigative unit, focusing on the intersection of business, politics and government.

MORE STORIES HAVE A TIP FOR A STORY?

I'm interested in receiving tips about government, politics and business in Texas.

**Most Read**

**What We're Watching**

During Donald Trump's second presidency, ProPublica will focus on the areas most in need of scrutiny. Here are some of the issues our reporters will be watching — and how to get in touch with them securely.

1 Texas Medical Board Sanctions Three Doctors for Delayed Care That Led to the Deaths of Two Pregnant Women

**Learn more about our reporting team.** We will continue to share our areas of interest as the news develops.

**Sharon Lerner**

I cover health and the environment and the agencies that govern them, including the Environmental Protection Agency.

Contact me

**Andy Kroll**

I cover justice and the rule of law, including the Justice Department, U.S. attorneys and the courts.

Contact me

**Melissa Sanchez**

I report on immigration and labor, and I am based in Chicago.

Contact me

**Jesse Coburn**

I cover housing and transportation, including the companies working in those fields and the regulators overseeing them.

Contact me

If you don't have a specific tip or story in mind, we could still use your help. Sign up to be a member of our **federal worker source network** to stay in touch.

2 **Trump Pardoned a Nursing Home Owner Who Owed Almost $19 Million to a Grieving Family**

3

**3D-Printed Homes, an Abandoned $590,000 Deposit, the FBI: What Really Happened in This Small Town?**

4 **Inside Trump's Effort to "Take Over" the Midterm Elections**

5 **Caught in the Crackdown: As Arrests at Anti-ICE Protests P**

# EXHIBIT 19

Mother Jones

POLITICS APRIL 9, 2026

# The Federal Database That Could Upend the Midterm Elections

*Error-filled SAVE queries could be used to purge state voter rolls—and challenge election results.*

JUDD LEGUM and REBECCA CROSBY




New Yorkers wait to cast their votes on November 2, 2025. **Stephanie Keith/Getty**

*This story was originally published by* Popular Information*, a substack publication to which you can subscribe here.*

**President Donald Trump** and the election conspiracy theorists he surrounds himself with are determined to exclude people from voting in the 2026 election based on one database: the Department of Homeland Security's Systematic Alien Verification for Entitlements (SAVE) system.

Why?

SAVE is an incomplete and flawed database that has been shown to produce a massive number of false positives, incorrectly identifying American citizens as aliens. Thus, using SAVE to exclude voters buttresses the lie that a significant number of undocumented immigrants vote in elections.

Trump's latest effort came last week when he signed an executive order directing DHS to use SAVE and other databases to create, for each state, "a list of individuals confirmed to be United States citizens who will be above the age of 18 at the time of an upcoming Federal election and who maintain a residence in the subject State." Trump's executive order then directs the Department of Justice (DOJ) to prosecute "individuals and public or private entities engaged in, or aiding and abetting, the printing, production, shipment, or

distribution of ballots" to anyone not on the list.

The order, in effect, confirms that the administration aims to exclude purportedly ineligible voters by creating a national voter registration list. It is an effort to coerce states to use the SAVE database to purge voters or risk criminal charges. But SAVE, as its full name suggests, was designed to determine eligibility for government benefits—not citizenship. And, crucially, as NPR noted, "Not all of the data is necessarily up to date."

Shortly after Trump's January 2025 inauguration, Elon Musk's Department of Government Efficiency "optimized" the SAVE database over two weeks, quickly adding a lot of additional information, including full social security numbers. DOGE also allowed state officials to search the database for hundreds of thousands of voters at once with bulk uploads.

Used in this manner, SAVE has produced an extraordinarily high error rate.

In Missouri, for example, Republican Secretary of State Denny Hoskins ran the state's voter list through SAVE in November 2025 and distributed the results to county election officials. For St. Louis County, SAVE flagged 691 registered voters as noncitizens. But the county immediately determined that 35 percent of the names were naturalized citizens. After the list was cross-referenced with passport data in January, which has more accurate citizenship information, the list was cut to 133—meaning at least 81 percent of SAVE's noncitizen results were incorrect. Even that list "may not be final" and once a final list is established, anyone remaining on it will receive a letter and have 90 days to appeal.

Seventy county clerks in Missouri, Republicans and Democrats, sent a letter to the state's legislative leaders warning that the SAVE database is repeatedly flagging "individuals we know to be US citizens—our neighbors, colleagues and even voters we have personally registered at naturalization ceremonies."

Texas also uploaded its voter list to SAVE. In Denton County, SAVE identified 84 supposed noncitizens registered to vote. Twelve responded to a notice with proof they were citizens. Fourteen others correctly marked on their registration forms that they were *not* citizens but were mistakenly registered anyway. The rest did not respond to the notice and were removed from the rolls, even though county election officials believe most of that group are eligible voters.

"What is bugging me is I think our voter rolls may be more accurate than this database," Denton County elections administrator Frank Phillips told *ProPublica*. "My gut feeling is more of these are citizens than not."

Trump's executive order also attempts to weaponize the US Postal Service (USPS), prohibiting it from mailing ballots to anyone who does not appear on the new federal voter list.

Trump's executive order, which would inject chaos into the voting process months before the election, is already being challenged in multiple court cases. These challenges have a good chance of success because the Constitution is very clear that states, not the federal government, have the primary authority to administer elections. Congress can pass laws that impact election administration, but Trump is attempting to invalidate state laws and procedures by executive fiat.

Trump's efforts to enlist the USPS are also legally dubious, because it is an independent agency legally obligated to deliver mail throughout the country in a neutral manner. Trump's order would transform it into an arbiter of voter eligibility.

But even if his executive order is blocked by the courts, the push to purge voters from the rolls before November—or challenge ballots after the votes are in—remains a threat.

**Trump's executive order** is trying to force states to cross-reference their voting list with the SAVE database. But in November 2025, even before the executive order was issued, the US Citizenship and Immigration Services (USCIS) announced that 26 states "already have, or are in the process of establishing, a memorandum of agreement for voter verification with SAVE."

The USCIS website specifically lists 24 states that have formally registered to use SAVE: Alabama, Arizona, Arkansas, Colorado, Florida, Georgia, Idaho, Indiana, Iowa, Kansas, Louisiana, Michigan, Mississippi, Missouri, Montana, North Carolina, North Dakota, Ohio, South Carolina, Tennessee, Texas, Utah, Virginia, and Wyoming. It's possible that more will join before the election.

***When asked whether the DOJ could ask DHS to scour state voter rolls for noncitizens, Voting Section chief Eric Neff said, "Yes, and we intend to do so."***

According to the DHS, SAVE has labeled 21,000 registered voters submitted by states as noncitizens. Whatever happens with the executive order, the purging of voters based on SAVE data in these states will continue. It's unclear what, if anything, each state will do to verify the list of supposed noncitizens produced by SAVE.

Separately, the DOJ has requested detailed voter roll data from at least 48 states. The states were presented with a memorandum of understanding from the DOJ requiring them to remove any voters the federal government deemed ineligible using SAVE and potentially other databases. In December, the acting head of the DOJ Voting Section, Eric Neff, said 11 states were willing to comply with the MOU.

According to a tracker maintained by the Brennan Center, 12 states have provided (or committed to provide) a full list of registered voters, including drivers license numbers and other personal information, to the DOJ. (Several other states have provided publicly available voter data.)

The DOJ has sued 30 states and the District of Columbia to force them to turn over detailed voter registration. Courts have dismissed cases against California, Oregon, Georgia, and Michigan. But the DOJ has subsequently appealed or refiled in those states. The rest of the cases are still pending.

If the DOJ is ultimately successful in some or all of those cases, it could use the data to pressure states to purge their rolls of voters SAVE identified as noncitizens—just as the executive order contemplates. It could also use SAVE's list of alleged noncitizens to challenge the results of close elections.

**The Trump administration** has claimed that it is requesting states' voter data to check for compliance with federal laws requiring states to maintain clean voter registration lists, including the Help America Vote Act and the National Voter Registration Act.

At the end of March, however, CBS News reported that the DOJ and the DHS "are close to finalizing an agreement that will allow the federal government to use sensitive voter registration data for immigration and criminal investigations."

According to CBS, under the agreement, the DOJ would share state voter registration data with Immigration and Customs Enforcement to check whether noncitizens have voted or are registered. Sources told CBS that the White House was also involved in discussions about the agreement.

The DOJ's agreement with DHS appears to contradict statements made in court by its lawyers. On March 3, during a hearing in Minnesota, the court asked DOJ attorney James Tucker if the voter data was being used for immigration enforcement. "Not to my knowledge," Tucker said.

On March 19, a federal judge in Connecticut asked Tucker if the DOJ would guarantee that voter data would not be given to DHS. "I simply cannot state what the Attorney General's purpose may be at some other time," Tucker replied. "What I can say is, as of today, there has been no directive or instruction that the data, the non-publicly available data, is going to be transmitted to any other agency." He went on to say, "Under the circumstances it's not consistent with what the United States has specifically stated in its basis and purpose."

But after CBS News asked the DOJ for comment on the agreement, a DOJ attorney acknowledged its true plans to the court. When asked by a Rhode Island judge whether the DOJ could ask DHS to check for noncitizens on the state's voter rolls, Neff said, "Yes, and we intend to do so," the *Rhode Island Current* reported.

The timeline raises serious ethical questions about whether DOJ attorneys knew about the deal with DHS and have intentionally misled the court, which would violate American Bar Association rules. While CBS News "could not determine whether all of the lawyers…arguing the cases in court" knew of the plan, sources said that "at least a handful of senior attorneys from the Civil Rights Division have been privy to some discussions about the data-sharing plan…in addition to multiple officials in other Justice Department offices, including the deputy attorney general."


**I'M HOPEFUL BECAUSE OF READERS LIKE YOU. WILL YOU PITCH IN TODAY?**

We see the headlines on a weekly basis: the claw backs in public media, the gutting of *The Washington Post*, the bending over backwards to appeal to Trump and his allies.

**But not here**.

When *Mother Jones* started publishing 50 years ago, our founders made a critical decision: to be a reader-supported nonprofit. They knew that no corporate owner would be interested in a muckraking newsroom; they also knew that no muckraking newsroom would be interested in following the agenda of a corporate owner.

And so, we've been reader-funded for half a century. We rely on contributions from our readers—**readers like you**—whether it's $50, or $15 a month, or whatever fits your budget. People give what they can, and every donation makes a difference for our newsroom, which has grown tremendously—in size and reach and renown—since its inception in 1976.

You may be wondering: **What does it take to publish an investigation**? **And what does my donation actually fund**? The answers are one and the same: It takes people, resources, and time. And that's what your donation funds directly.

**Every donation *Mother Jones* receives from readers fortifies our newsroom**, whether we're covering underreported scandals out of Washington, DC, or the most important news of the day. And right now, **each donation will be doubled thanks to a $50,000 match**. So when you make a donation, it'll go twice as far.

Your support keeps us going. If you're able, donate today.

Thanks for reading.

—Monika Bauerlein, CEO

One-Time | Monthly

$12 | $15 | $25

Other Amount

Continue

VISA MasterCard AMERICAN EXPRESS DISCOVER PayPal

**I'M HOPEFUL BECAUSE OF READERS LIKE YOU. WILL YOU PITCH IN TODAY?**

We see the headlines on a weekly basis: the claw backs in public media, the gutting of *The Washington Post*, the bending over backwards to appeal to Trump and his allies.

**But not here**.

When *Mother Jones* started publishing 50 years ago, our founders made a critical decision: to be a reader-supported nonprofit. They knew that no corporate owner would be interested in a muckraking newsroom; they also knew that no muckraking newsroom would be interested in following the agenda of a corporate owner.

And so, we've been reader-funded for half a century. We rely on contributions from our readers—**readers like you**—whether it's $50, or $15 a month, or whatever fits your budget. People give what they can, and every donation makes a difference for our newsroom, which has grown tremendously—in size and reach and renown—since its inception in 1976.

You may be wondering: **What does it take to publish an investigation**? **And what does my donation actually fund**? The answers are one and the same: It takes people, resources, and time. And that's what your donation funds directly.

**Every donation *Mother Jones* receives from readers fortifies our newsroom**, whether we're covering underreported scandals out of Washington, DC, or the most important news of the day. And right now, **each donation will be doubled thanks to a $50,000**

**match**. So when you make a donation, it'll go twice as far.

Your support keeps us going. If you're able, donate today.

Thanks for reading.

—Monika Bauerlein, CEO

One-Time Monthly

$35 $50 $100

Other Amount

Continue

This site is protected by reCAPTCHA and the Google Privacy Policy and Terms of Service apply.

Copyright © 2026 Mother Jones and the Center for Investigative Reporting. All Rights Reserved.

# EXHIBIT 20

Sign in to CNN with Google

Continue

ADVERTISEMENT



POLITICS • 9 MIN READ

FOR SUBSCRIBERS

# Markwayne Mullin uses Homeland Security to further Trump's voter fraud crusade

UPDATED AUG 12, 2026

By Gabe Cohen, Priscilla Alvarez, Tierney Sneed



Homeland Security Secretary Markwayne Mullin speaks to reporters about election security, in the Indian Treaty Room of the Eisenhower Executive Office Building in Washington, DC, on July 17.
*(Julia Demaree Nikhinson/AP)*

A puzzling email landed in Nevada's state election office last month. A Fox News reporter wanted to know if the state had a response to the Department of Homeland Security's purported discovery of more than 15,000 noncitizens on its voter rolls.

Election officials circulated the request. No one knew where the claim had come from.

ADVERTISEMENT

"We just responded very plainly, like we have no idea what you're talking about," Nevada Secretary of State Cisco Aguilar told CNN.

Three days later, they got their answer. DHS announced that an analysis of public voter data had found more than 250,000 potential noncitizens registered in Nevada, California, New Jersey and Pennsylvania.

**RELATED ARTICLE**



Trump's mail voting appeal tests Supreme Court's anti-chaos election rule

8 MIN READ

Officials in all four states said they were blindsided. They disputed the findings and said DHS had provided neither its methodology nor the names of the allegedly ineligible voters.

"I can't take something that's made up out of thin air and try to justify it or defend it," Aguilar said. "We operate off of facts, not allegations or anecdotal information."

ADVERTISEMENT

The announcement coincided with a primetime address by President Donald Trump, who said he was declassifying information exposing vulnerabilities in the nation's election system. His allies hailed the findings as a bombshell. Publicly and privately, some Republican officials balked at them.

Homeland Security Secretary Markwayne Mullin, who has long echoed some of Trump's election fraud claims, underscored his role after the president's speech. At a press conference on the White House grounds, he touted his department's noncitizen findings, urged more states to collaborate, and delivered a stark warning.

"If the election officials – once we gave them the information they need to secure their elections, and they chose not to – then those individuals can also be held accountable by fines, by penalties, and even, depending on how far it goes, prison," Mullin said.

Since taking over DHS in March after Trump fired Kristi Noem, Mullin has accelerated efforts to make the department a central force in Trump's crusade against purported widespread election fraud. DHS has pushed states to share their voter rolls for audit and vowed to withhold grant funding from those that refuse to adopt a broader set of election reforms.

Last year, DHS tapped Heather Honey, a Trump-aligned election researcher who gained national attention for her efforts challenging the 2020 results, to lead an "election integrity" campaign.

Heather Honey, a conservative election researcher, leaves the federal courthouse in Harrisburg, Pennsylvania, on October 18, 2024 *(Mark Scolforo/AP/File)*

Honey's influence has grown under Mullin, and in June, the department promoted her to senior counselor to the secretary.

In Trump's second term, DHS has pivoted away from its longstanding role to help with election security and focused far more resources on voter fraud allegations, claiming troves of noncitizens are registered – and likely voting – especially in Democratic-led states.

ADVERTISEMENT

Federal law bars noncitizens from voting as well as making false statements to register. The administration has sharply intensified efforts to uncover such violations – pursuing criminal charges and deportations.

The department has leaned for investigative work on one of its federal agencies – Homeland Security Investigations – an arm of Immigration and Customs Enforcement that typically tackles major crimes like human trafficking, drug smuggling and child exploitation, not voter fraud.

“HSI is actively rooting out and investigating election fraud wherever it can be found,” a DHS spokesperson said in a statement to CNN. “We have repeatedly demonstrated that illegal aliens can and do vote in our elections.”

## Federal agents hunt for voter fraud

Communications obtained by CNN show that HSI agents have spent months pressing local election officials across the country for voter records to build criminal cases. Their inquiries have primarily centered on a slew of individual voters, but the probes have expanded to canvassing groups and even questions on debunked theories about the 2020 election – often with a sense of urgency.

ADVERTISEMENT

“I wouldn’t normally ask this of you if I was conducting an investigation with my usual methodology and speed, but there’s a bit of pressure on the timeline of things,” one HSI agent told a county election official in Ohio while requesting records for several names.

The agent later acknowledged: “Voter fraud investigations aren’t typically what HSI works.”

Workers and voters are pictured at a polling place in Las Vegas, in June 2022. *(John Locher/AP/File)*

Under the Trump administration, agents have, for example, been assigned to investigate whether naturalized US citizens registered or voted before becoming citizens, according to an internal memo reviewed by CNN. Another memo directs HSI agents to coordinate with US Citizenship and Immigration Services to begin removal proceedings when a noncitizen is suspected of or linked to voter fraud.

“All HSI offices are engaged in these important efforts,” the DHS spokesperson said.

ADVERTISEMENT

For months, agents have been working to trace the voting histories of tens of thousands of people flagged as potential noncitizens by a controversial federal verification system — the same pool of names Mullin cited at his news conference as definitive proof that large numbers of noncitizens are registered to vote.

While Trump and his allies have made sweeping claims about widespread noncitizen voting, emails obtained by CNN reveal a messier reality. Agents repeatedly pursued leads only to discover that they had identified the wrong people or lacked enough information to know for sure — and in some cases, few had ever cast a ballot.

President Donald Trump answers questions from reporters after signing an executive order regarding mail-in voting in the Oval Office of the White House, on March 31. *(Alex Brandon/AP)*

In Franklin County, Ohio, several people flagged by HSI had never been registered to vote. After confusion over another person's birthdate, the agent wrote: "Oops! Turns out the voter is actually his father."

The emails show the inquiry soon expanded to canvassing groups, including questions about the Ohio Organizing Collaborative, a progressive voter-turnout organization that federal agents raided in June – four months after the exchange.

ADVERTISEMENT

In Fort Bend County, Texas, HSI subpoenaed the election director for records before supplying a list of names to check, according to records obtained by Democracy Forward and shared with CNN. When county officials asked for more details to ensure they had identified the correct voters, the investigator replied: “At this time, the information I sent is all we have. If you could just proceed with the information provided, that would be great. We may have to do additional checks on our end.”

“This looks like DHS scraping the bottom of the barrel,” said Brendan Fischer, Director of Strategic Investigations at Campaign Legal Center, a voting-rights advocacy group.

Over the past 18 months, the administration has enhanced the citizenship records programs known as SAVE (Systematic Alien Verification for Entitlements) with data from other federal agencies, a move that was praised by Republican election officials who nonetheless have acknowledged that the data-matching can produce false positives and requires further investigation. Separately, the Justice Department has been demanding that states turn over their voter rolls — bringing lawsuits against 30 states that have refused — so that the administration can do its own SAVE audits for ineligible voters.

“The expansion of SAVE failed to substantiate claims of widespread noncitizen voting, so now the administration is trying to save face by directing HSI investigators to pursue a very limited number of potential cases,” Fischer said.

A guidance document circulated within HSI last year, which CNN reviewed, tells agents working election-related cases to determine which federal laws give them authority to investigate before collecting evidence. It also directs them to consult prosecutors before issuing subpoenas or conducting interviews.

ADVERTISEMENT

The document warns against public actions that could influence an election and bars immigration enforcement that "chills" voting. It also prohibits agents from bypassing election officials who control records or Justice Department divisions that oversee election matters.

## Investigating Trump's 2020 loss

DHS has also joined the administration's continuing effort to find evidence supporting Trump's unfounded claim that the 2020 election was rigged against him.

In February, HSI contacted the Arizona attorney general's office with questions about previous reviews of the election. The outreach, first reported by VoteBeat, came days after Noem, then the Homeland Security secretary, held an unusual news conference in Arizona promoting a stalled Trump-backed election bill.

In the queries to officials working under Arizona's Democratic attorney general, an HSI agent asked about claims involving late-arriving ballots in Maricopa County and supposed discrepancies in the ink used to print some ballots — allegations that had already been investigated.

ADVERTISEMENT

"I have to get a report in by (close of business) today, so was hoping to have some of the materials soon if at all possible," an HSI agent wrote in a follow-up email.

Poll workers count ballots inside the Maricopa County Election Department in Phoenix, Arizona, on November 5, 2020. *(Olivier/AFP/Getty Images/File)*

The attorney general's office provided materials assembled during an earlier investigation by Mark Brnovich, the Republican who led the office until 2023, prompting additional questions from the HSI official on March 5.

Noem was fired by Trump that day, with her replacement by Mullin announced simultaneously. HSI's 2020-related queries to the state attorney general ceased, but separately, the Justice Department obtained records from another review of that election from Arizona's Republican-controlled Senate. There has been no public investigatory action in the federal 2020 probes in Arizona since then.

## Inflated claims of non-citizens on voter rolls

Under Mullin, DHS has made sweeping claims of foreigners polluting the voter rolls of Democratic-led states while at

times overstating what has been uncovered while working with Republican election officials.

ADVERTISEMENT

Last month, DHS said it found more than 28,000 noncitizens (since revised to under 25,000) on the voter rolls of roughly two dozen mostly GOP-led states that voluntarily handed over their rolls.

But officials in two of those states – Georgia and North Carolina – have questioned the findings, saying the numbers are likely inflated and require more scrutiny. Republican officials elsewhere have stressed that the matches produced by SAVE must go through additional rounds of vetting once the federal government hands them over to states.

In Texas, one of the states DHS has touted for its cooperation, the secretary of state's office recently informed local election officials that some voters whose registrations were cancelled because of the SAVE review might need to be added back to the rolls, because the state had records indicating they had already proved their citizenship at the DMV.

Still, DHS is urging states to let the administration inspect their voter rolls, noting that only state and local election officials – not the federal government – can remove voters.

The DHS voter audit operation faces multiple lawsuits alleging the federal data system is leading to sloppy purges that disenfranchise eligible voters. In one of those cases, a court found the DHS violated privacy law in how it revamped the data program and issued a ruling that has blocked its use for most states.

DHS is appealing that ruling, and Mullin blasted it as coming from an “activist” judge.

ADVERTISEMENT

The administration has not disclosed how many HSI investigations have led to referrals for prosecution or deportation beyond a small number of publicized cases. They include charges announced by the Justice Department this spring against several alleged noncitizen voters in New Jersey.

Those charges predated Democratic Gov. Mikie Sherrill’s disclosure that a state DMV error had mistakenly added thousands of noncitizens to New Jersey’s voter rolls, nearly 400 of whom cast ballots, according to the governor.

DHS officials say they’re investigating the blunder to tee up prosecutions and deportations. Sherrill has refused the administration’s request for data on those voters, saying “The request had no legal basis, and I will always protect New Jerseyans.”

In Nevada, meanwhile, DHS last week requested that state election officials meet virtually with Mullin to discuss the thousands of potential noncitizens purportedly registered to vote. In emails obtained by CNN, DHS said it appreciated Nevada’s “willingness to collaborate on this important effort” and hoped to schedule “as quickly as possible.”

A Nevada official waved off that request, telling DHS it had not adequately explained how it came up with its claims about the state’s voter rolls.

ADVERTISEMENT

"Once we receive and evaluate that information, we will be in a position to engage in a productive and meaningful discussion with your office," the official said.

DHS replied that its analysis "was not done using SAVE" and offered to explain its process and provide a list of suspected noncitizens during the meeting.

"Let's set up a call," the Nevada official responded.

## Up next



'A criminal is a criminal': DHS Secretary Mullin defends aggressive deportation efforts as some Republicans waver

6:52



GOP congresswoman breaks with Trump in new ad ahead of midterms: 'Feel betrayed'

3 MIN READ



Nominee for DOJ watchdog says violence on January 6 wasn't an 'attack' on the Capitol

2 MIN READ

## Most popular

1 Cindy Crawford's son, model Presley Gerber, dies at 27

2 'Crisis even bigger than Covid': American business owners are barely getting by

3 Venezuelan DoorDash driver shot and wounded by ICE agent in Austin, Texas, officials say

4 Major TV networks stand with CNN, decline to replace its White House pool crew

AID CONTENT



d by Charles Schwab

Elements of a Smart Trade Plan



Ad by Charles Schwab

How to Help Protect Your Parents from Scams







d by Charles Schwab
ower and AI Boost Infrastructure Investments



Ad by Charles Schwab
7 Steps to Financial Independence



d by SmartAsset
sk a Pro: "I'm 65 With $1.1M Saved.
/hat's My Retirement Budget?"



Ad by MFS Investment Management
Trading volume alone may not reflect how much of an ETF can be traded.



Ad by Charles Schwab
Is Your Tax Strategy Keeping Up with Your Life?




d by FinanceBuzz
l Dumb Mistakes The Middle-Class Can't Afford Right Now in
laryland .



Ad by E*TRADE from Morgan Stanley
Start investing in crypto* at E*TRADE. *Powered by zerohash



d by TradeStation
ome people are born to trade.



Ad by Fisher Investments
7 Ways to Generate Income With a



Ad by NerdWallet Advisors Match
Ask An Advisor: Should I Take Social




d by SavingsAccounts.com
D Rates That Can't be Ignored

Ad by The Motley Fool
California CEO Puts $2.6 Billion On 1 Stock





d by hear.com
xperts Tested 17 Hearing Aids. Their #1 Vill Shock you

Ad by Solace Bands
Our Biggest Sale of the Year

Ad by Reuters Plus for TD
"They are in the small business owner's corner"

---

Search CNN...

Subscribe

Sign in

Listen

Watch

© 2026 Cable News Network. A Warner Bros. Discovery Company. All Rights Reserved.

CNN Sans ™ & © 2016 Cable News Network.

# EXHIBIT 21

FALL MEMBER DRIVE

Journalism for the people, not for profit.

**Donate Now**

Donate

T ROTA FOR PROPUBLICA. ANIMATION BY HENRIKE LENDOWSKI FOR PROPUBLICA.

# Inside Trump's Failed Hunt for Noncitizen Voters

**by Peter Elkind, Jen Fifield, Doug Bock Clark, Ken B. Morales and Andy Mannix**

August 14, 2026, 6:00 am

*ProPublica is a nonprofit newsroom that investigates abuses of power. Sign up to receive our biggest stories as soon as they're published.*

## Reporting Highlights

- **Inflated Claims:** HSI deployed its tech platform to find noncitizens on voter rolls, despite warnings from agency insiders

that it would lead to an "ungodly" number of false positives.

- **Privacy Concerns:** DOJ leaders ignored internal concerns that transferring voter lists to HSI for criminal investigation might not be legal.
- **Scant Results:** Despite intense White House pressure, the effort has produced only a few dozen noncitizen voter prosecutions nationwide — and even fewer convictions.

These highlights were written by the reporters and editors who worked on this story.

It was late March when Joe Teirab, the second-in-command at Minnesota's U.S. attorney's office, received an urgent email from Washington.

The federal government was scrambling to find criminal cases to back up President Donald Trump's claims that illegal voting by noncitizens was tipping the scales in American elections. Agents from Homeland Security Investigations, a massive federal law enforcement agency, had been dispatched to work leads across the country, including hundreds in Minnesota.

Teirab was already under pressure. In an earlier missive, Nick Davis, a high-ranking Justice Department appointee helping to lead the election fraud crusade, had reminded him the cases were so high priority that Teirab and his staff couldn't decline to move forward on them without express approval from agency higher-ups. On March 24, Davis demanded a status report — within hours.

Teirab, a former Marine and a Harvard Law graduate who'd run unsuccessfully for Congress as a Republican, responded with a blunt reality check.

"Bottom line up front," he replied in an email reviewed by ProPublica. After subpoenaing records on about 130 people, only one had been referred for prosecution, his staff had told him. Agents had deluged local election offices with calls and demands for voting histories, demonstrating "a complete lack of understanding" of illegal voting investigations.

"The HSI task force has been disjointed and disorganized," Teirab wrote. The entire process, he said, had been "dysfunctional."

ADVERTISEMENT

Since Trump regained the White House, his administration has launched a series of unprecedented initiatives to find and prosecute voting by noncitizens, which he's long claimed, without evidence, is rampant.

He's stepped up this push in recent weeks, saying in a nationally televised speech that the American election system was "so vulnerable that no one can possibly defend it." To support that assertion, the Department of Homeland Security, HSI's parent agency, released documents asserting it had found more than 250,000 noncitizens on voter rolls in just four states, all led by Democrats. The documents included no explanation of how that number was calculated.

It's well known the administration has tasked HSI — a force established to combat drug cartels, terrorism and other cross-border criminal enterprises — with leading the campaign to find election fraud cases in the United States.

But an investigation by ProPublica reveals for the first time how the Trump administration came to harness HSI's personnel, technology and sweeping legal authority in service of its election agenda — and how meager the results have been, despite the prodigious resources sunk into the effort.

According to interviews and internal emails reviewed by ProPublica, career staffers at the Justice Department warned that transferring voter rolls to HSI to enable it to search for noncitizen voters could violate federal privacy laws. Similarly, longtime HSI insiders cautioned that using the agency's databases and tools to search these lists would yield mismatches and wildly inflated results.

The administration plowed forward anyway.

---

We are continuing our reporting on how the Trump administration has enlisted HSI agents and technology in unprecedented ways to enforce immigration laws and to bring cases against suspected noncitizen voters. Do you work at HSI and have information you can share with us? You can reach our tip line on Signal at 917-512-0201, or you can contact Peter Elkind at peter.elkind@propublica.org or on Signal at 817-691-3110. Please be as specific, detailed and clear as you can.

---

HSI's involvement in the hunt for election fraud traces at least to summer 2025, when agency supervisors embraced a proposal from a midlevel agent who'd publicly echoed Trump's claims about elections. He argued the agency's powerful databases and tools could find noncitizens even on the voter lists that states make publicly available, from which the most confidential information has been redacted. Under Trump, the Justice Department had collected many public voter rolls as part of a controversial effort to compel states to turn over the unredacted versions.

Those searches went forward, ProPublica's reporting shows, helping to generate tens of thousands of leads regarding illegal voting across the country. But when HSI agents were sent to investigate them, the results were similar to what Teirab reported from Minnesota.

Between January 2025 and May 2026, a ProPublica analysis of Justice Department data shows, fewer than

150 alleged noncitizen voters were referred for prosecution. Even fewer — 41 — were charged with voting illegally or other election-related crimes. (More than 150 million people voted in the most recent presidential election.)

In response to questions from ProPublica, administration officials insisted the effort spearheaded by HSI was producing meaningful results.

"President Trump is committed to ensuring that Americans have full confidence in the administration of elections, and that includes totally accurate and up-to-date voter rolls free of errors and unlawfully registered non-citizen voters," Abigail Jackson, a White House spokesperson, said in response to ProPublica's request for comment. "Noncitizens voting is a crime. Anyone breaking the law will be held accountable."

A DHS spokesperson didn't answer questions about why so few prosecutions have resulted from HSI's work. The agency wouldn't specify what tools or techniques HSI had used, but confirmed it had cross-referenced "publicly available data" from state voter rolls with information on "known illegal aliens" in its systems. "It's not rocket science," the spokesperson wrote of this initiative in a response to ProPublica's questions. "It's an easy step to secure our elections."

ADVERTISEMENT

Teirab and the U.S. attorney's office in Minnesota declined to comment.

There's an array of reasons why Trump's campaign to document claims of widespread voter fraud hasn't succeeded. Most obviously, it's exceedingly rare, as countless studies and state audits have found. Noncitizens often get on voter rolls by accident or when government officials make errors. Last month, New Jersey disclosed that a mistake involving its Motor Vehicle Commission caused 6,600 noncitizens to be registered (fewer than 400 voted).

The administration's critics say its hunt for noncitizen voters aligns with Trump's attempts to seek more federal control over elections while stoking doubt and fear about the voting process. Since taking back the Oval Office, Trump has tried to impose new restrictions on voter registration, mail-in ballots and voting

machines, though judges have shut down most of these efforts.

Former officials at DHS and the Justice Department called the move to involve HSI a further escalation and questioned the propriety of aiming the agency's muscle and technology at individual cases of illegal voting.

"It's one thing if you're going after Pablo Escobar," said Steve Bunnell, a former DHS general counsel and senior intelligence adviser who handled voting fraud prosecutions during more than a decade at the Justice Department. "It's another thing if you're going after some cleaning lady who's been working in the United States for 20 years and taking care of her 80-year-old mother and taking her little kids to church."



MATT ROTA FOR PROPUBLICA

## "The Swiss Army Knife of Federal Law Enforcement"

Trump's enlistment of HSI in his election fight is no accident. Cobbled together in the aftermath of 9/11, the agency has 7,100 armed, highly trained agents and another 800 criminal analysts, as well as access to troves of confidential data about hundreds of millions of Americans.

Though part of Immigration and Customs Enforcement, the agency has historically stayed out of immigration cases. During the first Trump administration, leaders of 19 HSI regional offices — virtually its entire top field hierarchy — signed a letter calling for HSI to become a standalone agency, arguing that ICE's deportation work dissuaded people from cooperating with its investigations. But when Trump returned to the White House, it swiftly became clear that the agency would play a central role in investigations related to the president's twin obsessions, illegal immigration and noncitizen voting.

Trump picked his field general for repurposing HSI even before taking the oath of office. In December 2024, he named Anthony Salisbury, a 50-year-old career agent who'd run the agency's Miami office, as a deputy homeland security adviser, reporting to White House policy chief Stephen Miller. He was also given a dual appointment as head of HSI.

Salisbury was colorful: A mixed martial arts enthusiast, he once appeared at the agency's headquarters with his face bruised and eye blackened from a recent bout. He'd sometimes entertain colleagues by pulling out a bridge that covers his missing front teeth.

To agency veterans, however, he was forever linked to a 2011 operation he'd overseen in Mexico in which one agent was killed and another wounded in a highway ambush by a drug cartel. An agency review submitted to Trump in April 2020 concluded that errors by HSI supervisors, including Salisbury, contributed to the outcome; it urged the administration to consider disciplinary action. None was taken against Salisbury, however.

Salisbury did not respond to requests for comment from ProPublica. A White House official called him "a critical member of the Trump administration" who was "cleared" in every review of the Mexico incident and was subsequently "promoted six times under multiple administrations."

---

**"It's one thing if you're going after Pablo Escobar. It's another thing if you're going after some cleaning lady who's been working in the United States for 20 years and taking care of her 80-year-old mother and taking her little kids to church."**

— Steve Bunnell, a former DHS general counsel and senior intelligence adviser

---

Once elevated to his new posts, Salisbury took charge of carrying out the second Trump administration's agenda for HSI, personally issuing staffing directives, reassignments and promotions, current and former agency officials told ProPublica. (A number of them spoke on condition of anonymity out of fear of retribution.)

Starting in early 2025, Salisbury oversaw the unprecedented reassignment of more than 6,000 agents to

immigration enforcement, diverting most of the agency from its normal duties. He then also pointed HSI at noncitizen voting, presiding over multiple meetings with officials at DOJ and Homeland Security focused on election fraud, according to emails reviewed by ProPublica and agency supervisors who worked with him.

"Stephen Miller has an HSI deputy for a reason," said Eric Balliet, a high-level HSI manager who retired in 2024 after 23 years with the agency. (Like many HSI veterans, Balliet has remained in close contact with former colleagues.) "Salisbury is going to salute and execute, and he is going to make sure that from the HSI side, they fall in line, and there's going to be no resistance or pushback. HSI has been turned into the Swiss Army knife of federal law enforcement."

In early July 2025, Frank Quiñones, an HSI special agent who'd worked under Salisbury in Florida, approached leaders at the HSI Innovation Lab with an idea for using the agency's technology to find noncitizen voters on state voter rolls, sources at the agency told ProPublica. Quiñones had been transferred to Washington to oversee a unit that had previously handled cases involving the theft of government benefits but that had been enlisted into voting investigations.

The lab, housed in an unmarked office in a D.C. suburb, had access to the government's most sensitive databases, from suspicious activity reports to arrest records. Staffed by a combination of HSI experts and outside consultants, it developed software tools to comb the data for information that could help agents pursue criminal suspects.

ADVERTISEMENT

Quiñones was a true believer in Trump's claims about election fraud: In multiple Facebook posts and reposts, ProPublica found, he promoted claims that the 2020 presidential vote had been stolen. At a meeting with the Innovation Lab's overseers, according to sources who worked in the lab, he pitched using the lab's technology to identify illegal voters — even though the agency lacked voter rolls that included identifiers such as partial Social Security numbers. (Quiñones did not respond to ProPublica requests for comment.)

For proof of concept, Quiñones proposed using a February 2021 public voter list he'd obtained for New

Jersey and running it through HSI's databases. The lab staff viewed his idea as "a little insane," one recalled — both unreliable and improper. Since the public rolls don't include voters' unique identifiers, people at the lab also knew linking them to HSI's data would produce mismatches — what the staffer called an "ungodly" number of false positives. The lab team also worried about violating longstanding safeguards limiting use of private citizen data. They "didn't want to touch this," the staffer added. Quiñones defended his idea, repeatedly declaring: "The president wants this!"

Tom Hodge, an HSI data analyst at the meeting, proposed running the voter information through the Athena Toolbox, an analytical platform developed by the Sandia National Laboratories that had access to all of HSI's databases. (Hodge did not respond to ProPublica requests for comment. Sandia referred ProPublica's questions to the facilities' parent agencies, including the Department of Energy, which did not respond to our requests.)

Hodge and the Sandia team spent the next six weeks on the project, reporting they'd found large numbers of noncitizens on Quiñones' 2021 New Jersey list. According to one former HSI official, they said they'd found "5,000 high-confidence illegal voters" in just a single New Jersey county. (Officials at the New Jersey secretary of state's office, which oversees the state's voter rolls, declined to comment on the claim. Beth Thompson, head of a group for local New Jersey election officials, called the number impossibly high, even accounting for the mistake disclosed by the state.)

The apparent breakthrough couldn't have come at a better time.

The Trump administration's other efforts to identify noncitizens on state voter rolls were running into a variety of roadblocks.

The administration had hoped to persuade states to check their voters' citizenship status using a system called the Systematic Alien Verification for Entitlements, or SAVE, but many didn't. Most states also refused the Justice Department's demands to turn over their unredacted voter rolls, including partial Social Security numbers, which thwarted the agency's plan to run them through SAVE. Courts have stymied the DOJ's attempts to sue for the records, citing the Constitution, which gives primary control over elections to the states.

In an Aug. 21 email to a half dozen administration officials, Quiñones touted the solution he'd brought to the HSI Innovation Lab: using HSI's platform to search voter rolls. The results, Quiñones noted, could fuel both criminal and immigration investigations.

ADVERTISEMENT

By the end of the month, those in top election-related roles at DHS and the Justice Department were actively promoting what they dubbed the "HSI Tool" as a preferred alternative to SAVE, according to people familiar with the matter. Among them was Heather Honey, the prominent election denier appointed as a senior counselor at DHS, who is helping lead the government's efforts to identify noncitizens on voter rolls. (Honey did not respond to ProPublica's requests for comment. In an email responding to questions to her, DHS said Honey's "expertise in election administration" was "invaluable to the Department's efforts to protect critical infrastructure.")

The White House, too, got behind the idea. In a November email, J. Brian Sikma, special assistant to the president, excitedly noted that the New Jersey trial cross-checking voter rolls with DHS data appeared to have identified a "very significant number" of "potential non-citizens." (Sikma didn't respond to a request for comment.)

The DOJ, Sikma reported, had already obtained public voter rolls for many other states. He included a list of them, adding: "It is of paramount importance that these also be reviewed expeditiously."



MATT ROTA FOR PROPUBLICA

## Running "Roughshod" Over Privacy

As the push to use HSI's tech to search voter information gained momentum, a new problem emerged.

Career attorneys at the Justice Department, including specialists on privacy law, raised concerns that transferring voter rolls wholesale from the agency to DHS might not be legal, according to internal emails reviewed by ProPublica and interviews with several former officials.

The voter rolls the DOJ had collected contained sensitive information on millions of Americans. Even the public versions, which political parties and candidates routinely obtain to target ads and messages, included voters' addresses, birth dates and party affiliations. For the 16 states that have agreed to share their unredacted voter lists, the DOJ had citizens' partial Social Security numbers or driver's license information, too.

Federal laws, particularly the Privacy Act, dictate what data government agencies can collect, what it can be used for, how it can be shared, and how it must be protected. Agencies have to disclose their plans in advance, gathering public comment. A person's information can't be released or shared without their consent, subject to limited exceptions.

From the outset, the Trump administration's effort to combine data across federal agencies has repeatedly drawn criticism from courts and whistleblowers for failing to adhere to restrictions meant to keep data private and secure. In June, for example, a judge prohibited the government from using SAVE for mass searches, ruling the administration had violated federal privacy laws by giving DHS access to Social Security data to enhance the tool. The administration has appealed that ruling.

In July 2025, as word got around that the DOJ might hand over voter data to DHS, a half dozen career attorneys who had been reassigned into the voting section voiced their unease to supervisors, according to two former DOJ lawyers. Their concerns were disregarded, prompting most to resign.

Instead, the DOJ's office of legal counsel pushed forward with plans to share the public voter rolls, claiming a Privacy Act exception allowed HSI to receive such data without public notice as long as it was for law enforcement purposes. DHS just needed to submit a letter officially requesting the data for those purposes, an attorney in the legal counsel's office explained, according to internal emails.

But this exception was meant to be used to get information on individual criminal suspects, not to gain mass access to data on people suspected of no wrongdoing, according to Nikhel Sus, chief counsel for Citizens for Responsibility and Ethics in Washington, which has sued the Trump administration on behalf of voter and pro-privacy groups, filing the case that eventually limited SAVE's use.

---

**"[Anthony] Salisbury is going to salute and execute, and he is going to make sure that from the HSI side, they fall in line, and there's going to be no resistance or pushback. HSI has been turned into the Swiss Army knife of federal law enforcement."**

— Eric Balliet, a former high-level HSI manager

---

Peter Winn, a 29-year Justice Department veteran who had served as the agency's acting privacy chief for nearly a decade, drafted a letter to set out the data-sharing agreement between the DOJ and DHS, according to internal documents reviewed by ProPublica.

In a Feb. 12 email to two top DOJ officials, he said he'd rewritten an initial draft memo to "make the information sharing arrangement far easier to defend, if and when it is challenged in court."

Rather than simply handing over the voter rolls, Winn proposed having DHS request "pertinent and relevant" information about specific people from the DOJ, then having technical staff at Justice and Homeland Security "coordinate" to fulfill the requests.

"Having slept on it," Winn wrote, "I ended up deciding that our initial idea of sending a huge amount of

raw unprocessed voter registration data to DHS, involved taking far too much unnecessary legal risk, given that 99% of the data would implicate the privacy and civil liberties of United States Citizens, and would risk adding to the false narrative in the establishment press of DOJ and DHS being unconcerned with the privacy and civil liberties of Americans."

Winn attached his proposed letter, to be signed by Todd Lyons, then the acting director of ICE.

Winn's suggested restrictions were quickly abandoned, however. A second draft of the letter, dated March 4, contained altered language providing that the voter information would be "transferred" to HSI, with one exception: Voters' party affiliation would be redacted, if possible, it said.

The final letter, signed by Lyons and sent to the DOJ just two days later, abandoned even that limitation. Just three paragraphs long, it permitted HSI to use the voter rolls to pursue any "appropriate investigation of potential violations of federal election law."

ADVERTISEMENT

In response to questions from ProPublica, Winn said "I can't really comment on internal drafts of correspondence."

A Justice Department spokesperson defended the government's actions, saying "no one should oppose intergovernmental data sharing and coordination that enable swift investigations and prosecution of illegal alien voting." DHS echoed the DOJ's view, calling such information sharing "essential to protecting America's election process by keeping noncitizens off voter rolls" and "an easy step to secure our elections."

Sus said that by pooling voters' sensitive personal identifiers, along with their party and voting histories, the administration has "run roughshod" over privacy laws and is creating a "1984-style database" that could be used to surveil political participation.

CREW filed a lawsuit in April on behalf of the nonprofit advocacy group Common Cause that argues it's illegal for the administration to use the law enforcement exception to justify mass sharing of voter information.

Balliet, the former HSI agent, expressed similar concerns, saying that handing over voter rolls to run through DHS' systems amounted to "a mass data-collection effort by the government against its own citizens in a non-criminal setting." On a practical level, he added, the data sharing increased the risk of breaches that can open law-abiding citizens up to identity theft.

"As a citizen, I want the government to take seriously the protection of my private data," he said. "If it falls into the wrong hands, it's not the government that suffers. It's me."






MATT ROTA FOR PROPUBLICA

## Collapsing Claims

By January 2026, scores of HSI agents were fanning out across the country to investigate thousands of leads about illegal voting.

About 25,000 of them involved people SAVE had identified as potential noncitizens on state voter rolls. Another 15,000 were given to HSI's cross-border financial crimes unit, which was told to prioritize them over money laundering and fraud cases, a former high-level HSI official said. Quiñones' unit led a separate effort to find additional cases by reviewing whether people who'd recently become citizens had voted before they were naturalized, then lied about it in naturalization interviews.

Still more leads came from running public voter rolls through the HSI lab's databases, though it's not clear how many. Agency sources told ProPublica that the rolls of New Jersey and Pennsylvania were searched using the Athena Toolbox. When DHS announced it had found more than 250,000 noncitizens on the registered voter lists of four Democrat-led states, it said that included "as many as" 35,152 in New Jersey and 14,576 in Pennsylvania. Both states have asked DHS to provide the source of the numbers.

Once federal investigators started digging into these cases, however, they often fell apart.

ADVERTISEMENT

Through May, prosecutors had charged fewer than four dozen people with crimes related to noncitizen voting, ProPublica's analysis of DOJ data and federal court filings shows, getting convictions or guilty pleas in 14 cases.

The largest cluster of cases was brought in the Southern District of Florida, headed by Jason Reding Quiñones (no relation to the HSI agent), a staunch Trump ally who has led investigations of the president's political opponents. Voters have been sentenced in eight of the office's cases; seven others are pending.

Prosecutors have initiated a total of seven noncitizen voting cases as of May in the four states where DHS claimed to have found more than a quarter million noncitizens on the rolls. Collectively, these states have more than 40 million registered voters.

Overall, the paltry numbers reflect the realities HSI investigators confronted on the ground as they tried to convert leads into cases, a ProPublica review of records obtained by voting-advocacy groups Campaign Legal Center and Democracy Forward shows.

Emails between agents and local election officials in Texas and Ohio indicate much of the federal information on purported noncitizens was inaccurate, the consequence of flawed data matching. When agents demanded voting histories and registration forms, they often discovered people weren't registered in the counties where HSI thought they were. When voters register, they must attest that they are U.S. citizens; agents found some, however, who'd been put on voter rolls in error after disclosing they weren't citizens. Many had never voted.

---

**"Our initial idea of sending a huge amount of raw unprocessed voter registration data to DHS, involved taking far too much unnecessary legal risk, given that 99% of the data would implicate the privacy and civil liberties of United States Citizens."**

— Peter Winn, a Justice Department veteran, in an email urging limits on data sharing that were not adopted

Most HSI agents, steeped in pursuing complex international crimes, had no experience in pursuing voting fraud. In his email to Nick Davis at the Justice Department, Teirab, the top deputy in Minnesota's U.S. attorney's office, described the chaos that ensued when the state and at least six counties got subpoenas for voters' records. The demands "presented a host of issues," Teirab wrote to Davis. (Davis did not respond to a request for comment.)

"An unknown number of agents are constantly arriving in Minnesota without any knowledge of the investigation, the issues already discussed and decided, and the processes they need to follow," Teirab complained. "Instead of getting up to speed and learning, they have demanded many calls and subpoenas, most of which demonstrate a complete lack of understanding of the investigation."

In Stearns County in central Minnesota, HSI agents subpoenaed voting histories on 13 people, county officials told ProPublica. Only six turned out to live there.

Minnesota Secretary of State Steve Simon, a Democrat, said the effort revealed federal investigators' ignorance about "the nuance of elections administration." The rate of purposeful election crime is "microscopic," he said. "The very human errors that can happen are not some sort of plot or scheme to dirty up the voting rolls, but are just everyday human beings making mistakes, not intending at all to violate any law."

As of May, only one illegal voting case has been referred for prosecution in Minnesota. The state has more than 3.8 million registered voters.

ADVERTISEMENT

Even Republican-led states like Ohio, which has shared its unredacted voter rolls with the DOJ and run them through the SAVE system, have struggled to meet Trump administration demands to deliver cases.

In October, the Ohio secretary of state referred more than 1,000 voters identified as possible noncitizens to the federal government, claiming 167 had voted at least once since 2018. At least nine HSI agents in

Cincinnati and Cleveland began to investigate, emails obtained by Campaign Legal Center and shared with ProPublica show.

The agents bombarded local election officials with requests for voting histories and other records, some dating back decades. “Sorry again for piecemealing these to you,” one agent wrote to an official in Butler County, outside Cincinnati, after making five separate requests over two weeks. Mohamed Al-Hamdani, a Democratic member of Montgomery County’s Board of Elections, which received similar inquiries, said they amounted to “witch hunts” that ate up staff time.

In February, Davis sent an email pressing Ohio’s two U.S. attorneys’ offices for an “election integrity” update, asking: “How close are we to complaints/indictments, how many subjects, what issues you’ve run into, how many referrals have been closed and why, how helpful HSI has been.”

As of May, just two voting cases had been referred for prosecution in Ohio and no one had been charged, federal data shows. The state has nearly 8 million voters.

In the past, it was uncommon for federal prosecutors to pursue charges against noncitizen voters who didn’t understand that it was against the law for them to vote. Without evidence of a coordinated effort or plot, it didn’t make sense to put resources into such prosecutions, a former DOJ official who oversaw election cases said.

Now, however, U.S. attorneys’ offices are taking a different approach, pursuing prosecutions that could result in prison terms or deportation.

In May 2025, federal prosecutors in Florida filed illegal voting charges against a mother and daughter, both Ukrainian citizens, who’d registered after becoming permanent U.S. residents, then voted in the 2024 presidential election. They’ve pleaded not guilty, with the mother saying in an interview with investigators that she thought having a green card meant she could vote. They and their attorneys didn’t respond to requests for comment from ProPublica. The prosecutor handling the case for the Southern District of Florida also didn’t respond to questions. The mother and daughter are scheduled to go to trial in September.

MATT ROTA FOR PROPUBLICA

## “Far-Reaching Consequences”

Experts on both elections and national security warn there may be profound longer-term costs to unleashing the federal government’s investigative and prosecutorial might to try to prove the president’s claims about noncitizen voting.

Current and former HSI agents say critical investigations — including task forces aimed at drug rings, human trafficking and money laundering — have languished as the agency has pivoted to take on noncitizen voting and immigration enforcement.

In February 2026, according to court files and emails reviewed by ProPublica, an HSI agent in Ohio who'd been leading a multistate child sex abuse investigation was abruptly assigned to pursue dozens of leads on suspected noncitizen voters, work that took months. It wasn't until May that he made an arrest in the other case. Prosecutors have filed child exploitation and pornography charges against the man, 38, in connection with acts involving at least five 14-year-old girls.

ADVERTISEMENT

Cases like this "don't just stop," said Balliet, the 23-year HSI veteran. "When you pull people off them for an extended period of time, those criminal networks will adapt, and people get killed and kidnapped."

Federal data hints at a broader slowdown in what had been HSI's most urgent work. According to an annual government report, the number of wiretaps obtained by DHS — often to investigate drug trafficking — plummeted to 23 in 2025, from 133 the previous year. In the report, DHS attributed the decline to several factors, including "changes in administration enforcement and prosecutorial priorities."

"It's never been a better time to be involved in transnational organized crime," said John Tobon, a high-ranking HSI official who retired in early 2025.

---

**"The very human errors that can happen are not some sort of plot or scheme to dirty up the voting rolls, but are just everyday human beings making mistakes, not intending at all to violate any law."**

— Minnesota Secretary of State Steve Simon

---

In its statement, DHS denied HSI has neglected its core mission, saying the agency has increased its efforts

to combat criminal cartels, gangs and drug traffickers in response to multiple Trump executive orders.

Though HSI's voting-related investigations have yielded only a small number of prosecutions, voter advocacy groups worry the Trump administration will use them to justify more extreme interventions.

Its latest tactics include threatening to withhold funds from states it says are refusing to check their voter rolls for noncitizens and saying it will prosecute state election officials who "knowingly" fail to remove noncitizens. Trump has also continued to press Congress to enact the SAVE America Act, which would require people to provide proof of citizenship when registering to vote, a measure advocates have criticized as a barrier to voting. Democrats are preparing for the prospect of federal troops being sent to the polls to intimidate voters.

"Those concerns are playing out in real time, with far-reaching consequences," said Dax Goldstein, a director at the States United Democracy Center, a nonprofit group that works to build confidence in elections. "When federal agencies are misused and weaponized, people lose trust in government itself."

### How We Counted Voter Fraud Cases

To count voter fraud case referrals, we analyzed the May 2026 release of the Justice Department's national caseload data. We examined both active and closed criminal referrals made between Jan. 20, 2025, and May 31, 2026. We counted referrals the DOJ listed as election fraud or where the lead charge was one of a set of voting fraud statutes identified in internal memos. We also examined public court documents to identify every prosecution where those statutes were charged. All prosecutions we included involve alleged noncitizen voters.

Misty Harris contributed research. William Turton and Avi Asher-Schapiro contributed reporting. Pratheek Rebala and Carla Astudillo contributed data reporting.

**Peter Elkind**

**Jen Fifield**

**Doug Bock Clark**

**Ken B. Morales**

**Andy Mannix**

Filed under — Democracy, Trump Administration

Republish This Story

## Who owns ProPublica? No one.

# EXHIBIT 22

News

# Aggressive DHS hunt for voter fraud only finding a handful of possible noncitizen cases

Nine states have reportedly been targeted in the latest surge by the Department of Homeland Security to root out voter fraud. One state told MS NOW the findings there have been single-digit.

By Laura Barrón-López and Madeleine Bimonte

Sept. 4, 2026, 9:09 AM EDT

The Trump administration ramped up its hunt for noncitizens on voter rolls this week as the president continued to claim without evidence that such fraud is widespread and damaging America's elections.

But the rapidly expanding campaign by the Department of Homeland Security to track down voter fraud is failing to produce proof that backs up President Donald Trump's claims that tens of thousands of noncitizens are illegally registered and voting.

Across the nine states reportedly targeted in the surge, some said they had yet to hear from Homeland Security about any possible voter fraud investigations. Others were subpoenaed this week for voting history on what amounted to a small number of individuals compared to the states' voting populations. Though more subpoenas could come, they haven't come close to the tens of thousands of "potential" noncitizens the Trump administration claims to have identified on voter rolls.



Upcoming Live Q&A
Ask Maddow Anything
Go behind the scenes with Rachel Maddow every Monday as she answers your questions ahead of her weekly broadcast.
Today 12:00 PM EDT
Become a Member

Sponsored Stories

DOCTORS MEMORY REPORT
MDs Say Mental Decline Begins When Seniors Can't Pronounce These 3 Phrases. Can You?

MEMORY HEALTH JOURNAL
Forgetting Names After 50? Try This Ritual Tonight

by Taboola

On Tuesday, the secretary of state's office in Georgia, one of the targeted states, received an "Immigration Enforcement Subpoena" requesting information about 13 individuals, according to a copy of the subpoena reviewed by MS NOW and a state election official.

The subpoena requests an "Individual Voter Report including all voting history and participation and a copy of any available voting documents including identity and/or citizenship documents" for the 13 individuals, "pursuant to a criminal investigation being conducted by the US Immigration & Customs Enforcement, Homeland Security Investigations."

In Washington, Border Patrol officers requested similar information for two individuals this week, Washington Secretary of State Steve Hobbs told MS NOW.

On Thursday the Wisconsin Elections Commission received subpoenas for roughly 15 individuals, requesting voting

history, an election official in the state told MS NOW. The official said the information ultimately shared with DHS in such instances is all publicly available data.

“The small numbers of subpoenas that they’ve issued show that this is not the widespread phenomena they wanted the public to believe it could be,” said Andrea Flores, a former immigration policy adviser and DHS official during the Obama and Biden administrations. “It also should be a sign to Congress that they need to step in and demand information about why this entire investigatory agency is continuing to look for noncitizen voters and not continue their transnational criminal investigations.”

Flores — along with election officials, civil rights advocates and some former DHS officials — has warned that citizens have already been and could continue to be ensnared in the Trump administration’s noncitizen voter hunt, potentially resulting in eligible

voters being purged from rolls or prosecutions against citizens helping with voter registration.

Asked about the latest “coordinated criminal voter fraud surge initiative” targeting specific states, which was first reported by CNN, an unnamed DHS spokesperson said “while ICE Homeland Security Investigations is not able to comment on any active investigations, HSI is actively rooting out and investigating election fraud wherever it can be found.” The states where investigations are reportedly ramping up include Washington, Wisconsin, Missouri, Georgia, California, Pennsylvania, Nevada, New York and Connecticut.

“DHS is laser-focused on prosecuting and removing aliens who vote and preventing the dilution of the votes of U.S. citizens,” the DHS spokesperson told MS NOW.

For years, Trump has made outlandish and baseless claims that noncitizens are to blame for Republican electoral losses and that

Democrats are "rigging" elections by registering noncitizens to vote.

The search, first launched by DHS last year at the explicit direction of the White House, has steadily increased with more workers and resources diverted from across the department to work on the effort.

Homeland Security Investigations agents, who usually investigate major crimes like human trafficking, terrorism and child exploitation, were tasked with launching the effort last year. And more HSI agents have since been assigned in field offices across the country to sift through voter data and "amazingly large" spreadsheets that were handed over to agents with no clear explanation on how the lists were produced or where they came from, according to two former HSI officials with knowledge of the initiative.

In February the "nationwide program to investigate allegations of voter fraud" expanded as HSI agents were directed to investigate and prosecute naturalized citizens who

may have improperly voted in past elections, MS NOW reported at the time.

**More articles**

DHS has not verified its claim of nearly 16,000 noncitizen voters in Nevada



Vaughn Hillyard, Laura Barrón-López

Trump signs executive order targeting mail-in ballots. But it might have no teeth.



Erum Salam

The former HSI officials, who spoke to MS NOW on the condition of anonymity, given the sensitive nature of the information discussed, said that among the lists of thousands of individuals being handed to HSI agents to sift through, many are coming back as false positive, or "derived citizens" — people who have no documentation of citizenship because they automatically became citizens as

children when their parents naturalized, or when they were adopted by U.S. citizens. Very few, if any, are rising to the level of investigations and even then, those probes do not mean that DHS has found criminality or is close to bringing charges.

The Pennsylvania secretary of state's office told MS NOW that it has "not received any communications" from DHS agents "regarding intentions to conduct election — or voter fraud — related investigative activity in Pennsylvania." State officials would not comment on whether they had received subpoenas.

Connecticut also has yet to receive any communication from DHS about a possible voter fraud investigation, according to a senior election official in the state.

According to a ProPublica investigation of data from the Department of Justice, between January 2025 and May 2026, 41 alleged non-itizen voters were charged for their involvement in

unlawful voting practices or voting illegally. More than 150 million people voted in the 2024 presidential election and more than 112 million ballots were cast in the last midterm election.

Still, noncitizen voting is extremely rare, even by the conservative Heritage Foundation's accounting. And despite the president's obsession with uncovering widespread noncitizen voter fraud, his administration has failed to produce evidence to back up its claims.

The two former HSI officials, who spent decades at Homeland Security, said that HSI, the chief investigation arm, has "never" before been tasked with hunting for voter fraud on such a wide scale, not even in the immediate aftermath of the 9/11 terrorist attack.

The DHS spokesperson claimed that since April 2025, "more than 24,000 cases have been identified by SAVE as potential non-U.S. citizens who were on voter rolls, and those cases

have been referred to ICE's Homeland Security Investigations for further investigation." The SAVE database, which has been historically used for determining immigration benefits, has been repurposed by DHS to screen voters.

DHS' latest figure is significantly less than than the more than 250,000 "potential" noncitizens Trump and DHS Secretary Markwayne Mullin said the department had identified on voter rolls across four states.

"The end goal with this, as with every single thing the administration is doing, is to undermine the integrity of the upcoming elections, which it appears that his party might lose," said David Becker, executive director of the Center for Election Innovation and Research, which advises election officials across the country.

Becker added that the administration intends "to sow doubt about the integrity of the system that we know is very secure

and transparent."



**Laura Barrón-López**

Laura Barrón-López is a White House reporter for MS NOW.

**Madeleine Bimonte**

Madeleine Bimonte is a journalist with MS NOW, based in New York.

Become a Member to join the discussion

## Comments

Join the Conversation ›

## White House

The desperation at the heart of Trump's latest press ban

Dan Froomkin

ICE agent shoots and wounds man in Austin, Texas, officials say

The Associated Press

Mamdani and Zelenskyy make Trump's dance card on U.N. sidelines

Zachary Wacker

## Congress

The Senate GOP is stalling before an oncoming midterms disaster

Hayes Brown

## Supreme Court

There is a huge problem with Montana's new ballot initiative. It's called the First Amendment.

Jessica Levinson

## Newsletters

Vi
Al

**MS NOW's We The People**

MS NOW's community newsletter, featuring exclusive insights from hosts and experts, delivered biweekly

A Florida Republican just filmed an ad chastising Trump. This data suggests why.

Julio Ricardo Varela

What Trump's threat to demolish the Kennedy Center brings to mind

Zeeshan Aleem

What's next in Trump's bid to revive his 'big lie' defamation case against CNN

Jordan Rubin

What Trump lauding Thomas and Alito as 'legends' means for the Supreme Court's future

Jordan Rubin




**The Rachel Maddow Show**

The best of Rachel, including video highlights and the latest from The MaddowBlog, delivered daily




**The Blueprint with Jen Psaki**

Jen Psaki chronicles the players, issues and movements shaping the future of the Democratic Party, delivered weekly

Meet the

Everything MS NOW, all together

Meet the Team

Discover the shows everyone's talking about.

Explore

Explore

Exp

SPONSORED / DOCTORS MEMORY REPORT

**MDs Say Mental Decline Begins When Seniors Can't Pronounce These 3 Phrases. Can You?**

SPONSORED / MEMORY HEALTH JOURNAL

**Forgetting Names After 50? Try This Ritual Tonight**

SPONSORED / THE WELLNESS BEACON

Learn More

**The Overlooked Boxed Cereal Now Tied to 8 Out of 10 Forgetfulness Cases**

SPONSORED / HEALTH WELLNESS

Learn More

**The Little Blue Tablet That's Bringing Couples Closer**

SPONSORED / MEMORY EXPERTS DIGEST

**Sharp Seniors Do This Before Bed. Most People Over 50 Don't**

SPONSORED / TODAY 55+: NEURO HEALTH

**Misplacing Things Lately? Experts Say: Notice If You Often Say These 3 Phrases**

SPONSORED / BLOOD PRILL

Learn More

**It's Not Salt: Doctors Now Tie High Blood Pressure to a Drink Most Seniors Have Before 9AM**

SPONSORED / TODAY 55+: NEURO HEALTH

**Japan's Oldest Doctors Say Forgetfulness Isn't Just Age: Rethinking These 4 Things**

SPONSORED / DIRECTMAX

Learn More

**If You're Over 50 and It's Not Working, Read This Before Bed**

SPONSORED / WELLNESS BALANCE

Read More

**Pulmonologists Identify 10 Popular Medications Now Linked to Breathlessness (See the List)**

SPONSORED / HEALTH WELLNESS

Learn More

**Couples Over 50 Say This Tiny Tablet Changed Everything**

SPONSORED / STELO

**Get nutrition insights tailored to you**

SPONSORED / HEALTHJOURNAL

**The Real Reason Your Lower Back Hurts Might Surprise You**

SPONSORED / MEMORYHEALTHJOURNAL

**Over 60? Here's What to Know About Everyday Memory Changes**

## More From MS NOW

MS NOW

**‘That’s bad’: Joe Scarborough stunned by ‘devastating’**

MS NOW

**Why Trump’s newly announced ‘AI Force’ is impossible to take seriously**

MS NOW

**Nicolle Wallace: Trump family’s ‘astronomical’ corruption can’t be a punch line**

SPONSORED / COGNITIVEHEALTHSUPPORT

Learn More

MDs Say Cognitive Decline Begins When Seniors Often Say These 3 Phrases — See Which Ones

SPONSORED / TRILIFT

Learn More

Don't Moisturize Crepe Skin! Tighten It With This Drugstore Item Instead

SPONSORED / JOURNALREPORT

This Popular Breakfast Item Is Now Tied to 89% of Forgetful Minds

SPONSORED / COGNITIVEJOURNAL

Learn More

Is This Boxed Cereal in Your Kitchen? It's Now Linked to 8 Out of 10 Memory Loss Cases

MS NOW

## Democrats have stumbled onto a new impeachment

MS NOW

**Trump says Don Jr. repaid Russian oligarch who spent hundreds of thousands on wedding**

**If Trump and others violate a court's order on the Kennedy Center, would there be any real**

This site is now part of **Versant**. By continuing, you agree to our **Terms**. You also acknowledge that our updated **Privacy Policy** applies, including your existing data. For info on your data rights, click "Your Privacy Choices" or see "**Your Rights**" in our Privacy Policy.

We and our partners also use tools on this site to provide the services, personalize your experience, and for analytics, marketing, and advertising. If you previously opted out of selling, sharing, or targeted advertising on this site, you will need to update your Privacy Choice.

Your Privacy Choices

Continue

# EXHIBIT 23

# *Administration Targets Noncitizen Voting, Despite Finding It Rare*

The intensified push is part of an extraordinary all-fronts effort to insert federal law enforcement into the machinery of American elections ahead of the midterms.

Listen · 8:22 min







**By Glenn Thrush, Devlin Barrett, Alan Feuer, Zolan Kanno-Youngs and Hamed Aleaziz**
Reporting from Washington

Feb. 18, 2026

Homeland security officials, at the direction of the White House, are intensifying efforts to investigate voting by noncitizens in pursuit of President Trump's baseless claims that illegal voting by undocumented immigrants is a rampant and insidious threat.

Homeland Security Investigations, an arm of Immigration and Customs Enforcement, recently issued a two-page memo requiring its employees to "review all open and closed voter fraud cases" involving immigrants who registered to vote, or actually voted, before they became naturalized U.S. citizens.

The memo, obtained by The New York Times, is part of an extraordinary all-fronts effort to insert federal law enforcement into the machinery of American elections ahead of the midterms. It is consistent with instructions the administration has issued to some U.S. attorneys' offices around the country in recent weeks.

The initiative "reflects the administration's commitment to safeguarding democratic processes and maintaining public confidence in the electoral system," the memo stated.

The nationwide effort to find and charge criminal voting cases is meant to target all noncitizen voters, but could have a particularly negative effect on current and former green card holders. While in the country legally, green card holders are not U.S. citizens and therefore may not vote legally in federal, state and most local elections — but might be unaware of these distinctions.

Such confusion is hardly unheard-of: It appeared to have been the cause of a small town mayor's recent arrest on charges of voting illegally by the state authorities in Kansas.

The push comes as an analysis of immigrant voting, commissioned by the Trump administration, has provided no evidence of widespread or even significant voter fraud, according to interviews with government officials and documents reviewed by The New York Times.

Officials referred about 10,000 of 49.5 million voter registrations to Homeland Security Investigations for further investigation.

That was roughly 0.02 percent of the names processed.

The Justice Department and Homeland Security Department declined to comment.

Mr. Trump "is committed to ensuring that Americans have full confidence in the administration of elections, and that includes totally accurate and up-to-date voter rolls free of errors and unlawfully registered noncitizen voters," Abigail Jackson, a White House spokeswoman, said in a statement.

"Noncitizens voting is a crime," she added. "Anyone breaking the law will be held accountable."

Administration officials have pointed to an array of arrests and actions to justify cracking down on illegal voting, despite the lack of evidence that scattered irregularities and relatively rare instances of fraud have made a significant difference in recent elections.

Instead, they have presented as a major accomplishment the removal of dead voters from state rolls. They have also publicized the discovery of noncitizens, typically no more than a few hundred to about a thousand, who were registered illegally in Louisiana, Ohio and Texas and subsequently purged from the rolls.

A small percentage of those instances have resulted in actual prosecutions, however, and many of those cases have involved immigrants charged with more serious criminal offenses, including illegal gun possession.

**Sign up for the On Politics newsletter.** It's a pivotal moment for American politics. Join us for 2026 and beyond. Get it sent to your inbox.

The directive for H.S.I. agents appears aimed at trying to determine if immigrants who became naturalized may have voted illegally before they gained citizenship. If so, the directive envisions not just charging them with certain crimes and misdemeanors, but might also strip them of their citizenship and deport them.

The administration's efforts are not limited to cases related to immigration, but also those involving discredited conspiracy theories involving the foreign manipulation of voting machines and other claims of vote-fixing that served as the justification for the F.B.I.'s seizure near Atlanta last month of ballots from the 2020 election.

An emerging focus of the administration's effort is to scour voter rolls in populous conservative states, like Florida and Texas, whose state governments are working closely with the Trump administration. States controlled by Democrats have resisted efforts to give the administration access to such data.

Both the H.S.I. memo and instructions given to career prosecutors cite Mr. Trump's executive order on election security to provide a legal basis for their actions. A senior administration official said the initiative was not new but reflected the enactment of existing directives ahead of the elections.

The overall effort to enlist federal law enforcement in elections is being coordinated, at least in part, by Anthony Salisbury, a top deputy to Stephen Miller, Mr. Trump's domestic policy adviser and the architect of the administration's increasingly hard-line immigration crackdown.

Anthony Salisbury has, at least in part, coordinated the administration's effort to enlist federal law enforcement in elections. Andrew Harnik/Getty Images

In recent weeks, Mr. Salisbury, himself a former H.S.I. agent, has overseen a working group on election fraud. At times it has included three aides to the deputy attorney general, Todd Blanche: Colin McDonald, Nick Davis and Vetan Kapoor; a top H.S.I. official, John Condon; representatives from the National Security Council and other White House aides, according to a person familiar with the group who requested anonymity to discuss internal deliberations.

It is not clear what directives the group has issued. But the effort is decidedly top-down.

In some instances, career prosecutors, typically given broad investigative discretion, have been ordered to provide their Trump-appointed superiors detailed justification if they choose not to bring voting fraud prosecutions that are flagged as potentially promising, according to officials who requested anonymity to avoid retribution.

Federal prosecutors in the Southern District of Florida, a jurisdiction with a large immigrant population and a state government friendly to the Trump administration, recently received such a directive, according to a person familiar with the matter.

It was highly unusual in demanding that any decision to decline to pursue an immigration-related case needed to be reviewed by the U.S. attorney, Jason A. Reding Quiñones, and his chief deputy, the person said.

The increasing involvement of H.S.I., an agency responsible for immigration enforcement, in elections has raised alarm among voting rights groups that believe it is part of a campaign to intimidate legal voting by immigrants.

Kristi Noem, the homeland security secretary, stoked those concerns when she recently said her goal in cracking down on voter fraud was to “make sure we have the right people voting, electing the right leaders to lead this country.”

Mr. Trump, who has promoted a variety of discredited conspiracies, has said he wants to “nationalize” the elections, even though the Constitution explicitly gives the authority to administer elections to the states.

He has also said that if the Republican-controlled Congress does not pass a new law imposing strict identification requirements to vote, he will seek to do so by presidential decree. That bill would require proof of citizenship, such as a passport or birth certificate, to vote. Roughly half of Americans have a passport.

The bill would also impose criminal penalties on any election official who registers a person to vote without knowing if they are U.S. citizens — even if they are U.S. citizens.

The Trump administration has made denaturalization a priority for the Department of Homeland Security.

Late last year, The Times reported that the agency was seeking 100 to 200 denaturalization cases a month from immigration officers across the country. Administration officials have said the effort is meant to root out those who fraudulently or wrongfully received their citizenship, while advocates for immigrants see it as a way to further curtail people’s legal immigration pathways.

**Glenn Thrush** covers the Department of Justice for The Times and has also written about gun violence, civil rights and conditions in the country’s jails and prisons.

**Devlin Barrett** covers the Justice Department and the F.B.I. for The Times.

# EXHIBIT 24

News

# White House directing DHS to hunt for voter fraud by naturalized citizens: Sources

Agents will be required to turn over names of immigrants who voted before they became citizens — and then explain to the White House why they weren't charged with a crime.




A recent memo calls for HSI agents to focus on naturalized citizens. *Carson Elm-Picard / MS NOW; Charly Triballeau / AFP via Getty Images; Joseph Prezioso / AFP via Getty Images*

By **Carol Leonnig**, **Laura Barrón-López** and **Vaughn Hillyard**

[redacted]

Feb. 18, 2026, 5:15 PM EST

The Department of Homeland Security's chief investigations arm this week launched a broader nationwide campaign to investigate and prosecute naturalized citizens who may have improperly voted in past elections before they became citizens, according to documents reviewed by MS NOW, an effort spurring deep concern among law enforcement agents that the administration's true goal is to intimidate voters from participating in future elections.

Agents with DHS Homeland Security Investigations were notified last week of the new initiative, in which agents in all field offices are required to review both open and closed cases of suspected illegal voting by noncitizen immigrants, according to the documents and three people familiar with the plan.

Launched at the direction of the



Upcoming Live Q&A

Ask Maddow Anything

Go behind the scenes with Rachel Maddow every Monday as she answers your questions ahead of her weekly broadcast.

Today 12:00 PM EDT

Become a Member

Sponsored Stories

DOCTORS MEMORY REPORT

MDs Say Mental Decline Begins When Seniors Can't Pronounce These 3 Phrases. Can You?

DOCTORS MEMORY REPORT

Japan's Oldest Doctors Say Memory Loss Isn't Age: Just Avoid Eating These 3 Foods

by Taboola

White House, the people said, the program requires agents to determine if naturalized citizens voted or registered to vote prior to becoming citizens. Investigators are then asked to submit reports to the White House detailing each case in which they declined to bring charges, the people said. An administration official speaking on background disputed that characterization.

Voting experts have consistently said the Trump administration's claims of widespread fraudulent voting by immigrants are wildly exaggerated and the number of such incidents is very small.

"In accordance with Executive Order 1428 (Preserving and Protecting the Integrity of American Elections), which mandates enhanced federal oversight and enforcement of election integrity … HSI has launched a nationwide program to investigate allegations of voter fraud," the memo said.

But the memo, which is headlined

"Potential Voter Fraud – Denaturalization," calls for HSI agents to focus largely on immigrants who eventually have become naturalized citizens, asking HSI offices to identify naturalized citizens who may have registered to vote or voted illegally, by doing so before they were officially citizens.

The initiative has escalated dire concerns among federal prosecutors and other law enforcement agents about the likelihood these probes will frighten a broad category of voters from going to the polls in upcoming midterms, according to law enforcement sources who spoke to MS NOW.

Two current and former DHS officials told MS NOW that they have never heard of an initiative like this being run by the department ever before, calling it "not normal."

The White House started targeting noncitizens suspected of voter fraud as early as last summer and tasked some HSI agents with investigating and seeking prosecutions. The White

House handed more than 1,000 names of noncitizens suspected of committing voter fraud to HSI, with the expectation that it would result in criminal prosecutions for nearly all of those individuals, a former HSI official with knowledge of the initiative told MS NOW.

The Friday memo to agents represents a notable escalation in that effort, one that now appears to extend beyond current noncitizens to naturalized citizens and their conduct prior to being a citizen.

White House spokesperson Abigail Jackson said the memo shows the department's "continuing efforts to implement the President's Executive Order from nearly a year ago by identifying individuals who appear to have broken the law — and the only people who should be concerned by this are criminals," she said.

"President Trump is committed to ensuring that Americans have full confidence in the administration of elections, and that includes totally

accurate and up-to-date voter rolls free of errors and unlawfully registered noncitizen voters," she continued.

"Noncitizen voting is a crime. Anyone breaking the law will be held accountable."

MS NOW has also learned that senior DHS and Justice Department appointees have held a series of meetings to discuss sending law enforcement to polling places to "secure" elections. This has also ramped up legal concerns for law enforcement and military personnel, according to people involved in their conversations, given that a federal law makes it a crime for military personnel or armed law enforcement to deploy to a polling location in a way that intimidates voters.

DHS did not immediately respond to MS NOW's request for comment.

---

**More articles**

Aggressive



ICE



DHS hunt for voter fraud only finding a handful of possible noncitizen cases




Laura Barrón-López, Madeleine Bimonte

deploys to airports to back TSA as DHS funding fight drags on



Laura Barrón-López, Julianne McShane

In an interview with NBC earlier this month, President Donald Trump threatened a federal takeover of some state elections due to what he calls the threat of noncitizens illegally voting.

"These people were brought to our country to vote, and they vote illegally," he said.

The driving force behind the sweeping HSI investigations is White House deputy chief of staff Stephen Miller, according to three people relaying concerns about the program. His office has held weekly meetings on the launch of the plan in

recent weeks with both DHS and Justice Department leadership, the people said.

Miller is a key proponent of stripping foreign-born citizens of their citizenship as part of a broader deportation strategy, pushing the Justice Department to step up investigations into whether new citizens engaged in any crime or fraud.

Miller has long promoted false and debunked claims that millions of illegal aliens vote in elections, skewing the results to favor Democratic candidates. Last year, he called birthright citizenship an "atrocity" and called out the threat that immigrants — and their children who later gain legal citizenship by being born in America — present to Republican candidates in elections.

"Illegal aliens and their descendants are one of the largest voting blocs in the United States," Miller said in December 2025, on the eve of the Supreme Court taking up a case that challenges the Constitution's grant

of birthright citizenship to people born in America. The court has yet to rule on the issue.

The DHS memo lays out five federal statutes HSI can use to charge naturalized citizens with felonies or misdemeanors if they voted before they became citizens, including false claims of citizenship, as well as registration and voter fraud.

DHS Secretary Kristi Noem held a news conference in Maricopa County, Arizona, on Friday to tout her role in election security and promote the SAVE Act. She said that while states have primary responsibility for running elections, Congress has given her department additional powers and duties to take "mitigation measures" and ensure that "we have the right people voting."

"Elections is another one of those critical infrastructure responsibilities that I have as well, and I would say that many people believe that it may be one of the most important things that we need

to make sure we trust is reliable, and that when it gets to Election Day, that we've been proactive to make sure that we have the right people voting, electing the right leaders to lead this country through the days that we have, knowing that people can trust it."

When asked by reporters to describe any specific cases of fraud in Arizona that concerned her, she could not name any.

"Oh, I'm sure there's many of them," Noem said.

**Carol Leonnig**

Carol Leonnig is a senior investigative reporter with MS NOW.

**Laura Barrón-López**

Laura Barrón-López is a White House reporter for MS NOW.

**Vaughn Hillyard**

Vaughn Hillyard is a senior White House reporter for MS NOW.

Become a Member to join the discussion

## Comments

**Join the Conversation ›**

## White House

### White House pool suspends TV coverage of Trump after CNN ban

Sydney Carruth

## Congress

### Republicans ignored the warning signs. Now they're facing the consequences.

Hayes Brown

## Supreme Court

### There is a huge problem with Montana's new ballot initiative. It's called the First Amendment.

Jessica Levinson

## Newsletters

Vi AI



### MS NOW's We The People

MS NOW's community newsletter, featuring exclusive insights from hosts and experts, delivered biweekly

Trump's crusade for a 'triumphal arch' took such a farcical turn for 1 misguided reason

Steve Benen

MS NOW, CNN and Politico are suing Trump and senior officials over White House ban

Fallon Gallagher

A Florida Republican just filmed an ad chastising Trump. This data suggests why.

Julio Ricardo Varela

What Trump's threat to demolish the Kennedy Center brings to mind

Zeeshan Aleem

What's next in Trump's bid to revive his 'big lie' defamation case against CNN

Jordan Rubin

What Trump lauding Thomas and Alito as 'legends' means for the Supreme Court's future

Jordan Rubin




### The Rachel Maddow Show

The best of Rachel, including video highlights and the latest from The MaddowBlog, delivered daily




### The Blueprint with Jen Psaki

Jen Psaki chronicles the players, issues and movements shaping the future of the Democratic Party, delivered weekly

Meet the

Everything MS NOW, all together

Meet the Team

→ Discover the shows everyone's talking about.

Explore

Explore

Exp

SPONSORED / DOCTORS MEMORY REPORT

**MDs Say Mental Decline Begins When Seniors Can't Pronounce These 3 Phrases. Can You?**

SPONSORED / DOCTORS MEMORY REPORT

**Japan's Oldest Doctors Say Memory Loss Isn't Age: Just Avoid Eating These 3 Foods**

SPONSORED / THE WELLNESS BEACON

Learn More

**The Overlooked Boxed Cereal Now Tied to 8 Out of 10 Forgetfulness Cases**

SPONSORED / BLOOD PRILL

Learn More

**It's Not Salt: Doctors Now Tie High Blood Pressure to a Drink Most Seniors Have Before 9AM**

SPONSORED / HEALTH JOURNAL

**The Real Reason Your Lower Back Hurts Might Surprise You**

SPONSORED / MEMORY EXPERTS DIGEST

**Sharp Seniors Do This Before Bed. Most People Over 50 Don't**

SPONSORED / COGNITIVE WELLNESS INSTITUTE

Learn More

**Senior's Top MDs Say Mental Decline Isn't Age: Just Avoid Drinking These 3 Beverages**

SPONSORED / TRILIFT

Learn More

**Don't Moisturize Crepe Skin! Tighten It With This Drugstore Item Instead**

SPONSORED / HEALTH WELLNESS

Learn More

**The Little Blue Tablet That's Bringing Couples Closer**

SPONSORED / JOURNAL REPORT

**This Popular Breakfast Item Is Now Tied to 89% of Forgetful Minds**

SPONSORED / TODAY 55+: NEURO HEALTH

**Japan's Oldest Doctors Say Forgetfulness Isn't Just Age: Rethinking These 4 Things**

SPONSORED / COGNITIVE HEALTH SUPPORT

Learn More

**MDs Say Cognitive Decline Begins When Seniors Often Say These 3 Phrases — See Which Ones**

SPONSORED / DAILYREPORT

## Sharp Seniors Avoid These 3 Cereals (Number 2 Is In Most Kitchens)

SPONSORED / TODAY55+: NEUROHEALTH

## Misplacing Things Lately? Experts Say: Notice If You Often Say These 3 Phrases

## More From MS NOW

MS NOW

## ‘That’s bad’: Joe Scarborough stunned by ‘devastating’

MS NOW

**Democrats have stumbled onto a new impeachment strategy**

MS NOW

**Nicolle Wallace: Trump family’s ‘astronomical’ corruption can’t be a punch line**

SPONSORED / HEALTH WELLNESS

Learn More

## She Noticed the Difference After He Tried This Blue Tablet

SPONSORED / GRADDI

Read More

## Why Christmas Decor Lovers Are Collecting These Little Witches

SPONSORED / WELLNESS INSIDER

## Try This 30-Second Trick Before Bed(Men Over 50 Swear By it)

SPONSORED / WELLNESS BALANCE

Read More

## Pulmonologists Identify 10 Popular Medications Now Linked to Breathlessness (See the List)

MS NOW

This site is now part of **Versant**. By continuing, you agree to our **Terms**. You also acknowledge that our updated **Privacy Policy** applies, including your existing data. For info on your data rights, click "Your Privacy Choices" or see "**Your Rights**" in our Privacy Policy.

We and our partners also use tools on this site to provide the services,

personalize your experience, and for analytics, marketing, and advertising. If you previously opted out of selling, sharing, or targeted advertising on this site, you will need to update your Privacy Choice.

Your Privacy Choices

Continue

# EXHIBIT 25

(Slip Opinion)

# Authority to Obtain and Share Statewide Voter Roll Data

The Department of Justice's Civil Rights Division has authority to seek statewide voter lists and share them with the Department of Homeland Security as part of its effort to identify individuals who are ineligible to vote, which other provisions of law do not limit.

May 12, 2026

MEMORANDUM OPINION FOR THE
ASSISTANT ATTORNEY GENERAL
CIVIL RIGHTS DIVISION

As part of his efforts to preserve and protect the integrity of the American electoral process, President Trump has directed the Attorney General to "prioritize enforcement of 18 U.S.C. [§§] 611 and 1015(f) and similar laws that restrict non-citizens from registering to vote or voting, including through use of . . . databases or information maintained by the Department of Homeland Security" ("DHS") and "similar records relating to citizenship." Exec. Order No. 14248 § 2(e) (2025). He has further directed the Attorney General to "take appropriate action with respect to States that fail to comply with the list maintenance requirements of the National Voter Registration Act and the Help America Vote Act contained in 52 U.S.C. [§] 20507 and 52 U.S.C. [§] 21083." *Id.* § 3(c).

In response to the President's order to identify those who may be voting illegally (whether by reason of alienage or otherwise), the Civil Rights Division ("Division" or "CRT") proposed to seek statewide voter lists, and then to share the lists with Homeland Security Investigations ("HSI") or another unit within DHS. In connection with that proposal, you asked us whether (1) the Civil Rights Act of 1960 authorizes the Division to seek these records from states, (2) the Division may compel states to produce their voter registration lists notwithstanding other federal laws or principles of estoppel, and (3) the Division may share such lists with DHS for the purpose of identifying illegal aliens who are ineligible to vote. In early September 2025, we informally answered each question in the affirmative. At your subsequent request, we now memorialize and expand upon the basis of our advice.

# I.

"Confidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (per curiam); *see also, e.g.*, *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 197 (2008) (opinion of Stevens, J.). "Common sense, as well as constitutional law, compels the conclusion that" such confidence requires "substantial regulation" if "some sort of order, rather than chaos, is to accompany the democratic processes." *Burdick v. Takushi*, 504 U.S. 428, 433 (1992) (quoting *Storer v. Brown*, 415 U.S. 724, 730 (1974)). It also requires "the prevention of fraud." *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2340 (2021); *see also, e.g.*, *Eu v. S.F. Cnty. Democratic Cent. Comm.*, 489 U.S. 214, 231 (1989). "Fraud can affect the outcome of a close election . . . ." *Brnovich*, 141 S. Ct. at 2340; *cf. Bush v. Gore*, 531 U.S. 98, 100–03 (2000) (per curiam) (discussing the outcome of an election decided by a few hundred votes). Indeed, voter fraud "dilute[s] the right of citizens to cast ballots that carry appropriate weight," *Brnovich*, 141 S. Ct. at 2340, and even the *perception* of "[v]oter fraud drives honest citizens out of the democratic process and breeds distrust of our government," *Purcell*, 549 U.S. at 4. Congress has passed numerous statutes to prevent just such an outcome, and your question arises out of efforts to enforce those statutes.

## A.

### 1.

Although regulating elections is primarily the purview of states, Congress has exercised its enumerated powers to enact several statutes intended to ensure that only those who are entitled to vote in federal elections do so. U.S. Const. art. I, § 4, cl. 1; *id.* amend. XIV, § 5; *accord id.* amends. I, XV, XIX, XXVI. As relevant here, the National Voter Registration Act of 1993, Pub. L. No. 103-31, 107 Stat. 77 ("NVRA"), "has two main objectives: increasing voter registration and removing ineligible persons from the States' voter registration rolls." *Husted v. A. Philip Randolph Inst.*, 584 U.S. 756, 761 (2018). "To achieve the latter goal, the NVRA requires States to 'conduct a general program that makes a reasonable effort to remove the names' of voters who are ineligible

'by reason of' death or change in residence." *Id.* (quoting 52 U.S.C. § 20507(a)(4)); *see also Crawford*, 553 U.S. at 192. And it permits the Attorney General to "bring a civil action in an appropriate district court for such declaratory or injunctive relief as is necessary" to ensure that the NVRA's voter-list maintenance is "carr[ied] out." 52 U.S.C. § 20510(a).

The Help America Vote Act of 2002, Pub. L. No. 107-252, 116 Stat. 1666 ("HAVA"), reinforces this obligation by "requir[ing] every State to create and maintain a computerized statewide list of all registered voters," *Crawford*, 553 U.S. at 192 (citing 42 U.S.C. § 15483(a) (Supp. V 2000), currently codified at 52 U.S.C. § 21083(a)), which must meet certain specified requirements, 52 U.S.C. § 21083(a)(1), (4). It also requires state and local election officials to "perform list maintenance with respect to the computerized list on a regular basis," *id.* § 21083(a)(2)(A), and that states "make[] a reasonable effort to remove registrants who are ineligible to vote from the official list of eligible voters," *id.* § 21083(a)(4)(A).[1] Again, "[t]he Attorney General may bring a civil action against any State or jurisdiction . . . as may be necessary to carry out" HAVA's election "administration requirements." *Id.* § 21111.

To assist in enforcing these and other election laws, Congress has long granted the Attorney General broad investigative authority. In particular, section 301 of Civil Rights Act of 1960 provides, in relevant part, that "[e]very officer of election shall retain and preserve, for a period of twenty-two months from the date of" any federal election "all records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election." Pub. L. No. 86-449, § 301, 74 Stat. 86, 88 (codified at 52 U.S.C. § 20701) ("CRA" or "Civil Rights Act"). Section 303, in turn, requires that "[a]ny record or paper required by [section 301] to be retained and preserved shall, upon demand in writing" by a representative of the Attorney General "be made available for inspection, reproduction, and copying." 52 U.S.C. § 20703.[2] Section 303 further provides that "[t]his

---

[1] Although not immediately relevant to your question, we note that states must also design their election systems to contain "[s]afeguards to ensure that eligible voters are not removed in error from the official list of eligible voters." 52 U.S.C. § 21083(a)(4)(B).

[2] To be sure, 52 U.S.C. § 20703 does require the materials to be made available "at the principal office of their custodian." As you did not indicate that the location of any review

demand shall contain a statement of the basis and the purpose therefor." *Id.* Should an election officer refuse to comply with a demand for production under section 303, the Attorney General may sue in district court "to compel the production of such record or paper." *Id.* § 20705.

**2.**

The Attorney General may wish to investigate whether illegal aliens are being removed from voter-registration lists as part of those lists' ordinary maintenance.[3] Federal law protects the priceless value of citizenship by prohibiting illegal aliens from registering to vote or voting. Thus, for example, the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA") makes it a crime punishable by up to a year in prison for an alien to vote in federal elections, subject to certain exemptions not relevant here. Pub. L. No. 104-208, div. C, § 216(a)–(b), 110 Stat. 3009-546, 3009-572–73 (codified at 18 U.S.C. § 611(a)–(b)). It further provides, again with certain exceptions not relevant here, that

> [w]hoever knowingly makes any false statement or claim that he is a citizen of the United States in order to register to vote or to vote in any Federal, State, or local election (including an initiative, recall, or referendum) . . . [s]hall be fined under this title or imprisoned not more than five years, or both.

18 U.S.C. § 1015(f).

Although their exact scope differs, the NVRA and Voting Rights Act of 1965 also criminalize the submission of certain materially false statements when establishing one's eligibility to vote or when casting one's ballot.

---

would be an issue, we have not examined what the provision requires during an era where many voting records are maintained electronically.

[3] Other issues include whether the individuals who appear in a state's list are felons; are mentally incompetent; are not of age to vote; have not provided the required registration information; do not reside in the relevant jurisdiction; or appear in the list multiple times. *See* 52 U.S.C. § 20507(a)(3)(B), (a)(4); *id.* § 21083(a)(2)(A)(ii), (a)(2)(B)(iii), (a)(5)(A), (b)(4)(A)(i)–(iii). Federal law may vary somewhat regarding how it applies to each of these grounds for exclusion from the list. Either way, in focusing much of our discussion on alienage, we do not mean to take a position (or depart from a prior position) on such issues on behalf of the Department of Justice. We merely describe the context in which your question was raised to us.

*See* 52 U.S.C. §§ 10307(c), 20511(2). Because illegal aliens are ineligible to vote, these generally applicable laws are also implicated by an illegal alien's presence on a state's voter rolls.

**B.**

To ensure (among other things) that states are complying with Congress's demand to remove those who are ineligible to vote from their rolls—whether due to illegal presence in this country or otherwise—the Division has sent states letters demanding that they produce copies of their statewide voter registration lists. Those letters reflect that the Division seeks these lists as part of what we understand to be a good-faith effort to determine whether it needs to institute enforcement actions against such states pursuant to 52 U.S.C. §§ 20510(a) and 21111. *See, e.g.*, Memorandum for Steve Hobbs, Secretary of State, State of Washington, from Harmeet K. Dhillon, Assistant Attorney General, Civil Rights Division, *Re: Request for Complete Washington's Voter Registration List with All Fields* at 1–2 (Sept. 8, 2025), https://perma.cc/6N9J-CQBB ("Dhillon Memorandum"). Specifically, the Division informed states that it demands the lists to assess each "[s]tate's compliance with the statewide voter registration list maintenance provisions of the" NVRA and HAVA, and it invoked the Attorney General's investigatory authority under the Civil Rights Act. *Id.* at 1 & n.1.

As part of that compliance-ensuring effort, the Division has proposed to share these lists with HSI or another unit within DHS, which would enable cross-referencing the lists against existing databases in order to identify illegal aliens who are ineligible to vote. Although this activity may have incidental immigration consequences by providing DHS updated information regarding the location of illegal aliens, *cf. Padilla v. Kentucky*, 559 U.S. 356, 369 (2010) (acknowledging that the collateral immigration consequences of a criminal plea or conviction can be "complex"), your staff has represented that the purpose of its activity is to facilitate ordinary list maintenance. If the search reveals that an alien unlawfully has registered to vote or voted in an election, the Division may seek to strike the alien's name from the voter registration list for future elections, refer the alien for prosecution, or both.[4] Senior leadership offices within

[4] CRT generally is authorized to enforce "all Federal statutes affecting civil rights, including those pertaining to elections and voting." 28 C.F.R. § 0.50(a). "Notwithstanding

the Department of Justice ("DOJ") have further represented to us that, at the time the requests were made, DOJ did not intend to use these lists for immigration enforcement.[5]

Before seeking to enforce state compliance with your letters, you asked our Office whether the Civil Rights Act allows the Attorney General to compel states to turn over statewide voter lists, and whether federal law permits the Attorney General to share those records for the purpose of investigating voter fraud. In consultation with HSI, you further asked whether federal law authorizes DHS to *receive* that information. We provided informal advice in the affirmative as to each question, which you have subsequently asked us to memorialize. We now do so.[6]

## II.

To start, we conclude that federal law authorizes the Division to compel states to produce their statewide voter registration lists regardless of whether the Division intends to share them with HSI or another unit within DHS so that DHS may cross-check them against existing databases. Such lists fall within the scope of the data that Congress has permitted the Attorney General to demand: A state's voter registration list falls within CRA section 301's scope, and no state is entitled to withhold responsive materials based on privacy or confidentiality provisions found in state law. Section 303's requirement that the Division include in its demand for such a list "a statement of the basis and the purpose therefor,"

---

the provisions of the foregoing sentence, the responsibility for the enforcement of" 18 U.S.C. § 611 and 52 U.S.C. § 10307 "is assigned to the Assistant Attorney General, Criminal Division," 28 C.F.R. § 0.50(a) (listing section 1973i of title 42, which is now section 10307), although CRT may refer matters under these statutes to the Criminal Division for prosecution, *see id.* § 0.50(d)–(e); *see also id.* § 0.55(m)(1)–(2) (Criminal Division is responsible for these matters).

[5] To be clear, we have received no information as of the time of signature that this intent has changed. But consistent with the purpose of this memorandum to record past advice, it reflects facts as we understood them at the time of our advice.

[6] We are aware that CRT's efforts have come under significant scrutiny in litigation. Consistent with this Office's longstanding practice, this memorandum reflects the facts as we understood them when we provided our advice in mid-September 2025. We address additional counterarguments raised by litigation only to explain why they do not change our prior advice.

52 U.S.C. § 20703, meanwhile, imposes relatively minimal burdens that the Division has satisfied here.[7]

**A.**

As noted above, the Civil Rights Act requires state election officers to retain for a period of twenty-two months after an election "all records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election." CRA § 301, 74 Stat. at 88 (codified at 52 U.S.C. § 20701). Because statewide voter registration lists both "relat[e] to" voter "registration" and "come into [the] possession" of state election officers, 52 U.S.C. § 20701, they fall within section 301's scope. Moreover, nothing in section 303 allows a state to withhold or redact the voter registration list based on privacy protections in *state* law.

**1.**

A state's statewide voter registration list is perhaps the archetypical example of a "record" that "relat[es]" to voter "registration." *Id.* "When a term goes undefined in a statute, we give the term its ordinary meaning." *Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 566 (2012). And "[t]he ordinary meaning of" the term "relating to," the Supreme Court has explained, "is a broad one." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992). This term means "to stand in some relation; to have bearing or concern; to pertain; refer; to bring into association with or connection with." *Id.* (quoting *Black's Law Dictionary* 1158 (5th ed. 1979)); *see also Milner v. Dep't of the Navy*, 562 U.S. 562, 566 n.1 (2011) (noting that the term "related" is "expansive"). Since a statewide voter registration list is the method by which a state records who has registered

[7] For the avoidance of doubt, we do not think that CRT's statement of purpose in this case is subject to judicial review. But we do not expound upon that issue here, which is subject to significant litigation and outside the scope of the question upon which we were asked to opine. *See, e.g.*, Maine's Opposition to the United States's Motion for Order to Show Cause at 11–13, *United States v. Bellows*, No. 1:25-CV-00468-LEW (D. Me. Dec. 12, 2025), Dkt. No. 55; Proposed Notice of Motion & Motion to Dismiss at 18 n.8, *United States v. Weber*, No. 2:25-CV-09149-DOC-ADS (C.D. Cal. Nov. 17, 2025), Dkt. No. 62-1.

to vote, one cannot seriously dispute that such a list "has 'a connection with, or reference to,' the topics the statute enumerates," *Coventry Health Care of Mo., Inc. v. Nevils*, 581 U.S. 87, 96 (2017) (quoting *Morales*, 504 U.S. at 384)—namely, voter "registration," 52 U.S.C. § 20701.[8]

**2.**

Some might argue that, because state election officers create statewide voter registration lists,[9] those lists do not "come into [their] possession," *id.*, but this is not the best reading of the statute. Instead, the ordinary meaning of the term "possession" encompasses "enjoyment of a thing which a man holds or exercises by himself, or by another who keeps or exercises it in his name"—regardless of how such dominion is obtained. *Bouvier's Law Dictionary: Baldwin's Students Edition* 955 (1934); *see also Webster's Seventh New Collegiate Dictionary* 663 (1967 ed.) ("the act of having or taking into control"); *Webster's Third New International Dictionary* 1770 (1971 ed.) ("something owned, occupied, or controlled"). Moreover, one can "come into" possession of a thing that one created oneself; the phrase does not carry a requirement that the thing is received from a third party. 52 U.S.C. § 20701. Instead, it means simply "to acquire as a possession or achievement." *Merriam-Webster's Collegiate Dictionary* 228 (10th ed. 2002) ("*Merriam-Webster's Tenth*"); *The Random House Dictionary of the English Language* 294 (1979 ed.) ("*Random House*") ("to acquire; get"). And one may "acquire" something by creating it. *See Merriam-Webster's Tenth* at 10 (defining "acquire" as "to come into possession or control of often by unspecified means"); *Random House* at 13 ("to come into possession of; get as one's own" or "to gain for oneself through one's actions or efforts"). Case law[10]—not to mention

---

[8] For this reason, the statutory text belies any assertion that section 301 is limited to voter-created records or voter-taken action; it specifically enumerates an "application, registration, payment of poll tax, or other act requisite to voting in such election." 52 U.S.C. § 20701.

[9] *See, e.g.*, Intervenors John Schneck & Marpheen Chann's Motion to Dismiss & Memorandum in Support at 14–18, *Bellows*, No. 1:25-CV-00468-LEW (D. Me. Dec. 12, 2025), Dkt. No. 61.

[10] *See, e.g.*, *United States v. Malik*, 385 F.3d 758, 759 (7th Cir. 2004); *U.S. Coachways, Inc. v. Vaccarello*, No. 1:17-CV-05983-EK-SMG, 2018 WL 3716888, at *2

common sense[11]—amply demonstrates that it is not unusual to say that one comes into possession of a thing that one created oneself. This is particularly true when the entity that comes into possession of an item is a *state*: The item (in this case, a list) can be created by local employees, compiled by municipalities, and ultimately used by a statewide agency. The state comes into possession of the list created by local employees and compiled by municipalities.

If Congress had meant to limit section 303 to materials that a third party has provided state election officers, it had other, more specific words available. For example, ordinarily the term "receive" is used to mean "[t]o come into possession of, get, acquire, or the like, from any source outside of oneself." *Webster's New International Dictionary* 2076 (2d ed. 1958) ("*Webster's New International*"); *see also* 75 *Corpus Juris Secundum* 642–43 (Francis J. Ludes & Harold J. Gilbert eds., 1952) ("It indicates a transfer of possession from one person . . . to another . . . . [I]n order to receive there must be one person to offer and another to take."). Accordingly, Congress has made it a crime to "receive" or "possess" various items, including (depending on the circumstances) certain firearms, 26 U.S.C. § 5861; *see also* 18 U.S.C. § 926A; tobacco products, 26 U.S.C. § 5751; ransom money, 18 U.S.C. § 1202; and various weapons of mass destruction, *id.* § 2332h (radiological dispersal devices); *id.* § 175c (the variola virus). Listing both verbs would be redundant if one cannot be considered to "possess" an object merely because one has "receive[d]" it, or "g[ot it] from some outside source." *Black's Law Dictionary* 1523 (12th ed. 2024) ("*Black's Twelfth*") (defining "receive"). These definitions, read in their larger statutory context, confirm that the states "come into [the] possession" of their statewide voter registration

---

(E.D.N.Y. Aug. 3, 2018); *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Pracs., & Prods. Liab. Litig.*, No. 8:10-ML-02151-JVS-E, 2010 WL 2901798, at *5 (C.D. Cal. July 20, 2010).

[11] For example, there can be little dispute that Aaron still possessed the golden calf when Moses retuned from Mount Sinai, *see Exodus* 32:1–6, 22–24; that a motor enthusiast continues to possess a kit car after it is constructed, Peter Jones, *Are Kit Cars Street Legal? Rules Explained (With Examples)*, Motor & Wheels (Oct. 23, 2023), https://perma.cc/7PAP-CXBN; or that homeowners expect to retain possession of the results of their do-it-yourself home improvements indefinitely, *e.g.*, *DIY Projects and Ideas*, Home Depot, https://perma.cc/YW59-ZW6L (last visited May 6, 2026).

lists within section 301's meaning, 52 U.S.C. § 20701, even though they create such lists themselves.[12]

To be sure, at times, Congress has used the phrase "in the possession of," *e.g.*, 30 U.S.C. § 1732(b); 6 U.S.C. § 1502(a), to reflect items that a person currently possesses. But the "construction of statutory language often turns on context, which certainly may include the definitions of related words," *FCC v. AT&T Inc.*, 562 U.S. 397, 404 (2011) (citation omitted)—not to mention "common sense," *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000). Absent contrary indication, ordinary English language reflects that cognates—such as "possess" and "possession"—"typically reflect the meaning of corresponding" words. *AT&T*, 562 U.S. at 402. We see no such contrary indication here.

Moreover, for those who find legislative history useful or persuasive, the Civil Rights Act's accompanying House Report, too, suggests that section 303's drafters understood it to encompass "all records and papers in the possession of election officers relating to . . . act[s] requisite to voting," not just materials received from others. H.R. Rep. No. 86-956, at 6 (1959).

Unsurprisingly, then, courts long have recognized that section 301 encompasses materials in a state election officer's possession regardless of whether he received them from another or created them himself. *See, e.g.*, *Kennedy v. Lynd* ("*Lynd II*"), 306 F.2d 222, 227 (5th Cir. 1962); *Alabama ex rel. Gallion v. Rogers*, 187 F. Supp. 848, 855 (M.D. Ala. 1960), *aff'd sub nom.*, *Dinkens v. Att'y Gen.*, 285 F.2d 430 (5th Cir. 1961). Indeed, courts specifically have recognized that section 301 encompasses "records of voting registration," *United States v. Mississippi*, 380 U.S. 128, 134, 136–38 (1965), including voter registration lists, *see, e.g.*, *United States v. Maine*, No. 1:06-CV-0086-JAW, 2007 WL 1059565, at *5 (D. Me. Apr. 4, 2007); *McIntyre v. Morgan*, 624 F. Supp. 658, 664 (S.D. Ind. 1985).

---

[12] We are aware that, since the time we originally conveyed our advice, at least one court has held the opposite. *See United States v. Benson*, No. 1:25-CV-01148-HYJ-PJG, 2026 WL 362789, at *9–10 (W.D. Mich. Feb. 10, 2026). Because rulings in these cases postdate the informal advice we have since been asked to memorialize, we do not discuss them at length in this memorandum. Consistent with our ongoing obligation to provide our best view of the law to the Executive Branch, we have continued to monitor the evolving litigation landscape. As of the date of this memorandum's signing, none of these cases has provided reasoning that has led us to doubt or revise our advice from last fall.

In reaching this conclusion, courts have recognized that limiting section 301 to materials that a state election official has acquired from a third party would undermine the statute's purpose. That is, section 303 was "designed to secure a more effective protection of the right to vote" by enabling "preliminary investigations of registration practices . . . in order to determine whether or not such practices conform to constitutional principles." *Gallion*, 187 F. Supp. at 853.[13] Interpreting section 301 to exclude materials that state election officers have created themselves—including statewide voter registration lists—would subvert that purpose by frustrating the Division's ability to acquire evidence that could shed light on whether a violation of the law has occurred. And though purpose cannot overcome plain text, courts "have rejected rules that would 'thwart and defeat [an agency's] appropriate investigatory powers.'" *United States v. Clarke*, 573 U.S. 248, 254 (2014) (quoting *Donaldson v. United States*, 400 U.S. 517, 533 (1971)); *accord N.Y. State Dep't of Soc. Servs. v. Dublino*, 413 U.S. 405, 419–20 (1973) ("We cannot interpret federal statutes to negate their own stated purposes.").

**3.**

Section 303 does not permit a state to redact or withhold any information from its statewide voter registration list based on privacy or confidentiality provisions of state law. Section 303's scope "is sweeping," *Lynd II*, 306 F.2d at 226, providing without qualification that "[*a*]*ny* record or paper required by [section 301] to be retained and preserved *shall*" be produced. 52 U.S.C. § 20703 (emphases added). Because that mandatory language preempts contrary state law, a state must produce information that lies within section 303's scope upon demand—period.

"Read naturally, the word 'any' has an expansive meaning, that is, 'one or some indiscriminately of whatever kind.'" *United States v. Gonzales*,

[13] *See also, e.g.*, *Lynd II*, 306 F.2d at 228 ("Its purpose is to enable the Attorney General to determine whether . . . actions should be instituted. And it is to enable him to obtain evidence for use in such cases if and when filed."); *In re Coleman*, 208 F. Supp. 199, 199–200 (S.D. Miss. 1962) ("The purpose of this demand is to examine the aforesaid records in order to ascertain whether or not violations of Federal law in regard to registration and voting have occurred."), *aff'd sub nom.*, *Coleman v. Kennedy*, 313 F.2d 867 (5th Cir. 1963).

520 U.S. 1, 5 (1997) (quoting *Webster's Third New International Dictionary* 97 (1976)). Although Congress *could* have included a saving provision for state privacy laws, *see, e.g.*, 18 U.S.C. § 1838; 42 U.S.C. § 300jj-19(c)(4), "Congress did not add any language limiting the breadth of that word," *Gonzales*, 520 U.S. at 5, in enacting section 303.

To the extent of an irreconcilable conflict between section 303 and state-law privacy or confidentiality protections, section 303 wins. The Constitution's Supremacy Clause provides that "the Laws of the United States which shall be made in Pursuance" of the Constitution "shall be the supreme Law of the Land . . . , any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. "This means that when federal and state law conflict, federal law prevails and state law is preempted." *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 471 (2018); *see also Preemptive Effect of Defense Production Act Order on State Law*, 50 Op. O.L.C. __, at *4, *7–9 (Mar. 3, 2026). State privacy laws that require election officials to withhold or redact information that Congress has mandated they produce are thus "preempted because [they] impose[] a duty that [i]s inconsistent . . . with federal law." *Murphy*, 584 U.S. at 478; *see also Mut. Pharm. Co. v. Bartlett*, 570 U.S. 472, 480 (2013) ("[S]tate law [is] impliedly pre-empted where it is 'impossible for a private party to comply with both state and federal requirements.'" (quoting *English v. Gen. Elec. Co.*, 496 U.S. 72, 79 (1990))).

A state seeking to withhold information it deems private or confidential from its response to a section 303 demand will not find support in the Elections Clause. To the contrary, that Clause provides that "[t]he Times, Places and Manner of holding Elections for Senators and Representatives[] shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of ch[oo]sing Senators." U.S. Const. art. I, § 4, cl. 1. As described to the people of New York before ratification, that provision "authorises the national Legislature to regulate in the last resort the election of its own members," and ensures that the Constitution "contain[s] in itself the means of its own preservation." *The Federalist* No. 59, at 397–98 (Alexander Hamilton) (Jacob E. Cooke ed., 1961) (emphasis omitted). Far from creating a special rule of state power to override Congress, "the federalism concerns" surrounding preemption "are somewhat *weaker*"

under the Elections Clause precisely because "the [s]tates' role in regulating congressional elections . . . has always existed subject to the express qualification that it 'terminates according to federal law.'" *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 14–15 (2013) (emphasis added) (quoting *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 347 (2001)). That is, the Elections Clause is a rare instance in which the Framers granted Congress "a revisionary power . . . to counter state legislatures." *Rucho v. Common Cause*, 139 S. Ct. 2484, 2495 (2019).

To be sure, as with other aspects of "the regulation of elections for the Federal Government," the Framers granted authority "in the first instance to the local administrations; which in ordinary cases, and when no improper views prevail, may be both more convenient and more satisfactory." *The Federalist* No. 59, at 399. But "whenever extraordinary circumstances might render [an] interposition necessary to its safety," *id.*, a state's authority to protect the privacy or confidentiality of election-related personal information must yield to Congress's superior authority under the Clause, *see Ex parte Siebold*, 100 U.S. (10 Otto) 371, 384 (1880); *Inter Tribal Council*, 570 U.S. at 14—not to mention the Fourteenth and Fifteenth Amendments, *see City of Rome v. United States*, 446 U.S. 156, 179–80 (1980)—to require that states produce the materials unredacted.

One counterargument is that courts "sometimes" presume that federal law does not preempt state law "unless that was the clear and manifest purpose of Congress." *Inter Tribal Council*, 570 U.S. at 13 (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)). But for at least three reasons, such a presumption cannot justify withholding or redacting information sought under section 303.

*First*, the Elections Clause, *see* U.S. Const. art. I, § 4, cl. 1, authorizes Congress to enact regulations that displace state law. Such regulations include those "relating to 'registration,'" *Inter Tribal Council*, 570 U.S. at 8–9 (quoting *Smiley v. Holm*, 285 U.S. 355, 366 (1932)), such as section 303, *see Gallion*, 187 F. Supp. at 853 & n.6. On its face, the Elections Clause "empower[s] Congress to override state election rules." *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 814–15 (2015). "Because the power the Elections Clause confers is none other than the power to pre-empt, the reasonable assumption is that the statutory text accurately communicates the scope of Congress's pre-emptive in-

tent," free from any presumption about preemption one way or another. *Inter Tribal Council*, 570 U.S. at 14.

*Second*, presuming Congress did not intend to preempt state privacy laws would be irreconcilable with the context of section 303. After all, Congress enacted section 303 for the "clear and manifest purpose," *Inter Tribal Council*, 570 U.S. at 13 (citation omitted), of overcoming the "refusal of some State and local authority to permit such inspection," H.R. Rep. No. 86-956, at 7; *see also, e.g.*, *Message to Congress*, Pub. Papers of Pres. Dwight D. Eisenhower at 166 (1959). And far from leaving the effectiveness of federal investigations to the vagaries of state privacy laws, Congress has in the Civil Rights Act, together with the Privacy Act of 1974, Pub. L. No. 93-579, 88 Stat. 1896 ("Privacy Act"), created "a comprehensive and detailed set of requirements for the management of confidential records held by Executive Branch agencies." *FAA v. Cooper*, 566 U.S. 284, 287 (2012). This scheme lays out in full what Congress itself has deemed to be adequate privacy and confidentiality protections for election-connected information. The states need not supplement them—and, in this case, cannot. *See, e.g.*, *Alexander v. Sandoval*, 532 U.S. 275, 290 (2001); *Switchmen's Union of N. Am. v. Nat'l Mediation Bd.*, 320 U.S. 297, 301 (1943).

*Third*, even when one applies the presumption against preemption, that presumption only presumes that Congress did not intend to preempt "innocuous" rules, which burden federal law only in "incidental" ways. *Gobeille v. Liberty Mut. Ins. Co.*, 577 U.S. 312, 325 (2016). The same presumption would not apply to "a state law that enters a fundamental area of [a federal] regulation" or that "counters the federal purpose." *Id.* at 325–26. In this instance, any applicable state-law privacy or confidentiality provision would enter "a fundamental area" of section 303, *id.*, because it would require a state to withhold the very material that section 303 requires a state to produce on demand, such that the presumption against preemption simply would be rebutted. *See id.* at 325; *see also Egelhoff v. Egelhoff ex rel. Breiner*, 532 U.S. 141, 148–50 (2001). Thus, even if the presumption against preemption would otherwise apply (and it would not), it does not justify the redaction or withholding of information that Congress specifically required states to provide.

**B.**

Based on the facts as they have been communicated to us, the Division can also satisfy section 303's requirement that a "demand shall contain a statement of . . . the purpose therefor." 52 U.S.C. § 20703. Because the Civil Rights Act does not limit the purposes for which the information may be sought (or on what basis), this requirement imposes a minimal burden. And an effort to ensure that states are complying with the NVRA's and HAVA's list-maintenance requirements is a proper "purpose" for demanding that the states produce those lists. *Id.*

**1.**

The Civil Rights Act imposes only one requirement when it comes to such a demand for information: that the Attorney General state his "purpose," *id.*—that is, his "object to be attained" or "end or aim to be kept in view," *Webster's New International* at 2018. Congress could have limited the purposes for which the Division may invoke section 303. "But that is not the text of the statute Congress enacted." *Pac. Operators Offshore, LLP v. Valladolid*, 565 U.S. 207, 215 (2012). And we generally "resist reading words or elements into a statute that do not appear on its face," *Duty to Report Suspected Child Abuse Under 42 U.S.C. § 13031*, 36 Op. O.L.C. 167, 181 (2012) ("*Duty to Report*") (quoting *Dean v. United States*, 556 U.S. 568, 572 (2009)), as doing so would violate the "fundamental principle of statutory interpretation that 'absent provisions cannot be supplied by'" an interpreter, *Rotkiske v. Klemm*, 140 S. Ct. 355, 360–61 (2019) (alteration accepted) (quoting Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 94 (2012)).[14]

Nor can we infer that section 303 may be used only for the purpose of enforcing the Civil Rights Act itself. After all, much of that law is about issues besides voting, *see* CRA, tits. II, V, VII, 74 Stat. at 86–88, 89–90, 92, and title III (in which section 303 is located) imposed no new substantive requirements on states or localities with respect to voting, *see generally*

[14] *See also, e.g.*, *Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687, 701–02 (1995); *Howe v. Smith*, 452 U.S. 473, 480–82 (1981); *Detroit Tr. Co. v. The Thomas Barlum*, 293 U.S. 21, 37–38 (1934).

*ally id.*, tit. III, 74 Stat. at 88–89.[15] Since the availability of records under section 303 is tied to acts requisite to voting, limiting the set of permissible purposes for section 303 demands to those that enforce provisions that have nothing to do with voting would render the provision a nullity. "It is an 'elementary canon of construction that a statute should be interpreted so as not to render one part inoperative.'" *South Carolina v. Catawba Indian Tribe, Inc.*, 476 U.S. 498, 510 n.22 (1986) (quoting *Colautti v. Franklin*, 439 U.S. 379, 392 (1979)); *see also, e.g.*, *United States v. Tohono O'odham Nation*, 563 U.S. 307, 315 (2011); *Dublino*, 413 U.S. at 419–20.

Limiting the statute's scope by atextual interpretive "supplementation is particularly inappropriate when, as here, Congress has shown that it knows how to adopt the omitted language or provision." *Rotkiske*, 140 S. Ct. at 361. Other statutes authorize agencies to obtain certain materials for only specified purposes.[16] "So if we needed any proof that Congress knew how to" limit the purposes for which an agency can obtain information "when it meant" to do so, "here we find it." *Caraco Pharm. Lab'ys, Ltd. v. Novo Nordisk A/S*, 566 U.S. 399, 416 (2012); *see also United States v. Shabani*, 513 U.S. 10, 14 (1994) ("In light of this additional element in [one] statute, Congress' silence in [a different statute] speaks volumes."). Congress chose not to do so here.

**2.**

One counterargument rests on legislative history indicating that Congress enacted section 303 to provide DOJ with additional tools to enforce existing voting laws, including the voting provisions of the Civil Rights Act of 1957, Pub. L. No. 85-315, pt. IV, 71 Stat. 634, 637–38, which was

---

[15] Title VI of the Civil Rights Act admittedly expanded the *remedies* available when a court finds a deprivation of certain preexisting rights or privileges with respect to voting, but it does not create any such rights or privileges. *See* CRA, tit. VI, 74 Stat. at 90–92.

[16] *See, e.g.*, 8 U.S.C. § 1446(b) ("For [the] purposes" of "conduct[ing] examinations upon applications for naturalization," an agency "is authorized . . . to require by subp[o]ena the attendance and testimony of witnesses" and "production of relevant books, papers, and documents."); 12 U.S.C. § 1467a(g)(2) ("any investigation under this section"); 29 U.S.C. § 2616(d) ("any investigation provided for in this section"); 46 U.S.C. § 12140(b)(1) ("any investigation conducted under this section"); 50 U.S.C. § 4101(c)(1) ("any hearing, examination, or investigation under this subchapter").

the first "civil rights measure to pass the Congress in 85 years," *Statement by the President Upon Signing the Civil Rights Act of 1960*, Pub. Papers of Pres. Dwight D. Eisenhower 398, 398 (May 6, 1960) ("*Statement*"). For example, the House Report accompanying the CRA observed that "[e]xperience has shown the need for this legislation," because "lacking a suitable provision for access to voting records during the course of an investigation and prior to the institution of a suit" rendered "the authority of the Attorney General . . . relatively ineffective." H.R. Rep. No. 86-956, at 7. Others involved in the legislation echoed this sentiment.[17] We are unpersuaded.

For one, this would be a novel way to read a statutory provision. As even a court that has since disagreed with our advice has recognized, "[t]here is no rule of statutory interpretation that prevents a statute from interacting with, or being used in conjunction with, subsequently enacted statutes." *Benson*, 2026 WL 362789, at *8. To the contrary, "the meaning of one statute may be affected by other Acts, particularly where Congress has spoken subsequently and more specifically to the topic at hand." *Brown & Williamson Tobacco Corp*., 529 U.S. at 133. "Th[e] classic [interpretive] task of reconciling many laws enacted over time, and getting them to 'make sense' in combination, necessarily assumes that the implications of a statute may be altered by the implications of a later statute." *United States v. Fausto*, 484 U.S. 439, 453 (1988).

It would be particularly problematic to apply such a view to a procedural statute that, on its face, stretches across different substantive protections. Congress can and does adopt procedures to enforce substantive legal rules already on the books and then modifies or adds to those legal rules without changing the legal scheme. For example, Congress passed the Administrative Procedure Act ("APA") in 1946, Pub. L. No. 79-404, 60 Stat. 237, *amended by*, Pub. L. No. 89-554, 80 Stat. 378 (1966), to govern federal agency action as it enforced existing organic statutes, *see*

---

[17] *See Statement* at 398 ("One provision, which requires the retention of voting records, will be of invaluable aid in the successful enforcement of existing voting rights statutes."); *Special Message to the Congress on Civil Rights*, Pub. Papers of Dwight D. Eisenhower 164, 166 (Feb. 5, 1959) ("*Message to Congress*") (calling for "[s]upplemental legislation" to address "[a] serious obstacle" to the 1957 law); S. Rep. No. 86-1205, at 2 (1960) (noting that the 1957 law failed to "provide sufficient mechanisms and alternatives to overcome systematic disfranchisement").

Admin. Conf. of the U.S., *Administrative Procedure Act*, https://perma.cc/8ALK-D9Q7 (last visited May 6, 2026) (providing a brief overview of the APA and its history). The APA has never been understood as applying only to the agencies that existed when Congress enacted it, and no court has suggested that subsequently created agencies need not heed its dictates. *Id.*; *see also* 5 U.S.C. § 551(1) (providing expressly which kinds of agencies are exempted from the APA's rules). Rather, agencies that Congress created quite recently still abide by that 80-year-old statute. *Compare, e.g.*, Homeland Security Act of 2002, Pub. L. No. 107-296, § 101, 116 Stat. 2135, 2142 ("Homeland Security Act" or "HSA") (establishing the Department of Homeland Security), *with, e.g.*, *DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1905 (2020) (applying the APA to DHS actions).

For another, legislative history "can assist in" the interpretive process "to the extent [that it] demonstrate[s] the manner in which the public used or understood a particular word or phrase," *McDonald v. City of Chicago*, 561 U.S. 742, 828 (2010) (Thomas, J., concurring in part and concurring in judgment); *see also Standard Oil Co. of N.J. v. United States*, 221 U.S. 1, 50 (1911) (substantively similar), but "legislative history is not the law," *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 523 (2018). Rather, when interpreting a statute, the "proper starting point lies in a careful examination of the ordinary meaning and structure of the law itself. Where, as here, that examination yields a clear answer, [we] must stop." *Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2364 (2019) (citation omitted).[18]

But even taking this legislative history on its own terms, it shows at most that Congress intended section 303 to aid DOJ in enforcing existing voting laws—not that Congress meant section 303 to be unavailable for enforcing other laws within DOJ's jurisdiction, including voting laws that Congress would enact in the future such as the NVRA or HAVA.

---

[18] *See also, e.g.*, *Davis v. Mich. Dep't of the Treasury*, 489 U.S. 803, 809 (1989) ("[T]he words of a statute must be read in their context and with a view to their place in the overall statutory scheme."); *Decker v. Nw. Env't Def. Ctr.*, 568 U.S. 597, 618 (2013) (Scalia, J., concurring in part and dissenting in part) ("We do not inquire what the legislature meant; we ask only what the statute means." (quoting Oliver Wendell Holmes, *The Theory of Legal Interpretation*, 12 Harv. L. Rev. 417, 419 (1899))).

"[S]tatutory prohibitions often go beyond the principal evil to cover reasonably comparable evils, and it is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 79 (1998). Congress might have had in mind voting laws that were already on the books (and the 1957 law in particular) when it enacted section 303, but "Congress for cogent reasons chose to enact a more general statute, one which, although it had [existing voting rights laws] as its focus, was not limited in application" to those laws. *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 248 (1989).

If anything, other aspects of section 303's legislative history demonstrate that it does *not* limit the purposes for which it can be used to enforce preexisting voting statutes. For example, an early version of what eventually would become section 303 would have authorized DOJ, when "conducting any investigation in carrying out the powers and authority conferred in [section 131(c) of the 1957 law] . . . , to require by subp[o]ena the production of such [materials] as may be relevant or material to such investigation." S. 499, 86th Cong. § 301 (1959). As enacted and signed into law, section 303 conspicuously omits that limitation. *See* CRA § 303, 74 Stat. at 88 (codified at 52 U.S.C. § 20703). "Few principles of statutory construction are more compelling than the proposition that Congress does not intend *sub silentio* to enact statutory language that it has earlier discarded." *INS v. Cardoza-Fonseca*, 480 U.S. 421, 442–42 (1987) (quoting *Nachman Corp. v. Pension Benefit Guaranty Corp.*, 446 U.S. 359, 392–93 (1980) (Stewart, J., dissenting)); *see also, e.g.*, *Russello*, 464 U.S. at 23–24; *Gen. Acct. Off. v. Gen. Acct. Off. Pers. Appeals Bd.*, 698 F.2d 516, 525 n.52 (D.C. Cir. 1983).[19]

[19] "[F]loor statements by individual legislators rank among the least illuminating forms of legislative history," *NLRB v. SW Gen., Inc.*, 580 U.S. 288, 307 (2017), even when made by sponsors of the bill, *see Brnovich*, 141 S. Ct. at 2350 (rejecting a "cat's paw" theory of legislative history as inconsistent with legislators' "duty to exercise their judgment and to represent their constituents"). But for those who find such materials helpful, *see, e.g.*, *Corley v. United States*, 556 U.S. 303, 317–20 (2009), "one of the principal spokesmen for the bill in the Senate," *Coleman*, 313 F.2d at 868, unequivocally stated that "[c]learly a sufficient statement would be the assertion that the demand was made for the purpose of investigating possible violations of a Federal statute," 106 Cong. Rec. 7767 (1960) (Sen. Kenneth Keating).

**3.**

Even if section 303 *were* limited to enforcing voting-rights legislation, the Division's stated purpose here would satisfy this minimal burden. In each section 303 demand to the states, the Division stated that it requests the state's statewide voter registration list "to assess [the] state's compliance with the statewide [list-]maintenance provisions of the NVRA." *E.g.*, Dhillon Memorandum at 1. Although perhaps aimed at a larger group of states than has been done in the past, this request is entirely in line with the Division's historical practice of invoking section 303 to demand materials, including statewide voter registration lists, from the states when enforcing a variety of voting statutes. These statutes include both the NVRA and HAVA, as well as the Voting Rights Act of 1965 and the Uniformed and Overseas Citizens Absentee Voting Act, Pub. L. No. 99-410, 100 Stat. 924 (1986).[20] That level of application is to be expected: Even assuming that section 303 is limited to enforcement of voting statutes, bringing it to bear on the NVRA's and HAVA's list-maintenance provisions, which are designed to ensure that only those who are entitled to vote actually do so, is consistent with such a limitation.

We do not think that the Division's decision to use the statewide voter-registration lists to investigate voter fraud (whether by illegal aliens or otherwise) alters this analysis. By requiring that a demand specify "*the* purpose therefor," 52 U.S.C. § 20703 (emphasis added), section 303 "uses the definite article to reference the particular" purpose that the Division had for making it, *Slack Techs., LLC v. Pirani*, 143 S. Ct. 1433, 1440 (2023). The Division has represented to us that it decided to use the voter registration lists to investigate voter fraud, including by illegal aliens, only after issuing the section 303 demands in question. A secondary purpose such as this does not, in our view, constitute part of "*the* purpose" for these demands that section 303 requires the Division to state. 52 U.S.C. § 20703 (emphasis added); *cf. TIG Ins. Co. v. Republic of*

---

[20] *See, e.g.*, Letter for R. Tamar Hagler, Chief, Voting Section, Civil Rights Division, from Michael L. Jones Jr., General Counsel, Office of the Secretary of State of Alabama at 1 (Sept. 19, 2024); Order at 2, *United States v. Alabama*, No. 2:08-CV-00920-WKW-CSC (M.D. Ala. Mar. 27, 2009), Dkt. No. 24; Memorandum of Understanding Between the Department of Justice and the Office of the Texas Secretary of State (May 13, 2008), https://perma.cc/GEL3-2287; Consent Judgment & Decree, *United States v. Georgia*, No. 1:06-CV-02442-CC (N.D. Ga. Oct. 27, 2006), Dkt. No. 4.

*Argentina*, 967 F.3d 778, 783 (D.C. Cir. 2020) (noting that, under "the usual rules governing civil litigation, . . . district courts generally assess facts at the time of filing"). Regardless, such a purpose is permissible under section 303 given that, as explained, section 303 does not limit the purposes for which the Division may invoke it. And, beyond this fact, even were section 303 limited to the enforcement of voting statutes, statutes that criminalize voter fraud would satisfy any such condition.

**C.**

The Division also has articulated a valid "basis" for its demands that States produce their statewide voter registration lists. 52 U.S.C. § 20703. Again, this is a fairly minimal requirement, which the Division satisfied in saying that it requests the state's statewide voter-registration list "to assess [the] state's compliance with the statewide [list-]maintenance provisions of the NVRA." *E.g.*, Dhillon Memorandum at 1.

The general rule is that an administrative subpoena's validity does not turn on "the strength of the underlying complaint." *McLane Co. v. EEOC*, 581 U.S. 72, 76 (2017); *see also EEOC v. Shell Oil Co.*, 466 U.S. 54, 72 n.26 (1984) (noting that an administrative subpoena's validity does not depend on the underlying charge being "'well founded' or 'verifiable'" (citation omitted)). Congress often empowers a federal agency to "investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not." *United States v. Morton Salt Co.*, 338 U.S. 632, 642–43 (1950). That general rule applies here because section 303 demands are in the nature of "subpoenas." Aram A. Gavoor & Steven A. Platt, *Administrative Investigations*, 97 Ind. L.J. 421, 434 & n.94 (2022); *see also Black's Twelfth* at 1732 (noting that an "administrative subpoena" is "issued by an administrative agency to compel an individual to provide information to the agency").

Congress knows how to depart from that general rule: It can condition an agency's authority to compel the production of materials on the agency's demonstration of adequate grounds to believe that a legal violation has occurred. The Stored Communications Act, Pub. L. No. 99-508, tit. II, 100 Stat. 1860 (1986), *amended by* Pub. L. No. 103-414, § 207(a)(2), 108 Stat. 4279, 4292 (1994), for example, authorizes the government to obtain certain communications or records thereof only if it "offers specific and articulable facts showing that there are reasonable grounds to believe" the

materials sought "are relevant and material to an ongoing criminal investigation." 18 U.S.C. § 2703(d). Another provision of that statute requires a warrant. *See id.* § 2703(a). When sought from a federal district court, that warrant must be issued pursuant to the Federal Rules of Criminal Procedure, *see id.*, which require a showing of "probable cause," Fed. R. Crim. P. 41(d)(1). And another statute allows the Federal Bureau of Investigation to obtain a court order for acquiring certain records only if it "specif[ies] that . . . there are specific and articulable facts giving reason to believe that the person to whom the records pertain is a foreign power or an agent of a foreign power." 50 U.S.C. § 1862(b)(2). Section 303's absence of any similar requirement is revealing. *See Duty to Report*, 36 Op. O.L.C. at 181; *Rotkiske*, 140 S. Ct. at 360–61.

Here, Congress instead requires only that the Attorney General (or his designee) offer a "basis"—that is, "foundation" or "support"—for a section 303 demand. *Oxford Dictionary of English Etymology* 77 (1966). A section 303 demand does not require "detailed information" or "specific details of voter discrimination," *United States v. Lynd* ("*Lynd I*"), 301 F.2d 818, 822 (5th Cir. 1962),[21] and cannot be defeated for purportedly lacking a "proper basis" merely by virtue of election officials denying that a violation has occurred, *Kennedy v. Bruce*, 298 F.2d 860, 863 (5th Cir. 1962). Further, reading such a requirement into section 303 would frustrate the statute's "very purpose," which "is to discover and procure evidence, not to prove a pending charge or complaint, but upon which to make one if . . . the facts thus discovered should justify doing so." *Okla. Press Publ'g Co. v. Walling*, 327 U.S. 186, 201 (1946); *see also Lynd II*, 306 F.2d at 225, 228; *Coleman*, 208 F. Supp. at 200–01; *Gallion*, 187 F. Supp. at 853.

Nor does Congress require a demand's "basis" to be distinct from its "purpose." Section 303's use of the terms "basis" and "purpose" reflects "a lawyerly penchant for doublets (aid and abet, cease and desist, null and void)." *King v. Burwell*, 576 U.S. 473, 502 (2015) (Scalia, J., dissenting);

---

[21] True, in *Lynd I*, the Fifth Circuit stated that a "simple assertion . . . that there are reasonable grounds for belief that certain voters are being discriminatorily denied their voting rights in a given county" was a sufficient condition that justifies the request. 301 F.2d at 822. But *Lynd I* did not hold that "a sufficient condition" to justify a section 303 demand was also "a necessary one" to justify any request. *Clark v. Arizona*, 548 U.S. 735, 753 (2006).

*accord Temporary Presidential Designation of Acting Board Members of the Inter-American Foundation and the United States African Development Foundation*, 49 Op. O.L.C. __, at *8 n.3 (Mar. 14, 2025) (same). That is, section 303's use of the phrase "the basis and the purpose therefor" is best understood to require the Attorney General or his designee to tell a state what he is looking for and a high-level explanation as to why. *See* 52 U.S.C. § 20703. As a result, as in other legal contexts, the same explanation can furnish both an action's "conceptual basis and purpose[]." *Daily Income Fund, Inc. v. Fox*, 464 U.S. 523, 533–34 (1984); *see also, e.g.*, *Heckler v. Chaney*, 470 U.S. 821, 841 (1985) (Marshall, J., concurring in judgment).

Contrary to one counterargument we have seen,[22] such an interpretation does not improperly render the term "basis" superfluous. "Doublets in our language of the law often are not redundancies but rather the result of the merger of the Anglo-Saxon and Norman French strands of modern day legal English," Paul Brickner, *How Judges Think*, 59 Case W. Rsrv. L. Rev. 793, 800 (2009) (book review),[23] and thus often function "as a single unit of analysis to convey only a single meaning," Ethan J. Leib & James J. Brudney, *The Belt-and-Suspenders Canon*, 105 Iowa L. Rev. 735, 741 (2020). This grammatical usage, unsurprisingly, tracks investigative reality: Although the "basis" of an investigation can be distinct from its "purpose" if someone approaches investigators with a specific factual reason to think records will reveal wrongdoing, it is common in the early days of an investigation for the "basis" of the inquiry to overlap with its "purpose," especially when an agency undertakes the investigation simply to ensure that the law is being followed. In this instance, the purpose for asking for the lists is to investigate states' NVRA and HAVA compliance, and the basis for asking for the lists is that they contain critical evidence in assessing NVRA and HAVA compliance, which Congress has tasked

---

[22] *See, e.g.*, Maine's Motion to Dismiss at 14–16, *Bellows*, No. 1:25-CV-00468-LEW (D. Me. Dec. 12, 2025), Dkt. No. 54.

[23] In the Norman Conquest's wake, "official proceedings were conducted in Norman French, while the parties themselves almost invariably spoke Old English, a Germanic tongue. This led to the practice of including both the French and Old English words in every critical phrase in a document." Drury Stevenson, *Forensic Linguistics: An Introduction to Language in the Justice System*, 77 U. Colo. L. Rev. 257, 261 (2006) (book review).

the Division with investigating. And, as already noted, section 303 does not require the Division to have some pre-existing level of suspicion to justify an investigation. *McLane Co.*, 581 U.S. at 76; *EEOC*, 466 U.S. at 72 n.26.

Even if a section 303 demand's "purpose" is legally distinct from its "basis," and "the same [information] may prove two separate elements, this does not mean that the two elements collapse into one." *Boyle v. United States*, 556 U.S. 938, 950 n.5 (2009).[24] For example, the Division's purpose may be to investigate whether a state is failing to adequately maintain its voter rolls, or improperly imposing a poll tax, but the investigation's starting point may be "reasonable grounds for belief that certain voters are being discriminatorily denied their voting rights in a given county" within that state. *Lynd I*, 301 F.2d at 822. As a practical matter, such circumstances may be rare, but "[l]anguage in a statute is not rendered superfluous merely because in some contexts that language may not be pertinent." *United States v. Turkette*, 452 U.S. 576, 583 n.5 (1981); *see, e.g.*, *Kawashima v. Holder*, 565 U.S. 478, 488 (2012); *BFP v. Resol. Tr. Corp.*, 511 U.S. 531, 545–46 (1994).[25]

## III.

Having concluded that section 303 allows the Division to seek statewide voter registration lists, you also asked us whether the Privacy Act, Driver's Privacy Protection Act of 1994, Pub. L. No. 103-322, tit. XXX, 108 Stat. 2099 ("Driver's Privacy Protection Act"), or E-Government Act of 2002, Pub. L. No. 107-347, 116 Stat. 2899

---

[24] *See also, e.g.*, *Begala v. PNC Bank, Ohio, N.A.*, 214 F.3d 776, 781 (6th Cir. 2000) ("[T]he plaintiff may allege the separate elements . . . through the same facts . . . ."); *Vitaline Corp. v. Gen. Mills, Inc.*, 891 F.2d 273, 275 (Fed. Cir. 1989) ("Although abandonment requires both non-use and intent not to resume use of the mark, the element of intent can be established inferentially by the same facts that establish non-use."); *United States v. Qaoud*, 777 F.2d 1105, 1115 (6th Cir. 1985) ("[S]eparate elements . . . may be proved by the same evidence.").

[25] Even if this were not the case, the canon against surplusage does not compel such a construction, as it "is not an absolute rule" and "certainly does not require us to favor an unusual meaning that will avoid surplusage over a more natural one." *Stanley v. City of Sanford*, 145 S. Ct. 2058, 2066 (2025) (cleaned up); *see also Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 385 (2013) ("The canon against surplusage is not an absolute rule" and "has considerably less force in" some contexts than in others.).

("E-Government Act"), prevent the Division from obtaining these lists (in whole or in part). We advised that they do not.

**A.**

The Privacy Act's limitation on an agency's ability to maintain records that "describ[e]" the exercise of First Amendment rights, 5 U.S.C. § 552a(e)(7), does not prevent the Division from retaining statewide voter registration lists under section 303. Even if we assume the Privacy Act is implicated by these lists, the Division's demands fall within the scope of an authorized law enforcement activity. These lists also fall within the scope of a published Privacy Act System of Records Notice ("SORN"). And finally, the Privacy Act's restrictions on disclosure for use in a computer-matching program do not apply here.

**1.**

For agencies that maintain records systems, the Privacy Act provides that federal agencies can "maintain no record describing how any individual exercises rights guaranteed by the First Amendment" unless the record falls within a specified exception. *Id.* § 552a(e)(7). It is clear that the First Amendment protects the "rights of voters." *Burdick*, 504 U.S. at 434; *see also generally* Armand Derfner & J. Gerald Hebert, *Voting Is Speech*, 34 Yale L. & Pol'y Rev. 471 (2016). It is far *less* clear that statewide lists of who is registered to vote "describ[e] how any individual exercises" that right. 5 U.S.C. § 552a(e)(7). Assuming they do, however, the Division may retain them in this instance, as the Division's actions are "within the scope of an authorized law enforcement activity" for two independent reasons—necessarily implying that they can *obtain* the materials consistent with the Privacy Act. *Id.*

*First*, enforcing the NVRA's and HAVA's list-maintenance requirements satisfies the Privacy Act law enforcement exception regardless of whether either statute carries criminal penalties. The NVRA and HAVA are laws that the DOJ may enforce through "declaratory or injunctive relief." 52 U.S.C. § 20510(a) (NVRA); *id.* § 21111 (HAVA). Both Congress and the courts have recognized that "law enforcement" extends beyond "investigation of . . . criminal activity." *Jabara v. Webster*, 691 F.2d 272, 280 (6th Cir. 1982) (finding that 5 U.S.C. § 552a(e)(7)'s excep-

tion for authorized law-enforcement activities is not limited "to investigation of . . . criminal activity").

*Second*, even if the potential for criminal penalties were necessary (and they are not here), we understand that the Division further intends to use the voter-registration lists to identify those (including illegal aliens) who are ineligible to vote. "Congress has vested in the Attorney General the power to conduct the criminal litigation of the United States Government," *United States v. Nixon*, 418 U.S. 683, 694 (1974); *see also* 28 U.S.C. §§ 516, 533(1), 547(1), including the enforcement of federal statutes that ban voter fraud, *see* 18 U.S.C. § 1015(f); 52 U.S.C. § 20511(2). And by regulation, the Division has been delegated powers to assist in that effort. *See* 28 C.F.R. § 0.50(a).[26] Because the Division's proposed uses of the lists are "pertinent to and within the scope of an authorized law enforcement activity," 5 U.S.C. § 552a(e)(7), the Privacy Act permits the Division to retain them.

**2.**

At the time of the Division's demands, its collection of statewide voter registration lists also satisfied the Privacy Act's requirement that each agency maintaining a system of records shall "publish in the Federal Register upon establishment or revision a notice of the existence and character of the system of records"—that is, a SORN. *Id.* § 552a(e)(4). That "notice shall include," as relevant here, both "the categories of individuals on whom records are maintained in the system" and "the categories of records maintained in the system." *Id.* We understand, based on our conversations with CRT, that the Division intends to retain the lists sought in a system of records known as the "Central Civil Rights Division Index File and Associated Records" ("Central Index File"). *See* Privacy Act of 1974; Systems of Records, 68 Fed. Reg. 47,610, 47,611 (Aug. 11, 2003). Because a published SORN has covered both the categories of individuals who appear in the lists and the lists themselves, the Division's collection of the lists satisfies the Privacy Act's SORN requirements.

---

[26] By regulation, the Criminal Division enforces 18 U.S.C. § 611 and 52 U.S.C. § 10307. *See* 28 C.F.R. §§ 0.50(a)(1)–(2), 0.55(m)(1)–(2). Thus, we do not consider these statutes in our analysis of 5 U.S.C. § 552a(e)(7) as they apply to matters CRT enforces.

*First*, the SORN that announced the Central Index File's establishment states that "categories of individuals covered by the system . . . may include: [s]ubjects of investigations" and "victims." 68 Fed. Reg. at 47,611 (capitalization omitted). Both of these categories cover persons who appear in the lists.

The term "subject" is a "term[] of art in the context of DOJ investigations," *Am. Oversight v. DOJ*, 45 F.4th 579, 582 n.2 (2d Cir. 2022), which, for as long as the relevant SORN has existed, has included anyone whose "conduct is within the scope of the . . . investigation," Justice Manual § 9-11.151 (Jan. 2020), https://perma.cc/9HVT-HLZC.[27] Standing in contrast to a "target"—who is considered "a putative defendant" because of "substantial evidence" linking that individual to a crime, *id.*—a "subject's" conduct may be entirely "innocent." *Am. Oversight*, 45 F.4th at 594 n.19. "Here, the context of these words—the water in which they swim—indicates that [the SORN] used them as terms of art." *United States v. Hansen*, 143 S. Ct. 1932, 1943 (2023). The Justice Manual "sets forth internal [DOJ] policies and procedures" for all Department components, Justice Manual § 1-1.100 (Mar. 2024), https://perma.cc/9JXJ-2X9U—including the Division, the author of the SORN, *cf. id.* § 8-1.010. Context thus suggests that the SORN uses the term "subject" to mean a person whose conduct is within an investigation's scope.[28]

Persons who appear in a statewide voter registration list are "[s]ubjects of investigations," 68 Fed. Reg. at 47,611, as their voter registrations are within the scope of the Division's investigation into voter fraud. The Division has represented to us that it must examine every individual entry in a statewide voter registration list to determine whether the list satisfies

---

[27] *See* United States Attorneys' Manual § 9-11.150 (Oct. 1, 1990); United States Attorneys' Manual § 9-11.260 (Apr. 4, 1985). Because DOJ renamed *United States Attorneys' Manual* to *Justice Manual* in 2018, *see Justice Manual*, Dep't of Just., https://perma.cc/387L-XCEY, we refer to it herein as "the Manual."

[28] Even if "[s]ubjects of investigations" were *not* a term of art, 68 Fed. Reg. at 47,611, we would still look to the Manual. It "was compiled by experts in the field of federal prosecution for the guidance of professionals in that field," *In re North*, 11 F.3d 1075, 1077 (D.C. Cir. 1993), making its longstanding provisions represent "a body of experience and informed judgment to which [interpreters] may properly resort for guidance." *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2262 (2024) (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)).

the NRVA's and HAVA's list-maintenance requirements. *Accord* 52 U.S.C. § 20507(a)(3)(B), (a)(4); *id.* § 21083(a)(2)(A)(ii), (a)(2)(B)(iii), (a)(5)(A), (b)(4)(A)(i)–(iii). These persons' registrations thus are "within the scope of the [Division's] investigation" of a state's compliance with the NVRA's and HAVA's list-maintenance requirements. Justice Manual § 9-11.151.

Moreover, legitimate voters who appear on these lists are the potential "victims" of voter fraud, 68 Fed. Reg. at 47,611, which "deprives, defrauds, or attempts to deprive or defraud the residents of a State of a fair and impartially conducted election process," 52 U.S.C. § 20511(a)(2). Their role in the electoral process suffers "unlawful 'dilution,'" *Regents of the Univ. of Cal. v. Bakke*, 438 U.S. 265, 304–05 (1978) (opinion of Powell, J.) (citing *United Jewish Orgs. of Williamsburgh, Inc. v. Carey*, 430 U.S. 144 (1977)), which can be severe enough to "affect the outcome of a close election," *Brnovich*, 141 S. Ct. at 2340. Although often downplayed in public discourse, courts have repeatedly recognized that "[t]he right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." *Purcell*, 549 U.S. at 4 (quoting *Reynolds v. Sims*, 377 U.S. 533, 555 (1964)).[29] As such, persons who appear legitimately in the voter-registration lists are potential victims within the SORN's meaning.

*Second*, the same SORN also covers the statewide voter registration lists themselves, which include "case files, matters, memoranda, correspondence, studies, and reports relating to enforcement of civil rights laws and other various duties of the . . . Division." 68 Fed. Reg. at 47,611. For the reasons already discussed, these lists "relat[e]" to efforts by the Division to "enforce[] . . . civil rights laws." *Id.*; *see supra* Part II.A.1. The lists thus fall within the SORN's scope, satisfying this aspect of the Privacy Act.

A counterargument could be that the Division's proposed *collection* of the voter rolls does not satisfy the SORN requirement unless HSI's SORN

---

[29] *See also, e.g.*, *Burson v. Freeman*, 504 U.S. 191, 199 (1992) (plurality opinion); *Anderson v. United States*, 417 U.S. 211, 226–27 (1974); *Gray v. Sanders*, 372 U.S. 368, 379–81 (1963); *Crawford v. Marion Cnty. Election Bd.*, 472 F.3d 949, 952 (7th Cir. 2007), *aff'd*, 553 U.S. 181 (2008).

(or that of another component within DHS for that matter) similarly encompasses the lists' data. Not so. An agency must publish a new SORN whenever it "establish[es] or revis[es]" a "system of records," 5 U.S.C. § 552a(e)(4), a term defined in relevant part as "a group of any records under the control of any agency," *id.* § 552a(a)(5). The Division has represented to us that DOJ will access an account on DHS's Systematic Alien Verification for Entitlements system that DOJ controls and that belongs to DOJ for oversight and audit functions. DOJ will upload the files for a DHS employee to access individual records; no one at DHS will download the lists to a server or place them in a directory that it controls. If events occur as thus described, review of names from the lists would not appear to entail placing the lists in a DHS "system of records"—that is, a group of records under DHS's "control." *Id.* Because such read-only access neither "establish[es]" nor "revis[es]" a DHS "system of records," the lists need not fall within the scope of any DHS SORN at all. *Id.* § 552a(e)(4). The Division has thus complied with the only SORN requirement to which the demand is subject.

**3.**

The Division's efforts similarly do not run afoul of the Privacy Act's bar against the provision of information "for use in a computer matching program," *id.* § 552a(o)(1), as one commentator has suggested.[30] At a high level, a "matching program" involves "any computerized comparison" between either (i) federal and non-federal records to make certain eligibility or recoupment decisions "with respect to[] cash or in-kind assistance or payments under Federal benefit programs," or (ii) "two or more automated Federal personnel or payroll systems of records or a system of Federal personnel or payroll records with non-Federal records." *Id.* § 552a(a)(8)(A). The Privacy Act further defines the phrase "Federal benefit program" as encompassing "any program administered or funded by the Federal Government, or by any agent or State on behalf of the Federal Government, providing cash or in-kind assistance in the form of payments, grants, loans, or loan guarantees to individuals." *Id.* § 552a(a)(12).

[30] *See* Justin Levitt, *The Recent Rash of DOJ Voter File "Requests*,*"* Election L. Blog (July 18, 2025), https://perma.cc/9AHQ-GURL.

As we understand the facts, the Division's efforts to obtain information from the states do not run afoul of this prohibition because the Division would not use such lists for any prohibited purpose. As the lists are not personnel or payroll records, they fall entirely outside section 552a(a)(8)(A)(ii). And, even if done electronically, collection and review of statewide voter registration lists to enforce the NVRA and HAVA have no conceivable connection to "cash or in-kind assistance or payments under Federal benefit programs," let alone to the recoupment of payments or debts thereunder. *Id.* § 552a(a)(8)(A)(i).

This conclusion is fully consistent with the Privacy Act's contemplation of matching programs that involve states, local governments, and agencies thereof. *See id.* § 552a(a)(11), (o)(1). Although a record in the possession of a state, local government, or agency thereof can be part of a matching program, the Privacy Act's limits on disclosure for use in a matching program apply only to records in the federal government's possession. This fact accords with the Privacy Act's goal of "protect[ing] the privacy of individuals identified in information systems maintained *by Federal agencies*." Privacy Act § 2(a)(5), 88 Stat. at 1896 (emphasis added). Thus, the Privacy Act does not preclude the Division from obtaining information from states under the present scenario.

**B.**

For similar reasons, the Driver's Privacy Protection Act does not prevent the Division from obtaining the statewide voter registration lists either. That statute provides that a state department of motor vehicles (or an affiliated person) "shall not knowingly disclose or otherwise make available . . . personal information . . . about any individual obtained by the department in connection with a motor vehicle record." 18 U.S.C. § 2721(a). Like the Privacy Act, however, it excepts disclosure "[f]or use by any government agency, including any . . . law enforcement agency, in carrying out its functions." *Id.* § 2721(b)(1). And, as just discussed, the Division intends to use the lists "in carrying out its functions," *id.*, of enforcing the NVRA's and HAVA's list-maintenance requirements.

**C.**

The E-Government Act similarly does not apply to the Division's efforts to obtain statewide voter registration lists. Section 208 of that

statute requires an agency to conduct, review, and, if practicable, publish a privacy-impact assessment before "initiating a new collection of information that . . . includes any information in an identifiable form permitting the physical or online contacting of [10 or more] specific" persons or entities.[31] E-Government Act § 208(b)(1)(A)(ii), 116 Stat. 2899, 2921–22 (codified at 44 U.S.C. § 3501 note). But the section 303 demands at issue here neither pose "questions" to nor impose "reporting requirements" on states. *See id.* Neither aspect of the E-Government Act applies here.[32]

*First*, the Division's section 303 demands do not pose "questions" to the states. *See id.* § 208(b)(1)(A)(ii)(II), 116 Stat. at 2921–22. Paradigmatic "questions" subject to section 208's requirements are those found on the decennial-census questionnaire. *See Elec. Priv. Info. Ctr. v. U.S. Dep't of Com.*, 928 F.3d 95, 99 (D.C. Cir. 2019). The section 303 demands do not ask, "What is all the information in your statewide voter registration list?" Rather, as noted above, they take the form of administrative subpoenas. *See supra* Part II.C. The distinction between subpoenas and interrogatories or deposition by written question is well known in the law. *See, e.g.*, *United States v. Clinesmith*, No. 2:23-CV-20063-DDC-1, 2025 WL 974262, at *5 & n.1 (D. Kan. Apr. 1, 2025); *Sekerke v. Arkwright*, No. 3:20-CV-01045-JO-AHG, 2023 WL 1453147, at *5 (S.D. Cal. Feb. 1, 2023). Congress is presumed to have acted deliberately and in full knowledge of that distinction when it declined to impose section 208 requirements on administrative subpoenas (and other devices of such a nature, whether or not formally styled as "subpoenas"). *See Gallardo ex rel. Vassallo v. Marstiller*, 142 S. Ct. 1751, 1761 (2022) ("We must also read [a statute's] text in light of background legal principles . . . .").

*Second*, the Division's section 303 demands do not impose "reporting requirements" on states. E-Government Act § 208(b)(1)(A)(ii)(II), 116 Stat. at 2921–22. Like the word "subject," *see supra* Part III.A.2, the phrase "reporting requirement" is a term of art that is well understood to

---

[31] Section 201 defines the term "persons" in section 208 to cover states. *See* E-Government Act §§ 201, 208(b)(1)(A)(ii)(II), 116 Stat. at 2910, 2921–22; 44 U.S.C. § 3502(10).

[32] For the avoidance of doubt, we do not suggest that, apart from these reasons, the E-Government Act may bar CRT's demands for information. We simply do not reach the questions, as they are unnecessary to our inquiry herein.

be conceptually distinct from a subpoena by courts;[33] by Congress, *see, e.g.*, 49 U.S.C. § 20107(a)(1); and by commentators, *see, e.g.*, Robert A. Mikos, *Can the States Keep Secrets from the Federal Government?*, 161 U. Pa. L. Rev. 103, 115 (2012). Although both can result in the provision of similar information, reporting requirements generally are fixed by law in advance to require certain people or entities to provide certain information under certain circumstances. *See, e.g.*, *District of Columbia v. Carter*, 409 U.S. 418, 429–30 n.25 (1973); *Cal. Bankers Ass'n v. Shultz*, 416 U.S. 21, 26–30 (1974); 31 U.S.C. § 5314; Homebuyers Privacy Protection Act, Pub. L. No. 119-36, § 4(b), 139 Stat. 493, 494 (2025). By contrast, although subpoenas can require ongoing production, they generally issue on an ad hoc basis as part of (or as prelude to) an enforcement action or other litigation, typically about something that happened in the past. *See* Fed. R. Civ. P. 45; Fed. R. Crim. P. 17. Because a section 303 demand is in essence a backward-looking subpoena, *see supra* Part II.C, it does not impose a forward-looking reporting requirement on a state.

Even if section 303 demands were deemed to pose "questions" to or impose "reporting requirements" on states, the E-Government Act still would not apply because the demands do not "initiat[e] a new collection of information" within section 208's meaning. E-Government Act § 208(b)(1)(A)(ii), 116 Stat. at 2921–22; *see also id.* § 201, 116 Stat. at 2910; 44 U.S.C. §§ 3502(3), 3518(c). Neither "initiating" nor "new" has a statutory definition provided by this statute. *See* 44 U.S.C. 3502. "Contemporary dictionaries define 'initiate' as '[t]o begin, commence, enter upon; to introduce, set going, give rise to, originate, "start" (a course of action, practice, etc.'" *Elec. Priv. Info. Ctr. v. U.S. Dep't of Com.*, 356 F. Supp. 3d 85, 89 (D.D.C. 2019) (alteration in original) (citations omitted), *vacated and remanded on other grounds*, 928 F.3d 95 (D.C. Cir. 2019). The relevant definition of "new" is "[h]aving been made or come into being only a short time ago; recent" or "[n]ever used . . . before now." *The American Heritage College Dictionary* 936 (4th ed. 2002); *see also Merriam-Webster's Tenth* at 780 ("having existed or having been

[33] *See, e.g.*, *McLaughlin v. Kings Island, Div. of Taft Broad. Co.*, 849 F.2d 990, 995 (6th Cir. 1988); *United States v. D.F.*, 63 F.3d 671, 684 n.20 (7th Cir. 1995), *judgment vacated on other grounds*, 517 U.S. 1231 (1996); *Canal Refin. Co. v. Corrallo*, 616 F. Supp. 1035, 1037–38 (D.D.C. 1985).

made but a short time" or "different from one of the same category that has existed previously"). Here, the Division seeks information that states are already required to collect and maintain. *See* 52 U.S.C. § 21083(a)(1)(A); 44 U.S.C. § 3502(3)(A). As a result, the Division's demands for election-related information do not require states to introduce any recordkeeping or collection requirements that did not previously exist.

One could argue that the collection is new to the federal government even if states had already collected the information from their local governments. It is far from apparent to us that the transfer of data that has already been collected implicates the type of privacy interests that Congress had in mind. But even if it did, through a series of statutory cross-references, Congress has excluded most (if not all) federal enforcement proceedings. Specifically, section 208 takes its definition of "collection of information" from 44 U.S.C. § 3502(3), *see* E-Government Act § 201, 116 Stat. at 2910, which excludes any "collection of information described under section 3518(c)(1)," 44 U.S.C. § 3502(3)(B). Section 3518(c)(1) generally exempts from section 208 the collection of information in federal criminal investigations, *see id.* § 3518(c)(1)(A); civil actions to which the federal government or an agency is party, *see id.* § 3518(c)(1)(B)(i); and most "administrative action[s] or investigation[s]," *id.* § 3518(c)(1)(B)(ii). With that said, section 208 does apply "to the collection of information during the conduct of general investigations" outside of the antitrust context "undertaken with reference to a category of individuals or entities such as a class of licensees or an entire industry." *Id.* § 3518(c)(2). Apart from that proviso for general investigations, your inquiry would fall squarely into one of the three excluded categories. We do not think the general-investigations proviso, however, applies. Your inquiry is certainly widespread, but the phrasing of that proviso—and particularly the exclusion of antitrust actions—indicates that a "general investigation" of a class or industry refers to an investigation *of the group as a group* rather than widespread investigation of such a group or industry's members, such as your investigation in to HAVA and NVRA compliance by various states.[34]

[34] *See, e.g.*, 30 U.S.C. § 3 (empowering the Bureau of Mines to investigate the "mining, quarrying, metallurgical, and other mineral industries"); 43 U.S.C. § 316n (authoriz-

## IV.

Finally, we have identified no impediment to the Division sharing with HSI or another unit within DHS—or DHS receiving—the statewide voter registration lists for the purpose of identifying individuals (including illegal aliens) who are ineligible to vote. Neither the Civil Rights Act itself nor the doctrine of equitable estoppel restricts the Division from sharing the lists.[35] The Privacy Act imposes certain restrictions, but the Division's proposed sharing can be done in a way that satisfies at least two of the statute's exceptions.

### A.

The Civil Rights Act imposes no limits on the Division's ability to share the statewide voter registration lists acquired pursuant to section 303 under circumstances presented here. Congress knows how to "establish[] an absolute prohibition on disclosure of information." *Telematch, Inc. v. U.S. Dep't of Agric.*, 45 F.4th 343, 352 (D.C. Cir. 2022). Congress also knows how to pass a statute under which "[d]isclosure . . . is prohibited unless for a purpose permitted by an exception." *Maracich v. Spears*, 570 U.S. 48, 52 (2013); *see also, e.g.*, *U.S. Dep't of Def. v. FLRA*, 510 U.S. 487, 498–99 (1994); *United States v. Woodward*, 256 U.S. 632, 634 (1921). The CRA falls in the latter category: Although it generally prohibits disclosure of materials obtained pursuant to section 303, one of the exceptions available under the Privacy Act is disclosure "to . . . governmental agencies." 52 U.S.C. § 20704.

### B.

This analysis is not changed by the Division having represented to certain states that it would use their voter registration lists solely for list-

---

ing the Secretary of Agriculture to investigate the reindeer industry in Alaska); *cf.* 19 U.S.C. § 1862(b)(1)(A) (empowering the Secretary of Commerce to investigate the import of "articles" on national security).

[35] HAVA requires a state motor-vehicle authority to enter into an agreement with the Commissioner of Social Security for the purposes of verifying that applicable information is accurate, *see* 52 U.S.C. § 21083(a)(5)(B)(ii), and this agreement shall "include . . . safeguards to assure the maintenance of [such information's] confidentiality," 42 U.S.C. § 405(r)(9)(A)(ii). But nothing in either the Civil Rights Act or HAVA restricts CRT's ability to share voter registration lists obtained under section 303.

maintenance purposes. Any argument to the contrary would sound in equitable estoppel, which does not preclude the Division from using lists acquired in such a manner for other purposes.

"From [its] earliest cases," the Supreme Court has "recognized that equitable estoppel will not lie against the Government as it lies against private litigants." *OPM v. Richmond*, 496 U.S. 414, 419 (1990). The Court has acknowledged that arguments for "a flat rule that estoppel may not in any circumstances run against the Government" are "substantial." *Id.* at 423 (quoting *Heckler v. Cmty. Health Servs. of Crawford Cnty., Inc.*, 467 U.S. 51, 60 (1984)). And although the Court has yet to adopt such a categorical rule in most contexts,[36] it has (1) declined to hold that even "some type of 'affirmative misconduct' might give rise to estoppel against the Government," *id.* at 421; (2) suggested that, at a minimum, "extreme circumstances" would be necessary in order to equitably estop the United States, *id.* at 434; and (3) "reversed every finding of estoppel" against the United States that it has reviewed, *id.* at 422.

Even if equitable estoppel could run against the government, a party cannot successfully invoke it against the United States "without at least demonstrating that the traditional elements of an estoppel are present." *Heckler*, 467 U.S. at 61. These include (among other things) that (1) the United States made "a definite misrepresentation of fact" upon which (2) the party seeking estoppel acted "in reasonable reliance," resulting in a "detrimental change in position." *Id.* at 59, 61. A state could not establish either in this circumstance.

*First*, based on the facts as we understand them, the states cannot show that the Division has made "a definite misrepresentation of fact," *id.* at 59, because there are no facts supporting any "allegation that [a federal] official knowingly misled" any state. *Statute of Limitations and Settlement of Equal Credit Opportunity Act Discrimination Claims Against the*

[36] The Supreme Court has suggested that estoppel will not lie against the United States "in matters of national and international concern." *Sanitary Dist. of Chi. v. United States*, 266 U.S. 405, 427 (1925); *see also United States v. California*, 332 U.S. 19, 39–40 (1947). Because a state cannot satisfy even the traditional elements of equitable estoppel here, as explained further in this Part, we do not consider whether a state's estoppel claim also would fail on the ground that it implicates matters of national concern. *See Rann v. Chao*, 346 F.3d 192, 197 (D.C. Cir. 2003); *United States v. Harvey*, 661 F.2d 767, 775 (9th Cir. 1981).

*Department of Agriculture*, 22 Op. O.L.C. 11, 28 (1998) ("*Equal Credit*"); *see also, e.g.*, *Henshaw v. Bissell*, 85 U.S. (18 Wall.) 255, 271 (1874) (requiring "some degree of turpitude in his conduct which has misled others to their injury"). The Division has represented to us that it had no intention of using the statewide voter registration lists to identify illegal aliens for immigration enforcement at the time that it demanded these lists from states, and we are aware of no such intention today. There cannot be "estoppel by silence concerning facts of which defendants may have had no actual knowledge," *Wiser v. Lawler*, 189 U.S. 260, 270 (1903), because no one "knowingly misled" states regarding the purpose for seeking the lists, *see Equal Credit*, 22 Op. O.L.C. at 28.

*Second*, we do not think that the states can demonstrate a "detrimental change in position," *Heckler*, 467 U.S. at 59, resulting from any claimed misrepresentation by the Division. A party "cannot raise an estoppel without proving that it will be significantly worse off than if" the party it seeks to estop "had never" made the alleged misrepresentation in the first place. *Id.* at 63. Had the Division informed the states ahead of time that it would use their statewide voter registration lists to identify illegal aliens as well as others who are ineligible to vote, the states still would have needed to produce their lists to the Division upon its demand, for all the reasons that we have already explained above. *See supra* Parts II–IV.A. A party cannot, for example, estop the United States from recovering funds "to which [the party] was not entitled . . . in the first place," for the simple reason that the party is not made "significantly worse off than if it had never obtained the . . . funds in question." *Heckler*, 467 U.S. at 53, 61, 63. And of course, a state that refused to comply with the Division's section 303 demand plainly cannot show detrimental reliance.

### C.

By contrast, the Privacy Act *does* restrict the Division from "disclos[ing] any record" that falls within the Division's ambit "except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains," unless an enumerated exception to the general prohibition on disclosure applies. 5 U.S.C. § 552a(b). But at least two such exceptions apply in this circumstance: the law-enforcement exception and the routine-use exception.

**1.**

Most directly on point, the Privacy Act authorizes disclosure for law-enforcement purposes. Specifically, it allows disclosure to a broad range of "agenc[ies]" or "instrumentalit[ies]" (1) "for a civil or criminal law enforcement activity" that (2) "is authorized by law," if (3) "the head of the agency or instrumentality has made a written request" that meets certain requirements. *Id.* § 552a(b)(7). Although we have not been provided a copy of any relevant request from HSI (or any other DHS unit), we see no reason why the Division sharing the voter registration lists could not be done in a way that satisfies each of these elements.

*First*, for many of the reasons already discussed, because HSI would use the voter registration lists to investigate voter fraud by (among others) illegal aliens, disclosure would be for a law-enforcement activity. *See supra* Part III.A.1; *see also, e.g.*, *United States v. Collins*, 596 F.2d 166, 169 (6th Cir. 1979); *Manivannan v. U.S. Dep't of Energy*, No. 2:18-CV-00297-MPK, 2024 WL 3046476, at *14 (W.D. Pa. June 18, 2024), *aff'd*, No. 24-2337, 2025 WL 1742785 (3d Cir. June 24, 2025); *Gonzalez v. United States*, No. 8:07-CR-00202-DOC-6, 2021 WL 9747618, at *4 (C.D. Cal. June 11, 2021); *SEC v. Dimensional Ent. Corp.*, 518 F. Supp. 773, 777 (S.D.N.Y. 1981).

*Second*, although an admittedly closer question, our view is that HSI is authorized by law to investigate such voter fraud. As already noted, the Attorney General is authorized to "conduct the criminal litigation of the United States Government." *Nixon*, 418 U.S. at 694. Prior to Congress's enactment of the Homeland Security Act, the Attorney General also had full authority, which he had delegated to the Immigration and Naturalization Service ("INS"), to "administer and enforce the Immigration and Nationality Act and all other laws relating to immigration (including but not limited to admission, exclusion, and deportation)," subject to certain limited exceptions not relevant here. 28 C.F.R. § 0.105(a) (2002); *see also* 8 C.F.R. § 100.2(a) (2002). Sections 611(a) and 1015(f) of title 18 to the U.S. Code, which criminalize voter fraud by illegal aliens and were enacted as part of IIRIRA, are in any reasonable sense "laws relating to immigration." 8 C.F.R. § 100.2(a) (2002); 28 C.F.R. § 0.105(a) (2002); *see also Coventry Health*, 581 U.S. at 96; *Milner*, 562 U.S. at 566 n.1; *Morales*, 504 U.S. at 383.

The Homeland Security Act transferred from INS to the newly established DHS, as relevant here, the law-enforcement "functions performed under . . . [t]he investigations program." HSA § 441, 116 Stat. at 2192 (codified at 6 U.S.C. § 251); *see also* 6 U.S.C. § 542(a) (directing the President to transmit to certain congressional committees the corresponding reorganization plan for DHS). The Secretary of Homeland Security, in turn, delegated to Immigration and Customs Enforcement ("ICE") what had been "[INS's] interior enforcement functions, including. . . the investigations program." H.R. Doc. No. 108-32, at 3 (2003). As with many issues relating to the organization of DHS, the exact mechanisms are a bit messy.[37] But the upshot is that since 2003, *see Flores v. Bondi*, No. 2:85-CV-04544-DMG-AGR, 2025 WL 2995478, at *1 (C.D. Cal. Aug. 15, 2025) (recognizing that the 2003 reorganization plan remains in force), ICE has had the authority to investigate violations of 18 U.S.C. §§ 611(a) and 1015(f). Our understanding based on our conversations with the Division is that ICE has delegated such authority to HSI. For these reasons, HSI's investigation of voter fraud by illegal aliens "is authorized by law." 5 U.S.C. § 552a(b)(7).[38]

*Third*, the Division should have little difficulty satisfying the law-enforcement exception's procedural requirements. The exception authorizes disclosure of information to an agency "if the head of the agency" seeking the record "has made a written request to the agency which maintains the record specifying the particular portion desired and the law enforcement activity for which the record is sought." *Id.*

This requirement "assur[es] some high level evaluation of the need for the information," but is not particularly onerous. *Doe v. DiGenova*, 779 F.2d 74, 84 (D.C. Cir. 1985). The request must be in writing. *See United States Secret Service Use of the National Crime Information Center*, 6 Op. O.L.C. 313, 323 n.22 (1982); *Covert v. Harrington*, 876 F.2d 751,

---

[37] *See* Dep't of Homeland Sec., Delegation No. 7030.2, *Delegation of Authority to the Assistant Secretary for U.S. Immigration and Customs Enforcement* § 2(C) (Mar. 1, 2003), https://perma.cc/8X3S-J87F; *see also Umanzor-Chavez v. Noem*, No. 8:25-CV-01634-SAG, 2025 WL 2467640, at *5 (D. Md. Aug. 27, 2025); *Margallo-Gans v. USCIS*, No. 1:21-CV-02898-APM, 2024 WL 1212778, at *4 (D.D.C. Mar. 20, 2024).

[38] Because 6 U.S.C. § 251(4) authorizes DHS to investigate violations of 18 U.S.C. §§ 611(a) and 1015(f), we do not address here whether 8 U.S.C. § 1103(a)(1) and 19 U.S.C. § 1589a(3) do as well.

754 n.2 (9th Cir. 1989). And it should specify that DHS seeks the statewide voter registration lists for the purpose of investigating violations of 18 U.S.C. §§ 611(a) and 1015(f), and specifically to identify illegal aliens who have registered to vote or have voted. There are, however, several officials within DHS who can likely provide the request that the information be shared, as the Privacy Act's definition of "agency" includes both cabinet departments and their various components. *See Loc. 2855, Am. Fed'n of Gov't Emps. v. United States*, 602 F.2d 574, 578 n.5 (3d Cir. 1979); *Ramer v. Saxbe*, 522 F.2d 695, 697 (D.C. Cir. 1975); *cf. Tran v. Dep't of Treasury*, 351 F. Supp. 3d 130, 136–37 (D.D.C. 2019), *aff'd*, 798 F. App'x 649 (D.C. Cir. 2020).

In this instance, the Secretary of Homeland Security, the Senior Official Performing the Duties of the Director of ICE, and the Acting Executive Associate Director for HSI, or their designees, among others, may request the statewide voter registration lists from the Division under the law-enforcement exception. 5 U.S.C. § 552a(b)(7); 6 C.F.R. § 5.20(b)(1), (c). So long as any of these officials make the request, we believe that the request would satisfy the law-enforcement exception's requirements.

**2.**

Even apart from the law-enforcement exception, the Privacy Act authorizes disclosure of covered information "for a routine use as defined in subsection (a)(7) of this section and described under subsection (e)(4)(D) of this section." 5 U.S.C. § 552a(b)(3). As explained above, whenever an agency establishes or revises a system of records, it must publish a new SORN. *See supra* Part III.A.2. The SORN must include "each routine use of the records contained in the system, including the categories of users and the purpose of such use." 5 U.S.C. § 552a(e)(4)(D).

Because the Division's sharing of the voter rolls would comply with its longstanding SORN, it also complies with the routine-use exception to the Privacy Act. Specifically, the SORN for the Central Index File provides, in relevant part:

> A record maintained in this system of records may be disseminated as a routine use of such records as follows: . . . In the course of . . . the investigation or litigation of a case or matter, a record may be disseminated to a Federal . . . agency . . . if there is reason to believe

> that such agency . . . possesses information or has the expertise in an official or technical capacity . . . to analyze information relating to the investigation . . . and the dissemination is reasonably necessary to elicit such . . . information or expert analysis . . . .

68 Fed. Reg. at 47,611. Here, the Division is investigating, among other things, voter fraud, including by illegal aliens. *E.g.*, Dhillon Memorandum at 1 (citing 52 U.S.C. § 21083(a)(5)(A)(i)). As it is the entity charged with maintaining databases relating to illegal immigration, we see little doubt that DHS "possesses information or has the expertise in an official or technical capacity . . . to analyze information relating to the investigation." 68 Fed. Reg. at 47,611. And the Division does not have the capacity internally to identify illegal immigrants who are on states' voter rolls, so its sharing these lists with DHS also "is reasonably necessary to elicit such assistance, information or expert analysis." *Id.*

One counterargument is that this understanding of what use qualifies as routine runs against the principle recognized by the D.C. Circuit that an agency "may not utilize the 'routine use' exception to circumvent the mandates of the Privacy Act." *Doe v. Stephens*, 851 F.2d 1457, 1466 (D.C. Cir. 1988). Although we have characterized that ruling as "reasonable" and "likely" to be "followed in future decisions," Memorandum for Donald L. Ivers, Acting General Counsel, Department of Veterans Affairs, from William P. Barr, Assistant Attorney General, Office of Legal Counsel, *Re: Interpretation of Subsections 552a(b)(3) and (b)(7) of the Privacy Act (5 U.S.C. § 552a) in Light of* Doe v. DiGenova*, 779 F.2d 74 (D.C. Cir. 1985) and* Doe v. Stephens*, 851 F.2d 1457 (D.C. Cir. 1988)* at 11 (Aug. 28, 1989), it must be read in conjunction with the principle that the very purpose of the routine-use exception is to enable disclosures "which would otherwise violate the [Privacy] Act," *Swenson v. U.S. Postal Serv.*, 890 F.2d 1075, 1078 (9th Cir. 1989).

Neither we nor the courts have elucidated a clear standard for when a routine use crosses the line to circumventing more specific provisions in the Privacy Act, but we do not understand CRT to be attempting to circumvent the law enforcement exception for at least three different reasons. *First*, we have already concluded that the more specific provision—the law-enforcement exception—is satisfied. *See supra* Part IV.C.1. *Second*, the normal concerns that inhere in circumvention are not present here because no one appears to be attempting to use the routine-use

exception to evade the limitations on the law-enforcement exception.[39] Instead, whereas the law-enforcement exception's purpose is to facilitate the receiving entity's own law-enforcement activity, *see* 5 U.S.C. § 552a(b)(7), the routine-use exception's purpose is to enable a receiving entity to assist the sharing agency's investigation, *see* 68 Fed. Reg. at 47,611. Because these provisions serve different purposes, relying on the routine-use exception would not circumvent the limits on the law-enforcement exception. *Third*, precisely because the routine-use exception only applies to facilitate the Division's *own* investigation, it is actually the *more* restrictive exception, as the law-enforcement exception allows the receiving agency to use the record for *any* authorized law-enforcement activity. *Compare* 68 Fed. Reg. at 47,611, *with* 5 U.S.C. § 552a(b)(7). Under such circumstances, circumvention is not a concern, and either exception will allow the Division to share the records with DHS.

**V.**

In sum, we conclude that section 303 of the Civil Rights Act authorizes the Division to seek statewide voter registration lists from states. Moreover, the Privacy Act, Driver's Privacy Protection Act, and E-Government Act do not limit that authority. Finally, no other legal restriction impedes the Division from sharing the lists with DHS as part of its effort to identify individuals who are ineligible to vote, including—in DHS's specific jurisdiction—illegal aliens.

LANORA C. PETTIT
*Principal Deputy Assistant Attorney General*
*Office of Legal Counsel*

---

[39] *See McConnell v. Fed. Election Comm'n*, 540 U.S. 93, 131 (2003), *overruled on other grounds by Citizens United v. Fed. Election Comm'n*, 558 U.S. 310 (2010); *G. & C. Merriam Co. v. Webster Dictionary Co.*, 639 F.2d 29, 40 (1st Cir. 1980); *Holloway v. Bristol-Myers Corp.*, 485 F.2d 986, 990 (D.C. Cir. 1973); *United States v. Amalgamated Sugar Co.*, 48 F.2d 156, 158 (10th Cir. 1931); *Barnsdall v. Owen*, 200 F. 519, 522 (8th Cir. 1912).

# EXHIBIT 26

91° WATCH

NEWS WEATHER STREAM NOW 2 INVESTIGATES SPORTS TRIPLE TEAM TRAFFIC CLARK HOWARD
COMMUNITY HOUSE 2 HOME STEALS AND DEALS DESTINATIONS DISCOVERED



US citizen detained by ICE at Atlanta Airport as...

Resize:

Drag to Resize Video

LOCAL

# US citizen detained by ICE at Atlanta Airport as he boarded flight

NOW PLAYING ABOVE

US citizen detained by ICE at Atlanta Airport as he boarded flight

By **Ashlyn Webb, WSB-TV**
August 11, 2026 at 8:56 am EDT

By **Ashlyn Webb, WSB-TV**
August 11, 2026 at 8:56 am EDT

CLAYTON COUNTY, Ga. — A Cartersville man said ICE agents wrongly detained him at Hartsfield-Jackson Atlanta International Airport.

The American citizen told **Channel 2's Ashlyn Webb** that he's still shaken by what happened.

John Phillips had made it through TSA, had his ID checked and went through facial recognition before agents stopped him as he was boarding, he said.

ADVERTISEMENT




Bodies found on Georgia mountain identified,...

Discover

“I’ll never approach a door of an aircraft without wondering if there’s guys standing back there,” he said.

It was supposed to be a routine work trip to Las Vegas, but a Delta agent told him the airline was working to upgrade his seat.

He just needed to board last.

Phillips says three ICE agents in tactical gear stopped him in the jet bridge, pinned him to the wall and put him in handcuffs.

He says he didn’t resist but told them he was an American citizen.

**[DOWNLOAD: Free WSB-TV News app for alerts as news breaks]**

“They cuff me and start asking me, ‘What’s your name? What’s your birthday?’” he said.

He says after about five minutes in handcuffs, agents found his Georgia ID and showed him a picture of the man they were actually looking for.

“He looks nothing like me, other than that he’s a white guy and I’m a white guy,” Phillips said.

Agents told him the other man was from England but shared his name and birthday.

Immigration attorney Charles Kuck said ICE still must have probable cause to make an arrest.

“There is no probable cause here. A matching name and birth date is not probable cause,” Kuck said.

Phillips now wants to know how this happened.

“I just am flabbergasted that all of the security that we have at the airport, that they don’t know that I am the John Phillips that lives in Georgia and is not an English guy,” he said.

Delta released a statement which read in part:

*“Delta employees do not have insight into or control over law enforcement decisions, and our role is to ensure flights operate safely and customers are treated with respect. We are reviewing this event internally and are reaching out to the customer directly.”*

ICE confirmed the incident and shared a statement with **Channel 2 Action News** that read:

> *ICE conducts targeted enforcement actions based on investigative leads and available identifying information. In this instance, officers briefly encountered an individual at the*

> *airport during an ongoing enforcement effort. After additional verification determined the individual was not the person sought, officers promptly released him.*
>
> *The encounter occurred outside public view to minimize disruption to airport operations and protect the individual's privacy. ICE takes seriously its responsibility to conduct enforcement activities professionally, lawfully, and with appropriate safeguards.*
>
> *For operational and privacy reasons, ICE does not discuss specific investigative details or information involving individuals who are not taken into custody.*

**[SIGN UP: WSB-TV Daily Headlines Newsletter]**

*©2026 Cox Media Group*

Read Next



Removed Stockbridge mayor breaks sil

2 Join the Conversation View Comments

Ask a Pro: "How Long Does $2.5 Million Last in Retirement?"

This quiz matches over 50,000 people each month with vetted finar Start Now

SmartAsset | Sponsored

Live Sports on ESPN

Stream NFL, NBA, NHL, College Football, and more on the ESPN App.

ESPN | Sponsored Sign up

The Little Blue Tablet That's Bringing Couples Closer

Men over 50 are quietly adding this rapid-dissolve supplement to their day— and their partners are noticing the difference.

**Health Wellness** | Sponsored

Learn More

Why Couples Over 50 Are Feeling Like Newlyweds Again

It dissolves under the tongue in seconds. This sublingual formula is designed to support men's vitality naturally — no prescription needed.

**Health Wellness** | Sponsored

Learn More

10 Things To Know About The SURI 2.0 Before Your Next Trip

**Popdust** | Sponsored

Learn More

We've tested 27 popular teeth whitening products: These 5 are the best

Here are the 5 winners

**Consumer Reviews** | Sponsored

Learn More

Massachusetts: Worst Car Insurance Companies for Overcharging (Is Yours On The List?)

Drivers Had No Idea They Could Do This

**Comparisons.org** | Sponsored

Learn More

Cardiologists Say Blood Pressure Isn't Just About Age — You Consume the Real Cause Every Day

**Heart Health** | Sponsored

Derek Chauvin: Unconfirmed Reports Of A Pardon Have Minnesota Officials Preparing

**Blavity.com** | Sponsored

New SUVs With Tiny Price Tags (Take A Look)

**SearchResultOffers | Search Ads** | Sponsored

Learn More

NYC to Nice in Style with La Compagnie

For business travel, La Compagnie offers an all-business-class experience from New York to Nice. Enjoy comfort, efficiency, and top-tier service, making your journey as productive as it is luxurious.

**La Compagnie** | Sponsored

Book Now

Women With $1M+: Learn 5 Ways to Prepare for Medical Inflation

**Fisher Investments** | Sponsored

Learn More

Women With More Than $1M: Turn Your Investments Into Retirement Income

**Fisher Investments** | Sponsored

Learn More

Operator of 314 Wendy's locations in the US files for bankruptcy protection

Former Georgia deputy pleads guilty to incest charges

Donald Trump Jr.'s wedding celebration was partially funded by Russian oligarch, the couple confirms

Meghan’s mansion proves why she left, here's how it looks inside

**Little Fries** | Sponsored

Misplacing Things Lately? Experts Say: Notice If You Often Say These 3 Phrases

**Today 55+: Neuro Health** | Sponsored

Average Cost To Rent A Private Jet May Surprise You! (Take A Look)

**SearchResultOffers | Search Ads** | Sponsored

Learn More

Fly La Compagnie with Ultimate Flexibility

Experience 100% business-class flights from NY to Paris, Milan & Nice. Book your trip with La Compagnie today and edit existing bookings absolutely free of charge. Travel in unparalleled comfort and luxury without any change fees.

**La Compagnie** | Sponsored

Book Now

Seniors Above 55 Years Of Age Can Now Fly Business Class For The Price of Economy
Americans Nationwide Are Booking Luxury Flights for Economy Cost
**Smart Travel Tips** | Sponsored
**Learn More**

2 brothers shot, killed after fight over football game days ago, mother says
**WSB-TV Channel 2 - Atlanta**

Georgia mom killed in four-wheeler crash
**WSB-TV Channel 2 - Atlanta**

It's Not Salt: Doctors Now Tie High Blood Pressure to a Drink Most Seniors Have Before 9AM
**Blood Prill** | Sponsored
**Learn More**

We've tested 27 popular teeth whitening products: Here are the 5 winners
**Consumer Reviews** | Sponsored
**Learn More**

Hiroshi Closes His Knife Shop After 55 Years
**Sakura Knives** | Sponsored
**Learn More**

ADVERTISEMENT



*Forecast from Chief Meteorologist*

**Brad Nitz**

AMS CERTIFIED

| NOW | 9 PM | 12 AM |
|---|---|---|
| 91° | 76° | 74° |





ADVERTISEMENT


## Most Read



**2 brothers shot, killed after fight over football game days…**



**11-year-old, 12-year-old boys killed in shooting identified**




**University student found dead, GBI doing medical examination**



**Georgia mom killed in four-wheeler crash**




**SNAP benefits changing in Georgia; benefits increasing…**




AdChoices Sponsored

## You May Like

**Football Season on ESPN**

ESPN

**Former Governor Nikki Haley Says Georgia-Bor…**

Blavity.com

**Refresh your look this season with Shady Rays'…**

Shady Rays

**Things I Wish I Knew Before Trying SURI 2.0**

Popdust

**What Does A New Roof Cost For A 1,500 Sq. Ft. Home?**

Home Living Report

Sponsored Links by Taboola

ADVERTISEMENT

NEWS

Local

Watch Live

Nation/World

Triple Team Traffic

WEATHER

Current Conditions

Stormtracker 2HD Radar

5 Day Forecast

CONTACT US

About WSBTV

What's On WSBTV

EEO Statement

Advertise with WSBTV

WSBTV Public File

FCC Applications

Editorial Guidelines

FOLLOW US

**© 2025 Cox Media Group.** This station is part of Cox Media Group Television. Learn about **careers** at Cox Media Group. By using this website, you accept the terms of our **Visitor Agreement** and **Privacy Policy**, and understand your options regarding **Ad Choices**.

**Manage Cookie Preferences** | **Do Not Sell or Share My Personal Information**

# EXHIBIT 27

U.S. Department of Homeland Security

# DHS Directs ICE to Deport Aliens Who Vote in American Elections

**Release Date:** June 9, 2026

*The Immigration and Nationality Act directs the removal of aliens who illegally vote in American elections*

WASHINGTON – The United States Department of Homeland Security (DHS) released the following statement after DHS General Counsel James Percival directed U.S. Immigration and Customs Enforcement (ICE) to enforce stricter penalties, including deportation, for aliens who **illegally vote in American elections.**

In a letter to ICE leadership, DHS points out that the Immigration and Nationality Act directs the removal of aliens who illegally vote or make a false claim to U.S. citizenship, which often go hand-in-hand. These provisions even allow for the removal of aliens legally in the U.S. if they illegally participate in our elections. A criminal conviction is not required to invoke these provisions.

*"The importance of free, fair, and honest elections is without question. Echoing the words of President Trump, 'the right of American citizens to have their votes properly counted and tabulated, without illegal dilution, is vital to determining the rightful winner of an election,'"* said **DHS General Counsel James Percival.** *"Illegal voting by aliens dilutes the votes of American citizens and undermines our democracy. It must have consequences."*

This directive will help to further implement policies like those that President Donald J. Trump enacted with Executive Order 14248 (https://www.whitehouse.gov/presidential-actions/2025/03/preserving-and-protecting-the-integrity-of-american-elections/) , *Preserving and Protecting the Integrity of American Elections*, signed on March 25, 2025. That order directs actions across the federal government, including with regard to verifying voter eligibility, grant administration, information-sharing, enforcement of federal integrity laws, improving voting systems, and criminal prosecution of unlawful voting by aliens.

# # #

## Topics

[HOMELAND SECURITY ENTERPRISE (/TOPICS/HOMELAND-SECURITY-ENTERPRISE)]

[IMMIGRATION AND CUSTOMS ENFORCEMENT (/TOPICS/IMMIGRATION-AND-CUSTOMS-ENFORCEMENT)]

## Keywords

ELECTION SECURITY (/KEYWORDS/ELECTION-SECURITY)

IMMIGRATION AND CUSTOMS ENFORCEMENT (ICE) (/KEYWORDS/IMMIGRATION-AND-CUSTOMS-ENFORCEMENT-ICE)

IMMIGRATION ENFORCEMENT (/KEYWORDS/IMMIGRATION-ENFORCEMENT) EXECUTIVE ORDER (/KEYWORDS/EXECUTIVE-ORDER)

PRESIDENT TRUMP (/KEYWORDS/PRESIDENT-TRUMP)

Last Updated: 06/10/2026

# EXHIBIT 28

The Washington Post
Democracy Dies in Darkness
molly.golski

Advertisement

Immigration

# Immigration officers are being diverted to Trump's voter-fraud effort

The reassignment is the latest step to marshal the federal government behind Trump's unsupported claim that noncitizens vote enough to change U.S. elections.

August 25, 2026

6 min Summary 157 Make us preferred on Google



Voters at an Exeter, New Hampshire, polling place in 2016. (Elise Amendola/AP)

By Ted Hesson

Hundreds of federal immigration officers responsible for vetting the applications of people seeking a legal status in the United States are being reassigned to search for potential voter fraud, three former officials told The Washington Post.

Fraud detection officers with U.S. Citizenship and Immigration Services have been tasked with screening voter data to look for noncitizens who registered to vote, said the former officials, who spoke on the condition of anonymity to discuss internal security operations. The officers' work screening immigration applications for false information and possible security threats has effectively ground to a halt, they said.

Advertisement

The reassignment is the latest step in a broad campaign by President Donald Trump to marshal the federal government behind his unsupported claim that noncitizens vote in numbers large enough to change U.S. elections.

Since Trump has returned to office, his administration has shifted the Justice Department's Voting Section away from its traditional focus on discrimination and voter access and toward fraud investigations, sued at least 30 states and the District of Columbia for detailed voter rolls and directed federal agencies to build citizenship lists and search voter records for noncitizens.

The administration says the efforts are needed to protect election integrity. But documented cases of noncitizens voting remain rare, and the campaign has largely focused federal power on identifying people for removal from voter rolls, requiring documentary proof of citizenship and restricting mail-in voting.

"The Department of Homeland Security is working with states to lawfully obtain voter records to cross reference with USCIS information and identify potential aliens that are unlawfully registered to vote or have unlawfully voted in a U.S. election," USCIS spokesman Zach Kahler said.

Homeland Security Secretary Markwayne Mullin has pledged to use his agency's resources to push Trump's voter fraud effort forward. Last month, he threatened to punish states by withholding funds and arresting election officials if noncitizens vote in states that don't participate in federal programs purporting to secure elections.

Advertisement

"We are not going to spend taxpayer dollars reimbursing a state that is refusing to secure our elections," Mullin said.

U.S. Immigration and Customs Enforcement's investigative arm, Homeland Security Investigations, also appears to be involved in Trump's push to find evidence of voter fraud. The agency posted a request for contractors Tuesday who would be responsible for the "handling and secure delivery of publicly available voter registration files and voter history files."

The reassigned USCIS officers are part of the Fraud Detection and National Security Directorate and play a key role in ensuring that "any apparent material doubt or discrepancy" in someone's application is "looked into and cleared up," said Michael Valverde, who was associate director of field operations at USCIS until October 2025.

Immigration lawyers said there could be vast ramifications for scores of people if their work screening immigration applications is slowed down.

"As cases go unadjudicated, individuals fall out of status, becoming susceptible to ICE enforcement," said Shev Dalal-Dheini, senior director of government relations at the American Immigration Lawyers Association.

Trump has moved to restrict legal immigration, implementing travel bans that block people from dozens of countries from obtaining green cards, cutting refugee admissions and halting the diversity visa program, which had been available to people from nations with lower rates of immigration to the U.S.

Advertisement

But federal judges have declared several of those efforts unlawful and ordered the administration to resume processing.

On Friday, U.S. District Judge Jeannette Vargas, a nominee of President Joe Biden, ordered officials to restart handling visa requests for people from 75 countries subjected to a sweeping ban that included applicants from Brazil, Iran, Russia and Somalia.

Another federal judge ordered USCIS in June to resume processing the paperwork of asylum applicants and people from more than three dozen countries covered under another travel ban. In that case, U.S. District Judge John J. McConnell of Rhode Island issued a follow-up order days later that instructed USCIS to immediately restart work on applications and provide evidence of it within 24 hours.

"There is no excuse this time," McConnell wrote. "The government has an obligation to immediately comply with this order."

The redirection of resources is raising concerns over whether USCIS will be able to follow court orders to restart various types of legal immigration processing.

"If they're doing this, clearly they're not adjudicating those cases," one of the former officials said.

A report earlier this year by the National Foundation for American Policy found Trump's restrictive immigration policies could result in 33 percent to 55 percent fewer green cards being issued over his four-year term than if the fiscal 2023 rate continued.

Advertisement

Trump froze refugee admissions from around the world after taking office in January 2025. Weeks later, he launched an effort to bring White South Africans of Afrikaner ethnicity into the U.S. as refugees, claiming they were victims of race-based persecution in majority-Black South Africa.

The government of South Africa strongly denies the claims but has allowed the refugee program to proceed despite diplomatic friction.

Some USCIS vetting officers will also be assigned to the refugee effort for White South Africans, two former officials said. Roughly 10,200 South Africans had entered as of July 31, according to U.S. State Department figures. The only other refugees permitted to enter this fiscal year were three Afghans, the figures show.

The officers reassigned to the voter fraud push will be part of an effort the agency has deemed a top priority, a former USCIS official said.

According to Trump and Mullin, about 278,000 noncitizens are unlawfully registered to vote in federal elections in a number of states where they said the rolls were reviewed. They said 250,000 of those people were in just four states: Nevada, California, Pennsylvania and New Jersey. Their assessment did not include all states.

Advertisement

But election experts say those figures are significantly overstated and note that officials have struggled to find instances of voter fraud by noncitizens to back the president's assertions.

In the case of Nevada, Mullin said in July there may have been some 16,000 noncitizens registered to vote in Nevada and called on Secretary of State Cisco Aguilar, a Democrat, to investigate. But DHS officials later told Aguilar's office that it had only confirmed 185 noncitizens were registered in the state and that more than 14,000 cases still required review, according to emails released through an open records request.

When asked by Nevada officials to provide the names, addresses and dates of birth for the 185 people, DHS declined.

*Aaron Schaffer contributed to this report.*

**What readers are saying**

The comments express strong criticism and concern over Donald Trump's actions and intentions regarding election integrity and voter suppression. Many commenters accuse Trump of perpetuating false claims of voter fraud to justify intimidating tactics, such as deploying ICE agents... Show more

This summary is AI-generated. AI can make mistakes and this summary is not a replacement for reading the comments.

Comments 157

**Popular articles**



**Column** Trisha Pasricha

As a doctor, here's one drugstore medication I tell people to rethink

Earlier today



He spent 11 months inside DOGE. Now he wants to set the record straight.

Earlier today



How Trump turned a refugee bureau into a $410 million deportation operation

Earlier today

View 3 more stories

# EXHIBIT 29

# Voting officials fear DHS may actually be a threat to elections this year

JUNE 16, 2026 · 5:00 AM ET

Miles Parks





Secretary of Homeland Security Markwayne Mullin speaks during a June 11 press conference.

*Oliver Contreras/AFP via Getty Images*

*Stay up to date with our Politics newsletter, sent weekly.*

Gary Berntsen is convinced Venezuela stole the 2020 U.S. election.

That myth has been debunked numerous times, including as part of Fox News' 2023 $787 million settlement with voting machine company Dominion, but Berntsen, a former CIA operative, has been pushing it for years.

"One of the things that we learned is there's 14 different technical ways that you can steal an election," Berntsen explained in an interview in the fall with conservative podcaster Lara Logan.

But ahead of the 2024 election, Berntsen says he couldn't get anyone to listen to him. Not the FBI. Not the media.

Finally, he went to Congress, where he says he was similarly rebuffed by almost everyone, including Republicans. Except one.

"One politician in America was not afraid," Berntsen told Logan. "It was Markwayne Mullin of Oklahoma."

Allies of Berntsen say Mullin — then a U.S. senator, now the head of the Department of Homeland Security — brokered a meeting at Mar-a-Lago so Berntsen could brief President Trump's team on conspiracy theories about Venezuelan interference in elections.

That is just one time of many that Mullin has gone to bat for election denial.

"[D]ue to all of the fraud and uncertainty surrounding the 2020 election there is no way I can vote to certify the Electoral College," Mullin wrote online on Jan. 2, 2021. Four days later, after a mob overran the U.S. Capitol during the certification, Mullin was one of 147 congressional Republicans who still voted not to certify the results.

Mullin's history of false election fraud claims has heightened concerns that voting officials have had for more than a year: that DHS will not be a partner helping to secure elections, but rather a threat seeking to undermine results that Trump dislikes.



ELECTIONS

**Republicans' sweeping election overhaul fails in the Senate**

ELECTIONS

**The Justice Department plans to share sensitive voter data with Homeland Security**

Numerous local election officials, across the political spectrum, have told NPR they are avoiding sharing voter data or other security information with the federal government for fear that information could be used against them in some way.

"I'm actively discouraging it," said Matt Crane, a former Republican county clerk who now runs the professional organization for local election officials in Colorado. "I don't trust how the administration is using that data. I don't trust that they're going to keep it confidential. And so I can't in good conscience advocate that any of my counties do any work with them right now."

Trump has spoken about wanting to "take over" elections in America. And Crane noted that the current DHS point person for elections, Heather Honey, also has a long history of spreading election misinformation.

"All of this points to the fact that these are not trusted partners anymore," Crane said. "They've brought the fox into the henhouse."

## From allies to adversaries

It's hard to overstate how different the federal election security landscape looks heading into this year's midterms, compared with two years ago prior to the last federal campaign.

---

ONLY ON NPR

**As American elections become more tense, officials are turning to local police**

The Trump administration has taken unprecedented steps to investigate local election administration, including taking states to court in an effort to get their private voter registration data and attempting (and in some cases succeeding) to access voting machines and ballots.

Administration officials, like White House border czar Tom Homan, and other Trump allies have seemed open to deploying immigration enforcement to voting locations this fall. That would be against federal law.

"They say illegal aliens don't vote. But … part of DHS' job is [to] secure elections, and I'm not going to say, you know, what our plan is going forward," Homan said on *The Charlie Kirk Show* this spring. "But if only U.S. citizens can vote, I don't see the issue."

At his confirmation hearing in March, Mullin said DHS agents would only be present at polling places if there was a specific threat at those locations.

And in a statement to NPR about this story, DHS said Secretary Mullin is "committed to restoring integrity to our election systems and ensuring that American citizens, and only American citizens, are electing American leaders."

But he now helms a department where most people working on election security issues, at least within its Cybersecurity and Infrastructure Security Agency (CISA), were pushed out or resigned last year. That agency — which Trump created in his first term — has also been without a Senate-confirmed leader for the entirety of

Trump's second term.

Paul Lux, a Republican election supervisor in Okaloosa County, Fla., says the federal government has told local officials it is still providing the same cybersecurity services as were offered under the Biden administration and during Trump's first term, but he has not heard of any counties in Florida that have actually received services from the agency recently.

"You know, try calling somebody at CISA and see who answers the phone," Lux said in an interview earlier this year. "Because at the end of the day, it's been radio silence from CISA when we reach out about just about anything."

In response to a request for comment from NPR, a CISA spokesperson said the agency provides "state and local election officials, upon request, no-cost voluntary services such as the sharing of threat information, technical expertise, vulnerability scanning, and resilience-building support."

But the spokesperson did not detail how many election jurisdictions it has provided services for during Trump's second term.

Until recently, Lux chaired a national cybersecurity partnership for local and state election officials called the Elections Infrastructure Information Sharing and

Analysis Center (EI-ISAC). The organization spawned after Russia's efforts to interfere in the 2016 U.S. election exposed how little threat information was being communicated across the nation's thousands of election jurisdictions.

---

ELECTIONS

**Replacing aging U.S. voting equipment will take years and billions of dollars**

For its first seven years, the EI-ISAC — which provides numerous cybersecurity tools like endpoint protection and malicious domain blocking, in addition to issuing best practices to its members — was funded by the federal government. But in 2025, the Trump administration zeroed out the funding as part of its DOGE cuts.

Election officials are still baffled by how that move and other cuts at DHS square with Trump's language on wanting to secure U.S. elections.

"The actions of defunding and dismantling those protections speak for themselves," said Jocelyn Benson, Michigan's Democratic secretary of state and a candidate for governor. "And it's meant that we as states have had to rebuild networks to protect our respective states from foreign interference. That's not easy. And we can never replicate what the federal government has built and had done."

## A fractured landscape

The EI-ISAC scrambled last year to create a membership model funded by its county and state members, but the organization told NPR that membership is less than 20% of what it was before the federal funding cut.

"So that collective collaboration is unfortunately becoming more fractured," Lux said.

Sen. Mark Warner, D-Va., introduced legislation this month that would restore funding for a broader threat-sharing service that covers all local governments. But there's no indication the bill will gain traction.

Marci Andino, a former South Carolina election official who now runs the EI-ISAC as executive director, said without federal backing, a big challenge is just communicating with the thousands of election jurisdictions. Some are eligible to join the group for free because their state pays for a membership plan, but it's a struggle to reach all of them to let them know that.

"We're continuing to get the message out that the EI-ISAC still exists," Andino said. "We're having to say, 'Hey, we're still here.'"

ONLY ON NPR

**Americans are split on wanting the National Guard to monitor voting, a new poll finds**

In addition to the cybersecurity services the organization provides, the EI-ISAC also plans to stand up a virtual situation room for elections, similar to one that was previously provided by the federal government through CISA.

On Election Day, election officials can log on to share physical or cyber threats they're encountering in real time and see whether other local governments are seeing the same thing.

There was no such space during the off-year elections last year, but the EI-ISAC plans to offer one this year. All members will be invited, but no one from DHS will be there.

If the federal government wants a role in election security again at some point, said Lux, the Florida voting official, they'll be invited back — skeptically.

"[They'll] probably be that uncle that we keep at arm's length at Thanksgiving rather than giving him a big bear hug," Lux said. "But, you know, we'll have to see. Certainly, the relationship has been damaged. And how long it takes to rebuild that trust will depend on how dedicated they are to trying to rebuild that trust."

***NPR does not offer or accept money for coverage or interviews.***
*Anyone who makes such an offer or request is not an NPR employee and does not represent NPR.*

voting stories

## More Stories From NPR

SCIENCE

**A bug commonly sold at pet stores is helping scientists with a vexing task**

ELECTIONS

**How President Trump's efforts to change voting laws may play out in the midterms**

OBITUARIES

**Editor Rose Friedman, who helped shape NPR's cultural coverage, dies at 38**

ELECTIONS

**Inside the unprecedented threats election officials are facing ahead of mid-terms**

**Ballot seizures seemed impossible. But judges and officials are prepping for them now**

**Dolly Parton contained multitudes. We're looking back on these beloved performances**

## Popular on NPR.org

ENVIRONMENT
**This farm raised thousands of pigs for slaughter. Now it's growing mushrooms instead**

OBITUARIES
**Editor Rose Friedman, who helped shape NPR's cultural coverage, dies at 38**

EUROPE
**German chancellor stands his ground after his party loses in state elections**

NEWS
**Trump says his D.C. arch will serve as 'military complex' with snipers and drones**

ELECTIONS
**Many GOP candidates still echo Trump's 2020 claims. Lots of voters want to move on**

IMMIGRATION
**Federal immigration agent shoots and injures man in Austin, Texas**

## NPR Editors' Picks

WORLD

**What to know as world leaders converge at the United Nations this week**

THE AMERICAS

**18 suspects accused in the 2021 killing of Haiti's president being extradited to U.S.**

MEDIA

**CNN, MS NOW and Politico sue Trump after being barred from White House**

WORLD

**Poison suspected in deaths of ten lions in game reserve in Tanzania**

WORLD

**Germany's Merz vows to press ahead with reforms after historic state election defeat**

GLOBAL HEALTH

**PHOTOS: The precarious life of fisherfolk**

# EXHIBIT 30

THE WIRED APP IS HERE DOWNLOAD NOW »



DAVID GILBERT POLITICS MAY 20, 2026 6:00 AM

# Election Officials Are Getting Ready for ICE to Show Up at the Polls

**The Trump administration keeps threatening to send federal agents to oversee elections. State and local officials are preparing, and even gaming out what happens if they're arrested.**




PHOTOGRAPH: JIM VONDRUSKA/GETTY IMAGES

2 SAVE THIS STORY

Listen • 9 minutes

**LAST WEEK, AS** President Donald Trump prepared to leave the White House on his way to China for a state visit, he was asked if he would be willing to deploy troops from the National Guard or agents from Immigration and Customs Enforcement (ICE) to polling locations during November's midterms.

"I would do anything necessary to make sure we have honest elections," Trump responded.

Trump's comments are the latest in a litany of confusing and sometimes contradictory statements from his administration about the possibility of deploying federal agents to oversee the elections. It's already had a chilling effect on voters and election workers.

WIRED spoke to more than a dozen election officials, including secretaries of state and election directors in red and blue states, about the possibility of an ICE deployment to polling locations in November. While some officials say they are not worried, the majority said they had major concerns, especially as these statements come during a much broader attack on elections and democracy from the Trump administration. At least one has actively planned for a scenario in which he's arrested.

With six months to go before the midterms, the officials said they are now scrambling to reassure voters, replace federal election resources eliminated by Trump, and try to plan for scenarios they have never had to contemplate before.

"The state of things is completely different than it has been in any federal

election that I've been a part of," one election director from a western state who requested anonymity to speak openly tells WIRED. "I've been doing this for 21 years now, and this is the first time we've had to start to prepare for, or at least respond to, public questions about federal interference. It's ratcheted up to a whole new level now where there is a possibility [ICE is] going to be at polling places."

**Got a Tip?**

Are you an election worker with insight into what's happening? We'd like to hear from you. Using a nonwork phone or computer, contact David Gilbert at david.gilbert@wired.com or securely on Signal on DavidGilbert.01.

These concerns first began when the Trump administration launched mass deployments of ICE agents to cities like Chicago and Minneapolis. Election officials across the country became concerned that those same agents could show up at polling locations. Prominent figures on the right boosted the idea: "We're going to have ICE surround the polls come November," former White House adviser Steve Bannon told his podcast listeners on February 3, a day after Trump called to "nationalize" elections. "You can whine and cry and throw your toys out of the pram all you want, but we will never again allow an election to be stolen." The call for ICE to be deployed to polling locations is rooted in large part in the baseless conspiracy theory that noncitizens vote in huge numbers, even though noncitizen voting accounts for a vanishingly small fraction of a percent of votes cast during US elections.

When asked about Bannon's claims two days later, White House press secretary Karoline Leavitt refused to rule out the possibility. She said that while she hadn't heard the president discussing "formal plans" to deploy ICE to polling locations, she added, "I can't guarantee that an ICE agent

won't be around a polling location in November."

While the Department of Homeland Security (DHS) later ruled out the possibility that ICE would be deployed to the polls while on a call with scores of election officials, on March 18, the new Homeland Security secretary Markwayne Mullin refused to rule out the possibility during his confirmation hearing, saying he doesn't "understand what the concern about enforcing immigration at polling places is anyways because ... there shouldn't be any illegals at the polling spot."

A week later, during the Conservative Political Action Conference meeting, now acting attorney general Todd Blanche endorsed the idea of ICE at the polls and repeated the conspiracy theory about noncitizens voting as an excuse to deploy ICE. "Why is there objection to sending ICE officers to polling places?" he asked. "Illegals can't vote. It doesn't make any sense."

When asked for comment regarding ICE being deployed to the polls, White House spokesperson Abigail Jackson said, "President Trump has been clear: Securing our elections and ensuring only American citizens vote in American elections is a top priority."

Similarly, a DHS spokesperson referred WIRED to Mullin's comments, adding, "Elections exist for the American people, not illegal aliens, to choose their leaders."

Elections have, as specified by the US Constitution, always been run by the states, and despite Trump and his allies calling for elections to be "nationalized," that will remain the case for the 2026 midterms. Deploying

ICE, the National Guard, or any other armed federal agents to polling locations is illegal under US law.

Political messaging, however, has left election officials and voters unsure about what's to come.

"I think the administration's track record is such that, as much as I reassure people and tell them that we've gotten that assurance [that ICE won't be at polling locations], I'm not sure how much they believe," says an election director from an eastern state. "I'm not sure the administration itself really knows the direction it's going to go in, but we are preparing for all scenarios." The director asked not to be named due to fears of retribution from the government and concerns that federal election funds could be withheld.

In Maine, secretary of state Shenna Bellows sought to get assurances from the government in writing, sending a letter to the DHS in March seeking confirmation that ICE will not be deployed to the polls. The letter was signed by eight other secretaries of state. Months later, Bellows has yet to receive a response.

"We haven't received any satisfactory assurances from the federal government, but we don't expect any," says Bellows. "Donald Trump doesn't get to invade our polling places, seize our ballots, or control our elections just because he wants to. The Constitution and federal law could not be more clear that states, not the federal government, are in charge of elections."

Maine is one of dozens of states the Department of Justice has sued over their refusal to grant access to unredacted voter rolls. Last September, the government filed a lawsuit against Bellows, claiming that in her capacity as secretary of state, Maine had not complied with the National Voter

Registration Act. Bellows has filed a motion to dismiss the lawsuit.

Like many other election directors, Bellows and her colleagues are planning for eventualities they have never had to consider before. “Election officials are the world's best contingency planners,” says Bellows. “In the past, we've planned for natural disasters, for electricity outages, for, most recently, bomb threats, and we have been able to oversee successful elections.”

But while recent elections have brought an unprecedented surge in threats against election officials, the threat of federal interference in elections is something entirely new.

“There have been tabletops and everything else including this type of scenario [of ICE at polling stations],” says Jared DeMarinis, Maryland’s administrator of elections. “We have to prepare now for almost any eventuality that will occur. We even have to include in a tabletop exercise of me getting arrested.”

Election directors are also having to plan without many of the federal resources they have relied upon for years.

In March 2025, the Trump administration ordered the Cybersecurity and Infrastructure Security Agency (CISA) to stop almost all work related to election security and removed the role of regional election security advisers, who served as vital links between federal and local officials. CISA has also cut all funding for the Election Infrastructure Information Sharing and Analysis Center, which ensured the timely sharing of information between federal agencies and state officials. As a result, election officials

are now cobbling together their own systems and networks, communicating in online Zoom meetings and sharing information with colleagues in messaging apps.

Even so, election officials interviewed by WIRED echoed a similar belief: No matter what the Trump administration does, they say, their team will be able to run safe and secure elections.

"We have to assume that the Trump administration is willing to do anything to win," says Bellows. "But I have confidence that a majority of Americans will see these tactics for what they are, the desperate attempts of the nation's biggest loser to interfere, and it won't work."

## You Might Also Like

- **In your inbox:** Upgrade your life with WIRED-tested gear
- McDonald's built a 515-page dossier on me
- **Big Story:** AI is dead—organoids are alive
- The manosphere is a multibillion-dollar grievance industry
- **How to find us:** Add WIRED.com to your preferred sources in Google

David Gilbert is a reporter at WIRED covering disinformation, online extremism, and how these two online trends impact people's lives across the globe, with a special focus on the 2024 US presidential

Case 4:26-cv-10680-AMO Document 10-7 Filed 09/21/26 Page 359 of 1168

election. Prior to joining WIRED, he worked at VICE News. He lives in Ireland. ... Read More

REPORTER

TOPICS POLITICS ELECTIONS DONALD TRUMP REPUBLICANS ELECTION INTEGRITY IMMIGRATION AND CUSTOMS ENFORCEMENT

## Don't Just Keep Up. Get Ahead

Sign up for the *Daily* newsletter to get our biggest stories, handpicked for you each day.

SIGN UP

By signing up, you agree to our user agreement (including class action waiver and arbitration provisions), and acknowledge our privacy policy.

READ MORE

## The Leftist Split Over AI Doom

The left wants AI regulation. They just can't agree on what it should look like or how concerned they should be.

VITTORIA ELLIOTT

## Democrats Have a Plan to Force Trump's Associates to Cooperate Wi...

Case 4:26-cv-10680-AMO Document 10-7 Filed 09/21/26 Page 361 of 1168

## Democrats Have a Plan to Force Trump's Associates to Cooperate With...

Donald Trump's West Wing renovations and DC arch could be on the chopping block, should Democrats win the midterms—they could also be leverage.

HUGO LOWELL

## Trump Probably Won't Give $5,000 to Every US Adult if Republicans...

The eyebrow-raising proposal, delivered during the president's speech at the midterm convention, would cost $1.2 trillion and would need congressional approval.

HUGO LOWELL

## Lawmakers Want States to Crack Down on Flock Cameras—or Pay th...

A new bipartisan effort in Congress to rein in automated license plate readers takes a page from the national drinking age: Comply, or risk losing federal highway funding.

PARESH DAVE

## The FBI Doubles Down on Easing 'Bestiality' Hiring Standards

FBI director Kash Patel claimed to US senators that the removal of a bar on hiring people who had engaged in bestiality was aimed at protecting sexual assault survivors.

TIM MARCHMAN

**A Year After Charlie Kirk's Death, Turning Point Plans to Spend Big on...**

Turning Point will spend tens of millions on ads and turnout, sources say, with a focus on New Hampshire, Arizona, and Nevada.

HUGO LOWELL

## The Supreme Court Just Blocked Trump's Efforts to Control Mail-In...

The ruling bars the United States Postal Service from implementing restrictions that experts and election officials say would upend voting in November.

DAVID GILBERT

## Prediction Market Betting Is Getting People Banned and Arrested

This week on *Uncanny Valley*, we dig into the latest prediction market buzz, Flock's AI-powered police search tool, and how tech bros don't know how to talk about "rouge" AI agents

BRIAN BARRETT

Case 4:26-cv-10680-AMO Document 10-7 Filed 09/21/26 Page 365 of 1168

YOUR PRIVACY CHOICES

# EXHIBIT 31

*Office of the Director*

**U.S. Department of Homeland Security**
500 12th Street, SW
Washington, DC 20536

**U.S. Immigration and Customs Enforcement**

May 11, 2026

The Honorable Jena Griswold
Colorado Secretary of State
1700 Broadway, Suite 550
Denver, Colorado 80290

Dear Secretary of State Griswold:

Thank you for your March 9, 2026 letter to the Department of Homeland Security (DHS). I am responding on behalf of the Department.

In your letter, you ask for confirmation that U.S. Immigration and Customs Enforcement (ICE) officers and special agents will not be present at voting and election administration locations during the 2026 election. As you are aware, ICE's mission is to protect the United States from the cross-border crime and illegal immigration that threaten national security and public safety. This mission is executed through the enforcement of more than 400 federal statutes and focuses on immigration enforcement and combating transnational crime.

Therefore, there is no reason for ICE personnel to be deployed to polling places. ICE officers and special agents are sworn federal law enforcement officials that are responsible for enforcing violations of immigration and criminal laws. However, as the principal investigative component of DHS, ICE Homeland Security Investigations plays an important role in investigating voter fraud and will continue to perform this vital mission.

Thank you again for your letter. Should you wish to discuss this matter further, please contact the ICE Office of Partnership and Engagement via email at iceope@ice.dhs.gov.

Sincerely,

Todd M. Lyons
Senior Official Performing the Duties of the Director
U.S. Immigration and Customs Enforcement

cc: The Honorable Steve Simon
The Honorable Tobias Read
The Honorable Steve Hobbs
The Honorable Alexi Giannoulias
The Honorable Stephanie Thomas
The Honorable Shenna Bellows
The Honorable Gregg Amore
The Honorable Maggie Toulouse Oliver

# EXHIBIT 32

← **Truth Details**

1321 replies

**Donald J. Trump**

@realDonaldTrump

Palestinian Chuck Schumer is hiring Eric Holder, famous for handing guns to Mexican cartels under the Barack Hussein Obama administration, as part of a Democrat-led "Election Integrity Group" that will no doubt try to suppress Republican voters, and interfere in our Elections. Furthermore, Marc Elias, a terrible lawyer with a horrible track record, is also involved. This is the same disgusting individual who was responsible for the fake Russia dossier from a foreign nation to meddle in the 2016 Election, which I won in historic fashion. The Democrats are totally unhinged and we will not allow them to threaten the integrity of our Elections.

During my Historic Election in 2024, when I won every single Swing State, and decisively won both the Electoral and Popular votes by wide margins, the Republicans had an Election Integrity Army in every single State to preserve the sanctity of each legal vote. We will be doing the same again in 2026, but it will be much bigger and stronger. All Americans should have their voices be heard by casting a vote. Be assured this Election will be fair! President DONALD J. TRUMP

**5.61k** ReTruths **19.2k** Likes May 10, 2026 at 2:42 PM

# EXHIBIT 33


Dora Damatta-Rodriguez at her home in San Carlos, Panama, after being deported from the U.S. over a 2016 vote that she said she believed was legal. REUTERS/Enea Lebrun

According to U.S. President Donald Trump, America is a hotbed of voting fraud – and foreigners are major culprits.

He has portrayed noncitizen voting as part of a broad Democratic Party conspiracy to dilute Republican power. He has claimed on social media that "Crazed" Democrats allow unvetted migrants to enter the U.S. "SO THEY CAN VOTE, VOTE, VOTE." He has called for elections to be nationalized due to the danger of noncitizens casting ballots. And he has described illegal voting by noncitizens as so widespread that "cheating is rampant in our elections."

He has offered little evidence for his allegations of widespread fraud, however, including his claim in a primetime speech on Thursday that 278,000 noncitizens are registered to vote.

Now, a new Reuters analysis of federal court data undercuts Trump's assertion that a conspiracy of noncitizen voting is afoot in America.

Advertisement · Scroll to continue

Case records show that federal prosecutors have charged just 129 people under a federal "voting by aliens" statute created by Congress in 1996, Reuters found. More than two-thirds of those prosecutions – 86 – have been filed during Trump's five-and-a-half years in office. In none of the cases did prosecutors allege a coordinated effort to influence an election. And no defendant was accused of being paid to vote. Instead, many appear to stem from voter confusion, miscommunication with election officials or administrative errors.

One of the people swept up in Trump's crackdown is Dora Damatta-Rodriguez. The 72-year-old Panama-born grandmother had lived in the U.S. for decades before casting a ballot in the 2016 election. She told Reuters she hoped her vote would make life better for her four children and 15 grandchildren, all U.S. citizens.

"I wasn't sneaking in," she later told a judge, according to a transcript. "I believe I was doing it by the law."

She wasn't. Damatta, who entered the U.S. legally in 1973 with her American husband, was convicted in a North Carolina federal court in 2019 of illegal voting. She had three decades-old misdemeanor convictions, which the judge ruled were too old to be considered in sentencing her for the voting offense.

Advertisement · Scroll to continue

[illegible]

Keepsakes from Damatta-Rodriguez's years in the U.S. at her home in Panama. Her noncitizen-voting conviction was revisited during Trump's second term. REUTERS/Enea Lebrun

The case appeared closed. Then, in December 2025, immigration authorities detained Damatta during a passport check at Houston's airport as she prepared to fly to Europe on vacation. After pulling up her 2019 conviction for noncitizen voting, they put her in detention and began deportation proceedings as part of Trump's immigration crackdown.

While in custody in Texas, she prepared to contest her case at an April 9 hearing. But when the day arrived, she learned that the court already had ordered her removal. She was deported to Panama in June.

"It feels like I was executed in Texas," she said by telephone from a small town in Chiriqui province in Panama where she's now living.

In response to questions about Damatta's case, Homeland Security said she was a "criminal illegal alien" who entered the U.S. illegally through Mexico in 2009. Court records from her 2019 voting case, however, show she was a lawful permanent resident. Her lawyer told the court she had been living legally in the U.S. for more than four decades, and an image of her green card shared with Reuters shows she obtained permanent resident status in 1973 as the spouse of a U.S. citizen.

Damatta-Rodriguez displays a photograph of herself with a Trump banner. She said she voted for Trump in 2016 and continues to support him despite her deportation. REUTERS/Enea Lebrun

The Homeland Security statement also said she had a criminal record that included alien smuggling, disorderly conduct and driving under the influence. Federal and state court records, however, show no convictions or prosecutions of her for those offenses. The records reviewed by Reuters showed three older misdemeanor convictions – for shoplifting in 1982, driving without a proper license in 1995 and larceny in 1997 – which the judge in her voting case ruled were too old to be considered at sentencing.

After Reuters presented Homeland Security with findings contradicting its allegations, the agency repeated the claims without providing evidence.

The circumstances that led some noncitizens to vote often began with mundane encounters: a conversation with a county clerk, a voter-registration drive or a misunderstanding left uncorrected for years. One man told a judge that a Florida motor vehicle office clerk incorrectly informed him that he could vote because he was married to a U.S. citizen.

In a letter to a judge disclosed in court, one noncitizen voter explained why he trusted advice from a clerk at a state motor vehicle licensing office and registered to vote.

Another testified that a canvasser urged her to register even after she disclosed she was not a citizen, suggesting it could help her path to naturalization. At least three said in legal documents that they used government-issued identification when they registered and were never told they were ineligible. They later cast ballots in federal elections and were penalized years afterward.

The defendants came from at least 33 countries, including Mexico, South Korea, Japan, Poland, Israel, Nigeria and Canada.

A 66-year-old Ohio man who emigrated from Germany as a child and never became a U.S. citizen told Reuters he was registered to vote while getting license plates at a Bureau of Motor Vehicles office near Cleveland years ago. When he said he wasn't eligible, an official brushed it aside, telling him he could register as long as he had standard identification, he recalled.

He went on to vote in 12 elections between 2009 and 2024. He also requested an absentee ballot for Ohio's 2020 Republican primary, voting records show.

"I didn't even know what the hell I was signing up for," said the man, who spoke on condition of anonymity amid the immigration crackdown.

Damatta-Rodriguez looks through family photographs in San Carlitos, Panama. She lived in the U.S. for decades before being deported this year. REUTERS/Enea Lebrun

## A WIDENING NET

Under Trump, federal law enforcement officials have been directed to prioritize prosecutions and deportations for noncitizen voting, according to executive orders, public statements by senior officials and an internal Homeland Security memo. Some Republican-led states such as Ohio and Texas – both of which have competitive U.S. Senate races this year – are enthusiastic partners.

In Ohio, the office of Republican Secretary of State Frank LaRose, a Trump supporter, partnered with Homeland Security agents last year to help search for voter fraud in the state. In October, LaRose referred 167 names of alleged noncitizen voters to the U.S. Justice Department for possible prosecution.

Since then, Homeland Security agents have requested voting files in Ohio for at least 308 people, according to emails the agents sent to local election boards that were reviewed by Reuters. Most – or 214 of them – never cast a ballot, according to voting records. Among the rest, 64 voted and 20 attempted to vote but had their ballots rejected. Reuters couldn't determine voting histories for 10 others.

Homeland Security interviewed at least 12 of the people whose records it sought in Ohio, including lawful permanent residents and naturalized citizens, and initiated deportation proceedings against at least two of them this year, according to two immigration lawyers in Ohio.

LaRose's office is "very proud" of its efforts on voter rolls, it said in a statement. "We're working with law enforcement every day to hold accountable those who try to cheat the system, including noncitizens who cast illegal votes."

In Texas, at least five counties have received Homeland Security subpoenas or other requests for voter records, according to interviews with election officials, voting records and emails between local officials and Homeland Security agents obtained through records requests.

A Homeland Security agent told Roxzine Stinson, the election administrator in heavily Republican Lubbock County, that the agency planned to seek voter records from election offices across Texas, Stinson said in an interview. She declined to comment further or disclose how many voters were covered by the subpoena her office received this year.

In Texas' Webb County, on the Mexico border, election administrator Jose Luis Castillo said Homeland Security has sought records for 10 suspected noncitizen voters since April. Only one appeared to have cast a ballot, he said – once, in 2014, after being inadvertently registered at a driver's-license office.

Castillo questioned the value of the search. "We aren't finding what they think is out there." He has no party affiliation, he said in an interview.

**"We aren't finding what they think is out there."**

Jose Luis Castillo, election administrator for Webb County, Texas

In Massachusetts, Homeland Security's review of voter rolls identified a Canadian national who lived in the state and voted in Democratic primaries and other federal, state and local elections dating to 2008. State officials were already investigating the case, however, and had filed a complaint in April before the Justice Department charged the man in May with voting as an alien following a joint probe with Homeland Security.

Court records show federal agents were combing voter rolls in other Massachusetts communities for additional suspected noncitizens. The Canadian and his lawyer did not respond to requests for comment.

Related Content

How Trump is moving to control U.S. elections, one state at a time

Trump push for state voter rolls rebuffed by courts as midterms near

US spy chief's office investigated voting machines in Puerto Rico

In an interview, William Galvin, Massachusetts' Democratic secretary of state, said he supports prosecuting noncitizen voting but was skeptical about deploying federal investigative power at that scale. "If you are going to comb through five million voters on the chance you might find a noncitizen, is that a good allocation of resources?" he said.

Homeland Security did not respond to questions about its operations in Ohio, Texas and Massachusetts.

Violations of the 1996 statute criminalizing "voting by aliens" – 18 USC 611 – are misdemeanors punishable by up to one year of imprisonment and a maximum $100,000 fine. But penalties historically have been mostly modest, often fines or probation. Judges typically do not have the option of ordering deportations in criminal cases. Expulsions are initiated separately by immigration authorities.

While Trump frequently cites noncitizen voting cases as evidence of fraud, legal scholars say the offense differs from fraud as the term is commonly understood. Fraud typically involves intentional deception. But under the federal statute, prosecutors need only show that a person was not a citizen and cast a ballot. They do not need to prove the person intended to deceive election officials or knowingly violate the law.

"It's misleading," University of Idaho College of Law professor Benjamin Cover said of equating noncitizen voting with fraud. "There's no fraud element in the statute."

Prosecutions for noncitizen voting don't support President Trump's conspiracy claims.

## ERRONEOUS FLAGS

The crackdown is also sweeping up an unknown number of legitimate voters.

To find suspected noncitizen voters, federal investigators have relied heavily on a national database – Systematic Alien Verification for Entitlements, or SAVE. It was created in 1986 to verify the immigration status of applicants for public benefits such as food and housing.

The Trump administration expanded SAVE last year, adding new data sources and encouraging states to use it for large-scale reviews of voter rolls. Justice Department lawyers acknowledged in court that the system could incorrectly flag some naturalized U.S. citizens, but argued the risk was too small to justify stopping its use.

At least 18 Republican-led states adopted the revamped system. Then, in June, a federal judge in Washington barred its use for voter verification, ruling that the changes made the system less accurate and risked disenfranchising eligible voters. A ruling this month by a federal court in Florida ordered Homeland Security to restore use for four Republican-led states. The conflicting rulings have yet to be resolved.

Texas ran its nearly 19 million registered voters through SAVE last year and identified 2,724 people across 177 counties who, state officials said, needed to prove their citizenship. The secretary of state ordered counties to notify those voters and give them 30 days to provide documentation or face suspension from the rolls. Data collected by the Texas Association of County Election Officials from 40 counties showed that, as of May, about 100 people had provided proof of citizenship, while more than 900 did not respond and had their registrations suspended. Reuters could not determine whether any of those suspended were noncitizens.

Voters cast ballots in McAllen, Texas. Republican-led states have increasingly used federal citizenship databases to search voter rolls for suspected noncitizens. REUTERS/Callaghan O'Hare

The Texas Secretary of State's office said counties are responsible for reviewing voters flagged through SAVE and that many are still evaluating the data.

In Indiana, officials last year identified 1,611 people they said had not been citizens upon obtaining driver's licenses or other state identification documents, and gave them 30 days to prove their eligibility or face removal from the voter rolls. The group represented a tiny fraction – 0.03% – of Indiana's 4.8 million registered voters in 2024, and many appeared to be naturalized U.S. citizens, Reuters found. The office of Indiana Secretary of State Diego Morales, a Republican, did not respond to a request for comment.

One was Lucinda Delgado, a 39-year-old mother of three in Indianapolis. She emigrated from the Dominican Republic in 1993 at age seven, became a citizen in 2021 and registered to vote in 2025. Under Indiana law, voters don't register a party affiliation.

In March, after receiving a letter from her local election board demanding proof of citizenship within 30 days, she sent a copy of her naturalization certificate. Delgado remained on the rolls and has yet to decide who to support in November's election. Still, she worries about older voters and others who may struggle to navigate the paperwork or quickly locate documents needed to prove their eligibility.

"They're never going to be able to vote," she said.

> The Misinformation Monitor newsletter rounds up international misinformation narratives, with a "Real or Fake?" quiz in every edition. Sign up here.

Additional reporting by Nate Raymond in Boston, Kristina Cooke in San Francisco, Jack Queen in New York, and John Shiffman and Andrew Goudsward in Washington. Photo Editing by Corinne Perkins and Tomas Bravo. Design by John Emerson. Editing by Noeleen Walder, Linda So and Jason Szep.

Our Standards: **The Thomson Reuters Trust Principles.**

Suggested Topics: Investigates

**Tom Hals**
Thomson Reuters

Tom Hals is an award-winning reporter with 25 years of experience working in Asia, Europe and the United States. Since 2009 he has covered legal issues and high-stakes court battles, ranging from challenges to pandemic policies to Elon Musk's campaign to end his deal for Twitter.

**Peter Eisler**
Thomson Reuters

Peter Eisler is a reporter on Reuters' Enterprise and Investigations team. His work focuses on political and criminal justice issues. In 2026, he shared the Pulitzer Prize for National Reporting, awarded for a series of stories examining President Donald Trump's campaign of retribution against his perceived political foes.

**Ned Parker**
Thomson Reuters

Ned Parker is a reporter with Reuters' Political Investigations team. He and colleagues won the 2026 Pulitzer Prize for National Reporting for documenting how President Trump used the U.S. government and the influence of his supporters to exact vengeance on his perceived foes. Parker is a former Reuters Baghdad bureau chief, where he and his team were finalists for the 2015 Pulitzer Prize in International Reporting for their reporting on the rise of ISIS in Iraq.

**Luc Cohen**
Thomson Reuters

Reports on the New York federal courts. Previously worked as a correspondent in Venezuela and Argentina.

**Do you have a news tip?**
How to contact Reuters securely
Contact us

## Read Next

Investigations
**Mark Zuckerberg had a bold plan to replace Meta staff with AI. Here's how it imploded.**

Investigations
**Illicit Iranian gambling network helped pull off a $4 billion sanctions dodge**

Investigations
**How Volkswagen's flying-car dream crashed in China**

Investigations
**Regime change? Inside Reza Pahlavi's faltering bid to lead Iran**

World
**A year in a foxh one Ukrainian s survived beneat lines**

## Sponsored Content

Dianomi Advertise Here



**Moving Abroad: Finanical Checklist and Tips**
Sponsored by



**Low-cost crypto trading now at E*TRADE – powered by zerohash**
Sponsored by
E*TRADE from Morgan Stanley




**Week Ahead**
Sponsored by
Charles Schwab

## Investigations >

# Trump's pressure on NATO is reshaping Europe's defenses. Will it break the alliance?

Investigations · September 17, 2026

The president's confrontation with NATO hasn't led to a major U.S. withdrawal. But a big troop cut remains an option, Pentagon sources say, and allies are preparing for a future less dependent on Washington.

Investigations
**How Trump's war on EVs derailed America's auto-factory revival**
September 15, 2026

Investigations
**Election officials prepare for chaos as Trump seeks to tilt the midterms to Republicans**
September 15, 2026

Investigations
**Deadly strike on Iranian wedding was likely a direct hit by a US munition, analysis shows**
September 3, 2026

Investigations
**As agriculture wilts under financial pressure, former Arkansas farmer cultivates Senate bid**
August 31, 2026

Investigations
**China can build kung fu-fighting robots. But it can't get them to do factory work**
August 27, 2026

## Sponsored Content

Dianomi Advertise Here

**Crypto trading 24/7 at E*TRADE – powered by zerohash**
Sponsored by E*TRADE from Morgan Stanley



**How to Freeze Your Credit—and Why It Matters**
Sponsored by Charles Schwab



**How to Deal with an Unexpected Tax Bill**
Sponsored by Charles Schwab



**Moving Abroad: Finanical Checklist and Tips**
Sponsored by Charles Schwab



**Schwab's Take on Market Volatility**
Sponsored by Charles Schwab



**How to Freeze Your Credit—and Why It Matters**
Sponsored by Charles Schwab



## Sponsored Content

Dianomi Advertise Here



E*TRADE from Morgan Stanley
**Trade crypto* with confidence at E*TRADE. *Powered by zerohash**



Charles Schwab
**How to Freeze Your Credit—and Why It Matters**



Charles Schwab
**Smart Ways to Manage Kids' Sports Expenses**

Charles Schwab
**Moving Abroad: Financial Checklist and Tips**



Charles Schwab
**10 Answers to Common Investing Questions**



Fidelity Investments
**How to set up a series of recurring investments.**



Charles Schwab
**Schwab's Market Outlook**



E*TRADE from Morgan Stanley
**Trade crypto*, stocks and more at E*TRADE. *Powered by zerohash**



The Motley Fool
**Motley Fool Issues First-Ever 9X Buy Alert**





© 2026 Reuters. All rights reserved

# EXHIBIT 34

# *Trump Regrets Not Seizing Voting Machines After 2020 Election*

In an interview, the president said he should have ordered the National Guard to take the machines to find evidence of fraud, but added that the Guard might not have had the sophistication to do so.

Listen · 5:14 min




**By Alan Feuer and Ashley Ahn**

Jan. 11, 2026

President Trump said during an interview with The New York Times that he regretted not ordering the National Guard to seize voting machines in swing states after his loss in the 2020 election, even though he doubted whether the Guard was "sophisticated enough" to carry out the order effectively.

The remarks by Mr. Trump in the interview last week harked back to one of the most perilous moments from his first term in office, when he was urged by some advisers to order his national security agencies to take control of machines manufactured by Dominion Voting Systems in an effort to find evidence that they had been hacked to rig the election against him.

The statement also came as he has continued his attacks on digital voting machines, saying that he wants to "lead a movement" to get rid of them altogether in advance of this year's midterm elections.

Mr. Trump has long been obsessed with voting machines, particularly those built by Dominion, a company that has figured prominently in conspiracy theories that technology was used to rob him of victory in his race against Joseph R. Biden Jr.

Allegations that Dominion machines were hacked in a plot to flip votes away from Mr. Trump swirled constantly in the chaotic period after the 2020 election and sat at the heart of several lawsuits filed by the pro-Trump lawyer Sidney Powell that sought to overturn the results of the vote in four key swing states.

The accusations about Dominion came to a head during a pitched Oval Office meeting on Dec. 18, 2020, when a team of outside advisers, including Ms. Powell and Michael T. Flynn, the former national security adviser, pitched Mr. Trump on a brazen plan: They wanted the president to use the military or federal law enforcement officers to seize Dominion machines in several states where he believed there had been fraud in order to conduct a recount of the vote.

The advisers went so far as to present Mr. Trump with draft executive orders that they claimed would grant him the authority to follow through on the outrageous plan.

Even proposing the idea of inserting armed federal forces into the administration of a presidential race shattered the most basic norms of American democracy. And it was vigorously opposed at the meeting by several of Mr. Trump's top aides, including Pat A. Cipollone, his White House counsel at the time. The aides argued that Mr. Trump had no legal basis to seize the machines and they quickly called other top officials in an effort to persuade the president that there was no evidence that Dominion systems had been interfered with.

Still, Mr. Trump explored the possibility of seizing the machines. He raised the question separately with Attorney General William P. Barr, who immediately shot it down. And he directed one of his personal lawyers, Rudolph W. Giuliani,

to ask high-ranking officials in the Department of Homeland Security if they could legally seize the machines. Again, he was rebuffed.

In the end, Mr. Trump did not move forward with the proposal — a decision he said in the interview with The Times that he regretted.

**Sign up for the On Politics newsletter.** It's a pivotal moment for American politics. Join us for 2026 and beyond. Get it sent to your inbox.

"Well, I should have," he said.

Asked whether using the military to impound voting machines had been a viable option, the president questioned the sophistication of the National Guard.

"I don't know that they are sophisticated enough," he said. "You know, they're good warriors. I'm not sure that they're sophisticated enough in the ways of crooked Democrats, and the way they cheat, to figure that out."

Mr. Trump's expression of regret, while somewhat vaguely worded, was nonetheless a warning sign that he had not given up on the idea that voting machines were dangerous or that they could be seized in an effort to curb fraud.

Just last week, he reposted several social media messages that continued to push the claim that Dominion machines had been rigged against him. And last month, he sought to pardon Tina Peters, a former Colorado county clerk who is serving a nine-year prison sentence on state charges of tampering with Dominion machines in an effort to prove that they were used in a plot against Mr. Trump.

At the same time, Mr. Trump has not been shy in using the National Guard, deploying thousands of its troops in recent months to cities that he says are overrun with crime. He has argued that the deployments are necessary to

restore law and order to the cities, despite the objections of state and local leaders, who have called the moves unnecessary and unlawful.

The president's use of the National Guard during his second term has become the focus of a multistate legal battle. While some cases remain largely unresolved, in December, the Supreme Court ruled against Mr. Trump for his deployment of troops in the Chicago area, citing an 1878 law, which bans the use of the military for domestic policing.

Since taking office again almost a year ago, Mr. Trump has sought to expand the scope of his powers and has wielded federal authority to exact retribution on political enemies and push his domestic agenda. And he has said he is willing to invoke the Insurrection Act and federalize some National Guard units if he feels it is important to do so.

**Alan Feuer** covers extremism and political violence for The Times, focusing on the criminal cases involving the Jan. 6 attack on the Capitol and against former President Donald J. Trump.

**Ashley Ahn** covers breaking news for The Times from New York.

# EXHIBIT 35

Donald J. Trump



# Speech: Donald Trump Delivers the State of the Union Address - February 24, 2026






## Full Transcript

Donald Trump 00:00:00-00:01:30 (90 sec) NO STRESSLENS

Well, thank you very much, everybody. It's really an honor. Speaker Johnson, Vice President Vance, First Lady of the United States. Second lady of the United States. Members of Congress and my fellow Americans, our nation is back, bigger, better, richer and stronger than ever before. Less than five months from now, our country will celebrate an epic milestone in American history, the 250th anniversary of our glorious American independence.

Donald Trump 00:01:30-00:02:26 (56 sec) NO STRESSLENS

This July 4th, we will mark two and a half centuries of liberty and triumph, progress and freedom, in the most incredible and exceptional nation ever to exist on the face of the Earth. And you've seen nothing yet. We're going to do better and better and better. This is the golden age of America. When I last spoke in this chamber 12 months ago, I had just inherited a nation in crisis with a stagnant economy, inflation at record levels, a wide open border, horrendous recruitment for military and police, rampant crime at home and wars and chaos all over the world.

Donald Trump 00:02:26-00:03:22 (56 sec) NO STRESSLENS

But tonight, after just one year, I can say with dignity and pride that we have achieved a transformation like no one has ever seen before and a turnaround for the ages. It is indeed a turnaround for the ages. And we will never go back to where we were just a very short time ago. We're not going back today.

Donald Trump 00:03:22-00:04:06 (44 sec) NO STRESSLENS

Today, our border is secure. [Audience chants "USA"] Thank you. Today our border is secure, our spirit is restored, inflation is plummeting, incomes are rising fast, the roaring economy is roaring like never before and our enemies are scared. Our military and police are stacked and America is respected again, perhaps like never before.

Donald Trump 00:04:06-00:05:11 (65 sec) NO STRESSLENS

After four years in which millions and millions of illegal aliens poured across our borders totally unvetted and unchecked, we now have the strongest and most secure border in American history by far. In the past nine months, zero illegal aliens have been admitted to the United States. But we will always allow people to come in legally, people that will love our country and will work hard to maintain our country.

Donald Trump 00:05:11-00:05:57 (47 sec) NO STRESSLENS

The flow of deadly fentanyl across our border is down by a record 56 percent in one year. And last year the murder rate saw its single largest decline in recorded history. This is the biggest decline, think of it, in recorded history -- the lowest number in over 125 years. Year 1900, in fact substantially before my wonderful father -- I had a wonderful father, Fred -- before he was born, substantially before he was born.

Donald Trump 00:05:57-00:06:17 (20 sec) NO SIGNAL (0.707)

That's a long time ago. He wouldn't like me to say that. But that's a long time ago. [Laughter] The Biden administration and its allies in Congress gave us the worst inflation in the history of our country. But in 12 months, my administration has driven core inflation down to the lowest level in more than five years.

Donald Trump 00:06:17-00:07:15 (57 sec) NO STRESSLENS

And in the last three months of 2025, it was down to 1.7 percent. Gasoline, which reached a peak of over $6 a gallon in some states. Under my predecessor, it was quite honestly a disaster; it is now below $2.30 a gallon in most states and in some places $1.99 a gallon. And when I visited the great state of Iowa just a few weeks ago, I even saw $1.85 a gallon for gasoline.

Donald Trump 00:07:15-00:07:44 (29 sec) NO SIGNAL (0.151)

Mortgage rates are the lowest in four years and falling fast, and the annual cost of a typical new mortgage is down almost $5,000 just since I took office, one year. And low interest rates will solve the Biden created housing problem, while at the same time protecting the values of those people who already own a house that really feel rich for the first time in their lives.

Donald Trump 00:07:44-00:08:10 (26 sec) NO SIGNAL (0.377)

We want to protect those values; we want to keep those values up. We're going to do both. And we are going to keep it that way. The stock market has set 53 all-time record highs since the election. Think of that, one year -- boosting pensions, 401(k)s and retirement accounts for the millions and millions of Americans are all gaining.

Donald Trump 00:08:10-00:08:37 (27 sec) NO SIGNAL (0.03)

Everybody's up, way up. In four long years, the last administration got less than $1 trillion in new investment in the United States. And when I say less, substantially less. In 12 months, I secured commitments for more than $18 trillion pouring in from all over the globe. Think of it, much less than $1 trillion for four years versus much more than $18 trillion for one year.

Donald Trump 00:08:37-00:09:01 (24 sec) NO SIGNAL (0.207)

What a difference a president makes. A short time ago we were a dead country, now we are the hottest country anywhere in the world, the hottest. As thousands of new businesses are forming and factories, plants and laboratories are being built, we have added 70,000 new construction jobs in just a very short period of time.

Donald Trump 00:09:01-00:09:38 (36 sec) NO SIGNAL (0.228)

It's getting bigger and bigger and stronger. Nobody can believe what they're watching. American oil production is up by more than 600,000 barrels a day and we just received from our new friend and partner, Venezuela, more than 80 million barrels of oil. American natural gas production is at an all-time high because I kept my promise to drill baby drill.

Donald Trump 00:09:38-00:10:31 (54 sec) NO STRESSLENS

More Americans are working today than at any time in the history of our country. Think about that, any time in the history of our country, more working today and 100 percent of all jobs created under my administration have been in the private sector. We ended DEI in America. We cut a record number of job killing regulations and, in one year, we have lifted 2.4 million Americans, a record, off of food stamps.

Donald Trump 00:10:31-00:10:47 (16 sec) STRONG (2.616)
1 of 87 paragraphs scored.

And for all of these reasons, I say tonight, members of Congress, the state of our Union is strong. Our country is winning again. In fact, we're winning so much that we really don't know what to do about it. People are asking me, please, please, please, Mr. President, we're winning too much. We can't take it anymore.

Donald Trump 00:10:47-00:11:29 (42 sec) NO STRESSLENS

We're not used to winning in our country. Until you came along, we were just always losing, but now we're winning too much. And I say no, no, no, you're going to win again. You're going to win big; you're going to win bigger than ever. And to prove that point -- to prove that point, here with us tonight is a group of winners who just made the entire nation proud.

Donald Trump 00:11:29-00:12:03 (34 sec) NO SIGNAL (0.809)

The men's gold medal Olympic hockey team, come on in. [Audience chants "USA"] Go ahead. That's the first time I've ever seen them get up. [Laughter] And actually, not all of them did get up. But they beat a fantastic Canadian team in overtime, as everybody saw -- as did the American women who will soon be coming to the White House.

Donald Trump 00:12:03-00:12:28 (25 sec) NO SIGNAL (0.67)

They were in the Oval Office before and I just want to say a second, very big congratulations to Team USA. But I have to say that -- and I told them this and we took a vote of the team. I said, anybody votes no, I'm not doing it. So they stood there and they weren't about to say no, because I've never seen a goaltender play as well as goalie, Connor Hellebuyck.

Donald Trump 00:12:28-00:14:04 (97 sec) NO STRESSLENS

Think of it, 46 shots on goal. And I asked him, the one shot, the one where you put your stick in the back and it hit the neck of your stick and bounced off, do you practice that, or was that a little lucky? [Laughter] He refused to answer that question. But I just want to tell you that the members of this great hockey squad will be very happy to hear based on their vote and my vote, and in this case, my vote was more important, that I will soon be presenting Connor with our highest civilian honor, which we will be given and which has been given to many athletes over the years.

Donald Trump 00:14:04-00:15:04 (60 sec) NO STRESSLENS

But when I say many, not too many, like 12. [Laughter] It's called the highest civilian honor in our country, the Presidential Medal of Freedom. Great athletes have gotten that, very great, the best and I thought he deserved it. And I did take a vote, every single one of them. I said, I'm not giving it if anybody says no. And every single one of them rapidly put up their hand.

Donald Trump 00:15:04-00:15:24 (19 sec) NO SIGNAL (0.066)

So I want to thank you all. What a special job you did, what special champions you are. Thank you very much. I'm also pleased to say that the next time the Olympic torch is lit, it will be here in America for the 2028 Olympics and it's the summer version right in Los Angeles. We're going to do a good job in Los Angeles.

Donald Trump 00:15:24-00:16:51 (88 sec) NO STRESSLENS

And Los Angeles is going to be safe just like Washington DC is now one of the safest cities in the country. And this year, and I must say, I got them both. I got them in my first term and I was disappointed because I didn't think I'd be the president when this happened. But strange things took place and now I've got them because I got the Olympics and I got the 2026 FIFA World Cup and I wanted to claim the 250th, but I didn't get away with that one. [Laughter] I couldn't claim that one for myself, but we're getting the World Cup, so we have the World Cup and the Olympics coming and that is exciting news.

Donald Trump 00:16:51-00:17:32 (41 sec) NO STRESSLENS

So this will be a year to celebrate our country and the heroes who have kept it free, men like Buddy Taggart. At age 17, Buddy volunteered to defend America in World War II, serving in the Pacific under the great General Douglas MacArthur. He fought bravely in the famous Battle of Manila, worked so hard. He was badly wounded and almost killed by enemy machine guns in Luzon.

Donald Trump 00:17:32-00:18:10 (38 sec) NO STRESSLENS

And 81 years ago this month, he liberated the largest internment camp in the Philippines, one of the largest anywhere in the world. But he earned many honors, including a Purple Heart and a Bronze Star, came home started a family and tonight he is in the gallery looking forward to July 4th, 2026, his 100th birthday.

Donald Trump 00:18:10-00:18:43 (33 sec) MEDIUM (1.822)

So Buddy, you're a brave man and we salute you. Even in times of challenge, setback and immense heartache, the spirit of 1776 has always shown through very brightly. It was July 4th of last year when flood waters tore through a girls' summer camp in central Texas, one of the worst things I've ever seen. I was there.

Donald Trump 00:18:43-00:19:05 (22 sec) NO SIGNAL (0.755)

Rising 26 feet in the matter of minutes, tragically claiming many, many lives. You all remember that one. As the waters threatened to sweep her away, 11 year old Millie Kate McClelland closed her eyes and prayed to God. She thought she was going to die. Those prayers were answered when Coast Guard rescue swimmer Scott Ruskin descended from a helicopter above.

Donald Trump 00:19:05-00:19:49 (44 sec) NO STRESSLENS

Nobody knew where he came from. It was Scott's first ever rescue mission, a young guy, but very brave, very, very top, always top in his class. And he lifted not just Millie Kate, but 164 others to safety. People watched Scott from a distance and they couldn't believe what they were seeing. The winds were blowing, the rain was pouring, everything was going and that rapid water, nobody's ever seen anything like it. They said, wow, that's something.

Donald Trump 00:19:49-00:20:19 (30 sec) NO SIGNAL (0.925)

Tonight, Scott and Millie Kate are here together, reunited for the very first time. Thank you, Scott, Millie Kate. And Petty Officer Ruskin, I'm pleased to inform you that I am now awarding you the Legion of Merit for extraordinary heroism, which is what it was, extraordinary heroism. Thank you. And I'd like to have the military aid to please come down and take care of the service, military aid.

Donald Trump 00:20:19-00:21:43 (84 sec) NO STRESSLENS

Thank you very much. Take care of that very important service. Thank you very much. From 1776 to today, every generation of Americans has stepped forward to defend life, liberty and the pursuit of happiness. And they really doing it for the next generation, but now it's our turn. Together, we're building a nation where every child has the chance to reach higher and go further, where government answers to the people, not the powerful and where the interests of hardworking American citizens are always our first and ultimate concern.

Donald Trump 00:21:43-00:22:04 (21 sec) NO SIGNAL (0.616)

That is the debt we owe to the heroes who came before us and that is the promise we must keep to America for our 250th year. Last year, I urged this Congress to begin the mission by passing the largest tax cuts in American history and our Republican majorities delivered so beautifully. Thank you, Republicans.

Donald Trump 00:22:04-00:22:53 (49 sec) NO STRESSLENS

All Democrats, every single one of them, voted against these really important and very necessary massive tax cuts. They wanted large scale tax increases to hurt the people instead. But we held strong and with the Great Big, Beautiful Bill, we gave you no tax on tips, no tax on overtime and no tax on Social Security for our great seniors.

Donald Trump 00:22:53-00:24:06 (73 sec) NO STRESSLENS

And we also made interest on auto loans tax deductible -- the first time -- but only if the car is made in America. Recently in Pennsylvania, I met Megan Hemhauser, a devoted mom who home schools her children -- beautiful, two children -- during the day while waiting tables at night as her husband works overtime operating very heavy equipment.

Donald Trump 00:24:06-00:24:32 (25 sec) NO SIGNAL (0.471)

Megan is here this evening and she's happy to tell you that she is so, so much richer because, with no tax on tips, no tax on overtime and our expanded child tax credit done again by Republicans, Megan and her husband will take home more than $5,000 extra just for the year cutting her tax bill in more than half.

Donald Trump 00:24:32-00:24:55 (23 sec) NO SIGNAL (0.815)

Megan, please stand up. We're fighting for you, Megan. Thank you. Thank you, Megan. We're fighting for you, Megan. Under our bill parents like Megan can also activate their children's brand-new Trump Accounts and I didn't name it. I didn't name it. I did not name that. Nobody believes me, but I did not name it. It was named by a very tall man sitting right there in the third row.

Donald Trump 00:24:55-00:25:42 (47 sec) NO STRESSLENS

Nice man, a good man. Tax free investment accounts for every American child. This is something that's so special and has taken off and gone through the roof. Millions will be prefunded courtesy of the US Treasury and private individuals like Michael and Susan Dell, who have donated $6.25 billion to fund the Trump Accounts for 25 million American children.

Donald Trump 00:25:42-00:26:33 (51 sec) NO STRESSLENS

They're great people. You know, I asked Michael Dell, how do you make all that money? He said, well, I just sat in my dorm in school, and I made computers and I'd sell them to people. And I just kept selling and selling and selling and pretty amazing story. That's called the American Dream. He sold a lot of computers, a lot of those laptops.

Donald Trump 00:26:33-00:27:35 (62 sec) NO STRESSLENS

So, I congratulate him on that, but I really thank him and Susan, as well as others like Brad Gerstner a very tremendous guy. He was behind it right from the beginning, Brad Gerstner. Thank you, Brad. So, with modest additional contributions, these young people's accounts could grow to over $100,000 or more by the time they turn 18. Think of it, how much money is that for somebody that started with nothing?

Donald Trump 00:27:35-00:28:12 (36 sec) NO STRESSLENS

Over $100,000, could be much more than that. To make this investment in our children's future go to TrumpAccounts.gov, TrumpAccounts.gov. And a lot of people are doing it. That setting every record in the book. It's popular. They knew what was going to -- what it was going to take. I'm so proud of them. I'm so proud of the people that got it started.

Donald Trump 00:28:12-00:29:05 (53 sec) NO STRESSLENS

Now it's just taken off. One of the primary reasons for our country's stunning economic turnaround, the biggest in history where the Dow Jones broke 50,000 four years ahead of schedule and the S&P hit 7,000 where it wasn't supposed to do it for many years, were tariffs. I used these tariffs, took in hundreds of billions of dollars to make great deals for our country, both economically and on a national security basis.

Donald Trump 00:29:05-00:29:44 (39 sec) NO STRESSLENS

Everything was working well. Countries that were ripping us off for decades are now paying us hundreds of billions of dollars. They were ripping us so badly, you all know that. Everybody knows it, even the Democrats know it, they just don't want to say it. And yet these countries are now happy and so are we. We made deals, the deals are all done and they're happy.

Donald Trump 00:29:44-00:30:24 (41 sec) NO STRESSLENS

They're not making money like they used to but we're making a lot of money. There was no inflation, tremendous growth. And the big story was how Donald Trump called the economy correctly and 22 Nobel Prize winners in economics didn't, they got it totally wrong. They got it really wrong. And then just four days ago, an unfortunate ruling from the United States Supreme Court, it just came down.

Donald Trump 00:30:24-00:31:09 (45 sec) NO STRESSLENS

It came down, very unfortunate ruling. But the good news is that almost all countries and corporations want to keep the deal that they already made. Right, Scott? Knowing that the legal power that I as president have to make a new deal could be far worse for them. And therefore, they will continue to work along the same successful path that we had negotiated before the Supreme Court's unfortunate involvement.

Donald Trump 00:31:09-00:31:56 (46 sec) NO STRESSLENS

So, despite the disappointing ruling, these powerful country saving, it's saving our country the kind of money we're taking in, peace protecting. Many of the wars I settled was because of the threat of tariffs. I wouldn't have been able to settle them without them. Will remain in place under fully approved and tested alternative legal statutes and they have been tested for a long time.

Donald Trump 00:31:56-00:32:38 (43 sec) NO STRESSLENS

They're a little more complex, but they're actually probably better. Leading to a solution that will be even stronger than before. Congressional action will not be necessary. It's already time tested and approved. And as time goes by, I believe the tariffs, paid for by foreign countries, will, like in the past, substantially replace the modern-day system of income tax, taking a great financial burden off the people that I love.

Donald Trump 00:32:38-00:33:37 (59 sec) NO STRESSLENS

Moving forward, factories, jobs, investment and trillions and trillions of dollars will continue pouring into the United States of America because we finally have a president who puts America first. I put America first. I love America. For decades, before I came along, we had the exact opposite. From trade to health care, from energy to immigration, everything was stolen and rigged in order to drain the wealth out of the productive hardworking people who make our country great, who make our country run.

Donald Trump 00:33:37-00:34:11 (34 sec) WEAK (1.485)

Under Biden and his corrupt partners in Congress and beyond, it reached a breaking point with the Green New Scam, open borders for everyone. They poured in by the millions and millions from prisons, from mental institutions. They were murderers, 11,888 murderers. They came into our country; you allowed that to happen.

Donald Trump 00:34:11-00:34:39 (28 sec) NO SIGNAL (0.988)

And record-setting inflation that cost the typical family $34,000 in just a speck of time. Now the same people in this chamber who voted for those disasters suddenly used the word affordability, a word -- they just used it. Somebody gave it to them, knowing full well that they caused and created the increased prices that all of our citizens had to endure.

Donald Trump 00:34:39-00:35:24 (45 sec) NO STRESSLENS

You caused that problem; you caused that problem. They knew their statements were a lie. They knew it. They knew their statements were a dirty, rotten, lie. Their policies created the high prices. Our policies are rapidly ending them. We are doing really well. Those prices are plummeting downward. The price of eggs is down 60 percent.

Donald Trump 00:35:24-00:35:57 (33 sec) NO STRESSLENS

Madam Secretary, thank you. The cost of chicken, butter, fruit, hotels, automobiles, rent, is lower today than when I took office, by a lot. And even beef, which was very high, is starting to come down significantly. Just hold on a little while, we're getting it down. And soon you will see numbers that few people would think were possible to achieve just a short time ago.

Donald Trump 00:35:57-00:36:24 (28 sec) WEAK (1.282)

Nobody can believe when they see the kind of numbers and especially energy, when they see energy going down to numbers like that. They cannot believe it. It's like another big tax cut. I'm also confronting one of the biggest rip-offs of our times, the crushing cost of health care, caused by you, since the passage of the Affordable Care Act, sometimes referred to as Obamacare.

Donald Trump 00:36:24-00:36:50 (25 sec) NO SIGNAL (0.337)

Big insurance companies got rich. It was meant for the insurance companies, not for the people. With our government giving them hundreds and hundreds of billions of dollars a year as their stock prices soared 1,000, 1,200, 1,400 and even 1,700 percent, like nothing else. That's why I introduced the great health care plan.

Donald Trump 00:36:50-00:37:37 (47 sec) NO STRESSLENS

I want to stop all payments to big insurance companies and instead, give that money directly to the people so they can buy their own health care, which will be better health care at a much lower cost. In addition, my plan requires maximum price transparency. That's a big deal. Sounds so simple, so big. And I did that in my first term and the Democrats immediately terminated it with full knowledge that they were doing a very bad thing for the people.

Donald Trump 00:37:37-00:38:04 (27 sec) MEDIUM (1.506)

Costs we're going to go way up and that's what happened. And now I'm bringing them way down on health care and everything else. I'm also ending the wildly inflated cost of prescription drugs like has never happened before. Other presidents tried to do it, but they never could. They tried. Most didn't try, actually, but they tried.

Donald Trump 00:38:04-00:38:43 (38 sec) NO SIGNAL (0.029)

They said they tried. They couldn't do it. They didn't even come close. They were all talk and no action, but I got it done. Under my just enacted Most Favored Nation agreements, Americans who have for decades paid by far the highest prices of any nation anywhere in the world for prescription drugs will now pay the lowest price anywhere in the world for drugs, anywhere, the lowest price.

Donald Trump 00:38:43-00:39:17 (34 sec) NO SIGNAL (0.806)

So in my first year of the second term, should be my third term, but strange things happen. [Laughter] I took prescription drugs, a very big part of health care from the highest price in the entire world to the lowest. That's a big achievement. The result is price differences of 300, 400, 500, 600 percent and more, all available right now at a new website called trump.gov.

Donald Trump 00:39:17-00:40:07 (50 sec) NO STRESSLENS

And I didn't name that one either, by the way. And here tonight is the very first customer ever to get that big discount, and it is big, Catherine Rayner. For five years, she and her husband have struggled with infertility and they turned to IVF. One drug has been costing Catherine $4,000 to purchase. But a few weeks ago, she logged on to the website and got that same drug that cost costs $4,000, got it for under $500, a reduction of much more actually than $3,500. Catherine, we are all praying for you and you're going to be a great mom.

Donald Trump 00:40:07-00:40:47 (40 sec) NO STRESSLENS

So now I'm calling on Congress to codify my Most Favored Nation program into law. Now the one thing I'm not sure it matters because it's going to be very hard for somebody that comes along after me to say, let's raise drug prices by 700 or 800 percent. But John and Mike, if you don't mind, codify it anyway.

Donald Trump 00:40:47-00:41:13 (26 sec) NO SIGNAL (0.981)

They may do it. Codify it anyway. Thank you. Many Americans are also concerned that energy demand from AI data centers could unfairly drive up their electric utility bills. Tonight, I'm pleased to announce that I have negotiated the new Ratepayer Protection Pledge. You know what that is. We're telling the major tech companies that they have the obligation to provide for their own power needs.

Donald Trump 00:41:13-00:41:35 (22 sec) WEAK (1.105)

They can build their own power plants as part of their factory, so that no one's prices will go up, and in many cases, prices of electricity will go down for the community and very substantially down. This is a unique strategy never used in this country before. We have an old grid. It could never handle the kind of numbers, the amount of electricity that's needed.

Donald Trump 00:41:35-00:41:54 (19 sec) NO SIGNAL (0.676)

So I'm telling them they can build their own plant. They're going to produce their own electricity. It will ensure the company's ability to get electricity while at the same time, lowering prices of electricity for you and could be very substantial for all of your cities and towns. You're going to see some good things happen over the next number of years.

Donald Trump 00:41:54-00:42:17 (23 sec) WEAK (1.059)

Another pillar of the American dream that has been under attack is homeownership. With us tonight is Rachel Wiggins, a mom of two from Houston. She placed bids on 20 homes and lost all of those bids to gigantic investment firms that bypassed inspection, paid all cash and turned those houses into rentals, stealing away her American dream.

Donald Trump 00:42:17-00:42:52 (35 sec) NO SIGNAL (0.154)

She was devastated. Stories like this are why last month I signed executive order to ban large Wall Street investment firms from buying up in the thousands, single-family homes. And now I'm asking Congress to make that ban permanent because homes for people -- really, that's what we want. We want homes for people, not for corporations.

Donald Trump 00:42:52-00:43:19 (28 sec) NO SIGNAL (0.448)

Corporations are doing just fine, Rachel, thank you very much. Good luck with your home. You'll get one soon. We're also working to make it easier for Americans to save for retirement. And under this administration, we will always protect Social Security and Medicare. They are not protecting it for our seniors.

Donald Trump 00:43:19-00:43:57 (38 sec) NO STRESSLENS

We will always protect Social Security, Medicare, Medicaid. Since I took office, the typical 401-K balance is up by at least $30,000. That's a lot of money. We have millions and millions of people, because the stock market has done so well, setting all those records. Your 401(k)s are way up. Yet, half of all of working Americans still do not have access to a retirement plan with matching contributions from an employer.

Donald Trump 00:43:57-00:44:22 (24 sec) NO SIGNAL (0.516)

To remedy this gross disparity, I am announcing that next year, my administration will give these often forgotten American workers, great people, the people that built our country, access to the same type of retirement plan offered to every federal worker. We will match your contribution with up to $1,000 each year, as we ensure that all Americans can profit from a rising stock market.

Donald Trump 00:44:22-00:44:27 (5 sec) WEAK (1.287)

Let's also ensure that members of Congress cannot corruptly profit from using insider information. They stood up for that. I can't believe.

Note 00:44:27-00:44:27 ( sec) NO STRESSLENS

[Crosstalk]

Donald Trump 00:44:27-00:45:04 (37 sec) NO STRESSLENS

I can't believe it. Did Nancy Pelosi stand up, if she's here? Doubt it. Pass the Stop Insider Trading Act without delay. I wasn't sure if anybody, even on this side, was going to applaud for that.

Donald Trump 00:45:04-00:45:53 (49 sec) NO STRESSLENS

I'm very impressed. Thank you. I'm very impressed. But when it comes to the corruption that is plundering -- really, it's plundering America. There's been no more stunning example than Minnesota, where members of the Somali community have pillaged an estimated $19 billion from the American taxpayer. We have all the information and, in actuality, the number is much higher than that.

Donald Trump 00:45:53-00:46:18 (25 sec) NO STRESSLENS

And California, Massachusetts, Maine and many other states are even worse. This is the kind of corruption that shreds the fabric of a nation, and we are working on it like you wouldn't believe. So, tonight, although started four months ago, I am officially announcing the war on fraud to be led by our great Vice President, JD Vance.

Donald Trump 00:46:18-00:47:05 (47 sec) NO STRESSLENS

He'll get it done and, if we're able to find enough of that fraud, we will actually have a balanced budget overnight. It'll go very quickly. That's the kind of money you're talking about. We'll balance our budget. The Somali pirates who ransacked Minnesota, remind us that there are large parts of the world where bribery, corruption and lawlessness are the norm, not the exception.

Donald Trump 00:47:05-00:47:30 (25 sec) WEAK (1.144)

Importing these cultures through unrestricted immigration and open borders brings those problems right here to the USA. And it is the American people who pay the price in higher medical bills, car insurance rates, rent, taxes and perhaps most importantly crime. We will take care of this problem. We're going to take care of this problem.

Donald Trump 00:47:30-00:48:08 (38 sec) NO SIGNAL (0.496)

We are not playing games. Delilah Coleman was only five years old in June 2024 when an 18-wheel tractor-trailer plowed into her stopped car traveling at 60 miles an hour or more. The driver was an illegal alien let in by Joe Biden and given a commercial driver's license by open borders politicians in California.

Donald Trump 00:48:08-00:48:42 (34 sec) NO SIGNAL (0.356)

Doctors said Delilah would never be able to walk or talk, have a good life. She wouldn't even be able to eat again. But against all odds, she is now in the first grade, learning to walk. And she's here this evening with her dad Marcus, a fantastic man. Delilah, please, you are a great inspiration. Please stand up. Thank you, Delilah.

Donald Trump 00:48:42-00:49:21 (39 sec) NO STRESSLENS

Many, if not most, illegal aliens do not speak English and cannot read even the most basic road signs as to direction, speed, danger or location. That's why tonight I'm calling on Congress to pass what we will call the Delilah Law, barring any state from granting commercial driver's licenses to illegal aliens.

Donald Trump 00:49:21-00:50:02 (41 sec) NO STRESSLENS

And yesterday, as you probably saw at the White House, I hosted a ceremony with Americans who lost their treasured loved ones to the scourge of illegal immigration. People came into our country -- how we allowed this to happen with our open borders. These are the Angel Moms and Families that for decades our government betrayed and our media totally ignored -- totally.

Donald Trump 00:50:02-00:50:28 (27 sec) NO SIGNAL (0.686)

It was terrible, hard to believe actually. In 2023, a 16-year-old high school cheerleader named Lizbeth Medina was supposed to perform in her town's Christmas parade, but she never arrived. Her mother Jacqueline went home to look for her and she found her lying dead in a bathtub bleeding profusely after being stabbed 25 times.

Donald Trump 00:50:28-00:51:28 (60 sec) NO STRESSLENS

Lizbeth's killer was a previously arrested illegal alien who had broken in and brutally -- just brutally extinguished the brightest light in her family's life, violently and viciously. Her heartbroken mother is in the gallery to remind everyone in this chamber exactly why we are deporting illegal alien criminals from our country at record numbers and we're getting them the hell out of here fast.

Donald Trump 00:51:28-00:52:13 (45 sec) NO STRESSLENS

We don't want them. Thank you very much, Jacqueline. Thank you. We can never forget that many in this room not only allowed the border invasion to happen before I got involved, but indeed they would do it all over again if they ever had the chance. If they ever got elected, they would open up those borders to some of the worst criminals anywhere in the world.

Donald Trump 00:52:13-00:52:41 (28 sec) NO SIGNAL (0.914)

The only thing standing between Americans and a wide-open border right now is President Donald J. Trump and our great Republican patriots in Congress. Thank you. Thank you. As we speak, Democrats in this chamber have cut off all funding for the Department of Homeland Security. It's all cut off. It's all cut off.

Donald Trump 00:52:41-00:53:30 (48 sec) NO STRESSLENS

They have instituted another Democrat shutdown, the first one costing us 2 points on GDP. 2 points we lost on GDP, which probably made them quite happy actually. Now they have closed the agency responsible for protecting Americans from terrorists and murderers. Tonight, I'm demanding the full and immediate restoration of all funding for the border security, homeland security of the United States and also for helping people clean up their snow.

Donald Trump 00:53:30-00:55:39 (130 sec) NO STRESSLENS

We have no money because of the Democrats, and it would be nice -- we'd love to give you a hand at cleaning it up, but you gave no money. Nobody's getting paid; it's a shame. So, you have to think about it. We have, in case you didn't know, a pretty large snowstorm out there. One of the great things about the State of the Union is how it gives Americans the chance to see clearly what their Representatives really believe.

Donald Trump 00:55:39-00:55:54 (15 sec) NO SIGNAL (0.496)

So, tonight, I'm inviting every legislator to join with my administration in reaffirming a fundamental principle. If you agree with this statement, then stand up and show your support. The first duty of the American government is to protect American citizens, not illegal aliens.

Note 00:55:54-00:55:54 ( sec) NO STRESSLENS

[Audience disruption]

Donald Trump 00:55:54-00:56:47 (53 sec) NO STRESSLENS

Isn't that a shame? You should be ashamed of yourself, not standing up. You should be ashamed of yourself. That is why I'm also asking you to end deadly sanctuary cities that protect the criminals and enact serious penalties for public officials who block the removal of criminal aliens, in many cases, drug lords, murderers all over our country.

Donald Trump 00:56:47-00:57:14 (27 sec) NO SIGNAL (0.706)

They're blocking the removal of these people out of our country and you should be ashamed of yourself. [Audience chants "USA"] And perhaps most importantly, I'm asking you to approve the Save America Act to stop illegal aliens and others who are unpermitted persons from voting in our sacred American elections.

Donald Trump 00:57:14-00:57:41 (27 sec) NO SIGNAL (0.926)

That cheating is rampant in our elections. It's rampant. It's very simple, all voters must show voter ID. All voters must show proof of citizenship in order to vote. And no more crooked mail-in ballots except for illness, disability, military or travel, none. And this should be an easy one, and by the way, it's polling at 89 percent, including Democrats, 89 percent.

Donald Trump 00:57:41-00:58:16 (36 sec) NO STRESSLENS

And even the new communist mayor of New York City, I think he's a nice guy, actually, speak to him a lot. Bad policy, but nice guy. Just said they want people to shovel snow. They got hit hard. Wants them to shovel snow. But if you apply for that job, you need to show two original forms of ID and a Social Security card.

Donald Trump 00:58:16-00:58:44 (28 sec) NO SIGNAL (0.578)

Yet, they don't want identification for the greatest privilege of them all, voting in America. No, it's no good, no good. Both Republicans and Democrats overwhelmingly agree on the policy that we just enunciated and Congress should unite and enact this common sense, country-saving legislation right now and it should be before anything else happens.

Donald Trump 00:58:44-00:59:46 (62 sec) NO STRESSLENS

And the reason they don't want to do it, why would anybody not want voter ID? One reason, because they want to cheat. There's only one reason. They make up all excuses. They say it's racist. They come up with things. You almost say, what imagination they have. They want to cheat, they have cheated and their policy is so bad that the only way they can get elected is to cheat and we're going to stop it. We have to stop it, John.

Donald Trump 00:59:46-01:00:18 (32 sec) NO SIGNAL (0.493)

And here is one more opportunity to show common sense in government. In the gallery tonight are Sage Blair and her mother, Michelle. In 2021, Sage was 14 when school officials in Virginia sought to socially transition her to a new gender, treating her as a boy and hiding it from her parents. Hard to believe, isn't it? Before long, a confused Sage ran away from home.

Donald Trump 01:00:18-01:00:48 (31 sec) WEAK (1.25)

After she was found in a horrific situation in Maryland, a left-wing judge refused to return sage to her parents because they did not immediately state that their daughter was their son. Sage was thrown into an all-boys state home and suffered terribly for a long time. But today, all of that is behind them because sage is a proud and wonderful young woman with a full ride scholarship to Liberty University.

Donald Trump 01:00:48-01:01:31 (43 sec) NO STRESSLENS

Sage and Michelle, please stand up. And thank you for your great bravery and who can believe that we're even speaking about things like this. 15 years ago, if somebody was up here and said that, they'd say, what's wrong with him? But now we have to say it because it's going on all over, numerous states, without even telling the parents.

Donald Trump 01:01:31-01:02:15 (44 sec) NO STRESSLENS

But surely, we can all agree no state can be allowed to rip children from their parents arms and transition them to a new gender against the parents will. Who would believe that we've been talking about that. We must ban it and we must ban it immediately. Look, nobody stands up. These people are crazy. I'm telling you, they're crazy.

Donald Trump 01:02:15-01:02:46 (31 sec) WEAK (1.358)

Amazing. [Inaudible] boy, oh boy. We're lucky we have a country with people like this. Democrats are destroying our country, but we've stopped it just in the nick of time, didn't we? No one cares more about protecting America's youth than our wonderful First Lady, now a movie star. She's a movie star, can you believe it? Who would have believed that?

Donald Trump 01:02:46-01:03:14 (27 sec) NO SIGNAL (0.938)

Over the past year, she has had an incredible impact championing AI legislation advancing a landmark executive order on foster care and helping secure $30 million to launch the Melania Trump Foster Youth to Independence Initiative. It's a tremendous -- really, a tremendous thing that happened and had a lot of bipartisan support.

Donald Trump 01:03:14-01:03:44 (30 sec) NO SIGNAL (0.345)

She gets much better bipartisan support than I do. I get none. She gets a lot. Someday you're going to have to tell me how you did that. And students and educators in every state have joined the First Lady's efforts in the presidential AI challenge, keeping America's next generation positioned to succeed and strongly succeed in the future.

Donald Trump 01:03:44-01:04:54 (70 sec) NO STRESSLENS

Tonight, we welcome two young people whose lives reflect the First Lady's impact, Cierra Burns and Everest Nevermont. Thank you both. And Melania, thank you. I know how hard you worked on it. Thank you very much. I'm very proud to say that during my time in office, both the first four years and in particular this last year, there has been a tremendous renewal in religion, faith, Christianity and belief in God, tremendous renewal.

Donald Trump 01:04:54-01:05:21 (27 sec) NO SIGNAL (0.706)

This is especially true among young people, and a big part of that has -- had to do with my great friend Charlie Kirk, a great guy, great man. So, last year Charlie was violently murdered by an assassin and martyred, really martyred for his beliefs. His wonderful wife Erika is with us tonight. Erika, please stand.

Donald Trump 01:05:21-01:06:14 (53 sec) NO STRESSLENS

Thank you, Erika -- been through a lot. In Charlie's memory, we must all come together to reaffirm that America is one nation under God, and we must totally reject political violence of any kind. We love religion and we love bringing it back and it's coming back at levels that nobody actually thought possible.

Donald Trump 01:06:14-01:06:42 (28 sec) WEAK (1.336)

It's really a beautiful thing to see. Above all, unleashing America's promise requires keeping our communities safe. We have made incredible strides, yet dangerous repeat offenders continue to be released by pro-crime Democrat politicians again and again. We are honored to be joined tonight by a woman who's been through hell, Anya Zarutska.

Donald Trump 01:06:42-01:07:18 (35 sec) MEDIUM (1.656)

In 2022, she and her beautiful daughter -- so beautiful, what a beautiful young woman. Iryna fled war torn Ukraine to live with relatives near Charlotte, North Carolina. And by the way, what's going on with Charlotte? Last summer, 23-year-old Iryna was riding home on the train when a deranged monster, who had been arrested over a dozen times and was released through no cash bail, stood up and viciously slashed a knife through her neck and body.

Donald Trump 01:07:18-01:07:42 (25 sec) WEAK (1.074)

No one will ever forget -- there were people on that train, no one will ever forget the expression of terror on Iryna's face as she looked up at her attacker in the last seconds of her life. She died instantly. She had escaped a brutal war only to be slain by a hardened criminal set free to kill in America, came in through open borders.

Donald Trump 01:07:42-01:08:41 (59 sec) NO STRESSLENS

Mrs. Zarutska, tonight, I promise you we will ensure justice for your magnificent daughter Iryna. How do you not stand? How do you not stand? I'm asking this Congress to pass tough legislation to ensure that violent and dangerous repeat offenders are put behind bars and, importantly, that they stay there.

Donald Trump 01:08:41-01:09:09 (28 sec) NO SIGNAL (0.864)

Starting last summer, I deployed our National Guard and federal law enforcement to restore law and order to our most dangerous cities, including Memphis, Tennessee, big success; New Orleans, Louisiana, big success; and our nation's capital itself, Washington DC where we have almost no crime anymore in Washington DC. How did that happen?

Donald Trump 01:09:09-01:09:55 (47 sec) NO STRESSLENS

In fact, crime in Washington is now at the lowest level ever recorded, and murders in DC this January were down close to 100 percent from a year ago. They don't like to hear that. One of the -- sick people. One of the brave service members who helped achieve this stunning turnaround was 20-year-old West Virginia Army National Guard Specialist, Sarah Beckstrom.

Donald Trump 01:09:55-01:10:20 (24 sec) NO STRESSLENS

After a four-month deployment, she voluntarily extended her service, and her rank was going to be lifted. She was doing so well. They were so proud of her. But the very next day she was on patrol near the White House when she was ambushed and shot in the head by a terrorist monster from Afghanistan, shouldn't have been in our country.

Donald Trump 01:10:20-01:10:42 (22 sec) NO SIGNAL (0.994)

And all because she wore the uniform of our nation, she was shot. He traveled here because he didn't like people wearing our uniform, he was sick and deranged. Shouldn't have been in our country. Sarah Beckstrom died in order to defend our capital. And we are honored to be joined by her wonderful parents.

Donald Trump 01:10:42-01:11:31 (50 sec) NO STRESSLENS

Gary and Evalea, your daughter was a true American patriot, and she will be greatly missed. She was a great person. I saw reports on her; they've never seen anything like it. So sorry, thank you very much. A great young lady. I saw reports that were like perfect. She was perfect. Serving alongside Sarah that day was Staff Sergeant Andrew Wolfe.

Donald Trump 01:11:31-01:11:56 (25 sec) NO SIGNAL (0.53)

The terrorist shot Andrew in the head, and no one thought he could possibly make it. The two of them, Sarah and Andrew, both shot violently in the head, neither was expected to make it. They weren't even given a chance, except his wonderful mother named Melody who I spoke to the same night, and she was so positive.

Donald Trump 01:11:56-01:12:22 (25 sec) WEAK (1.021)

The doctors thought that Andrew was gone, but his mother said no, no, Mr. President, Andrew will be fine. He's going to make it. I've never seen anything like it. I mean he was given almost no chance. She said I have no doubt, sir, he's going to be OK. This was a conversation that I had with her that night with her son laying hopelessly in bed, blood all over.

Donald Trump 01:12:22-01:12:43 (21 sec) NO SIGNAL (0.027)

Everybody is praying. She said sir, he will be OK. The doctors didn't understand what she was saying and, after looking at the results of the damage done, neither did I. She was so strong and conclusive that even Andrew's great father felt she didn't really understand the gravity of the situation, but she turned out to be right.

Donald Trump 01:12:43-01:13:39 (56 sec) NO STRESSLENS

Right, Melody? She turned out to be right. Amazing, actually. I said where does this woman come from? She's the most positive person I've ever met. With God's help, Andrew has battled back from the edge of death -- and we're talking about the edge of death, on his way to a miraculous recovery. He's got a little work to do, but he's doing great.

Donald Trump 01:13:39-01:14:24 (45 sec) NO STRESSLENS

Nice to see -- he's a good-looking guy. Nice to see you. Thanks, Andrew. Thank you very much. So, Andrew, while you're up, now I'm going to ask a highly respected General James Seward to present Staff Sergeant Andrew Wolf and the great family of Sarah Beckstrom with the award created by our late great president, George Washington himself.

Donald Trump 01:14:24-01:15:52 (88 sec) NO STRESSLENS

It's called the Purple Heart. We love you all. Love you. We're proudly restoring safety for Americans at home and we are also restoring security for Americans abroad. Our country has never been stronger. In my first 10 months I ended eight wars, including Cambodia. Isn't it funny? They're sick people. Cambodia and Thailand.

Donald Trump 01:15:52-01:16:18 (26 sec) WEAK (1.343)

Pakistan and India, would have been a nuclear war. 35 million people said the prime minister of Pakistan would have died if it were not for my involvement. Kosovo and Serbia, Israel and Iran, Egypt and Ethiopia, Armenia and Azerbaijan, the Congo and Rwanda and, of course, the war in Gaza, which proceeds at a very low level.

Donald Trump 01:16:18-01:17:20 (62 sec) NO STRESSLENS

It's just about there. And I want to thank Steve Witkoff and Jared Kushner for your help. Thank you, Steve. Thank you, Jared. And I also want to thank the man they report to, Secretary of State Marco Rubio. Thank you, Marco. People like you. You know, Marco got 100 percent of the votes when he was in -- I think our next one was about 54 percent.

Donald Trump 01:17:20-01:17:56 (36 sec) NO SIGNAL (0.653)

And some of the Democrats are now saying, I can't believe we approved that guy. [Laughter] And he said, it's an honor that they feel that way, right, Marco? You have done a great job, great secretary of state. I think he'll go down as the best ever. Under the ceasefire, I negotiated every single hostage, both living and dead has been returned home.

Donald Trump 01:17:56-01:18:34 (38 sec) NO SIGNAL (0.248)

Can you believe that? Nobody thought it was possible. Nobody thought that was possible. Both living and dead. And those parents who had a dead son, their boy, they'd always tell me their boy, they wanted him as much as though he were living. It was an amazing period of time and they came back. And when we got all of the living hostages back and many, many before them but I always said those last 20 are going to be very tough, but we got many, many more, hundreds.

Donald Trump 01:18:34-01:19:04 (30 sec) NO SIGNAL (0.786)

But I said those last 20 are going to be tough. We got them back. But we only got back 14 or 15 of the dead, of the 28. And believe it or not, Hamas worked along with Israel and they dug and they dug and they dug. It's a tough -- it's a tough thing to do, going through bodies all over, passing up 100 bodies sometimes for each one that they found.

Donald Trump 01:19:04-01:19:52 (48 sec) NO STRESSLENS

Tough job. And they finally got it back to 27. And then Steve and Jared, they got it back to 28. They found all 28. Nobody thought that was possible, but we did it. And I remember the family of the 28th. They were so -- grieved, but they were so happy, as happy as it's possible -- possible to be. They had their boy back.

Donald Trump 01:19:52-01:20:11 (20 sec) WEAK (1.241)

The mother said, sir, we have our boy back. What a period of time that was, but we got them all back. So thank you both very much. Great job. And we're working very hard to end the ninth war, the killing and slaughter between Russia and Ukraine, where 25,000 soldiers are dying each and every month. Think of that, 25,000 soldiers are dying a month, a war which would have never happened if I were president, would have never happened.

Donald Trump 01:20:11-01:20:48 (36 sec) NO SIGNAL (0.539)

As President, I will make peace wherever I can, but I will never hesitate to confront threats to America wherever we must. That's why in a breakthrough operation last June, the United States military obliterated Iran's nuclear weapons program with an attack on Iranian soil, known as Operation Midnight Hammer.

---

Donald Trump 01:20:48-01:21:19 (31 sec) NO SIGNAL (0.358)

For decades, it had been the policy of the United States never to allow Iran to obtain a nuclear weapon, many decades. Since they seized control of that proud nation 47 years ago, the regime and its murderous proxies have spread nothing but terrorism and death and hate. They've killed and maimed thousands of American service members and hundreds of thousands and even millions of people with what's called roadside bombs.

---

Donald Trump 01:21:19-01:21:52 (33 sec) NO SIGNAL (0.369)

They were the kings of the roadside bomb. And we took out Soleimani. I did that during my first term, had a huge impact. He was the father of the roadside bomb. And just over the last couple of months with the protests, they've killed at least, it looks like 32,000 protests, 32,000 protesters in their own country.

---

Donald Trump 01:21:52-01:22:17 (25 sec) WEAK (1.102)

They shot them and hung them. We stopped them from hanging a lot of them with the threat of serious violence. But this is some terrible people. They've already developed missiles that can threaten Europe and our bases overseas and they're working to build missiles that will soon reach the United States of America.

---

Donald Trump 01:22:17-01:22:43 (26 sec) MEDIUM (1.692)

After Midnight Hammer, they were warned to make no future attempts to rebuild their weapons program in a particular, nuclear weapons, yet they continue starting it all over. We wiped it out and they want to start all over again. And are at this moment again pursuing their sinister ambitions. We are in negotiations with them.

---

Donald Trump 01:22:43-01:23:36 (53 sec) NO STRESSLENS

They want to make a deal, but we haven't heard those secret words, we will never have a nuclear weapon. My preference -- My preference is to solve this problem through diplomacy. But one thing is certain, I will never allow the world's number one sponsor of terror, which they are by far to have a nuclear weapon, can't let that happen.

---

Donald Trump 01:23:36-01:24:00 (24 sec) WEAK (1.016)

And no nation should ever doubt America's resolve. We have the most powerful military on earth I rebuilt the military in my first term. We're going to continue to do so. Also, we just approved $1 trillion budget. We have no choice. We have to be strong, because hopefully we will seldom have to use this great power that we built together.

---

Donald Trump 01:24:00-01:24:38 (38 sec) NO SIGNAL (0.128)

It's really called peace through strength and it's been very, very effective. So thanks to Republican in Congress, we're investing that record number of dollars, have no choice, in the United States armed forces, also creating a lot of jobs, but we're not even doing it for that reason. Because as I said, we have more jobs, more people working today than ever before in the history of our country.

---

Donald Trump 01:24:38-01:25:13 (35 sec) NO SIGNAL (0.574)

And NATO countries, our friends and allies, and they are, they're our friends and they're our allies, have just agreed at my very strong request to pay five percent of GDP for military defense rather than the two percent, which they weren't paying; we were paying for almost all of them. Now they're paying five as opposed to not paying for it. And getting that 5 percent was something which everyone said would never be done, could not happen.

Donald Trump 01:25:13-01:25:37 (24 sec) MEDIUM (1.7)

We got it really easily with one meeting and a big difference between 2 percent that's not paid. We were paying the freight of many of them. Very few were paid out. Now 5 percent then they're paid. And everything we send over to Ukraine is sent through NATO and they pay us in full. They pay us totally in full.

Donald Trump 01:25:37-01:26:22 (45 sec) NO STRESSLENS

Every branch of our armed forces is setting records for recruitment. This is so exciting. And every service member recently received a warrior dividend of $1,776. You know, they put it on my desk. We got the money from tariffs and other things, a lot of money we have. We have much more money than people understand, have to rebuild that program a little bit, but it won't take long.

Donald Trump 01:26:22-01:26:51 (29 sec) WEAK (1.003)

But we got the money and it was $1,775 and they wanted my approval. And I said what's the number. $1,775. I said, wait a minute, for one more dollar we can have 1776. It's going to -- I said we're going to figure that out. I never asked anybody if we could afford it. One more dollar, I said $1,776. And I said that's good.

Donald Trump 01:26:51-01:27:30 (39 sec) NO STRESSLENS

And I'll tell you what, our military -- that was four months ago, our military, I never see a person in the military that doesn't thank me for it. So, we're honored to do it. They deserve it and we call it $1,776, It was great. And we love our military; we love our law enforcement. We love our firemen, you know the firemen don't get mentioned enough.

Donald Trump 01:27:30-01:28:15 (44 sec) NO STRESSLENS

We love our firemen. We're also restoring American security and dominance in the Western Hemisphere, acting to secure our national interests and defend our country from violence, drugs, terrorism and foreign interference. For years, large swaths of territory in our region, including large parts of Mexico, really large parts of Mexico, have been controlled by murderous drug cartels.

Donald Trump 01:28:15-01:28:54 (39 sec) NO SIGNAL (0.633)

That's why I designated these cartels as foreign terrorist organizations, and I declared illicit fentanyl as a weapon of mass destruction. And with our new military campaign, we have stopped record amounts of drugs coming into our country and virtually stopped it completely coming in by water or sea. You probably noticed that.

Donald Trump 01:28:54-01:29:20 (26 sec) WEAK (1.142)

We very seriously damaged their fishing industry also. Nobody wants to go fishing anymore. We've also taken down one of the most sinister cartel kingpins of all. You saw that yesterday. In January, elite American warriors carried out one of the most complex spectacular feats of military competence and power in world history.

Donald Trump 01:29:20-01:29:57 (38 sec) WEAK (1.03)

No one's seen anything like it. Foreign leaders, I won't tell you who, called me and they said very impressive, very good. They couldn't believe -- they all watched; they saw what happened. This is a different fighting force than we had years ago when we fought to tie. No, it's a great fighting force. I'm so proud of it. Look at Space Force.

Donald Trump 01:29:57-01:30:19 (22 sec) MEDIUM (1.902)

Space force is my baby because we did that. My baby's becoming so important. And America's armed forces overwhelmed all defenses and utterly defeated an enemy -- good fighters -- to end the reign of outlaw dictator Nicolas Maduro and bring him to face American justice. And this was an absolutely colossal victory for the security of the United States.

Donald Trump 01:30:19-01:30:42 (23 sec) WEAK (1.256)

And it also opens up a bright new beginning for the people of Venezuela. We're working closely with the new president of Venezuela, Delcy Rodriguez, to unleash extraordinary economic gains for both of our countries and to bring new hope to those who have suffered so terribly. They really did suffer. With us tonight is Alejandro Gonzalez.

Donald Trump 01:30:42-01:31:05 (23 sec) NO SIGNAL (0.633)

She grew up in a tight knit Venezuelan family and was especially close to her beloved uncle, Enrique. But after Enrique ran for office and opposed Maduro, he was kidnaped by Maduro's security forces and thrown into the regime's really infamous prison in Caracas. Alejandro feared she would never see her uncle again.

Donald Trump 01:31:05-01:31:27 (22 sec) WEAK (1.424)

She feared for her own life also. But since the raid, we have worked with the new leadership, and they have ordered the closure of that vile prison and released hundreds of political prisoners already with more to come. Alejandro, I'm pleased to inform you that not only has your uncle been released, but he's here tonight.

Donald Trump 01:31:27-01:32:33 (65 sec) NO STRESSLENS

We brought him over to celebrate his freedom with you in person. Enrique, please come down. Thank you, Enrique. Have a good time. Nice to have you back, Enrique. There were many heroes on that January raid to capture Maduro, really great heroes. It was very dangerous. They knew we were coming; they were all set.

Donald Trump 01:32:33-01:33:05 (32 sec) WEAK (1.194)

But the deeds of one warrior that night will live forever in the eternal chronicles of military valor, Chief Warrant Officer Five, Eric Slover, planned the mission and was the flight lead in the cockpit of the first helicopter. A big, beautiful, powerful helicopter, it was a massive Chinook carrying, as you can imagine, many, many American warfighters.

Donald Trump 01:33:05-01:33:31 (26 sec) NO SIGNAL (0.981)

Wearing the dog tags his wife Amy had blessed with holy water before he left, she knew it was going to be a rough one. Eric steered the Chinook under the cover of night and descended swiftly upon Maduros' heavily protected military fortress. This was a major military installation protected by thousands of soldiers and guarded by Russian and Chinese military technology.

Donald Trump 01:33:31-01:34:13 (42 sec) NO STRESSLENS

How did that work out? Not too good. [Laughter] While preparing to land, enemy machine guns fired from every angle and Eric was hit very badly in the leg and hip, one bullet after another. He absorbed four agonizing shots, shredding his leg into numerous pieces. And yet, despite the fact that the use of his legs was vital to a successful helicopter flight -- legs are the most important part of flying a helicopter -- to deliver the many commandos who would capture and detain Maduro was the only thing Eric was thinking about.

Donald Trump 01:34:13-01:34:49 (36 sec) WEAK (1.094)

Then even as he was gushing blood, which was flowing back down the aisle -- a helicopter lands at a steep angle -- the machine gun stood right in front of him. They were right in front of him, two machine gunners, who escaped the wrath of the previous planes. Eric maneuvered his helicopter with all of those lives and souls to face the enemy and let his gunners eliminate the threat -- turned the helicopter around so the gunners could take care of business, saving the lives of his fellow warriors from what could have been a catastrophic crash deep in enemy territory.

Donald Trump 01:34:49-01:35:34 (45 sec) NO STRESSLENS

Only after safely landing the helicopter with all the warriors aboard in the exact right spot, which was vital to the mission, we probably would have had maybe cancel the mission if that didn't happen, Eric told his copilot, also wounded but not as gravely, to take over, I'm about ready to pass out. The success of the entire mission and the lives of his fellow warriors hinge on Eric's ability to take the searing pain, it was unbelievable what's happened to his legs, of the bullets and keep on flying and landing and people knew what was happening.

Donald Trump 01:35:34-01:38:16 (162 sec) NO STRESSLENS

Everybody in the back of the helicopter knew because they saw the blood pouring down the aisle. Chief Warrant Officer Slover is still recovering from his serious wounds, but I'm thrilled to say that he is here tonight with his wife Amy. Eric and Amy, come on in. [Audience chants "USA"] So we have a surprise for Eric and Amy. In recognition of Eric's actions above and beyond the call of duty, I would now like to ask General Jonathan Braga to present Chief Warrant Officer Slover with our nation's highest military award, the Congressional Medal of Honor.

Donald Trump 01:38:16-01:38:42 (26 sec) NO SIGNAL (0.096)

Well, thank you very much, Eric and Amy, great to get to know you. I met with them and with a lot of their fellow warriors at Fort Bragg recently. You notice the name Fort Bragg, we have it back, we brought it back. We won the First World War with it, the Second World War with it and then they decide to change the name, but we changed it back.

Donald Trump 01:38:42-01:39:48 (66 sec) NO STRESSLENS

Everybody wanted it changed back too. And 10 of Eric's fellow warriors from that incredible night of victory will also be receiving medals at a private ceremony that will soon be held at the White House, and Eric, you'll be there. Thank you. Thank you, Eric. That's a big one. Tonight, We've celebrated many truly extraordinary American patriots, but there is one last living legend to honor before we go. He is one more heroic American aviator, navy fighter pilot Royce Williams served in World War II, Korea, Vietnam, flying more than 220 missions.

Donald Trump 01:39:48-01:40:23 (35 sec) NO SIGNAL (0.724)

In the skies over Korea in 1952, Royce was in the dogfight of a lifetime, legendary dogfight. Flying through blizzard conditions, his squadron was ambushed by seven Soviet fighter planes. It was his first aerial combat of the war and despite being massively outnumbered and outgunned, Royce led the takedown of four enemy jets and almost destroyed the others, vanquishing his adversaries while taking 263 bullets to his own plane and being seriously hurt.

Donald Trump 01:40:23-01:42:26 (123 sec) NO STRESSLENS

His story was secret for over 50 years. He didn't even want to tell his wife, but the legend grew and grew. But tonight, at 100 years old, this brave Navy captain is finally getting the recognition he deserves. He was a legend long before this evening. Royce, please stand up and I will ask the First Lady of the United States to present Captain Royce Williams with his Congressional Medal of Honor.

Donald Trump 01:42:26-01:43:20 (54 sec) NO STRESSLENS

Gilroy said, thank you, Eric. I've always wanted the Congressional Medal of Honor, but I was informed, I'm not allowed to give it to myself and I wouldn't know why I'd be taking it. But if they ever open up that law, I will be there with you someday. But, you know, that's our highest honor, Congressional Medal of Honor.

Donald Trump 01:43:20-01:44:12 (52 sec) NO STRESSLENS

And that's a big thing and it's an honor to be in the same room with you. Thank you both, very much, Eric, thank you. Thank you. 250 years is a long time in the life of a nation, but in another sense, it's really a mere moment in the eye of history. Two of the gentlemen we met in the gallery this evening took their first breaths one century ago, 100 years before that on July 4th, 1826, the author of the Declaration of Independence, brilliant.

Donald Trump 01:44:12-01:44:54 (42 sec) NO STRESSLENS

Thomas Jefferson drew his last breath. Just a single long human lifespan separates the giants who declared and won our independence from the heroes who stand among us tonight. Everything our nation has done, everything we have achieved has been the work of those few great lifetimes. In those brief chapters, Americans built this nation from 13 humble colonies into the pinnacle of human civilization and human freedom, the strongest, wealthiest, most powerful, most successful nation in all of history, Americans ventured out across the daunting and dangerous continent.

Donald Trump 01:44:54-01:45:26 (32 sec) NO SIGNAL (0.964)

We carved paths through an unforgiving wilderness, settled a boundless frontier and tamed the beautiful but very, very dangerous wild West. From empty marshes and wide-open plains, we raised up the world's greatest cities. Together, we mastered the world's mightiest industries, shattered history's monstrous tyrannies, and we liberated millions from the chains of fascism, Communism, oppression and terror.

Donald Trump 01:45:26-01:45:56 (30 sec) MEDIUM (1.644)

Americans lifted humanity into the skies on the wings of aluminum and steel. And then we launched mankind into the stars on rockets powered by sheer American will and unyielding American pride. We wired the globe with our ingenuity, we captivated the planet with American culture, and now we are pioneering the next great American breakthroughs that will change the entire world.

Donald Trump 01:45:56-01:46:29 (33 sec) WEAK (1.063)

All of this and so much more is the enduring legacy, unmatched glory of the hardworking patriots who built and defended this country and who still carry the hopes and freedoms on all of humanity's backs. For years, they were forgotten, betrayed and cast aside, but that great betrayal is over and they will never be forgotten again because when the world needs courage, daring vision and inspiration, it is still turning to America.

Donald Trump 01:46:29-01:47:00 (31 sec) NO SIGNAL (0.84)

And when God needs a nation to work his miracles, He knows exactly who to ask. There is no challenge Americans cannot overcome, no frontier too vast for us to conquer, no dream too bold for us to chase, no horizon too distant for us to claim. For our destiny is written by the hand of Providence and these first 250 years were just the beginning.

Donald Trump 01:47:00-01:47:21 (22 sec) NO SIGNAL (0.946)

From the rugged border towns of Texas to the heartland villages of Michigan. From the sun kissed shores of Florida to the endless fields of the Dakotas. And from the historic streets of Philadelphia to right here in our nation's capital, Washington DC, the Golden Age of America is upon us.

Donald Trump 01:47:21-01:47:49 (28 sec) NO SIGNAL (0.428)

The revolution that began in 1776 has not ended; it still continues because the flame of liberty and independence still burns in the heart of every American patriot. And our future will be bigger, better, brighter, bolder and more glorious than ever before. Thank you. God bless you and God bless America.

X

# EXHIBIT 36

**HSI NorCal**
@HSISanFrancisco

AMERICAN ELECTIONS ARE FOR AMERICANS.

HSI is committed to protecting the integrity of our elections by investigating voter election fraud and holding violators accountable.




2:15 PM · Sep 2, 2026 · **2,234** Views

# EXHIBIT 37

Home
Explore
Notifications
Follow
Chat
Grok
History
Creator Studio
Premium
Profile
More
Post

iokhlkjlkj
@iokhlkjlkj6y1

Post

**Homeland Security Investigations**
@HSI_HQ

HSI is committed to protecting election integrity.

We will continue to investigate credible fraud allegations with our partners and follow the facts wherever they lead.

5:15 PM · Sep 17, 2026 · **1,735** Views

1 11 46 3

Post your reply Reply

Show probable spam

Search

**Relevant people**

**Homeland Securi**
@HSI_HQ
@ICEgov HSI prot
investigating glob
local communities
go.dhs.gov/UC8

**What's happenin**

**Pro Football Promo**
New Users Get a 50% Tra
Promoted by Gemini

Gaming · Trending
**Destiny**
Trending with Bungie

Business and finance · Trend
**Fifth Third Park**
Trending with Comerica Park

Politics · Trending
**Belarus**
Trending with Potash, Lukas

Show more

Terms · Privacy · Cookies ·
US TIDA · Ads Info · More ···

# EXHIBIT 38

X ← **Post**

**Homeland Security Investigations**
@HSI_HQ

HSI recently arrested Darwin Jonathan Rivera Flores, a Honduran national federally charged with unlawfully registering to vote in California and falsely claiming to be a U.S. citizen.

HSI and our law enforcement partners will continue investigating fraud to protect the integrity of American elections.

☎️Report voter fraud. Call 866-347-2423




9:05 PM · Sep 13, 2026 · **4,676** Views

**Log in or sig**

See what's happ
conversation

Log

**Relevant pe**

**Homelar**
@HSI_HC

Terms · Privacy · Coo
More ··· © 2026 X Co

# EXHIBIT 39

JUSTICE MANUAL

## Title 9: Criminal

# 9-85.000 - Protection of Government Integrity


| | |
|---|---|
| 9-85.100 | Supervisory Jurisdiction |
| 9-85.101 | Bribery of Public Officials |
| 9-85.110 | Investigations Involving Members of Congress |
| 9-85.200 | Federally Protected Activities (18 U.S.C. § 245) |
| 9-85.210 | Violations of Campaign Financing Laws, Federal Patronage Laws, and Corruption of Elections — Consultation Requirement |
| 9-85.220 | Purchase and Sale of Public Office (18 U.S.C. §§ 210, 211) |
| 9-85.300 | Non-Interference in Elections When Conducting Federal Criminal Investigations Involving Ballot Fraud |
| 9-85.400 | Armed Officials Where Elections are Held |
| 9-85.500 | Actions that May Have an Impact on an Election |


### 9-85.100 Supervisory Jurisdiction

This chapter addresses crimes which affect government integrity, including bribery of public officials and accepting a gratuity, election crimes, and other related offenses. The Public Integrity Section of the Criminal Division has supervisory jurisdiction over these offenses.

[Updated April 2018]

### 9-85.101 Bribery of Public Officials

Section 201 of Title 18 is entitled "Bribery of public officials and witnesses." The statute comprises two distinct offenses, however, in common parlance only the first, codified in section 201(b) of the statute, is true "bribery." The second offense, codified in section 201(c), concerns what are commonly known as "gratuities," although that word does not appear anywhere in the statute. Due to this distinction, government attorneys should take particular care and should not hesitate to consult with the Public Integrity Section of the Criminal Division.

[updated January 2020]

### 9-85.110 Investigations Involving Members of Congress

Consultation with the Public Integrity Section ("PIN") is required in all investigations involving a Member of Congress or congressional staff member ("Congressional Staffer").[1] As set forth in the table below, such consultation shall occur, and where required, approval shall be obtained, prior to opening any investigation or taking particular investigative steps involving a Member of Congress or Congressional Staffer, including, but not limited to:

- interviewing or subpoenaing a Member of Congress or Congressional Staffer (unless the Member of Congress or Congressional Staffer is being interviewed as a victim);
- obtaining a subpoena, 2703(d) order, search warrant, or other legal process for records, information, or property belonging to a Member of Congress, Congressional Office, or Congressional Staffer; or
- engaging in consensual monitoring of oral communications of a Member of Congress or Congressional Staffer. Consensual monitoring in an investigation involving allegations of misconduct by a Member of Congress also requires approval by a Deputy Assistant Attorney General. *See* JM 9-7.302.

PIN may also recommend partnership with United States Attorney's Offices or other prosecuting components on particular matters that implicate PIN's areas of expertise.

As set forth in the table below, certain charging decisions and resolutions of criminal charges in such investigations require PIN approval. For example, any criminal charge, resolution of a criminal charge, or declination in a matter in which a Member of Congress is an investigative subject or target requires prior approval by PIN. (Note that plea agreements involving defendants who are candidates for Congress also require prior approval by PIN. *See* JM 9-16.110.) Where consultation or approval is required, no investigative action shall be taken until such consultation has been completed or such approval has been obtained.

U.S. Attorney's Offices should also apply elevated internal review and approval requirements for all investigative steps identified below, with U.S. Attorney approval required where PIN approval is required.

The requirements in this section are in addition, and not an alternative, to other consultation and approval requirements in the Justice Manual. Further, prior to taking an investigative step governed by one of the requirements set forth in this section, the United States Attorney's Office or other prosecuting component must file an Urgent Report. *See* JM 1-13.130. The Urgent Report should indicate whether PIN concurred with, or approved of, the planned investigative step.

| **Investigative Step/Prosecutorial Decision** | **Consultation or Approval Requirement**[2] |
|---|---|
| Case Opening, Where a Subject or Target is a Member of Congress, or Congressional Staffer When Related to the Staffer's Duties | Consultation with PIN |
| Issuance of Subpoena to a Congressional Office, Member of Congress, or Congressional Staffer | Consultation with PIN |
| Issuance of Subpoena to Third Party for Records Belonging to a Congressional Office, Member of Congress, or Congressional Staffer When Related to the Staffer's Duties | Approval by PIN |
| Issuance of Subpoena to Third Party for Records Belonging to Congressional Staffer When Unrelated to the Staffer's Duties | Consultation with PIN |
| Applications, Pursuant to 18 U.S.C. §§ 2703(d) or 2705(b), [3] for Records Belonging to a Congressional Office Member of Congress, or Congressional Staffer When Related to the Staffer's Duties | Approval by PIN |
| Applications, Pursuant to 18 U.S.C. §§ 2703(d) or 2705(b), for Records Belonging to Congressional Staffer When Unrelated to the Staffer's Duties | Consultation with PIN |
| Application for Pen Register or Trap & Trace Surveillance of Devices or Accounts Belonging to a Congressional Office Member of Congress, or Congressional Staffer When Related to the Staffer's Duties | Approval by PIN |
| Application for Pen Register or Trap & Trace Surveillance of Devices or Accounts Belonging to a Congressional Staffer When Unrelated to the Staffer's Duties | Consultation with PIN |
| Interview of Member of Congress or Congressional Staffer, Except When Member of Congress or Congressional Staffer Is a Victim | Consultation with PIN |
| Government-Directed Contact, by a Source or Government Cooperator, with Member of Congress or Congressional Staffer | Approval by PIN |
| Application for Warrant for Records, Information, or Property Belonging to a Congressional Office, Member of Congress, or Congressional Staffer, or for a Location or Device in Which Legislative Materials Are Likely To Be Found[4] | Approval by PIN |

| | |
|---|---|
| Application for Title III Electronic Surveillance if Member of Congress's or Congressional Staffer's Communications May Be Intercepted | Approval by PIN[5] |
| Consensual Electronic Monitoring of Oral Communications of Member of Congress or Congressional Staffer | Approval by PIN |
| Charging (Whether by Criminal Complaint, Information, or Indictment) in Matter in Which a Member of Congress Is a Subject or Target for Conduct Related to Public Office or Campaign Activities | Approval by PIN |
| Charging (Whether by Criminal Complaint, Information, or Indictment) in Matter in Which a Member of Congress Is a Subject or Target for Conduct Unrelated to Public Office or Campaign Activities | Consultation with PIN |
| Resolution of Criminal Charges (Guilty Plea, DPA, NPA, or Declination) in Matter in Which a Member of Congress Is a Subject or Target | Approval by PIN |
| Resolution of Criminal Charges Against a Congressional Staffer (Guilty Plea, DPA, NPA, or Declination) in Matter in Which a Member of Congress Is Not a Subject or Target | Consultation with PIN |

[1] In investigations in which Members of Congress or their offices or staff are crime victims — such as in a threats case, or when money or property is stolen from a Congressional office — prosecutors are generally encouraged but not required to consult with PIN. However, if investigative or prosecutorial steps that are otherwise addressed in this section become necessary in such a case, then the PIN consultation and approval requirements set forth in the chart below would apply. For example, if the investigation into a crime committed against a Member of Congress were to require a subpoena for records belonging to a Congressional office, then PIN consultation would be required.

[2] PIN must notify the Criminal Division's Assistant Attorney General of consultations and approvals undertaken.

[3] If a § 2705(b) order would delay notice to a Member of Congress, Congressional Office, or a Congressional Staffer, as defined in JM 9-85.110 , the prosecutor must disclose such information in the application to the Court. JM 9-13.700(2) .

[4] This approval requirement also applies to warrants for GPS or other location data and tracking devices for vehicles or other property, devices, or accounts belonging to a Member of Congress, Congressional Staffer, Congressional Office, or in which legislative materials are likely to be found.

[5] Additional approvals from the Office of Enforcement Operations, a Criminal Division Deputy Assistant Attorney General, and/or an Assistant Attorney General are required for TIIIs, as well as consensual monitoring in certain circumstances. *See* JM 9-7.000 *et seq.*

[updated September 2024]

## 9-85.200 - Federally Protected Activities (18 U.S.C. § 245)

No prosecution of an offense described in 18 U.S.C. § 245 (Federally Protected Activities) may be undertaken by the United States except upon the certification of the Attorney General, Deputy Attorney General, Associate Attorney General, or Assistant Attorney General for the Civil Rights or Criminal Division that in his or her judgment a prosecution by the United States is in the public interest and necessary to secure substantial justice. The function of certification may not be delegated. *See* 18 U.S.C. § 245(a)(1). The anti-riot provision, 18 U.S.C. § 245(b)(3), and violations of 18 U.S.C. § 245(b)(1), insofar as that provision relates to matters not involving discrimination or intimidation on grounds of race, color, religion, or national origin, are assigned to the Criminal Division and requests for certification relating to them should be sent to the Criminal Division.

When the offense involves voting, and race is not an issue, prosecutors should contact the Public Integrity Section of the Criminal Division. When the offense involves voting and race is an issue, prosecutors should contact the Criminal Section of the Civil Rights Division. For required authorizations in civil rights cases, including offenses under 18 U.S.C. §§ 247 and 249, *see* JM Sections 8-1.010 to 8-3.300.

[cited in JM 9-2.112; JM 9-85.210] [updated August 2022]

### 9-85.210 - Violations of Campaign Financing Laws, Federal Patronage Laws, and Corruption of Elections — Consultation Requirement

***Department leadership is currently revising this section. The Consultation Requirement is suspended while revisions are ongoing. [June 2025]***

Consultation with the Public Integrity Section of the Criminal Division is required in each federal criminal matter that involves alleged or suspected violations of federal or state campaign financing laws, federal patronage crimes, or corruption of the election process.

Federal prosecutors and agents must consult with the Public Integrity Section prior to opening any such matter or taking any potentially overt investigative step, including but not limited to interviewing witnesses, issuing grand jury subpoenas, executing search warrants, or conducting surveillance. This provision does not, however, apply to intaking a complaint, provided that the intaking component advises the complainant that receiving a complaint in no way implies that there is or will be any federal criminal investigation of the allegation.

Federal prosecutors shall also consult with the Public Integrity Section before instituting grand jury proceedings relating to, or filing an information or seeking an indictment charging, a campaign finance, ballot fraud, or patronage offense.

Matters for which consultation with the Public Integrity Section is required include, but are not limited to, investigations and prosecutions of the offenses codified in: 18 U.S.C. §§ 592 to 611; 52 U.S.C. §§ 10307, 20511, 20701, 30101-30145; and prosecutive theories that involve election fraud or campaign fund raising violations using 18 U.S.C. §§ 241, 242, and 245; 18 U.S.C. § 371; 18 U.S.C. §§ 1341, 1343, and 1346; 18 U.S.C. § 1952; and 18 U.S.C. §§ 1956 and 1957.

[cited in JM 9-43.100] [updated August 2022]

### 9-85.220 - Purchase and Sale of Public Office (18 U.S.C. §§ 210, 211)

United States Attorneys shall consult with the Public Integrity Section of the Criminal Division before instituting grand jury proceedings, filing an information, or seeking an indictment for violations of 18 U.S.C. §§ 210 and 211 (Purchase and Sale of Public Office).

[updated August 2022]

### 9-85.300 Non-Interference in Elections When Conducting Federal Criminal Investigations Involving Ballot Fraud

Ballot fraud is crime involving the process by which voters are registered, votes are cast, or votes are tabulated. The Department has long recognized that the States – not the federal government – are responsible for administering elections, determining the validity of votes, and tabulating the results, with challenges handled by the appropriate election administrators, officials, legislatures, and courts. The Department has a limited role in these processes and should generally avoid interfering or appearing to interfere with election administration, tabulation, validation, or certification. *See* § 9-85.500. The Department's role is limited to investigating and prosecuting violations of federal election laws and deterring criminal conduct. Accordingly, the Department should not engage in overt criminal investigative measures in matters involving alleged ballot fraud until the election in question has been concluded, its results certified, and all recounts and election contests concluded. Doing otherwise runs the risk of chilling legitimate voting and campaign activities and of interjecting the investigation itself into ongoing campaigns and the adjudication of any ensuing election contest. It may, however, often be appropriate, in consultation with the Public Integrity Section, to share information and allegations involving such matters with state or local authorities where an immediate need for overt measures exists. Exceptions to this policy may be recognized, but only with the approval of the Public Integrity Section.

[added August 2022]

### 9-85.400 Armed Officials Where Elections are Held

Issues involving the application of 18 U.S.C. § 592, which prohibits armed federal presence where elections are held, are

supervised by the Public Integrity Section. When issues arise regarding the presence of armed officials at a location where an election is being held, federal prosecutors and agents must consult the Public Integrity Section.

[added August 2022]

## 9-85.500 Actions that May Have an Impact on an Election

Federal prosecutors and agents may never select the timing of any action, including investigative steps, criminal charges, or statements, for the purpose of affecting any election, or for the purpose of giving an advantage or disadvantage to any candidate or political party. Such a purpose is inconsistent with the Department's mission and with the Principles of Federal Prosecution. *See* § 9-27.260. Any action likely to raise an issue or the perception of an issue under this provision requires consultation with the Public Integrity Section, and such action shall not be taken if the Public Integrity Section advises that further consultation is required with the Deputy Attorney General or Attorney General.

[added August 2022]

# EXHIBIT 40

# *Whistle-Blower: Federal Agents May Have Broken State Laws in Search for Voter Fraud*

Agents expressed concern about being directed by top Homeland Security leaders to use private information to look up voter records in state databases.

Listen · 8:22 min




**By Nick Corasaniti and Hamed Aleaziz**

Published Sept. 14, 2026 Updated Sept. 15, 2026

Investigators may have broken state laws under the direction of top Homeland Security leaders as part of an expansive effort to find noncitizens on the nation's voter rolls, according to a federal whistle-blower's account released on Monday.

The authorities also required agents to examine at least 40 voters each day, the account said, suggesting a rushed pace that raises questions about the thoroughness of the investigation. The effort has relied on questionable data, and has likely improperly flagged U.S. citizens who are eligible to vote, the whistle-blower said in a nearly 30-page report.

The whistle-blower report, provided to Senators Chuck Schumer and Alex Padilla, both Democrats, offers an inside view of what the Department of Homeland Security is calling the "Unlawful Voter Initiative." The New York Times revealed last month the existence of the operation, which has deployed hundreds of federal agents to scour voter rolls managed by the states in a

widespread hunt for evidence of voter fraud. The investigation stems from President Trump's longstanding fixation on noncitizen voting, despite decades of research showing the practice is vanishingly rare.

Democrats and voting rights activists have denounced the operation as yet another way Mr. Trump, who has acknowledged the headwinds Republicans are facing as they try to retain control of Congress, is trying to sow doubts about the legitimacy of U.S. elections. They fear that eligible voters could be disqualified from participating in the fall midterms, or, worse, that Mr. Trump will use the investigation to try to discard actual results.

"This is just the latest example of how far Donald Trump will go to interfere in our elections," Mr. Schumer, the minority leader, said in an interview. He added: "We've never seen anything quite like this. They come up with so many different ways to try and steal the election, to try and jaundice the election, but we've never seen anything quite like this. Department of Homeland Security is actually pulling away these law officers, these federal law enforcement officers, away from the work they're supposed to do."

On Sunday, the senators sent a letter to Markwayne Mullin, the Homeland Security secretary, demanding that the operation be halted and also seeking answers to a dozen specific questions. The senators included the full whistle-blower account, which was produced by Democracy Defenders Fund, a nonprofit watchdog group founded in 2023.

In an statement, the Homeland Security Department broadly defended its hunt for election fraud: "Our message to aliens who vote in American elections is clear: we will find you, arrest you, and you will face the consequences — including criminal charges and deportation."

The identity of the whistle-blower is not known to The Times. Democracy Defenders Fund said in its report that the whistle-blower requested anonymity because of "an extreme fear of retaliation but they feel an obligation to speak up

about the misconduct and gross mismanagement they have witnessed."

According to the whistle-blower, agents are expected to complete at least 40 reviews in each eight-hour day, giving them scant time — about 12 minutes — to determine each voter's citizenship and voting history. The consequence of the investigation is potentially vast, according to the account, because each review is recorded in a database that could affect individuals' immigration status or legal permanent residency.

The whistle-blower also questioned the legality of a crucial part of the operation, with investigators effectively posing as individual voters by using personally identifiable information compiled from both internal and external sources, such as birth dates or partial Social Security numbers, to look up voter records.

**Sign up for the On Politics newsletter.** It's a pivotal moment for American politics. Join us for 2026 and beyond. Get it sent to your inbox.

The agents plugged those names and personal data into public-facing state websites to find a subject's voter history. Some states, such as Virginia, declare explicitly that only individual voters may use the search tool to look up their own records. Others, such as California, require specific information such as a driver's license number or partial Social Security number in an effort to limit the use of the tool to individuals.

"I do think the American people value keeping their personal information private," Mr. Padilla said. "The other thing that's concerning here, that the American people who would be offended by, is the knowing inaccuracy of what they're doing, whether it's the data or their sham analysis. It's going to produce false positives."

Worried about the potential legal ramifications of such actions, the whistle-blower "expressed concerns" to those leading the investigation within Homeland Security's Fraud Detection and National Security Directorate, according to the account.

The office of the chief counsel at D.H.S. said it was permissible for agents to use the state databases for operations such as the Unlawful Voter Initiative. Yet leadership appeared to acknowledge the potential for legal liability, responding to internal questions that agents "are not personally liable for conducting these searches when done as part of their official duties and properly documented."

"This statement suggests that there may be legal implications for accessing these websites," said a report produced by the Democracy Defenders Fund, a government watchdog group that produced the whistle-blower report. "Yet they are still requiring officers to engage in this illegal activity with promises of personal liability protection."

In its statement, the department rejected the conclusion that leaders had encouraged lawbreaking.

"The Department accessed publicly available data from states' voter rolls and cross referenced them with known aliens in our systems," the statement said. "It's not rocket science; it's an easy step to secure our elections."

Core to the operation is a compilation of data on hundreds of thousands of voters from across the country, described to agents as "source data," according to previous reporting by The Times. Agents were given little to no information about where the source data originated; at one point, D.H.S. officials said some immigration information had been added to their source data using "supplemental magic," according to the whistle-blower account. The mysterious origin of the "source data" comes as voting rights groups and election officials have condemned the Trump administration's many efforts to compile a national voter file and citizenship list.

The whistle-blower report, however, indicates that the data is likely filled with errors. According to a transcript of a training video included in the account, the investigation has relied on data from multiple sources, including public voter files obtained from states, Department of Justice data and queries of records compiled by Immigration and Customs Enforcement.

The data also includes what are known as alien identification numbers, the training video says, which are numbers assigned to a noncitizen that stay in their Homeland Security files permanently, even if they subsequently become citizens who are eligible to vote. If the investigation is using the existence of an alien number to flag that a voter is ineligible, many legal citizens are likely to be improperly ensnared as unlawful voters.

The whistle-blower report suggested that agents were worried that creating records that relied on potentially faulty data could amount to falsification of records, which would be a federal crime.

Additionally, agents were instructed to look for evidence that naturalized citizens had registered to vote or cast ballots before they were granted citizenship. Agents who came to believe the source data was faulty grew reluctant to flag individuals based on that data, the whistle-blower said.

"In other words," the report says, "the current process is knowingly sweeping known U.S. citizens in as potentially 'unlawful voters.'"

**Nick Corasaniti** is a Times reporter covering national politics, with a focus on voting and elections.

**Hamed Aleaziz** covers the Department of Homeland Security and immigration policy for The Times.

---

A version of this article appears in print on , Section A, Page 14 of the New York edition with the headline: Whistle-Blower Says U.S. Vote-Fraud Search May Have Been Illegal

# EXHIBIT 41

# LOST, NOT STOLEN:

## The Conservative Case that Trump Lost and Biden Won the 2020 Presidential Election

July, 2022

Senator John Danforth
Benjamin Ginsberg
The Honorable Thomas B. Griffith
David Hoppe
The Honorable J. Michael Luttig
The Honorable Michael W. McConnell
The Honorable Theodore B. Olson
Senator Gordon H. Smith

**Contents**

Introduction ........ 1
Executive Summary ........ 3
Arizona ........ 7
1. *Claims that Dominion Voting Machines Were Manipulated.* ........ 10
2. *Claims that Ballots Were Not Properly Counted.* ........ 10
3. *Claims that Unsolicited Mail-In Ballots Were Sent to Voters.* ........ 11
4. *Claims that Voter-Eligibility Requirements Were Not Enforced.* ........ 12
5. *Claims that Ballot Drop Boxes Were Not Fairly Located Throughout the State.* ........ 12
6. *Claims that Poll Officials Failed to Carefully Monitor the Election Count.* ........ 12
**Summary** ........ 12
**Addenda** ........ 12
Georgia ........ 27
1. *Counting Unlawful Ballots, Including by Deceased, Non-Resident, and other Ineligible Voters.* ........ 29
2. *Absentee-Ballot Procedures.* ........ 30
3. *Dominion Voting Machine Fraud.* ........ 31
4. *Improper Election Result Certification.* ........ 32
5. *Observer Access.* ........ 32
6. *Third Party Funds.* ........ 32
**Summary** ........ 32
**Addendum** ........ 33
Michigan ........ 36
1. *Challenger Access.* ........ 40
2. *Dominion Voting Machines.* ........ 41
3. *Absentee Ballot Drop Box Video Surveillance.* ........ 42
4. *Alleged TCF Center Fraud.* ........ 42
5. *AVCB Balancing, Ineligible Voters, Unsolicited Ballots, and Third-Party Funds.* ........ 43
**Summary** ........ 43
**Addendum** ........ 44
Nevada ........ 47
1. *Voter Fraud.* ........ 48
2. *Interference With Election Observers.* ........ 48
3. *Fraud by Agilis Machines.* ........ 49

4. *AB4 and Unlawful Absentee-Voting Procedures.* .......... 49
5. *Voter Drives and Bribery.* .......... 49
**Summary** .......... 50
**Addendum** .......... 50
Pennsylvania .......... 53
1. *Extending Election Deadlines.* .......... 54
2. *Inadequate Observation of Ballot Processing.* .......... 55
3. *Counting Deficient—But Not fraudulent—Absentee Ballots.* .......... 56
4. *Pre-Election Challenges to Changed Voting Procedures.* .......... 58
5. *Voter Fraud.* .......... 58
**Summary** .......... 58
**Addendum** .......... 58
Wisconsin .......... 64
1. *Absentee-Voting Procedures.* .......... 65
**Summary** .......... 67
**Addendum** .......... 67

## Introduction

We are political conservatives who have spent most of our adult lives working to support the Constitution and the conservative principles upon which it is based: limited government, liberty, equality of opportunity, freedom of religion, a strong national defense, and the rule of law.

We have become deeply troubled by efforts to overturn or discredit the results of the 2020 Presidential Election. There is no principle of our Republic more fundamental than the right of the People to elect our leaders and for their votes to be counted accurately. Efforts to thwart the People's choice are deeply undemocratic and unpatriotic. Claims that an election was stolen, or that the outcome resulted from fraud, are deadly serious and should be made only on the basis of real and powerful evidence. If the American people lose trust that our elections are free and fair, we will lose our democracy. As Jonathan Haidt observed, "We just don't know what a democracy looks like when you drain all the trust out of the system." Paul Kelly, *"Very Good Chance" Democracy Is Doomed in America, Says Haidt,* AUSTRALIAN (July 20, 2019).

We therefore have undertaken an examination of every claim of fraud and miscount put forward by former President Trump and his advocates, and now put the results of those investigations before the American people, and especially before fellow conservatives who may be uncertain about what and whom to believe. Our conclusion is unequivocal: Joe Biden was the choice of a majority of the Electors, who themselves were the choice of the majority of voters in their states. Biden's victory is easily explained by a political landscape that was much different in 2020 than it was when President Trump narrowly won the presidency in 2016. President Trump waged his campaign for re-election during a devastating worldwide pandemic that caused a severe downturn in the global economy. This, coupled with an electorate that included a small but statistically significant number willing to vote for other Republican candidates on the ballot but not for President Trump, are the reasons his campaign fell short, not a fraudulent election.

Donald Trump and his supporters have failed to present evidence of fraud or inaccurate results significant enough to invalidate the results of the 2020 Presidential Election. We do not claim that election administration is perfect. Election fraud is a real thing; there are prosecutions in almost every election year, and no doubt some election fraud goes undetected. Nor do we disparage attempts to reduce fraud. States should continue to do what they can do to eliminate opportunities for election fraud and to punish it when it occurs. But there is absolutely no evidence of fraud in the 2020 Presidential Election on the magnitude necessary to shift the result in any state, let alone the nation as a whole. In fact, there was no fraud that changed the outcome in even a single precinct. It is wrong, and bad for our country, for people to propagate baseless claims that President Biden's election was not legitimate.

In the past 30 years, those tasked with administering our elections have helped create a modern election system in which we can and should have confidence. In all fifty states and at the national level there are transparent recount and election contest procedures designed to allow candidates to investigate and litigate claims of voter fraud and corruption. Those procedures have been tested in every presidential election since at least 2000 and have been found in every instance to be sound and reliable. The Trump Campaign and its supporters had full access to these remedies and used them in 64 proceedings in the states we examine, and in each instance, their claims of fraud and miscount failed. Our review of each of these Trump charges affirms that

the 2020 election was administered by trained professionals who reaffirmed their established track record for fairness.

The performance of the system in 2020 was all the more remarkable because of the extraordinary circumstances caused by the COVID-19 pandemic, which precipitated changes on an unprecedented scope and timeline. Some of those changes may have created possibilities for fraud, but there is no evidence that those risks materialized in reality; nor did they result in dampening voter participation—quite the opposite. Nonetheless, moving forward, the states should redouble their efforts to strengthen the integrity of our voting systems and make it as easy to vote and as hard to cheat as possible for persons of every circumstance.

We urge our fellow conservatives to cease obsessing over the results of the 2020 election, and to focus instead on presenting candidates and ideas that offer a positive vision for overcoming our current difficulties and bringing greater peace, prosperity, and liberty to our nation.

# Executive Summary

As part of his post-election attempts to retain the presidency, Donald Trump and his supporters filed 64 cases containing 187 counts in the six key battleground states, in addition to utilizing some of the recount and contest procedures available to them under state law. The former president maintains to this day that the 2020 election was stolen and the results fraudulent.

This Report takes a hard look at the very serious charges made by Trump and his supporters. The consequences of a president and a major party candidate making such charges are monumental. If true, our electoral system is in desperate need of repair. If not true, that must be said because such false charges corrode our democracy and leave a significant share of the population doubting the legitimacy of our system, seriously weakening the country.

Every member of this informal group has worked in Republican politics, been appointed to office by Republicans, or is otherwise associated with the Party. None have shifted loyalties to the Democratic Party, and none bear any ill will toward Trump and especially not toward his sincere supporters. Many of us have worked over the years in polling places as part of Republican Election Day Operations looking for the same sort of fraud and irregularities Donald Trump claimed in 2020. Such vigilance is entirely appropriate and must not be stigmatized as "voter suppression."

Fraud, irregularities, and procedural deficiencies formed the basis for challenging the results in five of the six highly contested Electoral College battleground states of Arizona (page 7), Georgia (page 27), Michigan (page 36), Nevada (page 47), and Wisconsin (page 64). In Pennsylvania (page 53), Trump verbally attacked the elections as fraudulent, but his lawyers never filed such charges in court.

For this Report, we examined every count of every case brought in these six battleground states. We include both a narrative for each state and an accompanying Addendum listing each case and its disposition.

We conclude that Donald Trump and his supporters had their day in court and failed to produce substantive evidence to make their case.

Of the 64 cases brought by Trump and his supporters, twenty were dismissed before a hearing on the merits, fourteen were voluntarily dismissed by Trump and his supporters before a hearing on the merits, and 30 cases included a hearing on the merits. Only in one Pennsylvania case involving far too few votes to overturn the results did Trump and his supporters prevail.

Repetition of these false charges causes real harm to the basic foundations of the country, with 30 percent of the population lacking faith in the results of our elections.

In our system of government, these cases provided the forums in which Trump and his supporters could and should have proven their claims. This Report shows that those efforts failed because of a lack of evidence and not because of erroneous rulings or unfair judges. Judges, legislators, and other election officers, often including members of his own party, gave Trump ample time and every opportunity to present evidence to make his case. Post-election audits or

reviews in each state also failed to show any irregularities or fraud that would overturn the electoral results. In many cases, after making extravagant claims of wrongdoing, Trump's legal representatives showed up in court or state proceedings empty-handed, and then returned to their rallies and media campaigns to repeat the same unsupported claims.

Even now, twenty months after the election, a period in which Trump's supporters have been energetically scouring every nook and cranny for proof that the election was stolen, they come up empty. Claims are made, trumpeted in sympathetic media, and accepted as truthful by many patriotic Americans. But on objective examination they have fallen short, every time.

Moreover, even if there were such evidence (which we did not find), there is an obligation on the part of a campaign challenging the veracity of official results to bring its challenges on a timely basis, through the established legal channels, based on ordinary rules of evidence and logic. In our system of government, these proceedings provide the forums in which Mr. Trump and his supporters could and should have proven their claims. They had every opportunity to use those channels.

Once they had lost, Trump and his supporters had an obligation to recognize that the election debate was over. Questions of election legality must be resolved dispassionately in courts of law, not through rallies and demonstrations—and most emphatically, not by applying political pressure and threats to induce Congress to ignore its constitutional duty and the electoral outcome for which the people voted, and which the legal processes of the affected states had examined and confirmed. The same system used to bring all his cases, recounts, and contests also sets deadlines for when the process becomes final, a winner is declared, and the losing candidate concedes. Trump failed to abide by that norm in contrast to prior losers of presidential elections such as Richard Nixon and Al Gore.

After reviewing the evidence presented in each court case and the post-election reviews with this lens, certain patterns emerge. Most obvious is that the former president's rhetoric—before, during and after the election—was not supported by the legal cases he tried to make or any evidence he introduced. Cases and reviews in the six battleground states included similar charges and similar dismissals by federal and state courts. This chart describes the nature of Trump's charges and the pages of each state's narrative that describe the outcome:

<u>Fraud or ballots improperly counted</u>:

Arizona, page 10;
Georgia, page 29;
Michigan, page 42;
Nevada, page 48;
Pennsylvania, page 58;
Wisconsin, page 67.

<u>Voting machines producing rigged results</u>:

Arizona, page 10;
Georgia, page 31;
Michigan, page 41;
Nevada, page 49.

<u>Absentee ballot or mail-in ballot irregularities</u>:
Arizona, page 11;
Michigan, page 42;
Pennsylvania, page 56;
Wisconsin, page 65.

<u>Ineligible voters</u>:
Arizona, page 12;
Georgia, page 29;
Michigan, page 43.

<u>Observers access blocked/failure to monitor polling places</u>:
Arizona, page 12;
Georgia, page 32;
Michigan, page 40;
Nevada, page 48;
Pennsylvania, page 55.

**<u>Post-election reviews and audits</u>**: In addition to the numerous legal cases, the six states conducted post-election reviews at the insistence of or because of the Trump allegations. This Report discusses those efforts, which also failed to support the allegations from Trump and his supporters:

<u>Arizona</u>: Cyber Ninjas review, pages 7–10, 16.
<u>Georgia</u>: The Secretary of State manually recounted all five million ballots cast (page 27) and conducted a post-election audit.
<u>Michigan</u>: Separate post-election investigations by a Michigan State Senate committee chaired by Republican Ed McBloom, pages 36–40, and Michigan's Office of the Auditor General, pages 36, 37.
<u>Nevada</u>: Republican Secretary of State investigations of voting complaints, page 47.
<u>Pennsylvania</u>: A statewide risk-limiting audit in February 2021, page 54. Republican state senators pursued a forensic audit that has yielded no evidence to date, page 54.
<u>Wisconsin</u>: The Wisconsin Legislative Audit Bureau, a non-partisan, independent body, found no evidence of widespread fraud to alter the election results, page 64. The conservative Wisconsin Institute for Law & Liberty likewise found no evidence of widespread voter fraud and no evidence of significant problems with voting machines, page 64. Wisconsin House Republicans hired a former state Supreme Court justice to examine the election; an interim report cited no evidence of fraudulent votes sufficient to overturn the results, page 65.

After the dismissal of all 64 court cases and state reviews, Trump and his supporters have continued in the sixteen months since Joe Biden's Inauguration with claims of a fraudulent election. Each has been refuted. Two of the most publicized examples illustrate this. In the first, economist John Lott Jr. produced a paper in *Public Choice* claiming that "simple tests of voter fraud" showed excess votes for Biden in Pennsylvania and Georgia and 255,000 excess votes in

six key states due to artificially large turnout across several counties. That was quickly refuted by political scientists Andrew Eggers and Justin Grimmer.[1]

A second example is a recent film from Dinesh D'Souza, "2000 Mules,"[2] which attempts to demonstrate rampant voter fraud in the 2020 Presidential Election through digital-device location-tracking data. Yet the film, heartily endorsed by Trump at its Mar-a-Lago premiere, has subsequently been thoroughly debunked in analyses.[3] What the film claims to portray is simply not supported by the evidence invoked by the film.

As this Report notes, in five of the six battleground states, analyses have shown that Trump lost not because of fraud but because a small but significant subset of Republican voters supported the GOP's candidates down-ballot but did not vote for Trump. In many instances, Republican candidates other than Trump won despite being subject to the same alleged fraudulent systems that Trump supporters declaim. *See* pages 7, 27, 36, 53, and 64.

We are most concerned that even after failing in more than 60 court cases to produce evidence of fraud or irregularities that would change the 2020 election results, the repetition of the false charges of a stolen election continues.

To have 30 percent of the country lack faith in election results based on unsubstantiated claims of a "stolen" election is not sustainable in a democracy, and it discredits the political party making those charges. We hope that setting out the full record in this Report will help restore faith in the reliability of our elections.

---

[1] Andrew Eggers & Justin Grimmer, *Comment on "Simple Tests for the Extent of Vote Fraud With Absentee and Provisional Ballots in the 2020 US Presidential Election"* (Apr. 2, 2022), https://www.dropbox.com/s/ouxd7zinzv8l9o6/Fraud2.pdf?dl=0.

[2] 2000 MULES, https://2000mules.com/ (last visited July 6, 2022).

[3] Danny Hakim & Alexandra Berzon, *A Big Lie in a New Package,* N.Y. TIMES (May 29, 2022), https://www.nytimes.com/2022/05/29/us/politics/2000-mules-trump-conspiracy-theory.html; Khaya Himmelman, *Fact Checking Dinesh D'Souza's "2,000 Mules,"* THE DISPATCH (May 21, 2022), https://factcheck.thedispatch.com/p/fact-checking-dinesh-dsouzas-2000?s=r; Tom Dreisbach, *A Pro-Trump Film Suggests Its Data Are So Accurate, It Solved a Murder. That's False*, NPR (May 17, 2022), https://www.npr.org/2022/05/17/1098787088/a-pro-trump-film-suggests-its-data-are-so-accurate-it-solved-a-murder-thats-fals; Ali Swenson, *Fact Focus: Gaping Holes in the Claim of 2K Ballot "Mules,"* ASSOCIATED PRESS (May 3, 2022), https://apnews.com/article/2022-midterm-elections-covid-technology-health-arizona-e1b49d2311bf900f44fa5c6dac406762; Philip Bump, *"2000 Mules" Offers the Least Convincing Election-Fraud Theory Yet*, WASH. POST (May 11, 2022), https://www.washingtonpost.com/politics/2022/05/11/2000-mules-offers-least-convincing-election-fraud-theory-yet/.

**Arizona**

Donald Trump and his supporters brought eight cases with 29 total counts challenging the results showing he lost Arizona. All were unsuccessful. Subsequently, an Arizona State Senate post-election review conducted by the firm Cyber Ninjas (a private firm hand-picked by the Trump forces) provided Donald Trump and his supporters every opportunity to demonstrate the fraud and irregularities they claimed but could not prove in post-election legal challenges. The Cyber Ninjas' final analysis reaffirmed Trump's loss, claiming 99 *additional votes* for Biden and 261 *fewer votes* for Trump.[4]

Biden outperformed Clinton's 2016 results, and Trump performed worse than he had in 2016. President Biden carried Arizona by a margin of 10,457 votes out of 3.4 million cast in the 2020 Presidential Election, official results from Arizona elections officials show.[5] Biden received 49.4% of the vote.[6] Trump received 49.0%.[7] In 2016, Trump carried Arizona by a margin of approximately 91,000 votes out of almost 2,605,000 votes cast.[8] Trump received 48.1% of the vote in 2016.[9] Hillary Clinton received 44.6%.[10] Disaffection for Trump among Republican voters led to ticket-splitting that hurt Trump and helped Biden.[11] Nearly 60,000 voters did *not* vote for Trump even though they voted Republican down-ballot; of these, 39,000 voted for Biden.[12] Considering only the two most populous counties in the state, more than 74,000 disaffected Republicans did not vote for Trump in 2020; 65% of these (48,577 votes) voted for Biden; those 48,577 votes alone represent 4.6 times Biden's margin of victory over Trump.[13]

Trump lost significant ground from 2016 among college-educated white women. In 2016, he bested Clinton among that group 48% to 46%.[14] In 2020, Biden won 56% of their vote, leaving

---

[4] David Schwartz & Nathan Layne, *"Truth Is Truth": Trump Dealt Blow as Republican-Led Arizona Audit Reaffirms Biden Win*, REUTERS (Sept. 27, 2021), https://www.reuters.com/world/us/arizona-republicans-release-findings-widely-panned-election-audit-2021-09-24/.

[5] Arizona Secretary of State, *State of Arizona Official Canvass* (Nov. 24, 2020), https://azsos.gov/sites/default/files/2020_General_State_Canvass.pdf.

[6] *Arizona Election Results & Maps 2020*, CNN (last visited June 9, 2022), https://www.cnn.com/election/2020/results/state/arizona.

[7] *Id*.

[8] *Arizona Election Results 2016*, N.Y. TIMES (Aug. 1, 2017), https://www.nytimes.com/elections/2016/results/arizona.

[9] *Id*.

[10] *Id*.

[11] Garrett Archer, *The Other Arizona Election Audit: Disaffected Republicans Handed Arizona to Joe Biden*, ABC 15 ARIZONA (June 22, 2021), https://www.abc15.com/news/in-depth/the-other-arizona-election-audit; Garrett Archer, *How President Joe Biden Pulled Off a Win in Arizona*, ABC 15 ARIZONA (Jan. 20, 2021), https://www.abc15.com/news/election-2020/how-president-joe-biden-pulled-off-a-win-in-arizona..

[12] Archer, *The Other Arizona Election Audit*, *supra* note 11.

[13] Benny White et al., *Lessons from Maricopa County: Slow Facts Versus Fast Lies in the Battle Against Disinformation*, INDEPENDENT MEDIA INSTITUTE 5 (Sept. 2, 2021), https://docs.real-audits.org/s/nqB2jrAzgPdewi2; *see* Nathaniel Rakich, *How Arizona Became a Swing State*, FIVETHIRTYEIGHT (June 29, 2020, 7:33 AM), https://fivethirtyeight.com/features/how-arizona-became-a-swing-state/.

[14] Eldrid Herrington, *What Happened? Arizona Turned Blue in the 2020 Presidential Election, but the Republicans Still Control the State*, USAPP—AMERICAN POLITICS AND POLICY BLOG (Jan. 21, 2021), https://blogs.lse.ac.uk/usappblog/2021/01/21/what-happened-arizona-turned-blue-in-the-2020-presidential-election-but-the-republicans-still-control-the-state/; *see also Exit Poll Results and Analysis from Arizona*, WASH. POST (Jan. 7, 2021), https://www.washingtonpost.com/elections/interactive/2020/exit-polls/arizona-exit-polls/.

44% for Trump.[15] Biden also performed well among the growing population of Spanish-speaking voters, receiving 70% of the vote.[16]

Trump and some of his supporters maintain that Arizona's certified results were fraudulent. Their evidence falls far short of their claims. Post-election reviews by state election officials found only 182 allegations of voter fraud that merited review.[17] Of that number, only four allegations led to charges, and no person's vote was counted more than once.[18] After conducting a state investigation, the Associated Press did not find widespread voter fraud.[19]

After Trump and his supporters alleged that rigged Dominion voting machines cost him the election, the Board of Supervisors in the largest county in the state, Maricopa County, which includes Phoenix, conducted a forensic audit of their Dominion voting machines. The Board retained two independent auditing firms experienced at analyzing election counts and accredited by the bipartisan U.S. Election Assistance Commission to certify the trustworthiness of voting machines.[20] The audit determined that the Dominion machines worked properly and found no evidence of manipulation.[21] An independent review resulting from an agreement between the Republican State Senate and Maricopa County found that the county's vote-counting machines were not connected to the internet and found no evidence of data deletion, purging, or overwriting or other evidence of obstruction.[22]

Several counties performed hand counts of the 2020 vote—Maricopa County did so three times. None of the recounts found material discrepancies with the certified results.[23] Few elections in history have been so thoroughly fly-specked after the fact with so little evidence of fraud or of miscounted ballots.

---

[15] *Exit Poll Results and Analysis from Arizona*, WASH. POST (Jan. 7, 2021), https://www.washingtonpost.com/elections/interactive/2020/exit-polls/arizona-exit-polls/.

[16] Herrington, *supra* note 14.

[17] Bob Christie & Christina A. Cassidy, *AP: Few AZ Voter Fraud Cases, Discrediting Trump's Claims*, ASSOCIATED PRESS (July 16, 2021), https://apnews.com/article/business-government-and-politics-arizona-election-2020-e6158cd1b0c6442716064e6791b4c6fc.

[18] *Id.*

[19] Christina A. Cassidy, *Far Too Little Vote Fraud to Tip Election to Trump, AP Finds*, ASSOCIATED PRESS (Dec. 14, 2021), https://apnews.com/article/voter-fraud-election-2020-joe-biden-donald-trump-7fcb6f134e528fee8237c7601db3328f.

[20] *Auditing Elections Equipment in Maricopa County*, MARICOPA COUNTY, https://www.maricopa.gov/5681/Elections-Equipment-Audit (last visited June 6, 2022).

[21] *See* SLI Compliance, Forensic Audit Report: Dominion Voting Systems, Democracy Suite 5.5B, Report Number: MCA-21001-AR-01 (2021), https://www.maricopa.gov/DocumentCenter/View/66843/SLI-Compliance-Forensic-Audit-Report?bidId; Pro V&V, Field Audit Report (2021), https://www.maricopa.gov/DocumentCenter/View/66844/Post-Audit-Report.

[22] Mary Jo Pitzl & Ronald J. Hansen, *Maricopa County's Vote-Counting Machines Were Not Connected to Internet, Independent Review Finds*, ARIZONA REPUBLIC (Mar. 23, 2022, 4:59 PM), https://www.azcentral.com/story/news/politics/elections/2022/03/23/arizona-audit-maricopa-county-election-machines-no-internet-connection-review-finds/7050408001/; JOHN SHADEGG, ANSWERS TO SENATE QUESTIONS REGARDING MARICOPA COUNTY ELECTION NETWORK: ARIZONA 2020 PRESIDENTIAL ELECTION 8–10 (Mar. 23, 2022), https://www.maricopa.gov/DocumentCenter/View/74501/Final-Report-Answers-to-Senate-Questions.

[23] *See* Arizona Sec'y of State, *Summary of Hand Count Audits—2020 General Election* (2020), https://azsos.gov/2020-general-election-hand-count-results (last updated Nov. 17, 2020, 4:54 PM).

The Arizona Senate's Republican majority hired the firm Cyber Ninjas to review the results from Maricopa County. After Cyber Ninjas issued a report raising questions about the election's administration, the Maricopa County Elections Department issued a rebuttal. We have reviewed the Cyber Ninjas report and the Maricopa County rebuttal and find that the Maricopa County rebuttal systematically refutes each and every one of the Cyber Ninjas' questions and allegations.[24]

We concur with the Maricopa County rebuttal, which states: "After an in-depth analysis and review of the reports and presentations issued by the Senate's contractors, we determined that nearly every finding [by the Cyber Ninjas audit] included faulty analysis, inaccurate claims, misleading conclusions, and a lack of understanding of federal and state election laws."[25] At the heart of the inaccuracies in the Cyber Ninjas' report "is a basic misunderstanding or ignorance of election laws and procedures."[26] A telling example was the Cyber Ninjas' claim that 74,000 more early ballots were returned than requested. As Maricopa County noted, that allegation was based on a lack of understanding of the way those ballots are tracked. For example, ballot envelopes may be scanned as "returned" more than once, as when a voter legally cures a questionable signature or unsigned envelope; Cyber Ninjas counted each scan as reflecting a separate returned ballot, when in reality there was just one ballot that was counted just one time.[27] Where Cyber Ninjas alleged tens of thousands of questionable ballots, the county identified just 37 (referred to the Republican Arizona Attorney General's Office for further investigation).[28] The Maricopa County rebuttal noted:

> In total, we found fewer than 100 potentially questionable ballots cast out of 2.1 million. This is the very definition of exceptionally rare. None of these instances impacted the outcome of races and a thorough review by our election professionals confirmed there were no systematic issues related to ballot counting and processing in the November 2020 General Election.[29]

After release of this report, and facing contempt fines of $50,000 per day for failure to comply with a judge's order that it provide records to an Arizona newspaper, Cyber Ninjas shut down[30] having reaffirmed Trump's loss and a net *gain* for Biden.[31]

---

[24] Maricopa Cnty. Elections Dep't & Off. Recorder, *Correcting the Record: Maricopa County's In-Depth Analysis of the Senate Inquiry* (2022) [hereinafter MARICOPA COUNTY REPORT], https://recorder.maricopa.gov/justthefacts/pdf/Correcting%20The%20Record%20-%20January%202022%20Report.pdf; *see Just the Facts*, Maricopa County Elections Department, https://recorder.maricopa.gov/justthefacts/ (last visited Jan. 10, 2022).

[25] MARICOPA COUNTY REPORT, *supra* note 24, at 3.

[26] *Id.*

[27] *Id.* at 68.

[28] *Id.* at 5.

[29] *Id.*

[30] John Wagner, *Cyber Ninjas, the Firm Hired to Conduct an Election Review in Arizona, Ordered to Pay $50,000 a Day in Sanctions*, WASH. POST (Jan. 7, 2022, 8:21 AM), https://www.washingtonpost.com/politics/cyber-ninjas-the-firm-hired-to-conduct-an-election-review-in-arizona-ordered-to-pay-50000-a-day-in-sanctions/2022/01/07/d6e8dfcc-6fb8-11ec-a5d2-7712163262f0_story.html.

[31] Schwartz & Layne, *supra* note 4.

The Arizona Senate hired two other firms, CyFIR and EchoMail. CyFIR reviewed Maricopa County's tabulation equipment and election-management system.[32] CyFIR falsely claimed that the county had deleted data, but the county showed that it had properly retained this data.[33] EchoMail reviewed 1.9 million early-ballot affidavit images.[34] It made a number of claims about the number of early ballots returned, allegedly duplicate ballot images, and other supposed "anomalies."[35] The County responded that these claims arose from "a flawed understanding of signature verification" laws and practices, namely the difference between a canvass (which counts ballots) and images of envelopes (which may be scanned multiple times if a voter cures a signature issue or signs a blank envelope).[36] We concur with the County.

The Trump campaign and its supporters brought an array of federal and state legal actions to Arizona's certified election results and asserted various claims of wrongdoing by election officials. Each challenge has failed, with some abandoned by their proponent before court determinations.

The legal challenges fall into six categories of claims.

*1. Claims that Dominion Voting Machines Were Manipulated.*

Plaintiffs in federal and state courts alleged that the Dominion voting machines used in Arizona were manipulated to decrease the count for Trump and increase the count for Biden. The federal court found the claims to be "void of plausible allegations."[37] The state courts dismissed similar claims for lack of standing after considering the evidence.[38] Forensic audits by multiple investigators including the Maricopa County Board of Supervisors, independent professional investigators, and a firm hired by Arizona Republicans all came to the same conclusion: that the Dominion voting machines functioned properly. Dominion has brought libel suits against some of its accusers.[39]

*2. Claims that Ballots Were Not Properly Counted.*

Plaintiffs in federal and state courts claimed that ballots were improperly counted or improperly *not* counted. Each of these claims was dismissed for lack of evidence or was voluntarily withdrawn.

After a trial in state court, the judge found insufficient evidence to support a claim that election officials were not careful verifying signatures on mail-in ballots: "The evidence does not

---

[32] MARICOPA COUNTY REPORT, *supra* note 24, at 5.
[33] *Id.* at 21.
[34] *Id.* at 7.
[35] *Id.*
[36] *Id.* at 75–76.
[37] Bowyer v. Ducey, 506 F. Supp. 3d 699, 723 (D. Ariz. 2020), *petition for writ of mandamus denied sub nom.* In re Bowyer, 141 S. Ct. 1509 (2021).
[38] Burk v. Ducey, No. CV-20-0349, 2021 WL 1380620 (Ariz. 2021), *cert. denied*, 141 S. Ct. 2600 (2021).
[39] *See* Alison Durkee, *Court Lets Challenge Against Former Overstock CEO Move Forward—Here's Where Dominion and Smartmatic's Defamation Suits Stand Now*, FORBES (Apr. 21, 2022, 1:55 PM), https://www.forbes.com/sites/alisondurkee/2022/04/21/after-court-lets-fox-news-challenge-move-forward-heres-where-dominion-and-smartmatic-defamation-suits-stand-now-and-who-could-be-next/?sh=6957581c20e2.

show that these affidavits are fraudulent, or that someone other than the voter signed them. There is no evidence that the manner in which signatures were reviewed was designed to benefit one candidate or another, or that there was any misconduct, impropriety, or violation of Arizona law with respect to the review of mail-in ballots."[40] The Arizona Supreme Court affirmed the decision, and the United States Supreme Court denied review.[41] We are not aware of any factual basis for skepticism about those judicial findings.

Another state court dismissed the Trump claim that election officials unlawfully disqualified a large number of ballots cast for Trump on Election Day. When claims that thousands of Arizonans were disenfranchised fell apart during a six-hour hearing, the Trump Campaign narrowed its allegations to a small number of overvotes, which the court found was far too small to have any effect on the outcome of the election.[42] When plaintiffs present no evidence after being the opportunity, that is tantamount to a demonstration that their claim is unfounded.

Allegations that election officials destroyed or replaced mail-in ballots were dismissed by a federal judge who decried the "cavalier approach" of Trump supporters in bringing claims the court concluded were "wholly unreliable."[43] The state court dismissed a similar claim.[44] Other plaintiffs in state court, who claimed that 131,092 mail-in ballots had not been counted, voluntarily dismissed their claim.[45]

Finally, a state-court plaintiff voluntarily dismissed her suit that alleged that election officials unlawfully rejected ballots cast for Trump.[46] A state judge dismissed a subsequent action this plaintiff brought days later, finding no violation after an evidentiary hearing.[47]

*3. Claims that Unsolicited Mail-In Ballots Were Sent to Voters.*

Under Arizona law, a mail-in ballot must be requested by a voter. One lawsuit alleged that 214,526 ballots in Arizona were not requested by the voter identified in the state's database. The plaintiffs voluntarily dismissed the suit.[48]

---

[40] Minute Entry at 7, Ward v. Jackson, No. CV 2020-015285 (Ariz. Super. Ct. Dec. 4, 2020), *aff'd*, No. CV-20-0343-AP/EL, 2020 WL 8617817 (Ariz. Dec. 8, 2020), *cert. denied*, 141 S. Ct. 1381 (2021).

[41] Ward v. Jackson, No. CV-20-0343-AP/EL, 2020 WL 8617817 (Ariz. Dec. 8, 2020), *cert. denied*, 141 S. Ct. 1381 (2021).

[42] Donald Trump for President, Inc. v. Hobbs, No. CV 2020-014248, 2020 WL 6691465 (Ariz. Super. Ct. Nov. 13, 2020); Maria Polletta, *Trump Lawsuit on Maricopa County Votes Dismissed by Judge as Outcome Wouldn't Affect Races*, ARIZONA REPUBLIC (Nov. 14, 2020), https://www.azcentral.com/story/news/politics/elections/2020/11/13/trump-lawsuit-maricopa-county-presidential-votes-dismissed-moot/6277110002/; Maria Polletta, *Trump Attorney Tells Maricopa County Judge that Vote Challenge Is Not About Fraud or Election Theft*, ARIZONA REPUBLIC (Nov. 13, 2020), https://www.azcentral.com/story/news/politics/elections/2020/11/12/maricopa-county-judge-hear-trump-team-case-maricopa-county-votes/6260414002.

[43] Bowyer, 506 F. Supp. 3d at 722-23.

[44] Burk, *supra* note 38.

[45] Stevenson v. Ducey, No. CV 2020-096490 (Ariz. Super. Ct. Dec. 7, 2020).

[46] Aguilera v. Fontes, No. CV2020-014083, 2020 WL 6537629 (Ariz. Super. Ct. Nov. 7, 2020).

[47] Aguilera v. Fontes, No. CV2020-014562 (Ariz. Super. Ct. Nov. 30, 2020), *aff'd sub nom*. Aguilera v. Richer, No. 1 CA-CV 20-0688 EL, 2021 WL 2425918 (Ariz. Ct. App. June 15, 2021).

[48] Petition for Election Contest, Stevenson v. Ducey, No. CV 2020-096490 (Ariz. Super. Ct. Dec. 4, 2020).

*4. Claims that Voter-Eligibility Requirements Were Not Enforced.*

Trump supporters filed suit in federal court claiming, among other things, that lax enforcement of voter-eligibility requirements resulted in the counting of thousands of ballots that had been unlawfully cast. In support of their allegations, the plaintiffs filed some 300 pages of attachments, but upon examination the court found these were "only impressive for their volume."[49] According to the court, "the various affidavits and expert reports are largely based on anonymous witnesses, hearsay, and irrelevant analysis of unrelated elections. [50] Another suit making the same claim in state court was voluntarily dismissed.[51]

*5. Claims that Ballot Drop Boxes Were Not Fairly Located Throughout the State.*

Plaintiffs voluntarily dismissed claims in state court alleging that Arizona unlawfully located more drop boxes in areas that tend to vote for progressive candidates than it did in traditionally conservative voting areas.[52] We stress that the claims were voluntarily dismissed. It is a disservice to the public for advocates of a candidate to continue to make claims of electoral improprieties when they have chosen not to test those claims in a court of evidence and law.

*6. Claims that Poll Officials Failed to Carefully Monitor the Election Count.*

The state court found there was not enough evidence to support the claim that election officials allowed fraud to take place because they were too lax in observing the vote count. The Arizona Supreme Court affirmed the decision.[53]

**Summary**

There is no evidence of any widespread misfeasance or malfeasance that would have affected the result of the 2020 Presidential Election in Arizona. Nearly all claims of voter fraud have failed, and no one's vote was counted more than once. The Trump campaign's claims about the Dominion voting machines were proven false by independent audits. The report from the now-defunct Cyber Ninjas has been debunked, and even it reaffirmed Trump's loss and found 99 *additional* votes for Biden. All legal claims—about Dominion voting machines, ballot counting, mail-in ballots, voter-eligibility requirements, ballot drop boxes, and conduct by poll officials—failed.

**Addenda**

Two addenda supporting the conclusions in the six buckets are appended. Addendum A is a table of the federal and state election-related claims filed in Arizona. Addendum B is a

[49] Bowyer, 506 F. Supp. 3d at 721.
[50] Bowyer, 506 F. Supp. 3d at 699.
[51] Petition for Voluntary Dismissal, Stevenson v. Ducey, No. CV 2020-096490 (Ariz. Super. Ct. Dec. 7, 2020); Petition for Election Contest, Stevenson v. Ducey, No. CV 2020-096490 (Ariz. Super. Ct. Dec. 4, 2020).
[52] Petition for Election Contest, Stevenson v. Ducey, No. CV 2020-096490 (Ariz. Super. Ct. Dec. 4, 2020).
[53] Minute Entry at 7, Ward v. Jackson, No. CV 2020-015285 (Ariz. Super. Ct. Dec. 4, 2020), *aff'd*, 2020 WL 8617817 (Ariz. Dec. 8, 2020), *cert. denied*, 141 S. Ct. 1381 (2021).

comparison of the claims made by Cyber Ninjas, which performed an analysis on the Maricopa County 2020 Presidential Election results and the County's response thereto.

**ADDENDUM A**
***Federal and State Cases Filed in Arizona***

| Case | Claim | Result |
|---|---|---|
| **Aguilera v. Fontes, No. CV2020-014083 (Ariz. Super. Ct., Maricopa Cnty.)** | Votes cast using Sharpies were unlawfully excluded from election results. | Plaintiff voluntarily dismissed three days after filing suit. |
| **Aguilera v. Fontes et al., No. CV2020-014562 (Ariz. Super. Ct., Maricopa Cnty.)** | Ballots were not counted due to deficient voting machines. | State judge dismissed the case after an evidentiary hearing. The Court of Appeals of Arizona affirmed sub nom. *Aguilera v. Richer*, No. 1 CA-CV 20-0688 EL, 2021 WL 2425918 (Ariz. Ct. App. June 15, 2021). |
| **Arizona Republican Party v. Fontes, No. CV 2020-014553 (Ariz. Super. Ct., Maricopa Cnty.)** | The Arizona Republican Party alleged that the Maricopa County Recorder violated a state statute requiring recounts by hand-count sampling by precinct instead of recounts by "vote center." The Party asked the court to declare the vote-center count unlawful and require a precinct vote. | State judge dismissed the case after holding a hearing on the merits, finding that defendants complied with the election manual and plaintiffs could have brought action months ago when rule made. Plaintiffs did not appeal. |
| **Burk v. Ducey, No. CV 2020-01869 (Ariz. Super. Ct., Pinal Cnty.); No. 20-0349 (Ariz. Supr. Ct.); No. 20-1243 (U.S.)** | A voter alleged widespread voter fraud, including: failing to count valid ballots and fraudulently switching Trump votes to Biden ones; counting unlawful absentee and mail-in ballots; committing fraud with Dominion machines; and violating observation rights. The voter asked the court to decertify Arizona's presidential election results or exclude unlawful absentee and mail-in ballots from the count. | State judge dismissed case after argument for lack of standing as voter did not show they were registered, also finding the complaint was untimely and barred by laches. The Arizona Supreme Court affirmed, and the U.S. Supreme Court denied certiorari. |
| **In re: Bowyer, No. CV-20-02321 (D. Ariz.); No. 20-858 (U.S.)** | Voters and electors alleged that defendants fraudulently counted or fabricated hundreds of thousands of illegal ballots, using in part Dominion Voting Systems' hardware and software in Maricopa County. Plaintiffs asked the | Judge dismissed claims on jurisdictional and merits grounds after hearing argument on a motion to dismiss. The U.S. Supreme Court denied a petition for expedited |

| Case | Claim | Result |
|---|---|---|
| | court to decertify the state's presidential election results. | consideration and ultimately denied certiorari. |
| **Stevenson v. Ducey, No. CV 2020-096490 (Ariz. Super. Ct., Maricopa Cnty.)** | Voters alleged that Arizona election officials did not enforce Arizona residency requirements, permitted "double voting," and used the Center for Tech and Civic Life to create illegal disparities in ballot and drop-box voting in demographically different areas of Arizona. Plaintiffs sought an injunction to prevent the certification of the election results and asked the governor to certify legislatively selected Presidential Electors. | Plaintiffs voluntarily dismissed four days after filing suit. |
| **Trump v. Hobbs, No. CV 2020-014248 (Ariz. Super. Ct., Maricopa Cnty.)** | Trump Campaign, Republican National Committee, and Arizona Republican Party alleged that Maricopa County elections officials violated state and federal law when overriding electronic tabulator errors for ballots rejected by an electronic tabulation device. | State judge dismissed suit from the bench at hearing on the merits; plaintiffs did not appeal. |
| **Ward v. Jackson, No. CV 2020-015285 (Ariz. Super. Ct., Maricopa Cnty.); No. 20-0343 (Ariz. Supr. Ct.); No. 20-809 (U.S.)** | Voter alleged that election officials failed to allow observation of signature verification as required by Arizona law; that these officials failed to allow plaintiff a reasonable inspection (sampling) of signatures as well as "duplicated" ballots to compare them to originals; and that the alleged illegal conduct required the court to annul the state's election. | State judge denied the petition for additional inspection of ballots after holding an evidentiary hearing. The Arizona Supreme Court affirmed, finding plaintiff showed no evidence of fraud. The U.S. Supreme Court denied a petition for expedited consideration and ultimately denied certiorari. |

**ADDENDUM B**

***Cyber Ninjas' Claims and Maricopa County Responses***[54]

| Claim by Cyber Ninjas' Sept. 24 Report: | Summary of Maricopa County's Response: |
|---|---|
| **Mail-in Ballots Voted from Prior Addresses**<br><br>23,344 mail-in ballots were cast under voter registration IDs for individuals that may not have received their ballots by mail because they moved, and no individual with an identical last name lived at the address. (p. 6)<br><br>An additional 2,382 ballots were cast under voter IDs for individuals that moved outside of Maricopa County prior to October 5, 2020. These were discovered by cross-checking the VM55 Final Voted File against a commercially available data source for identity and address verification provided by Melissa called Personator. (p. 14)<br><br>This same cross-check showed 2,081 instances of a voter casting a ballot in the 2020 election after moving out of the state of Arizona during the 29-day period before the election. (p. 16) | Maricopa County's review of the Senate data found no evidence of double voting. The County reviewed hundreds of the voter IDs provided in the Cyber Ninjas report's appendices and found no instances where a voter illegally voted from a prior address. Cyber Ninjas' conclusions are flawed because they based them on a third-party commercial database that is incomplete compared to the official records and are saying voters should not be allowed to vote if they are not in a commercial database. Cyber Ninjas further failed to realize that voters move and are legally allowed to update their addresses after the voter-registration period and vote in-person or by mail. Ballots are official election mail and cannot be forwarded to another address. Maricopa County relies on the voter's affirmation of their residential address until it is informed otherwise by the voter or by another trusted resource like the United States Postal Service or the National Change of Address report. |
| **More Ballots Returned by Voter than Received**<br><br>For individuals who voted by mail, 9,041 more ballots show as returned in the EV33 Early Voting Returns File than show as sent to that individual in the EV32 Early Voting Sent File. The analysis found, in most of these instances an individual was sent one ballot but received two ballots in total on different dates. (p. 8) | Cyber Ninjas did not realize that these entries were related to voters legally curing questionable signatures or blank envelopes. The County's preliminary review of voters from the Senate's data found no evidence of double voting. All early ballots must be accompanied by a signed affidavit envelope. When returned, the envelope is scanned by the Elections Department, which tracks that it was received. If the voter forgets to sign the envelope or the signature is questioned, staff works to contact the voter to "cure" the signature issue. During this process the |

[54] Maricopa Cnty. Elections Dep't, *Correcting the Record: Maricopa County's In-Depth Analysis of the Senate Inquiry* (Jan. 2022), https://recorder.maricopa.gov/justthefacts/pdf/Correcting%20The%20Record%20-%20January%202022%20Report.pdf (hereinafter MARICOPA COUNTY REPORT); *see* Maricopa Cnty. Elections Dep't, *Just The Facts*, https://recorder.maricopa.gov/justthefacts/ (last visited Jan. 10, 2022).

| Claim by Cyber Ninjas' Sept. 24 Report: | Summary of Maricopa County's Response: |
|---|---|
| | envelope is never opened. Once the signature is "cured," the envelope is scanned again creating a subsequent "received" entry in the EV33 Early Ballot Return File, which accounts for the Cyber Ninjas' inaccurate allegation. Only envelopes with verified signatures are opened and counted. |
| **Voters that Potentially Voted in Multiple Counties**<br><br>Comparing the Maricopa County VM55 Final Voted File to the equivalent files of the other fourteen Arizona counties resulted in 5,047 voters with the same first, middle, last name and birth year, and total number of votes (10,342) minus maximum potential of unique people (5,047) = 5,295 ballots. (p. 10) | Maricopa County's spot review of voters identified in Cyber Ninja's report found no evidence of double voting and found that all voters reviewed were eligible to cast a ballot. The Senate contractor's analysis used soft or partial matching criteria, which resulted in their false charges of double voting. Their analysis produced false positives because it did not compare all voter information such as full date of birth, middle name, and Social Security and driver's license numbers. For example, the Cyber Ninjas report included two voters with the same first and last name who live in the same home and were born in the same year. A more thorough review showed they have different middle names, different Social Security and driver's license numbers, and different signatures. |
| **The Official Result Totals Do Not Match the Equivalent Totals from the Final Voted File (VM55)**<br><br>These discrepancies are significant with a total ballot delta of 11,592 between the official canvass and the VM55 file when considering both the counted and uncounted ballots. The total amount of ballots impacted is 3,432. (p. 12)<br><br>Further, an analysis of the Maricopa County Official Canvass and the VM55 Final Voted file from November 2020 shows that multiple precincts counted votes in excess of the number of voters who participated in the 2020 General Election. The total amount of ballots impacted is 1,551. (p. 18) | Cyber Ninjas apparently did not know that voters with protected addresses are not included in public files but are included in the official results. To protect the identity of judges, law enforcement officers, and victims of harassment or abuse, Maricopa County is legally required to exclude these voters from all public files, including the VM55 Voted File. This is not unique to Maricopa County. Voting jurisdictions across the nation adhere to this requirement. Maricopa County had over 3,400 protected voters participate in the November 2020 General Election, which refutes these allegations. |
| **More Duplicates than Original Ballots** | The accuracy and completeness of Maricopa County's duplication process has been |

| Claim by Cyber Ninjas' Sept. 24 Report: | Summary of Maricopa County's Response: |
|---|---|
| Maricopa County reported 27,869 duplicate ballots pertaining to the Presidential Electors, but the audit team counted 29,557 duplicate ballots, and only 26,965 original ballots were sent to duplication. Comparing the total number of original ballots sent to duplication to the total number of duplicate ballots shows that Maricopa County counted 2,592 more duplicate ballots than original ballots sent to duplication. (p. 13) | confirmed by the Arizona Supreme Court (*Ward v. Jackson*). Maricopa County's detailed records show 27,869 ballots were sent to duplication for the 2020 General Election. During Cyber Ninjas' hand count, observers noted contractors spilled a box of UOCAVA (Uniformed and Overseas Citizens and Absentee Voting Act) ballots "across the Coliseum floor," and the large differences between the Senate's machine count and hand count have shown the faulty hand count processes to be unreliable. |
| **Failure to Follow Basic Cyber Security Practices**<br><br>Maricopa County failed to follow Department of Homeland Security's Cybersecurity and Infrastructure Agency (CISA) software and patch management recommendations. (p. 75) | The tabulation equipment is not connected to the internet, is updated following U.S. Election Assistance Commission guidelines, and is configured according to factory settings. The equipment has the latest EAC-approved software and patches installed. The EAC requires that any software and security updates to tabulation equipment must first be authorized by the tabulation vendor and thoroughly tested. The updates listed in the Senate presentation are part of the federally certified "trusted build" that must be installed during set up.<br><br>No logs were intentionally deleted. Maricopa County's tabulation equipment is NOT connected to the internet. The Senate's contractors misled the public, claiming that website servers REWEB 1601 and REGIS 1202 are connected to the Dominion air-gapped network when they are not. These are website servers for Recorder.Maricopa.Gov and are NOT connected to the air-gapped tabulation equipment. Additionally, while the tabulation equipment makes attempts to reach out to the internet for Microsoft updates, these requests fail because of the air-gapped structure of the equipment. Two federally certified Voting System Test Laboratories independently confirmed that the system is not connected to the internet. |

| Claim by Cyber Ninjas' Sept. 24 Report: | Summary of Maricopa County's Response: |
|---|---|
| **Failure to Follow Basic Cyber Security Practices**<br><br>Maricopa County failed to follow CISA credential management recommendations. (p. 76) | Maricopa County has a robust set of physical security controls to prevent unauthorized access to the tabulation equipment, including controlled restricted access and security cameras. To access each tabulator, an operator needs a series of two passwords and a security token (key). Passwords used to access the election program and to tabulate ballots are changed prior to each election. Observers are present during tabulation, and all totals are reconciled at the end of each shift. |
| **Failure to Follow Basic Cyber Security Practices**<br><br>Maricopa County failed to follow CISA log management recommendations. (p. 76) | The system automatically logs all actions taken on the equipment. These logs are configured according to factory settings and have a storage limit of twenty megabytes. |
| **Election Management System Database Purge**<br><br>Maricopa purged its Election Management System (EMS) database and logs before the audits performed by Pro V&V and SLI Compliance (p. 63); a large number of files on the EMS Server and HiPro Scanner machines were deleted, including ballot images, election-related databases, result files, and log files (p. 65); Windows security event logs were deleted. (p. 85-88) | Maricopa County archived all 2020 General Election data. Two accuracy tests, a statutorily required hand count, two forensic audits from certified firms, and the Senate's machine count confirmed that the ballot count was accurate. During the election, the county created daily backups of the EMS database and election files. These files have been maintained and safely secured. The Senate never subpoenaed or asked for these backup logs or archives. |

***Other Claims Made***[55]

| Claim | Summary of County's Response |
|---|---|
| **"74,000 more mail-in ballots were counted in the November 2020 General Election than were sent."** | "For the November 2020 General Election, Maricopa County had 2,364,426 requests for an early ballot and 1,918,024 early ballots returned either by mail or early in-person voting. The claim that Maricopa County had 74,000 more mail-in ballots than requests appears to be incorrectly calculated by comparing two files that are created during early voting, the EV32 and EV33 files." |
| **"Maricopa County's Tabulation System is connected to the internet and was hacked during the General Election."** | "Maricopa County uses an air-gapped system, meaning its tabulation equipment is never connected to the internet and is completely separated from the Maricopa County network. There are no routers connected to the system and there never have been.<br><br>"Two separate federally certified Voting System Test Laboratories independently confirmed that the system is not connected to the internet. . . . The firms also confirmed that there was not any malicious software or hardware installed on the tabulation equipment." |
| **"Since the County does not have Dominion's administrative security token and password, County Election Officials did not configure the tabulation equipment for the 2020 Elections."** | "County Election Officials program and configure the election equipment. County staff have the expertise, passwords, and security tokens needed to program, configure, and prepare the tabulation equipment for an election. The county provided the Senate with the security token and related passwords that were used to configure the November 2020 General Election. Dominion's administrative token and security password can be used to update the firmware on the tabulators. Any |

[55] *See Just the Facts*, *supra* note 54.

| Claim | Summary of County's Response |
|---|---|
| | changes to the firmware must go through federal and state certification and testing. The county does not need to have access to these security protocols to conduct elections." |
| **"The County does not change its Election Management System passwords."** | "Maricopa County has a robust set of security controls to prevent unauthorized access to its Election Management System (tabulation system). This includes maintaining the tabulation system and central count equipment in a secure ballot tabulation center with access controlled by badge readers. Only staff members who have a direct responsibility are provided access. The tabulation center is monitored by cameras 24 hours a day and seven days a week.<br><br>"Maricopa County also uses a series of passwords that provide different levels of access to tabulation systems and equipment. To access each tabulator, an operator needs a series of two passwords and a security token (key). Prior to each election, the county changes the password that is used to access the election program and to tabulate ballots.<br><br>"In addition, ballots are only tabulated when political party observers are present. The political party observers verify that the total number of ballots tabulated on each tabulator at the beginning and ending of each shift. At the end of each day, the totals are reconciled. This process independently validates that ballots are only counted when political party appointees are observing the process." |
| **"By not updating the tabulation equipment with Windows updates or security patches, the tabulation equipment is at risk."** | "The U.S. Election Assistance Commission's Testing & Certification Program (Version 2.0, Sections 1.16, 3.42, 3.43) requires that any software and security updates to tabulation equipment must first be authorized by the tabulation vendor and thoroughly tested by certified Voting System Test Laboratories. If Maricopa County were to implement a software or security update without its being tested and approved by the U.S. Elections Assistance Commission, the county's |

| Claim | Summary of County's Response |
|---|---|
| | tabulation equipment would lose its federal and state certification. This is not only a requirement, but it's also a best practice prior to implementation to ensure that each update does not pose a risk to the tabulation system.<br><br>"To ensure security vulnerabilities are not introduced after a tabulation system is certified, the county also maintains an air-gapped network." |
| **"Maricopa County relaxed signature verification requirements."** | "At no point during the 2020 election cycle did Maricopa County modify the rigorous signature-verification requirements. Any suggestion to the contrary is categorically false. Maricopa County follows rigorous state signature-verification guidelines, and staff receives training prior to elections to ensure compliance. In June 2020, all full-time staff members that perform signature verification in Maricopa County completed a statewide signature-verification certification course offered by the Associated Forensic Laboratory, LLC." |
| **"Maricopa County's ballot duplication process allowed illegitimate ballots to be counted."** | "At no point were illegitimate ballots duplicated or inserted into the duplication process. To ensure ballots can be counted for voters that are in the military, temporarily overseas, using a large print or braille ballots, or who return a ballot too damaged to be read by a tabulator, Maricopa County duplicates these ballots. During the duplication process, the Elections Department assigns a matching serial number to both the original and duplicated ballot. This number can be used to compare the original ballot with the duplicated ballot.<br><br>"The accuracy and completeness of Maricopa County's duplication process was confirmed in court in *Ward v. Jackson*, where the plaintiffs randomly sampled 1,626 of the 27,000 duplicated ballots. The Arizona Supreme Court affirmed the lower court ruling, 'conclude[ing] [*sic*], unanimously, that . . . the challenge fails to present any |

| Claim | Summary of County's Response |
| --- | --- |
| | evidence of "misconduct," "illegal votes" or that the Biden Electors "did not in fact receive the highest number of votes for office," let alone establish any degree of fraud or a sufficient error rate that would undermine the certainty of the election results.' (Ariz. Supr. Ct., December 9, 2020)<br><br>"There may be some instances where the serial number was printed over the timing mark on the original damaged ballot. Since the duplicated ballot and not the original is tabulated, the added serial number overlapping a timing mark does not impact tabulation. When reviewing the randomly sampled duplicated ballots in *Ward v. Jackson*, the county was able to find and reconcile the serial numbers for all ballots reviewed." |
| **"VoteSecur paper has a special coating that prevents bleed through and Maricopa County used thinner paper for Election Day Voters."** | "Maricopa County used 80lb VoteSecur paper for every ballot (early, Election Day, provisional, and accessible voting devices) in the November 2020 General Election. According to the manufacturer, the VoteSecur paper that the county used in the November 2020 General Election has no special properties that would prevent bleed through. Because ballots are designed with offset columns, ink that bleeds through the ballot does not impact tabulation." |
| **"Sharpies caused overvotes on Election Day ballots."** | "Sharpies do not invalidate ballots. Leading up to the 2020 March Presidential Preference Election, the Elections Department did extensive testing on our new tabulation equipment using different types of ink and paper weight. The manufacturer also recommends Sharpies, as they provide the fastest-drying ink, a necessity on Election Day to ensure the ink dries before voters place their ballots into the tabulation equipment. If the ink smudges on tabulators, it can be a major cause of delays at voting locations. Because federal law requires counties to work to avoid long voting lines, |

| Claim | Summary of County's Response |
| --- | --- |
| | the county says it used the fastest-drying ink available on Election Day. Voters casting an early ballot could use Sharpies or ballpoint pens, since early ballots are signature verified and processed, allowing the ink plenty of time to dry before being tabulated at the Elections Department.<br><br>"In addition, Maricopa County designs the ballot with offset columns, ensuring ink that bleeds through the ballot does not impact tabulation. People who voted early could use Sharpies or other types of ink.<br><br>"The Elections Department programs the tabulation equipment to accurately tabulate ballots based on the location of the ovals and the offset columns. This accuracy was verified through logic and accuracy tests, a hand-count audit performed by the political parties, and post-election audits performed by EAC-certified voting-testing laboratories. This is evidenced by the fact that there were only 5,002 overvotes on the presidential contest out of 2,089,563 total ballots cast. This small percentage (0.2%) is smaller than in prior elections that had a presidential contest on the ballot. When reviewing Election Day ballots, there were 233 overvotes out of 167,878 ballots. This represents an even smaller percentage at (0.1%) of the total Election Day ballots." |
| **Partisan "Private donations from Mark Zuckerberg and others impacted the election results."** | "Maricopa County used four grants in the November 2020 election, all approved in public meetings. Two grants were from non-profits, one was a state-funded grant, and one was CARES funding from the federal government." |
| **"3,981 voters were registered to vote after the deadline in violation of an Arizona Supreme Court ruling prior to the election."** | "[The county's] analysis of the voter rolls found no evidence of any ballot counted from a voter registered after the voter-registration deadline. The courts extended the General Election voter-registration deadline to October 15, 2020 at 11:59 p.m. Only voters whose forms were received by the deadline |

| Claim | Summary of County's Response |
| --- | --- |
| | were eligible to vote in the election. Between the original Oct. 5 deadline and the court-ordered extension, the county received approximately 18,529 voter registration forms. Voter-registration staff completed processing the forms around October 23.<br><br>"If any of the voter-registration forms were incomplete or deficient, election laws and policies require that the county put the voter on suspension. The county notified these people of the issues and ways to rectify their registration form in order to be officially added to the voter rolls. In these cases, once the county receives the correct information, the voter is officially added to the voter rolls. State law dictates that the voter would be considered registered from the date they submitted their original registration form.<br><br>"Additionally, there were approximately 7,605 provisional ballots that were cast and ultimately rejected because the voters were not eligible to vote in the election. However, there were 6,198 voters that cast provisional ballots; these were researched and found to meet the legal eligibility requirements, including that those voters were registered to vote before the registration deadline. Those ballots were counted as part of the official returns for the November General Election." |
| **"11,386 November General Election voters were illegally allowed to vote because they were listed on the December 2, 2020 voter file but not listed on the November 7, 2020 voter file."** | "The county's review of the Nov. 7 and Dec. 2 files from 2020 found that every voter on the Dec. 2 voter file who was legally given credit for voting during the November 2020 General Election was registered by the October 15 deadline. . . . Arizona law allows provisional ballots to be processed up to ten business days after the election. The Nov. 7 file would not have included all provisional-ballot-processing results.<br><br>"It is common for a voter who was previously suspended or in an inactive status to vote provisionally and cure their registration status |

| Claim | Summary of County's Response |
|---|---|
| | and be added back to the official active voter rolls. Additionally, voters who cast a provisional ballot that is rejected often complete new voter registrations and appear on the voter rolls in subsequent months." |
| **"Maricopa County committed fraud because 18,000 people voted on Election Day but were subsequently removed from the voter rolls."** | "Maricopa County has over 2.6 million registered voters, and it is not unusual for there to be tens of thousands of changes to the voter rolls each month. . . . There were 13,320 voters removed from the voter rolls between November 3, 2020, and January 2, 2021. The majority (7,916) of these removals were because a voter moved out of Maricopa County or passed away during this period. The remainder (5,404) were for situations such as felony convictions, adjudicated as incapacitated, or the request of the voter to be removed from the rolls." |

***

**Georgia**

Donald Trump and his supporters brought eleven cases with 38 counts challenging the results showing he lost Georgia. They were not successful in any of those actions. None of the numerous forums that reviewed Trump's allegations sustained Trump's charges of fraud, irregularities, or procedural deficiencies sufficient to overturn the outcome of the 2020 Presidential Election.[56] Georgia Secretary of State Brad Raffensperger, a conservative Republican, conducted a full manual recount of the five million ballots cast, confirming Biden's victory.[57] At Trump's request, election officials then conducted a post-certification recount, which also confirmed Biden's victory.[58] Secretary Raffensperger, with the assistance of the Georgia Bureau of Investigation, evaluated and rejected numerous claims of fraud.[59]

President Biden carried Georgia by a margin of 11,779 votes out of five million votes cast in the 2020 Presidential Election, according to Georgia's official certification of the vote.[60] Biden received 49.5% of the vote. Trump received 49.3%.[61] In 2016, Trump carried Georgia by a margin of 211,141 votes out of 4.1 million votes cast.[62] Trump received 50.4% of the vote in 2016, while Clinton received 45.3%.[63]

Biden was the first Democratic presidential candidate to win Georgia since 1992.[64] Biden capitalized on grassroots organizing, a rapidly diversifying electorate, significantly increased turnout, and suburbs growing in population and becoming inhospitable to 2020 Republican candidates.[65] Democrats have made slow and steady gains in Georgia, with candidates focusing

---

[56] David Wickert & Greg Bluestein, *Inside the Campaign to Undermine Georgia's Election*, https://www.ajc.com/politics/election/georgia-2020-election-what-happened/?_gl=1*pekhqg*_ga*NDg1NTU1NzI2LjE2NDIwOTA0MTk.*_ga_6VR7Y4BTY5*MTY0NTYzMjEyOS41LjEuMTY0NTYzMzA3My4w (last visited Jun. 9, 2022).

[57] Wood v. Raffensperger, 501 F. Supp. 3d 1310, 1319-20 (N.D. Ga. 2020), *aff'd*, 981 F.3d 1307 (11th Cir. 2020), *cert. denied*, 141 S. Ct. 1379 (2021).

[58] Alison Durkee, *Georgia Recertifies Biden's Win After Trump-Ordered Recount Fails Again,* FORBES (Dec. 7, 2020) [hereinafter Durkee, *Georgia Recertifies*], https://www.forbes.com/sites/alisondurkee/2020/12/07/georgia-to-recertify-biden-win-election-results-after-trump-ordered-recount-fails-again/?sh=1fa6c4af679a.

[59] Georgia Sec'y of State Investigations Div., *Georgia Sec'y of State/Georgia Bureau of Investigation ABM Signature Audit Rep*. (Dec. 29, 2020), https://ia601803.us.archive.org/4/items/cobb-county-abm-audit-report-20201229/Cobb%20County%20ABM%20Audit%20Report%2020201229.pdf; David Wickert, *GBI to Aid Georgia Voting Fraud Investigations*, THE ATLANTA JOURNAL-CONSTITUTION (Dec. 4, 2020), https://www.ajc.com/politics/election/gbi-to-aid-georgia-voting-fraud-investigations/JX77G2JGEFFK3F3MZGTKT6VUDQ/; Mark Niesse, *Investigation Finds Less Double Voting in Georgia than Alleged*, THE ATLANTA JOURNAL-CONSTITUTION (Feb. 8, 2022), https://www.ajc.com/politics/investigation-finds-far-less-double-voting-in-georgia-than-alleged/WAOLVUT7B5HYFI7KX5E6OZW75A/.

[60] Georgia Election Results 2020, POLITICO (last updated Jan. 6, 2021), https://www.politico.com/2020-election/results/georgia/; Georgia Sec'y of State, *Number of Absentee Ballots Rejected for Signature Issues in the 2020 Election Increased 350% from 2018*, https://sos.ga.gov/news/number-absentee-ballots-rejected-signature-issues-2020-election-increased-350-2018 (last visited Dec. 14, 2021).

[61] *Georgia Election Results 2020*, POLITICO (last updated Jan. 6, 2021), https://www.politico.com/2020-election/results/georgia/.

[62] *Georgia Election Results*, N.Y. TIMES (Aug. 1, 2017), https://www.nytimes.com/elections/2016/results/georgia.

[63] *Id*.

[64] Gregory Krieg, *Joe Biden Becomes First Democrat in 28 Years to Win Georgia*, CNN (Nov. 13, 2020), https://www.cnn.com/2020/11/13/politics/joe-biden-wins-georgia/index.html.

[65] *Id*.

on bringing out Democratic voters who did not vote in previous election cycles, thus closing the gap with Republicans in recent elections.[66] In addition to bringing out Democratic voters, Biden also succeeded among swing and suburban voters.[67]

Trump election challengers emerged soon after election day. Each has been refuted.

- Matthew Braynard, president of Looking Ahead America, provided declarations in several lawsuits and issued reports analyzing election results. In one lawsuit, Braynard wrote (among other claims of voter fraud) that more than 20,000 absentee or early-voter ballots were cast by non-citizens of Georgia.[68] More recently, Braynard's organization issued a "Georgia Report," claiming that at least 12,547 votes were illegally cast in the state.[69] While making the broad allegations, Braynard did not offer the specific names to support the claims and were debunked.

- Braynard's "Georgia Report" was discredited as lacking merit and being based on speculation, according to individuals from bipartisan election-integrity organizations.[70] Three political science professors, from Stanford University and the University of California Los Angeles, found that the report was "fatally flawed and unreliable"—even after it was revised in response to the professors' initial critiques.[71]

  Harvard professor and voting-statistics expert Stephen Ansolabehere also evaluated Braynard's claim that 20,000 non-citizens voted; he found that Braynard "offer[ed] no conclusions based on scientifically accepted standards of evidence" and that parts of the report were "riddled with errors and biases that render it invalid for purposes of drawing inferences about the quantities at issue."[72]

---

[66] *Id.*

[67] David Weigel & Lauren Tierney, *How Votes Shifted in the Six Political States of Georgia*, WASH. POST (Dec. 8, 2020), https://www.washingtonpost.com/graphics/2020/politics/georgia-senate-political-geography/; Nate Cohn, Matthew Conlen & Charlie Smart, *Detailed Turnout Data Shows How Georgia Turned Blue*, N.Y. TIMES (Nov. 17, 2020), https://www.nytimes.com/interactive/2020/11/17/upshot/georgia-precinct-shift-suburbs.html; Adam Van Brimmer, *"The Place Where We Put This Country Back on Track": How Joe Biden Turned Georgia Purple*, USA TODAY (Nov. 6, 2020), https://www.usatoday.com/story/news/politics/elections/2020/11/06/biden-georgia-election-battleground-swing-state-purple/6192813002/.

[68] *See* Expert Rep. of Matthew Braynard (Exhibit 1 to Notice of Filing), Pearson v. Kemp, No. 1:20-cv-4809-TCB (N.D. Ga. Nov. 20, 2020), ECF No. 45.1, available at https://electioncases.osu.edu/wp-content/uploads/2020/11/Pearson-v-Kemp-Doc45.1.pdf.

[69] Justin Grimmer et al., *Evaluating Look Ahead America's "The Georgia Report" on Illegal, Out-of-State Voting in the 2020 Election*, HOOVER (Aug. 11, 2021), https://www.hoover.org/research/evaluating-look-ahead-americas-georgia-report-illegal-out-state-voting-2020-election; Tom Kertscher, *No Proof for Another Pro-Trump Claim of Thousands of Illegal Votes in Georgia*, POLITIFACT (Apr. 28, 2021), https://www.politifact.com/factchecks/2021/apr/28/blog-posting/no-proof-another-pro-trump-claim-thousands-illegal/.

[70] Kertscher, *supra* note 69.

[71] Grimmer et al., *supra* note 69.

[72] Noah Y. Kim, *Fact-Check: Did 4,925 People Improperly Vote in Georgia?*, POLITIFACT (Jan. 6, 2021), https://www.statesman.com/story/news/politics/politifact/2021/01/06/no-evidence-4-925-voters-out-state-voted-georgia-presidential-election/6565409002/.

- Trump claimed that some 5,000 ballots in Georgia were cast by deceased voters, but the State Election Board found just four, all of which had been returned by relatives; these were referred to the state attorney general for investigation.[73]

The Associated Press reviewed all claims of voter fraud and found no widespread fraud; there were 64 cases of potential fraud (representing 0.54% of the margin of Biden's victory), and 31 were the result of administrative error or other mistake.[74]

More recently, Trump claimed that ballots were sold in Georgia for $10 each.[75] The claim stems from an allegation made by a group, True the Vote, which has declined to produce supporting evidence.[76] A similar allegation that the group made in September 2021 was reviewed by the Georgia Bureau of Investigation, which determined that an investigation was not justified because of the lack of evidence supporting the allegation.[77]

Legal challenges fall into six categories.

1. *Counting Unlawful Ballots, Including by Deceased, Non-Resident, and other Ineligible Voters.*

Trump and his supporters alleged that election officials counted ballots cast by ineligible voters, such as non-residents and deceased individuals, double-counted ballots, and counted fraudulent ballots.[78] They alleged that surveillance video at Atlanta's State Farm Arena showed officials taking ballots from suitcases under tables and counting them.[79] Each of the Trump challenges failed and has been refuted.

Election officials counted each ballot three times, and each count showed a Biden victory consistent with the Election Day tabulation. In addition to being counted on Election Day, they were counted during the statewide risk-limiting audit (hand recount) and during a post-certification recount.[80] The statewide audit confirmed Biden's victory, though it slightly narrowed the election results; the variance in total vote count between the machine and hand

[73] Mark Niesse, *Alleged "Dead" Georgia Voters Found Alive and Well After 2020 Election*, ATLANTA-JOURNAL CONSTITUTION (Dec. 27, 2021), https://www.ajc.com/politics/alleged-dead-georgia-voters-found-alive-and-well-after-2020-election/DAL3VY7NFNHL5OREMHD7QECOCA/.

[74] Cassidy, *supra* note 19; *State Details of AP's Review of Potential Voter Fraud Cases*, ASSOCIATED PRESS (Dec. 14, 2021), https://apnews.com/article/joe-biden-arizona-donald-trump-voter-registration-tucson-c64bba90b8c074bf8bdfd2c751b6b0f2.

[75] McKenzie Sadeghi, *Fact Check: Georgia Investigation into Alleged Ballot Harvesting is Not Evidence of Election Fraud*, USA TODAY (Jan. 7, 2022), https://www.usatoday.com/story/news/factcheck/2022/01/07/fact-check-trump-makes-misleading-claim-georgia-2020-election/9128609002/.

[76] *Id.*

[77] *Id.*

[78] Complaint at 1, Boland v. Raffensperger, No. 2020CV343018, 2020 Ga. Super. LEXIS 1897 (Fulton Cnty. Super. Ct. Dec. 8, 2020); Complaint at 20, 25, Trump v. Raffensperger, No. 2020CV343255 (Fulton Cnty. Super. Ct. Dec. 4, 2020); Order Granting Motion to Dismiss at 2, Favorito v. Fulton County, No. 2020CV343938 (Fulton Cnty. Super. Ct. Oct. 13, 2021).

[79] Justin Gray, *Georgia Election Officials Show Frame-by-Frame What Happened in Fulton Surveillance Video*, WSB-TV (Dec. 4, 2020, 8:23 PM), https://www.wsbtv.com/news/politics/georgia-election-officials-show-frame-by-frame-what-really-happened-fulton-surveillance-video/T5M3PYIBYFHFFOD3CIB2ULDVDE/.

[80] Ga. Sec'y State, *2020 General Election Risk-Limiting Audit*, https://sos.ga.gov/page/2020-general-election-risk-limiting-audit (last visited June 6, 2022); Durkee, *Georgia Recertifies*, *supra* note 58.

recounts was 0.1053%, far less than the 1.0 to 1.5% variance found in past Georgia elections.[81] No county showed a variance in margin greater than 0.73%, and 103 of the 159 counties showed a margin variance of less than 0.05%.[82] The third count, which followed Georgia's certification of its election results, showed that Biden won the election by 11,700 votes.[83]

A state judge rejected claims of ineligible voters as "rest[ing] on speculation rather than duly pled facts."[84] The Georgia Supreme Court denied the plaintiff's request for an emergency appeal.[85] The state's highest court also declined to expedite a case brought in Fulton County Superior Court alleging a host of fraudulent activities by election officials, including counting ballots cast by ineligible voters.[86]

One lawsuit alleging nefarious and improper ballot-counting activity in Fulton County was dismissed for failure to allege a particularized injury, after state officials reported that an investigation found no evidence to support the claims.[87]

*2. Absentee-Ballot Procedures.*

Several challengers alleged that Secretary Raffensperger unconstitutionally required three clerks, rather than one, to reject an absentee ballot based on its signature.[88] The federal court rejected this claim.[89] The judge noted that the procedures did not impermissibly alter the law, but provided an "additional safeguard to ensure election security," and that, if anything, the Secretary's action in requiring additional review "sought to achieve consistency among the county election officials in Georgia" in furtherance of the claimant's "stated goals of conducting free, fair, and transparent public elections."[90] The state court dismissed a similar claim.[91] The judge explained that the plaintiff's claims "do not support an allegation of impropriety or a conclusion that sufficient illegal votes were cast to change or place in doubt the result of the election."[92] The processing rules for absentee ballots were applied "in a wholly uniform manner

---

[81] Ga. Sec'y State, *Risk-Limiting Audit Report* (2020), https://sos.ga.gov/admin/uploads/11.19_.20_Risk_Limiting_Audit_Report_Memo_1.pdf.
[82] *Id*.
[83] Durkee, *Georgia Recertifies*, *supra* note 58.
[84] Boland v. Raffensperger, No. 2020CV343018, 2020 Ga. Super. LEXIS 1897, at *6 (Ga. Super. Ct. Fulton Cnty. Dec. 8, 2020).
[85] Boland v. Raffensperger, No. S21M0565 (Ga. Dec. 14, 2020).
[86] Trump v. Raffensperger, No. S21M0561 (Ga. Dec. 12, 2020).
[87] Order Granting Motion to Dismiss at 11, Favorito v. Fulton County, No. 2020CV343938 (Fulton Cnty. Super. Ct. Oct. 13, 2021); Stephen Fowler, *Judge Dismisses VoterGA's Fulton County Ballot Inspection Lawsuit*, GPB (Oct. 13, 2021, 9:43 AM), https://www.gpb.org/news/2021/10/13/judge-dismisses-votergas-fulton-county-ballot-inspection-lawsuit.
[88] Wood v. Raffensperger, 501 F. Supp. 3d 1310, 1326 (N.D. Ga. 2020), *aff'd*, 981 F.3d 1307 (11th Cir. 2020), *cert. denied*, 141 S. Ct. 1045 (2021).
[89] *Id.* at 1328.
[90] *Id*.
[91] Boland v. Raffensperger, No. 2020CV343018, 2020 Ga. Super. LEXIS 1897 (Ga. Super. Ct. Dec. 8, 2020).
[92] *Id.* at *6.

across the entire state. In other words, no voter—including [the plaintiff]—was treated any differently than any other voter."[93]

Courts also dismissed claims alleging that absentee ballots were opened before Election Day[94] and that ballot drop boxes were unlawfully installed.[95] A federal court found the claims of fraud to be "far too conclusive and speculative."[96] Plaintiffs voluntarily dismissed a suit making similar allegations regarding absentee ballots, as well as claims that Secretary Raffensperger violated state law by sending unsolicited absentee-ballot applications to all Georgia voters, after both the state Superior Court and the Georgia Supreme Court declined to give the case emergency consideration.[97]

Finally, after holding an evidentiary hearing, a state judge rejected claims that Chatham County officials accepted late absentee ballots, finding no evidence of fraud or unlawful activity.[98]

*3. Dominion Voting Machine Fraud.*

Plaintiffs claimed that Dominion voting machines were fraudulently manipulated to help Biden.[99] Allegations included computerized ballot-stuffing, vote manipulation, unprotected audit logs, and security vulnerabilities allowing remote, unauthorized access into Dominion voting software.[100] Each court rejected these claims.

One federal court rejected these allegations and a request for a temporary restraining order for lack of standing.[101] Plaintiff's allegations, and his claims that Dominion was "founded by foreign oligarchs and dictators . . . to make sure [that] Venezuelan dictator Hugo Chavez never lost another election," were "astonishingly speculative," the court said.[102] Appellate courts likewise affirmed or declined to review.[103]

---

[93] Wood v. Raffensperger, 501 F. Supp. 3d 1310, 1326 (N.D. Ga.), *aff'd*, 981 F.3d 1307 (11th Cir. 2020), *cert. denied*, 141 S. Ct. 1045 (2021).

[94] Complaint at 11, Wood v. Raffensperger, No. 1:20-cv-5155, 2020 WL 7706833 (N.D. Ga. Dec. 28, 2020), *aff'd*, No. 20-14813, 2021 WL 3440690 (11th Cir. Aug. 6, 2021), *cert. denied*, 142 S. Ct. 1211 (2022).

[95] *Id.*

[96] Wood v. Raffensperger, No. 1:20-CV-5155-TCB, 2020 WL 7706833, at *4 (N.D. Ga. Dec. 28, 2020), *aff'd*, No. 20-14813, 2021 WL 3440690 (11th Cir. Aug. 6, 2021), *cert. denied*, 142 S. Ct. 1211 (2022).

[97] Response to Plaintiffs' Notice of Filing Voluntary Dismissal, Trump v. Raffensperger, No. 2020CV343255 (Ga. Super. Ct. Jan. 7, 2021); Ga. Sec'y of State, *Trump Legal Team Folds* (Jan. 7, 2021), https://sos.ga.gov/news/trump-legal-team-folds.

[98] *In re* Enforcement of Election Laws and Securing Ballots Cast or Received After 7:00 p.m. on November 3, 2020, No. SPCV20-00982, 2020 WL 6701610 (Ga. Super. Ct. Nov. 5, 2020).

[99] Complaint at 3–4, ¶¶ 2, 4, Pearson v. Kemp, No. 1:20-cv-4809-TCB, 2020 WL 7040582 (N.D. Ga. Nov. 29, 2020), *appeal dismissed*, No. 20-14480, 831 F. App'x 467 (11th Cir. Dec. 4, 2020), *pet. for writ of mandamus dismissed sub nom.* Pearson v. Georgia, No. 20-816, 2021 WL 1081233 (U.S. Feb. 11, 2021).

[100] *Id.* at 3–4, ¶¶ 5, 8.

[101] Wood v. Raffensperger, No. 1:20-CV-5155-TCB, 2020 WL 7706833, at *5 (N.D. Ga. Dec. 28, 2020), *aff'd*, No. 20-14813, 2021 WL 3440690 (11th Cir. Aug. 6, 2021).

[102] *Id.*

[103] Pearson v. Kemp, No. 1:20-cv-4809-TCB, 2020 WL 7040582 (N.D. Ga. Nov. 29, 2020), *appeal dismissed*, No. 20-14480, 831 F. App'x 467 (11th Cir. Dec. 4, 2020), *pet. for writ of mandamus dismissed sub nom.* Pearson v.

*4. Improper Election Result Certification.*

Trump supporters alleged that Governor Brian Kemp and Secretary Raffensperger improperly certified the election results without resolving pending election contests as required by Georgia law.[104] A federal judge faulted the "dilatory actions" by the Trump plaintiffs, noting that they were provided adequate opportunity to be heard in state court.[105]

*5. Observer Access.*

Challengers alleged that Georgia officials failed to provide meaningful access to observe and monitor ballot counting and recounts. Specifically, the Trump supporters alleged that Georgia officials failed to provide access to observers during the initial counting of absentee ballots and during the subsequent risk-limiting audit (statewide hand recount). The federal court found no credible evidence of fraud or impropriety: the plaintiff "present[ed] no authority, and the Court finds none, providing for a right to unrestrained observation or monitoring of vote counting, recounting, or auditing," and the plaintiff's purported evidence of statewide impropriety was mere speculation.[106]

Plaintiffs voluntarily dismissed another lawsuit alleging inadequate observer access after a federal judge denied their petition for injunctive relief.[107]

*6. Third Party Funds.*

Trump supporters alleged that Fulton County officials violated state law by accepting a donation for election administration from Mark Zuckerberg through a private nonprofit organization called the Center for Tech and Civic Life. The complaint alleged this donation caused a private–public entanglement that impacted election results.[108] A state court judge dismissed the case on procedural grounds.[109] The plaintiff did not appeal.

**Summary**

There was no widespread voter fraud in Georgia. The Associated Press identified just 64 cases of *potential* fraud, which represents one-half of one percent of Biden's victory, far too few

Georgia, No. 20-816, 2021 WL 1081233 (U.S. Feb. 11, 2021); Wood v. Raffensperger, No. 1:20-CV-5155-TCB, 2020 WL 7706833 (N.D. Ga. Dec. 28, 2020), *aff'd*, No. 20-14813, 2021 WL 3440690 (11th Cir. Aug. 6, 2021) (affirming district court), *In re* Wood, No. 20-887, 141 S. Ct. 1529 (U.S. Mar. 8, 2021) (denying petition for writ of mandamus).

[104] Complaint at 18, ¶ 40, Trump v. Kemp, 511 F. Supp. 3d 1325, 1329 (N.D. Ga. 2020).

[105] Trump v. Kemp, 511 F. Supp. 3d 1325, 1332 (N.D. Ga. 2021).

[106] Wood v. Raffensperger, 501 F. Supp. 3d 1310, 1317, 1319–20, 1330 (N.D. Ga.), *aff'd*, 981 F.3d 1307 (11th Cir. 2020), *cert. denied*, 141 S. Ct. 1379 (2021).

[107] Trump v. Kemp, 511 F. Supp. 3d 1325 (N.D. Ga. 2020).

[108] Pet. for Election Contest at 4, 12, ¶ 26, Wood v. Raffensperger, No. 2020CV342959 (Ga. Super. Ct. Fulton Cnty. Dec. 8, 2020).

[109] Final Order, Wood v. Raffensperger, No. 2020CV342959 (Ga. Super. Ct. Fulton Cnty. Dec. 8, 2020).

to change the result.[110] Allegations from Trump or his campaign were all debunked by investigating officials and the courts. These claims were founded on speculation, not facts.

**Addendum**

A list of state and federal cases filed in Georgia follows.

**ADDENDUM**

| Case | Claim | Result |
|---|---|---|
| **In re: Enforcement of Election Laws and Securing Ballots Cast or Received After 7:00 p.m. on November 3, 2020, SPCV20-00982 (Ga. Super. Ct.)** | Georgia Republican Party and Trump campaign alleged that the Chatham County Board of Elections counted absentee ballots received after 7:00 p.m. on Election Day in violation of Georgia law. | State judge held evidentiary hearing and dismissed petition; found no evidence of late ballots or unlawful action by the Board. |
| **Brooks v. Mahoney, III, No. 4:20-cv-00281 (S.D. Ga.)** | Voters alleged that defendants counted illegal ballots such as double votes, votes by ineligible voters, votes by phantom (fictitious) voters, felon votes (where illegal), and non-citizen votes; voters also made ballot-harvesting allegations. | Plaintiffs voluntarily dismissed the suit five days after filing suit. |
| **Wood v. Raffensperger, No. 1:20-cv-04651 (N.D. Ga.); 20-14418 (11th Cir.); 20-799 (Supr. Ct.)** | Plaintiff alleged that Secretary of State's March 2020 settlement with the state Democratic Party violated state law regarding defective ballots. | Judge dismissed the case for lack of standing. The 11th Circuit affirmed, and the U.S. Supreme Court denied motion to expedite consideration and later denied certiorari. |
| **In re: Pearson, No. 1:20-cv-04809 (N.D. Ga.); 20-14480 (11th Cir.);** | Voters alleged that statewide ballot fraud and other election-day issues illegally manipulated the election in Joe Biden's favor. | Judge entered a limited temporary restraining order, held a hearing, and dismissed the case. The 11th Circuit denied the petition to file an |

[110] Cassidy, *supra* note 19.

| Case | Claim | Result |
|---|---|---|
| **20-816 (U.S.)** | | interlocutory appeal. The U.S. Supreme Court denied Plaintiffs' petition for expedited consideration and later denied certiorari. |
| **Wood v. Raffensperger, 2020CV342959 (Fulton Cnty. Super. Ct.)** | Voter alleged that the Secretary of State violated state and federal law by using funds received from Facebook CEO Mark Zuckerberg's Center for Tech and Civic Life, negotiating an unlawful settlement agreement regarding absentee ballots, and not enforcing state law residency requirements. | State judge dismissed the case on procedural grounds. Plaintiff did not appeal. |
| **Boland v. Raffensperger, 2020CV343018 (Fulton Cnty. Super. Ct.); S21M0565 (Ga. Supr. Ct.)** | Voter alleged that the Secretary of State violated state law by allowing non-residents to vote and failing to properly verify voter signatures. | State judge dismissed the case on procedural grounds. The Georgia Supreme Court denied petition for emergency direct appeal. |
| **Trump v. Raffensperger, 2020CV343255 (Fulton Cnty. Super. Ct.), S21M0561 (Ga. Supr. Ct.)** | Trump campaign alleged violations of state law by not adequately matching voter signatures, failing to establish uniform absentee-ballot counting procedures, and permitting widespread irregularities and fraud. Plaintiffs sought to prevent certification of the results and requested an immediate audit of signatures on absentee ballot applications and ballots. | State judge dismissed the case for lack of jurisdiction. The Georgia Supreme Court denied review. |
| **Still v. Raffensperger, 2020CV343711 (Fulton Cnty. Super. Ct.)** | Voter and presidential Elector alleged that the respondents violated state constitution and election statutes by certifying election results with discrepancies between election day results and recounts. | Voluntary dismissal. |
| **Wood v. Raffensperger, No. 1:20-cv-05155 (N.D. Ga.); No. 20-887 (U.S.)** | Plaintiff alleged that the Secretary of State committed a host of election fouls by violating Georgia's statutory mail-in absentee-ballot signature verification procedure and the prohibition on opening absentee ballots before Election Day; unlawfully installed unauthorized ballot drop boxes; and used unreliable and compromised Dominion Voting Systems | Judge denied the motion for a temporary restraining order, holding that plaintiff lacked standing. The U.S. Supreme Court denied the petition for mandamus. |

| Case | Claim | Result |
| --- | --- | --- |
| | software. Plaintiff also sought to enjoin Georgia's senatorial runoff election. | |
| **Trump v. Kemp, No. 1:20-cv-05310 (N.D. Ga.)** | President Trump alleged that Governor and Secretary of State violated the U.S. Constitution by deviating from the "manner" the Georgia legislature established for choosing Presidential Electors and asked the court to issue an injunction directing the defendants to decertify the election results. | Judge denied the motion for expedited declaratory and injunctive relief. Plaintiff then moved for voluntary dismissal. |
| **Favorito v. Cooney, No. 2020CV343938 (Fulton Cnty. Super. Ct.)** | Fulton County tabulation observer and several hand-count auditors alleged a range of fraud at State Farm Arena, including counting fraudulent ballots. | State judge unsealed Fulton County ballots and thereafter dismissed case as to County; state officials remain and case is pending. |

***

## Michigan

Donald Trump's supporters brought nine cases with 31 counts challenging the results in Michigan. They were not successful in any of those actions. A Michigan State Senate committee chaired by a Republican Senator examined the charges of fraud and irregularities made by Trump and his supporters and found none of them meritorious.[111] Michigan's Office of the Auditor General, whose head was appointed by the Republican-led legislature, issued a report March 4, 2022, rebutting a principal charge of Trump and his supporters: that a significant number of fraudulent votes were cast on behalf of dead people in the state's 2020 Presidential Election.[112]

According to Michigan election officials who certified the results, President Biden carried Michigan by a margin of 154,188 votes out of 5.5 million cast.[113] Biden received 50.6% of the vote and Trump received 47.8%.[114] In 2016, Trump carried Michigan by a margin of 10,700 votes out of roughly five million cast.[115] Trump received 47.3% of the vote.[116] Clinton received 47.0%.[117]

Biden's victory is attributed to gains in suburban counties, especially those in Detroit suburbs, as well as strength in urban cores and small metropolitan areas.[118] Trump increased his share of votes in 63 of the state's 83 counties, winning 73 counties; but Trump won fewer counties than the 75 he took in 2016, and the counties he did win are sparse in population.[119] In addition, support for third-party candidates dwindled from 5% of the vote in 2016 to just 1.5% in 2020.[120]

Various forums reviewed claims of fraudulent and otherwise unlawful election activity made by former president Trump and his supporters. The Republican members of the state's Senate

[111] Clara Hendrickson & Dave Boucher, *Michigan Republican-Led Investigation Rejects Trump's Claim That Nov. 3 Election Was Stolen* (June 24, 2021), https://www.freep.com/story/news/politics/elections/2021/06/23/michigan-senate-investigation-election-trump/5035244001/.

[112] Craig Mauger, *New Michigan Audit Debunks Dead Voter Theory in 2020 Election* (Mar. 4, 2022), https://www.detroitnews.com/story/news/politics/2022/03/04/audit-debunks-dead-voter-theory-michigan-2020-election/9373387002/.

[113] *Michigan Election Results 2020*, POLITICO (last updated Jan. 6, 2021), https://www.politico.com/2020-election/results/michigan/; Michigan Bureau of Elections, *Audits of the November 3, 2020 General Election* 1 (2021), https://www.michigan.gov/documents/sos/BOE_2020_Post_Election_Audit_Report_04_21_21_723005_7.pdf.

[114] *Michigan Election Results 2020*, *supra* note 113.

[115] *Id*.

[116] *Id*.

[117] *Id*.

[118] William H. Frey, *Biden's Victory Came From the Suburbs*, BROOKINGS (Nov. 13, 2020), https://www.brookings.edu/research/bidens-victory-came-from-the-suburbs/; David Eggert, *Biden Won Michigan with Surge in Cities, Suburbs*, ASSOCIATED PRESS (Nov. 7, 2020), https://apnews.com/article/election-2020-joe-biden-donald-trump-hillary-clinton-michigan-f667cdcbfb02ba8f5b80553d3e1153f8; Tim Alberta, *Three Reasons Biden Flipped the Midwest*, POLITICO (Nov. 4, 2020), https://www.politico.com/news/magazine/2020/11/04/three-reasons-biden-flipped-the-midwest-434114.

[119] Mike Wilkinson, *How Biden Won, Even as Much of Michigan Went for Trump; 5 Election Takeaways*, BRIDGE MICHIGAN (Nov. 5, 2020), https://www.bridgemi.com/michigan-government/how-biden-won-even-much-michigan-went-trump-5-election-takeaways.

[120] *Id*.

Oversight Committee conducted their own thorough investigation of Trump's election-related allegations, reaching the following conclusions:[121]

- *Alleged fraud at the TCF Center*. There was no evidence of fraud at Detroit's TCF Center. The Committee heard testimony regarding signature-matching allegations,[122] allegedly fraudulent voting machines,[123] and unlawful "ballot dumps,"[124] and found no proof that "something illegal actually occurred" or that "ballots were fraudulent."[125]

- *Voter fraud*. There was no evidence of voter fraud. The Committee investigated claims that more than 200 individuals in Wayne County were believed to be deceased and cast a ballot.[126] The Committee found only two instances in which the individual appeared to be deceased but voted; one of which was a clerical error (a deceased father had the same name as his son) and one was a vote cast by a 92-year-old absentee voter who died four days before election day.[127] The Committee found no other valid claims of deceased voters.[128]

- *Ballots cast by ineligible voters.* The March 2022 Michigan Auditor General's Report found that 1,616 votes, or 0.03% of the total ballots, were cast by people who were deceased as of Election Day and that the majority of these had been cast by people alive when they sent in their ballots ahead of the election but passed away before Election Day.[129] The report also found that 99.99% of the voters examined were within acceptable age parameters and 99.99% of the votes cast were not identified as a duplicate vote, far from the margin needed to show that the final results would have given Trump the state.[130]

- *Ballot-box tampering*. There was no evidence of ballot-box tampering.[131]

- *Unsolicited absentee ballots*. Michigan prohibits the sending of absentee ballots without a prior request. Trump supporters made public claims that hundreds of thousands of absentee ballots were sent to voters without a prior request, in violation of Michigan law, but the Republican-controlled Senate Oversight Committee stated

---

[121] Michigan Senate Oversight Committee, *Report on the November 2020 Election in Michigan* 6 (2021) [hereinafter MICHIGAN SENATE OVERSIGHT COMMITTEE REPORT], https://misenategopcdn.s3.us-east-1.amazonaws.com/99/doccuments/20210623/SMPO_2020ElectionReport_2.pdf.

[122] *Id.* at 24. The Report also notes that the Department of Attorney General informed the committee on June 15, 2021 that it has been investigating issues related to the events at the TCF Center. *Id.* at 14 n.1.

[123] *Id.* at 19–21.

[124] *Id.* at 26–27.

[125] *Id.* at 27.

[126] *Id.* at 9.

[127] *Id.* The Report notes that election officials discovered or removed roughly 3,500 absentee ballots submitted by voters who were alive when they submitted the ballot but died before Election Day. *Id*.

[128] *Id*.

[129] Mauger, *supra* note 112.

[130] *Id*.

[131] MICHIGAN SENATE OVERSIGHT COMMITTEE REPORT, *supra* note 121, at 22.

that "no evidence [was] presented to the Committee" supporting that claim.[132] Instead, the Committee found that it appeared that many who claimed to have received an unsolicited ballot actually received an absentee-ballot *application,* which is called for under Michigan law.[133]

- The report concluded that "while there are glaring issues that must be addressed in current Michigan election law, election security, and certain procedures, there is no evidence presented at this time to prove either significant acts of fraud or that an organized, wide-scale effort to commit fraudulent activity was perpetrated in order to subvert the will of Michigan voters."[134]

The Michigan Bureau of Elections released an Audit Report in April 2021, similarly concluding that, "[a]fter the most extensive audits in state history, no evidence of intentional misconduct of fraud by election officials was discovered."[135]

One of the principal claims by then-President Trump and his supporters was that direct-recording electronic voting machines in Michigan had been "intentionally and purposefully designed" to produce ballot-counting errors, with the result that thousands of votes were misrecorded. These claims were based primarily on an audit of votes in Antrim County, Michigan, conducted by a company named Allied Security Operations Group, led by Russell James Ramsland. Ramsland submitted a signed report to a Michigan court in December, 2020, claiming an "error rate" in Dominion voting machines of 68.05%. Trump tweeted the report as evidence of "massive fraud," and referred repeatedly to the Ramsland report at the rally in Washington on January 6, 2021.[136] Even today it is one of the major contributing causes of the popular belief that the election was stolen.

Both the Michigan Bureau of Elections and the Senate Oversight Committee investigated the Ramsland claims. The Bureau of Elections found that there was "no evidence that equipment used to tabulate or report election results did not function properly when properly programmed and tested."[137] After hearing "many hours of testimony," the Senate Oversight Committee likewise found the Ramsland report inaccurate and wrote that the "significant amount of concern about the technology used to count ballots" in Antrim County stemmed from claims that were "unjustified and unfair to the people of Antrim County and the state of Michigan."[138] An analysis by engineering and computer science professor J. Alex Halderman at the University of Michigan noted that the Ramsland report "contains an extraordinary number of false, inaccurate, or unsubstantiated statements and conclusions."[139]

---

[132] *Id.* at 10.
[133] *Id.*
[134] *Id.* at 6.
[135] MICHIGAN BUREAU OF ELECTIONS, *supra* note 113, at 33.
[136] For background on the claims made by Ramsland and his company, *see* Emma Brown et al., *The Making of a Myth*, WASH. POST (May 9, 2021), https://www.washingtonpost.com/investigations/interactive/2021/trump-election-fraud-texas-businessman-ramsland-asog/.
[137] MICHIGAN BUREAU OF ELECTIONS, *supra* note 113, at 3.
[138] MICHIGAN SENATE OVERSIGHT COMMITTEE REPORT, *supra* note 121, at 19.
[139] J. Alex Halderman, *Analysis of the Antrim County, Michigan November 2020 Election Incident* 40 (2021), https://www.michigan.gov/documents/sos/Antrim_720623_7.pdf.

These conclusions were confirmed by a forensic review of the Dominion voting machines in Antrim County, ordered by the state court.[140] A day after the election, that County reported that Biden led Trump by 3,000 votes with 98% of the votes counted.[141] This was a mistake, and officials soon corrected the results to show that Trump won by more than 3,000 votes.[142] Trump claimed that this revealed fraud with the Dominion voting machines.[143] It was later confirmed, however, that a County clerk made the error, which never made it into the official results.[144] A manual hand count of all paper ballots in Antrim County, held on December 17, 2020, found results almost identical to the voting machine results (which were uncorrupted by the clerk's error).[145] Further, Michigan Secretary of State Jocelyn Benson instituted a statewide hand recount of 18,000 randomly selected ballots, which confirmed Biden's win; she found that "the percentage of votes for each candidate was within fractions of a percentage point of machine-tabulated totals."[146] The audit confirmed the accuracy of the various vote-counting machines, including Dominion.[147] The Trump team has not suggested any flaws in this audit.

Both the Michigan Bureau of Elections and the Senate Oversight Committee looked into allegations of "imbalances," where claimants alleged that the number of absentee ballots did not match the number of voters recorded as having returned absentee ballots.[148] While there were some small imbalances (for example, four out of 41,000 absentee ballots in one instance and 21 out of 174,000 in another), there was no evidence of intentional misconduct or fraud by election officials.[149] The Senate Committee Report found "the unbalanced precincts in Michigan counties were marginal and, in no way, would have impacted the outcome of the Presidential election."[150]

We do not mean to suggest that the voting systems used in Michigan were perfect, or that they were impervious to fraud. Responsible experts have recommended that electronic voting counts be supplemented with paper records to enable recounts and detect error. But in 2020, despite well-funded efforts by pro-Trump investigators to find evidence of fraud or significant error, they found none.

The Associated Press reviewed every potential case of voter fraud and also concluded there was no widespread voter fraud in Michigan.[151] The AP found 56 potential instances of voter fraud, representing 0.04% of Biden's margin of victory in Michigan.[152] Most of these cases involved two individuals suspected of submitting some 50 fraudulent requests for absentee

---

[140] Angelo Fichera, *Audit in Michigan County Refutes Dominion Conspiracy Theory*, FACTCHECK.ORG (Dec. 18, 2020), https://www.factcheck.org/2020/12/audit-in-michigan-county-refutes-dominion-conspiracy-theory/.
[141] *Id*.
[142] *Id*.
[143] D'Angelo Gore et al., *Trump's 'Most Important' Speech Was Mostly False*, FactCheck.org (Dec. 3, 2020), https://www.factcheck.org/2020/12/trumps-most-important-speech-was-mostly-false/.
[144] *Id*.
[145] Fichera, *supra* note 140.
[146] *Statewide Election Audit Process Affirms Presidential Election Outcome*, MICH. DEP'T STATE (Feb. 12, 2021), https://www.michigan.gov/sos/0,4670,7-127--552029--,00.html.
[147] *Id*.
[148] MICHIGAN BUREAU OF ELECTIONS REPORT, *supra* note 113, at 8.
[149] *Id.* at 15–16, 20, 33.
[150] MICHIGAN SENATE OVERSIGHT COMMITTEE REPORT, *supra* note 121, at 23.
[151] Cassidy, *supra* note 19.
[152] *Id*.

ballots in three counties, all of which were flagged by election officials; no ballots were improperly cast.[153]

Other legal claims fall into the following categories.

*1. Challenger Access.*

Several plaintiffs alleged that election challengers did not have adequate access to monitor absentee-ballot counting and processing. Michigan's election procedures provide that absentee ballots may be processed and counted by either the board of election inspectors serving at a voter's assigned precinct or by an Absent Voter Counting Board ("AVCB").[154] Plaintiffs alleged that Republican challengers were removed or given inadequate access to watch the AVCBs in action. Specifically, various lawsuits alleged that Republican challengers were denied a meaningful opportunity to observe the counts, denied access to the facility, and denied re-entry; that Republican challengers who left the facility were not replaced while Democratic challengers were; that social distancing was enforced in a partisan manner; that election officials blocked challengers from viewing the handling and counting of ballots; that challengers were forced to observe at unreasonable distances; that windows were covered to prevent viewing; and that election officials intimidated, threatened, and harassed challengers.[155]

Every court that examined these allegations by Trump or his supporters found them either insufficient or not credible. One state court determined that allegations of inadequate access at Detroit's TCF Center were based entirely on unsubstantiated speculation.[156] A different state court rejected similar allegations on procedural grounds.[157] The federal court rejected allegations relating to the treatment of challengers as not bearing on the validity of votes.[158] That court subsequently awarded more than $150,000 in sanctions against the Trump-aligned plaintiffs' attorneys.[159]

The court wrote in a 110-page decision:

---

[153] *Id.*

[154] Michigan law prevented officials from beginning to process the state's 3.3 million absentee ballots until 7 a.m. on Election Day, and by Wednesday morning after the election, many large municipalities like Detroit were still tallying votes. *See, e.g.*, Riley Beggin, *Why Michigan is Waiting: State Law Bars Early Counting of Absentee Votes*, BRIDGE MICHIGAN (Nov. 4, 2020), https://www.bridgemi.com/michigan-government/why-michigan-waiting-state-law-bars-early-counting-absentee-votes.

[155] *E.g.,* Complaint, King v. Whitmer, No. 2:20-cv-13134 (E.D. Mich. Nov. 25, 2020); Complaint, Donald J. Trump for President, Inc. v. Benson, No. 20-000225-MZ, 2021 WL 433995 (Mich. Ct. Cl. Jan. 6, 2021); Complaint, Donald J. Trump for President, Inc. v. Benson, No. 1:20-cv-01083 (W.D. Mich. Nov. 11, 2020); Complaint, Stoddard v. City Election Comm'n, No. 20-014604-CZ (Wayne Cnty. Cir. Ct. Nov. 4, 2020); Complaint, Bally v. Whitmer, No. 1:20-cv-1088 (W.D. Mich. Nov. 11, 2020); Complaint, Costantino v. Detroit, No. 20-014780-AW (Wayne Cnty. Cir. Ct. Nov. 9, 2020); Complaint, Johnson v. Benson, No. 162286 (Nov. 26, 2020).

[156] *Stoddard*, No. 20-014604 (Wayne Cnty. Cir. Ct. Nov. 4, 2020).

[157] Donald J. Trump for President, Inc. v. Benson, 2021 WL 433995.

[158] King v. Whitmer, 505 F. Supp. 3d 720, 738 (E.D. Mich. Dec. 7, 2020). Because we sometimes note when decisions were rendered by Republican or Trump-appointed judges, it is only fair to point out that the judge in this case was an Obama appointee. That does not provide any reason to doubt the reliability of the court's conclusions.

[159] *King*, No. 2:20-cv-13134, 2021 WL 5711102 (E.D. Mich. Dec. 2, 2021); Judgment, *King*, No. 2:20-cv-13134 (E.D. Mich. Dec. 2, 2021), ECF No. 180.

> This lawsuit represents a historic and profound abuse of the judicial process. It is one thing to take on the charge of vindicating rights associated with an allegedly fraudulent election. It is another to take on the charge of deceiving a federal court and the American people into believing that rights were infringed, without regard to whether any laws or rights were in fact violated. This is what happened here. . . .
>
> The attorneys who filed the instant lawsuit abused the well-established rules applicable to the litigation process by proffering claims not backed by law; proffering claims not backed by evidence (but instead, speculation, conjecture, and unwarranted suspicion); proffering factual allegations and claims without engaging in the required prefiling inquiry; and dragging out these proceedings even after they acknowledged that it was too late to attain the relief sought.
>
> *And this case was never about fraud—it was about undermining the People's faith in our democracy and debasing the judicial process to do so*.[160]

The Michigan Supreme Court dismissed a petition with similar challenges.[161]

2. *Dominion Voting Machines.*

As discussed above, Trump-aligned Plaintiffs alleged fraud with Dominion voting machines and misconduct by Michigan election officials. They alleged that Dominion voting machines were tampered with, resulting in unreliable ballot counts.[162] They alleged that Biden received 2,015 "phantom votes" in Antrim County as a result of defective (or tampered-with) Dominion machines.[163] Each court that examined these fraud allegations found them meritless.

A federal court soundly rejected claims that election machines and software in Wayne County flipped Trump votes to Biden.[164] The plaintiffs relied on a report by Russell James Ramsland claiming that Dominion voting machines injected 289,866 illegal votes in Michigan.[165] The federal court found that these allegations amounted to nothing more than "an amalgamation of

---

[160] *King*, 556 F. Supp. 3d 680, 688–89 (E.D. Mich. Aug. 25, 2021) (emphasis in original).

[161] Johnson v. Benson, 506 Mich. 975 (2020). Three justices dissented.

[162] *See* Compl., Bailey v. Antrim Co., No. 2020-9238 CZ (Mich. Cir. Ct. Nov. 23, 2020); Compl., Bally v. Whitmer, No. 1:20-cv-1088 (W.D. Mich. Nov. 11, 2020) (alleging that same untested Dominion machines used in Wayne County); Compl. ¶ 5, King v. Whitmer, No. 2:20-cv-13134 (E.D. Mich. Nov. 25, 2020) (alleging that Dominion was "founded by foreign oligarchs and dictators to ensure computerized ballot-stuffing and vote manipulation to whatever level was needed to make certain Venezuelan dictator Hugo Chavez never lost another election").

[163] Compl. ¶ 28, Bailey v. Antrim Co., No. 2020-9238 CZ (Mich. Cir. Ct. Nov. 23, 2020).

[164] *King*, 505 F. Supp. 3d at 738.

[165] *See* Russell Ramsland, *Antrim Michigan Forensics Report*, ALLIED SEC. OPERATIONS GRP. § B.2 (Dec. 13, 2020), https://s3.documentcloud.org/documents/20423772/antrim-county-forensics-report.pdf; *see also* Compl. ¶ 11, *King*, 505 F. Supp. 3d 720.

theories, conjecture, and speculation that such alterations were *possible*."[166] That court later sanctioned the plaintiffs' attorneys for failing to "inquire into Ramsland's outlandish and easily debunked numbers."[167] "Even the most basic internet inquiry would have alerted Plaintiffs' counsel to the wildly inaccurate assertions in Ramsland's affidavit."[168] For example, Ramsland represented data as being from Michigan when it was actually from Minnesota.[169]

As noted above, a state court permitted a forensic review of the Dominion voting machines in Antrim County.[170] After this review failed to uncover any fraud, the case was dismissed.[171]

*3. Absentee Ballot Drop Box Video Surveillance.*

Challengers alleged that ballots were deposited in remote, unattended absentee-ballot drop boxes without meaningful opportunity to observe or challenge the ballots, in violation of state law.[172] A state court found that the challengers provided no factual basis to support their allegations.[173] Responsible experts in election procedure have observed that unattended drop boxes are inconsistent with best practices and are insufficiently protected against potential fraud. But that is not the same as saying that in any particular election, there actually *was* fraud. Persons who claim that a democratic election has been tainted by fraud bear a burden, both in court and in public discourse, to rely on provable facts and actual evidence. It is poisonous to our system for people on either side of the aisle to lodge allegations of voting fraud without being able to back them up.

*4. Alleged TCF Center Fraud.*

There were numerous claims of mistake, irregularity, and fraud at the Detroit-area voting centers, and particularly the TCF Center.[174] Trump-aligned plaintiffs claimed that election officials processed ballots from voters whose names failed to appear on qualified-voter-file lists; instructed election workers not to verify signatures on absentee ballots, to backdate absentee ballots, and to process such ballots regardless of their validity; processed "vote dumps," or batches of tens of thousands of unsecured and unsealed ballots, some brought into the TCF Center by suitcases and coolers, and attributed the ballots only to Democratic candidates;

---

[166] King v. Whitmer, 505 F. Supp. 3d 720, 738 (E.D. Mich. Dec. 7, 2020).
[167] King v. Whitmer, 556 F. Supp. 3d 680, 723 (E.D. Mich. Aug. 25, 2021) (boldface deleted).
[168] *Id.* at 724.
[169] *Id.*
[170] Bailey v. Antrim Co., No. 2020-9238 CZ (Mich. Cir. Ct. May 18, 2021).
[171] Clara Hendrickson, *Judge Dismisses Antrim County Election Fraud Lawsuit*, DETROIT FREE PRESS (May 18, 2021), https://www.freep.com/story/news/politics/2021/05/18/michigan-judge-antrim-county-election-lawsuit/4980333001/.
[172] Compl., *Donald J. Trump for President, Inc. v. Benson*, No. 20-000225-MZ, 2020 WL 6482579 (Mich. Ct. Cl. Nov. 4, 2020).
[173] Donald J. Trump for President, Inc. v. Benson, No. 20-000225-MZ, 2020 WL 6594903 (Mich. Ct. Cl. Nov. 6, 2020).
[174] Compl., Johnson v. Benson, No. 1:20-cv-01098 (W.D. Mich. Nov. 16, 2020); Compl., Costantino v. City of Detroit, No. 20-014780-AW (Mich. Cir. Ct. Nov. 9, 2020); Compl., Bally v. Whitmer, No. 1:20-cv-1088 (W.D. Mich. Nov. 11, 2020); Compl., Donald J. Trump Campaign v. Benson, 2020 WL 8573864 (W.D. Mich. Nov. 11, 2020); Compl., King v. Whitmer, No. 2:20-cv-13134 (E.D. Mich. Nov. 25, 2020); Compl., Johnson v. Benson, No. 162286 (Mich. Nov. 26, 2020); Compl., Stoddard v. City Election Commission, No. 20-014601-cz (Mich. Cir. Ct. Nov. 4, 2020).

systematically used false information (such as birthdays) to process ballots; refused to record challenges to their processes; removed challengers that politely voiced challenges; intimidated poll watchers; locked credentialed challengers out of the counting room; coached voters to vote for Biden and watched them vote; used ballot tabulators that miscounted votes for Trump and counted them for Biden; used election workers whose salaries were provided by Democratic Party operatives; and failed to ensure that ballots were duplicated correctly.[175]

Courts rejected each of these claims for lack of factual basis. A federal district court found no evidence of tampering or improperly counting ballots.[176] The "closest Plaintiffs g[o]t" on their claim that physical ballots were altered was an affiant's statement that they "believe[d]" some workers were changing votes. But, as the court explained, "a belief is not evidence," and "nothing but speculation and conjecture" supported claims "that votes for President Trump were destroyed, discarded or switched to votes for Vice President Biden."[177] After an evidentiary hearing, a state court found that the Trump plaintiffs' "interpretation of events [wa]s incorrect and not credible."[178] Another state court found that the claims were "based upon speculation and conjecture."[179] The court held that plaintiffs' evidence failed to show that they were likely to succeed on the merits.[180] The Michigan Supreme Court also declined the opportunity to examine challenges to TCF Center activities.[181]

### *5. AVCB Balancing, Ineligible Voters, Unsolicited Ballots, and Third-Party Funds.*

Plaintiffs brought claims about imbalances in absentee ballots, ineligible voters, and receipt of unsolicited absentee ballots to the Michigan Supreme Court.[182] They also alleged that more than $9.8 million in private money was poured into the state to create an unfair election system that favored Democratic strongholds' voter-registration and get-out-the-vote efforts. The Michigan Supreme Court denied the petition, declining to exercise jurisdiction.[183] There is much to criticize in the involvement of private funding in voting drives, but there are many unfair things that happen in elections, which have nothing to do with fraud.

## **Summary**

All claims of any wrongdoing sufficient to affect the result of the 2020 Presidential Election in Michigan have been thoroughly investigated and refuted. There was no widespread voter fraud. The was no such fraud at Detroit's TCF Center, no evidence of ballot-box tampering, and no evidence of intentional misconduct or fraud by election officials. Claims of fraud by

---

[175] Compl., Costantino v. City of Detroit, No. 20-014780-AW (Mich. Cir. Ct. Nov. 9, 2020); Compl., Donald J. Trump Campaign v. Benson, No. 1:20-cv-01083 (W.D. Mich. Nov. 11, 2020); Compl., Johnson v. Benson, No. 1:20-cv-01098 (W.D. Mich. Nov. 16, 2020); Amanda Seitz & David Klepper, *Dangerously Viral: How Trump Supporters Spread False Claims*, ABC NEWS (Dec. 4, 2020), https://abcnews.go.com/Politics/wireStory/dangerously-viral-trump-supporters-spread-false-claims-74533348.
[176] King v. Whitmer, 505 F. Supp. 3d 720, at 738 (E.D. Mich. Dec. 7, 2020).
[177] *Id.*
[178] Costantino v. City of Detroit, No. 20-014780-AW (Mich. Cir. Ct. Nov. 13, 2020).
[179] Stoddard v. City Election Commission, No. 20-014601-cz (Mich. Cir. Ct. Nov. 6, 2020).
[180] *Id.*
[181] *Johnson, supra* note 161.
[182] Compl., Johnson v. Benson, No. 162286 (Mich. Nov. 26, 2020).
[183] Johnson v. Benson, 506 Mich. 975 (2020).

Dominion voting machines were riddled with "wildly inaccurate assertions" and eviscerated after a forensic review of the machines. Legal challenges were aptly described by one judge as "profound abuse of the judicial process," and attempt to "undermin[e] the People's faith in our democracy."[184]

**Addendum**

A list of state and federal cases filed in Michigan follows.

**ADDENDUM**

| Case | Claim | Result |
|---|---|---|
| **Bailey v. Antrim Co., 2020-9238 CZ (Mich. Cir. Ct., Antrim Cnty.)** | Voters alleged that Dominion voting machines erroneously recorded the vote in Antrim County. Plaintiffs asked to conduct forensic review of Dominion voting machines. | Judge granted temporary injunction and authorized forensic examination of machines on December 4, 2020. Review conducted and results published in Ramsland report. Judge dismissed suit as moot on May 18, 2021, because relief sought was obtained. |
| **Bally v. Whitmer, No. 1:20-cv-1088 (W.D. Mich.)** | Voters alleged that election officials refused to permit statutorily designated challengers observe the conduct of elections and the processing of ballots; disregarded valid challenges; pre-dated ballots not eligible to be counted; counted ineligible ballots; allowed ballots to be dropped into unattended drop boxes; and engaged in other conduct contrary to federal statutory and constitutional law. Voters asked the court to enjoin certification and exclude improperly counted ballots. | Plaintiffs voluntarily dismissed four days after filing suit. |
| **Costantino v. City of Detroit, 20-014780-AW (Mich. Cir. Ct., Wayne Cnty.); No. 355443 (Mich. Ct. App.); No. 162245 (Mich. Supr. Ct.)** | Voters alleged defendants engaged in election fraud, mainly at Detroit's TCF Center, by processing votes from ineligible (and nonexistent) voters, processing unverified ballots and ballots received after the deadline, systematically using false information to process ballots, coaching voters to vote for Biden, and restricting challengers' access, in addition to other fraudulent actions. Voters sought a statutorily permitted audit of the city of Detroit's election results. | Judge dismissed after holding a hearing on the merits and determining that defendants offered a more "persuasive explanation of activity"; the Michigan Court of Appeals and the Michigan Supreme Court denied plaintiffs' requests for leave to file appeal. |

[184] *King*, *supra* note 176, at 688–89.

| Case | Claim | Result |
|---|---|---|
| **Donald J. Trump for President, Inc. v. Benson, No. 20-000225-MZ (Mich. Ct. Claims); No. 355378 (Mich. Ct. App.); No. 162320 (Mich. Supr. Ct.)** | Trump campaign and election challenger alleged that election officials unlawfully excluded election challengers from viewing the absentee/mail-in ballot review process. Plaintiffs sought an order that would halt ballot counting until challengers were present and would segregate uninspected ballots. | Judge denied emergency petition for relief in November 2020 after holding evidentiary hearing; dismissed as moot in January 2020. Michigan Court of Appeals and Michigan Supreme Court denied leave to appeal. |
| **Donald J. Trump for President, Inc. v. Benson, No. 1:20-cv-01083 (W.D. Mich.)** | Trump campaign alleged that election officials unlawfully excluded election challengers from viewing the absentee/mail-in ballot review process. Plaintiffs asked the court to enjoin certification until compliance with state law confirmed. | Plaintiffs voluntarily dismissed one week after filing suit. |
| **Johnson v. Benson, No. 162286 (Mich. Supr. Ct.)** | Voters alleged that some 500,000 ballots were unlawful due to nefarious ballot-counting activities at Detroit's TCF center and by implementing an absentee-ballot scheme that sent unsolicited absentee ballots and had the effect of counting unlawfully cast ballots and diluted validly cast ballots. | Petition to file complaint invoking Michigan Supreme Court's original jurisdiction denied. Two justices dissented. |
| **Johnson v. Benson, No. 1:20-cv-01098 (W.D. Mich.)** | Voters asked the court to enjoin certification of Michigan's popular vote in the presidential election, alleging that the state's absentee-voting procedures were unconstitutional. | Plaintiffs voluntarily dismissed three days after filing suit. |
| **King v. Whitmer, No. 20-13134 (E.D. Mich.); No. 20-815 (U.S.)** | Voters, via former Trump counsel Sidney Powell, alleged that defendants violated various state and federal laws by denying meaningful access for party representatives to observe the counting of votes, treating one class of Michigan voters (in-person voters) differently than another class of Michigan voters (absentee/mail-in voters), and permitting widespread voter fraud due to the use of Dominion voting machines and software. Voters sought decertification of the presidential election results. | Judge dismissed the case on sovereign-immunity and other justiciability grounds after a hearing on the merits. The U.S. Supreme Court denied the petition for expedited consideration, and the parties later stipulated to dismissal. |
| **Stoddard v. City Election Commission, No. 20-014604-CZ (Mich. Cir.** | Voter and nonprofit Election Integrity Fund alleged that defendant failed to ensure that representatives of both political parties were present at the Absent Voter Counting Board as required by Michigan law and unlawfully | Judge denied petition on grounds that plaintiffs failed to show a likelihood of success on the merits; plaintiffs did not appeal. |

| Case | Claim | Result |
|---|---|---|
| **Ct., Wayne Cnty.)** | "cured" deficient ballots. Plaintiffs sought an order that would halt ballot duplicating until observers were present and would segregate duplicated ballots. | |

***

## Nevada

Donald Trump or his supporters brought ten cases with 28 counts challenging the results in Nevada. Despite one of his key supporters claiming that in Nevada "we have thousands and thousands of examples of real people in real-life instances of voter illegality" and that Nevada was "the big treasure trove of illegal balloting in all of" the states Trump contested,[185] as detailed below, Trump and his supporters were unsuccessful in proving fraud or irregularities sufficient to overturn the election results in any court or investigation.

According to Nevada election officials who certified the results, President Biden carried Nevada by a margin of 33,596 votes over Trump, out of nearly 1.4 million votes cast.[186] Biden received 50.1% of the vote.[187] Trump received 47.7% of the vote.[188] In 2016, Clinton carried Nevada by a margin of 27,202 votes out of approximately 1.125 million votes cast,[189] receiving 47.9% of the vote[190] to Trump's 45.5%.[191]

Biden's win in Nevada, like Clinton's, is attributable to a reliable base of Democrats in southern Nevada.[192] He performed far better with Latina women than Latino men and outperformed Trump with independents.[193]

The Nevada Secretary of State, a Republican, conducted numerous investigations of the election results, based on nearly 300 election complaints submitted by Trump and his supporters between September 2020 and March 2021.[194] Those investigations repeatedly confirmed the integrity of the election,[195] finding no allegations of election misconduct that would have any impact on the election results. In December 2020, the Secretary of State announced that her office had uncovered evidence of several isolated cases of possible voter fraud but had not

---

[185] Angelica Stabile, *Matt Schlapp: Nevada Allowing Trump Team to Present Election Fraud Case "A Great Step,"* FOX NEWS (Nov. 24, 2020), https://www.foxnews.com/politics/matt-schlapp-nevada-trump-2020-campaign-voter-fraud-evidence.

[186] Nevada Secretary of State, *2020 Statewide General Election Results*, https://www.nvsos.gov/SOSelectionPages/results/2020StateWideGeneral/ElectionSummary.aspx (last visited June 7, 2022).

[187] *Id*.

[188] *Id*.

[189] Nevada Secretary of State, *Silver State 2016 Election Night Results*, https://www.nvsos.gov/silverstate2016gen/USPresidential/index.shtml (last visited June 7, 2022).

[190] *Id*.

[191] *Id*.

[192] James DeHaven, *It's Over: How Biden Won Nevada as Ballot Count Continues in Post-2020 Election Whirlwind*, RENO GAZETTE JOURNAL (Nov. 7, 2020), https://www.rgj.com/story/news/politics/2020/11/07/election-results-2020-how-joe-biden-won-nevada-ballot-clark-county/6206337002/.

[193] *Nevada Exit Polls: How Different Groups Voted*, N.Y. TIMES (last visited June 7, 2022), https://www.nytimes.com/interactive/2020/11/03/us/elections/exit-polls-nevada.html; DeHaven, *supra* note 192.

[194] *See, e.g.*, Riley Snyder & Michelle Rindels, *Most 2020 Nevada Election Integrity Cases Resolved Without Finding of Fraud; Recent Republican Document Drop Under Review*, NEVADA INDEPENDENT (Mar. 18, 2021), https://thenevadaindependent.com/article/most-2020-nevada-election-integrity-cases-resolved-without-finding-of-fraud-recent-republican-document-drop-under-review.

[195] Riley Snyder, *Cegavske: No "Evidentiary Support" Among NV GOP Claims that 2020 Election Was Plagued by Widespread Fraud,* NEVADA INDEPENDENT (April 21, 2021), https://thenevadaindependent.com/article/cegavske-no-evidentiary-support-among-nv-gop-claims-that-2020-election-was-plagued-by-widespread-fraud.

uncovered evidence of any large-scale fraud that would affect the outcome of the presidential election.[196]

In early March 2021, the state Republican Party delivered another 3,000 complaints to the Secretary. In April 2021, the Secretary issued a response finding that most of these complaints were based on a misunderstanding of how voter registration records were created and kept.[197] None involved widespread fraud that would call into question the election results, the Secretary found. A few involved discrete events that were already under investigation by the Secretary's office or referred for investigation by law enforcement.[198]

The Associated Press independently reviewed the Trump claims of voter fraud and found no evidence of widespread fraud.[199] Local election officials identified fewer than 100 potential fraud cases, representing less than 0.3% of Biden's margin of victory.[200]

*1. Voter Fraud.*

No allegations of voter fraud were found to be meritorious at the scale necessary to impact the outcome of the election.

A state court found that plaintiffs had failed to offer sufficient evidence to support their claims that officials counted ballots cast by nonresidents and improperly authenticated ballots in sufficient numbers to affect the outcome.[201] We emphasize that the court's finding was that Trump and his supporters failed *even to offer* sufficient evidence. In other words, when given a chance to prove their claims in court, they came up short.

*2. Interference With Election Observers*.

Voters in Clark County alleged that the election officials failed to give observers adequate access to ballot counting. Despite concluding that the plaintiffs had no standing to bring such claims, the court invited them to make their best case. After evidentiary hearings that examined all evidence the plaintiffs presented, two separate state-court judges dismissed these claims, finding no evidence that election officials had done anything amiss.[202]

---

[196] Nevada Secretary of State, *Facts vs. Myths: Nevada 2020 Post–General Election* (last visited Dec. 20, 2021), https://www.nvsos.gov/sos/home/showpublisheddocument?id=9191.

[197] Report of the Office of Secretary of State Re: Elections Integrity Reports (Apr. 21, 2021), https://www.nvsos.gov/sos/home/showpublisheddocument?id=9428.

[198] *Id*.; David Charns, *I-Team: Nevada Review Finds Some Cases of Dead or Double Voters, But No Widespread Fraud*, 8 NEWS NOW (Apr. 21, 2021), https://www.8newsnow.com/i-team/i-team-nevada-review-finds-some-cases-of-dead-or-double-voters-but-no-widespread-fraud/.

[199] Cassidy, *supra* note 19.

[200] State Details of AP's Review of Potential Voter Fraud Cases, *supra* note 74.

[201] Law v. Whitmer, 477 P.3d 1124, 2020 WL 7240299 (Nev. Dec. 8, 2020).

[202] Kraus v. Cegavske, No. 20 OC 00142 (Nev. Dist. Ct. Oct. 29, 2020), slip op. at 11; Law v. Whitmer, No. 20 OC 00163 (Nev. Dist. Ct. Dec. 8, 2020), slip op. at 22; Stephanie Becker, *Judge Rejects Republican Efforts to Halt Early Vote Counting in Las Vegas*, CNN POLITICS (Nov. 2, 2020), https://www.cnn.com/2020/11/02/politics/nevada-las-vegas-signature-lawsuit/index.html.

3. *Fraud by Agilis Machines.*

Several lawsuits brought in state and federal courts alleged that the use of the Agilis Ballot Sorting System led to fraud and malfunctions that affected the election results. Some of these claims attacked the reliability of the machines themselves. Others alleged misconduct in their use by election officials. No court found evidence to support any of these allegations.

A claim brought in state court by voters in Clark County alleged that use of Agilis machines was unlawful. A state court dismissed this, stating there was no evidence of any Agilis errors or inaccuracies.[203] A federal court dismissed similar claims after a hearing due to lack of evidence.[204]

4. *AB4 and Unlawful Absentee-Voting Procedures.*

Several pre-election lawsuits targeted Assembly Bill 4 ("AB4"), a statute enacted in August 2020 that modified voting procedures during states of emergency in ways that plaintiffs alleged invited fraud. The Trump Campaign, the Republican National Committee, and the Nevada Republican Party immediately challenged the statute in federal court. Their lawsuit was dismissed for lack of standing.[205] Both federal and state courts ultimately rejected claims that the statute unlawfully treated in-person votes differently than absentee ballots.[206] Even if these claims were correct—and there is no reason to assume they were—they did not purport to identify any fraud, or any mistakes in vote tabulation.

5. *Voter Drives and Bribery.*

A state court found that plaintiffs had failed to show that state officials unlawfully conducted voting drives and offered something of value—T-shirts—in exchange for voting.[207] Another lawsuit alleged that voter drives targeting Native Americans had unlawfully depicted Biden and his running mate, Kamala Harris, in promotional materials, unfairly swaying the election in their favor.[208] The state court dismissed the claims, finding no evidence of voter manipulation.[209] It is not unusual for campaigns to challenge various aspects of election administration, which are properly resolved in court prior to the election. They provide no basis for disqualifying votes or overturning results *after* the election.

---

[203] Kraus v. Cegavske, No. 20 OC 00142 (Nev. Dist. Ct. Oct. 29, 2020), slip op. at 4, 12.

[204] *See* Hearing Trans., Stokke v. Cegavske, No. 2:20-cv-02046 (D. Nev. Nov. 6, 2020); *see also* Law v. Whitmer, No. 20 OC 00163 1B (Nev. Dist. Ct. Nov. 17, 2020), *aff'd*, No. 82178, 477 P.3d 1124, 2020 WL 7240299 (Nev. 2020).

[205] Trump v. Cegavske, 488 F. Supp. 3d 993 (D. Nev. 2020).

[206] Kraus v. Cegavske, No. 20 OC 00142 (Nev. Dist. Ct. Oct. 29, 2020), slip op. at 13; Hearing Trans. at 78-79, Stokke v. Cegavske, No. 2:20-cv-02046 (D. Nev. Nov. 6, 2020).

[207] Law v. Whitmer, 477 P.3d 1124, 2020 WL 7240299 (Nev. 2020); Statement of Contest at 19, ¶ 96, Law v. Whitmer, No. 20 OC 00163 1B (Nev. Dist. Ct. Dec. 8, 2020).

[208] Law v. Whitmer, 477 P.3d 1124, 2020 WL 7240299 (Nev. 2020).

[209] *Id*.

## Summary

The 2020 Presidential Election in Nevada was conducted with integrity, as affirmed and reaffirmed by investigations. Cases of voter fraud were isolated and few. There was no illegal interference with election observers, fraud by voting machines, unlawful absentee-voting procedures, or bribery of voters.

## Addendum

A list of state and federal cases filed in Nevada follows.

**ADDENDUM**

| Case | Claim | Result |
|---|---|---|
| **Kraus v. Cegavske, No. 20 OC 00142 (1st Jud. District, Nev.); No. 82018 (Nev. Supr. Ct.)** | *Pre-Election*: Plaintiffs challenged the Clark County Registrar's failure to submit a timely election-procedure plan to the Secretary of State, along with its use of Agilis machines to process ballots. Plaintiffs also challenged adequacy of observer procedures and asked the court to hold that Nevada's Secretary of State was required to submit a plan to the Clark County Registrar that ensured meaningful observation of the ballot-counting process. | State court determined that plaintiffs lacked standing and that the claims failed on the merits, as Registrar had submitted permissible plan. Plaintiffs appealed to the state Supreme Court on Election Day, Nov. 3, 2020, but voluntarily dismissed the appeal one week later. |
| **Elections Integrity Project of Nevada v. Cegavske, No. A-20-820510-C (Clark Cnty. District Ct.); No. 81847 (Nev. Supr. Ct.)** | The Election Integrity Project and a voter sought to enjoin certification of election results due to widespread fraud enabled by allegedly unconstitutional mail-in ballot legislation, AB4, which (1) allocated in-person polling places unequally, (2) permitted different counties to use different counting procedures, (3) provided no minimal procedural safeguards to protect against unequal evaluation of ballots, (4) permitted votes cast after election day to be counted, and (5) permitted duplicate voting or ballots mailed to ineligible or deceased voters. | State court held a hearing and found that there was insufficient evidence that implementation of AB4 would dilute votes cast or otherwise lead to incorrect results. The Nevada Supreme Court affirmed, agreeing that plaintiffs failed to make their prima facie showing or provide any "concrete evidence" that illegitimate votes would be counted under the law. |
| **Stokke v. Cegavske, No. 2:20-CV-02046 (D. Nev.)** | Candidates and voters alleged that use of the Agilis software system violated state and federal law by placing voters in Clark County at unequal risk of having their votes diluted by votes with mismatched signatures. Plaintiffs also sought greater access for ballot-counting observers. | Judge held an evidentiary hearing and denied plaintiffs' request for a temporary restraining order. Plaintiffs later voluntarily dismissed the suit. |
| **Becker v. Gloria, No. A-20-824878-W (Clark Cnty. Dist. Ct.)** | Candidates and voters alleged that Clark County officials flouted state election law by "flooding" the county with untraceable ballots and using the Agilis mail-ballot processing machines rather than hand-verifying signatures as required by Nevada law. They sought an order requiring new election in Clark County. | State court dismissed suit for lack of jurisdiction and on the merits, as no evidence of ballot discrepancies was offered. |
| **Law v. Whitmer, 20** | Presidential Electors for Trump alleged widespread electronic voting systems | State court dismissed suit on jurisdictional grounds but also |

| Case | Claim | Result |
|---|---|---|
| **OC 00163 1B (1st Jud. District, Nev.); No. 82178 (Nev. Supr. Ct.)** | malfunctions both due to the Agilis machines and generally across the country; that voting drives to encourage Native Americans to vote favorably depicted Biden-Harris in promotional material and that any resulting votes should be invalidated; and that the Agilis machines, which were used to verify signatures in Clark County but not elsewhere, resulted in an equal protection violation. Plaintiffs sought certification of Trump as the election winner. | ruled on the merits that there was no proof of machine malfunctions, improper votes, election-board malfeasance, or vote manipulation. The court dismissed the case with prejudice. The Nevada Supreme Court affirmed. |
| **Trump v. Cegavske, No. 2:20-cv-1445 (D. Nev.)** | *Pre-Election*: The Trump Campaign, Republican National Committee, and state Republican Party alleged that changes to the state's election procedures (i.e., accepting ballots received after Election Day) violated federal law. | Judge dismissed suit for lack of standing. |
| **Rodimer v. Gloria, No. A-20-825130-W (Clark Cnty. Dist. Ct.)** | Candidate alleged that Clark County officials' use of the Agilis system to verify signatures violated state law requiring that verification be conducted by a human. Candidate sought invalidation of all votes verified by the system and new election. | After oral argument, state court dismissed suit for lack of jurisdiction. |
| **Becker v. Cannizzaro, No. A-20-825067-P (Clark Cnty. Dist. Ct.)** | Candidate contended that the Clark County Registrar of Voters found discrepancies in ballot tracking, used the allegedly unreliable Agilis system, and should have moved certain voters to the inactive list. Candidate sought a new election. | Plaintiffs voluntarily dismissed case two days after filing suit. |
| **Marchant v. Gloria, No. A-20-824884-W (Clark Cnty. Dist. Ct.)** | Candidate alleged that Clark County officials' use of the Agilis system to verify signatures violated state law requiring that verification be conducted by a human. | State court dismissed case for lack of jurisdiction and also wrote that the claim would fail on the merits because plaintiff failed to show ballot loss or destruction. |
| **Donald J. Trump for President v. Gloria, No. A-20-824153-C (Clark Cnty. Dist. Ct.)** | Trump Campaign and state Republican Party sought injunctive relief from Clark County to keep poll locations affected by voting machine malfunctions open until 8:00 p.m. | State court issued order requiring polls to remain open until 8:00 p.m. Plaintiffs thereafter voluntarily dismissed the suit. |

***

**Pennsylvania**

Pennsylvania was one of two states whose Electors were formally challenged during the joint session of Congress on January 6, 2021, and was also the focus of a number of lawsuits and public claims. Donald Trump and his supporters brought nineteen cases with over 45 counts challenging the results showing that he lost Pennsylvania. Putting aside the claims challenging, wholesale and without evidence, millions of ballots cast, the number of votes challenged was significantly smaller than Joe Biden's official margin of victory; thus, even if every challenge were meritorious, this would not have been enough to produce a different outcome. No lawsuits brought by the Trump Campaign or its supporters focused directly on voter fraud and, in many instances, as described below, plaintiffs acknowledged their challenges were not the product of or even a signpost for fraud. An Associated Press survey of county elections officials in 2021 found just 26 potential cases of voter fraud in the 2020 election, representing 0.03% of Biden's margin of victory.[210]

According to Pennsylvania election officials who certified the results, President Biden carried Pennsylvania by a margin of 80,555 votes out of 6.9 million cast. Biden received 50% of the vote. Trump received 48.8%.[211] In 2016, President Trump carried Pennsylvania by a margin of 44,292 votes out of more than six million cast.[212] Trump received 48.2% of the vote. Clinton received 47.5%.[213]

While Biden's largest vote margins came from dense population centers with large Black populations,[214] including Philadelphia and Pittsburgh,[215] he made gains in Republican counties and outperformed Clinton in counties she won in 2016.[216] Democrats saw increased support in suburban Philadelphia counties (as compared to 2016), while Republican gains in suburban Pittsburgh were not as great.[217]

Despite not filing any legal actions based on fraud, Trump did claim fraud in several tweets. In one set of tweets, he alleged that Richard Hopkins, a postal worker, had heard the Erie County postmaster tell a supervisor "that they had 'messed up' by failing to backdate the postmark on

[210] *State Details of AP's Review of Potential Voter Fraud Cases*, *supra* note 74; Cassidy, *supra* note 19.

[211] *Pennsylvania Election Results 2020*, POLITICO (last updated Jan. 6, 2021), https://www.politico.com/2020-election/results/pennsylvania/; Penn. Dep't of State, *Pennsylvania's Election Stats* (last visited Dec. 14, 2021), https://www.dos.pa.gov/VotingElections/BEST/Pages/BEST-Election-Stats.aspx; *Pennsylvania Breaks Voter Turnout Record in 2020 Election*, KDKA-TV NEWS (Nov. 17, 2020), https://www.cbsnews.com/pittsburgh/news/pennsylvania-2020-election-voter-turnout/.

[212] *Pennsylvania Election Results 2016*, N.Y. TIMES (Sept. 13, 2017), https://www.nytimes.com/elections/2016/results/pennsylvania.

[213] *Id.*

[214] *Pennsylvania Election Results 2020*, *supra* note 211.

[215] Keith Collins et al., *How Biden Flipped Pennsylvania & Won the Election*, N.Y. TIMES (Nov. 10, 2020), https://www.nytimes.com/interactive/2020/11/07/us/elections/pennsylvania-counties-battleground-state.html; United States Census Bureau, https://data.census.gov/cedsci/map?g=0400000US42%240500000&tid=DECENNIALPL2020.P1&cid=P1_004N&vintage=2020&layer=VT_2020_050_00_PY_D1&mode=thematic&loc=40.8334,-78.0322,z6.8593.

[216] Holly Otterbein, *How Pennsylvania Was Won*, POLITICO (Nov. 7, 2020), https://www.politico.com/news/2020/11/07/how-pennsylvania-was-won-434974.

[217] Frey, *supra* note 118.

ballots that arrived after Election Day."[218] Hopkins later admitted that the story was not true.[219] Trump's campaign director of Election Day operations, Mike Roman, also broadcast on Twitter that "ballot-stuffing" had occurred in Philadelphia based on a video that showed a woman dropping off three ballots in a ballot drop box.[220] State officials rejected the video as evidence of fraud because voters are allowed to drop off ballots on behalf of others.[221]

Pennsylvania completed a statewide risk-limiting audit of the 2020 Presidential Election in February 2021. Sixty-three of Pennsylvania's 67 counties participated in reviewing a statistical sample of more than 45,000 randomly selected ballots. "The results of the sample mirrored the reported Presidential Election results across the participating counties within a fraction of a percentage point," confirming the accuracy of the vote count.[222] As of December 2021, some Republican state senators were pursuing a forensic audit of the state's election results using an Iowa-based firm that has never conducted an election review and that was hired under a no-bid contract. As of this writing, there are no results of this.[223]

Legal challenges in Pennsylvania largely focused on procedural defects, such as absentee-voting procedures, extended deadlines, or technically deficient ballots, rather than direct allegations of fraud. These challenges fall into three categories of claims described below. None succeeded and every court to review these claims determined that there was no fraud that would have altered the outcome of the election.

*1. Extending Election Deadlines.*

Challenges to ballot-deadline extensions met some success based on state statutes, but no court found any evidence of fraud connected with extended deadlines.

In advance of the election, the Pennsylvania Secretary of State issued guidance to county Boards of Election ("BOEs") that extended the cure period for which no verified proof of

---

[218] Ann Gerhart, *Election Results Under Attack: Here Are the Facts*, WASH. POST (last updated Mar. 11, 2021), https://www.washingtonpost.com/elections/interactive/2020/election-integrity/.

[219] *Id*.

[220] *Id*.

[221] *Id*.

[222] Penn. Dep't of State, *Post-Election Audits* (last visited Dec. 14, 2021), https://www.votespa.com/About-Election .

[223] Marc Levy, *Pa. GOP's Election Inquiry: Courts, Conspiracies, and More Costs*, ASSOCIATED PRESS (Feb. 4, 2022), https://whyy.org/articles/pa-gops-election-inquiry-courts-conspiracies-more-costs/; Sam Dunklau, *Pa. Senate Election "Audit" Contract Doesn't Say If the Public Will See the Results*, WITF (Dec. 7, 2021), https://whyy.org/articles/pa-senate-election-audit-contract-doesnt-say-if-the-public-will-see-the-results/; Joe Napsha, *Process of Pending Pennsylvania Election Audit Remains Shrouded in Secrecy*, TRIB LIVE (Nov. 23, 2021), https://triblive.com/news/pennsylvania/process-of-pending-pennsylvania-election-audit-remains-shrouded-in-secrecy/; Nathan Layne, *Trump Ally in Pennsylvania Pushes for Arizona-Style Audit of 2020 Election*, REUTERS (July 7, 2021), https://www.reuters.com/world/us/trump-ally-pennsylvania-pushes-arizona-style-audit-2020-election-2021-07-07/; *see also* Katie Meyer, *Pa. Republicans Are Taking Election "Audits" Seriously. Here's What to Know About Their Plan*, WHYY (July 18, 2021), https://whyy.org/articles/pa-republicans-are-taking-election-audits-seriously-heres-what-to-know-about-their-plan/.

identification was received by the statutory deadline. A state court invalidated this guidance as barred by statute.[224]

In September 2020, the Pennsylvania Supreme Court granted a three-day extension of the deadline for receipt of absentee and mail-in ballots, permitting ballots to be counted if mailed and postmarked by 8:00 p.m. on Election Day and received by 5:00 p.m. on November 6, 2020, determining that COVID-19 was a natural disaster that justified such an extension.[225] This decision may be questionable as an interpretation of state law, but on review in the United States Supreme Court the state agreed to sequester any ballots received by mail after 8:00 p.m. on Election Day, so that the issue could be litigated on the merits if it would affect the outcome of the election.[226] As it happened, the number of ballots at issue were so few (10,000) that, even if all were cast for Trump, they would not have changed the outcome of the race.[227] The Supreme Court subsequently denied a petition for certiorari, presumably because the question presented no longer would have real-world significance for the election.[228]

A challenge to Pennsylvania's universal mail-in voting statute failed as untimely.[229] The Pennsylvania Supreme Court dismissed the case and vacated a preliminary injunction order that the lower court had entered enjoining the certification of election results.[230] This is the sort of election administration question that must be resolved in advance of an election. There are reasonable arguments for and against universal mail-in voting, but the adoption of such a system by a state cannot be considered fraud or vote-stealing.

*2. Inadequate Observation of Ballot Processing.*

Trump made several uncorroborated allegations of observer-related violations. He alleged on Twitter that as many as 700,000 ballots were not allowed to be viewed while processed in Philadelphia and Pittsburgh.[231] Plaintiffs allied with the Trump Campaign made similar allegations in lawsuits. These claims uniformly failed in court.

One federal court dismissed claims that the Trump Campaign's watchers were prevented from observing the opening, reviewing, and counting of ballots, noting that the Campaign had failed to plead differential treatment of its watchers.[232] The Third Circuit affirmed, noting as well that the Trump Campaign did not make allegations that the alleged inadequate observation resulted in fraud.[233]

---

[224] Donald J. Trump for President v. Boockvar , No. 602 MD 2020 (Pa. Commw. Ct. Nov. 12, 2020).

[225] Pennsylvania Democratic Party v. Boockvar, 238 A.3d 345, 370–72 (Pa. 2020), *cert. denied sub nom*. Republican Party of Pennsylvania v. Degraffenreid, 141 S. Ct. 732 (2021).

[226] Republican Party of Pennsylvania v. Boockvar, No. 20A84, 208 L. Ed. 2d 293 (U.S. 2020).

[227] Jonathan Lai, *About 10,000 Pa. Mail-In Ballots Arrived After Election Day: They Are Thrown Out*, THE MORNING CALL (Nov. 11, 2020), https://www.mcall.com/news/nation-world/ct-pennsylvania-election-results-20201111-jnbso56erbgsxlfv244lipxdyy-story.html.

[228] Republican Party of Pennsylvania v. Degraffenreid, 141 S. Ct. 732, 739 (2021).

[229] Kelly v. Commonwealth, No. 68 MAP 2020, 240 A.3d 1255 (Pa. 2020).

[230] *Id*.

[231] Gerhart, *supra* note 218.

[232] Donald J. Trump for President, Inc. v. Boockvar, 502 F. Supp. 3d 899, 921-22 (M.D. Pa. 2020).

[233] Donald J. Trump for President, Inc. v. Sec'y of Pa., 830 F. App'x 377, 386 (3d Cir. 2020).

The Pennsylvania Supreme Court upheld a requirement that observers in Philadelphia County maintain at least fifteen feet of distance from ballot processors and follow other COVID-19 protocols. The rules were "reasonable in that they allowed candidate representatives to observe the Board conducting its activities as prescribed under the Election Code."[234] Republican and Democratic observers were subject to the same rules.

Another lawsuit was voluntarily dismissed after the parties reached an agreement by which 60 observers each from the Democratic and Republican parties were permitted to observe the mail-in ballot counting process in Philadelphia County.[235]

*3. Counting Deficient—But Not fraudulent—Absentee Ballots.*

Some 2.63 million mail and absentee ballots were cast in Pennsylvania.[236] Challenges to allegedly deficient ballots met with some success, but not on grounds of fraud.

A state trial court, affirmed by a state appellate court, dismissed a Trump Campaign suit challenging 2,177 absentee and mail-in ballots cast in Bucks County. The suit was based on purported deficiencies such as unsealed privacy envelopes or ballots without a date handwritten on the outer envelope.[237] The state court found that "[t]here is nothing in the record and nothing alleged that would lead to the conclusion that any of the challenged ballots were submitted by someone not qualified or entitled to vote in this election."[238] For over 175 years, courts have (almost) uniformly held that formal defects that do not create ambiguities regarding voter intent or have any indicia of fraud should be counted.[239]

A state court similarly dismissed allegations regarding almost 600 absentee and mail-in ballots cast in Montgomery County, ballots challenged on the ground that the voters failed to fill out their address immediately below their declaration on the outer ballot envelope.[240] The ballots substantially complied with statutory requirements, and there were no allegations of fraud or improper influence.[241]

The Pennsylvania Supreme Court likewise dismissed similar challenges to 8,329 votes in Philadelphia County and 2,349 votes in Allegheny County. The court held that the state election code did not require the disqualification of "mail-in or absentee ballots submitted by qualified

---

[234] *In re* Canvassing Observation, 241 A.3d 339, 351 (Pa. 2020).

[235] Donald J. Trump for President, Inc. v. Phila. Cnty. Bd. of Elections, No. 2:20-cv-05533 (E.D. Pa. Nov. 5, 2020); John L. Micek, *Trump Federal Lawsuit Over Election Observers Resolved, Report,* PA. CAPITAL-STAR (Nov. 5, 2020), https://www.penncapital-star.com/livefeeds/trump-federal-lawsuit-over-election-observers-resolved-report/.

[236] *Pennsylvania's Election Stats*, *supra* note 211.

[237] *In re* Canvass of Absentee & Mail-In Ballots of November 3, 2020, Gen. Election, No. 20-05786-35 (Bucks Cnty. Pa. Com. Pl. Nov. 19, 2020), *aff'd* 1191 C.D. 2020 (Pa. Commw. Ct. Nov. 25, 2020).

[238] *Id*.

[239] *See* Edward B. Foley, BALLOT BATTLES: THE HISTORY OF DISPUTED ELECTIONS IN THE UNITED STATES 163 (2016) (referring to a decision by the Maine Supreme Court to this effect in 1837 as "leading in nation").

[240] Donald J. Trump for President v. Montgomery Cnty. Bd. of Elections, No. 2020-18680 (Montgomery Cnty. Ct. Com. Pl. Nov. 13, 2020).

[241] *Id*.

electors who signed the declaration on their ballot's outer envelope but did not handwrite their name, their address, and/or a date, where no fraud or irregularity had been alleged."[242]

In perhaps the most dramatic Pennsylvania case, the Trump Campaign sought to disqualify some seven million absentee and mail-in ballots on the basis of allegations that they (i) lacked a secrecy envelope, (ii) did not include a dated and signed declaration on the outside envelope, or (iii) were delivered by third parties for non-disabled voters.[243] Counsel for the Campaign, Rudy Giuliani, told the court that there was "widespread, nationwide voter fraud," but under questioning by the judge, he stated, "[t]his is not a fraud case."[244] After examining the allegations, the district court wrote, "[o]ne might expect that when seeking such a startling outcome [as discarding millions of legally cast votes], a plaintiff would come formidably armed with compelling legal arguments and factual proof of rampant corruption . . . . Instead, this Court has been presented with strained legal arguments without merit and speculative accusations, unpled in the operative complaint and unsupported by evidence."[245] In an opinion by Trump appointee Stephanos Bibas, the Third Circuit affirmed, writing that the Trump Campaign's claims "have no merit," that they challenged a number of ballots "far smaller than the roughly 81,000-vote margin of victory," and that the Trump Campaign "never claim[ed] fraud or that any votes were cast by illegal voters."[246]

It is a disservice to the public for representatives of a campaign, especially the campaign of an incumbent president, to make and repeat the claim that there is proof of massive voter fraud, only to abandon any claim of fraud in the courtroom, where there are rules of evidence. When Democrats have done this (on far smaller scale), Republicans have been rightly critical. It is important for Republicans as well as Democrats to insist on rigorous proof—not speculation, not rumor-mongering—when claiming that an election has been stolen.

Two Pennsylvania state courts did order provisional relief, but not based on fraud. A split panel enjoined Allegheny County officials from counting 270 provisional ballots for which voters had signed the outer envelope in only one of two required places or that were deemed otherwise defective.[247] Another state court ordered officials to set aside provisional ballots cast on Election Day by voters whose absentee or mail-in ballots were also timely received.[248]

---

[242] *In re* Canvass of Absentee & Mail-In Ballots of November 3, 2020, Gen. Election, 241 A.3d 1058, 1062 (Pa. 2020).

[243] Complaint at 8, Donald J. Trump for President, Inc. v. Boockvar, No. 4:20-cv-02078, 502 F. Supp. 3d 899, 906 (M.D. Pa. 2020).

[244] Tessa Berenson, *Donald Trump and his Lawyers Are Making Sweeping Allegations of Voter Fraud in Public. In Court, They Say No Such Thing*, TIME (Nov. 20, 2020), https://time.com/5914377/donald-trump-no-evidence-fraud/.

[245] Donald J. Trump for President, Inc. v. Boockvar, 502 F. Supp. 3d 899, 906 (M.D. Pa. 2020).

[246] Donald J. Trump for President, Inc. v. Sec'y of Pa., 830 F. App'x 377, 382 (3d Cir. 2020).

[247] Ziccarelli v. Allegheny Cnty. Bd. of Elections, No. GD-20-011793 (Allegheny Cnty. Ct. Com. Pl. Nov. 18, 2020), *rev'd sub nom. In re* Allegheny Cnty. Provisional Ballots in the 2020 Gen. Election, No. 1161 C.D. 2020 (Pa. Commw. Ct. Nov. 19, 2020).

[248] Hamm v. Boockvar, No. 600 M.D. 2020 (Pa. Commw. Ct. Nov. 6, 2020).

*4. Pre-Election Challenges to Changed Voting Procedures*.

The Pennsylvania legislature enacted a “no excuse” absentee-voting law in October 2019 (Act 77). Subsequently, state election officials made a number of decisions about how to administer the new system, some of which were controversial. As was their right, the Trump Campaign filed lawsuits challenging the law and many of these procedures in both state and federal courts. Some of these challenges succeeded and some failed.[249] For example, the court agreed with the plaintiffs that it was not legal to count mail-in ballots that lacked the outer, “secrecy” envelope, holding that this requirement was a reasonable safeguard for the secret ballot. [250] After taking and analyzing extensive expert evidence from both sides regarding fraud risks, the courts rejected the Trump Campaign’s challenges to the use of ballot drop boxes.[251] The merits of these challenges may reasonably be debated, but the point is that the challenges were brought in a proper forum at the proper time, and were rejected in accordance with normal procedures for resolution of an election dispute.

*5. Voter Fraud.*

No lawsuits focused principally on voter fraud, as opposed to other deficiencies with ballots or improper deadlines, as discussed above.

**Summary**

Contrary to public claims, Trump made no formal allegation of voter fraud in Pennsylvania, and there was no widespread fraud. The Associated Press identified just 26 *potential* cases of voter fraud, but these represent just 0.03% of Biden’s margin of victory, far, far too few to have any impact on the result. Procedural claims, not based on fraud, met with some success, but none impugned the outcome of the election. To be sure, the legislature made significant last-minute changes in voting procedures, which inspired challenges under Pennsylvania (not federal) constitutional law. Last-minute changes are not optimal, and we would hope that this experience would not be repeated outside the circumstances of the COVID-19 emergency. But the new procedures (“no excuse” mail-in ballots) have been used in other states for years without incident, and there is no evidence that they resulted in any increase in fraud.

**Addendum**

A list of state and federal cases filed in Pennsylvania follows.

---

[249] Pennsylvania Democratic Party v. Boockvar, 238 A.3d 345 (Pa. 2020); Donald J. Trump for President, Inc. v. Boockvar, 493 F. Supp. 3d 331 (W.D. Pa. 2020).

[250] Pennsylvania Democratic Party v. Boockvar, 238 A.3d at 374-80.

[251] Donald J. Trump for President, Inc. v. Boockvar, 493 F. Supp. 3d 331, 352-64 (W.D. Pa. 2020).

**ADDENDUM**

| Case | Claim | Result |
|---|---|---|
| **Trump v. Boockvar, No. 2:20-cv-966 (W.D. Pa.)** | *Pre-Election*: Trump Campaign alleged that Pennsylvania's "no excuse" mail-in voting plan—including the validity of ballot drop boxes and the permissibility of counting mail-in ballots that suffer from certain procedural defects—was unconstitutional and could lead to fraud and vote dilution. | Judge initially stayed the case so state courts could provide clarity on the unsettled state-law issues underlying the claims. After the Pennsylvania Supreme Court ruled on the issues, this court found for the defendants on all federal claims, declined to exercise supplemental jurisdiction over state-law claims, and dismissed the case. |
| **Republican Party of Pennsylvania v. Degraffenreid, 407 MD 2020 (Pa. Commw. Ct.); 133 MM 2020 (Supr. Ct. of Pa.); Nos. 20-542, 20-574 (U.S.)** | *Pre-Election*: Democratic Party of Pennsylvania sought declarations that county elections boards had authority to establish temporary drop boxes for mail-in ballots, extend the absentee-ballot deadline, and "cure" ballot defects; and a declaration that the states' poll-watcher residency requirement was constitutional.<br><br>The state's Republican Party sought a stay in the U.S. Supreme Court after plaintiffs' request was partially granted, alleging that the court usurped the legislature's authority by extending the deadline for accepting ballots. | Pennsylvania Supreme Court held that county elections boards could establish temporary mail-in ballot drop boxes, allowed a three-day extension to 5:00 p.m. on November 6, 2020, of the absentee and mail-in ballot received-by deadline, and upheld the poll-watcher residency requirement.<br><br>The U.S. Supreme Court denied the stay application; Justice Alito later granted the Republican Party's request to segregate ballots received by mail after 8:00 p.m. on Nov. 3, 2020, pending certiorari decision. The Court ultimately denied certiorari. |
| **Trump v. Philadelphia County Board of Elections, No. 200902035 (Philadelphia Cnty. Ct. Com. Pl.); 983 C.D. 2020 (Pa. Commw. Ct.)** | *Pre-Election*: Trump Campaign filed an emergency petition requesting permission for its representatives to observe ballot processing in satellite election offices. | State court denied the petition because state law allowed election watchers to be present in polling places but not satellite offices. The state intermediate appellate court affirmed. |
| **In re: November 3, 2020 General Election,** | The Secretary of State asked the Pennsylvania Supreme Court to determine whether the | The Pennsylvania Supreme Court held that the Code does not authorize or require county elections |

| | | |
|---|---|---|
| **149 MM 2020 (Supr. Ct. of Pa.); No. 20-845 (U.S.)** | Election Code authorizes or requires county elections boards to reject absentee or mail-in ballots based on alleged or perceived signature variances. | boards to reject absentee or mail-in ballots based on an analysis of a voter's signature. The U.S. Supreme Court denied certiorari. |
| **Bognet v. Boockvar, No. 3:20-cv-215 (W.D. Pa.); No. 20-3214 (3d Cir.), No. 20-740 (U.S.)** | *Pre-Election*: Congressional candidate and several voters alleged that the Pennsylvania Supreme Court unconstitutionally usurped the state legislature and Congress's power by adopting a three-day extension of the received-by deadline for absentee and mail-in ballots and by adopting a presumption of timeliness for ballots received on or before 5:00 p.m. on November 6, 2020. | Judge concluded that the plaintiffs were likely to succeed on the merits of their equal-protection claim related to the "Presumption of Timeliness," but denied the petition because the claims were brought too close to the election. The Third Circuit affirmed; the U.S. Supreme Court granted certiorari, vacated the judgment, and remanded with instructions to dismiss the case as moot. |
| **In re: Canvassing Observation/Donald J. Trump for President, Inc. v. Degraffenreid, 201107003 (Phila. Cnty. Ct. Com. Pl.); 1094 C.D. 2020 (Pa. Commw. Ct.); 30 EAP 2020 (Supr. Ct. of Pa.); No. 20-845 (U.S.)** | Trump Campaign alleged that election officials did not provide designated observers meaningful access to observe the elections board employees who were canvassing the absentee and mail-in ballots; instead, they had to stand 15–18 feet from officials, which was too far to read any ballots and ensure the officials were logging them correctly. | After an evidentiary hearing, state court dismissed the case, holding that state law does not require that observers have the opportunity to "meaningfully . . . see the process." The intermediate appellate court reversed, holding that the law was ambiguous and, to comport with the purpose of the law, observers should be able to ascertain sufficient details to assess the process. The Pennsylvania Supreme Court reinstated the trial court's order, finding that the regulations were reasonable. Two justices filed dissenting opinions. The U.S. Supreme Court denied certiorari. |
| **Hamm v. Boockvar, 600 M.D. 2020 (Pa. Commw. Ct.)** | Candidates and voters sought an order prohibiting the Secretary of State from (1) permitting invalidly submitted absentee and mail-in ballots to be "cured" by submission of provisional ballots and (2) disclosing identifying information about voters who | State court granted plaintiffs' request in part, ordering that provisional ballots cast on Election Day by electors whose absentee or mail-in ballots had been timely received should be segregated and secured from other provisional ballots pending a determination as to each ballot's validity. |

| | | |
|---|---|---|
| | submitted ballots that must be rejected for non-compliance with state law. | |
| **Donald J. Trump for President v. Boockvar, 602 M.D. 2020 (Pa. Commw. Ct.)** | Trump Campaign sought an injunction prohibiting the Secretary of State from counting ballots for which proof of identification was not received and verified by Nov. 9, 2020. | State court ordered county elections boards to segregate ballots, for which identification was received and verified after Nov. 9, 2020, and later, held that the Secretary impermissibly exceeded authority by changing the identification deadline and enjoined the elections boards from counting the segregated votes. |
| **Donald J. Trump for President, Inc. v. Philadelphia County Board of Elections , No. 2:20-cv-05533 (E.D. Pa.)** | Trump Campaign alleged that the Philadelphia County elections board violated state law by denying party representatives access to observe the ballot-counting process. | The parties settled. |
| **Donald J. Trump for President, Inc. v. Montgomery County Board of Elections , No. 2020-18680 (Montgomery Cnty. Ct. Com. Pl.)** | Trump Campaign alleged that the Montgomery County elections board violated state law when it allegedly canvassed and counted 592 absentee and mail-in ballots for which the outer declaration envelope was not completely filled with the voter's signature, address, and date. | State court denied the Campaign's petition, holding that state law does not require a voter to provide their address on the declaration envelope. The court concluded that the 592 challenged ballots must be counted. |
| **Barnette v. Lawrence, No. 2:20-cv-5477 (E.D. Pa.)** | Presidential Electors alleged that the Montgomery County elections board violated state law by pre-canvassing mail-in ballots received before Nov. 3, 2020, and by permitting deficient ballots to be cured. | Judge denied plaintiffs' motion for a temporary restraining order. Plaintiffs then voluntarily dismissed. |
| **In re: Canvass of Absentee and Mail-In Ballots of November 3, 2020 Election, No. 20-05786-35 (Bucks Cnty. Ct. Com. Pl.); 1191 C.D. 2020 (Pa. Commw. Ct.); 676 MAL 2020 (Supr.** | Trump Campaign alleged that the Bucks County elections board violated state law by counting 2,177 deficient absentee and mail-in ballots. | State court dismissed case, finding among other things no evidence that the absence of a sealed inner envelope jeopardized the privacy of the ballot. Intermediate appellate court affirmed, noting that the parties stipulated that there was neither evidence of fraud nor that ineligible voters voted. Pennsylvania Supreme Court denied an emergency |

| | | |
|---|---|---|
| **Ct. of Pa.); No. 20-845 (U.S.)** | | petition for appeal, and the U.S. Supreme Court denied expedited consideration and later denied certiorari. |
| **Donald J. Trump for President, Inc. v. Boockvar, No. 4:20-cv-02078 (M.D. Pa.); No. 20-3371 (3d Cir.)** | Trump Campaign alleged that the Secretary of State and various county elections boards prevented the Campaign's observers from meaningful access to view pre-canvass and canvassing activities and improperly permitted mail-in ballots to be cured. Campaign asked court to enjoin certification of the election results. | Judge dismissed the case and concluded that Trump Campaign had failed to plead that its watchers were treated differently from Biden Campaign watchers and concluded that alleged differences in implementation among counties was not equal protection violation. Third Circuit affirmed, holding that the Campaign was unlikely to succeed on the merits and was unable to show irreparable harm. |
| **Pirkle v. Wolf, No. 4:20-cv-02088 (M.D. Pa.)** | Voters alleged that Philadelphia, Montgomery, Delaware, and Allegheny Counties unlawfully counted ballots that should not have been included in the state's certified results. | Plaintiffs voluntarily dismissed. |
| **In re: Canvass of Absentee and Mail-In Ballots, Nos. 201100874–201100878 (Philadelphia Cnty. Ct. Com. Pl.); 31-35 EAP 2020 (Supr. Ct. of Pa.); No. 20-845 (U.S.)** | Trump Campaign alleged that the Philadelphia County elections board violated state law by counting 8,329 absentee and mail-in ballots containing technical defects such as a missing date next to a signature, a missing printed name of the voter, and/or a missing street address for the voter. | State court dismissed the claim, holding that missing components—date and printed address on internal envelope—were not requirements necessary to prevent fraud. Pennsylvania Supreme Court affirmed, noting that the failure to include a handwritten name, address, or date in the voter declaration is a technical violation of the Election Code but does not warrant the wholesale disenfranchisement of thousands of voters. The U.S. Supreme Court declined expedited consideration and later denied certiorari. |
| **In re: 2,349 Ballots in the 2020 General Election, No. GD20-011654 (Allegheny Cnty. Ct. Com. Pl.); 1162 C.D. 2020 (Pa. Commw. Ct.); 29** | State Senate candidate alleged that the Allegheny County elections board violated state law by allowing 2,349 mail-in ballots lacking the date written by the elector on the outer envelope to be counted. | State court held that the ballots were properly counted because defects were minor and technical. The intermediate appellate court reversed, holding that state law clearly required the missing information. Pennsylvania Supreme |

| | | |
|---|---|---|
| **WAP 2020 (Supr. Ct. of Pa.); No. 20-845 (U.S.)** | | Court reversed, holding that minor, technical violations of the Election Code do not warrant the wholesale disenfranchisement of thousands of voters. U.S. Supreme Court denied expedited consideration and certiorari. |
| **In re: Allegheny County Provisional Ballots, GD 20-011793 (Allegheny Cnty. Ct. Com. Pl); 1161 C.D. 2020 (Pa. Commw. Ct.); 338 WAL 2020 (Supr. Ct. of Pa.)** | State Senate candidate alleged that 270 provisional ballots were defective either because they lacked a required signature or affidavit or for another reason. | State court concluded that no fraud occurred, and voters did as they were told by officials, so the provisional ballots should be counted. Intermediate appellate court reversed, concluding that the Election Code clearly prohibits counting deficient ballots. It ordered that the 270 ballots not be counted. One judge dissented. Pennsylvania Supreme Court denied the petition for appeal. |
| **Kelly v. Pennsylvania, 620 MD 2020 (Pa. Commw. Ct.); 68 MAP 2020 (Supr. Ct. of Pa.); No. 20-810 (U.S.)** | Congressman and several voters alleged that "no excuse" absentee voting law unlawfully expanded the scope of absentee voting. Plaintiffs sought a temporary restraining order against certification while the courts ruled on the issue. | State court temporarily enjoined certification of results. The Pennsylvania Supreme Court vacated the injunction and dismissed with prejudice because plaintiffs failed to challenge year-old law in a timely manner. One justice dissented. U.S. Supreme Court denied expedited consideration and certiorari. |
| **Metcalfe v. Wolf, 636 MD 202 (Pa. Commw. Ct.)** | Plaintiff electors alleged that the defendants failed to implement recommendations provided in a Performance Audit Report conducted by the Department of the Auditor General and disregarded the state Election Code by authorizing officials to count defective absentee and mail-in ballots. Electors sought order requiring Governor Tom Wolf to decertify state's election results and an injunction stopping state's Electors from casting votes. | State court dismissed claim as filed after statutory deadline for initiating an election contest. |

***

**Wisconsin**

Donald Trump and his supporters brought seven cases with sixteen counts in Wisconsin, alleging that fraudulent votes were counted and that elections officials violated the law in their rulings on the counting and casting of ballots. Both federal and state courts examined these allegations, and found them all baseless. Post-election analyses have confirmed the courts' rulings that no systemic fraud existed that would have altered the election results. In an October 2021 report, the Wisconsin Legislative Audit Bureau, a non-partisan and independent body, found no evidence of widespread fraud that would alter the election results.[252] In December 2021, the conservative Wisconsin Institute for Law & Liberty likewise found no evidence of widespread voter fraud and no evidence of significant problems with voting machines—in fact, they found that Democratic candidates performed worse than expected in areas with Dominion machines.[253] Similarly, in December 2021, the Associated Press concluded its study of the election, which found no evidence of widespread fraud. The AP survey of local elections officials and prosecutors identified 31 potential cases of voter fraud, representing less than 0.15% of Biden's margin of victory.[254]

According to Wisconsin officials' certification of the results, President Biden carried Wisconsin by a margin of 20,682 votes out of 3.3 million cast.[255] Biden received 49.57% of the vote. Trump received 48.94%.[256] In 2016, President Trump carried Wisconsin by a margin of 22,748 votes out of nearly three million cast.[257] Trump received 47.2% of the votes cast to Clinton's 46.5%.[258] The 2020 voter turnout was the largest ever in Wisconsin. At least 72% of the voting-age population cast ballots.[259]

Biden's win has been attributed to improved performance in Wisconsin suburban and smaller metropolitan counties, as well as traditional Democratic strength in urban areas.[260] Republicans' margins in Milwaukee's suburban counties were lower than in 2016, while Democrats made gains in urban cores and large suburbs and reduced their losses in small metropolitan areas.[261]

---

[252] Wisconsin Legislative Audit Bureau, *Report 21-19, Elections Administration* (Oct. 2021), https://legis.wisconsin.gov/lab/media/3288/21-19full.pdf.

[253] Will Flanders et al., *A Review of the 2020 Election*, WIS. INST. FOR LAW & LIBERTY (Dec. 2021), https://will-law.org/election-integrity/; Alison Durkee, *Wisconsin Conservative Group Finds "No Evidence of Widespread Fraud" in 2020 Election*, FORBES (Dec. 7, 2021), https://www.forbes.com/sites/alisondurkee/2021/12/07/wisconsin-conservative-group-finds-no-evidence-of-widespread-fraud-in-2020-election/?sh=4d9ab7e645be.

[254] Cassidy, *supra* note 19; *State Details of AP's Review of Potential Voter Fraud Cases*, *supra* note 74.

[255] Trump v. Wisconsin Elections Comm'n, 506 F. Supp. 3d 620, 629 (E.D. Wis. 2020); *Presidential Election Results*, FOX NEWS, https://www.foxnews.com/elections/2020/general-results.

[256] *Presidential Election Results*, *supra* note 255.

[257] *Wisconsin Election Results 2016*, N.Y. TIMES (Aug. 1, 2017), https://www.nytimes.com/elections/2016/results/wisconsin.

[258] *Id*.

[259] Katelyn Ferral, *Big Margins in Cities, Gains in the Suburbs: How Joe Biden Won Wisconsin*, THE CAP. TIMES (Nov. 6, 2020), https://madison.com/ct/news/local/govt-and-politics/big-margins-in-cities-gains-in-the-suburbs-how-joe-biden-won-wisconsin/article_7b3bec6a-6cd0-545e-bbf4-84e929df191c.html.

[260] Frey, *supra* note 118; Ferral, *supra* note 259.

[261] Frey, *supra* note 118.

"Biden's success was due to motivating more voters in the state's two largest urban areas—Dane and Milwaukee counties—than Hillary Clinton did four years ago."[262]

Trump and his Campaign had the right under Wisconsin law to seek a recount either statewide or in certain counties.[263] They chose a recount in only Milwaukee and Dane counties, traditional Democratic strongholds.[264] The recounts resulted in a slightly larger lead for Biden.[265] Legal challenges brought by Trump and aligned groups were all unsuccessful.

Still, some state government officials have lodged charges of fraud and crimes in the administration of the election. Former state Supreme Court Justice Michael Gableman issued an interim report on his investigation for Assembly Republicans that focused on how voting was conducted in nursing homes and on grants from the nonprofit Center for Tech and Civic Life that went to Wisconsin's five largest cities to help them run the 2020 election during the COVID-19 pandemic. The Gableman report included only general charges and no specifics of illegal votes cast or counted sufficient to overturn the results of the election, but Gableman nonetheless publicly called on the state legislature to decertify Wisconsin's electoral votes on those grounds, a statement from which he later distanced himself.[266] The nonpartisan Wisconsin Legislative Council opined there is no authority for decertification under these circumstances, a conclusion we examine below.[267]

The allegations by Trump and his supporters fall into this category:

1. *Absentee-Voting Procedures*.

In March 2020, the Wisconsin Elections Commission issued guidance on absentee-voting procedures. Most of the lawsuits by Trump and his supporters challenged this guidance but were filed in November 2020, eight months after the actual rulings and after the election was held and the results known. It is entirely proper for campaigns to challenge new rules for election administration, but this must be done sufficiently before the election to enable corrections to be made. It would be an affront to democracy to disqualify votes that were cast in compliance with unchallenged procedures on account of lawsuits filed after the election has taken place and the other candidate has won.

No court found any evidence of widespread fraud or dubious activity that would have changed the outcome of the election. Two cases, one federal and one state, robustly analyzed

---

[262] Ferral, *supra* note 259.

[263] WIS. STAT. § 9.01.

[264] Nam Y. Huh, *Milwaukee County Spent Nearly $1.7M on Presidential Recount*, WIS. STATE J. (Dec. 24, 2020), https://madison.com/wsj/news/local/govt-and-politics/elections/milwaukee-county-spent-nearly-1-7m-on-presidential-recount/article_05608ba1-530c-5e7c-aa21-68ca10cc1fd8.html.

[265] Biden's lead went from 20,427 votes to 20,682 votes. Trump v. Biden, 951 N.W.2d 568, 571 (2020).

[266] Patrick Marley & Molly Beck, *Gableman Report to Wisconsin Republicans Promotes Legally Debunked Effort to Decertify 2020 Election,* MILWAUKEE J. SENTINEL (Mar. 1, 2022), https://www.jsonline.com/story/news/politics/2022/03/01/gableman-report-promotes-legally-debunked-effort-decertify-election/9319277002/; Patrick Marley & Molly Beck, *Michael Gableman Backs Away From Talk of Election Decertification, Republican Leaders Say*, MILWAUKEE J. SENTINEL (May 13, 2022) [hereinafter *Michael Gableman Backs Away*], https://www.jsonline.com/story/news/politics/2022/05/13/gableman-backs-away-talk-decertification-republicans-say/9744178002/?gnt-cfr=1.

[267] *Michael Gableman Backs Away*, *supra* note 266.

election-abuse claims. In the federal case, the Trump Campaign alleged that three pieces of guidance from the Wisconsin Elections Commission impermissibly expanded standards for "indefinitely confined" voters, invited voter fraud by allowing the use of unstaffed drop boxes, and misled municipal clerks about their powers to complete or correct address information on absentee ballots.[268] The Campaign asked that the election results be thrown out and the winner chosen by the state legislature.[269] The federal district court (where the judge was a Trump appointee) dismissed the case, finding that "[a]t best, plaintiff has raised disputed issues of statutory construction on three aspects of election administration."[270] The state guidance fell within the legislature's mandate, and the Campaign could have raised the issues before the election.[271] The Seventh Circuit affirmed, and the United States Supreme Court declined to consider the matter.[272]

Similar allegations fared no better in state court. There, the Trump Campaign alleged that election officials had violated several state laws governing the processing and counting of absentee and mail-in ballots. The Campaign asked the court to strike the following (from ballots in Dane County and Milwaukee County): all ballots from voters claiming to be indefinitely confined beginning March 25, 2020; ballots from all in-person absentee voters because the form used was not a "written application"; ballots on which officials improperly added witness information; and ballots collected at the Democracy in the Park event in Madison, Wisconsin, during which some 17,000 voters dropped off their absentee ballots.[273] The court dismissed the case, finding "no credible evidence of misconduct or wide-scale fraud."[274] The Wisconsin Supreme Court affirmed. It held that the challenge regarding indefinitely confined voters was meritless on its face because the plaintiffs asked the court to strike *all* confined voters without regard to whether any individual voter was actually indefinitely confined.[275] The other claims failed because the Campaign waited until after the unfavorable election outcome to bring them and then challenged only unfavorable results in Democratic-leaning counties.[276] (The core holding of *Bush v. Gore* was that it violates the Equal Protection Clause to use different recount procedures for only the ballots challenged by one side.)[277] One concurring opinion noted that "the President failed to point to even one vote cast in this election by an ineligible voter."[278] Another noted that the challenges were "not of widespread fraud or serious election improprieties" but "ordinary" election administration challenges, "for example, challenging whether an 'application' form in use statewide for a decade constitutes a sufficient application (it does). . . . Wisconsin's electorate should be encouraged that the issues raised in this case are focused on

---

[268] Trump v. Wisconsin Elections Comm'n, 983 F.3d 919, 923-24 (7th Cir. 2020) (explaining claims).
[269] Wisconsin Elections Comm'n, 506 F. Supp. 3d at 624.
[270] *Id*. at 639.
[271] *Id*. at 637, 639 n.10.
[272] Trump v. Wisconsin Elections Comm'n, 983 F.3d 919 (7th Cir. 2020), *cert. denied*, 141 S. Ct. 1516 (2021).
[273] Trump v. Biden, No. 2020-cv-7092 (Milwaukee Cir. Ct. Dec. 11, 2020); Biden, 951 N.W.2d at 570 (explaining various claims).
[274] Patrick Marley, *Trump Lawsuit in Wisconsin Is Thrown Out in a Fifth Adverse Ruling for the President in a Little Over a Week*, USA TODAY (Dec. 11, 2020), https://www.usatoday.com/story/news/politics/elections/2020/12/11/wisconsin-judge-hears-trump-election-case/6514932002/?scrolla=5eb6d68b7fedc32c19ef33b4.
[275] Biden, 951 N.W.2d at 571-572.
[276] *Id*. at 571, 574.
[277] 531 U.S. 98 (2000).
[278] Biden, 951 N.W.2d at 578 (Dallet, J., concurring).

rather technical issues such as whether a witness must include their zip code as part of their address."[279] The United States Supreme Court denied certiorari.[280]

### Summary

There was no widespread voter fraud in Wisconsin. Trump-requested recounts only increased Biden's margin of victory. Legal claims targeted not fraud but ordinary election-administration challenges related to absentee and mail-in ballots. All were rejected.

### Addendum

A list of state and federal cases filed in Wisconsin follows.

[279] *Biden*, 951 N.W.2d at 583 (Hagedorn, J., concurring).
[280] Trump v. Biden, 141 S. Ct. 1387 (2021).

**ADDENDUM**

| Case | Claim | Result |
|---|---|---|
| **Langenhorst v. Pecore, No. 1:20-cv-01701 (E.D. WI.)** | Voters alleged that certain Wisconsin counties unlawfully counted fraudulent ballots. | Plaintiffs voluntarily dismissed four days after filing suit. |
| **WI Voters Alliance v. Wisconsin Elections Commission, No. 2020AP1930 (Wis. Supr. Ct.)** | Plaintiff alleged that the Wisconsin Elections Commission and local election officials counted unlawful absentee ballots, primarily in cities that received funds from Facebook CEO Mark Zuckerberg's Center for Tech and Civic Life. Plaintiffs asked that the election results be declared void and the state legislature choose Electors. | Wisconsin Supreme Court denied petition for leave to file original action because "issues of material fact" prevented court's review, and it would be better suited for circuit court review. |
| **Mueller v. Jacobs, No. 2020AP1958 (Wis. Supr. Ct.)** | A voter backed by the Amos Center for Justice and Liberty challenged the use of absentee-ballot drop boxes. Plaintiff asked the Wisconsin Supreme Court to set aside the results and direct the state legislature to choose Electors. | Wisconsin Supreme Court denied petition for leave to file original action, over three dissenting votes. |
| **Feehan v. Wisconsin Elections Commission, 2:20-cv-1771 (E.D. WI.); No. 20-859 (U.S.)** | Sidney Powell, former member of Trump's legal team, and Lin Wood made several conspiracy accusations and alleged that election officials counted improperly filled-out absentee ballots. | Judge dismissed case for lack of jurisdiction. U.S. Supreme Court denied petitions for writs of mandamus. |
| **Trump v. Evers, No. 2020AP1971 (Wis. Supr. Ct.)** | Trump Campaign challenged Governor Tony Evers' directive permitting absentee ballots to be issued to voters in Milwaukee County and Dane County who did not first submit a written application and alleged that improperly filled-out votes were counted in both counties; also alleged that Madison's Democracy in the Park events violated state law. Plaintiff asked the Wisconsin Supreme Court to void the governor's certification of the election and prohibit the governor from signing a certificate of election, set aside the results, and direct the state legislature to choose Electors. | Wisconsin Supreme Court denied petition for leave to file original action because circuit court provided adequate venue. |
| **Trump v. WI Elections Commission, No. 20-cv-1785** | Trump Campaign alleged that the Wisconsin Elections Commission unlawfully issued absentee ballots, proliferated unmanned mail-in ballot drop boxes, counted vast numbers of | After holding an evidentiary hearing, Judge determined that the commission did not violate |

| Case | Claim | Result |
|---|---|---|
| **(E.D. WI.); No. 20-3414 (7th Cir.); No. 20-883 (U.S.)** | mail-in ballots outside the visibility of poll watchers, reduced or eliminated mandatory voter certifications for mail-in ballots, and permitted "ballot tampering." Plaintiff asked that the case be remanded to the Wisconsin Legislature to consider the alleged election improprieties and to determine the appropriate remedy, including the appointment of Electors. | state or federal law. The Seventh Circuit affirmed. The U.S. Supreme Court denied the petition for expedited consideration and denied certiorari. |
| **Trump v. Biden, 2020CV7092; 2020CV2514 (Consolidated) (Milwaukee Cir. Ct.); No. 2020AP2038 (Wis. Supr. Ct.); No. 882 (U.S.)** | Trump Campaign appealed recount determinations in Milwaukee and Dane counties and alleged that state election officials violated state laws by processing and counting certain absentee and mail-in ballots. | State judge dismissed the case after adopting the defendants' joint findings of fact. Wisconsin Supreme Court affirmed. The U.S. Supreme Court denied the petition for expedited consideration and denied certiorari. |

***

# EXHIBIT 42




**On Air** September 19, 2026 · 8:16 · CLIP

# Mullin details voter fraud probe, border protection after Texas arrests

DHS Sec. Markwayne Mullin joins 'Saturday in America' to discuss the crackdown on non-citizen voting and reversing former President Joe Biden's border failures.

DHS Sec. Markwayne Mullin joins 'Saturday in America' to highlight border enforcement updates and criticize the Biden administration border policies following 16 straight months of zero releases under current enforcement. He reiterates that DHS and ICE remain committed to targeting high-risk individuals to keep American communities safe.

Tags SHOWS | WHAT TO WATCH | VIDEOS | LATEST NEWS | VIDEOS | ON AIR | SATURDAY IN AMERICA W/ KAYLEIGH MCENANY | V-VIDEO | U.S. | POLITICS

**Featured Articles**

DHS chief fires back at Jayapal over claim majority of immigration arrests pose 'no threat'

**...See more**

## Live Now

All times eastern

| NOW - 11:00 AM | 11:00 AM | 11:30 AM |
|---|---|---|
| **America's Newsroom** 10:00 AM - 11:00 AM Watch | **The Faulkner Focus** 11:00 AM - 12:00 PM | |
| **Varney & Company** 10:00 AM - 11:00 AM Watch | **Varney & Company** 11:00 AM - 12:00 PM | |
| **Fox Weather** Live Stream Watch | | |
| **FOX News Radio Live Channel Coverage** Live Stream Watch | | |
| **WATCH LIVE: FDNY hold press conference after 9/11 documents release on toxic air at Ground Zero** Live Stream Watch | | |

## Next Up




**Former Cornell student sues university over alleged sexual assault**
September 20, 2026




**US embassies issue warnings after Houthi missile attack on Riyadh**
September 20, 2026




**Trump's media ban could 'create precedent' that binds future administrations: Jonathan Turley**
September 20, 2026




**Angry crowd gathers at scene of Texas ICE shooting**
September 20, 2026




**Text messages surface in murder trial with former 'American Idol' contestant**
September 20, 2026




**Trump bans CNN, Politico from White House as WHCA fires back**
September 20, 2026




**Restaurant operator reveals why tamales are disappearing from Mexican menus**
September 20, 2026




**Iran escalation threatens Middle East as Houthi conflict intensifies**
September 20, 2026




**Trump in 'deciding mode' on Iran, says 'very big things' are coming**
September 20, 2026




**Mark Levin: We're on the precipice of something huge**
September 20, 2026




**Pentagon admits US has space weapons in Earth's orbit**
September 20, 2026




**Ukraine in better position politically, militarily and economically than at any point in war: Finnish president**
September 20, 2026




**Man shot by ICE officer in Austin is an illegal immigrant from Venezuela, DHS sources say**
September 20, 2026




**WATCH: Protest erupts near Austin ICE shooting scene as night falls**
September 20, 2026




**Officials give update after ICE-involved shooting in Austin, Texas**
September 20, 2026




**State Department issues Middle East travel warning for Americans**
September 20, 2026




**Agitators scream at authorities near ICE shooting scene in Austin**
September 20, 2026




**Fox News Poll reveals voters' top priorities as Michigan Senate race heats up**
September 20, 2026




**Houthi attack on Saudi Arabia raises new fears for global oil supply**
September 20, 2026




**Robert Kraft set a 'powerful example' with Macklemore ban, political analyst says**
September 20, 2026

**New Privacy Policy**

**Updated Terms of Use**

**Your Privacy Choices**

**Closed Caption Policy**

**Stream Safely**

**News Sitemap**

**Video Sitemap**

# EXHIBIT 43

START THE DAY HERE
Hillary Clinton to give Epstein deposition. US-Iran nuclear talks resume. Rock & Roll Hall of Fame announces nominations.

POLITICS • 2 MIN READ

# es are agents of federal government in elections

FEB 3, 2026

By  Donald Judd






President Donald Trump attends a bill signing in the Oval Office of the White House on February 3, 2026. *(Alex Wong/Getty Images)*

President Donald Trump on Tuesday claimed that "a state is an agent for the federal government in elections," as he defended his call for Republicans to **nationalize elections**.

"I want to see elections be honest — and if a state can't run an election, I think the people behind me should do something about it," Trump told CNN's Kaitlan Collins during an Oval Office signing ceremony with Republican lawmakers.

"A state is an agent for the federal government in elections. I don't know why the federal government doesn't do them anyway," he said, adding that it's a "disgrace" how "horribly" some states run elections.

Elections are run by state and local officials, with the federal government playing only a limited role. But that hasn't stopped Trump from attempting to revamp how elections are conducted, as his administration pushes to overhaul rules ahead of the midterm elections.

The president named Atlanta, where less than a week ago the FBI searched an **elections office** as part of a Justice Department probe into alleged voter fraud, and other cities with Democratic strongholds as seeing "horrible corruption on elections."



CNN One Thing
The Brewing Battle for Control of How

CNN Politics Subscribe

the federal government to count the votes. If they can't count the votes legally and honestly, then somebody else should take over."

Pressed by Collins on the **provisions in the Constitution** that local officials administer elections, Trump said, "They can administer the election, but they have to do it honestly."

Earlier in the day, White House press secretary Karoline Leavitt told reporters that Trump was talking about the need for a national voter ID requirement when he called on Republicans to "nationalize the voting" in an interview that aired Monday.

"What the president was referring to is the SAVE Act," Leavitt told reporters, referring to legislation that would require proof of citizenship to register to vote. "It provides very commonsense measures for voting in our country, such as voter ID." Noncitizens are already prohibited from voting in federal elections.

On several occasions, Trump has pledged to change how the country votes, zeroing in on methods he falsely claims lead to fraudulent voting and kicking off a rare **mid-decade redistricting campaign** intended to help Republicans win additional US House seats.

Search CNN...

Subscribe

Sign in

Listen

Watch

US

World

Politics

Business

Markets

Health

CNN Underscored

Entertainment

Tech

Style

Travel

Sports

Science

Climate

Weather

Winter Olympics 2026

Ukraine-Russia War

Israel-Hamas War

Watch

Listen

Games

About CNN

FOLLOW CNN POLITICS

DOWNLOAD THE CNN APP

Download on the App Store GET IT ON Google Play

Terms of Use Privacy Policy Manage Cookies Ad Choices Accessibility & CC About Subscribe Newsletters Transcripts Help Center

© 2026 Cable News Network. A Warner Bros. Discovery Company. All Rights Reserved.
CNN Sans ™ & © 2016 Cable News Network.

# EXHIBIT 44

Politics

# Trump suggests Republicans should nationalize voting. Here's what to know.

By Melissa Quinn

February 3, 2026 / 6:18 PM EST / CBS News

Add CBS News on Google

*Washington* — President Trump suggested Monday that Republicans should "nationalize" voting, the latest escalation in his and his administration's efforts to step into federal elections ahead of the 2026 midterms.

During a podcast interview with former FBI deputy director Dan Bongino, Mr. Trump repeated his claims that people who are in the U.S. illegally are voting in federal elections and urged Republicans to "take over the voting" in at least 15 states.

"The Republicans should say, 'we want to take over,'" Mr. Trump said Monday. "The Republicans ought to nationalize the voting. And then we have states that are so crooked, and they're counting votes."

A day later, Mr. Trump said in an Oval Office event, while flanked by lawmakers and members of his Cabinet: "I want to see elections be honest, and if a state can't run an election, I think the people behind me should do something about it."

## Constitution gives states — not the president — the power to run elections

The Constitution's Elections Clause gives states the authority to set the rules for federal elections, and offices at the state and local levels oversee their administration, though Congress can pass election regulations in certain cases.

As a result, the president has virtually no role in overseeing elections, said David Becker, a CBS News election law contributor and the executive director of the Center for Election Innovation and Research.

"The Elections Clause of the Constitution couldn't be any more clear," Becker said on CBS News' "The Takeout with Major Garrett" on Tuesday. "It's actually one of the areas the Founders carved out, specifically to exclude the executive from any power over elections."

**Why Trump says Republican "nationalize" elections**
(03:27)

FACE THE NATION
Full transcript of "Face the Na with Margaret Brennan," Sept 2026

CBS POLITICS
Bessent meets with Chinese counterpart ahead of Trump-) summit

CBS POLITICS
Trump to meet Mamdani in N York City on Monday

THE FREEPRESS
Trump Has Had Enough of Tu Carlson

AD

Continue watching
Illinois Gov. JB Pritzker details using GLP-1 for weight loss af...
after the ad

Asked by reporters Tuesday about those constitutional limits, Mr. Trump said states "can administer the election, but they have to do it honestly." He also referred to states as "agents of the federal government" and argued that federal authorities should be more involved.

White House press secretary Karoline Leavitt told CBS News senior White House correspondent Weijia Jiang earlier Tuesday that Mr. Trump "believes in the United States Constitution," but also believes there has been "a lot of fraud and irregularities."

## Trump moves to expand control over elections

The president has accused Democrats of allowing undocumented immigrants in their states to vote in order to bolster their support, and claimed repeatedly, without evidence, that the 2020 election was rife with fraud.

Dozens of lawsuits filed by his campaign and GOP allies that sought to overturn the 2020 election results were dismissed, and Bill Barr, who served as attorney general in Mr. Trump's first term, said the Justice Department did not uncover any evidence of widespread fraud.

Still, Mr. Trump and his administration have undertaken efforts to exert more control over elections. The president signed an executive order last year that aimed to overhaul elections, including by requiring documentary proof of citizenship to register to vote. It is a crime for noncitizens to vote in federal elections and violators face up to a year in prison.

But the directive faced several legal challenges, and portions of it, including the proof-of-citizenship provisions, have been blocked by federal judges.

The Justice Department has also demanded complete voter registration lists from nearly every state and Washington, D.C., according to the Brennan Center for Justice. It has filed lawsuits against two dozen states and the District of Columbia for refusing to hand over the records, which include voters' addresses, birth dates and partial Social Security numbers.

Mr. Trump also urged Republican state lawmakers to redraw their congressional district lines to help the GOP hold onto its majority in the House. After Texas adopted new voting boundaries that aimed to give Republicans five additional House seats, California approved its own plan to make five seats more favorable to Democrats. Several other states have also moved to recraft their congressional maps.

Then, last week, the FBI executed a search warrant at a Fulton County, Georgia, elections office and seized ballots from the 2020 presidential election. Mr. Trump has repeatedly claimed without evidence that the 2020 presidential election in Georgia, where he lost to former President Joe Biden, was "rigged" against him.

The president told Bongino that "you're going to see some interesting things come in" regarding Georgia, and again asserted without evidence that he won the 2020 election.

The FBI's search, as well as the presence of Director of National Intelligence Tulsi Gabbard at the scene, raised alarms among Democrats on Capitol Hill. Gabbard told lawmakers in a letter Monday that Mr. Trump requested she be at the search of the Fulton County elections hub. She also acknowledged facilitating a phone call between FBI agents in Atlanta and the president, and said Mr. Trump wanted to "thank the agents personally for their work." Gabbard said the president did not ask any questions and did not issue any directives.

The New York Times had reported earlier Monday that Gabbard helped arrange the call between Mr. Trump and FBI agents after the search.

Mr. Trump has also backed the SAVE Act, a bill backed by congressional Republicans that would require state election officials to get in-person proof of citizenship from people registering to vote. Leavitt said Tueday the president's comments on taking over elections referred to that legislation.

"President Trump cares deeply about the safety and security of our elections — that's why he's urged Congress to pass the SAVE Act and other legislative proposals that would establish a uniform standard of photo ID for voting, prohibit no-excuse mail-in voting, and end the practice of ballot harvesting," Abigail Jackson, a White House spokeswoman, said in response to Mr. Trump's comments.

## Congressional Republicans push back on nationalizing elections

The president's call to "nationalize elections" is facing pushback from Republican leaders on Capitol Hill. Senate Majority Leader John Thune told reporters that while he backs a plan to require photo identification to vote, he does not favor federalizing elections.

"I'm a big believer in decentralized and distributing power, and I think it's harder to hack 50 election systems than it is to hack one," he told reporters on Capitol Hill. "So in my view, that's always a system that's worked quite well."

House Speaker Mike Johnson also defended the system of states administering elections and said Mr. Trump was "expressing frustration" about election integrity.

"It's a system that works well, so long as the states make it a priority to ensure the integrity of our elections, and we have real concerns about some of the blue states, frankly, that have not been doing that well," he told reporters. "So that's the president's — he's expressing that frustration. We all have it. We're looking for solutions."

Patrick Maguire and Kaia Hubbard contributed to this report.

**2026 Midterm Elections** More ›

FACE THE NATION
Salazar tells Trump on Hispanic voters: "Preserve that fortune"

CBS POLITICS
GOP congresswoman says Trump immigration enforcement has "gone too far"

CBS POLITICS
House cutting week short before adjourning until after midterms

CBS POLITICS
Supreme Court blocks new USPS rules for mail ballots in blow to Trump

**Go deeper with The Free Press**

THE FREEPRESS
Trump Has Had Enough of Tucker Carlson



THE FREEPRESS
Nick Fuentes's Plan to 'Infiltrate Politics' and Subvert the GOP



In: Voting Donald Trump Election

© 2026 CBS Interactive Inc. All Rights Reserved.


## MDs Say Mental Decline Begins When Seniors Can't Pronounce These 3 Phrases. Can You?

PAID DOCTORS MEMORY REPORT

## Legendary Investor: World's Richest Man's Next Move Will Mint 1,806,000 Millionaires

James Altucher just made his boldest prediction yet. So if you missed out on SpaceX, Tesla or any other massive profit opportunity… Now could be your second chance.

PAID PARADIGM PRESS Learn More

## Senior's Top MDs Say Mental Decline Isn't Age: Just Avoid Drinking These 3 Beverages

PAID COGNITIVE WELLNESS INSTITUTE Learn More

## He Built Tesla. He Built SpaceX. Altucher Says His Next Move is Bigger

James Altucher just made his boldest prediction yet. So if you missed out on SpaceX, Tesla or any other massive profit opportunity… Now could be your second chance.

PAID PARADIGM PRESS Learn More

## MDs Say Cognitive Decline Begins When Seniors Often Say These 3 Phrases – See Which Ones

PAID COGNITIVE HEALTH SUPPORT Learn More

## 3 Beverages Now Connected to 4 Out of 5 Cases of Senior Cognitive Decline

PAID THE WELLNESS BEACON Learn More

## This Popular Breakfast Item Is Now Tied to 89% of Forgetful Minds

PAID JOURNAL REPORT

## Japan's Oldest Doctors Say Forgetfulness Isn't Just Age: Rethinking These 4 Things

PAID SHARP MIND: TRY THIS TODAY

## Feeling More Absent-Minded? Notice If You Often Say These 3 Phrases

PAID SENIOR WELLNESS INSIGHTS

## At 66, I Stopped Wearing Bras. Here's What I Wear Instead

PAID COMFORT LIVING TODAY Learn More

## Sharp Seniors Avoid These 3 Cereals (Number 2 Is In Most Kitchens)

PAID DAILY REPORT

## Misplacing Things Lately? Experts Say: Notice If You Often Say These 3 Phrases.

PAID SENIOR WELLNESS INSIGHTS

## Worst Car Insurance Companies for Overcharging (Is Yours On the List?)

Auto Insurance | Sponsored Learn more

## Forgetfulness Begins When Seniors Notice These 3 Signs (See Which Ones)

PAID FOCUS REPORT Learn More

## Dermatologists: The 1 Vitamin You Need If You Have Wrinkles

She stopped using her moisturizer and tried this instead — the results surprised everyone.

PAID ANTI-AGING CENTER Read More

## Misplacing Things Lately? Experts Say: Notice If You Often Say These 3 Phrases

PAID TODAY 55+: NEURO HEALTH

## 9 Out of 10 Sharp Seniors Avoid These 3 Grocery Items (See The List)

PAID TOMORROW CENTURI

## Wrinkles? Most People Use Lotions. Koreans Do This Instead

PAID THE SKINCARE MAGAZINE Read Now

## Crepey Skin? Most People Buy Lotions. Koreans Use This Instead (It's Genius)

PAID TRI LIFT Learn More

## Chronic tinnitus has been associated with a common practice

PAID EAR.HEALTH I NEWS Learn More

## Here Are The 26+ Coolest Gifts For This Year

PAID GADGETS Shop Now


## 60 Minutes: Patrick Clancy

CBS NEWS

## NASCAR: Drivers brawl in Bristol

CBS NEWS


## Still Eating This Cereal? Sharp Seniors Quit It Years Ago

PAID JOURNAL REPORT

## Virginia: Worst Car Zip Codes for Overcharging Insurance (Is Yours On The List?)

Your current rate may not be your only option — see what drivers are comparing before their next bill.

PAID OTTO INSURANCE Get Rates

## Dermatologists Reveal: Forget Collagen, Use This Household Item Instead

She stopped using her moisturizer and tried this instead, the results surprised everyone.

PAID ANTI-AGING CENTER Read More

## Hiroshi Closes His Knife Shop After 55 Years

PAID SAKURA KNIVES Learn More

The Missing Nutrient Behind Thin Hair

PAID BEAUTIFUL HAIR AGAIN

The Popular Breakfast Item Tied to 89% of Cognitive Decline Scenarios

PAID COGNITIVE JOURNAL Learn More



Copyright ©2026 CBS Interactive Inc. All rights reserved.

ORACLE NetSuite

# EXHIBIT 45

# *Justice Dept. Pushes Limits of Its Power Over State Elections*

The department once tried to stay out of state elections, urging caution. It is now pressing forward with claims of fraud as President Trump revives his unfounded assertions that elections cannot be trusted.

Listen · 9:25 min



**By Devlin Barrett**
Devlin Barrett covers the Justice Department, and reported from Washington.

June 11, 2026

Speaking to a conservative radio host on Monday, the top federal prosecutor in Los Angeles made an unusually pointed prediction that cast doubt on the results of California's primary races, even as votes were still being counted.

"We will be charging some people," the prosecutor, Bill Essayli, told the host, Glenn Beck, delivering a promise that would most likely have been considered a violation of Justice Department policy under decades of past practice. "It will be election fraud charges in the next — I hate to put timelines on things — one or two months I believe. We need some of these results to be certified so we can prove some of the allegations."

The declaration, issued by an outspoken loyalist to President Trump, was a vivid example of the Justice Department's approach to voting under the Trump administration. The agency is seeking to assert more control over elections and

consequences in the midterm elections this year, when control of Congress hangs in the balance.

It is part of a broader effort by Mr. Trump to undermine confidence in the elections by repeatedly making baseless claims of voter fraud. The playbook dates to his first run for office in 2016, when he raised the specter of a rigged vote during his campaign and revisited the unfounded assertion even after he was declared the victor because Hillary Clinton had won the popular vote. In 2020, he revived the strategy, going so far as to try to overturn the results in swing states that had been won by Joseph R. Biden Jr.

In the last year alone, the Justice Department has sought voter roll data from most states; sued those that have declined to comply; opened a criminal investigation into 2020 election results in Fulton County, Ga., a state Mr. Trump narrowly lost that year; and demanded ballots from the 2024 race from Wayne County, Mich.

The administration is "throwing everything against the wall that they can find, and nothing is sticking," said David Becker, a former voting rights lawyer at the Justice Department who is now the executive director of the Center for Election Innovation and Research.

"Almost all of their work is going back over conspiracy theorists' allegations that were debunked five years ago," he added. "They are running out of tools in their toolbox."

California appears to be an early testing ground, as Mr. Trump and his allies stoke doubt about election outcomes they do not like, despite a lack of evidence of widespread fraud.

overt criminal investigative measures in matters involving alleged ballot fraud until the election in question has been concluded, its results certified, and all recounts and election contests concluded."

The same section declares that the Justice Department "should generally avoid interfering or appearing to interfere with election administration, tabulation, validation or certification."

Asked about Mr. Essayli's remarks, a department spokeswoman, Natalie Baldassarre, said that election integrity was a top administration priority, and insisted that the department had legal authority to enforce election law, including by requesting state voter rolls.

The investigations in California, she added, were "in line with this authority, and will continue despite the state's unwillingness to comply and reassure voters that their elections are in fact free, fair and transparent." A spokesman for Mr. Essayli declined to comment.

Bill Essayli, the top federal prosecutor in Los Angeles, predicted that there would be election fraud charges, even though votes were still being counted. Patrick T. Fallon/Agence France-Presse — Getty Images

The administration has already effectively dismantled its public integrity section in Washington, which had for years included round-the-clock legal advisers in the week leading up to a general election.

Its lawyers consulted with federal prosecutors and agents across the country about instances of possible election-related crimes, like ballot tampering or threats against candidates. Those lawyers tended to act as important checks on overly aggressive investigations that could be seen by the public as trying to affect the outcome of races.

**Sign up for the On Politics newsletter.** It's a pivotal moment for American politics. Join us for 2026 and beyond. Get it sent to your inbox.

Most often, the public integrity lawyers would advise investigators to proceed cautiously and quietly, rather than give more attention or importance to rumors or false accusations.

attorneys encouraged to more aggressively investigate, prosecute and discuss their work on election fraud.

Mr. Essayli has not only loudly announced his investigations, but he has also dispatched a prosecutor to the offices where ballots were being counted. And he has appealed for anyone with evidence of voter fraud to come forward, saying that "what we need right now are witnesses."

Since taking over as the top prosecutor in Los Angeles, Mr. Essayli, a former state assemblyman, has proved willing to carry out Mr. Trump's agenda. He has dropped cases against the president's allies; aggressively pursued charges against protesters rallying against the administration's immigration crackdown only to face a string of losses; and investigated California over its policies toward transgender athletes.

Mr. Essayli has criticized voting laws in the state as particularly vulnerable to fraud and manipulation, joining a chorus of Republicans who have assailed the process. California is particularly slow when counting ballots because of how many residents vote by mail. After holding an election on June 2, officials in the state were still counting votes this week, prompting G.O.P. lawmakers to claim that the delay meant deceit.

"Some of these efforts are so diabolical and so far upstream it is impossible to prove," Speaker Mike Johnson said. "But I think everybody knows instinctively something is wrong here."

Dora Rose, the deputy director of the League of Women Voters of California, countered the claims of fraud that Mr. Trump and his allies were pushing.

"They don't have the facts, so they're manufacturing fear and they're manufacturing chaos," Ms. Rose said. "A slow count is not a sign that something is wrong. In fact, it's a sign that things are going the right way."

and election law experts said that the administration's efforts to portray California's voting as crooked were wrong and unfair, because the amount of voter fraud discovered by the authorities is exceedingly rare.

On social media, Mr. Essayli has tied his criminal investigations to a wide-ranging effort by the Trump administration to sue more than 25 states over their voter rolls, which includes the personal data of millions of Americans.

California, he said, "has stonewalled every effort to verify that only eligible U.S. citizens are registered to vote." He warned that his office would "not look the other way."

"We will investigate and prosecute," he added. "Every legal vote deserves to be counted. Every illegal vote cancels one out."

In recent weeks, Justice Department leaders have ramped up their rhetoric about elections, particularly regarding Mr. Trump's loss in 2020.

The acting attorney general, Todd Blanche, said in an interview last month on Fox News that there was "a ton of evidence that the election was rigged." Such evidence had existed for many years, he added, but the people responsible were "very good at hiding up misconduct."

Even though the White House has no formal or legal role in administering elections, Mr. Trump installed Kurt Olsen, who tried to help overturn his election loss in 2020, to oversee election integrity and security. Mr. Olsen has since moved to the Justice Department, working in a U.S. attorney office's in Florida that is investigating what Trump supporters call a "grand conspiracy" against him.

Despite the Trump administration's demands for voter roll data, at least eight federal district judges have turned the administration away. Half of those judges were appointed by Mr. Trump. The administration is appealing the decisions.

"I don't know that the Department of Justice has ever had a zero-for-eight streak," Mr. Becker said, adding that Mr. Essayli's comments were likely to make it even harder for a judge to rule in the administration's favor.

Under Mr. Trump, the Justice Department has struggled to retain personnel, rapidly losing thousands of career lawyers and installing ardent, less experienced loyalists in their place.

While the president's unfounded claims of fraud were eroding trust in the election system, Mr. Becker added, the Trump administration's election investigations were having a similarly corrosive effect inside the department.

"They are running out of people," he said. "When the only people you can hire are bad lawyers, you get bad cases litigated badly."

Soumya Karlamangla contributed reporting from San Francisco.

**Devlin Barrett** covers the Justice Department and the F.B.I. for The Times.

---

A version of this article appears in print on , Section A, Page 10 of the New York edition with the headline: Justice Dept. Parrots Trump On Vote Fraud

# EXHIBIT 46

# Federal Prosecution of Election Offenses

## Eighth Edition

*December 2017*

Edited by:

Richard C. Pilger, Director
Election Crimes Branch
Public Integrity Section

# TABLE OF CONTENTS

**PREFACE .......... xii**

**CHAPTER ONE: OVERVIEW .......... 1**

A. INTRODUCTION .......... 1
B. TYPES OF ELECTION CRIMES .......... 2
1. Election Fraud .......... 2
2. Patronage Crimes .......... 3
3. Campaign Financing Crimes .......... 4
4. Civil Rights Crimes .......... 5
C. FEDERAL JURISDICTION .......... 5
D. ADVANTAGES OF FEDERAL PROSECUTION .......... 7
E. FEDERAL ROLE: PROSECUTION, NOT INTERVENTION .......... 8
F. EVALUATING AN ELECTION FRAUD ALLEGATION .......... 10
G. INVESTIGATIVE CONSIDERATIONS IN ELECTION FRAUD CASES .......... 11
H. EVALUATING A CAMPAIGN FINANCING ALLEGATION .......... 12
I. INVESTIGATIVE CONSIDERATIONS IN CAMPAIGN FINANCING CASES .......... 14
J. CONSULTATION REQUIREMENTS AND RECOMMENDATIONS .......... 15
1. Consultation Requirements for Election Fraud and Patronage Crimes .......... 16
2. Consultation Requirements for Campaign Financing Crimes .......... 17

**CHAPTER TWO: CORRUPTION OF THE ELECTION PROCESS ....................................................................19**

A. HISTORICAL BACKGROUND ............................19
B. WHAT IS ELECTION FRAUD? ............................22
1. In General ..........................................................22
2. Conduct that Constitutes Federal Election Fraud ..............................................23
3. Conduct that Does Not Constitute Federal Election Fraud ....................................26
4. Conditions Conducive to Election Fraud .........27
5. Voter Participation Versus Non-voter Participation Cases .........................................27
(a) Election frauds not involving the participation of voters ...............................28
(b) Election frauds involving the participation of voters ..................................................29
C. JURISDICTIONAL SUMMARY ..........................30
1. Statutes Applicable to Non-Federal Elections ........................................................31
2. Statutes Applicable to Federal Elections Only ................................................32
D. STATUTES ..........................................................33
1. Conspiracy Against Rights: 18 U.S.C. § 241 ...33
2. Deprivation of Rights under Color of Law: 18 U.S.C. § 242 ...............................................37
3. False Information in, and Payments for, Registering and Voting: 52 U.S.C. § 10307(c).......................................38
(a) The basis for federal jurisdiction ..............39
(b) False information to an election official ...40
(c) Vote-Buying ..........................................43
(d) Conspiracy to cause illegal voting ............45
4. Voting More than Once: 52 U.S.C. § 10307(e).......................................46

5. Voter Intimidation ........................................49
(a) Intimidation in voting and registering to vote: 52 U.S.C. § 20511(1) .....................51
(b) Intimidation of voters: 18 U.S.C. § 594...52
(c) Coercion of political activity: 18 U.S.C. § 610 ..................................................53
(d) Conspiracy against rights and deprivation of constitutional rights: 18 U.S.C. §§ 241 and 242 ....................................................53
(e) Federally protected activities: 18 U.S.C. § 245(b)(1)(A) .......................................55
6. Voter Suppression: 18 U.S.C. §§ 241 and 242 ................................56
7. Fraudulent Registration or Voting: 52 U.S.C. § 20511(2) .................................................58
(a) Fraudulent registration: § 20511(2)(A) ...59
(b) Fraudulent voting: § 20511(2)(B) ...........60
8. Voting by Non-citizens ..................................60
(a) Fraudulent registration and voting: 52 U.S.C. § 20511(2) ..............................61
(b) False claims to register or vote: 18 U.S.C. § 1015(f) ..............................................62
(c) False claims of citizenship: 18 U.S.C. § 911 ....................................................63
9. Voting by Aliens: 18 U.S.C. § 611 .................63
10. Travel Act: 18 U.S.C. § 1952 .........................64
11. Mail and Wire Fraud: 18 U.S.C. §§ 1341, 1343 .................................67
(a) "Salary Theory" of mail and wire fraud ...67
(b) "Cost-of-election" theory: 18 U.S.C. § 1341 ....................................72
12. Troops at Polls: 18 U.S.C. § 592 ....................73
13. Campaign Dirty Tricks ..................................73
(a) Election communications and solicitations: 52 U.S.C. § 30120 ...................................74

(b) Fraudulent misrepresentation: 52 U.S.C. § 30124 ....74

14. Retention of Federal Election Records: 52 U.S.C. § 20701 ....75

(a) Legislative purpose and background ....76

(b) The basic requirements of Section 20701 ....77

(c) Section 20701 requires document preservation, not document generation ....78

(d) Originals must be retained ....78

(e) Election officials must supervise storage ....79

15. Section 20701 versus National Voter Registration Act ....79

E. POLICY AND PROCEDURAL CONSIDERATIONS ....80

1. Consultation Requirements ....80

2. Urgent Reports and Press Releases ....83

3. Federal Seizure of State Election Materials ....83

4. Non-interference with Elections ....84

5. Limitations on Federal Poll Watching ....85

6. Selective Prosecution Issues ....86

F. SUGGESTIONS FOR SUCCESSFUL ELECTION FRAUD INVESTIGATIONS ....86

1. Getting Started ....87

(a) Publicize your intent to prosecute election fraud ....87

(b) Be aware of the importance of voting documentation ....88

(c) Consider the advantages of federal prosecution ....90

(d) Focus on areas vulnerable to election fraud ....91

(e) Develop your investigative strategy early ....91

2. The Investigation ....92

(a) Preliminary investigation ..........................92
(b) Grand jury and FBI full-field investigations ..........................................93
3. Investigating Two Types of Election Fraud .....93
(a) Absentee ballot frauds ..............................93
(b) Ballot-box stuffing cases ..........................95
4. A Few Cautions ..............................................96
5. Conclusion .....................................................98

**CHAPTER THREE: PATRONAGE CRIMES ..................99**

A. HISTORICAL BACKGROUND ..........................99
B. STATUTES .........................................................101
1. Limitations Based on Federal Employment or Workspace ...................................................101
(a) Solicitation of political contributions: 18 U.S.C. § 602 ....................................101
(b) Making political contributions: 18 U.S.C. § 603 ........................................................103
(c) Intimidation to secure political contributions: 18 U.S.C. § 606 .............103
(d) Coercion of political activity: 18 U.S.C. § 610 .........................................................104
2. Place of solicitation: 18 U.S.C. § 607 ...........105
3. Limitations Based on Federal Programs and Benefits ...........................................................107
(a) Promise or deprivation of federal employment or other benefit for political activity: 18 U.S.C. §§ 600 and 601 ........107
(b) Promise of appointment by candidate: 18 U.S.C. § 599 .....................................110
(c) Interference in election by employees of federal, state, or territorial governments: 18 U.S.C. § 595 .....................................111

(d) Coercion by means of relief appropriations: 18 U.S.C. § 598 ....................................111
(e) Solicitation from persons on relief: 18 U.S.C. § 604 ....................................111
(f) Disclosure of names of persons on relief: 18 U.S.C. § 605 ....................................112
4. Permissible Political Activity under the Hatch Act, as Amended: 5 U.S.C. §§ 7323 and 7324 ..........................112
C. POLICY AND PROCEDURAL CONSIDERATIONS ........................................115

**CHAPTER FOUR: ELECTION DAY PROCEDURES ..116**

**CHAPTER FIVE: CAMPAIGN FINANCE CRIMES.....122**

A. INTRODUCTION ............................................122
B. STATUTORY SCOPE ......................................124
1. Types of Statutes ..........................................124
2. Basic Statutory Definitions ..........................125
3. Statutory Presumptions .................................128
C. STATUTES .....................................................129
1. Introduction ...................................................129
2. Substantive Statutes .....................................129
(a) 52 U.S.C. § 30116: Limitations on contributions and expenditures ...............129
(b) 52 U.S.C. § 30118: Prohibition on contributions and expenditures by national banks, corporations, or labor organizations ........................................133
(c) 52 U.S.C. § 30119: Prohibition on contributions by government contractors 136
(d) 52 U.S.C. § 30120: Attribution of sponsors of political communications and solicitations ............................................137

(e) 52 U.S.C. § 30121: Prohibition on contributions, donations, and expenditures by foreign nationals ....138
(f) 52 U.S.C. § 30122: Prohibition on contributions through conduits ....141
(g) 52 U.S.C. § 30123: Limitation on contribution of currency....143
(h) 52 U.S.C. § 30124: Fraudulent misrepresentation of campaign authority....143
(i) 52 U.S.C. § 30125: Soft money of political parties....144
i. Section 30125(a) ....144
ii. Section 30125(b) ....145
iii. Section 30125(d)....147
iv. Section 30125(e) ....147
3. 52 U.S.C. § 30114: Prohibition on Conversion of Campaign Funds ....148
4. 52 U.S.C. §§ 30102, 30103, and 30104: Organization, Recordkeeping, and Reporting Requirements ....149
D. ENFORCEMENT ....150
1. Three Types of Enforcement ....150
2. FECA's Criminal Penalty Provision ....152
(a) Intent ....152
(b) Aggregate value ....155
3. Penalties ....156
4. Statute of Limitations for Campaign Financing Offenses ....157
5. Venue for FECA Offenses ....157
6. Other Applicable Federal Criminal Statutes ..158
(a) Willfully causing submission of false information to the Federal Election Commission: 18 U.S.C. §§ 1001 and 2....159

(b) Conspiracy to defraud the United States: 18 U.S.C. § 371 ........ 162
(c) Public financing crimes relating to presidential campaigns ........ 163
(d) Mail and wire fraud: 18 U.S.C. §§ 1341 and 1343 ........ 165
(e) False records in the administration of a federal matter: 18 U.S.C. § 1519 ........ 167
7. Policy and Procedural Considerations ........ 167
(a) Consultation requirements and recommendations ........ 167
(b) Investigative jurisdiction ........ 168
(c) Non-waiver of the Federal Election Commission's civil enforcement authority ........ 169
(d) Dealings with the Federal Election Commission ........ 169
(e) Federal Election Commission officials as prosecution witnesses ........ 170

**CHAPTER SIX: SENTENCING OF ELECTION CRIMES ........ 172**

A. OVERVIEW ........ 172
B. CONVICTIONS INVOLVING CORRUPTION OF THE ELECTORAL PROCESS ........ 173
1. § 2H2.1: Obstructing an Election or Registration ........ 174
2. § 2C1.8: Making, Receiving, or Failing to Report a Contribution, Donation, or Expenditure in Violation of the Federal Election Campaign Act; Fraudulently Misrepresenting Campaign Authority; Soliciting or Receiving a Donation in Connection with an Election While on Certain Federal Property ........ 180

3. Examples of Application of FECA Sentencing Guidelines ....................................................185
   (a) Example 1: The conduit ........................185
   (b) Example 2: A typical FECA crime: laundered corporate contributions ..........187
   (c) Example 3: Corporate contributor to multiple candidates through threats and coercion ..........................................188
   (d) Example 4: Fundraiser possessing special skill ........................................................190
   (e) Example 5: Major political party donor seeking a benefit from the government ...191
   (f) Example 6: Foreign agent who gives funds from foreign government to non-federal candidates to obtain a specific benefit from the government .....................................192

C. CONVICTIONS OF CAMPAIGN FINANCING VIOLATIONS ADDRESSED UNDER ALTERNATIVE THEORIES OF PROSECUTION ...............................................194
1. Conspiracy to Disrupt and Impede the Federal Election Commission ....................................194
2. False Statements to the Federal Election Commission and False Internal Records .........194
3. Embezzlement of Campaign Funds ................195

D. OBLIGATION TO REPORT FELONY CONVICTIONS TO STATE ELECTION OFFICIALS .......................................................196

**CHAPTER SEVEN: CONCLUSION – WHY PROSECUTING ELECTION CRIMES IS SO IMPORTANT ...........................................................197**

**APPENDIX A: EXCERPT FROM *McCONNELL v. FEDERAL ELECTION COMMISSION* ............................202**

**APPENDIX B: STATUTES ................................................216**

**APPENDIX C: EDITORIAL RECLASSIFICATION TABLE FOR TITLE 52 .......................................................274**

**APPENDIX D: TABLE OF CASES ....................................275**

# PREFACE

This eighth edition of *Federal Prosecution of Election Offenses* builds on the original work of Craig C. Donsanto, Nancy N. Simmons, and others, in all of the prior editions. This edition updates their work with developments in the law of election offenses since the last edition in 2007. Trial Attorneys Amanda R. Vaughn and Simon J. Cataldo of the Public Integrity Section have contributed substantially to this edition.

Among other things, this edition accounts for important changes in the law regarding independent expenditures and honest services fraud, reflecting the Supreme Court's holdings in *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310 (2010), and *Skilling v. United States*, 561 U.S. 358 (2010). On a practical level, the statutory references and appendix have been updated to account for the recodification of many election crimes into Title 52 of the United States Code. This edition also streamlines discussion of the history of amendments to the Federal Election Campaign Act given the passage of time since the most recent actions by Congress.

This monograph provides only internal Department of Justice guidance. It is not intended to, does not, and may not be relied upon to create any rights, substantive or procedural, enforceable at law by any party in any matter civil or criminal. Nor are any limitations placed on otherwise lawful litigative prerogatives of the Department of Justice.

Richard C. Pilger
Director, Election Crimes Branch
Public Integrity Section, Criminal Division

December 2017

# CHAPTER ONE

# OVERVIEW

This book was written to help federal prosecutors and investigators discharge the responsibility of the United States Department of Justice in attacking corruption of the election process with all available statutes and theories of prosecution. It addresses how the Department handles all federal election offenses, other than those involving civil rights, which are enforced by the Department's Civil Rights Division. This Overview summarizes the Department's policies, as well as key legal and investigative considerations, related to the investigation and prosecution of election offenses.

## A. INTRODUCTION

In the United States, as in other democratic societies, it is through the ballot box that the will of the people is translated into government that serves rather than oppresses. It is through elections that the government is held accountable to the people and political conflicts are channeled into peaceful resolutions. And it is through elections that power is attained and transferred.

Our constitutional system of representative government only works when the worth of honest ballots is not diluted by invalid ballots procured by corruption. As the Supreme Court stated in a case upholding federal convictions for ballot box stuffing: "Every voter in a federal . . . election, . . . whether he votes for a candidate with little chance of winning or for one with little chance of losing, has a right under the Constitution to have his vote fairly counted, without its being distorted by fraudulently cast votes." *Anderson v. United States*, 417 U.S. 211, 227 (1974). When the election process is corrupted, democracy is jeopardized. Accordingly, the effective prosecution of corruption of the election process is a significant federal law enforcement priority.

Although corrupt government may exist without election crime, when election crime exists, public corruption of some form is also usually present. This is so because virtually all election crime is driven by a motive to control governmental power for some corrupt purpose. Election crime cases therefore often provide effective tools for attacking other forms of public corruption. The task of the federal prosecutor and investigator is not only to vindicate the fundamental principle of fair elections by convicting those who corrupt them but also to find the motive behind the election fraud and, when possible, to prosecute those involved in the underlying corruption.

There are several reasons why election crime prosecutions may present an easier means of obtaining convictions than do other forms of public corruption:

- Election crimes usually occur largely in public.

- Election crimes often involve many players. For example, successful voter bribery schemes require numerous voters; ballot box stuffing requires controlling all the election officials in a polling location; and illegal political contributions generally involve numerous conduits to disguise the transaction.

- Election crimes tend to leave paper trails, either in state voting documentation or in public reports filed by federal campaigns.

## B. TYPES OF ELECTION CRIMES

### 1. Election Fraud

Election fraud usually involves corruption of one of three processes: the obtaining and marking of ballots, the counting and certification of election results, or the registration of voters. Election fraud is generally not common when one party or one faction of a

party dominates the political landscape. Rather, the conditions most conducive to election fraud are close factional competition within an electoral jurisdiction for an elected position that matters. Thus, in a jurisdiction when one party is dominant, election fraud may nevertheless occur during the primary season, as various party factions vie for power.

Most election fraud aims at ensuring that important elected positions are occupied by "friendly" candidates. It occurs most often when the financial stakes involved in who controls public offices are great – as is often the case when patronage positions are a major source of employment, or when illicit activities are being conducted that require protection from official scrutiny. As noted, election crimes will typically coincide with other types of corruption.

### 2. Patronage Crimes

Patronage is a term used to describe the doctrine of "to the victor go the spoils." The Supreme Court has held that the firing, based on partisan considerations, of public employees who occupy non-confidential and non-policymaking positions violates the First Amendment. Moreover, an aggressive and pervasive patronage system can provide a fertile breeding ground for other forms of corruption. It is therefore important to root out aggravated patronage abuses wherever they occur.

Patronage crimes are most prevalent when one political faction or party dominates the political landscape but is also required to defend its position of power against a credible opposition. Patronage crimes are also common in jurisdictions where other forms of public corruption are prevalent and tolerated by the body politic.

### 3. Campaign Financing Crimes

The federal campaign financing laws are embodied within the Federal Election Campaign Act of 1971 (FECA), 52 U.S.C. §§ 30101–30146, as amended (most significantly in 1974, 1976, 1979, and 2002).

As amended, FECA applies to virtually all financial transactions that impact upon, directly or indirectly, the election of candidates for federal office, that is, candidates for President or Vice President or for the United States Senate or House of Representatives. FECA reaches a wide range of communications aimed at influencing the public with respect to issues that are closely identified with federal candidates, referred to in the law as "electioneering communications."

FECA contains its own criminal sanctions, which provide that, to be a crime, a FECA violation must have been committed knowingly and willfully and, except for campaign misrepresentations and certain coerced contributions, must have involved at least $2,000 in a calendar year. 52 U.S.C. § 30109(d). FECA crimes aggregating $25,000 or more are five-year felonies, and those that involve illegal *conduit contributions* and aggregate over $10,000 are two-year felonies. 52 U.S.C. § 30109(d)(1)(A), (D). Moreover, all criminal violations of FECA are subject to U.S. Sentencing Guideline § 2C1.8, that the United States Sentencing Commission promulgated in response to a specific Congressional directive.

FECA violations that either: (1) do not present knowing and willful violations, or (2) involve sums below the statutory minimums for criminal prosecution, are handled non-criminally by the Federal Election Commission (FEC) under the statute's civil enforcement provisions. 52 U.S.C. § 30109(a).

Finally, FECA violations that result in false information being provided to the FEC may present violations of 18 U.S.C. § 371 (conspiracy to disrupt and impede a federal agency), 18 U.S.C. § 1001 (false statements within the jurisdiction of a federal agency), 18 U.S.C. § 1505 (obstruction of agency proceedings), or 18 U.S.C. § 1519 (creation of false records in relation to or contemplation of federal matters).

### 4. Civil Rights Crimes

Schemes to deprive minorities of the right to vote are federal crimes under the Voting Rights Act of 1965, as amended. 52 U.S.C. § 10308. Discrimination based on a potential voter's race, or on ethnic factors or minority language, may also be redressed under such criminal statutes as 18 U.S.C. §§ 241 and 242. These prosecutions are handled by Criminal Section of the Civil Rights Division.

In addition to civil rights crimes, federal law provides non-criminal remedies for any conduct that diminishes an individual's voting rights based on racial, ethnic, or language minority factors. These civil remedies are incorporated within the Voting Rights Act of 1965, as amended, and other civil rights laws, and they are enforced by the Voting Section of the Civil Rights Division.

## C. FEDERAL JURISDICTION

The federal government asserts jurisdiction over an election offense to ensure that basic rights of United States citizenship, and a fundamental process of representative democracy, remain uncorrupted.

Election crime cases tend to be long-term projects focusing on individuals with different degrees of culpability. The ultimate

goal is to move up the ladder of culpability to candidates, political operatives, public officials, and others who attempted to corrupt, or did corrupt, the public office involved.

Federal jurisdiction over election fraud is easily established in elections when a federal candidate is on the ballot. The mere listing of a federal candidate's name on a ballot is sufficient, under most of the federal statutes used to prosecute voter fraud, to establish federal jurisdiction. This generally occurs in what are called "mixed" elections, when federal and non-federal candidates are running simultaneously. In such cases, the federal interest is based on the presence of a federal candidate, whose election may be tainted, or appear tainted, by the fraud, a potential effect that Congress has the constitutional authority to regulate under Article I, Section 2, clause 1; Article I, Section 4, clause 1; Article II, Section 1, clause 2; and the Seventeenth Amendment.

The absence of a federal candidate from the ballot can present federal law enforcement with special challenges in attaining federal jurisdiction over election crime. Those challenges can sometimes be met, provided the investigation focuses on identifying additional facts that are needed to invoke application of the federal criminal laws that potentially apply to both federal and non-federal elections. These generally include election frauds that involve the necessary participation of public officers, notably election officials acting "under color of law," voting by non-citizens, fraudulently registering voters, or paying voters in violation of state law.

Federal jurisdiction over campaign financing offenses under FECA also derives from Congress's authority to regulate the federal election process. While a number of the provisions added to FECA by the Bipartisan Campaign Reform Act (BCRA) address financial activities by state and local parties that are generic in the sense that they simultaneously benefit both federal

and non-federal candidates, federal campaign financing law does not apply to violations of state campaign laws. Most states have enacted laws regulating and requiring transparency of campaign financing of candidates seeking state or local office. While violations of these state statutes are not, by themselves, federal crimes, they may be evidence of other federal crimes, including Hobbs Act, Travel Act, mail or wire fraud, or other offenses.

## D. ADVANTAGES OF FEDERAL PROSECUTION

The Constitution confers upon the states primary authority over the election process. Accordingly, federal law does not directly address how elections should be conducted. State law historically has regulated such important activities as the registration of voters, the qualifications for absentee voting, the type of voting equipment used to tabulate votes, the selection of election officials, and the procedures and safeguards for counting ballots.

These factors might suggest that the prosecution of election crime should be left primarily to local law enforcement. However, local law enforcement often is not equipped to prosecute election offenses. Federal law enforcement might be the only enforcement option available.

Four characteristics of the federal criminal justice system support the federal prosecution of election crimes despite the primary role of the states in most facets of election administration:

- Federal grand juries, the secrecy requirements of which help protect the testimony of witnesses who tend to be vulnerable to manipulation and intimidation.

- Federal trial juries, which are drawn from a broader geographic area than are most state juries, and thus lessen the possibility of local bias.

- Resources to handle the labor-intensive investigations generally required for successful prosecution of election crime.

- Detachment from local political forces and interests.

## E. FEDERAL ROLE: PROSECUTION, NOT INTERVENTION

The principal responsibility for overseeing the election process rests with the states. With the significant exception of violations of the Voting Rights Act involving denigration of the right to vote based on race, ethnicity, or language minority status, the federal government plays a role secondary to that of the states in election matters.[1] It is the states that have primary authority to ensure that only qualified individuals register and vote, that the polling process is conducted fairly, and that the candidate who received the most valid votes is certified as the winner.[2]

The federal prosecutor's role in matters involving corruption of the process by which elections are conducted, on the other hand, focuses on prosecuting individuals who commit federal crimes in connection with an election. Deterrence of future similar crimes is an important objective of such federal prosecutions. However, this deterrence is achieved by public

---

[1] When election offenses are driven by animus based on race, ethnicity, or language-minority status, the broad protections of the 1965 Voting Rights Act and other civil rights statutes apply. 52 U.S.C. §§ 10101, 10301, 10303(f), & 10503. Such matters are supervised by the Civil Rights Division.

[2] Of course, the U.S. electoral college presents an exception.

awareness of the Department's prosecutive interest in, and prosecution of, election fraud – not through interference with the process itself.

Because the federal prosecutor's function in the area of election fraud is not primarily preventative, any criminal investigation by the Department must be conducted in a way that minimizes the likelihood that the investigation itself may become a factor in the election. The mere fact that a criminal investigation is being conducted may impact upon the adjudication of election litigation and contests in state courts. Moreover, the seizure by federal authorities of documentation generated by the election process may deprive state election and judicial authorities of critical materials needed to resolve election disputes, conduct recounts, and certify the ultimate winners. Accordingly, it is the general policy of the Department not to conduct overt investigations, including interviews with individual voters, until after the outcome of the election allegedly affected by the fraud is certified.

In addition, the federal prosecutor has no authority to send FBI Special Agents or Deputy U.S. Marshals to polling places. In fact, a federal statute makes it a felony for any federal official to send "armed men" to the vicinity of open polling places. 18 U.S.C. § 592. In light of these considerations, Department and FBI policy requires that any investigative action that involves an intrusion by federal investigators into the area immediately surrounding an open polling place be approved by the Criminal Division's Public Integrity Section.

## F. EVALUATING AN ELECTION FRAUD ALLEGATION

Not all irregularities in the election process are appropriate for criminal prosecution. It is, for example, not a federal crime for election officials to make negligent mistakes in the administration of an election. Many of these non-criminal lapses are redressed through election contests, recounts, education programs, or disciplinary action against election officials whose mistakes are the result of negligence rather than corruption.

Determining whether an election fraud allegation warrants federal criminal investigation and possible prosecution requires that federal prosecutors and investigators answer two basic questions:

(1) Is criminal prosecution the appropriate remedy for the allegations and facts presented? Criminal prosecution is most appropriate when the facts demonstrate that the defendant's objective was to corrupt the process by which voters were registered, or by which ballots were obtained, cast, or counted.

(2) Is there potential federal jurisdiction over the conduct? Answering this question requires determining whether the conduct is cognizable under the federal criminal statutes that apply to election crimes. These generally allow for the prosecution of corrupt acts that occur in elections when the name of a federal candidate appears on the ballot, that are committed "under color of law," that involve voting by non-citizens, that focus on registering to vote, and when the election fraud is part of a larger public corruption problem reachable using general anti-corruption statutes, such as 18 U.S.C. §§ 201, 666, 1346, 1951, and 1952.

## G. INVESTIGATIVE CONSIDERATIONS IN ELECTION FRAUD CASES

When investigating election fraud, three considerations that are absent from most criminal investigations must be kept in mind: (1) respect for the primary role of the states in administering the voting process, (2) an awareness of the role of the election in the governmental process, and (3) sensitivity to the exercise of First Amendment rights in the election context. As a result, there are limitations on various investigative steps in an election fraud case.

In most cases, election-related documents should not be taken from the custody of local election administrators until the election to which they pertain has been certified and the time for contesting the election results has expired.[3] This avoids interfering with the governmental processes affected by the election.[4]

Another limitation affects voter interviews. Election fraud cases often depend on the testimony of individual voters whose votes were co-opted in one way or another. But in most cases voters should not be interviewed, or other voter-related investigation done, until after the election is over. Such overt investigative steps may chill legitimate voting activities. They

---

[3] This non-interference policy assumes there is no evidence that local election administrators seek to retain or destroy the election records for a corrupt purpose or to further an ongoing election fraud scheme.

[4] In cases in which physical custody may interfere unnecessarily with local election procedures, law enforcement may still take reasonable steps to ensure that such records retain their integrity and are effectively made available to federal law enforcement. Such steps may include the issuance of a grand jury subpoena, and formal and informal agreements concerning the custody, control, and integrity of such records.

are also likely to be perceived by voters and candidates as an intrusion into the election. Indeed, the fact of a federal criminal investigation may itself become an issue in the election.[5]

Some election frauds implicate a voter who participates in a voting act attributed to him or her; such cases include vote-buying schemes, absentee ballot fraud, and the like. Successful prosecution of those who organize such schemes often requires the cooperation of either the voter or the person who attempted to corrupt or take advantage of the voter. Accordingly, federal prosecutors should apply standard Department policies regarding charging decisions when contemplating charges against voters who cooperate and testify truthfully in cases involving organizational voter fraud.

## H. EVALUATING A CAMPAIGN FINANCING ALLEGATION

In general, violations of FECA become crimes when they satisfy a monetary threshold and are committed with specific criminal intent. Non-criminal FECA violations are subject to the exclusive jurisdiction of the FEC. To determine whether a FECA violation warrants criminal investigation, the following questions should be answered:

(1) Does the conduct involve a situation in which the application of the law to the facts is clear? That is, does it violate one of the principal prohibitions of FECA, namely, the prohibitions against:

- Excessive contributions (52 U.S.C. § 30116);

---

[5] Accordingly, the Public Integrity Section must be consulted prior to any voter interviews in the pre-election or balloting period. U.S. DEP'T OF JUSTICE, U.S. ATTORNEYS' MANUAL (USAM) § 9-85.210.

- Corporate and union contributions and coordinated expenditures (52 U.S.C. § 30118);
- Contributions from government contractors (52 U.S.C. § 30119);
- Donations from foreign nationals (52 U.S.C. § 30121);
- Disguised contributions through conduits (52 U.S.C. § 30122);
- Cash contributions (52 U.S.C. § 30123);
- Contributions raised through fraud (52 U.S.C. § 30124(b));
- The solicitation or receipt of "soft money" (funds not raised in compliance with FECA) by national political parties (52 U.S.C. § 30125);
- The conversion of campaign funds (52 U.S.C. § 30114); or
- The concealment of true recipients of expenditures (52 U.S.C. § 3104(b)(5)(A)).

And, if so:

(2) Was the total monetary amount involved in the violation at least $2,000? Most FECA violations become crimes when they aggregate $2,000 or more in a calendar year. Offenses that aggregate at least $25,000 (or *more* than $10,000 in the case of conduit violations) are felonies; offenses under these amounts are misdemeanors. 52 U.S.C. § 30109(d)(1). The Department interprets the significant enhancements to FECA's criminal

penalties enacted in 2002 as reflecting a clear congressional intent that all knowing and willful violations involving sums that aggregate above the statutory minimums for FECA crimes be considered for prosecution.

(3) Was the violation committed under circumstances suggesting that the conduct was "knowing and willful?" FECA violations become potential crimes when they are committed knowingly and willfully, that is, by offenders who acted with knowledge that their conduct was against the law. While this is at times a difficult element to satisfy, examples of evidence supporting the element include: (a) an attempt to disguise or conceal financial activity regulated by FECA; (b) status or prior experience as a campaign official, candidate, professional fundraiser, or lawyer; and (c) efforts by campaigns to notify contributors of applicable campaign finance law (e.g., donor card warnings).

## I. INVESTIGATIVE CONSIDERATIONS IN CAMPAIGN FINANCING CASES

Campaign financing cases have come to occupy an increasingly significant portion of the investigative and prosecutive resources that the Justice Department devotes to election crimes. Because criminal FECA violations require proof that defendants acted with the knowledge that their conduct was unlawful, matters investigated as possible criminal FECA violations generally must fall clearly within FECA's prohibitions.

If a campaign financing offense violates one of FECA's prohibitions and was committed in a manner calculated to conceal it from the public, the Justice Department also may pursue the matter as a conspiracy to defraud the United States under 18 U.S.C. § 371, or as a false statement or record under 18 U.S.C. § 1001 or §1519.

When investigating a criminal violation of FECA, care must be taken not to compromise the FEC's civil and administrative jurisdiction under 52 U.S.C. § 30109(a). All plea agreements involving activities that concern FECA violations should therefore contain an express disclaimer regarding the FEC's civil enforcement authority.

Finally, the public disclosure features of FECA provide investigators a source of information concerning suspicious contributions. The FEC maintains public data in a manner that permits it to be sorted by contributor, date of contribution, amount of contribution, occupation and employer of contributor, and identity of donee. Data is also similarly maintained with respect to expenditures. Therefore, the FEC's public database of financial transactions can be particularly useful in the preliminary stage of campaign financing investigations to evaluate or confirm the likelihood of a FECA violation. This data can be accessed and sorted at www.fec.gov.

## J. CONSULTATION REQUIREMENTS AND RECOMMENDATIONS

Justice Department supervision over the enforcement of all criminal statutes and prosecutive theories involving corruption of the election process, criminal patronage violations, and campaign financing crimes is delegated to the Criminal Division's Public Integrity Section. This Headquarters' consultation policy is set forth in the U.S. DEP'T OF JUSTICE, U.S. ATTORNEYS' MANUAL (USAM), Section 9-85.210. In 1980, the Election Crimes Branch was created within the Public Integrity Section to manage this supervisory responsibility. The Branch is headed by a Director and staffed on a case-by-case basis with Section prosecutors experienced in handling the investigation and prosecution of election crimes.

The Department's consultation requirements for election crime matters are designed to ensure that national standards are maintained for the federal prosecution of election crimes, that investigative resources focus on matters that have prosecutive potential, and that appropriate deference is given to the FEC's civil enforcement responsibilities over campaign financing violations so that the missions of both the Department and the FEC may be fulfilled in each case. The requirements are also intended to help ensure that investigations are pursued in a way that respects both individual voting rights and the states' primary responsibility for administering the electoral process. These requirements are as follows:

### 1. Consultation Requirements for Election Fraud and Patronage Crimes

United States Attorneys' Offices and FBI field offices may conduct a preliminary investigation of an alleged election fraud or patronage crime without consulting the Public Integrity Section. A preliminary investigation is limited to those investigative steps necessary to flesh out the complaint in order to determine whether a federal crime might have occurred and, if so, whether it might warrant federal prosecution. However, a preliminary investigation does not include interviewing voters during the pre-election or balloting periods concerning the circumstances under which they voted, as such interviews have the potential to interfere with the election process or inadvertently chill the exercise of an individual's voting rights.

Consultation with the Public Integrity Section is required to:

- expand an election fraud or patronage investigation beyond a preliminary stage;

- conduct interviews with individual voters during the pre-election period, on election day, or immediately after the election, concerning the circumstances under which they voted;
- issue a subpoena or search warrant in connection with an election fraud or patronage matter;
- present evidence involving an election fraud or patronage matter to a grand jury;
- file a criminal charge involving an election fraud or patronage offense; or
- present an indictment to a grand jury that charges an election fraud or patronage offense.

It is also recommended, although not required, that the Public Integrity Section be consulted with respect to sentencing issues during any plea negotiations in order to ensure consistency with similar cases.

### 2. Consultation Requirements for Campaign Financing Crimes

Additional considerations come into play in cases involving possible campaign financing violations under FECA, notably including the concurrent jurisdiction of the FEC to conduct parallel civil proceedings in this area and the resulting need to coordinate criminal law enforcement with the Commission. Therefore, consultation with the Public Integrity Section is required to:

- conduct *any* inquiry or preliminary investigation in a matter involving a possible campaign financing offense (including Title 18 offenses);
- issue a subpoena or search warrant in connection with a campaign financing matter;
- present evidence involving a campaign financing matter to a grand jury;
- file a criminal charge involving a campaign financing crime; or
- present an indictment to a grand jury that charges a campaign financing crime.

As is the case with election frauds, it also recommended that the Section be consulted with respect to sentencing matters during any plea negotiations in order to ensure consistency with similar cases.

The Public Integrity Section and its Election Crimes Branch are available to assist United States Attorneys' Offices and FBI field offices in handling election crime matters. This assistance includes evaluating election crime allegations, structuring investigations, and drafting indictments and other pleadings. The Election Crimes Branch also serves as the point of contact between the Department of Justice and the FEC, which share enforcement jurisdiction over federal campaign financing violations. Finally, Section attorneys may be available to provide operational assistance in election crime investigations and trials.

# CHAPTER TWO

# CORRUPTION OF THE ELECTION PROCESS

## A. HISTORICAL BACKGROUND

Federal concern over the integrity of the franchise has historically had two distinct areas of focus. The first, to ensure elections that are free from corruption for the general public, is the subject of this chapter. The second, to ensure there is no discrimination against minorities at the ballot box, involves entirely different constitutional and federal interests, and is supervised by the Justice Department's Civil Rights Division.

Federal interest in the integrity of the franchise was first manifested immediately after the Civil War. Between 1868 and 1870, Congress passed the Enforcement Acts, which served as the basis for federal activism in prosecuting corruption of the franchise until most of them were repealed in the 1890s. *See In re Coy*, 127 U.S. 731 (1888); *Ex parte Yarborough*, 110 U.S. 651 (1884); *Ex parte Siebold*, 100 U.S. 371 (1880).

Many of the Enforcement Acts had broad jurisdictional predicates that allowed them to be applied to a wide variety of corrupt election practices as long as a federal candidate was on the ballot. In *Coy*, the Supreme Court held that Congress had authority under the Constitution's Necessary and Proper Clause to regulate any activity during a mixed federal/state election that exposed the federal election to potential harm, whether that harm materialized or not. *Coy* is still good law. *United States v. Slone*, 411 F.3d 643, 647 (6th Cir. 2005); *United States v. Mason*, 673 F.2d 737, 739 (4th Cir. 1982); *United States v. Malmay*, 671 F.2d 869, 874–75 (5th Cir. 1982).

After Reconstruction, federal activism in election matters subsided. The repeal of most of the Enforcement Acts in 1894

eliminated the statutory tools that had encouraged federal activism in election fraud matters. Two surviving provisions of these Acts, now embodied in 18 U.S.C. §§ 241 and 242, covered only intentional deprivations of rights guaranteed directly by the Constitution or federal law. The courts during this period incorrectly held that the Constitution directly conferred a right to vote only for federal officers, and that conduct aimed at corrupting non-federal contests was not prosecutable in federal courts. *See United States v. Gradwell*, 243 U.S. 476 (1917); *Guinn v. United States*, 238 U.S. 347 (1915). Federal attention to election fraud was further incorrectly limited by case law holding that primary elections were not part of the official election process, *Newberry* v. *United States*, 256 U.S. 232 (1918), and by cases like *United States v. Bathgate*, 246 U.S. 220 (1918), which read the entire subject of vote-buying out of federal criminal law, even when it was directed at federal contests.

In 1941, the Supreme Court reversed direction, overturning *Newberry*. The Court recognized that primary elections are an integral part of the process by which candidates are elected to office. *United States v. Classic*, 313 U.S. 299 (1941). *Classic* changed the judicial attitude toward federal intervention in election matters and ushered in a new period of federal activism. Federal courts now regard the right to vote in a fairly conducted election as a constitutionally protected feature of United States citizenship. *Reynolds v. Sims*, 377 U.S. 533 (1964).

In 1973, the use of Section 241 to address election fraud began to expand. *See, e.g.*, *United States v. Anderson*, 481 F.2d 685 (4th Cir. 1973), *aff'd on other grounds*, 417 U.S. 211 (1974). Since then, this statute has been successfully applied to prosecute certain types of local and tribal election fraud. *United States v. Wadena*, 152 F.3d 831, 843–47 (8th Cir. 1998) (applying Section 241 to the fabrication and false notarization of absentee ballots in tribal election); *United States v. Olinger*, 759 F.2d 1293, 1296–98 (7th Cir. 1985) (fabrication of absentee votes in mixed federal state election); *United States v. Stollings*, 501 F.2d 954, 955 (4th Cir. 1974) (rejecting defendant's argument that a federal grand jury lacked authority to

investigate a Section 241 violation involving the contested primary election of a state official).[6]

The mail and wire fraud statutes, 18 U.S.C. §§ 1341 & 1343, have sometimes been proposed as an alternative means to reach local election fraud, under the theory that such schemes defrauded citizens of their right to fair and honest elections. However, such a mail or wire fraud theory is not viable in light of *Skilling v. United States*, 561 U.S. 358 (2010) (honest services mail or wire fraud under 18 U.S.C. § 1346 limited to offenses in the nature of bribery or kickbacks).

Finally, over the past forty years, Congress has enacted new criminal laws with broad jurisdictional bases to combat false voter registrations, vote-buying, multiple-voting, and fraudulent voting in elections in which a federal candidate is on the ballot. 52 U.S.C. §§ 10307(c), 10307(e), 20511. These statutes rest on Congress's power to regulate federal elections (U.S. CONST. art. I, § 4) and on its power under the Necessary and Proper Clause (U.S. CONST. art. I, § 8, cl. 18) to enact laws to protect the federal election process from potential corruption. The federal jurisdictional predicate underlying these statutes is satisfied as long as either the name of a federal candidate is on the ballot, or the fraud involves corruption of the voter registration process in a state where one registers to vote simultaneously for federal as well as other offices. *Slone*, 411 F.3d at 647–48; *United States v. McCranie*, 169 F.3d 723, 727 (11th Cir. 1999).

---

[6] As indicated in the cited cases, Section 241 has been used to prosecute election fraud that affects the vote for federal officials, as well as vote fraud directed at non-federal candidates that involves the corruption of public officials – most often election officers – acting under color of law, i.e., ballot-box stuffing schemes. This latter type of scheme will be referred to in this book as a "public scheme." A scheme that does not involve the necessary participation of corrupt officials acting under color of law, but that affects the tabulation of votes for federal candidates, will be referred to as a "private scheme."

## B. WHAT IS ELECTION FRAUD?

### 1. In General

Election fraud involves a substantive irregularity relating to the voting act – such as bribery, intimidation, or forgery – which has the potential to taint the election itself. During the past century and a half, Congress and the federal courts have articulated the following constitutional principles concerning the right to vote in the United States. Any activity intended to interfere corruptly with any of the principles indicated below may be actionable as a federal crime:

- All qualified citizens are eligible to vote.
- All qualified voters have the right to have their votes counted fairly and honestly.
- Invalid ballots dilute the worth of valid ballots, and therefore will not be counted.
- Every qualified voter has the right to make a personal and independent election decision.
- Qualified voters may opt not to participate in an election.
- Voting shall not be influenced by bribery or intimidation.

Simply put, then, election fraud is conduct intended to corrupt:

- The process by which ballots are obtained, marked, or tabulated,
- The process by which election results are canvassed and certified, or
- The process by which voters are registered.

On the other hand, schemes that involve corruption of other political processes (i.e., political campaigning, circulation of nominating petitions, etc.) do not normally serve as the basis for a federal election crime.

### 2. Conduct that Constitutes Federal Election Fraud[7]

The following activities provide a basis for federal prosecution under the statutes referenced in each category:

- Paying voters for registering to vote, or for voting, in elections in which a federal candidate is on the ballot (52 U.S.C. § 10307(c), 18 U.S.C. § 597), or through the use of interstate facilities (such as the mails or of telephones) in those states in which vote-buying is a "bribery" offense (18 U.S.C. § 1952), as well as in federal elections[8] in those states in which purchased registrations or votes are voidable under applicable state law (52 U.S.C. § 20511(2)).

- Conspiring to prevent voters from participating in elections in which a federal candidate is on the ballot, or when done "under color of law" in *any* election, federal or non-federal (18 U.S.C. §§ 241, 242).

- Voting in federal elections for individuals who do not personally participate in, and assent to, the voting act

---

[7] As used throughout this book, the terms "federal election fraud" and "election fraud" mean fraud relating to an election in which a federal criminal statute applies. As will be discussed below, these terms are not limited to frauds aimed at corrupting federal elections.

[8] For purposes of this book, the term "federal election" means an election in which the name of a federal candidate is on the ballot, regardless of whether there is proof that the fraud caused a vote to be cast for the federal candidate. A "non-federal election" is one in which no federal candidate is on the ballot.

attributed to them, or impersonating voters, or casting ballots in the names of voters who do not vote in federal elections (52 U.S.C. §§ 10307(c), 10307(e), 20511(2)).

- Intimidating voters through physical duress in any type of election (18 U.S.C. § 245(b)(1)(A)), or through physical or economic threats in connection with their registering to vote or voting in federal elections (52 U.S.C. § 20511(1)), or their vote for a federal candidate (18 U.S.C. § 594). If the victim is a federal employee, intimidation in connection with *any* election, federal or non-federal, is prohibited (18 U.S.C. § 610).

- Malfeasance by election officials acting "under color of law" by performing such acts as diluting valid ballots with invalid ones (ballot-box stuffing), rendering false tabulations of votes, or preventing valid voter registrations or votes from being given effect in *any* election, federal or non-federal (18 U.S.C. §§ 241, 242), as well as in elections in which federal candidates are on the ballot (52 U.S.C. §§ 10307(c), 10307(e), 20511(2)).

- Submitting fictitious names to election officers for inclusion on voter registration rolls, thereby qualifying the ostensible voters to vote in federal elections (52 U.S.C. §§ 10307(c), 20511(2)).[9]

- Knowingly procuring eligibility to vote for federal office by persons who are not entitled to vote under applicable state law, notably persons who have committed serious crimes (approximately 40 states) (52 U.S.C. §§ 10307(c),

---

[9] With respect to fraudulent voter registrations, election registration is "unitary" in all 50 states in the sense that a person registers only once to become eligible to cast ballots for both federal and non-federal candidates. Therefore, false information given to establish eligibility to register to vote is actionable federally regardless of the type of election that motivated the subjects to act. *See, e., United States v. Cianciulli*, 482 F. Supp. 585, 617 (E.D. Pa. 1979).

20511(2)), and persons who are not United States citizens (currently all states) (52 U.S.C. §§ 10307(c), 20511(2); 18 U.S.C. §§ 1015(f), 611).

- Knowingly making a false claim of United States citizenship to register to vote or to vote in any election (18 U.S.C. § 1015(f)), or falsely and willfully claiming U.S. citizenship for, *inter alia,* registering or voting in any election (18 U.S.C. § 911).

- Providing false information concerning a person's name, address, or period of residence in a voting district to establish that person's eligibility to register or to vote in a federal election (52 U.S.C. §§ 10307(c), 20511(2)).

- Causing the production of voter registrations that qualify alleged voters to vote for federal candidates, or the production of ballots in federal elections, that the actor knows are materially defective under applicable state law (52 U.S.C. § 20511(2)).

- Using the mails or interstate wire facilities to obtain the salary and emoluments of an elected official through any of the activities mentioned above (18 U.S.C. §§ 1341, 1343). Depending on the Circuit, this "salary theory" of mail and wire fraud has potential as a prosecutive theory that would extend federal criminal jurisdiction to election fraud schemes, including those that occurred in non-federal elections.[10]

[10] *Compare United States v. Ratcliff*, 488 F.3d 639, 647 (5th Cir. 2007) (candidate lied to election ethics board about illegal campaign loans), *United States v. Turner*, 459 F.3d 775, 784–90 (6th Cir. 2006) (defendant fraudulently concealed illegal contributions and bribed voters to vote for candidate), *Westchester Cnty. Indep. Party v. Astorino*, No. 13–CV–7737(KMK), 2015 WL 5883718, at *11–12 (S.D.N.Y. Oct. 8, 2015) (holding that "a person who has committed election fraud in order to obtain the normal salary given to the person holding that elected office has not committed money or property fraud, because the victim the government – has not

- Ordering, keeping, or having under one's authority or control any troops or armed persons at any polling place in *any* election, federal or non-federal. The actor must be an active civilian or military officer or employee of the United States Government (18 U.S.C. § 592).

### 3. Conduct that Does Not Constitute Federal Election Fraud

Various types of conduct that may adversely affect the election of a federal candidate may not constitute a federal election crime, despite what in many instances might be their reprehensible character. For example, a federal election crime does not normally involve irregularities relating to: (1) distributing inaccurate campaign literature, (2) campaigning too close to the polls, (3) engaging in activities to influence an opponent's withdrawal from an election, or (4) failing to comply with state-mandated voting procedures through the negligence of election officials. Also, "facilitation benefits," e.g., things of value given to voters to make it easier for them to cast a ballot that are not intended to stimulate or reward the voting act itself, such as a ride to the polls or a stamp to mail an absentee ballot, do not ordinarily involve federal crimes.

---

been deprived either of any money or property or the choice in how to spend the money"), *and United States v. George*, No. 86–CR–123, 1987 WL 48848, at *2 (W.D. Ky. Oct. 20, 1987) (similar), *with United States v. Schermerhorn*, 713 F. Supp. 88, 92 (S.D.N.Y. 1989) (scheme to conceal that state senate candidate was being financed by organized crime in violation of state campaign financing laws held actionable under the salary theory), *United States v. Webb*, 689 F. Supp. 703 (W.D. Ky. 1988) (scheme to fraudulently elect sheriff by procuring false absentee ballots held actionable under the salary theory), *and United States v. Ingber*, Cr. No. 86-1402 (2d Cir. Feb. 4, 1987) (unpublished), *quoted in Ingber v. Enzor*, 664 F. Supp. 814, 815–16 (S.D.N.Y. 1987) (*habeas* opinion).

### 4. Conditions Conducive to Election Fraud

Most election fraud is aimed at corrupting elections for local offices, which control or influence patronage positions and contracting for materials and services. Election fraud schemes are thus often linked to such other crimes as protection of illegal activities, corruption of local governmental processes, and patronage abuses.

Election fraud does not normally occur in jurisdictions where one political faction enjoys widespread support among the electorate, because in such a situation it is usually unnecessary or impractical to resort to election fraud in order to control local public offices.[11] Instead, election fraud occurs most frequently when there are fairly equal political factions, and when the stakes involved in who controls public offices are weighty – as is often the case when patronage jobs are a major source of employment, or when illicit activities are being protected from law enforcement scrutiny. In sum, election fraud is most likely to occur in electoral jurisdictions where there is close factional competition for an elected position that matters.

### 5. Voter Participation Versus Non-voter Participation Cases

As a practical matter, election frauds fall into two basic categories: those in which individual voters do not participate in the fraud, and those in which they do. The investigative approach and prosecutive potential are different for each type of case.

---

[11] Election fraud might occur at the local level in districts controlled by one political faction in order to affect a contested election in a larger jurisdiction. For example, a corrupt mayor assured of his own reelection might nevertheless engage in election fraud for the purpose of affecting a state-wide election that is perceived to be close.

### (a) Election frauds not involving the participation of voters

The first category involves cases when voters do not participate, in any way, in the voting act attributed to them. These cases include ballot-box stuffing cases, ghost voting cases, and "nursing home" frauds.[12] All such matters are potential federal crimes. Proof of these crimes depends largely on evidence generated by the voting process, or on handwriting exemplars taken from persons who had access to voting materials, and thus the opportunity to misuse them. Some of the more common ways these crimes are committed include:

- Placing fictitious names on the voter rolls. This "deadwood" allows for fraudulent ballots, which can be used to stuff the ballot box.

- Casting bogus ballots in the names of persons who did not vote.

- Obtaining and marking absentee ballots without the active input of the voters involved. Absentee ballots are particularly susceptible to fraudulent abuse because, by definition, they are marked and cast outside the presence of election officials and the structured environment of a polling place.

- Falsifying vote tallies.

[12] An example of a successfully prosecuted nursing home fraud is *United States v. Odom*, 736 F.2d 104, 106–08 (4th Cir. 1984), which involved a scheme by local law enforcement officials and others to vote the absentee ballots of mentally incompetent residents.

### (b) Election frauds involving the participation of voters

The second category of election frauds includes cases in which the voters do participate, at least to some extent, in the voting acts attributed to them. Common examples include:

- Vote-buying schemes;
- Absentee ballot frauds;
- Voter intimidation schemes;
- Migratory-voting (or floating-voter) schemes;
- Voter "assistance" frauds, in which the wishes of the voters are ignored or not sought.

Successful prosecution of these cases usually requires the cooperation and testimony of the voters whose ballots were corrupted. This requirement presents several difficulties. An initial problem is that the voters themselves might be technically guilty of participating in the scheme. However, because the voters can often be considered victims, in appropriate cases federal prosecutors should consider declining to prosecute them in exchange for truthful cooperation against organizers of such schemes.

The second difficulty encountered in cases when voters participate is that the voter's presence alone may suggest that he or she "consented" to the defendant's conduct (marking the ballot, taking the ballot, choosing the candidates, etc.). *Compare United States v. Salisbury*, 983 F.2d 1369, 1379 (6th Cir. 1993) (leaving unanswered the question whether a voter who signs a ballot envelope at the defendant's instruction but is not allowed to choose the candidates has consented to having the defendant mark the ballot), *with United States v. Cole*, 41 F.3d 303, 308 (7th Cir. 1994) (finding

that voters who merely signed ballots subsequently marked by the defendant were not expressing their own electoral preferences).

While the presence of the ostensible voter when another marks his or her ballot does not negate whatever crime might be occurring, it thus may increase the difficulty of proving the crime. This difficulty is compounded because those who commit this type of crime generally target vulnerable members of society, such as persons who are uneducated, socially disadvantaged, or impoverished and dependent upon government services – precisely the types of people who are likely targets for manipulation or intimidation. Therefore, in cases when the voter is present when another person marks his or her ballot, the evidence should show that the defendant either procured the voter's ballot through means that were themselves corrupt (such as bribery or threats), or that the defendant marked the voter's ballot without the voter's consent or input. *United States v. Boards*, 10 F.3d 587, 589 (8th Cir. 1993); *Cole,* 41 F.3d at 308.

## C. JURISDICTIONAL SUMMARY

Under the Constitution, the states retain broad jurisdiction over the elective process. When the federal government enters the field of elections, it does so to address specific federal interests, such as: (1) the protection of the voting rights of racial, ethnic, or language-minorities, a specific constitutional right; (2) the registration of voters to vote in federal elections; (3) the standardization and procurement of voting equipment purchased with federal funds; (4) the protection of the federal election process against corruption; (5) the protection of the voting process from corruption accomplished under color of law; and (6) the oversight of non-citizen and other voting by persons ineligible to vote under applicable state law.

Most federal election crime statutes do not apply to all elections. Several apply only to elections in which federal candidates are on the ballot, and a few require proof either that the fraud was intended to influence a federal contest or that a federal contest was affected by the fraud.

For federal jurisdictional purposes, there are two fundamental types of elections in which federal election crimes may occur: federal elections, in which the ballot includes the name of one or more candidates running for federal office; and non-federal elections, in which only the names of local or state candidates are on the ballot. Elections in which the ballot includes the names of both federal and non-federal candidates, often referred to as "mixed" elections, are "federal elections" for the purpose of the federal election crime statutes.

### 1. Statutes Applicable to Non-Federal Elections

Several federal criminal statutes can apply to purely non-federal elections, in addition to federal or mixed elections:

- 52 U.S.C. § 10307(c) and § 20511(2)(A), and 18 U.S.C. § 1015(f) – any fraud that is aimed at the process by which voters are registered, notably schemes to furnish materially false information to election registrars;

- 18 U.S.C. § 241 – any conspiracy to interfere with federal voting rights, and certain conspiracies involving state voting rights;

- 18 U.S.C. § 242 – any scheme that involves the necessary participation of public officials, usually election officers or notaries, acting "under color of law," which is actionable as a derogation of the "one person, one vote" principle of the 14th Amendment, i.e., "public schemes;"[13]

- 18 U.S.C. § 245(b)(1)(A) – physical threats or reprisals against candidates, voters, poll watchers, or election officials;

[13] If a public scheme involves bribery or kickbacks, federal prosecutors should also evaluate whether a public scheme may be charged as a deprivation of honest services. 18 U.S.C. §§ 1341, 1343, 1346.

- 18 U.S.C. § 592 – "armed" persons stationed at the polls;

- 18 U.S.C. § 609 – coercion of voting among the military;

- 18 U.S.C. § 610 – coercion of federal employees for political activity;

- 18 U.S.C. § 911 – fraudulent assertion of United States citizenship;

- 18 U.S.C. §§ 1341, 1343 – schemes involving the mails or interstate wires to corrupt elections that are predicated on the "salary" or "pecuniary loss" theories; and

- 18 U.S.C. § 1952 – schemes to use the mails or an interstate facility (such as a telephone) in furtherance of vote-buying activities in states that treat vote-buying as bribery.

### 2. Statutes Applicable to Federal Elections Only

The following additional statutes apply to federal (including "mixed") elections, but not to purely non-federal elections:[14]

- 18 U.S.C. § 594 – intimidation of voters;

- 18 U.S.C. § 597 – payments to vote, or to refrain from voting, for a federal candidate;

- 18 U.S.C. § 608(b) – vote-buying and false registration under the Uniformed and Overseas Citizens Absentee Voting Act;

---

[14] The name of a federal candidate on the ballot is sufficient to obtain federal jurisdiction.

- 18 U.S.C. § 611 – voting by aliens;
- 52 U.S.C. § 10307(c) – payments for voting and conspiracies to encourage illegal voting;
- 52 U.S.C. § 10307(e) – multiple-voting;
- 52 U.S.C. § 20511(1) – voter intimidation; and
- 52 U.S.C. § 20511(2) – fraudulent voting.

## D. STATUTES[15]

### 1. Conspiracy Against Rights: 18 U.S.C. § 241

Section 241 makes it unlawful for two or more persons to "conspire to injure, oppress, threaten, or intimidate any person in any State, Territory, Commonwealth, Possession, or District in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States." Violations are punishable by imprisonment for up to ten years or, if death results, by imprisonment for any term of years or for life, or by a sentence of death.

The Supreme Court long ago recognized that the right to vote for federal offices is among the rights secured by Article I, Sections 2 and 4, of the Constitution, and hence is protected by Section 241. *United States v. Classic*, 313 U.S. 299 (1941); *Ex parte Yarborough*, 110 U.S. 651 (1884). Although the statute was enacted just after the Civil War to address efforts to deprive the newly emancipated slaves of the basic rights of citizenship, such as the right to vote, it has been interpreted to

---

[15] The text of the statutes discussed below is printed in Appendix C. Each statute carries, in addition to the prison term noted, fines applicable under 18 U.S.C. § 3571.

include any effort to derogate any right that flows from the Constitution or from federal law.

Section 241 has been an important statutory tool in election crime prosecutions. Originally held to apply only to schemes to corrupt elections for federal office, it has been successfully applied to non-federal elections as well, provided that state action was a necessary feature of the fraud. This state action requirement can be met not only by the participation of poll officials and notaries public, but by activities of persons who clothe themselves with the appearance of state authority, e.g., with uniforms, credentials, and badges. *Williams v. United States*, 341 U.S. 97 (1951).

Section 241 embraces conspiracies to:

- stuff a ballot box with forged ballots, *United States v. Saylor*, 322 U.S. 385 (1944); *United States v. Mosley*, 238 U.S. 383 (1915);

- prevent the official count of ballots in primary elections, *United States v. Classic,* 313 U.S. 299 (1941);

- destroy voter registration applications, *United States v. Haynes*, Nos. 91-5979, 91-6076, 1992 WL 296782, at *1 (6th Cir. Oct. 15, 1992);

- destroy ballots, *United States v. Townsley*, 843 F.2d 1070, 1073–75 (8th Cir. 1988);

- exploit the infirmities of elderly or handicapped people by casting absentee ballots in their names, *United States v. Morado*, 454 F.2d 167, 171 (5th Cir. 1972);

- illegally register voters and cast absentee ballots in their names, *United States v. Weston*, 417 F.2d 181, 182–85 (4th Cir. 1969);

- injure, threaten, or intimidate a voter in the exercise of his right to vote, *Fields v. United States*, 228 F.2d 544 (4th Cir. 1955);

- impersonate qualified voters, *Crolich v. United States*, 196 F.2d 879, 879 (5th Cir. 1952);

- fail to count votes and to alter votes counted, *Ryan v. United States*, 99 F.2d 864, 866 (8th Cir. 1938); *Walker v. United States*, 93 F.2d 383, 386 (8th Cir. 1937); and

- steal votes by changing the votes cast by voters at voting machines, *United States v. Thompson*, No. 6:09–16–KKC, 2013 WL 5528827, at *1 (E.D. Ky. Oct. 4, 2013).

Section 241 should be considered when addressing schemes to thwart voting in federal elections. In 2005, Section 241 was charged, along with telephone harassment charges under 47 U.S.C. § 223, in a scheme to jam the telephone lines of two get-out-the-vote services that were perpetrated to prevent voters from obtaining rides to the polls in the 2002 general elections. While the defendant was convicted only on the telephone harassment charges, the district court held that Section 241 applied to the facts (*United States v. Tobin*, No. 04-216-01 (SM), 2005 WL 3199672, at *1–3 (D.N.H. Nov. 30, 2005)).

Section 241 does not require that the conspiracy be successful, *United States v. Bradberry*, 517 F.2d 498, 499 n.6 (7th Cir. 1975), nor need there be proof of an overt act. *United States v. Colvin*, 353 F.3d 569, 576 (7th Cir. 2003); *United States v. Whitney*, 229 F.3d 1296, 1301 (10th Cir. 2000). *But see United States v. Brown*, 49

F.3d 1162, 1165 (6th Cir. 1995) (stating in dicta that Section 241 requires an overt act). Section 241 reaches conduct affecting the integrity of the federal election process as a whole, and does not require fraudulent action with respect to any particular voter. *United States v. Nathan*, 238 F.2d 401, 407 (7th Cir. 1956).

On the other hand, Section 241 does not reach schemes to corrupt the balloting process through voter bribery, *United States v. Bathgate*, 246 U.S. 220 (1918), even schemes that involve poll officers to ensure that the bribed voters mark their ballots as they were paid to do, *United States v. McLean*, 808 F.2d 1044, 1048–49 (4th Cir. 1987) (noting, however, that Section 241 may apply when vote-buying occurs in conjunction with other corrupt practices, such as ballot-box stuffing).

Section 241 prohibits only conspiracies to interfere with rights flowing directly from the Constitution or federal statutes. This element has led to considerable judicial speculation over the extent to which the Constitution protects the right to vote for candidates running for non-federal offices. *Oregon v. Mitchell*, 400 U.S. 112 (1970); *Reynolds v. Sims*, 377 U.S. 533 (1964); *Blitz v. United States*, 153 U.S. 308 (1894); *In re Coy*, 127 U.S. 731 (1888); *Ex parte Siebold*, 100 U.S. 371 (1880)*; see also Duncan v. Poythress*, 657 F.2d 691, 699–706 (5th Cir. 1981). While *dicta* in *Reynolds* casts the parameters of the federally protected right to vote in extremely broad terms, in a ballot fraud case ten years later, the Supreme Court specifically refused to decide whether the federally secured franchise extended to non-federal contests. *Anderson v. United States*, 417 U.S. 211 (1974).

The use of Section 241 in election fraud cases generally falls into two types: "public schemes" and "private schemes." A public scheme is one that involves the necessary participation of a public official acting under the color of law. In election fraud cases, this public official is usually an election officer using his office to dilute valid ballots with invalid ballots, or to otherwise corrupt an honest vote tally in derogation of the Equal Protection and Due Process

Clauses of the Fourteenth Amendment. *See, e.g.*, *Haynes*, 1992 WL 296782, at *1; *Townsley*, 843 F.2d at 1073–75; *United States v. Howard*, 774 F.2d 838 (7th Cir. 1985); *United States v. Olinger*, 759 F.2d 1293 (7th Cir. 1985); *Anderson*, 481 F.2d at 689. Another case involving a public scheme turned on the necessary participation of a notary public who falsely notarized forged voter signatures on absentee ballot materials in an Indian tribal election. *United States v. Wadena*, 152 F.3d 831, 855 (8th Cir. 1998).

A private scheme is a pattern of conduct that does not involve the necessary participation of a public official acting under color of law, but that can be shown to have adversely affected the ability of qualified voters to vote in elections in which federal candidates were on the ballot. Examples of private schemes include: (1) voting fraudulent ballots in mixed elections, and (2) thwarting get-out-the-vote or ride-to-the-polls activities of political factions or parties through such methods as jamming telephone lines or vandalizing motor vehicles.

Public schemes may be prosecuted under Section 241 regardless of the nature of the election, i.e., elections with or without a federal candidate. On the other hand, private schemes can be prosecuted under Section 241 only when the objective of the conspiracy was to corrupt a specific federal contest, or when the scheme can be shown to have affected, directly or indirectly, the vote count for a federal candidate, e.g., when fraudulent ballots were cast for an entire party ticket that included a federal office.

### 2. Deprivation of Rights under Color of Law: 18 U.S.C. § 242

Section 242, also enacted as a post-Civil War statute, makes it unlawful for anyone acting under color of law, statute, ordinance, regulation, or custom to willfully deprive a person of any right, privilege, or immunity secured or protected by the Constitution or laws of the United States. Violations are one-year misdemeanors unless bodily injury occurs, in which case the penalty is ten years,

unless death results, in which case the penalty is imprisonment for any term of years or for life, or a sentence of death.

Prosecutions under Section 242 need not show the existence of a conspiracy. However, the defendants must have acted illegally "under color of law," i.e., the case must involve a public scheme, as discussed above. This element does not require that the defendant be a *de jure* officer or a government official; it is sufficient if he or she jointly acted with state agents in committing the offense, *United States v. Price*, 383 U.S. 787 (1966), or if his or her actions were made possible by the fact that they were clothed with the authority of state law, *Williams v. United States*, 341 U.S. 97 (1951); *United States v. Classic*, 313 U.S. 299 (1941).

Because a Section 242 violation can be a substantive offense for election fraud conspiracies prosecutable under Section 241, the cases cited in the discussion of Section 241 that involve public schemes (i.e., those involving misconduct under color of law) apply to Section 242.

### 3. False Information in, and Payments for, Registering and Voting: 52 U.S.C. § 10307(c)

Section 10307(c) makes it unlawful, in an election in which a federal candidate is on the ballot, to knowingly and willfully: (1) give false information as to name, address, or period of residence for the purpose of establishing one's eligibility to register or vote; (2) pay, offer to pay, or accept payment for registering to vote or for voting; or (3) conspire with another person to vote illegally. Violations are punishable by imprisonment for up to five years.

**(a) The basis for federal jurisdiction**[16]

Congress added Section 10307(c) (originally codified as 42 U.S.C. § 1973i(c)) to the 1965 Voting Rights Act to ensure the integrity of the balloting process in the context of an expanded franchise. In so doing, Congress intended that Section 10307(c) have a broad reach. In fact, the original version of Section 10307(c) would have applied to all elections. However, constitutional concerns were raised during congressional debate on the bill, and the provision's scope was narrowed to elections that included a federal contest. Section 10307(c) rests on Congress's power to regulate federal elections and on the Necessary and Proper Clause. U.S. CONST. art. I, § 4; art. I, § 8, cl. 18; *United States v. Slone*, 411 F.3d 643, 648–49 (6th Cir. 2005).

Section 10307(c) has been held to protect two distinct aspects of a federal election: the actual results of the election, and the integrity of the process of electing federal officials. *United States v. Cole*, 41 F.3d 303, 307 (7th Cir. 1994). In *Cole*, the Seventh Circuit held that federal jurisdiction is satisfied so long as a single federal candidate is on the ballot – even if the federal candidate is unopposed – because fraud in a mixed election automatically has an impact on the integrity of the federal election process. *See also Slone*, 411 F.3d at 648–49; *McCranie*, 169 F.3d at 727 (jurisdiction under Section 10307(c) satisfied by the name of unopposed federal candidate on ballot); *United States v. Douglas*, No. 309-014, 2010 WL 737330, at *4 (S.D. Ga. Mar. 2, 2010).

Section 10307(c) is particularly useful for two reasons: (1) it eliminates the unresolved issue of the scope of the constitutional right to vote in matters not involving racial discrimination, and (2) it eliminates the need to prove that a given pattern of corrupt conduct had an actual impact on a federal election. It is sufficient under

---

[16] The discussion here concerning federal jurisdiction under Section 10307(c) applies equally to its companion statute, 52 U.S.C. § 10307(e), which addresses multiple-voting with a federal jurisdictional predicate phrased precisely the same way.

Section 10307(c) that a pattern of corrupt conduct took place during a mixed election; in that situation it is presumed that the fraud will expose the federal race to potential harm. *Slone*, 411 F.3d at 647 (collecting cases).

Cases arising under this statute that involve corruption of the process by which individuals register, as distinguished from the circumstances under which they vote, present a different federal jurisdictional issue that is easily satisfied. This is because voter registration in every state is “unitary” in the sense that one registers to vote only once in order to become eligible to vote for all candidates on the ballot – local, state, and federal. Although a state could choose to maintain separate registration lists for federal and non-federal elections, at the time this book was written, no state had chosen to do so. Consequently, any corrupt act that affects the voter registration process and that can be reached under Section 10307(c) satisfies this federal jurisdictional requirement. An excellent discussion of this issue is contained in *United States v. Cianciulli*, 482 F. Supp. 585, 617–18 (E.D. Pa. 1979).

**(b) False information to an election official**

The “false information” provision of Section 10307(c) prohibits any person from furnishing certain false data to an election official to establish eligibility to register or to vote in a federal election. The statute applies to three types of information: name, address, and period of residence in the voting district. *See, e.g.*, *United States v. Collins*, 685 F.3d 651, 653, 657 (7th Cir. 2012) (candidate established residency using false address in order to vote and run for public office). False information concerning other factors (such as citizenship, felon status, and mental competence) are not covered by this provision.[17]

---

[17] Such matters may, however, be charged as conspiracies to encourage illegal voting under the conspiracy clause of Section 10307(c); as citizenship offenses under, *inter alia*, 18 U.S.C. §§ 911 and 1015(f); or under the broad “false information” provision of 52 U.S.C. § 20511. These statutes will be discussed below.

As just discussed, registration to vote is "unitary," i.e., a single registration qualifies the applicant to cast ballots for all elections. Thus, the jurisdictional requirement that the false information be used to establish eligibility to vote in a federal election is satisfied automatically whenever a false statement is made to get one's name on the registration rolls. *See United States v. Bowman*, 636 F.2d 1003, 1008 (5th Cir. 1981).

On the other hand, when the false data is furnished to poll officials for the purpose of enabling a voter to cast a ballot in a particular election (as when one voter attempts to impersonate another), it must be shown that a federal candidate was being voted upon at the time. In such situations, the evidence should show that the course of fraudulent conduct could have jeopardized the integrity of the federal race, or, at a minimum, that the name of a federal candidate was on the ballot. *United States v. Carmichael*, 685 F.2d 903, 908–09 (4th Cir. 1982).

In *United States v. Boards*, 10 F.3d 587 (8th Cir. 1993), the Eighth Circuit confirmed the broad reach of the "false information" provision of Section 10307(c). The defendants in this case, and their unindicted co-conspirators, had obtained and marked the absentee ballots of other registered voters by forging the voters' names on ballot applications and directing that the ballots be sent to a post office box without the voters' knowledge. *Id*. at 588. The district court incorrectly granted post-verdict judgments of acquittal as to those counts in which the defendants' roles were limited to fraudulently completing an application for an absentee ballot, based on its conclusions that: (1) the statute did not extend to ballot applications, (2) the statute did not cover giving false information as to the names of real voters (as opposed to fictitious names), and (3) the defendants could not be convicted when the ballots were actually voted by an unidentified co-conspirator. *Id.* at 589.

The court of appeals rejected each of these narrow interpretations of Section 10307(c). It first held that an application for a ballot falls within the broad definition of "vote" in the statute,

"because an absentee voter must first apply for an absentee ballot as a 'prerequisite to voting.'" *Id.* at 589 (quoting the definition of "vote" in 52 U.S.C. § 10310(c)(1)). The court also held that by using the names of real registered voters on the applications, the defendants "[gave] false information as to [their] name[s]" within the meaning of Section 10307(c).[18] *Id.* Finally, the court held that one of the defendants, whose role was limited to completing absentee ballot applications for ballots that others used to fraudulently vote, was liable under 18 U.S.C. § 2 as an aider and abettor. *Id.* at 589–90.

Subsequently, in *United States v. Smith*, the Eleventh Circuit held that each forgery of a voter's name on a ballot document or on an application for a ballot constituted a separate offense under the "false information as to name" clause of Section 10307(c). 231 F.3d 800, 815 (11th Cir. 2000).

Section 10307(c)'s false information clause is particularly useful when the evidence shows that a voter's signature (name) was forged on an election-related document, for example: (1) when signatures on poll lists are forged by election officials who are stuffing a ballot box, (2) when a voter's signature on an application for an absentee ballot is forged, or (3) when bogus voter registration documents are fabricated in order to get names on voter registries.

Some, but not all, states permit a practice commonly known as "bounty-hunting," that is, paying people to collect voter registrations on a per-registration basis. Where it is allowed, it is not unusual to find that this method of remuneration provides a motive for the unscrupulous to forge voter registrations and to enhance the piecework payments they can receive. While this situation usually does not result in fraudulent votes actually being cast, it does cause voter registration offices to become overloaded with the task of processing large numbers of bogus registrations immediately prior to an

---

[18] The Eighth Circuit observed that "[b]ecause only registered voters are eligible to apply for and vote absentee ballots, the use of real registered voters' names was essential to the scheme to obtain and fraudulently vote absentee ballots . . . ." *Id.*

election, when the resources of those offices should be directed at preparing ballots and staffing polling sites. It also risks overloading voter rolls with "deadwood" names, which in turn undermines public confidence in the election process. Thus, even when no fraudulent votes result from bounty-hunting, the fraudulent registrations that arise from this conduct are not victimless offenses. Federal prosecutors should be cognizant of these circumstances and, when evidence of fraudulent registrations inspired by bounty-hunting is discovered, should consider prosecuting the individuals submitting the false registrations, as well as, in appropriate circumstances, the organizations that employ and pay them, under Section 10307(c).

### (c) Vote-Buying

The clause of Section 10307(c) that prohibits vote-buying does so in broad terms, covering any payment made or offered to a would-be voter "for registering to vote or for voting" in an election when the name of a federal candidate appears on the ballot.[19] Section 10307(c) applies as long as a pattern of vote-buying exposes a federal election to potential corruption, even though it cannot be shown that the threat materialized.

This aspect of Section 10307(c), is directed at eliminating commercial considerations from the voting process. *See United States v. Thomas*, 510 F.3d 714, 717 (7th Cir. 2007); *United States v. Garcia*, 719 F.2d 99, 102 (5th Cir. 1983); *United States v. Mason*, 673 F.2d 737, 739 (4th Cir. 1982); *United States v. Bowman*, 636 F2d. 1003, 1012 (5th Cir. 1981). The statute rests on the premises that potential

---

[19] The federal criminal code contains another vote-buying statute, 18 U.S.C. § 597, which has a narrower scope and provides for lesser penalties than Section 10307(c). Section 597 prohibits making or offering to make an expenditure to any person to vote or withhold his or her vote for a federal candidate. Non-willful violations of Section 597 are one-year misdemeanors; willful violations are two-year felonies. Section 597 and 52 U.S.C. § 10307(c) are distinct offenses, since each requires proof of an element that the other does not. *Whalen v. United States*, 445 U.S. 684 (1980); *Blockburger v. United States*, 284 U.S. 299 (1932). Whereas Section 597 requires that the payment be made to influence a federal election, Section 10307(c) requires that the defendant acted "knowingly and willfully."

voters can choose not to vote; that those who choose to vote have a right not to have the voting process diluted with ballots that have been procured through bribery; and that the selection of the nation's leaders should not degenerate into a spending contest, with the victor being the candidate who can pay the most voters. *See United States v. Blanton*, 77 F. Supp. 812, 816 (E.D. Mo. 1948).

The bribe may be anything having monetary value, including cash, liquor, lottery chances, and welfare benefits such as food stamps. *Garcia*, 719 F.2d at 102. However, offering free rides to the polls or providing employees paid leave while they vote are not prohibited. *United States v. Lewin*, 467 F.2d 1132, 1136 (7th Cir. 1972). Such things are given to make it easier for people to vote, not to induce them to do so. This distinction is important. For an offer or a payment to violate Section 10307(c), it must have been intended to induce or reward the voter for engaging in one or more acts necessary to cast a ballot. Section 10307(c) does *not* prohibit offering or giving things having pecuniary value, such as a ride to the polls or time off from work, to help individuals who have already made up their minds to vote to do so.

Moreover, payments made for some purpose other than to induce or reward voting activity, such as remuneration for campaign work, do not violate this statute. *See United States v. Canales* 744 F.2d 413, 423 (5th Cir. 1984) (upholding conviction because jury justified in inferring that payments were for voting, not campaign work). Similarly, Section 10307(c) does not apply to payments made to signature-gatherers for voter registrations such individuals may obtain. However, such payments become actionable under Section 10307(c) if they are shared with the person being registered.

Finally, Section 10307(c) does not require that the offer or payment be made with a specific intent to influence a federal contest. It is sufficient that the name of a federal candidate appeared on the ballot in the election when the payment or offer of payment occurred. *Slone*, 411 F.3d at 647–48; *McCranie*, 169 F.3d at 725 (payments to vote for county commissioner); *Cole*, 41 F.3d at 306–07 (unopposed

House and Senate candidates on ballot); *United States v. Daugherty*, 952 F.2d 969, 970 (8th Cir. 1991) (payments to vote for several local candidates); *United States v. Odom*, 858 F.2d 664, 665–66 (11th Cir. 1988) (payments to vote for state representative); *United States v. Campbell*, 845 F.2d 782, 784 (8th Cir. 1988); (payments to benefit a candidate for county judge); *Garcia*, 719 F.2d at 100 (food stamps to vote for candidate for county judge); *Malmay*, 671 F.2d at 870 (payments to vote for school board member); *Carmichael*, 685 F.2d at 905 (payments for sheriff).

#### (d) Conspiracy to cause illegal voting

The second clause of Section 10307(c) criminalizes conspiracies to encourage "illegal voting."[20] The phrase "illegal voting" is not defined in the statute. On its face it encompasses unlawful conduct in connection with voting. It has potential application to those who undertake to cause others to register or vote in conscious derogation of state or federal laws. *Cianciulli*, 482 F.Supp. at 616 (noting that this clause would prohibit "vot[ing] illegally in an improper election district"). For example, all states require voters to be United States citizens, and most states disenfranchise people who have been convicted of certain crimes, who are mentally incompetent, or who possess other disabilities that may warrant restriction of the right to vote. This provision requires that the voters participate in the conspiracy.[21]

The conspiracy provision of Section 10307(c) applies only to the statute's "illegal voting" clause. *Olinger*, 759 F.2d at 1298–1300. Conspiracies arising under the other clauses of Section 10307(c) (i.e., those involving vote-buying or fraudulent registration) should be charged under the general federal conspiracy statute, 18 U.S.C. § 371.

---

[20] Violations of this provision are felonies.

[21] False statements involving any fact that is material to registering or voting under state law may also be prosecuted under 52 U.S.C. § 20511, as will be discussed in Part D.7 of this chapter.

**4. Voting More than Once: 52 U.S.C. § 10307(e)**

Section 10307(e), enacted as part of the 1975 amendments to the Voting Rights Act of 1965, makes it a crime to vote "more than once" in any election in which a federal candidate is on the ballot. Violations are punishable by imprisonment for up to five years.

The federal jurisdictional basis for this statute is identical to that for 52 U.S.C. § 10307(c), which is discussed in detail above.

Section 10307(e) is most useful as a statutory weapon against frauds that do not involve the participation of voters in the balloting acts attributed to them. Examples of such frauds are schemes to cast ballots in the names of voters who were deceased or absent, *Olinger*, 759 F.2d at 1297; schemes to exploit the infirmities of the mentally handicapped by casting ballots in their names, *United States v. Odom*, 736 F.2d 104, 106 (4th Cir. 1984); and schemes to cast absentee ballots in the names of voters who did not participate in and consent to the marking of their ballots, *Smith*, 231 F.3d at 804–05.

Most cases prosecuted under the multiple-voting statute have involved defendants who physically marked ballots outside the presence of the voters in whose names they were cast – in other words, without the voters' participation or knowledge.

The statute may also be applied successfully to schemes when the voters are present but do not participate in any way, or otherwise consent to the defendant's assistance, in the voting process. However, when the scheme involves "assisting" voters who are present and who also marginally participate in the process, such as by signing a ballot document, prosecuting the case under Section 10307(e) might present difficulties. For instance, in *United States v. Salisbury*, 983 F.2d 1369, 1372 (6th Cir. 1993), the defendant got voters to sign their absentee ballot forms, and then instructed them how to mark their ballots, generally without allowing them to choose the candidates – and even in some cases without disclosing the identity of

the candidates on the ballot. In a few cases the defendant also personally marked others' ballots. *Id.* The Sixth Circuit held that the concept "votes more than once" in Section 10307(e) was unconstitutionally vague as applied to these facts. *Id.* at 1379. Because the phrase "votes more than once" was not defined in the statute, the court found the phrase did not clearly apply when the defendant did not physically mark another's ballot. *Id.* The court further held that, even if the defendant did mark another's ballot, it wasn't clear this was an act of "voting" by the defendant if the defendant got the ostensible voters to demonstrate "consent" by signing their names to the accompanying ballot forms. *Id.*[22]

In a similar multiple-voting opinion published one year after the Sixth Circuit's *Salisbury* decision, however, the Seventh Circuit, with the benefit of more detailed jury instructions, took a different approach. *United States v. Cole*, 41 F.3d 303 (7th Cir. 1994). In both cases, the defendants had marked absentee ballots of other persons after getting the voters to sign their ballot documents. The Seventh Circuit rejected the Sixth Circuit's contention that the term "vote" was unconstitutionally vague, finding that the term was broadly and adequately defined in the Voting Rights Act itself, 52 U.S.C. § 10310(c)(1), and that this statutory definition was supported by both the dictionary and the commonly understood meaning of the word. *Id.* at 308–09. The Seventh Circuit thus held that the facts established a clear violation by the defendant of the multiple-voting prohibition in Section 10307(e).[23]

In addition to their conflicting holdings, the *Salisbury* and *Cole* opinions differ in their approach to so-called voter "assistance"

---

[22] The *Salisbury* court noted that in *United States v. Hogue*, 812 F.2d 1568 (11th Cir. 1987), the jury was instructed that illegal voting under Section 10307(e) included marking another person's ballot without his or her "express or implied consent," but found that, based on the facts of *Salisbury*, the jury should also have been given definitions of "vote" and "consent." *Salisbury*, 983 F.2d at 1377.

[23] "Ordinary people can conclude that the absentee voters were not expressing their wills or preferences, i.e., that Cole was using the absentee voters' ballots to vote his will and preferences." *Cole*, 41 F.3d at 308.

cases. *Salisbury* focused on the issue of voter consent – that is, whether the voters had, by their conduct, in some way "consented" to having the defendant mark, or help them mark, their own ballots. *Cole*, on the other hand, focused on whether it was the voter or the defendant who actually expressed candidate preferences.

In a more recent case, the Eleventh Circuit followed the rationale in *Cole* with respect to a scheme to obtain and cast ballots for indigent voters without their knowledge or consent. *United States v. Smith*, 231 F.3d 800 (11th Cir. 2000). The court even went so far as to note that, in its view, a Section 10307(e) offense could exist regardless of whether the voter had consented to another's marking his ballot. *Id.* at 819 n.20.

While the approach taken in *Cole* and *Smith* is, from a prosecutor's perspective, preferable to the approach taken in *Salisbury*, the latter's discussion of the issue of possible voter "consent" remains important, since facts suggesting the possibility of consent may weaken the evidence of fraud. Taken together, these three cases suggest the following approach to voter "assistance" frauds:

- Section 10307(e) most clearly applies to cases of "ballot theft." Examples of such situations are when the defendant marked the ballots of others without their input; when voters did not knowingly consent to the defendant's participation in their voting transactions; when the voters' electoral preferences were disregarded; or when the defendant marked the ballots of voters who lacked the mental capacity to vote or to consent to the defendant's activities.

- Jury instructions for a Section 10307(e) charge should amplify the key term "votes more than once" in the context of the particular case, and specifically define the terms "vote," and, when appropriate, "consent" and "implied consent." *E.g.*, 52 U.S.C. § 10310(c)(l) (containing an extremely broad definition of "vote");

*Boards*, 10 F.3d at 589 (holding that this definition encompasses applying for an absentee ballot).

Thus, while the clearest use of Section 10307(e) is to prosecute pure ballot forgery schemes, the statute can also apply to other types of schemes when voters are manipulated, misled, or otherwise deprived of their votes. *See, e.g.*, *Cole*, 41 F.3d at 310–11 (witness believed the defendant was merely registering her to vote, not helping her vote). Schemes to steal the votes of the elderly, infirm, or economically disadvantaged may constitute multiple-voting, especially if there is a clear absence of meaningful voter participation. Because of their vulnerability, these persons are frequent targets of ballot schemes, and often do not even know that their ballots have been stolen or their voting choices ignored. Further, if they have been intimidated, they are generally reluctant to say so.

There is a significant evidentiary difference between voter intimidation and multiple-voting that suggests that the multiple-voting statute may become the preferred charging statute for voter "assistance" frauds. Voter intimidation requires proof of a difficult element: the existence of physical or economic intimidation that is intended by the defendant. In contrast, the key element in a multiple-voting offense is whether the defendant voted the ballot of another person without consulting with that person or taking into account his or her electoral preferences.

In conclusion, if the facts show manipulation of "vulnerable victims" as referenced in the sentencing guidelines for the purpose of obtaining control over the victims' ballot choices, the use of Section 10307(e) as a prosecutive theory should be considered.

### 5. Voter Intimidation

Voter intimidation schemes are the functional opposite of voter bribery schemes. In the case of voter bribery, voting activity is stimulated by offering or giving something of value to individuals to induce them to vote or reward them for having voted. The goal of

voter intimidation, on the other hand, is to deter or influence voting activity through threats to deprive voters of something they already have, such as jobs, government benefits, or, in extreme cases, their personal safety. Another distinction between vote-buying and intimidation is that bribery generates concrete evidence: the payment itself (generally money). Intimidation, on the other hand, is amorphous and largely subjective in nature, and lacks such concrete evidence.

Voter intimidation warrants prompt and effective redress by the criminal justice system. Yet a number of factors make it difficult to prosecute. The intimidation is likely to be both subtle and without witnesses. Furthermore, voters who have been intimidated are not merely victims; it is their testimony that proves the crime. These voters must testify, publicly and in an adversarial proceeding, against the very person who intimidated them. Obtaining this crucial testimony must be done carefully and respectfully. Because such offenses often occur in remote and insular communities, investigators should increase their efforts to maintain contact with voters, especially after charges are brought. Prosecutors should consider "locking in" testimony in grand jury sessions even at the risk of creating some negative *Jencks* material.[24]

The crime of voter "intimidation" normally requires evidence of threats, duress, economic coercion, or some other aggravating factor that tends to improperly induce conduct on the part of the victim. If such evidence is lacking, an alternative prosecutive theory may apply to the facts, such as multiple- voting in violation of 52 U.S.C. § 10307(e). Indeed, in certain cases the concepts of "intimidation" and "voting more than once" might overlap and even merge. For example, a scheme that targets the votes of persons who are mentally handicapped, economically depressed, or socially vulnerable may involve elements of both crimes. Because of their vulnerability, these

---

[24] Federal prosecutors should be mindful of Department resources and policies regarding the rights of victims and the concerns regarding their use as witnesses, and should consult with the victim-witness coordinator in their Office or Division.

persons are often easily manipulated – without the need for inducements, threats, or duress. In such cases, the use of Section 10307(e) as a prosecutive theory should be considered. *See generally United States v. Odom*, 736 F.2d 104 (4th Cir. 1984).

The main federal criminal statutes that can apply to voter intimidation are: 52 U.S.C. § 20511(1); 18 U.S.C. §§ 241, 242, 245(b)(1)(A), 594, and 610. Each of these statutes is discussed below.

#### (a) Intimidation in voting and registering to vote: 52 U.S.C. § 20511(1)

In 1993, Congress enacted the National Voter Registration Act (NVRA), 52 U.S.C. §§ 20501 through 20511. The principal purpose of this legislation was to require that the states provide prospective voters with uniform and convenient means by which to register for the federal franchise. In response to concerns that relaxing registration requirements may lead to an increase in election fraud, the NVRA also included a series of election crimes, one of which prohibits knowingly and willfully intimidating or coercing[25] prospective voters in registering to vote, or for voting, in any election for federal office.[26] 52 U.S.C. § 20511(1). Violators are subject to imprisonment for up to five years.

---

[25] For guidance in determining what constitutes "intimidation" or "coercion" under this statute, see the discussion of 18 U.S.C. § 594 below. Voter "intimidation" accomplished through conduct not covered by this statute or Section 594 may present violations of the Voting Rights Act, 52 U.S.C. § 10307(b), which is enforced by the Civil Rights Division through non-criminal remedies.

[26] The jurisdictional element for Section 20511(1) is "in any election for Federal office." This is slightly different phraseology than used in Sections 10307(c) and (e), as discussed above. In matters involving intimidation in connection with voter *registration*, this jurisdictional element is currently satisfied in every case because voter registration is unitary in all 50 states: i.e., one registers to vote only once to become eligible to vote for federal as well as non-federal candidates. However, when the intimidation occurs in connection with *voting*, the jurisdictional situation might not be as clear. Absent case law to the contrary, federal prosecutors should advocate the position that "an election for Federal office" means any election in which a federal candidate is on the ballot.

**(b) Intimidation of voters: 18 U.S.C. § 594**

Section 594 prohibits intimidating, threatening, or coercing anyone, or attempting to do so, for the purpose of interfering with an individual's right to vote or not vote in any election held solely or in part to elect a federal candidate. The statute does not apply to primaries. Violations are one-year misdemeanors.

The operative words in Section 594 are "intimidates," "threatens," and "coerces." The *scienter* element requires proof that the actor intended to force voters to act against their will by placing them in fear of losing something of value. The feared loss might be something tangible, such as money or economic benefits, or intangible, such as liberty or safety.

Section 594 was enacted as part of the original 1939 Hatch Act, which aimed at prohibiting the blatant economic coercion used during the 1930s to force federal employees and recipients of federal relief benefits to perform political work and to vote for and contribute to the candidates supported by their supervisors. The congressional debates on the Hatch Act show that Congress intended Section 594 to apply when persons were placed in fear of losing something of value for the purpose of extracting involuntary political activities. 84 CONG. REC. 9596-611 (1939). Although the impetus for the passage of Section 594 was Congress's concern over the use of threats of economic loss to induce political activity, the statute also applies to conduct which interferes, or attempts to interfere, with an individual's right to vote by placing him or her in fear of suffering other kinds of tangible and intangible losses. It thus criminalizes conduct intended to force prospective voters to vote against their preferences, or refrain from voting, through activity reasonably calculated to instill some form of fear.[27]

[27] The civil counterparts to Section 594, 52 U.S.C. §§ 10101(b) and 10307(b), may also be used to combat non-violent voter intimidation. *See, e.g.*, *United States v. North Carolina Republican Party*, No. 91-161-Civ-5F (E.D.N.C., consent decree

### (c) Coercion of political activity: 18 U.S.C. § 610

Section 610 was enacted as part of the 1993 Hatch Act reform amendments to provide increased protection against political manipulation of federal employees in the executive branch.[28] It prohibits intimidating or coercing a federal employee to induce or discourage "any political activity" by the employee. Violators are subject to imprisonment for up to three years. This statute is discussed in detail in Chapter Three, which addresses patronage crimes.

Although the class of persons covered by Section 610 is limited to federal employees, the conduct covered by this statute is broad: it reaches political activity that relates to any public office or election, whether federal, state, or local. The phrase "political activity" in Section 610 expressly includes, but is not limited to, "voting or refusing to vote for any candidate or measure," "making or refusing to make any political contribution," and "working or refusing to work on behalf of any candidate."

### (d) Conspiracy against rights and deprivation of constitutional rights: 18 U.S.C. §§ 241 and 242

Section 241 makes it a ten-year felony to "conspire to injure, oppress, threaten, or intimidate" any person in the free exercise of any right or privilege secured by the Constitution or laws of the United

---

entered Feb. 27, 1992) (consent order entered against political organization for mailing postcards to thousands of minority voters that contained false voting information and a threat of prosecution).

[28] A similar statute addresses political intimidation within the military. 18 U.S.C. § 609. It prohibits officers of the United States Armed Forces from misusing military authority to coerce members of the military to vote for a federal, state, or local candidate. Violations are five-year felonies. In addition, 18 U.S.C. § 593 makes it a five-year felony for a member of the military to interfere with a voter in any general or special election, and 18 U.S.C. § 596 makes it a misdemeanor to poll members of the armed forces regarding candidate preferences.

States" – including the right to vote. The statute, which is discussed in detail above, has potential application in two forms of voter intimidation: a conspiracy to prevent persons whom the subjects knew were qualified voters from entering or getting to the polls to vote in an election when a federal candidate is on the ballot, and a conspiracy to misuse state authority to prevent qualified voters from voting for any candidate in any election.

Section 241 has been successfully used to prosecute intimidation in connection with political activities. *Wilkins v. United States*, 376 F.2d 552 (5th Cir. 1967) (*en banc*). *Wilkins* involved both violence and clear racial animus, and arose out of the shooting of a participant in the 1965 Selma-to-Montgomery voting rights march. *Id.* at 557–59. The marchers had intended to present the Governor of Alabama with a petition for redress of grievances, including denial of their right to vote. *Id.* at 555. The Fifth Circuit held that those marching to protest denial of their voting rights were exercising "an attribute of national citizenship, guaranteed by the United States," and that shooting one of the marchers therefore violated Section 241. *Id.* at 561.

Section 242 makes it a misdemeanor for any person to act "under color of any law, statute, ordinance, regulation, or custom," to willfully deprive any person in a state, territory, or district of a right guaranteed by the Constitution or federal law. For all practical purposes, this statute embodies the substantive offense for a Section 241 conspiracy, and it therefore can apply to voter intimidation.

It is the Criminal Division's position that Sections 241 and 242 may be used to prosecute schemes to intimidate voters in federal elections through threats of physical or economic duress, or to prevent otherwise lawfully qualified voters from getting to the polls in elections when a federal candidate is on the ballot. Examples of the latter include intentionally jamming telephone lines to disrupt a political party's get-out-the-vote or ride-to-the-polls efforts, and schemes to vandalize motor vehicles that a political faction or party intended to use to get voters to the polls.

### (e) Federally protected activities: 18 U.S.C. § 245(b)(1)(A)

The Civil Rights Act of 1968 contained a broad provision that addresses violence intended to intimidate voting in any election in this country. 18 U.S.C. § 245(b)(1)(A). This provision applies without regard to the presence of racial or ethnic factors.

Section 245(b)(1)(A) makes it illegal to use or threaten to use physical force to intimidate individuals from, among other things, "voting or qualifying to vote." It reaches threats to use physical force against a victim because the victim has exercised his or her franchise, or to prevent the victim from doing so. Violations are misdemeanors if no bodily injury results, ten-year felonies if there is bodily injury, and any term of years, life imprisonment, or death if death results.

Prosecutions under Section 245 require written authorization by the Attorney General, the Deputy Attorney General, the Associate Attorney General, or a specially designated Assistant Attorney General, who must certify that federal prosecution of the matter is "in the public interest and necessary to secure substantial justice." 18 U.S.C. § 245(a)(1). This approval requirement was imposed in response to federalism issues that many Members of Congress believed were inherent in a statute giving the federal government prosecutive jurisdiction over what otherwise would be mere assault and battery cases. S. REP. NO. 90-721 (1967), *reprinted in* 1968 U.S.C.C.A.N. 1837-67. In making the required certification, the standard to be applied is whether the facts of the particular matter are such that the appropriate state law enforcement authorities should, but either cannot or will not, effectively enforce the applicable state law, thereby creating an overriding need for federal intervention. *Id.* at 1845-48.

### 6. Voter Suppression: 18 U.S.C. §§ 241 and 242

Voter suppression schemes are designed to ensure the election of a favored candidate by blocking or impeding voters believed to oppose that candidate from getting to the polls to cast their ballots. Examples include providing false information to the public – or a particular segment of the public – regarding the qualifications to vote, the consequences of voting in connection with citizenship status, the dates or qualifications for absentee voting, the date of an election, the hours for voting, or the correct voting precinct. Another voter suppression scheme, attempted with partial success, involved impeding access to voting by jamming the telephone lines of entities offering rides to the polls in order to prevent voters from requesting needed transportation. This case was successfully prosecuted and is discussed below.

Currently there is no federal criminal statute that directly prohibits voter suppression activity. Nevertheless, the conspiracy against rights statute, 18 U.S.C. § 241, has been successfully used to prosecute conspiracies to destroy valid voter registrations, *United States v. Haynes*, Nos. 91-5979, 91-6076, 1992 WL 296782, at *1 (6th Cir. Oct. 15, 1992), and to destroy ballots, *In re Coy,* 127 U.S. 731 (1888), *United States v. Townsley*, 843 F.2d 1070 (8th Cir. 1988). The Criminal Division believes that voter suppression conspiracies, such as those described above, are the functional equivalent of the acts involved in these prosecutions, and that voter suppression conspiracies can – and should – be pursued under Section 241 where their objective is to deter voting in a federal election (thus depriving the victim voters of their federally guaranteed right to vote for federal candidates), or in any election when they involve "state action" in their execution (thus depriving the victim voters of their rights to due process and equal protection as guaranteed by the Fourteenth Amendment). As noted above, the substantive crime for Section 241 conspiracies can be prosecuted under 18 U.S.C. § 242, deprivation of constitutional rights, where the voter suppression is carried out "under color of law."

This prosecutive theory was used in a case in New Hampshire. In *United States v. Tobin,* No. 04-216-01 (SM), 2005 WL 3199672, at *1 (D.N.H. Nov. 30, 2005), a senior political party official was charged with violating Section 241 and with telephone harassment offenses under 47 U.S.C. § 223 in connection with a scheme to jam telephone lines for ride-to-the-polls services offered by the opposing political party and the local fire department during the 2002 general elections. The object of the conspiracy was to impede certain voters from getting to the polls in order to influence what was perceived to have been a very close United States Senate contest. *Id.* The defendant challenged the Section 241 charge, claiming that the statute had never been applied to a voter suppression scheme such as the one involved in that case, and that application of Section 241 to the scheme would therefore deprive him of constitutionally required notice that his activities were proscribed. *Id.* The district court disagreed and upheld the charge, stating:

> [T]he "fair warning" issue turns generally on whether a person of ordinary intelligence would know that the acts charged would violate specific constitutional rights. Or, with reference to the allegations in the superseding indictment, whether a person of ordinary intelligence would understand that participating in an agreement, or conspiracy, whose purpose is to prevent qualified persons from freely exercising their right to vote, would violate Section 241. Plainly, a reasonable person would understand that the right to vote is a right protected by the Constitution. He or she would also understand that knowingly joining a conspiracy with the specific intent to impede or prevent qualified persons from exercising the right to vote is conduct punishable under Section 241.

*Id*. at *3.[29]

---

[29] The defendant's convictions on the telephone harassment charges were reversed on appeal due to error in the jury instructions under § 223. *United States v. Tobin*, 480 F.3d 53, 56–58 (1st Cir. 2007).

The prosecution of voter suppression schemes represents an important law enforcement priority, and such schemes should be aggressively investigated. Unless Congress enacts a statute specifically criminalizing this type of conduct, 18 U.S.C. §§ 241 and 242 are the appropriate prosecutive tool by which to charge provable offenses.

### 7. Fraudulent Registration or Voting: 52 U.S.C. § 20511(2)

This provision was enacted as part of the National Voter Registration Act of 1993 (NVRA). As discussed above, Congress enacted the NVRA to ease voter registration requirements throughout the country. The major purpose of this legislation was to promote the exercise of the franchise by replacing diverse state voter registration requirements with uniform and more convenient registration options, such as registration by mail, when applying for a driver's license, and at various government agencies.

In addition, the NVRA sought to protect the integrity of the electoral process and the accuracy of the country's voter registration rolls. To further these goals, a criminal statute was enacted that specifically addressed two common forms of electoral corruption: intimidation of voters (52 U.S.C. § 20511(1), (discussed above), and fraudulent registration and voting (52 U.S.C. § 20511(2)). Violations are subject to imprisonment for up to five years.

With respect to fraudulent registration and voting, Section 20511(2) criminalizes submitting voter registrations or ballots that contain materially false information with knowledge of the falsity. *E.g.*, *United States v. Prude*, 489 F.3d 873, 874–75 (7th Cir. 2007) (affirming conviction of disenfranchised felon who voted after notice of her ineligibility).

The use of the word "willfully" in Section 20511(2) indicates that federal prosecutors must be prepared to prove that the offender was aware that he or she was doing something unlawful.

Section 20511(2) is also limited to conduct that occurs "in any election for Federal office." While the phrasing of this jurisdictional element differs somewhat from the jurisdictional language used by Congress in earlier election fraud statutes, the Department believes that it was intended to achieve the same result.[30]

**(a) Fraudulent registration: § 20511(2)(A)**

Subsection 20511(2)(A) prohibits any person, in an election for federal office, from defrauding or attempting to defraud state residents of a fair and an impartially conducted election by procuring or submitting voter registration applications that the offender knows are materially false or defective under state law. The scope of the statute is broader than that of the "false information" provision of Section 10307(c), discussed above, which is limited to false information involving only name, address, or period of residence. The statute applies to any false information that is material to a registration decision by an election official. For this reason, the provision is likely to be the statute of preference for most false registration matters.

As already discussed, because registration to vote is unitary in all states, in the sense that in registering to vote an individual becomes eligible to vote in all elections, federal as well as non-federal, the jurisdictional element is automatically satisfied in schemes to submit fraudulent registration applications.

---

[30] The earlier statutes, 52 U.S.C. §§ 10307(c) and (e), contain express references to each federal office (Member of the House, Member of the Senate, President, Vice President, presidential elector) and type of election (primary, general, special) providing federal jurisdiction. The revised language seems to have been intended as a less cumbersome rephrasing of the required federal nexus.

### (b) Fraudulent voting: § 20511(2)(B)

Subsection 20511(2)(B) prohibits any person, in an election for federal office, from defrauding or attempting to defraud the residents of a state of a fair election through casting or tabulating ballots that the offender knows are materially false or fraudulent under state law. Unlike other ballot fraud laws discussed in this chapter, the focus of this provision is not on any single type of fraud, but rather on the result of the false information: that is, whether the ballot generated through the false information was defective and void under state law. Because of the conceptual breadth of this provision, it is a useful alternative to other fraud statutes in reaching certain forms of election corruption, particularly alien and felon voting.

However, the statute's jurisdictional element, "in any election for Federal office," substantially restricts its usefulness for fraudulent voting (as opposed to fraudulent registration) schemes, as it applies only to elections that include a federal candidate. Thus, its scope is similar to that of 52 U.S.C. §§ 10307(c) and (e), and arises from the fact that fraudulent activity aimed at any race in a mixed election has the potential to taint the integrity of the federal race.

### 8. Voting by Non-citizens

Federal law does not expressly require that persons be United States citizens to vote. Moreover, eligibility to vote is a matter that the Constitution leaves primarily to the states.[31] At the time this book was written, however, all states required that prospective voters be United States citizens.

Historically, the states have regulated both the administrative and substantive facets of the election process, including how one

[31] U.S. CONST. art. I, § 2; *id*. amend. XVII (electors for Members of the United States House of Representatives and the United States Senate have the qualifications for electors of the most numerous branch of the state legislatures); *id*. art. II, § 1, cl. 2 (presidential electors chosen as directed by state legislatures).

registers to vote and who is eligible to do so. Federal requirements, on the other hand, generally have focused on specific federal interests, such as protecting the integrity of the federal elective process and the exercise of fundamental rights to which constitutional protection has been expressly granted.[32]

Federal laws do, however, have quite a bit to say about citizenship and voting. Specifically, in 1993 the federal role in the election process expanded significantly with the enactment of the NVRA. This legislation required, among other things, that forms used to register persons to vote in federal elections clearly state "each eligibility requirement (including citizenship)" and that persons registering to vote in federal elections affirm that they meet "each eligibility requirement (including citizenship)." 52 U.S.C. §§ 20504(c)(2)(C), 20506(a)(6)(A)(i), 20508(b)(2). Nine years later, Congress passed the Help America Vote Act of 2002, which reemphasized these requirements in the case of voters who register to vote via mail by requiring the states to place a citizenship question on mailed registration forms. 52 U.S.C. § 21083(b)(4)(A)(i).

In addition to these federal requirements relating to voter registration, registering to vote and voting by non-citizens may be prosecuted under four separate federal criminal laws:

**(a) Fraudulent registration and voting: 52 U.S.C. § 20511(2)**

As already discussed, the NVRA enacted a criminal statute that reaches the knowing and willful submission to election authorities of false information that is material under state law. 52 U.S.C. § 20511(2). Because all states currently make citizenship a prerequisite for voting, statements by prospective voters concerning

---

32 For example, the states are prohibited from depriving "citizens of the United States" of the franchise on account of any of the following factors: race (amend. XV), gender (amend. XIX), non-payment of poll tax (amend. XXIV), age of 18 or older (amend. XXVI; 52 U.S.C. § 10701), residency after 30 days (52 U.S.C. § 10502), or overseas residence (52 U.S.C. § 20302).

citizenship status are automatically "material" within the meaning of this statute. Therefore, any false statement concerning an applicant's citizenship status that is made on a registration form submitted to election authorities, or made so that the individual may vote, can involve a violation of this statute.

As discussed above, the jurisdictional requirement – that the fraud be "in any election for Federal office" – is satisfied in voter registration cases whenever a false statement concerning citizenship status is made on a voter registration form because registration is unitary in every state. The jurisdictional requirement for voting cases is likely only satisfied where the ballot included a federal candidate.

Proof of the willfulness element is relatively easy in cases involving false claims of citizenship because, since 1993 when the NVRA was enacted, the citizenship requirement must be stated on the voter registration form, and the form requires that the voter check a box indicating that he or she is a citizen.

**(b) False claims to register or vote: 18 U.S.C. § 1015(f)**

Section 1015(f) was enacted in 1996 to provide an additional criminal prohibition addressing the participation of non-citizens in the voting process. This statute makes it an offense for an individual to make a false statement or claim that he or she is a citizen of the United States in order to register or to vote. Unlike all other statutes addressing alien voting, Section 1015(f) expressly applies to all elections – federal, state, and local – as well as to initiatives, recalls, and referenda.

Jurisdictionally, Section 1015(f) rests on Congress's power over nationality (U.S. CONST. art. I, § 8, cl. 4) rather than on the Election Clause (U.S. CONST. art. I, § 4, cl. 1), which provides the basis for its broad reach.

Violations of Section 1015(f) are felonies, punishable by imprisonment for up to five years.

### (c) False claims of citizenship: 18 U.S.C. § 911

Section 911 prohibits the knowing and willful false assertion of United States citizenship by a non-citizen. *See, e.g.*, *United States v. Franklin*, 188 F.2d 182 (7th Cir. 1951); *Fotie v. United States*,137 F.2d 831 (8th Cir. 1943). Section 911 requires proof that the offender was aware he was not a United States citizen, and that he was falsely claiming to be a citizen. Violations of Section 911 are punishable by up to three years of imprisonment.

As noted, all states (but not all local jurisdictions) require United States citizenship as a prerequisite for voting; and, under the NVRA, all states must make this citizenship requirement clear, and prospective registrants must sign applications under penalty of perjury attesting that they meet this requirement. Therefore, falsely attesting to citizenship in any state is now more likely to be demonstrably willful, and therefore cognizable under Section 911.

### 9. Voting by Aliens: 18 U.S.C. § 611

Section 611 creates an additional crime for voting by persons who are not United States citizens. It applies to voting by non-citizens in an election when a federal candidate is on the ballot, except when non-citizens are authorized to vote by state or local law for non-federal candidates or issues, and the ballot is formatted in a way that the non-citizen has the opportunity to vote solely for these non-federal candidates or issues. Unlike Section 1015(f), Section 611 is directed at the act of voting, rather than the act of lying.

Also unlike Section 1015(f), Section 611 states a general intent offense, i.e., the offender must have known that he or she was not a citizen, and that the act he or she performed was an act of voting. However, it is not necessary to prove that the offender knew that voting by non-citizens was illegal. As thus interpreted, Section 611

has been held to conform to constitutional standards. *See United States v. Knight*, 490 F.3d 1268, 1270 (11th Cir. 2007).

Violations of Section 611 are misdemeanors, punishable by up to one year of imprisonment.

**10. Travel Act: 18 U.S.C. § 1952**

The Travel Act, 18 U.S.C. § 1952, prohibits interstate travel, the use of any other facility (such as a telephone or the internet) capable of use interstate, and any use of the mails, to further specified "unlawful activity," including bribery in violation of state or federal law. Violations are punishable by imprisonment for up to five years. This statute may be useful in election crime matters because it applies to vote-buying offenses that occur in states where vote-buying is a "bribery" offense, regardless of the type of election involved.

The predicate bribery under state law need not be common law bribery. The Travel Act applies as long as the conduct is classified as a "bribery" offense under applicable state law. *Perrin v. United States*, 444 U.S. 37 (1979); *United States v. Dansker*, 537 F.2d 40, 47 (3d Cir. 1976). In addition, the Travel Act has been held to incorporate state crimes regardless of whether they are classified as felonies or misdemeanors. *United States v. Polizzi*, 500 F.2d 856, 873 n.17 (9th Cir. 1974); *United States v. Karigiannis*, 430 F.2d 148, 150 (7th Cir. 1970); *Schwartz v. Upper Deck Co.*, 183 F.R.D. 672, 678 (S.D. Cal. 1999).

The first task in determining whether the Travel Act has potential application to a vote-buying scheme, therefore, is to examine the law of the state where the vote-buying occurred to determine if it either: (1) is classified as a bribery offense, or (2) describes the offense of paying voters for voting in a way that requires proof of a *quid pro quo*, i.e., that a voter be paid in consideration for his or her vote for one or more candidates. If the state offense meets either of these criteria, the Travel Act potentially applies.

The analysis of whether an offense qualifies under these criteria can involve complex questions of state law. In *United States v. Manzo*, 851 F. Supp. 2d 797, 800 (D.N.J. 2012), the government charged an unsuccessful mayoral candidate with a Travel Act violation for accepting a campaign contribution in exchange for a promise to assist the development of real estate interests held by the bribe payor if the candidate prevailed in the election. The court, after extensively reviewing New Jersey's bribery and solicitation statutes, as well as the common law of bribery, determined that neither specifically proscribed the acceptance of a benefit by an unsuccessful candidate in exchange for a promise to perform an official act once elected. *Id.* at 811–29. Therefore, the government had not properly alleged a Travel Act violation, and the court granted the defendant's motion to dismiss the indictment. *Id.* at 829. The court did, however, note that "it is a crime in New Jersey to engage in bribery as a candidate in order to purchase or induce certain behaviors of voters specifically," *id.* at 812, indicating that a vote-buying allegation would constitute a valid charge under the Travel Act.

Travel Act jurisdiction rests on predicate acts of interstate travel, the use of interstate facilities, or the use of the mails (intra or interstate). *E.g., United States v. Nader*, 542 F.3d 713, 722 (9th Cir. 2008) ("We hold that intrastate telephone calls made with intent to further unlawful activity can violate the Travel Act because the telephone is a facility in interstate commerce."); *United States v. Halloran*, 821 F.3d 321, 342 (2d Cir. 2016), *cert. denied*, 137 S. Ct. 1118 (2017) (citing *Nader*, 542 F.32 at 722) (holding purely intrastate use of an interstate facility, "e.g., the telephone or the internet" is sufficient to violate the Travel Act). Since election fraud is a local crime, interstate predicate acts are rarely present. The Travel Act may be considered as a vehicle to prosecute vote-buying schemes, however, in which the mails, a telephone, or the internet were used in those states where vote-buying is statutorily defined as bribery. This theory is one of the few available that do not require a federal candidate on the ballot.

As with the mail and wire fraud statutes, each use of the interstate facility or mail in furtherance of the bribery scheme is a separate offense. *United States v. Jabara*, 644 F.2d 574, 577–78 (6th Cir. 1981). The defendant need not actually have used the facility or mail, so long as it was a reasonably foreseeable consequence of his or her activities. *United States v. Kelley*, 395 F.2d 727, 729 (2d Cir. 1968). Nor need the jurisdictional act have in itself constituted the illegal activity, as long as it promoted it in some way. *United States v. Welch*, 327 F.3d 1081, 1092 (10th Cir. 2003); *United States v. Bagnariol*, 665 F.2d 877, 898–99 (9th Cir. 1981); *United States v. Peskin*, 527 F.2d 71, 79 n.3 (7th Cir. 1975); *McIntosh v. United States*, 385 F.2d 274, 276 (8th Cir. 1967).

An unusual feature of the Travel Act is that it requires an overt act subsequent to the jurisdictional event charged in the indictment. Thus, if a Travel Act charge is predicated on a use of the mails, the government must allege and prove that the defendant subsequently acted to further the underlying unlawful activity. The subsequent overt act need not be unlawful in itself; this element has been generally held to be satisfied by the commission of a legal act as long as the act facilitated the unlawful activity. *See, e.g.*, *United States v. Davis*, 780 F.2d 838, 842 (10th Cir. 1985).

The Travel Act may be particularly useful in voter bribery cases in non-federal elections that involve the mailing of absentee ballot materials. Such matters usually involve a defendant who offers voters compensation for voting, followed by the voter applying for, obtaining, and ultimately casting an absentee ballot. Each voting transaction can involve as many as four separate mailings: (1) when the absentee ballot application is sent to the voter, (2) when the completed application is sent to the local election board, (3) when the absentee ballot is sent to the voter, and (4) when the voter sends the completed ballot back to the election authority for tabulation.

Because the mailing must be in furtherance of the scheme, however, care should be taken to ensure that the voting transaction in question was corrupted by a bribe before the mailing that is

charged. If, for example, the voter was not led to believe that he or she would be paid for voting until after applying for, and receiving, an absentee ballot package, then the only mailing affected by bribery would be the transmission of the ballot package to the election authority; the Travel Act charge is best predicated on this final mailing, with some other subsequent overt act charged.

### 11. Mail and Wire Fraud: 18 U.S.C. §§ 1341 and 1343

The federal mail and wire fraud statutes prohibit use of the United States mails, or a private or commercial interstate carrier, or the use of interstate wire communications to further a "scheme or artifice to defraud." 18 U.S.C. §§ 1341 and 1343.[33] Violations are punishable by imprisonment for up to twenty years.

Despite their prior broad application to election fraud at the state and local level, post-*McNally*, 483 U.S. 350 (1987), and *Skilling*, 561 U.S. 358 (2010), the mail and wire fraud statutes reach only those schemes to defraud others of property rights, and schemes to deprive others of the intangible right to honest services through bribery or kickbacks under 18. U.S.C. § 1346. Section 1346, therefore, likely will not provide a basis for prosecuting most types of election fraud. Federal prosecutors should consult with the Public Integrity Section before using Section 1346 in the context of election fraud.

#### (a) "Salary Theory" of mail and wire fraud

The Court's narrowing of the mail and wire fraud statutes does not entirely foreclose their use in prosecuting election fraud. Schemes to obtain salaried positions by falsely representing the applicant's credentials to a hiring authority remain prosecutable under the mail and wire fraud statutes after *McNally*. The objective of such "salary schemes" is to obtain pecuniary items – i.e., "money or property" – by fraud; such schemes are therefore clearly within the

---

[33] The mail and wire fraud statutes are essentially identical, except for their jurisdictional requirements.

scope of the common law concepts of fraud to which *McNally* sought to restrict the mail fraud statute. *See United States v. Sorich*, 523 F.3d 702, 712–13 (7th Cir. 2008) (scheme creating fraudulent hiring bureaucracy for city employees led to "salaries fraudulently obtained" and "job opportunities fraudulently denied," both of which "represent[ed] property for purposes of mail fraud"); *United States v. Granberry*, 908 F.2d 278, 280 (8th Cir. 1990) (scheme to obtain "wages paid" by falsifying application "is within the narrowest reading of the [mail fraud] statute"); *United States v. Doherty*, 867 F.2d 47, 54–57 (1st Cir. 1989) (Breyer, J.) (indictment alleging scheme to rig police promotion exam and make fraudulent appointments deemed "sufficient to charge a valid conspiracy to defraud the Commonwealth of 'money or property,' namely, a scheme 'for obtaining' the money used to pay the salaries of those improperly promoted 'by means of false or fraudulent pretenses'") (quoting 18 U.S.C. § 1341); *United States v. O'Brien*, 994 F. Supp. 2d 167, 182–83 (D. Mass. 2014) (scheme to hire and promote unqualified probation department employees); *United States v. Ferrara*, 701 F. Supp. 39, 41–42 (E.D.N.Y. 1988) (scheme to obtain hospital salaries by falsifying medical training), *aff'd*, 868 F.2d 1268 (2d Cir. 1988); *United States v. Thomas*, 686 F. Supp. 1078, 1083–85 (M.D. Pa. 1988) (scheme to rig police entrance exam), *aff'd*, 866 F.2d 1414 (3d Cir. 1988) (table); *cf. United States v. Cooper*, 677 F. Supp. 778, 781–82 (D. Del. 1988) (wire fraud scheme to obtain pay for person not performing work).

This salary theory of post-*McNally* mail or wire fraud has potential application to some election fraud schemes, since most elected offices in the United States carry with them a salary and various emoluments that have monetary value. For example, schemes to obtain salaried elected positions through procuring and tabulating invalid ballots, or by concealing from a supervising authority the receipt of illegal campaign funds during an election, result in the payment of a salary to an official who would not have been elected absent the fraud.

In addition, election fraud schemes can present related issues concerning the quality and value of the public officer hired thereby.

The Supreme Court observed in *McNally* that deceit concerning the quality and value of a commodity or service remains within the scope of Section 1341:

> We note that as the action comes to us, there was no charge and that the jury was not required to find that the Commonwealth itself was defrauded of any money or property. It was not charged that in the absence of the alleged scheme the Commonwealth would have paid a *lower* premium or secured *better* insurance.

*McNally*, 483 U.S. at 360 (emphasis added). Election fraud schemes involve an aspect of material concealment insofar as the "value" of the services the public is paying for are concerned: the public "hired" the candidate because it was falsely led to believe this candidate received the most valid votes, or (at least in part) because it believed the candidate did not engage in illegal fundraising activities, and consequently received services from an individual that were thus of lower value.

This "salary theory" of post-*McNally* mail or wire fraud has been applied to election frauds in only a few cases to date, with mixed results. The Fifth and Sixth Circuits have outright rejected the theory in the election fraud context. *United States v. Ratcliff*, 488 F.3d 639, 647 (5th Cir. 2007) (candidate lied to election ethics board about illegal campaign loans); *United States v. Turner*, 459 F.3d 775, 784–90 (6th Cir. 2006) (defendant fraudulently concealed illegal contributions and bribed voters to vote for candidate). District courts have split on whether the theory is viable in prosecuting election fraud. *Compare United States v. Schermerhorn*, 713 F. Supp. 88, 92 (S.D.N.Y. 1989) (scheme to conceal that state senate candidate was being financed by organized crime in violation of state campaign financing laws held actionable under the salary theory); *United States v. Webb*, 689 F. Supp. 703, 707 (W.D. Ky. 1988) (scheme to fraudulently elect sheriff by procuring false absentee ballots held actionable under the salary theory), *with Westchester Cnty. Indep. Party v. Astorino*, No. 13–CV–7737 (KMK), 2015 WL 5883718, at

*11–12 (S.D.N.Y. Oct. 8, 2015) (holding that "a person who has committed election fraud in order to obtain the normal salary given to the person holding that elected office has not committed money or property fraud, because the victim – the government – has not been deprived either of any money or property or the choice in how to spend the money"); *United States v. George*, No. 86–CR–123, 1987 WL 48848, at *2 (W.D. Ky. Oct. 20, 1987) (similar).

Thus, the salary theory may still be viable in the election fraud context. Schemes designed to fraudulently elect a public official are materially indistinguishable from schemes to fraudulently obtain other government employment for purposes of Sections 1341 and 1343. The holdings of the Fifth and Sixth Circuits in *Ratcliff* and *Turner*, respectively, rely on three basic rationales that appear to conflict with case law discussing the salary theory in other contexts.

Both holdings rely on the courts' observation that the elected officials' fraudulently-obtained salaries did not cause the paying localities to incur a net monetary loss, because *someone* would be paid the salaries regardless of who ultimately obtained the positions. *Ratcliff*, 488 F.3d at 645; *Turner*, 465 F.3d at 680.[34] But, as the First Circuit has explained, "[Section] 1341 forbids schemes to defraud *or* to obtain money by false pretenses; this statutory language suggests no requirement that the scheme must be aimed at money which would not otherwise have gone to someone who honestly obtained the victim's business." *Doherty*, 867 F.2d at 60. Other circuit and district courts, applying the mail fraud statute to crimes outside of the election context, have confronted and rejected the rationale relied upon in *Ratcliff* and *Turner* as well. *See, e.g.*, *id*; *Sorich*, 523 F.3d at 712–13;

---

[34] In *United States v. Goodrich*, the Eleventh Circuit rejected the government's attempt to apply the salary theory to a scheme whereby the defendant bribed county officials. 871 F.2d 1011, 1013–14 (11th Cir. 1989). The district court had reasoned that the defendant defrauded the county of salaries paid to officials by bribing them to take certain official actions and conduct "sham meetings." *Id.* at 1013. Foreshadowing *Turner* and *Ratcliff*, the Eleventh Circuit reasoned that "the indictment does not allege that the purported mail fraud caused the County to incur any expenses over and above the cost of conducting regularly-scheduled commission business." *Id.* at 1013. The Second Circuit expressly declined to opine on the theory's application to a scheme to bribe previously-elected union officials. *United States v. Coppola*, 671 F.3d 220, 237 (2d Cir. 2012).

*Granberry*, 908 F.2d at 280; *United States v. Thomas*, 686 F. Supp. 1078, 1085 (M.D. Pa. 1988); *Webb*, 689 F. Supp. at 707 (characterizing "[a] net loss in the salary expended" as "superfluous" to a mail fraud charge). Moreover, the net expense rationale ignores the Supreme Court's observation in *McNally*, quoted above, that fraud causing a lower-quality service to be provided can give rise to a viable mail fraud claim. *See Schermerhorn*, 713 F. Supp. at 92 (explaining that the defendant's emphasis on overall cost "is at the expense of the remainder of that disjunctive clause – 'or secured better insurance'") (quoting *McNally*, 483 U.S. at 360)); *Granberry*, 908 F.2d at 280 ("What the school district wanted was a competent school-bus driver who was truthful and had not been convicted of a felony, and this is not what it got."). Neither the statutory language nor common law concepts of fraud require courts to "abide [or] judicially sanction the conclusion that corrupt and non-corrupt elected officials are of equal value." *Schermerhorn*, 713 F. Supp. at 92.

The Fifth Circuit's holding in *Ratcliff* also rested on its observation that the defendant's fraudulent misrepresentations were aimed directly at a local ethics board, rather than the locality paying the official's salary. *Ratcliff*, 488 F.3d at 644–45. However, just three years later, in *United States v. McMillan*, the circuit disavowed that line of reasoning, acknowledging that "[n]othing in the mail and wire fraud statutes requires that the party deprived of money or property be the same party who is actually deceived." 600 F.3d 434, 449 (5th Cir. 2010) (internal quotation marks omitted). The *McMillan* court instead read *Ratcliff*'s holding to rely principally upon the first basis explained above, i.e., the fact that the elected official's "salary and benefits . . . would have been paid regardless of the defendant's misrepresentations." *Id.* at 448.

Finally, in *Turner*, the Sixth Circuit based its holding in part on its view that the locality paying the official's salary lacked "control over the appropriation of the salary beyond ensuring payment to the duly elected official." *Turner*, 465 F.3d at 682. But there is no support in the statutory language for such a limitation. *See* 18 U.S.C. §§ 1341, 1343 (making unlawful "*any* scheme or artifice to defraud, or for

obtaining money or property by means of false or fraudulent pretenses, representations, or promises . . . .") (emphasis added). Nothing in the language of Sections 1341 or 1343, or *McNally*, for that matter, indicates that the *process* of selecting the official or employee – be it by popular election or a more traditional hiring procedure – is material for purposes of determining liability. It would be an odd result indeed if a bad actor who secures elected office by fraud could evade prosecution under Sections 1341 or 1343 simply because the hiring procedure involved delegation or otherwise involved multiple actors, not all of whom were directly targeted by the fraudulent conduct.

**(b) "Cost-of-election" theory: 18 U.S.C. § 1341**

One court, the D.C. Circuit, has held that a scheme to cast fraudulent ballots in a labor union election, which had the effect of tainting the entire election, was a scheme to defraud the election authority charged with running the election of the costs involved. *United States v. DeFries*, 43 F.3d 707, 710–11 (D.C. Cir. 1995).

*DeFries* was not a traditional election fraud prosecution. Rather, it involved corruption of a union election when supporters of one candidate for union office cast fraudulent ballots for that candidate. *Id.* at 708. When the scheme was uncovered, the United States Department of Labor ordered that a new election be held, thereby causing the union to incur an actual pecuniary loss. The D.C. Circuit held that the relationship between that pecuniary loss and the voter fraud scheme was sufficient to satisfy the requirements of *McNally*. *Id.* at 710–11.

This theory of prosecution has potential usefulness primarily when the mail and wire fraud statutes are needed to federalize voter frauds involving the counting of illegal ballots in non-federal elections, particularly when the fraud has led to a successful election contest and the election authority has been ordered to hold a new election, thereby incurring additional costs.

**12. Troops at Polls: 18 U.S.C. § 592**

This statute makes it unlawful for anyone in the military or federal civil service to station troops or "armed men" at the polls in a general or special election (but not a primary), except when necessary "to repel armed enemies of the United States." Violations are punishable by imprisonment for up to five years and disqualification from any federal office.

Section 592 prohibits the use of official authority to order armed personnel to the polls; it does not reach the personnel who respond to those orders. The effect of this statute is to prohibit FBI Special Agents from conducting investigations within the polls on election day, and Deputy U.S. Marshals from being stationed at open polls, as both are required to carry their weapons while on duty.

This statute applies only to agents of the United States government. It does not prohibit state or local law enforcement agencies from sending police officers to quell disturbances at polling places, nor does it preempt state laws that require police officers to be stationed in polling places. And finally, it does not prohibit armed federal response when a polling place has ceased to function because of, for example, a bomb threat or active shooter.

**13. Campaign Dirty Tricks**

Two federal statutes, both of which are part of the Federal Election Campaign Act (FECA), specifically address campaign tactics and practices: 52 U.S.C. §§ 30120 and 30124. As is the case with all other FECA provisions, violations of these two statutes are subject to both civil and criminal penalties, 52 U.S.C. §§ 30109(a) and 30109(d) respectively. These penalties will be further discussed in Chapter Five.

### (a) Election communications and solicitations: 52 U.S.C. § 30120

Section 30120 provides that whenever a person or political committee makes certain types of election-related disbursements, an expenditure for the purpose of financing a public communication advocating the election or defeat of a clearly identified federal candidate, or a solicitation for the purpose of influencing the election of a federal candidate, the communication must contain an attribution clause identifying the candidate, committee, or person who authorized and/or paid for the communication. The content of the attribution, as well as its size and location in the advertisement, are described in the statute.

This statute has potential application to unattributed false, inflammatory, or scurrilous campaign literature that calls for the election or defeat of a federal candidate.

### (b) Fraudulent misrepresentation: 52 U.S.C. § 30124

Section 30124 prohibits fraudulently representing one's authority to speak for a federal candidate or political party. The provision contains two specific prohibitions:

- Section 30124(a) forbids a federal candidate or an agent of a federal candidate from misrepresenting his or her authority to speak, write, or otherwise act for any other federal candidate or political party in a matter which is damaging to that other candidate or political party. For example, Section 30124(a) would prohibit an agent of federal candidate A from issuing a statement that was purportedly written by federal candidate B, and which concerned a matter which was damaging to candidate B.

- Section 30124(b) forbids any person from fraudulently representing his or her authority to solicit contributions

on behalf of a federal candidate or political party. For example, this provision would prohibit any person from raising money by claiming that he or she represented federal candidate A, when, in fact, the person had no such authority.

### 14. Retention of Federal Election Records: 52 U.S.C. § 20701

The detection, investigation, and proof of election crimes – and in many instances Voting Rights Act violations – often depend on documentation generated during the voter registration, voting, tabulation, and election certification processes. In recognition of this fact, and the length of time it can take for credible evidence suggesting election fraud or voting rights violations to develop, Congress enacted Section 20701 to require that documentation generated in connection with the voting and registration process be retained for twenty-two months if it pertained to an election that included a federal candidate. Absent this statute, the disposition of election documentation would be subject solely to state law, which in virtually all states permits its destruction within a few months after the election is certified.

Section 20701 provides for criminal misdemeanor penalties for any election officer who willfully fails to retain records covered by the statute. Section 20702 provides similar criminal penalties for election officers or other persons who willfully steal, destroy, or alter covered records.[35] In addition to these criminal penalties, the reach of this statute to specific categories of election documentation is critical to both prosecutors and election administrators, who must often

[35] Election administrators, document custodians, or other persons who willfully violate Section 20701 or Section 20702 are subject to imprisonment for up to one year.

resolve election disputes and answer challenges to the fairness of elections.[36]

For this reason, a detailed discussion of Section 20701 and its application to particular types of election documentation generated in the current age of electronic voting follows.

### (a) Legislative purpose and background

The voting process generates voluminous documents and records, ranging from voter registration forms and absentee ballot applications to ballots and tally reports. If election fraud occurs, these records often play an important role in the detection and prosecution of the crime. Documentation generated by the election process also plays an equally important role in the detection, investigation, and prosecution of federal civil rights violations.

State laws generally require that voting documents be retained for sixty to ninety days. Those relatively brief periods are usually insufficient to make certain that voting records will be preserved until more subtle forms of federal civil rights abuses and election crimes have been detected.

In 1960, Congress enacted a federal requirement that extended the document retention period for elections when federal candidates were on the ballot to *twenty-two months* after the election. Pub. L. 86-449, Title III, § 301, 74 Stat. 88; 52 U.S.C. §§ 20701–20706. As noted above, this documentation retention requirement is backed-up with criminal misdemeanor penalties that apply to election officers or other persons who willfully destroy covered election records before the expiration of the federal retention period.

---

[36] Indeed, the federal courts have recognized that the purpose of this federal document retention requirement is to protect the right to vote by facilitating the investigation of illegal election practices. *Kennedy v. Lynd*, 306 F.2d 222, 228 (5th Cir. 1962).

The retention requirements of Section 20701 are aimed specifically at election administrators. In a parochial sense, these laws place criminally sanctionable duties on election officials. However, in a broader sense, this federal retention law assists election administrators in performing the tasks of managing elections and determining winners of elective contests. It does this by requiring election managers to focus appropriate attention on the types of election records under their supervision and control that may be needed to resolve challenges to the election process, and by requiring that they take appropriate steps to ensure that those records will be preserved intact until such time as they may become needed to resolve legitimate questions that frequently arise involving the election process.

### (b) The basic requirements of Section 20701

Section 20701 requires that election administrators preserve for twenty-two months "all records and papers" that come into their possession relating to any "application, registration, payment of poll tax, or other act requisite to voting." This retention requirement applies to all elections in which a candidate for federal office was on the ballot, that is, a candidate for the United States Senate, the United States House of Representatives, President or Vice President of the United States, or presidential elector. Retention and disposition of records in elections with no federal candidate on the ballot (including elections for state and local bond issues, initiatives, referenda and the like) are governed by state law. Section 20701 does not apply to records generated in connection with purely local or state elections.

However, Section 20701 does apply to all records generated in connection with the process of registering voters and maintaining current electoral rolls. This is because voter registration in virtually all United States jurisdictions is "unitary" in the sense that a potential voter registers only once to become eligible to vote for both local and federal candidates. *See United States v. Cianciulli*, 482 F. Supp. 585, 617 (E.D. Pa. 1979). Thus, registration records must be preserved as long as the voter registration to which they pertain is considered an

"active" one under local law and practice, and those records cannot be disposed of until the expiration of twenty-two months following the date on which the registration ceased to be "active."

This statute must be interpreted in keeping with its congressional objective: under Section 20701, all documents and records that may be relevant to the detection or prosecution of federal civil rights or election crimes must be maintained if the documents or records were generated in connection with an election that included one or more federal candidates.

#### (c) Section 20701 requires document preservation, not document generation

Section 20701 does *not* require that states or localities produce records in the course of their election processes. However, if a state or locality chooses to create a record that pertains to voting, this statute requires that record be retained if it relates to voting in an election covered by the statute.

#### (d) Originals must be retained

Section 20701 further requires that the original documents be retained, even in those jurisdictions that have the capability to reduce original records to digitized replicas. This is because handwriting analysis may be difficult to perform on digitized reproductions of signatures, and because the legislative purpose advanced by this statute is to preserve election records for their evidentiary value in criminal and civil rights lawsuits. Therefore, in states and localities that employ new digitization technology to archive election forms that were originally manually subscribed by voters, Section 20701 requires that the originals be maintained for the requisite twenty-two month period.

### (e) Election officials must supervise storage

Section 20701 requires that covered election documentation be retained either physically by election officials themselves, or under their direct administrative supervision. This is because the document retention requirements of this federal law place the retention and safekeeping duties squarely on the shoulders of election officers.

An electoral jurisdiction, however, may validly determine that election records subject to Section 20701 would most efficiently be kept under the physical supervision of government officers other than election officers (e.g., motor vehicle departments and social service administrators). If an electoral jurisdiction makes such a determination, Section 20701 requires that administrative procedures be in place giving election officers ultimate management authority over the retention and security of those election records, including the right to physically access and dispose of them. The terms and conditions of storage also must conform to the retention requirements of the statute.

### 15. Section 20701 versus National Voter Registration Act

The retention requirements of Section 20701 interface significantly with somewhat similar retention requirements of the NVRA, 52 U.S.C. § 20507(i). However, there are four major differences between these two provisions:

- Section 20701 applies to all records generated by the election process, while Section 20507(i) applies only to registration records generated under the NVRA.

- Section 20701's retention period is twenty-two months while Section 20507(i)'s retention period is two years.

- Section 20507(i) requires that, with certain exceptions, covered records also must be made available to the public for inspection for two years.

- Violations of Section 20701 are subject to criminal sanctions, while violations of Section 20507(i) are subject only to non-criminal remedies.

## E. POLICY AND PROCEDURAL CONSIDERATIONS

Election-related allegations range from minor infractions, such as campaigning too close to the polls, to sophisticated criminal enterprises aimed at ensuring the election of corrupt public officials. Such matters present obvious and wide disparities in their adverse social consequences. As the Department has long strived to achieve a nationally consistent response to electoral fraud, it is important that federal investigators and prosecutors avail themselves of the expertise and institutional knowledge that the Public Integrity Section possesses in this sensitive area of law enforcement.

### 1. Consultation Requirements

The Department of Justice has a long-standing consultation policy for election crime investigations involving violations of the statutes discussed in this chapter. The policy is set forth in Section 9-85.210 of the U.S. DEP'T OF JUSTICE, UNITED STATES ATTORNEYS' MANUAL (USAM). The purposes of the consultation policy are to assist federal prosecutors and investigators in determining whether there is a sufficient factual legal basis to commence a federal criminal investigation, and, if so, to ensure that the investigation is timed in a manner that does not interfere with the adjudication of the election itself.

Upon receipt of an election fraud allegation, a United States Attorney's Office may, if the Office considers it warranted, request the FBI to conduct a preliminary inquiry in the form of an "assessment."[37]

[37] An "assessment" is defined in the FBI's Domestic Operations and Field Guide (2015) (DIOG) Section 5 to include those investigative steps necessary to flesh out the

Consultation with the Public Integrity Section is not required at this initial stage, although it is always welcome.

If the results of the preliminary inquiry suggest that further investigation is warranted, the United States Attorney's Office should contact the Public Integrity Section. Specifically, consultation with the Public Integrity Section, and with higher-level Department officials in the event agreement is not reached, is required for all grand jury and "full" investigations[38] of election fraud. Consultation with the Public Integrity Section is also required prior to filing any complaint or information, or prior to requesting a grand jury to act upon a proposed indictment that charges any of the election fraud offenses discussed in this chapter.

In practice, consultation typically proceeds as follows:

- The results of the preliminary investigation are submitted to FBI Headquarters and the Public Integrity Section, together with the recommendation of the United States Attorney's Office as to whether further investigation is warranted. At this point, if the matter has merit, it is discussed informally between the Section and the Assistant United States Attorney responsible for the matter, and, on occasion, between the Section and the FBI.

- The Public Integrity Section may suggest that additional investigation be conducted before determining whether a full-field or grand jury investigation is warranted. The Section may also request a preliminary investigation of a

---

complaint in order to determine whether a federal crime may have occurred, and, if so, whether federal prosecution of that offense is appropriate. It generally involves an FBI interview of the complainant and follow-up on certain investigative leads arising from the interview.

38 In connection with election crime matters, a "full" FBI investigation is, essentially, anything beyond an assessment, and includes the FBI terms "preliminary investigation" and "full investigation." DIOG §§ 6 & 7. It is typically a broad-based investigation that often accompanies a grand jury investigation. Its purpose is to develop sufficient evidence of federal crimes to support federal charges.

matter that has been declined by a United States Attorney's Office.

- If the Public Integrity Section agrees that a full-field investigation and/or grand jury investigation of an election fraud allegation is warranted, a communication, in the form of an e-mail confirming this determination, is generally sent by the Section to the Assistant United States Attorney. At this stage, the Public Integrity Section also notifies FBI Headquarters that it has approved the initiation of a full-field or grand jury investigation of the matter. There is usually a discussion at this point of whether the United States Attorney's Office is able to make a commitment to prosecute any case that the investigation may generate, and, if not, whether the Public Integrity Section will handle the matter either jointly with the United States Attorney's Office or by itself.

- The initiation of any grand jury process in the matter, including the issuance of subpoenas for election documentation, requires prior consultation with the Public Integrity Section. This consultation is often done by phone, especially if speed is considered necessary to preserve voting documentation. As a rule, the Public Integrity Section will approve use of a grand jury at the time it approves a full-field investigation.

- Once this consultation has occurred, the United States Attorney's Office investigates the matter as it deems appropriate. While further consultation is not required until the charging stage, the Section welcomes questions and consultations regarding ongoing investigations.

- All indictments charging election fraud must be discussed with the Public Integrity Section before submission to the grand jury, as well as all information and criminal complaints.

- While acceptance of a plea agreement does not require consultation, this is encouraged in order to ensure that the plea agreement is consistent with those negotiated in similar cases elsewhere and with other department policies applicable with plea agreements. In addition, it is recommended that the Section be consulted in the case of pre-indictment pleas, although not required.

### 2. Urgent Reports and Press Releases

A United States Attorney's Office that is conducting an election fraud investigation should also submit urgent reports through the Executive Office for United States Attorneys at each critical stage of the investigation and ensuing prosecution. In addition, the filing of criminal charges should be accompanied by a press release that has been approved, when appropriate, by the Department's Office of Public Affairs.

### 3. Federal Seizure of State Election Materials

Federal custody of election materials is normally obtained by grand jury subpoena. In taking custody of election documents, election officials should not be deprived of documents necessary to tally and recount the ballots and to certify the election results.[39] Accordingly, copies in lieu of originals should be accepted until the state's need for the documentation expires. Originals may eventually be necessary for handwriting and other forensic analysis and for evidentiary purposes.

---

[39] An exception to this rule might be warranted if the facts indicate that the election officials are involved in an ongoing election fraud or obstruction scheme.

### 4. Non-interference with Elections

The Justice Department's goals in the area of election crime are to prosecute those who violate federal criminal law and, through such prosecutions, to deter corruption of future elections. The Department does not have a role in determining which candidate won a particular election, or whether another election should be held because of the impact of the alleged fraud on the election. In most instances, these issues are for the candidates to litigate in the courts or to advocate before their legislative bodies or election boards. Although civil rights actions under 42 U.S.C. § 1983 may be brought by private citizens to redress election irregularities, the federal prosecutor has no role in such suits.

In investigating an election fraud matter, federal law enforcement personnel should carefully evaluate whether an investigative step under consideration has the potential to affect the election itself. Starting a public criminal investigation of alleged election fraud before the election to which the allegations pertain has been concluded runs the obvious risk of chilling legitimate voting and campaign activities. It also runs the significant risk of interjecting the investigation itself as an issue, both in the campaign and in the adjudication of any ensuing election contest.

Accordingly, overt criminal investigative measures should not ordinarily be taken in matters involving alleged fraud in the manner in which votes were cast or counted until the election in question has been concluded, its results certified, and all recounts and election contests concluded. Not only does such investigative restraint avoid interjecting the federal government into election campaigns, the voting process, and the adjudication of ensuing recounts and election contest litigation, but it also ensures that evidence developed during any election litigation is available to investigators, thereby minimizing the need to duplicate investigative efforts. Many election fraud issues are developed to the standards of factual predication for a federal criminal investigation during post-election litigation.

The Department views any voter interviews in the pre-election and balloting periods, other than interviews of a complainant and any witnesses he or she may identify, as beyond a preliminary investigation. A United States Attorney's Office considering such interviews must therefore first consult with the Public Integrity Section. USAM 9-85.210. This consultation is also necessary before any investigation is undertaken near the polls while voting is in progress.

The policy discussed above does not apply to covert investigative techniques, nor does it apply to investigations or prosecutions of federal crimes other than those that focus on the manner in which votes were cast or counted. However, if there is any doubt about whether the policy may apply, we recommend that the Public Integrity Section be consulted.

Exceptions to this general rule of course exist. For example, one exception may be appropriate when undercover techniques are justified and the Department's guidelines for undercover operations have been met. Another exception may apply when it is possible to both complete an investigation and file criminal charges against an offender prior to the period immediately before an election. All such exceptions require consultation with the Public Integrity Section, as they involve action beyond a preliminary investigation.

### 5. Limitations on Federal Poll Watching

Federal agents may not be stationed at open polling places, except in cases of discrimination covered by the Voting Rights Act, or as part of the Civil Rights Division's oversight obligations with respect to the election system mandates enacted by the Help America Vote Act.[40]

---

[40] In such cases, the Civil Rights Division's Voting Section determines if there is a risk that voting by minorities will be impeded in a location specially covered by the Voting Rights Act. If so, the Voting Section will ask that the location be certified for "federal observers." Such observers are sent to view conduct at the polls and report

Control of polling places is governed by state laws that regulate who is authorized to be inside a polling place. Many of these laws have criminal penalties. Most states provide that no one except voters, election administrators, and perhaps party representatives may serve as poll watchers, or even approach closer than fifty to one hundred feet from an open poll. Except in Illinois, state poll access statutes do not contemplate that federal personnel serve as poll watchers or otherwise enter areas when polling is taking place. Therefore, other than as specifically provided by the Voting Rights Act and other civil rights laws, there is no statutory basis for federal personnel to serve as poll watchers.

In fact, federal law provides criminal penalties for any federal official who sends "armed men" to open polling locations. 18 U.S.C. § 592. Accordingly, the FBI's *Manual of Investigative Operations and Guidelines*, at § 56-8(6), provides that investigations in the vicinity of open polls must first be approved by the Justice Department.

### 6. Selective Prosecution Issues

The prosecution of certain types of electoral corruption can occasionally present sensitive issues of selective prosecution. A useful analysis of the law in this area, in the context of a voter fraud case, is contained in *United States v. Smith*, 231 F.3d 800, 807–13 (11th Cir. 2000).

## F. SUGGESTIONS FOR SUCCESSFUL ELECTION FRAUD INVESTIGATIONS

Most of the general principles and procedures that govern federal criminal investigations apply to the investigation of election crimes. This section will discuss those investigative issues and tactics that are unique to election fraud cases.

back through the Voting Section; they have no role in the detection of election crimes not involving racial animus.

Election fraud prosecutions are usually fairly easy to present, and the Department's conviction rate has been quite good. These prosecutions have proven to be a fast and effective method of combating election corruption. Moreover, because the motive for most election fraud is to corrupt the public office sought by those committing the fraud, these cases also provide an avenue to address other serious forms of public corruption.

If properly managed, election fraud cases are generally well received by the public. Favorable public reaction is likely to generate additional investigative leads in this sensitive area of criminal law enforcement.

### 1. Getting Started

Several basic steps underlie most successful election fraud investigations.

#### (a) Publicize your intent to prosecute election fraud

Most complaints that lead to prosecutable election fraud cases come from participants in the political process, such as voters, candidates, campaign workers, and poll officials. However, in places where election fraud has been entrenched, there is often widespread tolerance of election abuses among local law enforcement authorities. This frequently leads to public cynicism, which must be overcome if productive complaints are to be generated. The following steps can help:

- Hold press conferences before important elections and announce that prosecution of election fraud is a federal law enforcement priority.

- Ensure that Assistant United States Attorneys and FBI Special Agents are accessible to the public during and immediately after important elections by publicizing the

telephone numbers through which the public can reach them.

- Contact local election administrators (registrars, county and town clerks, boards of election, etc.) and high-level state officials (the State Attorney General's Office, Secretary of State) to enlist their support in detecting and reporting election abuses. These people are generally dedicated public servants who want to eliminate criminal election abuses. They are also the custodians of important records generated during the voting process.

**(b) Be aware of the importance of voting documentation**

The voting process generates voluminous documentary evidence. Federal law requires that all voting documentation relating to an election that includes a federal contest be retained for at least twenty-two months after the election. 52 U.S.C. § 20701. The 1993 NVRA extended this period to two years for voter registration records generated under the Act. 52 U.S.C § 20507(i). Because the federal retention periods are significantly longer than normally required by state law, it is important to contact all election administrators in the district at the beginning of a ballot fraud investigation to be certain that they are aware of these federal requirements.

Voting documentation includes voter registration cards, absentee ballot applications, absentee ballot envelopes, tally sheets, poll lists, and ballots. These materials are particularly important to successful election crime investigations, since they contain information that helps identify fraudulent voting transactions and potential defendants. For example:

- Most states require persons seeking to vote to provide personal information to election registrars, and to furnish a handwriting specimen for comparison with the voter's signature on the registration form. These data can be

used to determine the authenticity of specific voting transactions.

- In many states, voters must sign a poll list before casting their ballots on election day. The validity of a particular voting transaction can be determined by comparing a voter's signature at the polls to the signature on his or her registration card. Persons responsible for casting fraudulent votes may be identified by comparing the poll list signatures of known fraudulent voting transactions to exemplars taken from suspects.

- States generally require voters to apply for absentee ballots in writing. They also customarily require an absentee voter to sign an oath (generally on the ballot envelope) attesting to the authenticity of the vote. These signatures can be used to identify fraudulent voting transactions and might also help identify potential defendants.

- Election officials are generally required to maintain logs of absentee applications received and approved, and of ballots issued, returned, and challenged. Once a few fraudulent voting transactions have been identified, this information can be used to identify the subjects with whom the voters involved dealt, and to locate other voters who also dealt with the same subjects.

- Election day tally sheets normally contain the handwritten certification of the poll officials who prepared them, and in many states these officials are required to execute an oath attesting to the authenticity and accuracy of the returns. These documents may corroborate the identities of those persons with official access to the tally sheets.

- Many states require voters who ask for help in voting at the polls to execute affidavits identifying the person they wish to accompany them into the voting booth. This information can be used to identify patterns of voter intimidation and voter bribery.

### (c) Consider the advantages of federal prosecution

Although the states have principal responsibility for administering the election process, many state law enforcement authorities are not well equipped to act effectively against ballot fraud. State and local prosecutors should be advised of the federal interest in prosecuting election fraud, and of the following factors that favor federal prosecution of this type of case:

- Resources: Election fraud investigations usually require a fairly large manpower commitment, which the federal government is normally better able to marshal than are local law enforcement authorities.

- Grand jury: The development of election crime cases requires an effective grand jury process through which testimony can be secured from the vulnerable witnesses who are frequently encountered in these cases, and through which necessary documentation can be secured.

- Broadly drawn venires: Election fraud is usually best tried by juries that are not drawn from the immediate location where the alleged fraud occurred. Federal venires are normally drawn from wider geographic areas than are state or local venires.

- Political detachment: State and local prosecutors are usually more closely linked to local politics than are federal prosecutors. Federal prosecution of election crime may therefore be viewed by the public and the media as more impartial.

### (d) Focus on areas vulnerable to election fraud

Election crime is most apt to occur in jurisdictions where there is substantial conflict among political factions, where voters are fairly equally distributed among factions, where local officials wield substantial power, and where there is a high degree of voter apathy. Jurisdictions meeting these criteria should be identified, and complaints coming from them given special attention in allocating investigative resources.

### (e) Develop your investigative strategy early

The typical election fraud scheme involves many levels of participants performing a variety of tasks on behalf of political operatives. For example, vote-buying schemes usually have "haulers" who take voters to the polls and pay them; "lieutenants," "bankers," or "politiqueras," who obtain and distribute the money to the haulers; "captains" who coordinate the activities of the haulers; and "checkers" who accompany the voters into the voting booth to assure that they vote "correctly." *See United States v. Adams*, 722 F.3d 788, 798–99 (6th Cir. 2013).

It is important to attempt at an early stage to identify as many of the participants in the scheme as possible and to assess their relative culpability. It is also helpful to identify the likely motive behind the scheme. An investigative strategy can then be developed which targets low-level participants for the purpose of encouraging them to be witnesses against more highly placed participants in the election scheme. These less culpable participants might also provide evidence and leads regarding the illegal activity or scheme motivating the election fraud.

### 2. The Investigation

Election fraud investigations fall into two stages: a preliminary investigation, followed by a grand jury investigation along with an FBI full-field investigation. Preliminary investigations are usually initiated by the United States Attorney's Office or FBI office that received the complaint. Consultation with the Public Integrity Section is required before grand jury and FBI full-field investigations are initiated. FBI participation must also be approved by FBI Headquarters.

#### (a) Preliminary investigation

A preliminary investigation typically involves interviewing the complainant, then conducting a sufficient investigation to:

- identify the crime allegedly committed;
- determine whether that crime is prosecutable under federal law;
- evaluate the need for federal intervention as a function of –
    - the extent to which the crime may have impacted adversely on a federal election,
    - the extent to which the crime corrupted the registration or voting process, and
    - the desire and capability of local law enforcement officials to handle the case;
- identify persons who may have participated in the scheme; and

- identify, if possible, a few specific fraudulent voting transactions.

After the results of the preliminary investigation are reviewed by the United States Attorney's Office, they are forwarded to the Public Integrity Section and FBI Headquarters, along with the United States Attorney's recommendation as to whether further investigation is warranted. At this point, the matter will usually be discussed between attorneys in the Public Integrity Section and the United States Attorney's Office handling the matter. After this consultation, a grand jury and/or full-field investigation will be initiated in appropriate cases.

#### (b) Grand jury and FBI full-field investigations

The purposes of grand jury and FBI full-field investigations are to develop sufficient evidence against specific subjects to support criminal charges. These investigations are often time-consuming and labor-intensive, and generally involve obtaining and examining many election documents. Investigative approaches for two common types of election fraud are discussed below.

### 3. Investigating Two Types of Election Fraud

The most frequently encountered election frauds are absentee ballot fraud and ballot-box stuffing. Strategies for investigating these frauds are similar, but not identical.

#### (a) Absentee ballot frauds

Absentee ballot frauds involve the corruption of absentee voting transactions through such means as bribery, forgery, intimidation, and voter impersonation. Investigating these frauds involves identifying specific fraudulent voting transactions, interviewing voters who were corrupted or defrauded, using these persons as witnesses to prosecute those who corrupted or defrauded

them, and flipping those defendants to make cases against higher-level targets. The typical investigative approach is to:

- *Subpoena relevant absentee ballot documentation.*
  This documentation includes applications for absentee ballots; absentee ballots; envelopes in which ballots are placed (usually called a "privacy" or an "oath" envelope); outer envelopes forwarding ballots for tabulation (usually called a "mailer"); logs kept by election officials of applications issued, applications received, ballots issued, ballots returned, and ballots challenged; and the permanent voter registration cards for the voters ostensibly involved.

- *Analyze election documents.*
  Ballot applications and oath envelopes generally contain three key items that often reveal questionable voting transactions: the voter's purported signature, signatures of witnesses or notaries, and the address where the ballot package was sent. Examples of significant data are common notaries and witnesses; mismatches of voters' signatures on absentee ballot applications, ballot envelopes, or registration cards; and applications directed to be sent to addresses other than the addresses of the voters.

- *Identify similar transactions.*
  If the preliminary investigation identifies specific questionable voting transactions, the document analysis should be directed at identifying voting transactions having similar characteristics, such as the same handwriting, witnesses, or addresses to which absentee ballot packages were sent.

- *Interview voters allegedly involved.*
  After identifying questionable voting transactions, the voters whose names appear on the documents should be interviewed to determine whether they voted, and if so,

under what circumstances (for example, whether they were paid, intimidated, or not consulted).

- *Compare handwriting exemplars of subjects.*
  Handwriting exemplars of persons suspected of forging absentee ballot documents should be obtained and compared with the handwriting on those questioned documents.

- *Develop multiple witnesses.*
  Voters involved in fraudulent voting transactions are usually poorly educated, often intimidated by defendants and courtrooms, and generally may not make strong witnesses.[41] Successful prosecution of this type of case normally requires the testimony of several voter-witnesses against each defendant.

**(b) Ballot-box stuffing cases**

These cases involve the insertion into ballot boxes of invalid, fraudulent, or otherwise illegal ballots. All ballot-box stuffing schemes necessarily involve poll officials, since access to voting documents is essential to this type of fraud and is controlled by state law. Ballot-box stuffing investigations seek to identify fraudulent voting transactions and to link specific poll officials to them. The general investigative methodology is to:

- *Subpoena election documents.*
  Obtain and examine the poll lists or other documentation that voters sign when entering the polls; the registration cards for voters residing in the target precinct, any paper or punch card ballots, and any tally sheets prepared by the poll officials reporting the election results.

---

[41] These very factors, on the other hand, demonstrate to the jury the susceptibility of these persons to manipulation, which is often important evidence in the case.

- *Examine election documents.*
  Examine poll lists for similar handwriting, giving special attention to names entered at times when voting activity was slow (such as mid-morning and early afternoon) and shortly before the polls closed.

- *Compare voters' signatures.*
  Compare signatures on the poll list with corresponding permanent registration cards to identify voters who may not have cast the ballots attributed to them.

- *Take handwriting exemplars.*
  Take exemplars from each poll official having access to the ballot box, and then compare them with questionable signatures of alleged voters.

- *Interview voters.*
  Interview the voters whose ballots were used in the scheme to determine whether they voted at the polls, and, if so, under what circumstances.[42]

### 4. A Few Cautions

Election fraud investigations raise a number of issues not normally encountered in other criminal investigations. Federal prosecutors and investigators should keep the following principles in mind:

*i.* *Respect the integrity of the polls.*
All states define by statute those persons entitled to be inside the polls during an election. Most state poll access laws do not permit federal law enforcement officials access to open polling places. Asking federal investigators to enter open polls risks violating the sovereignty that the states

---

[42] Successful prosecution of those schemes may require the cooperation of a poll official or other "insider."

have in this area, and might lead to confrontations among poll officials, local police, and federal agents. It also risks violating a federal statute that prohibits sending armed federal agents to the polls. 18 U.S.C. § 592.

*ii. Non-interference with the voting process.*

States use many types of documentation in conducting elections (such as registration cards, voter lists, poll books, and voting machines), and in tabulating and certifying the results (such as ballots, tally sheets, and absentee voting materials). Subpoenas for such documentation should be timed, and compliance procedures developed, so as not to deprive election officials of records they need to tabulate votes and certify election returns.

*iii. Need for probable cause before opening sealed ballots.*

Absentee ballots might come into the possession of federal officials while still sealed in the envelopes bearing the names of the voters who ostensibly marked them. Also, a few states provide for some types of paper ballots to be numbered in a way that corresponds with the order of signatures on a poll list. In either situation, marked ballots can be attributed to individual voters. This is particularly useful in cases involving suspected fraud in the marking or alteration of the ballot document itself. However, since voted ballots are documents in which individuals have an expectation of privacy, sealed ballots should not be opened without satisfying the Fourth Amendment's probable cause standard. Accordingly, a search warrant should be obtained before taking investigative steps that would result in linking individual ballots to the voters who allegedly cast them. Alternatively, if the individuals whose names appear on the sealed ballot envelopes deny that they voted, these individuals may be asked if they are willing to open the ballot envelopes ostensibly "voted" by them.

### 5. Conclusion

Election fraud cases can be successful and uncomplicated. However, prosecutors and investigators should use great care to avoid the pitfalls peculiar to these types of cases. Close consultation with the Public Integrity Section and its Election Crimes Branch, although not required after grand jury and FBI full-field investigations have been approved, can help avoid those pitfalls, develop effective investigative and legal strategies, and increase the likelihood of prosecutive success.

# CHAPTER THREE

# PATRONAGE CRIMES

## A. HISTORICAL BACKGROUND

Federal jurisdiction over patronage crimes is usually attained by virtue of the federal funds involved in a government job or benefit that is used to induce or reward partisan activity by government employees. Over the past century, Congress has enacted, at roughly fifty-year intervals, three landmark pieces of legislation in this area.

Until the Hatch Act reform amendments of 1993, most federal laws dealing with patronage abuses of government personnel and programs derived from either the 1883 Pendleton Civil Service Act or the 1939 Hatch Act. The Pendleton Act aimed at dismantling the partisan "spoils system" that existed in the executive branch of the federal government at the time; it created a merit civil service, and enacted the Civil Service Commission to ensure non-partisan federal employment. The Act also contained four criminal provisions designed to protect federal employees against political manipulation. These provisions, now codified at 18 U.S.C. §§ 602, 603, 606, and 607, prohibit political shakedowns of federal employees, political activity in federal workspace, and politically motivated threats and reprisals against federal employees.

In 1907, President Theodore Roosevelt promulgated an executive order, known as Civil Service Rule No. 1, that prohibited most active campaigning and electioneering by merit civil servants. Over the next thirty years, the Civil Service Commission decided approximately 2,000 administrative cases involving alleged violations of this executive order, and in the process defined the scope of permissible political activities.

In 1939, the Hatch Act codified this ban on active partisan campaigning by executive branch employees, and incorporated those

Civil Service Commission rules that defined permissible and impermissible activities. 5 U.S.C. § 7324 (repealed 1993). The Hatch Act also provided criminal penalties for various forms of political abuses in the administration of federal law, policies, and programs; these criminal provisions are now codified at 18 U.S.C. §§ 595, 598, 600, 601, 604, and 605.

In 1993, Congress enacted its third major piece of civil service legislation, which significantly reduced the scope of the 1939 Hatch Act ban on political activities. 5 U.S.C. §§ 7321–7326. The 1993 Hatch Act amendments permit all federal employees in the executive branch (other than those working in specified law enforcement or national security agencies) to engage in overt partisan activity, including the solicitation of political contributions from colleagues under certain circumstances. Although the amendments included a new anti-patronage provision, the overall goal was to remove the statutory shield, deemed no longer necessary, that had separated partisan politics and federal employment for over half a century.

Current federal law limits patronage practices and partisan political considerations in the federal civil service and in the administration of federal laws and programs. In extreme cases, patronage abuses may constitute a conspiracy to defraud the United States in the operation of a federally funded program. *See, e.g.*, *United States v. Pintar*, 630 F.2d 1270, 1273 (8th Cir. 1980); *Langer v. United States*, 76 F.2d 817, 818 (8th Cir. 1935). The Supreme Court, through a line of cases dating back to the 1970s, has held that personnel decisions involving the award, termination, or modification of employment conditions of ministerial positions in the public sector cannot be made solely on the basis of partisan association or partisan loyalty. To do so violates the First Amendment rights of public employees or those seeking such positions. *Rutan v. Republican Party of Illinois*, 497 U.S. 62 (1990); *Branti v. Finkel*, 445 U.S. 507 (1980); *Elrod v. Burns*, 427 U.S. 347 (1976). On the other hand, the Court recognized that partisan considerations may constitutionally play a part in personnel decisions involving public employees who occupy policymaking positions or positions involving

confidential relationships to senior public officers, when partisan loyalty is a reasonably necessary element of the job. *Id.* The distinction between ministerial public positions and those that involve policy formulation is difficult, and has, in the past, been left by the courts largely to a case-by-case analysis. Nevertheless, the distinction is important in assessing the scope and purpose of federal criminal laws addressing illegal patronage.

## B. STATUTES

The text of the criminal statutes discussed in this section is printed in Appendix B. Each of these statutes carries, in addition to the prison term noted, fines under 18 U.S.C. § 3571.

### 1. Limitations Based on Federal Employment or Workspace

#### (a) Solicitation of political contributions: 18 U.S.C. § 602

Section 602 prohibits a United States Senator or Representative, a candidate for Congress, officer or employee of the United States, or person receiving compensation for services from the United States Treasury, from knowingly soliciting any contribution from any other such officer, employee, or person, except as permitted under the 1993 Hatch Act amendments. The statute applies only to contributions made to influence a federal election. Violations are punishable by imprisonment for up to three years.

Section 602 has been interpreted by the courts as criminalizing aggravated forms of political "shakedowns." *United States v. Wurzbach*, 280 U.S. 396, 398 (1930) (statute prohibits exerting "pressure for money for political purpose"); *Ex parte Curtis*, 106 U.S. 371, 374 (1882) (statute protects federal employees against political "extractions through fear of personal loss"); *see also Brehm v. United States*, 196 F.2d 769, 770 (D.C. Cir. 1952); *United States v. Burleson*, 127 F. Supp. 400, 402 (E.D. Tenn. 1954).

The Criminal Division has interpreted Section 602 as not prohibiting a federal employee's solicitation of voluntary political contributions from other non-subordinate federal employees. However, because of the potential for coercion, express or implied, that inheres in the supervisor-subordinate relationship, contributions solicited from a *subordinate* are not considered "voluntary." The 1993 Hatch Act amendments reflect this interpretation; both the criminal and civil codes, as amended, expressly prohibit the solicitation of subordinates, while allowing certain solicitations of colleagues. The 1993 law further amended Sections 602 to exempt the soliciting activities authorized by the civil Hatch Act provisions, 5 U.S.C. §§ 7323 and 7324.

All officers and employees of the executive, judicial, or legislative branches of the federal government are within the class reached by Section 602. The statute does not reach persons who are paid with federal funds that have lost their "federal" character, such as state or local government employees or persons paid under federal grants. However, 18 U.S.C. §§ 600 and 601 may cover such persons.

The Federal Election Campaign Act Amendments of 1979 limited Section 602 in two respects. First, the word "knowingly" was added to clarify that the solicitor must have been aware of the federal status of the person solicited. Second, the critical term "contribution" in Section 602 was linked to the definition of this term in FECA, at 52 U.S.C. § 30101(8), which restricts "contributions" to financial activities intended to influence a federal election.

### (b) Making political contributions: 18 U.S.C. § 603

Section 603, like Section 602, reaches only contributions made to influence federal elections. The statute prohibits any officer or employee of the United States, or a person receiving compensation for services from money derived from the United States Treasury, from giving a contribution to any other such officer, employee, or person, or to any United States Senator or Representative, if the person receiving the contribution is the donor's "employer or employing authority." Although modified by the 1993 Hatch Act amendments, Section 603's basic prohibition against political donations between subordinates and supervisors was retained.[43] Section 603 applies to all congressional staff and White House employees, as well as to civil service personnel. Violations are punishable by imprisonment for up to three years.

The Department of Justice Office of Legal Counsel has interpreted Section 603 as *not* reaching voluntary contributions made by rank-and-file employees of the executive branch of the government to campaign committees authorized by an incumbent President or Vice President, provided that such donations are given in compliance with the provisions of the 1993 Hatch Act reform amendments (i.e., voluntarily and while the donor is off duty, not in a federal office space, and not in uniform or in a government-owned vehicle).

### (c) Intimidation to secure political contributions: 18 U.S.C. § 606

Section 606 makes it unlawful for a United States Senator, United States Representative, or federal officer or employee to discharge, demote, or promote another federal officer or employee, or to threaten or promise to do so, for making or failing to make "any contribution of money or other valuable thing for any political

[43] This prohibition was also added by the 1993 law to the civil Hatch Act provision. 5 U.S.C. § 7323(a).

purpose." Violations are punishable by imprisonment for up to three years.

Section 606 encompasses coerced donations of anything of value (including services) from federal employees to a candidate for any elective office – federal, state, or local. This statute should be used in lieu of Section 602 whenever a federal employee is actively threatened with an adverse change to his or her conditions of employment to induce a political contribution. This is also addressed in the discussion of 18 U.S.C. § 610 below.

In the Criminal Division's view, Section 606 was not intended to prohibit the consideration of political factors (such as ideology) in the hiring, firing, or assignment of the small category of federal employees who perform policymaking or confidential duties for the President or Members of Congress. In the executive branch, these senior officials either hold jobs on Schedule C of the excepted service, which by law may be offered or terminated on the basis of such factors, or hold direct presidential appointments and by statute serve at the President's pleasure. Section 606 does, however, protect all federal officials, including senior policymakers, from being forced by job-related threats or reprisals to donate to political candidates or causes.

#### (d) Coercion of political activity: 18 U.S.C. § 610

Section 610 is an anti-intimidation statute enacted as part of the 1993 Hatch Act amendments to provide additional protections against political manipulation of the federal workforce.

The statute makes it a crime to intimidate, threaten, command, or coerce any employee of the executive branch to induce the victim to engage or not engage in any political activity.

The statute also prohibits attempts. It applies to all elections – federal, state, and local. Violations of Section 610 are punishable by imprisonment for up to three years.

Section 610 expressly includes within the broad phrase "any political activity" any conduct that relates to voting, to contributing, or to campaigning. Specifically, Section 610 provides that "any political activity" includes, but is not limited to: (1) voting or not voting for any candidate in any election; (2) making or refusing to make any political contribution; and (3) working or refusing to work on behalf of any candidate. The statute thus encompasses intimidation directed at inducing any form of political action.

The statute complements 18 U.S.C. § 606, which addresses coerced political donations from employees in any of the three branches of the federal government. Section 610 covers a broader range of conduct, while Section 606 protects a larger class of employees.

The inclusion of Section 610 in the 1993 Hatch Act amendments was in recognition of widely held concerns, both in Congress and in federal law enforcement agencies, that any lessening of the Hatch Act's prohibition on political activities may have the unintended effect of increasing the risk of political coercion and manipulation of federal employees. *See* 139 CONG. REC. H6817 (daily ed. Sept. 21, 1993).

**2. Place of solicitation: 18 U.S.C. § 607**

Section 607 makes it unlawful for anyone to solicit or receive a political donation in any room, area, or building where federal employees are engaged in official duties. The prohibition covers political solicitations that are delivered by mail, as well as those made in person. *See United States v. Thayer*, 209 U.S. 39 (1908). Violations are punishable by imprisonment for up to three years.

The Bipartisan Campaign Reform Act of 2002 clarified an ambiguity concerning the reach of this statute to solicitations and receipts of political donations that were not intended to influence federal elections, i.e., donations to benefit non-federal candidates and the non-federal activities of political parties and other organizations. Under the revised text, Section 607 reaches the solicitation and receipt of *all* political funds within areas where federal personnel are engaged in official duties.

Section 607 covers all three branches of the federal government. However, it specifically exempts any contribution for a Member of Congress received by the Member's congressional staff in his or her federal office, provided that there had been no request for the contribution to be delivered to the office, and provided further that the contribution is quickly forwarded to the Member's campaign committee.

Violations of Section 607 require proof that the defendant was actively aware of the federal character of the place where the solicitation took place or was directed. The employment status of the parties to the solicitation is immaterial; it is the employment status of the persons who routinely occupy the area where the solicitation occurs that determines whether Section 607 applies.

Prosecutable violations of Section 607 may arise from solicitations that can be characterized as "shakedowns" of federal personnel. Thus, Section 607 reaches solicitations by non-federal employees, filling a void not covered by Section 602, and also reaches shakedowns of congressional employees, who are not covered by the anti-intimidation prohibition contained in Section 610, that was enacted as part of the 1993 Hatch Act reforms.

When federal premises are leased or rented to candidates in accordance with General Services Administration regulations, the premises are not considered "federal" for the purposes of this statute. The same holds true for United States Postal Service post office boxes. Thus, under appropriate circumstances, political events may be

held in leased or rented portions of federal premises, and political contributions may be sent to and accepted in United States post office boxes.

Most matters that have arisen under Section 607 have involved computer-generated direct mail campaigns in which solicitation letters are inadvertently sent to prohibited areas. Such matters are unlikely to warrant prosecution. Instead, the Criminal Division usually advises the person or entity involved of the existence of the prohibition in Section 607, and requests that the mailing lists be purged of addresses that appear to belong to the federal government. A systematic refusal or failure to comply with formal warnings of this kind can serve as a basis for prosecution.

### 3. Limitations Based on Federal Programs and Benefits

#### (a) Promise or deprivation of federal employment or other benefit for political activity: 18 U.S.C. §§ 600 and 601

Section 600 makes it unlawful for anyone to promise any employment, position, contract, or other benefit derived in whole or in part from an Act of Congress, as consideration, favor, or reward for past or future political activity, including support for or opposition to any candidate or political party in any election. The statute applies to all candidates – federal, state, and local. Section 601 makes it unlawful for any person knowingly to cause or attempt to cause any other person to make a contribution on behalf of any candidate or political party by depriving or threatening to deprive the other person of employment or benefits made possible in whole or in part by an Act of Congress. The statute defines "contribution" as encompassing anything of value, including services. Like Section 600, it applies to contributions at federal, state, and local levels.

Violations of these statutes are one-year misdemeanors. Although in 1976 Congress increased the fines under Sections 600 and 601 from $1,000 to $10,000, fines under these statutes are

actually governed by the general criminal fine structure in 18 U.S.C. § 3571.

Sections 600 and 601 are the two principal statutes providing federal jurisdiction over situations when corrupt public officials use government-funded jobs or programs to advance a partisan political agenda rather than to serve the public interest. Both statutes reach employment and benefits that are funded by Congress in whole or in part. The statutes are not restricted to federal jobs, although Section 601 specifically covers threats to terminate federal employment.[44] Sections 600 and 601 thus protect a broader class of employees than Section 610, which is restricted to federal employees in the executive branch. In addition, there is no minimum amount of federal funds that must be involved in the employment or benefit on which the corrupt demand focuses to trigger a violation.

The principal distinction between Sections 600 and 601 is whether the coerced political activity is demanded as a condition precedent to obtaining a publicly funded job or benefit (Section 600), or occurs in the form of a threat to terminate a federal benefit or job the victim already possesses (Section 601). Section 601 requires proof that the motive for the adverse job action was political and not inadequate performance or some other job-related factor; it is a lesser included offense of Section 606 when the threatened employee is a federal civil servant.

As with Section 606, the Criminal Division believes that Sections 600 and 601 were not intended to reach the consideration of political factors in the hiring or termination of the small category of senior public employees who perform policymaking or confidential duties for elected officials of federal, state, or local governments. With respect to such employees, a degree of political loyalty may be considered a necessary aspect of competent performance. *Compare Connick v. Myers*, 461 U.S. 138, 148–49 (1983) (upholding dismissal of an allegedly disruptive assistant district attorney), *with Rutan v.*

---

[44] Section 601 has a parallel provision in 18 U.S.C. § 665(b), which covers programs under the Comprehensive Employment and Training Act.

*Republican Party of Illinois*, 497 U.S. 62 (1990) (patronage promotions and hirings of rank-and-file public employees violate rights of speech and association); *Branti v. Finkel*, 445 U.S. 507, 517–19 (1980) (public employees may not be discharged based solely on their political beliefs unless party affiliation is an appropriate requirement for effective performance); *Elrod v. Burns*, 427 U.S. 347, 367 (1976) (patronage dismissals of non-policymaking public employees violate the First and Fourteenth Amendments).

Although Sections 600 and 601 are misdemeanors, there are alternative felony theories of prosecution that may be applicable to conduct implicating these statutes. Such theories include:

- The Travel Act, 18 U.S.C. § 1952, in states having statutes that broadly define bribery and extortion.

- Conspiracy to defraud the United States, 18 U.S.C. § 371, to the extent that the evidence shows a conspiracy to defraud the public of the fair and impartial administration of a federal grant or program.

- Bribery concerning federally funded programs, 18 U.S.C. § 666. However, the Third Circuit has held Section 666 inapplicable to a scheme to demand non-pecuniary political services from public employees. *See United States v. Cicco*, 938 F.2d 441, 444–46 (3d Cir. 1991).

The *Cicco* case illustrates the use of alternative theories to prosecute local public officials for corrupt patronage abuses. Unfortunately, the case also illustrates the difficulties involved in prosecuting patronage crimes under current law. Although the jury convicted the defendants under both Section 601 and Section 666, the two convictions were ultimately reversed on appeal.

In *Cicco*, local public officials demanded political services from part-time public employees, and when the employees refused to perform the services, the employees were denied permanent

employment. *Id.* at 443. The patronage scheme was charged under Section 601, and also under Sections 666, 1341, 1346, and 1952. All four prosecutive theories went to the jury, which convicted the defendants on the Sections 601 and 666 counts. In the defendants' first appeal, the Third Circuit reversed the Section 666 convictions, holding that Congress did not intend this statute to apply to the extortion of political activity rather than money. *Id.* at 445. In a subsequent appeal, the Third Circuit held that Section 601 does not apply if there are no express threats or specific promises made to induce political services from public employees. *United States v. Cicco*, 10 F.3d 980, 985 (3d Cir. 1993).

**(b) Promise of appointment by candidate: 18 U.S.C. § 599**

This statute prohibits a candidate for federal office from promising appointments "to any public or private position or employment" in return for "support in his candidacy." It is one of the few federal criminal laws specifically addressing campaign-related activity by candidates. It is a class statute that applies only to misconduct by federal candidates. Willful violations are two-year felonies; non-willful violations are misdemeanors.

Section 599 has potential application when one candidate attempts to secure an opponent's withdrawal, or to elicit the opponent's endorsement, by offering the opponent a public or private job. *See also* 18 U.S.C. § 600, discussed above. It also applies to offers of jobs by federal candidates to *others* to secure endorsements. While Section 599 does not reach offers or payments of *money* to secure withdrawal or endorsements, if the payment was not reported accurately, such matters may be prosecutable as a reporting violation of FECA under 52 U.S.C. §§ 30104(b) and 30109(d).

### (c) Interference in election by employees of federal, state, or territorial governments: 18 U.S.C. § 595

Section 595 was enacted as part of the original 1939 Hatch Act. The statute prohibits any public officer or employee, in connection with an activity financed wholly or in part by the United States, from using his or her official authority to interfere with or affect the nomination or election of a candidate for federal office. This statute is aimed at the misuse of official authority. It does not prohibit normal campaign activities by federal, state, or local employees.[45] Violations are one-year misdemeanors.

Section 595 applies to all public officials, whether elected or appointed, federal or non-federal. For example, an appointed policymaking government official who bases a specific governmental decision on an intent to influence the vote for or against an identified federal candidate violates Section 595. The nexus between the official action and an intent to influence must be clear to establish a violation of this statute.

### (d) Coercion by means of relief appropriations: 18 U.S.C. § 598

Section 598 prohibits the use of funds appropriated by Congress for relief or public works projects to interfere with, restrain, or coerce any person in the exercise of his or her right to vote in any election. Violations are one-year misdemeanors.

### (e) Solicitation from persons on relief: 18 U.S.C. § 604

Section 604 makes it unlawful for any person to solicit or receive contributions for any political purpose from any person known to be entitled to, or receiving compensation, employment, or

---

45 However, such political activities must be consistent with the Hatch Act restrictions on political activity, as amended in 1993, which will be discussed later in this chapter.

other benefit provided for or made possible by an Act of Congress appropriating funds for relief purposes. Violations are one-year misdemeanors.

**(f) Disclosure of names of persons on relief: 18 U.S.C. § 605**

Section 605 prohibits the furnishing or disclosure, for any political purpose, to a candidate, committee, or campaign manager, of any list of persons receiving compensation, employment, or benefits made possible by any Act of Congress appropriating funds for relief purposes. It also makes unlawful the receipt of any such list for political purposes. Violations are one-year misdemeanors.

**4. Permissible Political Activity under the Hatch Act, as Amended: 5 U.S.C. § 7323 and § 7324**

Although the 1939 Hatch Act consisted mostly of criminal provisions, it became widely known as a result of its one civil provision, which limited active partisan politicking by executive branch employees. 5 U.S.C. § 7324(a)(2) (repealed). This restriction on overt politicking lasted over fifty years, during which it was challenged on both constitutional and public policy grounds. The constitutional challenges were unsuccessful. *Civil Serv. Comm'n v. Letter Carriers*, 413 U.S. 548 (1973); *United Pub. Workers v. Mitchell*, 330 U.S. 75 (1947). The public policy challenges were successful in part, and ultimately led to the 1993 Hatch Act reforms, which substantively changed the Hatch Act politicking restrictions.

The 1993 legislation lifted the original ban on taking "an active part in political management or in political campaigns" for most employees of the executive branch. However, it continued the ban for employees of the following law enforcement and intelligence agencies:

Federal Election Commission
Federal Bureau of Investigation
Secret Service
Central Intelligence Agency
National Security Council
National Security Agency
Defense Intelligence Agency
Merit Systems Protection Board
Office of Special Counsel
Office of Criminal Investigation of the Internal Revenue Service
Office of Investigative Programs of the United States Customs Service
Office of Law Enforcement of the Bureau of Alcohol, Tobacco, and Firearms
National Geospatial-Intelligence Agency
Office of the Director of National Intelligence.

5 U.S.C. § 7323(b)(2)(B)(i). The ban is also retained for career members of the Senior Executive Service, 5 U.S.C. § 7323(b)(2)(B)(ii), and for employees of the Criminal or National Security Divisions of the Department of Justice, 5 U.S.C. § 7323(b)(3).

With the foregoing exceptions, federal employees are now permitted to hold positions in political party organizations; however, they are still precluded from becoming partisan candidates in elections to public office. 5 U.S.C. § 7323(a)(3). In addition, although solicitations of the general public are still barred, the law permits, under certain circumstances, employees who are members of a union or employee organization to solicit fellow members for

contributions to the organization's political committee. 5 U.S.C. § 7323(a)(2); 5 C.F.R. § 734.

A violation of the Hatch Act's politicking ban is not a federal crime; it is a personnel infraction. The statute is enforced by the Merit Systems Protection Board and by the United States Office of Special Counsel. 5 U.S.C. §§ 1204, 1212.

Active partisan campaigning in violation of the Hatch Act can lead to termination from federal employment, or thirty days' suspension if the Merit Systems Protection Board recommends a lesser penalty. 5 U.S.C. § 7326.

The partisan activity currently prohibited for employees of the specifically designated law enforcement agencies listed above is taking "an active part in political management or in political campaigns." Both the amended and original statutes expressly define this phrase to include those acts of "political campaigning" that were prohibited by the Civil Service Commission prior to July 19, 1940, the date the original Hatch Act went into effect. 5 U.S.C. § 7323(b)(4); 5 U.S.C. § 7324(a)(2) (repealed 1993); 5 C.F.R. §§ 733.121-733.124.

Although a subject of some confusion, the Hatch Act ban was never intended to apply to an employee's expression of personal opinion, whether given privately or publicly, on political candidates and issues. This basic right of expression was recognized in the original 1939 Hatch Act, former 5 U.S.C. § 7324(a)(2). It was reaffirmed by two appellate decisions, which reversed Hatch Act enforcement actions based on an employee's public expression of political opinion. *See Biller v. Merit Sys. Prot. Bd.*, 863 F.2d 1079, 1090–91 (2d Cir. 1988); *Blaylock v. Merit Sys. Prot. Bd.*, 851 F.2d 1348, 1354 (11th Cir. 1988). Finally, the principle was restated in the 1993 Hatch Act amendments. 5 U.S.C. § 7323(c) (employees retain the right to express their opinions on political candidates and issues). Thus, employees in designated law enforcement agencies who

remain covered by the Hatch Act politicking ban retain the right to express their personal political views.

All inquiries concerning possible violations of the Hatch Act politicking ban should be directed to the Office of Special Counsel.

## C. POLICY AND PROCEDURAL CONSIDERATIONS

United States Attorneys' Offices must consult the Public Integrity Section before instituting grand jury proceedings, filing an information, or seeking an indictment that charges patronage crimes. USAM § 9-85.210. As with election fraud matters, these consultation requirements are intended to assist federal prosecutors in this area and to ensure nationwide uniformity in the enforcement of these criminal patronage statutes.

# CHAPTER FOUR

# ELECTION DAY PROCEDURES

This chapter summarizes the Election Day Program that the Department of Justice implements for the federal general elections. This program has been in effect since 1970. The Election Day Program is also implemented on a narrower geographic basis in connection with other significant elections when the Department determines that the need exists.

There is a substantial federal interest in ensuring that complaints of election abuses that are made during elections are reviewed carefully and that appropriate action is taken promptly. This review allows the Department to determine whether the alleged facts warrant a criminal investigation, and, if so, of what nature and scope. Accordingly, for decades the Department has implemented an Election Day Program for those elections in which the federal interest is greatest, namely, the federal general elections that occur in November of even-numbered years. During these elections, the entire United States House of Representatives and one-third of the United States Senate are elected, along with, every four years, the President and Vice President. In addition, some federal anti-corruption statutes reach conduct occurring in state and local elections. On a case-by-case basis, the Election Day Program may be expanded to include non-federal elections when adequate predication exists to suggest a possible violation of federal criminal law.

The Election Day Program calls upon the Department's 93 United States Attorneys to designate one or more senior Assistant United States Attorneys (AUSAs) to serve a two-year term as District Election Officer (DEO) for his or her district. These AUSAs are

provided training and guidance by the Department in the areas of election crimes and voting rights violations. Since 2002, the Department's Criminal Division and Civil Rights Division have conducted training conferences for the DEOs prior to the November general elections.

The Election Day Program is designed to coordinate Department responses to election-related allegations among the United States Attorneys' Offices, FBI field offices, and Justice Department prosecutors in Washington, D.C. The Program also alerts the public to the Department's commitment to prosecuting election fraud.

Three important principles apply to the Election Day Program:

- First, as with all election crime matters, the Election Day Program emphasizes the detection, evaluation, and prosecution of crimes. As a general rule, except for the activities covered by the federal voting rights laws, the Department does not have authority to directly intercede in the election process itself.

- Second, except in matters involving alleged discrimination in the franchise that are covered by the civil rights statutes, the Justice Department generally has not heretofore placed observers inside open polling stations, even though there might be a reasonable basis for believing that criminal activity will occur there. This arises in part from respect for state laws governing who may be inside open polls, and in part from 18 U.S.C. § 592, which prohibits federal officials from stationing armed men at places where elections are in progress. However, there is no federal statutory bar against sending *unarmed* federal personnel, such as Assistant United States Attorneys, into open polling places as long as their presence is either

allowed by state law, or permitted by local election administrators. Federal prosecutors and investigators are encouraged to consider this option in appropriate circumstances, in consultation with the Public Integrity Section.

- Third, the Department does not intercede on behalf of private litigants in civil election contests. Such matters are private in nature, and are customarily redressed through election contests under state law or civil rights suits under 42 U.S.C. § 1983.

The following is a general summary of the Election Day Program implemented by the Department and its District Election Officers on election day:

Before significant elections –

- The Justice Department issues a press release emphasizing the federal interests in prosecuting election crime and protecting voting rights.

- Similar press releases are then issued throughout the country by each United States Attorney. The telephone number of each AUSA serving as a District Election Officer is publicized locally, as well as the telephone numbers of the local offices of the FBI. Citizens are encouraged to bring complaints of possible election fraud to the attention of these law enforcement officials.

- Each United States Attorney and District Election Officer is encouraged to meet with the state and, if possible, local officials responsible for the administration of the election process and the prosecution of crimes against that process. The purpose of these meetings is to

convey federal interest in assuming an appropriate law enforcement role with respect to electoral corruption, and to make federal assets and personnel available to assist the states in such matters.

On election day –

- In each district, the District Election Officer receives and handles election fraud allegations.

- FBI Special Agents are made available in each district to receive election-related complaints from all sources.

- If warranted, the District Election Officer or United States Attorney may request the FBI to interview a person who alleges that an election crime has occurred. However, care must be taken to ensure that the interview does not affect the election itself. To avoid this potential danger, overt investigation of election-related allegations, other than taking statements from complaining witnesses, ordinarily occurs after the election is over.

- In Washington, prosecutors in the Criminal Division's Public Integrity Section are available as long as polls remain open, to provide advice to United States Attorneys, District Election Officers, and FBI personnel. Special attention is given to preserving evidence that may lose its integrity with the passage of time.

- Under certain circumstances, FBI Headquarters may authorize its agents to conduct covert operations before, during, or after the election upon request of the Public Integrity Section. However, such operations must be predicated on preexisting evidence that observable or otherwise detectable illegal activities (such as vote-

buying) are likely to occur in that election. Such requests require particularly close review because of the risk of chilling legitimate voting activity, especially covert operations near or around polling places. Therefore, requests for authorization to use such techniques should be addressed to the Public Integrity Section as far before the election as is possible.

After the election –

- A United States Attorney's Office may request the FBI to conduct a preliminary investigation into election fraud allegations that the Office believes warrant further inquiry.

- The Public Integrity Section may also request a preliminary investigation into any election-related allegations.

- The results of each preliminary investigation are reviewed by attorneys in the United States Attorney's Office and in the Public Integrity Section. These offices then consult to determine which matters may warrant a grand jury and full-field investigation.

- The United States Attorney's Office, with the assistance of the FBI, conducts whatever additional investigation that Office deems appropriate.

- At the conclusion of the investigation, the United States Attorney's Office discusses any proposed federal charges with the Public Integrity Section. After this consultation, the United States Attorney's Office prosecutes those charges.

- On its own, or in collaboration with the United States Attorneys' Offices, the Public Integrity Section also investigates and prosecutes election crimes.

# CHAPTER FIVE

# CAMPAIGN FINANCING CRIMES

## A. INTRODUCTION

The nation's campaign financing laws are designed to regulate the influence of money on politics, to combat actual or apparent *quid pro quo* corruption.[46] The campaign finance laws do this by limiting the size of contributions that individuals may contribute; by prohibiting contributions from entities such as corporations, unions, and banks, whose potential corrupting influence on democratic government has been historically demonstrated, to candidates for public office and political parties; and by imposing strict disclosure requirements on those who participate in the federal campaign financing process. Transparency in campaign financing has also become a pillar of international standards for democratic elections.

In addition to the federal government, all the states have campaign financing laws. These vary from state to state, and in many instances they vary significantly from those at the federal level. Because this book is written for federal prosecutors and investigators, its focus is on the federal laws that govern this subject. In addition, because the power of the federal government in the area of campaign financing is limited primarily to regulating the financing of federal candidates, *Burroughs v. United States*, 290 U.S. 534 (1934), the focus of this chapter is further limited to federal laws that address the

[46] As to actual *quid pro quo* corruption, the Supreme Court has held that campaign contributions may constitute a violation of the Hobbs Act, 18 U.S.C. § 1951, only when they are provided in exchange for a specific requested exercise of official authority. *Evans v. United States,* 504 U.S. 255 (1992); *McCormick v. United States*, 500 U.S. 257 (1991). This is in recognition of the important and necessary role that campaign contributions play in our political system.

flow of money intended to influence election of candidates for federal office, that is, the Office of President, Vice President, or Member of Congress.[47]

Criminal violations of federal campaign financing laws require proof that the conduct was committed "knowingly and willfully."[48] *See United States v. Danielczyk*, 917 F. Supp. 2d 573, 578–80 (E.D. Va. 2013). As discussed below, this means that the defendant must know that his or her conduct is unlawful.

This standard creates an elevated *scienter* element requiring, at the very least, that application of the law to the facts in question be fairly clear. When there is substantial doubt concerning whether the law applies to the facts of a particular matter, the offender is more likely to have an intent defense. Consequently, this chapter will not attempt to cover the entire scope of the federal campaign financing laws. Rather, it will focus on the features of these laws that are well-defined and commonly understood by persons who participate in the modern federal campaign financing process.

---

47 Violations of state campaign financing laws may, however, suggest the presence of federal corruption offenses. Consideration should be given to whether the alleged conduct may constitute, for example, possible mail, wire, or honest services fraud (18 U.S.C. §§ 1341, 1343, 1346); extortion under the Hobbs Act (18 U.S.C. § 1951); or federal program bribery (18 U.S.C. § 666). It is also important to note that those who violate state campaign financing laws might also engage in similar schemes at the federal level.

48 Violations of these laws that are committed with lesser intent – including all violations committed negligently or because the offender did not understand his or her conduct to be unlawful – are not federal crimes. They are subject to civil and administrative enforcement by the Federal Election Commission.

## B. STATUTORY SCOPE

### 1. Types of Statutes

There are four main types of federal campaign financing laws:

- Laws that limit the amount of contributions;
- Laws that prohibit contributions by persons and entities whose participation in the federal election process has been deemed by Congress to present a sufficient potential for corruption as to warrant outright prohibition;
- Transparency laws that place before the voting public pertinent facts concerning the raising and spending of campaign funds; and
- Public funding laws, which, at the time of this edition, apply federally only to the campaigns of candidates seeking election to the Presidency.

The federal statute that regulates the financing of federal campaigns and ensures campaign transparency is the Federal Election Campaign Act of 1971, as amended (FECA or the Act). 52 U.S.C. §§ 30101, et seq.[49] The Act was amended significantly in 1974, 1976, 1979, and most recently in 2002. The 2002 amendments were contained in the Bipartisan Campaign Reform Act (BCRA). More recently, decisions by the U.S. Supreme Court and some U.S. Courts of Appeals have significantly limited what is prohibited under the statute.

---

[49] FECA's provisions were housed in Title 2 of the United States Code until September 1, 2014, when it was transferred to Title 52.

With two exceptions described below, FECA applies only to financial activity intended to influence the campaigns of candidates running for federal office (the Senate, House of Representatives, Presidency, or Vice Presidency). It contains two basic types of regulation: (1) campaign financing statutes, which regulate the sources and amounts of funds given or spent to influence a federal election; and (2) campaign reporting statutes, which require disclosure by federal candidates and political committees of the sources and recipients of their campaign funds.

Two federal statutes address public funding for presidential campaigns: the Presidential Primary Matching Payment Account Act, 26 U.S.C. §§ 9031-9042, which provides for federal matching payments for presidential primary campaigns; and the Presidential Election Campaign Fund Act, 26 U.S.C. §§ 9001-9012, which provides for full federal funding for presidential general election campaigns.[50]

### 2. Basic Statutory Definitions

FECA defines the basic terms that apply to the Act's substantive provisions. Because these terms are critical to a general understanding of the Act, it is important to identify them at the outset. These basic definitions are codified at 52 U.S.C. § 30101. The most important of these definitions are:

- "election" – a general, special, primary, or runoff election, or a convention or caucus held to nominate a candidate. § 30101(1).

- "candidate" – an individual who seeks nomination or election to federal office and has received contributions aggregating over $5,000 or has made expenditures

[50] In recent elections, presidential candidates have increasingly foregone federal matching funds.

aggregating over $5,000. or authorized such contributions or expenditures by another. § 30101(2).

- "federal office" – the office of President or Vice President of the United States, United States Senator, United States Representative, or Delegate or Resident Commissioner to the United States House of Representatives. § 30101(3).

- "political committee" – any committee or other group of persons that receives contributions or makes expenditures aggregating over $1,000 in a calendar year. § 30101(4).

- "contribution" – in general, any gift, loan, or anything else having pecuniary value that is made for the purpose of influencing the nomination or election of a federal candidate. § 30101(8).

- "expenditure" – in general, any purchase, payment, or anything else having pecuniary value that is made for the purpose of influencing the nomination or election of a federal candidate. § 30101(9). In the context of public communications, the definition has been judicially limited to disbursements for communications that contain "magic words of express advocacy," such as "elect," "defeat," or "vote for," or that otherwise clearly call for elective action for or against a clearly identified federal candidate. *Fed. Election Comm'n v. Mass. Citizens for Life, Inc.*, 479 U.S. 238, 247–249 (1986); *Buckley v. Valeo*, 424 U.S. 1, 44 n.52 (1976).

- "Electioneering communication" – a public communication made through the media within certain periods before a federal election that "refers to" a clearly

identified federal candidate and, in the case of a candidate for the United States House or Senate, is targeted to the relevant electorate. 52 U.S.C § 30104(f)(3). This term refers mostly to "issue ads," communications that suggest support for a federal candidate but do not contain words of express advocacy, such as "vote for" or "elect." Because these communications do not contain words of "express advocacy," they are generally not "expenditures," unless, as discussed below, a provision of the Act expressly deems them such. However, if they exceed $10,000 in a calendar year, they must be reported. § 30104(f)(4).

- "federal election activity" – activity by state or local political party committees that simultaneously benefits federal and non-federal candidates, such as get-out-the-vote and voter registration drives. § 30101(20). As discussed below, these activities can no longer be paid for with "soft money," but must be paid for with funds raised in compliance with the Act. 52 U.S.C. § 30125.

With two exceptions relating to electioneering communications, the nouns describing the payment for "electioneering communications" and "federal election activity" is generally "disbursement" – not "expenditure" or "contribution." This distinction is critical, as "disbursements" are not covered by FECA's criminal penalty, which is confined to violations that involve a "contribution, donation, or expenditure." § 30109(d)(1). Therefore most violations of provisions involving "electioneering communications" and "federal election activity" fall exclusively within the civil enforcement jurisdiction of the Federal Election Commission.

### 3. Statutory Presumptions

Under certain circumstances, an unregulated activity will become subject to the Act because of its connection with a federal candidate or political committee. The following definitions reflect the statutory presumptions that result in coverage – or additional coverage – under the Act:

- "coordinated expenditure" – an expenditure that is made "in cooperation, consultation, or concert with, or at the request or suggestion of" a federal candidate or an agent of a federal candidate. Such an expenditure is deemed to be a "contribution" to the candidate – and, as such, subject to the Act's limits and prohibitions. 52 U.S.C. § 30116(a)(7)(B)(i).

- "electioneering communication"– as set forth above, this term includes broadcast communications within certain periods before primary and general elections that refer to a clearly identified federal candidate. In general, payments for these communications are not "expenditures" because they do not expressly advocate a candidate's election or defeat. However, if the electioneering communication is coordinated with a federal candidate or an agent of the candidate, the costs of the communication are deemed to be a "contribution" to the candidate – and thus subject to the Act's limits – as well as an "expenditure" by the candidate. 52 U.S.C. § 30116(a)(7)(C).

## C. STATUTES

### 1. Introduction

This section will present a discussion of those substantive provisions of FECA that are of most interest to federal prosecutors and investigators. We do not attempt to present a thorough discussion of the entire Act, or of all issues that might arise under it. The Justice Department's criminal jurisdiction is, for the most part, limited to violations that are committed "knowingly and willfully," that is, by subjects who knew their conduct was unlawful, even if they are unaware of which statute they were violating and what that statute required. *See* 52 U.S.C. § 30109(d)(1).

In view of the above considerations, the discussion that follows is confined to those substantive provisions of FECA that are fairly clear, generally well-known, and enforceable through the Act's criminal penalties.

### 2. Substantive Statutes

#### (a) 52 U.S.C. § 30116: Limitations on contributions and expenditures

Section 30116 sets quantitative limits on the amounts individuals, political committees, and other entities may contribute to federal candidates and political committees. 52 U.S.C. § 30116(a). It also limits expenditures by party committees and presidential candidates who accept federal funding. 52 U.S.C. § 30116(b) & (d). Generally, cases prosecuted under Section 30116 involve excessive contributions that are effected either surreptitiously (such as through conduits), or in the furtherance of some other felonious objective (such as a bribe that is disguised as a contribution to a candidate).

As noted above, "contribution" is generally defined as anything of value for the purpose of influencing a federal election. § 30101(8). In addition, the term includes expenditures that are made in "cooperation, consultation, or concert with, or at the request or suggestion of" a candidate, a person authorized to act on behalf of a candidate, or a national, state, or local party committee. 52 U.S.C. § 30116(a)(7)(B). "Disbursements," which do not fall within the reach of FECA's criminal penalties, therefore, can become "contributions" which do fall within its reach, if they are coordinated. For example, electioneering communications, if coordinated, will be deemed a "contribution" to the candidate or committee with whom or which they are coordinated, as well as an "expenditure" by that candidate or committee. 52 U.S.C. § 30116(a)(7)(C). An "expenditure" is a disbursement made for the purpose of influencing a federal election. 52 U.S.C. § 30101(9).

The distinction between a contribution and an expenditure has constitutional significance. Contributions are made by one person or entity to another to enable the recipient of the funds to engage in political speech of the recipient's choosing, while expenditures are made directly by the owner of the funds for political speech chosen by the owner of the funds. Thus, contributions are indirect political speech, and as such may constitutionally be subject to more stringent regulation than expenditures, which are direct political speech. *Buckley v. Valeo*, 424 U.S. 1, 13-59 (1976).

Section 30116(a) sets contribution limits for two sets of entities: those made by "persons" (individuals, partnerships, committees, and associations) and those made by "multi-candidate political committees" (political committees registered for six months with the FEC that have received contributions from over fifty persons and that support at least five federal candidates).[51] The

---

[51] A third category of limits on total contributions a person could make in a two-year period, 52 U.S.C. § 30116(a)(3), was invalidated by the Supreme Court in 2014. *See McCutcheon v. Fed. Election Comm'n*, 134 S. Ct. 1434 (2014).

contribution limits currently in place and discussed below have repeatedly been upheld against First Amendment challenges, and there is no question today that they are constitutionally valid. *McConnell v. Fed. Election Comm'n*, 540 U.S. 93 (2003); *Buckley v. Valeo*, 424 U.S. 1 (1976); *see also Nixon v. Shrink Missouri PAC*, 528 U.S. 377 (2000) (upholding similar state contribution limits).

Under Subsection 30116(a)(1), contributions from "persons" (individuals, associations, and committees) may not exceed:

- $2,000 to a federal candidate with respect to any election (primary and general elections are treated as separate elections for the purpose of Section 30116);
- $25,000 in a calendar year to a national party committee[52];
- $10,000 in a calendar year to a state party committee; or
- $5,000 in a calendar year to any other political committee.

Under Subsection 30116(a)(2), contributions from "multi-candidate political committees" may not exceed:

- $5,000 to a federal candidate per election;
- $15,000 in a calendar year to a national party committee; or

---

[52] At the time this book was written, there were six national party committees: the Republican National Committee, the Democratic National Committee, the National Republican Senatorial Committee, the Democratic Senatorial Campaign Committee, the National Republican Congressional Committee, and the Democratic Congressional Campaign Committee. 11 C.F.R. § 110.1(c)(2).

- $5,000 in a calendar year to any other political committee.

The limits on contributions by "persons" to federal candidates and national party committees are adjusted for inflation every two years, with the increases announced in odd-numbered years and effective for the two-year election cycle beginning with the day after the last general election. 52 U.S.C. § 30116(c). For the current limits, visit the FEC's website.

The above limits do not apply to transfers between the national, state, district, and local committees of the same political party. 52 U.S.C. § 30116(a)(4). However, contributions to a candidate from political committees that are subject to common control (e.g., committees affiliated with several locals of the same union, or committees affiliated with subsidiaries of the same corporation) are treated as though they were from a single political committee. 52 U.S.C. § 30116(a)(5).

The above limits also do not apply to contributions to political committees that engage in independent expenditures only (commonly known as "Super PACs"), meaning the committee does not coordinate any of its expenditures with a candidate or committee that makes contributions to a candidate or party. *See SpeechNow.org v. Fed. Election Comm'n*, 599 F.3d 686, 696 (D.C. Cir. 2010) (finding Section 30116's limits on contributions to independent expenditure-only political committees did not further the government's interest in preventing corruption or the appearance of corruption and thus were invalid under the First Amendment).

Limitations on expenditures are far fewer than those on contributions. A candidate's expenditures can constitutionally be limited only if the candidate elects to participate in a public funding program. *Buckley v. Valeo*, 424 U.S. 1, 54-59 (1976). At present, only presidential candidates have the option of receiving federal funds for

their campaigns; hence, these are the only candidates who may be subject to expenditure limits. *See* 52 U.S.C. § 30116(b). FECA also places limitations on expenditures by national and state party committees. The limits on expenditures by presidential candidates accepting public funding and party committees are increased to reflect inflation as discussed above. 52 U.S.C. § 30116(c)(1)(B).

There are no limits on expenditures by a person that are made independently of the candidate being benefitted thereby. However, if such "independent expenditures" exceed certain monetary thresholds, they must be reported to the FEC. 52 U.S.C. § 30104(g). This reporting requirement applies even if the entity making the independent expenditure is not required to register as a political committee with the FEC.

There are also no limits on the amount of personal funds that a federal candidate may use in his or her campaign. Under *Buckley v. Valeo*, 424 U.S. at 52–53, this use of personal funds represents an "expenditure" that cannot be constitutionally limited.

**(b) 52 U.S.C. § 30118: Prohibition on contributions and expenditures by national banks, corporations, or labor organizations**

Although Section 30118, when enacted, barred both corporate and union contributions and expenditures entirely – with the exception of those made by separate segregated funds – the Supreme Court has since invalidated as unconstitutional any limits on independent expenditures by corporations or labor organizations made directly from those entities' general treasury funds. *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310 (2010) (overturning part of its earlier decision in *McConnell v. Fed. Election Comm'n*, 540 U.S. 93 (2003) and all of its decision in *Austin v. Michigan Chamber of Commerce*, 494 U.S. 652 (1990)). In doing so, however, the Court continued to recognize the important governmental interest in preventing corruption and the

appearance of corruption, it upheld FECA's disclosure requirements, and it did nothing to disturb the Court's prior findings that limits on corporate and union contributions, as opposed to expenditures, appropriately further that interest. *See id.* at 356–57; *see also Cort v. Ash*, 422 U.S. 66 (1975); *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 787–88 n.26 (1978) (finding limits on contributions address problem of corruption of elected representatives through creation of political debts) (dictum).

Section 30118 prohibits the following:

- Contributions (which include coordinated expenditures) by corporations and labor organizations in connection with any federal election, unless made to a Super PAC (a political committee engaging only in independent expenditures).[53]

- Contributions and expenditures by a national bank or a federally chartered corporation in connection with any election – federal, state, or local.[54]

- Consent to a prohibited contribution or expenditure by any officer of a corporation, labor organization, or national bank; and

- Knowing acceptance of a prohibited contribution by any candidate, political committee, or other person.

---

53 The ban on corporate and union contributions to independent expenditure-only political committees was invalidated by the D.C. Circuit in *SpeechNow.org v. Fed. Election Comm'n*, 599 F.3d 686 (D.C. Cir. 2010).

54 This statute is one of two FECA prohibitions that extend to non-federal elections. The other is 52 U.S.C. § 30121, which prohibits foreign nationals from making contributions to non-federal as well as federal elections.

There are a number of corporate and union political activities that are not prohibited under FECA. After *Citizens United*, corporations and labor organizations are no longer prohibited from spending treasury funds to expressly advocate the election or defeat of a clearly identified federal candidate or to engage in electioneering communications,[55] as long as they do so independently of any candidates or organizations that contribute to candidates. *See also Fed. Election Comm'n v. Wis. Right to Life*, 551 U.S. 449 (2007) (invalidating limits on corporate and union electioneering communications).

Even before *Citizens United*, corporations and unions were not barred from using treasury funds to establish and operate "separate segregated funds" – commonly known as "affiliated political action committees," or PACs – provided the PACs confined their solicitation activities to raising voluntary contributions from corporate employees or union members, respectively. *Pipefitters Local Union No. 562 v. United States*, 407 U.S. 385, 409 (1972). They also always have been allowed to use corporate or union funds to finance communications, on any subject, between labor unions and their membership or between corporations and their stockholders, *see United States v. Auto. Workers,* 352 U.S. 567 (1957), as well as to support non-partisan expenditures, or to cover the costs of publishing statements of editorial opinion in newspapers of general public distribution that are owned by corporations or unions, *see United States v. C.I.O.*, 335 U.S. 106 (1948).

The statute also does not restrict contributions or expenditures

---

55 "Electioneering communication" includes any broadcast or satellite communication which "refers to" a clearly identified federal candidate; is made 30 days before a primary or 60 days before a general or runoff election; and, in the case of a candidate for the United States Senate or United States House of Representatives, is targeted to the relevant electorate. 52 U.S.C. § 30104(f)(3)(A)(i).

from the personal resources of corporate or union officials, provided, of course, that the value of the funds given or spent are not reimbursed or otherwise passed back to a corporate or a union fisc such that the corporation or union would be engaging in conduct prohibited by the statute.

As with all other FECA violations, to reach the level of a Section 30118 criminal violation, the act had to have been committed "willfully." Absent direct evidence of such criminal intent (as through a confession), a prosecution under Section 30118 will most likely be successful when funds were diverted from a corporate or union treasury and laundered in some fashion to a candidate or when an entity using corporate or union funds to engage in election activity coordinates its expenditures with a candidate.

**(c) 52 U.S.C. § 30119: Prohibition on contributions by government contractors**

Section 30119 prohibits any person who is a signatory to, or who is negotiating for, a contract to furnish material, equipment, services, or supplies to the United States government, from making or promising to make a contribution "for any political purpose." It has been construed by the FEC to reach only contributions for the purpose of influencing the nomination or election of candidates for federal office. *See* 11 C.F.R. § 115.2(a). The statute applies to all types of businesses, including sole proprietorships, partnerships, and corporations, and reaches gifts made from such entities' business or partnership assets.[56] With respect to partnerships, however, the FEC has determined that Section 30119 does not prohibit contributions made from the personal assets of the partners, provided of course, that

---

[56] The D.C. Circuit reaffirmed that the ban on individual contractor contributions furthers the government's compelling interest in preventing *quid pro quo* corruption and the appearance of corruption in an 11-0 *en banc* decision. *See Wagner v. Fed. Election Comm'n*, 793 F.3d 1 (D.C. Cir. 2015).

the value of such contributions is not reimbursed from, or otherwise passed back to, partnership assets. 11 C.F.R. § 115.4.

The statute applies only to business entities that have negotiated or are negotiating for a contract with a department or agency of the United States. Thus, the statute does not reach those who have contracts with non-federal agencies to perform work under a federal program or grant. Nor does it reach persons who provide services to third-party beneficiaries under federal programs that require the signing of agreements with the federal government, such as physicians performing services for patients under Medicare. Finally, officers and stockholders of incorporated government contractors are not usually covered by Section 30119, because the government contract is usually with the corporate entity, not its officers. However, individual corporate officers may be covered by Section 30119 if they are individually liable on the government contract. Government contractors may make non-partisan expenditures, may establish and administer affiliated PACs, and may communicate with their officers and stockholders on political matters.

### (d) 52 U.S.C. § 30120: Attribution of sponsors of political communications and solicitations

Section 30120 requires that certain political communications include the identity of the person or entity responsible for the communication. Prior to enactment of BCRA in 2002, the statute was limited to two types of political communications:

(1) communications "expressly advocating the election or defeat" of a clearly identified federal candidate, and

(2) communications soliciting contributions to a federal candidate or political committee.

BCRA added two more types of communications requiring this attribution:

(1) general advertisements by political committees, and

(2) "electioneering communications" by any person, that is, communications to a targeted electorate within certain periods before primary and general elections that refer to a federal candidate.

Section 30120 does not cover anonymous communications that leave to inference the identity of a particular candidate. The FEC, acting pursuant to its advisory opinion authority under 52 U.S.C. § 30108, has excluded several categories of campaign advocacy (such as bumper stickers and skywriting) from the reach of this law. 11 C.F.R. § 110.11(a)(2).

Although BCRA expanded the scope of Section 30120, only violations involving, generally, the two communications originally covered by the statute – communications that expressly advocate a federal candidate's election or defeat and communications that solicit contributions – are subject to prosecution. Funds expended for such communications are "expenditures" under the Act, and are therefore subject to its criminal provision, section 30109(d)(1). Electioneering communications and general political advertising by political committees, on the other hand, generally involve "disbursements," which are not reachable by the Act's criminal provision.

**(e) 52 U.S.C. § 30121: Prohibition on contributions, donations, and expenditures by foreign nationals**

Section 30121 prohibits contributions and "donations" by foreign nationals to all United States elections, whether federal, state, or

local. It is one of the few federal campaign financing statutes that reach activities directed at both federal and non-federal elections.[57]

Specifically, the statute prohibits foreign nationals from engaging in the following types of political activity:

- Making, directly or through any other person, a contribution or donation in connection with any federal, state, or local election, or knowingly soliciting or accepting a contribution or donation from a foreign national.

- Making, directly or indirectly, an expenditure, as defined by Section 30101.

- Making, directly or indirectly, an independent expenditure.

- Making, directly or indirectly, a disbursement for an electioneering communication, within the meaning of 52 U.S.C. § 30104(f)(3).

BCRA added the term "donation" to Section 30121's prohibition (as well as to the Act's criminal provision), to leave no doubt that political donations to state and local candidates are covered.[58]

All types of Section 30121 violations are subject to prosecution except those involving electioneering communications, which are

---

[57] 52 U.S.C. § 30118, discussed above, which bars national banks and federal corporations from making a contribution in connection with an election to any political office. 52 U.S.C. § 30124 bars any fraudulent solicitation of funds on behalf of any candidate.

[58] Although not defined in the Act, a "donation" is a political gift that is not a "contribution" – a term that is confined to federal campaigns. Hence a "donation" is a political gift that is given to a candidate for state or local office or to a political committee in connection with a state or local election.

defined for purposes of Section 30121 as “disbursements” and therefore are not covered by the Act’s criminal penalty.

The term “foreign national” means: (1) a “foreign principal” within the meaning of the Foreign Agents Registration Act, 22 U.S.C. § 611, and (2) any person who is not a citizen of the United States, or a national of the United States who is not lawfully admitted for permanent residence. 52 U.S.C. § 30121(b). A “foreign principal” includes a foreign government, a foreign political party, and a corporation organized under the laws of a foreign country. None of these entities may make contributions or donations to any candidate or political party in the United States.

Through its regulations, advisory opinions, and civil enforcement actions, the FEC has addressed the application of Section 30121 to contributions by domestic subsidiaries of foreign corporations.[59] The Commission has determined that a domestic subsidiary that is chartered under the laws of any state or United States territory, and has its principal place of business in the United States, is not a foreign principal – even though all of its capital stock may be owned by foreign individuals or entities. The FEC has, however, concluded that Section 30121 prohibits contributions by a domestic subsidiary if the parent foreign corporation provides funding for the contribution, or if individual foreign nationals are involved in any way in making the contribution. In 1991, the FEC rejected proposed rulemaking that would have expanded the scope of Section 30121 to include domestic subsidiaries of foreign-owned entities.

There are significant enhancements for FECA violations involving a foreign national or foreign government. U.S.S.G. § 2C1.8(b)(2). The Guideline is discussed in Chapter Six.

---

[59] Persons who rely in good faith on an FEC advisory opinion may be immune from sanctions under FECA, including criminal prosecution. 52 U.S.C. § 30108(c)(2).

### (f) 52 U.S.C. § 30122: Prohibition on contributions through conduits

Section 30122 makes it unlawful for any person to make a contribution in the name of another, or for any person to permit his or her name to be used to make such a contribution. The statute also prohibits any person from knowingly accepting a contribution made by one person in the name of another.

The conduit statute is one of FECA's most frequently violated prohibitions. It was challenged and upheld in *United States v. O'Donnell*, 608 F.3d 546 (9th Cir. 2010). This is because it prohibits conduct that is often used by perpetrators to disguise other campaign financing violations, such as contributions over the Act's limits in violation of Section 30116, or from prohibited sources in violation of Section 30118 or Section 30121.

Section 30122 violations occur when a person gives money to straw donors, or conduits, for the purpose of having the conduits pass the funds on to a specific federal candidate as their own contributions. The motive is typically to preserve the true donor's anonymity and aggregate contribution amount, as the ostensible contributions will be reported publicly as having been made by the straw donors. A common type of conduit scheme involves a corporate official who instructs the corporation's employees to make contributions to a federal candidate, and then reimburses the employees from corporate funds generally through fictitious bonuses or pay raises. In so doing, illegal corporate funds are laundered to the candidate in violation of both Sections 30122 and 30118.

As discussed previously, to be subject to prosecution as a FECA crime, the act must be knowing and willful. Laundering campaign contributions through straw donors is persuasive evidence of the Act's willful intent element.

Conduit crimes are subject to a separate felony penalty with a lower monetary floor than the general felony provision for FECA offenses. Specifically, conduit crimes aggregating over $10,000 in a calendar year are now punishable as felonies, and subject to two years of imprisonment or fines. 52 U.S.C. § 30109(d)(1)(D). Conduit crimes aggregating $25,000 or more are subject to FECA's five-year felony provision. 52 U.S.C. § 30122(d)(1)(A)(ii). Finally, conduit crimes aggregating between $2,000 and $10,000 are one-year misdemeanors. 52 U.S.C. § 30122(d)(1)(A)(i).

Conduit violations also may be prosecuted under the federal conspiracy and false statement statutes, 18 U.S.C. §§ 371 and 1001. Courts have held that the use of conduits to disguise illegal contributions to federal candidates is evidence of an intent to interfere with the accurate reporting of campaign contributions, an intent to defraud the FEC, and an intent to cause false information to be conveyed to the FEC. *See United States v. Hsia*, 176 F.3d 517 (D.C. Cir. 1999); *see also United States v. Hopkins*, 916 F.2d 207, 213–15 (5th Cir. 1990) (upholding Section 1001 conviction for filing false statements on disclosure reports required by the Ethics in Government Act).

Conduit schemes often involve multi-district activity, and therefore the question of where a contribution is "made" or "received" within the meaning of Section 30122 can present venue questions. For a discussion of such venue issues, see *United States v. Passodelis*, 615 F.2d 975 (3d Cir. 1980) (reversing a conviction under Section 30122's predecessor, 18 U.S.C. § 614, on venue grounds). For a discussion of statute of limitations issues that also can arise in such cases, see *United States v. Hankin*, 607 F.2d 611 (3d Cir. 1979) (reversing a conviction under 18 U.S.C. § 614 on statute of limitations grounds).

### (g) 52 U.S.C. § 30123: Limitation on contribution of currency

Section 30123 makes it unlawful for any person to contribute more than $100 in United States or foreign currency to the campaign of a federal candidate. The limitation is cumulative, and applies to the candidate's entire campaign, including the primary and general election. The limitation differs from, and is in addition to, the contribution limitations in Section 30116.

The statute does not expressly address receiving cash for political purposes, but campaign agents who knowingly solicit or receive cash in violation of Section 30123 may be liable as aiders and abettors under 18 U.S.C. § 2.

### (h) 52 U.S.C. § 30124: Fraudulent misrepresentation of campaign authority

Section 30124 prohibits two discrete types of fraudulent misrepresentations in connection with federal campaigns: certain campaign "dirty tricks," and fraudulent fundraising. Specifically:

- Section 30124(a) prohibits federal candidates and their agents from fraudulently misrepresenting that they have authority to speak or act for another federal candidate or political party on a matter that is damaging to the other candidate or political party. The statute also prohibits conspiracies to misrepresent campaign authority to damage an opponent.

- Section 30124(b) prohibits any person from fraudulently misrepresenting, or conspiring with another to fraudulently misrepresent, that he or she is acting for any

> candidate or political party for the purpose of soliciting contributions or donations.[60]

Unlike all other FECA violations, violations of Section 30124 may be prosecuted without regard to the sum of money involved. 52 U.S.C. § 30109(d)(1)(C). Violations that involve amounts under $25,000 are one-year misdemeanors and violations involving $25,000 or more are five-year felonies. 52 U.S.C. § 30109(d)(1)(A).

#### (i) 52 U.S.C. § 30125: Soft money of political parties

Section 30125, the so-called "soft money ban" enacted by BCRA in 2002, was designed to eliminate unregulated "soft money" from the federal election campaign process. It has several clear features that are enforceable through FECA's criminal penalty.

##### i. Section 30125(a)

Section 30125(a) provides that a "national committee of a political party (including a national congressional campaign committee of a political party)," an agent of such a national committee, and any entity that is established, financed, or controlled by such a national committee, may not "solicit, receive, or direct to another person" any "contribution, donation, or transfer of funds," or spend any funds, that are not subject to the limits and prohibitions of FECA.[61] Such funds would include contributions that exceed the

---

[60] Violations of Section 30124(b) involving fraudulent fundraising that are accomplished through the use of the mails or interstate wires may also be prosecuted as fraud offenses under 18 U.S.C. §§ 1341 or 1343.

[61] At the time this book was written, the following six committees were subject to this prohibition: the Republican National Committee, the Democratic National Committee, the National Republican Senatorial Committee, the Democratic Senatorial Campaign Committee, the National Republican Congressional Committee,

Act's quantitative limitations in violation of Section 30116; contributions from prohibited sources, such as corporations, labor organizations, banks, or government contractors in violation of Section 30118, Section 30119, or Section 30121; and contributions laundered through conduits or in cash in violation of Section 30122 or Section 30123.

Stated differently, national committees of political parties and their agents may only solicit, receive, or direct funds that comply with the limitations and prohibitions of FECA, that is, "hard money." Any act of solicitation, receipt, or direction of "soft money" funds by a national party committee, its agents, or an entity it controls violates Section 30125(a).

Of particular significance is the statute's inclusion of the verb "direct." *See* 11 C.F.R. 300.2(n) (defining "direct" within the meaning of the statute). It would be, for example, a violation of Section 30125(a) if an agent of a national party committee suggested to a wealthy contributor that instead of giving soft money to the national party (which is no longer permissible), the contributor give the funds to a state or local component of the national party committee. It would also be a violation of Section 30125(a) if the agent suggested that a prohibited funding source such as a corporation or a labor organization give to a recipient not covered by FECA, such as a candidate for non-federal office.

**ii. Section 30125(b)**

Section 30125(b) prohibits state and local committees, as well as their officers and agents, from expending or disbursing funds that have not been raised in accord with the limitations and prohibitions of FECA on "federal election activity." This term was enacted by

---

and the Democratic Congressional Campaign Committee. *See* 11 C.F.R. § 110.1(c)(2).

BCRA and is defined broadly to include any activity that benefits both federal and non-federal candidates. 52 U.S.C. § 30101(20). Examples of "federal election activity" include get-out-the-vote efforts, voter registration drives, and generic public communications that simultaneously benefit a political party's federal and non-federal candidates, such as, "vote for the Democratic [or Republican] Party."

Prior to BCRA, the FEC permitted "generic" expenses such as those noted above to be allocated between federal and non-federal candidates, requiring that only the portion of their cost that was attributed to the promotion of federal candidates be paid from "hard money." This allocation process proved to be both weak and unenforceable. By enacting Section 30125, Congress rejected the FEC's allocation rules, and plugged this loophole by statutorily deeming all such "generic" activities around federal elections by state and local party committees to be entirely "federal" in nature, thus requiring that they be financed entirely from "hard money," i.e., money raised in compliance with FECA. The following year, the Supreme Court upheld this extension of FECA's coverage as a constitutional legislative effort to avoid circumvention of the Act. *McConnell v. Fed. Election Comm'n*, 540 U.S. 93 (2003). Thus, if an agent of a state political party committee knowingly and willfully uses "soft money" to pay for "generic" party advertisements, the agent would be in violation of 30125(b).

Section 30125(b) does not cover state and local political party communications that refer entirely to non-federal candidates. The statute also does not apply to expenditures or disbursements for generic get-out-the-vote or voter registration drives that are paid from a special fund that the Act permits state and local party committees to maintain. These special accounts – called "Levin" accounts after the Senator who sponsored this provision – may raise up to $10,000 from individual contributors, provided that national party committees, state party committees acting jointly, and, with narrow exceptions, federal

candidates and officeholders are not involved in the solicitation of such funds. 52 U.S.C. § 30125(b)(2)(C) & (e)(3).

**iii. Section 30125(d)**

Section 30125(d) prohibits any national, state, or local committee of a political party, as well as agents thereof, from soliciting, making, or directing any contribution or donation to any organization that is exempt from federal taxation under the provisions of 26 U.S.C. §§ 501 or 527, if said tax-exempt organizations have made expenditures or disbursements to fund "federal election activities." Again, these include primarily "generic" expenses such as paying for get-out-the-vote or voter registration drives, or public communications that benefit simultaneously both federal and non-federal candidates. This far-reaching prohibition was also upheld in *McConnell* as a necessary measure to prevent evasion of the ban on the use of soft money in federal campaigns

**iv. Section 30125(e)**

Finally, Section 30125(e) addresses what are commonly known as "leadership PACs." Prior to BCRA, these PACs were established and controlled by a federal candidate or officeholder to raise funds for candidates at the federal, state, and local levels in the expectation that such activities would also enhance the candidate's or officeholder's own political power. Specifically, Section 30125(e) provides that a federal candidate or officeholder, or an entity controlled by such a person, may not "solicit, receive, direct, transfer, or spend" funds raised in violation of FECA's limitations and prohibitions in connection with the election of any candidate for federal, state, or local elective office. § 30125(e)(1). The statute contains an exception for a federal candidate or officeholder who is also running simultaneously for a state or local office, which permits the candidate to solicit, receive, or spend "soft money" on behalf of his or her non-federal election campaign, provided that the transactions are

permitted under state law. 52 U.S.C. § 30125(e)(2). As noted above, in *McConnell* the Supreme Court upheld this broad limitation against various constitutional challenges, finding it necessary to prevent circumvention of the statute's prohibition on the use of soft money by federal candidates and officials to influence federal elections.

### 3. 52 U.S.C. § 30114: Prohibition on Conversion of Campaign Funds

Section 30114 regulates the use of funds contributed to federal candidates and officeholders and reflects Congress's clear intent to bar completely the conversion of campaign funds for personal purposes. The statute is composed of two provisions and applies to *all* contributions to a federal candidate:

- Section 30114(a) sets forth the permissible uses of contributed funds, including use for "otherwise authorized expenditures in connection with a campaign for Federal office" and for "ordinary and necessary expenses incurred in connection with duties of the individual as a holder of Federal office."

- Section 30114(b) contains the statutory prohibition: A contribution to a federal candidate may not be "converted by any person to personal use." 52 U.S.C. § 30114(b)(1). The provision further provides that a contribution shall be considered to be converted to personal use if it is used to fulfill any "commitment, obligation, or expense of a person that would exist irrespective of the candidate's election campaign." 52 U.S.C. § 30114(b)(2).

- Finally, Section 30114(b)(2) lists nine specific examples of prohibited personal uses of campaign funds, such as mortgage payments, clothing expenses, vacations, and non-campaign-related car expenses.

Even temporary diversion can give rise to criminal prosecution. *See, e.g.*, *United States v. Taff*, 400 F. Supp. 2d 1270 (D. Kan. 2005) (rejecting motion to dismiss indictment charging Section 30114 (then 2 U.S.C. § 439a) based on candidate's temporary use of campaign funds for house closing).

Further, although the statute is limited to funds contributed to federal candidates and their authorized committees, conversion of contributions to other political committees can be addressed under Title 18 fraud statutes. Conduct in violation of Section 30114 can also be prosecuted under the false statements statute, 18 U.S.C. § 1001, for willfully causing another to submit false information to the FEC regarding the existence or use of the funds, and the false records statute, 18 U.S.C. § 1519.

### 4. 52 U.S.C. §§ 30102, 30103, and 30104: Organization, Recordkeeping, and Reporting Requirements

In brief, FECA requires federal candidates and political committees to file with the FEC a statement of organization and periodic reports of receipts and disbursements. 52 U.S.C. §§ 30103, 30104. The reports are made available to the public, and must identify, among other things, persons contributing over $200 in a calendar year. 52 U.S.C. § 30104(b)(3)(A). The Act also requires that persons making independent expenditures (as distinct from contributions) in excess of $250 to elect or to defeat a federal candidate must file reports with the FEC. 52 U.S.C. § 30104(c). This requirement applies even to those persons or entities that are not required to register as political committees under the statute.

Most campaign records must be maintained for three years, including records reflecting the identity of all contributors giving in excess of $50. 52 U.S.C. § 30102(c) & (d). In addition, persons who collect, receive, or otherwise handle contributions to a political

committee from other persons are required to forward those contributions to the committee's treasurer within ten days, along with the name and address of any person who contributed over $50 to the candidate. 52 U.S.C. § 30102(b).

## D. ENFORCEMENT

### 1. Three Types of Enforcement

Federal campaign financing violations are subject to three types of enforcement:

i) Criminal prosecution by the Justice Department as felonies, either under FECA; under other federal criminal statutes addressing frauds and false statements, such as 18 U.S.C. §§ 371, 1001, 1341, 1343, and 1519; or under Title 26 statutes if the matter involves a publicly funded presidential campaign;

ii) Criminal prosecution by the Justice Department as FECA misdemeanors if the amount of the violation does not reach the felony threshold; and

iii) Civil enforcement proceedings by the FEC.

FECA creates a statutory dichotomy between non-willful violations involving any amount, and willful violations involving $2,000 or more within a calendar year. The former are expressly subject to the exclusive civil jurisdiction of the FEC. 52 U.S.C. §§ 30109(a), 30107(e). The latter are subject to both civil enforcement proceedings by the FEC and criminal prosecution by the Justice Department. 52 U.S.C. § 30109(a)(5)(B) & (C) & (d). In addition, the Commission has statutory authority to interpret the statute through regulations and advisory opinions, and its opinion should be given

deference. 52 U.S.C. §§ 30106(b)(1), 30107(a)(7)-(8), & (e); *FEC v. Democratic Senatorial Campaign Comm.*, 454 U.S. 27, 37 (1981).

The FEC pursues FECA violations under the statutory scheme set forth in Section 30109(a). In brief, civil penalties can be imposed through a "conciliation" process, which is roughly equivalent to an administrative guilty plea with a stipulated penalty agreed upon by the FEC and the respondent; civil penalties can also be imposed through a civil suit brought by the FEC in federal district court. Civil sanctions range from "cease and desist" agreements (in which the respondent agrees not to commit a similar violation in the future) to relatively substantial fines. The size of the civil fine depends both on the amount involved in the violation and the degree of knowledge and intent of the respondent. 52 U.S.C. § 30109(a)(5) & (a)(6). The FEC possesses subpoena power and the power to administer oaths, § 30107(a)(3) & (a)(2), as well.

Criminal prosecution under FECA can be pursued before civil and administrative remedies are exhausted. § 30109(a) & (d); *see United States v. Int'l Union of Operating Eng'rs, Local 701*, 638 F.2d 1161, 1162–68 (9th Cir. 1979); *see also Marcus v. Holder*, 574 F.3d 1182, 1184–86 (9th Cir. 2009); *Fieger v. U.S. Attorney Gen.*, 542 F.3d 1111, 1119 (6th Cir. 2008); *Bialek v. Mukaskey*, 529 F.3d 1267, 1271 (10th Cir. 2008).

The BCRA amendments to FECA in 2002 significantly enhanced the criminal penalties for willful violations of FECA. BCRA did so in response to identified anti-social consequences, namely, corruption and the appearance of corruption arising from FECA violations, and the consequent adverse effect on the proper functioning of American democracy.

These issues are addressed comprehensively in the Supreme Court's decision in *McConnell v. Fed. Election Comm'n*, 540 U.S. 93 (2003). Accordingly, all willful FECA violations that exceed the applicable jurisdictional floor specified in the Act's criminal provision

should be considered for federal prosecution under one or more of the prosecutive theories presented above.

### 2. FECA's Criminal Penalty Provision

As noted above, FECA has an internal criminal penalty provision, Section 30109(d). In order for a FECA violation to be a federal crime, Section 30109(d) generally requires that two elements be satisfied: the violation must have been committed "knowingly and willfully," and, with certain exceptions, the amount involved in the violation must aggregate $2,000 or more in a calendar year. Moreover, a single pattern of illegal conduct can often involve several FECA offenses, which may have different monetary thresholds for criminal penalties. An example would be corporate contributions in violation of Section 30118 that are laundered through conduits in violation of Section 30122. Prosecutions under the Act thus present three factual issues: intent, aggregate value, and applicable penalties. These topics are discussed below.

#### (a) Intent

Most FECA violations must have been done "knowingly and willfully" to provide a basis for criminal liability. § 30109(d). The willfulness required is defined by the *Bryan* standard, articulated by the Supreme Court in *Bryan v. United States*, 524 U.S. 184 (1998). In that case, the Supreme Court considered the willfulness requirement for trading in or transporting firearms in interstate commerce without a license. Finding that the statute at issue was not highly technical such that it would "ensnar[e] individuals engaged in apparently innocent conduct," as the tax laws might, the Court found willfulness, as used in the statute, did not require the defendant to have known of a specific statutory duty. *Bryan*, 524 U.S. at 193–95. Instead, the defendant need only know, generally, that his conduct was unlawful. *Id.* at 195–96.

Courts directly addressing the criminal intent requirement under FECA have applied the *Bryan* standard. *United States v. Whittemore*, 944 F. Supp. 2d 1003, 1006–10 (D. Nev. 2013) ("[T]he government must prove that Whittemore knew his conduct violated *some* law, but it need not prove which one."), *aff'd,* 776 F.3d 1074 (9th Cir. 2015), *cert. denied,* 136 S. Ct. 89 (2015); *United States v. Danielczyk*, 788 F. Supp. 2d 472, 489–93 (E.D. Va. 2011) ("[T]he Government must prove that Defendants intended to violate the law (whatever the law was)."), *rev'd on other grounds,* 683 F.3d 611 (4th Cir. 2012), *cert. denied,* 133 S. Ct. 1459 (2013).

Offenders may argue that a higher standard applies: the standard articulated for willful violations of the tax code and currency structuring by the Supreme Court in *Cheek v. United States*, 498 U.S. 192, 201 (1991), and *Ratzlaf v. United States*, 510 U.S. 135, 144–45, 149 (1994), respectively. Finding the tax code and currency structuring laws particularly complex and likely to ensnare innocent conduct, the Supreme Court found "willful" as used in those cases to require knowledge of the particular statutory requirement violated. Most courts interpreting these cases have understood the intent standard articulated to thus be limited to the criminal violations related to those specific schemes. One exception is a 1994 case, *United States v. Curran*, 20 F.3d 560 (3d Cir. 1994), in which the Third Circuit applied the *Cheek*/*Ratzlaf* standard to the willfulness requirement for causing false statements in violation of 18 U.S.C. §§ 1001 & 2(b), where the defendant had caused a campaign treasurer to file false reports with the FEC. Since *Bryan*, however, most circuits have rejected such an expansion of the *Cheek* standard for willfulness. *E.g.*, *United States v. Hsia*, 176 F.3d 517, 522 (D.C. Cir. 1999). Even the Third Circuit has appeared to retreat from this interpretation. *See United States v. Starnes*, 583 F.3d 196, 211–12 (3d Cir. 2009) (noting that the *Cheek/Ratzlaf* standard is used in only rare instances involving "highly technical statutes . . ., such as the federal criminal tax and antistructuring provisions" and that the court applied the heightened standard in *Curran* because of the "tandem violations of §§ 1001 & 2(b) in the 'federal election law context'").

As of the time of this publication no court has held that the *Cheek/Ratzlaf* standard applies to FECA offenses. In pre-*Bryan* and pre-*Cheek*/*Ratzlaf* cases, the D.C. Circuit required a "knowing, conscious, and deliberate flaunting" of the statute, *see Nat'l Right to Work Comm. v. FEC*, 716 F.2d 1401, 1403 (D.C. Cir. 1983); *AFL-CIO v. FEC*, 628 F.2d 97, 101 (D.C. Cir. 1980); but, these cases do not reflect the evolved understanding of "willful" as articulated by the Supreme Court in *Bryan*, *Cheek*, and *Ratzlaf*. As the courts found in *Whittemore* and *Danielczyk*, the core prohibitions of FECA are not complex in the same manner as those regulatory schemes at issue in *Cheek* and *Ratzlaf,* and thus FECA does not merit the even higher intent standard.

With the *Bryan* standard in mind, examples of evidence that has been used to prove that FECA violations were committed knowingly and willfully include:

- The use of surreptitious means, such as cash, conduits, or false documentation, to conceal the violation;

- Making a prohibited "in-kind" contribution by paying directly for goods or services provided to a recipient political committee;

- Proof that the offender is active in political fundraising and is personally well-versed in the federal campaign financing laws (such as offenders who can be shown to be professional lobbyists or fundraisers);

- Proof that the substantive FECA violation took place as part of another felonious end (such as the use of corporate funds to pay a bribe to a public official in violation of 18 U.S.C. § 201, with the bribe disguised as an ostensible campaign contribution to the official's campaign committee); and

- Proof that the donor received information about FECA prohibitions and requirements directly from a candidate, political committee, or campaign, e.g., through the use and execution of what are called "contributor cards."

Certain provisions of FECA address acts that are *malum in se*, that is, inherently wrongful conduct from which willful intent to violate the law can be inferred from mere proof that the prohibited act was committed. These exceptional provisions are the Act's prohibitions against: conversion of campaign funds (§ 30114); misrepresentation of campaign authority to damage an opponent's campaign (§ 30124(a)); fraudulent solicitations (§ 30124(b)); certain coerced contributions by corporations and unions (§ 30118(b)(3)(A)); and false expenditure reports to the FEC (§ 30104(b)(5)(A)). In such cases, the instructions must not take the intent issue from the jury. However, evidence and argument before the jury on the element of willfulness in these cases may not require as much proof of concealment as in other FECA offenses.

**(b) Aggregate value**

For most FECA offenses to be eligible for criminal penalties, the contributions or expenditures at issue must "aggregate" to $2,000 or more in a calendar year. 52 U.S.C. § 30109(d)(1)(A). The exceptions to this $2,000 requirement are violations of the prohibition in Section 30118(b)(3) against the use by corporate or union PACs of coerced contributions, which sets a threshold of $250, and knowing and willful violations of the prohibition in Section 30124 against fraudulent misrepresentation of campaign authority to damage another candidate or political party or to solicit contributions for a candidate or political party, which sets no threshold.

In determining the aggregate value of a FECA violation, the customary practice has been to include the overall "value" of a series of

violations that are committed by, and attributed to, a given offender. For example, a $50,000 illegal corporate contribution within a given calendar year that was illegally passed through 50 individuals serving as conduits would have an aggregate value of $50,000.

### 3. Penalties

FECA offenses carry different penalties depending on the aggregate amount of the contributions and expenditures involved:

- All FECA violations that aggregate $25,000 or more in a calendar year are felonies subject to imprisonment for five years and, except for conduit violations, fines imposed pursuant to 18 U.S.C. § 3571 (up to $250,000 for each offense by an individual and up to $500,000 for each offense by an organization). 52 U.S.C. § 30109(d)(1)(A)(i).

- Conduit violations (52 U.S.C. § 30122) that aggregate *more than* $10,000 in a calendar year are felonies: those aggregating under $25,000 are two-year felonies, and those aggregating $25,000 or more are five-year felonies. 52 U.S.C. § 30109(d)(1)(D)(i). In addition, these offenses can be subject to a fine of 300% of the amount involved in the violation, and a maximum fine that is the greater of either $50,000, or 1,000% of the aggregate value involved in the offense, or the amount provided for in 18 U.S.C. § 3571. 52 U.S.C. § 30109(d)(1)(D)(ii).

- Fraudulent misrepresentations of campaign authority to damage an opponent or to solicit funds (2 U.S.C. § 30124) involving less than $25,000 in a calendar year are misdemeanors subject to one year of imprisonment and fines imposed pursuant to 18 U.S.C. § 3571 (up to $100,000 for each offense by an individual and up to

$200,000 for each offense by an organization). 52 U.S.C. § 30109(d)(1)(C).

- Violations of the prohibition against the use of coerced contributions by corporations and unions (52 U.S.C. § 30118(b)(3)(A)) that aggregate $250 or more in a calendar year are subject to one year of imprisonment and fines imposed pursuant to 18 U.S.C. § 3571. 52 U.S.C. § 30109(d)(1)(B).

- Violations of all other FECA provisions that aggregate $2,000 or more in a calendar year are misdemeanors subject to one year of imprisonment and fines imposed pursuant to 18 U.S.C. § 3571. 52 U.S.C. § 30109(d)(1)(A)(ii).

Of course, the actual penalties imposed for these offenses are subject to the guidance provided in FECA sentencing guideline, U.S.S.G. § 2C1.8.

#### 4. Statute of Limitations for Campaign Financing Offenses

FECA violations are subject to a five-year statute of limitations period, 52 U.S.C. § 30145, the same as the general statute of limitations for most federal crimes, *see* 18 U.S.C. § 3282. The five-year limitations period also governs the prosecution of conduct based on FECA violations that is prosecuted under 18 U.S.C. §§ 371, 1001, or 1519. *Id*. This five-year period also applies to FECA-based crimes charged as frauds under the public financing provisions governing presidential campaigns. 26 U.S.C. §§ 9012(c), 9042(b).

#### 5. Venue for FECA Offenses

The campaign financing statutes focus on the "making" and "receiving" of contributions and expenditures, and venue generally lies where a prohibited transaction was made or received. While this presents no problems in cases involving intradistrict transactions, one court of appeals has interpreted "making a contribution" so narrowly that serious difficulties may be encountered in establishing a centralized venue over multi-district FECA violations. *United States v. Passodelis*, 615 F.2d 975 (3d Cir. 1980).

In *Passodelis*, a campaign fundraiser had been convicted under 52 U.S.C. §§ 30116 and 30122 predecessor statutes for making excessive contributions to a presidential candidate through conduits in four states. Venue was laid in the district where the political committee to which these donations were given had its offices and bank accounts. The court of appeals held that cases against the donors had to be brought in the district where the donors "made" the prohibited donations, and that this concept did not encompass the district where the donee deposited the funds. Prosecutors facing similar fact situations should contact the Public Integrity Section to discuss potential solutions regarding venue.

In *United States v. Chestnut*, 533 F.2d 40 (2d Cir. 1976), the Second Circuit held that the act of "receiving" a prohibited contribution or expenditure encompassed the donee's acceptance of it. Therefore, multi-district acceptance, or "donee," cases may be brought in the district where the donee accepted the donation.

Venue for reporting offenses lies generally where the inaccurate report was prepared, dispatched, or received by the FEC. The FEC's offices are in the District of Columbia.

### 6. Other Applicable Federal Criminal Statutes

Conduct giving rise to a FECA violation may also give rise to violations of other federal statutes as well. The following statutes

provide viable charging theories for conduct in violation of FECA and should be pursued where applicable.

**(a) Willfully causing submission of false information to the Federal Election Commission: 18 U.S.C. §§ 1001 and 2.**

Each political committee that seeks to influence a federal election is required to have a treasurer who is required to file periodic reports with the FEC of contributions to and expenditures by the committee, including the identity of all persons contributing over $200 in a calendar year. 52 U.S.C. §§ 30102(a), 30104(a) & (b)(3)(A). In addition, persons receiving a contribution to a political committee must forward it to the treasurer, along with the identity of all donors contributing over $50. 52 U.S.C. § 30102(b). The treasurer's reports thus include information from individuals who have forwarded contributions to the committee.

A treasurer who submits information concerning contributions or expenditures to the FEC, knowing the information to be false, violates 18 U.S.C. § 1001. A person involved in a transaction reportable under FECA who attempts to disguise it, or misrepresents its source, purpose, or amount, "willfully causes" the treasurer of the recipient committee to furnish false information concerning the transaction to the FEC in violation of 18 U.S.C. §§ 2(b) and 1001 under the *Bryan* intent standard (which Department policy recognizes as applicable to § 1001). This information is "material" to the "jurisdiction" of the FEC in that it impacts adversely upon the Commission's statutory duties to make public an accurate account of financial transactions done for the purpose of influencing a federal election, *see* 52 U.S.C. § 30111(a)(4), and, in situations when the concealed fact itself constitutes a violation of FECA, to enforce the law, *see* §§ 30107(a)(6) & (9), 30109(a)(5).

The application of Section 1001 to campaign financing violations follows from *United States v. Hansen*, 772 F.2d 940 (D.C. Cir. 1985). In that case, Congressman Hansen was indicted and convicted under Section 1001 for filing false reports with the House Committee on Standards of Official Conduct under the 1978 Ethics in Government Act (EIGA). Like a portion of FECA, EIGA is essentially a disclosure statute; it applies to federal officeholders and candidates, while FECA applies to persons seeking federal office. Also like FECA, EIGA has an internal penalty that provides for non-felony sanctions. The D.C. Circuit rejected the contention that, by enacting EIGA, Congress had repealed by implication existing felony sanctions for false reports by public officials; the court held that the civil penalty in EIGA and the felony penalty under Section 1001 "produce a natural progression in penalties," and that "those who lie on their [EIGA] forms" violate Section 1001. *Hansen*, 772 F.2d at 945.

The use of Section 1001, in conjunction with Section 2(b), to prosecute those who willfully cause the treasurer of a political committee to submit materially false data to the FEC has been upheld by every court that has decided the issue.[62] *United States v. Hsia*, 176 F.3d 517 (D.C. Cir. 1999); *United States v. Kanchanalak*, 192 F.3d 1037 (D.C. Cir. 1999); *United States v. Curran*, 20 F.3d 560 (3d Cir. 1994); *United States v. Hopkins*, 916 F.2d 207 (5th Cir. 1990); *United States v. Braddock*, Crim. No. 12-cr-157, 2013 WL 4441531, at *10 (D. Conn. Aug. 14, 2013); *United States v. O'Donnell*, Crim. No. 08-872, 2009 WL 9041223, at *6 (C.D. Cal.), *aff'd*, 608 F.3d 546 (9th Cir. 2010); *see also United States v. Whittemore*, 776 F.3d 1074, 1080 (9th Cir. 2015) (finding a jury's conclusion that the defendant caused a false report to the FEC in violation of 18 U.S.C. §§ 1001(a)(2)

---

[62] Several significant false reporting cases were prosecuted during the early days of FECA, before the FEC was created. *E.g.*, *United States v. Fin. Comm. to Re-elect the President*, 507 F.2d 1194, 1197–98 (D.C. Cir. 1974) (upholding convictions for willful failure to report a $200,000 cash contribution).

and 2 "follow[ed] accordingly" from findings that the defendant was the "true source" of the money used for contributions made by conduits); *United States v. Gabriel,* 125 F.3d 89 (2d Cir. 1997) (*dicta*) (analyzing the interrelationship between Section 1001 and FECA).

In most circuits, for a defendant to have "knowingly and willfully" made a false statement or have caused false statements to be made to the FEC, he or she must have known that the statement was false and he or she must have intended to act unlawfully, even if he or she was unaware of the specific reporting requirement. Most circuits have adopted this interpretation of the willful requirement in Section 1001; *see also Bryan*, 524 U.S. 184 (1998). Some have adopted a lesser standard. *See United States v. Hsia*, 176 F.3d 517, 521–22 (D.C. Cir. 1999); *United States v. Hopkins*, 916 F.2d 207, 214–15 (5th Cir. 1990). The Third Circuit, alone, has required the heightened showing that the defendant have also been aware of the specific statutory duty to disclose. *See Curran*, 20 F.3d at 570; *see also Starnes*, 583 F.3d at 211 (limiting *Curran* to "tandem violations of §§ 1001 and 2(b) in the 'federal election law context.'"). Department policy is to apply the *Bryan* standard.

The elements of a Section 1001 offense, in the context of false statements made to the FEC, are:

- the defendant caused another to make a statement that was false;

- the false statement concerned a matter that was within the jurisdiction of the Federal Election Commission; that is, the false statement related to a fact that the Federal Election Campaign Act required to be accurately reported;

- the false statement was material to the FEC, that is, it had the natural tendency to influence the FEC in the performance of its official duties; and

- the defendant acted knowingly and willfully; that is, the defendant intended to cause the recipient to record false statements and knew, generally, that making such a false statement as unlawful. However, the government does *not* have to prove that the defendant was aware of the specific statutory requirements and prohibitions of FECA or that he or she was aware of the federal agency's interest in the matter falsified.

**(b) Conspiracy to defraud the United States: 18 U.S.C. § 371**

The "conspiracy to defraud" approach to FECA crimes is based on *Hammerschmidt v. United States*, 265 U.S. 182 (1924), which held that a conspiracy to defraud the United States under Section 371 includes a conspiracy "to interfere with or obstruct one of [the federal government's] lawful governmental functions by deceit, craft, or trickery, or at least by means that are dishonest." *Id.* at 188. *See also, Dennis v. United States*, 384 U.S. 855, 861 (1966); *Haas v. Henkel*, 216 U.S. 462, 469 (1910).

This conspiracy theory, as applied to the functioning of the FEC, is as follows: the FEC, an agency of the United States, has the principal statutory duties of enforcing FECA's campaign financing prohibitions and disclosure requirements and providing the public with accurate information regarding the source and use of contributions to federal candidates and expenditures supporting federal candidates. 52 U.S.C. §§ 30106 and 30107. To perform these duties, the FEC must receive accurate information from the candidates and political committees that are required to file reports under the Act. A scheme to infuse patently illegal funds into a federal campaign, such as by using conduits or other means calculated to conceal the illegal source of the contribution, thus disrupts and impedes the FEC in the performance of its statutory duties.

As previously stated, prosecution under FECA's criminal provision requires proof that the defendant was aware that his or her conduct was generally unlawful. When the conduct is charged under Section 371, however, the proof must also show that the defendant intended to disrupt and impede the lawful functioning of the FEC. Indeed, the crux of a Section 371 FECA case is an intent on the part of the defendant to thwart the FEC. That is a higher factual burden than is required under 18 U.S.C. § 1001, and is arguably a greater factual burden than is required by Section 30109(d).

The use of Section 371 in this manner has been approved by the Third, Fifth, and D.C. Circuits. *United States v. Hsia*, 176 F.3d 517, 521 (D.C. Cir. 1999); *United States v. Curran*, 20 F.3d 560, 562 (3d Cir. 1994); *United States v. Hopkins*, 916 F.2d 207, 212 (5th Cir. 1990).

#### (c) Public financing crimes relating to presidential campaigns

The anti-fraud provisions of the Presidential Primary Matching Payment Account Act, 26 U.S.C. §§ 9031-9042, and the Presidential Election Campaign Fund Act, 26 U.S.C. §§ 9001-9012, are five-year felonies and can be used to prosecute aggravated campaign financing schemes involving presidential campaigns. 26 U.S.C. §§ 9012 and 9042.

These statutes were enacted after the Supreme Court struck down the 1974 FECA's limits on campaign expenditures by federal candidates as violative of free speech. *Buckley v. Valeo*, 424 U.S. 1 (1976). The statutes tie eligibility for federal funds to voluntary adherence to campaign expenditure limits by participating candidates. Thus, presidential candidates are given a choice between making unlimited campaign expenditures or accepting public funds for their

campaigns in return for agreeing to abide by campaign expenditure limits.

The "matching payment" statute applies to the presidential primary campaign. It provides that, once certain statutory qualifications are met, a presidential candidate is entitled to receive matching payments (for contributions up to $250 from individual donors) from the United States Treasury for his or her campaign, up to half of the applicable total campaign spending limit. 26 U.S.C. § 9034(b). Presidential candidates who choose to accept primary campaign matching funds are subject to FECA's campaign expenditure limits. 52 U.S.C. § 30116(b).

The general election funding statute allows a candidate who has been nominated by a major party (i.e., the Republican Party or the Democratic Party) or by a qualifying minor or new party for the Presidency to receive all of his or her campaign funds from the United States Treasury. 26 U.S.C. § 9004(a)(1). Presidential candidates who choose to accept this federal grant are subject to the campaign expenditure limits in 2 U.S.C. § 441a(b), and are also for the most part prohibited from accepting any private contributions in connection with the general election phase of their campaigns. 26 U.S.C. §§ 9003 and 9012.

Both public financing statutes contain bookkeeping and reporting requirements, and also require that each campaign receiving federal funds submit to a post-election audit by the FEC. 26 U.S.C. §§ 9033 and 9003. Participating candidates must also agree to pay back all funds which the FEC determines were not used for campaign purposes, or which were spent in excess of the expenditure limit, were not matchable, or were otherwise illegal. 26 U.S.C. §§ 9038 and 9007.

Each of these statutes contains its own criminal provision for, among other things, providing false information to the FEC to obtain

public funds, which is punishable by imprisonment for up to five years and a fine under 18 U.S.C. § 3571. 26 U.S.C. §§ 9042(c) and 9012(d). Prosecutors considering false statement charges in connection with conduct violating one of these public funding laws thus have the choice of using either the public funding statute that specifically addresses the conduct or the general false statements statute, 18 U.S.C. § 1001. *See also United States v. Hopkins*, 916 F.2d 207 (5th Cir.1990) (same); *United States v. Woodward*, 469 U.S. 105 (1985) (affirming Section 1001 charge for currency reporting offense).

The administration and civil enforcement of these grant programs are within the FEC's sole jurisdiction. However, since these are federal funding programs, with federal candidates as the beneficiaries, if there is evidence of an intent to defraud the United States in the implementation of these programs, criminal prosecution is warranted and should be pursued.

**(d) Mail and wire fraud: 18 U.S.C. §§ 1341 and 1343**

The federal mail and wire fraud statutes, 18 U.S.C. §§ 1341 and 1343, which criminalize the use of the mails or interstate wires to further a scheme or artifice to defraud,[63] can provide an additional basis for prosecuting conduct that also violates FECA. Further, conduct in violation of state campaign finance laws, although not subject to FECA's provisions, may violate other federal laws, like the mail and wire fraud statutes. Federal prosecutors should consider these statutes when evaluating possible charges for unlawful campaign finance conduct.

The salary theory of mail and wire fraud, discussed at length in Chapter 2, may also provide a basis to prosecute state and federal campaign financial law violations by candidates and their agents. As discussed, however, courts are split as to whether the salary theory is

---

[63] Except for the jurisdictional element, the mail and wire fraud statutes are identical and courts have interpreted their elements in the same manner.

viable and federal prosecutors should be familiar with the law in their circuit and district before pursuing charges on this basis and consult with the Public Integrity Section.

In addition to the penalties imposed for diverting campaign funds in violation of Section 30114, the mail and wire fraud statutes may be used to prosecute embezzlement or theft of campaign funds. These cases generally fall into three factual scenarios, only the first two of which are also covered by Section 30114:

i) Diversion by a candidate or campaign agent of incoming contributions to the candidate or committee before the contributions are deposited; and

ii) Embezzlement by a campaign agent or other person of contributions to a candidate or committee that have been deposited into the campaign's account; and

iii) Establishment of a fictitious political organization for the purpose of raising funds to be converted to personal use.

Examples of campaign embezzlement cases are *United States v. Thomas*, Cr. No. 05-0423 (D.D.C., information filed Nov. 30, 2005); *United States v. Bracewell*, Cr. No. 91-57-N (M.D. Ala., superseding indictment filed May 9, 1991); and *United States v. Karlsen*, Cr. No. 89-353 (D. Az., indictment filed Oct. 18, 1989).[64]

---

64 Copies of these charges, to which the defendants pled guilty, can be obtained from the Public Integrity Section.

#### (e) False records in the administration of a federal matter: 18 U.S.C. § 1519

Title 18 also affords an alternative for charging false statements that a defendant makes or causes in *records* of either a federal political entity (such as a federal candidate's authorized campaign committee) or in reports to the FEC. Specifically, under 18 U.S.C. § 1519, "[w]hoever knowingly … conceals, covers up, falsifies, or makes a false entry in any record [or] document … with the intent to impede, obstruct, or influence the investigation or proper administration of any matter within the jurisdiction of any department or agency of the United States … or in relation to or contemplation of any such matter or case" commits a twenty-year felony. The Department has applied this statute, in conjunction with 18 U.S.C. § 2, in charging defendants with causing false internal records of campaign expenditures and false external records in the follow-on campaign filings with the FEC by unwitting campaign personnel. The FEC's proper administration of the reporting and publication of expenditure reports serve as the predicate federal matter.

### 7. Policy and Procedural Considerations

#### (a) Consultation requirements and recommendations

For decades, the Public Integrity Section has coordinated the Department's law enforcement efforts against campaign financing crimes with United States Attorneys' Offices. The Section has two main goals in this area: to provide prompt and accurate guidance regarding the prosecutive potential of campaign financing allegations, and to assist the United States Attorneys' Offices and the FBI in bringing effective criminal penalties to bear when warranted.

Not all FECA violations are federal crimes, either because they lack the requisite criminal intent or because they do not meet the applicable monetary floor for FECA crimes. Early consultation with

the Public Integrity Section assists the Department, the United States Attorneys' Offices, and the FBI by ensuring that investigative and prosecutorial resources are focused on FECA violations only when appropriate.

Accordingly, the Department requires that the Public Integrity Section be consulted before beginning any criminal investigation, including a preliminary investigation, of a matter involving possible violations of FECA. USAM § 9-85.210. This consultation is also required before any investigation of campaign financing activities under one of the Title 18 felony theories discussed above. *Id.* The Public Integrity Section also recommends that the Section be consulted before commencing an investigation of possible violations of the public funding programs in Title 26.

Facts reflecting possible non-criminal FECA violations, should be brought to the attention of the Public Integrity Section, which will forward them to the FEC.

#### (b) Investigative jurisdiction

Criminal investigations of possible FECA violations, as well as violations of 26 U.S.C. §§ 9012 and 9042, are conducted by the FBI and other federal law enforcement agencies. Civil investigations are conducted by the FEC. The FEC is authorized by statute to conduct a civil inquiry parallel to an active criminal investigation involving the same matter. 52 U.S.C. §§ 30107(a)(9) and (e). Parallel proceedings present unique challenges to federal prosecutors and investigators. In these cases the Public Integrity Section should be consulted to ensure that any procedures or agreements regarding parallel proceedings are followed.

### (c) Non-waiver of the Federal Election Commission's civil enforcement authority

The FEC's enforcement jurisdiction over non-criminal FECA violations cannot be compromised or waived by the Department of Justice. 52 U.S.C. § 30107(a)(6) and (e). Accordingly, plea agreements with defendants who have possible non-criminal exposure for FECA violations must contain a specific disclaimer to the effect that the Department of Justice is not waiving the civil enforcement jurisdiction of the FEC, such as the following:

> Nothing in this agreement waives or limits in any way the authority of the Federal Election Commission to seek civil penalties or other administrative remedies for violations of the Federal Election Campaign Act pursuant to Section 30109(a) of Title 52, United States Code.

### (d) Dealings with the Federal Election Commission

As discussed above, the FEC and the Justice Department have overlapping enforcement responsibilities over willful and aggravated violations of FECA. At the same time, the FEC is an independent executive agency responsible for the oversight and civil enforcement of the federal campaign financing laws. The Commission's independent authority requires that the Department respect the FEC's enforcement efforts. Over time, the Public Integrity Section has developed good relationships with the FEC and its staff, and can help prosecutors and agents quickly obtain the information they need from the FEC. The FEC's Public Records Division has long been a helpful resource in developing campaign financing cases.

The United States Attorneys' Offices and the FBI should, whenever possible, route inquires to the FEC through the Public Integrity Section. Doing this avoids confusion and increases the

likelihood of a positive response from the Commission. It also helps to ensure that the good working relationship between the two agencies is maintained. The Section has also had success in recent years in working with the FEC to ensure that the Commission's civil enforcement responsibilities do not interfere with the Department's overlapping criminal jurisdiction. On occasion the FEC has voluntarily delayed moving forward with its own proceedings in order to avoid potential adverse effects on a pending criminal investigation.

In 1977, the FEC and the Department of Justice entered into a Memorandum of Understanding relating to their respective law enforcement jurisdiction and responsibilities. 43 FED. REG. 5441 (1978). However, in light of the significant statutory enhancements to the Department's ability to prosecute FECA crimes that were contained in the 2002 Bipartisan Campaign Reform Act, the 1977 Memorandum no longer reflects current congressional intent or Department policy.

**(e) Federal Election Commission officials as prosecution witnesses**

The prosecution of criminal cases involving FECA violations generally requires testimony from expert witnesses and document custodians from the FEC. In order to utilize 18 U.S.C. §§ 371, 1001, or 1519 for FECA violations, the prosecutor must prove that the filings on which the case is based were false to a point that they had the potential to mislead or disrupt the FEC's ability to discharge its statutory responsibilities. Federal prosecutors seeking FEC witnesses should contact the Public Integrity Section, which will arrange for an FEC official who possesses the requisite expertise to testify to these issues. The FEC has at times advised that requests for FEC staff to appear as prosecution trial witnesses should be made by subpoena.[65]

[65] This is a departure from the usual practice of relying on oral or written requests for trial testimony from federal government personnel.

In 1991, the Justice Department's Justice Management Division (JMD) concluded that the travel and subsistence expenses of FEC staff who testify for the prosecution at FECA-based criminal trials are to be borne by the Department. Therefore, before a subpoena is served on an FEC employee to testify as a trial witness, the federal prosecutor handling the case should prepare a JMD expert witness form (OBD 47) providing information about the case and the FEC employee's role in it. This form is then to be submitted to JMD, which will generate a financial commitment form to accompany the trial subpoena when it is served on the prospective FEC witness.

# CHAPTER SIX

# SENTENCING OF ELECTION CRIMES

## A. OVERVIEW

This chapter discusses the sentencing of election crimes pursuant to the United States Sentencing Guidelines promulgated by the United States Sentencing Commission. U.S. SENTENCING GUIDELINES MANUAL (U.S.S.G. or sentencing guidelines).

For sentencing purposes, election crimes are divided into four categories:

(1) *Offenses involving corruption of the electoral process.* This type of offense is governed by U.S.S.G. § 2H2.1.

(2) *Offenses that violate FECA.* Campaign financing offenses that occur after January 25, 2003, are governed by U.S.S.G. § 2C1.8, a guideline that was promulgated by the United States Sentencing Commission in response to a congressional mandate in the BCRA. *See United States v. Rowland*, Cr. No. 3:14cr79 (JBA), 2015 WL 1275655, at *3 (D. Conn. Mar. 19, 2015) (applying Section 2C1.8 to a FECA violation). Prior to January 25, 2003, there was no guideline, or analogous guideline, that applied to FECA offenses and therefore FECA crimes were sentenced pursuant to U.S.S.G. § 2X5.1.

(3) *Campaign financing offenses addressed by alternative theories of prosecution.* Certain campaign financing crimes also may be prosecuted under Title 18 statutes, such as 18 U.S.C. § 371 (conspiracy), § 1001 (false statements), § 1341 (mail fraud), § 1343 (wire fraud), and § 1519 (creation of false

internal or external records). Conspiracy and fraud offenses are governed by U.S.S.G. § 2C1.1. Courts have held that Section 2C1.1 applies only to conspiracies to defraud that harm the government "in a manner similar to bribery offenses," although such a limitation is not apparent on the face of the guideline language. *See United States v. Huizar-Velazquez*, 720 F.3d 1189, 1191 (9th Cir. 2013); *see also United States v. Orsburn*, 525 F.3d 543, 544 (7th Cir. 2008) (Section §2C1.1 does not apply to "simple theft by public officials"); *Rowland*, 2015 WL 1275655, at *2 (holding that Section 2C1.8, rather than Section 2C1.1, applied to defendant's conviction for obstructing an FEC investigation).

False statement offenses that occur after January 25, 2003, are governed by FECA guideline pursuant to the cross-reference for fraudulent statements in U.S.S.G. § 2B1.1(c)(3).

(4) *Patronage offenses*. To date, there has been no jurisprudence addressing the application of the sentencing guidelines to patronage offenses. Some of these crimes (*e.g.,* 18 U.S.C. §§ 600, 601) may be governed by the fraud guideline, U.S.S.G. § 2B1.1. Others (*e.g.*, 18 U.S.C. §§ 602, 606, 610) may be governed by the robbery and extortion guideline, U.S.S.G. § 2B3.1. A few do not appear to be governed by any guideline, and thus would be handled for sentencing purposes under U.S.S.G. §§ 2X5.1 or 2X5.2.

## B. CONVICTIONS INVOLVING CORRUPTION OF THE ELECTORAL PROCESS

The guideline that governs sentencing for convictions that involve corruption of the electoral process is U.S.S.G. § 2H2.1. By its terms, this guideline applies to corruption of the electoral process regardless of the type of scheme involved or federal statute it violates. The guideline provides for three

alternative base offense levels (18, 12, or 6) depending upon the nature of the conduct involved in the offense. Specifically, Section 2H2.1 reads as follows:

**1. § 2H2.1: Obstructing an Election or Registration**

(a) Base Offense Level (Apply the greatest):

(1) **18,** if the obstruction occurred by use of force or threat of force against person(s) or property; or

(2) **12**, if the obstruction occurred by forgery, fraud, theft, bribery, deceit, or other means, except as provided in (3) below; or

(3) **6,** if the defendant (A) solicited, demanded, accepted, or agreed to accept anything of value to vote, refrain from voting, vote for or against a particular candidate, or register to vote, (B) gave false information to establish eligibility to vote, or (C) voted more than once in a federal election.

Most election frauds involve offenders who have schemed, either by themselves or with others, to cause numerous illegal ballots to be cast through such methods as forgery, fraud, bribery, voter impersonation, multiple-voting, or ballot-box stuffing. Such conduct falls within U.S.S.G. § 2H2.1(a)(2) and calls for a base offense level of twelve. Relevant conduct, as defined in U.S.S.G. § 1B1.3(a), should be considered in selecting the appropriate base offense level.

Three circuits have approved sentencing calculations under this guideline:

In *United States v. Smith*, 231 F.3d 800, 818-21 (11th Cir. 2000), the Eleventh Circuit discussed the application of Section 2H2.1(a)(2) to a voter fraud scheme involving a deputy voter registrar and a political activist. The defendants were charged and convicted of multiple-voting (i.e., marking ballots in the names of voters without the voters' knowledge) in violation of 52 U.S.C. § 10307(e), and forging voters' names on applications for absentee ballots and on ballots in violation of 52 U.S.C. § 10307(c). *Id.* at 805-06. The Eleventh Circuit approved the following guideline calculations made by the district court: (1) a base offense level of twelve for both defendants; (2) a two-level enhancement for the deputy registrar for abuse of a position of public trust under U.S.S.G. § 3B1.3; (3) a four-level enhancement for both defendants based on the court's finding that each was an "organizer or leader of criminal activity that involved five or more participants" under U.S.S.G. § 3B1.1(a); and (4) a two-level enhancement for the political activist for obstructing justice based on evidence that the defendant influenced a witness to give a false affidavit concerning material facts. *Id.* at 819-21.

*United States v. Cole*, 41 F.3d 303 (7th Cir. 1994), also involved a deputy voter registrar who was convicted of multiple-voting in violation of 52 U.S.C. § 10307(e). Proof at trial established that the defendant applied for and marked absentee ballots for several voters without their knowledge and consent, and that he threatened one of these voters to dissuade him from cooperating in the ensuing criminal investigation. *Id.* at 308, 311. The district judge assigned a base offense level of twelve to the offense under Section 2H2.1(a)(2), and applied enhancements for the leadership role in a conspiracy involving five or more participants under Section 3B1.1(a) (four levels), abuse of a position of public trust under Section 3B1.3 (two levels), and

obstruction of justice under Section 3C1.1 (two levels), for a total offense level of twenty. *Id.* at 311. The defendant was sentenced to forty-six months of imprisonment. *Id.* at 305. The Seventh Circuit held that the district judge's sentencing analysis was accurate. *Id.* at 311.

In *United States v. Haynes*, Nos. 91-5979, 91-6076, 1992 WL 296782, at *1 (6th Cir. Oct. 15, 1992), the defendants, party officials authorized to register voters, were convicted of conspiracy against rights and deprivation of constitutional rights in violation of 18 U.S.C. §§ 241 and 242 by destroying over 150 voter registration applications. Starting with a base level of twelve, they received upward adjustments of two levels for abuse of a position of trust, and five levels for multiple counts, resulting in a total offense level of nineteen. *Id.* at *3-4. The trial court imposed sentences of thirty months of imprisonment. *Id.* at *2. The Sixth Circuit upheld these sentences with the exception of a two-level reduction for the less culpable defendant. *Id.*at *3.

Other election fraud convictions have resulted in similar calculations under the sentencing guidelines. *E.g., United States v. Slone,* 411 F.3d 643, 650-51 (6th Cir. 2005) (affirming defendant's conviction for vote-buying in violation of 52 U.S.C. § 10307(c) and sentence of fifteen months' imprisonment calculated on a base offense level of twelve under § 2H2.1(a)(2), plus a two-level enhancement for obstructing justice under § 3C1.1(b) for lying to the FBI); *United States v. Sparkman*, Cr. No. 99-30, 2008 WL 2787415, at *1 (E.D. Ky. July 12, 2000) (following conviction for vote-buying in violation of 52 U.S.C. § 10307(c) and lying to the FBI in violation of 18 U.S.C. § 1001, sentence of twenty-four months' imprisonment calculated on a base offense level of twelve under § 2H2.1(a)(2), a three-level enhancement for leadership role under § 3B1.1(b), and two-level enhancement for obstruction of justice under § 3C1.1(b), for a total offense level of seventeen); *United States v. Boards*, Cr. No.

LR-92-183 (E.D. Ark. Sept. 12, 1994) (sentencing proceeding) (following convictions for conspiracy and providing false information under § 10307(c); total offense level of eight; prison term of thirteen months imposed), 10 F.3d 587 (8th Cir. 1993) (reversing trial court's judgments of acquittal on several counts and affirming other convictions); *United States v. Salisbury*, Cr. No. 2-90-197 (S.D. Ohio Oct. 8, 1991) (sentencing proceeding) (conviction for multiple-voting in violation of 52 U.S.C. § 10307(e); total offense level of fourteen; prison term of eighteen months imposed), *rev'd on other grounds*, 983 F.2d 1369 (6th Cir. 1993) (statute unconstitutionally vague as applied to defendant's conduct).

The *Smith* and *Cole* cases illustrate several issues prosecutors are likely to face in this area. First, all the defendants received four-level enhancements for their role in the offenses. In *Cole*, the defendant had contended that the fifteen voters involved were victims of the conspiracy, not "participants" within the meaning of Section 3B1.1. The court agreed with the government that, regardless of whether the voters were participants or outsiders, the criminal activity was "otherwise extensive" within the meaning of Section 3B1.1(a). In addition, both district courts found that a deputy voter registrar occupied a position of trust, requiring a two-level increase under Section 3B1.3. The Sixth Circuit also approved this upward adjustment in *Haynes*.

The *Smith* case presented another important sentencing issue. The defendants argued that the offense was essentially a "multiple-voting" crime, and the appropriate base level for "multiple-voting" was six under Section 2H2.1(a)(3) rather than twelve under Section 2H2.1(a)(2). Their argument was based on the fact that the words "multiple- voting" appear in Section 2H2.1(a)(3). The Eleventh Circuit held that despite this specific reference, Section 2H2.1(a)(3) was intended to apply only to isolated instances of electoral fraud (e.g., one person voting

twice), and that Subsection (a)(2), not (a)(3), governed all vote fraud schemes that entailed the casting of several corrupt ballots:

> We agree with the district court that the appropriate base offense level was 12, as provided in Section 2H2.1(a)(2). The language of (a)(2) applies in any case in which a forgery, fraud, theft, bribery, deceit or other means are used to effect the vote of another person, or the vote another person was entitled to cast. By contrast, the language of (a)(3) addresses an individual who acts unlawfully only with respect to his own vote, or votes more than once in his own name. The offenses for which Smith and Tyree were convicted involved the votes of other individuals, in particular, the forging of other voters' names on applications for absentee ballot and affidavits of absentee voters. The district court did not err in applying a base offense level of 12.

*Smith*, 231 F.3d at 817–18.

In summary, certain factors that are often involved in election frauds will increase recommended sentences under the sentencing guidelines:

- A defendant who occupies a leadership or supervisory role in an election fraud scheme may receive an additional two to four levels under Section 3B1.1.

- A defendant who abuses a position of public or private trust (such as a public official who uses his or her office to facilitate election fraud, or a private individual who fraudulently marks and submits ballots entrusted to him or her by voters) will receive two additional

offense levels under Section 3B1.3. U.S.S.G. § 2H2.1, cmt. background (1998).

- If individual voters are viewed as vulnerable victims, separate substantive counts under Section 2H2.1 generally cannot be grouped under Section 3D1.2, so that counts involving multiple voters may result in increases of up to an additional five levels.

- Obstruction may add increased levels under Section 3C1.1. *See Slone*, 411 F.3d 643 (lying to the FBI); *Cole*, 41 F.3d 303 (threatening a witness).

- If the election fraud involved "corrupting a public official," an upward departure may be warranted under Chapter Five, Part K (Departures). U.S.S.G. § 2H2.1, cmt. n.1 (1998).

Thus, even for defendants without a criminal history, the guidelines' upward adjustments generally raise the base offense level for election fraud to a point where the imposition of significant prison terms is recommended.

For the purpose of sentencing criminal violations of FECA, offenses are handled under FECA guidelines. The guideline, U.S.S.G. § 2C1.8, reads as follows:

2. **§ 2C1.8: Making, Receiving, or Failing to Report a Contribution, Donation, or Expenditure in Violation of the Federal Election Campaign Act; Fraudulently Misrepresenting Campaign Authority; Soliciting or Receiving a Donation in Connection with an Election While on Certain Federal Property**

(a) Base Offense Level: **8**

(b) Specific Offense Characteristics

(1) If the value of the illegal transactions exceeded $6,500, increase by the number of levels from the table in § 2B1.1 (Theft, Property Destruction, and Fraud) corresponding to that amount.

(2) (Apply the greater) If the offense involved, directly or indirectly, an illegal transaction made by or received from –

(A) a foreign national, increase by **2** levels; or

(B) a government of a foreign country, increase by **4** levels.

(3) If (A) the offense involved the contribution, donation, solicitation, expenditure, disbursement, or receipt of governmental funds; or (B) the

defendant committed the offense for the purpose of obtaining a specific, identifiable non-monetary Federal benefit, increase by **2** levels.

(4) If the defendant engaged in 30 or more illegal transactions, increase by **2** levels.

(5) If the offense involved a contribution, donation, solicitation, or expenditure made or obtained through intimidation, threat of pecuniary or other harm, or coercion, increase by **4** levels.

(c) Cross Reference

(1) If the offense involved a bribe or gratuity, apply § 2C1.1 (Offering, Giving, Soliciting, or Receiving a Bribe; Extortion Under Color of Official Right; Fraud Involving the Deprivation of the Intangible Right to Honest Services of Public Officials; Conspiracy to Defraud by Interference with Governmental Functions) or § 2C1.2 (Offering, Giving, Soliciting, or Receiving a Gratuity), as appropriate, if the resulting offense level is greater than the offense level determined above.

*Commentary*

*Statutory Provisions: 18 U.S.C. § 607; 52 U.S.C. §§ 30109(d), 30114, 30116, 30117, 30118, 30119, 30120, 30121, 30122, 30123, 30124(a), 30125, 30126. For additional provision(s), see Statutory Index (Appendix A).*

*Application Notes:*

1. *Definitions.— For purposes of this guideline:*

   *"Foreign national" has the meaning given that term in section 319(b) of the Federal Election Campaign Act of 1971, 52 U.S.C. § 30121(b).*

   *"Government of a foreign country" has the meaning given that term in section 1(e) of the Foreign Agents Registration Act of 1938 (22 U.S.C. § 611(e)).*

   *"Governmental funds" means money, assets, or property, of the United States Government, of a State government, or of a local government, including any branch, subdivision, department, agency, or other component of any such government. "State" means any of the fifty States, the District of Columbia, the Commonwealth of Puerto Rico, the United States Virgin Islands, Guam, the Northern Mariana Islands, or American Samoa. "Local government" means the government of a political subdivision of a State.*

   *"Illegal transaction" means (A) any contribution, donation, solicitation, or expenditure of money or anything of value, or any other conduct, prohibited by the Federal Election Campaign Act of 1971, 52 U.S.C. § 30101 et seq; (B) any contribution, donation, solicitation, or expenditure of money or anything of value made in excess of the amount of such*

*contribution, donation, solicitation, or expenditure that may be made under such Act; and (C) in the case of a violation of 18 U.S.C. § 607, any solicitation or receipt of money or anything of value under that section. The terms "contribution" and "expenditure" have the meaning given those terms in section 301(8) and (9) of the Federal Election Campaign Act of 1971 (52 U.S.C. § 30101(8) and (9)), respectively.*

2. *Application of Subsection (b)(3)(B).— Subsection (b)(3)(B) provides an enhancement for a defendant who commits the offense for the purpose of achieving a specific, identifiable non- monetary Federal benefit that does not rise to the level of a bribe or a gratuity. Subsection (b)(3)(B) is not intended to apply to offenses under this guideline in which the defendant's only motivation for commission of the offense is generally to achieve increased visibility with, or heightened access to, public officials. Rather, subsection (b)(3)(B) is intended to apply to defendants who commit the offense to obtain a specific, identifiable non-monetary Federal benefit, such as a Presidential pardon or information proprietary to the government.*

3. *Application of Subsection (b)(4).— Subsection (b)(4) shall apply if the defendant engaged in any combination of 30 or more illegal transactions during the course of the offense, whether or not the illegal transactions resulted in a conviction for such conduct.*

4. *Departure Provision.— In a case in which the defendant's conduct was part of a systematic or pervasive corruption of a governmental function, process, or office that may cause loss of public confidence in government, an upward departure may be warranted.*

* * *

In addition, when creating the guideline in 2003, the Sentencing Commission amended Section 3D1.2(d) regarding closely related counts to include Section 2C1.8, and amended Section 5E1.2 to incorporate FECA's mandatory minimum fining provisions and maximum fining range under 52 U.S.C. § 30109(d)(1)(D) for conduit crimes that violate 52 U.S.C. § 30122.

Finally, in commenting on the guideline, the Sentencing Commission recognized that there might be cases in which the defendant has entered into a conciliation agreement with the FEC. The Commission stated that the existence of such a conciliation agreement, and the extent of compliance with it, are appropriate factors for a sentencing court to consider in determining at what point within the applicable fine guideline range to sentence the defendant. However, the Commission also stated that these factors are not appropriate when the defendant began negotiations toward a conciliation agreement after becoming aware of a criminal investigation.

In addition to sentencing issues, a criminal disposition for a FECA offense might present an opportunity for the defendant to obtain a concurrent settlement from the FEC of his or her civil liability for FECA violations through what is known as a "global" plea agreement. If during plea negotiations the defendant indicates a desire to settle his or her civil FECA liability as well, the Department can assist in forwarding this request to the FEC. The normal procedure is for the federal prosecutor to contact the Public Integrity Section, which will forward the defendant's request and proposed civil settlement to the FEC for its consideration.

### 3. Examples of Application of FECA Sentencing Guidelines

The following six examples illustrate how the Department believes the guideline for campaign financing crimes would work for various FECA financing crimes. Each scenario assumes conviction after trial.[66] We have also assumed that the defendant falls under Criminal History Category I.

#### (a) Example 1: The conduit

Factual Scenario: The defendant permitted his name to be used by another person to make a contribution of $4,000 to a federal candidate ($2,000 for the primary and $2,000 for the general election) in violation of 52 U.S.C. § 30122. The funds used to make the contribution came from the other person. The aggregate value of the conduit violations is $4,000. Because the aggregate violation is at least $2,000 but does not exceed $25,000, it is a misdemeanor under 52 U.S.C. § 30109(d)(1)(A)(ii).[67]

---

[66] As readers know, the majority of federal prosecutions result in pleas of guilty, which generally result in a reduction of two or three levels in the defendant's total offense level under § 3E1.1 for acceptance of responsibility. We have not included calculations based on guilty pleas. A two- or three-level reduction in total offense level, especially at higher total levels, may result in a significant reduction in the recommended term of imprisonment.

[67] The offense is a Class A misdemeanor, 18 U.S.C. § 3559(a)(6), to which the guidelines apply. U.S.S.G. § 1B1.2(a).

Total Offense Level: **8**

Base Offense Level under § 2C1.8(a): **8**

Enhancement under § 2B1.1 for value not exceeding $6,500: **0**

Enhancement for number of illegal transactions under § 2C1.8(b)(4) (two conduit contributions of $2,000 each): **0**

Recommended Sentence:

(1) *Incarceration*: 0 to 6 months in Zone A.

(2) *Fine*: A minimum fine of $1,000 and a statutory maximum fine of $100,000, calculated as follows:

(a) Guideline fine: The maximum fine for a Class A misdemeanor under 18 U.S.C. § 3571(b)(5) is $100,000. However, the applicable guideline fine under U.S.S.G. § 5E1.2(c)(3) for an offense level of 8 would be a minimum of $2,000 and a maximum of $20,000. A fine above $20,000 for this offense would require an upward departure under § 5K2.0.

(b) FECA mandatory fine: Not applicable. The offense of conviction involves two violations of 52 U.S.C. § 30122, totaling $4,000. Since the violations do not exceed $25,000, this is a misdemeanor that is subject to the penalty provisions of 52 U.S.C. § 30109(d)(1)(A)(ii) and 18 U.S.C. § 3571(b)(5). Because this is a misdemeanor, the mandatory minimum and the discretionary maximum fining provisions applicable to felony conduit violations under 52 U.S.C. § 30109(d)(1)(D)(i) do not apply.

### (b) Example 2: A typical FECA crime: laundered corporate contributions

Factual Scenario: A corporate CEO contributes $50,000 in corporate funds to a federal candidate in violation of 52 U.S.C. § 30118 by laundering the money through thirteen conduits in violation of § 30122, twelve of whom gave $4,000, and one of whom gave $2,000. The defendant's motive was to fulfill a pledge. The conduct results in one § 30118 felony violation under § 30109(d)(1)(A)(i) with an aggregate value of $50,000, and one § 30122 felony violation under § 30109(d)(1)(D)(i) involving the thirteen conduit transactions. The combined aggregate value of the defendant's illegal conduct is $50,000. The conduct would be charged in two counts: one violation of § 30118 charged under § 30109(d)(1)(A)(i), and thirteen violations of § 30122 aggregated together as one offense charged under § 30109(d)(1)(D)(i).

Total Offense Level: **14**

Base Offense Level under § 2C1.8(a): **8**

Enhancement for value between $40,000 and $95,000 under § 2B1.1(b)(1)(D): **6**

Enhancement for number of illegal transactions under § 2C1.8(b)(4) (fourteen violations – one § 30118 corporate contribution crime and thirteen § 30122 conduit crimes): **0**

Recommended Sentence:

(1) *Incarceration*: 15 to 21 months in Zone D

(2) *Fine*: Between $154,000 and $540,000. Since there are two counts of conviction, the total fine would be the fine on each count added together, calculated as follows:

**(a)** § 30118 count (corporate contribution). Based on an offense level of 14, the guideline range for a fine under this count is $7,500 to $75,000. U.S.S.G. § 5E1.2(c)(3).

**(b)** § 30122 count (conduit contributions). By statute, the fine imposed under this count would be a minimum fine of $150,000 (300% of aggregate violative amount) and a maximum fine of $500,000

(1,000% of aggregate violative amount). 52 U.S.C.
§ 30109(d)(1)(D). Since these are higher fines than those permitted under U.S.S.G. § 5E1.2(c)(3), they prevail. *Id.* § 5E1.2(c)(4).

(c) Total combined fine:

(i) minimum: $7,500 + $150,000 = $162,500

(ii) maximum: $75,000 + $500,000 = $575,000

### (c) Example 3: Corporate contributor to multiple candidates through threats and coercion

Factual Scenario: The defendant is an individual who controls two corporations. The defendant gives $50,000 in corporate funds to fifty federal candidates in $1,000 amounts by laundering them through fifty corporate senior management personnel, and passes the cost of these

contributions back to the two corporations. The defendant makes clear to senior management that their success in his companies depends on their participation in the scheme. The defendant's motive is ideological – all the recipients represent causes in which he believes. The aggregate value involved in the defendant's conduct is $50,000. The conduct would be charged in two counts: one felony violation of Section 30118 charged under § 30109(d)(1)(A)(i), and fifty violations of Section 30122 aggregated together as one felony offense charged under § 30109(d)(1)(D)(i).

Total offense level: **20**

Base Offense Level under § 2C1.8(a): **8**
Enhancements for aggregate value of offense between $40,000 and $95,000 under § 2B1.1(b)(1)(D): **6**

Enhancements for number of illegal transactions under § 2C1.8(b)(4) (Fifty-two offenses – two § 30118 corporate contribution offenses and fifty § 30122 conduit offenses): **2**
Enhancement for intimidation and threats under § 2C1.8(b)(5): **4**

Recommended Sentence:

(1) *Incarceration*: 33 to 41 months in Zone D

(2) *Fine*: Because the nature of the conduct would result in convictions under both the criminal penalty applicable to conduit violations of FECA (§ 30109(d)(1)(D)), and the criminal penalty applicable to non-conduit violations of FECA (§ 30109(d)(1)(A)), the statutory

minimum and maximum penalties for conduit convictions will apply and result in enhanced fines. See Example 2 for an illustration of such a computation.

**(d) Example 4: Fundraiser possessing special skill**

<u>Factual Scenario</u>: The defendant is a professional federal fundraiser who has attended several training courses sponsored by the Federal Election Commission and is therefore intimately familiar with the requirements and prohibitions of the Federal Election Campaign Act. The fundraiser has been retained by a federal candidate. He approaches a wealthy donor who he knows has given the candidate the maximum amount permitted by FECA, and suggests that the donor make a further contribution by permitting the candidate and his staffers to use the donor's personal jet for campaign purposes and without billing the campaign for its use. The ensuing illegal "in-kind" contribution is valued at $225,000, for which the fundraiser is liable as an aider and abettor. The aggregate value of the offense is $225,000, consisting of one felony violation of 52 U.S.C. § 30116(a)(1)(A), charged under Section 30109(d)(1)(A)(i) and 18 U.S.C. § 2.

<u>Total Offense Level</u>: **20**

Base Offense Level under § 2C1.8(a): **8**

Enhancement for value between $150,000 and $250,000 under § 2B1.1(b)(1)(F): **10**

Enhancement for number of transactions under § 2C1.8(b)(4) (one § 30116 violation): **0**

Enhancement for use of special skill under § 3B1.3: **2**

Recommended Sentence:

(1) *Incarceration*: 33 to 41 months in Zone D.
(2) *Fine*: between $15,000 and $150,000, calculated under § 5E1.2(c)(3).[68]

### (e) Example 5: Major political party donor seeking a benefit from the government

Factual Scenario: A wealthy individual wishes to contribute to a national political party committee in order to win political influence to obtain a pardon for his best friend. Under FECA, as amended by the Bipartisan Campaign Reform Act, individuals may give only $25,000 per year to national political party committees, and national political party committees cannot accept soft money. The individual therefore donates the remaining $225,000 to the national party committee by giving the committee the benefit of his personal jet to fly committee staffers around the country, at a value of $225,000, in violation of 2 U.S.C. § 441a(a)(1)(B). The aggregate value of the offense is $225,000 charged under Section 437g(d)(1)(A)(i).

Total Offense Level: **22**

Base Offense Level under § 2C1.8(a): **8**
Enhancement for value between $200,000 and $400,000 under § 2B1.1(b)(1)(G): **12**
Enhancement for number of illegal transactions under § 2C1.8(b)(4) (one $225,000 excessive contribution to a national party committee): **0**

[68] There were no conduit offenses involved in this example. Therefore the mandatory minimum fine and maximum fining range under Section 30109(d)(1)(D) do not apply.

Enhancement for intent to obtain a specific non-monetary federal benefit from the government under § 2C1.8(b)(3): **2**

Recommended Sentence:

(1) *Incarceration*: 41 to 51 months in Zone D.
(2) *Fine*: Between $10,000 and $100,000, pursuant to § 5E1.2(c)(3).

**(f) Example 6: Foreign agent who gives funds from foreign government to non-federal candidates to obtain a specific benefit from the government**

Factual Scenario: The defendant is an agent of a foreign government that is currently seeking United States diplomatic recognition of its annexation of neighboring territory it occupied during a recent military action. In the hopes of garnering political support for this cause, the defendant is given $250,000 by his foreign government principal, which he then gives in $50,000 increments to five candidates seeking governorships of five large states within the United States that impose no limits on political contributions. To conceal his identity, the defendant launders the funds through five individuals who have names that are ethnically identifiable with his foreign government principal, but who have resident alien status under U.S. law. The defendant's conduct results in five violations of 52 U.S.C. § 30121 having an aggregate value of $250,000,

charged together as one felony violation of Section 30109(d)(1)(A)(i).[69]

Total Offense Level: **24**

Base Offense Level: **8**

Enhancements for aggregate value of offense between $150,000 and $250,000 under § 2B1.1(b)(1)(G): **10**

Enhancements for foreign government source: **4**

Enhancements for number of illegal transactions (five § 30121 offenses): **0**

Enhancement for intent to achieve a non-monetary benefit from the Government: **2**

Recommended Sentence:

(1) *Incarceration*: 51 to 63 months in Zone D. (This sentence would be capped at 60 months, the maximum term permitted under Section 30109(d)(1)(A)).

(2) *Fine*: $20,000 to $200,000, calculated under Section 5E1.2(c)(3).

69 Although in BCRA Congress made clear that the prohibition in Section 30121 on contributions from foreign nationals also reached donations to candidates for non-federal office, BCRA did not extend Section 30122 to encompass conduit donations to non-federal candidates.

## C. CONVICTIONS OF CAMPAIGN FINANCING VIOLATIONS ADDRESSED UNDER ALTERNATIVE THEORIES OF PROSECUTION

### 1. Conspiracy to Disrupt and Impede the Federal Election Commission

A scheme involving two or more participants designed in part to thwart the statutory duties of the Federal Election Commission to enforce FECA's reporting requirements and prohibitions and to provide the public with accurate data regarding the financial activities by federal candidates and entities supporting them can be prosecuted as a conspiracy under 18 U.S.C. § 371. The object of such a conspiracy would be to disrupt and to impede the FEC's ability to enforce FECA's requirements and prohibitions, and its statutory duty to make available to the public accurate information regarding contributions and expenditures made to influence the election of federal candidates.

Such offenses are governed by U.S.S.G. § 2C1.1. This guideline carries a base offense level of twelve or fourteen and an enhancement if the conduct involved an elected official or a person in a high-level decision making or sensitive position. In addition, if the defendant's conduct involved "pervasive corruption of a governmental function, process, or office that may cause loss of public confidence in government," an upward departure may be warranted. 52 U.S.C. § 2C1.1, cmt. n.7.

### 2. False Statements to the Federal Election Commission and False Internal Records

Many types of campaign financing crimes may also be charged as willfully causing false statements to be made to a federal agency under 18 U.S.C. § 1001(a)(2). Such false statement

offenses occurring after January 25, 2003, are governed by FECA guideline, U.S.S.G. § 2C1.8, pursuant to the cross-reference in U.S.S.G. § 2B1.1(c)(3) for false statements. Additionally, both false internal campaign records and false FEC filings may be charged as an obstruction under 18 U.S.C. § 1519, which is governed by U.S.S.G. §2J1.2, which, with a base offense level of 14, likely provides the highest guideline range available in campaign finance cases.

### 3. Embezzlement of Campaign Funds

On occasion, treasurers and other agents of candidates or political committees, and at times even candidates, convert campaign contributions to their personal use. If the conversion involves funds from a candidate's committee, it is prohibited by FECA. 52 U.S.C. § 30114. However, if the embezzlement is from a political committee that is not a candidate's committee, FECA prohibition in Section 30114 does not apply. In any event, campaign embezzlements may be prosecuted under the mail or wire fraud statutes, as a scheme to obtain money or property by deceit (18 U.S.C. §§ 1341, 1343). Section 30114 crimes aggregating $25,000 or more are felonies and for sentencing purposes fall under FECA guideline § 2C1.8. This is the preferred approach if the victim is a candidate's committee and the amount embezzled is at least $25,000.

For embezzlements from political committees that are not candidate committees, and for embezzlements from candidate committees involving amounts under $25,000, the mail and wire fraud statutes continue to be useful alternatives. Violations of Sections 1341 and 1343 are governed by the fraud guideline, U.S.S.G. § 2B1.1, which carries a base offense level of 6 with possible enhancements under the fraud loss table, § 2B1.1(b)(1).

Finally, a campaign embezzlement can be addressed under the false statements statute, 18 U.S.C. §§ 1001 and 1519, and 18 U.S.C. § 2 (willfully causing an offense). This is because the embezzlement is concealed from the committee's treasurer, who is required to file detailed reports with the FEC regarding the committee's receipts and disbursements. 52 U.S.C. § 30104(b). Thus, a person who embezzles contributions from a committee willfully causes the committee's treasurer to create false internal records and to submit false information to the FEC regarding the actual use of the funds, in violation of both the reporting requirements of FECA and 18 U.S.C. §§ 1001 and 1519. False statements involving FECA violations fall under FECA guideline, U.S.S.G. § 2C1.8.

## D. OBLIGATION TO REPORT FELONY CONVICTIONS TO STATE ELECTION OFFICIALS

The National Voter Registration Act of 1993 requires United States Attorneys' Offices to send a written notice whenever a defendant is convicted of a felony to the chief state election official in the state where the defendant resides. 52 U.S.C. § 20507(g). The notice must include basic information regarding the defendant, the court, the offense, and the sentence. 52 U.S.C. § 20507(g)(2). In addition, if the conviction is overturned, the election official must be sent written notice of the vacation of conviction. 52 U.S.C. § 20507(g)(4).

This information is important to election authorities who determine a person's eligibility to vote. You may identify the appropriate state election official using the website www.nased.org.

# CHAPTER SEVEN

# CONCLUSION

## WHY PROSECUTING ELECTION CRIMES IS IMPORTANT

We conclude this book with an editorial printed in the March 19, 2004, edition of Big Sandy News, Eastern Kentucky, concerning a series of election fraud prosecutions in a rural jurisdiction in the Appalachian Mountains of Eastern Kentucky. The editorial comments on the sentencing of the County Judge-Executive of Knott County and a campaign worker for vote-buying. It appears here with the permission of The Big Sandy News, whose late Publisher and Editor, Scott Perry, led a strong charge against public corruption and took a proactive role in this difficult and ongoing fight.[70]

In Kentucky, county judge-executives are the chief operating officers of county government, and, as such, occupy a position of substantial power. The jury's conviction of Knott County Judge-Executive Donnie Newsome was the culmination of a series of vote-buying cases that were jointly prosecuted by the United States Attorney's Office for the Eastern District of Kentucky and the Public Integrity Section during 2003 and early 2004. The charges arose from a scheme to pay individuals for voting in the 1998 Kentucky federal primary in violation of 52 U.S.C. § 10307(c). The investigation ultimately resulted in the indictment of 17 defendants. Thirteen of the defendants were convicted, three were acquitted, and one defendant's case was dismissed on a motion to dismiss made by the government.

---

[70] The Big Sandy News, Eastern Kentucky's oldest newspaper and the most widely circulated non-daily in Kentucky, was established in 1885 in Louisa, Kentucky.

Subsequent to his conviction, Judge-Executive Newsome cooperated with the government and received a sentence reduction recommendation under U.S.S.G. § 5K1.1. On March 16, 2004, he was sentenced to serve 26 months in prison.[71]

The following editorial, reprinted here in its entirety, presents a concise and eloquent statement of why the investigation and prosecution of electoral corruption are important law enforcement priorities of the Justice Department.

*Vote fraud sentencing sad, encouraging*
*– by Susan Allen*

*Tuesday's sentencing in federal court of Knott County Judge-Executive Donnie Newsome and campaign worker Willard Smith on vote buying charges was both a sad and encouraging day for Eastern Kentucky.*

*Sad the people of Knott County were effectively robbed of their voting rights by Newsome and others dolling out cash to buy a public office.*

*Sad that, as Federal Judge Danny C. Reeves pointed out, some people in Knott and other counties think that elections are supposed to be bought and the only reason to go to the polls is to get their pay off.*

*Sad those seeking public office in Knott County, and most assuredly in other counties, target poor, handicapped,*

[71] The sentencing judge stated that had it not been for the prosecution's recommendation for a downward departure, he was prepared to sentence Newsome to five years of imprisonment.

*addicted and uneducated voters to carry out their scheme to secure public office and a hefty paycheck.*

*Sad that voters in Knott and other counties have been reduced by years and years of political corruption to truly believing that selling their vote is not wrong, it's the norm.*

*Sad that Eastern Kentuckians have pretty much been left to the mercy of the political machines which serve as dictators of their lives, from their home towns all the way to Frankfort.*

*Sad that generations sacrificed their lives and their children's lives to the political bosses for mere bones from their local leaders while now their kids are dying from drug overdoses which, we strongly suspect, are directly tied to the years of iniquity and demoralization.*

*Sad that even today some elected officials continue the abuse and either refuse or can't comprehend the impact of their past and current atrocities against their own people.*

*Sad that Judge Reeves could see and completely understand during just a one week trial the utter hopelessness and apathy in the area people feel regarding the so-called democratic process.*

*Sad that our state lawmakers have piddled away their time during this legislative session on petty political issues without even proposing laws that would bar convicted felons, especially vote buyers from retaining their offices while appealing their verdicts.*

*Sad that Donnie Newsome continues to rule Knott County from a jail cell.*

*Tuesday's events were encouraging in that prosecutors [AUSA E.D. Ky.] Tom Self and [Public Integrity Section Trial Attorney] Richard Pilger were willing to fight the hard battle for the people of Knott County, which hopefully will lead to at least a grassroots effort for people to take back their towns.*

*Encouraging that some light has been shed on the workings of the dark political underworld which might shock the good people of Eastern Kentucky into action, at least for their children's future.*

*Encouraging that what might be perceived as a baby step with Newsome's conviction could finally lead to that giant step Eastern Kentuckians must surely be ready to take to recapture control of their own destinies.*

*Encouraging that federal authorities have pledged to continue the fight they have started to restore to the people the right to govern themselves without dealing with a stacked deck.*

*Encouraging that Judge Reeves and prosecutors did see that the Knott Countians who sold their votes, in some cases for food, were victims of Newsome's plot and didn't need to be punished further.*

*Encouraging that there's some branch of government, in this case on the federal level, not shy about taking on political power houses, knowing the obstacles in their way will be many.*

*Encouraging that Newsome's lips have loosened regarding others involved in similar schemes to buy public office, even though we suspect it has nothing to do with righting the wrongs, only a self-serving move to spend less days behind bars.*

*Encouraging that maybe, for once, we are not in this fight alone and have a place to turn to for help when we are willing to stand up to the machine.*

*The feds have helped us take that first step toward getting back what is rightfully ours which has been traded away by others in the past in back room deals. Not only do they need our help, WE need our help.*

*This time, let's not let ourselves down.*

# APPENDIX A

## EXCERPT FROM *McCONNELL v. FEDERAL ELECTION COMMISSION*

In 2003, the Supreme Court presented a concise history of the federal campaign financing laws contained in the Federal Election Campaign Act of 1971, as amended, 2 U.S.C. §§ 431-455 (FECA). It did so in the context of upholding the constitutionality of the vast majority of restrictions that were added to these laws in 2002 by the Bipartisan Campaign Reform Act (BCRA) to close large gaps in statutory coverage that had emerged over the past three decades since FECA's original enactment. *McConnell v. Fed. Election Comm'n*, 540 U.S. 93 (2003). Set forth below are pertinent excerpts from the Supreme Court's discussion of our country's regulation of campaign financing and the events that led up to enactment of BCRA in 2002. *Id.* at 115-132.[72]

* * *

> More than a century ago the "sober-minded Elihu Root" advocated legislation that would prohibit political contri- butions by corporations in order to prevent "'the great aggregations of wealth, from using their corporate funds, directly or indirectly,'" to elect legislators who would "'vote for their protection and the advancement of their interests as against those of the public.'" *United States v. Automobile Workers*, 352 U.S. 567, 571 (1957) (quoting E. Root, Addresses on Government and Citizenship 143 (R. Bacon & J. Scott eds.1916))....

---

[72] The text presented here has been edited for conciseness. For example, all footnotes have been omitted, as have other court citations, extended recitations of legislative citations, and quotations from lower court decisions that have little direct bearing on the Court's ultimate rulings on the legal and constitutional issues involved. Interested readers may wish to consult the full decision for the entire content of the Court's discussion.

> [T]he first [campaign financing] enactment responded to President Theodore Roosevelt's call for legislation forbidding all contributions by corporations "'to any political committee or for any political purpose.'" *Ibid*. The resulting 1907 statute completely banned corporate contributions of "money . . . in connection with" any federal election. Tillman Act, ch. 420, 34 Stat. 864. Congress soon amended the statute to require the public disclosure of certain contributions and expenditures and to place "maximum limits on the amounts that congressional candidates could spend in seeking nomination and election." *Automobile Workers*, *supra*, at 575-76.

> In 1925 Congress [enacted the Federal Corrupt Practices Act, which] extended the prohibition of "contributions" "to include 'anything of value,' and made acceptance of a corporate contribution as well as the giving of such a contribution a crime." *Fed. Election Comm'n v. Nat'l Right to Work Comm.,* 459 U.S. 197, 209 (1982). During the debates preceding that amendment, a leading Senator characterized "'the apparent hold on political parties which business interests and certain organizations seek and sometimes obtain by reason of liberal campaign contributions'" as "'one of the great political evils of the time.'" *Automobile Workers*, *supra*, at 576 (quoting 65 Cong. Rec. 9507-9508 (1924)). We upheld the amended statute against a constitutional challenge, observing that "[t]he power of Congress to protect the election of President and Vice President from corruption being clear, the choice of means to that end presents a question primarily addressed to the judgment of Congress." *Burroughs v. United States*, 290 U.S. 534, 547 (1934).

> Congress' historical concern with the "political potentialities of wealth" and their "untoward consequences for

the democratic process," *Automobile Workers*, *supra*, at 577-78, has long reached beyond corporate money. During and shortly after World War II, Congress reacted to the "enormous financial outlays" made by some unions in connection with national elections. 352 U.S., at 579. Congress first restricted union contributions in the Hatch Act, 18 U.S.C. § 610, and it later prohibited "union contributions in connection with federal elections . . . altogether." *Nat'l Right to Work*, *supra*, at 209 (citing War Labor Disputes Act, Smith-Connally Anti-Strike Act, ch. 144, § 9, 57 Stat. 167). Congress subsequently extended that prohibition to cover unions' election-related expenditures as well as contributions, and it broadened the coverage of federal campaigns to include both primary and general elections. Labor Management Relations Act, 1947 (Taft-Hartley Act), 61 Stat. 136. See *Automobile Workers*, *supra*, at 578-84. During the consideration of those measures, legislators repeatedly voiced their concerns regarding the pernicious influence of large campaign contributions. As we noted in a unanimous opinion recalling this history, Congress' "careful legislative adjustment of the federal electoral laws, in a 'cautious advance, step by step,' to account for the particular legal and economic attributes of corporations and labor organizations warrants considerable deference." *Nat'l Right to Work*, *supra*, at 209.

In early 1972 Congress continued its steady improvement of the national election laws by enacting FECA. As first enacted, that statute required disclosure of all contributions exceeding $100 and of expenditures by candidates and political committees that spent more than $1,000 per year. *Id.*, at 11-19. It also prohibited contributions made in the name of another person, *id.*, at 19, and by Government contractors, *id.*, at 10. The law ratified the earlier prohibition on the use of corporate and union

general treasury funds for political contributions and expenditures, but it expressly permitted corporations and unions to establish and administer separate segregated funds (commonly known as political action committees, or PACs) for election-related contributions and expenditures. *Id.*, at 12-13. *See Pipefitters v. United States*, 407 U.S. 385, 409-10 (1972).

As the 1972 presidential elections made clear, however, FECA's passage did not deter unseemly fundraising and campaign practices. Evidence of those practices persuaded Congress to enact the Federal Election Campaign Act Amendments of 1974. Reviewing a constitutional challenge to the amendments, the Court of Appeals for the District of Columbia Circuit described them as "by far the most comprehensive . . . reform legislation [ever] passed by Congress concerning the election of the President, Vice- President and Members of Congress." *Buckley v. Valeo*, 519 F.2d 821, 831 (D.C. Cir. 1975) (en banc) (*per curiam*).

The 1974 amendments closed the loophole that had allowed candidates to use an unlimited number of political committees for fundraising purposes and thereby to circumvent the limits on individual committees' receipts and disbursements. They also limited individual political contributions to any single candidate to $1,000 per election, with an overall annual limitation of $25,000 by any contributor; imposed ceilings on spending by candidates and political parties for national conventions; required reporting and public disclosure of contributions and expenditures exceeding certain limits; and established the Federal Election Commission (FEC) to administer and enforce the legislation. *Id.*, at 831-34.

The Court of Appeals upheld the 1974 amendments almost in their entirety. It concluded that the clear and compelling interest in preserving the integrity of the electoral process provided a sufficient basis for sustaining the substantive provisions of the Act. The court's opinion relied heavily on findings that large contributions facilitated access to public officials and described methods of evading the contribution limits that had enabled contributors of massive sums to avoid disclosure . . .. *Id., at* 837-41.

The Court of Appeals upheld the provisions establishing contribution and expenditure limitations on the theory that they should be viewed as regulations of conduct rather than speech. *Id.*, at 840-41. This Court, however, concluded that each set of limitations raised serious--though different--concerns under the First Amendment. *Buckley v. Valeo*, 424 U.S. 1, 14-23 (1976) (*per curiam)*. We treated the limitations on candidate and individual expenditures as direct restraints on speech, but we observed that the contribution limitations, in contrast, imposed only "a marginal restriction upon the contributor's ability to engage in free communication." *Id.*, at 20-22. Considering the "deeply disturbing examples" of corruption related to candidate contributions discussed in the Court of Appeals' opinion, we determined that limiting contributions served an interest in protecting "the integrity of our system of representative democracy." *Id.*, at 26-27. In the end, the Act's primary purpose –"to limit the actuality and appearance of corruption resulting from large individual financial contributions"– provided a constitutionally sufficient justification for the $1,000 contribution limitation." *Id.*, at 26.

We prefaced our analysis of the $1,000 limitation on expenditures by observing that it broadly encompassed

every expenditure "'relative to a clearly identified candidate.'" *Id.*, at 39 (quoting 18 U.S.C. § 608(e)(1) (1970 ed., Supp. IV)). To avoid vagueness concerns we construed that phrase to apply only to "communications that in express terms advocate the election or defeat of a clearly identified candidate for federal office." 424 U.S., at 42-44. We concluded, however, that as so narrowed, the provision would not provide effective protection against the dangers of *quid pro quo* arrangements, because persons and groups could eschew expenditures that expressly advocated the election or defeat of a clearly identified candidate while remaining "free to spend as much as they want to promote the candidate and his views." *Id.*, at 45. We also rejected the argument that the expenditure limits were necessary to prevent attempts to circumvent the Act's contribution limits, because FECA already treated expenditures controlled by or coordinated with the candidate as contributions, and we were not persuaded that independent expenditures posed the same risk of real or apparent corruption as coordinated expenditures. *Id.*, at 46-47. We therefore held that Congress' interest in preventing real or apparent corruption was inadequate to justify the heavy burdens on the freedoms of expression and association that the expenditure limits imposed. We upheld all of the disclosure and reporting requirements in the Act that were challenged on appeal to this Court after finding that they vindicated three important interests: providing the electorate with relevant information about the candidates and their supporters; deterring actual corruption and discouraging the use of money for improper purposes; and facilitating enforcement of the prohibitions in the Act. *Id.*, at 66-68. In order to avoid an overbreadth problem, however, we placed the same narrowing construction on the term "expenditure" in the disclosure context that we had adopted in the context of the expenditure limitations. Thus, we construed the reporting requirement for persons making expenditures of more than $100 in a year "to reach only funds used for

communications that expressly advocate the election or defeat of a clearly identified candidate." *Id.*, at 80.

Our opinion in *Buckley* addressed issues that primarily related to contributions and expenditures by individuals, since none of the parties challenged the prohibition on contributions by corporations and labor unions. We noted, however, that the statute authorized the use of corporate and union resources to form and administer segregated funds that could be used for political purposes. *Id.*, at 28-29, n.31; *see also* n.3, *supra*.

Three important developments in the years after our decision in Buckley persuaded Congress that further legislation was necessary to regulate the role that corporations, unions, and wealthy contributors play in the electoral process. As a preface to our discussion of the specific provisions of BCRA, we comment briefly on the increased importance of "soft money," the proliferation of "issue ads," and the disturbing findings of a Senate investigation into campaign practices related to the 1996 federal elections.

*Soft Money*

Under FECA, "contributions" must be made with funds that are subject to the Act's disclosure requirements and source and amount limitations. Such funds are known as "federal" or "hard" money. FECA defines the term "contribution," however, to include only the gift or advance of anything of value "made by any person for the purpose of influencing any election for *Federal* office." 2 U.S.C. § 431(8)(A)(i) (emphasis added). Donations made solely for the purpose of influencing state or local elections are therefore unaffected by FECA's requirements and prohibitions. As

a result, prior to the enactment of BCRA, federal law permitted corporations and unions, as well as individuals who had already made the maximum permissible contributions to federal candidates, to contribute "non-federal money"– also known as "soft money"– to political parties for activities intended to influence state or local elections.

Shortly after *Buckley* was decided, questions arose concerning the treatment of contributions intended to influence both federal and state elections. Although a literal reading of FECA's definition of "contribution" would have required such activities to be funded with hard money, the FEC ruled that political parties could fund mixed-purpose activities – including get-out-the-vote drives and generic party advertising – in part with soft money. In 1995 the FEC concluded that the parties could also use soft money to defray the costs of "legislative advocacy media advertisements," even if the ads mentioned the name of a federal candidate, so long as they did not expressly advocate the candidate's election or defeat. FEC Advisory Op. 1995-25.

> [Footnote 7:] ... In 1990 the FEC . . . promulgat[ed] fixed allocation rates. 11 CFR § 106.5 (1991). The regulations required the Republican National Committee (RNC) and Democratic National Committee (DNC) to pay for at least 60% of mixed-purpose activities (65% in presidential election years) with funds from their federal accounts. § 106.5(b)(2). By contrast, the regulations required state and local committees to allocate similar expenditures based on the ratio of federal to non-federal offices on the State's ballot, § 106.5(d)(1), which in practice meant that they could expend a substantially greater proportion of soft money than

national parties to fund mixed-purpose activities affecting both federal and state elections.

As the permissible uses of soft money expanded, the amount of soft money raised and spent by the national political parties increased exponentially. Of the two major parties' total spending, soft money accounted for 5% ($21.6 million) in 1984, 11% ($45 million) in 1988, 16% ($80 million) in 1992, 30% ($272 million) in 1996, and 42% ($498 million) in 2000. The national parties transferred large amounts of their soft money to the state parties, which were allowed to use a larger percentage of soft money to finance mixed-purpose activities under FEC rules. In the year 2000, for example, the national parties diverted $280 million – more than half of their soft money – to state parties.

Not only were such soft-money contributions often designed to gain access to federal candidates, but they were in many cases solicited by the candidates themselves. Candidates often directed potential donors to party committees and tax-exempt organizations that could legally accept soft money. For example, a federal legislator running for reelection solicited soft money from a supporter by advising him that even though he had already "'contributed the legal maximum'" to the campaign committee, he could still make an additional contribution to a joint program supporting federal, state, and local candidates of his party. Such solicitations were not uncommon.

The solicitation, transfer, and use of soft money thus enabled parties and candidates to circumvent FECA's limitations on the source and amount of contributions in connection with federal elections.

*Issue Advertising*

In *Buckley* we construed FECA's disclosure and reporting requirements, as well as its expenditure limitations, "to reach only funds used for communications that expressly advocate the election or defeat of a clearly identified candidate." 424 U.S., at 80. As a result of that strict reading of the statute, the use or omission of "magic words" such as "Elect John Smith" or "Vote Against Jane Doe" marked a bright statutory line separating "express advocacy" from "issue advocacy." *See id.*, at 44, n.52. Express advocacy was subject to FECA's limitations and could be financed only using hard money. The political parties, in other words, could not use soft money to sponsor ads that used any magic words, and corporations and unions could not fund such ads out of their general treasuries. So-called issue ads, on the other hand, not only could be financed with soft money, but could be aired without disclosing the identity of, or any other information about, their sponsors.

While the distinction between "issue" and express advocacy seemed neat in theory, the two categories of advertisements proved functionally identical in important respects. Both were used to advocate the election or defeat of clearly identified federal candidates, even though the so-called issue ads eschewed the use of magic words. Little difference existed, for example, between an ad that urged viewers to "Vote Against Jane Doe" and one that condemned Jane Doe's record on a particular issue before exhorting viewers to "call Jane Doe and tell her what you think." Indeed, campaign professionals testified that the most effective campaign ads, like the most effective commercials for products such as Coca-Cola, should, and did, avoid the use of the magic words. Moreover, the conclusion that such ads were specifically intended to affect election

results was confirmed by the fact that almost all of them aired in the 60 days immediately preceding a federal election. Corporations and unions spent hundreds of millions of dollars of their general funds to pay for these ads, and those expenditures, like soft-money donations to the political parties, were unregulated under FECA. Indeed, the ads were attractive to organizations and candidates precisely because they were beyond FECA's reach, enabling candidates and their parties to work closely with friendly interest groups to sponsor so-called issue ads when the candidates themselves were running out of money…

Because FECA's disclosure requirements did not apply to so-called issue ads, sponsors of such ads often used misleading names to conceal their identity. "Citizens for Better Medicare," for instance, was not a grassroots organization of citizens, as its name might suggest, but was instead a platform for an association of drug manufacturers. And "Republicans for Clean Air," which ran ads in the 2000 Republican Presidential primary, was actually an organization consisting of just two individuals – brothers who together spent $25 million on ads supporting their favored candidate.

While the public may not have been fully informed about the sponsorship of so-called issue ads, the record indicates that candidates and officeholders often were. A former Senator confirmed that candidates and officials knew who their friends were and "sometimes suggest[ed] that corporations or individuals make donations to interest groups that run 'issue ads.'" As with soft-money contributions, political parties and candidates used the availability of so-called issue ads to circumvent FECA's limitations, asking donors who contributed their permitted quota of hard money

to give money to non-profit corporations to spend on "issue" advocacy.

*Senate Committee Investigation*

In 1998 the Senate Committee on Governmental Affairs issued a six-volume report summarizing the results of an extensive investigation into the campaign practices in the 1996 federal elections. The report gave particular attention to the effect of soft money on the American political system, including elected officials' practice of granting special access in return for political contributions.

The committee's principal findings relating to Democratic Party fundraising were set forth in the majority's report, while the minority report primarily described Republican practices. The two reports reached consensus, however, on certain central propositions. They agreed that the "soft money loophole" had led to a "meltdown" of the campaign finance system that had been intended "to keep corporate, union and large individual contributions from influencing the electoral process." One Senator stated that "the hearings provided overwhelming evidence that the twin loopholes of soft money and bogus issue advertising have virtually destroyed our campaign finance laws, leaving us with little more than a pile of legal rubble."

The report was critical of both parties' methods of raising soft money, as well as their use of those funds. It concluded that both parties promised and provided special access to candidates and senior Government officials in exchange for large soft-money contributions. The committee majority described the White House coffees that rewarded major donors with access to President Clinton, and the courtesies extended to an international businessman

named Roger Tamraz, who candidly acknowledged that his donations of about $300,000 to the DNC and to state parties were motivated by his interest in gaining the Federal Government's support for an oil-line project in the Caucasus. The minority described the promotional materials used by the RNC's two principal donor programs, "Team 100" and the "Republican Eagles," which promised "special access to high-ranking Republican elected officials, including governors, senators, and representatives." One fundraising letter recited that the chairman of the RNC had personally escorted a donor on appointments that "'turned out to be very significant in legislation affecting public utility holding companies'" and made the donor "'a hero in his industry.'"

In 1996 both parties began to use large amounts of soft money to pay for issue advertising designed to influence federal elections. The committee found such ads highly problematic for two reasons. Since they accomplished the same purposes as express advocacy (which could lawfully be funded only with hard money), the ads enabled unions, corporations, and wealthy contributors to circumvent protections that FECA was intended to provide. Moreover, though ostensibly independent of the candidates, the ads were often actually coordinated with, and controlled by, the campaigns. The ads thus provided a means for evading FECA's candidate contribution limits.

The report also emphasized the role of state and local parties. While the FEC's allocation regime permitted national parties to use soft money to pay for up to 40% of the costs of both generic voter activities and issue advertising, they allowed state and local parties to use larger percentages of soft money for those purposes. For that reason, national parties often made substantial transfers of soft money to "state and local political parties for 'generic

voter activities' that in fact ultimately benefit[ed] federal candidates because the funds for all practical purposes remain[ed] under the control of the national committees." The report concluded that "[t]he use of such soft money thus allow[ed] more corporate, union treasury, and large contributions from wealthy individuals into the system."

The report discussed potential reforms, including a ban on soft money at the national and state party levels and restrictions on sham issue advocacy by non-party groups. The majority expressed the view that a ban on the raising of soft money by national party committees would effectively address the use of union and corporate general treasury funds in the federal political process only if it required that candidate-specific ads be funded with hard money. The minority similarly recommended the elimination of soft-money contributions to political parties from individuals, corporations, and unions, as well as "reforms addressing candidate advertisements masquerading as issue ads."

* * *

The findings contained in the 1998 report by the Senate Committee on Governmental Affairs were the basis for the Bipartisan Campaign Reform Act passed four years later.

# APPENDIX B

# STATUTES

## EXCERPTS FROM TITLE 18 OF THE UNITED STATES CODE

**§ 241. Conspiracy against rights**

If two or more persons conspire to injure, oppress, threaten, or intimidate any person in any State, Territory, Commonwealth, Possession, or District in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States, or because of his having so exercised the same; or

If two or more persons go in disguise on the highway, or on the premises of another, with intent to prevent or hinder his free exercise or enjoyment of any right or privilege so secured–

They shall be fined under this title or imprisoned not more than ten years, or both; and if death results from the acts committed in violation of this section or if such acts include kidnapping or an attempt to kidnap, aggravated sexual abuse or an attempt to commit aggravated sexual abuse, or an attempt to kill, they shall be fined under this title or imprisoned for any term of years or for life, or both, or may be sentenced to death.

* * * * *

**§ 242. Deprivation of rights under color of law**

Whoever, under color of any law, statute, ordinance, regulation, or custom, willfully subjects any person in any State, Territory, Commonwealth, Possession, or District to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States, or to different punishments, pains, or penalties, on account of such person being an alien, or by reason of his color, or race, than are prescribed for the punishment of citizens, shall

be fined under this title or imprisoned not more than one year, or both; and if bodily injury results from the acts committed in violation of this section or if such acts include the use, attempted use, or threatened use of a dangerous weapon, explosives, or fire, shall be fined under this title or imprisoned not more than ten years, or both; and if death results from the acts committed in violation of this section or if such acts include kidnapping or an attempt to kidnap, aggravated sexual abuse, or an attempt to commit aggravated sexual abuse, or an attempt to kill, shall be fined under this title, or imprisoned for any term of years or for life, or both, or may be sentenced to death.

* * * * *

**§ 245. Federally protected activities**

**(b)** Whoever, whether or not acting under color of law, by force or threat of force willfully injures, intimidates or interferes with, or attempts to injure, intimidate or interfere with–

**(1)** any person because he is or has been, or in order to intimidate such person or any other person or any class of persons from–

**(A)** voting or qualifying to vote, qualifying or campaigning as a candidate for elective office, or qualifying or acting as a poll watcher, or any legally authorized election official, in any primary, special, or general election;

shall be fined under this title, or imprisoned not more than one year, or both; and if bodily injury results from the acts committed in violation of this section or if such acts include the use, attempted use, or threatened use of a dangerous weapon, explosives, or fire shall be fined under this title, or imprisoned not more than ten years, or both; and if death results from the acts committed in violation of this section or if such acts include kidnapping or an attempt to kidnap, aggravated sexual abuse or an attempt to commit aggravated sexual abuse, or an attempt to kill, shall be fined under this title or imprisoned for any term of years or for life, or both, or may be sentenced to death.

* * * * *

**§ 371. Conspiracy to commit offense or to defraud United States**

If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both.

If, however, the offense, the commission of which is the object of the conspiracy, is a misdemeanor only, the punishment for such conspiracy shall not exceed the maximum punishment provided for such misdemeanor.

* * * * *

**§ 592. Troops at polls**

Whoever, being an officer of the Army or Navy, or other person in the civil, military, or naval service of the United States, orders, brings, keeps, or has under his authority or control any troops or armed men at any place where a general or special election is held, unless such force be necessary to repel armed enemies of the United States, shall be fined under this title or imprisoned not more than five years, or both; and be disqualified from holding any office of honor, profit, or trust under the United States.

This section shall not prevent any officer or member of the armed forces of the United States from exercising the right of suffrage in any election district to which he may belong, if otherwise qualified according to the laws of the State in which he offers to vote.

* * * * *

**§ 593. Interference by armed forces**

Whoever, being an officer or member of the Armed Forces of the United States, prescribes or fixes or attempts to prescribe or fix, whether by proclamation, order or otherwise, the qualifications of voters at any election in any State; or

Whoever, being such officer or member, prevents or attempts to prevent by force, threat, intimidation, advice or otherwise any qualified voter of any State from fully exercising the right of suffrage at any general or special election; or

Whoever, being such officer or member, orders or compels or attempts to compel any election officer in any State to receive a vote from a person not legally qualified to vote; or

Whoever, being such officer or member, imposes or attempts to impose any regulations for conducting any general or special election in a State, different from those prescribed by law; or

Whoever, being such officer or member, interferes in any manner with an election officer's discharge of his duties–

Shall be fined under this title or imprisoned not more than five years, or both; and disqualified from holding any office of honor, profit or trust under the United States.

This section shall not prevent any officer or member of the Armed Forces from exercising the right of suffrage in any district to which he may belong, if otherwise qualified according to the laws of the State of such district.

* * * * *

**§ 594. Intimidation of voters**

Whoever intimidates, threatens, coerces, or attempts to intimidate, threaten, or coerce, any other person for the purpose of interfering with the right of such other person to vote or to vote as he may choose, or of causing such other person to vote for, or not to vote for, any candidate for the office of President, Vice President, Presidential elector, Member of the Senate, Member of the House of Representatives, Delegate from the District of Columbia, or Resident Commissioner, at any election held solely or in part for the purpose of electing such candidate, shall be fined under this title or imprisoned not more than one year, or both.

* * * * *

**§ 595. Interference by administrative employees of Federal, State, or Territorial Governments**

Whoever, being a person employed in any administrative position by the United States, or by any department or agency thereof, or by the District of Columbia or any agency or instrumentality thereof, or by any State, Territory, or Possession of the United States, or any political subdivision, municipality, or agency thereof, or agency of such political subdivision or municipality (including any corporation owned or controlled by any State, Territory, or Possession of the United States or by any such political subdivision, municipality, or agency), in connection with any activity which is financed in whole or in part by loans or grants made by the United States, or any department or agency thereof, uses his official authority for the purpose of interfering with, or affecting, the nomination or the election of any candidate for the office of President, Vice President, Presidential elector, Member of the Senate, Member of the House of Representatives, Delegate from the District of Columbia, or Resident Commissioner, shall be fined under this title or imprisoned not more than one year, or both.

This section shall not prohibit or make unlawful any act by any officer or employee of any educational or research institution, establishment, agency, or system which is supported in whole or in part by any state or political subdivision thereof, or by the District of Columbia or by any Territory or Possession of the United States; or by any recognized religious, philanthropic or cultural organization.

* * * * *

**§ 596. Polling armed forces**

Whoever, within or without the Armed Forces of the United States, polls any member of such forces, either within or without the United States, either before or after he executes any ballot under any Federal or State law, with reference to his choice of or his vote for any candidate, or states, publishes, or releases any result of any purported poll taken from or among the members of the Armed Forces of the United States or including within it the statement of choice for such

candidate or of such votes cast by any member of the Armed Forces of the United States, shall be fined under this title or imprisoned for not more than one year, or both.

The word "poll" means any request for information, verbal or written, which by its language or form of expression requires or implies the necessity of an answer, where the request is made with the intent of compiling the result of the answers obtained, either for the personal use of the person making the request, or for the purpose of reporting the same to any other person, persons, political party, unincorporated association or corporation, or for the purpose of publishing the same orally, by radio, or in written or printed form.

* * * * *

**§ 597. Expenditures to influence voting**

Whoever makes or offers to make an expenditure to any person, either to vote or withhold his vote, or to vote for or against any candidate; and

Whoever solicits, accepts, or receives any such expenditure in consideration of his vote or the withholding of his vote–

Shall be fined under this title or imprisoned not more than one year, or both; and if the violation was willful, shall be fined under this title or imprisoned not more than two years, or both.

* * * * *

**§ 598. Coercion by means of relief appropriations**

Whoever uses any part of any appropriation made by Congress for work relief, relief, or for increasing employment by providing loans and grants for public-works projects, or exercises or administers any authority conferred by any Appropriation Act for the purpose of interfering with, restraining, or coercing any individual in the exercise of his right to vote at any election, shall be fined under this title or imprisoned not more than one year, or both.

* * * * *

**§ 599. Promise of appointment by candidate**

Whoever, being a candidate, directly or indirectly promises or pledges the appointment, or the use of his influence or support for the appointment of any person to any public or private position or employment, for the purpose of procuring support in his candidacy shall be fined under this title or imprisoned not more than one year, or both; and if the violation was willful, shall be fined under this title or imprisoned not more than two years, or both.

* * * * *

**§ 600. Promise of employment or other benefit for political activity**

Whoever, directly or indirectly, promises any employment, position, compensation, contract, appointment, or other benefit, provided for or made possible in whole or in part by any Act of Congress, or any special consideration in obtaining any such benefit, to any person as consideration, favor, or reward for any political activity or for the support of or opposition to any candidate or any political party in connection with any general or special election to any political office, or in connection with any primary election or political convention or caucus held to select candidates for any political office, shall be fined under this title or imprisoned not more than one year, or both.

* * * * *

**§ 601. Deprivation of employment or other benefit for political contribution**

**(a)** Whoever, directly or indirectly, knowingly causes or attempts to cause any person to make a contribution of a thing of value (including services) for the benefit of any candidate or any political party, by

means of the denial or deprivation, or the threat of the denial or deprivation, of–

**(1)** any employment, position, or work in or for any agency or other entity of the Government of the United States, a State, or a political subdivision of a State, or any compensation or benefit of such employment, position, or work; or

**(2)** any payment or benefit of a program of the United States, a State, or a political subdivision of a State; if such employment, position, work, compensation, payment, or benefit is provided for or made possible in whole or in part by an Act of Congress, shall be fined under this title, or imprisoned not more than one year, or both.

**(b)** As used in this section–

**(1)** the term "candidate" means an individual who seeks nomination for election, or election, to Federal, State, or local office, whether or not such individual is elected, and, for purposes of this paragraph, an individual shall be deemed to seek nomination for election, or election, to Federal, State, or local office, if he has (A) taken the action necessary under the law of a State to qualify himself for nomination for election, or election, or (B) received contributions or made expenditures, or has given his consent for any other person to receive contributions or make expenditures, with a view to bringing about his nomination for election, or election, to such office;

**(2)** the term "election" means (A) a general, special primary, or runoff election, (B) a convention or caucus of a political party held to nominate a candidate, (C) a primary election held for the selection of delegates to a nominating convention of a political party, (D) a primary election held for the expression of a preference for the nomination of persons for election to the office of President, and (E) the election of delegates to a constitutional convention for proposing amendments to the Constitution of the United States or of any State; and

**(3)** the term "State" means a State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, or any territory or possession of the United States.

* * * * *

**§ 602. Solicitation of political contributions**

**(a)** It shall be unlawful for–

**(1)** a candidate for the Congress;

**(2)** an individual elected to or serving in the office of Senator or Representative in, or Delegate or Resident Commissioner to, the Congress;

**(3)** an officer or employee of the United States or any department or agency thereof; or

**(4)** a person receiving any salary or compensation for services from money derived from the Treasury of the United States; to knowingly solicit any contribution within the meaning of section 301(8) of the Federal Election Campaign Act of 1971 [52 U.S.C.A. § 431(8)] from any other such officer, employee, or person. Any person who violates this section shall be fined under this title or imprisoned not more than 3 years, or both.

**(b)** The prohibition in subsection (a) shall not apply to any activity of an employee (as defined in section 7322(1) of title 5) or any individual employed in or under the United States Postal Service or the Postal Rate Commission, unless that activity is prohibited by section 7323 or 7324 of such title.

* * * * *

**§ 603. Making political contributions**

**(a)** It shall be unlawful for an officer or employee of the United States or any department or agency thereof, or a person receiving any salary or compensation for services from money derived from the Treasury of the United States, to make any contribution within the meaning of section 301(8) of the Federal Election Campaign Act of

1971 to any other such officer, employee or person or to any Senator or Representative in, or Delegate or Resident Commissioner to, the Congress, if the person receiving such contribution is the employer or employing authority of the person making the contribution. Any person who violates this section shall be fined under this title or imprisoned not more than three years, or both.

**(b)** For purposes of this section, a contribution to an authorized committee as defined in section 302(e) (1) of the Federal Election Campaign Act of 1971 shall be considered a contribution to the individual who has authorized such committee.

**(c)** The prohibition in subsection (a) shall not apply to any activity of an employee (as defined in section 7322(1) of title 5) or any individual employed in or under the United States Postal Service or the Postal Rate Commission, unless that activity is prohibited by section 7323 or 7324 of such title.

* * * * *

### § 604. Solicitation from persons on relief

Whoever solicits or receives or is in any manner concerned in soliciting or receiving any assessment, subscription, or contribution for any political purpose from any person known by him to be entitled to, or receiving compensation, employment, or other benefit provided for or made possible by any Act of Congress appropriating funds for work relief or relief purposes, shall be fined under this title or imprisoned not more than one year, or both.

* * * * *

### § 605. Disclosure of names of persons on relief

Whoever, for political purposes, furnishes or discloses any list or names of persons receiving compensation, employment or benefits provided for or made possible by any Act of Congress appropriating, or authorizing the appropriation of funds for work relief or relief purposes, to a political candidate, committee, campaign manager, or to any person

for delivery to a political candidate, committee, or campaign manager; and

Whoever receives any such list or names for political purposes–

Shall be fined under this title or imprisoned not more than one year, or both.

* * * * *

### § 606. Intimidation to secure political contributions

Whoever, being one of the officers or employees of the United States mentioned in section 602 of this title, discharges, or promotes, or degrades, or in any manner changes the official rank or compensation of any other officer or employee, or promises or threatens so to do, for giving or withholding or neglecting to make any contribution of money or other valuable thing for any political purpose, shall be fined under this title or imprisoned not more than three years, or both.

* * * * *

### § 607. Place of solicitation

**(a) Prohibition.–**

**(1) In general.**–It shall be unlawful for any person to solicit or receive a donation of money or other thing of value in connection with a Federal, State, or local election from a person who is located in a room or building occupied in the discharge of official duties by an officer or employee of the United States. It shall be unlawful for an individual who is an officer or employee of the Federal Government, including the President, Vice President, and Members of Congress, to solicit or receive a donation of money or other thing of value in connection with a Federal, State, or local election, while in any room or building occupied in the discharge of official duties by an officer or employee of the United States, from any person.

**(2) Penalty.**–A person who violates this section shall be fined not more than $5,000, imprisoned not more than 3 years, or both.

**(b)** The prohibition in subsection (a) shall not apply to the receipt of contributions by persons on the staff of a Senator or Representative in, or Delegate or Resident Commissioner to, the Congress or Executive Office of the President, provided, that such contributions have not been solicited in any manner which directs the contributor to mail or deliver a contribution to any room, building, or other facility referred to in subsection (a), and provided that such contributions are transferred within seven days of receipt to a political committee within the meaning of section 302(e) of the Federal Election Campaign Act of 1971.

* * * * *

### § 608. Absent uniformed services voters and overseas voters

**(a)** Whoever knowingly deprives or attempts to deprive any person of a right under the Uniformed and Overseas Citizens Absentee Voting Act shall be fined in accordance with this title or imprisoned not more than five years, or both.

**(b)** Whoever knowingly gives false information for the purpose of establishing the eligibility of any person to register or vote under the Uniformed and Overseas Citizens Absentee Voting Act, or pays or offers to pay, or accepts payment for registering or voting under such Act shall be fined in accordance with this title or imprisoned not more than five years, or both.

* * * * *

### § 609. Use of military authority to influence vote of member of Armed Forces

Whoever, being a commissioned, noncommissioned, warrant, or petty officer of an Armed Force, uses military authority to influence the vote of a member of the Armed Forces or to require a member of the Armed Forces to march to a polling place, or attempts to do so, shall be

fined in accordance with this title or imprisoned not more than five years, or both. Nothing in this section shall prohibit free discussion of political issues or candidates for public office.

* * * * *

### § 610. Coercion of political activity

It shall be unlawful for any person to intimidate, threaten, command, or coerce, or attempt to intimidate, threaten, command, or coerce, any employee of the Federal Government as defined in section 7322(1) of title 5, United States Code, to engage in, or not to engage in, any political activity, including, but not limited to, voting or refusing to vote for any candidate or measure in any election, making or refusing to make any political contribution, or working or refusing to work on behalf of any candidate. Any person who violates this section shall be fined under this title or imprisoned not more than three years, or both.

* * * * *

### § 611. Voting by aliens

**(a)** It shall be unlawful for any alien to vote in any election held solely or in part for the purpose of electing a candidate for the office of President, Vice President, Presidential elector, Member of the Senate, Member of the House of Representatives, Delegate from the District of Columbia, or Resident Commissioner, unless–

- **(1)** the election is held partly for some other purpose;
- **(2)** aliens are authorized to vote for such other purpose under a State constitution or statute or a local ordinance; and
- **(3)** voting for such other purpose is conducted independently of voting for a candidate for such Federal offices, in such a manner that an alien has the opportunity to vote for such other purpose, but not an opportunity to vote for a candidate for any one or more of such Federal offices.

**(b)** Any person who violates this section shall be fined under this title, imprisoned not more than one year, or both.

**(c)** Subsection (a) does not apply to an alien if–

**(1)** each natural parent of the alien (or, in the case of an adopted alien, each adoptive parent of the alien) is or was a citizen (whether by birth or naturalization);

**(2)** the alien permanently resided in the United States prior to attaining the age of 16; and

**(3)** the alien reasonably believed at the time of voting in violation of such subsection that he or she was a citizen of the United States.

* * * * *

### § 911. Citizen of the United States

Whoever falsely and willfully represents himself to be a citizen of the United States shall be fined under this title or imprisoned not more than three years, or both.

* * * * *

### § 1001. Statements or entries generally

**(a)** Except as otherwise provided in this section, whoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully–

**(1)** falsifies, conceals, or covers up by any trick, scheme, or device a material fact;

**(2)** makes any materially false, fictitious, or fraudulent statement or representation; or

**(3)** makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry; shall be fined under this title, imprisoned not more than 5 years or, if the offense involves international or domestic terrorism (as defined in section 2331), imprisoned not more than 8 years, or both.

**(b)** Subsection (a) does not apply to a party to a judicial proceeding, or that party's counsel, for statements, representations, writings or documents submitted by such party or counsel to a judge or magistrate in that proceeding.

**(c)** With respect to any matter within the jurisdiction of the legislative branch, subsection (a) shall apply only to–

- **(1)** administrative matters, including a claim for payment, a matter related to the procurement of property or services, personnel or employment practices, or support services, or a document required by law, rule, or regulation to be submitted to the Congress or any office or officer within the legislative branch; or
- **(2)** any investigation or review, conducted pursuant to the authority of any committee, subcommittee, commission or office of the Congress, consistent with applicable rules of the House or Senate.

* * * * *

**§ 1015. Naturalization, citizenship or alien registry**

**(f)** Whoever knowingly makes any false statement or claim that he is a citizen of the United States in order to register to vote or to vote in any Federal, State, or local election (including an initiative, recall, or referendum)–

Shall be fined under this title or imprisoned not more than five years, or both. Subsection (f) does not apply to an alien if each natural parent of the alien (or, in the case of an adopted alien, each adoptive parent of the alien) is or was a citizen (whether by birth or naturalization), the alien permanently resided in the United States prior to attaining the age of 16, and the alien reasonably believed at the time of making the false statement or claim that he or she was a citizen of the United States.

* * * * *

**§ 1341. Frauds and swindles**

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined under this title or imprisoned not more than 20 years, or both. If the violation affects a financial institution, such person shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

* * * * *

**§ 1343. Fraud by wire, radio, or television**

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both. If the violation affects a financial institution, such person shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

* * * * *

**§ 1346. Definition of "scheme or artifice to defraud"**

For the purposes of this chapter, the term "scheme or artifice to defraud" includes a scheme or artifice to deprive another of the intangible right of honest services.

* * * * *

**§ 1519. Destruction, alteration, or falsification of records in Federal investigations and bankruptcy**

Whoever knowingly alters, destroys, mutilates, conceals, covers up, falsifies, or makes a false entry in any record, document, or tangible object with the intent to impede, obstruct, or influence the investigation or proper administration of any matter within the jurisdiction of any department or agency of the United States or any case filed under title 11, or in relation to or contemplation of any such matter or case, shall be fined under this title, imprisoned not more than 20 years, or both.

* * * * *

**§ 1952. Interstate and foreign travel or transportation in aid of racketeering enterprises**

**(a)** Whoever travels in interstate or foreign commerce or uses the mail or any facility in interstate or foreign commerce, with intent to–

**(1)** distribute the proceeds of any unlawful activity; or

**(2)** commit any crime of violence to further any unlawful activity; or

**(3)** otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity, and thereafter performs or attempts to perform–

**(A)** an act described in paragraph (1) or (3) shall be fined under this title, imprisoned not more than 5 years, or both; or

**(B)** an act described in paragraph (2) shall be fined under this title, imprisoned for not more than 20 years, or both, and if death results shall be imprisoned for any term of years or for life.

**(b)** As used in this section (i) "unlawful activity" means (1) any business enterprise involving gambling, liquor on which the Federal excise tax has not been paid, narcotics or controlled substances (as defined in section 102(6) of the Controlled Substances Act), or prostitution offenses in violation of the laws of the State in which they are committed or of the United States, (2) extortion, bribery, or arson in violation of the laws of the State in which committed or of the United States, or (3) any act which is indictable under sub- chapter II of chapter 53 of title 31, United States Code, or under section 1956 or 1957 of this title and (ii) the term "State" includes a State of the United States, the District of Columbia, and any commonwealth, territory, or possession of the United States.

**(c)** Investigations of violations under this section involving liquor shall be conducted under the supervision of the Attorney General.

# EXCERPTS FROM TITLE 26, UNITED STATES CODE

**§ 9012. Criminal penalties**

**(c) Unlawful use of payments.–**

**(1)** It shall be unlawful for any person who receives any payment under section 9006, or to whom any portion of any payment received under such section is transferred, knowingly and willfully to use, or authorize the use of, such payment or such portion for any purpose other than–

**(A)** to defray the qualified campaign expenses with respect to which such payment was made, or

**(B)** to repay loans the proceeds of which were used, or otherwise to restore funds (other than contributions to defray qualified campaign expenses which were received and expended) which were used, to defray such qualified campaign expenses.

**(2)** It shall be unlawful for the national committee of a major party or minor party which receives any payment under section 9008(b)(3) to use, or authorize the use of, such payment for any purpose other than a purpose authorized by section 9008(c).

**(3)** Any person who violates paragraph (1) shall be fined not more than $10,000, or imprisoned not more than five years, or both.

**(d) False statements, etc.–**

**(1)** It shall be unlawful for any person knowingly and willfully–

**(A)** to furnish any false, fictitious, or fraudulent evidence, books, or information to the Commission under this subtitle, or to include in any evidence, books, or information so furnished any misrepresentation of a material fact, or to falsify or conceal any evidence, books, or information relevant to a certification by the

Commission or an examination and audit by the Commission under this chapter; or

**(B)** to fail to furnish to the Commission any records, books, or information requested by it for purposes of this chapter.

**(2)** Any person who violates paragraph (1) shall be fined not more than $10,000, or imprisoned not more than five years, or both.

* * * * *

### § 9042. Criminal penalties

**(b) Unlawful use of payments.–**

**(1)** It is unlawful for any person who receives any payment under section 9037, or to whom any portion of any such payment is transferred, knowingly and willfully to use, or authorize the use of, such payment or such portion for any purpose other than—

**(A)** to defray qualified campaign expenses, or

**(B)** to repay loans the proceeds of which were used, or otherwise to restore funds (other than contributions to defray qualified campaign expenses which were received and expended) which were used, to defray qualified campaign expenses.

**(c) False statements, etc.–**

**(1)** It is unlawful for any person knowingly and willfully–

**(A)** to furnish any false, fictitious, or fraudulent evidence, books, or information to the Commission under this chapter, or to include in any evidence, books, or information so furnished any misrepresentation of a material fact, or to falsify or conceal any evidence, books, or information relevant to a certification by the Commission or an examination and audit by the Commission under this chapter, or

**(B)** to fail to furnish to the Commission any records, books, or information requested by it for purposes of this chapter.

**(2)** Any person who violates the provisions of paragraph (1) shall be fined not more than $10,000, or imprisoned not more than 5 years, or both.

# EXCERPTS FROM TITLE 52, UNITED STATES CODE

**§ 10307. Prohibited acts**

**(c) False information in registering or voting; penalties**

Whoever knowingly or willfully gives false information as to his name, address or period of residence in the voting district for the purpose of establishing his eligibility to register or vote, or conspires with another individual for the purpose of encouraging his false registration to vote or illegal voting, or pays or offers to pay or accepts payment either for registration to vote or for voting shall be fined not more than $10,000 or imprisoned not more than five years, or both: *Provided, however*, that this provision shall be applicable only to general, special, or primary elections held solely or in part for the purpose of selecting or electing any candidate for the office of President, Vice President, presidential elector, Member of the United States Senate, Member of the United States House of Representatives, Delegate from the District of Columbia, Guam, or the Virgin Islands, or Resident Commissioner of the Commonwealth of Puerto Rico.

**(e) Voting more than once**

**(1)** Whoever votes more than once in an election referred to in paragraph (2) shall be fined not more than $10,000 or imprisoned not more than five years, or both.

**(2)** The prohibition of this subsection applies with respect to any general, special, or primary election held solely or in part for the purpose of selecting or electing any candidate for the office of President, Vice President, presidential elector, Member of the United States Senate, Member of the United States House of Representatives, Delegate from the District of Columbia, Guam, or the Virgin Islands, or Resident Commissioner of the Commonwealth of Puerto Rico.

**(3)** As used in this subsection, the term "votes more than once" does not include the casting of an additional ballot if all prior ballots of that voter were invalidated, nor does it include the

voting in two jurisdictions under section 1973aa-1 of this title, to the extent two ballots are not cast for an election to the same candidacy or office.

* * * * *

**§ 20511. Criminal penalties**

A person, including an election official, who in any election for Federal office–

**(1)** knowingly and willfully intimidates, threatens, or coerces, or attempts to intimidate, threaten, or coerce, any person for–

**(A)** registering to vote, or voting, or attempting to register or vote;

**(B)** urging or aiding any person to register to vote, to vote, or to attempt to register or vote; or

**(C)** exercising any right under this subchapter; or

**(2)** knowingly and willfully deprives, defrauds, or attempts to deprive or defraud the residents of a State of a fair and impartially conducted election process, by–

**(A)** the procurement or submission of voter registration applications that are known by the person to be materially false, fictitious, or fraudulent under the laws of the State in which the election is held; or

the procurement, casting, or tabulation of ballots that are known by the person to be materially false, fictitious, or fraudulent under the laws of the State in which the election is held, shall be fined in accordance with Title 18 (which fines shall be paid into the general fund of the Treasury, miscellaneous receipts (pursuant to section 3302 of Title 31), notwithstanding any other law), or imprisoned not more than 5 years, or both.

* * * * *

**§ 30101. Definitions**

When used in this Act:

**(1) Election**. The term “election” means–

**(A)** a general, special, primary, or runoff election;

**(B)** a convention or caucus of a political party which has authority to nominate a candidate;

**(C)** a primary election held for the selection of delegates to a national nominating convention of a political party; and

**(D)** a primary election held for the expression of a preference for the nomination of individuals for election to the office of President.

**(2) Candidate**. The term “candidate” means an individual who seeks nomination for election, or election, to Federal office, and for purposes of this paragraph, an individual shall be deemed to seek nomination for election, or election–

**(A)** if such individual has received contributions aggregating in excess of $5,000 or has made expenditures aggregating in excess of $5,000; or

**(B)** if such individual has given his or her consent to another person to receive contributions or make expenditures on behalf of such individual and if such person has received such contributions aggregating in excess of $5,000 or has made such expenditures aggregating in excess of $5,000.

**(3) Federal office**. The term “Federal office” means the office of President or Vice President, or of Senator or Representative in, or Delegate or Resident Commissioner to, the Congress.

**(4) Political committee**. The term “political committee” means–

**(A)** any committee, club, association, or other group of persons which receives contributions aggregating in excess of $1,000 during a calendar year or which makes expenditures aggregating in excess of $1,000 during a calendar year; or

**(B)** any separate segregated fund established under the provisions of section 441b(b) of this title; or

**(C)** any local committee of a political party which receives contributions aggregating in excess of $5,000 during a

calendar year, or makes payments exempted from the definition of contribution or expenditure as defined in paragraphs (8) and (9) aggregating in excess of $5,000 during a calendar year, or makes contributions aggregating in excess of $1,000 during a calendar year or makes expenditures aggregating in excess of $1,000 during a calendar year.

* * * * *

**(8)(A) Contribution**. The term "contribution" includes–

**(i)** any gift, subscription, loan, advance, or deposit of money or anything of value made by any person for the purpose of influencing any election for Federal office; or

**(ii)** the payment by any person of compensation for the personal services of another person which are rendered to a political committee without charge for any purpose.

* * * * *

**(9)(A) Expenditure**. The term "expenditure" includes–

**(i)** any purchase, payment, distribution, loan, advance, deposit, or gift of money or anything of value, made by any person for the purpose of influencing any election for Federal office; and

**(ii)** a written contract, promise, or agreement to make an expenditure.

* * * * *

**(11) Person**. The term "person" includes an individual, partnership, committee, association, corporation, labor organization, or any other organization or group of persons, but such term does not include the Federal Government or any authority of the Federal Government.

* * * * *

**(14) National committee**. The term “national committee” means the organization which, by virtue of the bylaws of a political party, is responsible for the day-to-day operation of such political party at the national level, as determined by the Commission.

**(15) State committee**. The term “State committee” means the organization which, by virtue of the bylaws of a political party, is responsible for the day-to-day operation of such political party at the State level, as determined by the Commission.

**(16) Political party**. The term “political party” means an association, committee, or organization which nominates a candidate for election to any Federal office whose name appears on the election ballot as the candidate of such association, committee, or organization.

**(17) Independent expenditure**. The term “independent expenditure” means an expenditure by a person–

- **(A)** expressly advocating the election or defeat of a clearly identified candidate; and
- **(B)** that is not made in concert or cooperation with or at the request or suggestion of such candidate, the candidate's authorized political committee, or their agents, or a political party committee or its agents.

* * * * *

**(20) Federal election activity**

**(A) In general**. The term “Federal election activity” means–

- **(i)** voter registration activity during the period that begins on the date that is 120 days before the date a regularly scheduled Federal election is held and ends on the date of the election;
- **(ii)** voter identification, get-out-the-vote activity, or generic campaign activity conducted in connection with an election in which a candidate for Federal office appears on the ballot (regardless of whether a candidate for State or local office also appears on the ballot).

**(iii)** a public communication that refers to a clearly identified candidate for Federal office (regardless of whether a candidate for State or local office is also mentioned or identified) and that promotes or supports a candidate for that office, or attacks or opposes a candidate for that office (regardless of whether the communication expressly advocates a vote for or against a candidate); or

**(iv)** services provided during any month by an employee of a State, district, or local committee of a political party who spends more than 25 percent of that individual's compensated time during that month on activities in connection with a Federal election.

* * * * *

**(21) Generic campaign activity**. The term "generic campaign activity" means a campaign activity that promotes a political party and does not promote a candidate or non-Federal candidate.

**(22) Public communication**. The term "public communication" means a communication by means of any broadcast, cable, or satellite communication, newspaper, magazine, outdoor advertising facility, mass mailing, or telephone bank to the general public, or any other form of general public political advertising.

* * * * *

## § 30102. Organization of political committees

### (a) Treasurer; vacancy; official authorizations

Every political committee shall have a treasurer. No contribution or expenditure shall be accepted or made by or on behalf of a political committee during any period in which the office of treasurer is vacant. No expenditure shall be made for or on behalf of a political committee without the authorization of the treasurer or his or her designated agent.

**(b) Account of contributions; segregated funds**

**(1)** Every person who receives a contribution for an authorized political committee shall, no later than 10 days after receiving such contribution, forward to the treasurer such contribution, and if the amount of the contribution is in excess of $50 the name and address of the person making the contribution and the date of receipt.

**(2)** Every person who receives a contribution for a political committee which is not an authorized committee shall–

**(A)** if the amount of the contribution is $50 or less, forward to the treasurer such contribution no later than 30 days after receiving the contribution; and

**(B)** if the amount of the contribution is in excess of $50, forward to the treasurer such contribution, the name and address of the person making the contribution, and the date of receipt of the contribution, no later than 10 days after receiving the contribution.

**(3)** All funds of a political committee shall be segregated from, and may not be commingled with, the personal funds of any individual.

**(c) Recordkeeping**

The treasurer of a political committee shall keep an account of–

**(1)** all contributions received by or on behalf of such political committee;

**(2)** the name and address of any person who makes any contribution in excess of $50, together with the date and amount of such contribution by any person;

**(3)** the identification of any person who makes a contribution or contributions aggregating more than $200 during a calendar year, together with the date and amount of any such contribution;

**(4)** the identification of any political committee which makes a contribution, together with the date and amount of any such contribution; and

**(5)** the name and address of every person to whom any disbursement is made, the date, amount, and purpose of the disbursement, and the name of the candidate and the office sought by the candidate, if any, for whom the disbursement was made, including a receipt, invoice, or canceled check for each disbursement in excess of $200.

* * * * *

**(e) Principal and additional campaign committees; designations, status of candidate, authorized committees, etc.**

**(1)** Each candidate for Federal office (other than the nominee for the office of Vice President) shall designate in writing a political committee in accordance with paragraph (3) to serve as the principal campaign committee of such candidate. Such designation shall be made no later than 15 days after becoming a candidate. A candidate may designate additional political committees in accordance with paragraph (3) to serve as authorized committees of such candidate. Such designation shall be in writing and filed with the principal campaign committee of such candidate in accordance with subsection (f)(1) of this section.

**(2)** Any candidate described in paragraph (1) who receives a contribution, or any loan for use in connection with the campaign of such candidate for election, or makes a disbursement in connection with such campaign, shall be considered, for purposes of this Act, as having received the contribution or loan, or as having made the disbursement, as the case may be, as an agent of the authorized committee or committees of such candidate.

**(3)**

**(A)** No political committee which supports or has supported more than one candidate may be designated as an authorized committee, except that–

(i) the candidate for the office of President nominated by a political party may designate the national committee of such political party as a principal campaign committee, but only if that national committee maintains separate books of account with respect to its function as a principal campaign committee; and

(ii) candidates may designate a political committee established solely for the purpose of joint fundraising by such candidates as an authorized committee.

(B) As used in this section, the term "support" does not include a contribution by any authorized committee in amounts of $2,000 or less to an authorized committee of any other candidate.

(4) The name of each authorized committee shall include the name of the candidate who authorized such committee under paragraph (1). In the case of any political committee which is not an authorized committee, such political committee shall not include the name of any candidate in its name.

(5) The name of any separate segregated fund established pursuant to section 441b(b) of this title shall include the name of its connected organization.

**(f) Filing with and receipt of designations, statements, and reports by principal campaign committee**

(1) Notwithstanding any other provision of this Act, each designation, statement, or report of receipts or disbursements made by an authorized committee of a candidate shall be filed with the candidate's principal campaign committee.

(2) Each principal campaign committee shall receive all designations, statements, and reports required to be filed with it under paragraph (1) and shall compile and file such designations, statements, and reports in accordance with this Act.

* * * * *

**§ 30104. Reporting requirements**

**(a) Receipts and disbursements by treasurers of political committees; filing requirements**

**(1)** Each treasurer of a political committee shall file reports of receipts and disbursements in accordance with the provisions of this subsection. The treasurer shall sign each such report.

* * * * *

**(b) Contents of reports**

Each report under this section shall disclose–

**(1)** the amount of cash on hand at the beginning of the reporting period;

**(2)** for the reporting period and the calendar year (or election cycle, in the case of an authorized committee of a candidate for Federal office), the total amount of all receipts, and the total amount of all receipts in the following categories:

**(A)** contributions from persons other than political committees;

**(B)** for an authorized committee, contributions from the candidate....

* * * * *

**(3)** the identification of each–

**(A)** person (other than a political committee) who makes a contribution to the reporting committee during the reporting period, whose contribution or contributions have an aggregate amount or value in excess of $200 within the calendar year (or election cycle, in the case of an authorized committee of a candidate for Federal office), or in any lesser amount if the reporting committee should so elect, together with the date and amount of any such contribution;

* * * * *

**(4)** for the reporting period and the calendar year (or election cycle, in the case of an authorized committee of a candidate for Federal office), the total amount of all disbursements, and all disbursements in the following categories:

**(A)** expenditures made to meet candidate or committee operating expenses;

* * * * *

**(6)(A)** for an authorized committee, the name and address of each person who has received any disbursement not disclosed under paragraph (5) in an aggregate amount or value in excess of $200 within the calendar year (or election cycle, in the case of an authorized committee of a candidate for Federal office), together with the date and amount of any such disbursement;

**(B)** for any other political committee, the name and address of each–

* * * * *

**(v)** person who has received any disbursement not otherwise disclosed in this paragraph or paragraph (5) in an aggregate amount or value in excess of $200 within the calendar year (or election cycle, in the case of an authorized committee of a candidate for Federal office), from the reporting committee within the reporting period, together with the date, amount, and purpose of any such disbursement;

* * * * *

**(f) Disclosure of electioneering communications**

**(1) Statement required**

Every person who makes a disbursement for the direct costs of producing and airing electioneering communications in an aggregate amount in excess of $10,000 during any calendar year shall, within 24 hours of each disclosure date, file with the Commission a statement containing the information described in paragraph (2).

**(2) Contents of Statement**

Each statement required to be filed under this subsection shall be made under penalty of perjury and shall contain the following information:

**(A)** The identification of the person making the disbursement, of any person sharing or exercising direction or control over the activities of such person, and of the custodian of the books and accounts of the person making the disbursement.

**(B)** The principal place of business of the person making the disbursement, if an individual.

**(C)** The amount of each disbursement of more than $200 during the period covered by the statement and the identification of the person to whom the disbursement was made.

**(D)** The elections to which the electioneering communications pertain and the names (if known) of the candidates identified or to be identified.

**(E)** If the disbursements were paid out of a segregated bank account which consists of funds contributed solely by individuals who are United States citizens or nationals or lawfully admitted for permanent residence (as defined in section 1101(a)(20) of Title 8) directly to this account for electioneering communications, the names and addresses of all contributors who contributed an aggregate amount of $1,000 or more to that account during the period beginning on the first day of the preceding calendar year

and ending on the disclosure date. Nothing in this subparagraph is to be construed as a prohibition on the use of funds in such a segregated account for a purpose other than electioneering communications.

**(F)** If the disbursements were paid out of funds not described in subparagraph (E), the names and addresses of all contributors who contributed an aggregate amount of $1,000 or more to the person making the disbursement during the period beginning on the first day of the preceding calendar year and ending on the disclosure date.

**(3) Electioneering communication**

For purposes of this subsection–

**(A) In general**

**(i)** The term "electioneering communication" means any broadcast, cable, or satellite communication which–

**(I)** refers to a clearly identified candidate for Federal office;

**(II)** is made within–

**(aa)** 60 days before a general, special, or runoff election for the office sought by the candidate; or

**(bb)** 30 days before a primary or preference election, or a convention or caucus of a political party that has authority to nominate a candidate, for the office sought by the candidate; and

**(III)** in the case of a communication which refers to a candidate for an office other than President or Vice President, is targeted to the relevant electorate.

* * * * *

**§ 30109. Enforcement**

**(d) Penalties; defenses; mitigation of offenses**

**(1)(A)** Any person who knowingly and willfully commits a violation of any provision of this act which involves the making, receiving, or reporting of any contribution, donation, or expenditure

**(i)** Aggregating $25,000 or more during a calendar year shall be fined under Title 18, or imprisoned for not more than 5 years, or both; or

**(ii)** aggregating $2,000 or more (but less than $25,000) during a calendar year shall be fined under such title, or imprisoned for not more than 1 year, or both.

**(B)** In the case of a knowing and willful violation of section 441b(b)(3) of this title, the penalties set forth in this subsection shall apply to a violation involving an amount aggregating $250 or more during a calendar year. Such violation of section 441b(b)(3) of this title may incorporate a violation of section 441c(b), 30122, or 441g of this title.

**(C)** In the case of a knowing and willful violation of section 441h of this title, the penalties set forth in this subsection shall apply without regard to whether the making, receiving, or reporting of a contribution or expenditure of $1,000 or more is involved.

**(D)** Any person who knowingly and willfully commits a violation of section 30122 of this title involving an amount aggregating more than $10,000 during a calendar year shall be

**(i)** imprisoned for not more than 2 years if the amount is less than $25,000 (and subject to imprisonment under subparagraph (A) if the amount is $25,000 or more);

**(ii)** fined not less than 300 percent of the amount involved in the violation and not more than the greater of–

**(i)** $50,000; or

**(ii)** 1,000 percent of the amount involved in the violation; or

**(iii)** both imprisoned under clause (i) and fined under clause (ii).

**(2)** In any criminal action brought for a violation of any provision of this Act or of chapter 95 or chapter 96 of Title 26, any defendant may evidence their lack of knowledge or intent to commit the alleged violation by introducing as evidence a conciliation agreement entered into between the defendant and the Commission under subsection (a)(4)(A) of this section which specifically deals with the act or failure to act constituting such violation and which is still in effect.

**(3)** In any criminal action brought for a violation of any provision of this Act or of chapter 95 or chapter 96 of Title 26, 0the court before which such action is brought shall take into account, in weighing the seriousness of the violation and in considering the appropriateness of the penalty to be imposed if the defendant is found guilty, whether–

**(A)** the specific act or failure to act which constitutes the violation for which the action was brought is the subject of a conciliation agreement entered into between the defendant and the Commission under subparagraph (a)(4)(A);

**(B)** the conciliation agreement is in effect; and

**(C)** the defendant is, with respect to the violation involved, in compliance with the conciliation agreement.

* * * * *

### § 30114. Use of contributed amounts for certain purposes

**(a) Permitted uses**

A contribution accepted by a candidate, and any other donation received by an individual as support for activities of the individual as a holder of Federal office, may be used by the candidate or individual–

**(1)** for otherwise authorized expenditures in connection with the campaign for Federal office of the candidate or individual;

**(2)** for ordinary and necessary expenses incurred in connection with duties of the individual as a holder of Federal office;

**(3)** for contributions to an organization described in section 170(c) of Title 26;

**(4)** for transfers, without limitation, to a national, State, or local committee of a political party;

**(5)** for donations to State and local candidates subject to the provisions of State law; or

**(6)** for any other lawful purpose unless prohibited by subsection (b) of this section.

**(b) Prohibited use**

**(1) In general**

A contribution or donation described in subsection (a) of this section shall not be converted by any person to personal use.

**(2) Conversion**

For the purposes of paragraph (1), a contribution or donation shall be considered to be converted to personal use if the contribution or amount is used to fulfill any commitment, obligation, or expense of a person that would exist irrespective of the candidate's election campaign or individual's duties as a holder of Federal office, including–

**(A)** a home mortgage, rent, or utility payment;

**(B)** a clothing purchase;

**(C)** a noncampaign-related automobile expense;

**(D)** a country club membership;
**(E)** a vacation or other noncampaign-related trip;
**(F)** a household food item;
**(G)** a tuition payment;
**(H)** admission to a sporting event, concert, theater, or other form of entertainment not associated with an election campaign; and
**(I)** dues, fees, and other payments to a health club or recreational facility.

* * * * *

### § 30116. Limitations on contributions and expenditures

**(a) Dollar limits on contributions**

**(1)** Except as provided in subsection (i) of this section and section 441a-1 of this title, no person shall make contributions–

**(A)** to any candidate and his authorized political committees with respect to any election for Federal office which, in the aggregate, exceed $2,000;

**(B)** to the political committees established and maintained by a national political party, which are not the authorized political committees of any candidate, in any calendar year which, in the aggregate, exceed $25,000;

**(C)** to any other political committee (other than a committee described in subparagraph (D)) in any calendar year which, in the aggregate, exceed $5,000; or

**(D)** to a political committee established and maintained by a State committee of a political party in any calendar year which, in the aggregate, exceed $10,000.

**(2)** No multicandidate political committee shall make contributions–

**(A)** to any candidate and his authorized political committees with respect to any election for Federal office which, in the aggregate, exceed $5,000;

**(B)** to the political committees established and maintained by a national political party, which are not the authorized political committees of any candidate, in any calendar year, which, in the aggregate, exceed $15,000; or

**(C)** to any other political committee in any calendar year which, in the aggregate, exceed $5,000.

**(3)** During the period which begins on January 1 of an odd-numbered year and ends on December 31 of the next even-numbered year, no individual may make contributions aggregating more than–

**(A)** $37,500, in the case of contributions to candidates and the authorized committees of candidates;

**(B)** $57,500, in the case of any other contributions, of which not more than $37,500 may be attributable to contributions to political committees which are not political committees of national political parties.

**(4)** The limitations on contributions contained in paragraphs and (2) do not apply to transfers between and among political committees which are national, State, district, or local committees (including any subordinate committee thereof) of the same political party for purposes of paragraph (2), the term "multicandidate political committee" means a political committee which has been registered under section 433 of this title for a period of not less than 6 months, which has received contributions from more than 50 persons, and, candidates for Federal office.

**(5)** For purposes of the limitations provided by paragraph (1) and paragraph (2), all contributions made by political committees established or financed or maintained or controlled by any corporation, labor

organization, or any other person, including any parent, subsidiary, branch, division, department, or local unit of such corporation, labor organization, or any other person, or by any group of such persons, shall be considered to have been made by a single political committee, except that (A) nothing in this sentence shall limit transfers between political committees of funds raised through joint fund raising efforts; (B) for purposes of the limitations provided by paragraph (1) and paragraph (2) all contributions made by a single political committee established or financed or maintained or controlled by a national committee of a political party and by a single political committee established or financed or maintained or controlled by the State committee of a political party shall not be considered to have been made by a single political committee; and (C) nothing in this section shall limit the transfer of funds between the principal campaign committee of a candidate seeking nomination or election to a Federal office and the principal campaign committee of that candidate for nomination or election to another Federal office if (i) such transfer is not made when the candidate is actively seeking nomination or election to both such offices; (ii) the limitations contained in this Act on contributions by persons are not exceeded by such transfer; and (iii) the candidate has not elected to receive any funds under chapter 95 or chapter 96 of Title 26. In any case in which a corporation and any of its subsidiaries, branches, divisions, departments, or local units, or a labor organization and any of its subsidiaries, branches, divisions, departments, or local units establish or finance or maintain or control more than one separate segregated fund, all such separate segregated funds shall be treated as a single separate segregated fund for

purposes of the limitations provided by paragraph (1) and paragraph (2).

**(6)** The limitations on contributions to a candidate imposed by paragraphs (1) and (2) of this subsection shall apply separately with respect to each election, except that all elections held in any calendar year for the office of President of the United States (except a general election for such office) shall be considered to be one election.

**(7)** For purposes of this subsection–

**(A)** contributions to a named candidate made to any political committee authorized by such candidate to accept contributions on his behalf shall be considered to be contributions made to such candidate;

**(B)(i)** expenditures made by any person in cooperation, consultation, or concert, with, or at the request or suggestion of, a candidate, his authorized political committees, or their agents, shall be considered to be a contribution to such candidate;

**(ii)** expenditures made by any person (other than a candidate or candidate's authorized committee) in cooperation, consultation, or concert with, or at the request or suggestion of, a national, State, or local committee of a political party, shall be considered to be contributions made to such party committee; and

**(iii)** the financing by any person of the dissemination, distribution, or republication, in whole or in part, of any broadcast or any written, graphic, or other form of campaign materials prepared by the candidate, his campaign committees, or their authorized agents shall be considered to be an

expenditure for purposes of this paragraph; and

**(C)** if–

**(i)** any person makes, or contracts to make, any disbursement for any electioneering communication (within the meaning of section 434(f)(3) of this title); and

**(ii)** such disbursement is coordinated with a candidate or an authorized committee of such candidate, a Federal, State, or local political party or committee thereof, or an agent or official of any such candidate, party, or committee; such disbursement or contracting shall be treated as a contribution to the candidate supported by the electioneering communication or that candidate's party and as an expenditure by that candidate or that candidate's party; and

**(D)** contributions made to or for the benefit of any candidate nominated by a political party for election to the office of Vice President of the United States shall be considered to be contributions made to or for the benefit of the candidate of such party for election to the office of President of the United States (except a general election for such office) shall be considered to be one election.

**(8)** For purposes of the limitations imposed by this section, all contributions made by a person, either directly or indirectly, on behalf of a particular candidate, including contributions which are in any way earmarked or otherwise directed through an intermediary or conduit to such candidate, shall be treated as contributions from such person to such candidate. The intermediary or conduit shall report the original source and the intended

recipient of such contribution to the Commission and to the intended recipient.

* * * * *

**(f) Prohibited contributions and expenditures**

No candidate or political committee shall knowingly accept any contribution or make any expenditure in violation of the provisions of this section. No officer or employee of a political committee shall knowingly accept a contribution made for the benefit or use of a candidate, or knowingly make any expenditure on behalf of a candidate, in violation of any limitation imposed on contributions and expenditures under this section.

* * * * *

**§ 30118. Contributions or expenditures by national banks, corporations, or labor organizations**

**(a) In General**

It is unlawful for any national bank, or any corporation organized by authority of any law of Congress, to make a contribution or expenditure in connection with any election to any political office, or in connection with any primary election or political convention or caucus held to select candidates for any political office, or for any corporation whatever, or any labor organization, to make a contribution or expenditure in connection with any election at which presidential and vice presidential electors or a Senator or Representative in, or a Delegate or Resident Commissioner to, Congress are to be voted for, or in connection with any primary election or political convention or caucus held to select candidates for any of the foregoing offices, or for any candidate, political committee, or other person knowingly to accept or receive any contribution prohibited by this section, or any officer or any director of any corporation or any national bank or any officer of any labor organization to consent

to any contribution or expenditure by the corporation, national bank, or labor organization, as the case may be, prohibited by this section.

**(b) Definitions; Particular Activities Prohibited or Allowed**

**(1)** For the purposes of this section the term "labor organization" means any organization of any kind, or any agency or employee representation committee or plan, in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work.

**(2)** For purposes of this section and section 79l(h) of Title 15, the term "contribution or expenditure" includes a contribution or expenditure, as those terms are defined in section 431 of this title, and also includes any direct or indirect payment, distribution, loan, advance, deposit, or gift of money, or any services, or anything of value (except a loan of money by a national or State bank made in accordance with the applicable banking laws and regulations and in the ordinary course of business) to any candidate, campaign committee, or political party or organization, in connection with any election to any of the offices referred to in this section or for any applicable electioneering communication, but shall not include (A) communications by a corporation to its stockholders and executive or administrative personnel and their families or by a labor organization to its members and their families on any subject; (B) nonpartisan registration and get-out-the-vote campaigns by a corporation aimed at its stockholders and executive or administrative personnel and their families, or by a labor

organization aimed at its members and their families; and (C) the establishment, administration, and solicitation of contributions to a separate segregated fund to be utilized for political purposes by a corporation, labor organization, membership organization, cooperative, or corporation without capital stock.

**(3)** It shall be unlawful–

**(A)** for such a fund to make a contribution or expenditure by utilizing money or anything of value secured by physical force, job discrimination, financial reprisals, or the threat of force, job discrimination, or financial reprisal; or by dues, fees, or other moneys required as a condition of membership in a labor organization or as a condition of employment, or by moneys obtained in any commercial transaction;

**(B)** for any person soliciting an employee for a contribution to such a fund to fail to inform such employee of the political purposes of such fund at the time of such solicitation; and

**(C)** for any person soliciting an employee for a contribution to such a fund to fail to inform such employee, at the time of such solicitation, of his right to refuse to so contribute without any reprisal.

**(4)**

**(A)** Except as provided in subparagraphs (B), (C), and (D), it shall be unlawful–

**(i)** for a corporation, or a separate segregated fund established by a corporation, to solicit contributions to such a fund from any person other than its stockholders and their families and its executive or administrative personnel and their families, and

- **(ii)** for a labor organization, or a separate segregated fund established by a labor organization, to solicit contributions to such a fund from any person other than its members and their families.

**(B)** It shall not be unlawful under this section for a corporation, a labor organization, or a separate segregated fund established by such corporation or such labor organization, to make 2 written solicitations for contributions during the calendar year from any stockholder, executive or administrative personnel, or employee of a corporation or the families of such persons. A solicitation under this subparagraph may be made only by mail addressed to stockholders, executive or administrative personnel, or employees at their residence and shall be so designed that the corporation, labor organization, or separate segregated fund conducting such solicitation cannot determine who makes a contribution of $50 or less as a result of such solicitation and who does not make such a contribution.

**(C)** This paragraph shall not prevent a membership organization, cooperative, or corporation without capital stock, or a separate segregated fund established by a membership organization, cooperative, or corporation without capital stock, from soliciting contributions to such a fund from members of such organization, cooperative, or corporation without capital stock.

**(D)** This paragraph shall not prevent a trade association or a separate segregated fund established by a trade association from soliciting contributions from the stockholders and executive or administrative personnel of the

member corporations of such trade association and the families of such stockholders or personnel to the extent that such solicitation of such stockholders and personnel, and their families, has been separately and specifically approved by the member corporation involved, and such member corporation does not approve any such solicitation by more than one such trade association in any calendar year.

**(c)** Rules relating to electioneering communications

**(1) Applicable electioneering communication**

For purposes of this section, the term "applicable electioneering communication" means an electioneering communication (within the meaning of section 434(f)(3) of this title) which is made by any entity described in subsection (a) of this section or by any other person using funds donated by an entity described in subsection (a) of this section.

**(2) Exception**

Notwithstanding paragraph (1), the term "applicable electioneering communication" does not include a communication by a section 501(c)(4) organization or a political organization (as defined in section 527(e)(1) of Title 26) made under section 434(f)(2)(E) or (F) of this title if the communication is paid for exclusively by funds provided directly by individuals who are United States citizens or nationals or lawfully admitted for permanent residence (as defined in section 1101(a)(20) of Title 8). For purposes of the preceding sentence, the term "provided directly by individuals" does not include funds the source of which is an entity described in subsection (a) of this section.

* * * * *

### § 30119. Contributions by government contractors

**(a) Prohibition**

It shall be unlawful for any person–

**(1)** who enters into any contract with the United States or any department or agency thereof either for the rendition of personal services or furnishing any material, supplies, or equipment to the United States or any department or agency thereof or for selling any land or building to the United States or any department or agency thereof, if payment for the performance of such contract or payment for such material, supplies, equipment, land, or building is to be made in whole or in part from funds appropriated by the Congress, at any time between the commencement of negotiations for and the later of (A) the completion of performance under; or (B) the termination of negotiations for, such contract or furnishing of material, supplies, equipment, land, or buildings, directly or indirectly to make any contribution of money or other things of value, or to promise expressly or impliedly to make any such contribution to any political party, committee, or candidate for public office or to any person for any political purpose or use; or

**(2)** knowingly to solicit any such contribution from any such person for any such purpose during any such period.

**(b) Separate segregated funds**

This section does not prohibit or make unlawful the establishment or administration of, or the solicitation of contributions to, any separate segregated fund by any corporation, labor organization, membership organization, cooperative, or corporation without capital stock for the purpose of influencing the nomination for election, or election, of any person to Federal office, unless the provisions of section 441b of this title prohibit or make unlawful the establishment

or administration of, or the solicitation of contributions to, such fund. Each specific prohibition, allowance, and duty applicable to a corporation, labor organization, or separate segregated fund under section 441b of this title applies to a corporation, labor organization, or separate segregated fund to which this subsection applies.

**(c) "Labor organization" defined**

For purposes of this section, the term "labor organization" has the meaning given it by section 441b(b)(1) of this title.

* * * * *

**§ 30120. Publication and distribution of statements and solicitations; charge for newspaper or magazine space**

**(a)** Whenever a political committee makes a disbursement for the purpose of financing any communication through any broadcasting station, newspaper, magazine, outdoor advertising facility, mailing, or any other type of general public political advertising, or whenever any person makes a disbursement for the purpose of financing communications expressly advocating the election or defeat of a clearly identified candidate, or solicits any contribution through any broadcasting station, newspaper, magazine, outdoor advertising facility, mailing, or any other type of general public political advertising or makes a disbursement for an electioneering communication (as defined in section 434(f)(3) of this title), such communication–

**(1)** if paid for and authorized by a candidate, an authorized political committee of a candidate, or its agents, shall clearly state that the communication has been paid for by such authorized political committee, or[73]

**(2)** if paid for by other persons but authorized by a candidate, an authorized political committee of a candidate, or its agents, shall clearly state that the

[73] So in original. The word "or" probably should appear at the end of par. (2).

communication is paid for by such other persons and authorized by such authorized political committee;

**(3)** if not authorized by a candidate, an authorized political committee of a candidate, or its agents, shall clearly state the name and permanent street address, telephone number, or World Wide Web address of the person who paid for the communication and state that the communication is not authorized by any candidate or candidate's committee.

**(b)** No person who sells space in a newspaper or magazine to a candidate or to the agent of a candidate, for use in connection with such candidate's campaign, may charge any amount for such space which exceeds the amount charged for comparable use of such space for other purposes.

**(c)** Specification

Any printed communication described in subsection (a) of this section shall–

**(1)** be of sufficient type size to be clearly readable by the recipient of the communication;

**(2)** be contained in a printed box set apart from the other contents of the communication; and

**(3)** be printed with a reasonable degree of color contrast between the background and the printed statement.

**(d)** Additional requirements

**(1)** Communications by candidates or authorized persons

**(A) By radio**

Any communication described in paragraph (1) or (2) of subsection (a) of this section which is transmitted through radio shall include, in addition to the requirements of that paragraph, an audio statement by the candidate that identifies the candidate and states that the candidate has approved the communication.

**(B) By television**

Any communication described in paragraph (1) or (2) of subsection (a) of this section which is transmitted

through television shall include, in addition to the requirements of that paragraph, a statement that identifies the candidate and states that the candidate has approved the communication.

Such statement–

**(i)** shall be conveyed by–

**(I)** an unobscured, full-screen view of the candidate making the statement, or

**(II)** the candidate in voice-over, accompanied by a clearly identifiable photographic or similar image of the candidate; and

**(i)** shall also appear in writing at the end of the communication in a clearly readable manner with a reasonable degree of color contrast between the background and the printed statement, for a period of at least 4 seconds.

**(2) Communications by others**

Any communication described in paragraph (3) of subsection (a) of this section which is transmitted through radio or television shall include, in addition to the requirements of that paragraph, in a clearly spoken manner, the following audio statement: "_is responsible for the content of this advertising." (with the blank to be filled in with the name of the political committee or other person paying for the communication and the name of any connected organization of the payor). If transmitted through television, the statement shall be conveyed by an unobscured, full-screen view of a representative of the political committee or other person making the statement, or by a representative of such political committee or other person in voice-over, and shall also appear in a clearly readable manner with a reasonable degree of color contrast between the background and the printed statement, for a period of at least 4 seconds.

* * * * *

### § 30121. Contributions and donations by foreign nationals

**(a) Prohibition**

It shall be unlawful for–

**(1)** a foreign national, directly or indirectly, to make–

**(A)** a contribution or donation of money or other thing of value, or to make an express or implied promise to make a contribution or donation, in connection with a Federal, State, or local election;

**(B)** a contribution or donation to a committee of a political party; or

**(C)** an expenditure, independent expenditure, or disbursement for an electioneering communication (within the meaning of section 434(f)(3) of this title); or

**(2)** a person to solicit, accept, or receive a contribution or donation described in subparagraph (A) or (B) of paragraph (1) from a foreign national.

**(b) "Foreign National" Defined**

As used in this section, the term "foreign national" means–

**(3)** a foreign principal, as such term is defined by section 611(b) of Title 22, except that the term "foreign national" shall not include any individual who is a citizen of the United States; or

**(4)** an individual who is not a citizen of the United States or a national of the United States (as defined in section 1101(a)(22) of Title 8) and who is not lawfully admitted for permanent residence, as defined by section 1101(a)(2) of Title 8.

* * * * *

**§ 30122. Contributions in name of another prohibited**

No person shall make a contribution in the name of another person or knowingly permit his name to be used to effect such a contribution, and no person shall knowingly accept a contribution made by one person in the name of another person.

* * * * *

**§ 30123. Limitation on contribution of currency**

No person shall make contributions of currency of the United States or currency of any foreign country to or for the benefit of any candidate which, in the aggregate, exceed $100, with respect to any campaign of such candidate for nomination for election, or for election, to Federal office.

* * * * *

**§ 30124. Fraudulent misrepresentation of campaign authority**

**(a)** In general

No person who is a candidate for Federal office or an employee or agent of such a candidate shall–

**(1)** fraudulently misrepresent himself or any committee or organization under his control as speaking or writing or otherwise acting for or on behalf of any other candidate or political party or employee or agent thereof on a matter which is damaging to such other candidate or political party or employee or agent thereof; or

**(2)** willfully and knowingly participate in or conspire to participate in any plan, scheme, or design to violate paragraph (1).

**(b)** Fraudulent solicitation of funds No person shall–

**(1)** fraudulently misrepresent the person as speaking, writing, or otherwise acting for or on behalf of any candidate or political party or employee or agent

thereof for the purpose of soliciting contributions or donations; or

**(2)** willfully and knowingly participate in or conspire to participate in any plan, scheme, or design to violate paragraph (1).

* * * * *

### § 30125. Soft money of political parties

**(a) National committees**

**(1) In general**

A national committee of a political party (including a national congressional campaign committee of a political party) may not solicit, receive, or direct to another person a contribution, donation, or transfer of funds or any other thing of value, or spend any funds, that are not subject to the limitations, prohibitions, and reporting requirements of this Act.

**(2) Applicability**

The prohibition established by paragraph (1) applies to any such national committee, any officer or agent acting on behalf of such a national committee, and any entity that is directly or indirectly established, financed, maintained, or controlled by such a national committee.

**(b) State, district, and local committees**

**(1) In general**

Except as provided in paragraph (2), an amount that is expended or disbursed for Federal election activity by a State, district, or local committee of a political party (including an entity that is directly or indirectly established, financed, maintained, or controlled by a State, district, or local committee of a political party and an officer or agent acting on behalf of such committee or entity), or by an association or similar group of candidates for State or local office or of individuals holding State or local office, shall

be made from funds subject to the limitations, prohibitions, and reporting requirements of this Act.

**(2) Applicability**

**(A) In general**

Notwithstanding clause (i) or (ii) of section 431(20)(A) of this title, and subject to subparagraph (B), paragraph (1) shall not apply to any amount expended or disbursed by a State, district, or local committee of a political party for an activity described in either such clause to the extent the amounts expended or disbursed for such activity are allocated (under regulations prescribed by the Commission) among amounts–

**(i)** which consist solely of contributions subject to the limitations, prohibitions, and reporting requirements of this Act (other than amounts described in subparagraph (B)(iii)); and

**(ii)** other amounts which are not subject to the limitations, prohibitions, and reporting requirements of this Act (other than any requirements of this subsection).

**(B) Conditions**

Subparagraph (A) shall only apply if–

**(i)** the activity does not refer to a clearly identified candidate for Federal office;

**(ii)** the amounts expended or disbursed are not for the costs of any broadcasting, cable, or satellite communication, other than a communication which refers solely to a clearly identified candidate for State or local office;

**(iii)** the amounts expended or disbursed which are described in subparagraph (A)(ii) are paid from amounts which are donated in accordance with State law and which meet the requirements of subparagraph (C), except that no person (including any person established, financed,

maintained, or controlled by such person) may donate more than $10,000 to a State, district, or local committee of a political party in a calendar year for such expenditures or disbursements; and

**(iv)** the amounts expended or disbursed are made solely from funds raised by the State, local, or district committee which makes such expenditure or disbursement, and do not include any funds provided to such committee from–

**(I)** any other State, local, or district committee of any State party,

**(II)** the national committee of a political party (including a national congressional campaign committee of a political party),

**(III)** any officer or agent acting on behalf of any committee described in subclause (i) or (II), or

**(IV)** any entity directly or indirectly established, financed, maintained, or controlled by any committee described in subclause (i) or (II).

**(C) Prohibiting involvement of National parties, Federal candidates and officeholders, and State parties acting jointly**

Notwithstanding subsection (e) of this section (other than subsection (e)(3) of this section), amounts specifically authorized to be spent under subparagraph (B)(iii) meet the requirements of this subparagraph only if the amounts–

**(i)** are not solicited, received, directed, transferred, or spent by or in the name of any person described in subsection (a) or (e) of this section; and

**(ii)** are not solicited, received, or directed through fundraising activities conducted jointly by 2 or

more State, local, or district committees of any political party or their agents, or by a State, local, or district committee of a political party on behalf of the State, local, or district committee of a political party or its agent in one or more other States.

**(c) Fundraising costs**

An amount spent by a person described in subsection (a) or (b) of this section to raise funds that are used, in whole or in part, for expenditures and disbursements for a Federal election activity shall be made from funds subject to the limitations, prohibitions, and reporting requirements of this Act.

* * * * *

**(e) Federal candidates**

**(1) In general**

A candidate, individual holding Federal office, agent of a candidate or an individual holding Federal office, or an entity directly or indirectly established, financed, maintained or controlled by or acting on behalf of 1 or more candidates or individuals holding Federal office, shall not–

**(A)** solicit, receive, direct, transfer, or spend funds in connection with an election for Federal office, including funds for any Federal election activity, unless the funds are subject to the limitations, prohibitions, and reporting requirements of this Act; or

**(B)** solicit, receive, direct, transfer, or spend funds in connection with any election other than an election for Federal office or disburse funds in connection with such an election unless the funds—

**(i)** are not in excess of the amounts permitted with respect to contributions to candidates and

political committees under paragraphs (1), (2), and (3) of section 441a(a) of this title; and

**(ii)** are not from sources prohibited by this Act from making contributions in connection with an election for Federal office.

* * * * *

**§ 30145. Period of limitations**

**(a)** No person shall be prosecuted, tried, or punished for any violation of subchapter I of this chapter, unless the indictment is found or the information is instituted within 5 years after the date of the violation.

**(b)** Notwithstanding any other provision of law–

**(1)** the period of limitations referred to in subsection (a) of this section shall apply with respect to violations referred to in such subsection committed before, on, or after the effective date of this section; and

**(2)** no criminal proceeding shall be instituted against any person for any act or omission which was a violation of any provision of subchapter I of this chapter, as in effect on December 31, 1974, if such act or omission does not constitute a violation of any such provision, as amended by the Federal Election Campaign Act Amendments of 1974.

# APPENDIX C

# EDITORIAL RECLASSIFICATION TABLE FOR TITLE 52

| Title | Former Designation | Current Designation |
|---|---|---|
| Definitions | 2 U.S.C. § 431 | 52 U.S.C. § 30101 |
| Organization of political committees | 2 U.S.C. § 432 | 52 U.S.C. § 30102 |
| Reporting requirements | 2 U.S.C. § 434 | 52 U.S.C. § 30104 |
| Enforcement | 2 U.S.C. § 437g | 52 U.S.C. § 30109 |
| Use of contributed amounts for certain purposes | 2 U.S.C. § 439a | 52 U.S.C. § 30114 |
| Limitations on contributions and expenditures | 2 U.S.C. § 441a | 52 U.S.C. § 30116 |
| Contributions or expenditures by national banks, corporations, or labor organizations | 2 U.S.C. § 441b | 52 U.S.C. § 30118 |
| Contributions by government contractors | 2 U.S.C. § 441c | 52 U.S.C. § 30119 |
| Publication and distribution of statements and solicitations; charge for newspaper or magazine space | 2 U.S.C. § 441d | 52 U.S.C. § 30120 |
| Contributions and donations by foreign nationals | 2 U.S.C. § 441e | 52 U.S.C. § 30121 |
| Contributions in name of another prohibited | 2 U.S.C. § 441f | 52 U.S.C. § 30122 |
| Limitation on contribution of currency | 2 U.S.C. § 441g | 52 U.S.C. § 30123 |
| Fraudulent misrepresentation of campaign authority | 2 U.S.C. § 441h | 52 U.S.C. § 30124 |
| Soft money of political parties | 2 U.S.C. § 441i | 52 U.S.C. § 30125 |
| Period of limitations | 2 U.S.C. § 455 | 52 U.S.C. § 30145 |
| Prohibited Acts | 42 U.S.C. § 1973i | 52 U.S.C. § 10307 |
| Criminal Penalties | 42 U.S.C. § 1973gg-10 | 52 U.S.C. § 20511 |

# APPENDIX D

## TABLE OF CASES

**CASES**

*AFL-CIO v. Fed. Election Comm'n*,
628 F.2d 97 (D.C. Cir. 1980)....................................................154
*Anderson v. United States*, 417 U.S. 211 (1974)....................1, 36
*Austin v. Michigan Chamber of Commerce*,
494 U.S. 652 (1990)................................................................133
*Bialek v. Mukaskey*, 529 F.3d 1267 (10th Cir. 2008)....................151
*Biller v. Merit Sys. Prot. Bd.*, 863 F.2d 1079 (2d Cir. 1988)......114
*Blaylock v. Merit Sys. Prot. Bd.*,
851 F.2d 1348 (11th Cir. 1988) ...............................................114
*Blitz v. United States*, 153 U.S. 308 (1894) ...................................36
*Blockburger v. United States*, 284 U.S. 299 (1932) .................43
*Branti v. Finkel*, 445 U.S. 507 (1980) .................................100, 109
*Brehm v. United States*, 196 F.2d 769 (D.C. Cir. 1952)................101
*Buckley v. Valeo*, 424 U.S. 1 (1976) .......................................passim
*Buckley v. Valeo*,
519 F.2d 821 (D.C. Cir. 1975) (en banc) ...........................205, 206
*Burroughs v. United States*, 290 U.S. 534 (1934)..............122, 203
*Cheek v. United States*, 498 U.S. 192 (1991) ..........................153, 154
*Citizens United v. Fed. Election Comm'n*,
558 U.S. 310 (2010)......................................................... 133–135
*Civil Serv. Comm. v. Letter Carriers*,
413 U.S. 548 (1973)................................................................112
*Connick v. Myers*, 461 U.S. 138 (1983) .......................................108
*Cort v. Ash*, 422 U.S. 66 (1975) ................................................134
*Crolich v. United States*, 196 F.2d 879 (5th Cir. 1952)..................35
*Dennis v. United States*, 384 U.S. 855 (1966) .............................162
*Duncan v. Poythress*, 657 F.2d 691 (5th Cir. 1981)......................36
*Elrod v. Burns*, 427 U.S. 347 (1976) ............................100, 101, 109
*Evans v. United States,* 504 U.S. 255 (1992) ...............................122
*Ex parte Curtis*, 106 U.S. 371 (1882) ..........................................101
*Ex parte Siebold*, 100 U.S. 371 (1880)....................................19, 36
*Ex parte Yarborough*, 110 U.S. 651 (1884)...............................19, 33

*Fed. Election Comm'n v. Wis. Right to Life*,
551 U.S. 449 (2007)....................................................................135
*Fed. Election Comm'n v. Nat'l Right to Work Comm.*,
459 U.S. 197 (1982).......................................................... 203, 204
*Fed. Election Comm'n v. Mass. Citizens for Life, Inc.*, 479 U.S.
238 (1986)..........................................................................126
*Fieger v. U.S. Attorney General*, 542 F.3d 1111 (6th Cir. 2008)..151
*Fields v. United States*, 228 F.2d 544 (4th Cir. 1955)...................35
*First Nat'l Bank of Boston v. Bellotti*,
435 U.S. 765 (1978) ...............................................................134
*Fotie v. United States,* 137 F.2d 831 (8th Cir. 1943) .....................63
*Guinn v. United States*, 238 U.S. 347 (1915) ..............................20
*Haas v. Henkel*, 216 U.S. 462 (1910) ..........................................162
*Hammerschmidt v. United States*, 265 U.S. 182 (1924) ...........162
*In re Coy*, 127 U.S. 731 (1888)......................................19, 36, 56
*Ingber v. Enzor*, 664 F. Supp. 814 (S.D.N.Y. 1987)............26
*Kennedy v. Lynd*, 306 F.2d 222 (5th Cir. 1962) ............................76
*Langer v. United States*, 76 F.2d 817 (8th Cir. 1935)................100
*Marcus v. Holder*, 574 F.3d 1182 (9th Cir. 2009)........................151
*McConnell v. Fed. Election Comm'n*,
540 U.S. 93 (2003) ..........................................................passim
*McCormick v. United States*, 500 U.S. 257 (1991) ......................122
*McCutcheon v. Fed. Election Comm'n*,
134 S. Ct. 1434 (2014)..........................................................130
*McIntosh v. United States*, 385 F.2d 274 (8th Cir. 1967)................66
*McNally v. United States*, 483 U.S. 350 (1987) ......................passim
*Nat'l Right to Work Comm. v. Fed. Election Comm'n*, 716 F.2d
1401 (D.C. Cir. 1983)............................................................154
*Newberry* v. *United States*, 256 U.S. 232 (1918) ..........................20
*Nixon v. Shrink Missouri PAC*, 528 U.S. 377 (2000)....................131
*Oregon v. Mitchell*, 400 U.S. 112 (1970)...................................36
*Perrin v. United States*, 444 U.S. 37 (1979) ..................................64
*Pipefitters v. United States*, 407 U.S. 385 (1972)..............135, 205
*Ratzlaf v. United States*, 510 U.S. 135 (1994).........................153, 154
*Reynolds v. Sims*, 377 U.S. 533 (1964) ...................................20, 36
*Rutan v. Republican Party of Illinois*,
497 U.S. 62 (1990)..............................................100, 101, 108
*Ryan v. United States*, 99 F.2d 864 (8th Cir. 1938)........................35

*Schwartz v. Upper Deck Co.*, 183 F.R.D. 672 (S.D. Cal. 1999)..... 64
*Skilling v. United States*, 561 U.S. 358 (2010).......................... 21, 67
*SpeechNow.org v. Fed. Election Comm'n*,
599 F.3d 686 (D.C. Cir. 2010) ........................................ 132, 134
*United Public Workers v. Mitchell*, 330 U.S. 75 (1947)............. 112
*United States v. Anderson*, 481 F.2d 685 (4th Cir. 1973)........ 20, 37
*United States v. Auto. Workers*,
352 U.S. 567 (1957) ........................................... 135, 202, 203, 204
*United States v. Canales*, 744 F.2d 413 (5th Cir. 1984) ........... 44
*United States v. Fin. Comm. to Re-elect the President*,
507 F.2d 1194 (D.C. Cir. 1974) ....................................... 160
*United States v. Gradwell*, 243 U.S. 476 (1917)........................ 20
*United States v. Hopkins*, 916 F.2d 207 (5th Cir. 1990) ....... passim
*United States v. Howard*, 774 F.2d 838 (7th Cir. 1985) ................. 37
*United States v. Ingber*,
Cr. No. 86-1402 (2d Cir. Feb. 4, 1987) ............................... 26
*United States v. Kelley*, 395 F.2d 727 (2d Cir. 1968).................... 66
*United States v. Malmay*, 671 F.2d 869 (5th Cir. 1982).......... 19, 45
*United States v. Mason*, 673 F.2d 737 (4th Cir. 1982)............ 19, 43
*United States v. Olinger*,
759 F.2d 1293 (7th Cir. 1985).............................. 20, 37, 45, 46
*United States v. Pintar*, 630 F.2d 1270 (8th Cir. 1980) ............ 100
*United States v. Prude*, 489 F.3d 873 (7th Cir. 2007) ............. 58
*United States v. Webb*,
689 F. Supp. 703 (W.D. Ky. 1988)........................ 26, 69, 71
*United States v. Weston*, 417 F.2d 181 (4th Cir. 1969) ................. 35
*United States v. Woodward*, 469 U.S. 105 (1985)....................... 165
*United States v. Adams*, 722 F.3d 788 (6th Cir. 2013)..................... 91
*United States v. Bagnariol*, 665 F.2d 877 (9th Cir. 1981);............. 66
*United States v. Bathgate*, 246 U.S. 220 (1918)........................ 20, 36
*United States v. Blanton*, 77 F. Supp. 812 (E.D. Mo. 1948)........... 44
*United States v. Boards*,
10 F.3d 587 (8th Cir. 1993) ...................................... 30, 41, 42, 49
*United States v. Boards*,
Cr. No. LR-92-183 (E.D. Ark. Sept. 12, 1994) ....................... 177
*United States v. Bowman*, 636 F.2d 1003 (5th Cir. 1981)........ 41, 43
*United States v. Bracewell*,
Cr. No. 91-57-N (M.D. Ala., May 9, 1991) ........................... 166

*United States v. Bradberry*, 517 F.2d 498 (7th Cir. 1975)............35
*United States v. Braddock*, Crim. No. 12-cr-157,
2013 WL 4441531 (D. Conn. Aug. 14, 2013)..........................160
*United States v. Brown*, 49 F.3d 1162 (6th Cir. 1995)............. 35–36
*United States v. Bryan*, 524 U.S. 184 (1998)...........................passim
*United States v. Burleson*, 127 F. Supp. 400 (E.D. Tenn. 1954) ..101
*United States v. C.I.O.*, 335 U.S. 106 (1948)...............................135
*United States v. Campbell*, 845 F.2d 782 (8th Cir. 1988)..............45
*United States v. Carmichael*, 685 F.2d 903 (4th Cir. 1982)......41, 45
*United States v. Chestnut*, 533 F.2d 40 (2d Cir. 1976)..................158
*United States v. Cianciulli*,
482 F. Supp. 585 (E.D. Pa. 1979)............................24, 40, 45, 77
*United States v. Cicco*, 10 F.3d 980 (3d Cir. 1993).......................110
*United States v. Cicco*, 938 F.2d 441 (3d Cir. 1991)............109, 110
*United States v. Classic*, 313 U.S. 299 (1941)..............20, 33, 34, 38
*United States v. Cole*, 41 F.3d 303 (7th Cir. 1994)..................passim
*United States v. Collins*, 685 F.3d 651 (7th Cir. 2012)..................40
*United States v. Colvin*, 353 F.3d 569 (7th Cir. 2003)....................35
*United States v. Cooper*, 677 F. Supp. 778 (D. Del. 1988).............68
*United States v. Coppola*, 671 F.3d 220 (2d Cir. 2012).................70
*United States v. Danielczyk*,
788 F. Supp. 2d 472 (E.D. Va. 2011)..................................153, 154
*United States v. Danielczyk*,
917 F. Supp. 2d 573, 578-80 (E.D. Va. 2013)...........................123
*United States v. Dansker*, 537 F.2d 40 (3d Cir. 1976)...................64
*United States v. Daugherty*, 952 F.2d 969 (8th Cir. 1991)..........45
*United States v. Davis*, 780 F.2d 838 (10th Cir. 1985)..................66
*United States v. DeFries*, 43 F.3d 707 (D.C. Cir. 1995)..............72
*United States v. Doherty*, 867 F.2d 47 (1st Cir. 1989).............68, 70
*United States v. Douglas*, No. 309-014,
2010 WL 737330 (S.D. Ga. Mar. 2, 2010)...................................39
*United States v. Ferrara*, 701 F. Supp. 39 (E.D.N.Y. 1988)...........68
*United States v. Franklin,* 188 F.2d 182 (7th Cir. 1951)................63
*United States v. Gabriel,* 125 F.3d 89 (2d Cir. 1997.....................161
*United States v. Garcia*, 719 F.2d 99 (5th Cir. 1983)........43, 44, 45
*United States v. George*, No. 86–CR–123,
1987 WL 48848 (W.D. Ky. Oct. 20, 1987).....................26, 70
*United States v. Goodrich*, 871 F.2d 1011 (11th Cir. 1989)...........70

*United States v. Granberry*,
908 F.2d 278 (8th Cir. 1990) ............................................68, 71
*United States v. Hankin*, 607 F.2d 611 (3d Cir. 1979) ...............142
*United States v. Hansen*, 772 F.2d 940 (D.C. Cir. 1985)..............160
*United States v. Haynes*, Nos. 91-5979, 91-6076,
1992 WL 296782 (6th Cir. Oct. 15, 1992) ..........................passim
*United States v. Hogue*, 812 F.2d 1568 (11th Cir. 1987).......47
*United States v. Hsia*, 176 F.3d 517 (D.C. Cir. 1999)...........passim
*United States v. Huizar-Velazquez*,
720 F.3d 1189 (9th Cir. 2013) ..................................................173
*United States v. Int'l Union of Operating Eng.*,
638 F.2d 1161 (9th Cir. 1979)...................................................151
*United States v. Jabara*, 644 F.2d 574 (6th Cir. 1981) ..................66
*United States v. Kanchanalak*,
192 F.3d 1037 (D.C. Cir. 1999) ................................................160
*United States v. Karigiannis*, 430 F.2d 148 (7th Cir. 1970)..........64
*United States v. Karlsen*, Cr. No. 89-353
(D. Az., indictment filed Oct. 18, 1989)................................166
*United States v. Knight*, 490 F.3d 1268 (11th Cir. 2007)................64
*United States v. Lewin*, 467 F.2d 1132 (7th Cir. 1972) .................44
*United States v. Manzo*, 851 F. Supp. 2d 797 (D.N.J. 2012)..........65
*United States v. McCranie*,
169 F.3d 723 (11th Cir. 1999).......................................21, 39, 44
*United States v. McLean*, 808 F.2d 1044 (4th Cir. 1987)..............36
*United States v. McMillan,* 600 F.3d 434 (5th Cir. 2010) .............71
*United States v. Morado*, 454 F.2d 167 (5th Cir. 1972).................34
*United States v. Mosley*, 238 U.S. 383 (1915)...............................34
*United States v. Nader,* 542 F.3d 713 (9th Cir. 2008).....................65
*United States v. Nathan*, 238 F.2d 401 (7th Cir. 1956)..................36
*United States v. North Carolina Republican Party*,
No. 91-161-Civ-5F (E.D.N.C. Feb. 27, 1992) ................. 52–53
*United States v. O'Brien*, 994 F. Supp. 2d 167 (D. Mass 2014) .....68
*United States v. O'Donnell*, Crim. No. 08-872,
2009 WL 9041223 (C.D. Cal.) ........................................141, 160
*United States v. Odom*,
736 F.2d 104 (4th Cir. 1984)...............................28, 45, 46, 51
*United States v. Orsburn*, 525 F.3d 543 (7th Cir. 2008) ..............173

*United States v. Passodelis*,
615 F.2d 975 (3d Cir. 1980) .......................................... 142, 158
*United States v. Peskin*, 527 F.2d 71 (7th Cir. 1975) ............... 66
*United States v. Polizzi*, 500 F.2d 856 (9th Cir. 1974)................ 64
*United States v. Price*, 383 U.S. 787 (1966) ................................ 38
*United States v. Ratcliff*,
488 F.3d 639 (5th Cir. 2007) .........................................passim
United States v. Rowland, Cr. No. 3:14cr79 (JBA),
2015 WL 1275655 (D. Conn. Mar. 19, 2015) .................. 172, 173
*United States v. Salisbury*,
983 F.2d 1369 (6th Cir. 1993).........................................passim
*United States v. Salisbury*,
Cr. No. 2-90-197 (S.D. Ohio Oct. 8, 1991) ............................... 177
*United States v. Saylor*, 322 U.S. 385 (1944)................................ 34
*United States v. Schermerhorn*,
713 F. Supp. 88 (S.D.N.Y. 1989) ............................. 26, 69, 71
*United States v. Slone*, 411 F.3d 643 (6th Cir. 2005).............passim
*United States v. Smith*, 231 F.3d 800 (11th Cir. 2000)............passim
*United States v. Sorich*, 523 F.3d 702 (7th Cir. 2008) ............. 68, 70
*United States v. Sparkman*, Cr. No. 99-30,
2008 WL 2787415, (E.D. Ky. July 12, 2000).......................... 176
*United States v. Starnes*, 583 F.3d 196 (3d Cir. 2009)............ 153, 161
*United States v. Stollings*, 501 F.2d 954 (4th Cir. 1974)................ 20
*United States v. Taff*, 400 F. Supp. 2d 1270 (D. Kan. 2005)........ 149
*United States v. Thayer*, 209 U.S. 39 (1908)............................... 105
*United States v. Thomas*, 510 F.3d 714 (7th Cir. 2007) .................. 43
*United States v. Thomas*, 686 F. Supp. 1078 (M.D. Pa. 1988) .. 68, 71
*United States v. Thomas*, Cr. No. 05-0423
(D.D.C., information filed November 30, 2005) ...................... 166
*United States v. Thompson*, No. 6:09–16–KKC,
2013 WL 5528827 (E.D. Ky. Oct. 4, 2013) ............................... 35
*United States v. Tobin*, No. 04-216-01 (SM), 2005 WL 3199672
(D.N.H. Nov. 30, 2005) ........................................................ 35, 57
*United States v. Townsley*,
843 F.2d 1070 (8th Cir. 1988) ...................................... 34, 37, 56
*United States v. Turner*,
459 F.3d 775 (6th Cir. 2006) ................................ 25, 69, 70, 71
*United States v. Wadena*, 152 F.3d 831 (8th Cir. 1998) ........... 20, 37

*United States v. Welch*, 327 F.3d 1081, 1092 (10th Cir. 2003)......66
*United States v. Whitney*,
229 F.3d 1296 (10th Cir. 2000) ........................................35
*United States v. Whittemore*,
776 F.3d 1074, 1080 (9th Cir. 2015)..........................................160
*United States v. Whittemore*,
944 F. Supp. 2d 1003 (D. Nev. 2013)........................... 152–54, 160
*United States v. Wurzbach*, 280 U.S. 396 (1930).......................101
*Wagner v. FEC*, 793 F.3d 1 (D.C. Cir. 2015)...............................136
*Walker v. United States*, 93 F.2d 383 (8th Cir. 1937) ....................35
*Westchester Cnty. Indep. Party v. Astorino*,
No. 13–CV–7737(KMK), 2015 WL 5883718
(S.D.N.Y. Oct. 8, 2015) ............................................... 25, 69–70
*Whalen v. United States*, 445 U.S. 684 (1980) ........................43
*Wilkins v. United States*, 376 F.2d 552 (5th Cir. 1967) (*en banc*)...54
*Williams v. United States*, 341 U.S. 97 (1951) .........................34, 38

# EXHIBIT 47

# Federal Prosecution of Election Offenses

## Seventh Edition

*May 2007*

*(Revised August 2007)*

Written by:

Craig C. Donsanto, Director
Election Crimes Branch
Public Integrity Section

and

Nancy L. Simmons
Senior Counsel for Policy
Public Integrity Section

# NOTE

This revision of the Seventh Edition of Federal Prosecution of Election Offenses includes four significant holdings bearing on the material contained in this book that were handed down between the date of its initial printing in May 2007 and the date of this revision in August 2007:

The Supreme Court's decision in *Federal Election Commission v. Wisconsin Right to Life, Inc.*, 551 U.S. ___, 127 S.Ct. 2652 (2007), addressing the constitutionality of the prohibition against corporate and union "electioneering communications" that was added to the Federal Election Campaign Act by the Bipartisan Campaign Reform Act of 2002.

The Fifth Circuit's decision in *United States v. Ratcliff*, 488 F.3d 639 (5th Cir. 2007), addressing the applicability of the so-called "salary theory" of mail and wire fraud to election matters involving violations of state campaign finance laws.

The Eleventh Circuit's decision in *United States v. Knight*, ___ F.3d ___, 2007 WL 1892861 (11th Cir. July 3, 2007), addressing the intent element of the crime of "voting by aliens" set forth in 18 U.S.C. § 611.

The Seventh Circuit's decision in *United States v. Prude*, 489 F.3d 873 (7th Cir. 2007), reporting the first jurisprudence under the criminal provision of the National Voter Registration Act of 1993, 42 U.S.C. §1973gg-10(2).

These recent cases are discussed briefly in this revision.

Craig C. Donsanto
Nancy L. Simmons

August 2007

# TABLE OF CONTENTS

**Page**

**PREFACE**.. xiii

**CHAPTER ONE: OVERVIEW**. 1

A. INTRODUCTION. 1
B. TYPES OF ELECTION CRIMES. 2
1. Election Fraud. 2
2. Patronage Crimes. 3
3. Campaign Financing Crimes. 4
4. Civil Rights Crimes. 5
C. FEDERAL JURISDICTION. 5
D. ADVANTAGES OF FEDERAL PROSECUTION. 8
E. FEDERAL ROLE: PROSECUTION, NOT INTERVENTION. 9
F. EVALUATING AN ELECTION FRAUD ALLEGATION. 10
G. INVESTIGATIVE CONSIDERATIONS IN ELECTION FRAUD CASES. 11
H. EVALUATING A CAMPAIGN FINANCING ALLEGATION. 13
I. INVESTIGATIVE CONSIDERATIONS IN CAMPAIGN FINANCING CASES. 15
J. CONSULTATION REQUIREMENTS AND RECOMMENDATIONS. 16
1. Consultation Requirements for Election Frauds and Patronage Crimes. 17
2. Consultation Requirements for Campaign Financing Crimes. 18

**CHAPTER TWO: CORRUPTION OF THE ELECTION PROCESS** . . . . . 21

A. HISTORICAL BACKGROUND . . . . . 21
B. WHAT IS ELECTION FRAUD? . . . . . 24
1. In General. . . . . 24
2. Conduct that Constitutes Federal Election Fraud . . . . . 26
3. Conduct that Does Not Constitute Federal Election Fraud. . . . . 29
4. Conditions Conducive to Election Fraud. . . . . 30
5. Voter Participation Versus Nonvoter Participation Cases. . . . . 31
(a) Election frauds not involving the participation of voters. . . . . 31
(b) Election frauds involving the participation of voters. . . . . 32
C. JURISDICTIONAL SUMMARY . . . . . 33
1. Statutes Applicable to Nonfederal Elections . . . . . 34
2. Statutes Applicable to Federal Elections . . . . . 36
D. STATUTES . . . . . 37
1. Conspiracy Against Rights. 18 U.S.C. § 241 . . . . . 37
2. Deprivation of Rights under Color of Law. 18 U.S.C. § 242 . . . . . 41
3. False Information in, and Payments for, Registering and Voting. 42 U.S.C. § 1973i(c) . . . . . 41
(a) The basis for federal jurisdiction . . . . . 42
(b) False information to an election official. . . . . 44
(c) Commercialization of the vote . . . . . 47

(d) Conspiracy to cause illegal voting. . . . . . . . . 49

4. Voting More than Once.
42 U.S.C. § 1973i(e). . . . . . . . . . . . . . . . . . . . . . . 50
5. Voter Intimidation. . . . . . . . . . . . . . . . . . . . . . . . . 54
(a) Intimidation in voting and
registering to vote.
42 U.S.C. § 1973gg-10(1). . . . . . . . . . . . . . . 55
(b) Intimidation of voters.
18 U.S.C. § 594. . . . . . . . . . . . . . . . . . . . . . . 56
(c) Coercion of political activity.
18 U.S.C. § 610. . . . . . . . . . . . . . . . . . . . . . . 57
(d) Conspiracy against rights and
deprivation of constitutional rights.
18 U.S.C. § 241 and § 242. . . . . . . . . . . . . . . 58
(e) Federally protected activities.
18 U.S.C. § 245(b)(1)(A). . . . . . . . . . . . . . . . 60
6. Voter Suppression.
18 U.S.C. § 241 and § 242.. . . . . . . . . . . . . . . . . . 61
7. Fraudulent Registration or Voting.
42 U.S.C. § 1973gg-10(2). . . . . . . . . . . . . . . . . . . 63
(a) Fraudulent registration.
§ 1973gg-10(2)(A). . . . . . . . . . . . . . . . . . . . . 64
(b) Fraudulent voting.
§ 1973gg-10(2)(B). . . . . . . . . . . . . . . . . . . . . 65
8. Voting by Noncitizens. . . . . . . . . . . . . . . . . . . . . . . 66
(a) Fraudulent registration and voting
under the NVRA.
42 U.S.C. § 1973gg-10(2). . . . . . . . . . . . . . . 67
(b) False claims to register or vote.
18 U.S.C. § 1015(f). . . . . . . . . . . . . . . . . . . . 68
(c) False claims of citizenship.
18 U.S.C. § 911. . . . . . . . . . . . . . . . . . . . . . . 68

(d) Voting by aliens. 18 U.S.C. § 611. . . . . . . . . 69

9. Travel Act. 18 U.S.C. § 1952. . . . . . . . . . . . . . . . 70
10. Mail Fraud. 18 U.S.C. § 1341. . . . . . . . . . . . . . . 72
(a) Background.. . . . . . . . . . . . . . . . . . . . . . . . . . 73
(b) Salary theory of mail fraud. . . . . . . . . . . . . . . 74
(c) "Honest services" fraud. 18 U.S.C. § 1346. . . . . . . . . . . . . . . . . . . . . . 77
(d) "Cost-of-election" theory. 18 U.S.C. § 1341. . . . . . . . . . . . . . . . . . . . . . 78
11. Troops at Polls. 18 U.S.C. § 592. . . . . . . . . . . . . 79
12. Campaign Dirty Tricks.. . . . . . . . . . . . . . . . . . . . . 80
(a) Election communications and solicitations. 2 U.S.C. § 441d. . . . . . . . . . . . 80
(b) Fraudulent misrepresentation. 2 U.S.C. § 441h. . . . . . . . . . . . . . . . . . . . . . 80
13. Retention of Federal Election Records. 42 U.S.C. § 1974. . . . . . . . . . . . . . . . . . . . . . . . . 81
(a) Legislative purpose and background. . . . . . . 82
(b) The basic requirements of Section 1974. . . . 83
(c) Section 1974 requires document preservation, not document generation.. . . . . 84
(d) Originals must be retained. . . . . . . . . . . . . . . 85
(e) Election officials must supervise storage. . . . 85
(f) Retention not required for certain records. . . 86
(g) Retention under Section 1974 versus retention under the National Voter Registration Act.. . . . . . . . . . 86
E. POLICY AND PROCEDURAL CONSIDERATIONS. . . . . . . . . . . . . . . . . . . . . . . . . 87
1. Consultation Requirements. . . . . . . . . . . . . . . . . . 87
2. Urgent Reports and Press Releases. . . . . . . . . . . . 90
3. Federal Seizure of State Election Materials.. . . . . 91

4. Noninterference with Elections. . . . . . . . . . . . . . . 91
5. Limitations on Federal Poll Watching. . . . . . . . . . 93

6. Selective Prosecution Issues. . . . . . . . . . . . . . . . . 94
F. SUGGESTIONS FOR SUCCESSFUL ELECTION FRAUD CASE INVESTIGATIONS. . . . . . . . . . . . . . 94
1. Getting Started. . . . . . . . . . . . . . . . . . . . . . . . . . 95
(a) Publicize your intent to prosecute election fraud. . . . . . . . . . . . . . . . . . . . . . . . 95
(b) Be aware of the importance of voting documentation. . . . . . . . . . . . . . . . . . . 96
(c) Consider the advantages of federal prosecution. . . . . . . . . . . . . . . . . . . . . . . . . . 98
(d) Focus on areas vulnerable to election fraud. . . . . . . . . . . . . . . . . . . . . . . . 99
(e) Develop your investigative strategy early.. . . . . . . . . . . . . . . . . . . . . . . . 99
2. The Investigation. . . . . . . . . . . . . . . . . . . . . . . . . 99
(a) Preliminary investigation. . . . . . . . . . . . . . . 100
(b) Grand jury and FBI full-field investigations. . . . . . . . . . . . . . . . . . . . . . . . 101
3. Investigating Two Types of Election Fraud. . . . . . . . . . . . . . . . . . . . . . . . . 101
(a) Absentee ballot frauds. . . . . . . . . . . . . . . . . 101
(b) Ballot-box stuffing cases. . . . . . . . . . . . . . . 103
4. A Few Cautions. . . . . . . . . . . . . . . . . . . . . . . . . 104
5. Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 106

**CHAPTER THREE: PATRONAGE CRIMES**. . . . . . . . . . . 107

A. HISTORICAL BACKGROUND. . . . . . . . . . . . . . . . 107
B. STATUTES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 109
1. Limitations Based on Federal Employment or Workspace. . . . . . . . . . . . . . . . . 109

(a) Solicitation of political contributions. 18 U.S.C. § 602 . . . . . . . . . . . . . . . . . . . . . . . 109

(b) Making political contributions. 18 U.S.C. § 603. . . . . . . . . . . . . . . . . . . . . . . . 111
(c) Intimidation to secure political contributions. 18 U.S.C. § 606. . . . . . . . . . 111
(d) Coercion of political activity. 18 U.S.C. § 610. . . . . . . . . . . . . . . . . . . . . . . . 112
(e) Place of solicitation. 18 U.S.C. § 607. . . . . . . . . . . . . . . . . . . . . . . . 114

2. Limitations Based on Federal Programs and Benefits. . . . . . . . . . . . . . . . . . . . . . 115
(a) Promise or deprivation of federal employment or other benefit for political activity. 18 U.S.C. § 600 and § 601. . . . . . . . . . . . . . . 115
(b) Promise of appointment by candidate. 18 U.S.C. § 599. . . . . . . . . . . . . . . 119
(c) Interference in election by employees of federal, state, or territorial governments. 18 U.S.C. § 595. . . . . . . . . . . . . . . . . . . . . . . . 119
(d) Coercion by means of relief appropriations. 18 U.S.C. § 598. . . . . . . . . 120
(e) Solicitation from persons on relief. 18 U.S.C. § 604. . . . . . . . . . . . . . . . . . . . . . . . 120
(f) Disclosure of names of persons on relief. 18 U.S.C. § 605.. . . . . . . . . . . . . . . . 121

3. Permissible Political Activity under the Hatch Act, as Amended. 5 U.S.C. § 7323 and § 7324.. . . . . . . . . . . . . . . . . 121

C. POLICY AND PROCEDURAL CONSIDERATIONS. . . . . . . . . . . . . . . . . . . . . . . . . 124

**CHAPTER FOUR: ELECTION DAY PROCEDURES.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 125

**CHAPTER FIVE: CAMPAIGN FINANCING CRIMES.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 133

A. INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . 133
B. STATUTORY SCOPE. . . . . . . . . . . . . . . . . . . . . . . . 136
1. Types of Statutes. . . . . . . . . . . . . . . . . . . . . . . . . 136
2. Basic Statutory Definitions. . . . . . . . . . . . . . . . . 137
3. Statutory Presumptions. . . . . . . . . . . . . . . . . . . . 140
C. HISTORICAL BACKGROUND: 1907 to 2002. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 141
1. Overview. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 141
2. Campaign Financing Laws.. . . . . . . . . . . . . . . . . 142
3. Campaign Reporting Laws.. . . . . . . . . . . . . . . . . 144
4. The Bipartisan Campaign Reform Act of 2002. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 145
(a) Headline features of the 2002 campaign reforms. . . . . . . . . . . . . . . . . . . . . . 146
(b) BCRA’s criminal enforcement enhancements. . . . . . . . . . . . . . . . . . . . . . . . 148
D. STATUTES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 151
1. Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 151
2. The “Heartland” Provisions of the Campaign Financing Laws.. . . . . . . . . . . . . . . . . . 151
3. Campaign Financing Crimes. . . . . . . . . . . . . . . . 154
4. Substantive Statutes. . . . . . . . . . . . . . . . . . . . . . . 155
(a) 2 U.S.C. § 441a. Limitations on contributions and expenditures.. . . . . . . . . . . 155

(b) 2 U.S.C. § 441b. Prohibition on contributions and expenditures by national banks, corporations, and labor organizations.. . . . . . . . . . . . . . . . . 159
(c) 2 U.S.C. § 441c. Prohibition on contributions by government contractors. . . . . . . . . . . . . . . . . . . . . . . . . . . 162
(d) 2 U.S.C. § 441d. Attribution of sponsors of political communications and solicitations. . . . . . . . . . . . . . . . . . . . . . . 163
(e) 2 U.S.C. § 441e. Prohibition on contributions, donations, and expenditures by foreign nationals.. . . . . . . . . 164
(f) 2 U.S.C. § 441f. Prohibition on contributions through conduits . . . . . . . . . . 166
(g) 2 U.S.C. § 441g. Limitation on contribution of currency. . . . . . . . . . . . . . . . . 168
(h) 2 U.S.C. § 441h. Fraudulent misrepresentation of campaign authority. . . 169
(i) 2 U.S.C. § 441i. Prohibition against soft money of political parties. . . . . . . . . . . . 170
(j) 2 U.S.C. § 439a. Prohibition on conversion of campaign funds. . . . . . . . . . . 174
(k) 2 U.S.C. § 432, 433, 434. Organization, recordkeeping, and reporting requirements. . . . . . . . . . . . . . . . . . . . . . . . . . . . 176

E. ENFORCEMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 176
1. Three Types of Enforcement. . . . . . . . . . . . . . . . . 176
2. General Observations.. . . . . . . . . . . . . . . . . . . . . . 177
3. Criminal Prosecution. . . . . . . . . . . . . . . . . . . . . . . 178
(a) Intent.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 179

(b) Aggregate Value. . . . . . . . . . . . . . . . . . . . . . . . 180
(c) Penalties. . . . . . . . . . . . . . . . . . . . . . . . . . . 182

4. Felony Theories for FECA Crimes. . . . . . . . . . . . 184
(a) Willfully causing submission of false information to the Federal Election Commission. 18 U.S.C. § 1001 and § 2. . . . . . . . . . . . . . . . 184
(b) Conspiracy to defraud the United States. 18 U.S.C. § 371. . . . . . . . . . . . . . . . . . . . . . . 187
5. Public Financing Crimes Relating to Presidential Campaigns. . . . . . . . . . . . . . . . . . . . . 188
6. Violations of State Campaign Financing Laws. . . . . . . . . . . . . . . . . . . . . . . . . 191
(a) Honest services frauds. 18 U.S.C. § 1346. . . . . . . . . . . . . . . . . . . . . . 191
(b) Mail Fraud. 18 U.S.C. § 1341. . . . . . . . . . . . 193
7. Schemes to Divert Campaign Funds. . . . . . . . . . 194
(a) FECA conversion. . . . . . . . . . . . . . . . . . . . . 195
(b) Deprivation of honest services. . . . . . . . . . . 197
(c) Reporting offenses. . . . . . . . . . . . . . . . . . . . 197
8. Administrative and Civil Enforcement by the Federal Election Commission. . . . . . . . . . 198
9. Criteria for Prosecutive Evaluation of FECA Violations. . . . . . . . . . . . . . . . . . . . . . . 198
10. Venue for FECA Offenses. . . . . . . . . . . . . . . . . . 199
11. Statute of Limitations for Campaign Financing Offenses. . . . . . . . . . . . . . . . . . . . . . . 200
F. POLICY AND PROCEDURAL CONSIDERATIONS. . . . . . . . . . . . . . . . . . . . . . . . . 201
1. Consultation Requirements and Recommendations. . . . . . . . . . . . . . . . . . . . . . . . 201
2. Investigative Jurisdiction. . . . . . . . . . . . . . . . . . . . 202
3. Nonwaiver of the Federal Election

Commission's Civil Enforcement Authority. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 202

4. Dealings with the Federal Election Commission. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 203
5. Federal Election Officials as Prosecution Witnesses. . . . . . . . . . . . . . . . . . . . . . 203
6. Memorandum of Understanding between the Federal Election Commission and the Department of Justice. . . . . . . . . . . . . . . . . . . . . 205

**CHAPTER SIX: SENTENCING OF ELECTION CRIMES**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 207

A. OVERVIEW. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 207
1. Categories of Election Crimes. . . . . . . . . . . . . . . 207
B. CONVICTIONS INVOLVING CORRUPTION OF THE ELECTORAL PROCESS. . . . . . . . . . . . . . . . . . . . . 208
C. CONVICTIONS INVOLVING VIOLATIONS OF THE FEDERAL ELECTION CAMPAIGN ACT . . . . . . . . . . . . . . . . 214
1. Campaign Financing Crimes Before the Bipartisan Campaign Reform Act of 2002. . . . . 215
2. Campaign Financing Crimes after the Bipartisan Campaign Reform Act of 2002. . . . . 218
3. Examples of Application of FECA Sentencing Guideline.. . . . . . . . . . . . . . . . . . . . . . . 223
Example 1: The Conduit.. . . . . . . . . . . . . . . . . . . . 224
Example 2: The Typical FECA Crime – Laundered Corporate Contributions. . . . . . . . 225
Example 3: Corporate Contributor to Multiple Candidates through Threats and Coercion. . . 227

Example 4: Fundraiser Possessing Special Skill.. . . . . . . . . . . . . . . . . . . . . . . . . . 228

Example 5: Major Political Party Donor Seeking a Benefit from the Government. . . . . 229

Example 6: Foreign Agent Who Gives Funds from Foreign Government to Nonfederal Candidates to Obtain a Specific Benefit from the Government. . . . . . 231

D. CONVICTIONS OF CAMPAIGN FINANCING VIOLATIONS ADDRESSED UNDER ALTERNATIVE THEORIES OF PROSECUTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . 232

1. Conspiracy to Disrupt and Impede the Federal Election Commission.. . . . . . . . . . . . . . . 232

2. False Statements to the Federal Election Commission . . . . . . . . . . . . . . . . . . . . . . 233

3. Embezzlement of Campaign Funds. . . . . . . . . . . 233

E. OBLIGATION TO REPORT FELONY CONVICTIONS TO STATE ELECTION OFFICIALS. . . . . . . . . . . . . . . . . . . . . . 234

**CHAPTER SEVEN: CONCLUSION – WHY PROSECUTING ELECTION CRIMES IS IMPORTANT**. . . . . . . . . . . . . . . . . . . . . . . . . . . . 237

**APPENDIX A: Excerpt from *McConnell v. Federal Election Commission***. . . . . . . . . . . . 243

**APPENDIX B: Department of Justice and Federal Election Commission Memorandum of Understanding**. . . . . . . . . 259

**APPENDIX C: Statutes**. . . . . . . . . . . . . . . . . . . . . . . . . . . . 263

**APPENDIX D: Table of Cases**. . . . . . . . . . . . . . . . . . . . . . . . 319

# PREFACE

Welcome to the Seventh Edition of Federal Prosecution of Election Offenses, a project that has been in the works for over two years. This book replaces the Sixth Edition, which was published in 1995, and represents a complete re-write of that last book.

There have been a number of significant developments in the law dealing with elections and election finance – and, accordingly, in the Department's enforcement approach in this area – since we last wrote on these subjects.

In 2002, Congress passed the Bipartisan Campaign Reform Act (BCRA). One of the goals of this legislation was to close major loopholes involving so-called "soft money" and "issue advocacy" that had developed since enactment of the original Federal Election Campaign Act (FECA) in 1971. Another of BCRA's goals was to provide enhanced criminal penalties for knowing and willful FECA violations. Yet another goal was to put in place a strong sentencing guideline for FECA crimes. The following year the United States Sentencing Commission obliged, promulgating a sentencing guideline, U.S.S.G. § 2C1.8, that recommends imprisonment for most campaign financing offenses. Subsequent First Amendment challenges to BCRA's broad provisions were resoundingly rejected by the Supreme Court, which upheld the landmark provisions as constitutional anti-corruption measures designed to address public corruption and the appearance of public corruption. *McConnell v. Federal Election Commission*, 540 U.S. 93 (2003).

In addition to these legislative efforts, in 2002 then-Attorney General John Ashcroft established a Department-wide Ballot Access

and Voting Integrity Initiative to increase the Department's efforts and effectiveness in addressing election crimes and voting rights violations. As a result of this ongoing Initiative, there has been a marked increase in nationwide prosecutions and convictions for ballot fraud and campaign financing fraud. The Department's objectives in bringing these cases are two-fold: to convict those who attempt to corrupt elections, and to protect the integrity of the election process by deterring others from corrupting future elections. Each of these events will be discussed fully in this volume.

This is the latest in a series of books on the criminal enforcement of federal election laws with which we are proud to have been associated. However, projects this vast could not succeed without the strong support of our superiors and the dedicated help of several special colleagues here in the Public Integrity Section.

We would be derelict were we not to recognize with sincere gratitude the significant contributions that were made to this book by The Honorable Noel L. Hillman, our Chief from 2002 to 2006, who is now a federal district judge. Noel's personal involvement and support during its drafting reflected his view of this book as a forceful tool for federal prosecutors and investigators in the pursuit of crimes that corrupt and subvert our representative form of government. Our thanks further go to Public Integrity Section Trial Attorney Richard C. Pilger for his valuable input.

We are also extremely indebted to Forensic Accountant Christine M. Cartwright for her editorial assistance and tireless dedication to the formidable task of preparing this book for publication, as well as to Supervisory Litigation Support Specialist Danny P. Foster and to Office Support Specialist James E. Wedge for their work on this project.

Finally, we acknowledge with appreciation the contributions to the Department's law enforcement efforts in this area that have been made over the years by the Assistant United States Attorneys who

have served, some for decades, as District Election Officers, and by the special agents of the Federal Bureau of Investigation who have assisted in these cases. We are pleased to recognize the FBI's increased enforcement efforts in this area, which led to the Bureau's establishment in 2006 of its own Campaign Finance and Ballot Fraud Initiative with specially trained agents serving as election crime coordinators in all its Field Offices. The implementation of this Initiative has been due in large measure to the dedication of Supervisory Special Agent Michael B. Elliott of the Public Corruption Unit at FBI Headquarters.

The materials that are contained between the covers of this book represent the knowledge of elections, and of election law, that the two of us have gathered over the cumulative total of sixty years we have been privileged to serve our country at the United States Department of Justice. It is our sincere hope that this book will contribute to the understanding and appreciation of the important legal and tactical issues and challenges presented by the effective criminal enforcement of federal election laws.

CRAIG C. DONSANTO
NANCY L. SIMMONS

Public Integrity Section
Criminal Division
May 2007

# CHAPTER ONE

# OVERVIEW

This book was written to help federal prosecutors and investigators discharge the responsibility of the United States Department of Justice in attacking corruption of the election process with all available statutes and theories of prosecution. It addresses how the Department handles all federal election offenses, other than those involving civil rights, which are enforced by the Department's Civil Rights Division. This Overview summarizes the Department's policies, as well as key legal and investigative considerations, related to the investigation and prosecution of election offenses.

## A. INTRODUCTION

In the United States, as in other democratic societies, it is through the ballot box that the will of the people is translated into government that serves rather than oppresses. It is through elections that the government is held accountable to the people and political conflicts are channeled into peaceful resolutions. And it is through elections that power is attained and transferred.

Our constitutional system of representative government only works when the worth of honest ballots is not diluted by invalid ballots procured by corruption. As the Supreme Court stated in a case upholding federal convictions for ballot box stuffing: "Every voter in a federal . . . election, . . . whether he votes for a candidate with little chance of winning or for one with little chance of losing, has a right under the Constitution to have his vote fairly counted, without

its being distorted by fraudulently cast votes." *Anderson v. United States*, 417 U.S. 211, 227 (1974). When the election process is corrupted, democracy is jeopardized. Accordingly, the effective prosecution of corruption of the election process is a significant federal law enforcement priority.

Although corrupt government may exist without election crime, when election crime exists, public corruption of some form is also usually present. This is so because virtually all election crime is driven by a motive to control governmental power for some corrupt purpose. Election crime cases therefore often provide effective tools for attacking other forms of public corruption. The task of the federal prosecutor and investigator is not only to vindicate the fundamental principle of fair elections by convicting those who corrupt them, but also to find the motive behind the election fraud and, when possible, to prosecute those involved in the underlying corruption.

There are several reasons why election crime prosecutions may present an easier means of obtaining convictions than do other forms of public corruption:

- Election crimes usually occur largely in public.

- Election crimes often involve many players. For example, successful voter bribery schemes require numerous voters; ballot box stuffing requires controlling all the election officials in a polling location; illegal political contributions generally involve numerous conduits to disguise the transaction.

- Election crimes tend to leave paper trails, either in state voting documentation or in public reports filed by federal campaigns.

## B. TYPES OF ELECTION CRIMES

### 1. Election Fraud

Election fraud usually involves corruption of one of three processes: the obtaining and marking of ballots, the counting and certification of election results, or the registration of voters. Election fraud is generally not common when one party or one faction of a party dominates the political landscape. Rather, the conditions most conducive to election fraud are close factional competition within an electoral jurisdiction for an elected position that matters. Thus, in a jurisdiction when one party is dominant, election fraud may nevertheless occur during the primary season, as various party factions vie for power.

Most election fraud aims at ensuring that important elected positions are occupied by "friendly" candidates. It occurs most often when the financial stakes involved in who controls public offices are great – as is often the case when patronage positions are a major source of employment, or when illicit activities are being conducted that require protection from official scrutiny. As noted, election crimes will typically coincide with other types of corruption.

**2. Patronage Crimes**

Patronage is a term used to describe the doctrine of "to the victor go the spoils." The Supreme Court has held that the firing, based on partisan considerations, of public employees who occupy non-confidential and non-policymaking positions violates the First Amendment. Moreover, an aggressive and pervasive patronage system can provide a fertile breeding ground for other forms of corruption. It is therefore important to root out aggravated patronage abuses wherever they occur.

Patronage crimes are most prevalent when one political faction or party dominates the political landscape but is also required to defend its position of power against a credible opposition. Patronage crimes are also common in jurisdictions where other forms of public corruption are prevalent and tolerated by the body politic.

### 3. Campaign Financing Crimes

The federal campaign financing laws are embodied within the Federal Election Campaign Act of 1971 (FECA), 2 U.S.C. §§ 431-455, as amended, most significantly in 1974, 1976, 1979, and 2002.

The 2002 Amendments to FECA were contained in a far-reaching piece of legislation called the Bipartisan Campaign Reform Act (BCRA) (popularly known as the McCain-Feingold bill after its main Senate sponsors), most of which became effective on November 6, 2002. As amended by BCRA, FECA applies to virtually all financial transactions that impact upon, directly or indirectly, the election of candidates for federal office, that is, candidates for President or Vice President or for the United States Senate or House of Representatives. Also as amended by BCRA, FECA now reaches a wide range of communications aimed at influencing the public with respect to issues that are closely identified with federal candidates, referred to in the law as "electioneering communications."

FECA contains its own criminal sanctions, which in turn provide that, to be a crime, a FECA violation must have been committed knowingly and willfully and, except for campaign misrepresentations and certain coerced contributions, must have involved at least $2,000 in a calendar year. 2 U.S.C. § 437g(d). Prior to BCRA, all FECA crimes were one-year misdemeanors. However, for FECA crimes that occur on or after November 6, 2002 (when BCRA took effect), those aggregating $25,000 or more are five-year felonies, and those that involve illegal conduit contributions and aggregate over $10,000 are two-year felonies. 2 U.S.C. §§ 437g(d)(1)(A), (D). Moreover, all criminal violations of FECA that occur after January 25, 2003, are subject to a new sentencing guideline, U.S. Sentencing Guideline § 2C1.8, that the United States Sentencing Commission promulgated in response to a specific BCRA directive.

FECA violations that either: (1) do not present knowing and willful violations, e.g., those resulting from negligence or mistake on the part of the offender as to what the law required or forbade, or (2) involve sums below the statutory minimums for criminal prosecution, are handled noncriminally by the Federal Election Commission (FEC) under the statute's civil enforcement provisions. 2 U.S.C. § 437g(a).

Finally, FECA violations that result in false information being provided to the FEC may present violations of 18 U.S.C. § 371 (conspiracy to disrupt and impede a federal agency), 18 U.S.C. § 1001 (false statements within the jurisdiction of a federal agency), or 18 U.S.C. § 1505 (obstruction of agency proceedings).

**4. Civil Rights Crimes**

Schemes to deprive minorities of the right to vote are federal crimes under the Voting Rights Act of 1965, as amended. 42 U.S.C. § 1973j. Discrimination based on a potential voter's race, or on ethnic factors or minority language, may also be redressed under such criminal statutes as 18 U.S.C. §§ 241 and 242. These prosecutions are handled by Criminal Section of the Civil Rights Division.

In addition to civil rights crimes, federal law provides noncriminal remedies for any conduct that diminishes an individual's voting rights based on racial, ethnic, or language minority factors. These civil remedies are incorporated within the Voting Rights Act of 1965, as amended, and other civil rights laws, and they are enforced by the Voting Section of the Civil Rights Division.

## C. FEDERAL JURISDICTION

The federal government asserts jurisdiction over an election offense to ensure that basic rights of United States citizenship, and a fundamental process of representative democracy, remain uncorrupted. An important, Department-wide "Ballot Access and

Voting Integrity Initiative" was announced by Attorney General Ashcroft on October 1, 2002, to combat election crimes and voting-related civil rights offenses through vigorous enforcement. Under this Department Initiative, the prosecution of all federal election crimes represents an important law enforcement objective. These enhanced enforcement efforts have not only served to protect a cornerstone of American democracy against corruption and abuse, they also have helped federal law enforcement attain an investigative foothold against other criminal activities that election crimes are often committed to foster or protect.

Election crime cases tend to be long-term prosecutive projects focusing on individuals with different degrees of culpability. The ultimate goal is to move up the ladder of culpability to candidates, political operatives, public officials, and others who attempted to corrupt, or did corrupt, the public office involved.

Federal jurisdiction over election fraud is easily established in elections when a federal candidate is on the ballot. The mere listing of a federal candidate's name on a ballot is sufficient under most of the federal statutes used to prosecute voter fraud to satisfy federal jurisdiction. This generally occurs in what are called "mixed" elections, when federal and nonfederal candidates are running simultaneously. In such cases, the federal interest is based on the presence of a federal candidate, whose election may be tainted, or appear tainted, by the fraud, a potential effect that Congress has the constitutional authority to regulate under Article I, Section 2, clause 1; Article I, Section 4, clause 1; Article II, Section 1, clause 2; and the Seventeenth Amendment.

When there is no federal candidate on the ballot, federal jurisdiction is harder to attain. Before *McNally v. United States*, 483 U.S. 350 (1987), the mail fraud statute was often used to achieve federal jurisdiction over election fraud that occurred in nonfederal elections. The scheme charged was one to defraud the public of its intangible "right to a fair election." However, in *McNally*, the

Supreme Court held that intangible rights, including the intangible right to a fair election, were not covered by the mail fraud statute.

In response to the *McNally* decision, Congress passed 18 U.S.C. § 1346. Under Section 1346, the mail fraud statute once again applies to schemes to defraud persons of their intangible right to "honest services." However, because Section 1346 did not clearly restore mail fraud jurisdiction over local election fraud, this statute should only be used when the election fraud involved honest services fraud by a public official, such as a poll official who abuses his or her office to fraudulently manipulate the vote. In the absence of a scheme involving honest services fraud, prosecutors may also consider the mail fraud salary theory, discussed in Chapter Two, although this theory has not been well received by the courts. *See United States v. Turner*, 459 F.3d 775 (6th Cir. 2006) (holding both salary theory and honest services theories inapplicable to election fraud by local candidate).

In short, the absence of a federal candidate from the ballot can present federal law enforcement with special challenges in attaining federal jurisdiction over election crime. Those challenges can sometimes be met, provided the investigation focuses on identifying additional facts that are needed to invoke application of the federal criminal laws that potentially apply to both federal and nonfederal elections. These generally include election frauds that involve the necessary participation of public officers, notably election officials acting "under color of law," voting by noncitizens, and fraudulently registering voters.

Federal jurisdiction over campaign financing offenses under FECA also derives from Congress's authority to regulate the federal election process. While a number of the provisions added to FECA by BCRA address financial activities by state and local parties that are generic in nature in the sense that they simultaneously benefit both federal and nonfederal candidates, federal campaign financing law does not apply to violations of state campaign laws.

Most states have enacted laws regulating and requiring transparency of campaign financing of candidates seeking state or local office. While violations of these state statutes are not, by themselves, federal crimes, they may be evidence of other federal crimes, including Hobbs Act, Travel Act, or honest service offenses.

## D. ADVANTAGES OF FEDERAL PROSECUTION

The Constitution confers upon the states primary authority over the election process. Accordingly, federal law does not directly address how elections should be conducted. State law historically has regulated such important activities as the registration of voters, the qualifications for absentee voting, the type of voting equipment used to tabulate votes, the selection of election officials, and the procedures and safeguards for counting ballots.

These factors might suggest that the prosecution of election crime should be left primarily to local law enforcement. However, local law enforcement often is not equipped to prosecute election offenses. Federal law enforcement might be the only enforcement option available.

Four characteristics of the federal criminal justice system support the federal prosecution of election crimes despite the primary role of the states in most facets of election administration:

- Federal grand juries, the secrecy requirements of which help protect the testimony of witnesses who tend to be vulnerable to manipulation and intimidation.

- Federal trial juries, which are drawn from a broader geographic area than are most state juries, and thus lessen the possibility of local bias.

- Resources to handle the labor-intensive investigations generally required for successful prosecution of election crime.

- Detachment from local political forces and interests.

## E. FEDERAL ROLE: PROSECUTION, NOT INTERVENTION

The principal responsibility for overseeing the election process rests with the states. With the significant exception of violations of the Voting Rights Act involving denigration of the right to vote based on race, ethnicity, or language minority status, the federal government plays a role secondary to that of the states in election matters.[1] It is the states that have primary authority to ensure that only qualified individuals register and vote, that the polling process is conducted fairly, and that the candidate who received the most valid votes is certified as the winner.[2]

The federal prosecutor's role in matters involving corruption of the process by which elections are conducted, on the other hand, focuses on prosecuting individuals who commit federal crimes in connection with an election. Deterrence of future similar crimes is an important objective of such federal prosecutions. However, this deterrence is achieved by public awareness of the Department's prosecutive interest in, and prosecution of, election fraud – not through interference with the process itself.

---

[1] When election offenses are driven by animus based on race, ethnicity, or language-minority status, the broad protections of the 1965 Voting Rights Act and other civil rights statutes apply. 42 U.S.C. §§ 1971, 1973, 1973b(f), 1973aa-1a. Such matters are supervised by the Civil Rights Division.

[2] Of course, U.S. presidential elections are an exception.

Because the federal prosecutor's function in the area of election fraud is not primarily preventative, any criminal investigation by the Department must be conducted in a way that minimizes the likelihood that the investigation itself may become a factor in the election. The mere fact that a criminal investigation is being conducted may impact upon the adjudication of election litigation and contests in state courts. Moreover, the seizure by federal authorities of documentation generated by the election process may deprive state election and judicial authorities of critical materials needed to resolve election disputes, conduct recounts, and certify the ultimate winners. Accordingly, it is the general policy of the Department not to conduct overt investigations, including interviews with individual voters, until after the outcome of the election allegedly affected by the fraud is certified.[3]

In addition, the federal prosecutor has no authority to send FBI Special Agents or Deputy U.S. Marshals to polling places. In fact, a federal statute makes it a felony for any federal official to send "armed men" to the vicinity of open polling places. 18 U.S.C. § 592. In light of these considerations, Department and FBI policy requires that any investigative action that involves an intrusion by federal investigators into the area immediately surrounding an open polling place be approved by the Criminal Division's Public Integrity Section.

## F. EVALUATING AN ELECTION FRAUD ALLEGATION

In 2002, the Department established a Ballot Access and Voting Integrity Initiative to spearhead its increased efforts to address election crimes and voting rights violations. Under the ongoing Initiative, election crimes are a high law enforcement priority of the Department.

---

[3] This rule does not apply to covert investigative techniques.

However, not all irregularities in the election process are appropriate for criminal prosecution. It is, for example, not a federal crime to transport voters to the polls, or for election officials to make negligent mistakes in the administration of an election. Many of these noncriminal lapses are redressed through election contests, recounts, education programs, or disciplinary action against election officials whose mistakes are the result of negligence rather than corruption.

Determining whether an election fraud allegation warrants federal criminal investigation and possible prosecution requires that federal prosecutors and investigators answer two basic questions:

(1) Is criminal prosecution the appropriate remedy for the allegations and facts presented? Criminal prosecution is most appropriate when the facts demonstrate that the defendant's objective was to corrupt the process by which voters were registered, or by which ballots were obtained, cast, or counted.

(2) Is there potential federal jurisdiction over the conduct? Answering this question requires determining whether the conduct is cognizable under the federal criminal statutes that apply to election crimes. These generally allow for the prosecution of corrupt acts that occur in elections when the name of a federal candidate appears on the ballot, that are committed "under color of law," that involve voting by noncitizens, that focus on registering to vote, and when the election fraud is part of a larger public corruption problem reachable using general anti-corruption statutes, such as 18 U.S.C. §§ 666, 1341, 1346, 1951, and 1952.

## G. INVESTIGATIVE CONSIDERATIONS IN ELECTION FRAUD CASES

When investigating election fraud, three considerations that are absent from most criminal investigations must be kept in mind: (1) respect for the primary role of the states in administering the

voting process, (2) an awareness of the role of the election in the governmental process, and (3) sensitivity to the exercise of First Amendment rights in the election context. As a result, there are limitations on various investigative steps in an election fraud case.

In most cases, election-related documents should not be taken from the custody of local election administrators until the election to which they pertain has been certified, and the time for contesting the election results has expired.[4] This avoids interfering with the governmental processes affected by the election.[5]

Another limitation affects voter interviews. Election fraud cases often depend on the testimony of individual voters whose votes were co-opted in one way or another. But in most cases voters should not be interviewed, or other voter-related investigation done, until after the election is over. Such overt investigative steps may chill legitimate voting activities. They are also likely to be perceived by voters and candidates as an intrusion into the election. Indeed, the fact of a federal criminal investigation may itself become an issue in the election.[6]

---

[4] This non-interference policy assumes there is no evidence that local election administrators seek to retain the election records for a corrupt purpose or to further an ongoing election fraud scheme.

[5] In cases in which physical custody may interfere unnecessarily with local election procedures, law enforcement may still take reasonable steps to ensure that such records retain their integrity and are effectively made available to federal law enforcement. Such steps may include the issuance of a grand jury subpoena, and formal and informal agreements concerning the custody, control, and integrity of such records.

[6] Accordingly, the Public Integrity Section must be consulted prior to any voter interviews in the preelection or balloting period. U.S. DEP'T OF JUSTICE, U.S. ATTORNEYS' MANUAL (USAM) § 9-85.210.

Some election frauds implicate a voter who participates in a voting act attributed to him or her; such cases include vote-buying schemes, absentee ballot fraud, and the like. Successful prosecution of those who organize such schemes often requires the cooperation of either the voter or the person who attempted to corrupt or take advantage of the voter. Accordingly, federal prosecutors should apply standard Department policies regarding charging decisions when contemplating charges against voters who cooperate and testify truthfully in cases involving organizational voter fraud.

## H. EVALUATING A CAMPAIGN FINANCING ALLEGATION

In general, violations of the Federal Election Campaign Act become crimes when they satisfy a monetary threshold and are committed with specific criminal intent. Noncriminal FECA violations are subject to the exclusive jurisdiction of the Federal Election Commission (FEC). To determine whether a FECA violation warrants criminal investigation, the following questions should be answered:

(1) Does the conduct involve a situation in which the application of the law to the facts is clear? That is, does it violate one of the principal prohibitions of FECA, namely, the prohibitions against:

- Excessive contributions (2 U.S.C. § 441a);
- Corporate and union contributions and expenditures (2 U.S.C. § 441b);
- Contributions from government contractors (2 U.S.C. § 441c);
- Contributions from foreign nationals (2 U.S.C. § 441e);

- Disguised contributions through conduits (2 U.S.C. § 441f);

- Cash contributions (2 U.S.C. § 441g);

- Contributions raised through fraud (2 U.S.C. § 441h(b));

- The solicitation or receipt of "soft money" (funds not raised in compliance with FECA) by national political parties (2 U.S.C. § 441i); or

- The conversion of campaign funds (2 U.S.C. § 439a).

And, if so:

(2) Was the total monetary amount involved in the violation at least $2,000? Most FECA violations become crimes when they aggregate $2,000 or more in a calendar year. Offenses occurring on or after November 6, 2002, when the Bipartisan Campaign Reform Act (BCRA) took effect, and which aggregate at least $25,000 (or $10,000 in the case of conduit violations) are felonies; offenses under these amounts are misdemeanors. 2 U.S.C. § 437g(d)(1). The Department interprets the significant enhancements to FECA's criminal penalties enacted in 2002 through BCRA as reflecting a clear congressional intent that all knowing and willful violations involving sums that aggregate above the statutory minimums for FECA crimes be considered for prosecution.

(3) Was the violation committed under circumstances suggesting that the conduct was "knowing and willful?" FECA violations become potential crimes when they are committed knowingly and willfully, that is, by an offender who knew what the law forbade and violated it notwithstanding that knowledge. While this is at times a difficult element to satisfy, examples of evidence supporting the element include: (a) an attempt to disguise or conceal

financial activity regulated by FECA; (b) status or experience as a campaign official, professional fundraiser, or lawyer; and (c) efforts by campaigns to notify donors of applicable campaign finance law (e.g., donor card warnings).

## I. INVESTIGATIVE CONSIDERATIONS IN CAMPAIGN FINANCING CASES

Campaign financing cases have recently come to occupy an increasingly significant portion of the investigative and prosecutive resources that the Justice Department devotes to election crime. Because criminal FECA violations require proof that the defendant acted in conscious disregard of a known statutory duty imposed by the Act, matters investigated as possible criminal FECA violations generally must fall within one or more of FECA's heartland provisions.

If a campaign financing offense violates one of FECA's heartland prohibitions and was committed in a manner calculated to conceal it from the public, the Justice Department also may pursue the matter as a conspiracy to defraud the United States under 18 U.S.C. § 371, or as a false statement under 18 U.S.C. § 1001. The advantages of charging FECA offenses that occurred prior to November 6, 2002 (when BCRA took effect) under these Title 18 provisions include, in addition to the applicable penalty, availability of the general five-year statute of limitations under 18 U.S.C. § 3282, instead of the special three-year limitations period in 2 U.S.C. § 455 that applied to FECA crimes committed prior to BCRA's effective date.

When investigating a criminal violation of FECA, care must be taken not to compromise the FEC's civil and administrative jurisdiction under 2 U.S.C. § 437g(a). All plea agreements involving activities that concern FECA violations should therefore contain an express disclaimer regarding the FEC's civil enforcement authority.

Finally, the public disclosure features of FECA provide investigators a source of information concerning suspicious contributions. The FEC maintains public data in a manner that permits it to be sorted by contributor, date of contribution, amount of contribution, occupation and employer of contributor, and identity of donee. Data is also similarly maintained with respect to expenditures. Therefore, the FEC's public database of financial transactions can be particularly useful in the preliminary stage of campaign financing investigations to evaluate or confirm the likelihood of a FECA violation. This data can be accessed and sorted at www.fec.gov. An alternative and particularly user-friendly search capability has also been made available by an organization called the Center for Responsive Politics at www.opensecrets.org.

## J. CONSULTATION REQUIREMENTS AND RECOMMENDATIONS

Justice Department supervision over the enforcement of all criminal statutes and prosecutive theories involving corruption of the election process, criminal patronage violations, and campaign financing crimes is delegated to the Criminal Division's Public Integrity Section. This Headquarters' consultation policy is set forth in the U.S. DEP'T OF JUSTICE, U.S. ATTORNEYS' MANUAL (USAM), Section 9-85.210. In1980, the Election Crimes Branch was created within the Public Integrity Section to manage this supervisory responsibility. The Branch is headed by a Director and staffed on a case-by-case basis with Section prosecutors experienced in handling the investigation and prosecution of election crimes.

The Department's consultation requirements for election crime matters are designed to ensure that national standards are maintained for the federal prosecution of election crimes, that investigative resources focus on matters that have prosecutive potential, and that appropriate deference is given to the FEC's civil enforcement responsibilities over campaign financing violations. The requirements are also intended to help ensure that investigations are

pursued in a way that respects both individual voting rights and the states' primary responsibility for administering the electoral process. These requirements are as follows:

### 1. Consultation Requirements for Election Frauds and Patronage Crimes

United States Attorneys' Offices and FBI field offices may conduct a preliminary investigation of an alleged election fraud or patronage crime without consulting the Public Integrity Section. A preliminary investigation is limited to those investigative steps necessary to flesh out the complaint in order to determine whether a federal crime might have occurred, and, if so, whether it might warrant federal prosecution. However, a preliminary investigation does not include interviewing voters during the preelection or balloting periods concerning the circumstances under which they voted, as such interviews have the potential to interfere with the election process or inadvertently chill the exercise of an individual's voting rights.

Consultation with the Public Integrity Section is required to:

- expand an election fraud or patronage investigation beyond a preliminary stage;
- conduct interviews with individual voters during the preelection period, on election day, or immediately after the election, concerning the circumstances under which they voted;
- issue a subpoena or search warrant in connection with an election fraud or patronage matter;
- present evidence involving an election fraud or patronage matter to a grand jury;

- file a criminal charge involving an election fraud or patronage offense; or

- present an indictment to a grand jury that charges an election fraud or patronage offense.

It is also recommended, although not required, that the Public Integrity Section be consulted with respect to sentencing issues during any plea negotiations in order to ensure consistency with similar cases.

**2. Consultation Requirements for Campaign Financing Crimes**

Additional considerations come into play in cases involving possible campaign financing violations under FECA, notably, the concurrent jurisdiction of the FEC to conduct parallel civil proceedings in this area and the resulting need to coordinate criminal law enforcement with the Commission. Therefore, consultation with the Public Integrity Section is required to:

- conduct *any* inquiry or preliminary investigation in a matter involving a possible campaign financing offense;

- issue a subpoena or search warrant in connection with a campaign financing matter;

- present evidence involving a campaign financing matter to a grand jury;

- file a criminal charge involving a campaign financing crime; or

- present an indictment to a grand jury that charges a campaign financing crime.

As is the case with election frauds, it also recommended that the Section be consulted with respect to sentencing matters during any plea negotiations in order to ensure consistency with similar cases.

The Public Integrity Section and its Election Crimes Branch are available to assist United States Attorneys' Offices and FBI field offices in handling election crime matters. This assistance includes evaluating election crime allegations, structuring investigations, and drafting indictments and other pleadings. The Election Crimes Branch also serves as the point of contact between the Department of Justice and the FEC, which share enforcement jurisdiction over federal campaign financing violations. Finally, Section attorneys are available to provide operational assistance in election crime investigations and trials.

CHAPTER TWO

# CORRUPTION OF THE ELECTION PROCESS

## A. HISTORICAL BACKGROUND

Federal concern over the integrity of the franchise has historically had two distinct areas of focus. The first, to ensure elections that are free from corruption for the general public, is the subject of this chapter. The second, to ensure there is no discrimination against minorities at the ballot box, involves entirely different constitutional and federal interests, and is supervised by the Justice Department's Civil Rights Division.

Federal interest in the integrity of the franchise was first manifested immediately after the Civil War. Between 1868 and 1870, Congress passed the Enforcement Acts, which served as the basis for federal activism in prosecuting corruption of the franchise until most of them were repealed in the 1890s. *See In re Coy*, 127 U.S. 731 (1888); *Ex parte Yarborough*, 110 U.S. 651 (1884); *Ex parte Siebold*, 100 U.S. 371 (1880).

Many of the Enforcement Acts had broad jurisdictional predicates that allowed them to be applied to a wide variety of corrupt election practices as long as a federal candidate was on the ballot. In *Coy*, the Supreme Court held that Congress had authority under the Constitution's Necessary and Proper Clause to regulate any activity during a mixed federal/state election that exposed the federal election to potential harm, whether that harm materialized or not. *Coy* is still applicable law. *United States v. Carmichael*, 685 F.2d 903, 908 (4th Cir. 1982); *United States v. Mason*, 673 F.2d 737, 739 (4th Cir. 1982); *United States v. Malmay*, 671 F.2d 869, 874-75 (5th Cir. 1982); *United States v. Bowman*, 636 F.2d 1003, 1010 (5th Cir. 1981).

After Reconstruction, federal activism in election matters subsided. The repeal of most of the Enforcement Acts in 1894 eliminated the statutory tools that had encouraged federal activism in election fraud matters. Two surviving provisions of these Acts, now embodied in 18 U.S.C. §§ 241 and 242, covered only intentional deprivations of rights guaranteed directly by the Constitution or federal law. The courts during this period held that the Constitution directly conferred a right to vote only for federal officers, and that conduct aimed at corrupting nonfederal contests was not prosecutable in federal courts. *See United States v. Gradwell*, 243 U.S. 476 (1917); *Guinn v. United States*, 238 U.S. 347 (1915). Federal attention to election fraud was further limited by case law holding that primary elections were not part of the official election process, *Newberry* v. *United States*, 256 U.S. 232 (1918), and by cases like *United States v. Bathgate*, 246 U.S. 220 (1918), which read the entire subject of vote buying out of federal criminal law, even when it was directed at federal contests.

In 1941, the Supreme Court reversed direction, overturning *Newberry*. The Court recognized that primary elections are an integral part of the process by which candidates are elected to office. *United States v. Classic*, 313 U.S. 299 (1941). *Classic* changed the judicial attitude toward federal intervention in election matters and ushered in a new period of federal activism. Federal courts now regard the right to vote in a fairly conducted election as a constitutionally protected feature of United States citizenship. *Reynolds v. Sims*, 377 U.S. 533 (1964).

In 1973, the use of Section 241 to address election fraud began to expand. *See, e.g.*, *United States v. Anderson*, 481 F.2d 685 (4th Cir. 1973), *aff'd on other grounds*, 417 U.S. 211 (1974). Since then, this statute has been successfully applied to prosecute certain types of local election fraud. *United States v. Wadena*, 152 F.3d 831 (8th Cir. 1998); *United States v. Howard*, 774 F.2d 838 (7th Cir.

1985); *United States v. Olinger*, 759 F.2d 1293 (7th Cir. 1985); *United States v. Stollings*, 501 F.2d 954 (4th Cir. 1974).[7]

The mail fraud statute, 18 U.S.C. § 1341, was used successfully for decades to reach local election fraud, under the theory that such schemes defrauded citizens of their right to fair and honest elections. *United States v. Clapps*, 732 F.2d 1148 (3d Cir. 1984); *United States v. States*, 488 F.2d 761 (8th Cir. 1973). However, this mail fraud theory has been barred since 1987, when the Supreme Court held that Section 1341 did not apply to schemes to defraud someone of intangible rights (such as the right to honest elections). *McNally v. United States*, 483 U.S. 350 (1987). Congress responded to *McNally* the following year by enacting a provision that expressly defined Section 1341 to include schemes to defraud someone of "honest services." 18 U.S.C. § 1346. However, Section 1346 may not have restored use of Section 1341 for most election crimes, unless they involved the element of "honest services."

Finally, over the past forty years Congress has enacted new criminal laws with broad jurisdictional bases to combat false voter registrations, vote buying, multiple voting, and fraudulent voting in elections in which a federal candidate is on the ballot. 42 U.S.C.

---

[7] As indicated in the cited cases, Section 241 has been used to prosecute election fraud that affects the vote for federal officials, as well as vote fraud directed at nonfederal candidates that involves the corruption of public officials – most often election officers – acting under color of law, i.e., ballot-box stuffing schemes. This latter type of scheme will be referred to in this book as a "public scheme." A scheme that does not involve the necessary participation of corrupt officials acting under color of law but that affects the tabulation of votes for federal candidates will be referred to as a "private scheme."

§§ 1973i(c), 1973i(e), 1973gg-10. These statutes rest on Congress's power to regulate federal elections (U.S. CONST. art. I, § 4) and on its power under the Necessary and Proper Clause (U.S. CONST. art. I, § 8, cl. 18) to enact laws to protect the federal election process from the potential of corruption. The federal jurisdictional predicate underlying these statutes is satisfied as long as either the name of a federal candidate is on the ballot or the fraud involves corruption of the voter registration process in a state where one registers to vote simultaneously for federal as well as other offices. *United States v. Slone*, 411 F.3d 643 (6th Cir. 2005); *United States v. McCranie*, 169 F.3d 723 (11th Cir. 1999); *United States v. Howard*, 774 F.2d 838 (7th Cir. 1985); *United States v. Olinger*, 759 F.2d 1293 (7th Cir. 1985); *United States v. Garcia*, 719 F.2d 99 (5th Cir. 1983); *United States v.* Mason, 673 F.2d 737 (4th Cir. 1982); *United States v. Malmay*, 671 F.2d 869 (5th Cir. 1982); *United States v. Bowman*, 636 F2d 1003 (5th Cir. 1981); United *States v. Barker*, 514 F.2d 1077 (7th Cir. 1975); *United States v. Cianciulli*, 482 F. Supp. 585 (E.D. Pa. 1979).

## B. WHAT IS ELECTION FRAUD?

### 1. In General

Election fraud involves a substantive irregularity relating to the voting act – such as bribery, intimidation, or forgery – which has the potential to taint the election itself. During the past century and a half, Congress and the federal courts have articulated the following constitutional principles concerning the right to vote in the United States. Any activity intended to interfere corruptly with any of the principles indicated below may be actionable as a federal crime:

- All qualified citizens are eligible to vote.
- All qualified voters have the right to have their votes counted fairly and honestly.

- Invalid ballots dilute the worth of valid ballots, and therefore will not be counted.

- Every qualified voter has the right to make a personal and independent election decision.

- Qualified voters may opt not to participate in an election.

- Voting shall not be influenced by bribery or intimidation.

Simply put, then, election fraud is conduct intended to corrupt:

- The process by which ballots are obtained, marked, or tabulated,

- The process by which election results are canvassed and certified, or

- The process by which voters are registered.

On the other hand, schemes that involve corruption of other political processes (i.e., political campaigning, circulation of nominating petitions, etc.) do not normally serve as the basis for a federal election crime.

### 2. Conduct that Constitutes Federal Election Fraud[8]

The following activities provide a basis for federal prosecution under the statutes referenced in each category:

- Paying voters for registering to vote, or for voting, in elections in which a federal candidate is on the ballot (42 U.S.C. § 1973i(c), 18 U.S.C. § 597), or through the use of the mails in those states in which vote buying is a "bribery" offense (18 U.S.C. § 1952), as well as in federal elections[9] in those states in which purchased registrations or votes are voidable under applicable state law (42 U.S.C. § 1973gg-10(2)).

- Conspiring to prevent voters from participating in elections in which a federal candidate is on the ballot, or when done "under color of law" in *any* election, federal or nonfederal (18 U.S.C. §§ 241, 242).

- Voting in federal elections for individuals who do not personally participate in, and assent to, the voting act attributed to them, or impersonating voters or casting ballots in the names of voters who do not vote in federal elections (42 U.S.C. §§ 1973i(c), 1973i(e), 1973gg-10(2)).

---

[8] As used throughout this book, the terms "federal election fraud" and "election fraud" mean fraud relating to an election in which a federal criminal statute applies. As will be discussed below, these terms are not limited to frauds aimed at corrupting federal elections.

[9] For purposes of this book, the term "federal election" means an election in which the name of a federal candidate is on the ballot, regardless of whether there is proof that the fraud caused a vote to be cast for the federal candidate. A "nonfederal election" is one in which no federal candidate is on the ballot.

- Intimidating voters through physical duress in any type of election (18 U.S.C. § 245(b)(1)(A)), or through physical or economic threats in connection with their registering to vote or voting in federal elections (42 U.S.C. § 1973gg-10(1)), or their vote for a federal candidate (18 U.S.C. § 594). If the victim is a federal employee, intimidation in connection with *any* election, federal or nonfederal, is prohibited (18 U.S.C. § 610).

- Malfeasance by election officials acting "under color of law" by performing such acts as diluting valid ballots with invalid ones (ballot-box stuffing), rendering false tabulations of votes, or preventing valid voter registrations or votes from being given effect in *any* election, federal or nonfederal (18 U.S.C. §§ 241, 242), as well as in elections in which federal candidates are on the ballot (42 U.S.C. §§ 1973i(c), 1973i(e), 1973gg-10(2)).

- Submitting fictitious names to election officers for inclusion on voter registration rolls, thereby qualifying the ostensible voters to vote in federal elections (42 U.S.C. §§ 1973i(c), 1973gg-10(2)).[10]

- Knowingly procuring eligibility to vote for federal office by persons who are not entitled to vote under applicable state law, notably persons who have

---

[10] With respect to fraudulent voter registrations, election registration is "unitary" in all 50 states in the sense that a person registers only once to become eligible to cast ballots for both federal and nonfederal candidates. Therefore false information given to establish eligibility to register to vote is actionable federally regardless of the type of election that motivated the subjects to act. *United States v. Cianciulli*, 482 F. Supp. 585 (E.D. Pa. 1979).

committed serious crimes (approximately 40 states) (42 U.S.C. §§ 1973i(c), 1973gg-10(2)), and persons who are not United States citizens (currently all states) (42 U.S.C. §§ 1973i(c), 1973gg-10(2); 18 U.S.C. §§ 1015(f), 611).

- Knowingly making a false claim of United States citizenship to register to vote or to vote in any election (18 U.S.C. § 1015(f)), or falsely and willfully claiming U.S. citizenship for, *inter alia,* registering or voting in any election (18 U.S.C. § 911).

- Providing false information concerning a person's name, address, or period of residence in a voting district to establish that person's eligibility to register or to vote in a federal election (42 U.S.C. §§ 1973i(c), 1973gg-10(2)).

- Causing the production of voter registrations that qualify alleged voters to vote for federal candidates, or the production of ballots in federal elections, that the actor knows are materially defective under applicable state law (42 U.S.C. § 1973gg-10(2)).

- Using the mails or interstate wire facilities to obtain the salary and emoluments of an elected official through any of the activities mentioned above (18 U.S.C. §§ 1341, 1343). Until recently, the Criminal Division believed that the "salary theory" of mail and wire fraud had at least some potential as a prosecutive theory that would extend federal criminal jurisdiction to election fraud schemes, including those that occurred in nonfederal elections. Although the

theory received some initial judicial support, recent appellate jurisprudence has rejected it.[11]

- Ordering, keeping, or having under one's authority or control any troops or armed men at any polling place in *any* election, federal or nonfederal. The actor must be an active civilian or military officer or employee of the United States Government (18 U.S.C. § 592).

### 3. Conduct that Does Not Constitute Federal Election Fraud

Various types of conduct that may adversely affect the election of a federal candidate may not constitute a federal election crime, despite what in many instances might be their reprehensible character. For example, a federal election crime does not normally involve irregularities relating to: (1) distributing inaccurate campaign literature, (2) campaigning too close to the polls, (3) engaging in

---

[11] 18 U.S.C. § 1346, enacted in response to the Supreme Court's decision in *McNally v. United States*, 483 U.S. 350 (1987), may not have restored use of the mail and wire fraud statutes to all election fraud schemes because its "intangible rights" concept is confined to deprivation of "honest services," a motive not usually found in election fraud schemes. After the *McNally* decision the Department began using the salary theory of mail fraud to address election fraud schemes by charging that one of the purposes of the scheme was to obtain for the "favored" candidate the salary and emoluments of an elected position. This use of the salary theory has met with mixed results. *Compare United States v. Ratcliff*, 488 F.3d 639 (5th Cir. 2007), *and United States v. Turner*, 459 F.3d 775 (6th Cir. 2006) (rejecting the salary theory of mail fraud as applied to election fraud schemes), *with United States v. Ingber*, Cr. No. 86-1402 (2d Cir. Feb. 4, 1987) (unpublished), *quoted in Ingber v. Enzor*, 664 F. Supp. 814, 815-16 (S.D.N.Y. 1987) (*habeas* opinion), 841 F.2d 450 (2d Cir. 1988) (affirming on retroactivity grounds and not reaching application of salary theory) *and United States v. Webb*, 689 F. Supp. 703 (W.D. Ky. 1988) (accepting salary theory).

activities to influence an opponent's withdrawal from an election, or (4) failing to comply with state-mandated voting procedures through the negligence of election officials. Also, "facilitation benefits," e.g., things of value given to voters to make it easier for them to cast a ballot that are not intended to stimulate or reward the voting act itself, such as a ride to the polls or a stamp to mail an absentee ballot, do not ordinarily involve federal crimes.

### 4. Conditions Conducive to Election Fraud

Most election fraud is aimed at corrupting elections for local offices, which control or influence patronage positions and contracting for materials and services. Election fraud schemes are thus often linked to such other crimes as protection of illegal activities, corruption of local governmental processes, and patronage abuses.

Election fraud does not normally occur in jurisdictions where one political faction enjoys widespread support among the electorate, because in such a situation it is usually unnecessary or impractical to resort to election fraud in order to control local public offices.[12] Instead, election fraud occurs most frequently when there are fairly equal political factions, and when the stakes involved in who controls public offices are weighty – as is often the case when patronage jobs are a major source of employment, or when illicit activities are being protected from law enforcement scrutiny. In sum, election fraud is most likely to occur in electoral jurisdictions where there is close factional competition for an elected position that matters.

---

[12] Election fraud might occur at the local level in districts controlled by one political faction in order to affect a contested election in a larger jurisdiction. For example, a corrupt mayor assured of his own reelection might nevertheless engage in election fraud for the purpose of affecting a state-wide election that is perceived to be close.

### 5. Voter Participation Versus Nonvoter Participation Cases

As a practical matter, election frauds fall into two basic categories: those in which individual voters do not participate in the fraud, and those in which they do. The investigative approach and prosecutive potential are different for each type of case.

#### (a) Election frauds not involving the participation of voters

The first category involves cases when voters do not participate, in any way, in the voting act attributed to them. These cases include ballot-box stuffing cases, ghost voting cases, and "nursing home" frauds.[13] All such matters are potential federal crimes. Proof of these crimes depends largely on evidence generated by the voting process, or on handwriting exemplars taken from persons who had access to voting equipment, and thus the opportunity to misuse it. Some of the more common ways these crimes are committed include:

- Placing fictitious names on the voter rolls. This "deadwood" allows for fraudulent ballots, which can be used to stuff the ballot box.

- Casting bogus ballots in the names of persons who did not vote.

---

[13] An example of a successfully prosecuted nursing home fraud is *United States v. Odom*, 736 F.2d 104 (4th Cir. 1984), which involved a scheme by local law enforcement officials and others to vote the absentee ballots of mentally incompetent residents.

- Obtaining and marking absentee ballots without the active input of the voters involved. Absentee ballots are particularly susceptible to fraudulent abuse because, by definition, they are marked and cast outside the presence of election officials and the structured environment of a polling place.

- Falsifying vote tallies.

### (b) Election frauds involving the participation of voters

The second category of election frauds includes cases in which the voters do participate, at least to some extent, in the voting acts attributed to them. Common examples include:

- Vote-buying schemes;

- Absentee ballot frauds;

- Voter intimidation schemes;

- Migratory-voting (or floating-voter) schemes;

- Voter "assistance" frauds, in which the wishes of the voters are ignored or not sought.

Successful prosecution of these cases usually requires the cooperation and testimony of the voters whose ballots were corrupted. This requirement presents several difficulties. An initial problem is that the voters themselves might be technically guilty of participating in the scheme. However, because the voters can often be considered victims, in appropriate cases federal prosecutors should consider declining to prosecute them in exchange for truthful cooperation against organizers of such schemes.

The second difficulty encountered in cases when voters participate is that the voter's presence alone may suggest that he or she "consented" to the defendant's conduct (marking the ballot, taking the ballot, choosing the candidates, etc.). *Compare United States v. Salisbury*, 983 F.2d 1369 (6th Cir. 1993) (leaving unanswered the question whether a voter who signs a ballot envelope at the defendant's instruction but is not allowed to choose the candidates has consented to having the defendant mark the ballot), *with United States v. Cole*, 41 F.3d 303 (7th Cir. 1994) (finding that voters who merely signed ballots subsequently marked by the defendant were not expressing their own electoral preferences).

While the presence of the ostensible voter when another marks his or her ballot does not negate whatever crime might be occurring, it thus may increase the difficulty of proving the crime. This difficulty is compounded because those who commit this type of crime generally target vulnerable members of society, such as persons who are uneducated, socially disadvantaged, or impoverished and dependent upon government services – precisely the types of people who are likely targets for manipulation or intimidation. Therefore, in cases when the voter is present when another person marks his or her ballot, the evidence should show that the defendant either procured the voter's ballot through means that were themselves corrupt (such as bribery or threats), or that the defendant marked the voter's ballot without the voter's consent or input. *United States v. Boards*, 10 F.3d 587, 589 (8th Cir. 1993); *Cole,* 41 F.3d at 308.

## C. JURISDICTIONAL SUMMARY

Under the Constitution, the states retain broad jurisdiction over the elective process. When the federal government enters the field of elections, it does so to address specific federal interests, such as: (1) the protection of the voting rights of racial, ethnic, or language-minorities, a specific constitutional right; (2) the registration of voters to vote in federal elections; (3) the standardization and procurement of voting equipment purchased with federal funds;

(4) the protection of the federal election process against corruption; (5) the protection of the voting process from corruption accomplished under color of law; and (6) the oversight of noncitizen and other voting by persons ineligible to vote under applicable state law.

Most federal election crime statutes do not apply to all elections. Several apply only to elections in which federal candidates are on the ballot, and a few require proof either that the fraud was intended to influence a federal contest or that a federal contest was affected by the fraud.

For federal jurisdictional purposes, there are two fundamental types of elections in which federal election crimes may occur: federal elections, in which the ballot includes the name of one or more candidates running for federal office; and nonfederal elections, in which only the names of local or state candidates are on the ballot. Elections in which the ballot includes the names of both federal and nonfederal candidates, often referred to as "mixed" elections, are "federal elections" for the purpose of the federal election crime statutes.

### 1. Statutes Applicable to Nonfederal Elections

Several federal criminal statutes apply to purely nonfederal elections.

- 42 U.S.C. § 1973i(c) and § 1973gg-10(2)(A), and 18 U.S.C. § 1015(f) – any fraud that is aimed at the process by which voters are registered, notably schemes to furnish materially false information to election registrars;

- 18 U.S.C. §§ 241 and 242 – any scheme that involves the necessary participation of public officials, usually election officers or notaries, acting "under color of law," which is actionable as a derogation of the "one

person, one vote" principle of the Fourteenth Amendment, i.e., "public schemes;"[14]

- 18 U.S.C. § 245(b)(1)(A) – physical threats or reprisals against candidates, voters, poll watchers, or election officials;
- 18 U.S.C. § 592 – "armed men" stationed at the polls;
- 18 U.S.C. § 609 – coercion of voting among the military;
- 18 U.S.C. § 610 – coercion of federal employees for political activity;
- 18 U.S.C. § 911 – fraudulent assertion of United States citizenship;
- 18 U.S.C. § 1341 – schemes involving the mails to corrupt elections that are predicated on the post-*McNally* "salary" or "pecuniary loss" theories; and
- 18 U.S.C. § 1952 – schemes to use the mails in furtherance of vote-buying activities in states that treat vote buying as bribery.

The statutes listed above also apply to elections in which a federal candidate is on the ballot.

[14] Federal prosecutors should also evaluate whether a public scheme involves a deprivation of honest services. 18 U.S.C. §§ 1341, 1343, 1346.

### 2. Statutes Applicable to Federal Elections

The following additional statutes apply to federal (including "mixed") elections, but not to purely nonfederal elections:[15]

- 18 U.S.C. § 594 – intimidation of voters;
- 18 U.S.C. § 597 – payments to vote, or to refrain from voting, for a federal candidate;
- 18 U.S.C. § 608(b) – vote buying and false registration under the Uniformed and Overseas Citizens Absentee Voting Act;
- 18 U.S.C. § 611 – voting by aliens;
- 42 U.S.C. § 1973i(c) – payments for registering to vote or voting, fraudulent registrations, and conspiracies to encourage illegal voting;
- 42 U.S.C. § 1973i(e) – multiple voting;
- 42 U.S.C. § 1973gg-10(1) – voter intimidation; and
- 42 U.S.C. § 1973gg-10(2) – fraudulent voting or registering.

---

[15] The name of a federal candidate on the ballot is sufficient to obtain federal jurisdiction.

## D. STATUTES[16]

### 1. Conspiracy Against Rights. 18 U.S.C. § 241

Section 241 makes it unlawful for two or more persons to "conspire to injure, oppress, threaten, or intimidate any person in any State, Territory, Commonwealth, Possession, or District in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States." Violations are punishable by imprisonment for up to ten years or, if death results, by imprisonment for any term of years or for life, or by a sentence of death.

The Supreme Court long ago recognized that the right to vote for federal offices is among the rights secured by Article I, Sections 2 and 4, of the Constitution, and hence is protected by Section 241. *United States v. Classic*, 313 U.S. 299 (1941); *Ex parte Yarborough*, 110 U.S. 651 (1884). Although the statute was enacted just after the Civil War to address efforts to deprive the newly emancipated slaves of the basic rights of citizenship, such as the right to vote, it has been interpreted to include any effort to derogate any right that flows from the Constitution or from federal law.

Section 241 has been an important statutory tool in election crime prosecutions. Originally held to apply only to schemes to corrupt elections for federal office, it has recently been successfully applied to nonfederal elections as well, provided that state action was a necessary feature of the fraud. This state action requirement can be met not only by the participation of poll officials and notaries public, but by activities of persons who clothe themselves with the appearance of state authority, e.g., with uniforms, credentials, and badges. *Williams v. United States*, 341 U.S. 97 (1951).

---

[16] The text of the statutes discussed below is printed in Appendix A. Each statute carries, in addition to the prison term noted, fines applicable under 18 U.S.C. § 3571.

Section 241 embraces conspiracies to stuff a ballot box with forged ballots, *United States v. Saylor*, 322 U.S. 385 (1944); *United States v. Mosley*, 238 U.S. 383 (1915); to prevent the official count of ballots in primary elections, *Classic,* 313 U.S. 299; to destroy voter registration applications, *United States v. Haynes*, 977 F.2d 583 (6th Cir. 1992) (table) (available at 1992 WL 296782); to destroy ballots, *United States v. Townsley*, 843 F.2d 1070 (8th Cir. 1988); *United States v. Morado*, 454 F.2d 167 (5th Cir. 1972); to illegally register voters and cast absentee ballots in their names, *United States v. Weston*, 417 F.2d 181 (4th Cir. 1969); to injure, threaten, or intimidate a voter in the exercise of his right to vote, *Wilkins v. United States*, 376 F.2d 552 (5th Cir. 1967); *Fields v. United States*, 228 F.2d 544 (4th Cir. 1955); to impersonate qualified voters, *Crolich v. United States*, 196 F.2d 879 (5th Cir. 1952); to fail to count votes and to alter votes counted, *Ryan v. United States*, 99 F.2d 864 (8th Cir. 1938); *Walker v. United States*, 93 F.2d 383 (8th Cir. 1937); and to alter legal ballots, *United States v. Powell*, 81 F. Supp. 288 (E.D. Mo. 1948).

Recently, Section 241 was charged, along with telephone harassment charges under 47 U.S.C. § 223, in a scheme to jam the telephone lines of two get-out-the-vote services that were perpetrated to prevent voters from obtaining rides to the polls in the 2002 general elections. While the defendant was convicted only on the telephone harassment charges, the district court held that Section 241 applied to the facts (*United States v. Tobin*, No. 04-216-01 (SM), 2005 WL 3199672 (D.N.H. Nov. 30, 2005)). The Criminal Division continues to believe that Section 241 should be considered when addressing schemes to thwart voting in federal elections.

Section 241 does not require that the conspiracy be successful, *United States v. Bradberry*, 517 F.2d 498 (7th Cir. 1975), nor need there be proof of an overt act. *Williams v. United States*, 179 F.2d 644, 649 (5th Cir. 1950), *aff'd on other grounds*, 341 U.S. 70 (1951); *Morado*, 454 F.2d 167. Section 241 reaches conduct affecting the integrity of the federal election process as a whole, and does not

require fraudulent action with respect to any particular voter. *United States v. Nathan*, 238 F.2d 401 (7th Cir. 1956).

On the other hand, Section 241 does not reach schemes to corrupt the balloting process through voter bribery, *United States v. Bathgate*, 246 U.S. 220 (1918), even schemes that involve poll officers to ensure that the bribed voters mark their ballots as they were paid to do, *United States v. McLean*, 808 F.2d 1044 (4th Cir. 1987) (noting, however, that Section 241 may apply when vote buying occurs in conjunction with other corrupt practices, such as ballot-box stuffing).

Section 241 prohibits only conspiracies to interfere with rights flowing directly from the Constitution or federal statutes. This element has led to considerable judicial speculation over the extent to which the Constitution protects the right to vote for candidates running for nonfederal offices. *Oregon v. Mitchell*, 400 U.S. 112 (1970); *Reynolds v. Sims*, 377 U.S. 533 (1964); *Blitz v. United States*, 153 U.S. 308 (1894); *In re Coy*, 127 U.S. 731 (1888); *Ex parte Siebold*, 100 U.S. 371 (1880). *See also Duncan v. Poythress*, 657 F.2d 691 (5th Cir. 1981). While *dicta* in *Reynolds* casts the parameters of the federally protected right to vote in extremely broad terms, in a ballot fraud case ten years later, the Supreme Court specifically refused to decide whether the federally secured franchise extended to nonfederal contests. *Anderson v. United States*, 417 U.S. 211 (1974).

The use of Section 241 in election fraud cases generally falls into two types of situations: "public schemes" and "private schemes."

A public scheme is one that involves the necessary participation of a public official acting under the color of law. In election fraud cases, this public official is usually an election officer using his office to dilute valid ballots with invalid ballots or to otherwise corrupt an honest vote tally in derogation of the Equal

Protection and Due Process Clauses of the Fourteenth Amendment. *See, e.g.*, *United States v. Haynes*, 977 F.2d 583 (6th Cir. 1992) (table) (available at 1992 WL 296782); *United States v. Townsley*, 843 F.2d 1070 (8th Cir. 1988); *United States v. Howard*, 774 F.2d 838 (7th Cir. 1985); *United States v. Olinger*, 759 F.2d 1293 (7th Cir. 1985); *United States v. Stollings*, 501 F.2d 954 (4th Cir. 1974); *United States v. Anderson*, 481 F.2d 685 (4th Cir. 1973), *aff'd on other grounds*, 417 U.S. 211 (1974). Another case involving a public scheme turned on the necessary participation of a notary public who falsely notarized forged voter signatures on absentee ballot materials in an Indian tribal election. *United States v. Wadena*, 152 F.3d 831 (8th Cir. 1998).

A private scheme is a pattern of conduct that does not involve the necessary participation of a public official acting under color of law, but that can be shown to have adversely affected the ability of qualified voters to vote in elections in which federal candidates were on the ballot. Examples of private schemes include: (1) voting fraudulent ballots in mixed elections, and (2) thwarting get-out-the-vote or ride-to-the-polls activities of political factions or parties through such methods as jamming telephone lines or vandalizing motor vehicles.

Public schemes may be prosecuted under Section 241 regardless of the nature of the election, i.e., elections with or without a federal candidate. On the other hand, private schemes can be prosecuted under Section 241 only when the objective of the conspiracy was to corrupt a specific federal contest, or when the scheme can be shown to have affected, directly or indirectly, the vote count for a federal candidate, e.g., when fraudulent ballots were cast for an entire party ticket that included a federal office.

### 2. Deprivation of Rights under Color of Law. 18 U.S.C. § 242

Section 242, also enacted as a post-Civil War statute, makes it unlawful for anyone acting under color of law, statute, ordinance, regulation, or custom to willfully deprive a person of any right, privilege, or immunity secured or protected by the Constitution or laws of the United States. Violations are one-year misdemeanors unless bodily injury occurs, in which case the penalty is ten years, unless death results, in which case the penalty is imprisonment for any term of years or for life, or a sentence of death.

Prosecutions under Section 242 need not show the existence of a conspiracy. However, the defendants must have acted illegally "under color of law," i.e., the case must involve a public scheme, as discussed above. This element does not require that the defendant be a *de jure* officer or a government official; it is sufficient if he or she jointly acted with state agents in committing the offense, *United States v. Price*, 383 U.S. 787 (1966), or if his or her actions were made possible by the fact that they were clothed with the authority of state law, *Williams v. United States*, 341 U.S. 97 (1951); *United States v. Classic*, 313 U.S. 299 (1941).

Because a Section 242 violation can be a substantive offense for election fraud conspiracies prosecutable under Section 241, the cases cited in the discussion of Section 241 that involve public schemes (i.e., those involving misconduct under color of law) apply to Section 242.

### 3. False Information in, and Payments for, Registering and Voting. 42 U.S.C. § 1973i(c)

Section 1973i(c) makes it unlawful, in an election in which a federal candidate is on the ballot, to knowingly and willfully: (1) give false information as to name, address, or period of residence for the purpose of establishing one's eligibility to register or vote; (2) pay,

offer to pay, or accept payment for registering to vote or for voting; or (3) conspire with another person to vote illegally. Violations are punishable by imprisonment for up to five years.

**(a) The basis for federal jurisdiction**[17]

Congress added Section 1973i(c) to the 1965 Voting Rights Act to ensure the integrity of the balloting process in the context of an expanded franchise. In so doing, Congress intended that Section 1973i(c) have a broad reach. In fact, the original version of Section 1973i(c) would have applied to all elections. However, constitutional concerns were raised during congressional debate on the bill, and the provision's scope was narrowed to elections that included a federal contest. Section 1973i(c) rests on Congress's power to regulate federal elections and on the Necessary and Proper Clause. U.S. CONST. art. I, § 4; art. I, § 8, cl. 18; *United States v. Slone*, 411 F.3d 643 (6th Cir. 2005); *United States v. McCranie*, 169 F.3d 723 (11th Cir. 1999); *United States v. Cole*, 41 F.3d 303 (7th Cir. 1994); *United States v. Malmay*, 671 F.2d 869 (5th Cir. 1982); *United States v. Carmichael*, 685 F.2d 903 (4th Cir. 1982); *United States v. Bowman*, 636 F.2d 1003 (5th Cir. 1981); and *United States v. Cianciulli*, 482 F. Supp. 585 (E.D. Pa. 1979).

Section 1973i(c) has been held to protect two distinct aspects of a federal election: the actual results of the election, and the integrity of the process of electing federal officials. *United States v. Cole*, 41 F.3d 303 (7th Cir. 1994). In *Cole*, the Seventh Circuit held that federal jurisdiction is satisfied so long as a single federal candidate is on the ballot – even if the federal candidate is unopposed – because fraud in a mixed election automatically has an impact on the integrity of the federal election process. *See also United States v.*

[17] The discussion here concerning federal jurisdiction under Section 1973i(c) applies equally to its companion statute, 42 U.S.C. § 1973i(e), which addresses multiple voting with a federal jurisdictional predicate phrased precisely the same way.

*Slone*, 411 F.3d 643 (6th Cir. 2005); *and United States v. McCranie*, 169 F.3d 723 (11th Cir. 1999) (jurisdiction under Section 1973i(c) satisfied by name of unopposed federal candidate on ballot).

Section 1973i(c) is particularly useful for two reasons: (1) it eliminates the unresolved issue of the scope of the constitutional right to vote in matters not involving racial discrimination, and (2) it eliminates the need to prove that a given pattern of corrupt conduct had an actual impact on a federal election. It is sufficient under Section 1973i(c) that a pattern of corrupt conduct took place during a mixed election; in that situation it is presumed that the fraud will expose the federal race to potential harm. *United States v. Slone*, 411 F.3d 643 (6th Cir. 2005)*; United States v. Cole*, 41 F.3d 303 (7th Cir. 1994); *United States v. Olinger*, 759 F.2d 1293 (7th Cir. 1985); United *States v. Saenz*, 747 F.2d 930 (5th Cir. 1984); *United States v. Garcia*, 719 F.2d 99 (5th Cir. 1983); *United States v. Carmichael*, 685 F.2d 903 (4th Cir. 1982); *United States v. Mason*, 673 F.2d 737 (4th Cir. 1982); *United States v. Malmay*, 671 F.2d 869 (5th Cir. 1982); *United States v. Bowman*, 636 F.2d 1003 (5th Cir. 1981); *United States v. Sayre*, 522 F. Supp. 973 (W.D. Mo. 1981); *United States v. Simms*, 508 F. Supp. 1179 (W.D. La. 1979).

Cases arising under this statute that involve corruption of the process by which individuals register, as distinguished from the circumstances under which they vote, present a different federal jurisdictional issue that is easily satisfied. This is because voter registration in every state is "unitary" in the sense that one registers to vote only once in order to become eligible to vote for all candidates on the ballot – local, state, and federal. Although a state could choose to maintain separate registration lists for federal and nonfederal elections, at the time this book was written, no state had chosen to do so. Consequently, any corrupt act that affects the voter registration process and that can be reached under 42 U.S.C. § 1973i(c) satisfies this federal jurisdictional requirement. An excellent discussion of this issue is contained in *United States v. Cianciulli*, 482 F. Supp. 585 (E.D. Pa. 1979).

### (b) False information to an election official

The "false information" provision of Section 1973i(c) prohibits any person from furnishing certain false data to an election official to establish eligibility to register or vote. The statute applies to three types of information: name, address, and period of residence in the voting district. False information concerning other factors (such as citizenship, felon status, and mental competence) are not covered by this provision.[18]

As just discussed, registration to vote is "unitary," i.e., a single registration qualifies the applicant to cast ballots for all elections. Thus, the jurisdictional requirement that the false information be used to establish eligibility to vote in a federal election is satisfied automatically whenever a false statement is made to get one's name on the registration rolls. *United States v. Barker*, 514 F.2d 1077 (7th Cir. 1975); *Cianciulli*, 482 F.Supp. 585.

On the other hand, when the false data is furnished to poll officials for the purpose of enabling a voter to cast a ballot in a particular election (as when one voter attempts to impersonate another), it must be shown that a federal candidate was being voted upon at the time. In such situations, the evidence should show that the course of fraudulent conduct could have jeopardized the integrity of the federal race, or, at a minimum, that the name of a federal candidate was on the ballot. *Carmichael*, 685 F.2d 903*; Bowman*, 636 F.2d 1003. *See also In re Coy*, 127 U.S. 731 (1888).

In *United States v. Boards*, 10 F.3d 587 (8th Cir. 1993), the Eighth Circuit confirmed the broad reach of the "false information"

---

[18] Such matters may, however, be charged as conspiracies to encourage illegal voting under the conspiracy clause of Section 1973i(c); as citizenship offenses under, *inter alia*, 18 U.S.C. §§ 911 and 1015(f); or under the broad "false information" provision of 42 U.S.C. §1973gg-10. These statutes will be discussed below.

provision of Section 1973i(c). The defendants in this case, and their unindicted co-conspirators, had obtained and marked the absentee ballots of other registered voters by forging the voters' names on ballot applications and directing that the ballots be sent to a post office box without the voters' knowledge. The district court granted post-verdict judgments of acquittal as to those counts in which the defendants' roles were limited to fraudulently completing an application for an absentee ballot, based on its conclusions that: (1) the statute did not extend to ballot applications, (2) the statute did not cover giving false information as to the names of real voters (as opposed to fictitious names), and (3) the defendants could not be convicted when the ballots were actually voted by an unidentified co-conspirator.

The court of appeals rejected each of these narrow interpretations of Section 1973i(c). It first held that an application for a ballot falls within the broad definition of "vote" in the Voting Rights Act, "because an absentee voter must first apply for an absentee ballot as a 'prerequisite to voting.'" *Id.* at 589 (quoting 42 U.S.C. § 1973l(c)(1)). The court also held that by using the names of real registered voters on the applications, the defendants "[gave] false information as to [their] name[s]" within the meaning of Section 1973i(c).[19] *Id.* Finally, the court held that one of the defendants, whose role was limited to completing absentee ballot applications for ballots that others used to fraudulently vote, was liable under 18 U.S.C. § 2 as an aider and abettor.

Subsequently, in *United States v. Smith*, 231 F.3d 800 (11th Cir. 2000), the Eleventh Circuit held that each forgery of a voter's name on a ballot document or on an application for a ballot

[19] The Eighth Circuit observed, "[b]ecause only registered voters are eligible to apply for and vote absentee ballots, the use of real registered voters' names was essential to the scheme to obtain and fraudulently vote absentee ballots ...." *Id.*

constituted a separate offense under the “false information as to name” clause of Section 1973i(c).

Section 1973i(c)’s false information clause is particularly useful when the evidence shows that a voter’s signature (name) was forged on an election-related document, for example: (1) when signatures on poll lists are forged by election officials who are stuffing a ballot box, (2) when a voter’s signature on an application for an absentee ballot is forged, or (3) when bogus voter registration documents are fabricated in order to get names on voter registries.

Some, but not all, states permit a practice commonly known as "bounty-hunting,” that is, paying people to collect voter registrations on a per-registration basis. Where it is allowed, it is not unusual to find that this method of remuneration provides a motive for the unscrupulous to forge voter registrations and to enhance the piecework payments they can receive. While this situation usually does not result in fraudulent votes actually being cast, it does cause voter registration offices to become overloaded with the task of processing large numbers of bogus registrations immediately prior to an election, when the resources of those offices should be directed at preparing ballots and staffing polling sites. It also risks overloading voter rolls with “deadwood” names, which in turn undermines public confidence in the election process. Thus, even when no fraudulent votes result from bounty hunting, the fraudulent registrations that arise from this conduct are not victimless offenses. Federal prosecutors should be cognizant of these circumstances and, when evidence of fraudulent registrations inspired by bounty hunting is discovered, should consider prosecuting the individuals submitting the false registrations, as well as, in appropriate circumstances, the organizations that employ and pay them, under Section 1973i(c).

**(c) Commercialization of the vote**

The clause of Section 1973i(c) that prohibits "vote buying" does so in broad terms, covering any payment made or offered to a would-be voter "for registering to vote or for voting" in an election when the name of a federal candidate appears on the ballot.[20] Section 1973i(c) applies as long as a pattern of vote buying exposes a federal election to potential corruption, even though it cannot be shown that the threat materialized.

This aspect of Section 1973i(c), is directed at eliminating pecuniary considerations from the voting process. *United States v. Garcia*, 719 F.2d 99, 102 (5th Cir. 1983); *United States v. Mason*, 673 F.2d 737, 739 (4th Cir. 1982); *United States v. Bowman*, 636 F2d. 1003, 1012 (5th Cir. 1981). The statute rests on the premises that potential voters can choose not to vote; that those who choose to vote have a right not to have the voting process diluted with ballots that have been procured through bribery; and that the selection of the nation's leaders should not degenerate into a spending contest, with the victor being the candidate who can pay the most voters. *See also United States v. Blanton*, 77 F. Supp. 812, 816 (E.D. Mo. 1948).

The bribe may be anything having monetary value, including cash, liquor, lottery chances, and welfare benefits such as food stamps. *Garcia*, 719 F.2d at 102. However, offering free rides to the

---

[20] The federal criminal code contains another vote-buying statute, 18 U.S.C. § 597, which has a narrower scope and provides for lesser penalties than Section 1973i(c). Section 597 prohibits making or offering to make an expenditure to any person to vote or withhold his or her vote for a federal candidate. Nonwillful violations of Section 597 are one-year misdemeanors; willful violations are two-year felonies. Sections 597 and 1973i(c) are distinct offenses, since each requires proof of an element that the other does not. *Whalen v. United States*, 445 U.S. 684 (1980); *Blockburger v. United States*, 284 U.S. 299 (1932). Section 597 requires that the payment be made to influence a federal election; Section 1973i(c) requires that the defendant acted "knowingly and willfully."

polls or providing employees paid leave while they vote are not prohibited. *United States v. Lewin*, 467 F.2d 1132 (7th Cir. 1972). Such things are given to make it easier for people to vote, not to induce them to do so. This distinction is important. For an offer or a payment to violate Section 1973i(c), it must have been intended to induce or reward the voter for engaging in one or more acts necessary to cast a ballot. Section 1973i(c) does *not* prohibit offering or giving things having pecuniary value, such as a ride to the polls or time off from work, to help individuals who have already made up their minds to vote do so.

Moreover, payments made for some purpose other than to induce or reward voting activity, such as remuneration for campaign work, do not violate this statute. *See United States v. Canales* 744 F.2d 413 (5th Cir. 1984) (upholding conviction because jury justified in inferring that payments were for voting, not campaign work). Similarly, Section 1973i(c) does not apply to payments made to signature-gatherers for voter registrations such individuals may obtain. However, such payments become actionable under Section 1973i(c) if they are shared with the person being registered.

Finally, Section 1973i(c) does not require that the offer or payment be made with a specific intent to influence a federal contest. It is sufficient that the name of a federal candidate appeared on the ballot in the election when the payment or offer of payment occurred. *United States v. Slone*, 411 F.3d 643 (6th Cir. 2005) (unopposed Senate candidate on ballot); *United States v. McCranie*, 169 F.3d 723 (11th Cir. 1999), (payments to vote for county commissioner); *United States v. Cole*, 41 F.3d 303 (7th Cir. 1994) (unopposed House and Senate candidates on ballot); *United States v. Daugherty*, 952F.2d 969 (8th Cir. 1991) (payments to vote for several local candidates); *United States v. Odom*, 858 F.2d 664 (11th Cir. 1988) (payments to vote for state representative); *United States v. Campbell*, 845 F.2d 782 (8th Cir. 1988); (payments to benefit a candidate for county judge); *United States v. Garcia*, 719 F.2d 99 (5th Cir. 1983) (food stamps to vote for candidate for county judge); *United States v.*

*Malmay*, 671 F.2d 869 (5 th Cir. 1983) (payments to influence votes for candidates for sheriff and other local offices); *United States v. Carmichael*, 685 F.2d 903 (4th Cir. 1982) (payments for sheriff). United *States v. Malmay*, 671 F.2d 869 (5th Cir. 1983) (payments to vote for school board member).

**(d) Conspiracy to cause illegal voting**

The second clause of Section 1973i(c) criminalizes conspiracies to encourage "illegal voting." The phrase "illegal voting" is not defined in the statute. On its face it encompasses unlawful conduct in connection with voting. Violations of this provision are felonies.

The "illegal voting" clause of Section 1973i(c) has potential application to those who undertake to cause others to register or vote in conscious derogation of state or federal laws. *Cianciulli*, 482 F.Supp. at 616 (noting that this clause would prohibit "vot[ing] illegally in an improper election district"). For example, all states require voters to be United States citizens, and most states disenfranchise people who have been convicted of certain crimes, who are mentally incompetent, or who possess other disabilities that may warrant restriction of the right to vote. This provision requires that the voters participate in the conspiracy.[21]

The conspiracy provision of Section 1973i(c) applies only to the statute's "illegal voting" clause. *Olinger*, 759 F.2d at 1298-1300. Conspiracies arising under the other clauses of Section 1973i(c) (i.e., those involving vote buying or fraudulent registration) should be charged under the general federal conspiracy statute, 18 U.S.C. § 371.

---

[21] False statements involving any fact that is material to registering or voting under state law may also be prosecuted under 42 U.S.C. § 1973gg-10, as will be discussed below.

**4. Voting More than Once. 42 U.S.C. § 1973i(e)**

Section 1973i(e), enacted as part of the 1975 amendments to the Voting Rights Act of 1965, makes it a crime to vote "more than once" in any election in which a federal candidate is on the ballot. Violations are punishable by imprisonment for up to five years.

The federal jurisdictional basis for this statute is identical to that for 42 U.S.C. § 1973i(c), which is discussed in detail above.

Section 1973i(e) is most useful as a statutory weapon against frauds that do not involve the participation of voters in the balloting acts attributed to them. Examples of such frauds are schemes to cast ballots in the names of voters who were deceased or absent, *United States v. Olinger*, 759 F.2d 1293 (7th Cir. 1985); schemes to exploit the infirmities of the mentally handicapped by casting ballots in their names, *United States v. Odom*, 736 F.2d 104 (4th Cir. 1984); and schemes to cast absentee ballots in the names of voters who did not participate in and consent to the marking of their ballots, *United States v. Smith*, 231 F.3d 800 (11th Cir. 2000).

Most cases prosecuted under the multiple voting statute have involved defendants who physically marked ballots outside the presence of the voters in whose names they were cast – in other words, without the voters' participation or knowledge. The statute may also be applied successfully to schemes when the voters are present but do not participate in any way, or otherwise consent to the defendant's assistance, in the voting process.

However, when the scheme involves "assisting" voters who are present and who also marginally participate in the process, such as by signing a ballot document, prosecuting the case under Section 1973i(e) might present difficulties. For instance, in *United States v. Salisbury*, 983 F.2d 1369 (6th Cir. 1993), the defendant got voters to sign their absentee ballot forms, and then instructed them how to mark their ballots, generally without allowing them to choose the

candidates – and even in some cases not disclosing the identity of the candidates on the ballot. In a few cases the defendant also personally marked others' ballots. The Sixth Circuit held that the concept "votes more than once" in Section 1973i(e) was unconstitutionally vague as applied to these facts. Because the phrase "votes more than once" was not defined in the statute, the court found the phrase did not clearly apply when the defendant did not physically mark another's ballot. The court further held that, even if the defendant did mark another's ballot, it wasn't clear this was an act of "voting" by the defendant if the defendant got the ostensible voters to demonstrate "consent" by signing their names to the accompanying ballot forms. *Id.* at 1379.[22]

In a similar multiple-voting case a year after the Sixth Circuit's *Salisbury* decision, the Seventh Circuit took a different approach, with the benefit of more detailed jury instructions. *United States v. Cole*, 41 F.3d 303 (7th Cir. 1994). In both cases, the defendants had marked absentee ballots of other persons after getting the voters to sign their ballot documents. The Seventh Circuit rejected the Sixth Circuit's contention that the term "vote" was unconstitutionally vague, finding that the term was broadly and adequately defined in the Voting Rights Act itself, 42 U.S.C. § 1973l(c)(1), and that this statutory definition was supported by both the dictionary and the commonly understood meaning of the word.

---

[22] The *Salisbury* court noted that in *United States v. Hogue*, 812 F.2d 1568 (11th Cir. 1987), the jury was instructed that illegal voting under Section 1973i(e) included marking another person's ballot without his or her "express or implied consent," but found that, based on the facts of *Salisbury*, the jury should also have been given definitions of "vote" and "consent." *United States v. Salisbury*, 983 F.2d at 1377.

The Seventh Circuit held that the facts established a clear violation by the defendant of the multiple voting prohibition in Section 1973i(e).[23]

In addition to their conflicting holdings, the *Salisbury* and *Cole* opinions differ in their approach to so-called voter "assistance" cases. *Salisbury* focused on the issue of voter consent – that is, whether the voters had, by their conduct, in some way "consented" to having the defendant mark, or help them mark, their own ballots. *Cole*, on the other hand, focused on whether it was the voter or the defendant who actually expressed candidate preferences.

In a more recent case, the Eleventh Circuit followed the rationale in *Cole* with respect to a scheme to obtain and cast ballots for indigent voters without their knowledge or consent. *United States v. Smith*, 231 F.3d 800 (11th Cir. 2000). The court even went so far as to note that, in its view, a Section 1973i(e) offense could exist regardless of whether the voter had consented to another's marking his ballot. *Id.* at 819, n. 20.

While the approach taken in *Cole* and *Smith* is, from a prosecutor's perspective, preferable to the approach taken in *Salisbury*, the latter's discussion of the issue of possible voter "consent" remains important, since facts suggesting the possibility of consent may weaken the evidence of fraud. Taken together, these three cases suggest the following approach to voter "assistance" frauds:

- Section 1973i(e) most clearly applies to cases of "ballot theft." Examples of such situations are when the defendant marked the ballots of others without their input, when voters did not knowingly consent to the

[23] "Ordinary people can conclude that the absentee voters were not expressing their wills or preferences, i.e., that Cole was using the absentee voters' ballots to vote his will and preferences." *Id.* at 308.

defendant's participation in their voting transactions; when the voters' electoral preferences were disregarded; or when the defendant marked the ballots of voters who lacked the mental capacity to vote or to consent to the defendant's activities.

- Jury instructions for a Section 1973i(e) charge should amplify the key term "votes more than once" in the context of the particular case, and specifically define the terms "vote," and, when appropriate, "consent" and "implied consent." *See, e.g.*, 42 U.S.C. § 1973l(c)(l) (containing an extremely broad definition of "vote") *and United States v. Boards*, 10 F.3d 587, 589 (8th Cir. 1993) (holding that this definition encompasses applying for an absentee ballot).

Thus, while the clearest use of Section 1973i(e) is to prosecute pure ballot forgery schemes, the statute can also apply to other types of schemes when voters are manipulated, misled, or otherwise deprived of their votes. *See, e.g.*, *Cole*, 41 F.3d at 310-311 (witness believed the defendant was merely registering her to vote, not helping her vote). Schemes to steal the votes of the elderly, infirm, or economically disadvantaged may constitute multiple voting, especially if there is a clear absence of meaningful voter participation. Because of their vulnerability, these persons are frequent targets of ballot schemes, and often do not even know that their ballots have been stolen or their voting choices ignored. Furthermore, if they have been intimidated, they are generally reluctant to say so.

There is a significant evidentiary difference between voter intimidation and multiple voting that suggests that the multiple voting statute may become the preferred charging statute for voter "assistance" frauds. Voter intimidation requires proof of a difficult element: the existence of physical or economic intimidation that is intended by the defendant. In contrast, the key element in a multiple voting offense is whether the defendant voted the ballot of another

person without consulting with that person or taking into account his or her electoral preferences.

In conclusion, if the facts show manipulation of "vulnerable victims" as referenced in the sentencing guidelines for the purpose of obtaining control over the victims' ballot choices, the use of Section 1973i(e) as a prosecutive theory should be considered.

### 5. Voter Intimidation

Voter intimidation schemes are the functional opposite of voter bribery schemes. In the case of voter bribery, voting activity is stimulated by offering or giving something of value to individuals to induce them to vote or reward them for having voted. The goal of voter intimidation, on the other hand, is to deter or influence voting activity through threats to deprive voters of something they already have, such as jobs, government benefits, or, in extreme cases, their personal safety. Another distinction between vote buying and intimidation is that bribery generates concrete evidence: the payment itself (generally money). Intimidation, on the other hand, is amorphous and largely subjective in nature, and lacks such concrete evidence.

Voter intimidation is an assault against both the individual and society, warranting prompt and effective redress by the criminal justice system. Yet a number of factors make it difficult to prosecute. The intimidation is likely to be both subtle and without witnesses. Furthermore, voters who have been intimidated are not merely victims; it is their testimony that proves the crime. These voters must testify, publicly and in an adversarial proceeding, against the very person who intimidated them. Obtaining this crucial testimony must be done carefully and respectfully. Because such offenses often occur in remote and insular communities, investigators should increase their efforts to maintain contact with voters, especially after charges are brought. Prosecutors should consider "locking in" testimony in grand

jury sessions even at the risk of creating some negative *Jenks* material.[24]

The crime of voter "intimidation" normally requires evidence of threats, duress, economic coercion, or some other aggravating factor that tends to improperly induce conduct on the part of the victim. If such evidence is lacking, an alternative prosecutive theory may apply to the facts, such as multiple voting in violation of 42 U.S.C. § 1973i(e). Indeed, in certain cases the concepts of "intimidation" and "voting more than once" might overlap and even merge. For example, a scheme that targets the votes of persons who are mentally handicapped, economically depressed, or socially vulnerable may involve elements of both crimes. Because of their vulnerability, these persons are often easily manipulated – without the need for inducements, threats, or duress. In such cases, the use of Section 1973i(e) as a prosecutive theory should be considered. *United States v. Odom*, 736 F.2d 104 (4th Cir. 1984).

The main federal criminal statutes that can apply to voter intimidation are: 42 U.S.C. § 1973gg-10(1); 18 U.S.C. §§ 241, 242, 245(b)(1)(A), 594, and 610. Each of these statutes is discussed below.

**(a) Intimidation in voting and registering to vote. 42 U.S.C. § 1973gg-10(1)**

In 1993, Congress enacted the National Voter Registration Act (NVRA), 42 U.S.C. §§ 1973gg to 1973gg-10. The principal purpose of this legislation was to require that the states provide prospective voters with uniform and convenient means by which to

[24] Federal prosecutors should be mindful of Department resources and policies regarding the rights of victims and the concerns regarding their use as witnesses, and should consult with the victim-witness coordinator in their office or division.

register for the federal franchise. In response to concerns that relaxing registration requirements may lead to an increase in election fraud, the NVRA also included a new series of election crimes, one of which prohibits knowingly and willfully intimidating or coercing[25] prospective voters in registering to vote, or for voting, in any election for federal office.[26] 42 U.S.C. § 1973gg-10(1). Violators are subject to imprisonment for up to five years.

**(b) Intimidation of voters. 18 U.S.C. § 594**

Section 594 prohibits intimidating, threatening, or coercing anyone, or attempting to do so, for the purpose of interfering with an individual's right to vote or not vote in any election held solely or in part to elect a federal candidate. The statute does not apply to primaries. Violations are one-year misdemeanors.

The operative words in Section 594 are "intimidates," "threatens," and "coerces." The *scienter* element requires proof that

---

[25] For guidance in determining what constitutes "intimidation" or "coercion" under this statute, see the discussion of 18 U.S.C. § 594 below. Voter "intimidation" accomplished through conduct not covered by this statute or Section 594 may present violations of the Voting Rights Act, 42 U.S.C. § 1973i(b), which are enforced by the Civil Rights Division through noncriminal remedies.

[26] The jurisdictional element for Section 1973gg-10(1) is "in any election for Federal office." This is slightly different phraseology than used in Sections 1973i(c) and i(e), as discussed above. In matters involving intimidation in connection with voter *registration*, this jurisdictional element is currently satisfied in every case because voter registration is unitary in all 50 states: i.e., one registers to vote only once to become eligible to vote for federal as well as nonfederal candidates. However, when the intimidation occurs in connection with *voting*, the jurisdictional situation might not be as clear. Absent case law to the contrary, federal prosecutors should advocate the position that "an election for Federal office" means any election in which a federal candidate is on the ballot.

the actor intended to force voters to act against their will by placing them in fear of losing something of value. The feared loss might be something tangible, such as money or economic benefits, or intangible, such as liberty or safety.

Section 594 was enacted as part of the original 1939 Hatch Act, which aimed at prohibiting the blatant economic coercion used during the 1930s to force federal employees and recipients of federal relief benefits to perform political work and to vote for and contribute to the candidates supported by their supervisors. The congressional debates on the Hatch Act show that Congress intended Section 594 to apply when persons were placed in fear of losing something of value for the purpose of extracting involuntary political activities. 84 CONG. REC. 9596-611 (1939). Although the impetus for the passage of Section 594 was Congress's concern over the use of threats of economic loss to induce political activity, the statute also applies to conduct which interferes, or attempts to interfere, with an individual's right to vote by placing him or her in fear of suffering other kinds of tangible and intangible losses. It thus criminalizes conduct intended to force prospective voters to vote against their preferences, or refrain from voting, through activity reasonably calculated to instill some form of fear.[27]

**(c) Coercion of political activity. 18 U.S.C. § 610**

Section 610 was enacted as part of the 1993 Hatch Act reform amendments to provide increased protection against political

[27] The civil counterparts to Section 594, 42 U.S.C. §§ 1971(b) and 1973i(b), may also be used to combat nonviolent voter intimidation. *See, e.g.*, *United States v. North Carolina Republican Party*, No. 91-161-Civ-5F (E.D.N.C., consent decree entered Feb. 27, 1992) (consent order entered against political organization for mailing postcards to thousands of minority voters that contained false voting information and a threat of prosecution).

manipulation of federal employees in the executive branch.[28] It prohibits intimidating or coercing a federal employee to induce or discourage "any political activity" by the employee. Violators are subject to imprisonment for up to three years. This statute is discussed in detail in Chapter Three, which addresses patronage crimes.

Although the class of persons covered by Section 610 is limited to federal employees, the conduct covered by this statute is broad: it reaches political activity that relates to any public office or election, whether federal, state, or local. The phrase "political activity" in Section 610 expressly includes, but is not limited to, "voting or refusing to vote for any candidate or measure," "making or refusing to make any political contribution," and "working or refusing to work on behalf of any candidate."

**(d) Conspiracy against rights and deprivation of constitutional rights. 18 U.S.C. § 241 and § 242**

Section 241 makes it a ten-year felony to "conspire to injure, oppress, threaten, or intimidate" any person in the free exercise of any right or privilege secured by the Constitution or laws of the United States" – including the right to vote. The statute, which is discussed in detail above, has potential application in two forms of voter intimidation: a conspiracy to prevent persons whom the subjects knew were qualified voters from entering or getting to the polls to vote in an election when a federal candidate is on the ballot, and a

---

[28] A similar statute addresses political intimidation within the military. 18 U.S.C. § 609. It prohibits officers of the United States Armed Forces from misusing military authority to coerce members of the military to vote for a federal, state, or local candidate. Violations are five-year felonies. In addition, 18 U.S.C. § 593 makes it a five-year felony for a member of the military to interfere with a voter in any general or special election, and 18 U.S.C. § 596 makes it a misdemeanor to poll members of the armed forces regarding candidate preferences.

conspiracy to misuse state authority to prevent qualified voters from voting for any candidate in any election.

Section 241 has been successfully used to prosecute intimidation in connection with political activities. *Wilkins v. United States*, 376 F.2d 552 (5th Cir. 1967) (*en banc*). *Wilkins* involved both violence and clear racial animus, and arose out of the shooting of a participant in the 1965 Selma-to-Montgomery voting rights march. The marchers had intended to present the Governor of Alabama with a petition for redress of grievances, including denial of their right to vote. The Fifth Circuit held that those marching to protest denial of their voting rights were exercising "an attribute of national citizenship, guaranteed by the United States," and that shooting one of the marchers therefore violated Section 241. *Id.* at 561.

Section 242 makes it a misdemeanor for any person to act "under color of any law, statute, ordinance, regulation, or custom," to willfully deprive any person in a state, territory, or district of a right guaranteed by the Constitution or federal law. For all practical purposes, this statute embodies the substantive offense for a Section 241 conspiracy, and it therefore can apply to voter intimidation.

It is the Criminal Division's position that Sections 241 and 242 may be used to prosecute schemes to intimidate voters in federal elections through threats of physical or economic duress, or to prevent otherwise lawfully qualified voters from getting to the polls in elections when a federal candidate is on the ballot. Examples of the latter include intentionally jamming telephone lines to disrupt a political party's get-out-the-vote or ride-to-the-polls efforts, and schemes to vandalize motor vehicles that a political faction or party intended to use to get voters to the polls.

### (e) Federally protected activities. 18 U.S.C. § 245(b)(1)(A)

The Civil Rights Act of 1968 contained a broad provision that addresses violence intended to intimidate voting in any election in this country. 18 U.S.C. § 245(b)(1)(A). This provision applies without regard to the presence of racial or ethnic factors.

Section 245(b)(1)(A) makes it illegal to use or threaten to use physical force to intimidate individuals from, among other things, "voting or qualifying to vote." It reaches threats to use physical force against a victim because the victim has exercised his or her franchise, or to prevent the victim from doing so. Violations are misdemeanors if no bodily injury results, ten-year felonies if there is bodily injury, and any term of years, life imprisonment, or death if death results.

Prosecutions under Section 245 require written authorization by the Attorney General, the Deputy Attorney General, the Associate Attorney General, or a specially designated Assistant Attorney General, who must certify that federal prosecution of the matter is "in the public interest and necessary to secure substantial justice." § 245(a)(1). This approval requirement was imposed in response to federalism issues that many Members of Congress believed were inherent in a statute giving the federal government prosecutive jurisdiction over what otherwise would be mere assault and battery cases. S. REP. NO. 90-721 (1967), *reprinted in* 1968 U.S.C.C.A.N. 1837-67. In making the required certification, the standard to be applied is whether the facts of the particular matter are such that the appropriate state law enforcement authorities should, but either cannot or will not, effectively enforce the applicable state law, thereby creating an overriding need for federal intervention. *Id.* at 1845-48.

### 6. Voter Suppression. 18 U.S.C. § 241 and § 242

Voter suppression schemes are designed to ensure the election of a favored candidate by blocking or impeding voters believed to oppose that candidate from getting to the polls to cast their ballots. Examples include providing false information to the public – or a particular segment of the public – regarding the qualifications to vote, the consequences of voting in connection with citizenship status, the dates or qualifications for absentee voting, the date of an election, the hours for voting, or the correct voting precinct. Another voter suppression scheme, attempted recently with partial success, involved impeding access to voting by jamming the telephone lines of entities offering rides to the polls in order to prevent voters from requesting needed transportation. This case was successfully prosecuted and is discussed below.

Currently there is no federal criminal statute that expressly prohibits this sort of voter suppression activity.[29] Nevertheless, the conspiracy against rights statute, 18 U.S.C. § 241, has been successfully used to prosecute conspiracies to destroy valid voter registrations, *United States v. Haynes*, 977 F.2d 583 (6th Cir. 1992) (table) (available at 1992 WL 296782), and to destroy ballots, *In re Coy,* 127 U.S. 731 (1888), *United States v. Townsley*, 843 F.2d 1070 (8th Cir. 1988). The Criminal Division believes that voter supression conspiracies, such as those described above, are the functional equivalent of the acts involved in these prosecutions, and that voter suppression conspiracies can – and should – be pursued under Section 241 where their objective is to deter voting in a federal election (thus depriving the victim voters of their federally guaranteed right to vote for federal candidates), or in any election when they involve "state action" in their execution (thus depriving the victim voters of their

---

[29] At the time this book was written, the Congress was considering legislation that would specifically criminalize providing false information to the public and other deceptive practices to suppress voting in a federal election.

rights to due process and equal protection as guaranteed by the Fourteenth Amendment). As noted above, the substantive crime for Section 241 conspiracies can be prosecuted under 18 U.S.C. § 242, deprivation of constitutional rights, where the voter suppression is carried out "under color of law."

This prosecutive theory was recently used in a high-profile case in New Hampshire. In *United States v. Tobin,* No. 04-216-01 (SM), 2005 WL 3199672 (D.N.H. Nov. 30, 2005), a senior political party official was charged with violating Section 241 and with telephone harassment offenses under 47 U.S.C. § 223 in connection with a scheme to jam telephone lines for ride-to-the-polls services offered by the opposing political party and the local fire department during the 2002 general elections. The object of the conspiracy was to impede certain voters from getting to the polls in order to influence what was perceived to have been a very close United States Senate contest. The defendant challenged the Section 241 charge, claiming that the statute had never been applied to a voter suppression scheme such as the one involved in that case and that application of Section 241 to the scheme would therefore deprive him of constitutionally required notice that his activities were proscribed. The district court disagreed and upheld the charge, stating:

> [T]he "fair warning" issue turns generally on whether a person of ordinary intelligence would know that the acts charged would violate constitutional rights. Or, with reference to the allegations in the superseding indictment, whether a person of ordinary intelligence would understand that participating in an agreement, or conspiracy, whose purpose is to prevent qualified persons from freely exercising their right to vote, would violate Section 241. Plainly, a reasonable person would understand that the right to vote is a right protected by the Constitution. He or she would also understand that knowingly joining in a conspiracy with the specific intent

> to impede or prevent qualified persons from exercising the right to vote is conduct punishable under Section 241.

*Id*. at *3.[30]

The Criminal Division believes that the prosecution of voter suppression schemes represents an important law enforcement priority, that such schemes should be aggressively investigated, and that, until Congress enacts a statute specifically criminalizing this type of conduct, 18 U.S.C. § 241 is the appropriate prosecutive tool by which to charge provable offenses.

**7. Fraudulent Registration or Voting. 42 U.S.C. § 1973gg-10(2)**

This provision was enacted as part of the National Voter Registration Act of 1993 (NVRA). As discussed above, Congress enacted the NVRA to ease voter registration requirements throughout the country. The major purpose of this legislation was to promote the exercise of the franchise by replacing diverse state voter registration requirements with uniform and more convenient registration options, such as registration by mail, when applying for a driver's license, and at various government agencies.

In addition, the NVRA sought to protect the integrity of the electoral process and the accuracy of the country's voter registration rolls. To further these goals, a new criminal statute was enacted that specifically addressed two common forms of electoral corruption: intimidation of voters (42 U.S.C. § 1973gg-10(1), discussed above), and fraudulent registration and voting (42 U.S.C. § 1973gg-10(2)). Violations are subject to imprisonment for up to five years.

---

[30] The defendant's convictions on the telephone harassment charges were reversed on appeal due to error in the jury instructions under § 223. *United States v. Tobin*, 480 F.3d 53 (1st Cir. 2007).

The NVRA's criminal statute resulted from law enforcement concerns expressed during congressional debates on the bill. Both opponents and supporters recognized that relaxing voter registration requirements was likely to increase election fraud by making it easier for the unscrupulous to pack voting rolls with fraudulent registrations, which would facilitate fraudulent ballots. Section 1973gg-10(2) thus criminalizes submitting voter registrations or ballots that contain materially false information with knowledge of the falsity. *See United States v. Prude*, 489 F.3d 873 (7th Cir. 2007) (affirming conviction of disenfranchised felon who voted after notice of her ineligibility).

The constitutional basis of the NVRA is Congress's broad power to regulate the election of federal officials. NVRA's criminal provision reflects this federal focus, and is limited to conduct that occurs "in any election for Federal office." While the phrasing of this jurisdictional element differs somewhat from the jurisdictional language used by Congress in earlier election fraud statutes, the Department believes that it was intended to achieve the same result.[31]

**(a) Fraudulent registration. § 1973gg-10(2)(A)**

Subsection 1973gg-10(2)(A) prohibits any person, in an election for federal office, from defrauding or attempting to defraud state residents of a fair and an impartially conducted election by procuring or submitting voter registration applications that the offender knows are materially false or defective under state law. The

[31] The earlier statutes, 42 U.S.C. §§ 1973i(c) and (e), contain express references to each federal office (Member of the House, Member of the Senate, President, Vice President, presidential elector) and type of election (primary, general, special) providing federal jurisdiction. The revised language seems to have been intended as a less cumbersome rephrasing of the required federal nexus.

scope of the statute is broader than that of the "false information" provision of Section 1973i(c), discussed above, which is limited to false information involving only name, address, or period of residence. The statute applies to any false information that is material to a registration decision by an election official. For this reason, the provision is likely to be the statute of preference for most false registration matters.

For schemes to submit fraudulent registration applications, the statute's "Federal Office" jurisdictional element is automatically satisfied, and hence does not present a problem. This is because registration to vote is unitary in all states, in the sense that in registering to vote an individual becomes eligible to vote in all elections, federal as well as nonfederal.

**(b) Fraudulent voting: § 1973gg-10(2)(B)**

Subsection 1973gg-10(2)(B) prohibits any person, in an election for federal office, from defrauding or attempting to defraud the residents of a state of a fair election through casting or tabulating ballots that the offender knows are materially false or fraudulent under state law. Unlike other ballot fraud laws discussed in this chapter, the focus of this provision is not on any single type of fraud, but rather on the result of the false information: that is, whether the ballot generated through the false information was defective and void under state law. Because of the conceptual breadth of this provision, it is a useful alternative to general fraud statutes in reaching certain forms of election corruption, particularly alien and felon voting.

However, the statute's jurisdictional element, "in any election for Federal office," substantially restricts its usefulness for fraudulent voting (as opposed to fraudulent registration) schemes as it applies only to elections that include a federal candidate. Thus, its scope is similar to that of 42 U.S.C. §§ 1973i(c) and (e), and arises from the fact that fraudulent activity aimed at any race in a mixed election has the potential to taint the integrity of the federal race.

### 8. Voting by Noncitizens

Federal law does not expressly require that persons be United States citizens to vote. Moreover, eligibility to vote is a matter that the Constitution leaves primarily to the states.[32] At the time this book was written, all states required that prospective voters be United States citizens.

Historically, the states have regulated both the administrative and substantive facets of the election process, including how one registers to vote and who is eligible to do so. Federal requirements, on the other hand, generally have focused on specific federal interests, such as protecting the integrity of the federal elective process and the exercise of fundamental rights to which constitutional protection has been expressly granted.[33]

Federal laws do, however, have quite a bit to say about citizenship and voting. Specifically, in 1993 the federal role in the election process expanded significantly with the enactment of the National Voter Registration Act (NVRA). This legislation required, among other things, that forms used to register persons to vote in federal elections clearly state "each eligibility requirement (including citizenship)" and that persons registering to vote in federal elections affirm that they meet "each eligibility requirement (including

---

[32] U.S. CONST. art. I, § 2 and amend. XVII (electors for Members of the United States House of Representatives and the United States Senate have the qualifications for electors of the most numerous branch of the state legislatures); art. II, § 1, cl. 2 (presidential electors chosen as directed by state legislatures).

[33] For example, the states are prohibited from depriving "citizens of the United States" of the franchise on account of any of the following factors: race (amend. XV), gender (amend. XIX), nonpayment of poll tax (amend. XXIV), age 18 or older (amend. XXVI and 42 U.S.C. § 1973bb), residency after 30 days (42 U.S.C. § 1973aa-1), or overseas residence (42 U.S.C. § 1973ff-1).

citizenship)." 42 U.S.C. §§ 1973gg-3(c)(2)(C), 1973gg-5(a)(6)(A)(i), 1973gg-7(b)(2). Nine years later, Congress passed the Help America Vote Act of 2002, which reemphasized these requirements in the case of voters who register to vote via mail by requiring the states to place a citizenship question on mailed registration forms. 42 U.S.C. § 15483(b)(4)(A)(i).

In addition to these federal requirements relating to voter registration, registering to vote and voting by noncitizens are covered by four separate federal criminal laws:

**(a) Fraudulent registration and voting under the NVRA. 42 U.S.C. § 1973gg-10(2)**

The NVRA enacted a new criminal statute that reaches the knowing and willful submission to election authorities of false information that is material under state law. 42 U.S.C. § 1973gg-10(2). Because all states currently make citizenship a prerequisite for voting, statements by prospective voters concerning citizenship status are automatically "material" within the meaning of this statute. Therefore, any false statement concerning an applicant's citizenship status that is made on a registration form submitted to election authorities can involve a violation of this statute. Such violations are felonies subject to imprisonment for up to five years.

For jurisdictional purposes, the statute requires that the fraud be "in any election for Federal office." As discussed above, voter registration in every state is unitary in the sense that an individual registers to vote only once for all elective offices – local, state, and federal. Thus the jurisdictional element of Section 1973gg-10(2) is satisfied whenever a false statement concerning citizenship status is made on a voter registration form.

The use of the word "willful" suggests Section 1973gg-10(2) may be a specific intent offense. This means federal prosecutors may have to prove that the offender was aware that citizenship is a

requirement for voting, and that the registrant did not possess United States citizenship. In most instances, proof of the first element is relatively easy because, since 1993 when the NVRA was enacted, the citizenship requirement must be stated on the voter registration form, and the form requires that the voter check a box indicating that he or she is a citizen.

**(b) False claims to register or vote. 18 U.S.C. § 1015(f)**

Section 1015(f) was enacted in 1996 to provide an additional criminal prohibition addressing the participation of noncitizens in the voting process. This statute makes it an offense for an individual to make a false statement or claim that he or she is a citizen of the United States in order to register or to vote. Unlike all other statutes addressing alien voting, Section 1015(f) expressly applies to all elections – federal, state, and local – as well as to initiatives, recalls, and referenda.

Jurisdictionally, Section 1015(f) rests on Congress's power over nationality (U.S. CONST. art. I, § 8, cl. 4) rather than on the Election Clause (U.S. CONST. art. I, § 4, cl. 1), which provides the basis for its broad reach.

Violations of Section 1015(f) are felonies, punishable by imprisonment for up to five years.

**(c) False claims of citizenship. 18 U.S.C. § 911**

Section 911 prohibits the knowing and willful false assertion of United States citizenship by a noncitizen. *See, e.g.*, *United States v. Franklin*, 188 F.2d 182 (7th Cir. 1951); *Fotie v. United States*, 137 F.2d 831 (8th Cir. 1943). Violations of Section 911 are punishable by up to three years of imprisonment.

As noted, all states require United States citizenship as a prerequisite for voting. Historically, however, some states have not

implemented the prerequisite through voter registration forms that clearly alerted prospective registrants that only citizens may vote. Under the NVRA, all states must now make this citizenship requirement clear, and prospective registrants must sign applications under penalty of perjury attesting that they meet this requirement. Therefore, falsely attesting to citizenship in any state is now more likely to be demonstrably willful, and therefore cognizable under Section 911.

Section 911 requires proof that the offender was aware he was not a United States citizen, and that he was falsely claiming to be a citizen. Violations of Section 911 are felonies, punishable by up to three years of imprisonment.

**(d) Voting by aliens. 18 U.S.C. § 611**

Section 611 is a relatively new statute that creates an additional crime for voting by persons who are not United States citizens. It applies to voting by noncitizens in an election when a federal candidate is on the ballot, except when noncitizens are authorized to vote by state or local law for nonfederal candidates or issues, and the ballot is formatted in a way that the noncitizen has the opportunity to vote solely for these nonfederal candidates or issues. Unlike Section 1015(f), Section 611 is directed at the act of voting, rather than the act of lying.

Also unlike Section 1015(f), Section 611 states a general intent offense, i.e., the offender must have known that he or she was not a citizen and that the act he or she performed was an act of voting. However, it is not necessary to prove that the offender knew that voting by noncitizens was illegal. As thus interpreted, Section 611 has been held to conform to constitutional standards. *United States v. Knight*, ___ F.3d ___, 2007 WL 1892861 (11th Cir. July 3, 2007).

Violations of Section 611 are misdemeanors, punishable by up to one year of imprisonment.

**9. Travel Act. 18 U.S.C. § 1952**

The Travel Act, 18 U.S.C. § 1952, prohibits interstate travel, the interstate use of any other facility (such as a telephone), and any use of the mails to further specified "unlawful activity," including bribery in violation of state or federal law. Violations are punishable by imprisonment for up to five years. This statute is useful in election crime matters because it applies to vote-buying offenses that occur in states where vote buying is a "bribery" offense, regardless of the type of election involved.

The predicate bribery under state law need not be common law bribery. The Travel Act applies as long as the conduct is classified as a "bribery" offense under applicable state law. *Perrin v. United States*, 444 U.S. 37 (1979). In addition, the Travel Act has been held to incorporate state crimes regardless of whether they are classified as felonies or misdemeanors. *United States v. Polizzi*, 500 F.2d 856, 873 (9th Cir. 1974); *United States v. Karigiannis*, 430 F.2d 148, 150 (7th Cir. 1970).

The first task in determining whether the Travel Act has potential application to a vote-buying scheme is to examine the law of the state where the vote-buying occurred to determine if it either: (1) is classified as a bribery offense, or (2) describes the offense of paying voters for voting in a way that requires proof of a *quid pro quo*, i.e., that a voter be paid in consideration for his or her vote for one or more candidates. If the state offense meets either of these criteria, the Travel Act potentially applies.

In the past, Travel Act prosecutions have customarily rested on predicate acts of interstate travel or the use of interstate facilities. Since election fraud is a local crime, interstate predicate acts are rarely present, and the Travel Act has not been used to prosecute election crime. However, in *United States v. Riccardelli*, 794 F.2d 829 (2d Cir. 1986), the Second Circuit held that the Act's mail predicate was satisfied by proof of an intrastate mailing.

In reaching this conclusion, the court conducted an exhaustive analysis of the Travel Act's legislative history and Congress's authority to regulate the mails. The Sixth Circuit subsequently reached a contrary result, holding that the Travel Act's mail predicate required an interstate mailing. *United States v. Barry*, 888 F.2d 1092 (6th Cir. 1989). In 1990 Congress resolved this conflict by adopting the *Riccardelli* holding in an amendment to the Travel Act, expressly extending federal jurisdiction to any use of the mails in furtherance of a state predicate offense.

Thus, the Travel Act should be considered as a vehicle to prosecute vote-buying schemes in which the mails were used in those states where vote buying is statutorily defined as bribery. This theory is one of the few available that do not require a federal candidate on the ballot.

As with the mail fraud statute, each use of the mails in furtherance of the bribery scheme is a separate offense. *United States v. Jabara*, 644 F.2d 574 (6th Cir. 1981). The defendant need not actually have done the mailing, so long as it was a reasonably foreseeable consequence of his or her activities. *United States v. Kelley*, 395 F.2d 727 (2d Cir.1968). Nor need the mailing have in itself constituted the illegal activity, as long as it promoted it in some way. *United States v. Bagnariol*, 665 F.2d 877 (9th Cir. 1981); *United States v. Barbieri*, 614 F.2d 715 (10th Cir. 1980); *United States v. Peskin*, 527 F.2d 71 (7th Cir. 1975); *United States v. Wechsler*, 392 F.2d 344 (4th Cir. 1968).

An unusual feature of the Travel Act is that it requires an overt act subsequent to the jurisdictional event charged in the indictment. Thus, if a Travel Act charge is predicated on a use of the mails, the government must allege and prove that the defendant subsequently acted to further the underlying unlawful activity. The subsequent overt act need not be unlawful in itself; this element has been generally held to be satisfied by the commission of a legal act as

long as the act facilitated the unlawful activity. *See, e.g.*, *United States v. Davis*, 780 F.2d 838 (10th Cir. 1985).

The Travel Act is particularly useful in voter bribery cases in nonfederal elections that involve the mailing of absentee ballot materials. Such matters usually involve a defendant who offers voters compensation for voting, followed by the voter applying for, obtaining, and ultimately casting an absentee ballot. Each voting transaction can involve as many as four separate mailings: (1) when the absentee ballot application is sent to the voter, (2) when the completed application is sent to the local election board, (3) when the absentee ballot is sent to the voter, and (4) when the voter sends the completed ballot back to the election authority for tabulation.

Because the mailing must be in furtherance of the scheme, therefore, care should be taken to ensure that the voting transaction in question was corrupted by a bribe before the mailing that is charged. If, for example, the voter was not led to believe that he or she would be paid for voting until after applying for, and receiving, an absentee ballot package, then the only mailing affected by bribery would be the transmission of the ballot package to the election authority; the Travel Act charge is best predicated on this final mailing, with some other subsequent overt act charged.

### 10. Mail Fraud. 18 U.S.C. § 1341

The federal mail fraud statute prohibits use of the United States mails, or a private or commercial interstate carrier, to further a "scheme or artifice to defraud." 18 U.S.C. § 1341.[34] Violations are punishable by imprisonment for up to twenty years.

---

[34] The federal wire fraud statute, 18 U.S.C. § 1343, is essentially identical to the mail fraud statute, except for its jurisdictional element, and, accordingly has potential application to election fraud schemes that are furthered by interstate wires.

At present, the most viable means of addressing election crime under the mail fraud statute is the "salary theory," which, as will be discussed below, has received only limited – and in a recent case hostile – treatment by the courts. Under this approach, the pecuniary benefits of elective office are charged as the object of the scheme.

**(a) Background**

Until *McNally v. United States*, 483 U.S. 350 (1987), the mail fraud statute was frequently and successfully used to attain federal jurisdiction over schemes to corrupt local elections. Because its jurisdictional basis is the broad power of Congress to regulate the mails, Section 1341 was used to address corruption of the voting process in purely local or state elections. *See Badders v. United States*, 240 U.S. 391, 392 (1916) (the overt act of putting a letter in a United States post office is a matter Congress may regulate).

Courts had broadly interpreted the "scheme or artifice to defraud" element of Section 1341 to include nearly any effort to procure, cast, or tabulate ballots illegally under state law. The theory was that citizens were entitled to fair and honest elections, and a scheme to corrupt an election defrauded them of this right. *United States v. Girdner*, 754 F.2d 877, 880 (10th Cir. 1985) (scheme to cast votes for ineligible voters); *United States v. Clapps*, 732 F.2d 1148, 1152-53 (3d Cir. 1984) (scheme to usurp absentee ballots of elderly voters); *United States v. States*, 488 F.2d 761, 766 (8th Cir. 1973) (scheme to submit fraudulent absentee ballots). The mail fraud statute was even held to reach schemes to deprive the public of information required under state campaign finance disclosure statutes. *United States v. Buckley*, 689 F.2d 893, 897-98 (9th Cir. 1982); *United States v. Curry*, 681 F.2d 406, 411 (5th Cir. 1982).

The jurisdictional mailing element of Section 1341, moreover, usually posed no substantial obstacle in election fraud cases. The Second Circuit may have adopted the most expansive position,

holding in an unpublished opinion that the mail fraud statute applied to any fraudulent election practice resulting in postal delivery of a certificate of election to the winning candidate. *United States v. Ingber*, Cr. No. 86-1402 (2d Cir. Feb. 4, 1987) (unpublished), *quoted in Ingber v. Enzor*, 664 F. Supp. 814, 815-16 (S.D.N.Y. 1987) (*habeas* opinion). As most states mail such notices to victorious candidates, this theory would have allowed federal jurisdiction over election fraud by victorious politicians, both federal and nonfederal.

However, in *McNally*, the Supreme Court substantially restricted the utility of the mail fraud statute to combat election crimes. *McNally* held that "scheme to defraud" does not encompass schemes to deprive the public of intangible rights, such as the rights to good government and fair elections, but is limited to schemes to deprive others of property rights.

In 1988, Congress enacted 18 U.S.C. § 1346 in response to the *McNally* decision. Unfortunately, by its express terms, Section 1346 only applies to schemes to deprive another of the "intangible right of honest services," a concept that does not easily fit schemes to defraud the public of a fair election or of information required to be disclosed under federal or state campaign financing laws.

However, even a narrow definition of honest services fraud does not entirely foreclose use of the mail fraud statute to address election fraud. If a pecuniary interest – such as money or salary – is sought through the scheme, the mail fraud statute still applies. *See McNally*, 483 U.S. at 360 (noting that the jury was not charged on a money or property theory).

**(b) Salary theory of mail fraud**

Schemes to obtain salaried positions by falsely representing one's credentials to a hiring authority remain prosecutable under the mail fraud statute after *McNally*. The objective of such "salary schemes" is to obtain pecuniary items by fraud; such schemes are

therefore clearly within the scope of the common law concepts of fraud to which *McNally* sought to restrict the mail fraud statute. *See United States v. Granberry*, 908 F.2d 278, 280 (8th Cir. 1990) (scheme to obtain employment by falsifying application); *United States v. Doherty*, 867 F.2d 47, 54-57 (1st Cir. 1989) (scheme to rig police promotion exam); *United States v. Walters*, 711 F. Supp. 1435, 1442-46 (N.D. Ill. 1989) (scheme to obtain scholarships through false information), *rev'd on other grounds*, 913 F.2d 388 (7th Cir. 1990); *United States v. Ferrara*, 701 F. Supp. 39 (E.D.N.Y. 1988) (scheme to obtain hospital salaries by falsifying medical training), *aff'd*, 868 F.2d 1268 (2d Cir. 1988); *United States v. Thomas*, 686 F. Supp. 1078, 1083-85 (M.D. Pa. 1988) (scheme to rig police entrance exam), *aff'd*, 866 F.2d 1414 (3d Cir. 1988) (table); *United States v. Cooper*, 677 F. Supp. 778, 781-82 (D. Del. 1988) (wire fraud scheme to obtain pay for person not performing work).[35]

This theory of post-*McNally* mail fraud has potential application to some election fraud schemes, since most elected offices in the United States carry with them a salary and various emoluments that have monetary value. The criterion by which candidates for elected positions are selected by the public is who obtained the most valid votes. Thus, schemes to obtain salaried elected positions through procuring and tabulating invalid ballots may be capable of being charged as traditional common law frauds: i.e., schemes to obtain the salary of the office in question by concealing from the

---

[35] Another district court has upheld application of Section 1341 to a commercial bribery scheme to pay salary to a dishonest procurement officer. *United States v. Johns*, 742 F. Supp. 196, 204-06, 212-13 (E.D. Pa. 1990) (collecting cases in an extended discussion of the salary theory). The Third Circuit, however, reversed *Johns*'s mail fraud convictions with a cursory, unpublished order that held, enigmatically, that the "convictions for mail fraud must be reversed inasmuch as the evidence was insufficient, as a matter of law, to establish that appellant had defrauded his employer of money paid to him as salary." *United States v. Johns*, 972 F.2d 1333 (3d Cir. 1991) (table) (available at 1991 U.S. App. LEXIS 18586).

public authority responsible for counting votes and certifying winners material facts about the critical issue of which candidate received the most valid votes.

In addition, election fraud schemes can present related issues concerning the quality and value of the public officer hired thereby. The Supreme Court observed in *McNally* that deceit concerning the quality and value of a commodity or service remains within the scope of the mail fraud statute:

> We note that as the action comes to us, there was no charge and that the jury was not required to find that the Commonwealth itself was defrauded of any money or property. It was not charged that in the absence of the alleged scheme the Commonwealth would have paid a lower premium or secured better insurance.

*McNally*, 483 U.S. at 360 (emphasis added). Election fraud schemes involve an aspect of material concealment insofar as the "value" of the services the public is paying for are concerned: the public "hired" the candidate because it was falsely led to believe this candidate received the most valid votes, and consequently received services from a qualified individual that were thus of lower value.

The "salary theory" of post-*McNally* mail fraud has been applied to election frauds in only a few cases to date, and with mixed results. *Compare United States v. Walker*, 97 F.3d 253 (8th Cir. 1996) (mail fraud convictions affirmed under both salary theory and intangible right to honest services theory arising from scheme to secretly finance local candidate, when issue of applicability of salary theory not challenged), *United States v. Schermerhorn*, 713 F. Supp. 88 (S.D.N.Y. 1989) (scheme to conceal that state senate candidate was being financed by organized crime in violation of state campaign financing laws held actionable under the salary theory), *aff'd*, 906

F.2d 66 (2d Cir. 1990), *Ingber v. Enzor*, 841 F.2d 450 (2d Cir. 1988) (post-*McNally habeas* relief appropriate for pre-*McNally* mail fraud defendant convicted of securing election to salaried township position through illegal ballots, when the reviewing court could not determine whether jury's verdict rested on salary theory or on alternative intangible rights theory), *and United States v. Webb*, 689 F. Supp. 703 (W.D. Ky. 1988) (tax dollars paid to a public official elected by fraud are a loss to the citizens, who did not receive the benefit of the bargain), *with United States v. Ratcliff,* (salary theory of mail fraud held inapplicable to election fraud schemes), 488 F.3d 639 (5th Cir. 2007*), United States v. Turner*, 459 F. 3d 775 (6th Cir. 2006) (same), *and United States v. George*, No. CR86-0123, 1987 WL 48848 (W.D. Ky. 1987) (same).

**(c) "Honest services" fraud. 18 U.S.C. § 1346**

As summarized above, prior to *McNally* nearly all the circuits had held that a scheme to defraud the public of a fair and impartial election was one of the "intangible rights" schemes covered by the mail and wire fraud statutes. *McNally* repudiated this theory in an opinion that not only rejected the intangible rights theory of mail and wire fraud, but did so by citing several election fraud cases as examples of the kinds of fraud the Court found outside these criminal laws.

The following year, Congress responded to *McNally* by enacting 18 U.S.C. § 1346, which defined "scheme or artifice to defraud" to include "the intangible right of honest services." However, this language did not clearly restore the use of these statutes to election frauds. This is because Section 1346 encompasses only schemes to deprive a victim of the intangible right of "honest services," and most voter fraud schemes do not appear to involve

such an objective.[36] Moreover, jurisprudence in the arena of public corruption has generally confined Section 1346 to schemes involving traditional forms of corruption that involve a clear breach of the fiduciary duty of "honest services" owed by a public official to the body politic, e.g., bribery, extortion, embezzlement, theft, conflicts of interest, and, in some instances, gratuities. *See, e.g.*, *United States v. Panarella*, 277 F.3d 678 (3d Cir. 2002); *United States v. Sawyer*, 329 F.3d 31 (1st Cir. 2001); *United States v. Bloom*, 149 F.3d 649 (7th Cir. 1998); *United States v. Brumley*, 116 F.3d 728 (5th Cir. 1997) (*en banc*). *See also United States v. Grubb*, 11 F.3d 426 (4th Cir. 1993) (upholding multi-count convictions of a state judge, including honest services mail fraud, arising from a scheme to extort $10,000 donation from a candidate); *United States v. D'Alessio*, 822 F.Supp. 1134 (D.N.J. 1993) (dismissing indictment due to ambiguity regarding applicability of local gift rule but recognizing candidate's duty of honesty to contributors and the public). Federal prosecutors should consult the Public Integrity Section before using Section 1346 in the context of election fraud.

The application of the "honest services" theory of mail and wire fraud to election fraud schemes was expressly rejected by the Sixth Circuit in *United States v. Turner*, 459 F.3d 775 (6th Cir. 2006).

**(d) "Cost-of-election" theory. 18 U.S.C. § 1341**

One case, *United States v. DeFries*, 43 F.3d 707 (D.C. Cir. 1995), has held that a scheme to cast fraudulent ballots in a labor union election, which had the effect of tainting the entire election, was a scheme to defraud the election authority charged with running the election of the costs involved.

---

[36] An exception is frauds involving corrupt election officials, which deprive the body politic of their "honest services."

*DeFries* was not a traditional election fraud prosecution. Rather, it involved corruption of a union election when supporters of one candidate for union office cast fraudulent ballots for that candidate. When the scheme was uncovered, the United States Department of Labor ordered that a new election be held, thereby causing the union to incur an actual pecuniary loss. The D.C. Circuit held that the relationship between that pecuniary loss and the voter fraud scheme was sufficient to satisfy the requirements of *McNally*.

This theory of prosecution has potential validity primarily when the mail and wire fraud statutes are needed to federalize voter frauds involving the counting of illegal ballots in nonfederal elections, particularly when the fraud has led to a successful election contest and the election authority has been ordered to hold a new election, thereby incurring additional costs.

**11. Troops at Polls. 18 U.S.C. § 592**

This statute makes it unlawful for anyone in the military or federal civil service to station troops or "armed men" at the polls in a general or special election (but not a primary), except when necessary "to repel armed enemies of the United States." Violations are punishable by imprisonment for up to five years and disqualification from any federal office.

Section 592 prohibits the use of official authority to order armed personnel to the polls; it does not reach the troops who respond to those orders. The effect of this statute is to prohibit FBI Special Agents from conducting investigations within the polls on election day, and Deputy U.S. Marshals from being stationed at open polls, as both are required to carry their weapons while on duty.

This statute applies only to agents of the United States Government. It does not prohibit state or local law enforcement agencies from sending police officers to quell disturbances at polling

places, nor does it preempt state laws that require police officers to be stationed in polling places.

### 12. Campaign Dirty Tricks

Two federal statutes, both of which are part of the Federal Election Campaign Act (FECA), specifically address campaign tactics and practices: 2 U.S.C. §§ 441d and 441h. As is the case with all other FECA provisions, violations of these two statutes are subject to both civil and criminal penalties, 2 U.S.C. §§ 437g(a) and 437g(d) respectively. These penalties will be discussed in Chapter Five.

#### (a) Election communications and solicitations. 2 U.S.C. § 441d

Section 441d provides that whenever a person or political committee makes certain types of election-related disbursements, an expenditure for the purpose of financing a public communication advocating the election or defeat of a clearly identified federal candidate, or a solicitation for the purpose of influencing the election of a federal candidate, the communication must contain an attribution clause identifying the candidate, committee, or person who authorized and/or paid for the communication. The content of the attribution, as well as its size and location in the advertisement are described in the statute.

This Section has potential application to unattributed false, inflammatory, or scurrilous campaign literature that calls for the election or defeat of a federal candidate.

#### (b) Fraudulent misrepresentation. 2 U.S.C. § 441h

Section 441h prohibits fraudulently representing one's authority to speak for a federal candidate or political party. As a

result of the 2002 Bipartisan Campaign Reform Act (BCRA), the provision contains two specific prohibitions:

- Section 441h(a) forbids a federal candidate or an agent of a federal candidate from misrepresenting his or her authority to speak, write, or otherwise act for any other federal candidate or political party in a matter which is damaging to that other candidate or political party. For example, Section 441h(a) would prohibit an agent of federal candidate A from issuing a statement that was purportedly written by federal candidate B and which concerned a matter which was damaging to candidate B.

- Section 441h(b) forbids any person from fraudulently representing his or her authority to solicit contributions on behalf of a federal candidate or political party. This provision was added by BCRA and became effective on November 6, 2002. For example, this provision would prohibit any person from raising money by claiming that he or she represented federal candidate A when in fact the person had no such authority.

### 13. Retention of Federal Election Records. 42 U.S.C. § 1974

The detection, investigation, and proof of election crimes – and in many instances Voting Rights Act violations – often depend on documentation generated during the voter registration, voting, tabulation, and election certification processes. In recognition of this fact, and the length of time it can take for credible evidence suggesting election fraud or voting rights violations to develop, Congress enacted Section 1974 to require that documentation generated in connection with the voting and registration process be

retained for twenty-two months if it pertained to an election that included a federal candidate. Absent this statute, the disposition of election documentation would be subject solely to state law, which in virtually all states permits its destruction within a few months after the election is certified.

Section 1974 provides for criminal misdemeanor penalties for any election officer who willfully fails to retain records covered by the statute. Section 1974a provides similar criminal penalties for election officers or other persons who willfully steal, destroy, or alter covered records.[37] In addition to these criminal penalties, the reach of this statute to specific categories of election documentation is critical to both prosecutors and election administrators, who must often resolve election disputes and answer challenges to the fairness of elections.[38]

For this reason, a detailed discussion of Section 1974 and its application to particular types of election documentation generated in the current age of electronic voting will be presented here.

### (a) Legislative purpose and background

The voting process generates voluminous documents and records, ranging from voter registration forms and absentee ballot applications to ballots and tally reports. If election fraud occurs, these records often play an important role in the detection and prosecution of the crime. Documentation generated by the election process also

---

[37] Election administrators, document custodians, or other persons who willfully violate Section 1974 or Section 1974a are subject to imprisonment for up to one year.

[38] Indeed, the federal courts have recognized that the purpose of this federal document retention requirement is to protect the right to vote by facilitating the investigation of illegal election practices. *Kennedy v. Lynd*, 306 F.2d 222 (5th Cir. 1962).

plays an equally important role in the detection, investigation, and prosecution of federal civil rights violations.

State laws generally require that voting documents be retained for sixty to ninety days. Those relatively brief periods are usually insufficient to make certain that voting records will be preserved until more subtle forms of federal civil rights abuses and election crimes have been detected.

In 1960, Congress enacted a federal requirement that extended the document retention period for elections when federal candidates were on the ballot to *twenty-two months* after the election. Pub. L. 86-449, Title III, § 301, 74 Stat. 88; 42 U.S.C. §§ 1974-1974e. As noted above, this documentation retention requirement is backed-up with criminal misdemeanor penalties that apply to election officers or other persons who willfully destroy covered election records before the expiration of the federal retention period.

The retention requirements of Section 1974 are aimed specifically at election administrators. In a parochial sense, these laws place criminally sanctionable duties on election officials. However, in a broader sense, this federal retention law assists election administrators in performing the tasks of managing elections and determining winners of elective contests. It does this by requiring election managers to focus appropriate attention on the types of election records under their supervision and control that may be needed to resolve challenges to the election process, and by requiring that they take appropriate steps to ensure that those records will be preserved intact until such time as they may become needed to resolve legitimate questions that frequently arise involving the election process.

**(b) The basic requirements of Section 1974**

Section 1974 requires that election administrators preserve for twenty-two months "all records and papers" that come into their

possession relating to any "application, registration, payment of poll tax, or other act requisite to voting." This retention requirement applies to all elections in which a candidate for federal office was on the ballot, that is, a candidate for the United States Senate, the United States House of Representatives, President or Vice President of the United States, or presidential elector. Retention and disposition of records in elections with no federal candidate on the ballot are governed by state law. Section 1974 does not apply to records generated in connection with purely local or state elections.

However, Section 1974 does apply to all records generated in connection with the process of registering voters and maintaining current electoral rolls. This is because voter registration in virtually all United States jurisdictions is "unitary" in the sense that a potential voter registers only once to become eligible to vote for both local and federal candidates. *See United States v. Cianciulli*, 482 F.Supp. 585 (E.D. Pa. 1979). Thus, registration records must be preserved as long as the voter registration to which they pertain is considered an "active" one under local law and practice, and those records cannot be disposed of until the expiration of twenty-two months following the date on which the registration ceased to be "active."

This statute must be interpreted in keeping with its congressional objective: under Section 1974, all documents and records that may be relevant to the detection or prosecution of federal civil rights or election crimes must be maintained if the documents or records were generated in connection with an election that included one or more federal candidates.

#### (c) Section 1974 requires document preservation, not document generation

Section 1974 does *not* require that states or localities produce records in the course of their election processes. However, if a state or locality chooses to create a record that pertains to voting, this

statute requires that record be retained if it relates to voting in an election covered by the statute.

**(d) Originals must be retained**

Section 1974 further requires that the original documents be retained, even in those jurisdictions that have the capability to reduce original records to digitized replicas. This is because handwriting analysis may be difficult to perform on digitized reproductions of signatures, and because the legislative purpose advanced by this statute is to preserve election records for their evidentiary value in criminal and civil rights lawsuits. Therefore, in states and localities that employ new digitization technology to archive election forms that were originally manually subscribed by voters, Section 1974 requires that the originals be maintained for the requisite twenty-two month period.

**(e) Election officials must supervise storage**

Section 1974 requires that covered election documentation be retained either physically by election officials themselves, or under their direct administrative supervision. This is because the document retention requirements of this federal law place the retention and safekeeping duties squarely on the shoulders of election officers, and Section 1974 does not contemplate that this responsibility be shifted to other government agencies or officers.

An electoral jurisdiction may validly determine that election records subject to Section 1974 would most efficiently be kept under the physical supervision of government officers other than election officers (e.g., motor vehicle departments and social service administrators). This is particularly likely to occur following the enactment in 1993 of the National Voter Registration Act, which for the first time in many states authorizes government agencies other than election offices to play a substantive role in the voter registration process.

If an electoral jurisdiction makes such a determination, Section 1974 requires that administrative procedures be in place giving election officers ultimate management authority over the retention and security of those election records. Those administrative procedures should ensure that election officers retain ultimate responsibility for the retention and security of covered election records, that they also retain the right to physically access and dispose of them, and that the terms and conditions of storage conform to the retention requirements of the statute.

**(f) Retention not required for certain records**

Documentation generated in the course of elections held *solely* for local or state candidates, for bond issues, initiatives, referenda and the like, is not covered by Section 1974 and may be disposed of within the usually shorter time periods provided under state election laws. However, if there is a federal candidate on the ballot in the election, the federal retention requirement of twenty-two months applies.

**(g) Retention under Section 1974 versus retention under the National Voter Registration Act**

The retention requirements of Section 1974 interface significantly with somewhat similar retention requirements of the National Voter Registration Act, 42 U.S.C. § 1973gg-6(i). However, there are four major differences between these two provisions:

- Section 1974 applies to all records generated by the election process, while Section 1973gg-6(i) applies only to registration records generated under the NVRA.

- Section 1974's retention period is twenty-two months while Section 1973gg-6(i)'s retention period is two years.

- Section 1973gg-6(i) requires that, with certain exceptions, covered records also must be made available to the public for inspection for two years.

- Violations of Section 1974 are subject to criminal sanctions, while violations of Section 1973gg-6(i) are subject only to noncriminal remedies.

## E. POLICY AND PROCEDURAL CONSIDERATIONS

Election-related allegations range from minor infractions, such as campaigning too close to the polls, to sophisticated criminal enterprises aimed at ensuring the election of corrupt public officials. Such matters present obvious and wide disparities in their adverse social consequences. As the Department has long strived to achieve a nationally consistent response to electoral fraud, it is important that federal investigators and prosecutors avail themselves of the expertise and institutional knowledge that the Public Integrity Section possesses in this sensitive area of law enforcement.

### 1. Consultation Requirements

The Department of Justice has a long-standing consultation policy for election crime investigations involving violations of the statutes discussed in this chapter. The policy is set forth in Section 9-85.210 of the U.S. DEP'T OF JUSTICE, UNITED STATES ATTORNEYS' MANUAL (USAM). The purposes of the consultation policy are to assist federal prosecutors and investigators in determining whether there is a sufficient factual legal basis to commence a federal criminal investigation, and, if so, to ensure that the investigation is timed in a manner that does not interfere with the adjudication of the election itself.

Upon receipt of an election fraud allegation, a United States Attorney's Office may, if the Office considers it warranted, request

the FBI to conduct a preliminary investigation. Consultation with the Public Integrity Section is not required at this initial stage, although it is always welcome.

If the results of the preliminary investigation[39] suggest that further investigation is warranted, the United States Attorney's Office should contact the Public Integrity Section. Specifically, consultation with the Section, and with higher-level Department officials in the event agreement is not reached is required for all grand jury and "full-field" investigations[40] of election fraud. Consultation with Public Integrity is also required prior to filing any complaint or information, or prior to requesting a grand jury to act upon a proposed indictment, that charges any of the election fraud offenses discussed in this chapter.

In practice, consultation typically proceeds as follows:

- The results of the preliminary investigation are submitted to FBI Headquarters and the Public Integrity Section, together with the recommendation of the United States Attorney's Office as to whether further

---

[39] For purposes of election crime matters, a "preliminary investigation" includes those investigative steps necessary to flesh out the complaint in order to determine whether a federal crime may have occurred, and, if so, whether federal prosecution of that offense is appropriate. It generally involves an FBI interview of the complainant and follow-up on investigative leads arising from the interview. *See*, in this connection, the FBI's Manual of Investigative Operations and Guidelines, § 56-9.2.

[40] In connection with election crime matters, a "full-field" FBI investigation is, essentially, anything beyond a preliminary investigation. It is typically a broad-based investigation that often accompanies a grand jury investigation. Its purpose is to develop sufficient evidence of federal crimes to support federal charges.

investigation is warranted. At this point, if the matter has merit, it is discussed informally between the Section and the Assistant United States Attorney responsible for the matter, and, on occasion, between the Section and the FBI.

- The Public Integrity Section may suggest that additional investigation be conducted before determining whether a full-field or grand jury investigation is warranted. The Section may also request a preliminary investigation of a matter that has been declined by a United States Attorney's Office.

- If the Public Integrity Section agrees that a full-field investigation and/or grand jury investigation of an election fraud allegation is warranted, a communication, in the form of an e-mail confirming this determination, is generally sent by the Section to the Assistant United States Attorney. At this stage, the Public Integrity Section also notifies FBI Headquarters that it has approved the initiation of a full-field or grand jury investigation of the matter. There is usually a discussion at this point of whether the United States Attorney's Office is able to make a commitment to prosecute any case that the investigation may generate, and, if not, whether the Public Integrity Section will handle the matter either jointly with the United States Attorney's Office or by itself.

- The initiation of any grand jury process in the matter, including the issuance of subpoenas for election documentation, requires prior consultation with the Public Integrity Section. This consultation is often done by phone, especially if speed is considered necessary to preserve voting documentation. As a rule,

the Public Integrity Section will approve use of a grand jury at the time it approves a full-field investigation.

- Once this consultation has occurred, the United States Attorney's Office investigates the matter as it deems appropriate. While further consultation is not required until the charging stage, the Section welcomes questions and consultations regarding ongoing investigations.

- All indictments charging election fraud must be discussed with the Public Integrity Section before submission to the grand jury, as well as all informations and criminal complaints.

- While acceptance of a plea agreement does not require consultation, this is encouraged in order to ensure that the plea agreement is consistent with those negotiated in similar cases elsewhere and with other department policies applicable with plea agreements. In addition, it is recommended that the Section be consulted in the case of pre-indictment pleas, although not required.

### 2. Urgent Reports and Press Releases

A United States Attorney's Office that is conducting an election fraud investigation should also submit urgent reports through the Executive Office for United States Attorneys at each critical stage of the investigation and ensuing prosecution. In addition, the filing of criminal charges should be accompanied by a press release that has been approved, when appropriate, by the Department's Office of Public Affairs.

### 3. Federal Seizure of State Election Materials

Federal custody of election materials is normally obtained by grand jury subpoena. In taking custody of election documents, election officials should not be deprived of documents necessary to tally and recount the ballots and to certify the election results.[41] Accordingly, copies in lieu of originals should be accepted until the state's need for the documentation expires. Originals may eventually be necessary for handwriting and other forensic analysis and for evidentiary purposes.

### 4. Noninterference with Elections

The Justice Department's goals in the area of election crime are to prosecute those who violate federal criminal law and, through such prosecutions, to deter corruption of future elections. The Department does not have a role in determining which candidate won a particular election, or whether another election should be held because of the impact of the alleged fraud on the election. In most instances, these issues are for the candidates to litigate in the courts or to advocate before their legislative bodies or election boards. Although civil rights actions under 42 U.S.C. § 1983 may be brought by private citizens to redress election irregularities, the federal prosecutor has no role in such suits.

In investigating an election fraud matter, federal law enforcement personnel should carefully evaluate whether an investigative step under consideration has the potential to affect the election itself. Starting a public criminal investigation of alleged election fraud before the election to which the allegations pertain has been concluded runs the obvious risk of chilling legitimate voting and campaign activities. It also runs the significant risk of interjecting the

---

[41] An exception to this rule might be warranted if the facts indicate that the election officials are involved in an ongoing election fraud scheme.

investigation itself as an issue, both in the campaign and in the adjudication of any ensuing election contest.

Accordingly, overt criminal investigative measures should not ordinarily be taken in matters involving alleged fraud in the manner in which votes were cast or counted until the election in question has been concluded, its results certified, and all recounts and election contests concluded. Not only does such investigative restraint avoid interjecting the federal government into election campaigns, the voting process, and the adjudication of ensuing recounts and election contest litigation, but it also ensures that evidence developed during any election litigation is available to investigators, thereby minimizing the need to duplicate investigative efforts. Many election fraud issues are developed to the standards of factual predication for a federal criminal investigation during post-election litigation.

The Department views any voter interviews in the pre-election and balloting periods, other than interviews of a complainant and any witnesses he or she may identify, as beyond a preliminary investigation. A United States Attorney's Office considering such interviews must therefore first consult with the Public Integrity Section. USAM 9-85.210. This consultation is also necessary before any investigation is undertaken near the polls while voting is in progress.

The policy discussed above does not apply to covert investigative techniques, nor does it apply to investigations or prosecutions of federal crimes other than those that focus on the manner in which votes were cast or counted. However, if there is any doubt about whether the policy may apply, we recommend that the Public Integrity Section be consulted.

Exceptions to this general rule of course exist. For example, one exception may be appropriate when undercover techniques are justified and the Department's guidelines for undercover operations have been met. Another exception may apply when it is possible to

both complete an investigation and file criminal charges against an offender prior to the period immediately before an election. All such exceptions require consultation with the Public Integrity Section, as they involve action beyond a preliminary investigation.

### 5. Limitations on Federal Poll Watching

Federal agents may not be stationed at open polling places, except in cases of discrimination covered by the Voting Rights Act, or as part of the Civil Rights Division's oversight obligations with respect to the election system mandates enacted by the Help America Vote Act.[42]

Control of polling places is governed by state laws that regulate who is authorized to be inside a polling place. Many of these laws have criminal penalties. Most states provide that no one except voters, election administrators, and perhaps party representatives may serve as poll watchers, or even approach closer than fifty to one hundred feet from an open poll. Except in Illinois, state poll access statutes do not contemplate that federal agents serve as poll watchers or otherwise enter areas when polling is taking place. Therefore, other than as specifically provided by the Voting Rights Act and other civil rights laws, there is no statutory basis for federal personnel to serve as poll watchers.

In fact, federal law provides criminal penalties for any federal official who sends "armed men" to open polling locations. 18 U.S.C. § 592. Accordingly, the FBI's Manual of Investigative Operations

[42] In such cases, the Civil Rights Division's Voting Section determines if there is a risk that voting by minorities will be impeded in a location specially covered by the Voting Rights Act. If so, the Voting Section will ask that the location be certified for "federal observers." Such observers are sent to view conduct at the polls and report back through the Voting Section; they have no role in the detection of election crimes not involving racial animus.

and Guidelines, at § 56-8(6), provides that investigations in the vicinity of open polls must first be approved by the Justice Department.

### 6. Selective Prosecution Issues

The prosecution of certain types of electoral corruption can occasionally present sensitive issues of selective prosecution. A definitive analysis of the law in this area, in the context of a voter fraud case, is contained in *United States v. Smith*, 231 F.3d 800 (11th Cir. 2000).

## F. SUGGESTIONS FOR SUCCESSFUL ELECTION FRAUD CASE INVESTIGATIONS

Most of the general principles and procedures that govern federal criminal investigations apply to the investigation of election crimes. This section will discuss those investigative issues and tactics that are unique to election fraud cases.

Election fraud prosecutions are usually fairly easy to present, and the Department's conviction rate has been quite good. These prosecutions have proven to be a fast and effective method of combating election corruption. Moreover, because the motive for most election fraud is to corrupt the public office sought by those committing the fraud, these cases also provide an avenue to address other serious forms of public corruption.

If properly managed, election fraud cases are generally well received by the public. Favorable public reaction is likely to generate additional investigative leads in this sensitive area of criminal law enforcement.

### 1. Getting Started

Several basic steps underlie most successful election fraud investigations.

#### (a) Publicize your intent to prosecute election fraud

Most complaints that lead to prosecutable election fraud cases come from participants in the political process, such as voters, candidates, campaign workers, and poll officials. However, in places where election fraud has been entrenched, there is often widespread tolerance of election abuses among local law enforcement authorities. This frequently leads to public cynicism, which must be overcome if productive complaints are to be generated. The following steps can help:

- Hold press conferences before important elections and announce that prosecution of election fraud is a federal law enforcement priority.

- Ensure that Assistant United States Attorneys and FBI Special Agents are accessible to the public during and immediately after important elections by publicizing the telephone numbers through which the public can reach them.

- Contact local election administrators (registrars, county and town clerks, boards of election, etc.) and high-level state officials (the State Attorney General's Office, Secretary of State) to enlist their support in detecting and reporting election abuses. These people are generally dedicated public servants who want to eliminate criminal election abuses. They are also the custodians of important records generated during the voting process.

### (b) Be aware of the importance of voting documentation

The voting process generates voluminous documentary evidence. Federal law requires that all voting documentation relating to an election that includes a federal contest be retained for at least twenty-two months after the election. 42 U.S.C. § 1974. The 1993 National Voter Registration Act extended this period to two years for voter registration records generated under the Act. 42 U.S.C. § 1973gg-6(i). Because the federal retention periods are significantly longer than normally required by state law, it is important to contact all election administrators in the district at the beginning of a ballot fraud investigation to be certain that they are aware of these federal requirements.

Voting documentation includes voter registration cards, absentee ballot applications, absentee ballot envelopes, tally sheets, poll lists, and ballots. These materials are particularly important to successful election crime investigations, since they contain information that helps identify fraudulent voting transactions and potential defendants. For example:

- Most states require persons seeking to vote to provide personal information to election registrars, and to furnish a handwriting specimen for comparison with the voter's signature on the registration form. These data can be used to determine the authenticity of specific voting transactions.

- In many states, voters must sign a poll list before casting their ballots on election day. The validity of a particular voting transaction can be determined by comparing a voter's signature at the polls to the signature on his or her registration card. Persons responsible for casting fraudulent

votes may be identified by comparing the poll list signatures of known fraudulent voting transactions to exemplars taken from suspects.

- States generally require voters to apply for absentee ballots in writing. They also customarily require an absentee voter to sign an oath (generally on the ballot envelope) attesting to the authenticity of the vote. These signatures can be used to identify fraudulent voting transactions and might also help identify potential defendants.

- Election officials are generally required to maintain logs of absentee applications received and approved, and of ballots issued, returned, and challenged. Once a few fraudulent voting transactions have been identified, this information can be used to identify the subjects with whom the voters involved dealt, and to locate other voters who also dealt with the same subjects.

- Election day tally sheets normally contain the handwritten certification of the poll officials who prepared them, and in many states these officials are required to execute an oath attesting to the authenticity and accuracy of the returns. These documents may corroborate the identities of those persons with official access to the tally sheets.

- Many states require voters who ask for help in voting at the polls to execute affidavits identifying the person they wish to accompany them into the voting booth. This information can be used to identify patterns of voter intimidation and voter bribery.

### (c) Consider the advantages of federal prosecution

Although the states have principal responsibility for administering the election process, many state law enforcement authorities are not well equipped to act effectively against ballot fraud. State and local prosecutors should be advised of the federal interest in prosecuting election fraud, and of the following factors that favor federal prosecution of this type of case:

- Resources: Election fraud investigations usually require a fairly large manpower commitment, which the federal government is normally better able to marshal than are local law enforcement authorities.

- Grand jury: The development of election crime cases requires an effective grand jury process through which testimony can be secured from the vulnerable witnesses who are frequently encountered in these cases, and through which necessary documentation can be secured.

- Broadly drawn venires: Election fraud is usually best tried by juries that are not drawn from the immediate location where the alleged fraud occurred. Federal venires are normally drawn from wider geographic areas than are state or local venires.

- Political detachment: State and local prosecutors are usually more closely linked to local politics than are federal prosecutors. Federal prosecution of election crime may therefore be viewed by the public and the media as more impartial.

#### (d) Focus on areas vulnerable to election fraud

Election crime is most apt to occur in jurisdictions where there is substantial conflict among political factions, where voters are fairly equally distributed among factions, where local officials wield substantial power, and where there is a high degree of voter apathy. Jurisdictions meeting these criteria should be identified, and complaints coming from them given special attention in allocating investigative resources.

#### (e) Develop your investigative strategy early

The typical election fraud scheme involves many levels of participants performing a variety of tasks on behalf of political operatives. For example, vote-buying schemes usually have "haulers" who take voters to the polls and pay them; "lieutenants" or "bankers" who obtain and distribute the money to the haulers; "captains" who coordinate the activities of the haulers; and "checkers" who accompany the voters into the voting booth to assure that they vote "correctly."

It is important to attempt at an early stage to identify as many of the participants in the scheme as possible and to assess their relative culpability. It is also helpful to identify the likely motive behind the scheme. An investigative strategy can then be developed which targets low-level participants for the purpose of encouraging them to be witnesses against more highly placed participants in the election scheme. These less culpable participants might also provide evidence and leads regarding the illegal activity or scheme motivating the election fraud.

### 2. The Investigation

Election fraud investigations fall into two stages: a preliminary investigation, followed by a grand jury investigation along with an FBI full-field investigation. Preliminary investigations are usually

initiated by the United States Attorney's Office or FBI office that received the complaint. Consultation with the Public Integrity Section is required before grand jury and FBI full-field investigations are initiated. FBI participation must also be approved by FBI Headquarters.

**(a) Preliminary investigation**

A preliminary investigation typically involves interviewing the complainant, then conducting a sufficient investigation to:

- Identify the crime allegedly committed;
- Determine whether that crime is prosecutable under federal law;
- Evaluate the need for federal intervention as a function of –
  - the extent to which the crime may have impacted adversely on a federal election,
  - the extent to which the crime corrupted the registration or voting process, and
  - the desire and capability of local law enforcement officials to handle the case;
- Identify persons who may have participated in the scheme; and
- Identify, if possible, a few specific fraudulent voting transactions.

After the results of the preliminary investigation are reviewed by the United States Attorney's Office, they are forwarded to the

Public Integrity Section and FBI Headquarters, along with the United States Attorney's recommendation as to whether further investigation is warranted. At this point, the matter will usually be discussed between attorneys in the Public Integrity Section and the United States Attorney's Office handling the matter. After this consultation, a grand jury and/or full-field investigation will be initiated in appropriate cases.

**(b) Grand jury and FBI full-field investigations**

The purposes of grand jury and FBI full-field investigations are to develop sufficient evidence against specific subjects to support criminal charges. These investigations are often time- consuming and labor-intensive, and generally involve obtaining and examining many election documents. Investigative approaches for two common types of election fraud are discussed below.

**3. Investigating Two Types of Election Fraud**

The most frequently encountered election frauds are absentee ballot fraud and ballot-box stuffing. Strategies for investigating these frauds are similar, but not identical.

**(a) Absentee ballot frauds**

Absentee ballot frauds involve the corruption of absentee voting transactions through such means as bribery, forgery, intimidation, and voter impersonation. Investigating these frauds involves identifying specific fraudulent voting transactions, interviewing voters who were corrupted or defrauded, using these persons as witnesses to prosecute those who corrupted or defrauded them, and flipping those defendants to make cases against higher-level targets. The typical investigative approach is to:

- Subpoena relevant absentee ballot documentation. This documentation includes applications for

absentee ballots; absentee ballots; envelopes in which ballots are placed (usually called a "privacy" or an "oath" envelope); outer envelopes forwarding ballots for tabulation (usually called a "mailer"); logs kept by election officials of applications issued, applications received, ballots issued, ballots returned, and ballots challenged; and the permanent voter registration cards for the voters ostensibly involved.

- Analyze election documents.
  Ballot applications and oath envelopes generally contain three key items that often reveal questionable voting transactions: the voter's purported signature, signatures of witnesses or notaries, and the address where the ballot package was sent. Examples of significant data are common notaries and witnesses; mismatches of voters' signatures on absentee ballot applications, ballot envelopes, or registration cards; and applications directed to be sent to addresses other than the addresses of the voters.

- Identify similar transactions.
  If the preliminary investigation identifies specific questionable voting transactions, the document analysis should be directed at identifying voting transactions having similar characteristics, such as the same handwriting, witnesses, or addresses to which absentee ballot packages were sent.

- Interview voters allegedly involved.
  After identifying questionable voting transactions, the voters whose names appear on the documents should be interviewed to determine whether they voted, and if so, under what circumstances (for

example, whether they were paid, intimidated, or not consulted).

- Compare handwriting exemplars of subjects. Handwriting exemplars of persons suspected of forging absentee ballot documents should be obtained and compared with the handwriting on those questioned documents.

- Develop multiple witnesses. Voters involved in fraudulent voting transactions are usually poorly educated, often intimidated by defendants and courtrooms, and generally may not make strong witnesses.[43] Successful prosecution of this type of case normally requires the testimony of several voter-witnesses against each defendant.

**(b) Ballot-box stuffing cases**

These cases involve the insertion into ballot boxes of invalid, fraudulent, or otherwise illegal ballots. All ballot-box stuffing schemes necessarily involve poll officials, since access to voting documents is essential to this type of fraud and is controlled by state law. Ballot-box stuffing investigations seek to identify fraudulent voting transactions and to link specific poll officials to them. The general investigative methodology is to:

- Subpoena election documents: Obtain and examine the poll lists or other documentation that voters sign when entering the

---

[43] These very factors, on the other hand, demonstrate to the jury the susceptibility of these persons to manipulation, which is often important evidence in the case.

polls; the registration cards for voters residing in the target precinct, any paper or punch card ballots, and any tally sheets prepared by the poll officials reporting the election results.

- Examine election documents.
  Examine poll lists for similar handwriting, giving special attention to names entered at times when voting activity was slow (such as mid-morning and early afternoon) and shortly before the polls closed.

- Compare voters' signatures.
  Compare signatures on the poll list with corresponding permanent registration cards to identify voters who may not have cast the ballots attributed to them.

- Take handwriting exemplars.
  Take exemplars from each poll official having access to the ballot box, and then compare them with questionable signatures of alleged voters.

- Interview voters.
  Interview the voters whose ballots were used in the scheme to determine whether they voted at the polls, and, if so, under what circumstances.[44]

### 4. A Few Cautions

Election fraud investigations raise a number of issues not normally encountered in other criminal investigations. Federal

---

[44] Successful prosecution of those schemes may require the cooperation of a poll official or other "insider."

prosecutors and investigators should keep the following principles in mind:

- Respect the integrity of the polls.
  All states define by statute those persons entitled to be inside the polls during an election. Most state poll access laws do not permit federal law enforcement officials access to open polling places. Asking federal investigators to enter open polls risks violating the sovereignty that the states have in this area, and might lead to confrontations among poll officials, local police, and federal agents. It also risks violating a federal statute that prohibits sending armed federal agents to the polls. 18 U.S.C. § 592.

- Noninterference with the voting process.
  States use many types of documentation in conducting elections (such as registration cards, voter lists, poll books, and voting machines), and in tabulating and certifying the results (such as ballots, tally sheets, and absentee voting materials). Subpoenas for such documentation should be timed, and compliance procedures developed, so as not to deprive election officials of records they need to tabulate votes and certify election returns.

- Need for probable cause before opening sealed ballots.
  Absentee ballots might come into the possession of federal officials while still sealed in the envelopes bearing the names of the voters who ostensibly marked them. Also, a few states provide for some types of paper ballots to be numbered in a way that corresponds with the order of signatures on a poll list. In either situation, marked ballots can be attributed to individual voters. This is particularly useful in cases involving suspected fraud in the marking or alteration of the

ballot document itself. However, since voted ballots are documents in which individuals have an expectation of privacy, sealed ballots should not be opened without satisfying the Fourth Amendment's probable cause standard. Accordingly, a search warrant should be obtained before taking investigative steps that would result in linking individual ballots to the voters who allegedly cast them. Alternatively, if the individuals whose names appear on the sealed ballot envelopes deny that they voted, these individuals may be asked if they are willing to open the ballot envelopes ostensibly "voted" by them.

### 5. Conclusion

Election fraud cases can be successful and uncomplicated. However, prosecutors and investigators should use great care to avoid the pitfalls peculiar to these types of cases. Close consultation with the Public Integrity Section and its Election Crimes Branch, although not required after grand jury and FBI full-field investigations have been approved, can help avoid those pitfalls, develop effective investigative and legal strategies, and increase the likelihood of prosecutive success.

## CHAPTER THREE

# PATRONAGE CRIMES

## A. HISTORICAL BACKGROUND

Federal jurisdiction over patronage crimes is usually attained by virtue of the federal funds involved in a government job or benefit that is used to induce or reward partisan activity by government employees. Over the past century, Congress has enacted, at roughly fifty-year intervals, three landmark pieces of legislation in this area.

Until the Hatch Act reform amendments of 1993, most federal laws dealing with patronage abuses of government personnel and programs derived from either the 1883 Pendleton Civil Service Act or the 1939 Hatch Act. The Pendleton Act aimed at dismantling the partisan "spoils system" that existed in the executive branch of the federal government at the time; it created a merit civil service, and enacted the Civil Service Commission to ensure nonpartisan federal employment. The Act also contained four criminal provisions designed to protect federal employees against political manipulation. These provisions, now codified at 18 U.S.C. §§ 602, 603, 606, and 607, prohibit political shakedowns of federal employees, political activity in federal workspace, and politically motivated threats and reprisals against federal employees.

In 1907, President Theodore Roosevelt promulgated an executive order, known as Civil Service Rule No. 1, that prohibited most active campaigning and electioneering by merit civil servants. Over the next thirty years, the Civil Service Commission decided approximately 2,000 administrative cases involving alleged violations of this executive order, and in the process defined the scope of permissible political activities.

In 1939, the Hatch Act codified this ban on active partisan campaigning by executive branch employees, and incorporated those Civil Service Commission rules that defined permissible and impermissible activities. 5 U.S.C. § 7324 (repealed 1993). The Hatch Act also provided criminal penalties for various forms of political abuses in the administration of federal law, policies, and programs; these criminal provisions are now codified at 18 U.S.C. §§ 595, 598, 600, 601, 604, and 605.

In 1993, Congress enacted its third major piece of civil service legislation, which significantly reduced the scope of the 1939 Hatch Act ban on political activities. 5 U.S.C. §§ 7321-7326. The 1993 Hatch Act amendments permit all federal employees in the executive branch (other than those working in specified law enforcement or national security agencies) to engage in overt partisan activity, including the solicitation of political contributions from colleagues under certain circumstances. Although the amendments included a new anti-patronage provision, the overall goal was to remove the statutory shield, deemed no longer necessary, that had separated partisan politics and federal employment for over half a century.

Current federal law limits patronage practices and partisan political considerations in the federal civil service and in the administration of federal laws and programs. In extreme cases, patronage abuses may constitute a conspiracy to defraud the United States in the operation of a federally funded program. *See, e.g.*, *United States v. Pintar*, 630 F.2d 1270 (8th Cir. 1980); *Langer v. United States*, 76 F.2d 817 (8th Cir. 1935). The Supreme Court, through a line of cases dating back to the 1970s, has held that personnel decisions involving the award, termination, or modification of employment conditions of ministerial positions in the public sector cannot be made solely on the basis of partisan association or partisan loyalty. To do so violates the First Amendment rights of public employees or those seeking such positions. *Rutan v. Republican Party of Illinois*, 497 U.S. 62 (1990); *Branti v. Finkel*, 445 U.S. 507 (1980); *Elrod v. Burns*, 427 U.S. 347 (1976). On the other hand, the

Court recognized that partisan considerations may constitutionally play a part in personnel decisions involving public employees who occupy policymaking positions or positions involving confidential relationships to senior public officers, when partisan loyalty is a reasonably necessary element of the job. *Id.* The distinction between ministerial public positions and those that involve policy formulation is difficult, and has, in the past, been left by the courts largely to a case-by-case analysis. Nevertheless, the distinction is important in assessing the scope and purpose of federal criminal laws addressing illegal patronage.

## B. STATUTES

The text of the criminal statutes discussed in this section is printed in Appendix C. Each of these statutes carries, in addition to the prison term noted, fines under 18 U.S.C. § 3571.

### 1. Limitations Based on Federal Employment or Workspace

#### (a) Solicitation of political contributions: 18 U.S.C. § 602

Section 602 prohibits a United States Senator or Representative, a candidate for Congress, officer or employee of the United States, or person receiving compensation for services from the United States Treasury, from knowingly soliciting any contribution from any other such officer, employee, or person, except as permitted under the 1993 Hatch Act amendments. The statute applies only to contributions made to influence a federal election. Violations are punishable by imprisonment for up to three years.

Section 602 has been interpreted by the courts as criminalizing aggravated forms of political "shakedowns." *United States v. Wurzbach*, 280 U.S. 396, 398 (1930) (statute prohibits exerting "pressure for money for political purpose"); *Ex parte Curtis*,

106 U.S. 371, 374 (1882) (statute protects federal employees against political "extractions through fear of personal loss"). *See also Brehm v. United States*, 196 F.2d 769 (D.C. Cir. 1952); *and United States v. Burleson*, 127 F. Supp. 400 (E.D. Tenn. 1954).

The Criminal Division has interpreted Section 602 as not prohibiting a federal employee's solicitation of voluntary political contributions from other nonsubordinate federal employees. However, because of the potential for coercion, express or implied, that inheres in the supervisor-subordinate relationship, contributions solicited from a *subordinate* are not considered "voluntary." The 1993 Hatch Act amendments reflect this interpretation; both the criminal and civil codes, as amended, expressly prohibit the solicitation of subordinates, while allowing certain solicitations of colleagues. The 1993 law further amended Sections 602 to exempt the soliciting activities authorized by the new civil Hatch Act provisions, 5 U.S.C. §§ 7323 and 7324.

All officers and employees of the executive, judicial, or legislative branches of the federal government are within the class reached by Section 602. The statute does not reach persons who are paid with federal funds that have lost their "federal" character, such as state or local government employees or persons paid under federal grants. However, 18 U.S.C. §§ 600 and 601 may cover such persons.

The Federal Election Campaign Act Amendments of 1979 limited Section 602 in two respects. First, the word "knowingly" was added to clarify that the solicitor must have been aware of the federal status of the person solicited. Second, the critical term "contribution" in Section 602 was linked to the definition of this term in FECA, at 2 U.S.C. § 431(8), which restricts "contributions" to financial activities intended to influence a federal election.

### (b) Making political contributions: 18 U.S.C. § 603

Section 603, like Section 602, reaches only contributions made to influence federal elections. The statute prohibits any officer or employee of the United States, or a person receiving compensation for services from money derived from the United States Treasury, from giving a contribution to any other such officer, employee, or person, or to any United States Senator or Representative, if the person receiving the contribution is the donor's "employer or employing authority." Although modified by the 1993 Hatch Act amendments, Section 603's basic prohibition against political donations between subordinates and supervisors was retained.[45] Section 603 applies to all congressional staff and White House employees, as well as to civil service personnel. Violations are punishable by imprisonment for up to three years.

The Department of Justice Office of Legal Counsel has interpreted Section 603 as *not* reaching voluntary contributions made by rank-and-file employees of the executive branch of the government to campaign committees authorized by an incumbent President or Vice President, provided that such donations are given in compliance with the provisions of the 1993 Hatch Act reform amendments (i.e., voluntarily and while the donor is off duty, not in a federal office space, and not in uniform or in a government-owned vehicle).

### (c) Intimidation to secure political contributions: 18 U.S.C. § 606

Section 606 makes it unlawful for a United States Senator, United States Representative, or federal officer or employee to discharge, demote, or promote another federal officer or employee, or

[45] This prohibition was also added by the 1993 law to the new civil Hatch Act provision. 5 U.S.C. § 7323(a).

to threaten or promise to do so, for making or failing to make "any contribution of money or other valuable thing for any political purpose." Violations are punishable by imprisonment for up to three years.

Section 606 encompasses coerced donations of anything of value (including services) from federal employees to a candidate for any elective office – federal, state, or local. This statute should be used in lieu of Section 602 whenever a federal employee is actively threatened with an adverse change to his or her conditions of employment to induce a political contribution. This is also addressed in the discussion of 18 U.S.C. § 610 below.

In the Criminal Division's view, Section 606 was not intended to prohibit the consideration of political factors (such as ideology) in the hiring, firing, or assignment of the small category of federal employees who perform policymaking or confidential duties for the President or Members of Congress. In the executive branch, these senior officials either hold jobs on Schedule C of the excepted service, which by law may be offered or terminated on the basis of such factors, or hold direct presidential appointments and by statute serve at the President's pleasure. Section 606 does, however, protect all federal officials, including senior policymakers, from being forced by job-related threats or reprisals to donate to political candidates or causes.

**(d) Coercion of political activity: 18 U.S.C. § 610**

Section 610 is a relatively new anti-intimidation statute enacted as part of the 1993 Hatch Act amendments to provide additional protections against political manipulation of the federal workforce.

The statute makes it a crime to intimidate, threaten, command, or coerce any employee of the executive branch in order to induce the

victim to engage or not engage in any political activity.[46] The statute also prohibits attempts. It applies to all elections – federal, state, and local. Violations of Section 610 are punishable by imprisonment for up to three years.

Section 610 expressly includes within the broad phrase "any political activity" any conduct that relates to voting, to contributing, or to campaigning. Specifically, Section 610 provides that "any political activity" includes, but is not limited to: (1) voting or not voting for any candidate in any election; (2) making or refusing to make any political contribution; and (3) working or refusing to work on behalf of any candidate. The statute thus encompasses intimidation directed at inducing any form of political action.

The statute complements 18 U.S.C. § 606, which addresses coerced political donations from employees in any of the three branches of the federal government. Section 610 covers a broader range of conduct, while Section 606 protects a larger class of employees.

The inclusion of Section 610 in the 1993 Hatch Act amendments was in recognition of widely held concerns, both in Congress and in federal law enforcement agencies, that any lessening of the Hatch Act's prohibition on political activities may have the unintended effect of increasing the risk of political coercion and manipulation of federal employees. *See* 139 CONG. REC. H6817 (daily ed. Sept. 21, 1993).

---

[46] See also the voter intimidation statute enacted by the 1993 National Voter Registration Act, 42 U.S.C. § 1973gg-10(1), discussed in Chapter Two.

**(e) Place of solicitation: 18 U.S.C. § 607**

Section 607 makes it unlawful for anyone to solicit or receive a political donation in any room, area, or building where federal employees are engaged in official duties. The prohibition covers political solicitations that are delivered by mail, as well as those made in person. *United States v. Thayer*, 209 U.S. 39 (1908). Violations are punishable by imprisonment for up to three years.

The Bipartisan Campaign Reform Act of 2002 clarified an ambiguity concerning the reach of this statute to solicitations and receipts of political donations that were not intended to influence federal elections, i.e., donations to benefit nonfederal candidates and the nonfederal activities of political parties and other organizations. Under the revised text, which became effective November 6, 2002, Section 607 reaches the solicitation and receipt of *all* political funds within areas where federal personnel are engaged in official duties.

Section 607 covers all three branches of the federal government. However, it specifically exempts any contribution for a Member of Congress received by the Member's congressional staff in his or her federal office, provided that there had been no request for the contribution to be delivered to the office, and provided further that the contribution is quickly forwarded to the Member's campaign committee.

Violations of Section 607 require proof that the defendant was actively aware of the federal character of the place where the solicitation took place or was directed. The employment status of the parties to the solicitation is immaterial; it is the employment status of the persons who routinely occupy the area where the solicitation occurs that determines whether Section 607 applies.

Prosecutable violations of Section 607 may arise from solicitations that can be characterized as "shakedowns" of federal personnel. Thus, Section 607 reaches solicitations by nonfederal

employees, filling a void not covered by Section 602, and also reaches shakedowns of congressional employees, who are not covered by the anti-intimidation prohibition contained in Section 610, that was enacted as part of the 1993 Hatch Act reforms.

When federal premises are leased or rented to candidates in accordance with General Services Administration regulations, the premises are not considered "federal" for the purposes of this statute. The same holds true for United States Postal Service post office boxes. Thus, under appropriate circumstances, political events may be held in leased or rented portions of federal premises, and political contributions may be sent to and accepted in United States post office boxes.

Most matters that have arisen under Section 607 have involved computer-generated direct mail campaigns in which solicitation letters are inadvertently sent to prohibited areas. Such matters are unlikely to warrant prosecution. Instead, the Criminal Division usually advises the person or entity involved of the existence of the prohibition in Section 607, and requests that the mailing lists be purged of addresses that appear to belong to the federal government. A systematic refusal or failure to comply with formal warnings of this kind can serve as a basis for prosecution.

### 2. Limitations Based on Federal Programs and Benefits

#### (a) Promise or deprivation of federal employment or other benefit for political activity: 18 U.S.C. § 600 and § 601

Section 600 makes it unlawful for anyone to promise any employment, position, contract, or other benefit derived in whole or in part from an Act of Congress, as consideration, favor, or reward for past or future political activity, including support for or opposition to any candidate or political party in any election. The statute applies to all candidates – federal, state, and local.

Section 601 makes it unlawful for any person knowingly to cause or attempt to cause any other person to make a contribution on behalf of any candidate or political party by depriving or threatening to deprive the other person of employment or benefits made possible in whole or in part by an Act of Congress. The statute defines "contribution" as encompassing anything of value, including services. Like Section 600, it applies to contributions at federal, state, and local levels.

Violations of these statutes are one-year misdemeanors. Although in 1976 Congress increased the fines under Sections 600 and 601 from $1,000 to $10,000, fines under these statutes are actually governed by the general criminal fine structure in 18 U.S.C. § 3571.

Sections 600 and 601 are the two principal statutes providing federal jurisdiction over situations when corrupt public officials use government-funded jobs or programs to advance a partisan political agenda rather than to serve the public interest. Both statutes reach employment and benefits that are funded by Congress in whole or in part. The statutes are not restricted to federal jobs, although Section 601 specifically covers threats to terminate federal employment.[47] Sections 600 and 601 thus protect a broader class of employees than Section 610, which is restricted to federal employees in the executive branch. In addition, there is no minimum amount of federal funds that must be involved in the employment or benefit on which the corrupt demand focuses to trigger a violation.

The principal distinction between Sections 600 and 601 is whether the coerced political activity is demanded as a condition precedent to obtaining a publicly funded job or benefit (Section 600),

---

[47] Section 601 has a parallel provision in 18 U.S.C. § 665(b), which covers programs under the Comprehensive Employment and Training Act.

or occurs in the form of a threat to terminate a federal benefit or job the victim already possesses (Section 601). Section 601 requires proof that the motive for the adverse job action was political and not inadequate performance or some other job-related factor; it is a lesser included offense of Section 606 when the threatened employee is a federal civil servant.

As with Section 606, the Criminal Division believes that Sections 600 and 601 were not intended to reach the consideration of political factors in the hiring or termination of the small category of senior public employees who perform policymaking or confidential duties for elected officials of federal, state, or local governments. With respect to such employees, a degree of political loyalty may be considered a necessary aspect of competent performance. *Compare Connick v. Myers*, 461 U.S. 138, 148-49 (1983) (upholding dismissal of an allegedly disruptive assistant district attorney), *with Rutan v. Republican Party of Illinois*, 497 U.S. 62 (1990) (patronage promotions and hirings of rank-and-file public employees violate rights of speech and association); *Branti v. Finkel*, 445 U.S. 507, 517-19 (1980) (public employees may not be discharged based solely on their political beliefs unless party affiliation is an appropriate requirement for effective performance); *and Elrod v. Burns*, 427 U.S. 347, 367 (1976) (patronage dismissals of nonpolicymaking public employees violate the First and Fourteenth Amendments).

Although Sections 600 and 601 are misdemeanors, there are alternative felony theories of prosecution that may be applicable to conduct implicating these statutes. Such theories include:

- The Travel Act, 18 U.S.C. § 1952, in states having statutes that broadly define bribery and extortion.

- Honest services mail fraud, 18 U.S.C. §§ 1341 and 1346, to the extent that the patronage scheme results in the breach of a public official's fiduciary duty of honesty.

- Conspiracy to defraud the United States, 18 U.S.C. § 371, to the extent that the evidence shows a conspiracy to defraud the public of the fair and impartial administration of a federal grant or program.

- Bribery concerning federally funded programs, 18 U.S.C. § 666. However, the Third Circuit has held Section 666 inapplicable to a scheme to demand nonpecuniary political services from public employees. *United States v. Cicco*, 938 F.2d 441 (3d Cir. 1991).

The *Cicco* case illustrates the use of alternative theories to prosecute local public officials for corrupt patronage abuses. Unfortunately, the case also illustrates the difficulties involved in prosecuting patronage crimes under current law. Although the jury convicted the defendants under both Section 601 and Section 666, the two convictions were ultimately reversed on appeal.

In *Cicco*, local public officials demanded political services from part-time public employees, and when the employees refused to perform the services, the employees were denied permanent employment. The patronage scheme was charged under Section 601, and also under Sections 666, 1341, 1346, and 1952. All four prosecutive theories went to the jury, which convicted the defendants on the Sections 601 and 666 counts. In the defendants' first appeal, the Third Circuit reversed the Section 666 convictions, holding that Congress did not intend this statute to apply to the extortion of political activity rather than money. *Id.* In a subsequent appeal, the Third Circuit held that Section 601 does not apply if there are no express threats or specific promises made to induce political services from public employees. *United States v. Cicco*, 10 F.3d 980 (3d Cir. 1993).

### (b) Promise of appointment by candidate: 18 U.S.C. § 599

This statute prohibits a candidate for federal office from promising appointments "to any public or private position or employment" in return for "support in his candidacy." It is one of the few federal criminal laws specifically addressing campaign-related activity by candidates. It is a class statute that applies only to misconduct by federal candidates. Willful violations are two-year felonies; nonwillful violations are misdemeanors.

Section 599 has potential application when one candidate attempts to secure an opponent's withdrawal, or to elicit the opponent's endorsement, by offering the opponent a public or private job. *See also* 18 U.S.C. § 600, discussed above. It also applies to offers of jobs by federal candidates to *others* to secure endorsements. While Section 599 does not reach offers or payments of *money* to secure withdrawal or endorsements, if the payment was not reported accurately, such matters may be prosecutable as a reporting violation of FECA under 2 U.S.C. §§ 434(b) and 437g(d).

### (c) Interference in election by employees of federal, state, or territorial governments: 18 U.S.C. § 595

Section 595 was enacted as part of the original 1939 Hatch Act. The statute prohibits any public officer or employee, in connection with an activity financed wholly or in part by the United States, from using his or her official authority to interfere with or affect the nomination or election of a candidate for federal office. This statute is aimed at the misuse of official authority. It does not prohibit

normal campaign activities by federal, state, or local employees.[48] Violations are one-year misdemeanors.

Section 595 applies to all public officials, whether elected or appointed, federal or nonfederal. For example, an appointed policymaking government official who bases a specific governmental decision on an intent to influence the vote for or against an identified federal candidate violates Section 595. The nexus between the official action and an intent to influence must be clear to establish a violation of this statute.

**(d) Coercion by means of relief appropriations: 18 U.S.C. § 598**

Section 598 prohibits the use of funds appropriated by Congress for relief or public works projects to interfere with, restrain, or coerce any person in the exercise of his or her right to vote in any election. Violations are one-year misdemeanors.

**(e) Solicitation from persons on relief: 18 U.S.C. § 604**

Section 604 makes it unlawful for any person to solicit or receive contributions for any political purpose from any person known to be entitled to, or receiving compensation, employment, or other benefit provided for or made possible by an Act of Congress appropriating funds for relief purposes. Violations are one-year misdemeanors.

[48] However, such political activities must be consistent with the Hatch Act restrictions on political activity, as amended by the 1993 Hatch Act amendments, which will be discussed later in this chapter.

### (f) Disclosure of names of persons on relief: 18 U.S.C. § 605

Section 605 prohibits the furnishing or disclosure, for any political purpose, to a candidate, committee, or campaign manager, of any list of persons receiving compensation, employment, or benefits made possible by any Act of Congress appropriating funds for relief purposes. It also makes unlawful the receipt of any such list for political purposes. Violations are one-year misdemeanors.

### 3. Permissible Political Activity under the Hatch Act, as Amended: 5 U.S.C. § 7323 and § 7324

Although the 1939 Hatch Act consisted mostly of criminal provisions, it became widely known as a result of its one civil provision, which limited active partisan politicking by executive branch employees. 5 U.S.C. § 7324(a)(2) (repealed). This restriction on overt politicking lasted over fifty years, during which it was challenged on both constitutional and public policy grounds. The constitutional challenges were unsuccessful. *Civil Service Commission v. Letter Carriers*, 413 U.S. 548 (1973); *United Public Workers v. Mitchell*, 330 U.S. 75 (1947). The public policy challenges were successful in part, and ultimately led to the 1993 Hatch Act reforms, which substantively changed the Hatch Act politicking restrictions.

The 1993 legislation lifted the original ban on taking "an active part in political management or in political campaigns" for most employees of the executive branch. However, it continued the ban for employees of the following law enforcement and intelligence agencies:

Federal Election Commission
Federal Bureau of Investigation
Secret Service
Central Intelligence Agency

National Security Council
National Security Agency
Defense Intelligence Agency
Merit Systems Protection Board
Office of Special Counsel
Office of Criminal Investigation of the Internal Revenue Service
Office of Investigative Programs of the United States Customs Service
Office of Law Enforcement of the Bureau of Alcohol, Tobacco, and Firearms
National Geospatial-Intelligence Agency
Office of the Director of National Intelligence.

5 U.S.C. § 7323(b)(2)(B)(i). The ban is also retained for career members of the Senior Executive Service, 5 U.S.C. § 7323(b)(2)(B)(ii), and for employees of the Criminal Division of the Department of Justice, 5 U.S.C. § 7323(b)(3).

With the foregoing exceptions, federal employees are now permitted to hold positions in political party organizations; however, they are still precluded from becoming partisan candidates in elections to public office. 5 U.S.C. § 7323(a)(3). In addition, although solicitations of the general public are still barred, the new law permits, under certain circumstances, employees who are members of a union or employee organization to solicit fellow members for contributions to the organization's political committee. § 7323(a)(2). 5 C.F.R. Part 734.

A violation of the Hatch Act's politicking ban is not a federal crime; it is a personnel infraction. The statute is enforced by the United States Office of Special Counsel and by the Merit Systems Protection Board. 5 U.S.C. §§ 1204 and 1212.

Active partisan campaigning in violation of the Hatch Act can lead to termination from federal employment, or thirty days'

suspension if the Merit Systems Protection Board recommends a lesser penalty. 5 U.S.C. § 7326.

The partisan activity currently prohibited for employees of the specifically designated law enforcement agencies listed above is taking "an active part in political management or in political campaigns." Both the amended and original statutes expressly define this phrase to include those acts of "political campaigning" that were prohibited by the Civil Service Commission prior to July 19, 1940, the date the original Hatch Act went into effect. 5 U.S.C. § 7323(b)(4); 5 U.S.C. § 7324(a)(2) (repealed 1993); 5 C.F.R. §§ 733.121 – 733.124.

Although a subject of some unfortunate confusion, the Hatch Act ban was never intended to apply to an employee's expression of personal opinion, whether given privately or publicly, on political candidates and issues. This basic right of expression was recognized in the original 1939 Hatch Act, former 5 U.S.C. § 7324(a)(2). It was reaffirmed by two appellate decisions, which reversed Hatch Act enforcement actions based on an employee's public expression of political opinion. *See Biller v. Merit Systems Protection Board*, 863 F.2d 1079 (2d Cir. 1988); *Blaylock v. Merit Systems Protection Board*, 851 F.2d 1348 (11th Cir. 1988). Finally, the principle was restated in the 1993 Hatch Act amendments. 5 U.S.C. § 7323(c) (employees retain the right to express their opinions on political candidates and issues). Thus, employees in designated law enforcement agencies who remain covered by the Hatch Act politicking ban retain the right to express their personal political views.

All inquiries concerning possible violations of the Hatch Act politicking ban should be directed to the Office of Special Counsel, 1120 Vermont Avenue, N.W., Washington, D.C. 20419 (202/653-8971).

## C. POLICY AND PROCEDURAL CONSIDERATIONS

United States Attorneys' Offices must consult the Public Integrity Section before instituting grand jury proceedings, filing an information, or seeking an indictment that charges patronage crimes. USAM § 9-85.210. As with election fraud matters, these consultation requirements are intended to assist federal prosecutors in this area and to ensure nationwide uniformity in the enforcement of these criminal patronage statutes.

## CHAPTER FOUR

# ELECTION DAY PROCEDURES

This chapter summarizes the Election Day Program that the Department of Justice implements for the federal general elections. Although this program has been in effect since 1970, it has taken on added dimensions and importance since the creation of the Department's Ballot Access and Voting Integrity Initiative in 2002. The Election Day Program is also implemented on a narrower geographic basis in connection with other significant elections when the Department determines that the need exists.

There is a substantial federal interest in ensuring that complaints of election abuses that are made during elections are reviewed carefully and that appropriate action is taken promptly. This review allows the Department to determine whether the alleged facts warrant a criminal investigation, and, if so, of what nature and scope. Accordingly, for the past 35 years the Department has implemented an Election Day Program for those elections in which the federal interest is greatest, namely, the federal general elections that occur in November of even-numbered years. During these elections, the entire United States House of Representatives and one-third of the United States Senate are elected, along with, every four years, the President and Vice President. In addition, some federal anti-corruption statutes reach conduct occurring in state and local elections. On a case-by-case basis, the Election Day Program may be expanded to include nonfederal elections when adequate predication exists to suggest a possible violation of federal criminal law.

The Election Day Program calls upon the Department's 93 United States Attorneys to designate one or more senior Assistant United States Attorneys (AUSAs) to serve a two-year term as District Election Officer (DEO) for his or her district. These AUSAs are

provided training and guidance by the Department in the areas of election crimes and voting rights violations. Since 2002, the Department's Criminal Division and Civil Rights Division have conducted annual training conferences for the DEOs prior to the November general elections.

On October 8, 2002, the Department held the first of its Voting Integrity annual conferences for federal prosecutors from around the country on combating election fraud and voting rights abuses. These annual conferences have become an important part of the Department's Ballot Access and Voting Integrity Initiative. In his remarks to attendees at the 2002 conference, the Attorney General provided a succinct statement of the significant public policy reasons behind both the new Initiative and the Department's Election Day Program:

> *The strength of our democracy demands that we fulfill the rights of both ballot access and ballot integrity – to guarantee to every citizen, in accordance with the law, the right to vote, and to every voter the right to be counted.*
>
> *So we come together today to renew our democratic compact with the American people. We gather here, in this Great Hall of Justice, to begin a new ethic of enforcement of our voting rights.*
>
> *On October 1st [2002], I issued a Directive to all United States Attorneys announcing a Department-wide Voting Access and Integrity Initiative.*
>
> * * *
>
> *We have created this precedent-setting Voting Access and Integrity Initiative for two reasons: first, to*

*enhance our ability to deter discrimination and election fraud, and second, to prosecute violators vigorously whenever and wherever these offenses occur.*

- *Our goal is to work cooperatively with civil rights leaders and state and local election officials to prevent election offenses and to bring violators to justice.*

- *Our means are a national mobilization of the resources of the Department of Justice.*

- *And our message is clear and unequivocal: the Department of Justice will investigate and prosecute voting rights and election fraud offenses.*

* * *

*I have asked each U.S. Attorney and FBI Special Agent in Charge to meet with state officials who handle election violations in each district, in order to underscore the Department's commitment to preventing – and, if necessary, investigating and prosecuting – election fraud and voting rights offenses. I am also asking U.S. Attorneys, Election Officers and FBI officials to explore ways in which the Department can work more closely with state and local election and law enforcement authorities to deter and detect discrimination, prevent electoral corruption, and bring violators to justice.*

* * *

> *This is our compact with the American people. Our role is to train, to educate and ultimately to enforce – when and if the laws are violated. Our pledge is to ensure justice for all American voters.*

As the Attorney General explained in the above-quoted remarks, the Election Day Program is designed to coordinate Department responses to election-related allegations among the United States Attorneys' Offices, FBI field offices, and Justice Department prosecutors in Washington, D.C. The Program also alerts the public to the Department's commitment to prosecuting election fraud.

Three important principles apply to the Election Day Program:

- First, as with all election crime matters, the Election Day Program emphasizes the detection, evaluation, and prosecution of crimes. As a general rule, except for the activities covered by the federal voting rights laws, the Department does not have authority to directly intercede in the election process itself.

- Second, except in matters involving alleged discrimination in the franchise that are covered by the civil rights statutes, the Justice Department generally has not heretofore placed observers inside open polling stations, even though there might be a reasonable basis for believing that criminal activity will occur there. This arises in part from respect for state laws governing who may be inside open polls, and in part from 18 U.S.C. § 592, which prohibits federal officials from stationing armed men at places where elections are in progress. However, there is no federal statutory bar against sending *unarmed* federal personnel, such as Assistant United States Attorneys, into open polling places as long as their presence is either allowed by

state law or permitted by local election administrators. Federal prosecutors and investigators are encouraged to consider this option in appropriate circumstances, in consultation with the Public Integrity Section.

- Third, the Department does not intercede on behalf of private litigants in civil election contests. Such matters are private in nature, and are customarily redressed through election contests under state law or civil rights suits under 42 U.S.C. § 1983.

The following is a general summary of the Election Day Program implemented by the Department and its District Election Officers on election day:

Before significant elections –

- The Justice Department issues a press release emphasizing the federal interests in prosecuting election crime and protecting voting rights.

- Similar press releases are then issued throughout the country by each United States Attorney. The telephone number of each AUSA serving as a District Election Officer is publicized locally, as well as the telephone numbers of the local offices of the FBI. Citizens are encouraged to bring complaints of possible election fraud to the attention of these law enforcement officials.

- Each United States Attorney and District Election Officer is encouraged to meet with the state and, if possible, local officials responsible for the administration of the election process and the prosecution of crimes against that process. The purpose of these meetings is to convey federal interest in

assuming an appropriate law enforcement role with respect to electoral corruption, and to make federal assets and personnel available to assist the states in such matters.

On election day –

- In each district, the District Election Officer receives and handles election fraud allegations.

- FBI Special Agents are made available in each district to receive election-related complaints from all sources.

- If warranted, the District Election Officer or United States Attorney may request the FBI to interview a person who alleges that an election crime has occurred. However, care must be taken to ensure that the interview does not affect the election itself. To avoid this potential danger, overt investigation of election-related allegations, other than taking statements from complaining witnesses, ordinarily occurs after the election is over.

- In Washington, prosecutors in the Criminal Division's Public Integrity Section are available as long as polls remain open, to provide advice to United States Attorneys, District Election Officers, and FBI personnel. Special attention is given to preserving evidence that may lose its integrity with the passage of time.

- Under certain circumstances, FBI Headquarters may authorize its agents to conduct covert operations before, during, or after the election upon request of the Public Integrity Section. However, such operations must be predicated on preexisting evidence that

observable or otherwise detectable illegal activities (such as vote buying) are likely to occur in that election. Such requests require particularly close review because of the risk of chilling legitimate voting activity, especially covert operations near or around polling places. Therefore, requests for authorization to use such techniques should be addressed to the Public Integrity Section as far before the election as is feasible.

After the election –

- A United States Attorney's Office may request the FBI to conduct a preliminary investigation into election fraud allegations that the Office believes warrant further inquiry.

- The Public Integrity Section may also request a preliminary investigation into any election-related allegations.

- The results of each preliminary investigation are reviewed by attorneys in the United States Attorney's Office and in the Public Integrity Section. These offices then consult to determine which matters may warrant a grand jury and full-field investigation.

- The United States Attorney's Office, with the assistance of the FBI, conducts whatever additional investigation that Office deems appropriate.

- At the conclusion of the investigation, the United States Attorney's Office discusses any proposed federal charges with the Public Integrity Section. After this consultation, the United States Attorney's Office prosecutes those charges.

- On its own or in collaboration with the U.S. Attorneys' Offices, the Public Integrity Section also investigates and prosecutes election crimes.

CHAPTER FIVE

# CAMPAIGN FINANCING CRIMES

## A. INTRODUCTION

The objective of campaign financing laws is to regulate the influence of money on politics. These laws serve to fill a gap in the coverage of federal laws addressing corrupt payments to federal officials that are disguised as campaign contributions. Since the United States and most of the states choose to finance most political campaigns through private contributions rather than public funding, campaign contributions are a necessary feature of political life. Without private contributions to political committees, political discourse would be impeded. Thus, the Supreme Court has held that when corrupt payments masquerade as campaign contributions, they violate federal corruption laws only if they can be shown to have been exchanged on a *quid pro quo* basis for a specific official act. *McCormick v. United States*, 500 U.S. 257 (1991); *Evans v. United States,* 504 U.S. 255 (1992). Campaign financing and disclosure laws fill this void by addressing situations when corrupt payments disguised as contributions are given and received on less than a *quid pro quo* basis.

There is no arguing that money and honest politics are a difficult mix. Large contributions to political campaigns expose the processes of governance to undue influence that grows with the size of the contribution. While they may not buy specific official acts, they surely can and do buy access to politicians and political parties. Moreover, certain sources of political funding present a greater risk of corruption than others. Almost everyone agrees that it is important to have access to accurate information about who campaign donors are and how much they contribute.

The nation's campaign financing laws are designed to address the interplay between money and politics. Their principal objective is to minimize as much as possible the corruptive influence of money in politics. They do this by limiting the size of contributions that individuals may contribute; by prohibiting contributions from entities such as corporations, unions, and banks, whose potential corrupting influence on democratic government has been historically demonstrated; and by imposing rigid disclosure requirements on those who participate in the federal campaign financing process. Transparency in campaign financing has also become a pillar of international standards for democratic elections.

In addition to the federal government, all the states have campaign financing laws. These vary from state to state, and in many instances they vary significantly from those at the federal level. Because this book is written for federal prosecutors and investigators, its focus is on the federal laws that govern this subject. In addition, because the power of the federal government in the area of campaign financing is limited primarily to regulating the financing of federal candidates, *Burroughs v. United States*, 290 U.S. 534 (1934), the focus of this chapter is further limited to federal laws that address the flow of money intended to influence election of candidates for federal office, that is, the Office of President, Vice President, or Member of Congress.[49]

Criminal violations of federal campaign financing laws require proof that the conduct was committed "knowingly and

---

[49] Violations of state campaign financing laws may, however, suggest the presence of federal corruption offenses. Consideration should be given to whether the alleged conduct may constitute, for example, possible mail, wire, or honest services fraud (18 U.S.C. §§ 1341, 1343, 1346); extortion under the Hobbs Act (18 U.S.C. § 1951); or federal program bribery (18 U.S.C. § 666). It is also important to note that those who violate state campaign financing laws might also engage in similar schemes at the federal level.

willfully."[50] In the context of a regulatory scheme such as is involved here, these words of specific criminal intent require proof that the offender was aware of what the law required, and that he or she violated that law notwithstanding that knowledge, i.e., that the offender acted in conscious disregard of a known statutory duty or prohibition. *United States v. Curran*, 20 F.3d 560 (3rd Cir. 1994); *National Right to Work Committee v. Federal Election Commission*, 716 F.2d 1401 (D.C. Cir. 1983)*; AFL-CIO v. Federal Election Commission*, 628 F.2d 97 (D.C. Cir. 1980). *See also Ratzlaf v. United States,* 510 U.S. 135 (1994) ("willful" violation of *malum prohibitum* regulatory statute prohibiting the structuring of financial transactions to avoid currency reporting requirements requires proof that defendant was aware of the duty violated and violated that duty not withstanding that knowledge).

Such an elevated *scienter* element requires at the very least that there is clear application of the law to the facts in question. When there is doubt concerning whether the law applies to the facts of a particular matter, the offender is more likely to have an intent defense. Consequently, this chapter will not attempt to cover the entire scope of the federal campaign financing laws. Rather, it will focus on the features of these laws that are well defined and commonly understood by persons who participate in the modern federal campaign financing process.[51]

---

[50] Violations of these laws that are committed with lesser intent – including all violations committed negligently or because the offender did not understand the application of the law to his or her conduct – are not federal crimes. They are subject to civil and administrative enforcement by the Federal Election Commission.

[51] In light of ongoing regulatory rulemaking and possible statutory changes to the federal campaign financing laws, prosecutors and investigators who encounter a possible violation of these laws should consult the Director of the Election Crimes Branch of the Public Integrity Section.

## B. STATUTORY SCOPE

### 1. Types of Statutes

There are four main types of federal campaign financing laws:

- Laws that limit the amount of contributions;
- Laws that prohibit contributions and expenditures by persons and entities whose participation in the federal election process has been deemed by Congress to present a sufficient potential for corruption as to warrant outright prohibition;
- Transparency laws that place before the voting public pertinent facts concerning the raising and spending of campaign funds; and
- Public funding laws, which, at the time this book was written, apply only to the campaigns of candidates seeking election to the Presidency.

The federal statute that regulates the financing of federal campaigns and ensures campaign transparency is the Federal Election Campaign Act of 1971, as amended (FECA or the Act). 2 U.S.C. §§ 431 - 455. The Act was amended significantly in 1974, 1976, 1979, and most recently in 2002. The 2002 amendments were contained in the Bipartisan Campaign Reform Act (BCRA).

Two federal statutes address public funding for presidential campaigns: the Presidential Primary Matching Payment Account Act, 26 U.S.C. §§ 9031 - 9042, which provides for federal matching payments for presidential primary campaigns; and the Presidential Election Campaign Fund Act, 26 U.S.C. §§ 9001 - 9012, which provides for full federal funding for presidential general election campaigns.

As noted above, FECA limits the amounts that may be contributed to candidates and political committees and also prohibits contributions from certain sources altogether. Two terms have arisen as a result of these limits and prohibitions, "hard money" and "soft money," which are used to describe generically the two main categories of political funds raised and spent in connection with federal campaigns. Although not defined by the Act, they are used frequently and have commonly accepted meanings:

- "Hard money" refers to funds that were raised in accordance with the Act's limits and prohibitions. Hard money (sometimes referred to as "federal funds") may be used to influence federal elections.

- "Soft money" refers to funds that were not raised in compliance with the Act's limits and prohibitions. As such, soft money (sometimes referred to as "nonfederal funds") may only be used to pay for activities that do not influence federal elections, i.e., activities that FECA does not reach. Since the passage of BCRA in 2002, national political parties and their agents are prohibited from raising or spending soft money. 2 U.S.C. § 441i.

**2. Basic Statutory Definitions**

FECA defines the basic terms that apply to the Act's substantive provisions. Because these terms are critical to a general understanding of the Act, it is important to identify them at the outset. These basic definitions are codified at 2 U.S.C. § 431. The most important of these definitions are:

- "election" – a general, special, primary, or runoff election, or a convention or caucus held to nominate a candidate. § 431(1).

- "candidate" – an individual who seeks nomination or election to federal office and has received contributions aggregating over $5,000 or has made expenditures aggregating over $5,000 or authorized such contributions or expenditures by another. § 431(2).

- "federal office" – the office of President or Vice President of the United States, United States Senator, United States Representative, or Delegate or Resident Commissioner to the United States House of Representatives. § 431(3).

- "political committee" – any committee or other group of persons that receives contributions or makes expenditures aggregating over $1,000 in a calendar year. § 431(4).

- "contribution" – in general, any gift, loan, or anything else having pecuniary value that is made for the purpose of influencing the nomination or election of a federal candidate. § 431(8).

- "expenditure" – in general, any purchase, payment, or anything else having pecuniary value that is made for the purpose of influencing the nomination or election of a federal candidate. § 431(9). In the context of public communications, the definition has been judicially limited to disbursements for communications that contain "magic words of express advocacy," such as "elect," "defeat," or "vote for," or that otherwise clearly call for elective action for or against a clearly identified federal candidate. *Federal Election Commission v. Massachusetts Citizens for Life, Inc.*, 479 U.S. 238, 247-249 (1986); *Buckley v. Valeo*, 424 U.S. 1, 44 n. 52 (1976).

In addition, as amended by BCRA, FECA also contains two broad definitions that extend the Act's coverage to reach previously unregulated political communications and activities. These definitions are:

- "Electioneering communication" – a public communication made through the media within certain periods before a federal election that "refers to" a clearly identified federal candidate and, in the case of a candidate for the United States House or Senate, is targeted to the relevant electorate. 2 U.S.C. § 434(f)(3). Because these communications do not contain words of "express advocacy," they are generally not "expenditures," unless, as discussed below, a provision of the Act expressly deems them such. However, if they exceed $10,000 in a calendar year, they must be reported. § 434(f)(4).

- "federal election activity" – activity by state or local political party committees that simultaneously benefits federal and nonfederal candidates, such as get-out-the-vote and voter registration drives. § 431(20). As discussed below, these activities can no longer be paid for with "soft money," but must be paid for with funds raised in compliance with the Act. 2 U.S.C. § 441i.

With two exceptions relating to electioneering communications, the noun describing the payment for these newly covered election-related activities is "disbursement" – not "expenditure" or "contribution." This distinction is critical. As will be discussed below, conduct involving "disbursements" is not covered by FECA's criminal penalties.

### 3. Statutory Presumptions

Under certain circumstances, an unregulated activity will become subject to the Act because of its connection with a federal candidate or political committee. The following definitions reflect the statutory presumptions that result in coverage – or additional coverage – under the Act:

- "coordinated expenditure" – an expenditure that is made "in cooperation, consultation, or concert with, or at the made "in cooperation, consultation, or concert with, or at the request or suggestion of" a federal candidate or an agent of a federal candidate. Such an expenditure is deemed to be a "contribution" to the candidate – and, as such, subject to the Act's limits and prohibitions. 2 U.S.C. § 441a(a)(7)(B)(i).

- "electioneering communication"– as set forth above, this term includes broadcast communications within certain periods before primary and general elections that refer to a clearly identified federal candidate. In general, payments for these communications are not "expenditures" because they do not expressly advocate a candidate's election or defeat. However, there are two exceptions to this rule:

(a) If the electioneering communication is coordinated with a federal candidate or an agent of the candidate, the costs of the communication are deemed to be a "contribution" to the candidate – and thus subject to the Act's limits – as well as an "expenditure" by the candidate. 2 U.S.C. § 441a(a)(7)(C).

(b) If the electioneering communication is made by a corporation or union, it is deemed to be an "expenditure" – and thus prohibited. 2 U.S.C. §§ 441b(b)(2), 441b(C).

Thus, a coordinated expenditure is deemed a "contribution" that is subject to the Act's limits and prohibitions, and an electioneering communication made by a corporation or union is deemed an "expenditure" that is prohibited by the Act.

## C. HISTORICAL BACKGROUND: 1907 to 2002

### 1. Overview

The history of campaign finance regulation in the United States began a century ago. It represents a gradual recognition by the public and by its elected representatives in Congress that the flow of money to politicians and political organizations induces corruption, and reflects a corresponding gradual evolution of legislative responses to this threat.

The Federal Election Campaign Act of 1971, as amended, (FECA or the Act) 2 U.S.C. §§ 431 - 455, assembles in one place the federal laws that regulate the financing of federal political campaigns. In 2002, after over two decades of unsuccessful legislative efforts, the Act was amended to close large loopholes that had allowed a significant portion of political activity relating to federal campaigns to fall outside the Act's coverage. The 2002 amendments are part of broad legislative reforms contained in the Bipartisan Campaign Reform Act (BCRA).

With two exceptions, FECA applies only to financial activity intended to influence the campaigns of candidates running for federal office (the Senate, House of Representatives, Presidency, or Vice Presidency). It contains two basic types of regulation: (1) campaign financing statutes, which regulate the sources and amounts of funds given or spent to influence a federal election; and (2) campaign reporting statutes, which require disclosure by federal candidates and political committees of the sources and recipients of their campaign funds. These two types of statutes are discussed next.

**2. Campaign Financing Laws**

Campaign financing statutes limit, or prohibit outright, contributions from certain sources in the interest of deterring corruption and the appearance of corruption of the election process. *Austin v. Michigan Chamber of Commerce*, 494 U.S. 652 (1990); *First National Bank of Boston v. Bellotti*, 435 U.S. 765 (1978); *Buckley v. Valeo*, 424 U.S. 1 (1976).

The first federal campaign financing statute was the Tillman Act of 1907, which prohibited corporations from making contributions to federal candidates. The 1925 Federal Corrupt Practices Act provided additional campaign financing limitations relating to federal elections. Emergency legislation during World War II prohibited labor organizations from making contributions or expenditures in connection with federal elections, a ban that was later made permanent through the Taft-Hartley Act. In 1948, government contractors were added as prohibited sources of federal campaign funds. Between 1948 and 1972, the Supreme Court defined the parameters of many of these laws. *Pipefitters Local 562 v. United States*, 407 U.S. 385 (1972); *United States v. Automobile Workers*, 352 U.S. 567 (1957); *United States v. C.I.O.*, 335 U.S. 106 (1948).

These decisions were incorporated into the original 1971 FECA. The 1974 amendments to the Act enacted limits on political contributions and expenditures, added a strict liability criminal misdemeanor penalty, and created the Federal Election Commission (FEC), a separate federal agency authorized to interpret the Act and to provide civil and administrative penalties for violations. In 1976, these limits, and the FEC's structure as a quasi-legislative agency, were subjected to rigorous constitutional scrutiny by the Supreme Court in *Buckley*. The Court upheld the Act's limits on contributions, but overturned its expenditure limits as unconstitutional infringements on First Amendment speech. The Court also held that the FEC's organizational structure, under which the majority of the

Commission's members were appointed by Congress, violated the Appointments Clause of the Constitution.

These constitutional defects were corrected by the 1976 FECA amendments, which also transferred nine criminal statutes dealing with campaign financing from the criminal code (where they were formerly codified as 18 U.S.C. §§ 608 and 610-617) to FECA (where they are codified at 2 U.S.C. §§ 441a - 441h). The 1976 amendments also recreated the FEC as an independent agency within the executive branch with exclusive civil enforcement jurisdiction over all FECA violations, and created a new criminal misdemeanor penalty for violations aggregating $1,000 that were committed "knowingly and willfully."

The 1979 FECA amendments increased the monetary threshold for a criminal FECA violation from $1,000 to $2,000. They also reaffirmed the two-tiered, overlapping enforcement approach to campaign finance violations: all FECA violations, whether committed knowingly and willfully, negligently, or when the application of the law to the facts was not clear, were to be subject to civil and administrative sanctions assessed by the newly created Federal Election Commission. In addition, violations involving knowing and willful conduct together with aggregate sums above a monetary minimum were to be subject to criminal misdemeanor penalties enforced by the Justice Department.

Soon after the 1979 amendments took effect, substantial loopholes developed in the Act's coverage of financial activities relating to federal elections. The most significant of these were the emergence of so-called "soft money" disbursements and "issue ads."

The "soft money" loophole arose from the fact that FECA generally applied only to financial activities for the purpose of influencing a federal election. This meant that financial activity ostensibly directed at other purposes, such as issue advocacy or party-building activities that simultaneously benefitted both federal and

nonfederal candidates, was viewed by the FEC as outside the reach of the law.

The "issue ad" loophole arose from a footnote in *Buckley*, in which the Supreme Court construed the critical FECA term "expenditure," in the context of public communications, to apply only to financial activity that was aimed at the general public and contained words expressly advocating the election or defeat of a clearly identified federal candidate, such as "vote for," "defeat," or "elect." 424 U.S. at 44, n. 52.

In 2002, Congress enacted broad campaign financing reforms as part of the Bipartisan Campaign Reform Act. In addition to plugging the well-publicized soft money and issue ad loopholes, BCRA provided significant enhancements to the criminal penalties for FECA crimes. This landmark campaign financing legislation will be discussed below.

### 3. Campaign Reporting Laws

The first attempt at requiring federal candidates to disclose the identities of their campaign contributors was the 1925 Federal Corrupt Practices Act. However, this statute was both imprecise and riddled with exceptions. It was replaced in 1971 with the first FECA, which closed many of these loopholes.

Until the Federal Election Commission was created in 1974, the only enforcement remedy for violations of these disclosure laws was criminal prosecution, and the Act's criminal penalty was a strict liability misdemeanor. 2 U.S.C. § 441 (repealed). For a variety of reasons, such as the frequent absence of aggravating factors, few violations were pursued criminally. Nevertheless, several of the Watergate cases were successfully prosecuted under FECA because the facts demonstrated that inaccurate reporting was a result of purposeful deceit and flouting of the law. *E.g.*, *United States v. Finance Committee to Re-Elect the President*, 507 F.2d 1194 (D.C.

Cir. 1974) (affirming conviction of former President Nixon's reelection committee for FECA reporting violations).

The 1976 amendments repealed the Act's strict liability criminal penalty and replaced it with a two-tiered system of sanctions for all FECA violations, including reporting violations: (1) all FECA violations were subject to civil and administrative sanctions enforced by the FEC; and (2) FECA violations that aggregated $2,000 or more and involved knowing and willful conduct were also subject to criminal misdemeanor penalties enforced by the Justice Department.

As with FECA's campaign financing laws, criminal violations of its reporting features were subject to the Act's special three-year statute of limitations. 2 U.S.C. § 455 (repealed 2002). However, because Title 18 statutes generally had a five-year statute of limitations, as well as felony penalties, the Justice Department successfully utilized several of these felony offenses in the late 1980s and 1990s to address aggravated FECA reporting violations. These prosecutive theories involved false statements reachable under 18 U.S.C. § 1001 and the "conspiracy to defraud" prong of 18 U.S.C. § 371. *United States v. Hsia*, 176 F.3d 517 (D.C. Cir. 1999); *United States v. Curran*, 20 F.3d 560 (3d Cir. 1994); *United States v. Hopkins*, 916 F.2d 207 (5th Cir. 1990). Both theories are still valid today, and will be discussed below.

We turn now to a discussion of the 2002 campaign legislation.

#### 4. The Bipartisan Campaign Reform Act of 2002

In 2002, Congress enacted the Bipartisan Campaign Reform Act (BCRA), which finally addressed most of the lapses in FECA's coverage. The following year, the Supreme Court upheld most of these reforms. *McConnell v. Federal Election Commission*, 540 U.S.

93 (2003).[52] Many of BCRA's reforms are of little concern to federal prosecutors and investigators, either because they address activities that do not involve a "contribution," "donation," or "expenditure" – to which the Act's criminal penalties are expressly limited – or because they concern issues that are subject to evolving regulation when the application of the law to the facts is not entirely clear.

BCRA contained three "headline" features that had been the focus of the national debate over campaign finance reform during the years leading up to its enactment. More importantly, it also contained several less publicized – yet for federal prosecutors far more significant – enhancements to the criminal enforcement penalties applicable to criminal violations of the Act. Many of these enhancements had been law enforcement priorities of the Criminal Division for over a quarter century. The headline features and criminal enforcement enhancements are summarized below.

### (a) Headline features of the 2002 campaign reforms

#### i. Soft money ban

BCRA's principal headline feature was its soft money ban, which is codified at 2 U.S.C. § 441i. This statute eliminates the ability of national political party committees, and in most cases state and local party committees, to maintain separate accounts for money that does not comply with FECA's limitations and source prohibitions ("soft money"), and to use these unregulated funds for activities such as voter registration, get-out-the-vote drives, and "issue ads" that fall short of expressly advocating the election or defeat of a federal candidate. Under Section 441i, virtually all funds raised and spent by: (1) candidates for federal office; (2) national party committees,

[52] Excerpts of the Supreme Court's summary of the historical development of the federal campaign financing laws and the lapses in their coverage that were addressed by BCRA are contained in Appendix A.

such as the Democratic and Republican National Committees; and (3) agents of federal candidates or national party committees must be raised in accordance with FECA's limitations and prohibitions, i.e., the funds must be "hard money."

ii. <u>Electioneering communications</u>

The second headline feature of BCRA is the regulation of "electioneering communications" under FECA. This feature is designed to reach so-called "issue ads" (e.g., communications that suggest support for a federal candidate but do not contain words of express advocacy, such as "vote for" or "elect."

As explained above, the term "electioneering communication" applies only to a communication disseminated through the broadcast media, not through the print media or the Internet. The term includes any broadcast communication that refers to a clearly identified federal candidate; that is made either 30 days before a primary or 60 days before a general election; and, in the case of a House or Senate candidate, is targeted to the relevant electorate. § 434(f)(3)(A).

Payments for an "electioneering communication" are generally "disbursements," not "expenditures." This distinction is important, as "disbursements" are not covered by FECA's criminal penalty, which is confined to violations that involve a "contribution, donation, or expenditure." § 437g(d)(1). Therefore most violations of this provision fall exclusively within the civil enforcement jurisdiction of the Federal Election Commission. However, there are two exceptions to this rule:

- *"Coordinated electioneering communications."*

Electioneering communications that are coordinated with a candidate or party committee are deemed a "contribution" to the candidate or committee with whom or which they are coordinated, as well as an "expenditure" by that candidate or committee. § 441a(a)(7)(C). Because the statutory presumption transforms what otherwise would

be a "disbursement" into a "contribution" and an "expenditure," these communications can be reached by the Act's criminal penalty.

• *"Corporate and union electioneering communications."* The definition of "expenditure" in the FECA statute prohibiting corporations and unions from making an "expenditure" in connection with federal elections has been expanded to include an "electioneering communication." § 441b(b)(2). Therefore, if corporate or union funds are used to make such a communication the violation is covered by the Act's criminal penalty.

However, the Supreme Court recently held that the Act's prohibition on "electioneering communications" was unconstitutional as applied to a corporate communication that was capable of a reasonable interpretation <u>other than an appeal to vote for or against a specific federal candidate</u>. *Federal Election Commission v. Wisconsin Right to Life, Inc.*, 551 U.S. __, 127 S.Ct. 2652 (2007). Consequently, evaluation of a potential criminal case involving such a communication requires careful reading of the text and context of the communication.

iii. <u>New contribution limits</u>

BCRA's final headline feature is the increased amounts that individuals may contribute to federal candidates, political parties, and political committees. These limits had not been raised since their original enactment in 1974, despite the considerable inflation that had occurred since then. The new limits are codified at 2 U.S.C. § 441a, and will be discussed below.

**(b) BCRA's criminal enforcement enhancements**

The BCRA reforms that are of most interest to federal prosecutors and investigators are the significant enhancements to the penalties for criminal violations of FECA's substantive provisions. Specifically, BCRA:

- Repealed the special three-year statute of limitations that had governed FECA crimes since 1974, and replaced it with the traditional five-year limitations period that applies to most other federal crimes under 18 U.S.C. § 3282. 2 U.S.C. § 455(a).

- Created a five-year felony offense for FECA violations aggregating $25,000 or more during a calendar year. 2 U.S.C. § 437g(d)(1)(A)(i).

- Created a two-year felony offense for violations of the FECA prohibition against conduit contributions (2 U.S.C. § 441f) that aggregate over $10,000 in a calendar year. 2 U.S.C. § 437g(d)(1)(D)(i).

- Directed the United States Sentencing Commission to promulgate a guideline expressly covering FECA crimes.[53] On January 25, 2003, the Sentencing Commission promulgated the new guideline on an emergency basis, and it became effective for conduct taking place after that date. U.S.S.G. § 2C1.8. This new guideline is discussed in detail in Chapter Six.

- Clarified that FECA's ban on contributions from foreign nationals (2 U.S.C. §441e) applies to donations to nonfederal candidates as well as to contributions to federal candidates, thereby

---

[53] Congress also mandated that the guideline include a number of aggravating factors as enhancements, such as the amount involved in the offense, whether the offense involved foreign funds, and whether it was motivated by a desire to gain a specific advantage from the government. BCRA, § 314(b)(2).

codifying *United States v. Kanchanalak*, 192 F.3d 1037 (D.C. Cir. 1999).

- Expanded the FECA provision that forbids agents of one federal candidate from falsely representing that they have authority to speak for another federal candidate on a matter that is damaging to the other candidate (2 U.S.C. § 441h) to include a separate prohibition against misrepresentations by *anyone* for the purpose of soliciting contributions. 2 U.S.C. § 441h(b).[54]

- Expanded the law that forbids the solicitation or receipt in federal buildings of contributions for federal elections (18 U.S.C. § 607) to include donations for nonfederal elections. 18 U.S.C. § 607(a)(1).

- Provided additional criteria for what constitutes "coordination" between interest groups and candidates or political parties, and thus transforms the value of activities done on their behalf into an "in-kind contribution" to the candidate or political party. 2 U.S.C. § 441a(a)(7).

---

[54] Fraudulently soliciting political funds can also present violations of the mail or wire fraud statutes, 18 U.S.C. §§ 1341 or 1343. However, prosecuting fraudulent campaign solicitations under FECA's Section 441h usually results in a better sentencing calculation, and is thus the preferred approach to this sort of fraud.

## D. STATUTES

### 1. Introduction

This section will present a discussion of those substantive provisions of the Federal Election Campaign Act that are of principal interest to federal prosecutors and investigators. We do not attempt to present a thorough discussion of the entire FECA, or of all issues that might arise under the Act. The intricacy of this regulatory statute and the scope of its criminal provision confines the Justice Department's criminal jurisdiction to violations that are committed "knowingly and willfully," that is, by subjects who knew what the law required and who violated it notwithstanding that knowledge. 2 U.S.C. § 437g(d)(1); *National Right to Work Committee v. Federal Election Commission*, 716 F.2d 1401 (D.C. Cir. 1983); *AFL-CIO v. Federal Election Commission*, 628 F.2d 97 (D.C. Cir. 1980). In light of the limitation of FECA's criminal provision to offenders who flout a known statutory duty or prohibition, any situation when the application of the law to the facts is unclear does not easily produce a prosecutable FECA crime.

In view of the above considerations, the discussion that follows is confined to those substantive provisions of FECA that are clear, generally well-known, and enforceable through the Act's criminal penalties; i.e., knowing and willful violations that involve "the making, receiving, or reporting of any contribution, donation or expenditure" that falls in FECA's "heartland."

### 2. The "Heartland" Provisions of the Campaign Financing Laws

In general, to warrant criminal prosecution, a FECA violation should involve one of FECA's substantive, or "heartland," provisions. These provisions, and the principles underlying them, are:

- Limits on amount of contributions
  Large political contributions lead to perceived and actual corruption of public officials. The Act therefore has quantitative limits on the amounts that contributors can give to candidates seeking federal office and to political committees supporting federal candidates. 2 U.S.C. § 441a(a).

- Ban on contributions and expenditures by corporations and unions
  Financial political activism by corporations and unions can distort, and potentially corrupt, election results and issues. To avoid these adverse effects, and to protect shareholders and minority members from having their shared capital used for political purposes they may not support, unions and corporations may not make contributions or expenditures in connection with federal elections. 2 U.S.C. § 441b.

- Ban on contributions from federal contractors
  Persons and entities that are signatories on contracts to provide equipment, services, or supplies to the United States Government, or are negotiating for such contracts, should not seek to influence federal officials through political donations. They therefore may not make contributions or expenditures to influence the election of federal candidates. 2 U.S.C. § 441c.

- Ban on contributions from foreign nationals
  American elections should be shielded against foreign influence. Accordingly, persons who are not citizens of the United States or lawfully admitted for permanent residence may not make contributions or expenditures in connection with any United States election, whether at the federal, state, or local level. 2 U.S.C. § 441e.

- Ban on disguised and cash contributions
  To prevent circumvention of the Act's limits and prohibitions, and to ensure accurate public disclosure of all significant campaign data, contributions may not be laundered through conduits to conceal the true source of the funds. 2 U.S.C. § 441f. In addition, cash contributions over $100 to a federal candidate's campaign are prohibited. 2 U.S.C. § 441g.

- Transparency
  FECA is a "sunshine" statute as well as a regulatory and anti-corruption statute. The Act reflects Congress's belief that the public has a right to know which individuals and organizations support which federal candidates and in what amounts, so that voters can make informed decisions at the polls. Federal candidates and political committees supporting federal candidates are therefore required to register with the FEC, and to designate a treasurer who must file periodic reports with the FEC detailing all contributions received and expenditures made that aggregate over $200 in a calendar year. 2 U.S.C. §§ 432, 433, 434.

- Ban on use or direction of "soft money" by political parties
  To avoid circumvention of FECA's limits and prohibitions, national party committees must finance all their activities with "hard money," that is, funds raised in accordance with the Act, and may not solicit, spend, or direct to other sources "soft money." In addition, state and local party committees must use hard money for "federal election activity," including voter registration and get-out-the vote drives, and public communications that refer to and support or oppose a federal candidate. 2 U.S.C. § 441i.

- Theft from candidate's political committee
  No person may convert funds contributed to a federal candidate to his or her personal use.[55]
  2 U.S.C. § 439a.

### 3. Campaign Financing Crimes

As noted above, FECA has its own internal criminal penalty. 2 U.S.C. § 437g(d). Section 437g(d) provides that a violation of FECA is a federal crime if it is committed "knowingly and willfully" and, with two exceptions,[56] if it meets certain monetary thresholds. Specifically, if the violation involves the making, receiving, or reporting of a "contribution, donation, or expenditure" that:

- aggregates $2,000 or more in a calendar year, it is a one-year misdemeanor, § 437g(d)(1)(A)(ii);

- aggregates $25,000 or more in a calendar year, the violation is a five-year felony, §§ 437g(d)(1)(A)(i), 437g(d)(1)(D)(i); or

- aggregates over $10,000 in a calendar year and involves illegal conduit contributions, the violation is a two-year felony, § 437g(d)(1)(D)(i).

We now turn to a discussion of the Act's provisions.

---

[55] This anti-embezzlement provision does not apply to thefts from political committees that are not authorized candidate committees. However, such matters may be prosecuted as mail, wire, or honest services fraud under 18 U.S.C. §§ 1341, 1343, or 1346.

[56] The exceptions are fraudulent campaign representations and fraudulent solicitations, which have no criminal monetary threshold. 2 U.S.C. §§ 441h(a), 441h(b).

### 4. Substantive Statutes

#### (a) 2 U.S.C. § 441a. Limitations on contributions and expenditures

Section 441a sets quantitative limits on the amounts individuals, political committees, and other entities may contribute to federal candidates and political committees. § 441a(a). It also limits expenditures by party committees and presidential candidates who accept federal funding. §§ 441a(b), 441a(d).

As noted above, "contribution" is generally defined as a gift of anything of value for the purpose of influencing a federal election. § 431(8). In addition, the term includes expenditures that are made in "cooperation, consultation, or concert with, or at the request or suggestion of" a candidate, a person authorized to act on behalf of a candidate, or a national, state, or local party committee. § 441a(a)(7)(B). An "expenditure" is a disbursement made for the purpose of influencing a federal election. § 431(9).

The distinction between a contribution and an expenditure has constitutional significance. Contributions are made by one person or entity to another to enable the recipient of the funds to engage in political speech of the recipient's choosing, while expenditures are made directly by the owner of the funds for political speech chosen by the owner of the funds. Thus, contributions are indirect political speech, and as such may constitutionally be subject to more stringent regulation than expenditures, which are direct political speech. *Buckley v. Valeo*, 424 U.S. 1, 13-59 (1976).

Section 441a contains three sets of contribution limits:

First, subject to a cost-of-living escalation provision discussed below,[57] under Subsection 441a(a)(1), contributions from "persons" (individuals, associations, and committees) may not exceed:

- $2,000 to a federal candidate with respect to any election (primary and general elections are treated as separate elections for the purpose of Section 441a);
- $25,000 in a calendar year to a national party committee;[58]
- $10,000 in a calendar year to a state party committee; or
- $5,000 in a calendar year to any other political committee.

Second, under Subsection 441a(a)(2), contributions from "multi-candidate political committees" (political committees registered for six months with the FEC that have received contributions from over fifty persons and that support at least five federal candidates) may not exceed:

- $5,000 to a federal candidate per election;

---

[57] Certain limits may also be subject to increase due to the application of one of FECA's so-called "millionaire" provisions. §§ 441a(i), 441a-1.

[58] At the time this book was written, there were six national party committees: the Republican National Committee, the Democratic National Committee, the National Republican Senatorial Committee, the Democratic Senatorial Campaign Committee, the National Republican Congressional Committee, and the Democratic Congressional Campaign Committee. 11 C.F.R. § 110.1(c)(2).

- $15,000 in a calendar year to a national party committee; or

- $5,000 in a calendar year to any other political committee.

Third, under Subsection 441a(a)(3), individuals are subject to aggregate two-year contribution limits. During the period beginning January 1st of an odd-numbered year and ending December 31st of the following even-numbered year, individuals may not contribute in the aggregate more than:

- $37,500 to federal candidates; and

- $57,000 to all other political committees, of which no more than $37,500 may be contributed to political committees that are not national party committees.

The above limits do not apply to transfers between the national, state, district, and local committees of the same political party. § 441a(a)(4). However, contributions to a candidate from political committees that are subject to common control (e.g., committees affiliated with several locals of the same union, or committees affiliated with subsidiaries of the same corporation) are treated as though they were from a single political committee. § 441a(a)(5).

Finally, as a result of BCRA, the limits on contributions from persons are adjusted for inflation every two years. § 441a(c)(1)(C).[59] The increases are announced in odd-numbered years and are effective

---

[59] BCRA also authorized annual increases in the Act's limits on expenditures by candidates and party committees. § 441a(c)(1)(B).

for the two-year election cycle beginning with the day after the last general election.[60]

A candidate's expenditures can constitutionally be limited only if the candidate elects to participate in a public funding program. *Buckley v. Valeo*, 424 U.S. 1, 54-59 (1976); 2 U.S.C. § 441a(b). At present, only presidential candidates have the option of receiving federal funds for their campaigns; hence, these are the only candidates who may be subject to expenditure limits. There are, moreover, no limits on expenditures by a person that are made independently of the candidate being benefitted thereby. However, if such "independent expenditures" exceed certain monetary thresholds, they must be reported to the FEC. § 434(g).

There are also no limits on the amount of personal funds that a federal candidate may use in his or her campaign. Under *Buckley v. Valeo*, 424 U.S. 1 (1976), this use of personal funds represents an "expenditure" that cannot be constitutionally limited.

The contribution limits discussed above have been repeatedly upheld against First Amendment challenges, and there is no question today that they are constitutionally valid. *McConnell v. Federal Election Commission*, 540 U.S. 93 (2003); *Buckley v. Valeo*, 424 U.S. 1 (1976); *see also Nixon v. Shrink Missouri PAC*, 528 U.S. 377 (2000) (upholding similar state contribution limits).

---

[60] Thus, for example, for the 2005-2006 election cycle the quantitative limits on contributions from individuals are as follows: $2,100 per election to a federal candidate; $26,700 per year to national party committees; $37,300 per six-year election cycle to national party senate campaigns; $40,000 per two-year election cycle to all federal candidates; and $61,400 per two-year election cycle to all other political committees.

.

Generally, cases prosecuted under Section 441a involve excessive contributions that are effected either surreptitiously (such as through conduits) or in the furtherance of some other felonious objective (such as a bribe that is disguised as a contribution to a candidate).

### (b) 2 U.S.C. § 441b. Prohibition on contributions and expenditures by national banks, corporations, and labor organizations

Section 441b was designed primarily to protect the integrity of the election process against potential corruption resulting from the influx of vast aggregates of corporate and union wealth. *Cort v. Ash*, 422 U.S. 66 (1975); *see also First National Bank of Boston v. Bellotti*, 435 U.S. 765 (1978) (§ 441b addresses problem of corruption of elected representatives through creation of political debts) (dictum). The statute contains two broad prohibitions, one limited to federal elections, and one that encompasses all elections.

First, Section 441b prohibits any state-chartered corporation, or any labor organization, from making a contribution or expenditure in connection with any federal election.

Second, the statute prohibits a national bank or a federally chartered corporation from making a contribution or expenditure in connection with any election – federal, state, or local.[61]

In addition, Section 441b makes it unlawful for any officer of a corporation, labor organization, or national bank to consent to a prohibited contribution or expenditure; and for any candidate, political committee, or other person knowingly to accept such a

---

[61] This statute is one of two FECA prohibitions that extend to nonfederal elections. The other is 2 U.S.C. § 441e, which prohibits foreign nationals from making contributions to nonfederal as well as federal elections.

prohibited contribution. The statute does not restrict contributions or expenditures from the personal resources of corporate or union officials, provided, of course, that the value of the funds given are not reimbursed or otherwise passed back to a corporate or a union fisc.

The heart of the statute is its ban on the use of corporate treasury funds or of monies required as a condition for membership in a labor organization for contribution to federal campaigns, or for "active electioneering" in connection with federal campaigns. *United States v. Pipefitters Local 562*, 434 F.2d 1116 (8th Cir. 1970), *rev'd on other grounds*, 407 U.S. 385 (1972); *United States v. Automobile Workers*, 352 U.S. 567 (1957).

In 1972, the Supreme Court held that Section 441b's predecessor (18 U.S.C. § 610) did not bar corporations or unions from using their treasury funds to establish and operate "separate segregated funds" – commonly known as "affiliated political action committees," or PACs – provided the PACs confined their solicitation activities to raising voluntary contributions from corporate employees or union members, respectively. *Pipefitters*, 407 U.S. at 409. Also, the statute does not apply to the use of corporate or union funds to finance communications, on any subject, between labor unions and their membership or between corporations and their stockholders. *Automobile Workers,* 352 U.S. 567 (1957). Nor does it apply to nonpartisan expenditures, or to the costs of publishing statements of editorial opinion in newspapers of general public distribution that are owned by corporations or unions. *United States v. C.I.O.*, 335 U.S. 106 (1948).

The constitutionality of Section 441b has been frequently challenged, for the most part without success, and it is now well established that the Section's prohibitions on corporate and union political activity do not violate the First Amendment. *Austin v. Michigan Chamber of Commerce*, 494 U.S. 652 (1990); *Federal Election Commission v. National Right To Work Committee*, 459 U.S. 197 (1982); *Athens Lumber Co. v. Federal Election Commission*,

718 F.2d 363 (11th Cir. 1983); *United States v. Boyle*, 482 F.2d 755 (D.C. Cir. 1973). Although the statute treats corporations and unions somewhat differently because of their fundamentally different structures and compositions, this does not offend the Constitution's Equal Protection Clause. *Austin v. Michigan Chamber of Commerce*, 494 U.S. 652 (1990); *International Association of Machinists v. Federal Election Commission*, 678 F.2d 1092 (D.C. Cir. 1982), *aff'd*, 459 U.S. 983 (1982).

The statute has been held not to apply to a limited class of nonprofit corporations established solely to promote issues. *Federal Election Commission v. Massachusetts Citizens for Life*, 479 U.S. 238 (1986). *See also First National Bank of Boston v. Bellotti*, 435 U.S. 765 (1978) (holding unconstitutional a state statute prohibiting corporate expenditures for referenda and noting that the federal prohibition in § 441b does not apply to referenda).

Prior to the enactment of the 2002 campaign reforms, Section 441b applied only to the use of corporate or union funds to expressly advocate the election or defeat of a clearly identified federal candidate. BCRA expanded the statute to reach "electioneering communications" as well. As discussed previously, this term has a broad reach and may include many forms of issue advocacy. [62] *But see FEC v. Wisconsin Right to Life, Inc.,* 551 U.S. ___, 127 S.Ct. 2652 (2007) (holding prohibition unconstitutional as applied to communication focusing on issue rather than candidate's election.)

---

[62] "Electioneering communication" includes any broadcast or satellite communication which "refers to" a clearly identified federal candidate; is made 30 days before a primary or 60 days before a general or runoff election; and, in the case of a candidate for the United States Senate or United States House of Representatives, is targeted to the relevant electorate. 2 U.S.C. § 434(f)(3)(A)(i).

As with all other FECA violations, to reach the level of a Section 441b criminal violation, the act had to have been committed "knowingly and willfully." Absent direct evidence of such criminal intent, a prosecution under Section 441b will most likely be successful when funds were diverted from a corporate or union treasury and laundered in some fashion to a candidate.

**(c) 2 U.S.C. § 441c. Prohibition on contributions by government contractors**

Section 441c prohibits any person who is a signatory to, or who is negotiating for, a contract to furnish material, equipment, services, or supplies to the United States Government, from making or promising to make a contribution "for any political purpose." It has been construed by the FEC to reach only contributions for the purpose of influencing the nomination or election of candidates for federal office. 11 C.F.R. § 115.2(a). The statute applies to all types of businesses, including sole proprietorships, partnerships, and corporations, and reaches gifts made from such entities' business or partnership assets. With respect to partnerships, however, the FEC has determined that Section 441c does not prohibit donations made from the personal assets of the partners, provided of course, that the value of such contributions is not reimbursed from, or otherwise passed back to, partnership assets. 11 C.F.R. § 115.4.

The statute applies only to business entities that have negotiated or are negotiating for a contract with a department or agency of the United States. Thus, the statute does not reach those who have contracts with nonfederal agencies to perform work under a federal program or grant. Nor does it reach persons who provide services to third-party beneficiaries under federal programs that require the signing of agreements with the federal government, such as physicians performing services for patients under Medicare. Finally, officers and stockholders of incorporated government contractors are not usually covered by Section 441c, because the

government contract is usually with the corporate entity, not its officers. However, individual corporate officers may be covered by Section 441c if they are individually liable on the government contract.

The same statutory exemptions that apply to Section 441b also apply to Section 441c. Thus, government contractors may make nonpartisan expenditures, may establish and administer affiliated PACs, and may communicate with their officers and stockholders on political matters. In addition, Section 441c does not reach electioneering communications. Therefore, government contractors who are not incorporated (and thus not subject to Section 441b) are allowed to make electioneering communications.

**(d) 2 U.S.C. § 441d. Attribution of sponsors of political communications and solicitations**

Section 441d requires that certain political communications include the identity of the person or entity responsible for the communication. Prior to enactment of BCRA in 2002, the statute was limited to two types of political communications: (1) communications "expressly advocating the election or defeat" of a clearly identified federal candidate, and (2) communications soliciting contributions to a federal candidate or political committee. BCRA added two more types of communications requiring this attribution: (1) general advertisements by political committees, and (2) "electioneering communications" by any person, that is, communications to a targeted electorate within certain periods before primary and general elections that refer to a federal candidate.

Section 441d does not cover anonymous communications that leave to inference the identity of a particular candidate. The FEC, acting pursuant to its advisory opinion authority under 2 U.S.C. § 437f, has excluded several categories of campaign advocacy (such as bumper stickers and skywriting) from the reach of this law. 11 C.F.R. § 110.11(a)(2).

Although BCRA expanded the scope of Section 441d, only violations involving the two communications originally covered by the statute are subject to prosecution, namely, communications that expressly advocate a federal candidate's election or defeat, and communications that solicit contributions. Funds expended for such communications are "expenditures" under the Act, and are therefore subject to its criminal provision, § 437g(d)(1). Electioneering communications and general political advertising by political committees, on the other hand, generally involve "disbursements," which are not reachable by the Act's criminal provision.

**(e) 2 U.S.C. § 441e. Prohibition on contributions, donations, and expenditures by foreign nationals**

Section 441e prohibits contributions and donations by foreign nationals to all United States elections, whether federal, state, or local. It is one of the two federal campaign financing statutes that reach activities directed at both federal and nonfederal elections.[63]

Prior to the enactment of the Bipartisan Campaign Reform Act, the statute prohibited a foreign national from making, directly or through any other person, a contribution "in connection with an election to any political office." *United States v. Kanchanalak*, 192 F.3d 1037 (D.C. Cir. 1999) (statute reaches contributions "in connection with any federal, state, or local election"). The statute also prohibited any person from knowingly soliciting or accepting a contribution from a foreign national.

BCRA retained the prohibitions of Section 441e against contributions made by or accepted from foreign nationals in connection with any United States election, and expanded the statute to prohibit four additional types of political activity by foreign

---

[63] The other is 2 U.S.C. § 441b, discussed above, which bars national banks and federal corporations from making a contribution in connection with an election to any political office.

nationals: expenditures, independent expenditures, contributions to any political party, and electioneering communications. In addition, BCRA added the term "donation" to Section 441e's prohibition (as well as to the Act's criminal provision), to leave no doubt that political donations to state and local candidates are covered by its prohibition.[64] All types of Section 441e violations are subject to prosecution except those involving electioneering communications, which are defined for purposes of Section 441e as "disbursements" and therefore are not covered by the Act's criminal penalty.

The term "foreign national" means: (1) a "foreign principal" within the meaning of the Foreign Agents Registration Act, 22 U.S.C. § 611, and (2) any person who is not a citizen of the United States, or a national of the United States who is not lawfully admitted for permanent residence. § 441e(b). A "foreign principal" includes a foreign government, a foreign political party, and a corporation organized under the laws of a foreign country. None of these entities may make contributions or donations to any candidate or political party in the United States.

Through its regulations, advisory opinions, and civil enforcement actions, the FEC has addressed the application of Section 441e to contributions by domestic subsidiaries of foreign corporations.[65] The Commission has determined that a domestic subsidiary that is chartered under the laws of any state or United States territory, and has its principal place of business in the United States, is not a foreign principal – even though all of its capital stock

---

[64] Although not defined in the Act, a "donation" is a political gift that is not a "contribution" – a term that is confined to federal campaigns. Hence a "donation" is a political gift that is given to a candidate for state or local office or to a political committee in connection with a state or local election.

[65] Persons who rely in good faith on an FEC advisory opinion are immune from sanctions under FECA, including criminal prosecution. § 437f(c)(2).

may be owned by foreign individuals or entities. The FEC has, however, concluded that Section 441e prohibits contributions by a domestic subsidiary if the parent foreign corporation provides funding for the contribution, or if individual foreign nationals are involved in any way in making the contribution. In 1991, the FEC rejected proposed rulemaking that would have expanded the scope of Section 441e to include domestic subsidiaries of foreign-owned entities.

In response to a congressional directive in BCRA, the United States Sentencing Commission promulgated a new sentencing guideline for FECA offenses, U.S.S.G. § 2C1.8 (eff. January 25, 2003). The guideline provides significant enhancements for FECA violations involving a foreign national or foreign government. § 2C1.8(b)(2). The guideline is discussed in Chapter Six.

#### (f) 2 U.S.C. § 441f. Prohibition on contributions through conduits

Section 441f makes it unlawful for any person to make a contribution in the name of another, or for any person to permit his or her name to be used to make such a contribution. The statute also prohibits any person from knowingly accepting a contribution made by one person in the name of another.

The conduit statute is one of FECA's most frequently violated prohibitions. This is because it prohibits conduct that is often used by perpetrators to disguise other campaign financing violations, such as contributions over the Act's limits in violation of Section 441a, or from prohibited sources in violation of Section 441b or Section 441e.

Section 441f violations occur when a person gives money to straw donors, or conduits, for the purpose of having the conduits pass the funds on to a specific federal candidate as their own contributions. The motive is typically to preserve the true donor's anonymity and aggregate contribution amount, as the ostensible contributions will be reported publicly as having been made by the straw donors. A

common type of conduit scheme involves a corporate official who instructs the corporation's employees to make contributions to a federal candidate, and then reimburses the employees from corporate funds generally through fictitious bonuses or pay raises. In so doing, illegal corporate funds are laundered to the candidate in violation of both Sections 441f and 441b.

As discussed previously, to be subject to prosecution as a FECA crime, the act must be knowing and willful. Laundering campaign contributions through straw donors is persuasive evidence of the Act's willful intent element (conscious defiance of the law). *See AFL-CIO v. Federal Election Commission*, 628 F.2d 97, 101 (D.C. Cir. 1980) (willful violation requires knowing, conscious, and deliberate flaunting of the Act).

As noted above, the 2002 Bipartisan Campaign Reform Act included enhanced criminal penalties for FECA crimes. In formulating these new penalties, Congress gave particular attention to conduit schemes, and determined that they should be subject to a separate felony penalty with a lower monetary floor than the general felony provision contained in BCRA for FECA offenses. Specifically, conduit crimes aggregating over $10,000 in a calendar year are now punishable as felonies, and subject to two years of imprisonment and *mandatory* minimum fines. 2 U.S.C. § 437g(d)(1)(1)(D). Conduit crimes aggregating $25,000 or more are subject to FECA's other new felony provision, and are five-year felonies. 2 U.S.C. § 437g(d)(1)(A)(ii). Finally, conduit crimes aggregating between $2,000 and $10,000 are one-year misdemeanors. 2 U.S.C. § 437g(d)(1)(A)(i).

As will be discussed below, conduit violations also may be prosecuted under the federal conspiracy and false statement statutes, 18 U.S.C. §§ 371 and 1001. The courts have held that the use of conduits to disguise illegal contributions to federal candidates is evidence of an intent to interfere with the accurate reporting of campaign contributions, an intent to defraud the FEC, and an intent

to cause false information to be conveyed to the FEC. *United States v. Hsia*, 176 F.3d 517 (D.C. Cir. 1999). *See also United States v. Hopkins*, 916 F.2d 207, 213-15 (5th Cir. 1990) (upholding Section 1001 conviction for filing false statements on disclosure reports required by the Ethics in Government Act).

Conduit schemes often involve multi-district activity, and therefore the question of where a contribution is "made" or "received" within the meaning of Section 441f can present venue questions. For a discussion of such venue issues, *see United States v. Passodelis*, 615 F.2d 975 (3d Cir. 1980) (reversing a conviction under Section 441f's predecessor, 18 U.S.C. § 614, on venue grounds). For a discussion of statute of limitations issues that also can arise in such cases, *see United States v. Hankin*, 607 F.2d 611 (3d Cir. 1979) (reversing a conviction under 18 U.S.C. § 614 on statute of limitations grounds).

**(g) 2 U.S.C. § 441g. Limitation on contribution of currency**

Section 441g makes it unlawful for any person to contribute more than $100 in United States or foreign currency to the campaign of a federal candidate. The limitation is cumulative, and applies to the candidate's entire campaign, including the primary and general election. The limitation differs from, and is in addition to, the contribution limitations in Section 441a.

The statute does not expressly address receiving cash for political purposes, but campaign agents who knowingly solicit or receive cash in violation of Section 441g may be liable as aiders and abettors under 18 U.S.C. § 2.

### (h) 2 U.S.C. § 441h. Fraudulent misrepresentation of campaign authority

As a result of the 2002 Bipartisan Campaign Reform Act, Section 441h now prohibits two discrete types of fraudulent misrepresentations in connection with federal campaigns: certain campaign "dirty tricks," and fraudulent fundraising. Specifically:

- Section 441h(a) prohibits federal candidates and their agents from fraudulently misrepresenting that they have authority to speak or act for another federal candidate or political party on a matter that is damaging to the other candidate or political party. The statute also prohibits conspiracies to misrepresent campaign authority to damage an opponent.

- Section 441h(b), enacted by BCRA, prohibits any person from fraudulently misrepresenting, or conspiring with another to fraudulently misrepresent, that he or she is acting for a federal candidate or political party for the purpose of soliciting contributions or donations.[66]

Unlike all other FECA violations, violations of Section 441h may be prosecuted without regard to the sum of money involved. § 437g(d)(1)(C). Violations that involve amounts under $25,000 are one-year misdemeanors and violations involving $25,000 or more are five-year felonies. § 437g(d)(1)(A).

---

[66] Violations of Section 441h(b) involving fraudulent fund-raising that are accomplished through the use of the mails or interstate wires may also be prosecuted as fraud offenses under 18 U.S.C. § 1341 or § 1343.

### (i) 2 U.S.C. § 441i. Prohibition against soft money of political parties

Section 441i was also added to FECA by BCRA, and represents perhaps the single most significant achievement of that round of campaign financing reforms. This statute was designed to eliminate unregulated "soft money" from the federal election campaign process. Many of its potential areas of application to specific facts are continuing subjects for clarification by the FEC through its rule-making, advisory opinions, and civil enforcement actions.

Nevertheless, the so-called "soft money ban" codified in Section 441i has several clear features that are enforceable through FECA's criminal penalty. Specifically:

i. Section 441i(a)

Section 441i(a) provides that a "national committee of a political party (including a national congressional campaign committee of a political party)," an agent of such a national committee, and any entity that is established, financed, or controlled by such a national committee, may not "solicit, receive, or direct to another person" any "contribution, donation, or transfer of funds," or spend any funds, that are not subject to the limits and prohibitions of FECA.[67] Such funds would include contributions that exceed the Act's quantitative limitations in violation of Section 441a; contributions from prohibited sources, such as corporations, labor organizations, banks, or government contractors in violation of

---

[67] At the time this book was written, the following six committees were included in this prohibition: the Republican National Committee, the Democratic National Committee, the National Republican Senatorial Committee, the Democratic Senatorial Campaign Committee, the National Republican Congressional Committee, and the Democratic Congressional Campaign Committee. 11 C.F.R. § 110.1(c)(2).

Section 441b, Section 441c, or Section 441e; and contributions laundered through conduits or in cash in violation of Section 441f or Section 441g.

Stated differently, national committees of political parties and their agents may only solicit, receive, or direct funds that comply with the limitations and prohibitions of FECA, that is, "hard money." Any act of solicitation, receipt, or direction of "soft money" funds by a national party committee, its agents, or an entity it controls violates Section 441i(a).

Of particular significance here is the statute's inclusion of the verb "direct." It would be, for example, a violation of Section 441i(a) if an agent of a national party committee suggested to a wealthy contributor that instead of giving soft money to the national party (which is no longer permissible), the contributor give the funds to a state or local component of the national party committee. It would also be a violation of Section 441i(a) if the agent suggested that a prohibited funding source such as a corporation or a labor organization give to a recipient that is not covered by FECA, such as a candidate for nonfederal office.

ii. Section 441i(b)

Section 441i(b) prohibits state and local committees, as well as their officers and agents, from "expending or disbursing" funds that have not been raised in accordance with the limitations and prohibitions of FECA on "federal election activity." This new term was enacted by BCRA and is defined broadly to include any activity that benefits both federal and nonfederal candidates. § 431(20). Examples of "federal election activity" include get-out-the-vote efforts, voter registration drives, and generic public communications that simultaneously benefit a political party's federal and nonfederal candidates, such as, "vote for the Democratic [Republican] Party."

Prior to BCRA, the Federal Election Commission permitted "generic" expenses such as those noted above to be allocated between federal and nonfederal candidates, requiring that only the portion of their cost that was attributed to the promotion of federal candidates be paid from "hard money." This allocation process proved to be both weak and unenforceable. By enacting Section 441, Congress rejected the FEC's allocation rules, and plugged this loophole by statutorily deeming all such "generic" activities by state and local party committees to be entirely "federal" in nature, thus requiring that they be financed entirely from "hard money," i.e., money raised in compliance with FECA. The following year, the Supreme Court upheld this extension of FECA's coverage as a constitutional legislative effort to avoid circumvention of the Act. *McConnell v. Federal Election Commission*, 540 U.S. 93 (2003). Thus, if an agent of a state political party committee knowingly and willfully uses "soft money" to pay for "generic" party advertisements, the agent would be in violation of 441i(b).

Section 441i(b) does not cover state and local political party communications that refer entirely to nonfederal candidates. The statute also does not apply to expenditures or disbursements for generic get-out-the-vote or voter registration drives that are paid from a special fund that the Act permits state and local party committees to maintain. These special accounts – called "Levin" accounts after the Senator who sponsored this provision – may raise up to $10,000 from individual contributors, provided that national party committees, state party committees acting jointly, and, with narrow exceptions, federal candidates and officeholders are not involved in the solicitation of such funds. §§ 441i(b)(2)(C), 441i(e)(3).

iii. Section 441i(d)

Section 441i(d) prohibits any national, state, or local committee of a political party, as well as agents thereof, from "soliciting, making, or directing" any contribution or donation to any organization that is exempt from federal taxation under the provisions

of 26 U.S.C. § 501 or § 527, if said tax-exempt organizations have made expenditures or disbursements to fund "federal election activities." Again, these include primarily "generic" expenses such as paying for get-out-the-vote or voter registration drives, or public communications that benefit simultaneously both federal and nonfederal candidates. This far-reaching prohibition was also upheld in *McConnell* as a necessary measure to prevent evasion of the ban on the use of soft money in federal campaigns – the principal focus of Section 441i.

iv. Section 441i(e)

Finally, Section 441i(e) addresses what are commonly known as "leadership PACs." Prior to BCRA, these PACs were established and controlled by a federal candidate or officeholder to raise funds for candidates at the federal, state, and local levels in the expectation that such activities would also enhance the candidate's or officeholder's own political power. Specifically, Section 441i(e) provides that a federal candidate or officeholder, or an entity controlled by such a person, may not "solicit, receive, direct, transfer, or spend" funds raised in violation of FECA's limitations and prohibitions in connection with the election of any candidate for federal, state, or local elective office. § 441i(e)(1). The statute contains an exception for a federal candidate or officeholder who is also running simultaneously for a state or local office, which permits the candidate to solicit, receive, or spend "soft money"on behalf of his or her nonfederal election campaign, provided that the transactions are permitted under state law. § 441i(e)(2). As noted above, in *McConnell* the Supreme Court upheld this broad limitation against various constitutional challenges, finding it necessary to prevent circumvention of the statute's prohibition on the use of soft money by federal candidates and officials to influence federal elections.

Knowing and willful violations of Section 441i that aggregate $2,000 or more in a calendar year are one-year misdemeanors; those

aggregating $25,000 or more in a calendar year are five-year felonies. § 437g(d)(1)(A).

### (j) 2 U.S.C. § 439a. Prohibition on conversion of campaign funds

Section 439a regulates the use of funds contributed to federal candidates and officeholders. Over the years the statute has gone through a number of substantive changes, most of which have focused on the use of campaign funds to defray the personal expenses of federal candidates and officeholders.

As originally enacted, Section 439a provided that funds contributed to a federal candidate in excess of amounts needed for campaign expenditures, and funds donated to a federal officeholder, could be used: (1) to defray the candidate's expenses in connection with his or her official duties, (2) for contributions to charities, (3) for transfers to political parties, or (4) for any other "lawful purpose." However, it was unclear whether "lawful purpose" included the use of campaign funds for personal purposes. In 1980, the statute was amended to state expressly that such funds may not be converted by any federal candidate, federal official, or other person to any "personal use." However, the term "personal use" was not defined.

In 2002, Congress completely revised Section 439a as part of BCRA's broad campaign reforms, and, in the process, clarified exactly what it meant by a prohibited conversion to an individual's "personal use." The current statute applies to *all* contributions to a federal candidate – not just "excess" contributions – and is composed of two provisions:

- Section 439a(a) sets forth the permissible uses of contributed funds. It retains three previously permissible uses – for duties as an officeholder, contributions to charities, and transfers to political parties. In addition, Congress added another

permissible use relating to election campaigns: "for otherwise authorized expenditures in connection with the campaign for Federal office of the candidate." § 439a(a)(1). The former category, "for any other lawful purpose," was deleted.

- Section 439a(b) contains the statutory prohibition: a contribution to a federal candidate may not be "converted by any person to personal use." § 439a(b)(1). The provision further provides that a contribution shall be considered to be converted to personal use if it is used to fulfill any "commitment, obligation, or expense of a person that would exist irrespective of the candidate's election campaign." § 439a(b)(2). Finally, Section 439a(b)(2) lists nine specific examples of prohibited personal uses of campaign funds, such as mortgage payments, clothing expenses, vacations, and noncampaign-related car expenses.

Section 439a now reflects Congress's clear intent to bar completely the conversion of campaign funds for personal purposes. Although the statute is limited to funds contributed to federal candidates and their authorized committees, conversion of contributions to other political committees can be addressed under Title 18 fraud statutes. For example, if the conversion was by a campaign official, the conduct can be prosecuted as an honest services mail fraud under 18 U.S.C. §§ 1341 and 1346, as a scheme to deprive the campaign of the honest services of the campaign official; if the theft was by someone other than a campaign official, the matter can generally be reachable under the mail or wire fraud statutes, 18 U.S.C. § 1341 or § 1343.

In addition to prosecuting embezzlement and conversion of campaign funds under Section 439a or the fraud statutes, this conduct

can also be prosecuted under the false statements statute, 18 U.S.C. § 1001, for willfully causing another to submit false information to the FEC regarding the use of the funds.

#### (k) 2 U.S.C. §§ 432, 433, and 434. Organization, recordkeeping, and reporting requirements

In brief, FECA requires federal candidates and political committees supporting federal candidates to file with the FEC a statement of organization and periodic reports of receipts and disbursements. §§ 433, 434(a). The reports are made available to the public, and must identify, among other things, persons contributing over $200 in a calendar year. § 434(b)(3)(A). The Act also requires that persons making independent expenditures (as distinct from contributions) in excess of $250 to elect or to defeat a federal candidate must file reports with the FEC. § 434(c).

Most campaign records must be maintained for three years, including records reflecting the identity of all contributors giving in excess of $50. §§ 432(c), 432(d). In addition, persons who collect, receive, or otherwise handle contributions to a federal candidate from other persons are required to forward these contributions to the candidate's campaign treasurer within ten days, along with the name and address of any person who contributed over $50 to the candidate. § 432(b).

## E. ENFORCEMENT

### 1. Three Types of Enforcement

Federal campaign financing violations are subject to three types of enforcement:

- Criminal prosecution by the Justice Department as felonies, either under FECA, as amended by BCRA (i.e., after November 5, 2002); under other federal

criminal statutes addressing frauds and false statements, such as 18 U.S.C. §§ 371, 1001, 1341, 1343, and 1346; or under Title 26 statutes if the matter involves a publicly funded presidential campaign;

- Criminal prosecution by the Justice Department as FECA misdemeanors (before November 6, 2002, or if the amount of the violation does not reach the post-BCRA felony thresholds); and

- Civil enforcement proceedings by the Federal Election Commission.

**2. General Observations**

Criminal prosecution under FECA can be pursued before civil and administrative remedies are exhausted. §§ 437g(a), 437g(d); *United States v. International Union of Operating Engineers*, 638 F.2d 1161 (9th Cir. 1979); *United States v. Tonry*, 433 F. Supp. 620 (E.D. La. 1977); *United States v. Jackson*, 433 F. Supp. 239 (W.D. N.Y. 1977), *aff'd*, 586 F.2d 832 (2d Cir. 1978).

Before the 1976 FECA amendments, all FECA violations were subject to prosecution under a misdemeanor provision that applied regardless of the amount of funds involved, and that, on its face, required no criminal intent. 2 U.S.C. § 441 (1972 Supp.) (repealed). In affirming convictions under the 1971 FECA's reporting provisions, one appellate court held, however, that criminal violations required proof of "knowing" conduct, that is, knowledge of operable facts. *United States v. Finance Committee to Re-Elect the President*, 507 F.2d 1194, 1197-98 (D.C. Cir. 1974) (finding the defendant's secret transactions "clear indicators of guilty intent").

The 1976 FECA amendments transferred all of the campaign financing statutes that were in Title 18 to FECA, and also created a statutory dichotomy between nonwillful violations involving any

amount, and knowing and willful violations involving $2,000 or more within a calendar year. The former were expressly made subject to the exclusive civil jurisdiction of the Federal Election Commission. 2 U.S.C. §§ 437g(a), 437d(e). The latter were made subject to both civil enforcement proceedings by the FEC and criminal prosecution by the Justice Department. 2 U.S.C. §§ 437g(a)(5)(B), 437g(d).

The 2002 FECA amendments augmented the Act's criminal misdemeanor penalty by enacting two felony penalties for FECA crimes: knowing and willful violations aggregating $25,000 or more in a calendar year are now five-year felonies, and violations involving conduits that exceed $10,000 in a calendar year are two-year felonies. §§ 437g(d)(1)(A)(i), 437g(d)(1)(D)(i).

The FEC pursues FECA violations under the statutory scheme set forth in Section 437g(a). In brief, civil penalties can be imposed through a "conciliation" process, which is roughly equivalent to an administrative guilty plea with a stipulated penalty agreed upon by the FEC and the respondent; civil penalties can also be imposed through a civil suit brought by the FEC in federal district court. Civil sanctions range from "cease and desist" agreements (in which the respondent agrees not to commit a similar violation in the future) to relatively substantial fines. The size of the civil fine depends both on the amount involved in the violation and the degree of knowledge and intent of the respondent. §§ 437g(a)(5), (6). The FEC possesses subpoena power and the power to administer oaths, §§ 437d(a)(3) and 437d(a)(2), powers that it has been using with increasing frequency in recent years.

### 3. Criminal Prosecution

As noted above, FECA has an internal criminal penalty provision, Section 437g(d). In order for a FECA violation to be a federal crime, Section 437g(d) generally requires that two elements be satisfied: the violation must have been committed "knowingly and willfully," and, with certain exceptions, the amount involved in

the violation must aggregate $2,000 or more in a calendar year. Moreover, a single pattern of illegal conduct can often involve several FECA offenses, which may have different monetary thresholds. An example would be corporate contributions in violation of Section 441b that are laundered through conduits in violation of Section 441f. Prosecutions under the Act thus present three factual issues: intent, aggregate value, and applicable penalties. These topics are discussed next.

**(a) Intent**

For a FECA violation to have been committed "knowingly and willfully," the offender must have known what the law forbade or required and violated that statutory prohibition or duty notwithstanding that knowledge. *United States v. Finance Committee to Re-Elect the President*, 507 F.2d 1194, 1197-1198 (D.C. Cir. 1974); *see also National Right to Work Committee v. Federal Election Commission*, 716 F.2d 1401, 1403 (D.C. Cir. 1983) *and AFL-CIO v. Federal Election Commission*, 628 F.2d 97, 101 (D.C. Cir. 1980) (knowing and willful FECA violation requires "knowing, conscious, and deliberate flaunting" of the Act).

Examples of evidence that has been used to prove that FECA violations were committed knowingly and willfully include:

- The use of surreptitious means, such as cash, conduits, or false documentation, to conceal the violation;

- Making a prohibited "in-kind" contribution by paying directly for goods or services provided to a recipient political committee;

- Proof that the offender is active in political fund-raising and is personally well-versed in the federal campaign financing laws (such as offenders who

can be shown to be professional lobbyists or fundraisers);

- Proof that the substantive FECA violation took place as part of another felonious end (such as the use of corporate funds to pay a bribe to a public official in violation of 18 U.S.C. § 201, with the bribe disguised as an ostensible campaign contribution to the official's campaign committee); and

- Proof that the donor received information about FECA prohibitions and requirements directly from a candidate, political committee, or campaign, e.g., through the use and execution of what are called "donor cards."

Four provisions of FECA address acts that are *malum in se*, that is, inherently wrongful conduct from which willful intent to violate the law can be inferred from mere proof that the prohibited act was committed. These exceptional provisions are the Act's prohibitions against: conversion of campaign funds (§ 439a); misrepresentation of campaign authority to damage an opponent's campaign (§ 441h(a)); fraudulent solicitations (§ 441h(b)); and certain coerced contributions by corporations and unions (§ 441b(b)(3)(A)).

**(b) Aggregate value**

Prior to November 6, 2002, when BCRA's changes went into effect, all violations of FECA's substantive prohibitions that were committed knowingly and willfully were, with two exceptions, federal misdemeanors only if they involved conduct "aggregating" $2,000 or more in a calendar year. 2 U.S.C. § 437g(d)(2000). The exceptions to this $2,000 requirement were violations of the prohibition in Section 441b(b) against the use by corporate or union PACs of coerced contributions, and violations of the prohibition in

Section 441h against fraudulent misrepresentation of campaign authority to damage another candidate or political party.

In determining the aggregate value of a FECA violation, the customary practice has been to include the overall "value" of a series of violations that are committed by, and attributed to, a given offender. For example, a $50,000 illegal corporate contribution within a given calendar year that was illegally passed through 50 individuals serving as conduits would have an aggregate value of $50,000.

BCRA retained the $2,000 jurisdictional threshold for FECA misdemeanors, as well as its two exceptions noted above. It also added a third exception to this monetary floor for violations of the new prohibition against misrepresentation of campaign authority to solicit contributions for a candidate or political party. 2 U.S.C. § 441h(b).

In addition, BCRA added two new monetary thresholds for FECA crimes that occur after November 5, 2002 (when BCRA took effect):

- All FECA violations "aggregating" $25,000 or more in a calendar year are five-year felonies, 2 U.S.C. § 437g(d)(1)(A)(i); and

- Violations of FECA's prohibition against the use of conduit contributions (2 U.S.C. § 441f) "aggregating" over $10,000 in a calendar year are two-year felonies, 2 U.S.C. § 437g(d)(1)(D)(i).

Thus, if within the same calendar year an offender knowingly and willfully contributes $24,000 in illegal corporate funds through 12 conduits to make the transactions appear legal, that offender commits a felony violation of Section 441f, since the aggregate value of the conduit violation exceeds $10,000. The offender also commits

a misdemeanor violation of the corporate contribution prohibition in Section 441b, since the violation aggregates more than $2,000, but less than $25,000.

**(c) Penalties**

When this book was written, most FECA crimes prior to BCRA had expired under the special three-year statute of limitations that governed FECA offenses. Therefore, we do not focus on the penalties that previously applied to FECA crimes that took place before November 6, 2002, other than to note that such offenses were all misdemeanors subject to one year of imprisonment and a fine of the greater of (i) 300% of the aggregate value involved in the offense, or (ii) the appropriate fine under 18 U.S.C. § 3571 (i.e., $100,000 for each offense committed by an individual and $200,00 for each offense committed by an organization).[68]

For FECA offenses that take place after November 5, 2002, the following criminal penalties apply:

- All FECA violations that aggregate $25,000 or more in a calendar year are felonies subject to imprisonment for five years and, except for conduit violations, fines imposed pursuant to 18 U.S.C. § 3571 (up to $250,000 for each offense by an individual and up to $500,000 for each offense by an organization). 2 U.S.C. § 437g(d)(1)(A)(i).

- Conduit violations (2 U.S.C. § 441f) that aggregate more than $10,000 in a calendar year

---

[68] Federal prosecutors should also consider whether any conduct before November 6, 2002, may still be prosecuted under criminal statutes subject to a five-year statute of limitations, such as 18 U.S.C. §§ 1001 and 371. Such statutes also apply, of course, to conduct after BCRA's effective date.

are felonies: those aggregating under $25,000 are two-year felonies, and those aggregating $25,000 or more are five-year felonies. 2 U.S.C. § 437g (d)(1)(D)(i). In addition, these offenses are subject to a *mandatory* minimum fine of 300% of the amount involved in the violation, and a maximum fine that is the greater of either $50,000, or 1,000% of the aggregate value involved in the offense, or the amount provided for in 18 U.S.C. § 3571.
2 U.S.C. § 437g(d)(1)(D)(ii).

- Fraudulent misrepresentations of campaign authority to damage an opponent or to solicit funds (2 U.S.C. § 441h) involving less than $25,000 in a calendar year are misdemeanors subject to one year of imprisonment and fines imposed pursuant to 18 U.S.C. § 3571 (up to $100,000 for each offense by an individual and up to $200,000 for each offense by an organization). 2 U.S.C. § 437g(d)(1)(C).

- Violations of the prohibition against the use of coerced contributions by corporations and unions (2 U.S.C. § 441b(b)(3)(A)) that aggregate $250 or more in a calendar year are subject to one year of imprisonment and fines imposed pursuant to 18 U.S.C. § 3571. 2 U.S.C. § 437g(d)(1)(B).

- Violations of all other FECA provisions that aggregate $2,000 or more in a calendar year are misdemeanors subject to one year of imprisonment and fines imposed pursuant to 18 U.S.C. § 3571. 2 U.S.C. § 437g(d)(1)(A)(ii).

Of course, the actual penalties imposed for these offenses are subject to the guidance provided in the FECA sentencing guideline, U.S.S.G. § 2C1.8.

#### 4. Felony Theories for FECA Crimes

Prior to BCRA, when all FECA crimes were misdemeanors and subject to a special three-year statute of limitations, prosecuting aggravated campaign financing violations as Title 18 felonies offered strategic advantages. For example, such cases were governed by the general five-year criminal statute of limitations contained in 18 U.S.C. § 3282. Also, the sentencing calculus was usually harsher for violations of Title 18 offenses than for FECA crimes. Finally, conviction of a felony carried more serious collateral consequences.

The theories of prosecution developed prior to BCRA for these purposes utilized the federal conspiracy and false statements statutes, 18 U.S.C. §§ 371 and 1001. As discussed below, these theories remain viable charging options for FECA crimes.

##### (a) Willfully causing submission of false information to the Federal Election Commission. 18 U.S.C. § 1001 and § 2.

Each political committee that seeks to influence a federal election is required to have a treasurer who is required to file periodic reports with the FEC of contributions to and expenditures by the committee, including the identity of all persons contributing over $200 in a calendar year. 2 U.S.C. §§ 432(a), 434(a), 434(b)(3)(A). In addition, persons receiving a contribution to a political committee must forward it to the treasurer, along with the identity of all donors contributing over $50. 2 U.S.C. § 432(b). The treasurer's reports thus include information from individuals who have forwarded contributions to the committee.

A treasurer who submits information concerning contributions or expenditures to the FEC, knowing the information to be false, violates 18 U.S.C. § 1001. A person involved in a transaction reportable under FECA who attempts to disguise it, or misrepresents its source, purpose, or amount, "willfully causes" the treasurer of the recipient committee to furnish false information concerning the transaction to the FEC in violation of l8 U.S.C. §§ 2(b) and 1001. This information is "material" to the "jurisdiction" of the FEC in that it impacts adversely upon the Commission's statutory duties to make public an accurate account of financial transactions done for the purpose of influencing a federal election (2 U.S.C. § 438(a)(4)), and, in situations when the concealed fact itself constitutes a violation of FECA, to enforce the law (§§ 437d(a)(6), 437d(a)(9), 437g(a)(5)).

The application of Section 1001 to campaign financing violations follows from *United States v. Hansen*, 772 F.2d 940 (D.C. Cir. 1985). In this case, Congressman Hansen had been indicted and convicted under Section 1001 for filing false reports with the House Committee on Standards of Official Conduct under the 1978 Ethics in Government Act (EIGA). Like a portion of FECA, EIGA is essentially a disclosure statute; it applies to federal officeholders and candidates, while FECA applies to persons seeking federal office. Also like FECA, EIGA has an internal penalty that provides for nonfelony sanctions. The D.C. Circuit rejected the contention that, by enacting EIGA, Congress had repealed by implication existing felony sanctions for false reports by public officials; the court held that the civil penalty in EIGA and the felony penalty under Section 1001 "produce a natural progression in penalties," and that "those who lie on their [EIGA] forms" violate Section 1001. *Hansen*, 772 F.2d at 945.

The use of Section 1001, in conjunction with Section 2(b), to prosecute those who willfully cause the treasurer of a political

committee to submit materially false data to the FEC has been upheld by every court that has decided the issue. *United States v. Hsia*, 176 F.3d 517 (D.C. Cir. 1999); *United States v. Kanchanalak*, 192 F.3d 1037 (D.C. Cir. 1999); *United States v. Curran*, 20 F.3d 560 (3d Cir. 1994); *United States v. Hopkins*, 916 F.2d 207 (5th Cir. 1990). *See also United States v. Gabriel,* 125 F.3d 89 (2d Cir. 1997) (*dicta)* (analyzing the interrelationship between Section 1001 and FECA).

In *Curran,* the Third Circuit adopted a restrictive view of this theory of prosecution, and required proof that the offender had knowledge of the underlying FECA requirement or prohibition involved in the violation, similar to the type of proof needed for a conviction under FECA's criminal provision. However, the remainder of the circuits that have addressed this issue have rejected *Curran's* narrow reading of the law and have applied to Section 1001 prosecutions involving false FEC filings the same elements that apply in other Section 1001/Section 2 cases. *United States v. Hsia*, 176 F.3d 517; *see also United States v. Gabriel, 125 F.3d 89.* These elements are:

- the defendant caused another to make a statement that was false;
- the false statement concerned a matter that was within the jurisdiction of the Federal Election Commission; that is, the false statement related to a fact that the Federal Election Campaign Act required to be accurately reported;
- the false statement was material to the FEC, that is, it had the natural tendency to influence the FEC in the performance of its official duties; and

- the defendant acted knowingly and willfully; that is, the defendant intended to cause the recipient of political contributions to record false statements concerning their source. However, the government does *not* have to prove that the defendant was aware of the statutory requirements and prohibitions of FECA, that he purposefully violated the Act, or that he was aware of the federal agency's interest in the matter falsified. Proof that the defendant "acted deliberately and with knowledge that the representation was false" is sufficient. *United States v. Hopkins*, 916 F.2d at 214.

**(b) Conspiracy to defraud the United States. 18 U.S.C. § 371**

The "conspiracy to defraud" approach to FECA crimes is based on *Hammerschmidt v. United States*, 265 U.S. 182 (1924), which held that a conspiracy to defraud the United States under Section 371 includes a conspiracy "to interfere with or obstruct one of [the federal government's] lawful governmental functions by deceit, craft, or trickery, or at least by means that are dishonest." *Id.* at 188. *See also Dennis v. United States*, 384 U.S. 855, 861 (1966); *Haas v. Henkel*, 216 U.S. 462, 469 (1910).

This conspiracy theory, as applied to the functioning of the FEC, is as follows: the FEC, an agency of the United States, has the principal statutory duties of enforcing FECA's campaign financing prohibitions and disclosure requirements and providing the public with accurate information regarding the source and use of contributions to federal candidates and expenditures supporting federal candidates. 2 U.S.C. §§ 437c, 437d. To perform these duties

the FEC must receive accurate information from the candidates and political committees that are required to file reports under the Act. A scheme to infuse patently illegal funds into a federal campaign, such as by using conduits or other means calculated to conceal the illegal source of the contribution, thus disrupts and impedes the FEC in the performance of its statutory duties.

As previously stated, prosecution under FECA's criminal provision requires proof that the defendant was aware of the substantive FECA requirement he or she violated, and that he or she violated it notwithstanding this active awareness of wrongdoing. *National Right to Work Committee v. Federal Election Commission*, 716 F.2d 1401 (D.C. Cir. 1983); *AFL-CIO v. Federal Election Commission*, 628 F. 2d 97 (D.C. Cir. 1980). However, when the conduct is charged under Section 371, the proof must also show that the defendant intended to disrupt and impede the lawful functioning of the FEC. Indeed, the crux of a Section 371 FECA case is an intent on the part of the defendant to thwart the FEC. That is a higher factual burden than is required under 18 U.S.C. § 1001 in all but the Third Circuit, and is arguably a greater factual burden than is required by Section 437g(d).

The use of Section 371 in this manner has been approved by the Third and Fifth Circuits. *United States v. Curran*, 20 F.3d 560 (3d Cir. 1994); *United States v. Hopkins*, 916 F.2d 207 (5th Cir. 1990).

**5. Public Financing Crimes Relating to Presidential Campaigns**

The anti-fraud provisions of the Presidential Primary Matching Payment Account Act, 26 U.S.C. §§ 9031-9042, and the Presidential Election Campaign Fund Act, 26 U.S.C. §§ 9001-9012,

are five-year felonies and can be used to prosecute aggravated campaign financing schemes involving presidential campaigns. 26 U.S.C. §§ 9012, 9042.

These statutes were enacted after the Supreme Court struck down the 1974 FECA's limits on campaign expenditures by federal candidates as violative of free speech. *Buckley v. Valeo*, 424 U.S. 1 (1976). The statutes tie eligibility for federal funds to voluntary adherence to campaign expenditure limits by participating candidates. Thus, presidential candidates are given a choice between making unlimited campaign expenditures or accepting public funds for their campaigns in return for agreeing to abide by campaign expenditure limits.

The "matching payment" statute applies to the presidential primary campaign. It provides that, once certain statutory qualifications are met, a presidential candidate is entitled to receive matching payments (for contributions up to $250 from individual donors) from the United States Treasury for his or her campaign, up to half of the applicable total campaign spending limit. 26 U.S.C. § 9034(b). Presidential candidates who choose to accept primary campaign matching funds are subject to FECA's campaign expenditure limits. 2 U.S.C. § 441a(b).

The general election funding statute allows a candidate who has been nominated by a major party (i.e., the Republican Party or the Democratic Party) or by a qualifying minor or new party for the Presidency to receive all of his or her campaign funds from the United States Treasury. 26 U.S.C. § 9004(a)(1). Presidential candidates who choose to accept this federal grant are subject to the campaign expenditure limits in 2 U.S.C. § 441a(b), and are also for the most part prohibited from accepting any private contributions in

connection with the general election phase of their campaigns. 26 U.S.C. §§ 9003, 9012.

Both public financing statutes contain bookkeeping and reporting requirements, and also require that each campaign receiving federal funds submit to a post-election audit by the FEC. 26 U.S.C. §§ 9033, 9003. Participating candidates must also agree to pay back all funds which the FEC determines were not used for campaign purposes, or which were spent in excess of the expenditure limit, were not matchable, or were otherwise illegal. 26 U.S.C. §§ 9038, 9007.

Each of these statutes contains its own criminal provision for, among other things, providing false information to the FEC to obtain public funds, which is punishable by imprisonment for up to five years and a fine under 18 U.S.C. § 3571. 26 U.S.C. §§ 9042(c), 9012(d). Prosecutors considering false statement charges in connection with conduct violating one of these public funding laws thus have the choice of using either the public funding statute that specifically addresses the conduct or the general false statements statute, 18 U.S.C. § 1001. *See United States v. Curran*, 20 F.3d 560 (3rd Cir. 1994) (affirming Section 1001 charge for election law offense); *United States v. Hopkins*, 916 F.2d 207 (5th Cir.1990) (same); *see also United States v. Woodward*, 469 U.S. 105 (1985) (affirming Section 1001 charge for currency reporting offense).

The administration and civil enforcement of these grant programs are within the FEC's sole jurisdiction. However, since these are federal funding programs, with federal candidates as the beneficiaries, if there is evidence of an intent to defraud the United States in the implementation of these programs, criminal prosecution is warranted and should be pursued.

### 6. Violations of State Campaign Financing Laws

All states have campaign financing laws. Like their federal counterpart, these state laws prohibit contributions from certain sources, in some instances they limit the amounts that can be given to state and local candidates, and in most instances they impose transparency requirements on state and local candidates and political committees that are engaged in influencing state and local elections.

Federal law does not directly criminalize violations of state campaign financing laws. Federal prosecutors should consider, however, whether the underlying conduct violates federal criminal law.

Two federal fraud statutes (18 U.S.C. §§ 1341 and 1346) have been used in the recent past to reach certain violations of state campaign financing laws. These are discussed below.

#### (a) 18 U.S.C. § 1346. Honest services frauds

In *McNally v. United States*, 483 U.S. 350 (1987), the Supreme Court ruled that a scheme to defraud citizens of the honest services of a public official was not, in itself and in the absence of a proven pecuniary loss, a violation of the mail fraud statute, 18 U.S.C. § 1341. The Court in fact cited as examples several election fraud cases it believed did not present violations of the mail fraud statute in which the lower appellate courts had held that the mail fraud statute was applicable to schemes to deprive others of fair elections.[69]

---

[69] *United States v. Clapps*, 732 F.2d 1148 (3rd Cir. 1984); *United States v. States*, 488 F.2d 761 (8th Cir. 1973).

Prior to *McNally*, two circuits had held that the "intangible rights" theory of mail and wire fraud also reached schemes to deprive the inhabitants of a state of information that was required to be accurately disclosed under state campaign financing and lobbying disclosure laws. *United States v. Curry*, 681 F.2d 406 (5th Cir. 1982); *United States v. Buckley*, 689 F.2d 893 (9th Cir. 1982).

In response to the *McNally* decision, Congress passed 18 U.S.C. § 1346 the following year. Section 1346 defines a "scheme or artifice to defraud" for purposes of the mail and wire fraud statutes to include a scheme to deprive another of "the intangible right of honest services."

The appellate jurisprudence that has emerged since 1988 concerning the application of Section 1346 to the relationship between public officials and the people establishes that the statute was intended to reach traditional types of public corruption (e.g., bribery, extortion, aggravated conflicts of interest, thefts, embezzlements, and some gratuities when the conduct violates state laws). *See, e.g.*, *United States v. Brumley*, 116 F.3d 728 (5th Cir. 1997); *United States v. Czubinski*, 106 F.3d 1069 (1st Cir. 1997); *United States v. Sawyer*, 85 F.3d 713, 723-24 (1st Cir. 1996); *United States v. Bryan*, 58 F.3d 933, 939-43 (4th Cir. 1995); *United States v. Waymer*, 55 F.3d 564, 568 (11th Cir. 1995).

A few courts have suggested that Section 1346 may extend beyond traditional corruption to reach schemes to violate state campaign financing laws. *See United States v. Walker*, 97 F.3d 253 (8th Cir. 1996) (upholding mail fraud convictions under salary and intangible rights theories in a scheme to ensure a local candidate's election by secretly financing a straw candidate when application of the statute was not challenged); *United States v. Grubb*, 11 F.3d 426 (4th Cir. 1993) (upholding mail fraud convictions arising from a

secret bribe payment to a local candidate). However, in *United States v. Turner*, 459 F.3d 775 (6th Cir. 2006), the Sixth Circuit held that candidates do not owe a fiduciary duty of honest services to the public in the sense that holders of public office do, and that 18 U.S.C. § 1346 does not apply to schemes by candidates for public office to violate state campaign financing laws.

In view of the *Turner* decision, federal prosecutors considering using Section 1346 to reach schemes involving voter fraud or state campaign financing violations should consult with the Public Integrity Section.

**(b) 18 U.S.C. § 1341. Mail fraud**

The federal mail fraud statute prohibits the use of the mails to further a "scheme or artifice to defraud." 18 U.S.C. §1341.[70] As discussed above, the Supreme Court ruled in 1987 that these words were confined to schemes to obtain money or property.

A prosecutive theory that has been used with modest success permits a scheme to corrupt an election to be prosecuted as a "scheme to obtain money and property" when the scheme involves, as one of its motives, obtaining for the favored candidate an elected office that carries with it a salary and emoluments that have pecuniary value. The crux of this so-called "salary theory" of pecuniary fraud is that the perpetrators obtained for the favored candidate materially defective ballots that were void; that they intended to conceal the defective nature of the ballots in question from the election

[70] The federal wire fraud statute, 18 U.S.C. § 1343, is essentially identical to the mail fraud statute, except for its jurisdictional element, and thus has potential application to election fraud schemes that are furthered by interstate wires.

authorities charged with counting the votes and certifying the winner of the election; and that, since in a democracy the principal qualification for attaining elective office is that the winning candidate received the most valid votes, such a scheme had as one of its objectives obtaining the office – along with its pecuniary emoluments – for the favored candidate.

One reported decision has taken this theory of prosecution a step further and applied it to a scheme by a candidate for the New York State Senate to conceal from his state campaign finance reports that the candidate was required to file under state law the material fact that his campaign was being financed by individuals who were publicly known to have been associated with organized crime. *United States v. Schermerhorn*, 713 F. Supp. 88 (S.D. N.Y. 1989). *See also United States v. Walker*, 97 F.3d 253 (8 th Cir. 1996) (leaving undisturbed unchallenged mail fraud convictions involving false state campaign filings based on salary and honest services theories). However, as noted above, in *Turner* the Sixth Circuit analyzed the underpinnings of the "salary theory" of mail and wire fraud in the context of a vote-buying case involving false state campaign reports and concluded that the theory does not apply to schemes involving voting or campaign financing. As with situations involving the use of Section 1346 in the context of election fraud or financing schemes, in view of *Turner*, federal prosecutors anticipating using the salary theory in such situations should consult with the Public Integrity Section.

**7. Schemes to Divert Campaign Funds**

Recent years have seen a dramatic rise in the number of cases in which candidates and campaign fiduciaries steal money that has been contributed to a candidate or political committee for the purpose

of electing the candidate or the candidates supported by the political committee. These situations warrant aggressive federal enforcement.

Campaign fund diversion cases generally fall into three factual scenarios:

- Diversion by a candidate or campaign agent of incoming contributions to the candidate or committee before the contributions are deposited;

- Embezzlement by a campaign agent or other person of contributions to a candidate or committee that have been deposited into the campaign's account; and

- Establishment of a fictitious political organization for the purpose of raising funds to be converted to personal use.

The first two scenarios include theft of contributions to a candidate. These cases are usually prosecuted as FECA crimes under 2 U.S.C. § 439a, or as mail or honest services frauds under 18 U.S.C. §§ 1341 and 1346. Embezzlement of funds contributed to political committees may be prosecuted as mail or honest services fraud. In addition, all three scenarios may be prosecuted as reporting offenses under 2 U.S.C. § 434 or as false statements under 18 U.S.C. § 1001. These theories are discussed below.

**(a) FECA conversion**

FECA regulates the use of funds contributed to a federal candidate in 2 U.S.C. § 439a. Section 439a(b) prohibits the

conversion "by any person to personal use"[71] of funds that were contributed to a federal candidate, and further provides that such funds may only be used:

- to support the candidate's campaign for federal office;
- to defray the candidate's expenses as a holder of federal office;
- to make contributions to charitable organizations that are exempt from federal taxation under 26 U.S.C. § 501(c)(3); and
- to make transfers – without limit – to national, state, or local committees of a political party.

Violations of Section 439a are subject to the penalties described above for criminal FECA violations. If the violations took place after January 25, 2003, they are also subject to the advisory effect of U.S.S.G. § 2C1.8. *E.g., United States v. Taff*, 400 F. Supp. 2d 1270 (D. Kan. 2005) (rejecting motion to dismiss indictment charging § 439a based on candidate's temporary use of campaign funds for house closing).

[71] The statute lists a number of items that would be a prohibited "personal use," such as home mortgages, clothing, or any "expense of a person that would have existed irrespective of the candidate's election campaign or individual's duties as a holder of Federal office." § 439a(b).

### (b) Deprivation of honest services

Officials and fiscal agents of a candidate's campaign or any other political committee owe a fiduciary duty to the committee they serve, and they breach that fiduciary duty if they convert contributions entrusted to them to their personal use. If the scheme is furthered by use of the mails or interstate wires, it may be charged as mail or wire fraud. Examples of campaign embezzlement cases are *United States v. Thomas,* Cr. No. 05-0423 (D.D.C., information filed November 30, 2005); *United States v. Bracewell*, Cr. No. 91-57-N (M.D. Ala., superseding indictment filed May 9, 1991); and *United States v. Karlsen*, Cr. No. 89-353 (D. Az., indictment filed Oct. 18, 1989).[72]

### (c) Reporting offenses

The conversion of campaign funds is generally accompanied by concealment of the embezzlement on reports filed with the FEC pursuant to 2 U.S.C. § 434(b). In those situations, concealment of the embezzlement can be addressed through 18 U.S.C. § 1001, as discussed above, as well as under FECA's Section 434.[73]

---

[72] Copies of these charges, to which the defendants pled guilty, can be obtained from the Public Integrity Section.

[73] Several significant false reporting cases were prosecuted during the early days of FECA, before the FEC was created. *E.g.*, *United States v. Finance Committee to Re-elect the President*, 507 F.2d 1194 (D.C. Cir. 1974) (upholding convictions for willful failure to report a $200,000 cash contribution).

### 8. Administrative and Civil Enforcement by the Federal Election Commission

The Federal Election Commission has exclusive authority to enforce FECA's noncriminal penalties. 2 U.S.C. §§ 437g(a)(5), 437d(e). In addition, the Commission has statutory authority to interpret the statute through regulations and advisory opinions, and its opinion should be given deference. 2 U.S.C. §§ 437c(b)(1), 437d(a)(7), 437d(a)(8), 437d(e), 437f; *Federal Election Commission v. Democratic Senatorial Campaign Committee*, 454 U.S. 27, 37 (1981).

All FECA violations, including those committed knowingly and willfully, are subject to administrative and civil sanctions enforced by the FEC. The FEC has the power to levy fines through its enforcement procedures, and to seek civil penalties in court, but it cannot prosecute FECA offenses.

FECA violations that are committed knowingly and willfully and involve aggregate values that satisfy the monetary thresholds in the Act's criminal provision, 2 U.S.C. § 437g(d), are also federal crimes. These cases are prosecuted by the Department of Justice.

### 9. Criteria for Prosecutive Evaluation of FECA Violations

As discussed above, BCRA significantly enhanced the criminal penalties for knowing and willful violations of the Federal Election Campaign Act. BCRA did so in response to identified anti-social consequences, namely, corruption and the appearance of corruption arising from FECA violations, and their adverse effect on the proper functioning of American democracy. These issues are addressed comprehensively in the excerpts from the Supreme Court's

decision in *McConnell v. Federal Election Commission*, 540 U.S. 93 (2003) that are contained in Appendix A.

In view of the enhanced criminal penalties for FECA crimes and the legislative history supporting their enactment, it is the Justice Department's position that all knowing and willful FECA violations that exceed the applicable jurisdictional floor specified in the Act's criminal provision should be considered for federal prosecution under one or more of the prosecutive theories presented above.

**10. Venue for FECA Offenses**

The campaign financing statutes focus on the "making" and "receiving" of contributions and expenditures, and venue generally lies where a prohibited transaction was made or received. While this presents no problems in cases involving intradistrict transactions, an appeals court has interpreted "making a contribution" so narrowly that serious difficulties may be encountered in establishing a centralized venue over multi-district FECA violations. *United States v. Passodelis*, 615 F.2d 975 (3d Cir. 1980).

In *Passodelis*, a campaign fundraiser had been convicted under 2 U.S.C. §§ 441a and 441f predecessor statutes for making excessive contributions to a presidential candidate through conduits in four states. Venue was laid in the district where the political committee to which these donations were given had its offices and bank accounts. The court of appeals held that cases against the donors had to be brought in the district where the donors "made" the prohibited donations, and that this concept did not encompass the district where the donee deposited the funds. Prosecutors facing similar fact situations should contact the Public Integrity Section to discuss potential venue problems.

In *United States v. Chestnut*, 533 F.2d 40 (2d Cir. 1976), the Second Circuit held that the act of "receiving" a prohibited contribution or expenditure encompassed the donee's acceptance of it. Therefore, multi-district acceptance, or "donee," cases may be brought in the district where the donee accepted the donation.

Venue for reporting offenses lies generally where the inaccurate report was prepared, dispatched, or received by the FEC. The FEC's offices are in the District of Columbia.

**11. Statute of Limitations for Campaign Financing Offenses**

Prior to the enactment of BCRA, the statute of limitations for prosecuting campaign financing violations under FECA's misdemeanor provision was three years. 2 U.S.C. § 455 (2001). This brief statute of limitations period presented substantial law enforcement problems. *E.g., United States v. Hankin*, 607 F.2d 611 (3d Cir. 1979) (proof that contribution was deposited within the limitations period held not sufficient when other acts related to making the contribution occurred outside the period); *United States v. Curran*, 20 F.3d 560 (3d Cir. 1994) (noting that conduct charged under Title 18 would have supported FECA misdemeanor charge that was barred by the Act's three-year statute of limitations).

BCRA amended Section 455 and extended FECA's criminal statute of limitations to five years, the same as the general statute of limitations for most federal crimes. 18 U.S.C. § 3282. The five-year limitations period also governs the prosecution of conduct based on FECA violations that is prosecuted under 18 U.S.C. § 371 or § 1001. *Id*. This five-year period also applies to FECA-based crimes charged as frauds under the public financing provisions governing presidential campaigns. 26 U.S.C. §§ 9012(c), 9042(b).

## F. POLICY AND PROCEDURAL CONSIDERATIONS

### 1. Consultation Requirements and Recommendations

For the past three decades, the Public Integrity Section has coordinated the Department's law enforcement efforts over campaign financing crimes with United States Attorneys' Offices. The Section has two main goals in this area: to provide prompt and accurate guidance regarding the prosecutive potential of campaign financing allegations, and to assist the United States Attorneys' Offices and the FBI in bringing effective criminal penalties to bear when warranted.

Not all FECA violations are federal crimes, either because they lack the requisite criminal intent or because they do not meet the applicable monetary floor for FECA crimes. Early consultation with the Public Integrity Section assists the Department, the United States Attorneys' Offices, and the FBI by ensuring that investigative and prosecutorial resources are focused on FECA violations only when appropriate.

Accordingly, the Department requires that the Public Integrity Section be consulted before beginning any criminal investigation, including a preliminary investigation, of a matter involving possible violations of FECA. USAM § 9-85.210. This consultation is also required before any investigation of campaign financing activities under one of the Title 18 felony theories discussed above, as these prosecutive theories are based on FECA violations. *Id.* The Public Integrity Section also recommends that the Section be consulted before commencing an investigation of possible violations of the public funding programs in Title 26.

Facts reflecting possible noncriminal FECA violations, which are either reported to the Justice Department or generated during an

investigation of other offenses, should be brought to the attention of the Public Integrity Section, which will forward them to the FEC.

### 2. Investigative Jurisdiction

Criminal investigations of possible FECA violations, as well as violations of 26 U.S.C. §§ 9012 and 9042, are conducted by the FBI and other federal law enforcement agencies. Civil investigations are conducted by the FEC. The FEC is authorized by statute to conduct a civil inquiry parallel to an active criminal investigation involving the same matter. 2 U.S.C. §§ 437d (a)(9), 437d(e). Parallel proceedings present unique challenges to federal prosecutors and investigators. In these cases the Public Integrity Section should be consulted to ensure that any procedures or agreements regarding parallel proceedings are followed.

### 3. Nonwaiver of the Federal Election Commission's Civil Enforcement Authority

The FEC's enforcement jurisdiction over noncriminal FECA violations cannot be compromised or waived by the Department of Justice. 2 U.S.C. §§ 437d(a)(6), 437d(e). Accordingly, plea agreements with defendants who have possible noncriminal exposure for FECA violations must contain a specific disclaimer to the effect that the Department of Justice is not waiving the civil enforcement jurisdiction of the FEC, such as the following:

> Nothing in this agreement waives or limits in any way the authority of the Federal Election Commission to seek civil penalties or other administrative remedies for violations of the Federal Election Campaign Act pursuant to Section 437g(a) of Title 2, United States Code.

#### 4. Dealings with the Federal Election Commission

As discussed above, the FEC and the Justice Department have overlapping enforcement responsibilities over willful and aggravated violations of FECA. At the same time, the FEC is an independent executive agency responsible for the oversight and civil enforcement of the federal campaign financing laws. The Commission's independent authority requires that the Department respect the FEC's enforcement efforts. Over time, the Public Integrity Section has developed good relationships with the FEC and its staff, and can help prosecutors and agents quickly obtain the information they need from the FEC. The FEC's Public Records Division has long been a helpful resource in developing campaign financing cases.

The United States Attorneys' Offices and the FBI should, whenever possible, route inquires to the FEC through the Public Integrity Section. Doing this avoids confusion and increases the likelihood of a cooperative response from the Commission. It also helps to ensure that the good working relationship between the two agencies is maintained. The Section has also had success in recent years in working with the FEC to ensure that the Commission's civil enforcement responsibilities do not interfere with the Department's overlapping criminal jurisdiction. On occasion the FEC has voluntarily delayed moving forward with its own proceedings in order to avoid potential adverse effects on a pending criminal investigation.

#### 5. Federal Election Commission Officials as Prosecution Witnesses

The prosecution of criminal cases involving FECA violations generally requires testimony from expert witnesses and document custodians from the FEC. In light of the new felony penalties for FECA crimes enacted by BCRA and the continued utility of FECA

fraud cases under the *Hopkins* and *Hsia* theories, it is likely that the number of FECA criminal cases will continue to grow, as will the Department's need for such witnesses.

In order to utilize 18 U.S.C. §§ 371 or 1001 in a felony fraud under FECA, the prosecutor must prove that the filings on which the case is based were false to a point that they had the potential to mislead or disrupt the FEC's ability to discharge its statutory responsibilities. AUSAs seeking FEC witnesses should contact the Public Integrity Section, which will arrange for an FEC official who possesses the requisite expertise to testify to these issues. The FEC has advised that requests for FEC staff to appear as prosecution trial witnesses should be made by subpoena.[74]

In 1991, the Justice Department's Justice Management Division (JMD) concluded that the travel and subsistence expenses of FEC staff who testify for the prosecution at FECA-based criminal trials are to be borne by the Department. Therefore, before a subpoena is served on an FEC employee to testify as a trial witness, the AUSA handling the case should prepare a JMD expert witness form (OBD 47) providing information about the case and the FEC employee's role in it. This form is then to be submitted to JMD, which will generate a financial commitment form to accompany the trial subpoena when it is served on the prospective FEC witness.

[74] This is a departure from the usual practice of relying on oral or written requests for trial testimony from federal government personnel.

### 6. Memorandum of Understanding between the Federal Election Commission and the the Department of Justice

In 1977, the FEC and the Department of Justice entered into a Memorandum of Understanding relating to their respective law enforcement jurisdiction and responsibilities. 43 FED. REG. 5441 (1978). The text of the 1977 Memorandum of Understanding is contained in Appendix B.

However, in light of the significant statutory enhancements to the Department's ability to prosecute FECA crimes that were contained in the 2002 Bipartisan Campaign Reform Act, the 1977 Memorandum no longer reflects current congressional intent or Department policy. The Department and the FEC have begun negotiations for an updated Memorandum of Understanding.

.

## CHAPTER SIX

# SENTENCING OF ELECTION CRIMES

## A. OVERVIEW

This chapter discusses the sentencing of election crimes pursuant to the United States Sentencing Guidelines promulgated by the United States Sentencing Commission. U. S. SENTENCING GUIDELINES MANUAL (U.S.S.G. or sentencing guidelines).

### 1. Categories of Election Crimes

For sentencing purposes, election crimes are divided into four categories:

(1) *Offenses involving corruption of the electoral process*. This type of offense is governed by U.S.S.G. § 2H2.1.

(2) *Offenses that violate the Federal Election Campaign Act (FECA)*. Campaign financing offenses that occur after January 25, 2003, are governed by U.S.S.G. § 2C1.8, a new guideline that was promulgated by the United States Sentencing Commission in response to a congressional mandate in the Bipartisan Campaign Reform Act of 2002 (BCRA). Prior to January 25, 2003, there was no guideline, or analogous guideline, that applied to FECA offenses and therefore FECA crimes were sentenced pursuant to U.S.S.G. § 2X5.1.

(3) *Campaign financing offenses addressed by alternative theories of prosecution*. Certain campaign financing crimes also may be prosecuted under Title 18 statutes, such as 18 U.S.C. § 371 (conspiracy), § 1001 (false statements), § 1341 (mail fraud), § 1343 (wire fraud), and § 1346 (honest services fraud). Conspiracy and fraud offenses are governed by U.S.S.G. § 2C1.1. False statement offenses that occur after January 25, 2003, are governed by the new FECA guideline pursuant to the cross-reference for fraudulent statements in U.S.S.G. § 2B1.1(c)(3). In the case of false statements offenses occurring before this date, federal prosecutors should argue that the FECA guideline should be considered as a relevant sentencing factor pursuant to 18 U.S.C. § 3553(a).

(4) *Patronage offenses*. To date, there has been no jurisprudence addressing the application of the sentencing guidelines to patronage offenses. Some of these crimes (*e.g.,* 18 U.S.C. §§ 600, 601) may be governed by the fraud guideline, U.S.S.G. § 2B1.1. Others (*e.g.*, 18 U.S.C. §§ 602, 606, 610) may be governed by the robbery and extortion guideline, U.S.S.G. § 2B3.1. A few do not appear to be governed by any guideline, and thus would be handled for sentencing purposes under U.S.S.G. § 2X5.1.

## B. CONVICTIONS INVOLVING CORRUPTION OF THE ELECTORAL PROCESS

The guideline that governs sentencing for convictions that involve corruption of the electoral process is U.S.S.G. § 2H2.1. By its terms, this guideline applies to corruption of the electoral process regardless of the type of scheme involved or federal statute it violates. The guideline provides for three alternative base offense levels (18, 12, or 6) depending upon the nature of the conduct involved in the offense. Specifically, Section 2H2.1 reads as follows:

**§2H2.1. Obstructing an Election or Registration**

(a) Base Offense Level (Apply the greatest):

(1) **18,** if the obstruction occurred by use of force or threat of force against person(s) or property; or

(2) **12**, if the obstruction occurred by forgery, fraud, theft, bribery, deceit, or other means, except as provided in (3) below; or

(3) **6,** if the defendant (A) solicited, demanded, accepted, or agreed to accept anything of value to vote, refrain from voting, vote for or against a particular candidate, or register to vote, (B) gave false information to establish eligibility to vote, or (C) voted more than once in a federal election.

Most election frauds involve offenders who have schemed, either by themselves or with others, to cause numerous illegal ballots to be cast through such methods as forgery, fraud, bribery, voter impersonation, multiple voting, or ballot-box stuffing. Such conduct falls within U.S.S.G. § 2H2.1(a)(2) and calls for a base offense level of twelve. Relevant conduct, as defined in U.S.S.G. § 1B1.3(a), should be considered in selecting the appropriate base offense level.

Three circuits have approved sentencing calculations under this guideline:

In *United States v. Smith*, 231 F.3d 800 (11th Cir. 2000), the Eleventh Circuit discussed the application of Section 2H2.1(a)(2) to

a voter fraud scheme involving a deputy voter registrar and a political activist. The defendants were charged and convicted of multiple voting (i.e., marking ballots in the names of voters without the voters' knowledge) in violation of 42 U.S.C. § 1973i(e), and forging voters' names on applications for absentee ballots and on ballots in violation of 42 U.S.C. § 1973i(c). The Eleventh Circuit approved the following guideline calculations made by the district court: (1) a base offense level of twelve for both defendants; (2) a two-level enhancement for the deputy registrar for abuse of a position of public trust under U.S.S.G. § 3B1.3; (3) a four-level enhancement for both defendants based on the court's finding that each was an "organizer or leader of criminal activity that involved five or more participants" under U.S.S.G. § 3B1.1(a); and (4) a two-level enhancement for the political activist for obstructing justice based on evidence that the defendant influenced a witness to give a false affidavit concerning material facts.

__*United States v. Cole*, 41 F.3d 303 (7th Cir. 1994), also involved a deputy voter registrar who was convicted of multiple voting in violation of 42 U.S.C. § 1973i(e). Proof at trial established that the defendant applied for and marked absentee ballots for several voters without their knowledge and consent, and that he threatened one of these voters to dissuade him from cooperating in the ensuing criminal investigation. The district judge assigned a base offense level of twelve to the offense under Section 2H2.1(a)(2), and applied enhancements for the leadership role in a conspiracy involving five or more participants under Section 3B1.1(a) (four levels), abuse of a position of public trust under Section 3B1.3 (two levels), and obstruction of justice under Section 3C1.1 (two levels), for a total offense level of twenty. The defendant was sentenced to forty-six months of imprisonment. The Seventh Circuit held that the district judge's sentencing analysis was accurate.

In *United States v. Haynes*, 977 F.2d 583, WL 296782 (6th Cir. 1992) (table), the defendants, party officials authorized to register voters, were convicted of conspiracy against rights and deprivation of constitutional rights in violation of 18 U.S.C. §§ 241 and 242 by destroying over 150 voter registration applications. Starting with a base level of twelve, they received upward adjustments of two levels for abuse of a position of trust, and five levels for multiple counts, resulting in a total offense level of nineteen. The trial court imposed sentences of thirty months of imprisonment. The Sixth Circuit upheld these sentences with the exception of a two-level reduction for the less culpable defendant.

Other election fraud convictions have resulted in similar calculations under the sentencing guidelines. *E.g., United States v. Slone,* 411 F.3d 643 (6th Cir. 2005) (affirming defendant's conviction for vote buying in violation of 42 U.S.C. § 1973i(c) and sentence of fifteen months' imprisonment calculated on a base offense level of twelve under § 2H2.1(a)(2), plus a two-level enhancement for obstructing justice under § 3C1.1(b) for lying to the FBI); *United States v. Sparkman*, Cr. No. 99-30 (E.D. Ky. July 12, 2000) (sentencing proceeding) (following conviction for vote buying in violation of 42 U.S.C. § 1973i(c) and lying to the FBI in violation of 18 U.S.C. § 1001, sentence of twenty-four months' imprisonment calculated on a base offense level of twelve under § 2H2.1(a)(2), a three-level enhancement for leadership role under § 3B1.1(b), and two-level enhancement for obstruction of justice under § 3C1.1(b), for a total offense level of seventeen); *United States v. Boards*, Cr. No. LR-92-183 (E.D. Ark. Sept. 12, 1994) (sentencing proceeding) (following convictions for conspiracy and providing false information under § 1973i(c); total offense level of eight; prison term of thirteen months imposed), 10 F.3d 587 (8th Cir. 1993) (reversing trial court's judgments of acquittal on several counts and affirming other convictions); *United States v. Salisbury*, Cr. No. 2-90-197 (S.D. Ohio

Oct. 8, 1991) (sentencing proceeding) (conviction for multiple voting in violation of 42 U.S.C. § 1973i(e); total offense level of fourteen; prison term of eighteen months imposed), *rev'd on other grounds*, 983 F.2d 1369 (6th Cir. 1993) (statute unconstitutionally vague as applied to defendant's conduct).

The *Smith* and *Cole* cases illustrate several issues prosecutors are likely to face in this area. First, all the defendants received four-level enhancements for their role in the offenses. In *Cole*, the defendant had contended that the fifteen voters involved were victims of the conspiracy, not "participants" within the meaning of Section 3B1.1. The court agreed with the government that, regardless of whether the voters were participants or outsiders, the criminal activity was “otherwise extensive" within the meaning of Section 3B1.1(a). In addition, both district courts found that a deputy voter registrar occupied a position of trust, requiring a two-level increase under Section 3B1.3. The Sixth Circuit also approved this upward adjustment in *Haynes*.

The *Smith* case presented another important sentencing issue. The defendants argued that the offense was essentially a “multiple voting” crime, and the appropriate base level for “multiple voting” was six under Section 2H2.1(a)(3) rather than twelve under Section 2H2.1(a)(2). Their argument was based on the fact that the words “multiple voting” appear in Section 2H2.1(a)(3). The Eleventh Circuit held that despite this specific reference, Section 2H2.1(a)(3) was intended to apply only to isolated instances of electoral fraud (e.g., one person voting twice), and that Subsection (a)(2), not (a)(3), governed all vote fraud schemes that entailed the casting of several corrupt ballots:

> *We agree with the district court that the appropriate base offense level was 12, as provided in Section 2H2.1(a)(2). The language of (a)(2) applies in any case in which a forgery, fraud, theft, bribery, deceit or other means are used to effect the vote of another person, or the vote another person was entitled to cast. By contrast, the language of (a)(3) addresses an individual who acts unlawfully only with respect to his own vote, or votes more than once in his own name. The offenses for which Smith and Tyree were convicted involved the votes of other individuals, in particular, the forging of other voters' names on applications for absentee ballot and affidavits of absentee voters. The district court did not err in applying a base offense level of 12.*

*Smith*, 231 F.3d at 817-18.

In summary, certain factors that are often involved in election frauds will increase recommended sentences under the sentencing guidelines:

- A defendant who occupies a leadership or supervisory role in an election fraud scheme may receive an additional two to four levels under Section 3B1.1.

- A defendant who abuses a position of public or private trust (such as a public official who uses his or her office to facilitate election fraud, or a private individual who fraudulently marks and submits ballots entrusted to him or her by voters) will receive two additional offense levels under Section 3B1.3. U.S.S.G. § 2H2.1, cmt. background (1998).

- If individual voters are viewed as vulnerable victims, separate substantive counts under Section 2H2.1 generally cannot be grouped under Section 3D1.2, so that counts involving multiple voters may result in increases of up to an additional five levels.

- Obstruction may add increased levels under Section 3C1.1. *See Slone*, 411 F.3d 643 (lying to the FBI); *Cole*, 41 F.3d 303 (threatening a witness);

- If the election fraud involved "corrupting a public official," an upward departure may be warranted under Chapter Five, Part K (Departures). U.S.S.G. § 2H2.1, cmt. n.1 (1998).

Thus, even for defendants without a criminal history, the guidelines' upward adjustments generally raise the base offense level for election fraud to a point where the imposition of significant prison terms is recommended.

## C. CONVICTIONS INVOLVING VIOLATIONS OF THE FEDERAL ELECTION CAMPAIGN ACT

For the purpose of sentencing criminal violations of the Federal Election Campaign Act (FECA), the date January 25, 2003 is significant as this is the date that a new sentencing guideline for FECA offenses took effect: U.S.S.G. § 2C1.8. The FECA guideline was the result of a mandate to the United States Sentencing Commission contained in the Bipartisan Campaign Reform Act of 2002 (BCRA). Sentencing of FECA offenses occurring after January 2003 are handled under the FECA guideline; sentencing of FECA crimes occurring prior to this date are treated under criteria, discussed below, that the Department had established prior to BCRA.

### 1. Campaign Financing Crimes Before the Bipartisan Campaign Reform Act of 2002

Prior to BCRA, knowing and willful violations of FECA that met certain monetary thresholds were one-year misdemeanors. 2 U.S.C. § 437g(d)(1)(A) (2001). As noted above, no sentencing guideline addressed or was analogous to these campaign financing offenses.

For FECA crimes that had reached the sentencing stage between 1996 and January 2003, the Public Integrity Section had encouraged federal prosecutors to take the position that former U.S.S.G. § 2F1.1 (Theft, Fraud) (now § 2B1.1) did not govern FECA crimes, and therefore U.S.S.G. § 2X5.1 (Other Offenses) applied to FECA convictions. This position has been accepted in most of the cases in which it was advanced, although almost all of these dispositions have been negotiated plea agreements presented to the courts under Federal Rule of Criminal Procedure 11(c)(1)(C).

The reasoning behind this pre-BCRA sentencing position was as follows:

(1) There was no sentencing guideline for FECA crimes.

(2) FECA's criminal provision was a classic example of a regulatory offense that the guidelines were not designed to address. U.S.S.G. Preamble, Chapter One, Part A(6) 2001.

(3) A FECA offense, namely, a knowing and willful violation of a regulatory statute, was significantly different from a fraud offense designed to gain an advantage from another through deceit, which falls

under U.S.S.G. § 2F1.1 (now § 2B1.1), and therefore Section 2F1.1 did not govern FECA offenses.

(4) There was no analogous guideline for FECA offenses.

(5) Therefore, U.S.S.G. § 2X5.1 directed the sentencing court to examine the factors set forth in 18 U.S.C. § 3553(a) to determine the appropriate sentence.

In light of the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005), holding that the federal sentencing guidelines are advisory only, federal prosecutors should argue that the FECA guideline is an appropriate sentencing factor under Section 3553(a) for FECA crimes occurring before the guideline's effective date.

Prior to the enactment of BCRA, FECA crimes were one-year misdemeanors. As such, they were viewed primarily as fiscal offenses, for which significant fiscal penalties were seen as the appropriate remedy to serve the law enforcement objectives set forth in Section 3553(a). Moreover, when Congress had carefully crafted fiscal penalties for regulatory offenses, as it had done with pre-BCRA violations of FECA, the Department considered it appropriate under Section 3553(a) for the court to consult that penalty structure when determining an appropriate criminal sanction. The penalty structure that governed FECA violations before BCRA provided that the size of the fiscal component of the penalty would be determined in part by the amount involved in the violation and by the *mens rea* with which the offender acted. Specifically:

- Nonwillful or negligent FECA violations were subject to civil enforcement action by the Federal Election

Commission (FEC) and civil penalties *equal* to the amount involved in the violation or $5,000, whichever was greater. 2 U.S.C. § 437g(a)(5)(A)(2001).

- All knowing and willful FECA violations were subject to FEC enforcement and civil penalties of *twice* the amount involved in the violation or $10,000, whichever was greater. 2 U.S.C. § 437g(a)(5)(B) (2001).

- Knowing and willful FECA violations that involved $2,000 or more in a calendar year were also subject to criminal prosecution by the Justice Department. Until passage of the Crime Control Act of 1984, conviction subjected an offender to a criminal fine of *three* times the amount involved in the violation or $25,000, whichever was greater. 2 U.S.C. § 437g(d).

- Finally, the 1984 Crime Control Act – enacted eight years after FECA's penalty provision – provided that the criminal fine for an individual violation of a Class A misdemeanor, such as a FECA offense, was the amount specified in the underlying statute or $100,000, whichever was greater (18 U.S.C. § 3571 (b)(5)), while the criminal fine for an institutional violation of a Class A misdemeanor was the amount provided for in the underlying statute or $200,000, whichever was greater (18 U.S.C. § 3571(c)(5)).

This system of ascending sanctions, coupled with the repeated statutory command that the monetary sanction at each level should be the *greater* of the various sums provided, suggested that the appropriate penalties for a FECA conviction should be, for an individual defendant, $100,000 per count under 18 U.S.C.

§ 3571(b)(5), and, for a corporate defendant, $200,000 per count under 18 U.S.C. § 3571(c)(5).

### 2. Campaign Financing Crimes After the Bipartisan Campaign Reform Act of 2002

The 2002 Bipartisan Campaign Reform Act created two new felony offenses for knowing and willful violations of FECA. BCRA also increased the statute of limitations for FECA crimes from three to five years. Finally, BCRA directed the Sentencing Commission to promulgate a sentencing guideline that specifically addressed FECA crimes, and instructed the Commission to take into account certain aggravating conduct in formulating sentencing enhancements to this new guideline. The guideline, U.S.S.G. § 2C1.8, became effective on a temporary basis on January 25, 2003, and became permanent on November 1, 2003.

The FECA guideline reads as follows:

**§ 2C1.8. Making, Receiving, or Failing to Report a Contribution, Donation, or Expenditure in Violation of the Federal Election Campaign Act; Fraudulently Misrepresenting Campaign Authority; Soliciting or Receiving a Donation in Connection with an Election While on Certain Federal Property**

(a) Base Offense Level: **8**

(b) Specific Offense Characteristics

(1) If the value of the illegal transactions exceeded $5,000, increase by the number of levels from the table in § 2B1.1 (Theft, Property Destruction, and Fraud) corresponding to that amount.

(2) (Apply the greater) If the offense involved, directly or indirectly, an illegal transaction made by or received from —

(A) a foreign national, increase by **2** levels; or

(B) a government of a foreign country, increase by **4** levels.

(3) If (A) the offense involved the contribution, donation, solicitation, expenditure, disbursement, or receipt of governmental funds; or (B) the defendant committed the offense for the purpose of obtaining a specific, identifiable non-monetary Federal benefit, increase by **2** levels.

(4) If the defendant engaged in 30 or more illegal transactions, increase by **2** levels.

(5) If the offense involved a contribution, donation, solicitation, or expenditure

made or obtained through intimidation, threat of pecuniary or other harm, or coercion, increase by **4** levels.

(c) Cross Reference

(1) If the offense involved a bribe or gratuity, apply § 2C1.1 (Offering, Giving, Soliciting, or Receiving a Bribe; Extortion Under Color of Official Right; Fraud Involving the Deprivation of the Intangible Right to Honest Services of Public Officials; Conspiracy to Defraud by Interference with Governmental Functions) or § 2C1.2 (Offering, Giving, Soliciting, or Receiving a Gratuity), as appropriate, if the resulting offense level is greater than the offense level determined above.

*Commentary*

*Statutory Provisions: 2 U.S.C. §§ 437g(d)(1), 439a, 441a, 441a-1, 441b, 441c, 441d, 441e, 441f, 441g, 441h(a), 441i, 441k; 18 U.S.C. § 607. For additional provision(s), see Statutory Index (Appendix A).*

*Application Notes:*

*1. Definitions.—For purposes of this guideline:*

*"Foreign national" has the meaning given that term in section 319(b) of the Federal Election Campaign Act of 1971, 2 U.S.C. § 441e(b).*

*"Government of a foreign country" has the meaning given that term in section 1(e) of the Foreign Agents Registration Act of 1938 (22 U.S.C. § 611(e)).*

*"Governmental funds" means money, assets, or property, of the United States Government, of a State government, or of a local government, including any branch, subdivision, department, agency, or other component of any such government. "State" means any of the fifty States, the District of Columbia, the Commonwealth of Puerto Rico, the United States Virgin Islands, Guam, the Northern Mariana Islands, or American Samoa. "Local government" means the government of a political subdivision of a State.*

*"Illegal transaction" means (A) any contribution, donation, solicitation, or expenditure of money or anything of value, or any other conduct, prohibited by the Federal Election Campaign Act of 1971, 2 U.S.C. § 431 et seq; (B) any contribution, donation, solicitation, or expenditure of money or anything of value made in excess of the amount of such contribution, donation, solicitation, or expenditure that may be made under such Act; and (C) in the case of a violation of 18 U.S.C. § 607, any solicitation or receipt of money or anything of value under that section. The terms "contribution" and "expenditure" have the meaning given those terms in section 301(8) and (9) of the Federal Election Campaign Act of 1971 (2 U.S.C. § 431(8) and (9)), respectively.*

2. *<u>Application of Subsection (b)(3)(B)</u>.—Subsection (b)(3)(B) provides an enhancement for a defendant who commits the offense for the purpose of achieving a specific, identifiable non-monetary Federal benefit that does not rise to the level of a bribe or a gratuity. Subsection (b)(3)(B) is not intended to apply to offenses under this guideline in which the defendant's only motivation for commission of the offense is generally to achieve increased visibility with, or heightened access to, public officials. Rather, subsection (b)(3)(B) is intended to apply to defendants who commit the offense to obtain a specific, identifiable non-monetary Federal benefit, such as a Presidential pardon or information proprietary to the government.*

3. *<u>Application of Subsection (b)(4)</u>.—Subsection (b)(4) shall apply if the defendant engaged in any combination of 30 or more illegal transactions during the course of the offense, whether or not the illegal transactions resulted in a conviction for such conduct.*

4. *<u>Departure Provision</u>.—In a case in which the defendant's conduct was part of a systematic or pervasive corruption of a governmental function, process, or office that may cause loss of public confidence in government, an upward departure may be warranted.*

* * *

In addition, the Sentencing Commission amended Section 3D1.2(d) regarding closely related counts to include Section 2C1.8, and amended Section 5E1.2 to incorporate FECA's mandatory minimum fining provisions and maximum fining range under

2 U.S.C. § 437g(d)(1)(D) for conduit crimes that violate 2 U.S.C. § 441f.

Finally, in commenting on the new guideline, the Sentencing Commission recognized that there might be cases in which the defendant has entered into a conciliation agreement with the FEC. The Commission stated that the existence of such a conciliation agreement, and the extent of compliance with it, are appropriate factors for a sentencing court to consider in determining at what point within the applicable fine guideline range to sentence the defendant. However, the Commission also stated that these factors are not appropriate when the defendant began negotiations toward a conciliation agreement after becoming aware of a criminal investigation.

In addition to sentencing issues, a criminal disposition for a FECA offense might present an opportunity for the defendant to obtain a concurrent settlement from the FEC of his or her civil liability for FECA violations through what is known as a "global" plea agreement. If during plea negotiations the defendant indicates a desire to settle his or her civil FECA liability as well, the Department can assist in forwarding this request to the FEC. The normal procedure is for the AUSA to contact the Public Integrity Section, which will forward the defendant's request and proposed civil settlement to the FEC for its consideration.

### 3. Examples of Application of FECA Sentencing Guideline

The following six examples illustrate how the Department believes the guideline for campaign financing crimes would work for various FECA financing crimes. Each scenario assumes

conviction after trial.[75] We have also assumed that the defendant falls under Criminal History Category I.

**Example 1:**
**THE CONDUIT**

Factual Scenario: The defendant permitted his name to be used by another person to make a contribution of $4,000 to a federal candidate ($2,000 for the primary and $2,000 for the general election) in violation of 2 U.S.C. § 441f. The funds used to make the contribution came from the other person. The aggregate value of the conduit violations is $4,000. Because the aggregate violation is at least $2,000 but does not exceed $10,000, it is a misdemeanor under 2 U.S.C. § 437g(d)(1)(A)(ii).[76]

Total Offense Level: **8**

Base Offense Level under § 2C1.8(a): **8**

Enhancement under § 2B1.1 for value not exceeding $5,000: **0**

Enhancement for number of illegal transactions under § 2C1.8(b)(4) (two conduit contributions of $2,000 each): **0**

---

[75] As readers know, the majority of federal prosecutions result in pleas of guilty, which generally result in a reduction of two or three levels in the defendant's total offense level under § 3E1.1 for acceptance of responsibility. We have not included calculations based on guilty pleas. A two- or three-level reduction in total offense level, especially at higher total levels, may result in a significant reduction in the recommended term of imprisonment.

[76] The offense is a Class A misdemeanor, 18 U.S.C. § 3558(a)(6), to which the guidelines apply. U.S.S.G. § 1B1.2(a).

Recommended Sentence:

(1) *Incarceration*: 0 to 6 months in Zone A.

(2) *Fine*: A minimum fine of $1,000 and a statutory maximum fine of $100,000, calculated as follows:

(a) Guideline fine: The maximum fine for a Class A misdemeanor under 18 U.S.C. § 3571(b)(5) is $100,000. However, the applicable guideline fine under U.S.S.G. § 5E1.2(c)(3) for an offense level of 8 would be a minimum of $1,000 and a maximum of $10,000. A fine above $10,000 for this offense would require an upward departure under § 5K2.0.

(b) FECA mandatory fine: Not applicable. The offense of conviction involves two violations of 2 U.S.C. § 441f, totaling $4,000. Since the violations do not exceed $10,000, this is a misdemeanor that is subject to the penalty provisions of 2 U.S.C. § 438(g)(d)(1)(A)(ii) and 18 U.S.C. § 3571(b)(5). Because this is a misdemeanor, the mandatory minimum and the discretionary maximum fining provisions applicable to felony conduit violations under 2 U.S.C. § 437(g)(d)(1)(D)(i) do not apply.

**Example 2:**
**THE TYPICAL FECA CRIME –**
**LAUNDERED CORPORATE CONTRIBUTIONS**

Factual Scenario: A corporate CEO contributes $50,000 in corporate funds to a federal candidate in violation of 2 U.S.C. § 441b by laundering the money through thirteen conduits in violation of § 441f, twelve of whom gave $4,000, and one of whom gave $2,000. The defendant's motive was to fulfill a

pledge. The conduct results in one § 441b felony violation under § 437g(d)(1)(A)(i) with an aggregate value of $50,000, and one § 441f felony violation under § 437g(d)(1)(D)(i) involving the thirteen conduit transactions. The combined aggregate value of the defendant's illegal conduct is $50,000. The conduct would be charged in two counts: one violation of § 441b charged under § 437g(d)(1)(A)(i), and thirteen violations of § 441f aggregated together as one offense charged under § 437g(d)(1)(D)(i).

Total Offense Level: **14**

Base Offense Level under § 2C1.8(a): **8**

Enhancement for value between $30,000 and $70,000 under § 2B1.1(b)(1)(D): **6**

Enhancement for number of illegal transactions under § 2C1.8(b)(4) (fourteen violations – one § 441b corporate contribution crime and thirteen § 441f conduit crimes): **0**

Recommended Sentence:

(1) *Incarceration*: 15 to 21 months in Zone D

(2) *Fine*: Between $154,000 and $540,000. Since there are two counts of conviction, the total fine would be the fine on each count added together, calculated as follows:

(a) § 441b count (corporate contribution). Based on an offense level of 14, the guideline range for a fine under this count is $4,000 to $40,000. U.S.S.G. § 5E1.2(c)(3).

(b) § 441f count (conduit contributions). By statute, the fine imposed under this count would be a minimum fine of $150,000 (300% of aggregate violative amount) and a maximum fine of $500,000

(1,000% of aggregate violative amount). 2 U.S.C. § 437g(d)(1)(D). Since these are higher fines than those permitted under U.S.S.G. § 5E1.2(c)(3), they prevail. *Id.* § 5E1.2(c)(4). (c) Total combined fine:

(i) minimum: $4,000 + $150,000 = $154,000

(ii) maximum: $40,000 + $500,000 = $540,000

**Example 3:**
**CORPORATE CONTRIBUTOR TO MULTIPLE CANDIDATES THROUGH THREATS AND COERCION**

Factual Scenario: The defendant is an individual who controls two corporations. The defendant gives $50,000 in corporate funds to fifty federal candidates in $1,000 amounts by laundering them through fifty corporate senior management personnel, and passes the cost of these contributions back to the two corporations. The defendant makes clear to senior management that their success in his companies depends on their participation in the scheme. The defendant's motive is ideological – all the recipients represent causes in which he believes. The aggregate value involved in the defendant's conduct is $50,000. The conduct would be charged in two counts: one felony violation of Section 441b charged under § 437g(d)(1)(A)(i), and fifty violations of Section 441f aggregated together as one felony offense charged under § 437g(d)(1)(D)(i).

Total offense level: **20**

Base Offense Level under § 2C1.8(a): **8**

Enhancements for aggregate value of offense between

$30,000 and $70,000 under § 2B1.1(b)(1)(D): **6**

Enhancements for number of illegal transactions under § 2C1.8(b)(4) (Fifty-two offenses – two § 441b corporate contribution offenses and fifty § 441f conduit offenses): **2**

Enhancement for intimidation and threats under § 2C1.8(b)(5): **4**

Recommended Sentence:

(1) *Incarceration*: 33 to 41 months in Zone D

(2) *Fine*: Because the nature of the conduct would result in convictions under both the criminal penalty applicable to conduit violations of FECA (§ 437g(d)(1)(D)), and the criminal penalty applicable to nonconduit violations of FECA (§ 437g(d)(1)(A)), the statutory minimum and maximum penalties for conduit convictions will apply and result in enhanced fines. See Example 2 for an illustration of such a computation.

**Example 4:**
**FUNDRAISER POSSESSING SPECIAL SKILL**

Factual Scenario: The defendant is a professional federal fundraiser who has attended several training courses sponsored by the Federal Election Commission and is therefore intimately familiar with the requirements and prohibitions of the Federal Election Campaign Act. The fundraiser has been retained by a federal candidate. He approaches a wealthy donor who he knows has given the candidate the maximum amount permitted by FECA, and suggests that the donor make a further contribution by

permitting the candidate and his staffers to use the donor's personal jet for campaign purposes and without billing the campaign for its use. The ensuing illegal "in-kind" contribution is valued at $225,000, for which the fundraiser is liable as an aider and abettor. The aggregate value of the offense is $225,000, consisting of one felony violation of 2 U.S.C. § 441(a)(1)(A), charged under Section 437g(d)(1)(A)(i) and 18 U.S.C. § 2.

Total Offense Level: **22**

Base Offense Level under § 2C1.8(a): **8**
Enhancement for value between $200,000 and $400,000 under § 2B1.1(b)(1)(D): **12**
Enhancement for number of transactions under § 2C1.8(b)(4) (one § 441a violation): **0**
Enhancement for use of special skill under § 3B1.3: **2**

Recommended Sentence:

(1) *Incarceration*: 41 to 51 months in Zone D.
(2) *Fine*: between $7,500 and $75,000, calculated under § 5B1.2(c)(3).[77]

**Example 5:**
**MAJOR POLITICAL PARTY DONOR SEEKING A BENEFIT FROM THE GOVERNMENT**

Factual Scenario: A wealthy individual wishes to contribute $250,000 to a national political party committee in order to win political influence to obtain a pardon for his best friend.

[77] There were no conduit offenses involved in this example. Therefore the mandatory minimum fine and maximum fining range under Section 437g(d)(1)(D) do not apply.

Under FECA, as amended by the Bipartisan Campaign Reform Act, individuals may give only $25,000 per year to national political party committees, and national political party committees cannot accept soft money. The individual therefore donates the remaining $225,000 to the national party committee by giving the committee the benefit of his personal jet to fly committee staffers around the country, at a value of $225,000, in violation of 2 U.S.C. § 441a(a)(1)(B). The aggregate value of the offense is $225,000 charged under Section 437g(d)(1)(A)(i).

Total Offense Level: **22**

Base Offense Level under § 2C1.8(a): **8**

Enhancement for value between $200,000 and $400,000 under § 2B1.1(b)(1)(G): **12**

Enhancement for number of illegal transactions under § 2C1.8(b)(4) (one $225,000 excessive contribution to a national party committee): **0**

Enhancement for intent to obtain a specific nonmonetary federal benefit from the government under § 2C1.8(b)(3): **2**

Recommended Sentence:

(1) *Incarceration*: 41 to 51 months in Zone D.

(2) *Fine*: Between $10,000 and $100,000, pursuant to § 5E1.2(c)(3).

**Example 6:**
**FOREIGN AGENT WHO GIVES FUNDS FROM FOREIGN GOVERNMENT TO NONFEDERAL CANDIDATES TO OBTAIN A SPECIFIC BENEFIT FROM THE GOVERNMENT**

Factual Scenario: The defendant is an agent of a foreign government that is currently seeking United States diplomatic recognition of its annexation of neighboring territory it occupied during a recent military action. In the hopes of garnering political support for this cause, the defendant is given $250,000 by his foreign government principal, which he then gives in $50,000 increments to five candidates seeking governorships of five large states within the United States that impose no limits on political contributions. To conceal his identity, the defendant launders the funds through five individuals who have names that are ethnically identifiable with his foreign government principal, but who have resident alien status under U.S. law. The defendant's conduct results in five violations of 2 U.S.C. § 441e having an aggregate value of $250,000, charged together as one felony violation of Section 437g(d)(1)(A)(i).[78]

Total Offense Level: **26**

Base Offense Level: **8**

Enhancements for aggregate value of offense between $200,000 and $400,000 under § 2B1.1(b)(1)(G): **12**

Enhancements for foreign government source: **4**

Enhancements for number of illegal transactions

[78] Although in BCRA Congress made clear that the prohibition in Section 441e on contributions from foreign nationals also reached donations to candidates for nonfederal office, BCRA did not extend Section 441f to encompass conduit donations to nonfederal candidates.

(five § 441e offenses): **0**
Enhancement for intent to achieve a nonmonetary benefit from the Government: **2**

Recommended Sentence:

(1) *Incarceration*: 63 to 78 months in Zone D. (This sentence would be capped at 60 months, the maximum term permitted under Section 437g(d)(1)(A)).
(2) *Fine*: $17,500 to $175,000, calculated under Section 5E1.2(c)(3).

## D. CONVICTIONS OF CAMPAIGN FINANCING VIOLATIONS ADDRESSED UNDER ALTERNATIVE THEORIES OF PROSECUTION

### 1. Conspiracy to Disrupt and Impede the Federal Election Commission

A scheme involving two or more participants designed in part to thwart the statutory duties of the Federal Election Commission to enforce FECA's reporting requirements and prohibitions and to provide the public with accurate data regarding the financial activities by federal candidates and entities supporting them can be prosecuted as a conspiracy under 18 U.S.C. § 371. The object of such a conspiracy would be to disrupt and to impede the FEC's ability to enforce FECA's requirements and prohibitions, and its statutory duty to make available to the public accurate information regarding contributions and expenditures made to influence the election of federal candidates.

Such offenses are governed by U.S.S.G. § 2C1.7. This guideline carries a base offense level of ten and has an eight-level enhancement if the conduct involved an elected official or high-level

public policymaker. § 2C1.7(b)(1)(B). In addition, if the defendant's conduct involved "pervasive corruption of a governmental function, process, or office that may cause loss of public confidence in government," an upward departure may be warranted. § 2C1.7, cmt. n.1.

**2. False Statements to the Federal Election Commission**

Many types of campaign financing crimes may also be charged as willfully causing false statements to be made to a federal agency under 18 U.S.C. § 1001(a)(2). Such false statement offenses occurring after January 25, 2003, are governed by the new FECA guideline, U.S.S.G. § 2C1.8, pursuant to the cross-reference in U.S.S.G. § 2B1.1(c)(3) for false statements. For false statement offenses occurring before this date, federal prosecutors should argue that the new guideline should be considered as a relevant sentencing factor pursuant to 18 U.S.C. § 3553(a).

**3. Embezzlement of Campaign Funds**

On occasion, treasurers and other agents of candidates or political committees, and at times even candidates, convert campaign contributions to their personal use. If the conversion involves funds from a candidate's committee, it is prohibited by FECA. 2 U.S.C. § 439a. However, until the enactment of the 2002 Bipartisan Campaign Reform Act, all FECA crimes were one-year misdemeanors. Moreover, if the embezzlement is from a political committee that is not a candidate's committee, the FECA prohibition in Section 439a does not apply. Therefore, campaign embezzlements were commonly prosecuted under the mail fraud statute, either as a scheme to obtain money or property by deceit (18 U.S.C. § 1341), or as a scheme to deprive a political committee and its contributors of the fiduciary duty of honest services (18 U.S.C. §§ 1341, 1346), or both.

As a result of BCRA, Section 439a crimes aggregating $25,000 or more are now felonies and for sentencing purposes fall under the FECA guideline § 2C1.8. This is the preferred approach if the victim is a candidate's committee and the amount embezzled is at least $25,000.

For embezzlements from political committees that are not candidate committees, and for embezzlements from candidate committees involving amounts under $25,000, the mail and wire fraud statutes continue to be useful alternatives. Violations of Sections 1341 and 1343 are governed by the fraud guideline, U.S.S.G. § 2B1.1, which carries a base offense level of 6 with possible enhancements under the fraud loss table, § 2B1.1(b)(1). Embezzlement schemes that involve the deprivation of "honest services" as defined in 18 U.S.C. § 1346 also fall under the fraud guideline.

Finally, a campaign embezzlement can be addressed under the false statements statute, 18 U.S.C. § 1001, and 18 U.S.C. § 2 (willfully causing an offense). This is because the embezzlement is concealed from the committee's treasurer, who is required to file detailed reports with the FEC regarding the committee's receipts and disbursements. 2 U.S.C. § 434(b). Thus, a person who embezzles contributions from a committee willfully causes the committee's treasurer to submit false information to the FEC regarding the actual use of the funds, in violation of both the reporting requirements of FECA and 18 U.S.C. § 1001. False statements involving FECA violations fall under the FECA guideline, U.S.S.G. § 2C1.8.

## E. OBLIGATION TO REPORT FELONY CONVICTIONS TO STATE ELECTION OFFICIALS

The National Voter Registration Act of 1993 requires United States Attorneys' Offices to send a written notice whenever a

defendant is convicted of a felony to the chief state election official in the state where the defendant resides. 42 U.S.C. § 1973gg-6(g). The notice must include basic information regarding the defendant, the court, the offense, and the sentence. 42 U.S.C. § 1973gg-6(g)(2). In addition, if the conviction is overturned, the election official must be sent written notice of the vacation of conviction. § 1973gg-6(g)(4).

This information is important to election authorities who determine a person's eligibility to vote. You may identify the appropriate state election official using the website www.nased.org.

CHAPTER SEVEN

# CONCLUSION

## WHY PROSECUTING ELECTION CRIMES IS IMPORTANT

We conclude this book with an editorial printed in the March 19, 2004 edition of Big Sandy News, Eastern Kentucky, concerning a series of election fraud prosecutions in a rural jurisdiction in the Appalachian Mountains of Eastern Kentucky. The editorial comments on the sentencing of the County Judge-Executive of Knott County and a campaign worker for vote buying. It appears here with the permission of The Big Sandy News, whose late Publisher and Editor, Scott Perry, led a strong charge against public corruption and took a proactive role in this difficult and ongoing fight.[79]

In Kentucky, county judge-executives are the chief operating officers of county government, and, as such, occupy a position of substantial power. The jury's conviction of Knott County Judge-Executive Donnie Newsome was the culmination of a series of vote-buying cases that were jointly prosecuted by the United States Attorney's Office for the Eastern District of Kentucky and the Public Integrity Section during 2003 and early 2004. The charges arose from a scheme to pay individuals for voting in the 1998 Kentucky federal primary in violation of 42 U.S.C. § 1973i(c). The investigation

[79] The Big Sandy News, Eastern Kentucky's oldest newspaper and the most widely circulated non-daily in Kentucky, was established in 1885 in Louisa, Kentucky.

ultimately resulted in the indictment of 17 defendants. Thirteen of the defendants were convicted, three were acquitted, and one defendant's case was dismissed on a motion to dismiss made by the government.

Subsequent to his conviction, Judge-Executive Newsome cooperated with the government and received a sentence reduction recommendation under U.S.S.G. § 5K1.1. On March 16, 2004, he was sentenced to serve 26 months in prison.[80]

The following editorial, reprinted here in its entirety, presents a concise and eloquent statement of why the investigation and prosecution of electoral corruption are important law enforcement priorities of the Justice Department.

*Vote fraud sentencing sad, encouraging*
*– by Susan Allen*

*Tuesday's sentencing in federal court of Knott County Judge-Executive Donnie Newsome and campaign worker Willard Smith on vote buying charges was both a sad and encouraging day for Eastern Kentucky.*

*Sad the people of Knott County were effectively robbed of their voting rights by Newsome and others dolling out cash to buy a public office.*

*Sad that, as Federal Judge Danny C. Reeves pointed out, some people in Knott and other counties think that*

[80] The sentencing judge stated that had it not been for the prosecution's recommendation for a downward departure, he was prepared to sentence Newsome to five years of imprisonment.

*elections are supposed to be bought and the only reason to go to the polls is to get their pay off.*

*Sad those seeking public office in Knott County, and most assuredly in other counties, target poor, handicapped, addicted and uneducated voters to carry out their scheme to secure public office and a hefty paycheck.*

*Sad that voters in Knott and other counties have been reduced by years and years of political corruption to truly believing that selling their vote is not wrong, it's the norm.*

*Sad that Eastern Kentuckians have pretty much been left to the mercy of the political machines which serve as dictators of their lives, from their home towns all the way to Frankfort.*

*Sad that generations sacrificed their lives and their children's lives to the political bosses for mere bones from their local leaders while now their kids are dying from drug overdoses which, we strongly suspect, are directly tied to the years of iniquity and demoralization.*

*Sad that even today some elected officials continue the abuse and either refuse or can't comprehend the impact of their past and current atrocities against their own people.*

*Sad that Judge Reeves could see and completely understand during just a one week trial the utter hopelessness and apathy in the area people feel regarding the so-called democratic process.*

*Sad that our state lawmakers have piddled away their time during this legislative session on petty political issues without even proposing laws that would bar convicted felons, especially vote buyers from retaining their offices while appealing their verdicts.*

*Sad that Donnie Newsome continues to rule Knott County from a jail cell.*

*Tuesday's events were encouraging in that prosecutors [AUSA E.D. Ky.] Tom Self and [Public Integrity Section Trial Attorney] Richard Pilger were willing to fight the hard battle for the people of Knott County, which hopefully will lead to at least a grassroots effort for people to take back their towns.*

*Encouraging that some light has been shed on the workings of the dark political underworld which might shock the good people of Eastern Kentucky into action, at least for their children's future.*

*Encouraging that what might be perceived as a baby step with Newsome's conviction could finally lead to that giant step Eastern Kentuckians must surely be ready to take to recapture control of their own destinies.*

*Encouraging that federal authorities have pledged to continue the fight they have started to restore to the people the right to govern themselves without dealing with a stacked deck.*

*Encouraging that Judge Reeves and prosecutors did see that the Knott Countians who sold their votes, in some*

*cases for food, were victims of Newsome's plot and didn't need to be punished further.*

*Encouraging that there's some branch of government, in this case on the federal level, not shy about taking on political power houses, knowing the obstacles in their way will be many.*

*Encouraging that Newsome's lips have loosened regarding others involved in similar schemes to buy public office, even though we suspect it has nothing to do with righting the wrongs, only a self-serving move to spend less days behind bars.*

*Encouraging that maybe, for once, we are not in this fight alone and have a place to turn to for help when we are willing to stand up to the machine.*

*The feds have helped us take that first step toward getting back what is rightfully ours which has been traded away by others in the past in back room deals. Not only do they need our help, WE need our help.*

*This time, let's not let ourselves down.*

# APPENDIX A

## EXCERPT FROM McCONNELL v. FEDERAL ELECTION COMMISSION

In 2003, the Supreme Court presented a concise history of the federal campaign financing laws contained in the Federal Election Campaign Act of 1971, as amended, 2 U.S.C. §§ 431 - 455 (FECA). It did so in the context of upholding the constitutionality of the vast majority of new restrictions that were added to these laws in 2002 by the Bipartisan Campaign Reform Act (BCRA) to close large gaps in statutory coverage that had emerged over the past three decades since FECA's original enactment. *McConnell v. Federal Election Commission*, 540 U.S. 93 (2003). Set forth below are pertinent excerpts from the Supreme Court's discussion of our country's regulation of campaign financing and the events that led up to enactment of BCRA in 2002. 540 U.S. at 115-132.[81]

* * *

> More than a century ago the "sober-minded Elihu Root" advocated legislation that would prohibit political contributions by corporations in order to prevent " 'the great aggregations of wealth, from using their corporate funds, directly or indirectly,' " to elect legislators who would "'vote for their protection and the advancement of their interests as against those of the public.' " *United States v. Automobile Workers*, 352 U.S. 567, 571 (1957) (quoting E.

[81] The text presented here has been edited for conciseness. For example, all footnotes have been omitted, as have other court citations, extended recitations of legislative citations, and quotations from lower court decisions that have little direct bearing on the Court's ultimate rulings on the legal and constitutional issues involved. Interested readers may wish to consult the full decision for the entire content of the Court's discussion.

Root, Addresses on Government and Citizenship 143 (R. Bacon & J. Scott eds.1916))....

[T]he first [campaign financing] enactment responded to President Theodore Roosevelt's call for legislation forbidding all contributions by corporations " 'to any political committee or for any political purpose.' " *Ibid*. ...The resulting 1907 statute completely banned corporate contributions of "money ... in connection with" any federal election. Tillman Act, ch. 420, 34 Stat. 864. Congress soon amended the statute to require the public disclosure of certain contributions and expenditures and to place "maximum limits on the amounts that congressional candidates could spend in seeking nomination and election." *Automobile Workers*, *supra*, at 575-576.

In 1925 Congress [enacted the Federal Corrupt Practices Act, which] extended the prohibition of "contributions" "to include 'anything of value,' and made acceptance of a corporate contribution as well as the giving of such a contribution a crime." *Federal Election Comm'n v. National Right to Work Comm.,* 459 U.S. 197, 209 (1982). During the debates preceding that amendment, a leading Senator characterized " 'the apparent hold on political parties which business interests and certain organizations seek and sometimes obtain by reason of liberal campaign contributions' " as " 'one of the great political evils of the time.' " *Automobile Workers*, *supra*, at 576 (quoting 65 Cong. Rec. 9507-9508 (1924)). We upheld the amended statute against a constitutional challenge, observing that "[t]he power of Congress to protect the election of President and Vice President from corruption being clear, the choice of means to that end presents a question

primarily addressed to the judgment of Congress." *Burroughs v. United States*, 290 U.S. 534, 547 (1934).

Congress' historical concern with the "political potentialities of wealth" and their "untoward consequences for the democratic process," *Automobile Workers*, *supra*, at 577-578, has long reached beyond corporate money. During and shortly after World War II, Congress reacted to the "enormous financial outlays" made by some unions in connection with national elections. 352 U.S., at 579. Congress first restricted union contributions in the Hatch Act, 18 U.S.C. § 610, and it later prohibited "union contributions in connection with federal elections ... altogether." *National Right to Work*, *supra*, at 209 (citing War Labor Disputes Act (Smith-Connally Anti-Strike Act), ch. 144, § 9, 57 Stat. 167). Congress subsequently extended that prohibition to cover unions' election-related expenditures as well as contributions, and it broadened the coverage of federal campaigns to include both primary and general elections. Labor Management Relations Act, 1947 (Taft-Hartley Act), 61 Stat. 136. See *Automobile Workers*, *supra*, at 578-584. During the consideration of those measures, legislators repeatedly voiced their concerns regarding the pernicious influence of large campaign contributions. As we noted in a unanimous opinion recalling this history, Congress' "careful legislative adjustment of the federal electoral laws, in a 'cautious advance, step by step,' to account for the particular legal and economic attributes of corporations and labor organizations warrants considerable deference." *National Right to Work*, *supra*, at 209....

In early 1972 Congress continued its steady improvement of the national election laws by enacting FECA. As first

enacted, that statute required disclosure of all contributions exceeding $100 and of expenditures by candidates and political committees that spent more than $1,000 per year. *Id.*, at 11-19. It also prohibited contributions made in the name of another person, *id.*, at 19, and by Government contractors, *id.*, at 10. The law ratified the earlier prohibition on the use of corporate and union general treasury funds for political contributions and expenditures, but it expressly permitted corporations and unions to establish and administer separate segregated funds (commonly known as political action committees, or PACs) for election-related contributions and expenditures. *Id.*, at 12-13. See *Pipefitters v. United States*, 407 U.S. 385, 409-410 (1972).

As the 1972 presidential elections made clear, however, FECA's passage did not deter unseemly fundraising and campaign practices. Evidence of those practices persuaded Congress to enact the Federal Election Campaign Act Amendments of 1974. Reviewing a constitutional challenge to the amendments, the Court of Appeals for the District of Columbia Circuit described them as "by far the most comprehensive ... reform legislation [ever] passed by Congress concerning the election of the President, Vice-President and Members of Congress." *Buckley v. Valeo*, 519 F.2d 821, 831 (C.A.D.C.1975) (en banc) (*per curiam*).

The 1974 amendments closed the loophole that had allowed candidates to use an unlimited number of political committees for fundraising purposes and thereby to circumvent the limits on individual committees' receipts and disbursements. They also limited individual political contributions to any single candidate to $1,000 per election, with an overall annual limitation of $25,000 by

any contributor; imposed ceilings on spending by candidates and political parties for national conventions; required reporting and public disclosure of contributions and expenditures exceeding certain limits; and established the Federal Election Commission (FEC) to administer and enforce the legislation. *Id.*, at 831-834.

The Court of Appeals upheld the 1974 amendments almost in their entirety. It concluded that the clear and compelling interest in preserving the integrity of the electoral process provided a sufficient basis for sustaining the substantive provisions of the Act. The court's opinion relied heavily on findings that large contributions facilitated access to public officials and described methods of evading the contribution limits that had enabled contributors of massive sums to avoid disclosure.... *Id., at* 837-841.

The Court of Appeals upheld the provisions establishing contribution and expenditure limitations on the theory that they should be viewed as regulations of conduct rather than speech. *Id.*, at 840-841. This Court, however, concluded that each set of limitations raised serious--though different --concerns under the First Amendment. *Buckley v. Valeo*, 424 U.S. 1, 14-23 (1976) (*per curiam)*. We treated the limitations on candidate and individual expenditures as direct restraints on speech, but we observed that the contribution limitations, in contrast, imposed only "a marginal restriction upon the contributor's ability to engage in free communication." *Id.*, at 20-2. Considering the "deeply disturbing examples" of corruption related to candidate contributions discussed in the Court of Appeals' opinion, we determined that limiting contributions served an interest in protecting "the integrity of our system of representative democracy." *Id.*, at 26-27. In the end, the

Act's primary purpose--"to limit the actuality and appearance of corruption resulting from large individual financial contributions"--provided a constitutionally sufficient justification for the $1,000 contribution limitation." *Id.*, at 26.

We prefaced our analysis of the $1,000 limitation on expenditures by observing that it broadly encompassed every expenditure " 'relative to a clearly identified candidate.' " *Id.*, at 39 (quoting 18 U.S.C. § 608(e)(1) (1970 ed., Supp. IV)). To avoid vagueness concerns we construed that phrase to apply only to "communications that in express terms advocate the election or defeat of a clearly identified candidate for federal office." 424 U.S., at 42-44. We concluded, however, that as so narrowed, the provision would not provide effective protection against the dangers of *quid pro quo* arrangements, because persons and groups could eschew expenditures that expressly advocated the election or defeat of a clearly identified candidate while remaining "free to spend as much as they want to promote the candidate and his views." *Id.*, at 45. We also rejected the argument that the expenditure limits were necessary to prevent attempts to circumvent the Act's contribution limits, because FECA already treated expenditures controlled by or coordinated with the candidate as contributions, and we were not persuaded that independent expenditures posed the same risk of real or apparent corruption as coordinated expenditures. *Id.*, at 46-47. We therefore held that Congress' interest in preventing real or apparent corruption was inadequate to justify the heavy burdens on the freedoms of expression and association that the expenditure limits imposed.

We upheld all of the disclosure and reporting requirements in the Act that were challenged on appeal to this Court after finding that they vindicated three important interests: providing the electorate with relevant information about the candidates and their supporters; deterring actual corruption and discouraging the use of money for improper purposes; and facilitating enforcement of the prohibitions in the Act. *Id.*, at 66-68. In order to avoid an overbreadth problem, however, we placed the same narrowing construction on the term "expenditure" in the disclosure context that we had adopted in the context of the expenditure limitations. Thus, we construed the reporting requirement for persons making expenditures of more than $100 in a year "to reach only funds used for communications that expressly advocate the election or defeat of a clearly identified candidate." *Id.*, at 80.

Our opinion in *Buckley* addressed issues that primarily related to contributions and expenditures by individuals, since none of the parties challenged the prohibition on contributions by corporations and labor unions. We noted, however, that the statute authorized the use of corporate and union resources to form and administer segregated funds that could be used for political purposes. *Id.*, at 28-29, n. 31; see also n. 3, *supra*.

Three important developments in the years after our decision in Buckley persuaded Congress that further legislation was necessary to regulate the role that corporations, unions, and wealthy contributors play in the electoral process. As a preface to our discussion of the specific provisions of BCRA, we comment briefly on the increased importance of "soft money," the proliferation of "issue ads," and the disturbing findings of a Senate

investigation into campaign practices related to the 1996 federal elections.

*Soft Money*

Under FECA, "contributions" must be made with funds that are subject to the Act's disclosure requirements and source and amount limitations. Such funds are known as "federal" or "hard" money. FECA defines the term "contribution," however, to include only the gift or advance of anything of value "made by any person for the purpose of influencing any election for *Federal* office." 2 U.S.C. § 431(8)(A)(i) (emphasis added). Donations made solely for the purpose of influencing state or local elections are therefore unaffected by FECA's requirements and prohibitions. As a result, prior to the enactment of BCRA, federal law permitted corporations and unions, as well as individuals who had already made the maximum permissible contributions to federal candidates, to contribute "nonfederal money"--also known as "soft money"--to political parties for activities intended to influence state or local elections.

Shortly after *Buckley* was decided, questions arose concerning the treatment of contributions intended to influence both federal and state elections. Although a literal reading of FECA's definition of "contribution" would have required such activities to be funded with hard money, the FEC ruled that political parties could fund mixed-purpose activities -- including get-out-the-vote drives and generic party advertising--in part with soft money. In 1995 the FEC concluded that the parties could also use soft money to defray the costs of "legislative advocacy media advertisements," even if the ads

mentioned the name of a federal candidate, so long as they did not expressly advocate the candidate's election or defeat. FEC Advisory Op. 1995-25.

> [Footnote 7:] ... In 1990 the FEC ... promulgat[ed] fixed allocation rates. 11 CFR § 106.5 (1991). The regulations required the Republican National Committee (RNC) and Democratic National Committee (DNC) to pay for at least 60% of mixed-purpose activities (65% in presidential election years) with funds from their federal accounts. § 106.5(b)(2). By contrast, the regulations required state and local committees to allocate similar expenditures based on the ratio of federal to nonfederal offices on the State's ballot, § 106.5(d)(1), which in practice meant that they could expend a substantially greater proportion of soft money than national parties to fund mixed-purpose activities affecting both federal and state elections.

As the permissible uses of soft money expanded, the amount of soft money raised and spent by the national political parties increased exponentially. Of the two major parties' total spending, soft money accounted for 5% ($21.6 million) in 1984, 11% ($45 million) in 1988, 16% ($80 million) in 1992, 30% ($272 million) in 1996, and 42% ($498 million) in 2000. The national parties transferred large amounts of their soft money to the state parties, which were allowed to use a larger percentage of soft money to finance mixed-purpose activities under FEC rules. In the year 2000, for example, the national parties diverted $280 million--more than half of their soft money--to state parties....

Not only were such soft-money contributions often designed to gain access to federal candidates, but they were in many cases solicited by the candidates themselves. Candidates often directed potential donors to party committees and tax-exempt organizations that could legally accept soft money. For example, a federal legislator running for reelection solicited soft money from a supporter by advising him that even though he had already " 'contributed the legal maximum' " to the campaign committee, he could still make an additional contribution to a joint program supporting federal, state, and local candidates of his party. Such solicitations were not uncommon.

The solicitation, transfer, and use of soft money thus enabled parties and candidates to circumvent FECA's limitations on the source and amount of contributions in connection with federal elections.

*Issue Advertising*

In *Buckley* we construed FECA's disclosure and reporting requirements, as well as its expenditure limitations, "to reach only funds used for communications that expressly advocate the election or defeat of a clearly identified candidate." 424 U.S., at 80. As a result of that strict reading of the statute, the use or omission of "magic words" such as "Elect John Smith" or "Vote Against Jane Doe" marked a bright statutory line separating "express advocacy" from "issue advocacy." See *id*., at 44, n. 52. Express advocacy was subject to FECA's limitations and could be financed only using hard money. The political parties, in other words, could not use soft money to sponsor ads that used any magic words, and corporations

and unions could not fund such ads out of their general treasuries. So-called issue ads, on the other hand, not only could be financed with soft money, but could be aired without disclosing the identity of, or any other information about, their sponsors.

While the distinction between "issue" and express advocacy seemed neat in theory, the two categories of advertisements proved functionally identical in important respects. Both were used to advocate the election or defeat of clearly identified federal candidates, even though the so-called issue ads eschewed the use of magic words. Little difference existed, for example, between an ad that urged viewers to "vote against Jane Doe" and one that condemned Jane Doe's record on a particular issue before exhorting viewers to "call Jane Doe and tell her what you think." Indeed, campaign professionals testified that the most effective campaign ads, like the most effective commercials for products such as Coca-Cola, should, and did, avoid the use of the magic words. Moreover, the conclusion that such ads were specifically intended to affect election results was confirmed by the fact that almost all of them aired in the 60 days immediately preceding a federal election. Corporations and unions spent hundreds of millions of dollars of their general funds to pay for these ads, and those expenditures, like soft-money donations to the political parties, were unregulated under FECA. Indeed, the ads were attractive to organizations and candidates precisely because they were beyond FECA's reach, enabling candidates and their parties to work closely with friendly interest groups to sponsor so-called issue ads when the candidates themselves were running out of money....

Because FECA's disclosure requirements did not apply to so-called issue ads, sponsors of such ads often used misleading names to conceal their identity. "Citizens for Better Medicare," for instance, was not a grassroots organization of citizens, as its name might suggest, but was instead a platform for an association of drug manufacturers. And "Republicans for Clean Air," which ran ads in the 2000 Republican Presidential primary, was actually an organization consisting of just two individuals--brothers who together spent $25 million on ads supporting their favored candidate.

While the public may not have been fully informed about the sponsorship of so-called issue ads, the record indicates that candidates and officeholders often were. A former Senator confirmed that candidates and officials knew who their friends were and "sometimes suggest[ed] that corporations or individuals make donations to interest groups that run 'issue ads.' " As with soft-money contributions, political parties and candidates used the availability of so-called issue ads to circumvent FECA's limitations, asking donors who contributed their permitted quota of hard money to give money to nonprofit corporations to spend on "issue" advocacy.

*Senate Committee Investigation*

In 1998 the Senate Committee on Governmental Affairs issued a six-volume report summarizing the results of an extensive investigation into the campaign practices in the 1996 federal elections. The report gave particular attention to the effect of soft money on the American political system, including elected officials' practice of granting special access in return for political contributions.

The committee's principal findings relating to Democratic Party fundraising were set forth in the majority's report, while the minority report primarily described Republican practices. The two reports reached consensus, however, on certain central propositions. They agreed that the "soft money loophole" had led to a "meltdown" of the campaign finance system that had been intended "to keep corporate, union and large individual contributions from influencing the electoral process." One Senator stated that "the hearings provided overwhelming evidence that the twin loopholes of soft money and bogus issue advertising have virtually destroyed our campaign finance laws, leaving us with little more than a pile of legal rubble."

The report was critical of both parties' methods of raising soft money, as well as their use of those funds. It concluded that both parties promised and provided special access to candidates and senior Government officials in exchange for large soft-money contributions. The committee majority described the White House coffees that rewarded major donors with access to President Clinton, and the courtesies extended to an international businessman named Roger Tamraz, who candidly acknowledged that his donations of about $300,000 to the DNC and to state parties were motivated by his interest in gaining the Federal Government's support for an oil-line project in the Caucasus. The minority described the promotional materials used by the RNC's two principal donor programs, "Team 100" and the "Republican Eagles," which promised "special access to high-ranking Republican elected officials, including governors, senators, and representatives." One fundraising letter recited that the chairman of the RNC had personally escorted a donor on appointments that " 'turned out to be very significant in

legislation affecting public utility holding companies' " and made the donor " 'a hero in his industry.' "

In 1996 both parties began to use large amounts of soft money to pay for issue advertising designed to influence federal elections. The committee found such ads highly problematic for two reasons. Since they accomplished the same purposes as express advocacy (which could lawfully be funded only with hard money), the ads enabled unions, corporations, and wealthy contributors to circumvent protections that FECA was intended to provide. Moreover, though ostensibly independent of the candidates, the ads were often actually coordinated with, and controlled by, the campaigns. The ads thus provided a means for evading FECA's candidate contribution limits.

The report also emphasized the role of state and local parties. While the FEC's allocation regime permitted national parties to use soft money to pay for up to 40% of the costs of both generic voter activities and issue advertising, they allowed state and local parties to use larger percentages of soft money for those purposes. For that reason, national parties often made substantial transfers of soft money to "state and local political parties for 'generic voter activities' that in fact ultimately benefit[ed] federal candidates because the funds for all practical purposes remain[ed] under the control of the national committees." The report concluded that "[t]he use of such soft money thus allow[ed] more corporate, union treasury, and large contributions from wealthy individuals into the system."

The report discussed potential reforms, including a ban on soft money at the national and state party levels and

> restrictions on sham issue advocacy by nonparty groups. The majority expressed the view that a ban on the raising of soft money by national party committees would effectively address the use of union and corporate general treasury funds in the federal political process only if it required that candidate-specific ads be funded with hard money. The minority similarly recommended the elimination of soft-money contributions to political parties from individuals, corporations, and unions, as well as "reforms addressing candidate advertisements masquerading as issue ads."

* * *

The findings contained in the 1998 report by the Senate Committee on Governmental Affairs were the basis for the Bipartisan Campaign Reform Act passed four years later.

# APPENDIX B

## DEPARTMENT OF JUSTICE
## FEDERAL ELECTION COMMISSION
## MEMORANDUM OF UNDERSTANDING

The following is intended to serve as a guide for the Department of Justice (hereinafter referred to as the "Department") and the Federal Election Commission (hereinafter referred to as the "Commission") in the discharge of their respective statutory responsibilities under the Federal Election Campaign Act and Chapters 95 and 96 of the Internal Revenue Code:

(1) The Department recognizes the Federal Election Commission's exclusive jurisdiction in civil matters brought to the Commission's attention involving violations of the Federal Election Campaign Act and Chapters 95 and 96 of the Internal Revenue Code. It is agreed that Congress intended to centralize civil enforcement of the Federal Election Campaign Act in the Federal Election Commission by conferring on the Commission a broad range of powers and dispositional alternatives for handling nonwillful or unaggravated violations of these provisions.

(2) The Commission and the Department mutually recognize that all violations of the Federal Election Campaign Act and the antifraud provisions of Chapters 95 and 96 of the Internal Revenue Code, even those committed knowingly and wilfully, may not be proper subjects for prosecution as crimes under 2 U.S.C. 441; [now § 437g(d)], 26 U.S.C. 9012 or 26 U.S.C. 9042. For the most beneficial and effective enforcement of the Federal Election Campaign Act and the antifraud provisions of Chapters 95 and 96 of the Internal Revenue Code, those knowing and wilful violations which are significant and substantial and which may be described as aggravated in the intent in

which they were committed, or in the monetary amount involved should be referred by the Commission to the Department for criminal prosecution review. With this framework, numerous factors will frequently affect the determination of referrals, including the repetitive nature of the acts, the existence of a practice or pattern, prior notice, and the extent of the conduct in terms of geographic area, persons, and monetary amounts among many other proper considerations.

(3) Where the Commission discovers or learns of a probable significant and substantial violation, it will endeavor to expeditiously investigate and find whether clear and compelling evidence exists to determine probable cause to believe the violation was knowing and wilful. If the determination of probable cause is made, the Commission shall refer the case to the Department promptly.

(4) Where information comes to the attention of the Department indicating a probable violation of Title 2, the Department will apprise the Commission of such information at the earliest opportunity.

Where the Department determines that evidence of a probable violation of Title 2 amounts to a significant and substantial knowing and wilful violation, the Department will continue its investigation to prosecution when appropriate and necessary to its prosecutorial duties and functions, and will endeavor to make available to the Commission evidence developed during the course of its investigation subject to restricting law. Where the alleged violation warrants the impaneling of a grand jury, information obtained during the course of the grand jury proceedings will not be disclosed to the Commission, pursuant to Rule 6 of the Federal Rules of Criminal Procedure.

Where the Department determines that evidence of a probable violation of title 2 does not amount to a significant and substantial knowing and wilful violation (as described in paragraph 2 hereof), the Department will refer the matter to the Commission as promptly as

possible for its consideration of the wide range of appropriate remedies available to the Commission.

(5) This memorandum of understanding controls only the relationship between the Commission and the Department. It is not intended to confer any procedural or substantive rights on any person in any matter before the Department, the Commission or any court or agency of Government.

Dated: December 5, 1977.

For the United States Department of Justice.

BENJAMIN R. CIVILETTI,
Assistant Attorney General,
Criminal Division

Dated: December 8, 1977.

For the Federal Election Commission.

WILLIAM C. OLDAKER,
General Counsel

---

# APPENDIX C

## STATUTES

## A. EXCERPTS FROM TITLE 2, UNITED STATES CODE

### § 431. Definitions

When used in this Act:

**(1) Election**. The term "election" means–

**(A)** a general, special, primary, or runoff election;

**(B)** a convention or caucus of a political party which has authority to nominate a candidate;

**(C)** a primary election held for the selection of delegates to a national nominating convention of a political party; and

**(D)** a primary election held for the expression of a preference for the nomination of individuals for election to the office of President.

**(2) Candidate**. The term "candidate" means an individual who seeks nomination for election, or election, to Federal office, and for purposes of this paragraph, an individual shall be deemed to seek nomination for election, or election–

**(A)** if such individual has received contributions aggregating in excess of $5,000 or has made expenditures aggregating in excess of $5,000; or

**(B)** if such individual has given his or her consent to another person to receive contributions or make expenditures on behalf of such individual and if such person has received such contributions aggregating in excess of $5,000 or has made such expenditures aggregating in excess of $5,000.

**(3) Federal office**. The term "Federal office" means the office of President or Vice President, or of Senator or Representative in, or Delegate or Resident Commissioner to, the Congress.

**(4) Political committee**. The term "political committee" means–

**(A)** any committee, club, association, or other group of

persons which receives contributions aggregating in excess of $1,000 during a calendar year or which makes expenditures aggregating in excess of $1,000 during a calendar year; or

____ **(B)** any separate segregated fund established under the provisions of section 441b(b) of this title; or

**(C)** any local committee of a political party which receives contributions aggregating in excess of $5,000 during a calendar year, or makes payments exempted from the definition of contribution or expenditure as defined in paragraphs (8) and (9) aggregating in excess of $5,000 during a calendar year, or makes contributions aggregating in excess of $1,000 during a calendar year or makes expenditures aggregating in excess of $1,000 during a calendar year.

* * * * *

**(8)(A) Contribution**. The term "contribution" includes–

**(i)** any gift, subscription, loan, advance, or deposit of money or anything of value made by any person for the purpose of influencing any election for Federal office; or

**(ii)** the payment by any person of compensation for the personal services of another person which are rendered to a political committee without charge for any purpose.

* * * * *

**(9)(A) Expenditure**. The term "expenditure" includes–

**(i)** any purchase, payment, distribution, loan, advance, deposit, or gift of money or anything of value, made by any person for the purpose of influencing any election for Federal office; and

**(ii)** a written contract, promise, or agreement to make an expenditure.

* * * * *

**(11) Person**. The term "person" includes an individual, partnership, committee, association, corporation, labor organization, or any other organization or group of persons, but such term

does not include the Federal Government or any authority of the Federal Government.

* * * * *

**(14) National committee**. The term "national committee" means the organization which, by virtue of the bylaws of a political party, is responsible for the day-to-day operation of such political party at the national level, as determined by the Commission.

**(15) State committee**. The term "State committee" means the organization which, by virtue of the bylaws of a political party, is responsible for the day-to-day operation of such political party at the State level, as determined by the Commission.

**(16) Political party**. The term "political party" means an association, committee, or organization which nominates a candidate for election to any Federal office whose name appears on the election ballot as the candidate of such association, committee, or organization.

**(17) Independent expenditure**. The term "independent expenditure" means an expenditure by a person–

**(A)** expressly advocating the election or defeat of a clearly identified candidate; and

**(B)** that is not made in concert or cooperation with or at the request or suggestion of such candidate, the candidate's authorized political committee, or their agents, or a political party committee or its agents.

* * * * *

**(20) Federal election activity**

**(A) In general**. The term "Federal election activity" means–

**(i)** voter registration activity during the period that begins on the date that is 120 days before the date a regularly scheduled Federal election is held and ends on the date of the election;

**(ii)** voter identification, get-out-the-vote activity, or

generic campaign activity conducted in connection with an election in which a candidate for Federal office appears on the ballot (regardless of whether a candidate for State or local office also appears on the ballot).

**(iii)** a public communication that refers to a clearly identified candidate for Federal office (regardless of whether a candidate for State or local office is also mentioned or identified) and that promotes or supports a candidate for that office, or attacks or opposes a candidate for that office (regardless of whether the communication expressly advocates a vote for or against a candidate); or

**(iv)** services provided during any month by an employee of a State, district, or local committee of a political party who spends more than 25 percent of that individual's compensated time during that month on activities in connection with a Federal election.

* * * * *

**(21) Generic campaign activity**. The term "generic campaign activity" means a campaign activity that promotes a political party and does not promote a candidate or non-Federal candidate.

**(22) Public communication**. The term "public communication" means a communication by means of any broadcast, cable, or satellite communication, newspaper, magazine, outdoor advertising facility, mass mailing, or telephone bank to the general public, or any other form of general public political advertising.

* * * * *

## § 432. Organization of political committees

### (a) Treasurer; vacancy; official authorizations

Every political committee shall have a treasurer. No contribution or expenditure shall be accepted or made by or on behalf of a political committee during any period in which the office

of treasurer is vacant. No expenditure shall be made for or on behalf of a political committee without the authorization of the treasurer or his or her designated agent.

**(b) Account of contributions; segregated funds**

**(1)** Every person who receives a contribution for an authorized political committee shall, no later than 10 days after receiving such contribution, forward to the treasurer such contribution, and if the amount of the contribution is in excess of $50 the name and address of the person making the contribution and the date of receipt.

**(2)** Every person who receives a contribution for a political committee which is not an authorized committee shall–

**(A)** if the amount of the contribution is $50 or less, forward to the treasurer such contribution no later than 30 days after receiving the contribution; and

**(B)** if the amount of the contribution is in excess of $50, forward to the treasurer such contribution, the name and address of the person making the contribution, and the date of receipt of the contribution, no later than 10 days after receiving the contribution.

**(3)** All funds of a political committee shall be segregated from, and may not be commingled with, the personal funds of any individual.

**(c) Recordkeeping**

The treasurer of a political committee shall keep an account of–

**(1)** all contributions received by or on behalf of such political committee;

**(2)** the name and address of any person who makes any contribution in excess of $50, together with the date and amount of such contribution by any person;

**(3)** the identification of any person who makes a

contribution or contributions aggregating more than $200 during a calendar year, together with the date and amount of any such contribution;

**(4)** the identification of any political committee which makes a contribution, together with the date and amount of any such contribution; and

**(5)** the name and address of every person to whom any disbursement is made, the date, amount, and purpose of the disbursement, and the name of the candidate and the office sought by the candidate, if any, for whom the disbursement was made, including a receipt, invoice, or canceled check for each disbursement in excess of $200.

* * * * *

**(e) Principal and additional campaign committees; designations, status of candidate, authorized committees, etc.**

**(1)** Each candidate for Federal office (other than the nominee for the office of Vice President) shall designate in writing a political committee in accordance with paragraph (3) to serve as the principal campaign committee of such candidate. Such designation shall be made no later than 15 days after becoming a candidate. A candidate may designate additional political committees in accordance with paragraph (3) to serve as authorized committees of such candidate. Such designation shall be in writing and filed with the principal campaign committee of such candidate in accordance with subsection (f)(1) of this section.

**(2)** Any candidate described in paragraph (1) who receives a contribution, or any loan for use in connection with the campaign of such candidate for election, or makes a disbursement in connection with such campaign, shall be considered, for purposes of this Act, as having received the contribution or loan, or as having made the disbursement, as the case may be, as an agent of the authorized committee or

committees of such candidate.

**(3)(A)** No political committee which supports or has supported more than one candidate may be designated as an authorized committee, except that–

**(i)** the candidate for the office of President nominated by a political party may designate the national committee of such political party as a principal campaign committee, but only if that national committee maintains separate books of account with respect to its function as a principal campaign committee; and

**(ii)** candidates may designate a political committee established solely for the purpose of joint fundraising by such candidates as an authorized committee.

**(B)** As used in this section, the term "support" does not include a contribution by any authorized committee in amounts of $2,000 or less to an authorized committee of any other candidate.

**(4)** The name of each authorized committee shall include the name of the candidate who authorized such committee under paragraph (1). In the case of any political committee which is not an authorized committee, such political committee shall not include the name of any candidate in its name.

**(5)** The name of any separate segregated fund established pursuant to section 441b(b) of this title shall include the name of its connected organization.

**(f) Filing with and receipt of designations, statements, and reports by principal campaign committee**

**(1)** Notwithstanding any other provision of this Act, each designation, statement, or report of receipts or disbursements made by an authorized committee of a candidate shall be filed with the candidate's principal campaign committee.

**(2)** Each principal campaign committee shall receive all designations, statements, and reports required to be filed with it

under paragraph (1) and shall compile and file such designations, statements, and reports in accordance with this Act.

* * * * *

**§ 434. Reporting requirements**

**(a) Receipts and disbursements by treasurers of political committees; filing requirements**

**(1)** Each treasurer of a political committee shall file reports of receipts and disbursements in accordance with the provisions of this subsection. The treasurer shall sign each such report.

* * * * *

**(b) Contents of reports**

Each report under this section shall disclose–

**(1)** the amount of cash on hand at the beginning of the reporting period;

**(2)** for the reporting period and the calendar year (or election cycle, in the case of an authorized committee of a candidate for Federal office), the total amount of all receipts, and the total amount of all receipts in the following categories:

**(A)** contributions from persons other than political committees;

**(B)** for an authorized committee, contributions from the candidate....

* * * * *

**(3)** the identification of each–

**(A)** person (other than a political committee) who makes a contribution to the reporting committee during the reporting period, whose contribution or contributions have an aggregate amount or value in excess of $200 within the calendar year (or election cycle, in the case of an authorized committee of a candidate for Federal office), or in any lesser amount if the reporting committee should so elect, together with the date and amount of any such contribution;

* * * * *

**(4)** for the reporting period and the calendar year (or election cycle, in the case of an authorized committee of a candidate for Federal office), the total amount of all disbursements, and all disbursements in the following categories:

**(A)** expenditures made to meet candidate or committee operating expenses;

* * * * *

**(6)(A)** for an authorized committee, the name and address of each person who has received any disbursement not disclosed under paragraph (5) in an aggregate amount or value in excess of $200 within the calendar year (or election cycle, in the case of an authorized committee of a candidate for Federal office), together with the date and amount of any such disbursement;

**(B)** for any other political committee, the name and address of each–

* * * * *

**(v)** person who has received any disbursement not otherwise disclosed in this paragraph or paragraph (5) in an aggregate amount or value in excess of $200 within the calendar year (or election cycle, in the case of an authorized committee of a candidate for Federal office), from the reporting committee within the reporting period, together with the date, amount, and purpose of any such disbursement;

* * * * *

**(f) Disclosure of electioneering communications**

**(1) Statement required**

Every person who makes a disbursement for the direct costs of producing and airing electioneering communications in an aggregate amount in excess of $10,000 during any calendar year shall, within 24 hours of each disclosure date, file with the Commission a statement containing the information described in paragraph (2).

**(2) Contents of statement**

Each statement required to be filed under this subsection shall be made under penalty of perjury and shall contain the following information:

**(A)** The identification of the person making the disbursement, of any person sharing or exercising direction or control over the activities of such person, and of the custodian of the books and accounts of the person making the disbursement.

**(B)** The principal place of business of the person making the disbursement, if an individual.

**(C)** The amount of each disbursement of more than $200 during the period covered by the statement and the identification of the person to whom the disbursement was made.

**(D)** The elections to which the electioneering communications pertain and the names (if known) of the candidates identified or to be identified.

**(E)** If the disbursements were paid out of a segregated bank account which consists of funds contributed solely by individuals who are United States citizens or nationals or lawfully admitted for permanent residence (as defined in section 1101(a)(20) of Title 8) directly to this account for electioneering communications, the names and addresses of all contributors who contributed an aggregate amount of $1,000 or more to that account during the period beginning on the first day of the preceding calendar year and ending on the disclosure date. Nothing in this subparagraph is to be construed as a prohibition on the use of funds in such a segregated account for a purpose other than electioneering communications.

**(F)** If the disbursements were paid out of funds not described in subparagraph (E), the names and addresses of all contributors who contributed an aggregate amount of

$1,000 or more to the person making the disbursement during the period beginning on the first day of the preceding calendar year and ending on the disclosure date.

**(3) Electioneering communication**

For purposes of this subsection–

**(A) In general**

**(i)** The term "electioneering communication" means any broadcast, cable, or satellite communication which–

**(i)** refers to a clearly identified candidate for Federal office;

**(II)** is made within–

**(aa)** 60 days before a general, special, or runoff election for the office sought by the candidate; or

**(bb)** 30 days before a primary or preference election, or a convention or caucus of a political party that has authority to nominate a candidate, for the office sought by the candidate; and

**(III)** in the case of a communication which refers to a candidate for an office other than President or Vice President, is targeted to the relevant electorate.

* * * * *

## § 437g. Enforcement

* * * * *

**(d)** Penalties; defenses; mitigation of offenses

**(1)(A)** Any person who knowingly and willfully commits a violation of any provision of this act which involves the making, receiving, or reporting of any contribution, donation, or expenditure

**(i)** aggregating $25,000 or more during a calendar

year shall be fined under Title18, or imprisoned for not more than 5 years, or both; or

**(ii)** aggregating $2,000 or more (but less than $25,000) during a calendar year shall be fined under such title, or imprisoned for not more than 1 year, or both.

**(B)** In the case of a knowing and willful violation of section 441b(b)(3) of this title, the penalties set forth in this subsection shall apply to a violation involving an amount aggregating $250 or more during a calendar year. Such violation of section 441b(b)(3) of this title may incorporate a violation of section 441c(b), 441f, or 441g of this title.

**(C)** In the case of a knowing and willful violation of section 441h of this title, the penalties set forth in this subsection shall apply without regard to whether the making, receiving, or reporting of a contribution or expenditure of $1,000 or more is involved.

**(D)** Any person who knowingly and willfully commits a violation of section 441f of this title involving an amount aggregating more than $10,000 during a calendar year shall be

**(i)** imprisoned for not more than 2 years if the amount is less than $25,000 (and subject to imprisonment under subparagraph (A) if the amount is $25,000 or more);

**(ii)** fined not less than 300 percent of the amount involved in the violation and not more than the greater of–

**(i)** $50,000; or

**(II)** 1,000 percent of the amount involved in the violation; or

**(iii)** both imprisoned under clause (i) and fined under clause (ii).

**(2)** In any criminal action brought for a violation of any provision of this Act or of chapter 95 or chapter 96 of Title 26, any defendant may evidence their lack of knowledge or intent to commit the alleged violation by introducing as evidence a conciliation agreement entered into between the defendant and the Commission under subsection (a)(4)(A) of this section which specifically deals with the act or failure to act constituting such violation and which is still in effect.

**(3)** In any criminal action brought for a violation of any provision of this Act or of chapter 95 or chapter 96 of Title 26, the court before which such action is brought shall take into account, in weighing the seriousness of the violation and in considering the appropriateness of the penalty to be imposed if the defendant is found guilty, whether–

**(A)** the specific act or failure to act which constitutes the violation for which the action was brought is the subject of a conciliation agreement entered into between the defendant and the Commission under subparagraph (a)(4)(A);

**(B)** the conciliation agreement is in effect; and

**(C)** the defendant is, with respect to the violation involved, in compliance with the conciliation agreement.

### § 439a. Use of contributed amounts for certain purposes

#### (a) Permitted uses

A contribution accepted by a candidate, and any other donation received by an individual as support for activities of the individual as a holder of Federal office, may be used by the candidate or individual–

**(1)** for otherwise authorized expenditures in connection with the campaign for Federal office of the candidate or individual;

**(2)** for ordinary and necessary expenses incurred in connection with duties of the individual as a holder of Federal

office;

**(3)** for contributions to an organization described in section 170(c) of Title 26;

**(4)** for transfers, without limitation, to a national, State, or local committee of a political party;

**(5)** for donations to State and local candidates subject to the provisions of State law; or

**(6)** for any other lawful purpose unless prohibited by subsection (b) of this section.

**(b) Prohibited use**

**(1) In general**

A contribution or donation described in subsection (a) of this section shall not be converted by any person to personal use.

**(2) Conversion**

For the purposes of paragraph (1), a contribution or donation shall be considered to be converted to personal use if the contribution or amount is used to fulfill any commitment, obligation, or expense of a person that would exist irrespective of the candidate's election campaign or individual's duties as a holder of Federal office, including–

**(A)** a home mortgage, rent, or utility payment;

**(B)** a clothing purchase;

**(C)** a noncampaign-related automobile expense;

**(D)** a country club membership;

**(E)** a vacation or other noncampaign-related trip;

**(F)** a household food item;

**(G)** a tuition payment;

**(H)** admission to a sporting event, concert, theater, or other form of entertainment not associated with an election campaign; and

**(i)** dues, fees, and other payments to a health club or recreational facility.

**§ 441a. Limitations on contributions and expenditures**

**(a) Dollar limits on contributions**

**(1)** Except as provided in subsection (i) of this section and section 441a-1 of this title, no person shall make contributions–

**(A)** to any candidate and his authorized political committees with respect to any election for Federal office which, in the aggregate, exceed $2,000;

**(B)** to the political committees established and maintained by a national political party, which are not the authorized political committees of any candidate, in any calendar year which, in the aggregate, exceed $25,000;

**(C)** to any other political committee (other than a committee described in subparagraph (D)) in any calendar year which, in the aggregate, exceed $5,000; or

**(D)** to a political committee established and maintained by a State committee of a political party in any calendar year which, in the aggregate, exceed $10,000.

**(2)** No multicandidate political committee shall make contributions–

**(A)** to any candidate and his authorized political committees with respect to any election for Federal office which, in the aggregate, exceed $5,000;

**(B)** to the political committees established and maintained by a national political party, which are not the authorized political committees of any candidate, in any calendar year, which, in the aggregate, exceed $15,000; or

**(C)** to any other political committee in any calendar year which, in the aggregate, exceed $5,000.

**(3)** During the period which begins on January 1 of an odd-numbered year and ends on December 31 of the next even-numbered year, no individual may make contributions aggregating more than–

**(A)** $37,500, in the case of contributions to candidates

and the authorized committees of candidates;

**(B)** $57,500, in the case of any other contributions, of which not more than $37,500 may be attributable to contributions to political committees which are not political committees of national political parties.

**(4)** The limitations on contributions contained in paragraphs (1) and (2) do not apply to transfers between and among political committees which are national, State, district, or local committees (including any subordinate committee thereof) of the same political party for purposes of paragraph (2), the term "multicandidate political committee" means a political committee which has been registered under section 433 of this title for a period of not less than 6 months, which has received contributions from more than 50 persons, and, candidates for Federal office.

**(5)** For purposes of the limitations provided by paragraph (1) and paragraph (2), all contributions made by political committees established or financed or maintained or controlled by any corporation, labor organization, or any other person, including any parent, subsidiary, branch, division, department, or local unit of such corporation, labor organization, or any other person, or by any group of such persons, shall be considered to have been made by a single political committee, except that (A) nothing in this sentence shall limit transfers between political committees of funds raised through joint fund raising efforts; (B) for purposes of the limitations provided by paragraph (1) and paragraph (2) all contributions made by a single political committee established or financed or maintained or controlled by a national committee of a political party and by a single political committee established or financed or maintained or controlled by the State committee of a political party shall not be considered to have been made by a single political committee; and (C) nothing in this section shall limit the transfer of funds between the principal campaign

committee of a candidate seeking nomination or election to a Federal office and the principal campaign committee of that candidate for nomination or election to another Federal office if (i) such transfer is not made when the candidate is actively seeking nomination or election to both such offices; (ii) the limitations contained in this Act on contributions by persons are not exceeded by such transfer; and (iii) the candidate has not elected to receive any funds under chapter 95 or chapter 96 of Title 26. In any case in which a corporation and any of its subsidiaries, branches, divisions, departments, or local units, or a labor organization and any of its subsidiaries, branches, divisions, departments, or local units establish or finance or maintain or control more than one separate segregated fund, all such separate segregated funds shall be treated as a single separate segregated fund for purposes of the limitations provided by paragraph (1) and paragraph (2).

**(6)** The limitations on contributions to a candidate imposed by paragraphs (1) and (2) of this subsection shall apply separately with respect to each election, except that all elections held in any calendar year for the office of President of the United States (except a general election for such office) shall be considered to be one election.

**(7)** For purposes of this subsection--

**(A)** contributions to a named candidate made to any political committee authorized by such candidate to accept contributions on his behalf shall be considered to be contributions made to such candidate;

**(B)(i)** expenditures made by any person in cooperation, consultation, or concert, with, or at the request or suggestion of, a candidate, his authorized political committees, or their agents, shall be considered to be a contribution to such candidate;

**(ii)** expenditures made by any person (other than a candidate or candidate's authorized committee) in

cooperation, consultation, or concert with, or at the request or suggestion of, a national, State, or local committee of a political party, shall be considered to be contributions made to such party committee; and

**(iii)** the financing by any person of the dissemination, distribution, or republication, in whole or in part, of any broadcast or any written, graphic, or other form of campaign materials prepared by the candidate, his campaign committees, or their authorized agents shall be considered to be an expenditure for purposes of this paragraph; and

**(C)** if–

**(i)** any person makes, or contracts to make, any disbursement for any electioneering communication (within the meaning of section 434(f)(3) of this title); and

**(ii)** such disbursement is coordinated with a candidate or an authorized committee of such candidate, a Federal, State, or local political party or committee thereof, or an agent or official of any such candidate, party, or committee; such disbursement or contracting shall be treated as a contribution to the candidate supported by the electioneering communication or that candidate's party and as an expenditure by that candidate or that candidate's party; and

**(D)** contributions made to or for the benefit of any candidate nominated by a political party for election to the office of Vice President of the United States shall be considered to be contributions made to or for the benefit of the candidate of such party for election to the office of President of the United States (except a general election for such office) shall be considered to be one election.

**(8)** For purposes of the limitations imposed by this section, all contributions made by a person, either directly or indirectly, on behalf of a particular candidate, including contributions which are in any way earmarked or otherwise directed through an intermediary or conduit to such candidate, shall be treated as contributions from such person to such candidate. The intermediary or conduit shall report the original source and the intended recipient of such contribution to the Commission and to the intended recipient.

* * * * *

**(f) Prohibited contributions and expenditures**

No candidate or political committee shall knowingly accept any contribution or make any expenditure in violation of the provisions of this section. No officer or employee of a political committee shall knowingly accept a contribution made for the benefit or use of a candidate, or knowingly make any expenditure on behalf of a candidate, in violation of any limitation imposed on contributions and expenditures under this section.

### § 441b. Contributions or expenditures by national banks, corporations, or labor organizations

**(a)** It is unlawful for any national bank, or any corporation organized by authority of any law of Congress, to make a contribution or expenditure in connection with any election to any political office, or in connection with any primary election or political convention or caucus held to select candidates for any political office, or for any corporation whatever, or any labor organization, to make a contribution or expenditure in connection with any election at which presidential and vice presidential electors or a Senator or Representative in, or a Delegate or Resident Commissioner to, Congress are to be voted for, or in connection with any primary election or political convention or caucus held to select candidates for any of the foregoing offices, or for any

candidate, political committee, or other person knowingly to accept or receive any contribution prohibited by this section, or any officer or any director of any corporation or any national bank or any officer of any labor organization to consent to any contribution or expenditure by the corporation, national bank, or labor organization, as the case may be, prohibited by this section.

**(b)(1)** For the purposes of this section the term "labor organization" means any organization of any kind, or any agency or employee representation committee or plan, in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work.

**(2)** For purposes of this section and section 79l(h) of Title 15, the term "contribution or expenditure" includes a contribution or expenditure, as those terms are defined in section 431 of this title, and also includes any direct or indirect payment, distribution, loan, advance, deposit, or gift of money, or any services, or anything of value (except a loan of money by a national or State bank made in accordance with the applicable banking laws and regulations and in the ordinary course of business) to any candidate, campaign committee, or political party or organization, in connection with any election to any of the offices referred to in this section or for any applicable electioneering communication, but shall not include (A) communications by a corporation to its stockholders and executive or administrative personnel and their families or by a labor organization to its members and their families on any subject; (B) nonpartisan registration and get-out-the-vote campaigns by a corporation aimed at its stockholders and executive or administrative personnel and their families, or by a labor organization aimed at its members and their families; and (C) the establishment, administration, and solicitation of contributions to a separate segregated fund to be utilized for

political purposes by a corporation, labor organization, membership organization, cooperative, or corporation without capital stock.

**(3)** It shall be unlawful–

**(A)** for such a fund to make a contribution or expenditure by utilizing money or anything of value secured by physical force, job discrimination, financial reprisals, or the threat of force, job discrimination, or financial reprisal; or by dues, fees, or other moneys required as a condition of membership in a labor organization or as a condition of employment, or by moneys obtained in any commercial transaction;

**(B)** for any person soliciting an employee for a contribution to such a fund to fail to inform such employee of the political purposes of such fund at the time of such solicitation; and

**(C)** for any person soliciting an employee for a contribution to such a fund to fail to inform such employee, at the time of such solicitation, of his right to refuse to so contribute without any reprisal.

**(4)(A)** Except as provided in subparagraphs (B), (C), and (D), it shall be unlawful–

**(i)** for a corporation, or a separate segregated fund established by a corporation, to solicit contributions to such a fund from any person other than its stockholders and their families and its executive or administrative personnel and their families, and

**(ii)** for a labor organization, or a separate segregated fund established by a labor organization, to solicit contributions to such a fund from any person other than its members and their families.

**(B)** It shall not be unlawful under this section for a corporation, a labor organization, or a separate segregated fund established by such corporation or such labor

organization, to make 2 written solicitations for contributions during the calendar year from any stockholder, executive or administrative personnel, or employee of a corporation or the families of such persons. A solicitation under this subparagraph may be made only by mail addressed to stockholders, executive or administrative personnel, or employees at their residence and shall be so designed that the corporation, labor organization, or separate segregated fund conducting such solicitation cannot determine who makes a contribution of $50 or less as a result of such solicitation and who does not make such a contribution.

**(C)** This paragraph shall not prevent a membership organization, cooperative, or corporation without capital stock, or a separate segregated fund established by a membership organization, cooperative, or corporation without capital stock, from soliciting contributions to such a fund from members of such organization, cooperative, or corporation without capital stock.

**(D)** This paragraph shall not prevent a trade association or a separate segregated fund established by a trade association from soliciting contributions from the stockholders and executive or administrative personnel of the member corporations of such trade association and the families of such stockholders or personnel to the extent that such solicitation of such stockholders and personnel, and their families, has been separately and specifically approved by the member corporation involved, and such member corporation does not approve any such solicitation by more than one such trade association in any calendar year.

**(c)** Rules relating to electioneering communications

**(1) Applicable electioneering communication**

For purposes of this section, the term "applicable electioneering communication" means an electioneering

communication (within the meaning of section 434(f)(3) of this title) which is made by any entity described in subsection (a) of this section or by any other person using funds donated by an entity described in subsection (a) of this section.

**(2) Exception**

Notwithstanding paragraph (1), the term "applicable electioneering communication" does not include a communication by a section 501(c)(4) organization or a political organization (as defined in section 527(e)(1) of Title 26) made under section 434(f)(2)(E) or (F) of this title if the communication is paid for exclusively by funds provided directly by individuals who are United States citizens or nationals or lawfully admitted for permanent residence (as defined in section 1101(a)(20) of Title 8). For purposes of the preceding sentence, the term "provided directly by individuals" does not include funds the source of which is an entity described in subsection (a) of this section.

* * * * *

**§ 441c. Contributions by government contractors**

**(a) Prohibition**

It shall be unlawful for any person–

**(1)** who enters into any contract with the United States or any department or agency thereof either for the rendition of personal services or furnishing any material, supplies, or equipment to the United States or any department or agency thereof or for selling any land or building to the United States or any department or agency thereof, if payment for the performance of such contract or payment for such material, supplies, equipment, land, or building is to be made in whole or in part from funds appropriated by the Congress, at any time between the commencement of negotiations for and the later of (A) the completion of performance under; or (B) the termination of negotiations for, such contract or furnishing of material, supplies, equipment, land, or buildings, directly or

indirectly to make any contribution of money or other things of value, or to promise expressly or impliedly to make any such contribution to any political party, committee, or candidate for public office or to any person for any political purpose or use; or

**(2)** knowingly to solicit any such contribution from any such person for any such purpose during any such period.

**(b) Separate segregated funds**

This section does not prohibit or make unlawful the establishment or administration of, or the solicitation of contributions to, any separate segregated fund by any corporation, labor organization, membership organization, cooperative, or corporation without capital stock for the purpose of influencing the nomination for election, or election, of any person to Federal office, unless the provisions of section 441b of this title prohibit or make unlawful the establishment or administration of, or the solicitation of contributions to, such fund. Each specific prohibition, allowance, and duty applicable to a corporation, labor organization, or separate segregated fund under section 441b of this title applies to a corporation, labor organization, or separate segregated fund to which this subsection applies.

**(c) "Labor organization" defined**

For purposes of this section, the term "labor organization" has the meaning given it by section 441b(b)(1) of this title.

## § 441d. Publication and distribution of statements and solicitations; charge for newspaper or magazine space

**(a)** Whenever a political committee makes a disbursement for the purpose of financing any communication through any broadcasting station, newspaper, magazine, outdoor advertising facility, mailing, or any other type of general public political advertising, or whenever any person makes a disbursement for the purpose of financing communications expressly advocating the election or defeat of a clearly identified candidate, or solicits any

contribution through any broadcasting station, newspaper, magazine, outdoor advertising facility, mailing, or any other type of general public political advertising or makes a disbursement for an electioneering communication (as defined in section 434(f)(3) of this title), such communication–

**(1)** if paid for and authorized by a candidate, an authorized political committee of a candidate, or its agents, shall clearly state that the communication has been paid for by such authorized political committee, or [82]

**(2)** if paid for by other persons but authorized by a candidate, an authorized political committee of a candidate, or its agents, shall clearly state that the communication is paid for by such other persons and authorized by such authorized political committee;[1]

**(3)** if not authorized by a candidate, an authorized political committee of a candidate, or its agents, shall clearly state the name and permanent street address, telephone number, or World Wide Web address of the person who paid for the communication and state that the communication is not authorized by any candidate or candidate's committee.

**(b)** No person who sells space in a newspaper or magazine to a candidate or to the agent of a candidate, for use in connection with such candidate's campaign, may charge any amount for such space which exceeds the amount charged for comparable use of such space for other purposes.

**(c)** Specification

Any printed communication described in subsection (a) of this section shall–

**(1)** be of sufficient type size to be clearly readable by the recipient of the communication;

---

[82] So in original. The word "or" probably should appear at the end of par. (2).

**(2)** be contained in a printed box set apart from the other contents of the communication; and

**(3)** be printed with a reasonable degree of color contrast between the background and the printed statement.

**(d)** Additional requirements

**(1)** Communications by candidates or authorized persons

**(A) By radio**

Any communication described in paragraph (1) or (2) of subsection (a) of this section which is transmitted through radio shall include, in addition to the requirements of that paragraph, an audio statement by the candidate that identifies the candidate and states that the candidate has approved the communication.

**(B) By television**

Any communication described in paragraph (1) or (2) of subsection (a) of this section which is transmitted through television shall include, in addition to the requirements of that paragraph, a statement that identifies the candidate and states that the candidate has approved the communication.

Such statement–

**(i)** shall be conveyed by–

**(i)** an unobscured, full-screen view of the candidate making the statement, or

**(II)** the candidate in voice-over, accompanied by a clearly identifiable photographic or similar image of the candidate; and

**(ii)** shall also appear in writing at the end of the communication in a clearly readable manner with a reasonable degree of color contrast between the background and the printed statement, for a period of at least 4 seconds.

**(2) Communications by others**

Any communication described in paragraph (3) of subsection (a) of this section which is transmitted through radio or television shall include, in addition to the requirements of that paragraph, in a clearly spoken manner, the following audio statement: "_________ is responsible for the content of this advertising." (with the blank to be filled in with the name of the political committee or other person paying for the communication and the name of any connected organization of the payor). If transmitted through television, the statement shall be conveyed by an unobscured, full-screen view of a representative of the political committee or other person making the statement, or by a representative of such political committee or other person in voice-over, and shall also appear in a clearly readable manner with a reasonable degree of color contrast between the background and the printed statement, for a period of at least 4 seconds.

**§ 441e. Contributions and donations by foreign nationals**

**(a) Prohibition**

It shall be unlawful for–

**(1)** a foreign national, directly or indirectly, to make–

**(A)** a contribution or donation of money or other thing of value, or to make an express or implied promise to make a contribution or donation, in connection with a Federal, State, or local election;

**(B)** a contribution or donation to a committee of a political party; or

**(C)** an expenditure, independent expenditure, or disbursement for an electioneering communication (within the meaning of section 434(f)(3) of this title); or

**(2)** a person to solicit, accept, or receive a contribution or donation described in subparagraph (A) or (B) of paragraph (1) from a foreign national.

**(b) "Foreign national" defined**

As used in this section, the term "foreign national" means–

**(1)** a foreign principal, as such term is defined by section 611(b) of Title 22, except that the term "foreign national" shall not include any individual who is a citizen of the United States; or

**(2)** an individual who is not a citizen of the United States or a national of the United States (as defined in section 1101(a)(22) of Title 8) and who is not lawfully admitted for permanent residence, as defined by section 1101(a)(2) of Title 8.

**§ 441f. Contributions in name of another prohibited**

No person shall make a contribution in the name of another person or knowingly permit his name to be used to effect such a contribution, and no person shall knowingly accept a contribution made by one person in the name of another person.

**§ 441g. Limitation on contribution of currency**

No person shall make contributions of currency of the United States or currency of any foreign country to or for the benefit of any candidate which, in the aggregate, exceed $100, with respect to any campaign of such candidate for nomination for election, or for election, to Federal office.

**§ 441h. Fraudulent misrepresentation of campaign authority**

**(a)** In general

No person who is a candidate for Federal office or an employee or agent of such a candidate shall–

**(1)** fraudulently misrepresent himself or any committee or organization under his control as speaking or writing or otherwise acting for or on behalf of any other candidate or political party or employee or agent thereof on a matter which is damaging to such other candidate or political party or

employee or agent thereof; or

**(2)** willfully and knowingly participate in or conspire to participate in any plan, scheme, or design to violate paragraph (1).

**(b)** Fraudulent solicitation of funds

No person shall–

**(1)** fraudulently misrepresent the person as speaking, writing, or otherwise acting for or on behalf of any candidate or political party or employee or agent thereof for the purpose of soliciting contributions or donations; or

**(2)** willfully and knowingly participate in or conspire to participate in any plan, scheme, or design to violate paragraph (1).

## § 441i. Soft money of political parties

### (a) National committees

#### (1) In general

A national committee of a political party (including a national congressional campaign committee of a political party) may not solicit, receive, or direct to another person a contribution, donation, or transfer of funds or any other thing of value, or spend any funds, that are not subject to the limitations, prohibitions, and reporting requirements of this Act.

#### (2) Applicability

The prohibition established by paragraph (1) applies to any such national committee, any officer or agent acting on behalf of such a national committee, and any entity that is directly or indirectly established, financed, maintained, or controlled by such a national committee.

### (b) State, district, and local committees

#### (1) In general

Except as provided in paragraph (2), an amount that is expended or disbursed for Federal election activity by a State,

district, or local committee of a political party (including an entity that is directly or indirectly established, financed, maintained, or controlled by a State, district, or local committee of a political party and an officer or agent acting on behalf of such committee or entity), or by an association or similar group of candidates for State or local office or of individuals holding State or local office, shall be made from funds subject to the limitations, prohibitions, and reporting requirements of this Act.

**(2) Applicability**

**(A) In general**

Notwithstanding clause (i) or (ii) of section 431(20)(A) of this title, and subject to subparagraph (B), paragraph (1) shall not apply to any amount expended or disbursed by a State, district, or local committee of a political party for an activity described in either such clause to the extent the amounts expended or disbursed for such activity are allocated (under regulations prescribed by the Commission) among amounts–

**(i)** which consist solely of contributions subject to the limitations, prohibitions, and reporting requirements of this Act (other than amounts described in subparagraph (B)(iii)); and

**(ii)** other amounts which are not subject to the limitations, prohibitions, and reporting requirements of this Act (other than any requirements of this subsection).

**(B) Conditions**

Subparagraph (A) shall only apply if–

**(i)** the activity does not refer to a clearly identified candidate for Federal office;

**(ii)** the amounts expended or disbursed are not for the costs of any broadcasting, cable, or satellite communication, other than a communication which

refers solely to a clearly identified candidate for State or local office;

**(iii)** the amounts expended or disbursed which are described in subparagraph (A)(ii) are paid from amounts which are donated in accordance with State law and which meet the requirements of subparagraph (C), except that no person (including any person established, financed, maintained, or controlled by such person) may donate more than $10,000 to a State, district, or local committee of a political party in a calendar year for such expenditures or disbursements; and

**(iv)** the amounts expended or disbursed are made solely from funds raised by the State, local, or district committee which makes such expenditure or disbursement, and do not include any funds provided to such committee from–

**(i)** any other State, local, or district committee of any State party,

**(II)** the national committee of a political party (including a national congressional campaign committee of a political party),

**(III)** any officer or agent acting on behalf of any committee described in subclause (i) or (II), or

**(IV)** any entity directly or indirectly established, financed, maintained, or controlled by any committee described in subclause (i) or (II).

**(C) Prohibiting involvement of National parties, Federal candidates and officeholders, and State parties acting jointly**

Notwithstanding subsection (e) of this section (other than subsection (e)(3) of this section), amounts specifically

authorized to be spent under subparagraph (B)(iii) meet the requirements of this subparagraph only if the amounts–

**(i)** are not solicited, received, directed, transferred, or spent by or in the name of any person described in subsection (a) or (e) of this section; and

**(ii)** are not solicited, received, or directed through fundraising activities conducted jointly by 2 or more State, local, or district committees of any political party or their agents, or by a State, local, or district committee of a political party on behalf of the State, local, or district committee of a political party or its agent in one or more other States.

**(c) Fundraising costs**

An amount spent by a person described in subsection (a) or (b) of this section to raise funds that are used, in whole or in part, for expenditures and disbursements for a Federal election activity shall be made from funds subject to the limitations, prohibitions, and reporting requirements of this Act.

* * * * *

**(e) Federal candidates**

**(1) In general**

A candidate, individual holding Federal office, agent of a candidate or an individual holding Federal office, or an entity directly or indirectly established, financed, maintained or controlled by or acting on behalf of 1 or more candidates or individuals holding Federal office, shall not–

**(A)** solicit, receive, direct, transfer, or spend funds in connection with an election for Federal office, including funds for any Federal election activity, unless the funds are subject to the limitations, prohibitions, and reporting requirements of this Act; or

**(B)** solicit, receive, direct, transfer, or spend funds in

connection with any election other than an election for Federal office or disburse funds in connection with such an election unless the funds–

**(i)** are not in excess of the amounts permitted with respect to contributions to candidates and political committees under paragraphs (1), (2), and (3) of section 441a(a) of this title; and

**(ii)** are not from sources prohibited by this Act from making contributions in connection with an election for Federal office.

### § 455. Period of limitations

**(a)** No person shall be prosecuted, tried, or punished for any violation of subchapter I of this chapter, unless the indictment is found or the information is instituted within 5 years after the date of the violation.

**(b)** Notwithstanding any other provision of law–

**(1)** the period of limitations referred to in subsection (a) of this section shall apply with respect to violations referred to in such subsection committed before, on, or after the effective date of this section; and

**(2)** no criminal proceeding shall be instituted against any person for any act or omission which was a violation of any provision of subchapter I of this chapter, as in effect on December 31, 1974, if such act or omission does not constitute a violation of any such provision, as amended by the Federal Election Campaign Act Amendments of 1974.

## B. EXCERPTS FROM TITLE 18, UNITED STATES CODE

### § 241. Conspiracy against rights

If two or more persons conspire to injure, oppress, threaten, or intimidate any person in any State, Territory, Commonwealth, Possession, or District in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States, or because of his having so exercised the same; or

If two or more persons go in disguise on the highway, or on the premises of another, with intent to prevent or hinder his free exercise or enjoyment of any right or privilege so secured–

They shall be fined under this title or imprisoned not more than ten years, or both; and if death results from the acts committed in violation of this section or if such acts include kidnapping or an attempt to kidnap, aggravated sexual abuse or an attempt to commit aggravated sexual abuse, or an attempt to kill, they shall be fined under this title or imprisoned for any term of years or for life, or both, or may be sentenced to death.

### § 242. Deprivation of rights under color of law

Whoever, under color of any law, statute, ordinance, regulation, or custom, willfully subjects any person in any State, Territory, Commonwealth, Possession, or District to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States, or to different punishments, pains, or penalties, on account of such person being an alien, or by reason of his color, or race, than are prescribed for the punishment of citizens, shall be fined under this title or imprisoned not more than one year, or both; and if bodily injury results from the acts committed in violation of this section or if such acts include the use, attempted use, or threatened use of a dangerous weapon, explosives, or fire, shall be fined under this title or imprisoned not more than ten years, or both; and if death results from the acts committed in violation of this section or if such acts include

kidnapping or an attempt to kidnap, aggravated sexual abuse, or an attempt to commit aggravated sexual abuse, or an attempt to kill, shall be fined under this title, or imprisoned for any term of years or for life, or both, or may be sentenced to death.

**§ 245. Federally protected activities**

**(b)** Whoever, whether or not acting under color of law, by force or threat of force willfully injures, intimidates or interferes with, or attempts to injure, intimidate or interfere with–

**(1)** any person because he is or has been, or in order to intimidate such person or any other person or any class of persons from–

**(A)** voting or qualifying to vote, qualifying or campaigning as a candidate for elective office, or qualifying or acting as a poll watcher, or any legally authorized election official, in any primary, special, or general election;

* * * * *

shall be fined under this title, or imprisoned not more than one year, or both; and if bodily injury results from the acts committed in violation of this section or if such acts include the use, attempted use, or threatened use of a dangerous weapon, explosives, or fire shall be fined under this title, or imprisoned not more than ten years, or both; and if death results from the acts committed in violation of this section or if such acts include kidnapping or an attempt to kidnap, aggravated sexual abuse or an attempt to commit aggravated sexual abuse, or an attempt to kill, shall be fined under this title or imprisoned for any term of years or for life, or both, or may be sentenced to death.

* * * * *

**§ 371. Conspiracy to commit offense or to defraud United States**

If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any

agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both.

If, however, the offense, the commission of which is the object of the conspiracy, is a misdemeanor only, the punishment for such conspiracy shall not exceed the maximum punishment provided for such misdemeanor.

* * * * *

**§ 592. Troops at polls**

Whoever, being an officer of the Army or Navy, or other person in the civil, military, or naval service of the United States, orders, brings, keeps, or has under his authority or control any troops or armed men at any place where a general or special election is held, unless such force be necessary to repel armed enemies of the United States, shall be fined under this title or imprisoned not more than five years, or both; and be disqualified from holding any office of honor, profit, or trust under the United States.

This section shall not prevent any officer or member of the armed forces of the United States from exercising the right of suffrage in any election district to which he may belong, if otherwise qualified according to the laws of the State in which he offers to vote.

* * * * *

**§ 593. Interference by armed forces**

Whoever, being an officer or member of the Armed Forces of the United States, prescribes or fixes or attempts to prescribe or fix, whether by proclamation, order or otherwise, the qualifications of voters at any election in any State; or

Whoever, being such officer or member, prevents or attempts to prevent by force, threat, intimidation, advice or otherwise any

qualified voter of any State from fully exercising the right of suffrage at any general or special election; or

Whoever, being such officer or member, orders or compels or attempts to compel any election officer in any State to receive a vote from a person not legally qualified to vote; or

Whoever, being such officer or member, imposes or attempts to impose any regulations for conducting any general or special election in a State, different from those prescribed by law; or

Whoever, being such officer or member, interferes in any manner with an election officer's discharge of his duties–

Shall be fined under this title or imprisoned not more than five years, or both; and disqualified from holding any office of honor, profit or trust under the United States.

This section shall not prevent any officer or member of the Armed Forces from exercising the right of suffrage in any district to which he may belong, if otherwise qualified according to the laws of the State of such district.

### § 594. Intimidation of voters

Whoever intimidates, threatens, coerces, or attempts to intimidate, threaten, or coerce, any other person for the purpose of interfering with the right of such other person to vote or to vote as he may choose, or of causing such other person to vote for, or not to vote for, any candidate for the office of President, Vice President, Presidential elector, Member of the Senate, Member of the House of Representatives, Delegate from the District of Columbia, or Resident Commissioner, at any election held solely or in part for the purpose of electing such candidate, shall be fined under this title or imprisoned not more than one year, or both.

### § 595. Interference by administrative employees of Federal, State, or Territorial Governments

Whoever, being a person employed in any administrative position by the United States, or by any department or agency thereof, or by

the District of Columbia or any agency or instrumentality thereof, or by any State, Territory, or Possession of the United States, or any political subdivision, municipality, or agency thereof, or agency of such political subdivision or municipality (including any corporation owned or controlled by any State, Territory, or Possession of the United States or by any such political subdivision, municipality, or agency), in connection with any activity which is financed in whole or in part by loans or grants made by the United States, or any department or agency thereof, uses his official authority for the purpose of interfering with, or affecting, the nomination or the election of any candidate for the office of President, Vice President, Presidential elector, Member of the Senate, Member of the House of Representatives, Delegate from the District of Columbia, or Resident Commissioner, shall be fined under this title or imprisoned not more than one year, or both.

This section shall not prohibit or make unlawful any act by any officer or employee of any educational or research institution, establishment, agency, or system which is supported in whole or in part by any state or political subdivision thereof, or by the District of Columbia or by any Territory or Possession of the United States; or by any recognized religious, philanthropic or cultural organization.

**§ 596. Polling armed forces**

Whoever, within or without the Armed Forces of the United States, polls any member of such forces, either within or without the United States, either before or after he executes any ballot under any Federal or State law, with reference to his choice of or his vote for any candidate, or states, publishes, or releases any result of any purported poll taken from or among the members of the Armed Forces of the United States or including within it the statement of choice for such candidate or of such votes cast by any member of the Armed Forces of the United States, shall be fined under this title or imprisoned for not more than one year, or both.

The word "poll" means any request for information, verbal or written, which by its language or form of expression requires or implies the necessity of an answer, where the request is made with the intent of compiling the result of the answers obtained, either for the personal use of the person making the request, or for the purpose of reporting the same to any other person, persons, political party, unincorporated association or corporation, or for the purpose of publishing the same orally, by radio, or in written or printed form.

**§ 597. Expenditures to influence voting**

Whoever makes or offers to make an expenditure to any person, either to vote or withhold his vote, or to vote for or against any candidate; and

Whoever solicits, accepts, or receives any such expenditure in consideration of his vote or the withholding of his vote–

Shall be fined under this title or imprisoned not more than one year, or both; and if the violation was willful, shall be fined under this title or imprisoned not more than two years, or both.

**§ 598. Coercion by means of relief appropriations**

Whoever uses any part of any appropriation made by Congress for work relief, relief, or for increasing employment by providing loans and grants for public-works projects, or exercises or administers any authority conferred by any Appropriation Act for the purpose of interfering with, restraining, or coercing any individual in the exercise of his right to vote at any election, shall be fined under this title or imprisoned not more than one year, or both.

**§ 599. Promise of appointment by candidate**

Whoever, being a candidate, directly or indirectly promises or pledges the appointment, or the use of his influence or support for the appointment of any person to any public or private position or employment, for the purpose of procuring support in his candidacy shall be fined under this title or imprisoned not more than one year,

or both; and if the violation was willful, shall be fined under this title or imprisoned not more than two years, or both.

**§ 600. Promise of employment or other benefit for political activity**

Whoever, directly or indirectly, promises any employment, position, compensation, contract, appointment, or other benefit, provided for or made possible in whole or in part by any Act of Congress, or any special consideration in obtaining any such benefit, to any person as consideration, favor, or reward for any political activity or for the support of or opposition to any candidate or any political party in connection with any general or special election to any political office, or in connection with any primary election or political convention or caucus held to select candidates for any political office, shall be fined under this title or imprisoned not more than one year, or both.

**§ 601. Deprivation of employment or other benefit for political contribution**

**(a)** Whoever, directly or indirectly, knowingly causes or attempts to cause any person to make a contribution of a thing of value (including services) for the benefit of any candidate or any political party, by means of the denial or deprivation, or the threat of the denial or deprivation, of–

**(1)** any employment, position, or work in or for any agency or other entity of the Government of the United States, a State, or a political subdivision of a State, or any compensation or benefit of such employment, position, or work; or

**(2)** any payment or benefit of a program of the United States, a State, or a political subdivision of a State; if such employment, position, work, compensation, payment, or benefit is provided for or made possible in whole or in part by an Act of Congress, shall be fined under this title, or imprisoned not more than one year, or both.

**(b)** As used in this section–

**(1)** the term "candidate" means an individual who seeks nomination for election, or election, to Federal, State, or local office, whether or not such individual is elected, and, for purposes of this paragraph, an individual shall be deemed to seek nomination for election, or election, to Federal, State, or local office, if he has (A) taken the action necessary under the law of a State to qualify himself for nomination for election, or election, or (B) received contributions or made expenditures, or has given his consent for any other person to receive contributions or make expenditures, with a view to bringing about his nomination for election, or election, to such office;

**(2)** the term "election" means (A) a general, special primary, or runoff election, (B) a convention or caucus of a political party held to nominate a candidate, (C) a primary election held for the selection of delegates to a nominating convention of a political party, (D) a primary election held for the expression of a preference for the nomination of persons for election to the office of President, and (E) the election of delegates to a constitutional convention for proposing amendments to the Constitution of the United States or of any State; and

**(3)** the term "State" means a State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, or any territory or possession of the United States.

## § 602. Solicitation of political contributions

**(a)** It shall be unlawful for--

**(1)** a candidate for the Congress;

**(2)** an individual elected to or serving in the office of Senator or Representative in, or Delegate or Resident Commissioner to, the Congress;

**(3)** an officer or employee of the United States or any

department or agency thereof; or

**(4)** a person receiving any salary or compensation for services from money derived from the Treasury of the United States; to knowingly solicit any contribution within the meaning of section 301(8) of the Federal Election Campaign Act of 1971 [2 U.S.C.A. § 431(8)] from any other such officer, employee, or person. Any person who violates this section shall be fined under this title or imprisoned not more than 3 years, or both.

**(b)** The prohibition in subsection (a) shall not apply to any activity of an employee (as defined in section 7322(1) of title 5) or any individual employed in or under the United States Postal Service or the Postal Rate Commission, unless that activity is prohibited by section 7323 or 7324 of such title.

**§ 603. Making political contributions**

**(a)** It shall be unlawful for an officer or employee of the United States or any department or agency thereof, or a person receiving any salary or compensation for services from money derived from the Treasury of the United States, to make any contribution within the meaning of section 301(8) of the Federal Election Campaign Act of 1971 to any other such officer, employee or person or to any Senator or Representative in, or Delegate or Resident Commissioner to, the Congress, if the person receiving such contribution is the employer or employing authority of the person making the contribution. Any person who violates this section shall be fined under this title or imprisoned not more than three years, or both.

**(b)** For purposes of this section, a contribution to an authorized committee as defined in section 302(e) (1) of the Federal Election Campaign Act of 1971 shall be considered a contribution to the individual who has authorized such committee.

**(c)** The prohibition in subsection (a) shall not apply to any activity of an employee (as defined in section 7322(1) of title 5) or any individual employed in or under the United States Postal

Service or the Postal Rate Commission, unless that activity is prohibited by section 7323 or 7324 of such title.

**§ 604. Solicitation from persons on relief**

Whoever solicits or receives or is in any manner concerned in soliciting or receiving any assessment, subscription, or contribution for any political purpose from any person known by him to be entitled to, or receiving compensation, employment, or other benefit provided for or made possible by any Act of Congress appropriating funds for work relief or relief purposes, shall be fined under this title or imprisoned not more than one year, or both.

**§ 605. Disclosure of names of persons on relief**

Whoever, for political purposes, furnishes or discloses any list or names of persons receiving compensation, employment or benefits provided for or made possible by any Act of Congress appropriating, or authorizing the appropriation of funds for work relief or relief purposes, to a political candidate, committee, campaign manager, or to any person for delivery to a political candidate, committee, or campaign manager; and

Whoever receives any such list or names for political purposes–

Shall be fined under this title or imprisoned not more than one year, or both.

**§ 606. Intimidation to secure political contributions**

Whoever, being one of the officers or employees of the United States mentioned in section 602 of this title, discharges, or promotes, or degrades, or in any manner changes the official rank or compensation of any other officer or employee, or promises or threatens so to do, for giving or withholding or neglecting to make any contribution of money or other valuable thing for any political purpose, shall be fined under this title or imprisoned not more than three years, or both.

**§ 607. Place of solicitation**

**(a) Prohibition.–**

**(1) In general.**–It shall be unlawful for any person to solicit or receive a donation of money or other thing of value in connection with a Federal, State, or local election from a person who is located in a room or building occupied in the discharge of official duties by an officer or employee of the United States. It shall be unlawful for an individual who is an officer or employee of the Federal Government, including the President, Vice President, and Members of Congress, to solicit or receive a donation of money or other thing of value in connection with a Federal, State, or local election, while in any room or building occupied in the discharge of official duties by an officer or employee of the United States, from any person.

**(2) Penalty.**–A person who violates this section shall be fined not more than $5,000, imprisoned not more than 3 years, or both.

**(b)** The prohibition in subsection (a) shall not apply to the receipt of contributions by persons on the staff of a Senator or Representative in, or Delegate or Resident Commissioner to, the Congress or Executive Office of the President, provided, that such contributions have not been solicited in any manner which directs the contributor to mail or deliver a contribution to any room, building, or other facility referred to in subsection (a), and provided that such contributions are transferred within seven days of receipt to a political committee within the meaning of section 302(e) of the Federal Election Campaign Act of 1971.

**§ 608. Absent uniformed services voters and overseas voters**

**(a)** Whoever knowingly deprives or attempts to deprive any person of a right under the Uniformed and Overseas Citizens Absentee Voting Act shall be fined in accordance with this title or imprisoned not more than five years, or both.

**(b)** Whoever knowingly gives false information for the purpose of establishing the eligibility of any person to register or vote under the Uniformed and Overseas Citizens Absentee Voting Act, or pays or offers to pay, or accepts payment for registering or voting under such Act shall be fined in accordance with this title or imprisoned not more than five years, or both.

### § 609. Use of military authority to influence vote of member of Armed Forces

Whoever, being a commissioned, noncommissioned, warrant, or petty officer of an Armed Force, uses military authority to influence the vote of a member of the Armed Forces or to require a member of the Armed Forces to march to a polling place, or attempts to do so, shall be fined in accordance with this title or imprisoned not more than five years, or both. Nothing in this section shall prohibit free discussion of political issues or candidates for public office.

### § 610. Coercion of political activity

It shall be unlawful for any person to intimidate, threaten, command, or coerce, or attempt to intimidate, threaten, command, or coerce, any employee of the Federal Government as defined in section 7322(1) of title 5, United States Code, to engage in, or not to engage in, any political activity, including, but not limited to, voting or refusing to vote for any candidate or measure in any election, making or refusing to make any political contribution, or working or refusing to work on behalf of any candidate. Any person who violates this section shall be fined under this title or imprisoned not more than three years, or both.

### § 611. Voting by aliens

**(a)** It shall be unlawful for any alien to vote in any election held solely or in part for the purpose of electing a candidate for the office of President, Vice President, Presidential elector, Member of the

Senate, Member of the House of Representatives, Delegate from the District of Columbia, or Resident Commissioner, unless–

**(1)** the election is held partly for some other purpose;

**(2)** aliens are authorized to vote for such other purpose under a State constitution or statute or a local ordinance; and

**(3)** voting for such other purpose is conducted independently of voting for a candidate for such Federal offices, in such a manner that an alien has the opportunity to vote for such other purpose, but not an opportunity to vote for a candidate for any one or more of such Federal offices.

**(b)** Any person who violates this section shall be fined under this title, imprisoned not more than one year, or both.

**(c)** Subsection (a) does not apply to an alien if–

**(1)** each natural parent of the alien (or, in the case of an adopted alien, each adoptive parent of the alien) is or was a citizen (whether by birth or naturalization);

**(2)** the alien permanently resided in the United States prior to attaining the age of 16; and

**(3)** the alien reasonably believed at the time of voting in violation of such subsection that he or she was a citizen of the United States.

**§ 911. Citizen of the United States**

Whoever falsely and willfully represents himself to be a citizen of the United States shall be fined under this title or imprisoned not more than three years, or both.

**§ 1001. Statements or entries generally**

**(a)** Except as otherwise provided in this section, whoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully–

**(1)** falsifies, conceals, or covers up by any trick, scheme, or

device a material fact;

**(2)** makes any materially false, fictitious, or fraudulent statement or representation; or

**(3)** makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry; shall be fined under this title, imprisoned not more than 5 years or, if the offense involves international or domestic terrorism (as defined in section 2331), imprisoned not more than 8 years, or both.

**(b)** Subsection (a) does not apply to a party to a judicial proceeding, or that party's counsel, for statements, representations, writings or documents submitted by such party or counsel to a judge or magistrate in that proceeding.

**(c)** With respect to any matter within the jurisdiction of the legislative branch, subsection (a) shall apply only to–

**(1)** administrative matters, including a claim for payment, a matter related to the procurement of property or services, personnel or employment practices, or support services, or a document required by law, rule, or regulation to be submitted to the Congress or any office or officer within the legislative branch; or

**(2)** any investigation or review, conducted pursuant to the authority of any committee, subcommittee, commission or office of the Congress, consistent with applicable rules of the House or Senate.

**§ 1015. Naturalization, citizenship or alien registry**

* * * * *

**(f)** Whoever knowingly makes any false statement or claim that he is a citizen of the United States in order to register to vote or to vote in any Federal, State, or local election (including an initiative, recall, or referendum)–

Shall be fined under this title or imprisoned not more than five years, or both. Subsection (f) does not apply to an alien if

each natural parent of the alien (or, in the case of an adopted alien, each adoptive parent of the alien) is or was a citizen (whether by birth or naturalization), the alien permanently resided in the United States prior to attaining the age of 16, and the alien reasonably believed at the time of making the false statement or claim that he or she was a citizen of the United States.

**§ 1341. Frauds and swindles**

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined under this title or imprisoned not more than 20 years, or both. If the violation affects a financial institution, such person shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

**§ 1343. Fraud by wire, radio, or television**

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits

or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both. If the violation affects a financial institution, such person shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

**§ 1346. Definition of "scheme or artifice to defraud"**

For the purposes of this chapter, the term "scheme or artifice to defraud" includes a scheme or artifice to deprive another of the intangible right of honest services.

**§ 1952. Interstate and foreign travel or transportation in aid of racketeering enterprises**

**(a)** Whoever travels in interstate or foreign commerce or uses the mail or any facility in interstate or foreign commerce, with intent to–

**(1)** distribute the proceeds of any unlawful activity; or

**(2)** commit any crime of violence to further any unlawful activity; or

**(3)** otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity, and thereafter performs or attempts to perform–

**(A)** an act described in paragraph (1) or (3) shall be fined under this title, imprisoned not more than 5 years, or both; or

**(B)** an act described in paragraph (2) shall be fined under this title, imprisoned for not more than 20 years, or both, and if death results shall be imprisoned for any term of years or for life.

**(b)** As used in this section (i) "unlawful activity" means (1) any business enterprise involving gambling, liquor on which the Federal

excise tax has not been paid, narcotics or controlled substances (as defined in section 102(6) of the Controlled Substances Act), or prostitution offenses in violation of the laws of the State in which they are committed or of the United States, (2) extortion, bribery, or arson in violation of the laws of the State in which committed or of the United States, or (3) any act which is indictable under subchapter II of chapter 53 of title 31, United States Code, or under section 1956 or 1957 of this title and (ii) the term "State" includes a State of the United States, the District of Columbia, and any commonwealth, territory, or possession of the United States.

**(c)** Investigations of violations under this section involving liquor shall be conducted under the supervision of the Attorney General.

## 3. EXCERPTS FROM TITLE 26, UNITED STATES CODE

### § 9012. Criminal penalties

* * * * *

**(c) Unlawful use of payments.–**

**(1)** It shall be unlawful for any person who receives any payment under section 9006, or to whom any portion of any payment received under such section is transferred, knowingly and willfully to use, or authorize the use of, such payment or such portion for any purpose other than–

**(A)** to defray the qualified campaign expenses with respect to which such payment was made, or

**(B)** to repay loans the proceeds of which were used, or otherwise to restore funds (other than contributions to defray qualified campaign expenses which were received and expended) which were used, to defray such qualified campaign expenses.

**(2)** It shall be unlawful for the national committee of a major party or minor party which receives any payment under section 9008(b)(3) to use, or authorize the use of, such payment for any

purpose other than a purpose authorized by section 9008(c).

**(3)** Any person who violates paragraph (1) shall be fined not more than $10,000, or imprisoned not more than five years, or both.

**(d) False statements, etc.–**

**(1)** It shall be unlawful for any person knowingly and willfully–

**(A)** to furnish any false, fictitious, or fraudulent evidence, books, or information to the Commission under this subtitle, or to include in any evidence, books, or information so furnished any misrepresentation of a material fact, or to falsify or conceal any evidence, books, or information relevant to a certification by the Commission or an examination and audit by the Commission under this chapter; or

**(B)** to fail to furnish to the Commission any records, books, or information requested by it for purposes of this chapter.

**(2)** Any person who violates paragraph (1) shall be fined not more than $10,000, or imprisoned not more than five years, or both.

**§ 9042. Criminal penalties**

* * * * *

**(b) Unlawful use of payments.–**

**(1)** It is unlawful for any person who receives any payment under section 9037, or to whom any portion of any such payment is transferred, knowingly and willfully to use, or authorize the use of, such payment or such portion for any purpose other than--

**(A)** to defray qualified campaign expenses, or

**(B)** to repay loans the proceeds of which were used, or otherwise to restore funds (other than contributions to

defray qualified campaign expenses which were received and expended) which were used, to defray qualified campaign expenses.

**(2)** Any person who violates the provisions of paragraph (1) shall be fined not more than $10,000, or imprisoned not more than 5 years, or both.

* * * * *

**(b) Unlawful use of payments.–**

It is unlawful for any person who receives any payment under section 9037, or to whom any portion of any such payment is transferred, knowingly and willfully to use, or authorize the use of, such payment or such portion for any purpose other than–

**(A)** to defray qualified campaign expenses, or

**(B)** to repay loans the proceeds of which were used, or otherwise to restore funds (other than contributions to defrayqualified campaign expenses which were received and expended) which were used, to defray qualified campaign expenses.

**(c) False statements, etc.–**

**(1)** It is unlawful for any person knowingly and willfully–

**(A)** to furnish any false, fictitious, or fraudulent evidence, books, or information to the Commission under this chapter, or to include in any evidence, books, or information so furnished any misrepresentation of a material fact, or to falsify or conceal any evidence, books, or information relevant to a certification by the Commission or an examination and audit by the Commission under this chapter, or

**(B)** to fail to furnish to the Commission any records, books, or information requested by it for purposes of this chapter.

**(2)** Any person who violates the provisions of paragraph (1) shall be fined not more than $10,000, or imprisoned not more than 5 years, or both.

* * * * *

## 4. EXCERPTS FROM TITLE 42, UNITED STATES CODE

### § 1973i. Prohibited acts

* * * * *

**(c) False information in registering or voting; penalties**

Whoever knowingly or willfully gives false information as to his name, address or period of residence in the voting district for the purpose of establishing his eligibility to register or vote, or conspires with another individual for the purpose of encouraging his false registration to vote or illegal voting, or pays or offers to pay or accepts payment either for registration to vote or for voting shall be fined not more than $10,000 or imprisoned not more than five years, or both: *Provided, however*, That this provision shall be applicable only to general, special, or primary elections held solely or in part for the purpose of selecting or electing any candidate for the office of President, Vice President, presidential elector, Member of the United States Senate, Member of the United States House of Representatives, Delegate from the District of Columbia, Guam, or the Virgin Islands, or Resident Commissioner of the Commonwealth of Puerto Rico.

* * * * *

**(e) Voting more than once**

**(1)** Whoever votes more than once in an election referred to in paragraph (2) shall be fined not more than $10,000 or imprisoned not more than five years, or both.

**(2)** The prohibition of this subsection applies with respect to any general, special, or primary election held solely or in part for the purpose of selecting or electing any candidate for the office of President, Vice President, presidential elector,

Member of the United States Senate, Member of the United States House of Representatives, Delegate from the District of Columbia, Guam, or the Virgin Islands, or Resident Commissioner of the Commonwealth of Puerto Rico.

**(3)** As used in this subsection, the term "votes more than once" does not include the casting of an additional ballot if all prior ballots of that voter were invalidated, nor does it include the voting in two jurisdictions under section 1973aa-1 of this title, to the extent two ballots are not cast for an election to the same candidacy or office.

**§ 1973gg-10. Criminal penalties**

A person, including an election official, who in any election for Federal office–

**(1)** knowingly and willfully intimidates, threatens, or coerces, or attempts to intimidate, threaten, or coerce, any person for–

**(A)** registering to vote, or voting, or attempting to register or vote;

**(B)** urging or aiding any person to register to vote, to vote, or to attempt to register or vote; or

**(C)** exercising any right under this subchapter; or

**(2)** knowingly and willfully deprives, defrauds, or attempts to deprive or defraud the residents of a State of a fair and impartially conducted election process, by–

**(A)** the procurement or submission of voter registration applications that are known by the person to be materially false, fictitious, or fraudulent under the laws of the State in which the election is held; or

**(B)** the procurement, casting, or tabulation of ballots that are known by the person to be materially false, fictitious, or fraudulent under the laws of the State in which the election is held, shall be fined in accordance with Title 18 (which fines shall be paid into the general fund of the Treasury,

miscellaneous receipts (pursuant to section 3302 of Title 31), notwithstanding any other law), or imprisoned not more than 5 years, or both.

# APPENDIX D

## TABLE OF CASES

*AFL-CIO v. Federal Election Commission,* 628 F.2d 97 (D.C. Cir. 1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . 135, 151, 179, 188
*Anderson v. United States*, 417 U.S. 211 (1974). . . . . . . . . . . . . . . . 1, 2, 39
*Athens Lumber Co. v. Federal Election Commission*, 718 F.2d 363 (11th Cir. 1983). . . . . . . . . . . . . . . . . . . . . . . . . 160, 161
*Austin v. Michigan Chamber of Commerce*, 494 U.S. 652 (1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . 142, 160, 161
*Badders v. United States*, 240 U.S. 391 (1916). . . . . . . . . . . . . . . . . . . . . 73
*Biller v. Merit Systems Protection Board*, 863 F.2d 1079 (2d Cir. 1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 123
*Blaylock v. Merit Systems Protection Board*, 851 F.2d 1348 (11th Cir. 1988). . . . . . . . . . . . . . . . . . . . . . . . . . . 123
*Blitz v. United States*, 153 U.S. 308 (1894). . . . . . . . . . . . . . . . . . . . . . . . 39
*Blockburger v. United States*, 284 U.S. 299 (1932). . . . . . . . . . . . . . . . 47
*Branti v. Finkel*, 445 U.S. 507 (1980). . . . . . . . . . . . . . . . . . . . . . 108, 117
*Brehm v. United States*, 196 F.2d 769 (D.C. Cir. 1952). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 110
*Buckley v. Valeo*, 424 U.S. 1 (1976). . . . . . . . . . . 138, 142, 144, 155, 158, 189, 244, 246, 247, 248, 249, 250, 252
*Buckley v. Valeo*, 519 F.2d 821 (D.C. Cir. 1975). . . . . . . . . . . . . 243, 244
*Burroughs v. United States*, 290 U.S. 534 (1934). . . . . . . . . . . . . 134, 242
*Civil Service Commission v. Letter Carriers*, 413 U.S. 548 (1973). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 121
*Connick v. Myers*, 461 U.S. 138 (1983).. . . . . . . . . . . . . . . . . . . . . . . . 117
*Cort v. Ash*, 422 U.S. 66 (1975).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 159
*Crolich v. United States*, 196 F.2d 879 (5th Cir. 1952).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
*Dennis v. United States*, 384 U.S. 855 (1966). . . . . . . . . . . . . . . . . . . . 187
*Duncan v. Poythress*, 657 F.2d 691 (5th Cir. 1981).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
*Elrod v. Burns*, 427 U.S. 347 (1976). . . . . . . . . . . . . . . . . . . 108, 109, 117
*Evans v. United States*, 504 U.S. 255 (1992).. . . . . . . . . . . . . . . . . . . . . 133

*Ex parte Curtis*, 106 U.S. 371 (1882). . . . . . . . . . . . . . . . . . . . . . 109, 110
*Ex parte Siebold*, 100 U.S. 371 (1880). . . . . . . . . . . . . . . . . . . . . . . . 21, 39
*Ex parte Yarborough*, 110 U.S. 651 (1884).. . . . . . . . . . . . . . . . . . . . 21, 37
*Federal Election Commission v. Democratic Senatorial Campaign Committee*, 454 U.S. 27 (1981).. . . . . . . . . . . . . . . . . . . 198
*Federal Election Commission v. Massachusetts Citizens for Life, Inc.*, 479 U.S. 238 (1986). . . . . . . . . . . . . . . 138, 161
*Federal Election Commission v. National Right To Work Committee*, 459 U.S. 197 (1982). . . . . . . . . . . . . . . . . . . . 244
*Federal Election Commission v. Wisconsin Right to Life, Inc.*, 551 U.S. ___, 127 S.Ct. 2652 (2007). . . . . . . . . . . . . . . . . . . . 148, 161
*Fields v. United States*, 228 F.2d 544 (4th Cir. 1955).. . . . . . . . . . . . . . . 38
*First National Bank of Boston v. Bellotti*, 435 U.S. 765 (1978). . . . . . . . . . . . . . . . . . . . . . . . . . . . 142, 159, 161
*Fotie v. United States*, 137 F.2d 831 (8th Cir. 1943).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68
*Guinn v. United States*, 238 U.S. 347 (1915). . . . . . . . . . . . . . . . . . . . . 22
*Haas v. Henkel*, 216 U.S. 462 (1910). . . . . . . . . . . . . . . . . . . . . . . . . 187
*Hammerschmidt v. United States*, 265 U.S. 182 (1924). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 187
*In re Coy*, 127 U.S. 731 (1888). . . . . . . . . . . . . . . . . . . . . . 21, 39, 44, 61
*Ingber v. Enzor*, 664 F. Supp. 814 (S.D.N.Y. 1987). . . . . . . . . . . . . 29, 74
*Ingber v. Enzor*, 841 F.2d 450 (2d Cir. 1988). . . . . . . . . . . . . . . . . . . . . 77
*International Association of Machinists v. Federal Election Commission,* 678 F.2d 1092 (D.C. Cir. 1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 161
*Kennedy v. Lynd*, 306 F.2d 222 (5th Cir. 1962).. . . . . . . . . . . . . . . . . . . 82
*Langer v. United States*, 76 F.2d 817 (8th Cir. 1935).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 108
*McConnell v. Federal Election Commission*, 540 U.S. 93 (2003). . . . . . . . . . . . . . 145, 146, 158, 172, 173, 199, 243
*McCormick v. United States*, 500 U.S. 257 (1991). . . . . . . . . . . . . . . . 133
*McNally v. United States*, 483 U.S. 350 (1987). . . . . . . . . . . . . 6, 7, 23, 29, 35, 73, 74, 75, 76, 77, 79, 191, 192
*National Right to Work Committee v. Federal Election Commission*, 716 F.2d 1401 (D.C. Cir. 1983). . . . . . . . 135, 151, 179, 188, 245, 246
*Newberry v. United States*, 256 U.S. 232 (1918).. . . . . . . . . . . . . . . . . . 22

*Nixon v. Shrink Missouri PAC*, 528 U.S. 377 (2000). . . . . . . . . . . . . . . 158
*Oregon v. Mitchell*, 400 U.S. 112 (1970). . . . . . . . . . . . . . . . . . . . . . . . . 39
*Perrin v. United States*, 444 U.S. 37 (1979). . . . . . . . . . . . . . . . . . . . . . 70
*Pipefitters Local 562 v. United States*,
407 U.S. 385 (1972). . . . . . . . . . . . . . . . . . . . . . . . . . . . 142, 160, 246
*Ratzlaf v. United States*, 510 U.S. 135 (1994). . . . . . . . . . . . . . . . . . . . 135
*Reynolds v. Sims*, 377 U.S. 533 (1964). . . . . . . . . . . . . . . . . . . . . . . 22, 39
*Rutan v. Republican Party of Illinois*, 497 U.S. 62 (1990). . . . . . 108, 117
*Ryan v. United States*, 99 F.2d 864 (8th Cir. 1938). . . . . . . . . . . . . . . . . 38
*United Public Workers v. Mitchell*,
330 U.S. 75 (1947). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 121
*United States v. Anderson*, 481 F.2d 685
(4th Cir. 1973). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 40
*United States v. Automobile Workers*,
352 U.S. 567 (1957). . . . . . . . . . . . . . . . . . . . 142, 160, 243, 244, 245
*United States v. Bagnariol*, 665 F.2d 877
(9th Cir. 1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71
*United States v. Barbieri*, 614 F.2d 715
(10th Cir. 1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71
*United States v. Barker*, 514 F.2d 1077
(7th Cir. 1975). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 44
*United States v. Barry*, 888 F.2d 1092
(6th Cir. 1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71
*United States v. Bathgate*, 246 U.S. 220 (1918). . . . . . . . . . . . . . . . 22, 39
*United States v. Blanton*, 77 F. Supp. 812
(E.D. Mo. 1948). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47
*United States v. Bloom*, 149 F.3d 649
(7th Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78
*United States v. Boards*, Cr. No. LR-92-183
(E.D. Ark., Sept. 12, 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 211
*United States v. Boards*, 10 F.3d 587 (8th Cir. 1993). . . . . . 33, 44, 45, 53
*United States v. Booker*, 543 U.S. 220 (2005). . . . . . . . . . . . . . . . . . . . 216
*United States v. Bowman*, 636 F.2d 1003
(5th Cir. 1981). . . . . . . . . . . . . . . . . . . . . . . . . . 21, 24, 42, 43, 44, 47
*United States v. Boyle*, 482 F.2d 755
(D.C. Cir. 1973). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 161

*United States v. Bracewell*, Cr. No. 91-57-N
(M.D. Ala., May 9, 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 197
*United States v. Bradberry*, 517 F.2d 498
(7th Cir. 1975). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
*United States v. Brumley*, 116 F.3d 728
(5th Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78, 192
*United States v. Bryan*, 58 F.3d 933
(4th Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 192
*United States v. Buckley*, 689 F.2d 893
(9th Cir. 1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73, 192
*United States v. Burleson*, 127 F. Supp. 400
(E.D. Tenn. 1954). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 110
*United States v. Campbell*, 845 F.2d 782
(8th Cir. 1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48
*United States v. Canales*, 744 F.2d 413
(5th Cir. 1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48
*United States v. Carmichael*, 685 F.2d 903
(4th Cir. 1982). . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 42, 43, 44, 49
*United States v. Chestnut*, 533 F.2d 40
(2d Cir. 1976). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 200
*United States v. Cianciulli*, 482 F. Supp. 585
(E.D. Pa. 1979). . . . . . . . . . . . . . . . . . . . . . . 24, 27, 42, 43, 44, 49, 84
*United States v. Cicco*, 10 F.3d 980
(3d Cir. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 118
*United States v. Cicco*, 938 F.2d 441
(3d Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 118
*United States v. C.I.O.*, 335 U.S. 106 (1948).. . . . . . . . . . . . . . . . 142, 160
*United States v. Clapps*, 732 F.2d 1148
(3d Cir. 1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 73, 191
*United States v. Classic*, 313 U.S. 299 (1941).. . . . . . . . . . . 22, 37, 38, 41
*United States v. Cole*, 41 F.3d 303
(7th Cir. 1994). . . . . . . . . . . . 33, 42, 43, 48, 51, 52, 53, 210, 212, 214
*United States v. Cooper*, 677 F. Supp. 778
(D. Del. 1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75
*United States v. Curran*, 20 F.3d 560
(3d Cir. 1994). . . . . . . . . . . . . . . . . . . . 135, 145, 186, 188, 190, 200

*United States v. Curry*, 681 F.2d 406 (5th Cir. 1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73, 192
*United States v. Czubinski*, 106 F.3d 1069 (1st Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 192
*United States v. D'Alessio*, 822 F. Supp. 1134 (D.N.J. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78
*United States v. Daugherty*, 952 F.2d 969 (8th Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48
*United States v. Davis*, 780 F.2d 838 (10th Cir. 1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72
*United States v. DeFries*, 43 F.3d 707 (D.C. Cir. 1995).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78
*United States v. Doherty*, 867 F.2d 47 (1st Cir. 1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75
*United States v. Ferrara*, 701 F. Supp. 39 (E.D.N.Y. 1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75
*United States v. Finance Committee to Re-Elect the President*, 507 F.2d 1194 (D.C. Cir. 1974). . . . . . . 144, 145, 179, 197
*United States v. Franklin*, 188 F.2d 182 (7th Cir. 1951). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68
*United States v. Gabriel*, 125 F.3d 89 (2d Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 186
*United States v. Garcia*, 719 F.2d 99 (5th Cir. 1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 43, 47, 48
*United States v. George*, No. CR86-00123, 1987 WL 48848 (W.D. Ky. 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77
*United States v. Girdner*, 754 F.2d 877 (10th Cir. 1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73
*United States v. Gradwell*, 243 U.S. 476 (1917). . . . . . . . . . . . . . . . . . . . 22
*United States v. Granberry*, 908 F.2d 278 (8th Cir. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75
*United States v. Grubb*, 11 F.3d 426 (4th Cir. 1993).. . . . . . . . . . . 78, 192
*United States v. Hankin*, 607 F.2d 611 (3d Cir. 1979). . . . . . . . . 168, 200
*United States v. Hansen*, 772 F.2d 940 (D.C. Cir. 1985). . . . . . . . . . . 185
*United States v. Haynes*, 977 F.2d 583 (6th Cir. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . 38, 40, 61, 211, 212
*United States v. Hogue*, 812 F.2d 1568 (11th Cir. 1987). . . . . . . . . . . . 51

*United States v. Hopkins*, 916 F.2d 207
(5th Cir. 1990). . . . . . . . . . . . . . . . . 145, 168, 186, 187, 188, 190, 204
*United States v. Howard*, 774 F.2d 838
(7th Cir. 1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23, 24, 40
*United States v. Hsia*, 176 F.3d 517
(D.C. Cir. 1999).. . . . . . . . . . . . . . . . . . . . . . . . . . 145, 168, 186, 204
*United States v.* Ingber, Cr. No. 86-1402
(2d Cir. Feb. 4, 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 74
*United States v. International Union of Operating Engineers*, 638 F.2d 1161 (9th Cir. 1979).. . . . . . . . . . . . . . . . . . . 177
*United States v. Jabara*, 644 F.2d 574 (6th Cir. 1981). . . . . . . . . . . . . . 71
*United States v. Jackson*, 433 F. Supp. 239 (W.D. N.Y. 1977)..  . . . . . 177
*United States v. Johns*, 742 F. Supp. 196 (E.D. Pa. 1990). . . . . . . . . . . 75
*United States v. Johns*, 972 F.2d 1333 (3d Cir. 1991).. . . . . . . . . . . . . . 75
*United States v. Kanchanalak*, 192 F.3d 1037
(D.C. Cir. 1999).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 150, 164, 186
*United States v. Karigiannis*, 430 F.2d 148 (7th Cir. 1970). . . . . . . . . . 70
*United States v. Karlsen*, Cr. No. 89-353
(D. Az., indictment filed Oct. 18, 1989). . . . . . . . . . . . . . . . . . . . . 197
*United States v. Kelley*, 395 F.2d 727 (2d Cir. 1968). . . . . . . . . . . . . . . 71
*United States v. Knight*, ___ F.3d ___, 2007 WL 1892861
(11th Cir. July 3, 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69
*United States v. Lewin*, 467 F.2d 1132 (7th Cir. 1972). . . . . . . . . . . . . . 48
*United States v. Malmay*, 671 F.2d 869
(5th Cir. 1982). . . . . . . . . . . . . . . . . . . . . . . . . . 21, 24, 42, 43, 48, 49
*United States v. Mason*, 673 F.2d 737
(4th Cir. 1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 24, 43, 47
*United States v. McCranie*, 169 F.3d 723
(11th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 42, 43, 48
*United States v. McLean*, 808 F.2d 1044 (4th Cir. 1987). . . . . . . . . . . . 39
*United States v. Morado*, 454 F.2d 167 (5th Cir. 1972). . . . . . . . . . . . . 38
*United States v. Mosley*, 238 U.S. 383 (1915).. . . . . . . . . . . . . . . . . . . . 38
*United States v. Nathan*, 238 F.2d 401 (7th Cir. 1956). . . . . . . . . . . . . . 39
*United States v. North Carolina Republican Party*,
No. 91-161-Civ-5F (E.D.N.C.). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57
*United States v. Odom*, 736 F.2d 104 (4th Cir. 1984). . . . . . . . . . 31, 50, 55
*United States v. Odom*, 858 F.2d 664 (11th Cir. 1988). . . . . . . . . . . . . . 48

*United States v. Olinger*, 759 F.2d 1293 (7th Cir. 1985). . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 24, 40, 43, 49, 50
*United States v. Panarella*, 277 F.3d 678 (3d Cir. 2002). . . . . . . . . . . . 78
*United States v. Passodelis*, 615 F.2d 975 (3d Cir. 1980). . . . . . . 168, 199
*United States v. Peskin*, 527 F.2d 71 (7th Cir. 1975). . . . . . . . . . . . . . . 71
*United States v. Pintar*, 630 F.2d 1270 (8th Cir. 1980). . . . . . . . . . . . . 108
*United States v. Pipefitters Local 562*, 434 F.2d 1116 (8th Cir. 1970). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 160
*United States v. Polizzi*, 500 F.2d 856 (9th Cir. 1974). . . . . . . . . . . . . . 70
*United States v. Powell*, 81 F. Supp. 288 (E.D. Mo. 1948). . . . . . . . . . . 38
*United States v. Price*, 383 U.S. 787 (1966). . . . . . . . . . . . . . . . . . . . . . 41
*United States v. Prude*, 489 F.3d (7th Cir. 2007). . . . . . . . . . . . . . . . . . 64
*United States v. Ratcliff,* 488 F.3d 639, (5th Cir. 2007). . . . . . . . . . 29, 77
*United States v. Riccardelli*, 794 F.2d 829 (2d Cir. 1986). . . . . . . . . . . 70
*United States v. Saenz*, 747 F.2d 930 (5th Cir. 1984). . . . . . . . . . . . . . . 43
*United States v. Salisbury*, Cr. No. 2-90-197 (S.D. Ohio, Oct. 8, 1991, 6th Cir. 1993). . . . . . . . . . . . . . . . . 211, 212
*United States v. Salisbury*, 983 F.2d 1369 (6th Cir. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33, 50, 51, 52
*United States v. Sawyer*, 85 F.3d 713 (1st Cir. 1996). . . . . . . . . . . . . . 192
*United States v. Sawyer*, 329 F.3d 31 (1st Cir. 2001). . . . . . . . . . . . . . . 78
*United States v. Saylor*, 322 U.S. 385 (1944). . . . . . . . . . . . . . . . . . . . . 38
*United States v. Sayre*, 522 F. Supp. 973 (W.D. Mo. 1981). . . . . . . . . . 43
*United States v. Schermerhorn*, 713 F. Supp. 88 (S.D.N.Y. 1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76, 194
*United States v. Simms*, 508 F. Supp. 1179 (W.D. La. 1979). . . . . . . . . 43
*United States v. Slone*, 411 F.3d 643 (6th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . 24, 42, 43, 48, 211, 214
*United States v. Smith*, 231 F.3d 800 (11th Cir. 2000). . . . . . . . . . . . . . . . . . . . 45, 50, 52, 94, 209, 212, 213
*United States v. Sparkman*, Cr. No. 99-30 (E.D. Ky. 7/12/00). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 211
*United States v. States*, 488 F.2d 761 (8th Cir. 1973). . . . . . . . 23, 73, 191
*United States v. Stollings*, 501 F.2d 954 (4th Cir. 1974). . . . . . . . . . 23, 40
*United States v. Taff*, 400 F. Supp. 2d 1270 (D. Kan., 2005). . . . . . . . 196
*United States v. Thayer*, 209 U.S. 39 (1908). . . . . . . . . . . . . . . . . . . . . 114
*United States v. Thomas*, 686 F. Supp. 1078 (M.D. Pa. 1988). . . . . . . . 75

*United States v. Thomas*, Cr. No. *05-0423* (D. D.C., information filed November 30, 2005). . . . . . . . . . . . . . . . . . . . . . . 197
*United States v. Tobin*, No. 04-216-01 (SM), 2005 WL 3199672 (D.N.H. Nov. 30, 2005). . . . . . . . . . . . . 38, 62, 63
*United States v. Tonry*, 433 F. Supp. 620 (E.D. La. 1977). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 177
*United States v. Townsley*, 843 F.2d 1070 (8th Cir. 1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38, 40, 61
*United States v. Turner*, 459 F.3d 775 (6th Cir. 2006). . . . . . . . . . . . . . . . 7, 29, 77, 78, 193, 194
*United States v. Wadena*, 152 F.3d 831 (8th Cir. 1998). . . . . . . . . . . 22, 40
*United States v. Walker*, 97 F.3d 253 (8th Cir. 1996). . . . . . . 76, 192, 194
*United States v. Walters*, 711 F. Supp. 1435 (N.D. Ill. 1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75
*United States v. Waymer*, 55 F.3d 564 (11th Cir. 1995). . . . . . . . . . . . 192
*United States v. Webb*, 689 F. Supp. 703 (W.D. Ky. 1988). . . . . . . . 29, 77
*United States v. Wechsler*, 392 F.2d 344 (4th Cir. 1968). . . . . . . . . . . . 71
*United States v. Weston*, 417 F.2d 181 (4th Cir. 1969). . . . . . . . . . . . . . 38
*United States v. Woodward*, 469 U.S. 105 (1985). . . . . . . . . . . . . . . . . 190
*United States v. Wurzbach*, 280 U.S. 396 (1930). . . . . . . . . . . . . . . . . 109
*Walker v. United States*, 93 F.2d 383 (8th Cir. 1937). . . . . . . . . . . . . . . 38
*Whalen v. United States*, 445 U.S. 684 (1980). . . . . . . . . . . . . . . . . . . . 47
*Wilkins v. United States*, 376 F.2d 552 (5th Cir. 1967). . . . . . . . . . . 38, 59
*Williams v. United States,* 341 U.S. 97 (1951). . . . . . . . . . . . . . . . . . . . 37
*Williams v. United States*, 179 F.2d 644 (5th Cir. 1950). . . . . . . . . . 38, 41

# EXHIBIT 48

YouTube Search Sign in

# Secretary Mullin Delivers Remarks on President Trump's Update on Election Integrity Efforts

6.2K views Streamed 2mo ago

U.S. Department of Homeland Security
51.1K subscribers

Subscribe Like

Secretary of Homeland Security Markwayne Mullin delivers remarks to discuss the Trump Administration's efforts to secure American elections.
...more

New







1:00:33

**Rep. Thomas Massies (R-KY) on Epstein Files and Impeaching Secretary Hegseth**
C-SPAN
▷ 513K 5d ago



43:39

**Why Does Mass Create Gravity? The Real Answer by Richard Feynman Changes Everything**
Feynman Reborn
▷ 123K 5mo ago

New




34:24

**UnitedHealthcare & UnitedHealth Group: Last Week Tonight with John Oliver (HBO)**
LastWeekTonight
▷ 2.2M 19h ago

51:15

**Sec. Mullin, Sec. Duffy Address Interagency Effort to Crack Down on Trucking Fraud**
U.S. Department of Homeland Security
▷ 8.7K Streamed 3w ago

17:55

**James Talarico questions author of the "FURRIES Act"**
James Talarico
▷ 877K 1y ago

New

20:15

**MUST WATCH: Obama Gives Deep Take On AI Threat, Recursive Self-Improvement, & His Suggested Approach**
Forbes Breaking News
▷ 274K 1d ago

New

New

Case 4:26-cv-10680-AMO Document 10-7 Filed 09/21/26 Page 1168 of 1168

12:05

**'If you challenge our Armed Forces...': Hegseth delivers strong**

The Economic Times

24K 10h ago

12:30

**'F around and find out': Nicolle and Jim Acosta react to**

MS NOW

343K 4h ago

New

28:06

**Rand Paul Blocks John Kennedy's AI Kill Switch Bill & Calls For Committee Debate—Then Kennedy Reacts**

Forbes Breaking News

462K 4d ago

Show more

Comments are turned off. Learn more