CRAIG H. MISSAKIAN (CABN 125202)
United States Attorney
PAMELA T. JOHANN (CABN 145558)
Chief, Civil Division
KELSEY J. HELLAND (CABN 298888)
Assistant United States Attorney

450 Golden Gate Avenue, Box 36055
San Francisco, California 94102-3495
Telephone: (415) 436-7200
Fax: (415) 436-6748
kelsey.helland@usdoj.gov

Attorneys for Defendants

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| CALIFORNIA NURSES ASSOCIATION, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF HOMELAND SECURITY et al.,<br><br>Defendants. | Case No. 4:26-cv-10680-AMO<br><br>**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR APA STAY AND PRELIMINARY INJUNCTION**<br><br>Date: October 1, 2026<br>Time: 11:00 a.m.<br>Location: Courtroom 5, 2nd Floor<br><br>The Honorable Araceli Martínez-Olguín |

# TABLE OF CONTENTS


I. INTRODUCTION ....................................................................................................1

II. BACKGROUND ....................................................................................................2

A. Longstanding History Of Restrictions On Foreign Nationals Voting In The U.S. ....................................................................................................2

B. DHS Maintains Databases To Ensure Election Integrity. ....................................................................................................3

C. DHS Is Investigating Violations Of Federal Law In Advance Of The Election. ....................................................................................................4

III. ARGUMENT ....................................................................................................6

A. Plaintiffs Are Not Likely To Succeed On The Merits Of Their Claims. ....................................................................................................6

1. Plaintiffs lack standing. ....................................................................................................6

(i) Plaintiffs Have Not Alleged They or Any of Their Members Have Been Contacted by DHS. ....................................................................................................7

(ii) Voluntary Changes Based on Fears Do Not Confer Standing. ....................................................................................................8

(iii) CNA/NNU Has Not Shown Associational Standing. ....................................................................................................11

(iv) Local Government Plaintiffs Cannot Bring a Parens Patriae Lawsuit. ....................................................................................................12

2. Plaintiffs' APA claims fail to show a discrete, final agency action. ....................................................................................................13

3. The challenged actions, even if final, are committed to agency discretion. ....................................................................................................16

4. The challenged agency actions are not arbitrary or capricious. ....................................................................................................19

5. Plaintiffs cannot bring freestanding *ultra vires* causes of action. ....................................................................................................21

6. The challenged agency actions do not violate voting laws or rights. ....................................................................................................22

B. Plaintiffs Will Not Suffer Irreparable Harm. ....................................................................................................24

C. The Public Interest Weighs Against Granting Relief. ....................................................................................................26

1. The public interest favors maintaining the status quo. ....................................................................................................26

2. Any relief must be strictly limited. ....................................................................................................26

(i) Any Section 705 Stay Should Be Limited to the Parties. ....................................................................................................27

(ii) Any Injunctive Relief Should Be Narrowly Tailored. ....................................................................................................27

IV. CONCLUSION ....................................................................................................29

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Alexander v. Sandoval*,
532 U.S. 275 (2001) ... 22

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez,*
458 U.S. 592 ... 12, 13

*Andrews v. D'Souza*,
696 F. Supp. 3d 1332 (N.D. Ga. 2023) ... 22

*Arizona All. for Retired Americans v. Mayes*,
186 F.4th 622 (9th Cir. 2026) ... 7, 9, 10, 11

*ASSE Int'l, Inc. v. Kerry*,
803 F.3d 1059 (9th Cir. 2015) ... 17

*Ass'n of Am. Med. Colls. v. United States*,
217 F.3d 770 (9th Cir. 2000) ... 14

*Bennett v. Isagenix Int'l LLC*,
118 F.4th 1120 (9th Cir. 2024) ... 25

*Bennett v. Spear*,
520 U.S. 154 (1997) ... 14, 15

*Biden v. Nebraska*,
600 U.S. 477 (2023) ... 17

*Biden v. Texas*,
597 U.S. 785 (2022) ... 14

*Califano v. Yamasaki*,
442 U.S. 682 (1979) ... 27

*Caribbean Marine Servs. Co. v. Baldrige*,
844 F.2d 668 (9th Cir. 1988) ... 25

*Center for Biological Diversity v. Culver*,
No. 21-cv-07171-SI, 2024 WL 4505468 (N.D. Cal. Oct. 15, 2024) ... 21

*Center for Biological Diversity v. EPA*,
141 F.4th 153 (D.C. Cir. 2025) ... 20

*Changji Esquel Textile Co. v. Raimondo*,
40 F.4th 716 (D.C. Cir. 2022) ... 21, 22

*City & Cnty. of San Francisco v. Trump*,
783 F. Supp. 3d 1148 (N.D. Cal. 2025) ... 26

*City & Cnty. of San Francisco v. Whitaker*,
357 F. Supp. 3d 931 (N.D. Cal. 2018) ... 12

*City of Los Angeles v. Lyons*,
461 U.S. 95 (1983) ... 8

*City of North Miami v. Fed. Aviation Admin.*,
47 F.4th 1257 (11th Cir. 2022) ... 12

*City of Olmsted Falls v. FAA*,
292 F.3d 261 (D.C. Cir. 2002) ... 12

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) ... 7, 8

*Colo. Mont. Wyo. State Area Conf. of NAACP v. U.S. Election Integrity Plan*,
653 F. Supp. 3d 861 (D. Colo. 2023) ... 23

*Colorado v. DeJoy*,
487 F. Supp. 3d 1061 (D. Colo. 2020) ... 25

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*,
603 U.S. 799 (2024) ... 13

*Ctr. for Sustainable Econ. v. Jewell*,
779 F.3d 588 (D.C. Cir. 2015) ... 12

*Deaver v. Seymour*,
822 F.2d 66 (D.C. Cir. 1987) ... 18

*DHS v. League of Women Voters*,
No. 26A308, 609 U.S. __ (2026) ... 20, 21, 26

*DHS v. Regents of Univ. of Cal.*,
591 U.S. 1 (2020) ... 21

*FDA v. All. for Hippocratic Med.*,
602 U.S. 367 (2024) ... 7, 9, 10

*Fed. Express Corp. v. U.S. Dep't of Com.*,
39 F. 4th 756 (D.C. Cir. 2022) ... 21

*Garro Pinchi v. Noem*,
813 F. Supp. 3d 973 (N.D. Cal. 2025) ........ 17

*Gentile v. Sec. & Exch. Comm'n*,
974 F.3d 311 (3d Cir. 2020) ........ 16, 19

*Gonzaga University v. Doe*,
536 U.S. 273 (2002) ........ 22

*Harper v. Werfel*,
118 F.4th 100 (1st Cir. 2024) ........ 14

*Heckler v. Chaney*,
470 U.S. 821 (1985) ........ 16, 19

*Humane Soc'y of United States v. Hodel*,
840 F.2d 45 (D.C. Cir. 1988) ........ 12

*Hunt v. Wash. State Apple Advert. Comm'n*,
432 U.S. 333 (1977) ........ 11

*Interstate Com. Comm'n v. Bhd. of Locomotive Eng'rs*,
482 U.S. 270 (1987) ........ 17

*L.A. Mem'l Coliseum Comm'n v. NFL,*
634 F.2d 1197 (9th Cir. 1980) ........ 25

*Laird v. Tatum*.,
408 U.S. 1 (1972) ........ 10, 11

*Lands Council v. Powell*,
395 F.3d 1019 (9th Cir. 2005) ........ 20

*League of Women Voters v. DHS*,
835 F. Supp. 3d 79 (D.D.C. 2026) ........ 19

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) ........ 6, 8

*Lujan v. Nat'l Wildlife Fed'n*,
497 U.S. 871 (1990) ........ 13, 14

*LULAC v. Pub. Int. Legal Found.*,
No. 1:18-cv-00423, 2018 WL 3848404 (E.D. Va. Aug. 13, 2018) ........ 23

*Michigan v. DeVos*,
481 F. Supp. 3d 984 (N.D. Cal. 2020) ........ 26

*Mid States Coal. for Progress v. Surface Transp. Bd.*,
345 F.3d 520 (8th Cir. 2003) .......... 21

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) .......... 19

*Munaf v. Geren,*
553 U.S. 674 (2008) .......... 26

*Murthy v. Missouri*,
603 U.S. 43 (2024) .......... 27, 28

*Nat'l Coal. on Black Civic Participation v. Wohl*,
498 F.Supp.3d 457 (S.D.N.Y. 2020) .......... 25

*Nat'l Coal. on Black Civic Participation v. Wohl*,
512 F. Supp. 3d 500 (S.D.N.Y. 2021) .......... 24

*Ngure v. Ashcroft*,
367 F.3d 975 (8th Cir. 2004) .......... 16

*Norton v. S. Utah Wilderness All.*,
542 U.S. 55 (2004) .......... 13

*NRC v. Texas*,
605 U.S. 665 (2025) .......... 22

*Nw. Ctr. for Alternatives to Pesticides v. U.S. Dep't of Homeland Sec.*,
552 F. Supp. 3d 1078 (D. Or. 2021) .......... 14

*Nyunt v. Chairman, Broad. Bd. of Governors*,
589 F.3d 445 (D.C. Cir. 2009) .......... 22

*Ocean Beauty Seafoods, LLC v. Pac. Seafood Grp. Acquisition Co., Inc.*,
648 F. App'x 709 (9th Cir. 2016) .......... 25

*Olagues v. Russoniello*,
770 F.2d 791 (9th Cir. 1985) .......... 2, 24

*Olaguesv. Russoniello* ,
797 F.2d 1511 (9th Cir. 1986) .......... 18, 23

*Parsons v. United States Dep't of Just.*,
878 F.3d 162 (6th Cir. 2017) .......... 15

*Perez Perez v. Wolf*,
943 F.3d 853 (9th Cir. 2019) .......... 17

*Planned Parenthood S. Atl. v. Baker*,
941 F.3d 687 (4th Cir. 2019) .......... 22

*Pom Wonderful LLC v. Hubbard*,
775 F.3d 1118 (9th Cir. 2014) .......... 26

*PostSecondary Sch. v. DeVos*,
344 F. Supp. 3d 158 (D.D.C. 2018) .......... 24

*Prutehi Litekyan: Save Ritidian v. United States Dep't of Airforce*,
128 F.4th 1089 (9th Cir. 2025) .......... 15

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
566 U.S. 639 (2012) .......... 23

*Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n*,
324 F.3d 726 (D.C. Cir. 2003) .......... 16

*Sampson v. Murray*,
415 U.S. 61 (1974) .......... 27

*San Luis Unit Food Producers v. United States*,
709 F.3d 798 (9th Cir. 2013) .......... 14

*Sierra Club v. U.S. Army Corps of Eng'rs*,
446 F.3d 808 (8th Cir. 2006) .......... 14

*Smith v. Meese*,
821 F.2d 1484 (11th Cir. 1987) .......... 18

*South Carolina v. Katzenbach,*
383 U.S. 301 (1966) .......... 12

*Starbucks Corp. v. McKinney*,
602 U.S. 339 (2024) .......... 27

*Steel Co. v. Citizens for a Better Env't*,
523 U.S. 83 (1998) .......... 7

*Summers v. Earth Island Inst.*,
555 U.S. 488 (2009) .......... 11

*Tamenut v. Mukasey*,
521 F.3d 1000 (8th Cir. 2008) .......... 16

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) .......... 6, 11, 16

*Trump v. California*,
No. 26A124, 2026 WL 2473573 (U.S. Aug. 24, 2026) .......... 18

*Trump v. CASA, Inc.*,
606 U.S. 831 (2025) .......... 27

*Trump v. United States*,
603 U.S. 593 (2024) .......... 16, 19

*Twin Rivers Paper Co. LLC v. SEC*,
934 F.3d 607 (D.C. Cir. 2019) .......... 11

*United States v. Clark,*
249 F. Supp. 720 (S.D. Ala. 1965) .......... 18, 24

*United States v. Knight*,
490 F.3d 1268 (11th Cir. 2007) .......... 2

*United States v. Lerma*,
838 F. App'x 249 (9th Cir. 2020) .......... 2

*United States v. McLeod*,
385 F.2d 734 (5th Cir. 1967) .......... 18, 24

*United States v. Tan Duc Nguyen*,
673 F.3d 1259 (9th Cir. 2012) .......... 23

*United States v. Wood*,
295 F.2d 772 (5th Cir. 1961) .......... 18, 24

*Webster v. Doe*,
486 U.S. 592 (1988) .......... 16

*Winter v. California Medical Review Inc.,*
900 F.2d 1322 (9th Cir.1989) .......... 14

*Winter v. NRDC*,
555 U.S. 7 (2008) .......... 25

**Statutes**

5 U.S.C. § 551 .......... 13
5 U.S.C. § 701 .......... 16
5 U.S.C. § 704 .......... 13, 14
5 U.S.C. § 705 .......... 27
6 U.S.C. § 203 .......... 2, 24
6 U.S.C. § 251 .......... 23
8 U.S.C. § 1103 .......... 2, 23
8 U.S.C. § 1373 .......... 3, 17

18 U.S.C. § 611 ........ 2, 14, 23
19 U.S.C. § 1589a ........ 17
42 U.S.C. § 1320b–7 ........ 3
52 U.S.C. § 21083 ........ 3
52 U.S.C. § 50307 ........ 22

**Other Authorities**

Executive Order 14248 ........ 2
Executive Order 14399 ........ 3

# I. INTRODUCTION

Plaintiffs here appear to claim that DHS's use of "unreliable" systems identifying potential noncitizen voters is "arbitrary and capricious," and the agency should be enjoined from even investigating the status of such voters. At the outset, the pleadings throw a collection of conclusory and unsupported allegations at the wall in the hope that something will stick. It is difficult to discern what exactly Plaintiffs are alleging. There are myriad reasons why Plaintiffs' request for preliminary injunctive relief should fail.

First, Plaintiffs are not likely to succeed on the merits. Plaintiffs lack standing, because they fail to allege any definite, concrete harm to themselves. Moreover, the "policies" Plaintiffs challenge here are not policies at all; they are operational guidance that does not qualify as "final agency action" reviewable under the APA. Even if final agency action, the government's decisions about whether initial investigatory leads warrant further investigation are also committed to agency discretion. If reviewable, the actions are not arbitrary and capricious, because DHS reasonably decided to make use of the best data it had available to it to perform its law enforcement role, notwithstanding that the information may not be perfect in all cases. And Plaintiffs cannot bring freestanding, non-APA claims, but even if they could, they fail to show that mere investigations would violate the Voting Rights Act or the Constitution.

Second, Plaintiffs will not suffer irreparable harm without an injunction. Plaintiffs have not identified a single voter who has faced any of the harms that they claim to fear in this suit. Their vague descriptions of "intimidating conduct" lack specifics and, to the extent they can be identified, bear little relation to the particular information-sharing and investigative conduct actually challenged in this lawsuit.

And third, the balance of equities weighs against granting an injunction here. The federal government has statutory authority to investigate potential voting by noncitizens. Enjoining the government from even investigating such criminal violations would damage the public interest, not serve it. This is especially true given the remarkably broad scope of relief Plaintiffs seek, which would prevent the government from investigating violations of federal law no matter the strength of the evidence.

In evaluating Plaintiffs' request, it is critical to understand the actual agency actions at issue. Plaintiffs allege a vague and amorphous collection of purely internal DHS "Policies" here, but in actuality, the relevant agency actions are (1) a coordination agreement reflecting that USCIS will share certain information with HSI; and (2) weekly email guidance indicating that certain HSI offices should

temporarily prioritize investigations into potential noncitizen voting, subject to a rigorous set of filters to ensure that U.S. citizens will not be subject to investigations or enforcement action. Not only are these types of actions outside the scope of the APA; they are also reasonable exercises in internal law enforcement prerogatives that have not harmed Plaintiffs in any way.

For all of these reasons, the Court should deny Plaintiffs' motion for a preliminary injunction.

## II. BACKGROUND

### A. Longstanding History Of Restrictions On Foreign Nationals Voting In The U.S.

Federal law prohibits foreign nationals from registering to vote and voting in federal elections in the United States. *See, e.g.*, 18 U.S.C. §§ 611, 1015. For decades, the United States has investigated allegations that foreign nationals have voted, attempted to vote, or registered to vote in U.S. elections. *See, e.g.*, *Olagues v. Russoniello*, 770 F.2d 791, 794 (9th Cir. 1985) (*Olagues I*). These investigations have resulted in criminal convictions. *See, e.g.*, *United States v. Lerma*, 838 F. App'x 249, 250 (9th Cir. 2020); *United States v. Knight*, 490 F.3d 1268, 1269 (11th Cir. 2007).

Since the Homeland Security Act of 2002, DHS has been statutorily authorized to investigate the citizenship of registered voters in United States elections. *See* 6 U.S.C. §§ 203(1), 251(4) ("[T]here shall be transferred from the Commissioner of Immigration and Naturalization to the Secretary [of Homeland Security] all functions performed under the following programs . . . (4) The investigations program."); *see also* 8 U.S.C. §§ 1103(a)(1), 1357; *Authority to Obtain and Share Statewide Voter Roll Data*, 50 Op. O.L.C. __, at 37-38 (May 12, 2026).

On March 25, 2025, the President issued Executive Order 14248, establishing that "[i]t is the policy of [the] Administration to enforce Federal law and to protect the integrity of our election process." 90 Fed. Reg. 14,005, 14,006 (Mar. 25, 2025). Among other things, the Executive Order instructed that, "[t]o identify unqualified voters registered in the States," "the Secretary of Homeland Security shall, consistent with applicable law, ensure that State and local officials have . . . access to appropriate systems for verifying the citizenship or immigration status of individuals registering to vote or who are already registered," and that "the Department of Homeland Security . . . shall review each State's publicly available voter registration list and available records . . . , alongside Federal immigration databases and State records requested, . . . for consistency with Federal requirements." *Id.* at 14,006-07.

More recently, on March 21, 2026, the President issued Executive Order 14399, *Ensuring Citizenship Verification and Integrity in Federal Elections*. *See* 91 Fed. Reg. 17,125 (Mar. 31, 2026). EO 14399 reaffirmed that preventing and investigating election fraud, including by noncitizens, was a duty and priority of the federal government. *See id.* And it directed the Attorney General to prioritize prosecutions of election fraud, ordering that "[t]he Attorney General and the heads of executive departments and agencies (agencies) with relevant authority shall take all lawful steps to deter and address noncompliance with Federal law." *Id.* at 17,126-27.[1]

**B. DHS Maintains Databases To Ensure Election Integrity.**

In 1986, Congress required the federal government to "implement a system for the verification of immigration status . . . so that the system is available to all the States." 42 U.S.C. § 1320b–7 note. In 1996, Congress required the INS—whose functions have since been transferred to DHS—to "respond to an inquiry by a Federal, State, or local government agency, seeking to verify or ascertain the citizenship or immigration status of any individual within the jurisdiction of the agency for any purpose authorized by law, by providing the requested verification or status information." 8 U.S.C. § 1373(c). To ensure DHS can satisfy this duty, the statute twice provides that "[n]otwithstanding any other provision of Federal, State, or local law," no federal entity or official (among others) may "prohibit, or in any way restrict," the sharing with or by DHS of "information regarding" citizenship or immigration status. 8 U.S.C. § 1373(a)-(b). Separately, each State has a federal statutory duty to "ensure that voter registration records in the State are accurate and are updated regularly." 52 U.S.C. § 21083(a)(4).

USCIS's Fraud Detection and National Security (FDNS) Directorate supports this mission in various ways. *See* USCIS Decl. ¶ 4. "FDNS personnel conduct administrative inquiries, analyze information from authorized sources, document findings, and provide information to USCIS adjudicators, Homeland Security Investigations (HSI) agents, and other authorized government personnel." *Id.* "When FDNS receives information that can be used to identify potential unlawful voting, its general role is to assess and develop relevant facts." *Id.* ¶ 8. "Similar names, incomplete records, outdated citizenship

[1] The Supreme Court recently rejected a challenge to this provision of EO 14399 for lack of standing. *See Alabama v. California*, No. 26A139, 609 U.S. (2026) (Slip Op.) ("The States lack standing to challenge §2(b) for much the same reason: It does nothing to them. . . . Setting prosecutorial priorities lies within the President's Article II power.").

information, clerical errors, and other circumstances may require further manual review of all available data. FDNS therefore seeks to confirm identity and evaluate the available evidence before reporting a substantiated finding or making a referral for further investigation." *Id.*

"USCIS receives voter information through a variety of sources, including, but not limited to, information voluntarily provided by state and local jurisdictions, publicly available information, and other lawfully available data. USCIS compares voter information received from these sources against DHS and commercial database holdings to ascertain whether there is a potential identity match." *Id.* ¶ 10. "FDNS treats all referred information as potential leads of unlawful voting activity, subject to additional review. FDNS weighed the risk of inaccurate or incomplete information, including the possibility that in rare circumstances U.S. citizens might be incorrectly identified as aliens, against the importance of identifying matters that might warrant investigation and concluded that the process could proceed with safeguards intended to reduce the risk of an erroneous referral." *Id.* ¶ 15.

"In particular, before making a referral to HSI, FDNS manually reviews authorized DHS records and other lawfully available information to verify the individual's identity and determine whether the available evidence sufficiently supports the referral. If the records indicate that the person may have acquired or derived U.S. citizenship, contain material discrepancies, or otherwise do not adequately support alien status, FDNS concludes its review and does not refer it to HSI unless the data indicate that the person may have voted or registered to vote prior to naturalization." *Id.* ¶ 17.

**C. DHS Is Investigating Violations Of Federal Law In Advance Of The Election.**

As the chief criminal investigative arm within DHS, HSI has authority to investigate "individuals who were identified as potential illegal aliens at the time of the relevant voting or election-related activity and who may have engaged in voter fraud, false claims to U.S. citizenship, identity-based fraud, or other unlawful activity during the investigative process." HSI Decl. ¶ 12; *see also id.* at ¶ 10.[2] "HSI's investigations are not intended to investigate lawful voting activity by [U.S. citizens], nor are [U.S.

[2] This authority and the corresponding investigations are not new. *See e.g.,* ICE Press Release, *Previously deported criminal alien pleads guilty to voter fraud, illegal reentry and falsely claiming US citizenship* (Sept. 7, 2012), https://www.ice.gov/news/releases/previously-deported-criminal-alien-pleads-guilty-voter-fraud-illegal-reentry; ICE Press Release, *19 foreign nationals indicted for illegally voting in 2016 elections* (Aug. 27, 2018), https://www.ice.gov/news/releases/19-foreign-nationals-indicted-illegally-voting-2016-elections.

citizens] the intended investigative population of the initiative" *Id.* ¶ 12.

Indeed, "DHS has implemented a layered vetting process to filter out [U.S. citizens] so they are not impacted by" such investigations. *Id.* That process "includes multiple stages of data review and validation involving USCIS records and additional DHS data sources before a matter is referred for HSI investigative consideration." *Id.* "HSI, however, does not treat an initial data match or USCIS referral as a final determination of alienage, voting ineligibility, or criminal activity." *Id.* Among other things, "HSI will send to ERO to determine alienage." *Id.* ¶ 19. HSI also "conducts an independent review of the referral and available records to determine whether additional investigative activity is warranted and whether an appropriate investigative basis exists," which may include "verification of identity, immigration-status information, relevant DHS and law enforcement records, and other information pertinent to the allegations." *Id.* ¶ 22. And "[w]hen potential inaccuracies were identified in the USCIS lists, DHS sought further resources to prevent inaccuracies and developed a new model for generating leads for HSI's unlawful voting investigations." *Id.* ¶ 19.

If, upon conducting their investigation, HSI special agents determine that the subject of the investigation is a U.S. citizen, the agents will cease the investigation into that individual. *Id.* ¶ 23. If, on the other hand, HSI special agents determine that an individual who is likely not a citizen has unlawfully registered to vote, voted, or engaged in other criminal activity, HSI may conduct field operations to gather additional evidence and, if justified, take law enforcement action against such individuals. *See id.* ¶ 22. Where the evidence sufficiently supports criminal prosecutions, HSI will refer the matter to the Department of Justice, which may then exercise its own enforcement discretion to decide what cases may be appropriate for further investigation or, eventually, for a potential prosecution. *See id.* ¶ 22.

In March of 2026, HSI issued an update by email to all HSI Special Agents in Charge, titled "USCIS Coordination for Voter Fraud-Related NTAs." AR-1-1 to AR-1-2. This update reflected that USCIS and HSI were coordinating efforts to investigate alien voter fraud. *See id.* HSI field offices were directed to "evaluate" whether the "circumstances necessitate follow-up investigative action or case development." AR-1-1. Defendants understand that this update is what Plaintiffs characterize as the "HSI-USCIS Coordination Memo." *See* Compl. ¶¶ 116, 117.

On August 31, 2026, DHS issued a weekly update via email to HSI officers concerning "HSI

Election Integrity Investigations." AR-2-1. "While HSI's investigations into unlawful voting efforts, as indicated above, have been ongoing for over a year, HSI made the operational decision to surge resources to these investigations, as exemplified in the August 31, 2026 weekly update, in response to an influx of investigative leads HSI received from U.S. Citizenship and Immigration Services." HSI Decl. ¶ 11. The August 31 update included a section titled "Criminal Voter Fraud Initiative – Surge Operation," which provided that, "Beginning September 1, 2026, HSI will launch a coordinated Criminal Voter Fraud surge initiative to pursue investigative leads, conduct field interviews, and support timely prosecutorial review." AR-2-1. "Each SAC office with leads in the assigned state are asked to take investigative action each day," based on a particular schedule. *Id.* The "assigned states" included Washington, Wisconsin, Missouri, Georgia, California, and Pennsylvania, *id.* AR-2-2, and public reporting has also indicated that Nevada, New York, and Connecticut are included as well.[3]

Defendants understand that it is this August 31 update that Plaintiffs characterize as the "Surge Initiative Guidance" that "implement[ed]" what Plaintiffs call a "Field Operations Policy." *See* Mot. 5. However, neither the August 31 update nor any other HSI guidance or policy require HSI special agents to interview all potential noncitizen voters, whether a TECS record has been created or otherwise. *See* AR-2-1; HSI Decl. ¶¶ 18-22. Rather, consistent with the preexisting agency practice described above, HSI special agents would only conduct interviews in certain cases, where priorities and resources support such action. HSI Decl. ¶¶ 20-22. And, again, such interviews would only be conducted after "a layered vetting process to filter out" U.S. citizens from further investigation. HSI Decl. ¶¶ 12, 24.

## III. ARGUMENT

### A. Plaintiffs Are Not Likely To Succeed On The Merits Of Their Claims.

#### 1. Plaintiffs lack standing.

"[T]o establish standing, a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)). And the standing

---

[3] *See* Priscilla Alvarez et al., *DHS Plans To Launch Voter Fraud Investigation Surge Tuesday*, CNN (Aug. 31, 2026), https://www.cnn.com/2026/08/31/politics/homeland-security-voter-fraud-investigations

inquiry is the same for individuals and for organizations. That is, "organizations must satisfy the usual standards for injury in fact, causation, and redressability that apply to individuals." *Arizona All. for Retired Americans v. Mayes*, 186 F.4th 622, 630 (9th Cir. 2026) (internal citations omitted). Despite the various standing theories Plaintiffs allege, *see* Mot. 10, at most these theories boil down to detailing Plaintiffs' voluntary actions in response to speculative fears about possible investigations, and no Plaintiff has demonstrated Article III standing.

***(i) Plaintiffs Have Not Alleged They or Any of Their Members Have Been Contacted by DHS.***

The Supreme Court has "repeatedly reiterated that 'threatened injury must be certainly impending to constitute injury in fact,' and that 'allegations of possible future injury' are not sufficient." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013); *see also FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024) ("[T]he injury must be actual or imminent, not speculative—meaning that the injury must have already occurred or be likely to occur soon.").

No Plaintiff has demonstrated a certainly impending injury-in-fact. Plaintiffs fail to identify a single voter who has actually experienced any of the harms they speculate about—let alone a Plaintiff or a member of any Plaintiff organization. *See* Pls.' Exs. A-F. Instead, their asserted injuries rest on speculative fears that DHS *might* contact voters. For instance, three members of Plaintiff CNA/NNU allegedly "fear" being "targeted" by DHS because they are naturalized U.S. citizens. *See* Dkt. 10-1 ¶¶ 17-46. A declaration by the director of the San Francisco Office of Civil Engagement and Immigrant Affairs similarly posits that hypothetical actions by "federal agents to target U.S. citizen voters, including at their homes" might "intimidate" residents. Dkt. 10-2 ¶ 9. The director of the San Francisco's elections department expresses only "concerns" that ICE "could attempt to intimidate voters." Dkt. 10-3 ¶ 6. And Voto Latino's declaration cites generalized "fears of being unjustly investigated" based unspecified threatening voicemails from private individuals "over the years." Dkt. 10-5 ¶ 16. None of these assertions establish a concrete, imminent injury traceable to DHS.

Plaintiffs' speculative fears are insufficient to establish an injury-in-fact traceable to the challenged conduct. As the Supreme Court has explained, "psychic satisfaction is not an acceptable Article III remedy because it does not redress a cognizable Article III injury." *Steel Co. v. Citizens for a Better Env't*, 523

U.S. 83, 107 (1998). What matters is "it is the *reality* of the threat of [future] injury," not a plaintiff's "subjective apprehensions." *City of Los Angeles v. Lyons*, 461 U.S. 95, 107 n.8 (1983). Thus, the "emotional consequences" of government action "simply are not a sufficient basis for an injunction absent a real and immediate threat of future injury by the defendant." *Id.*

There is likewise no reason to think that any such injury to any of the Plaintiffs is likely, let alone imminent or "certainly impending." *Clapper*, 568 U.S. at 409 (quoting *Lujan*, 504 U.S. at 565 n.2). Plaintiffs submit an expert report contending that DHS's data will erroneously identify some U.S. citizens as noncitizens even if DHS has a "totally complete and accurate federal database of U.S. citizens." *See* Dkt. 10-6 5, 8. But such a conclusion does not support Plaintiffs' argument that these citizens will be contacted by DHS. Rather, DHS's review of records is the first step of many before DHS decides to investigate an individual, and there are various safeguards in place to prevent mistakenly contacting a U.S. citizen. *See* HSI Decl. ¶¶ 12-14, 18-24.

DHS has implemented procedural safeguards to prevent investigations into U.S. citizens. HSI's investigations are "not intended to investigate lawful voting activity by [U.S. citizens], nor are [U.S. citizens] the intended investigative population of the initiative." HSI Decl. ¶ 12. Indeed, "DHS has implemented a layered vetting process to filter out USCs so they are not impacted by" such investigations. *Id.* For instance, DHS has clarified a mere referral by FDNS to HSI is insufficient to establish criminal activity, voting ineligibility, or grounds for enforcement. *Id.* ¶¶ 12-13. Matters warranting further investigation are disseminated to field offices that are expected to independently assess the facts and available records before undertaking investigative action. *Id.* ¶¶ 14, 22. Given these safeguards, Plaintiffs' contention that DHS's policy "specifically targets naturalized citizens" is inaccurate, and Plaintiffs' contention does not establish that injury to voters is likely or imminent. *See* Mot. 12, 14.

#### ***(ii) Voluntary Changes Based on Fears Do Not Confer Standing.***

The Supreme Court has made clear that plaintiffs cannot "manufacture standing" by "inflicting harm on themselves" or voluntarily changing their behavior "based on [] fears of hypothetical future harm that is not certainly impending." *Clapper*, 568 U.S. at 416. A plaintiff's voluntary decisions or costs incurred in response to hypothetical harm cannot manufacture standing.

Plaintiffs' alleged injuries are speculative and self-imposed. Some of CNA's members decided not to volunteer to be poll monitors or decided to vote by mail based on their subjective fears. *See* Declaration of Bradley Van Waus in Support of Plaintiffs' Motion, Dkt. 10-1 (Van Waus Decl.) ¶¶ 36, 39. And Voto Latino alleges that some events at college campuses have been "canceled" because of "fear of being targeted by federal agents" and that programming has been adjusted and resources have been re-allocated for these reasons. Declaration of Beatriz Lopez in Support of Plaintiffs' Motion, Dkt. 10-5 (Lopez Decl.) ¶¶ 8-15. Many of these events that have been adjusted due to fears are in Texas, which is not the location of the alleged investigative activities that Plaintiffs challenge, raising questions as to whether the conduct challenged by this lawsuit causes Plaintiffs' voluntary changes in the first place. *See* Declaration of Beau Tremitiere in Support of Plaintiffs' Motion, Dkt. 10-7 (Tremitiere Decl.), Ex. 4 at 64 (listing nine states "expected to take investigative action."). Putting that aside, however, the voluntary changes detailed by Plaintiffs are insufficient to show injury.

Other alleged injuries seem unrelated to DHS's efforts to prevent voter fraud. For instance, since January 2025, a Santa Clara office has "invested" "additional resources to address community concerns." Declaration of Matt Moreles in Support of Plaintiffs' Motion, Dkt. 10-4 (Moreles Decl.) ¶ 4. In Fall 2025, a San Francisco office "expended City resources" in response to "[t]he threat of widespread DHS and National Guard deployments." Declaration of Jorge Rivas in Support of Plaintiffs' Motion, Dkt. 10-2 (Rivas Decl.) ¶ 5. These alleged changes appear to have been undertaken in response to DHS's enforcement of immigration laws generally, and not in response to the specific challenge that Plaintiffs bring. And, even assuming the new spending is related to DHS's investigation into unlawful voting, "an organization that has not suffered a concrete injury caused by a defendant's action cannot spend its way into standing simply by expending money to [counteract that action]." *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 394 (2024).

Plaintiffs' reliance on voluntary changes Voto Latino has undertaken to demonstrate organizational standing fails. *See* Mot. 10. Plaintiffs assert that Defendants have "directly affected" Voto Latino's "core business activities," and in so arguing, Plaintiffs rely on a Ninth Circuit decision finding that Voto Latino lacked standing. *See id.* at 11 (citing *Ariz. All. for Retired Ams. v. Mayes*, 186 F.4th 622, 631 (Aug. 7, 2026)). In *Arizona Alliance*, the Ninth Circuit held that Voto Latino's claimed "need

to divert resources to educate and assist voters whose registrations may be subject to cancellation" was insufficient to show standing. *Ariz. All.*, 186 F.4th at 628. Applying *Alliance for Hippocratic Medicine*, the Ninth Circuit held that "cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action" unless the challenged conduct directly interferes with the organization's core activities. *Id.* (citing *All. for Hippocratic Med.*, 602 U.S. at 370). That recently rejected theory is what Voto Latino relies on again here: it alleges that it has diverted resources to "defensive work" and incurred costs to distribute materials based on "fears of election-related investigations." *See* Lopez Decl. ¶¶ 11, 14. But voluntary, self-directed operational changes made in response to speculative fears do not constitute a concrete injury-in-fact and therefore cannot support organizational standing.

Nor do Voto Latino's reports of canceled campus events, reduced publicity, or changed programming confer organizational standing. *See* Lopez Decl ¶¶ 8-16. Voto Latino has failed to show that these voluntary responses were caused by the conduct challenged in this lawsuit. The declarant attributes the changes to a broader climate of fear, citing longstanding threats from private extremists, concerns about possible ICE activity at events generally, independent decisions by campus chapters, and challenges in obtaining university permits. *Id.* ¶¶ 7-12, 15-16. She further explains that the organization's 2026 outreach has been concentrated largely in Texas, which falls outside the set of nine states where investigative actions are "expected." *See id.* ¶¶ 12, 15; Tremitiere Ex. Ex. 4 at 64. Accordingly, Voto Latino has not demonstrated facts sufficient to show the elements required for organizational standing.

Plaintiffs' remaining standing theories fare no better. Their assertion of "chilling effects from the fear that Defendants create," *see* Mot. 10, is foreclosed by Supreme Court's decision in in *Laird v. Tatum*. 408 U.S. 1 (1972). There, the Supreme Court held plaintiffs failed to show standing to challenge alleged First Amendment "chilling" effects from Army surveillance of political activity because they put identified no specific action against them. *See id.* The Court reasoned that "allegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm; 'the federal courts established pursuant to Article III of the Constitution do not render advisory opinions.'" *Id.* at 14 (citations omitted). That is exactly the problem here: Plaintiffs offer no

that they or any of their members have been investigated, targeted or subject to any unlawful inquiry. And *Laird* makes clear that "chilling" effect does not arise "merely from the individual's knowledge that the governmental agency was engaged in certain activities or from the individual's concomitant fear that armed with the fruits of those activities, the agency might in the future take some other and additional action detrimental to that individual." *Id.* at 11. Plaintiffs' theory rests on precisely that type of speculative, subjective apprehension, which cannot support Article III standing.

Plaintiffs' "privacy interests" theory of standing also fails. *See* Mot. 10. An asserted privacy injury in the abstract is not concrete because it lacks the requisite "close historical or common-law analogue." *TransUnion LLC v. Ramirez,* 594 U.S. 413, 424 (2021). Plaintiffs identify no such analogue. And insofar as Plaintiffs contend that intra-governmental information sharing violates their privacy interests, that likewise lacks a "close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts." *TransUnion*, 594 U.S. at 425.

***(iii) CNA/NNU Has Not Shown Associational Standing.***

Plaintiff CNA/NNU asserts it has "associational standing" on behalf of their members. Mot. 10. Generally, "an association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). None of these requirements are met here.

The first and third requirements are not met, because CNA/NNU fails to "specifically 'identify members who have suffered the requisite harm.'" *Twin Rivers Paper Co. LLC v. SEC*, 934 F.3d 607, 613 (D.C. Cir. 2019) (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009)). CNA/NNU describe three anonymous members who have undertaken voluntary changes in response to speculative fears of future enforcement, which insufficient to show members who have suffered the requisite harm. *See also Arizona All.*, 186 F.4th at 631 n.1 (rejecting a claim for associational standing where the association "has not identified a member" who had been subjected to a challenged voting provision or who intended to engage in "arguably prohibited" conduct).

Importantly, CNA/NNU fails the second prong—germaneness. "The germaneness requirement mandates 'pertinence between litigation subject and organizational purpose.'" *Ctr. for Sustainable Econ. v. Jewell*, 779 F.3d 588, 597 (D.C. Cir. 2015) (quoting *Humane Soc'y of United States v. Hodel*, 840 F.2d 45, 58 (D.C. Cir. 1988)). Germaneness is required to prevent "litigious organizations from forcing the federal courts to resolve numerous issues as to which the organizations themselves enjoy little expertise and about which few of their members demonstrably care." *Id.* (quoting *Humane Soc'y*, 840 F.2d at 57).

CNA/NNU's stated mission is to promote "a unified vision of collective action for nurses and encourage members to lend their voice and participation in elections to choose the leaders who decide policy affecting registered nurses and labor issues." *See* Van Waus Decl. ¶ 7. It is not clear at all how CNA/NNU's organizational purpose is related to challenging investigations into unlawful voting by noncitizens, nor is it clear how CNA/NNU has "expertise" regarding this issue. See *Jewell*, 779 F.3d at 597. Accordingly, CNA/NNU has failed to demonstrate associational standing.

#### *(iv) Local Government Plaintiffs Cannot Bring a Parens Patriae Lawsuit.*

Two of Plaintiffs are local governments—the City and County of San Francisco and the County of Santa Clara. They contend they have standing based on their "cognizable property interests." Pls.' Mot at 10 (citing *City & Cnty. of San Francisco v. Whitaker*, 357 F. Supp. 3d 931, 943 (N.D. Cal. 2018)). But Plaintiffs omit that the district court case they rely on for this proposition dismissed the municipality's challenge to a federal government action for lack of standing. *See Whitaker*, 357 F. Supp. at 953.

Although states may litigate on behalf of their citizens as *parens patriae* in certain contexts, it is well established that "[a] State does not have standing as *parens patriae* to bring an action against the Federal Government." *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez,* 458 U.S. 592, 607, 610 n.16. That is because the federal government is "the *ultimate parens patriae* of every American citizen." *South Carolina v. Katzenbach,* 383 U.S. 301, 324 (1966) (emphasis added). The same is true for a municipality, which "derive[s] [its] existence from the state and function[s] as [a] political subdivision[] of the state." *City of North Miami v. Fed. Aviation Admin.*, 47 F.4th 1257, 1277 (11th Cir. 2022) (citing *City of Olmsted Falls v. FAA*, 292 F.3d 261, 268 (D.C. Cir. 2002)). In order to demonstrate sufficient

proprietary interests to bring have standing, a municipality must "articulate an interest apart from the interests of particular private parties, *i.e.*, the State must be more than a nominal party." *See Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 607 (1982).

The municipality plaintiffs lack standing to bring this challenge, because they essentially assert a *parens patriae* lawsuit, *i.e.*, on behalf of their citizens. They complain of feared injuries to their residents through investigations. *See* Rivas Decl.¶ 10 ("Members of the public are concerned about voter intimidation by DHS related to elections"); *see also* Moreles Decl. ¶ 7 (relaying fears that DHS's policies could "diminish the likelihood" that people will vote in Santa Clara County). They allege that "lawful U.S. citizen voters" are harmed. *See* Mot. 22-23. These are classic *parens patriae* theories which should not be considered. And their complaints that the municipalities have voluntarily incurred costs on "training" and "educational materials" ahead of the election is insufficient to show the municipalities have a concrete proprietary interest apart from their constituents. *See* Moreles Decl. ¶¶ 2, 6; Declaration of John Arntz in Support of Plaintiffs' Motion, Dkt. 10-3 (Arntz Decl.) ¶¶ 6, 7. The Local Government plaintiffs therefore lack standing.

**2. Plaintiffs' APA claims fail to show a discrete, final agency action.**

Even if Plaintiffs could show standing, all of Plaintiffs' APA claims fail for lack of final agency action. It is axiomatic that APA claims may only challenge a final agency action. 5 U.S.C. § 704.

A plaintiff cannot invoke the APA to attack government programs "consisting principally of . . . many individual" activities. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 893 (1990). Identifying a reviewable action is thus "necessary . . . for stating a claim under the APA." *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 808 (2024) (citation omitted).

For an "agency action" to be reviewable under the APA, it must be one of the "circumscribed, discrete" actions identified in the statutory definition of that term, *Norton v. S. Utah Wilderness All.* ("*SUWA*"), 542 U.S. 55, 62 (2004)—*i.e.*, "the whole or part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof," 5 U.S.C. § 551(13); *see also id.* § 551(4), (6), (8), (10), (11) (defining "rule," "order," "license," "sanction," and "relief"). A plaintiff seeking judicial review under the APA must therefore challenge a "specific" agency action falling within one of these discrete categories, rather than attempt to challenge an "abstract" policy or decision divorced from a concrete

action, *Biden v. Texas*, 597 U.S. 785, 809 (2022), or challenge "at a high[ ]level of generality" an agency "operation" or "program," *Lujan*, 497 U.S. at 894; *Sierra Club v. U.S. Army Corps of Eng'rs*, 446 F.3d 808, 813 (8th Cir. 2006) ("A broad agency program is not a final agency action within the meaning of 5 U.S.C. § 704."). Importantly "a broad, programmatic challenge to [an agency's] operation and management of [a statutory obligation] . . . [is] not cognizable under the APA." *San Luis Unit Food Producers v. United States*, 709 F.3d 798, 808 (9th Cir. 2013).

Plaintiffs bring a broad programmatic challenge to DHS's management of its obligation to enforce federal statutes prohibiting non-citizens from voting in federal elections, and to investigate such violations. *See, e.g.,* 18 U.S.C. §§ 611, 1015; *see also Nw. Ctr. for Alternatives to Pesticides v. U.S. Dep't of Homeland Sec*., 552 F. Supp. 3d 1078, 1087 (D. Or. 2021) (holding that DHS's decision to send law enforcement personnel to "quell protests" was a nonfinal, "interlocutory" decision). Plaintiffs' own allegations underscore the lack of a discrete agency action to challenge: they contend that Defendants are operating a policy under a "a *series* of publicly reported memoranda, directives, agency statements, and patterns of conduct" that allegedly violate the APA. Mot. 4 (emphasis added).

Even if Plaintiffs could identify a discrete agency action to challenge, they cannot show that it is a final agency action under 5 U.S.C. § 704. The Supreme Court has laid out a two-part test for finality, including that (1) "the action must mark the 'consummation' of the agency's decisionmaking process," rather than being "of a merely tentative or interlocutory nature[;]" and (2) "the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow[.]'" *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (citation modified). The APA expressly excludes "preliminary, procedural, or intermediate agency action[s] or ruling[s]." 5 U.S.C. § 704.

The Ninth Circuit has made clear that "[a]n investigation, even one conducted with an eye to enforcement, is quintessentially non-final as a form of agency action." *Ass'n of Am. Med. Colls. v. United States*, 217 F.3d 770, 780-81 (9th Cir. 2000); *see also Harper v. Werfel*, 118 F.4th 100, 116 (1st Cir. 2024), *cert. denied sub nom. Harper v. Faulkender*, 145 S. Ct. 2867 (2025) (holding that where an agency's conduct "amounts to an investigation," the complained-of agency activity "do[es] not constitute final agency action within the meaning of the APA"); *Winter v. California Medical Review Inc.,* 900 F.2d 1322, 1325-26 (9th Cir.1989) (reasoning that because the agency's conclusions could

change with additional information, an "[a]ppellant's claim that the investigation itself represented final agency action lacks merit").

The activities Plaintiffs challenge here are part of ongoing investigation activities that do not fix any obligations or legal consequences. Plaintiffs contend that DHS's directive to generate TECS records flagging certain individuals for further scrutiny constitutes a final agency action. *See* Mot. 17 (citing Tremitiere Decl., Ex. 2, at 41-43). But Plaintiffs' own exhibits show that the creation of a TECS record is nonfinal. Even the evidence Plaintiffs submitted of alleged training videos includes an acknowledgement that creation of a TECS record and referral to HSI simply "warrants further review." *See* Tremitiere Ex. 3 at 55. In other words, the creation of the TECS record does not make any final decision and does not create any legal consequence. Indeed, the existence of two social media posts by DHS that show DHS investigating alleged voter fraud are insufficient to show final agency action. *See* Tremitiere Decl., Exs. 12-15.

The cases that Plaintiffs rely on to establish final agency action are inapposite. *See* Mot. 17. In one cited case, the Ninth Circuit properly held that an agency decision to apply for a permit to dispose of hazardous waste "marked an endpoint, not a starting point" with respect to the agency decisionmaking process, because no further decision-making or judgments were required from the agency. *See Prutehi Litekyan: Save Ritidian v. United States Dep't of Airforce*, 128 F.4th 1089, 1109 (9th Cir. 2025), *cert. granted sub nom. Dep't of the Air Force v. Prutehi Guahan*, 146 S. Ct. 1794 (2026). By contrast, a proposed investigative lead, such as by the creation of a TECS record, is a "starting point" that requires several intervening judgments before any final decision is made regarding an individual for a violation of the law. *See* HSI Decl. ¶¶ 20-24.

Nor does the generation of a TECS record determine obligations or legal consequences. *Bennett*, 520 U.S. at 177-78. Plaintiffs argue that TECS records "can be used against individuals" in possible future interactions with the federal government, *see* Mot. 18, but any consequences depend on additional contingent events and do not show any "direct and appreciable" consequences required for final agency action. *See Parsons v. United States Dep't of Just.*, 878 F.3d 162, 167 (6th Cir. 2017). An agency action is not final if it "does not of itself adversely affect complainant but only affects his rights adversely on the contingency of future administrative action." *Id.* (holding that a designation of a group as a gang was

nonfinal because it "does not result in legal consequences"); *see also Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n*, 324 F.3d 726, 731 (D.C. Cir. 2003) (holding that an agency's stated intention to find a product was hazardous and a request for voluntary corrective action is nonfinal); *cf. TransUnion*, 594 U.S. at 437 (finding no concrete injury by "the mere existence" of false alerts on credit reports indicating plaintiffs were terrorists).

**3. The challenged actions, even if final, are committed to agency discretion.**

Separately, the APA bars judicial review of agency actions that are "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). A statute commits an action to an agency's discretion where it "is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Heckler v. Chaney*, 470 U.S. 821, 830 (1985); *accord Ngure v. Ashcroft*, 367 F.3d 975, 982 (8th Cir. 2004) ("[A]ctions are committed to agency discretion where it is not possible to devise" from the statute "an adequate standard of review for an agency action."). Determining whether a meaningful standard for reviewing an agency's discretionary decision exists thus "requires careful examination of" the statutory "language and structure . . . that supplies the applicable legal standards for reviewing that action" and "the nature of the administrative action at issue." *Tamenut v. Mukasey*, 521 F.3d 1000, 1003-04 (8th Cir. 2008) (en banc) (citations omitted). Only in those "rare instances" in which there is "no law to apply" is it appropriate to deem an action "committed to agency discretion" and therefore unreviewable. *Webster v. Doe*, 486 U.S. 592, 599-600 (1988).

This case involves one of those "rare instances." *Id.* The conduct Plaintiffs challenge—reviewing individuals for potential investigation—is classic prosecutorial and investigative discretion that is one of the traditional areas committed to agency discretion by law. *See Chaney*, 470 U.S. at 832. It is well established that investigative and prosecutorial decisionmaking is "the special province of the Executive Branch, which has 'exclusive authority and absolute discretion' to decide which crimes to investigate and prosecute, including with respect to allegations of election crime." *Trump v. United States*, 603 U.S. 593, 620 (2024) (citing *Chaney*, 470 U.S. at 832); *see also Gentile v. Sec. & Exch. Comm'n*, 974 F.3d 311, 318 (3d Cir. 2020) (holding that the SEC's decision to formally investigate Plaintiff was committed to agency discretion by law). The verification of citizenship or immigration status, moreover, stands

squarely within DHS's "wheelhouse," *Biden v. Nebraska*, 600 U.S. 477, 504 (2023), given that it is an express statutory duty of DHS under 8 U.S.C. § 1373.

Moreover, the statute authorizing DHS's investigative powers is broad and provides no meaningful standards by which to assess the challenged actions. Plaintiffs identify no statute dictating when DHS must investigate a potential offense or what investigative methods its officers must employ—and for good reason. The relevant statutes provide no such guidance. Instead, HSI special agents are generally "empowered to exercise the enforcement authority of a customs agent under 19 U.S.C. § 1589a" to investigate any violation of federal law. *See* HSI Decl. ¶¶ 7-8. The statute conferring investigative authority thus leaves no law to apply.

Nor do other sources provide law to apply. The mere creation of internal memoranda outlining enforcement priorities does not supply "law to apply," as an action does not "become[] reviewable" just because the agency provides a "reason" for it. *Interstate Com. Comm'n v. Bhd. of Locomotive Eng'rs*, 482 U.S. 270, 282-83 (1987) (citation omitted). And to Plaintiffs' assertion (Mot. 19), *Perez Perez v. Wolf* did not establish that cases alleging "constitutional error like the violation of a right to vote" provide meaningful standards for review. 943 F.3d 853, 861 (9th Cir. 2019). *Perez Perez* did not involve a constitutional claim at all. *See id.* Rather, it involved the denial of a U visa for an alien, and involved a statute providing details for the procedures and standards for issuing such visas. *Id.* Plaintiffs also contend that Section 11(b) of the Voting Rights Act supplies a standard for review. Mot. 19. That misunderstands the nature of the agency action; Section 11(b) does not provide a standard for deciding how HSI should run its investigation into suspected voter fraud or provide a standard for assessing whether the agency can make lawful inquiries into alleged voter fraud. Nor does Plaintiffs' assertion that "past practice" would supply a standard here. Mot. 19. Plaintiffs have not pointed to any binding previous policy limiting HSI's authority to examine suspected voter fraud offenses like those at issue in the cases they rely on. *See* Mot. 19 (citing *ASSE Int'l, Inc. v. Kerry*, 803 F.3d 1059, 1069 (9th Cir. 2015) & *Garro Pinchi v. Noem*, 813 F. Supp. 3d 973, 1021-22 (N.D. Cal. 2025). Plaintiffs cite no cases for the proposition that increasing certain resources to investigate certain crimes constitutes a change in binding policy, nor do they explain how such an increase would provide law to apply. Ultimately, Plaintiffs are trying to enjoin prosecutorial priorities—but those are classically committed to agency discretion. *See*

*Trump v. California*, No. 26A124, 2026 WL 2473573, at *3 (U.S. Aug. 24, 2026) (noting that "setting prosecutorial priorities lies within the President's Article II power," and the "decision to prioritize the prosecution of certain offenses does not inflict a traditionally recognized harm on the States").

Plaintiffs contend that courts have "well established" authority to enjoin unlawful investigations, but the cases they cite do not support that sweeping proposition. Start with *Smith v. Meese*. *See* Mot. 19 (citing *Smith v. Meese*, 821 F.2d 1484, 1494 (11th Cir. 1987)). *Smith* did not involve any equitable relief at all; rather, the Eleventh Circuit reversed dismissal of an equal protection claim where the plaintiffs alleged specific examples of federal agencies "abusively interrogat[ing] poor, elderly, and socially disadvantaged black voters" to deter them from voting. *See id.* Plaintiffs offer nothing comparable here that would overcome the presumption against issuing an injunction.

The remaining cases involving injunctions are likewise inapposite. *See* Mot. 19. *McLeod*, *Wood*, and *Clark* were actions brought by the United States seeking preventative relief against well-documented intimidation by state or local officials, including physical assault, baseless arrests, and prosecutions directed at Black voter registration efforts. *United States v. McLeod*, 385 F.2d 734, 740-41 (5th Cir. 1967); *United States v. Wood*, 295 F.2d 772, 781-82 (5th Cir. 1961); *United States v. Clark,* 249 F. Supp. 720, 725 (S.D. Ala. 1965). And the Ninth Circuit decision in *Olagues v. Russoniello* concerned an investigation that expressly targeted recently registered voters who had requested bilingual ballots. 797 F.2d 1511, 1519 (9th Cir. 1986) (en banc), *vacated as moot*, 484 U.S. 806 (1987). Here, by contrast, Plaintiffs identify no instances of voter targeting whatsoever.

Federal courts are generally reluctant to enjoin an investigation because any subject of that investigation may assert defenses in a future prosecution. *Deaver v. Seymour*, 822 F.2d 66, 69-70 (D.C. Cir. 1987). Plaintiffs attempt to avoid this principle by arguing that they "are not subjects of this investigation, could not be indicted through it, and cannot challenge the policies in criminal proceedings." Mot. 20. But that argument proves too much: if Plaintiffs and their members agree they are not targets of the challenged activity, then they have not shown the imminent injury required for standing or for irreparable harm.

In sum, HSI's ongoing investigations into potential voter fraud are committed to agency discretion by law. It is well established that investigative and prosecutorial decisionmaking is "the special province

of the Executive Branch, which has 'exclusive authority and absolute discretion' to decide which crimes to investigate and prosecute, including with respect to allegations of election crime." *Trump v. United States*, 603 U.S. at 620 (citing *Chaney*, 470 U.S. at 832); *see also Gentile*, 974 F.3d at 318. Plaintiffs cite no case that warrants departing from this principle, particularly where Plaintiffs have provided no evidence that the investigation at issue is unlawful or has harmed voters.

**4. The challenged agency actions are not arbitrary or capricious.**

Plaintiffs argue that USCIS's use of a "flawed database" renders its efforts to identify potential non-citizen voters "arbitrary and capricious." *See* Mot. 15. But that is not the law. What matters is not whether the underlying data is perfect; what matters is whether the agency "failed to consider an important aspect of the problem" or "offered an explanation for its decision that runs counter to the evidence." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Here, the record reflects that USCIS recognized that the available data was imperfect, but nevertheless determined that no better data was available to it. USCIS Decl. ¶¶ 15, 18. Weighing the pros and cons of generating potential investigative leads based on incomplete but best-available sources versus ceasing to conduct any such investigations whatsoever, USCIS elected to use the information available to it in order to generate potential leads. But, importantly, USCIS does not *exclusively* use that information to make outward-facing decisions. *See id.* ¶¶ 6, 8; *see also* HSI Decl. ¶¶ 12-14, 18-24. Having considered the relevant aspects of the problem and made an informed policy choice, the agency's decision was not arbitrary and capricious under the APA.

The Supreme Court's recent holding that DHS's use of the SAVE system likely is not arbitrary and capricious is highly instructive here. The district court in that case concluded that DHS had "haphazardly combined and repurposed the private information of millions of Americans, including citizenship data that they knew to be unreliable." *League of Women Voters v. DHS*, 835 F. Supp. 3d 79, 95 (D.D.C. 2026). It found that DHS's modifications to the SAVE system without notice and comment were arbitrary and capricious, because the agency failed to consider the reliance interests of the individuals whose new data would be added to the system. *Id.* at 131. The district court therefore vacated the agency's use of the system. *Id.* at 132. However, the Supreme Court stayed the district court's order pending further appeal, holding that DHS was statutorily authorized to receive the information at issue. *DHS v. League of Women*

*Voters*, No. 26A308, 609 U.S. at __ (2026) (Slip. Op. 3-5). Under *League of Women Voters*, DHS's efforts to conduct inquiries into voters whose citizenship cannot be determined are not arbitrary or capricious.

In arguing to the contrary, Plaintiffs rely on—but fundamentally misunderstand—two environmental cases. First, Plaintiffs cite *Lands Council v. Powell*, 395 F.3d 1019 (9th Cir. 2005), to argue that relying on a "flawed database" is arbitrary and capricious under the APA. *See* Mot. 15. That case involved whether the U.S. Forest Service complied with specific and highly technical requirements to manage species under the National Forest Management Act. 395 F.3d at 1036. Among other things, the "NFMA requires that the Forest Service identify Indicator Species, monitor their population trends, and evaluate each project alternative in terms of the impact on both Indicator Species habitat and Indicator Species populations." *Id.* In some cases, the Forest Service can "avoid studying the population trends of the Indicator Species by using Indicator Species habitat as a proxy for Indicator Species population trends"; "[c]rucial to this approach, however, is that the methodology for identifying the habitat proxy be sound." *Id.*

In *Lands Council*, the Forest Service's "methodology" was not "sound," because "the Forest Service's main tool for old growth calculation, the timber stand management reporting system database ('TSMRS'), was inaccurate." *Id.* Thus, the approach was "unable to satisfy the requirements of the NFMA." *Id.* (emphasis added). *Lands Council* does not stand for the proposition that any use of a database containing some inaccuracies is arbitrary and capricious under the APA, and no case has cited it for such a broad principle. Rather, the case stands for the unobjectionable point that, where an agency has a statutory duty to reliably monitor certain information, it cannot unreasonably rely on outdated and incorrect data.

Plaintiffs' second case, *Center for Biological Diversity v. EPA*, 141 F.4th 153 (D.C. Cir. 2025), does not help them either. That case concerned the EPA's different treatment of fuel standards for crop-based renewable fuels and all other fuel types. The court held that the EPA's "unexplained decision to generally rely on [] published estimates for every other fuel category and to disregard them for crop-based renewable fuels in favor of ranges derived from its dated 2010 study was arbitrary and capricious." *Id.* at 173. The EPA could not articulate a reason to treat one category of data differently than the others. *See id.* And importantly, the EPA "acknowledge[d]" that "newer data and research is now available." *Id.* Here, though, the parties agree that *no better data is available*. *See, e.g.*, Compl. ¶ 151.

Plaintiffs repeatedly assert (without having even seen the record) that the agency "disregarded" problems with its databases. But there is a difference between ignoring a system's limitations, and recognizing those limitations but making an informed decision to proceed in spite of them, and in combination with other mitigating information when nothing better is available. And Plaintiffs' own arguments and evidence reflect the latter is what occurred here. Plaintiffs note that USCIS staff raised concerns about potential errors, and were told essentially that they were doing the best they could. *See* Mot. 15; *see also* USCIS Decl. ¶ 18.

Indeed, it has long been the law that even "some errors" in an agency's records do not necessarily render the agency's reliance on that information "arbitrary and capricious." *Center for Biological Diversity v. Culver*, No. 21-cv-07171-SI, 2024 WL 4505468, at *29 (N.D. Cal. Oct. 15, 2024) (citing, e.g., *Mid States Coal. for Progress v. Surface Transp. Bd.*, 345 F.3d 520, 538 (8th Cir. 2003) ("[i]n a project of this size, the agency is not required to maximize precision at all costs")). But that is especially true where, as here, there is no better source of data or methodology available.

It bears emphasizing that the subsequent step in the investigatory process—individual interviews—is expressly designed to resolve the discrepancies about which Plaintiffs complain. But, of course, Plaintiffs also complain that those interviews are the source of the intimidation that prompted Plaintiffs to bring this litigation. In Plaintiffs' view, the government can neither use the data that it has nor take steps to correct it. Plaintiffs' clearly desired outcome is to prevent the government from taking action in this area altogether. *See* Dkt. 10-8. But the APA imposes *procedural* limits, not substantive ones. *See, e.g.*, *DHS v. Regents of Univ. of Cal.*, 591 U.S. 1, 16 (2020). Where, as here, the agency recognized the limitations of its information and the potential risks, but elected to pursue its policy objectives in spite of those risks and after considering and, as appropriate, mitigating those risks, the APA does not mandate a different result. *See League of Women Voters*, 609 U.S. __, at 5.

**5. Plaintiffs cannot bring freestanding *ultra vires* causes of action.**

To the extent Plaintiffs assert ultra vires claims, these cannot succeed for at least two reasons. First, such claims apply only to situations of an extreme statutory error "that disregards a specific and unambiguous statutory directive, or that violates some specific command of a statute will support relief." *Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 722 (D.C. Cir. 2022) (quoting *Fed. Express*

*Corp. v. U.S. Dep't of Com*., 39 F. 4th 756, 764 (D.C. Cir. 2022)). These "Hail Mary pass" claims "rarely succeed[]." *NRC v. Texas*, 605 U.S. 665, 681 82 (2025) (quoting *Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009)).

But Plaintiffs point to nothing close to a statutory violation of that sort here. Instead, they offer no more than the sort of "typical statutory-authority argument[s]" that do not suffice to state an ultra vires claim. *NRC*, 605 U.S. at 682. For example, rather than identify any "'clear and mandatory' statutory command" that some agency has violated, *Changji*, 40 F.4th at 722 (citation omitted), Plaintiffs simply argue that Plaintiffs' fears of possible enforcement, without more, is sufficient to show statutory and constitutional violations. That is incorrect—but even if it were correct, through enforcing federal laws criminalizing voter fraud by aliens, DHS has not "disregard[ed] a specific and unambiguous statutory directive" in a way that could support an ultra vires claim. *Changji*, 40 F.4th at 722 (citation omitted).

Setting aside Plaintiffs' statutory ultra vires claims, Plaintiffs also lack a private right of action to enforce Section 11(b) of the Voting Rights Act. "Section 11(b) sets forth no express cause of action for private parties to enforce its protections." *Andrews v. D'Souza*, 696 F. Supp. 3d 1332, 1350 (N.D. Ga. 2023). And "as a matter of black letter law, inferring a private right of action is a matter of statutory interpretation. If Congress is silent or ambiguous, courts may not find a cause of action 'no matter how desirable that might be as a policy matter.'" *Planned Parenthood S. Atl. v. Baker*, 941 F.3d 687, 694-95 (4th Cir. 2019) (citing *Alexander v. Sandoval*, 532 U.S. 275, 286-87 (2001)). Congress creates a private right of action by utilizing language that (1) is "rights-creating" and (2) displays an intent to create a private remedy. *See Gonzaga University v. Doe*, 536 U.S. 273, 284 (2002) ("[A] plaintiff suing under an implied right of action ... must show that the statute manifests an intent 'to create not just a private *right* but also a private *remedy*.'") (emphasis original) (quoting *Sandoval*, 532 U.S. at 286).

**6. The challenged agency actions do not violate voting laws or rights.**

Allowing the federal government to identify individuals who potentially voted unlawfully and then ask investigatory questions of some of those voters who cannot be determined to be U.S. citizens does not violate the Voting Rights Act or the Constitution.

Plaintiffs first argue that USCIS and HSI's efforts violate Section 11(b) of the VRA, 52 U.S.C.

§ 50307(b). That statute provides, as relevant here, that "[n]o person, whether acting under color of law or otherwise, shall intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for voting or attempting to vote." The agency actions at issue here, as described in the AR and declarations, do not violate this statutory provision.

Plaintiffs do not appear to claim that USCIS's mere sharing of information with HSI constitutes unlawful voter intimidation, nor could they. Rather, Plaintiffs appear to take issue with HSI agents interviewing individuals whom neither USCIS nor HSI can determine are U.S. citizens without an interview. But HSI special agents are federal law enforcement officers statutorily authorized to investigate potential voting by aliens ineligible to vote in violation of 18 U.S.C. § 611. *See, e.g.*, HSI Decl. ¶¶ 7-8; 6 U.S.C. § 251(4); 8 U.S.C. §§ 1103(a)(1), 1357. Given that federal law criminalizes voting by aliens in federal elections, authorized investigations by federal officers cannot violate the VRA. *See Olagues v. Russoniello*, 797 F.2d 1511, 1522 (9th Cir. 1986) (en banc) (*Olagues II*), vacated as moot *sub nom.* 484 U.S. 806 (1987) (noting that "[t]he district court dismissed the Voting Rights Act claim . . . on the basis that the Act does not expressly provide for a right of action against federal officials," but declining to reach the issue because the claim failed for other reasons). The more specific authorization to conduct such investigations controls over the general language of the VRA. *See, e.g.*, *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) ("It is a commonplace of statutory construction that the specific governs the general.") (citation omitted).

Indeed, Plaintiffs' overbroad reading of Section 11(b) would lead to absurd results: anytime a duly authorized law enforcement officer investigating an election crime makes a suspect nervous, Plaintiffs believe the VRA has been violated. The Court can look in vain for any principle that limits Plaintiffs' theory. But federal law does not need to entertain such hyperbole. Whatever else it covers, the VRA does not apply to statutorily authorized investigations into elections offenses.

Plaintiffs' cases are not to the contrary. Virtually all of them involved either private actors or local law enforcement agencies that were not authorized to investigation federal elections offenses. *See, e.g.*, *LULAC v. Pub. Int. Legal Found.*, No. 1:18-cv-00423, 2018 WL 3848404 (E.D. Va. Aug. 13, 2018) (private defendants); *United States v. Tan Duc Nguyen*, 673 F.3d 1259 (9th Cir. 2012) (private defendant); *Colo. Mont. Wyo. State Area Conf. of NAACP v. U.S. Election Integrity Plan*, 653 F. Supp. 3d 861 (D.

Colo. 2023) (private defendants); *Nat'l Coal. on Black Civic Participation v. Wohl*, 512 F. Supp. 3d 500 (S.D.N.Y. 2021) (private defendants); *United States v. McLeod*, 385 F.2d 734 (5th Cir. 1967) (local sheriff); *United States v. Wood*, 295 F.2d 772 (5th Cir. 1961) (local officials); *United States v. Clark*, 249 F. Supp. 720 (S.D. Ala. 1965) (three-judge court) (state and local officials). Here, DHS is so authorized. *See, e.g.*, 6 U.S.C. §§ 203(1), 251(4).

Even if some statutorily authorized federal investigative conduct could qualify as intimidation under the VRA, the potential for interviews reflected in the agency actions at issue here would not rise to that level. Again, USCIS first tries to remove the names of U.S. citizens from its lists, and HSI conducts further research itself before deciding to interview any particular person. And Plaintiffs do not and cannot show that HSI is taking any enforcement actions against any U.S. citizen related to voting. The "policies" at issue do not reflect threats against U.S. citizen voters. They reflect investigations, interviews, and potential criminal prosecutions of aliens who voted unlawfully.

For similar reasons, Plaintiffs will not succeed on their claim that the agency actions violate the fundamental right to vote. In rejecting a nearly identical claim that investigations into alien voting by the U.S. Attorney's Office violated the right to vote, the Ninth Circuit explained that "[i]t is difficult to see how any 'burden' was placed on anyone's right to vote, however, since no individual citizen was denied his right to vote." *Olagues I*, 770 F.2d at 802. "Individual citizens who were initially identified as not qualified thereafter were only the subject of narrowly confined, noncoercive follow-up interviews probing potentially unlawful activities of others." *Id.* "Even if we construe this as a 'burden,' it is a burden that all citizens must be asked to bear when they are potential witnesses to unlawful conduct." *Id.*

The same reasoning applies to Plaintiffs' claim here. The agency actions being challenged do not reflect burdens on U.S. citizens' right to vote. At most, they reflect U.S. citizens answering questions about their citizenship. Plaintiffs are not likely to succeed on their constitutional claim.

**B. Plaintiffs Will Not Suffer Irreparable Harm.**

Even if Plaintiffs had demonstrated an injury that was sufficient to show standing, "[a] prospective injury that is sufficient to establish standing . . . does not necessarily satisfy the more demanding burden of demonstrating irreparable injury." *Cal. Ass'n of Priv. PostSecondary Sch. v. DeVos*, 344 F. Supp. 3d 158, 170 (D.D.C. 2018). "A plaintiff must do more than merely allege imminent

harm sufficient to establish standing; a plaintiff must *demonstrate* immediate threatened injury as a prerequisite to preliminary injunctive relief." *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988). A plaintiff must also show that the threatened injury is non-speculative and likely to occur. *Ocean Beauty Seafoods, LLC v. Pac. Seafood Grp. Acquisition Co., Inc.*, 648 F. App'x 709, 711 (9th Cir. 2016). Nor may a Plaintiff manufacture irreparable harm through self-inflicted injuries. *Bennett v. Isagenix Int'l LLC*, 118 F.4th 1120, 1129 (9th Cir. 2024) (citing *L.A. Mem'l Coliseum Comm'n v. NFL,* 634 F.2d 1197, 1201 (9th Cir. 1980)).

Here, the same flaws that plague Plaintiffs' theories of standing are even more obviously fatal to any notion of imminent irreparable harm. Plaintiffs fail to show how *they* are likely to suffer irreparable harm absent emergency relief, which is required for emergency injunctive relief. *See Winter v. NRDC*, 555 U.S. 7, 20 (2008) ("A plaintiff seeking a preliminary injunction must establish . . . that *he* is likely to suffer irreparable harm in the absence of preliminary relief." (emphasis added)). As discussed above, Plaintiffs have not alleged a single voter has faced any of the harms that they claim to fear in this suit—much less a Plaintiff or a member of one of the Plaintiff organizations. *See* Pls.' Exs. A-F. Rather, as discussed above, Plaintiffs' claimed injuries are voluntary changes in response to speculative fears about possible investigation into U.S. citizens. *See id.*

Plaintiffs allege "Defendants are already engaging in intimidating conduct," but provide no specifics of such intimidating conduct towards any U.S. citizens registered to vote. *See* Mot. 21. The cases Plaintiffs cite underscore this difference: one case involved express outreach to voters, specifically over 85,000 robocalls targeting black minority voters that relayed false statements about voting by mail. *Nat'l Coal. on Black Civic Participation v. Wohl*, 498 F.Supp.3d 457, 474 (S.D.N.Y. 2020). Another case cited by Plaintiffs involved plans to mail a notice containing information contradicting Colorado election law to all Colorado residents. *Colorado v. DeJoy*, 487 F. Supp. 3d 1061, 1065 (D. Colo. 2020). By contrast, the Plaintiffs here have not provided any specifics of DHS questioning any voter, let alone any Plaintiff, underscoring that irreparable harm is not shown.

Nor have Plaintiffs shown that expending resources constitutes irreparable harm. The cases Plaintiffs cite for this proposition involve non-voluntary financial injuries, unlike the circumstances here. In *Michigan v. DeVos*, the state was compelled to divert an additional $16 million to private

schools after a federal agency re-calculated COVID-19 funding allocations to schools. *See* 481 F. Supp. 3d 984 (N.D. Cal. 2020). And in *City & County of San Francisco v. Trump*, the agency's action categorically withheld nearly all federal grants from sanctuary-jurisdiction cities. 783 F. Supp. 3d 1148, 1160 (N.D. Cal. 2025). These cases, which involved significant non-voluntary financial harms, are inapplicable here, where the government has not reduced Plaintiffs' funding nor taken any action that *forces* Plaintiffs to spend resources.

In sum, Plaintiffs' alleged harms fail to satisfy ordinary pleading standards, much less the "extraordinary" showing of harm required for preliminary injunctive relief. *Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1124 (9th Cir. 2014) (quoting *Munaf v. Geren,* 553 U.S. 674, 689 (2008)). Plaintiffs' motion should be denied.

**C. The Public Interest Weighs Against Granting Relief.**

**1. The public interest favors maintaining the status quo.**

As the Supreme Court recently held in *League of Women Voters*, "the Federal Government is likely to suffer irreparable harm" when it is ordered to cease sharing information regarding noncitizens on the voter rolls. 609 U.S. __, at 5. In that case, "[t]he District Court's order [] inhibit[ed] the Federal Government's efforts to assist state and local agencies in the proper administration of the midterm elections. Under these circumstances, the equities weigh in favor of" preventing such inhibitions. *Id.* at 6.

The balance of equities and public interest here similarly weigh in favor of denying injunctive relief. Plaintiffs cannot dispute that noncitizens do sometimes register to vote and even cast ballots in federal elections. As the Supreme Court wrote, "*individualized* inquiries" into such issues "are permitted under federal law during this period," even in the runup to the midterm elections. *Id.* at 6. Preventing the government from even investigating such issues—as Plaintiffs request—would effectively immunize violations of federal law, prevent the government from fulfilling its obligations to ensure the integrity of the election system, and undermine public confidence in U.S. elections.

**2. Any relief must be strictly limited.**

Plaintiffs seemingly request both a Section 705 stay under the APA and a universal preliminary injunction. *See* Mot. 23; *see also* Dkt. 10-8 (Proposed Order). Yet Plaintiffs fail to explain why such broad relief is required here. Such relief would be improper and the Court should decline to grant it.

***(i) Any Section 705 Stay Should Be Limited to the Parties.***

A stay under 5 U.S.C. § 705 is subject to the same equitable limitations that govern preliminary injunctions. Section 705 authorizes a reviewing court to "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings," but only "to the extent necessary to prevent irreparable injury."

Section 705 was intended "to reflect existing law . . . and not to fashion new rules of intervention for District Courts." *Sampson v. Murray*, 415 U.S. 61, 68 n.15 (1974). Consistent with that principle, the House Report that accompanied the APA explained that relief under Section 705 should "normally, if not always, be limited the parties' complainant." Administrative Procedure Act, S. Doc. No. 79-248, at 277 (1946). The Supreme Court recently instructed that "[w]hen interpreting a statute that authorizes federal courts to grant" preliminary relief, courts "do not lightly assume that Congress has intended to depart from established principles" of equity. *Starbucks Corp. v. McKinney*, 602 U.S. 339, 346 (2024) (citation omitted).

In limiting such relief "to the extent necessary to prevent irreparable injury," 5 U.S.C. § 705, the statue directs courts to apply traditional equitable principles, which include tailoring relief to be no more intrusive than necessary to prevent irreparable harm to the parties. Thus, Section 705's text, precedent, and the applicability of the injunction standard confirm that Section 705 is constrained by the same traditional equitable principles as the Judiciary Act of 1789. *See Trump v. CASA, Inc.*, 606 U.S. 831, 844-47 (2025). And just as those principles foreclose universal preliminary injunctions, they also foreclose universal relief under Section 705. *See id.* at 851-53.

***(ii) Any Injunctive Relief Should Be Narrowly Tailored.***

Plaintiffs separately request a universal injunction essentially Defendants from taking actions to investigate any voter fraud crimes through "November 25, 2026." Dkt. 10-8. Plaintiffs have not met their burden to show that such relief is warranted. Because "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs," the Court should be cautious in fashioning any injunction. *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979); *CASA*, 606 U.S. at 847. Because "standing is not dispensed in gross," plaintiffs must establish standing "for each form of relief that they seek." *Murthy v. Missouri*, 603 U.S. 43, 44 (2024) (citation omitted). Thus,

even if the Court is nevertheless inclined to grant Plaintiffs' requested relief, that relief must be narrowly tailored to address whatever irreparable harm Plaintiffs themselves might personally suffer between now and the midterm elections.

Plaintiffs' proposed order goes far beyond what is necessary to prevent the potential "intimidation" of bona fide U.S. citizen voters upon which they stake their claims. *See* Dkt. 10-8. Plaintiffs broadly seek to "STAY" what Plaintiffs characterize as the "Policies" at issue, which, again, are USCIS sharing information with HSI, and HSI prioritizing noncitizen voting investigations for the next couple of weeks. *See id.* The breadth of Plaintiffs' requests are remarkable; they ask the Court to order the government to "[s]uspend all guidance" to even "communicate" the "Policy." *Id.* at 2. But no Plaintiff nor any U.S. citizen voter is harmed by USCIS merely sharing information with HSI. There is no plausible basis to enjoin such entirely internal and preliminary pre-investigation efforts.

Plaintiffs also ask that the Court order that the government "take no further action against or involving individuals based on [the] TECS records" generated through the challenged agency actions since August 21, 2026 "during the pendency of this litigation." *Id.* Similarly, Plaintiffs ask that the Court broadly "ENJOIN" the government from "[c]onducting field operations pursuant to the September 1, 2026, Surge Initiative Guidance" or "[c]onducting elections-related field operations based in whole or in part on TECS records generated from the Voter Eligibility Matching Policy that began August 21, 2026." *Id.* In other words, even if the government has rock-solid information indicating that a noncitizen has deliberately registered to vote in the upcoming election, DHS agents would be prohibited from taking any enforcement action against that individual if a TECS record was generated through the agency actions challenged in this lawsuit. This would be a remarkable judicial intrusion into wholly lawful investigative activity, without any consideration of the strength of the government's evidence that noncitizens may be present on voter rolls.

If the Court were to grant any relief whatsoever, it should be limited to something akin to Paragraph 3.b. of Plaintiffs' proposed injunction, such that DHS would, for a limited period of time, be prevented from conducting field operations directed at individuals whom the agency knows or reasonably should know to be U.S. citizens. *See id.* Indeed, the multiple filters and checks that HSI already has in place before conducting field operations are designed to do exactly that. *See* HSI Decl. ¶¶ 12-14, 19-24.

And the government maintains that no injunctive relief is warranted here whatsoever, for the reasons discussed at length above. Nevertheless, this particular provision of Plaintiffs' requested injunction at least attempts to tie the requested relief to the supposed harms and allegedly unlawful activity.

**IV. CONCLUSION**

For the foregoing reasons, the government respectfully requests that the Court deny Plaintiffs' motion to for a preliminary injunction.

Dated: September 28, 2026

Respectfully submitted,

CRAIG H. MISSAKIAN
United States Attorney

*/s/ Kelsey J. Helland*
KELSEY J. HELLAND
Assistant United States Attorney

Attorneys for Defendants