UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

CALIFORNIA NURSES ASSOCIATION, et al.,

Plaintiffs,

v.

UNITED STATES DEPARTMENT OF HOMELAND SECURITY, et al.,

Defendants.

Case No. 4:26-cv-10680-AMO

**DECLARATION OF [redacted] IN SUPPORT OF THE GOVERNMENT'S OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

I, [redacted], hereby declare under penalty of perjury, as follows:

1. I am employed by the Department of Homeland Security (DHS), U.S. Immigration and Customs Enforcement (ICE), Homeland Security Investigations (HSI) as the Acting Deputy Assistant Director (ADAD) for the Cross-Border Financial Crime Center (CBFCC). I have held this position since [redacted].

2. I have been employed by ICE, HSI since [redacted]. Prior to my position as ADAD, I have served in other positions within HSI, to include Division Chief of the CBFCC, Unit Chief of the Financial Crimes Unit, Group Supervisor HSI Philadelphia, Program Manager HSI Philadelphia, and Special Agent HSI Philadelphia. Prior to HSI, I was employed with ICE/Enforcement and Removal Operations (ERO) and U.S. Customs and Border Protection (CBP).

3. In my current role, I supervise HSI special agents assigned to units within the CBFCC. The CBFCC covers various HSI programmatic areas targeting transnational criminal organizations (TCOs) that engage in money laundering, financial fraud, bulk cash smuggling, document fraud, benefit fraud, labor exploitation, and other crimes enforced by HSI. Therefore, the CBFCC houses specialized units dedicated to investigating and dismantling TCOs including the Financial Crimes Unit, the Asset Forfeiture Unit, the Worksite Enforcement Unit, and the Identity and Benefit Fraud Unit (IBFU), which, among other investigative areas, oversees the HSI's investigation into unlawful voting.

4. The purpose of this declaration is to clarify the scope of HSI's work in support of HSI's investigation into unlawful voting and explain in general terms how HSI is generating investigative leads using government databases to advance the investigations while mitigating any potential impact HSI's investigative efforts have on the voting rights of U.S. Citizens (USCs).

5. Based on my experience and the nature of my official duties, I am familiar with HSI's operational scope and investigative methodology regarding HSI's investigations into unlawful voting and the safeguards designed to protect the voting rights of USCs. This declaration is based upon my

personal knowledge and information made available to me in my official capacity as of today. I provide this declaration based on the best of my knowledge, information, belief, and reasonable inquiry into the matters at issue in the above-captioned case.

6. Responsibility for enforcing the federal immigration laws lies primarily with DHS and two of its components: ICE and CBP.

7. The Homeland Security Act of 2002, Pub. L. No. 107–296, 116 Stat. 2135 (2002) (codified at 6 U.S.C. § 101 et seq.), transferred all functions (including legal authorities and operational programs) of the U.S. Customs Service from the Department of the Treasury to the Department of Homeland Security (DHS). 6 U.S.C. § 203(1); *see also* 6 U.S.C. § 251(4). The Secretary of Homeland Security delegated customs law authorities to ICE. DHS Delegation No. 7030.2, *Delegation of Authority to the Assistant Secretary for U.S. Immigration and Customs Enforcement* (Nov. 13, 2004). ICE is the largest investigative branch of DHS and is charged with the enforcement of more than 400 federal statutes. The agency was created after the September 11 terror attacks by combining components of the former Immigration and Naturalization Service and the former U.S. Customs Service to more effectively enforce federal immigration and customs laws and protect the United States against terrorist attacks. The mission of ICE is to protect the United States from the cross-border crime and illegal immigration that threaten national security and public safety. To carry out that mission, ICE focuses on enforcing immigration laws, preventing terrorism, and combating transnational criminal threats. ICE consists of three core operational directorates: (1) ERO, which consists of twenty-five field offices led by Field Office Directors; (2) HSI, which consists of twenty-nine Special Agent in Charge Offices led by Special Agents-in-Charge; and (3) the Office of the Principal Legal Advisor, which consists of nine regional offices led by Regional Counsel.

8. HSI is tasked with a broad mission to combat transnational crime and immigration offenses that threaten the public safety and the national security of the United States. HSI special agents

are customs officers pursuant to 19 U.S.C. § 1401(i) and criminal investigators empowered with the law enforcement authority set forth at 19 U.S.C. § 1589a. Under this authority, HSI special agents may, among other authorities, "make an arrest without a warrant for any offense against the United States committed in the officer's presence or for a felony, cognizable under the laws of the United States committed outside the officer's presence if the officer has reasonable grounds to believe that the person to be arrested has committed or is committing a felony." 19 U.S.C. § 1589a(3). HSI special agents are also immigration officers empowered with the law enforcement authority set forth at 8 U.S.C. § 1357. As federal criminal investigators, HSI special agents are authorized to investigate and enforce numerous federal criminal and civil laws, including, but not limited to, laws residing in Titles 8, 18, 19, 21, 22, and 31 of the U.S. Code.

9. The HSI CBFCC's IBFU supports election integrity efforts. Specifically, HSI Headquarters/CBFCC facilitates the referral, coordination, and dissemination of investigative efforts into unlawful voting but does not direct a predetermined investigative outcome based solely on the referral.

10. HSI's election-related investigative effort dates to approximately March 2025. During the initial phase, a Headquarters team of HSI special agents and analysts, referred to internally as the "Tiger Team," received and vetted referrals involving suspected illegal aliens who voted in federal elections and disseminated investigative leads to HSI field offices for further review. In approximately July 2025, responsibility for coordinating the effort transitioned to the IBFU. IBFU has served as the HSI Headquarters program office supporting the initiative since that transition. Accordingly, the HSI effort has been underway since approximately March 2025, with IBFU assuming responsibility for the program in July 2025.

11. While HSI's investigations into unlawful voting efforts, as indicated above, have been ongoing for over a year, HSI made the operational decision to surge resources to these investigations, as

exemplified in the August 31, 2026 weekly update, in response to an influx of investigative leads HSI received from U.S. Citizenship and Immigration Services (USCIS).

12. HSI focuses on allegations involving individuals who were identified as potential illegal aliens at the time of the relevant voting or election-related activity and who may have engaged in voter fraud, false claims to U.S. citizenship, identity-based fraud, or other unlawful activity during the investigative process. HSI's investigations are not intended to investigate lawful voting activity by USCs, nor are USCs the intended investigative population of the initiative. DHS has implemented a layered vetting process to filter out USCs so they are not impacted by the HSI's investigations into unlawful voting, which occurs prior to the dissemination of investigative leads to HSI field offices. The process includes multiple stages of data review and validation involving USCIS records and additional DHS data sources before a matter is referred for HSI investigative consideration. USCIS records are the best available records for HSI when conducting its investigations into unlawful voting. HSI, however, does not treat an initial data match or USCIS referral as a final determination of alienage, voting ineligibility, or criminal activity.

13. HSI's investigations into unlawful voting originate from USCIS. A referral does not establish criminal activity, voting ineligibility, or grounds for enforcement. HSI Headquarters and IBFU do not make such determinations solely on the basis of a USCIS referral.

14. Referrals are provided to HSI field offices for situational awareness, investigative consideration, and any action the receiving HSI field office deems appropriate based on their independent assessment of the referral, available records, applicable investigative authorities, and the facts and circumstances of the individual matter. Within the receiving HSI field office, investigative decisions are made by the assigned case agent and appropriate supervisory personnel, consistent with their respective authorities and responsibilities and in accordance with applicable HSI policies and procedures. This encompasses the field office's established investigative and supervisory chain and does

not require HSI Headquarters/CBFCC to direct or approve individual investigative decisions unless otherwise required by applicable policy or procedure.

15. Any subsequent investigative activity must be conducted in accordance with applicable federal law, as well as DHS and ICE policies and investigative standards.

16. The allegations referred to HSI for investigation into unlawful voting may involve conduct including:

a. Potential fraudulent voter registration activity;

b. Potential false statements or misrepresentations concerning citizenship or voter eligibility;

c. Potential use of another person's identity or identity documents in connection with an election-related process;

d. Potential voting or attempted voting by an individual who may not have been eligible under applicable law;

e. Potential submission, production, or facilitation of fraudulent election-related documents; or

f. Other potentially unlawful conduct identified during the review of election-related activity.

17. HSI does not use USCIS's Systemic Alien Verification for Entitlements program (SAVE) independently to identify or generate the initial investigatory referrals described above.

18. Once HSI receives referrals from USCIS it assesses the information to determine whether additional investigative activity is warranted. HSI's investigations into unlawful voting are not designed or intended to target or intimidate USCs or interfere with the lawful exercise of voting rights. As mentioned above, precautions are taken to prevent potential impacts on USCs' lawful exercise of voting rights. HSI's investigative focus is on unlawful activity involving individuals preliminarily

identified through USCIS records as potential illegal aliens at the time of the relevant voting or election-related activity.

19. Because database information and historical records may require additional verification, USCIS's preliminary identification is not treated by HSI as a final determination of citizenship status or wrongdoing. Rather, USCIS transmits lists regarding aliens or USCs to HSI. HSI will send to ERO to determine alienage. HSI is not making a final determination of alienage. When potential inaccuracies were identified in the USCIS lists, DHS sought further resources to prevent inaccuracies and developed a new model for generating leads for HSI's unlawful voting investigations.

20. TECS records are primarily considered when a subject is encountered by DHS entities (i.e. border crossing). HSI never relies solely on the existence of a TECS record to conduct investigations. TECS records are another investigative resource used by HSI and like any investigative resource, the injunction will remove the ability to quickly identify subjects who for instance, are making entry into the United States as an illegal alien.

21. HSI does not interview every individual that USCIS has entered a TECS record for; HSI field offices must prioritize resources and therefore they evaluate which leads including TECS records entered by USCIS warrant further investigation.

22. Matters warranting further investigation are disseminated to HSI field offices in the form of investigative leads. HSI field offices are expected to independently assess the facts and available records before undertaking investigative action. Receipt of a lead does not, by itself, mean that an interview is required, an arrest needs to be made, or any other field operation must occur. The exact investigative actions HSI special agents undertake vary widely based on available facts, the standard operating procedures of each particular field office, and the circumstances of the particular case. The receiving HSI field office first conducts an independent review of the referral and available records to determine whether additional investigative activity is warranted and whether an appropriate

investigative basis exists. Where appropriate, this review may include verification of identity, immigration-status information, relevant DHS and law enforcement records, and other information pertinent to the allegations. Any subsequent decision to conduct an interview or other field activity is based on the facts developed during that review, is often done in consultation with the HSI field office's respective U.S. Attorney's Office for guidance on sufficient evidence needed to sustain a prosecution, and must be consistent with federal law, DHS and ICE policy, and investigative standards.

23. If subsequent review of a lead establishes that an individual was a USC at the relevant time and there is no independent basis for investigation, that individual would not fall within the HSI's investigative focus for illegal aliens who have engaged in unlawful voting activity in a federal election and no further action against that individual would be taken.

24. This layered process is intended to ensure that HSI's investigative resources remain focused on credible allegations of potential unlawful activity committed by illegal aliens while protecting the lawful voting activity and the rights of USCs.

25. I declare under the penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge.

Executed in Las Vegas, Nevada on September 28, 2026.

[redacted] Digitally signed by [redacted]
Date: 2026.09.28 17:15:39 -04'00'

[redacted]
Acting Deputy Assistant Director
Cross-Border Financial Crimes Center
Homeland Security Investigations