**PROTECT DEMOCRACY PROJECT**
BEAU C. TREMITIERE, SBN 320074
300 Center Ave, Suite G-251
Superior, CO 80027
GEOFFREY CURFMAN* NY Bar No. 5809199
JESSICA MARSDEN* NY Bar No. 5316526
82 Nassau St., #601
New York, NY 10038
HAYDEN JOHNSON* DC Bar No. 1671830
ZACHARY WEST* NY Bar No. 5192257
ASHLEY FOX* LA Bar No. 41748
2020 Pennsylvania Ave., N.W., Suite 163
Washington, D.C. 20006
Telephone: (202) 579-4582
Facsimile: (202) 769-3176
Email: beau.tremitiere@protectdemocracy.org

Attorneys for Plaintiffs
CALIFORNIA NURSES ASSOCIATION,
NATIONAL NURSES UNITED, and VOTO
LATINO FOUNDATION

*Additional Counsel for Plaintiffs in Signature Block*

**Admitted pro hac vice*

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVSION

| | |
|---|---|
| CALIFORNIA NURSES ASSOCIATION; NATIONAL NURSES UNITED; CITY AND COUNTY OF SAN FRANCISCO; COUNTY OF SANTA CLARA; and VOTO LATINO FOUNDATION,<br><br>Plaintiffs,<br><br>v.<br><br>MARKWAYNE MULLIN, in his official capacity as Secretary of Homeland Security; *et al.*,<br><br>Defendants. | Case No. 4:26-cv-10680-AMO<br><br>**PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR APA STAY AND PRELIMINARY INJUNCTION** |

# TABLE OF CONTENTS

INTRODUCTION ....... 1

BACKGROUND ....... 1

I. The Voter Eligibility Matching Policy Constructing Target Lists ....... 1

II. The Field Operations Policy Interrogating Voter Eligibility ....... 4

ARGUMENT ....... 6

I. Plaintiffs Are Likely to Succeed on the Merits ....... 6

A. The Evidence Presented by Both Sides Supports Plaintiffs ....... 6

B. Plaintiffs Have Standing to Seek Preliminary Relief ....... 7

C. Plaintiffs Are Likely to Prevail on Their Statutory and Constitutional Claims ....... 10

II. Defendants Do Not Rebut Plaintiffs' Showing of Irreparable Harm ....... 19

III. The Balance of the Equities and Public Interest Favor Preliminary Relief ....... 19

IV. Staying and Enjoining the Policies Where Their Coverage Extends is Appropriate ....... 20

CONCLUSION ....... 20

## TABLE OF AUTHORITIES

**Cases**

*AARA v. Clean Elections USA*,
638 F. Supp. 3d 1033 (D. Ariz. 2022) ........ 16

*AARA v. Clean Elections USA*,
No. 22-cv-01823, 2022 WL 17088041 (D. Ariz. Nov. 1, 2022) ........ 17

*AARA v. Clean Elections USA*,
2023 WL 1097766 (9th Cir. Jan. 26, 2023) ........ 16

*Al Otro Lado, Inc. v. McAleenan*,
394 F. Supp. 3d 1168 (S.D. Cal. 2019) ........ 12

*Am. Encore v. Fontes*,
152 F.4th 1097 (9th Cir. 2025) ........ 19

*Ariz. Dem. Party v. Hobbs*,
18 F.4th 1179 (9th Cir. 2021) ........ 18

*Arizona All. for Retired Americans v. Mayes*,
186 F.4th 622 (9th Cir. 2026) ........ 10

*Ass'n of Am. Med. Colls. v. United States*,
217 F.3d 770 (9th Cir. 2000) ........ 12

*Bennett v. Spear*,
520 U.S. 154 (1997) ........ 12

*Biden v. Texas*,
597 U.S. 785 (2022) ........ 11

*Burson v. Freeman*,
504 U.S. 191 (1992) ........ 17

*California v. Azar*,
911 F.3d 558 (9th Cir. 2018) ........ 19

*City & Cnty. of San Francisco v. Trump*,
783 F. Supp. 3d 1148 (N.D. Cal. 2025) ........ 9, 19

*City & Cnty. of San Francisco v. Trump*,
No. 25-3889 (9th Cir. June 23, 2025) ........ 9

*City of Sausalito v. O'Neill*,
386 F.3d 1186 (9th Cir. 2004) ........ 8

*Colo. Mont. Wyo. State Area Conf. of the NAACP v. Smith*,
180 F.4th 1266 (10th Cir. 2026) ........ 9, 10

*Colorado v. DeJoy*,
487 F. Supp. 3d 1061 (D. Colo. 2020) ........ 9

*Common Cause v. Dep't of Just.*,
No. 26-cv-1352, 2026 WL 3033772 (D.D.C. Oct. 9, 2026) .......... 2, 14

*Ctr. for Biological Diversity v. EPA*,
141 F.4th 153 (D.C. Cir. 2025) .......... 14

*Ctr. for Taxpayer Rights v. I.R.S.*,
No. 26-5006, 2026 WL 2635380 (D.C. Cir. Sep. 8, 2026) .......... 12

*Cuviello v. City of Vallejo*,
944 F.3d 816 (9th Cir. 2019) .......... 19

*Dep't of Com. v. New York*,
588 U.S. 752 (2019) .......... 8, 15

*DHS v. League of Women Voters*,
No. 26A308, 2026 WL 2879700 (U.S. Sept. 25, 2026) .......... 8, 15

*DHS v. Regents of the Univ. of Cal.*,
591 U.S. 1 (2020) .......... 15

*Dousa v. DHS*,
662 F. Supp. 3d 1123 (S.D. Cal. 2023) .......... 5, 12

*DSCC v. Trump*,
No. 26-cv-01114, 2026 WL 2681471 (D.D.C. Sept. 13, 2026) .......... 20

*Ga. Coal. for the People's Agenda v. Kemp*,
347 F. Supp. 3d 1251 (N.D. Ga. 2018) .......... 18

*Garro Pinchi v. Noem*,
813 F. Supp. 3d 973 (N.D. Cal. 2025) .......... 11, 15

*Gill v. Dep't of Justice*,
913 F.3d 1179 (9th Cir. 2019) .......... 12

*Greater Yellowstone Coal., Inc. v. Servheen*,
665 F.3d 1015 (9th Cir. 2011) .......... 14

*Guan v. Mayorkas*,
530 F. Supp. 3d 237 (E.D.N.Y. 2021) .......... 12

*Heckler v. Chaney*,
470 U.S. 821 (1985) .......... 15

*Hernandez v. Sessions*,
872 F.3d 976 (9th Cir. 2017) .......... 6

*In re Meta Pixel Healthcare Litig.*,
647 F. Supp. 3d 778 (N.D. Cal. 2022) .......... 19

*Johnson Tr. of Charley E. Johnson Revocable Living Tr. v. United States*,
145 F.4th 1158 (9th Cir. 2025) .......... 15

*Jolt Initiative, Inc. v. Paxton*,
821 F. Supp. 3d 706 (W.D. Tex. 2026) .......... 17

*Jones v. United States Postal Serv.*,
488 F. Supp. 3d 103 (S.D.N.Y. 2020) .......... 18

*Krabach v. King Cnty.*,
No. 2:22-cv-1252, 2023 WL 7018431 (W.D. Wash. Oct. 25, 2023) .......... 16

*Laird v. Tatum*,
408 U.S. 1 (1972) .......... 7

*Lands Council v. Powell*,
395 F.3d 1019 (9th Cir. 2005) .......... 14

*Lujan v. Nat'l Wildlife Fed'n*,
497 U.S. 871 (1990) .......... 11

*LULAC v. Exec. Off. of President*,
818 F. Supp. 3d 34 (D.D.C. 2026) .......... 17, 18, 20

*Meese v. Keene*,
481 U.S. 465 (1987) .......... 8

*Mi Familia Vota v. Fontes*,
129 F.4th 691 (9th Cir. 2025) .......... 7, 8

*Mich. Welfare Rts. Org. v. Trump*,
600 F. Supp. 3d 85 (D.D.C. 2022) .......... 16

*Michigan v. DeVos*,
481 F. Supp. 3d 984 (N.D. Cal. 2020) .......... 8

*Morse v. Republican Party of Virginia*,
517 U.S. 186 (1996) .......... 16

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) .......... 13, 14

*Nat'l Coal. on Black Civic Participation v. Wohl*,
661 F. Supp. 3d 78 (S.D.N.Y. 2023) .......... 10, 16, 17

*Novedades y Servicios, Inc. v. Fin. Crimes Enf't Network*,
181 F.4th 961 (9th Cir. 2026) .......... 20

*Olagues v. Russoniello*,
797 F.2d 1511 (9th Cir. 1986) .......... 18

*Olagues v. Russoniello*,
484 U.S. 806 (1987) .......... 18

*Pacito v. Trump*,
169 F.4th 895 (9th Cir. 2026) .......... 15

*Parsons v. Dep't of Just.*,
878 F.3d 162 (6th Cir. 2017) .......... 12

*Presidio Golf Club v. Nat'l Park Serv.*,
155 F.3d 1153 (9th Cir. 1998) .......... 7

*Prutehi Litekyan: Save Ritidian v. U.S. Dep't of Air Force*,
128 F.4th 1089 (9th Cir. 2025) .......... 11, 12

*Pub. Int. Legal Found., Inc. v. N.C. State Bd. of Elections*,
996 F.3d 257 (4th Cir. 2021) .......... 7

*Reynolds v. Sims*,
377 U.S. 533 (1964) .......... 18

*Six v. IQ Data Int'l, Inc.*,
129 F.4th 630 (9th Cir. 2025) .......... 7

*Tex. LULAC v. Whitley*,
No. CV SA-19-CA-074-FB, 2019 WL 7938511 (W.D. Tex. Feb. 27, 2019) .......... 18

*United States v. Bruce*,
353 F.2d 474 (5th Cir. 1965) .......... 17

*United States v. Cox*,
No. 0:25-cr-60249, 2026 WL 2948729 (S.D. Fla. Oct. 1, 2026) .......... 17

*United States v. McLeod*,
385 F.2d 734 (5th Cir. 1967) .......... 17

*United States v. Weber*,
816 F. Supp. 3d 1168 (C.D. Cal. 2026) .......... 2, 7, 14

*Vasquez Perdomo v. Noem*,
148 F.4th 656 (9th Cir. 2025) .......... 7, 8

*Walker v. City of Lakewood*,
272 F.3d 1114 (9th Cir. 2001) .......... 17

*Whatley v. City of Vidalia*,
399 F.2d 521 (5th Cir. 1968) .......... 17

*Winter v. Cal. Med. Review Inc.*,
900 F.2d 1322 (9th Cir. 1990) .......... 12

**Constitutional Provisions**

U.S. Const., art. I, § 4, cl. 1 .......... 8

**Statutes**

5 U.S.C. § 551 .......... 11

52 U.S.C. § 10101 .......... 16

52 U.S.C. § 10307 .......... 16

52 U.S.C. § 10310 .......... 16

8 U.S.C. § 1357 .......... 15

8 U.S.C. § 1373 .......... 15

Cal. Elec. Code § 320 .......... 8

*E-Government Act of 2002*,
Pub. L. No. 107-347, 116 Stat. 2899 .......... 14

**Rules and Regulations**

48 C.F.R. § 3002.101 .......... 7

9th Cir. G.O. 5.5 .......... 18

## INTRODUCTION

In public, Defendants flaunt the scope and intensity of their unprecedented election season Unlawful Voter Initiative. But before this Court, they insist it is run-of-the-mill law enforcement and that the Court should take their word, without substantiation and contrary to a growing body of documentary evidence, that they take meaningful steps to avoid targeting U.S. citizens.

In reality, DHS does not refute that it derived target lists from hastily constructed systems and processes, or that it failed to even attempt to calculate error rates. Although DHS now claims the newly produced documents show that it checks "a variety of sources" to protect eligible voters from harassment and intimidation, the undisputed record shows that DHS's sources and methodologies are rife with errors. DHS does not contest that U.S. citizens are swept up in its operations, or that it targets some naturalized citizens. Defendants' field operations interrogating voter eligibility and related propaganda campaign—surging at the peak of electoral activity—are paradigmatic voter intimidation and cause more irreparable harm by the day. Preliminary relief is warranted.

## BACKGROUND

To implement its Initiative, DHS has cobbled together a 300,000-person target list that includes U.S. citizens and is surging at least hundreds of HSI agents to interrogate individuals about their voter eligibility. Tremitiere Suppl. Decl., Ex. 49 at 5. While DHS has not revealed the full scope and details of its Initiative, the factual record before the Court confirms the existence and key aspects of the two component policies that Plaintiffs challenge.

### I. The Voter Eligibility Matching Policy Constructing Target Lists

Defendants' evidence (as well as a lawsuit just filed by the U.S. Department of Justice) confirms that the Voter Eligibility Matching Policy begins with USCIS receiving a presumptive target list from within DHS and then eliminating some targets based on public and commercial data. USCIS Decl. ¶ 10; AR 1-1; *see* Tremitiere Decl., Ex. 2 at 23; *United States v. California*, No. 2:26-cv-12025 (C.D. Cal. Oct. 15, 2026), ECF No. 1, ¶¶ 33-47. The Policy has serious defects at three levels: the initial target-list source data, the comparator voter-history data, and the matching procedures.

First, the sources DHS uses to generate an initial target list are incomplete and inaccurate. Grumbach Rep. 6-8. Here, Defendants state only that USCIS matches purported voter data "against

DHS and commercial database holdings." USCIS Decl. ¶ 10. But FOIA documents released October 7 reveal that the initial data is voluminous and unreliable. Tremitiere Suppl. Decl., Ex. 50 at 61, 123, 135.[1] The data includes 48.2 million records that DHS Deputy Assistant Secretary Heather Honey[2] brought in "through independent sources" of questionable provenance. *Id.* It also includes 50.6 million records from DOJ purporting to cover multiple states. *Id.*; Tremitiere Decl., Ex. 2 at 40. The DOJ records are either unlawfully transferred voter roll data from some states or unreliable public or commercial versions of voter data from other states like California. *See, e.g.*, *United States v. Weber*, 816 F. Supp. 3d 1168, 1187-88, 1192-95 (C.D. Cal. 2026); *Common Cause v. Dep't of Just.*, No. 26-cv-1352, 2026 WL 3033772, at *29-35 (D.D.C. Oct. 9, 2026), *United States v. California*, ECF No. 1, ¶ 33. The FOIA documents confirm that DHS purports to "enrich" data through iLab—described by a USCIS trainer as "supplemental magic"—using unknown AI tools to ingest data from various systems and create a hodgepodge of purported individual profiles. Tremitiere Suppl. Decl., Ex. 50 at 61, 123, 135; Ex. 2 at 41, 44; *United States v. California*, ECF No. 1, ¶ 35.

DHS confirms that it relied in part on targets generated from SAVE data. USCIS Decl. ¶¶ 11-14. SAVE is rife with errors. *See Common Cause*, 2026 WL 3033772, at *6, 16-17. For example, 87% of SAVE-flagged voters in Phoenix were in fact U.S. citizens; the error rate in a St. Louis list topped 81%; and of 2,724 Texans flagged, only 4.3% could be referred for prosecution and at least 21% were U.S. citizens. Tremitiere Decl., Ex. 19 at 187; Tremitiere Suppl. Decl., Exs. 51 at 3-4, 52 at 2-3.

DHS refuses to divulge what other source data it used to compile the initial target list. USCIS Decl. ¶ 10. But any internal or commercial data would be incomplete, inaccurate, or based on flawed assumptions about citizenship, and therefore produce flawed outputs. Grumbach Rep. 6-8; Grumbach

[1] Because these documents—particularly the Weekly Advisory Reports, the Voter Fraud Weeklys, and accompanying emails between high-level DHS policymakers and advisors—were before senior agency decisionmakers at adoption, *see* ECF 67 at 2, they and others like them up to the policy finality should have been provided unredacted as part of the AR. *See* Tremitiere Suppl. Decl., Ex. 50 at 32-86, 121-70. Defendants refused to produce them. *See id.*, Ex. 63 at 1.

[2] Heather Honey is well known for seeking to overturn the results of the 2020 presidential election. *See* Tremitiere Suppl. Decl., Ex. 61 at 2-3. For a helpful explanation of how the Administration's claims of widespread fraud have repeatedly proven false, see Tremitiere Suppl. Decl., Ex. 62 at 4-8.

Suppl. Rep. 3-6. Defendants do not contest that in Nevada, for example, DHS recently claimed it identified 16,000 improperly registered non-U.S. citizens, but after further investigation, state officials found *zero* ineligible voters. Tremitiere Suppl. Decl., Ex. 53 at 2-4.

Second, to match presumptive targets to registered voters, USCIS uses "voter information [received] through a variety of sources, including, but not limited to, information voluntarily provided by state and local jurisdictions, publicly available information, and other lawfully available data." USCIS Decl. ¶ 10. DHS does not explain what this "other" information is or why it would be reliable. DHS also admits that part of its Policy is to *specifically target naturalized* citizens if the data appears to suggest voting occurred before naturalization. USCIS Decl. ¶ 9; HSI Decl. ¶ 19; [redacted]. But DHS's data on both topics is highly likely to be unreliable. *See* Grumbach Suppl. Rep. 7-12.

Third, DHS's matching methodology is fundamentally flawed. DHS does not dispute USCIS had to treat the DHS source data for the initial target list as presumptively valid or that agents typically had *twelve minutes* to eliminate a person from the target list. Tremitiere Decl., Ex. 2 at 39, 42, 45-46, 50. USCIS states that it "seeks to exclude any United States Citizens from further review" and compares "*available* biographic data, to include but not limited to key identifiers such as first name, last name, date of birth, addresses, and other biographic information." USCIS Decl. ¶ 10 (emphasis added). But it does not dispute that some records have only a name and partial birthdate. Tremitiere Decl., Ex. 2 at 40-41, 49-50. USCIS also concedes that errors will result from "[s]imilar names, incomplete records, outdated citizenship information, clerical errors, and other circumstances." USCIS Decl. ¶ 8. DHS provides no evidence refuting that, per the Whistleblower Disclosure, agents simply input a name and birthdate into public voter portals or commercial databases to generate a match for HSI follow-up, or that when such information is unavailable (as in California), USCIS agents are instructed to create a TECS record based solely on DHS's initial target list. Tremitiere Decl., Ex. 2 at 38-39.

DHS does not contest that its staff raised serious concerns about the Policy. An internal email reportedly raised the alarm that DHS had only "some degree of confidence" that people flagged in USCIS's review were noncitizens who had "registered to vote and/or voted." Tremitiere Suppl. Decl., Ex. 49 at 4. The Whistleblower Disclosure notes that USCIS agents raised significant concerns that USCIS did not address. Tremitiere Decl., Ex. 2 at 33, 39, 42. Far from contesting these facts, the HSI

declarant acknowledges the USCIS target list was so unreliable that HSI had to create an ad hoc (and undisclosed) "new model" for targeting, HSI Decl. ¶ 19, even though HSI also claims the "USCIS records are the best available records," *id.* ¶ 12. USCIS is notably silent in response to those concerns.

Matching large data sets is error-prone under ideal conditions; DHS's unreliable records and rushed processes nearly guarantee that there will be high error rates that implicate U.S. citizens. Grumbach Suppl. Rep. 6-8; Grumbach Rep. 8-9. While USCIS claims to have qualitatively weighed the risk of errors, DHS does not claim that it even attempted to quantitatively ascertain error rates. *See* Grumbach Suppl. Rep. 9. DHS's declarants only vaguely gesture to processes that supposedly lessen errors, with unknown success. *See* USCIS Decl. ¶ 20; HSI Decl. ¶ 24. [redacted]

## II. The Field Operations Policy Interrogating Voter Eligibility

The Field Operations Policy is memorialized, at minimum, in an August 28 memo and the August 31 Surge Initiative Guidance, which direct HSI field offices to "pursue investigative leads, conduct field interviews, and support timely prosecutorial review" during voter registration and early voting periods in nine states. AR-2-01-04; *see* Tremitiere Decl., Ex. 4 at 64. HSI confirms the existence of the Policy in "general terms," describing the surge that started September 1 and a set of purported internal review procedures. HSI Decl. ¶¶ 4, 11, 22-24. Defendants leave out key details of their field operations, including the number of coercive interactions with U.S. citizens. But some core components are publicly known and not disputed.

*First*, Defendants do not dispute that some U.S. citizens are swept into the field operations. As noted above, the DHS declarants state that USCIS and HSI may *try* to eliminate U.S. citizens from the target list, but with unknown success. Defendants concede that interrogations about voter eligibility are the step "expressly designed to resolve the discrepancies" in the flawed records and matching process USCIS uses to produce the target lists. Opp. 21. DHS further acknowledges that part of its Policy is to *specifically target* some naturalized citizens. USCIS Decl. ¶¶ 9, 19; Tremitiere Decl., Ex. 2 at 44-50.

The high volume of targets compared to the low number of indictments is further evidence that

the lists are flawed. Secretary Mullin has repeatedly stated that DHS is targeting 300,000 individuals "and growing" that it "believe[s] voted illegally." Tremitiere Suppl. Decl., Ex. 54 at 2, Ex. 55 at 8:03-8:57, Ex. 56 at 2. Yet there have been 131 total prosecutions nationwide for alleged noncitizen voting since January 2025. Tremitiere Suppl. Decl., Ex. 62 at 7. Having previously claimed that nearly 200,000 noncitizens were registered in California, the federal government now alleges that this Initiative has identified "around 20,000" potential noncitizen voters in California. *United States v. California*, ECF No. 1, ¶ 46, Ex. A. Despite DHS conducting numerous operations targeting Californians, *e.g.*, Tremitiere Decl., Exs. 13 at 135, 14 at 137, 36 at 404, DOJ has indicted just *one individual* in California for allegedly registering (not voting) as a non-U.S. citizen. Tremitiere Suppl. Decl., Ex. 62 at 7. DHS's record of wrongly targeting U.S. citizens also gives little reassurance that HSI is avoiding eligible voters here. *See* Tremitiere Suppl. Decl, Ex. 57 at 5-6 (500-plus incidents).

*Second*, once an individual is referred for investigation, Defendants fail to provide any criteria or direction to field offices to avoid interrogating U.S. citizens or mitigate intimidating effects around the election. *See* AR-1, -2, -3. HSI does not claim it provided any such guidance. HSI Decl. ¶ 18.

*Third*, DHS propagandizes its operations, with recent social media posts showing armed agents in tactical gear interrogating people about voter eligibility at their homes. *See* Tremitiere Suppl. Decl., Ex. 58 at 2-6. DHS has used social and traditional media to amplify highly visible arrests by armed officers using shackles for alleged non-violent offenses. *E.g.*, Tremitiere Decl., Ex. 38; Tremitiere Suppl. Decl., Ex. 59. The August 28 memo expressly directs agents to "document investigative findings" in a "Criminal Voter Fraud Initiative Portal" outside the normal operational process so that photos and videos can be used by national DHS staff in "[m]edia and [r]eporting." AR2-01-02.

*Fourth*, even if an HSI agent does not interrogate a person based on a USCIS-generated TECS record from the Matching Policy, Defendants do not contest that a TECS record has other lasting effects and that they are "primarily considered when a subject is encountered by DHS entities (i.e. border crossing)." HSI Decl. ¶ 20; *see also Dousa v. DHS*, 662 F. Supp. 3d 1123, 1139, 1153 (S.D. Cal. 2023).

*Fifth*, the FOIA documents show that DHS surveils, covertly infiltrates, and interrogates the staff of non-profits and churches conducting voter engagement. Tremitiere Suppl. Decl., Ex. 50 at 133; *id.* at 29-30; *id.* at 99. As of July 2026, DHS targeted at least 148 such organizations. *Id.* at 133.

## ARGUMENT

### I. Plaintiffs Are Likely to Succeed on the Merits

Plaintiffs are likely to prevail on the merits, as they each have standing to pursue preliminary relief and are likely to succeed on their statutory and constitutional claims.

#### A. The Evidence Presented by Both Sides Supports Plaintiffs

The facts before the Court substantiate Plaintiffs' claims. Defendants' contrary statements that USCIS employed "safeguards" such as "checking available databases using all available information," USCIS Decl. ¶ 18, or that HSI employed a "layered vetting process" before its interrogations, HSI Decl. ¶ 12, are "conclusory assertions" that are not "supported by any actual evidence" and should be given little weight. *Hernandez v. Sessions*, 872 F.3d 976, 995 (9th Cir. 2017); *Nguyen v. Marin*, No. ED CV 26-1130, 2026 WL 822535, at *4 (C.D. Cal. Mar. 20, 2026). They are precisely the type of post-hoc "litigation affidavits" omitted from APA review. *See Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 419 (1971). And there are specific and well-founded reasons to doubt the veracity of conclusory DHS declarations that are not supported by documentary evidence. *See, e.g.*, *Almonte v. Genalo*, No. 26-cv-3633, 2026 WL 2983349, at *1 (E.D.N.Y. Oct. 5, 2026) ("ICE agents falsified official records trying to conceal their illegal actions, which included significant injury to a U.S. citizen," and have "given the false testimony and records supplied to the Court").

Nor does DHS's meager supplemental production (ECF No. 74-1) ("AR-3") provide that support. [redacted] Indeed, DHS elsewhere attempts to downplay its use of SAVE here, *see* HSI Decl. ¶ 17; USCIS Decl. ¶¶ 14-16, presumably because SAVE is known to be unreliable. Nor does a heavily redacted set of FAQs elucidate any "safeguards intended to reduce the risk of an erroneous referral." ECF No. 67 at 3. [redacted]

[redacted] Finally, Defendants' submission provides no evidence, despite the Court's order, that "these documents were considered by decision makers." *See* ECF No. 67 at 3.

**B. Plaintiffs Have Standing to Seek Preliminary Relief**

**1. CNA/NNU Have Associational Standing**

CNA/NNU establish associational standing. Their identified members "would otherwise have standing to sue in their own right," *see Mi Familia Vota v. Fontes*, 129 F.4th 691, 708 (9th Cir. 2025), from the concrete, particularized, and traceable fear and voting injuries they experience. Van Waus Decl. ¶¶ 12-46; Van Waus Suppl. Decl. ¶¶ 13-23.[3] Those members also face privacy harms analogous "in kind" to the intrusion-upon-seclusion tort. *Six v. IQ Data Int'l, Inc.*, 129 F.4th 630, 634-36 (9th Cir. 2025). Voters have a reasonable expectation of privacy in the information DHS is accessing. *Weber*, 816 F. Supp. 3d at 1174-76; *see also* 48 C.F.R. § 3002.101(11) (DHS regulation recognizing privacy interests). DHS intrudes on that privacy interest, including via unauthorized access to state voter portals. Tremitiere Decl., Ex 2 at 23, 33-35. The intrusion is highly offensive and carries the threat that Plaintiffs will be "public[ly] branded" with the stigma of voter fraud. *Pub. Int. Legal Found., Inc. v. N.C. State Bd. of Elections*, 996 F.3d 257, 267 (4th Cir. 2021). CNA/NNU also satisfy the "undemanding" germaneness element. *Presidio Golf Club v. Nat'l Park Serv.*, 155 F.3d 1153, 1159 (9th Cir. 1998). They seek to protect their members' ability to safely vote as a means to shape healthcare and labor policy. Van Waus Decl. ¶¶ 6-11; Van Waus Suppl. Decl. ¶¶ 7-12.

Defendants' reliance on *Laird v. Tatum*, 408 U.S. 1 (1972), Opp. 10-11, is unfounded. *Laird* held that a "subjective" and generalized fear about the "mere existence" of an internal Army surveillance program, "without more," is inadequate. 408 U.S. at 11, 14. But *Laird* reaffirms that chilling injuries from "a threat of specific future harm" are cognizable. *Id.* at 14. CNA/NNU can thus establish standing from a "realistic danger of sustaining a direct injury." *Fontes*, 129 F.4th at 708;

---

[3] CNA/NNU need only *identify* this sample of affected members and are not required to *name* them. *Fontes*, 129 F.4th at 708; *Vasquez Perdomo v. Noem*, 148 F.4th 656, 676-77 (9th Cir. 2025) .

*accord Dep't of Com. v. New York*, 588 U.S. 752, 767 (2019); *Vasquez Perdomo*, 148 F.4th at 676-77. In *Fontes*, for instance, a group had standing because of the risk that one of its 1,000 members could have their registration wrongly cancelled due to SAVE inaccuracies. 129 F.4th at 708-09. The risks to CNA/NNU's members are even more imminent and objectively reasonable: DHS targets 300,000 people, including U.S. citizens, and even singles out naturalized citizens; CNA/NNU have hundreds of thousands of members nationwide, many of whom are naturalized citizens or live in mixed-status households and face heightened risks; and DHS is engaged in widely promoted and sensationalized field operations that cause fear among members. *See* Van Waus Decl. ¶¶ 4, 12; Van Waus Suppl. Decl. ¶¶ 5. Members are also changing their behavior to avoid coercive DHS confrontations. Van Waus Decl. ¶¶ 14, 25-26, 35-37; Van Waus Suppl. Decl. ¶¶ 13-23. Such "affirmative steps to avoid risk of harm" "constitute[] cognizable injury." *Meese v. Keene*, 481 U.S. 465, 475 (1987); *accord DHS v. League of Women Voters*, No. 26A308, 2026 WL 2879700, at *2 (U.S. Sept. 25, 2026) ("*DHS v. LWV*") (reaffirming *Meese*).[4]

**2. Local Government Plaintiffs Have Standing**

Local Government Plaintiffs have standing to protect their "proprietary interests," including their "responsibilities, powers, and assets." *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1197 (9th Cir. 2004). Defendants' *parens patriae* argument is a straw man. Opp. 12-13. The governments assert their proprietary interests in (1) programmatic administration and their budgets, and (2) the hard-earned trust of their communities. Arntz Decl. ¶¶ 6-7; Moreles Decl. ¶ 7; Rivas Decl. ¶ 9. Increased investment in outreach and education to mitigate voter intimidation is a proprietary harm that is not "voluntary," *cf.* Opp. 9-10; it follows from a county's duty to administer free and fair elections, U.S. Const., art. I, § 4, cl. 1; Cal. Elec. Code § 320; *see also Michigan v. DeVos*, 481 F. Supp. 3d 984, 995-96 (N.D. Cal. 2020). The erosion of trust and confusion that Defendants inflict on Plaintiffs' communities, including

[4] As described in *Meese*, uncontested expert testimony is also relevant to understanding the objective fear and injuries. 81 U.S. at 473-74. Here, Dr. Grumbach explains that fear of being wrongly questioned can deter even voters who have not been contacted. He finds a "reasonable likelihood that learning of DHS field investigations into voting activity will generate fear among eligible U.S. citizen voters to such a degree that it dissuades them from voting," because each erroneous targeting "sends an informational signal . . . that the costs of voting have increased." Grumbach Suppl. Rep. 14-15.

large naturalized citizen populations, are also cognizable harms. *See City & Cnty. of San Francisco v. Trump*, 783 F. Supp. 3d 1148, 1187, 1202 (N.D. Cal. 2025), *appeal on different grounds docketed*, No. 25-3889 (9th Cir. June 23, 2025) ; *Colorado v. DeJoy*, 487 F. Supp. 3d 1061, 1065 (D. Colo. 2020).

In claiming that the local governments face only "speculative fears that DHS *might* contact voters," Opp. 7, DHS overlooks evidence showing that USCIS entered TECS records against most California residents DHS initially identified, Tremitiere Decl., Ex. 2 at 42, and their own social media touting operations in the Bay Area, Tremitiere Decl., Exs. 13 at 135, 36 at 404. Defendants' causation arguments also fail. *See* Opp. 9. San Francisco, for example, is expending resources to address threats of "federal deployments" likely to intimidate voters during the general elections, similar to its prior efforts to protect voters from DHS targeting during the primary. Rivas Decl. ¶¶ 6-9. These efforts are not theoretical: since this motion was filed, San Francisco has taken steps to respond to this voter intimidation and expects to take more still. Arntz Suppl. Decl. ¶¶ 2-3.

**3. Voto Latino Has Organizational Standing**

In voter intimidation cases, organizations "engag[ed] in . . . voter outreach and education" have standing to contest operations that disrupt their "core business activities." *Colo. Mont. Wyo. State Area Conf. of the NAACP v. Smith*, 180 F.4th 1266, 1274-76 (10th Cir. 2026). Like the private "door-to-door canvassing" intimidation campaign challenged in *Smith*, *id.*, the Unlawful Voter Initiative interferes with Voto Latino's "core business activities" as the nation's largest Latino get-out-the-vote organization. Lopez Decl. ¶ 3. Fears of coercive DHS confrontations and investigations among Voto Latino's constituencies and partners have forced Voto Latino to cancel or alter programs to mitigate risks to the organization and its constituencies and have made it more difficult for the organization to secure and retain valuable partnerships. Lopez Decl. ¶¶ 6-10, 15; Lopez Suppl. Decl. ¶¶ 5-9. Voto Latino has also had to "fundamentally change" its programs to focus on "defensive messaging" and the "defensive work of ensuring that longstanding Latino voters" are empowered to overcome their fear of DHS, rather than its planned "affirmative work of turning out new and low-propensity Latino voters." *Id.* ¶¶ 8, 13-14. Instead of its usual focus on creating materials explaining how and where to vote, Voto Latino must now develop educational materials "combatting fears of election-related investigations and arrests by DHS," such as explaining what "to expect from ICE, how to deescalate election-related

interactions with ICE, and how to document" voter intimidation. *Id.* ¶ 12. These programmatic and direct harms establish organizational standing in voter intimidation cases. *See Smith*, 180 F.4th at 1275; *Nat'l Coal. on Black Civic Participation v. Wohl*, 661 F. Supp. 3d 78, 111 (S.D.N.Y. 2023).

Defendants' contrary reliance on *Arizona Alliance for Retired Americans v. Mayes*, 186 F.4th 622 (9th Cir. 2026) (en banc), is misplaced, Opp. 9-10. There, the Ninth Circuit *affirmed* Voto Latino's standing for a pre-enforcement challenge to a criminal voter-fraud statute, even though the state disavowed its intention to prosecute. *Mayes*, 186 F.4th at 635-40. The court held that Voto Latino lacked standing to challenge a different law, but only because Voto Latino's programs focused exclusively on "new" voter registrations, and there was no "record support" that the law would affect any new registrations. *Id.* at 634-36. Voto Latino has both forms of standing described in *Mayes*: Defendants hinder the organization's core operations, and Voto Latino itself credibly fears being targeted. Lopez Decl. ¶ 15. The FOIA documents reveal that DHS is targeting voter engagement organizations like Voto Latino, including nearly 150 as of July 2026. Tremitiere Suppl. Decl., Ex. 50 at 29-39, 99, 133. The documents show that DHS even targeted one of Voto Latino's principal corporate partners supporting youth participation in elections. *See* Lopez Suppl. Decl. ¶¶ 3, 6. In addition to the injuries to its direct services, Voto Latino faces a credible threat that DHS will target it as the agency has targeted other voter mobilization organizations. *See Mayes*, 186 F.4th at 637-39.

### C. Plaintiffs Are Likely to Prevail on Their Statutory and Constitutional Claims

Plaintiffs are likely to prevail on their APA claims because the Initiative and its implementing Matching and Field Operations Policies are arbitrary and capricious final agency actions, not committed to agency discretion. DHS's policies, conduct, and threats also likely violate section 11(b) of the VRA and impermissibly burden fundamental constitutional rights.[5]

#### 1. Plaintiffs Challenge Discrete Final Agency Actions

Both components of the Unlawful Voter Initiative—the Matching and Field Operations

[5] Plaintiffs pursue their 11(b) and constitutional claims both as APA contrary-to-law violations and as standalone violations, and they vindicate the rights of both voters and entities engaged in voter programs. Plaintiffs do not presently pursue *ultra vires* claims. *Contra* Opp. 21-22.

Policies—are final agency actions, and Defendants' contrary arguments are meritless. To begin, these are agency actions. As Defendants do not dispute, each constitutes a "statement of general or particular applicability and future effect" that "prescribe[s]" and "implement[s] . . . policy," "procedure," and "practice requirements." *Prutehi Litekyan: Save Ritidian v. U.S. Dep't of Air Force*, 128 F.4th 1089, 1107 (9th Cir. 2025) (quoting 5 U.S.C. § 551(4)). Defendants do not dispute the Whistleblower Disclosure's explanation that DHS required the use of certain methodologies to investigate purported unlawful voting and the entry of TECS records based on that process. *See* Tremitiere Decl., Ex. 2 at 43-45; USCIS Decl. ¶ 17. They acknowledge that DHS ordered "a coordinated Criminal Voter Fraud surge initiative to pursue investigative leads, conduct field interviews, and support timely prosecutorial review" and the creation and use of a novel media "portal" to publicize policy implementation. Opp. 6; HSI Decl. ¶ 11; AR-2-02. These decisions to conduct investigations and "operations in the future according to specified protocols" constitute agency actions. *Prutehi*, 128 F.4th at 1107-08.

None of Defendants' arguments show otherwise. They are incorrect in arguing that Plaintiffs bring a "broad, programmatic challenge." Opp. 14 (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 890 (1990)). Plaintiffs do not "seek wholesale improvement" of DHS's enforcement regime but instead challenge the "specific" and "discrete" Matching and Field Operations policies. *Garro Pinchi v. Noem*, 813 F. Supp. 3d 973, 1022 (N.D. Cal. 2025) (quotations omitted). The limitation in *Lujan* applies to APA challenges that attempt to arbitrarily combine "individual," unrelated agency decisions—not a specific policy governing those decisions, or even "a completed universe of" decisions. 497 U.S. at 890. But Plaintiffs challenge DHS decisions applying "particular measure[s] across the board" to generate target lists and engage in field operations, the type of overarching agency action that "can of course be challenged under the APA." *Id.* at 890 n.2. Defendants' reliance on *Biden v. Texas* is puzzling because the Supreme Court held that DHS had undertaken final agency action by discontinuing enforcement policies, 597 U.S. 785, 807-10 (2022), analogous to DHS's decision here to initiate the specific enforcement policies. Defendants are also incorrect that agency action must be committed to a specifically identified policy document or that their failure to produce a fulsome AR disproves the existence of final agency action, Opp. 14; Suppl. Br. 3, as plaintiffs may challenge undisclosed and unwritten policies, *e.g.*, *Ctr. for Taxpayer Rights v. I.R.S.*, No. 26-5006, 2026 WL 2635380, at *5-6

(D.C. Cir. Sep. 8, 2026); *Al Otro Lado, Inc. v. McAleenan*, 394 F. Supp. 3d 1168, 1206 (S.D. Cal. 2019). Regardless, the policies here are specifically documented. *See* pp. 1-5.

Defendants also fail to show that these actions are nonfinal. Under the first *Bennett v. Spear* factor, the policies are the "consummation" of DHS's decision making, 520 U.S. 154, 178 (1997), and none of Defendants' arguments show otherwise. Their cited cases holding that an individual investigation is nonfinal while ongoing are irrelevant. Opp. 14-15 (citing, *e.g.*, *Winter v. Cal. Med. Review Inc.*, 900 F.2d 1322, 1325-26 (9th Cir. 1990)). Plaintiffs challenge not any individual investigation but instead *policies* prescribing the data sourcing and methodology for creating target lists, and the rollout of prescribed surge field operations and media campaigns in specific states. Further, unlike here, none of the plaintiffs in the cases Defendants cite sought to remedy the chilling effects of the investigations themselves, Opp. 14 (citing, *e.g.*, *Ass'n of Am. Med. Colls. v. United States*, 217 F.3d 770, 780-81 (9th Cir. 2000)), effects that are irreversible well before any enforcement actions run their course. Defendants indisputably "put" these decisions "into effect," such that they are not "of a merely tentative or interlocutory nature." *Prutehi*, 128 F.4th at 1108 (citations omitted) .

DHS's actions also satisfy the second *Bennett* factor. Entering a TECS record carries "legal consequences." *Bennett*, 520 U.S. at 178. Defendants do not dispute that the federal government uses these records in a wide range of interactions, including border crossings. Tremitiere Decl., Ex. 2 at 21; HSI Decl. ¶¶ 19-24; *see Dousa*, 662 F. Supp. 3d at 1139; *Guan v. Mayorkas*, 530 F. Supp. 3d 237, 260 (E.D.N.Y. 2021). Defendants misunderstand the law and facts in arguing that a TECS record has appreciable "consequences" only after "additional contingent events." Opp. 15. In *Prutehi*, for instance, the Air Force's decision to engage in ordnance disposal operations, reflected in a permit application, had legal consequences even though the application required subsequent state approval. 128 F.4th at 1108-09; *see Gill v. Dep't of Justice*, 913 F.3d 1179, 1185 (9th Cir. 2019) (action is "final even if its legal or practical effects are contingent on a future event"). And *Parsons v. Dep't of Just.*, 878 F.3d 162, 167 (6th Cir. 2017) (cited at Opp. 15) is off-base, as unlike a TECS record, the gang-designation report there did not confer any *authority* to detain affiliated individuals. *Id.* at 164-65. Regardless, Defendants also fail to account for the fact that both the Matching and Field Operations Policies impose obligations *on DHS*, which also satisfies *Bennett*'s second prong. *Prutehi*, 128 F.4th at 1111-12.

**2. The Challenged Policies Are Arbitrary and Capricious**

An agency acts arbitrarily and capriciously when it "offer[s] an explanation for its decision that runs counter to the evidence" or "entirely fail[s] to consider an important aspect of the problem." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The AR here illustrates the arbitrary and capricious violation because of what it does and does *not* contain. DHS's policies violate the APA because DHS (a) used data and adopted a targeting methodology that knowingly and even purposefully sweeps in U.S. citizens, without attempting to understand error rates or assess privacy impacts; (b) surged interrogations at private homes and in vehicle stops without considering or mitigating voter intimidation; and (c) failed to consider the alternative of waiting to enter TECS records or initiate interrogations of U.S. citizens until after the election.

Defendants contest virtually none of the facts underlying Plaintiffs' claims concerning the unreliable data and matching, including those arising from the Whistleblower Disclosure. *See generally* pp. 1-5. Defendants do not dispute that the source data underlying the Matching Policy falsely implicates U.S. citizens. Nor do they dispute that agents often matched targets with limited biographic data (in some cases, only name and partial birthdate) and limited access to comparator sources (and in some cases, including California, no additional sources). Yet DHS directed agents to presume the accuracy of its faulty initial source data, even absent corroboration. Despite DHS's claim that it instructed agents to use their discretion to avoid U.S. citizens, agents lacked reliable information and operated under quota and time pressures. Regardless, DHS did not take care to avoid citizens because it specifically targets naturalized citizens for TECS records and interrogations, despite lacking reliable data on dates of naturalization or voting history. DHS does not dispute that a TECS record has adverse consequences even without an HSI field operation. Although Defendants conceal the exact number of individuals against whom they have entered erroneous TECS records, and the number of U.S. citizens DHS has interrogated, Defendants do not dispute that, at least in California, DHS entered TECS records against more than half of those identified in its source data totaling "thousands or tens of thousands." Tremitiere Decl., Ex. 2 at 42, 46. While DHS says it qualitatively weighed the risks of wrongful targeting, it concedes that USCIS did not even attempt to quantitatively measure or understand expected error rates. Grumbach Suppl. Rep. 9. DHS's failure to "consider the risks that its policy posed

to U.S. citizens" is arbitrary and capricious. *See Common Cause*, 2026 WL 3033772, at *26.

DHS also did not consider critical aspects of the problem. *See id.* DHS did not consider the risk of voter intimidation from interrogating people, including eligible voters, during an election. DHS disregarded longstanding federal policy to avoid overt law enforcement operations during an election. Tremitiere Decl., Exs. 4 at 64, 45 at 516-17, 46 at 618, 47 at 928. DHS overlooked alternative approaches that could have mitigated these concerns, such as pausing field operations (at minimum, of naturalized citizens) during the election. *See State Farm*, 463 U.S. at 48. DHS instead deliberately surged operations in a staged rollout and media blitz that maximizes intimidation. DHS also separately failed to consider privacy interests and ignored its statutory obligation to evaluate those interests when collecting voter information via public portals. *See Weber*, 816 F. Supp. 3d at 1194. Indeed, because the Unlawful Voter Initiative requires the collection and storage of personally identifiable information (including at least voter roll data), DHS was required by law to assess the privacy impacts of that policy. *E-Government Act of 2002,* Pub. L. No. 107-347, § 208(b)(1)-(2), 116 Stat. 2899, 2921 (codified at 44 U.S.C. § 3501 note). The undisputed record evidence shows it failed to do so.

Defendants fail to distinguish cases in which courts have vacated agency actions relying on flawed data and methodologies like those here. *See* Pl. Br. 14-15. They suggest *Lands Council v. Powell* applies only where agencies have a "statutory duty" to conduct studies, Opp. 20, but the requirement to apply a "sound" methodology in implementing that statute, like here, stemmed from the APA itself. *See* 395 F.3d 1019, 1026, 1036-37 (9th Cir. 2005). While Defendants attempt to distinguish *Ctr. for Biological Diversity v. EPA* on the grounds that the EPA declined to use newer data, Opp. 20, the court vacated the EPA's decision because it was "not reasonably explained," 141 F.4th 153, 172 (D.C. Cir. 2025). That is the problem here: Defendants fail to explain why they decided to use faulty data and methodologies shortly before an election and without addressing the potential for voter intimidation. While DHS claims it relied on "imperfect" but best-available information, Opp. 19, even when "the available data does not settle a regulatory issue," DHS must still show a record basis for relying on the flawed data and that it considered important aspects of the problem. *State Farm*, 463 U.S. at 51-52; *see Greater Yellowstone Coal., Inc. v. Servheen*, 665 F.3d 1015, 1028 (9th Cir. 2011).

Defendants erroneously invoke the Supreme Court's recent emergency docket ruling in *DHS v.*

*LWV*, Opp. 19-20, which concluded the plaintiffs were unlikely to succeed on their claims under the Privacy Act, Social Security Act, and APA, because Congress "authorized DHS to request and receive information relating to citizenship and immigration status from other agencies," and to share that information with states. *LWV*, 2026 WL 2879700, at *2 (citing 8 U.S.C. § 1373). Plaintiffs here do not challenge DHS's data *sharing*; they instead challenge its unlawful use, despite important countervailing concerns, of unreliable data and methodologies in a manner that deters protected electoral activity. No act of Congress authorizes such arbitrary and capricious action. Indeed, section 11(b) prohibits it.

### 3. DHS's Policies Are Not Committed to Agency Discretion

Defendants fail to counter the "strong presumption" of APA reviewability, *Pacito v. Trump*, 169 F.4th 895, 930 (9th Cir. 2026), because this is not the rare case lacking a "meaningful standard against which to judge the agency's exercise of discretion," *Johnson Tr. of Charley E. Johnson Revocable Living Tr. v. United States*, 145 F.4th 1158, 1163 (9th Cir. 2025); Opp. 16; *see DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 18 (2020). This Court can evaluate the Initiative and its component policies for compliance with the Constitution, VRA, federal privacy law, and the federal government's prior practice of forgoing election-season operations, all of which provide "law to apply." *Garro Pinchi*, 813 F. Supp. at 1025. Defendants even concede that HSI's activity "must be conducted in accordance with applicable federal law, as well as DHS and ICE policies and investigative standards." HSI Decl. ¶¶ 8, 15 (citing, *e.g.*, 8 U.S.C. § 1357); *see also New York*, 588 U.S. at 771-73.

Nor can Defendants hide behind the principle of prosecutorial discretion. Section 701(a)(2) at times excludes from review challenges to agency *inaction*, because "when an agency refuses to act it generally does not exercise its coercive power over an individual's liberty or property rights." *Heckler v. Chaney*, 470 U.S. 821, 832 (1985). Here, the Policy requires a systematized search for targets based on flawed data and matching methodologies, without safeguards to protect U.S. citizens from coercive encounters with armed agents. "[W]hen an agency *does* act to enforce, that action itself provides a focus for judicial review." *Id.* (emphasis added).

Finally, Defendants have no real answer to Plaintiffs' authorities establishing the power of federal courts to enjoin unlawful and intimidating investigations in cases like this. Mot. 19-20. Characterizing *McLeod*, *Wood*, and *Clark* as involving "well-documented intimidation," Opp. 18, does

nothing but highlight the applicability of those cases here, as Defendants continue unabated in their daily intimidation campaign. And the undisputed fact that Plaintiffs, their members, and the eligible voters they serve are not legitimate targets for prosecution reaffirms that they cannot vindicate their rights via the criminal process—a civil action is the only plausible means of achieving relief.

**4. DHS Policies, Threats, and Conduct Likely Violate Section 11(b) of the VRA**

Plaintiffs are likely to succeed on their 11(b) claims. Pl. Br. 11-13. The Court should reject Defendants' contrary arguments, which would significantly limit section 11(b). *See* Opp. 22-24.

*First*, numerous courts have upheld 11(b)'s private right of action. *See Krabach v. King Cnty.*, No. 2:22-cv-1252, 2023 WL 7018431, at *3 (W.D. Wash. Oct. 25, 2023) (collecting cases). These cases draw from the Supreme Court's on-point reasoning concerning other VRA provisions in *Morse v. Republican Party of Virginia*, which emphasizes that Congress amended the VRA to enable actions "instituted by . . . *an aggrieved person*" and to permit fees for prevailing parties "*other than the United States*." 517 U.S. 186, 232-34 (1996). This textual analysis is equally applicable to section 11(b). *See Mich. Welfare Rts. Org. v. Trump*, 600 F. Supp. 3d 85, 105-06 (D.D.C. 2022). Defendants offer no contrary textual analysis and do not explain why only the federal executive—the entity *itself engaged in voter intimidation* here—can enforce section 11(b).

*Second*, it is immaterial whether HSI "intend[s]" to intimidate voters. *See* HSI Decl. ¶ 18. There is no purpose requirement: the statute prohibits acts that objectively "intimidate, threaten, or coerce, or attempt" to do so. 52 U.S.C. § 10307(b); *AARA v. Clean Elections USA*, 638 F. Supp. 3d 1033, 1041 (D. Ariz. 2022), *vacated as moot*, 2023 WL 1097766, at *1 (9th Cir. Jan. 26, 2023). Congress enacted 11(b) because a preexisting statute that required a purpose to intimidate—section 131(b) of the Civil Rights Act, 52 U.S.C. § 10101(b)—was insufficient to protect voters. *Wohl*, 661 F. Supp. 3d at 116.

*Third*, Defendants are wrong to suggest that section 11(b) only protects voters whom DHS has already interrogated. *Cf.* Opp. 7-8, 22-25. Section 11(b) "sweeps broadly." *AARA*, 638 F. Supp. 3d at 1041. Its protections apply to all phases of the voting process, 52 U.S.C. § 10310(c)(1), and it prohibits "threats" and "attempts" to intimidate and coerce as much as it prohibits successful intimidation. *Wohl*, 661 F. Supp. 3d at 116. The core analysis, as with other anti-intimidation statutes, is whether the "activities ha[ve] generated fear" that is objectively reasonable. *Walker v. City of Lakewood*, 272 F.3d

1114, 1129 n.4 (9th Cir. 2001); *accord Wohl*, 661 F. Supp. 3d at 112-13.

Defendants are creating objectively reasonable fear. Pl. Br. 11-13; Grumbach Suppl. Rep. 14. DHS uses faulty data and processes that sweep in U.S. citizens to create target lists, deploys armed agents to interrogate people during the height of electoral activity, and then propagandizes field actions to sensationalize the operations and spread fear. *See* pp. 1-5. The fear-inducing nature of this conduct is at least on par with other threats—sending letters, posting names online, making phone calls—that violate 11(b). Pl. Br. 11-12 (collecting cases). The federal executive has itself recognized that a government's door-knocking regarding voter eligibility "can have a significant intimidating effect on qualified voters that can deter them from seeking to vote in the future." *See* Tremitiere Suppl. Decl., Ex. 60 at 3-4. Moreover, section 11(b) does not require the fearful voters whom Plaintiffs serve and represent to wait for DHS to show up at their own doors before seeking relief. *See AARA v. Clean Elections USA*, No. 22-cv-01823, 2022 WL 17088041, at *1 (D. Ariz. Nov. 1, 2022) (after hearing finding liability, entering consent order to protect objectively fearful but not yet targeted voters). To be effective, section 11(b)'s protections must not permit intimidation to "drive the voter away before remedial action can be taken." *See Burson v. Freeman*, 504 U.S. 191, 207 (1992) (plurality op.).

*Fourth*, to rule on Plaintiffs' 11(b) claim, the Court need not decide whether DHS has the authority it claims. *Contra* Opp. 23.[6] When Congress enacted 11(b), voter intimidation caselaw enjoining harassing policing actions made clear that "[a]cts otherwise entirely within the law may violate [voter intimidation laws] if they have the proscribed effect" of intimidating voters. *United States v. McLeod*, 385 F.2d 734, 740 (5th Cir. 1967) (applying section 131(b)). It is "no excuse or defense" for Defendants to invoke an abstract legal authority. *See United States v. Bruce*, 353 F.2d 474, 476-77 (5th Cir. 1965). The same rule applies to section 11(b). *E.g. Jolt Initiative, Inc. v. Paxton*, 821 F. Supp. 3d 706, 726 (W.D. Tex. 2026); *Whatley v. City of Vidalia*, 399 F.2d 521, 526 (5th Cir. 1968). Thus, whether certain operations are authorized in the abstract is not the question. DHS's operations here are

[6] The constitutional scope of DHS's authority is not as clear-cut as Defendants suggest. *See United States v. Cox*, No. 0:25-cr-60249, 2026 WL 2948729, at *2 (S.D. Fla. Oct. 1, 2026); *LULAC v. Exec. Off. of President*, 818 F. Supp. 3d 34, 101 (D.D.C. 2026) ; *accord* Compl. Counts IV, VIII.

objectively intimidating and deter lawful electoral participation, in violation of section 11(b).

On this issue, Defendants rely heavily on *Olagues v. Russoniello*, 797 F.2d 1511 (9th Cir. 1986) (en banc), *vacated as moot*, 484 U.S. 806 (1987), and the prior panel opinion. *See* Opp. 2, 18, 23-24. But they identify no decision relying on *Olagues* in the manner they ask of this Court. The Supreme Court vacated the *en banc* opinion, and the panel opinion is not precedential. 9th Cir. G.O. 5.5(d). To the extent *Olagues* is persuasive, the *en banc* opinion *supports* Plaintiffs' ability to pursue statutory and constitutional claims to enjoin unlawful operations targeting voters because it reversed and remanded on that issue. *See* 797 F.2d at 1519. The 11(b) analysis in *Olagues*, on which Defendants rely, erroneously conflates it with section 131(b), but 11(b) lacks a purpose requirement. *See* p. 16.

**5. DHS Likely Violates the First and Fifth Amendments**

Plaintiffs are also likely to establish that DHS burdens the First and Fifth Amendment rights of voters and non-profit entities engaged in voter assistance and education. Pl. Br. 13-14. Such burdens are severe, even if some affected voters can overcome them. *See, e.g.*, *Ga. Coal. for the People's Agenda v. Kemp*, 347 F. Supp. 3d 1251, 1264 (N.D. Ga. 2018); *Tex. LULAC v. Whitley*, No. CV SA-19-CA-074-FB, 2019 WL 7938511, at *1 (W.D. Tex. Feb. 27, 2019). They also outweigh any interest in prosecuting rare cases of non-U.S. citizen voting, and Defendants' faulty target lists, timing, tactics, and minimal safeguards make the burdens not narrowly tailored. Pl. Br. 13-14.

Moreover, the scrutiny applied in this case is elevated for two reasons. First, "infringement" of the fundamental rights here "must be carefully and meticulously scrutinized." *Reynolds v. Sims*, 377 U.S. 533, 562 (1964). Courts apply lesser *Anderson-Burdick* scrutiny to balance rights with the duty of *state and local governments* to regulate elections. *See Ariz. Dem. Party v. Hobbs*, 18 F.4th 1179, 1188-87 (9th Cir. 2021). But the federal executive's constitutional role is more limited, *LULAC*, 818 F. Supp. 3d at 101, and the policies here severely burden voting rights by creating objectively reasonable, widespread fears of consequences for electoral participation, triggering heightened scrutiny. *See Jones v. United States Postal Serv.*, 488 F. Supp. 3d 103, 137-39 (S.D.N.Y. 2020). Second, while lesser scrutiny under *Anderson-Burdick* applies to generally applicable and even-handed regulations, "particular burden[s] on an identifiable segment of voters are more likely to raise constitutional concerns." *Hobbs*, 18 F.4th at 1190 (cleaned up). Defendants' actions encumber and even specifically

target eligible naturalized U.S. citizen voters, *see* Tremitiere Decl., Ex. 2 at 44-50; Grumbach Expert Rep. 12-13, reinforcing the need for close scrutiny.

Defendants' contrary argument relies solely on the *Olagues* panel opinion. Opp. 23. Even if the Court considers *Olagues*, the *en banc* opinion supports Plaintiffs because it found that similar operations "involve[] a suspect classification" that warrants strict scrutiny. 797 F.2d at 1521.

## II. Defendants Do Not Rebut Plaintiffs' Showing of Irreparable Harm

Defendants do not contest that impeding electoral participation "unquestionably constitutes irreparable injury." *See Am. Encore v. Fontes*, 152 F.4th 1097, 1118 (9th Cir. 2025). They argue instead, without contesting Plaintiffs' testimony, that Plaintiffs have not specifically "faced any of the harms that they claim to fear in this suit." Opp. 24-26. But Plaintiffs have suffered irreparable harm "even if it results from a threat of enforcement rather than actual enforcement." *Cuviello v. City of Vallejo*, 944 F.3d 816, 833 (9th Cir. 2019). Plaintiffs also have irreparable privacy harms that Defendants ignore. *See In re Meta Pixel Healthcare Litig.*, 647 F. Supp. 3d 778, 802 (N.D. Cal. 2022). Thus, Plaintiffs at minimum have established irreparable harm based on chilling effects, credible fears, voting burdens, and privacy injuries. Van Waus Decl. ¶¶ 12-17, 23-27, 32-38, 42-46; Arntz Decl. ¶¶ 6-7; Moreles Decl. ¶ 6; Rivas Decl. ¶ 9; Lopez Decl. ¶¶ 8-15.

Defendants also ignore the irreparable harm from eroded community trust and voter confusion. *See San Francisco*, 783 F. Supp. 3d at 1187, 1202. Without citation, Defendants argue only that the budgetary harms are smaller than in some other cases. Opp. 25-26. But the analysis "focuses on irreparability, irrespective of the magnitude of the injury." *California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018). Regardless, Defendants' failure to address voter confusion and loss of trust is fatal here.

## III. The Balance of the Equities and Public Interest Favor Preliminary Relief

The final two factors favor Plaintiffs. Defendants do not dispute the public interest in preserving elections free from intimidation. Pl. Br. 22. Their reliance on *DHS v. LWV* is unpersuasive. Opp. 26. Unlike in *LWV*, which addressed data sharing and privacy law, the question here is whether Defendants may continue door-knocking operations that sweep in U.S. citizens at the height of electoral activity. That DHS chose to execute these policies during the election—when consequences of erroneous leads are most egregious—is a problem of its own making. Moreover, the incidence of non-U.S. citizens

voting is vanishingly low, Pl. Br. 13, and any public interest in Defendants' operations during the election is outweighed by the interest in protecting citizens' rights to safely and freely vote. Defendants' false urgency is belied by the federal government's longstanding policy barring "overt criminal investigative measures" in election matters during election season. *See* Tremitiere Decl., Ex. 39 at 414.

**IV. Staying and Enjoining the Policies Where Their Coverage Extends is Appropriate**

The Court should stay and enjoin the policies in their entirety. First, binding precedent forecloses Defendants' lead argument concerning APA stays. *See Novedades y Servicios, Inc. v. Fin. Crimes Enf't Network*, 181 F.4th 961, 981-82 (9th Cir. 2026). Second, regardless of the general breadth of APA stays, granting relief to the extent of the policies' geographic coverage is necessary to afford complete relief. *See, e.g.*, *LULAC*, 818 F. Supp. 3d at 92; *DSCC v. Trump*, No. 26-cv-01114, 2026 WL 2681471, at *11 (D.D.C. Sept. 13, 2026). Plaintiffs have broad national coverage: CNA/NNU pursues relief for their members in 23 states, and Voto Latino conducts its voter mobilization programs across 37 states. Van Waus Decl. ¶¶ 3-4, 12-17; Lopez Decl. ¶ 4; Lopez Suppl. Decl. ¶ 9. DHS's actions are also national: USCIS generates faulty TECS records nationwide, HSI is surging operations in at least nine states (where Plaintiffs are active), and core to DHS's policy is an effort to propagandize the threats far and wide. DHS will intimidate voters across the country even if the operations are restrained in certain jurisdictions. Particularly because section 11(b) prohibits threats and attempts to intimidate voters, relief that is commensurate with the scale of the fears DHS has induced is appropriate. Complete relief for Plaintiffs requires staying and enjoining the policies and actions to their geographic extent.[7]

**CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request the Court grant the Motion.

---

[7] At minimum, relief should include archiving and taking no further action on TECS records or other leads generated from the matching policy. Proposed Order, ECF 10-8 ¶ 2(b). To the extent the Court geographically limits the field operations-related relief, Plaintiffs cover the states that Defendants do not dispute are subject to the surge: CA, CT, GA, MO, NV, NY, PA, WA, WI. Opp. 6. The Court could consider limiting relief to circumstances where the leads are drawn in part from the flawed TECS records or, as Defendants concede in their brief, Opp. 28, where they know, or reasonably should know, that the involved persons are U.S. citizens. ECF 10-8 ¶ 3(b). The Court could also consider enjoining the unlawful field operations through Election Day, or alternatively through November 25, which would encompass the ballot-curing phase in all of the reportedly targeted states. *Id.* ¶ 3.

DATED: October 16, 2026

Respectfully submitted,

By: *<u>/s/ Beau C. Tremitiere</u>*
BEAU C. TREMITIERE
Counsel
GEOFFREY CURFMAN*
Counsel
HAYDEN JOHNSON*
Counsel
ZACHARY WEST*
Counsel
JESSICA MARSDEN*
Counsel
ASHLEY FOX*
Counsel

Attorneys for Plaintiffs
CALIFORNIA NURSES ASSOCIATION,
NATIONAL NURSES UNITED, AND
VOTO LATINO FOUNDATION

DAVID CHIU
City Attorney
YVONNE R. MERÉ
Chief Deputy City Attorney
MOLLIE M. LEE
Chief of Strategic Advocacy
SARA J. EISENBERG
Chief of Complex and Affirmative Litigation
MICHAEL A. KEOUGH
Special Counsel
JOEL F. WACKS
Deputy City Attorney

By: *<u>/s/ Michael A. Keough</u>*
MICHAEL A. KEOUGH
Special Counsel

Attorneys for Plaintiff
CITY AND COUNTY OF SAN FRANCISCO

TONY LOPRESTI
County Counsel
KAVITA NARAYAN
Chief Assistant County Counsel
MEREDITH A. JOHNSON
Lead Deputy County Counsel
BILL NGUYEN
Deputy County Counsel

By: */s/ Bill Nguyen*
BILL NGUYEN
Deputy County Counsel

Attorneys for Plaintiff
COUNTY OF SANTA CLARA

BENJAMIN R. FARLEY*
Counsel
IMANI FRANKLIN*
Counsel

By: */s/ Benjamin R. Farley*
BENJAMIN R. FARLEY*
Counsel

Attorneys for Plaintiffs
CALIFORNIA NURSES ASSOCIATION,
NATIONAL NURSES UNITED, AND
VOTO LATINO FOUNDATION

**Admitted Pro Hac Vice*

## FILER'S ATTESTATION

I, Beau Tremitiere, am the ECF user whose identification and password are being used to file the foregoing. Pursuant to Civil Local Rule 5-1(i)(3), I hereby attest that the other above-named signatories concur in this filing.

DATED: October 16, 2026

Respectfully submitted,

By: */s/ Beau C. Tremitiere*
BEAU C. TREMITIERE
Counsel