# EXHIBIT K

**RESPONSE REPORT OF DR. JACOB M. GRUMBACH**

**October 16, 2026**

## I. Introduction

I have been asked by Plaintiffs to respond to Defendants' claims about a publicly reported surge in elections-related field operations by the U.S. Department of Homeland Security (DHS), and whether this surge will result in the targeting of U.S. citizens. Specifically, I have reviewed: i) the Declaration of Nicolas Bartell from U.S. Citizenship and Immigration Services (USCIS); ii) the anonymized declaration from the Acting Deputy Assistant Director of the Cross-Border Financial Crime Center of Homeland Security Investigations (HSI); iii) three documents Plaintiffs provided me from a recent publicly available HSI production made pursuant to the Freedom of Information Act, 5 U.S.C. § 552 ("FOIA documents")[1]; and iv) the reports and studies cited herein.

In my First Expert Report, I established that the data sources that DHS is using are both incomplete and inaccurate, and that the matching methodology DHS is using is highly likely to produce false positives that involve U.S. citizens. In this Response Report, I first explain that DHS is not refuting that its data sourcing and matching methodologies are likely to lead to false positives and sweep in U.S. citizens. Furthermore, despite the USCIS Declaration's claim that policies and safeguards exist to reduce error rates, the USCIS Declaration provides neither information about those safeguards nor the scope of the error rate. That is because the government likely does not, itself, know the error rate and does not provide the data to test it. I then explain that, although the HSI Declaration states that HSI intends to avoid intimidating interactions with U.S. citizens, the social science research indicates that eligible U.S. citizen voters will be intimidated.

---

[1] It is my understanding that these documents were produced in *Democracy Forward Foundation v. DHS*, No. 1:26-cv-02624 (D.D.C.). The documents I reviewed are marked 26-ICLI-00100 055–057; 26-ICLI-00100 124–126; 26-ICLI-00100 139–143.

## II. Defendants Do Not Negate Claims that a Citizen Database Constructed from Federal Databases Will Be Incomplete and Contain Inaccuracies

The USCIS Declaration describes its procedure for identifying potential noncitizen voters in a way that is largely consistent with my September 21 expert report ("First Expert Report"): "USCIS receives voter information through a variety of sources, including, but not limited to, information voluntarily provided by state and local jurisdictions, publicly available information, and other lawfully available data. . [sic] USCIS compares voter information received from these sources against DHS and commercial database holdings to ascertain whether there is a potential identity match" (USCIS Decl. ¶ 10).

Documents produced by DHS in response to a Freedom of Information Act request describe steps in the data process that neither declaration discloses. In a memo dated May 25, 2026, HSI indicates that "48.4 million records were obtained by DAS Heather Honey through independent sources of information" (26-ICLI-00100 057). The memo does not identify those sources or describe whether or how the data were verified. Whether data are fit for any purpose depends first on knowing where they came from: who collected them, when, by what method, what variables they contain, each variable's extent and form of missingness, and how often they have been updated. Without that information, there is no reliable way to assess the completeness or accuracy of these 48.4 million records, to determine whether they duplicate or conflict with records from other sources, or to estimate how many errors they will introduce when combined with or linked to other data.

The same memo reports that the "[d]atasets are currently with iLab for secondary enrichment and identification of high-value targets" (26-ICLI-00100 057). Another document in the production explains that iLab's processing "focuses on DOJ voting rolls and USCIS data" and describes ongoing coordination on "ingesting processed voter roll data into the ELITE

enforcement system to enhance lead management, analytical review, and investigative tracking" (26-ICLI-00100 125). And yet another document in the production indicates that data from six states had been "enriched by the iLab" and were "pending Palantir entry into ELITE" (26-ICLI-00100 140). The HSI Declaration, by contrast, says its purpose is to explain "how HSI is generating investigative leads using government databases" (HSI Decl. ¶ 4), yet neither it nor the USCIS Declaration mentions the 48.4 million records, iLab, ELITE, or the Department of Justice as a source of voter data.

In data science, "enrichment" commonly refers to appending information from other sources to existing records, which is itself a record-linkage step. Each additional system through which records are enriched, transferred, merged, and/or re-ingested is an additional point at which the record-linkage errors described in my First Expert Report can arise or compound (for example when names, dates of birth, or other identifiers are formatted or standardized differently across systems). The FOIA documents also state that criminal histories are "currently excluded," with "efforts underway to address this" (26-ICLI-00100 125), indicating that the methodology was still being developed. Neither declaration describes any of these processing steps or any validation of their accuracy.

One additional piece of information in the USCIS Declaration's description is the use of "commercial database holdings." Private companies such as Acxiom and Experian maintain commercial databases of U.S. residents. These databases, typically used for targeted advertising and other purposes, contain variables that purport to describe individuals in the database, such as their residential address, geolocation data, demographics, family structure, car ownership, and consumer behavior.

These commercial databases do not solve the problems of *incompleteness* and *inaccuracies* that I described in my First Expert Report. The reasons are twofold. First, the commercial databases, themselves, are incomplete and contain inaccuracies, and individuals with missing or inaccurate records in federal databases are more likely to have missing or inaccurate records in commercial databases. The same problems related to shared names and birthdates, data-entry error, missing records, and the like are common to commercial databases. Second and more importantly, commercial databases do not contain any direct information on an individual's citizenship status. Some commercial databases may attempt to *estimate* whether an individual is a citizen or noncitizen based on circumstantial information such as travel history, language preference, or social media activity.[2] But these kinds of characteristics are not complete or accurate. And, even if they were, these inputs are mere *correlates* of citizenship; they do not *determine* citizenship. There are millions of U.S. citizens with language preferences other than English, who have frequently traveled abroad, and who use social media to pursue international interests and connections.

The USCIS Declaration makes an effort to characterize the investigative procedures as "rigorous" (USCIS Decl. ¶ 10). The Declaration states that "[t]his is not a haphazard process but rather a rigorous analysis of available biographic data, to include but not limited to key identifiers such as first name, last name, date of birth, addresses, and other biographic information" (USCIS Decl. ¶ 10). It is worth noting here that neither the USCIS Declaration nor other government sources indicate how many of these variables are available for how many people.

---

[2] In most commercial databases, for example, an individual's racial identity (e.g., Asian, Black, Hispanic, White) is statistically modeled from the individual's location, surname, and potentially social media and consumer data (e.g., whether an individual subscribes to an ethnic affinity magazine).

As I also make clear in my First Expert Report, *incompleteness* and *inaccuracies* in the underlying databases make it the case that an "analysis of available biographic data" will inevitably lead to an unknown number of U.S. citizens on state voter registration lists being incorrectly determined to be noncitizens. In data science and statistics, the saying "garbage in, garbage out" refers to the fact that, if the underlying data contains problems (i.e., incompleteness and/or inaccuracies), then any output—such as the attempted determination of an individual's citizenship status—will be flawed regardless of the soundness or rigor of the analytical procedures used on the data. In applied statistics settings, we are vigilant against research that attempts to launder problematic databases (i.e., those that are incomplete and contain inaccuracies) with complex statistical procedures that make the process appear "rigorous." And, as explained in my First Expert Report, there are significant reasons to doubt the rigor and analytical procedures used here based on the publicly available information.

The USCIS Declaration also states that "SAVE is an online service that provides point-in-time information to federal, state, and local agencies by querying other existing federal record systems. SAVE is not a database" (USCIS Decl. ¶ 11). This description of SAVE does not negate or qualify any of the conclusions presented in my First Expert Report or this Response Report. The SAVE service queries one or more databases, including databases constructed from databases (e.g., from the SSA), which are themselves incomplete and contain inaccuracies.

The USCIS Declaration states that "[t]he SAVE program office only referred cases when an individual positively matched federal records indicating a status other than U.S. Citizen" (USCIS Decl. ¶ 12). This reveals that, despite USCIS attempting to speak to the reliability of its own processes, it does not address what data or methodologies the SAVE program office used to refer cases. Regardless, whether an individual is *positively* matched as a presumptive noncitizen

or *negatively* matched (i.e., no match is found in a list of U.S. citizens), the same issues of incompleteness and inaccuracies apply. A recently naturalized citizen whose records are not updated in time can be positively but incorrectly matched to a record that records them as a current noncitizen; this same citizen will also be negatively matched (i.e., not found) in a database of citizens due to the same problem that their status has not been updated throughout the underlying federal databases.

The USCIS Declaration also describes an exception to its safeguards. Although USCIS's Fraud Detection and National Security (FDNS) Directorate ordinarily ends its review when "the records indicate that the person may have acquired or derived U.S. citizenship, contain material discrepancies, or otherwise do not adequately support alien status," it nevertheless refers the person to HSI if "the data indicate that the person may have voted or registered to vote prior to naturalization" (USCIS Decl. ¶ 19; *see also id.* ¶ 9). This exception applies where the data are least reliable. Determining whether registration preceded naturalization requires comparing two dates, a registration date and a naturalization date, each drawn from records subject to the incompleteness and inaccuracies described above. As I explained in my First Expert Report, changes to an individual's citizenship status take time to be reflected in federal databases. A naturalized citizen who registered after naturalizing, but whose record reflects naturalization only as of a later update, will appear to have registered before naturalizing. The USCIS Declaration does not identify the source of either date or explain how FDNS accounts for this lag.

The USCIS Declaration states that "[t]he substantial majority of the information FDNS reviewed came from sources other than SAVE, including information voluntarily provided by state and local jurisdictions, publicly available information, and other lawfully available data" (USCIS Decl. ¶ 14). State and local jurisdictions do not have authority over citizenship. Data

from state and local governments on individuals' citizenship status will therefore have more extreme issues of incompleteness and inaccuracies than the already problematic federal and commercial databases.

The USCIS Declaration states that "FDNS treats all referred information as potential leads of unlawful voting activity, subject to additional review. FDNS weighed the risk of inaccurate or incomplete information, including the possibility that in rare circumstances U.S. citizens might be incorrectly identified as aliens, against the importance of identifying matters that might warrant investigation and concluded that the process could proceed with safeguards intended to reduce the risk of an erroneous referral" (USCIS Decl. ¶ 17). The USCIS Declaration tellingly offers no such calculation or methodology for how it has calculated the risk, weighed it, and improved its program accordingly. If an individual is determined by the procedure to be a noncitizen, we do not know the percent chance that this determination is incorrect. Regardless of whether DHS weighs the risks of targeting U.S. citizens in some qualitative sense, DHS offers no quantification of that risk. DHS has not indicated that it attempted to determine error rates of false positive and false negative determinations of citizenship status based on the information provided. Such quantification would be necessary to determine the rate at which U.S. citizens are erroneously targeted as noncitizens or the number of *bona fide* noncitizens seeking to vote that the agency's enforcement activities could stymie. In other words, DHS has offered no evidence that it has engaged in a genuine cost-benefit analysis of its policy that would reflect a rigorous weighing of the risk DHS claims to have undertaken. Moreover, from my review of the sources of data and the matching processes DHS is reportedly using to create the target lists, those errors rates will likely include a significant number of U.S. citizens.

Here, I return to describing how the fundamental issues of incomplete and inaccurate data will lead to the targeting of U.S. citizens. As I wrote in my First Expert Report, there is no currently existing federal database containing the current citizenship status for all U.S. citizens or non-U.S. citizen residents. If such a database is constructed from currently existing federal databases, it will be *incomplete*: it will not contain records for all current U.S. citizens. It will also contain *inaccuracies*: some records will contain inaccurate information about individuals' identities or characteristics.

USCIS has made public statements consistent with these facts. The "Voter Registration and Voter List Maintenance Fact Sheet" about the SAVE database (accessed June 18, 2026) states that, "[w]hen provided with required data elements, SAVE can *usually* verify U.S.-born citizens, naturalized U.S. citizens, and in certain cases, acquired U.S. citizens" (emphasis added).[3] The same document also states:

> SAVE can only verify data it can access. SAVE can verify U.S. citizenship for U.S. born citizens and citizens who have naturalized or have acquired U.S. citizenship provided there is a government record available to SAVE through DHS, DoS, or SSA systems. Accordingly, SAVE may not be able to confirm U.S. citizenship for an individual who: (1) is not designated as a U.S. citizen in SSA records, (2) has not received a Certificate of Citizenship or Naturalization from USCIS, and (3) has never been issued evidence of U.S. citizenship by DoS.

For example, these datasets may omit individuals who derived citizenship consequent to a parent's naturalization and who never applied for or received a U.S. passport.

These statements highlight the *incompleteness* of citizenship information in federal databases. Because of missing citizenship information in these databases, some U.S. citizens who are registered voters on state voter registration lists will not be found in a federal citizenship database. In my First Expert Report, I argued that *inaccuracies*

---

[3] https://web.archive.org/web/20260618145350/https://www.uscis.gov/save/current-user-agencies/guidance/voter-registration-and-voter-list-maintenance-fact-sheet

related to record linkage will also result in U.S. citizens not appearing in a federal citizenship database. These inaccuracies occur for at least four reasons: 1) changes to an individual's citizenship status take time to update in federal databases; 2) life events such as marriage can lead to a name change or other updated information; 3) different federal databases or administrators may treat alphabetic or alphanumeric characters differently; and 4) basic data entry errors are inevitable in large databases. Finally, the act of matching individuals from state voter registration databases to a federal citizenship database will introduce additional errors.

Due to these and other forms of *incompleteness* and *inaccuracies* in federal databases, some legitimate U.S. citizens who appear on state voter registration lists will not be found to be citizens in a federal citizenship database. If such individuals are targeted as potential noncitizens (e.g., via coercive investigatory interviews, registration checks, registration purges, legal prosecution), such targeting will include valid U.S. citizens.

The USCIS Declaration seems to confirm that the databases are incomplete and contain inaccuracies, stating there are situations in which U.S. citizens and noncitizens have "[s]imilar names, incomplete records, outdated citizenship information, clerical errors, and other circumstances" (USCIS Decl. ¶ 8). These issues can lead to a legitimate U.S. citizen voter being erroneously determined to be a noncitizen. Indeed, HSI acknowledges that "USCIS transmits lists regarding aliens or [U.S. citizens] to HSI" (HSI Decl. ¶ 19). Whatever the intended investigative population, the population that HSI actually receives includes citizens.

The Declaration states that these issues of incompleteness and inaccuracies "may require further manual review of all available data" and that "FDNS therefore seeks to

confirm identity and evaluate the available evidence before reporting a substantiated finding or making a referral for further investigation" (USCIS Decl. ¶ 8). As I have made clear in my First Expert Report and this Response Report, incompleteness and inaccuracies make it impossible to confirm whether some individuals are U.S. citizens through these data sources, regardless of whether all available data is manually reviewed.

Consider a naturalized citizen whose federal record still reflects a prior noncitizen status, and whose name and date of birth match an entry on a state voter file. A reviewer examining the available records would see a voter registration and a federal record indicating noncitizen status. Nothing in those records would reveal that the federal record is out of date. Manual review cannot correct an error that the underlying records do not disclose.

In sum, the data sources and matching methods described in the USCIS Declaration may be capable of generating investigative leads, but they cannot reliably determine whether any particular individual on a state voter registration list is a U.S. citizen. Nothing in Defendants' declarations alters the conclusions of my First Expert Report.

## III. Use of a Federal Citizenship Database Will Intimidate U.S. Citizen Voters

The HSI Declaration states that "HSI's investigations are not intended to investigate lawful voting activity by [U.S. citizens], nor are [U.S. citizens] the intended investigative population of the initiative" (HSI Decl. ¶ 12). The HSI Declaration further states that "HSI's investigations into unlawful voting are not designed or intended to target or intimidate USCs or interfere with the lawful exercise of voting rights" (HSI Decl. ¶ 18). These statements describe HSI's intentions. But whether enforcement deters eligible voters depends on how it is

experienced and perceived, not on what the agency intends. The research discussed below measures the effects of contact with law enforcement on later participation, regardless of the officers' purpose. Nor does the HSI Declaration identify any "precautions" directed at effects on voting. The only safeguards it describes are data-review steps (HSI Decl. ¶¶ 12, 22), which, for the reasons set forth in Section II, cannot reliably exclude U.S. citizens. As noted above, HSI itself acknowledges that U.S. citizens are included among the investigatory targets it receives from USCIS (HSI Decl. ¶ 19).

Since the underlying databases are incomplete and contain inaccuracies, some U.S. citizens will be targeted. This is highly consequential for those U.S. citizens who are targeted directly, and many of those contacted will become less likely to vote in future elections. Weaver and Lerman (2010) find that involvement with the criminal justice system is associated with lower voting and registration and lower trust in government, a civic penalty that is not explained by criminal propensity or socioeconomic differences. Even brief, low-level contact has this effect: using administrative records from Hillsborough County, Florida, Ben-Menachem and Morris (2023) compare the turnout of voters stopped by police shortly before and shortly after elections and find that traffic stops materially reduced turnout. These studies examine contact with police and the criminal justice system rather than immigration enforcement, but the mechanism, contact with law enforcement reducing later participation, is analogous.

U.S. citizens are already concerned about this form of intimidation. A September 2026 poll finds that "39% of Asian American and Pacific Islanders, 31% of Hispanics, 24% of Black respondents, and 9% of white respondents agreed with the statement 'I worry that going to the polls could put me at risk of being questioned by federal immigration officers, despite being a US citizen.'" The same poll finds that 40% of Americans thought it likely that federal

immigration officers would be present at polling places in their area during the 2026 midterm elections.[4]

But the DHS procedures will not only intimidate U.S. citizens who are directly targeted. They will also intimidate U.S. citizens who are not, themselves, directly targeted, but are concerned about being unduly targeted. There is a reasonable likelihood that learning of DHS field investigations into voting activity will generate fear among eligible U.S. citizen voters to such a degree that it dissuades them from voting.

Importantly, intimidation can be direct, such as a direct threat against an individual voter, or *proximal*, when a person is indirectly intimidated through their knowledge of the direct intimidation of other voters. Historically, when the Ku Klux Klan intimidated Black (and other groups of) voters through violence or threats of violence, Black people who were not direct victims of the violence were also intimidated. These individuals rationally inferred that, despite not yet being targeted, their act of voting would increase their future risk of victimization.[5]

Research on immigration enforcement over the past year finds that its effects extend beyond those directly contacted. In a nationally representative survey, more than one in three adults (36 percent) in families in which every member was born in the United States, among those aware of local enforcement activity, reported worrying that they or a family member would be approached by immigration authorities (Bernstein, Gonzalez, and Guelespe 2026). A 2026 working paper studying a major immigration enforcement operation announced in the Los Angeles region in May 2025 found that, within four to six weeks of the announcement, foot traffic in immigrant-heavy commercial areas was roughly 8 to 10 percent lower, and consumer

[4] https://elections.ucsd.edu/_files/surveys/Trust-in-Elections-Sept-2026.pdf

[5] There are other mechanisms at work. When a family member is convicted or jailed in the weeks before an election, other members of the household become less likely to vote because of the negative social and economic impacts to the household (White 2019).

spending in immigrant-heavy neighborhoods roughly 20 to 25 percent lower, than in comparison neighborhoods; the authors interpret these effects as spillovers extending well beyond the individuals directly targeted (Lester, Wilson, and Knaap 2026). These studies measure economic and social activity rather than voting, but they are consistent with the research discussed in this section: enforcement changes the behavior of people who are not themselves its targets.

It is citizens' sense of civic duty that motivates them to vote. That is the "benefit" that an individual gets from voting in an election, and that benefit must outweigh the costs of the effort of registering and casting the ballot. It is therefore relatively easy to discourage individuals from voting by raising the "costs of voting" (Downs 1957; Riker and Ordeshook 1968), by, for example, increasing the administrative barriers to casting a ballot.

But the costs of voting are not only the mundane hassles of registering to vote, learning about the candidates, and turning in your ballot. They also involve the risk of being incorrectly targeted as a fraudulent voter, such as a U.S. citizen being incorrectly targeted as a noncitizen. The data issues described earlier in this Response Report will result in an unknown number of U.S. citizen voters being erroneously targeted as noncitizens. When this occurs, it sends an informational signal not only to those voters who are directly targeted, but also to those who are not targeted, that the costs of voting have increased—that there is a chance that they, a legitimate U.S. citizen voter, will be targeted because they exercised their right to vote.

I reserve the right to continue to supplement my reports in light of additional facts, testimony, and/or materials that may come to light during the pendency of the above captioned case. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct according to the best of my knowledge, information, and belief.

October 16, 2026

## IV. References

Ben-Menachem, Jonathan, and Kevin T. Morris. "Ticketing and turnout: the participatory consequences of low-level police contact." *American Political Science Review* 117, no. 3 (2023): 822-834.

Bernstein, Hamutal, Dulce Gonzalez, and Diana Guelespe. 2026. "Immigration Enforcement Affected Both Immigrant and Nonimmigrant Families Across the US in 2025: Findings from the Well-Being and Basic Needs Survey." Washington, DC: Urban Institute, April 8, 2026.

Downs, Anthony. "An economic theory of political action in a democracy." *Journal of Political Economy* 65, no. 2 (1957): 135-150.

Lester, T. William, Matthew Wilson, and Eli Knaap. 2026. "The 'Chilling Effect' of ICE Enforcement: Evidence from High-Frequency Mobility and Spending Data in the Los Angeles Region." Working paper, January 26, 2026.

Riker, William H., and Peter C. Ordeshook. "A Theory of the Calculus of Voting." *American political science review* 62, no. 1 (1968): 25-42.

Weaver, Vesla M., and Amy E. Lerman. "Political consequences of the carceral state." *American Political Science Review* 104, no. 4 (2010): 817-833.

White, Ariel. "Family matters? Voting behavior in households with criminal justice contact." *American Political Science Review* 113, no. 2 (2019): 607-613.

**HOMELAND SECURITY INVESTIGATIONS**
*Countering Transnational Organized Crime*

**HSI Election Integrity Investigations**

05/25/2026

## Overview

Homeland Security Investigations (HSI) is advancing election integrity initiatives to protect the lawful voting process and ensure the reliability of immigration and identification systems used in voter registration. These efforts are fully aligned with Department of Homeland Security (DHS) and Department of Justice (DOJ) priorities to safeguard election systems, enhance interagency data accuracy, and maintain public trust.

## Short-Term Progress / Direction

(b)(7)(E)

## Most Important Updates

(b)(7)(E)



DEMOCRACY FORWARD

**Operational Metrics & Enforcement Actions**

(b)(7)(E)

**Research Updates – Nonprofit and NGO Review**

(b)(7)(E)

(b)(7)(E) **Strategies HSI/FBI Operations – Ohio**

(b)(7)(E)

**Columbus Votes Investigation**

(b)(7)(E)



DEMOCRACY FORWARD

(b)(7)(E)

**Strategic Lines of Effort**

- **USCIS-FDNS Reviews:**
  Prioritizing 26,235 USCIS-derived records for downstream vetting, with focus on top states: New Jersey, Michigan, Pennsylvania, Minnesota, and Ohio.
  - Records Processed: 2,290
  - Leads Disseminated: 1,586 to 24 HSI field offices
  - Remaining Pending Processing: 23,945
- **DOJ Dataset Intake:**
  **50.6 million** records ingested; processing underway. Priority states include Texas, Pennsylvania, California, New Jersey, Minnesota, Michigan, Arizona, Florida, Georgia, and Ohio.
- **DHS Dataset Intake:**
  **48.4 million** records were obtained by DAS Heather Honey through independent sources of information.
- **Data Enrichment & Targeting:**
  Datasets are currently with iLab for secondary enrichment and identification of high-value targets.



DEMOCRACY FORWARD

(b)(6),(b)(7)(C),(b)(7)(F)

---

**From:** (b)(6),(b)(7)(C),(b)(7)(F)
**Sent:** Thursday, May 28, 2026 8:16 AM
**To:** (b)(6),(b)(7)(C),(b)(7)(F)
**Cc:**
**Subject:** RE: Voter Fraud - D/EAD
**Attachments:** Voter Fraud Weekly 5.25.26_cleared.pdf

(b)(6),(b)(7)(C),(b)(7)(F)

OD cleared by me and approved by COS (b)(6),(b)(7)(C),(b)(7)(F) with minor edits.

Thanks

(b)(6),(b)(7)(C),(b)(7)(F)

**Deputy Chief of Staff**
**Office of the Director**
**U.S. Immigration and Customs Enforcement**
**Washington, D.C.**
(b)(6),(b)(7)(C),(b)(7)(F) **@hsi.dhs.gov**
**(WE>ME)**

(b)(6),(b)(7)(C),(b)(7)(F)

---

**From:** (b)(6),(b)(7)(C),(b)(7)(F) @hsi.dhs.gov>
**Sent:** Wednesday, May 27, 2026 3:06 PM
**To:** (b)(6),(b)(7)(C),(b)(7)(F) @ice.dhs.gov>; (b)(6),(b)(7)(C),(b)(7)(F) ice.dhs.gov>; (b)(6),(b)(7)(C),(b)(7)(F) (b)(6),(b)(7)(C),(b)(7)(F) @hsi.dhs.gov>
**Cc:** (b)(6),(b)(7)(C),(b)(7)(F) @hsi.dhs.gov>; (b)(6),(b)(7)(C),(b)(7)(F) ce.dhs.gov>; (b)(6),(b)(7)(C),(b)(7)(F) (b)(6),(b)(7)(C),(b)(7)(F) @hsi.dhs.gov>; (b)(6),(b)(7)(C),(b)(7)(F) @hsi.dhs.gov>
**Subject:** FW: Voter Fraud - D/EAD

D1 Team,

This report has been cleared by HSI EAD.

(b)(6),(b)(7)(C),(b)(7)(F)



DEMOCRACY FORWARD

**From:** (b)(6),(b)(7)(C),(b)(7)(F) @hsi.dhs.gov>
**Sent:** Wednesday, May 27, 2026 11:17 AM
**To:** (b)(6),(b)(7)(C),(b)(7)(F) @hsi.dhs.gov>
**Subject:** Voter Fraud - D/EAD

For D/EAD reference … reviewed/cleared by ADH.

(b)(6),(b)(7)(C),(b)(7)(F) Ph.D. | Chief of Staff
Countering Transnational Organized Crime
Homeland Security Investigations
500 12th Street SW, Washington, DC 20024
(b)(6),(b)(7)(C),(b)(7)(F) @HSI.DHS.GOV
Desk: (202) 732-(b)(6),(b)(7)(C),(b)(7)(F)
Cell: (213) 923-(b)(6),(b)(7)(C),(b)(7)(F)

**From:** (b)(6),(b)(7)(C),(b)(7)(F) @hsi.dhs.gov>
**Sent:** Tuesday, May 26, 2026 12:28 PM
**To:** (b)(6),(b)(7)(C),(b)(7)(F) @hsi.dhs.gov>
**Subject:** Voter Fraud - D/EAD

(b)(6),(b)(7)(C),(b)(7)(F)

See attached for D/EAD reference.

Compared to the previous week's submission, the 05/25/2026 report reflects several notable updates and new information:

- Voter fraud cases initiated increased from 411 to 418, and cases not referred for prosecution rose from 314 to 318, reflecting a slight uptick in investigative activity and prosecutorial review.
- Administrative arrests rose from 56 to 64. The report emphasizes a network-based investigative approach, prioritizing organization and facilitation analysis over individual leads, now stated as a strategic direction.
- iLab's processing focuses on DOJ voting rolls and USCIS data; criminal histories are currently excluded, with efforts underway to address this. Coordination with iLab continues, particularly on ingesting processed voter roll data into the ELITE enforcement system to enhance lead management, analytical review, and investigative tracking.
- No new research updates for Nonprofit or NGO review categories.
- Black Fork Strategies: HSI Cleveland and FBI are finalizing investigative plans for BFS-linked consolidation centers in Ohio. Columbus Votes investigation is unchanged, with all leads exhausted and no further action expected; phrasing updated for clarity.
- Strategic lines of effort: USCIS records prioritized for downstream vetting increased from 25,752 to 26,235; pending records rose from 23,462 to 23,945.

Overall, the most significant changes are increases in operational metrics, new strategic directions, and more detailed reporting on data processing and research activities.

**Summary of Flagged Changes**

| Section | 05/18/2026 | 05/25/2026 | Change/Update |
|---|---|---|---|
| Case Initiation | 411 | 418 | +7 cases |
| Not Referred for Prosecution | 314 | 318 | +4 cases |



DEMOCRACY FORWARD

| | | | |
|---|---|---|---|
| Administrative Arrests | 56 | 64 | +8 arrests |
| USCIS Records Prioritized | 25,752 | 26,235 | +483 records |
| USCIS Pending Processing | 23,462 | 23,945 | +483 records |
| NJ NGOs Reviewed | 44 | 44 | No change |
| iLab State Processing | Not specified | Detailed completion timeline by state | New info |
| ERO/ELITE System | Not mentioned | Discussions ongoing | New info |
| Criminal Histories | Not mentioned | Cannot be included at this time | New info |

(b)(6),(b)(7)(C),(b)(7)(F) Ph.D. | Chief of Staff
Countering Transnational Organized Crime
Homeland Security Investigations
500 12th Street SW, Washington, DC 20024
(b)(6),(b)(7)(C),(b)(7)(F) HSI.DHS.GOV
Desk: (202) 732[redacted]
Cell: (213) 923-[redacted]



DEMOCRACY FORWARD

REL0000301473

(b)(6),(b)(7)(C),(b)(7)(F)

---

**From:** (b)(6),(b)(7)(C),(b)(7)(F)
**Sent:** Tuesday, July 7, 2026 8:36 AM
**To:** (b)(6),(b)(7)(C),(b)(7)(F)
**Subject:** WAR Document - 06Jul26
**Attachments:** Fraud WAR - July 6 2026.docx

OD/DD,

Here is a copy of the WAR document submitted. Per (b)(6),(b)(7)(C),(b)(7)(F) hey are now tasking this document out through (b)(7)(E) and she will provide the document to WH Staff. This is week 1 of that process.

(b)(6),(b)(7)(C),(b)(7)(F)



DEMOCRACY FORWARD

**HOMELAND SECURITY INVESTIGATIONS**
*Countering Transnational Organized Crime*

## HSI Election Integrity Investigations

07/6/2026

**Overview**
Homeland Security Investigations (HSI), through the Cross Border Financial Crime Center (CBFCC), continues advancing a phased election integrity initiative focused on identifying unlawful voter activity, detecting organized facilitation networks, and supporting criminal and administrative enforcement actions. (b)(7)(E)

(b)(7)(E)

**Significant Legal Cases**
*State of California v. Trump*, No. 26-11581 (D. Mass.).

> Defendants … United States Department of Homeland Security, … including their officers, agents, servants, and employees, are enjoined from implementing, giving effect to, or enforcing Section 2 [*Establishment and Transmission of State Citizenship Lists and Prioritization of Investigations and Prosecutions Related to Election Fraud.*] of the EO as to Plaintiff States with respect to the November 3, 2026, or any earlier federal election, including taking any steps to create a new federal program to superintend and control Plaintiff States' maintenance of their voter rolls; or initiating any investigation or prosecution of Plaintiff States, their officials, local officials, or agents of such state or local officials involved in the administration of federal elections within Plaintiff States, stemming from the unconstitutional provisions in Section 2 of the EO. This injunction does not bar the federal government from providing assistance with verifying the citizenship or eligibility of any voter if the assistance is provided at the request of any State and within the framework provided by Congress.
>
> All Defendants, other than the President, are ordered that they must, in good faith, take such steps as are necessary to prevent explicit or implicit implementation of Sections 2, 3, and 5 of the EO, and to cease and reverse any implementation of those provisions, as to Plaintiff States, with respect to the November 3, 2026, or any earlier federal election.
>
> *Plaintiff States*: Arizona, California, Colorado, Connecticut, Delaware, District of Columbia, Illinois, Pennsylvania, Maine, Maryland, Massachusetts, Michigan, Minnesota, Nevada, New Jersey, New Mexico, New York, North Carolina, Oregon, Rhode Island, Vermont, Virginia, Washington, and Wisconsin

**iLab State Processing**
**MO, MI, NM, CT, GA and KY** have been enriched by the iLab and are pending Palantir entry into ELITE.

**Michigan** and **New Mexico** are pending legal review in compliance with Court Order *State of California v. Trump*, No. 26-11581 (D. Mass.).

**Recent Arrests**
On July 2, 2026, HSI New Orleans reported the criminal arrest of (b)(6),(b)(7)(C) a lawful permanent resident from Australia, for voter fraud. On June 11, 2026, [redacted] was indicted in the



DEMOCRACY FORWARD

Eastern District of Louisiana (EDLA) for False Claims of U.S. Citizenship and Voter Fraud and on July 1, 2026, (b)(6),(b)(7)(C) was arrested at the federal courthouse in New Orleans.

On July 1, 2026, HSI New Jersey in cooperation with New Jersey Election Integrity Task Force personnel from the FBI, and USCIS, reported the execution of a federal criminal arrest warrant for (b)(6),(b)(7)(C) (b)(6),(b)(7)(C) a Citizen of Slovakia residing in the U.S. as a lawful permanent resident. This enforcement action occurred in furtherance of investigations of aliens who have voted and/or registered to vote in federal elections contrary to federal law. (b)(6),(b)(7)(C) filed form N-400-Application for Naturalization with United States Citizenship and Immigration Services (USCIS) in which (b)(6),(b)(7)(C) claimed to have never registered to vote or voted in any Federal, state, or local election. This HSI-led investigation is being prosecuted by the USAO in the District of New Jersey.

**Planned Actions**

(b)(7)(E)

**Enforcement Stats**

(b)(7)(E)



DEMOCRACY FORWARD

(b)(7)(E)



DEMOCRACY FORWARD

# (b)(7)(E)

**Other Organizations**

(b)(7)(E)

**Upcoming State Primary Elections**

There is no state primary election scheduled the week of July 6. (b)(7)(E)
(b)(7)(E)

**Other Updates**

(b)(7)(E)



DEMOCRACY FORWARD