United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA NURSES ASSOCIATION, et al.,<br>Plaintiffs,<br>v.<br>MARKWAYNE MULLIN, et al.,<br>Defendants. | Case No. 26-cv-10680-AMO<br>**ORDER GRANTING PRELIMINARY INJUNCTION**<br>Re: Dkt. No. 10 |

The California Nurses Association and National Nurses United (together, "CNA/NNU"), the City and County of San Francisco, the County of Santa Clara (together, "Local Government Plaintiffs"), and Voto Latino Foundation's (all collectively, "Plaintiffs") motion for Administrative Procedure Act ("APA") stay and preliminary injunction was heard before this Court on October 19, 2026. Having read the papers filed by the parties and carefully considered their arguments therein and those made at the hearing, as well as the relevant legal authority, and good cause appearing, the Court GRANTS Plaintiffs' motion for preliminary injunction for the following reasons.

## I. FACTUAL BACKGROUND

Pursuant to the Trump Administration's prioritization of voter fraud, *see* Dkt. No. 50-2 at 15-18, in June 2026, the United States Department of Homeland Security's ("DHS") General Counsel ordered Immigration and Customs Enforcement ("ICE") to enforce stricter penalties, including deportation, against non-citizens believed to have improperly registered to vote or voted, whether criminally convicted or not. Dkt. No. 10-7 at 333. In August 2026, DHS implemented the "Unlawful Voter Initiative," which directed United States Citizenship and Immigration Services ("USCIS") personnel to generate target lists of individuals for investigation related to

improper voting and to coordinate with ICE's Homeland Security Investigations ("HSI") field offices to investigate identified individuals through interrogations. *Id.* at 11-13, 198-202, 336.

On September 14, 2026, Senators Chuck Schumer and Alex Padilla released a "Whistleblower Disclosure" that details DHS trainings and source data used for the Unlawful Voter Initiative. Dkt. No. 1 ¶ 3; Dkt. No. 10-7 at 19-51. According to public reporting, and the Whistleblower Disclosure, the Unlawful Voter Initiative consists of a series of memoranda, directives, agency statements, and patterns of conduct aimed at identifying non-citizen voting in violation of federal law. *See* Dkt. No. 10-7 at 53-55, 58-59. Therein, DHS directs HSI agents to prioritize cases involving alleged unlawful voting by non-citizens or recently naturalized citizens. Dkt. No. 10-7 at 44, 255-56.

On August 31, DHS issued the "Surge Initiative Guidance," an internal document directing HSI agents to prioritize field investigations questioning people about their voter eligibility in nine states: California, Connecticut, Georgia, Missouri, Nevada, New York, Pennsylvania, Washington, and Wisconsin. Dkt. No. 50-2 at 2-3; Dkt. No. 10-7 at 63-66. The Surge field investigations rely on USCIS' target lists, which were initiated in August, and the production of which have been increased pursuant to the Surge. Dkt. No. 10-7 at 23-24, 58-59; *see also id.* at 63-66. Implementation of the Surge involves two practices, which Plaintiffs define as the Voter Eligibility Matching Policy and the Field Operations Policy.

**A. Voter Eligibility Matching Policy**

The Voter Eligibility Matching Policy describes the process by which Defendants identify and internally investigate individuals that are suspected of voter fraud.

DHS compiles a target list of such individuals from a variety of sources, including state and local governments and publicly available information. Dkt. No. 46-1 ¶¶ 10, 17; Dkt. No. 1, ¶¶ 33-47. The initial target list data is voluminous and unreliable. *See* Dkt. No. 79-2 at 61, 123, 135. The data includes 48.2 million records that DHS received "through independent sources" of questionable provenance and, from the Department of Justice, 50.6 million records from official state voter roll data or, for states that would not share data, from unreliable commercial versions of voter roll data. Dkt. No. 79-2 at 61. DHS additionally "enriches" data through a software system

called iLab, using unknown artificial intelligence tools to ingest data from various systems and create a compiled list of individual profiles. *Id.* at 61, 129-35.

DHS gives the target list to USCIS, and USCIS personnel undertake a process to eliminate some individuals on the list who are not suspect, based on public and commercial data. Dkt. No. 46-1 ¶¶ 10, 17. Commercial databases are typically used for targeted advertising and include information such as a person's residential address, geolocation data, demographics, family structure, car ownership, and consumer behavior. Dkt. No. 78-4 at 5. Pursuant to agency instruction, USCIS personnel treat the DHS source data for the initial target lists as presumptively valid. Dkt. No. 10-7 at 39, 42, 45-46. USCIS "seeks to exclude any United States Citizens from further review" and compares "available biographic data, to include but not limited to key identifiers such as first name, last name, date of birth, addresses, and other biographic information." Dkt. No. 46-1 ¶ 10. USCIS concedes that errors will result from "[s]imilar names, incomplete records, outdated citizenship information, clerical errors, and other circumstances." *Id.* ¶ 8. It is DHS's policy to specifically target naturalized citizens if the data appears to suggest voting occurred before naturalization. *Id.* ¶ 9; Dkt. No. 46-2 ¶ 19.

During the Surge, the agents were ordered to complete a minimum of 40 suspected subject reviews, which requires officers to take no more than twelve minutes to eliminate a person from the target list using the commercial databases. Dkt. No. 10-7 at 50-51. Even under the best conditions, there is a high likelihood of error in review because there is no federal database containing citizenship status of U.S. residents. Dkt. No. 10-6 at 9-10 and Dkt. No. 46-1 ¶ 8. The time limitations implemented during the Surge further exacerbate the risk of error. Dkt. No. 10-6 at 12; Dkt. No. 10-7 at 50-51. The target list is used for carrying out investigations pursuant to the Field Operations Policy.

USCIS generates TECS[1] records for individuals identified through the Voter Eligibility Matching Policy. Dkt. No. 10-7 at 23, 50-51. TECS records may prompt further law enforcement

[1] TECS, which is not an acronym, is a system used by the DHS, specifically Customs and Border Protection, to track individuals and generate target operations. *See* Dkt. No. 1 n. 4. TECS is used to share information between federal, state, local, and tribal government agencies. *Id.*

follow-ups, including through field operations, but may also trigger further investigation by HSI beyond suspected voter fraud. Dkt. No. 10-7 at 21. The records "can be used against [an individual] in any interaction they may have with the federal government, such as crossing the border during travel or seeking a benefit." *Id.* According to the Whistleblower Disclosure, USCIS has created TECS records for U.S. citizens. *Id.*

**B. Field Operations Policy**

In response to the Surge Initiative Guidance, HSI launched, what Plaintiffs call, a Field Operations Policy, which directs HSI field offices to "pursue investigative leads, conduct field interviews, and support timely prosecutorial review" in the nine Surge states. Dkt. No. 50-2 at 2-3. The Field Operations Policy is the increased deployment of HSI officers for the purpose of conducting interrogations about suspected voter fraud during the Surge. The field interviews, or interrogations, about voter eligibility are "expressly designed to resolve the discrepancies" in the flawed records and matching process USCIS uses to produce the target lists. Dkt. No. 46 at 30:14-15. As with the Voter Eligibility Matching Policy, the Field Operations Policy also targets some naturalized citizens. Dkt. No. 48-1 ¶¶ 9, 19; Dkt. No. 10-7 at 44-50. Implementation of the Field Operations Policy corresponds with voter registration and early voting in the states. Dkt. No. 10-7 at 64; see also *id.* at 72, 91, 94, 99-122, 125-26, 130.

An August 28 memo expressly directs agents to "document investigative findings" in a "Criminal Voter Fraud Initiative Portal" outside the normal operational process so that photos and videos can be used by national DHS staff in "[m]edia and [r]eporting." Dkt. No. 50-2 at 2-3. DHS publicizes officer deployment, operations, and arrests related to voter fraud. *See* Dkt. No. 10-7 at 135 (@HSISanFrancisco's X post with photo of an armed HSI officer approaching a home); *id.* at 140 (@HSIKansasCity's X post with photo of HSI officers at the front door of a home); *id.* at 409 (@HSI_HQ's X post with video of a named individual being arrested on the street); *id*. at 1166 (U.S. Department of Homeland Security's video on YouTube of Secretary Markwayne Mullin holding a press conference, and announcing that the agency will "pursue maximum pressure"); Dkt. No. 79-6 at 2 (@DHSgov's X post with video of Secretary Markwayne Mullin detailing the number of voter fraud arrests made in a Fox News interview);

Dkt. No. 79-8 at 2 (@SecMullinDHS's X post with video of Secretary Mullin Fox News interview accompanied by footage of an individual being arrested for voter fraud); Dkt. No. 79-11 at 2 (@foxnewspolitics' X post of HSI footage showing federal agents executing a sweep of a home and arresting an individual who was indicted for voter fraud).

DHS "surveils, covertly infiltrates, and interrogates the staff of non-profits and churches conducting voter engagement" for purposes of carrying out the Surge. Dkt. No. 78 at 14 (citing Dkt. No. 79-2 at 29-30, 99, 133). As of July 2026, DHS targeted at least 148 such organizations. Dkt. No. 79-2 at 133.

## II. PROCEDURAL BACKGROUND

On September 18, 2026, Plaintiffs filed their Complaint against the U.S. Department of Homeland Security, U.S. Citizenship and Immigration Services, U.S. Immigration and Customs Enforcement, U.S. Customs and Border Protection, and several individuals in their official capacities. Dkt. No. 1. Soon after, Plaintiffs filed the instant motion for APA stay and preliminary injunction on September 21, 2026. Dkt. No. 10. That same day, they also moved for expedited production of the administrative record and expedited discovery. Dkt. No. 11. The Court granted the motion for expedited production of the administrative record and otherwise denied the motion for discovery on September 24, 2026. Dkt. No. 37. On September 28, 2026, Defendants filed their opposition to the motion for preliminary injunction, Dkt. No. 46, and produced the administrative record, Dkt. No. 47. The next day, Plaintiffs moved to complete the administrative record or, in the alternative, to supplement the record with expedited discovery. Dkt. No. 53. The Court stayed the preliminary injunction briefing schedule pending resolution of the motion to complete the administrative record. Dkt. No. 55. On October 5, 2026, the Court granted in part and denied in part the motion to complete the administrative record. Dkt. No. 67. Pursuant to the October 5 Order, Defendants supplemented the administrative record on October 13, 2026, Dkt. No. 70, and moved to seal the supplemented administrative record, Dkt. No. 74. On October 13, Defendants also filed a supplemental brief in support of their opposition to the motion at bar. Dkt. No. 71. Plaintiffs filed their reply on October 16, 2026, Dkt. No. 78, and moved to file the reply under seal to the extent it references the supplemental administrative

record, Dkt. No. 80.

Plaintiffs move for preliminary injunction under seven causes of action:

1) Intimidation of voters in violation of Section 11(b) of the Voting Rights Act of 1965 (52 U.S.C. § 10307(b));
2) Intimidation affecting voter assistance and mobilization in violation of Section 11(b) of the Voting Rights Act (52 U.S.C. § 10307(b));
3) Executive action in violation of the Constitutional Right to Vote;
4) Agency action contrary to law (intimidation of voters under Section 11(b)) in violation of the Administrative Procedure Act;
5) Agency action contrary to law (intimidation affecting voter assistance) in violation of the APA;
6) Agency action contrary to law (Constitutional Right to Vote) in violation of the APA; and
7) Arbitrary and capricious agency action in violation of the APA.

The Court first addresses the motion for preliminary injunction, then turns to the administrative motions to seal.

## III. MOTION FOR PRELIMINARY INJUNCTION

### A. Legal Standard

A "preliminary injunction is an extraordinary and drastic remedy" which should not be granted unless the movant shows "substantial proof" and, "*by a clear showing* carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis in original; quotation marks and citation omitted). The scope of "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979); *see also Trump v. CASA, Inc.*, 606 U.S. 831, 847 (2025).

To obtain preliminary injunctive relief, the moving party must show: (1) a likelihood of success on the merits, (2) a likelihood of irreparable harm to the moving party in the absence of preliminary relief, (3) the balance of equities tips in the favor of the moving party, and (4) an injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The *Winter* factors may be evaluated on a sliding scale such that preliminary relief may be

issued when the moving party demonstrates "that serious questions going to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir. 2011) (citation omitted). To grant preliminary injunctive relief, a court must find that "a certain threshold showing [has been] made on each factor." *Leiva-Perez v. Holder*, 640 F.3d 962, 966 (9th Cir. 2011) (per curiam).

**B. Likelihood of Success on the Merits**

Because it " 'is a threshold inquiry' and the most important factor," *Baird v. Bonta*, 81 F.4th 1036, 1040 (9th Cir. 2023), the Court begins by examining Plaintiffs' likelihood of success on the merits. In addition to a bevy of arguments on the legal merits, Defendants also raise challenges to Plaintiffs' standing to advance their claims. Because standing is essential for any claim to proceed, the Court analyzes each Plaintiff's standing first.

**1. Standing**

"Article III confines the federal judicial power to the resolution of 'Cases' and 'Controversies.' For there to be a case or controversy under Article III, the plaintiff must have a 'personal stake' in the case – in other words, standing." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (citation omitted). To have standing, Article III requires that "[t]he plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 330 (2016) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). "To establish an injury in fact, a plaintiff must show that [they] suffered 'an invasion of a legally protected interest' that is 'concrete and particularized.' " *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 597 (9th Cir. 2020) (quoting *Spokeo*, 578 U.S. at 339). "The party invoking federal jurisdiction bears the burden of establishing these elements." *Lujan*, 504 U.S. at 561. Because "standing is not dispensed in gross, . . . plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek." *TransUnion*, 594 U.S. at 431. At the preliminary-injunction stage, a plaintiff must make a "clear showing" that it is likely to establish each element of standing. *Ariz. All. for Retired Ams. v. Mayes*, 186 F.4th 622, 631 (9th Cir. 2026) (en banc).

Plaintiffs here invoke different forms of standing: the Local Government Plaintiffs assert their "proprietary interests" as the basis for the Court's standing; Voto Latino claims to have organizational standing; and CNA/NNU contend they can satisfy the three requirements for associational standing. The Court considers each in turn.

First, the Local Government Plaintiffs assert their "own proprietary interests" in administration and funding of programs related to voting and in the trust of their communities. Dkt. No. 78 at 15 (citing *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1197 (9th Cir. 2004)). However, Local Government Plaintiffs' costs of educational materials and speculation about the erosion of trust do not sufficiently show harms that are " 'actual or imminent, not conjectural or hypothetical,' and are 'fairly traceable' " to the Unlawful Voter Initiative. *Cf. City of Sausalito*, 386 F.3d at 1198-99 (finding Sausalito demonstrated standing to protect its "proprietary interests" by showing injury to municipal management and public safety functions as well as aesthetic and economic harm); *see also City & Cnty. of San Francisco v. Whitaker*, 357 F. Supp. 3d 931, 945-46, 949, 951-52 (N.D. Cal. 2018) (finding San Francisco lacked proprietary interest standing where it advanced only conjectural and hypothetical injuries arising from federal government actions that did not conflict with its regulation of the municipality's citizens). The Local Government Plaintiffs fail to clearly show they have standing for the requested relief at this stage.

Second, Plaintiff Voto Latino maintains that its diversion of resources, costs of educational materials, and cancellation of events constitute a cognizable harm to support organizational standing. Dkt. No. 10-5 ¶¶ 9-15; Dkt. No. 78-2 ¶¶ 3-5. However, this method of showing an injury in fact for organizational standing has been rejected by the Ninth Circuit. *See Ariz. All. for Retired Ams.*, 186 F.4th at 633-34; *see also id.* at 628 (finding that "need to divert resources to educate and assist voters whose registrations may be subject to cancellation" was insufficient to show standing). Voto Latino thus fails to clearly show that it has organizational standing sufficient to support preliminary injunctive relief.

Finally, CNA/NNU assert they have associational standing because " (a) [their] members would otherwise have standing to sue in their own right; (b) the interests [they] seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested

requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). The Court examines each *Hunt* element and finds CNA/NNU have associational standing.

**a. Individual Member Standing**

To have standing, an association "must show that a member suffers an injury-in-fact that is traceable to the defendant and likely to be redressed by a favorable decision." *Associated Gen. Contractors of Am., San Diego Chapter, Inc. v. Cal. Dep't of Transp.*, 713 F.3d 1187, 1194 (9th Cir. 2013). An association must make "specific allegations establishing that at least one identified member had suffered or would suffer harm." *Id.*

NNU's affiliate membership includes more than 225,000 members nationwide, which includes about 150,000 members of the CNA affiliate that spans California and twenty additional jurisdictions. Dkt. No. 10-1 ¶ 4. CNA/NNU's members include voters who are naturalized citizens and citizens who live in mixed immigration status households. *Id.* ¶ 12. Members organize to "advance local and national legislative priorities, promote a unified vision of collective action for nurses, and encourage members to lend their voice and participation in elections to choose the leaders who decide policy affecting registered nurses and labor issues." Dkt. No. 1 ¶ 24.

The Unlawful Voter Initiative empowers federal officials to target and interview individuals who DHS believes to have engaged in voter fraud based on flawed data, including instances where DHS simply did not have data to determine that the individual did not engage in voter fraud. Dkt. No. 10-7 at 42-44. CNA and NNU provide declarations identifying at least four U.S. citizen members who, due to the Surge, fear being wrongly identified, surveilled, targeted, investigated, forced into coercive encounters with HSI, and detained. Dkt Nos. 10-1 ¶¶ 23-46, 78-1 ¶ 14-21. These fears are well understood as intimidation and have manifested in members having "stopped attending and participating in election related campaign events, including for a candidate [one] supports" and one who "will no longer sign up to be a poll monitor for the 2026 General Election." Dkt. No. 10-1 ¶¶ 26, 37.

CNA/NNU have accordingly shown that their members are suffering a discrete injury in-

United States District Court
Northern District of California

fact, traceable to Defendants' Unlawful Voter Initiative and Surge and redressable by the injunction sought under the Voting Rights Act, Section 11(b), for intimidation affecting voter assistance and mobilization. *See Lujan*, 504 U.S. at 560. Though CNA/NNU contend that their members are also facing infringement of their voting rights, the declarations at most state that members will vote by mail rather than in person. Dkt. No. 10-1 ¶¶ 25, 36, 45. CNA/NNU have provided no basis from which to conclude that this is a cognizable harm under either the Constitution or the Voting Rights Act. Because the CNA/NNU members satisfy the three prongs for standing required by *Lujan*, the associations have standing to assert their Voting Rights Act claim for intimidation affecting voter assistance and mobilization on behalf of their members. *See id.* at 560-61.

**b. Germaneness**

The second prong for associational standing, germaneness, requires "an assurance that the association's litigators will themselves have a stake in the resolution of the dispute, and thus be in a position to serve as the defendant's natural adversary." *United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*, 517 U.S. 544, 555-56 (1996). This element requires only "mere pertinence between litigation subject and organizational purpose." *Presidio Golf Club v. Nat'l Park Serv.*, 155 F.3d 1153, 1159 (9th Cir. 1998).

NNU's core mission is "to ensure that its members will have their voices heard through collective action; are given a safe and accessible opportunity to participate in selecting the representatives who make decisions affecting their work conditions and life; and to encourage them to be active citizens engaging in a fair and free democratic process." Dkt. No. 10-1 ¶ 6; *see also* Dkt. No. 1 ¶ 26 (describing CNA/NNU's specific campaigns and extensive "get out the vote" actions). There is no question that protecting voting rights and assisting voters is germane to CNA/NNU's purpose. *See Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023).

**c. Necessity for member participation**

The third prong of associational standing is "best seen as focusing on . . . matters of administrative convenience and efficiency, not on elements of a case or controversy within the

meaning of the Constitution." *United Food & Com. Workers Union*, 517 U.S. at 557. "[I]ndividual participation is not normally necessary when an association seeks prospective or injunctive relief for its members." *Id.* at 546. Here, the principal claims are for injunctive and declaratory relief; such equitable relief is particularly suited for group representation. *See Warth v. Seldin*, 422 U.S. 490, 515 (1975). For all these reasons, CNA/NNU have established associational standing for all claims related to intimidation affecting voter assistance and mobilization.

**2. The Merits of CNA/NNU's Claims**

While CNA/NNU advance seven causes of action in support of their motion for an APA stay and preliminary injunction, the only sufficiently cognizable harm evidenced by CNA/NNU is grounded in intimidation affecting voter assistance and mobilization. Because CNA/NNU have not shown that they have standing to assert claims of voter intimidation under the Voting Rights Act or the constitutional right to vote, the Court need not assess the merits of those claims. Similarly, the Court does not delve into the merits of their Administrative Procedure Act claims because CNA/NNU have not at this stage adequately evidenced a final agency action, which requires articulation of a discrete and specific agency action, rather than a general operation or agency program. *San Luis Unit Food Producers v. United States*, 709 F.3d 798, 808 (9th Cir. 2013) ("[A] broad, programmatic challenge to [an agency's] operation and management of [a statutory obligation] . . . [is] not cognizable under the APA."). That leaves only CNA/NNU's Voting Rights Act claim for intimidation affecting voter assistance and mobilization.

Section 11(b) of the Voting Rights Act, 52 U.S.C. § 50307(b), provides that "[n]o person, whether acting under color of law or otherwise, shall . . . intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for urging or aiding any person to vote or attempt to vote." Unlawful intimidation includes "[a]ctions or communications that inspire fear of . . . legal repercussions, privacy violations, and even surveillance." *Ariz. All. for Retired Ams. v. Clean Elections USA*, 638 F. Supp. 3d 1033, 1041 (D. Ariz. 2022). The statute applies "regardless of whether defendants acted with the specific intent" to intimidate, *id.*, and regardless of whether the conduct "successfully prevents a person from voting [or urging or aiding any person to vote or



United States District Court
Northern District of California

attempt to vote],” *Nat’l Coal. on Black Civic Participation v. Wohl*, 512 F. Supp. 3d 500, 516 (S.D.N.Y. 2021).

Defendants assert that Section 11(b) of the Voting Rights Act does not create a private right of action. However, “persuasive authority across multiple districts has found congressional intent to create an implied right of action for § 11(b) specifically within the statutory text, meeting the ‘high bar’ for implied causes of action.” *Krabach v. King Cnty.*, No. 2:22-CV-1252-BJR, 2023 WL 7018431, at *3 (W.D. Wash. Oct. 25, 2023) (quoting *Mich Welfare Rts. Org. v. Trump*, 600 F. Supp. 3d 85, 105-106 (D.D.C. 2022) and collecting cases). Moreover, “a plain reading of the statutory language indicates that Congress intended that private action as well as government action be regulated.” *Colo. Mont. Wyo. State Area Conf. of NAACP v. United States Election Integrity Plan*, 653 F. Supp. 3d 861, 868 (D. Colo. 2023), *rev’d and remanded sub nom. Colo. Mont. Wyo. State Area Conf. of the NAACP v. Smith*, 180 F.4th 1266 (10th Cir. 2026); *see also League of United Latin Am. Citizens - Richmond Region Council 4614 v. Pub. Int. Legal Found.*, No. 1:18-CV-00423, 2018 WL 3848404, at *3 (E.D. Va. Aug. 13, 2018) (“*LULAC*”) (“Here, the language ‘or otherwise’ indicates Congressional intent to reach both government and private conduct under § 11(b).”); *Ariz. All. for Retired Ams*, 638 F. Supp. 3d at 1040-42; *Wohl*, 512 F. Supp. 3d at 509; *see also Allen v. State Bd. of Elections*, 393 U.S. 544, 554-57 (1969) (“We have previously held that a federal statute passed to protect a class of citizens, although not specifically authorizing members of the protected class to institute suit, nevertheless implied a private right of action.”). The Court finds the reasoning set forth in *Mich. Welfare Rts. Org.*, 600 F. Supp. 3d, persuasive, and concludes that Section 11(b) creates a private right of action.

In addition to establishing that Section 11(b) lends a private right of action, Plaintiffs demonstrate that they are likely to succeed in their claim that Defendants have run afoul of the Voting Rights Act’s prohibition of intimidating voter assistance and mobilization.

The core analysis for a Section 11(b) claim, as with other anti-intimidation statutes, is whether the “activities ha[ve] generated fear” that is objectively reasonable. *Walker v. City of Lakewood*, 272 F. 3d 1114, 1129 n. 4 (9th Cir. 2001); *accord Wohl*, 661 F. Supp. 3d at 112-13. “So long as the allegedly threatening or intimidating conduct puts individuals ‘in fear of

harassment and interference . . .,' the conduct is sufficient to support a Section 11(b) claim." *Ariz. All. for Retired Ams.*, 638 F. Supp. 3d at 1041 (quoting *LULAC*, 2018 WL 3848404, at *4). CNA/NNU provide substantial evidence demonstrating that Defendants' intimidating conduct, pursuant to the Unlawful Voter Initiative and Surge, is directly interfering with their members' right to encourage voters to participate in the 2026 midterm elections. *See* Dkt. No. 1 ¶¶ 239-42. The Surge, including publicization of the use of faulty data sources that sweep in U.S. citizens, engagement in investigations based on this faulty data, and the Field Operation Policy's implementation of a social media campaign showing arrests and interactions with armed officials, create a reasonable fear of harm to those assisting and mobilizing voters. *See, generally,* Dkt. Nos. 10-6, 78-4. Defendants announced the deployment of armed officers in a militarized action to individuals' homes and communities during the final months before midterm elections, inspiring fear in the CNA/NNU members who wish to mobilize, educate, and assist voters. Defendants' threats have already caused CNA/NNU members to withdraw from participating in electoral activity because they reasonably fear being subjected to physical, legal, or reputational harm to themselves and their loved ones. Dkt. No. 1 ¶¶ 239-42; Dkt Nos. 10-1 ¶¶ 23-46, 78-1 ¶¶ 14-21. The fear is objectively reasonable, and compounded by Defendants' use of data that is widely known to inadvertently include U.S. citizens, leaves citizens afraid that their name will be wrongly included in the hundreds of thousands identified for investigation. *See* Dkt. No. 10 at 18-19.

Defendants argue that federal officers cannot violate the Voting Rights Act because federal law criminalizes voting by non-citizens in federal elections and investigations are authorized by 6 U.S.C. §§ 203(1), 251(4). Dkt. No. 46 at 32:8-15 (citing *Olagues v. Russoniello*, 797 F.2d 1511, 1522 (9th Cir. 1986)). However, the sole legal authority on which Defendants rely explicitly declined to determine whether the Voting Rights Act may be brought against federal officers. *Olagues*, 797 F.2d at 1522, *vacated*, 484 U.S. 806 (1987) ("[W]e need not decide whether a claim for relief against federal officials may be asserted under the Voting Rights Act or whether the county officials would be protected as Russoniello's agents."). Because the plain text of the Voting Rights Act prohibits any person, "whether acting under color of law or otherwise" from



United States District Court
Northern District of California

intimidating someone urging or aiding any person to vote or attempting to vote, 52 U.S.C. § 50307(b), the Court concludes that there is no readily apparent basis to limit the reach of the statute, nor have Defendants offered one.

Defendants also rely on general doctrine of statutory construction, claiming that the more specific authorization to conduct investigations into fraudulent voting, 6 U.S.C. § 251(4); 8 U.S.C. §§ 1103(a)(1), 1357, controls over the general language of the Voting Rights Act. Dkt. No. 46 at 32:15-18 (citing *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012). The doctrine is inapposite here. The specific governs the general where a general permission or prohibition contradicts a specific permission or prohibition. *RadLAX Gateway Hotel, LLC*, 566 U.S. at 645. In such situations, "[t]o eliminate the contradiction, the specific provision is construed as an exception to the general one." *Id.* Section 11(b) does not contradict federal prohibitions on noncitizens voting in federal elections. Defendants have not shown that investigation of fraudulent voting requires the targeting of U.S. citizens, the deployment of armed agents, and the resulting intimation of citizens urging or aiding other persons to vote.

Declaring that an action is completed pursuant to legal authority does not make the act necessarily lawful. Plaintiffs do not claim, nor does the Court find, that it is unlawful for federal officials to undertake investigations into unlawful voting in federal elections. Rather, Plaintiffs seek to stop DHS from continuing to investigate U.S. citizens, who have a legal right to vote, in a way that intimidates and threatens the participation of CNA/NNU members from urging or aiding others to vote. Dkt. No. 10 at 17-19. DHS's stated intent to narrow its impact to people who are not citizens, Dkt. Nos. 46-1 ¶¶ 18-20, 46-2 ¶ 18, does not cure the reasonable fear of citizens being wrongly swept up during the investigations in light of the overbroad and inaccurate data sources and subjected to intimidation for exercising statutorily-protected voting rights, Dkt. No 78-4 at 13-15.

Defendants contend Plaintiffs' reading of Section 11(b) is overbroad because it would lead to the conclusion that "anytime a duly authorized law enforcement officer investigating an election crime makes a suspect nervous, Plaintiffs believe the VRA has been violated." Dkt. No. 46 at 32:19-21. However, Plaintiffs do not claim that the Voting Rights Act is violated any time an

officer investigates election crimes. Rather, at issue here is the reliance on admittedly flawed and incomplete data to create a list of individuals for HSI to interview in the months leading up to an election, including the roll out of a social media campaign publishing photos and videos of individuals being arrested for "unlawfully registering to vote in California," Dkt. No. 10-7 at 409, and posting that "HSI in California will investigate any allegations of noncitizens voting," *id.* at 135. *See also id.* at 140; Dkt. No. 79-6 at 2; Dkt. No. 79-8 at 2. These items, taken together, lead to an objectively reasonable fear of law enforcement entanglements that intimidates citizens from urging or aiding others in exercising their right to vote. Accordingly, the CNA/NNU are likely to succeed on their claim that the Voting Rights Act has been violated.

**C. Irreparable Harm**

In voter intimidation cases, district courts recognize that plaintiffs suffer irreparable harm if the "right to vote freely is abridged" because of "intimidation, threatening conduct, or coercion." *Wohl*, 498 F. Supp. 3d at 474. Section 11(b) explicitly links voting to voting-related activity, such as encouraging others to vote, in recognition of the need for extensive protections for "true enforcement of the Fifteenth Amendment's promise of unencumbered access to the vote." *Id.* at 476; *see also Jolt Initiative, Inc. v. Paxton*, 821 F. Supp. 3d 706, 726 (W.D. Tex. 2026). "[I]f some potential voters are improperly dissuaded from exercising their franchise, it is unlikely those voters can be identified, their votes cannot be recast, and no amount of traditional remedies such as money damages would suffice after the fact." *Wohl*, 498 F. Supp. 3d at 474 (internal quotation marks and citations omitted).

The ongoing intimidation that CNA/NNU members experience and the direct impediment it plays in their effort to engage voter outreach, education, and engagement efforts, are irreparable harms that are appropriately addressed by preliminary injunctive relief. *See Wohl*, 498 F. Supp. 3d at 474.

**D. Balance of Equities and Public Interest**

Where the government is a party, courts merge the analysis of the final two *Winter* factors, the balance of equities and the public interest. *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)). Courts "explore the

United States District Court
Northern District of California

relative harms to applicant and respondent, as well as the interests of the public at large." *Barnes v. E-Sys., Inc. Grp. Hosp. Med. & Surgical Ins. Plan*, 501 U.S. 1301, 1305 (1991) (internal quotation marks and citation omitted).

CNA/NNU members suffer substantial harm when they are prevented or impeded from carrying out their voter engagement, registration, and mobilization programs during the final months before a midterm election. By contrast, Defendants suffer little harm by temporary injunction, i.e., restoring the status quo ante. The Unlawful Voter Initiative is part of the federal administration's effort to combat voter fraud.[2] Limiting the Surge's policies that sweep in U.S. citizens for investigation, and result in the intimidation of CNA/NNU from urging or aiding others in exercising their right to vote during the final weeks leading up to the midterm elections does not prevent Defendants from exercising their authority to investigate voter fraud by lawful means. To the contrary, the federal government has a vested interest in free elections untainted by the threat that officers will dissuade voter engagement programs from conducting their core civic functions, whether that dissuasion be intentional or otherwise. *See Am. Encore v. Fontes*, 152 F.4th 1097, 1120 (9th Cir. 2025) ("Vindication of constitutional rights is always in the public interest.").

CNA/NNU's and the public's interest in safe elections, free from interference or intimidation, far exceed Defendants' purported interest in combating unlawful voting by non-U.S. citizens. *See Jolt*, 821 F. Supp. 3d at 727 (holding that voting rights group "ha[d] a more obvious interest in assisting others with registering to vote than" the Texas Attorney General did "in intimidating, threatening, or coercing Plaintiff, and the public interest favors preventing voter intimidation within the meaning of § 11(b) of the VRA."). The public's "deep interest in fair elections" weighs heavily in favor of preliminary relief to protect free participation in the midterm elections. *Lair v. Bullock*, 697 F.3d 1200, 1215 (9th Cir. 2012). Indeed, given that the balance of hardships tips sharply in CNA/NNU's favor, the Court would alternatively find that CNA/NNU

[2] Though the Court makes no findings related to the extent of the threat of voter fraud, it notes that other courts have found that the federal government has failed to establish that significant fraud threatens the reliability of upcoming elections. *See United States v. Weber*, 816 F. Supp. 3d 1168 n.26 (C.D. Cal. 2026) (collecting evidence that noncitizen voting is "exceedingly rare"); *see also DSCC v. Trump*, No. 26-cv-01114 (CJN), 2026 WL 2681471, at *10 (D.D.C. Sep. 13, 2026).

United States District Court
Northern District of California

would be entitled to injunctive relief even if their claims merely raised serious questions about whether the Defendants have violated Section 11(b) of the Voting Rights Act. *See All. for the Wild Rockies*, 632 F.3d at 1134-35.

**E. Bond**

"The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). The Ninth Circuit has "recognized that Rule 65(c) invests the district court with discretion as to the amount of security required, if any." *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003) (internal quotation marks and citation omitted). Because the Court perceives little to no prejudice to Defendants resulting from this preliminary injunction, Court issues a nominal bond of $100.

## IV. ADMINISTRATIVE MOTIONS TO SEAL

Defendants seek to seal the supplemental administrative record because it contains sensitive, non-public materials that contain law enforcement sensitive information, including "detailed internal procedures, operational safeguards, and investigative methodologies that USCIS [Fraud Detection and National Security] personnel employ when investigating unlawful voting." Dkt. No. 74 at 2:15-17. Because Defendants' motion to seal concerns documents that are not more than tangentially related to the case's merits they need only show " 'good cause' exists to protect the information from being disclosed to the public by balancing the needs for discovery against the need for confidentiality." *Pintos v. Pacific Creditors Ass'n*, 605 F.3d 665, 678 (9th Cir. 2010). Such good cause exists "to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." *Id.* (quoting Fed. R. Civ. P. 26(c)). Because the public interest in accessing the supplemental administrative record is minimal here, as access to those documents are not needed to understand the Court's order, Defendants' motion, Dkt. No. 74, is GRANTED. Similarly, because Plaintiffs' move to file under seal portions of their reply in support of the motion for preliminary injunction that reference, cite, or quote the supplemental administrative record their motion, Dkt. No. 80, is also GRANTED and the supplemental

administrative record, Dkt. No. 74-1, and the unredacted version of Plaintiffs' reply brief, Dkt. No. 80-2, shall remain filed under seal, pursuant to Civil Local Rules 79-5(f) and 7-11.

**CONCLUSION**

For the foregoing reasons, the Court **ORDERS**:

1) Defendants, Defendants' officers, agents, servants, employees, and attorneys, and others who are acting in concert or participation with them, are **ENJOINED** from:
   a. Conducting elections-related field operations and field interviews in California, Connecticut, Georgia, Missouri, Nevada, New York, Pennsylvania, Washington, and Wisconsin that involve or are likely to involve persons whom the Enjoined Parties know, suspect, or should reasonably know or suspect are U.S. citizens; and
   b. Conducting elections-related field operations in California, Connecticut, Georgia, Missouri, Nevada, New York, Pennsylvania, Washington, and Wisconsin based wholly on TECS records generated from the Voter Eligibility Matching Policy, as identified in this Order, against persons whom the Enjoined Parties know, suspect, or should reasonably know or suspect are U.S. citizens.
2) This order shall remain in effect until November 3, 2026, at 8:00pm, or when polling places close on Election Day, or as otherwise directed by the Court.
3) This Order is **STAYED** until 5:00 p.m. on Friday, October 23, 2026.
4) Plaintiffs **SHALL** post a nominal bond of $100 by no later than 5:00 p.m. on Thursday, October 22, 2026. The bond shall be filed in the Clerk's Office and be deposited into the registry of the Court. If said bond is not posted by the aforementioned date and time, this Order shall be dissolved.

//

//

//

//

//

//

5) Defendants' motion to file under seal the supplemental administrative record, Dkt. No. 74, and Plaintiffs' motion to file under seal their unredacted reply in support of the motion for preliminary injunction, Dkt. No. 80, are **GRANTED**.

**IT IS SO ORDERED.**

Dated: October 21, 2026

ARACELI MARTÍNEZ-OLGUÍN
United States District Judge