CRAIG H. MISSAKIAN (CABN 125202)
United States Attorney
KENNETH BRAKEBILL (CABN 196696)
Chief, Civil Division
KELSEY J. HELLAND (CABN 298888)
Assistant United States Attorney

450 Golden Gate Avenue, Box 36055
San Francisco, California 94102-3495
Telephone: (415) 436-7200
Fax: (415) 436-6748
kelsey.helland@usdoj.gov

Attorneys for Defendants

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| CALIFORNIA NURSES ASSOCIATION, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF HOMELAND SECURITY et al.,<br><br>Defendants. | Case No. 4:26-cv-10680-AMO<br><br>**DEFENDANTS' EX PARTE MOTION TO STAY PRELIMINARY INJUNCTION PENDING APPEAL**<br><br>The Honorable Araceli Martínez-Olguín |

# TABLE OF CONTENTS

I. INTRODUCTION ..... 1

II. BACKGROUND ..... 2

A. Statutory Background ..... 2

B. Factual Background ..... 3

C. Prior Proceedings ..... 4

III. LEGAL STANDARD ..... 6

IV. ARGUMENT ..... 7

A. CNA Lacks Associational Standing ..... 7

B. Plaintiffs' Voting Rights Act Claim Fails on the Merits ..... 9

C. The Preliminary Injunction is Impermissibly Vague and Improperly Intrudes on the Executive Branch's Enforcement of Federal Election Law ..... 11

D. The Remaining Stay Factors Decisively Favor the Government ..... 12

V. CONCLUSION ..... 13

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Alexander v. Sandoval*,
532 U.S. 275 (2001) ... 9
*Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*,
148 F.4th 648 (9th Cir. 2025) ... 6
*Andrews v. D'Souza*,
696 F. Supp. 3d 1332 (N.D. Ga. 2023) ... 10
*Arizona All. for Retired Ams. v. Mayes*,
186 F.4th 622 (9th Cir. 2026) ... 7
*City of Los Angeles v. Lyons*,
461 U.S. 95 (1983) ... 9
*Clapper v. Amnesty Int'l USA,*
568 U.S. 398 (2013) ... 7, 8, 9
*E. Palo Alto v. U.S. Dep't of Health & Hum. Servs.*,
137 F.4th 932 (9th Cir. 2025) ... 6
*FDA v. All. For Hippocratic Med.*,
602 U.S. 367 (2024) ... 7
*Gardner v. Jessup*,
2025 WL 4743403 (S.D. Ga. June 26, 2025) ... 10
*Hunt v. Washington State Apple Advert. Comm'n*,
432 U.S. 333 (1977) ... 7
*Jett v. Castaneda*,
578 F.2d 842 (9th Cir. 1978) ... 12
*Leiva-Perez v. Holder*,
640 F.3d 962 (9th Cir. 2011) ... 6, 7
*Mi Familia Vota v. Fontes*,
129 F.4th 691 (9th Cir. 2025) ... 8
*Michigan Welfare Rights Org. v. Trump*,
600 F. Supp. 3d 85 (D.D.C. 2022) ... 10
*Morse v. Republican Party of Virginia*,
517 U.S. 186 (1996) ... 10
*Nken v. Holder*,
556 U.S. 418 (2009) ... 6
*Tincher v. Noem*,
164 F.4th 1097 (8th Cir. 2026) ... 13
*Trump v. CASA, Inc.*,
606 U.S. 831 (2025) ... 12
*United States v. Holmes County*,
385 F.2d 145 (5th Cir. 1967) ... 11
*Vasquez Perdomo v. Noem*,
148 F.4th 656 (9th Cir. 2025) ... 8, 11

**Statutes**

8 U.S.C. §§ 1227(a)(3)(D) .......... 2
18 U.S.C. § 611 .......... 2
18 U.S.C. § 1015(f) .......... 2
52 U.S.C. § 10302 .......... 10
52 U.S.C. § 10307(b) .......... 2, 9, 10
52 U.S.C. § 10308(d) .......... 9
U.S. Const. art. I, § 4, cl 1 .......... 10

**Rules**

Federal Rule of Civil Procedure 65 .......... 11

**Other Authorities**

91 Fed. Reg. 17125 .......... 3
1965 U.S.C.C.A.N. 2437 .......... 10
H.R. Rep. 89-439 .......... 10
*Preserving and Protecting the Integrity of American Elections*,
Exec. Order No. 14248 .......... 3

## I. INTRODUCTION

Last week, this Court entered a preliminary injunction in Plaintiffs' favor, enjoining Defendants from "conducting elections-related field operations and field interviews" in nine states, where those operations "involve or are likely to involve persons whom the Enjoined Parties know, suspect, or should reasonably know or suspect are U.S. citizens." The Court further enjoined Defendants from "conducting elections-related field operations" in nine states, where those operations are "based wholly on TECS records generated from the Voter Eligibility Matching Policy, as identified in this Order, against persons whom the Enjoined Parties know, suspect, or should reasonably know or suspect are U.S. citizens." The government has appealed the preliminary injunction. *See* Dkt. 89.

The government respectfully requests a stay of the Court's preliminary injunction pending appeal. Pursuant to Federal Rule of Appellate Procedure 8(a)(1), a party must ordinarily move first in the district court to request a stay pending appeal. Given the imminence of the election, the government respectfully requests a decision on this *ex parte* motion as quickly as possible. The government respectfully informs the Court that the government plans to file a motion to stay in the Ninth Circuit today, Tuesday, October 27, asking the Ninth Circuit to decide the stay motion by Thursday, October 29, if this Court has not already granted the stay by that time.

The Department of Homeland Security (DHS) is actively working to enforce the federal statutes that bar noncitizens from voting or registering to vote in federal elections. Working from the best information lawfully available, DHS compares immigration and voting records to preliminarily identify persons who may have registered or voted illegally. Some of those leads are sent to Homeland Security Investigations (HSI) for further investigation, and some of those investigations result in a field interview to confirm that the subject is in fact a noncitizen. DHS recognizes that this process involves a risk of mistake regarding an individual's identity or immigration status, and works at every step to exclude U.S. citizens from the subject population. DHS has actively sought to inform the public, via social media and other channels, about its efforts to protect the integrity of American elections.

This Court held that by investigating unlawful voters, DHS likely illegally intimidated persons who wish to mobilize and assist lawful ones. The Court found that the government's investigative

approach likely violates Section 11(b) of the Voting Rights Act of 1965, 52 U.S.C. § 10307(b), and entered a preliminary injunction on that basis.

A stay is warranted here. Plaintiffs cannot claim standing to sue based on the remote possibility that they will be mistakenly identified as noncitizens and subject to a law-enforcement encounter as a result. And even if they had standing, their claims would still fail on the merits—Section 11(b) does not contain a private right of action, the government did not illegally intimidate plaintiffs because of their protected voter mobilization, and the preliminary injunction (which appears tailored to protect voters rather than persons who mobilize them) is in any event vague and overreaching. The end result is that DHS may be substantially chilled in enforcing federal voting law in the run-up to a nationwide election. The Court should immediately stay the preliminary injunction pending appeal.

## II. BACKGROUND

### A. Statutory Background

#### 1. Federal Prohibitions on Noncitizen Voting.

Congress has enacted multiple statutes that bar noncitizens from voting or registering to vote in federal elections. Fraudulently claiming U.S. citizenship in order to vote or register is a felony. 18 U.S.C. § 1015(f). And simply voting in a federal election while a noncitizen is generally a strict-liability misdemeanor. 18 U.S.C. § 611. In addition to these criminal penalties, noncitizens who illegally vote or register to vote also face significant civil immigration consequences. An alien who votes unlawfully, or who falsely represents himself as a U.S. citizen for voter-registration purposes, is generally inadmissible and removable as a matter of law. 8 U.S.C. §§ 1227(a)(3)(D), (a)(6), 1182(a)(6)(C)(ii), (a)(10)(D).[1]

#### 2. The Voting Rights Act.

Section 11(b) of the Voting Rights Act of 1965 provides in relevant part that "[n]o person, whether acting under color or law or otherwise, shall . . . intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for urging or aiding any person to vote or attempt to vote." 52 U.S.C. § 10307(b). The Act confers authority on the Attorney General to seek injunctions against any

[1] Each cited provision contains a narrow exception for certain people who "reasonably believed" that they were citizens. 18 U.S.C. §§ 1015, 611(c); 8 U.S.C. §§ 1227(a)(3)(D)(ii), (a)(6)(B), 1182(a)(6)(c)(ii)(II), (a)(10)(D)(ii).

act prohibited by Section 11. *Id.* § 10308.

**B. Factual Background**

The President has ordered the Executive Branch to protect the integrity of American elections by prioritizing the investigation and enforcement of federal laws that prohibit noncitizen voting. *Preserving and Protecting the Integrity of American Elections*, Exec. Order No. 14248 §§ 2(b)-(c), 2(e), 90 Fed. Reg. 14005, 14006-07 (Mar. 25, 2025); *Ensuring Citizenship Verification and Integrity in Federal Elections* § 5, 91 Fed. Reg. 17125, 17127 (Mar. 31, 2026). In furtherance of these directives, the Department of Homeland Security (DHS) has worked since March 2025 to identify and investigate instances of unlawful voting and voter registration by noncitizens. Declaration of Homeland Security Investigations (HSI Decl.) ¶ 10, Dkt. 46-2; Declaration of United States Citizenship and Immigration Services (USCIS Decl.) ¶ 9, Dkt. 46-1.

Two DHS components are primarily responsible for investigating noncitizen voting. At the threshold, United States Citizenship and Information Services (USCIS) identifies potential subjects of investigation by comparing federal immigration and naturalization records, along with relevant records available from commercial databases, against records of voting and voter registration that are "voluntarily provided by state and local jurisdictions" or otherwise "lawfully available" to the agency. USCIS Decl. ¶¶ 8, 10.

"Throughout its analysis [USCIS] seeks to exclude any United States Citizens from further review." USCIS Decl. ¶ 10. The agency is aware, however, of "the possibility that in rare circumstances U.S. citizens might be incorrectly identified as aliens." USCIS Decl. ¶ 17. It has accordingly established "safeguards intended to reduce the risk" of such errors. *Id.* For example, before a case is referred for further investigation outside of USCIS, the agency "manually reviews authorized DHS records and other lawfully available information to verify the individual's identity and determine whether the available evidence sufficiently supports the referral." USCIS Decl. ¶ 19; HSI Decl. ¶ 12. Where USCIS cannot confirm noncitizenship status, it only makes a referral if "the data indicate that the person may have voted or registered to vote prior to naturalization." USCIS Decl. ¶ 19.

When USCIS determines based on its review that a case may warrant further investigation, it

refers the matter to HSI, a component of U.S. Immigration and Customs Enforcement that is authorized to investigate unlawful noncitizen voting. HSI Decl. ¶¶ 7-8, 13; *see also Authority to Obtain and Share Statewide Voter Roll Data*, 50 Op. O.L.C. __, at 37-38 (May 12, 2026). In at least some cases, USCIS will also note its preliminary finding of unlawful voting or registration in a DHS system called TECS. *See* HSI Decl. ¶ 19-21.[2] TECS records are consulted "primarily . . . when a subject is encountered by DHS entities," such as at a border crossing. *Id.* ¶ 20.

HSI does not treat that agency's referrals (or entries in TECS) as "establish[ing] criminal activity, voting ineligibility, or grounds for enforcement," HSI Decl. ¶¶ 13, 19-20. Nor do such referrals "direct a predetermined investigative outcome." *Id.* ¶ 9. Instead, referrals are reviewed in the first instance by a component of HSI headquarters, and are disseminated to HSI field offices as "investigative leads" only if headquarters determines that they "warrant further investigation." *Id.* ¶¶ 9-10, 18. And HSI field offices, in turn, have broad discretion to decide whether and how to pursue each investigative lead. *See* HSI Decl. ¶ 22.

Beginning September 1, 2026, HSI "launch[ed] a coordinated Criminal Voter Fraud surge initiative to pursue investigative leads, conduct field interviews, and support timely prosecutorial review." Dkt. 77-1 at AR-2-001. As part of this enforcement initiative, HSI field offices in certain "assigned states" were "asked to take investigative action" on particular dates. While this initiative has been ongoing, DHS has taken steps to inform the public that the agency is vigorously pursuing potential violations of federal laws against noncitizen voting and false claims of citizenship. Dkt. 87 at 4-5 (collecting examples).

### C. Prior Proceedings

Plaintiffs are two labor unions, two local governments, and an advocacy organization focused on voter registration and turnout. *See generally* Dkt. 1 ¶¶ 20-48. They filed suit about two weeks into the challenged enforcement initiative. As relevant here, Plaintiffs asserted that DHS had violated Section 11(b) of the Voting Rights Act and sought a preliminary injunction against "elections-related field

---

[2] TECS at one time stood for "Treasury Enforcement Communication System," but is no longer used as an acronym.

operations and field interviews" involving U.S. citizens, Dkt. 10-8 at 3.[3]

The Court rejected many of plaintiffs' claims to standing but held that the two labor union plaintiffs—the California Nurses Association and National Nurses United (collectively, CNA)—have standing to raise a claim for intimidation directed at voter mobilization and assistance, and entered a preliminary injunction. The Court first held that CNA has associational standing because (as relevant here) at least one of its U.S. citizen members has stopped engaging in election-related activities based on a fear of being erroneously "identified, surveilled, targeted, investigated, forced into coercive encounters with HSI, and detained" in connection with a DHS investigation into noncitizen voting. Dkt. 87 at 9. The Court did not find—and CNA did not claim—that any of CNA's U.S. citizen members have in fact experienced such harms.

Turning to the merits, the Court first held that CNA may sue the United States under Section 11(b) notwithstanding that provision's textual silence regarding private enforcement. Dkt. 87 at 12. It then concluded that DHS's investigations into federal election-law violations constitute unlawful intimidation because (1) those investigations are predicated in their initial stages on sources of information the Court regarded as "overbroad," "inaccurate," "flawed[,] and incomplete"; and (2) DHS has used social media and other channels to inform the public that it is vigorously pursuing potential violations of federal law. Dkt. 87 at 14-15.

Finally, the Court determined that the remaining equitable factors support a preliminary injunction. It held that the government was inflicting irreparable harm to the extent it impeded activities protected by the Voting Rights Act because a lost chance to fairly participate in the political process cannot be restored after the fact. And it held that CNA and the public's interests in free and fair midterm elections outweigh the government's interest in an investigative approach that the Court regarded as a form of illegal intimidation. Dkt. 87 at 14-16.

The Court issued its preliminary injunction on October 21, 2026. That order applies in nine states: six named in the administrative record as the focus of DHS's enforcement activities—California, Georgia, Missouri, Pennsylvania, Washington, and Wisconsin—and three more purportedly identified as

---

[3] Plaintiffs also asserted other claims, but the Court declined to grant preliminary relief on any of them. Dkt. 87 at 11.

such in media reports—Connecticut, New York, and Nevada. *See* Dkt. 87 at 2, 18; Dkt. 77-1 at AR-2-001. In those states, the preliminary injunction prohibits DHS from:

> a. Conducting elections-related field operations and field interviews . . . that involve or are likely to involve persons whom the [defendants] know, suspect, or should reasonably know or suspect are U.S. citizens; and
>
> b. Conducting elections-related field operations . . . based wholly on TECS records generated from the Voter Eligibility Matching Policy, as identified in this Order, against persons whom the [defendants] know, suspect, or should reasonably know or suspect are U.S. citizens.

Dkt. 87 at 18.

After a brief initial stay ordered by the Court *sua sponte*, the preliminary injunction took effect at 5:00pm on October 23, 2026. Dkt. 87 at 18. It will "remain in effect until November 3, 2026, at 8:00pm, or when polling places close on Election Day, or as otherwise directed by the Court." *Id.*

## III. LEGAL STANDARD

Courts consider four factors to determine whether a stay pending appeal should be granted: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 434 (2009) (citation modified); *accord Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*, 148 F.4th 648, 654–56 (9th Cir. 2025) (applying *Nken* factors to grant stay of preliminary injunction pending appeal). "The first two factors . . . are the most critical." *Cmty. Legal Servs. in E. Palo Alto v. U.S. Dep't of Health & Hum. Servs.*, 137 F.4th 932, 937 (9th Cir. 2025) (citation modified).

The Ninth Circuit uses a "sliding scale" approach that balances these factors, such "that a stronger showing of one element may offset a weaker showing of another." *Leiva-Perez v. Holder*, 640 F.3d 962, 966 (9th Cir. 2011). Moreover, it has explained that "[a]lthough a stay pending appeal certainly has some functional overlap with an injunction, stays are typically less coercive and less disruptive than are injunctions." *Id.* (citation modified). "Whereas 'the extraordinary remedy of injunction' is the means by which a court 'directs the conduct of a party . . . with the backing of its full coercive powers,' a stay operates only 'upon the judicial proceeding itself . . . either by halting or

postponing some portion of the proceeding, or by temporarily divesting an order of enforceability.'" *Id.* (citation omitted). Thus, "a flexible approach is even more appropriate in the stay context." *Id.* Here, all four *Nken* factors weigh in favor of staying the Court's Order pending its appeal.

## IV. ARGUMENT

### A. CNA Lacks Associational Standing

Meeting Article III's minimum threshold for standing requires (among other things) that at least one plaintiff establish an injury in fact that is "actual or imminent, not speculative—meaning that the injury must have already occurred or be likely to occur soon." *FDA v. All. For Hippocratic Med.*, 602 U.S. 367, 381 (2024). Mere "allegations of possible future injury are not sufficient." *Clapper v. Amnesty Int'l USA,* 568 U.S. 398, 409 (2013) (quotation marks omitted). To obtain a preliminary injunction, there must be a "clear showing" that the plaintiff is likely to establish standing. *Arizona All. for Retired Ams. v. Mayes*, 186 F.4th 622, 631 (9th Cir. 2026) (en banc).

To establish associational standing, CNA must show that at least one of its members has suffered a cognizable injury in fact, such that the member "would otherwise have standing to sue in their own right." *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). The Court was mistaken to hold that this requirement was satisfied. *See* Dkt. 87 at 9-10.

Although CNA identified four members from whom its standing purportedly derives, each one presents the same basic facts: The member is a naturalized citizen, Dkt. 10-1 ¶¶ 20, 30, 41; Dkt. 78-1 ¶ 16, who is generally "aware" that DHS is investigating persons it "believes are non-citizens" who have voted or registered to vote, Dkt. 10-1 ¶¶ 23, 32; Dkt. 78-1 ¶ 18; *see* Dkt. 10-1 ¶ 42. They fear that in the course of those investigations DHS might mistake them for a noncitizen. Dkt. 10-1 ¶¶ 24, 36, 44; *see* Dkt. 78-1 ¶ 19. They fear in turn that if DHS mistakes them for a noncitizen, then they might be interviewed or detained. Dkt. 10-1 ¶¶ 24, 33, 44; Dkt. 78-1 ¶¶ 19-20. As a result of these fears, they have stopped engaging in election-related conduct such as attending political rallies, participating in campaign events, and serving as a poll monitor. Dkt. 10-1 ¶¶ 26, 37; Dkt. 78-1 ¶ 21.

But the Supreme Court has squarely held that a plaintiff's effort to avoid harm is not itself a basis for standing. *See Clapper*, 568 U.S. at 415-16. Instead, a plaintiff must demonstrate that but for efforts

to avoid a harm, the challenged action threatens harm that is "certainly impending." *Id.*

Plaintiffs' allegations here fall far short of that threshold. Any harm to the asserted interests would arise from a "highly attenuated . . . chain of contingencies" that as likely as not will never come to pass. *Clapper*, 568 U.S. at 410-11. CNA does not (and could not) claim that the government has a policy of questioning or detaining naturalized citizens based on that status (absent affirmative evidence of illegal voting or registration before naturalization); *cf. Vasquez Perdomo v. Noem*, 148 F.4th 656, 674-76 (9th Cir. 2025) (per curiam) (holding that allegedly unlawful law enforcement encounters were sufficiently imminent to support standing where they were "approv[ed] or authoriz[ed]" as "part of a pattern of officially sanctioned behavior); *Mi Familia Vota v. Fontes*, 129 F.4th 691, 708-09 (9th Cir. 2025) (finding standing where law required county recorders to review citizenship and make determinations that would automatically lead to cancellation of voter registration); *see* USCIS Decl. ¶ 19. Rather, CNA's naturalized members fear that they might be mistaken for noncitizens and encounter federal investigators as a result.

But an injury based on such a mistake could manifest (if at all) only following failures at multiple stages of DHS's "layered vetting process to filter out" U.S. citizens. HSI Decl. ¶ 12.[4] A naturalized citizen would need to (1) be the subject of an erroneous "initial system match" by USCIS, USCIS Decl. ¶ 18, which would need to (2) survive USCIS's "manual review" for "acquired or derived U.S. citizenship," *id.* ¶ 19. USCIS would then need to (3) "determine [that] the available evidence sufficiently supports . . . referral" to HSI headquarters, *id.*, which in turn would need to (4) conclude that the matter should be "disseminated to . . . field offices" because it "warrant[s] further investigation," HSI Decl. ¶ 22. And even after such dissemination, no law-enforcement encounter would occur until the receiving field office (5) "determine[d]," based on "an independent review of the referral and available records" that "an appropriate investigative basis exists" and warrants "additional investigative activity" in light of the office's limited resources, *id.* ¶¶ 21-22.

[4] As noted above, *see supra* p. 4, DHS policy permits investigation of naturalized U.S. citizens if there is affirmative evidence that they illegally voted or registered to vote prior to naturalization. USCIS Decl. ¶ 19. CNA's members do not assert that they have ever engaged in such conduct, or identify any reason DHS would likely suspect them of doing so. Nor are naturalized citizens subject to field operations by default.

DHS recognizes, and has designed its review process to minimize, the possibility that "in rare circumstances U.S. citizens might be incorrectly identified as aliens." USCIS Decl. ¶ 17. But it is "no more than conjecture to suggest" that such mistakes are the rule rather than the exception, and "surely no more than speculation to assert" that they will affect CNA's members in particular. *City of Los Angeles v. Lyons*, 461 U.S. 95, 105-08 (1983). "[A] theory of standing[] which relies on a highly attenuated chain of possibilities[] does not satisfy the requirement that threatened injury must be certainly impending." *Clapper*, 568 U.S. at 410.

**B. Plaintiffs' Voting Rights Act Claim Fails on the Merits**

For two reasons, the government is also likely to prevail on the merits of plaintiffs' claim that DHS has "intimidate[d], threaten[ed] or coerce[d]" them "for urging or aiding" others to vote. *See* 52 U.S.C. § 10307(b). First, there is no private cause of action to enforce Section 11(b). And second, even if that provision were privately enforceable, the record still would not support a finding of intimidation based on voter mobilization or assistance.

**1. There is no private right of action under the VRA.**

"[P]rivate rights of action to enforce federal law must be created by Congress." *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001). "The judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but *also* a private remedy." *Id* (emphasis added). "Statutory intent on th[e] latter point is determinative. Without it, a cause of action does not exist and courts may not create one, no matter how desirable . . . as a policy matter, or how compatible with the statute. *Id.* (citations omitted).

Section 11(b) does not contain an express private right of action, and nothing in that provision, or the rest of the Voting Rights Act, suggests that Congress intended to create one by implication. Indeed, the opposite is true. The Act provides expressly for enforcement of Section 11(b) by the Attorney General, 52 U.S.C. § 10308(d) (authorizing Attorney General to seek injunctions against "any act or practice prohibited by section . . . 10307"), and "the express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others," *Sandoval*, 532 U.S. at 290.

Moreover, where Congress elsewhere enacted language recognizing that *some* provisions of the

Voting Rights Act are privately enforceable by "an aggrieved person," it expressly cabined that recognition to "proceeding[s] instituted . . . under" statutes enacted "*to enforce the voting guarantees of the fourteenth or fifteenth amendment*." 52 U.S.C. § 10302; *see also Morse v. Republican Party of Virginia*, 517 U.S. 186, 233-34 (1996) (holding that because a different section of the Act was "by its terms . . . designed for enforcement of the . . . Fourteenth and Fifteenth Amendments," Congress "must have intended it to provide private remedies"). But Section 11(b)—which applies to private conduct as well as state action and requires no showing of discriminatory or race-based intent—is manifestly not based on those provisions. *Gardner v. Jessup*, 2025 WL 4743403, at *6 (S.D. Ga. June 26, 2025), *vacated on other grounds* 2026 WL 3089236 (S.D. Ga. June 29, 2026); *Andrews v. D'Souza*, 696 F. Supp. 3d 1332, 1351 (N.D. Ga. 2023). Rather, it is based on Congress' authority to "make or alter . . . Regulations" governing federal elections. U.S. Const. art. I, § 4, cl 1; H.R. Rep. 89-439 (1965), *as reprinted in* 1965 U.S.C.C.A.N. 2437, 2462. The Court provided no meaningful analysis of these precedents, instead simply following non-binding cases that have misapplied them. Dkt. 87 at 12 (citing *Michigan Welfare Rights Org. v. Trump*, 600 F. Supp. 3d 85, 104-06 (D.D.C. 2022)).

**2. Plaintiffs are not likely to succeed on their VRA claim.**

Even if Section 11(b) were privately enforceable, plaintiffs still would have no likelihood of success. By its plain terms, Section 11(b) does not reach every action that incidentally or inadvertently discourages someone from lawfully "urging or aiding" another person to vote. Rather, it prohibits only intimidating, threatening, or coercing a person "for" engaging in protected voter mobilization and assistance. 52 U.S.C. § 10307(b). In other words, intimidation can violate Section 11(b) only if it is "'because of,' 'on account of,' or 'in consequence of'" the alleged victim's protected activities. *For*, Black's Law Dictionary (1968 ed.).

There is no likelihood that plaintiffs can make the necessary showing here, where the record shows at most that DHS has vigorously pursued potential violations of indisputably valid federal election laws. *See supra* pp. 4-5. The Court apparently found unlawful intimidation based on the fact that DHS begins its investigations into noncitizen voting on the basis of incomplete information, and on the agency's efforts to inform the public about its enforcement activities. Dkt. 87 at 14-15. But those

facts are banal, not suspicious, and there is no reason to believe that in enacting Section 11(b) Congress meant to require federal law enforcement to investigate only those election crimes that require no further investigation, and to do so essentially in secret. The bare fact that the government is, by historical standards, pursuing *illegal* noncitizen voting with "unusual . . . exertion," and that its preliminary suspicions will sometimes prove "factually unfounded," does not support an inference that these investigations are being carried out on account of *lawful* electoral conduct, *see United States v. Holmes County*, 385 F.2d 145, 149 (5th Cir. 1967). And neither the Court's reasoning nor its injunction related to any effort to impede voter mobilization or assistance; instead, the Court focused on the government's effort to target unlawful voting by noncitizens, which is not addressed by Section 11(b). *See also* Dkt. 87 at 9-10 (holding that plaintiffs lack standing to assert that they were intimidated for voting rather than mobilizing or assisting others).

**C. The Preliminary Injunction is Impermissibly Vague and Improperly Intrudes on the Executive Branch's Enforcement of Federal Election Law**

The government is also entitled to a stay because the preliminary injunction is unenforceably vague and improperly seeks to superintend the details of DHS's investigative processes.

Federal Rule of Civil Procedure 65 requires injunctions to be "specific in terms" and to "describe in reasonable detail . . . the act or acts sought to be restrained. Fed. R. Civ. P. 65(d)(1). An injunction violates Rule 65's specificity provisions if it is "so vague that it has no reasonably specific meaning." *Vasquez Perdomo*, 148 F.4th at 679 (quotation marks omitted).

The preliminary injunction does satisfy this basic requirement. The government could be sanctioned for acting with a degree of constructive suspicion so attenuated that it could not be fairly assessed except in hindsight. To know whether a planned field operation would amount to contempt, investigators would have to consider whether (1) it is *likely* that the operation (2) *will* (3) *involve* (to an unspecified degree) persons (potentially unknown) whom the government (4) *should* (5) *suspect* are U.S. citizens. Dkt. 87 at 18. That leaves the government guessing as to what is actually required. An injunction with which compliance can be assessed only in retrospect does not provide the fair notice that Rule 65 requires. *Cf. Vasquez Perdomo*, 148 F.4th at 680 (injunction satisfied Rule 65 where government could avoid contempt by not making decision based on factors forbidden by the order's

plain terms, "even if a court later conclude[d]" that the bottom-line decision was wrong).

That vagueness is all the more impermissible under the circumstances of this case, where the gist of the injunction is that the government may not take otherwise-lawful steps to investigate potential federal crimes if the Court thinks its initial suspicions are ill-founded. But "the investigation of crime is primarily an executive function" and "a Court has no general supervisory jurisdiction over the course of executive investigations." *Jett v. Castaneda*, 578 F.2d 842, 845 (9th Cir. 1978). The Court deviated from this principle by entering an injunction that purports to dictate the quantum of evidence the Executive Branch must possess before it can fulfill that core executive role of conducting a criminal investigation.

**D. The Remaining Stay Factors Decisively Favor the Government**

The Court should stay the preliminary injunction because the government and public interest will be irreparably injured absent a stay. The Court effectively seeks to oversee DHS's efforts to determine whether preliminary evidence of noncitizen voting warrants further investigation. By itself, that violation of the separation of powers constitutes an irreparable harm to the Executive Branch. *See Trump v. CASA, Inc.*, 606 U.S. 831, 859 (2025).

That harm is further compounded by the order's remarkable vagueness. So long as the preliminary injunction stands, HSI special agents will be unable to determine which field operations will expose them to the threat of contempt. Special agents "may now fear, given the language of the preliminary injunction, that their actions—designed to remove U.S. citizens from suspicion of a criminal violation—may be in contempt of the court's order." Declaration of James C. Harris ("Harris Decl.") ¶ 12. That fear and ambiguity "adds confusion and hampers a special agent's ability to act decisively" in investigating unlawful voting. *Id.* As a result, "HSI agents may be deterred from performing their law enforcement functions." *Id.* ¶ 10. The injunction thus threatens to insulate individuals who cannot be "conclusively verif[ied]" as aliens from "lawful questioning and inquiry into the integrity of the voting system." *Id.*

The harm to the government from such a chill would be significant. "[I]n-person interview[s]" are "integral" to "nearly all voter fraud investigations" as a way to "ensure that DHS is investigating

noncitizen voters." Harris Decl. ¶ 11. In cases where HSI is chilled from conducting interviews based on the preliminary injunction, it would be "very difficult . . . to establish probable cause." *Id.*

Under any circumstances, this would constitute irreparable harm. *Tincher v. Noem*, 164 F.4th 1097, 1100 (8th Cir. 2026) (per curiam) ("Most critically, to the extent the injunction's breadth and vagueness cause federal agents to hesitate in performing their lawful duties, it threatens to irreparably harm the government and undermine the public interest." (citation modified)). The harm is only magnified by the rapidly approaching midterm elections. "Hampering DHS's ability to interview suspected unlawful voters for fear of inadvertently encountering U.S. citizens will effectively lessen the chances that DHS will be able to identify and arrest an alien who would have voted in a national election on November 3, 2026." Harris Decl. ¶ 13.

By contrast, plaintiffs fail to establish even standing to sue, much less a valid claim under the Voting Rights Act. The remote possibility that CNA's citizen members will be interviewed by law enforcement in order to confirm that they are *not* noncitizens is far too little harm to warrant disruption of a crucial initiative to enforce the federal election laws just days before a nationwide election. The mismatch between the claimed harms to voter-mobilization efforts and the preliminary injunction relating to investigations into potential voters themselves highlights the degree to which the injunction fails to redress any imminent irreparable harm. Accordingly, both the equities and the public interest decisively favor a stay pending appeal.

## V. CONCLUSION

For the foregoing reasons, the government respectfully requests that the Court enter an immediate stay of the preliminary injunction pending the resolution of the government's appeal.

Date: October 27, 2026

Respectfully submitted,

CRAIG H. MISSAKIAN
United States Attorney

*/s/ Kelsey J. Helland*
KELSEY J. HELLAND
Assistant United States Attorney

Attorneys for Defendants