**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

CALIFORNIA NURSES ASSOCIATION; NATIONAL NURSES UNITED; COUNTY OF SANTA CLARA; VOTO LATINO FOUNDATION; CITY AND COUNTY OF SAN FRANCISCO,

*Plaintiffs - Appellees*,

v.

MARKWAYNE MULLIN; UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES; JOSEPH B. EDLOW; UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT; DAVID J. VENTURELLA; ANTHONY SALISBURY; RODNEY S. SCOTT; THOMAS HOMAN; UNITED STATES DEPARTMENT OF HOMELAND SECURITY; UNITED STATES CUSTOMS AND BORDER PROTECTION,

*Defendants - Appellants*.

No. 26-7139

D.C. No. 4:26-cv-10680-AMO
Northern District of California, Oakland

ORDER

Filed October 30, 2026

Before: Sidney R. Thomas, Kim McLane Wardlaw, and Anthony D. Johnstone, Circuit Judges.

Order

---

## SUMMARY*

---


### Stay Pending Appeal / Elections

The panel (1) denied an emergency motion by U.S. Secretary of Homeland Security Markwayne Mullin and others (collectively "Federal Defendants") for a stay pending appeal of the district court's grant of a preliminary injunction in favor of the California Nurses Association and National Nurses United (together "CNA/NNU"); and (2) denied as moot the Federal Defendants' motion for an immediate administrative stay.

This case arises from the Federal Defendants' efforts to investigate alleged voter fraud by purported non-citizens. The U.S. Department of Homeland Security ("DHS") implemented its Unlawful Voter Initiative (the "Initiative"), a departmental project to gather and screen large amounts of data to generate a list of targets whom the government suspects committed voter fraud. Carrying out


* This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

the Initiative includes door-to-door interrogations and possible arrests by DHS personnel at various levels.

CNA/NNU, among other plaintiffs, challenged the Initiative, alleging in part violations of the Voting Rights Act of 1965 ("VRA"). The district court concluded that only CNA/NNU had associational standing, that CNA/NNU could only advance their claim for intimidation affecting voter assistance and mobilization under Section 11(b) of the VRA, and that CNA/NNU were likely to succeed on the merits of that claim.

The panel first held that the district court properly concluded that CNA/NNU has associational standing to pursue an intimidation claim under Section 11(b) of the VRA. The panel held that CNA/NNU's individual members who offered declarations have sufficiently shown standing to sue in their own right and that Plaintiffs have clearly shown that the Federal Defendants' conduct chills citizens' election-related activities and presents a real and immediate threat of future injury to their legally protected interest in participating in the election. The panel distinguished *Clapper v. Amnesty International USA*, 568 U.S. 398 (2013), explaining that this case involves a fear of harm substantially more likely and imminent than what the *Clapper* plaintiffs faced because DHS has already carried out actions under the Initiative.

The panel next held that the Federal Defendants have not carried their burden to show that they likely will be irreparably harmed if the panel does not grant a stay pending appeal for the four-and-a-half days remaining in the preliminary injunction's term. The Federal Defendants did not point to evidence explaining that field operations and interviews would be impracticable or impossible to conduct

under the preliminary injunction's constraints. Further, the Federal Defendants' questionable timing in pursuing a "surge" in voter fraud enforcement operations and their delay in seeking a stay undermine any potential showing of irreparable harm. Because the Federal Defendants failed to make the requisite showing of irreparable harm, the panel denied the stay without reaching the remaining stay factors.

Lastly, the panel held that the district court's injunction is not impermissibly vague. The district court properly enjoined defendants with a targeted injunction that focuses on operations against U.S. citizens and expires after voting concludes on November 3, 2026.

Accordingly, the panel denied the Federal Defendants' motion for a stay pending appeal.

---

## COUNSEL

Hayden Johnson (argued), Zachary West, Ashley Fox, and Jane Bentrott, Protect Democracy Project, Washington, D.C.; Jessica Marsden and Geoffrey Curfman, Protect Democracy Project, New York, New York; Beau Tremitiere, Protect Democracy Project, Superior, Colorado; Elizabeth B. Prelogar, Cooley LLP, Washington, D.C.; Anna M. Stapleton, Cooley LLP, San Francisco, California; Benjamin R. Farley and Imani R. Franklin, National Immigration Law Center, Washington, D.C.; Bill Nguyen, Deputy County Counsel; Meredith A. Johnson, Lead Deputy County Counsel; Kavita Narayan, Chief Assistant County Counsel; Tony LoPresti, County Counsel; Santa Clara Office of the County Counsel, San Jose, California; Sara J. Eisenberg, Joel F. Wacks, Mollie M. Lee, and Michael A. Keough, Attorneys; Yvonne Meré, Chief Deputy City Attorney;

David S. Chiu, City Attorney; San Francisco Office of the City Attorney, San Francisco, California; for Plaintiffs-Appellees.

Gabriel I. Schonfeld (argued), Daniel Tenny, and Mark R. Freeman, Attorneys, Appellate Staff; Eric D. McArthur, Deputy Assistant Attorney General; Brett A. Shumate, Assistant Attorney General; Civil Division, United States Department of Justice, Washington, D.C.; Kelsey J. Helland and Kenneth W. Brakebill, Assistant United States Attorneys; Craig H. Missakian, United States Attorney; Office of the United States Attorney, San Francisco, California; for Defendants-Appellants.

Adriel I. Cepeda Derieux, American Civil Liberties Union Foundation, Washington, D.C.; Sophia L. Lakin, American Civil Liberties Union Foundation, New York, New York; Julia A. Gomez, ACLU Foundation of Southern California, Los Angeles, California; Angelica Salceda and William S. Freeman, ACLU Foundation of Northern California, San Francisco, California; for Amicus Curiae Common Cause.

Stuart Naifeh, John Cusick, and Brittany Carter, NAACP Legal Defense and Educational Fund Inc., New York, New York; Max L. Meyers, National Association for the Advancement of Colored People, Baltimore, Maryland; Anuja D. Thatte, Deuel Ross, Hayley Hahn, and Victor Olofin, NAACP Legal Defense & Educational Fund Inc., Washington, D.C.; Leah Wong and Patrick Stegemoeller, Asian American Legal Defense and Education Fund, New York, New York; for Amici Curiae The NAACP Legal Defense and Educational Fund, Inc. National Association for the Advancement of Colored People, and Asian American Legal Defense and Educational Fund.

Case: 26-7139, 10/30/2026, DktEntry: 65.1 (6 of 25)
:26-cv-10680-AMO Document 103 Filed 11/06/26 Page 6 of 25 Page ID
#: 2392


Kevin J. Hamilton, Matthew P. Gordon, and Jonathan P. Hawley, Ashurst Perkins Coie US LLP, Seattle, Washington; Maria Trubetskaya, Ashurst Perkins Coie US LLP, Los Angeles, California; for Amicus Curiae League of Women Voters.

Laurence F. Pulgram and Todd R. Gregorian, Fenwick & West LLP, San Francisco, California; Anna Uhls, Fenwick & West LLP, Washington, D.C.; for Amici Curiae Former Federal Law-Enforcement and Immigration-Enforcement Officials, and Former Federal Prosecutors.

Dana M. Paikowsky, Rachel Appel, Alice C.C. Huling, and Bruce V. Spiva, Campaign Legal Center, Washington, D.C., for Amicus Curiae Justice Connection.

---

## ORDER

PER CURIAM:

Pursuant to Circuit Rule 27-3, U.S. Secretary of Homeland Security Markwayne Mullin, et al. (collectively "Federal Defendants") have moved for an immediate administrative stay and a stay pending appeal of the district court's grant of a preliminary injunction in favor of the California Nurses Association and National Nurses United (together, "CNA/NNU"). The request for stay pending appeal is denied. The request for administrative stay is denied as moot.[1]

[1] In their emergency motion, the Federal Defendants requested an immediate administrative stay while we consider their motion for a stay pending appeal. An administrative stay "is only intended to preserve the

# I

This case arises from the Federal Defendants' efforts to investigate alleged voter fraud by purported non-citizens. Since his inauguration on January 20, 2025, President Donald J. Trump has published several executive orders instructing federal agencies to enhance efforts to mitigate alleged illegal voting. *See, e.g.*, Preserving and Protecting the Integrity of American Elections, Exec. Order No. 14248, 90 Fed. Reg. 14005, 14006-07 (Mar. 25, 2025); Ensuring Citizenship Verification and Integrity in Federal Elections, Exec. Order No. 14399 § 5, 91 Fed. Reg. 17125, 17127 (Mar. 31, 2026).

Pursuant to these instructions, the U.S. Department of Homeland Security ("DHS") has enlisted Immigration and Customs Enforcement ("ICE") to "enforce stricter penalties" against non-citizens whom the government believes either registered to vote illegally or voted illegally. As the 2026 midterm elections neared, the government escalated its focus on non-citizen voting. On or around August 21, 2026, DHS began its Unlawful Voter Initiative ("Initiative"). The Initiative is a departmental project to gather and screen large amounts of data to generate a list of targets whom the government suspects committed voter fraud. Carrying out the Initiative includes door-to-door interrogations and possible arrests by DHS personnel at various levels.

On August 31, 2026, based on a "Surge Initiative Guidance" ("Surge") circulated to relevant personnel, DHS and its units were tasked with hastening implementation of

status quo until the substantive motion for a stay pending appeal can be considered on the merits." *Doe #1 v. Trump*, 944 F.3d 1222, 1223 (9th Cir. 2019). Accordingly, the request for administrative stay is denied as moot.

the Initiative in the run up to the 2026 midterm elections. Specifically, the Surge instructed agents to prioritize implementation in California, Connecticut, Georgia, Missouri, Nevada, New York, Pennsylvania, Washington, and Wisconsin.

The Initiative was made public by a "Whistleblower Disclosure" which raised varied concerns about the program. The specifics of the Initiative are as follows: DHS begins by developing a preliminary target list. In doing so, it collects and organizes copious amounts of data to build profiles of individuals it suspects of having committed voter fraud. The data is sourced broadly, ranging from state and local governments and commercial versions of voter roll data to unknown "independent sources" and publicly available information. The data includes millions of records of uncertain origin or from unverified commercial databases, and potentially 8.5 million records with inaccurate citizenship status.[2] The district court found that DHS "enriches" this data through iLab, which deploys artificial intelligence tools to synthesize the data and create profiles of individual targets. The data is seemingly entered into a program called the "ELITE enforcement system."

DHS then transfers its initial list of generated targets to United States Citizenship and Immigration Services ("USCIS"). USCIS is instructed to treat this list as presumptively valid and is tasked with refining the list, using other sources of undefined data, including public and commercial data. USCIS acknowledges that U.S. citizens may be present on the target list. While USCIS "seeks to exclude any United States Citizens from further review," it instructs its agents to complete at least 40 reviews of profiles

[2] Plaintiffs' motion for judicial notice is **GRANTED**.

per day. In turn, officers generally have up to 12 minutes to determine if a subject is a U.S. citizen. As the district court found, "[e]ven under the best conditions, there is a high likelihood of error in review because there is no federal database containing citizenship status of U.S. residents," and "[t]he time limitations implemented during the Surge further exacerbate the risk of error."

Once USCIS has refined its review, it produces a TECS record for target individuals. The Whistleblower Disclosure revealed that TECS records have been created for U.S. citizens and that those records can be used against them beyond the voting context, including in their interactions with the federal government.

USCIS then provides ICE's Homeland Security Investigations ("HSI") team with the list of targets. The targets identified are predominantly non-citizens or recently naturalized citizens suspected of voting, or registering to vote, before their naturalization. Once HSI obtains the list, it dispatches personnel to investigate identified targets through field interviews or interrogations. HSI frames these interviews as "expressly designed to resolve [data] discrepancies." HSI has increased the deployment of officers in line with Surge objectives, coinciding with voter registration and early voting in anticipation of the midterm elections on November 3, 2026. As part of this program, the district court noted that "DHS 'surveils, covertly infiltrates, and interrogates the staff of non-profits and churches conducting voter engagement' for purposes of carrying out the Surge." The Federal Defendants have targeted at least 165 such organizations through this program.

The Surge program is paired with a publicity campaign. The district court observed in the record that agents were told

by DHS to "document [their] investigative findings" for "[m]edia and [r]eporting." A special portal was created to facilitate sharing content from raids to DHS so that photos and videos could be posted widely. This policy has resulted in the broad dissemination of social media content showing HSI deployments in voter fraud operations. These photos or videos often show armed and masked agents making arrests or confronting individuals, sometimes dragging people out of their homes in the early hours of the morning.

## II

The California Nurses Association, National Nurses United, County of Santa Clara, Voto Latino Foundation, and the City and County of San Francisco ("Plaintiffs") filed this suit in September 2026. They alleged nine claims for relief, specifically: (1) intimidation of voters in violation of Section 11(b) of the Voting Rights Act of 1965 (52 U.S.C. § 10307(b)) ("VRA"); (2) intimidation affecting voter assistance and mobilization in violation of Section 11(b) of the VRA; (3) executive action in violation of the constitutional right to vote; (4) executive action in violation of the constitutional separation of powers under the Elections Clause, the Voter Qualification Clause, and the Seventeenth Amendment; (5) agency action contrary to law in violation of the Administrative Procedures Act ("APA"); (6) agency action in excess of jurisdiction under the APA; (7) agency action in violation of the constitutional right to vote under the APA; (8) agency action contrary to constitutional limitations of the separation of powers and federalism under the APA; and (9) arbitrary and capricious agency action in violation of the APA. Shortly thereafter, the Plaintiffs filed a motion for an APA stay and a preliminary injunction.

The district court concluded that only the CNA/NNU had associational standing. The district court also concluded that CNA/NNU could only advance their "claim for intimidation affecting voter assistance and mobilization" under Section 11(b) of the Voting Rights Act. In determining that CNA/NNU were likely to succeed on the merits of their Voting Rights Act claim, that their members would face irreparable harm, and the balance of the equities and public interest weighed in their favor, the district court entered a preliminary injunction enjoining the Federal Defendants. The injunction enjoined the Federal Defendants from:

> "Conducting elections-related field operations and field interviews in California, Connecticut, Georgia, Missouri, Nevada, New York, Pennsylvania, Washington, and Wisconsin that involve or are likely to involve persons whom the Enjoined Parties know, suspect, or should reasonably know or suspect are U.S. citizens; and
>
> "Conducting elections-related field operations in California, Connecticut, Georgia, Missouri, Nevada, New York, Pennsylvania, Washington, and Wisconsin based wholly on TECS records generated from the Voter Eligibility Matching Policy, as identified in this Order, against persons whom the Enjoined Parties know, suspect, or should reasonably know or suspect are U.S. citizens."

This appeal, and Federal Defendant's motion for an administrative stay and a stay pending appeal followed.

III

As a threshold issue to the motion for a stay pending appeal, we consider the question of standing. The district court concluded that the City and County of San Francisco, the County of Santa Clara, and the Voto Latino Foundation lacked associational or organizational standing at this stage of the proceedings. However, the district court concluded that CNA/NNU had associational standing to assert a claim of intimidation affecting voter assistance and mobilization under Section 11(b) of the Voting Rights Act.

Under *Hunt v. Washington State Apple Advertising Commission*, for an organization to have associational standing it must show that "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." 432 U.S. 333, 343 (1977). The organization must show that only one of its members has standing. *Central Sierra Env't Res. Ctr. v. Stanislaus Nat'l Forest*, 30 F.4th 929, 937–38 (9th Cir. 2022).

On appeal, the Federal Defendants ground their standing argument in the first prong of the *Hunt* analysis, arguing that the declarant-members of CNA/NNU lack the individual standing required to form the basis of associational standing. To have Article III standing as individuals, the members put forth by the association "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)). At the preliminary injunction stage,

Plaintiffs "must make a clear showing that [they are] likely to establish each element of standing." *Murthy v. Missouri*, 603 U.S. 43, 58 (2024). We review a district court's determination that a plaintiff has standing de novo. *Lopez v. Candaele*, 630 F.3d 775, 784-85 (9th Cir. 2010).

CNA/NNU assert that several individuals in the organization would have standing. Together, the unions have broad membership encompassing 225,000 individuals nationwide. Many of these individuals are naturalized citizens or citizens who live in mixed-status households. Declarations offered by CNA/NNU identify four members who are U.S. citizens, and who have stopped engaging in election-related activities in response to fear of DHS's Unlawful Voter Initiative. Specifically, the identified members fear being wrongly targeted, unlawfully detained, and being surveilled in their election-based work. These fears have caused the identified members to "stop[] attending and participating in election related campaign events." One declarant wrote that he is no longer going to be serving as a poll watcher.

CNA/NNU's individual members who offered declarations in this case have sufficiently shown standing to sue in their own right. Plaintiffs have clearly shown that the Federal Defendants' conduct chills citizens' election-related activities and presents "a real and immediate threat of future injury" to their legally protected interest in participating in the election. *Ariz. All. for Retired Ams. v. Mayes*, 186 F.4th 622, 635–36 (9th Cir. 2026) (en banc) (holding in a pre-enforcement facial challenge that a "chill" to plaintiffs' "voter-mobilization activities" is an injury-in-fact); *Mi Familia Vota v. Fontes*, 129 F.4th 691, 708–09 (9th Cir. 2025).

In *Mi Familia*, we found standing for naturalized citizens who challenged an Arizona law that allowed county recorders to conduct citizenship checks if there was "reason to believe" a person was not a citizen, and then under certain conditions cancel the voter registration. 129 F.4th at 708–09. In *Mi Familia*, no enforcement action had occurred, but it was sufficiently nonspeculative that naturalized citizens might be subject to citizenship checks and removed from voter lists while properly registered. Here, however, DHS has already taken actions under the Initiative, making the injury to Plaintiffs' members' election-related conduct substantially less speculative than what passed muster in *Mi Familia*. The district court also found that agents involved in interrogations as part of the Surge were directed to document their findings in a special portal so that DHS staff could use photos and videos in media and reporting.

Moreover, as part of the Surge, DHS "surveils, covertly infiltrates, and interrogates the staff of non-profits and churches conducting voter engagement" and had already targeted at least 165 organizations as of July 2026. Plaintiffs' members, including the four who offered declarations, are precisely the types of people the Initiative has already targeted, and the scope of the Initiative and Plaintiffs' membership make it such that there is a sufficiently high likelihood of future injury. This conclusion is further bolstered by our longstanding precedent that, even if the likelihood of future harm to "a particular individual plaintiff may not be 'high,'" we have not been convinced that a district court errs in "determining that future injury [is] nevertheless 'sufficiently likely'" where a defendant has adopted "a policy and practice of violating" a plaintiff's rights. *Melendres v. Arpaio*, 695 F.3d 990, 998 (9th Cir. 2012).

*Vasquez Perdomo* also offers an instructive comparison. 148 F.4th 656, 676 (9th Cir. 2025), *stay pending appeal granted*, 146 S.Ct. 1 (2025) (mem.). In *Vasquez Perdomo*, when the defendants were "engaged in a high-volume, District-wide practice of making detentive stops with less than reasonable suspicion," we found that "[t]he large scale of the association plaintiffs' Los Angeles-area memberships 'increases the threat of future harm to [the association plaintiffs'] members'" and established standing. *Id.* (internal citations omitted).

The Federal Defendants then turn to *Clapper v. Amnesty International USA* to defeat Plaintiffs' standing. 568 U.S. 398 (2013). For example, citing *Clapper*, Federal Defendants assert that a "plaintiff's effort to avoid harm is not itself a basis for standing." *Id.* at 415–16. They also draw from *Clapper* to argue that the harm alleged here arises from a "highly attenuated . . . chain of contingencies." *Id.* at 410–11. In *Clapper*, plaintiffs were individuals in the United States who feared that their communications with individuals overseas might be intercepted under a federal surveillance statute and therefore stopped communicating with certain individuals overseas or implemented expensive measures to avoid surveillance in their communications. *Id.* at 406. They filed suit challenging the statute's constitutionality the day the statute went into effect, before there was evidence that their communications had been intercepted under the challenged law. *Id.* at 407. The Court held that the plaintiffs did not have standing because their feared injury was "highly speculative," they had "no actual knowledge" of the challenged government conduct, and the realization of their fears rested on the combined "decisions of [several] independent actors." *Id.* at 410–13.

By contrast, the CNA/NNU members are acutely aware that DHS and its derivative agencies are implementing the Unlawful Voter Initiative, in substantial part because the government has made extensive efforts to publicize its activities. DHS has already carried out actions under the Initiative; this is not a pre-enforcement challenge. But this case involves a fear of harm substantially more likely and imminent than what the *Clapper* plaintiffs faced. Here, Plaintiffs fear something that has already begun happening to people like them. Unlike in *Clapper*, where a chain of individuals from different corners of the government, including federal judges, had to approve surveillance efforts under the statute, *id.* at 410, here all decisions about who to target and how to do so are apparently made internally at DHS without oversight from external parties or coordinate branches. Though the Federal Defendants argue that federal personnel still exercise significant discretion in deciding whom to target, the record is abundant with evidence that Surge policies encourage rapid verification and widespread deployment against the population that includes the CNA/NNU's members.

Further, the Federal Defendants try to frame the individuals' decision to stop engaging in election-related conduct out of fear as akin to the *Clapper* plaintiffs' efforts to "manufacture standing by choosing to make expenditures based on hypothetical future harm that is not certainly impending." *Id.* at 402. But Plaintiffs' standing rests on a sufficiently likely and imminent risk of harm. Their efforts to protect themselves merely bolster their standing rather than "manufacture" it in conflict with *Clapper*. *Id.*

It is also worth emphasizing that the precise harm at issue in an intimidation case under VRA Section 11(b) is fear and unease experienced by those subjected to intimidatory

conduct. *See United States v. McLeod*, 385 F.2d 734, 739–41 (5th Cir. 1967); *Nat'l Coal. on Black Civic Participation v. Wohl*, 498 F. Supp. 3d 457, 480–81 (S.D.N.Y. 2020). Here, the CNA/NNU declarants ground their injury in the fear caused by the highly publicized effort to "send[] a signal," in the words of Acting Deputy Attorney General Trent McCotter, that federal personnel will coercively target suspected illegal voters, including naturalized citizens who may have voted before naturalization, based on inaccurate data. To resolve that inaccuracy, Federal Defendants' agents interrogate naturalized citizens like declarants. The declarants' fear is reasonably exacerbated by two years of highly visible aggressive conduct by federal agents in immigration enforcement operations under this administration.

Having established that Plaintiffs' individual members would have standing in their own right, we turn briefly to the final two factors, which are not in dispute. This case is plainly germane to Plaintiffs' purpose, as CNA/NNU's core mission is "to ensure that our members will have their voices heard through collective action; are given a safe and accessible opportunity to participate in selecting the representatives who make decisions affecting their work conditions and life; and to encourage them to be active citizens engaging in a fair and free democratic process." As to the requirement that individual participation not be necessary, we agree with the district court that Plaintiffs' "principal claims are for injunctive and declaratory relief; such equitable relief is particularly suited for group representation."

## IV

We now turn to the merits of the Federal Defendant's request for a stay pending appeal. "A request for a stay pending appeal is committed to the exercise of judicial discretion." *Doe #1 v. Trump*, 957 F.3d 1050, 1058 (9th Cir. 2020) (citing *Virginian Ry. Co. v. United States*, 272 U.S. 658, 672 (1926)). "The party requesting a stay bears the burden of showing that the circumstances justify" the stay. *Nken v. Holder*, 556 U.S. 418, 433–34 (2009). In deciding whether to grant a stay, we consider: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Washington v. U.S. Dep't of Educ.*, 161 F.4th 1136, 1139 (9th Cir. 2025) (quoting *Nken*, 556 U.S. at 434 (citation modified)). "The first two factors of the traditional standard are the most critical." *Nken*, 556 U.S. at 434.

### A

We first consider irreparable harm. Showing "some possibility of irreparable injury fails to satisfy the [irreparable harm] factor." *Nken*, 556 U.S. at 434–35 (citation modified). The Federal Defendants must show "that irreparable injury is likely to occur during the period before the appeal is decided." *Doe #1*, 957 F.3d at 1059. When a party fails to demonstrate irreparable harm, the *Nken* analysis can "conclude." *Id.* at 1061.

The Federal Defendants first argue that the government will be irreparably injured absent a stay because "[t]he district court effectively seeks to oversee DHS's efforts to determine whether preliminary evidence of noncitizen

voting warrants further investigation." "To the extent that the Government claims that it has suffered an institutional injury by erosion of the separation of powers, that injury is not irreparable." *Washington v. Trump*, 847 F.3d 1151, 1168 (9th Cir. 2017) (per curiam) (internal quotation marks omitted). The question of whether the Federal Defendants' aggressive tactics in investigating noncitizen voting are lawful will "be resolved at the merits stage of this case." *Doe #1*, 957 F.3d at 1059. The government "may yet pursue and vindicate its interests in the full course of this litigation." *Washington*, 847 F.3d at 1168.

The Federal Defendants argue that, as long as the preliminary injunction is in effect, they will be irreparably harmed because "HSI special agents will be unable to determine which field operations will expose them to the threat of contempt." But the government "cannot suffer harm from an injunction that merely ends an unlawful practice." *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013). Moreover, the Federal Defendants argue that the injunction will insulate individuals who cannot be verified as noncitizens "from lawful questioning and inquiry into the integrity of the voting system." But the Federal Defendants do not point to evidence explaining that field operations and interviews would be impracticable or impossible to conduct under the preliminary injunction's constraints. *See Nken*, 556 U.S. at 433–34 ("The party requesting a stay bears the burden of showing that the circumstances justify an exercise of that discretion."). They rely on the declaration of James C. Harris, but many of the statements the Federal Defendants invoke are speculative. For example, Harris stated that HSI agents "may be deterred from performing their law enforcement functions." "The government cannot meet their burden . . . by submitting conclusory factual assertions and

speculative arguments." *Doe #1*, 957 F.3d at 1059–60 (citation modified).

This argument is further undermined by the Amicus Brief of Former Federal Law Enforcement and Immigration Enforcement Officials. The Amicus Brief outlines how the preliminary injunction "leaves DHS free to investigate voter fraud 'by lawful means'" and keeps the core investigations by Federal Defendants intact. Amici detail how the Federal Defendants can still choose to employ a range of less intrusive, and still effective, mechanisms to pursue unlawful voting. And notably, Amici suggest that the Federal Defendants' choice to pursue this Surge in a highly visible manner weeks, now days, away from Election Day runs counter to the long-term policy of avoiding visible election-related enforcement activities while voting is ongoing. DHS's General Counsel James Percival seems to agree that the Federal Defendants face minimal injury here, and that initial reporting on the preliminary injunction exaggerated its impact on the government.

Finally, the Federal Defendants' questionable timing in pursuing a "surge" in voter fraud enforcement operations, and Federal Defendants' delay in seeking a stay further undermine any potential showing of irreparable harm. In an operation ostensibly focused on past voter fraud, the government could have aggressively pursued its campaign against non-citizen voting well before these elections commenced. Because the acts scrutinized by the Federal Defendants relate to alleged illegal voting by non-citizens in previous elections, there were no apparent limitations on DHS's ability to conduct these investigations more deliberately, with less haste, and distanced from the current election. The Federal Defendants have had more than one-and-a-half years to aggravate their enforcement of this

Initiative in the build-up to Election Day. The Federal Defendants have not indicated why restrictions on the Surge now prevent them from conducting these operations. Nor have they explained why an injunction enjoining specific aspects of the Surge through Election Day causes irreparable harm when implementation of the Initiative can resume on November 4, 2026. To the extent that Federal Defendants are focused on preventing illegally registered noncitizens from voting in the upcoming election, Defendants' delay in beginning the Surge has rendered it no longer practicable to prosecute anyone they could identify before Election Day. *Cf. League of Women Voters of Mass. v. Trump*, 190 F.4th 27, 38 (1st Cir. 2026).

The Federal Defendants' delay in seeking this stay also speaks to a lack of imminent harm. The Federal Defendants did not seek a stay pending appeal from our court for four days after the district court issued the preliminary injunction. And since then, Federal Defendants have not articulated why they will be harmed by another four-and-a-half-day limitation on their Surge operations. Thus, the Federal Defendants have not shown that a stay is necessary to avoid irreparable injury. *See Nken*, 556 U.S. at 434–35.

B

"*Nken* instruct[s] 'that if the petition[er] has not made a certain threshold showing regarding irreparable harm . . . then a stay may not issue, regardless of the petitioner's proof regarding the other stay factors." *Doe #1*, 957 F.3d at 1058 (citation omitted). The Federal Defendants have not made this showing, and thus we deny their request for a stay.

## V

The Federal Defendants lastly argue that the government will be irreparably harmed by the injunction because it is impermissibly broad. Rule 65 requires that an order granting a preliminary injunction "state its terms specifically" and "describe in reasonable detail . . . the acts restrained or required." Fed. R. Civ. P. 65(d)(1)(B), (C). The injunction "must be tailored to remedy the specific harm alleged." *Lamb-Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970, 974 (9th Cir. 1991). "A district court has considerable discretion in fashioning suitable relief and defining the terms of an injunction." *Id.* "We will not set aside an injunction under Rule 65 unless it is 'so vague' that it has 'no reasonably specific meaning.'" *Vasquez Perdomo*, 148 F.4th at 679 (quoting *Melendres v. Skinner*, 113 F.4th 1126, 1140 (9th Cir. 2024)).

The district court enjoined the Federal Defendants "from[] [c]onducting elections-related field operations and field interviews in California, Connecticut, Georgia, Missouri, Nevada, New York, Pennsylvania, Washington, and Wisconsin that involve or are likely to involve persons whom the Enjoined Parties know, suspect, or should reasonably know or suspect are U.S. citizens; and [c]onducting elections-related field operations in California, Connecticut, Georgia, Missouri, Nevada, New York, Pennsylvania, Washington, and Wisconsin based wholly on TECS records generated from the Voter Eligibility Matching Policy, as identified in this Order, against persons whom the Enjoined Parties know, suspect, or should reasonably know or suspect are U.S. citizens." The injunction is also time limited, expiring when polls close on November 3, 2026.

Case: 26-7139, 10/30/2026, DktEntry: 65.1, Page 23 of 25
26-cv-10680-AMO Document 103 Filed 11/06/26 Page 23 of 25
#: 2409


The Federal Defendants rely on *Trump v. CASA, Inc.*, 606 U.S. 831 (2025). The Supreme Court's rationale in *CASA*, however, was based on the irreparable harm caused by "a federal court enter[ing] a universal injunction against the Government" and thereby "prevent[ing] the Government from enforcing its policies against nonparties." *Id.* at 835. *CASA* concerned universal injunctions and is not relevant here, as the district court's injunction applies to a narrowed set of states specific to CNA/NNU membership and Surge operations. Furthermore, here, the district court's injunction falls within "the broad boundaries of traditional equitable relief." *Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 322 (1999). It applies only to operations involving persons the enjoined parties "know, suspect, or should reasonably know or suspect are U.S. citizens," in nine states where CNA/NNU have members and DHS has focused its operations. The injunction is also appropriately time limited. It expires automatically when polls close on November 3, 2026. *Id.*

Further, Federal Defendants suggest that the injunction is "inscrutable" and because the enjoined parties "could be sanctioned for acting with a degree of constructive suspicion so attenuated that it could not be fairly assessed except in hindsight." In *Vasquez Perdomo*, we held that an injunction that prohibited the defendants from relying on a list of factors was impermissibly vague because the injunction qualified that prohibition with the clause "except as permitted by law" as that clause would be unclear to the "lay person" targets of the injunction. 148 F.4th at 680. By contrast, this injunction provides the enjoined parties with "specific directives with which to comply" that are rooted in terms comprehensible to a lay person. *Skinner*, 113 F.4th at 1140. And the injunction is drawn from language that the

Federal Defendants endorsed earlier, that "DHS would, for a limited period of time, be prevented from conducting field operations directed at individuals whom the agency knows or reasonably should know to be U.S. citizens."

The Federal Defendants also maintain that the preliminary injunction is impermissible insofar as it dictates the "quantum of evidence the Executive Branch must possess." *But see Vasquez Perdomo*, 148 F.4th at 680 (allowing a portion of a preliminary injunction to stand that prohibited stops unless an agent or officer had "reasonable suspicion that the person to be stopped is within the United States in violation of U.S. immigration law"). And as Plaintiffs note, we have previously upheld preliminary injunctions with similar scienter requirements. *See, e.g.*, *Index Newspapers LLC v. U.S. Marshals Serv.*, 977 F.3d 817, 826 n.3 (9th Cir. 2020).

For these reasons, we find that the district court's injunction is not impermissibly vague. The district court properly enjoined defendants with a targeted injunction that focuses on operations against U.S. citizens and expires after voting concludes on November 3, 2026.

## VI

In sum, the district court properly concluded that CNA/NNU has associational standing to pursue an intimidation claim under Section 11(b) of the Voting Rights Act. The Federal Defendants have not carried their burden to show that they likely will be irreparably harmed if we do not grant a stay pending appeal for the four-and-a-half days remaining in the preliminary injunction's term. The existing injunction is properly drawn and narrowly defined. Accordingly, we deny Federal Defendants' motion for a stay pending appeal.

**MOTION DENIED.**